UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether Products Liability Litigation | Master File No. 1:00-1898 MDL 1358 (SAS) M21-88 |
| This document pertains to: | |
| *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.,* No. 07 Civ. 10470 (SAS) | Civil Action |

**REPLY LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF THE SHELL DEFENDANTS**

On September 28, 2014, Shell Oil Company, Motiva Enterprises LLC, Equilon

Enterprises LLC, Shell Trading (US) Company, TMR Company, Shell Chemical Yabucoa, Inc.,

Shell International Petroleum Company Limited, and Shell Western Supply and Trading Limited

(collectively the "Shell Defendants") filed a Motion for Summary Judgment ("Motion") and a

Local Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment of the

Shell Defendants ("Shell Defendants' Statement of Facts").

On November 8, 2014, Plaintiffs, the Commonwealth of Puerto Rico and the

Environmental Quality Board, filed their Opposition to the Shell Defendants' Motion

("Opposition" or "Opp."), Responses in Opposition to Defendants' Local Rule 56.1 Statement

("Response"), and their own Local Rule 56.1 Statement in Support of their Opposition.  The

Opposition, Response, and additional Local Rule 56.1 Statement each contained additional

arguments and material.

"[R]eply papers may properly address new issues raised in the opposition papers so as to

avoid giving unfair advantage to the answering party." *Bayway Ref. Co. v. Oxygenated Mktg. &

Trading A.G.*, 215 F.3d 219, 226-27 (2d Cir. 2000).  Accordingly, the Shell Defendants hereby

respectfully submit their Reply to Plaintiffs' Response, including the "Additional Material Facts"

submitted by Plaintiffs in opposition to the Shell Defendants' Motion for Summary Judgment.

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 1.     Sol Puerto Rico Limited ("Sol") is a separate defendant in this case. Declaration of Ruben F. Reyna ("R. Reyna Decl.") ¶ 13. | 1.     Undisputed, but irrelevant to any issue in this motion. | 1.     Plaintiffs do not dispute this fact. |
| 2.     Throughout the relevant time period, the Shell-branded gasoline stations in Puerto Rico, including USTs and dispensing equipment at those stations, were owned, operated, and/or leased by Sol, which was formerly known as The Shell Company Puerto Rico Limited ("SCPRL"). R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests for Production of Documents, Interrogatory No. 2, p. 19 (Mar. 14, 2014); *Id.* ¶ 2, Ex. 1, Declaration of Dario E. Amadeo, ¶ 2. | 2.     Disputed. The evidence shows that, prior to 2006, Shell Int'l had involvement in the operation of retail stations owned by Shell PR in Puerto Rico and Shell Int'l was involved in many aspects of Shell PR's business. *See* Plaintiff's Rule 56.1 Statement of Undisputed Facts ¶¶ 1-3 ("Plaintiff's 56.1"). | 2.     **Disputed.**<br><br>Plaintiffs' arguments regarding Shell International Petroleum Company Limited's ("SIPC") alleged involvement in the operations of Shell Company Puerto Rico Limited ("SCPRL") are legal conclusions and do not raise triable facts relevant to Shell Defendants' Motion.<br><br>Dispute Plaintiffs' assertion that "[SIPC] had involvement in the operation of retail stations owned by [Sol (f/k/a SCPRL)] and [SIPC] was involved in many aspects of [Sol's] business." *See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 1-3. |
| 3.     In order to supply those stations, Sol acquired gasoline from various sources, including some of the Shell Defendants, but also from various other parties that are unrelated to Shell that are also named as defendants in this case. R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests | 3.     Disputed. Between 1988 and 2006, the Shell Defendants supplied millions of gallons of MTBE gasoline to Shell Puerto for distribution to Shell stations, thus placing these defendants in the chain of supply. The evidence shows that MTBE was present at detectable levels in large volumes of this gasoline.<br><br>The evidence shows that Shell PR distributed this gasoline to the | 3.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 3, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' suggestion that all of the "Shell branded gasoline" SCPRL distributed in |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| for Production of Documents, Interrogatory No. 2, pp. 19-21 (Mar. 14, 2014) ); *Id.* ¶ 2, Ex. 1, Declaration of Dario E. Amadeo, ¶ 7. | Shell Trial Site and Shell stations across Puerto Rico.  Shell PR leased bulk gasoline storage tanks at the Cataño Terminal, located just outside of San Juan, from approximately 1947 to April 2006, and last received gasoline at this facility around July-August 2004. (O'Reilly Decl. ¶ 2.  By 1985, all gasoline delivered to Shell at the Cataño Terminal came by barge or tanker.  (Barnhart Decl. Ex. 1, Olivera Depo. at 32:5-11.) All gasoline distributed by Shell PR from the Cataño Terminal was Shell branded gasoline.  (*Id.* at 29:15-17.)  Since 1979 most, if not all, of the gasoline supplied to the Shell Trial Site service station came from the Cataño Terminal. (O'Reilly ¶ 3.)  **<u>Shell International 1979-1998</u>**  Shell Int'l admits it supplied Shell PR with "finished gasoline from third parties" up to 1998. (O'Reilly ¶ 17)  Shell Int'l supplied gasoline to Shell PR from the Hovensa, St. Croix, and Maravan (later PDVSA), Curacao refineries. (O'Reilly Decl. ¶18, Shell Int'l Resp. to Fourth Rogs at 8-9; Barnhart Decl. Ex. 1 (Charman Depo. at 32:4-9.)  A 1987 supply contract between Shell PR and Shell Western Services (another affiliate of Shell Int'l) providing for gasoline from "Maraven" allowed for "MTBE PCT Volume Max. 10."  (O'Reilly Decl., Ex. 1, Memorandum, | Puerto Rico originated from the Shell Defendants.  The evidence does not support that assertion. *See* evidence cited in support of Shell Defendants' Undisputed Material Fact No. 3; Charman Decl. ¶ 10.  <u>SIPC</u>  Dispute Plaintiffs' suggestion that SIPC supply contracts containing specifications that permitted MTBE up to 10% by volume indicate that MTBE gas was required to be supplied pursuant to those agreements. Plaintiffs fail to proffer evidence to support this assertion and instead rely on speculation.  Plaintiffs mischaracterize deliveries of gasoline with MTBE from Hess/Hovic/Hovensa to SCPRL during 1994 to 1996 time period as being "pursuant to the agreements with [SIPC]." Plaintiffs fail to identify any evidence of agreements between Hess/Hovic/Hovensa and SIPC for the supply of gasoline to Puerto Rico.  To the contrary, the evidence demonstrates that during this time period, SCPRL contracted directly with HOVIC for the supply of gasoline. Reyna Reply Declaration ¶ 2, 11(a) through 11(f).  *See* O'Reilly Decl., Ex. 6(a) and 6(c) through 6(g) (identifying SCPRL as buyer). |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Product Supply Contract.)  This contract thus allowed for MTBE in gasoline.<br><br>In 1988, Shell Int'l division, Shell International Trading Company, entered into an evergreen contract to supply 3,000 barrels per day of premium and 5,000 barrels per day regular gasoline to Shell PR for delivery via tanker to San Juan (i.e. Cataño Terminal). (O'Reilly Decl. Ex. 1, White Oils Agreement at ¶¶ B.1-4; Barnhart Decl. Ex. 1, Charman Depo. at 66:15-23.) Premium gasoline specifications in the contract allowed "MTBE % vol max 10."   (*Id.* at App. - 1A.)<br><br>During the evergreen contract, on March 5, 1996, Hess delivered a shipment of 60,000 barrels of gasoline to Shell PR at Cataño which contained MTBE at 2.51% for mid-grade and 8.9% for premium grade.  (O'Reilly Decl., Ex. 1.)  Voluminous shipment records produced by the Hess/Hovensa/Hovic defendants show that after 1994, Hess/Hovic/Hovensa supplied substantial volumes of MTBE gasoline to Shell PR pursuant to the agreements with Shell Int'l. (Declaration of Nathan Short filed in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment re Lack of Causation ("Short Decl.") Records show that Hess/Hovic/Hovensa delivered substantial volumes of MTBE gasoline to Shell PR pursuant to the agreements with | Dispute Plaintiffs' suggestion that Certificates of Quality pertaining to gasoline obtained by other Defendants from the Curaçao refinery demonstrate that MTBE gasoline was also supplied to Sol (f/k/a SCPRL).<br><br>Dispute statement that "MTBE was known to be generally present in gasoline associated with Maraven (known as PDVSA)."  Maraven, which operated the Curaçao refinery, was an affiliate of Petróleos de Venezuela S.A., or PDVSA – not the equivalent of PDVSA.  There is no evidence to support Plaintiffs' assertion that "MTBE was generally known to be present" in gasoline associated with Maraven.  (*See* Barnhart Decl. Ex. 1(c), Watson Dep. 307:6-10, 412:6-17) (neither "Maraven" nor "Curaçao," are ever mentioned).  Furthermore, the Shell Defendants object to Plaintiffs' reliance on the testimony of Mr. Watson on the grounds that he lacked the necessary foundation.<br><br>Plaintiffs' summaries of shipments offered under Federal Rule of Evidence 1006 are subject to a separate motion to strike.<br><br>Dispute Plaintiffs' suggestion that the statement from Juan Vasquez indicated that Sol's (f/k/a SCPRL) use of MTBE starting in 1988 means that such |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Shell Int'l.  (Short Decl.)<br><br>Curacao refinery Certificates of Quality in 1991-1992 show that MTBE was present at concentrations of 13.5%, 14.6%, 14.1%, 8.8%, and 3.7% in gasoline shipped to Puerto Rico, including gasoline shipped to Shell PR. (O'Reilly Decl. Ex. 1.)  MTBE was known to be generally present in gasoline associated with Maraven (known as PDVSA).  (Barnhart Decl. Ex. 1, Watson Depo. at 307:6-10, 412:6-17.)<br><br>Shell PR admits that MTBE gasoline was supplied in the 1985-1998 Shell Int'l time period.  Shell PR's Chairman, Juan Vasquez, stated that with respect to Shell PR "[h]istorically, in Puerto Rico the use of MTBE started in 1988 . . ." (O'Reilly, Ex. 1.)  Shell PR personnel stated that gasoline containing MTBE had been imported by Shell PR at least until the "mid-90s."  (O'Reilly, Decl., Ex. 2.)<br><br>The evidence thus shows that substantial volumes of MTBE gasoline were, in fact, supplied by Shell Int'l to Shell PR from 1985 to 1998.<br><br>**Shell Western: 1998-2003**<br><br>Shell Western admits it supplied Shell PR from 1998 up to November 2003.  (O'Reilly Decl., ¶6.)  In September 1997, Shell Western took over Shell PR's | MTBE gasoline was received from the Shell Defendants.  The evidence cited by Plaintiffs does not support that suggestion.  *See* O'Reilly Decl., Ex. 1.<br><br>Dispute Plaintiffs' suggestion that statements from other Sol personnel indicated that gasoline containing MTBE was received from the Shell Defendants.  The evidence cited by Plaintiffs does not support that suggestion.  *See* O'Reilly Decl., Ex. 2.<br><br>Dispute that the evidence shows that "substantial volumes of MTBE gasoline were, in fact, supplied by [SIPC] from 1985 to 1998."<br><br>**Shell West**<br><br>Dispute that Ian Charman "confirmed that the Colonial codes reference specifically permit the use of MTBE." During his deposition, Plaintiffs' counsel inquired about the Colonial Pipeline specifications. In response to the question "And is that consistent with your understanding or recollection that a … Colonial grade conventional could allow an oxygenate to be present?" he stated "And I don't know the answer."  (Barnhart Decl. Ex. 1(b), Charman Dep. 77:7-12).<br><br>Dispute suggestion that supply contracts containing Colonial specifications that permitted |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | supply of gasoline from Hovic/Hovensa.  (Barnhart Decl., Ex. 1, Charman Depo. at 37:18-38:6.)  In January 1998, Shell Western signed a contract with Hovensa to supply gasoline to Shell PR until 2004 when the Cataño Terminal closed.  (*Id.*, Charman Depo. at 38:7-13.)

February 2000 and 2002 contracts between Shell Western and Shell PR to supply 160,000 bbls per month of premium and 210,000 bbls per month of regular gasoline states that all gasoline supplied by Shell Western must meet Colonial Pipeline specifications.  (O'Reilly Decl., Ex. 3, at ¶¶ 1-5; Ex. 18.)  Shell witnesses confirmed that the Colonial codes referenced specifically permit the use of MTBE.  (Barnhart Decl., Ex. 1, Charman Depo. at 76:20-78-7.)  These contracts allowed for MTBE.

Records show that numerous shipments from Hovensa purchased by Shell Western for Shell PR contained substantial amounts of MTBE.

•May 1998, four shipments (160,000 bbls) delivered by Hovic to Cataño contained MTBE at levels ranging from .07% to .25%. (O'Reilly Decl., Ex. 3.)
•October 2002, four shipments (25,000 bbls) delivered by Hovic to Cataño contained MTBE at levels ranging from .12% to .13%.  (*Id.*)
•October 2003, two shipments | oxygenates, indicate that MTBE gas was actually supplied pursuant to those agreements.

Dispute that Sol (f/k/a SCPRL) "acknowledged that it 'has marketed 1.4 MB Bls of mid-grade fuel, almost all containing MTBE at less than 3% over the past 5 years." This statement was not made by the Sol (f/k/a SCPRL) employee.  (*See.* O'Reilly Decl., Ex. 3(j)).  The actual quote does not include language "over the past 5 years." (*See Id.*).

Dispute suggestion that mid-grade fuel referenced in exhibit was supplied by Shell West.  The evidence cited by Plaintiffs does not support that suggestion.  *See* O'Reilly Decl., Ex. 3.

**<u>SOC</u>**

Dispute Plaintiffs' unsupported statement "Many Shell Oil related entities were also involved in the chain of supply for MTBE gasoline in Puerto Rico."

Dispute Plaintiffs' unsupported statement "The gasoline from Norco which Bloomer brokered likely contained MTBE."

Dispute that SOC was a consignee of a 1998 shipment from Hess to Sol (f/k/a SCPRL). Plaintiffs rely on unauthenticated hearsay in the form of a |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | (25,000 bbls) delivered by Hovic to Cataño contained MTBE at 0.8%. (*Id.*)<br><br>Records show that between 1997 and 2004, Hess/Hovic/Hovensa delivered substantial volumes of MTBE gasoline to Shell PR pursuant to the agreements with Shell Western.  (Short Decl.)<br><br>In 2000, Shell PR acknowledged that it "has marketed 1.4 MB Bls of mid-grade fuel, almost all containing MTBE at less than 3%" over the past 5 years." (O'Reilly Decl., Ex. 3.)<br><br>The evidence shows that Shell Western supplied millions of barrels of MTBE gasoline to Shell PR.<br><br>**Shell Oil Company 1990s-2003:**<br><br>Shell Oil admits that multiple shipments of gasoline manufactured by Shell's United States Deer Park and Norco refineries were supplied to Shell PR, and these refineries blended MTBE into gasoline beginning as early as 1979. (O'Reilly Decl., Ex. 19, Shell Defendants' Resp. to First Rogs at 3(b).) These refineries also started manufacturing MTBE for use in gasoline in 1992.  (*Id.*) Shell, moreover, identified numerous "conventional" gasoline products as "petroleum products containing MTBE" in Shell's CMO#4 declarations. (O'Reilly Decl., Ex. 4, at 8-23.) | document from a non-Shell entity.  There is no evidence that SOC was engaged in supply agreement with HOVIC during 1998 time period.  To the contrary, the evidence cited by Plaintiffs demonstrates that Shell West contracted with HOVIC at this time.  Barnhart Decl., Ex. 1(b), Charman Dep. 38:7-13.<br><br>Dispute Plaintiffs' suggestion that conventional gasoline was typically blended with MTBE by Norco in 1995 to 1998 time period.  To the contrary, batch report data for that time show that Norco mostly produced conventional gasoline without any MTBE.  For example, 36 batches of the first 46 batches blended in 1995 contained no MTBE and 46 of the first 47 batches in 1996 contained no MTBE.  *See* Reyna Decl. Ex. 7.<br><br>Dispute Plaintiffs' suggestion that any conventional gasoline blended with MTBE was actually shipped to Puerto Rico from Norco in the 1995 to 1998 time period.<br><br>Dispute Plaintiffs' assertion that Patrick Bloomer "could not deny that this gasoline may have gone to [Sol (f/k/a SCPRL]."  Mr. Bloomer was never asked to admit or deny anything of the sort.  During his deposition, Plaintiffs' counsel inquired about batch report data representing all the blends Norco made for each |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Many Shell Oil related entities were also involved in the chain of supply for MTBE gasoline to Puerto Rico.<br><br>Shell PR employee Ivan Cintron testified that if he wanted to purchase gasoline from any entity off-island then he had to "notify [Houston] immediately" so they could inspect tankers.  (Barnhart Decl., Ex. 3, Cintron Depo at 56:2-9.)  Mr. Bloomer, a 27-year Shell employee of Shell, confirmed that "[t]here was a standing [order] for all [Shell] locations that if you were going to come into a Shell location with another company's tankers, they had to be inspected for suitability . . . to come into a Shell facility. . . [t]here's a staff of marine individuals [employed by Shell Oil] whose job it is to inspect equipment . . ." (Barnhart Decl., Ex. 2, Bloomer Depo. at 125:18-126:25.)<br><br> During the late 1990s, Mr. Bloomer "received a call from Shell Puerto Rico requesting assistance" with "an alternative form of supply"   (*Id.* at 44:17-45:12.].  He "approached" both Deer Park and Norco to see if these refineries were capable of "supplying Puerto Rico," and was able to secure gasoline supplies for Shell PR from Norco.  (*Id.* at 45:19-46:5.)  The gasoline from Norco which Bloomer brokered likely contained MTBE. | of the years 1995 to 1998.  In response to the question "But you don't have a way of knowing which batch was used to fulfill a shipment to Puerto Rico?" he stated "That's correct.  Barnhart Decl. Ex. 2(a), Bloomer Dep. 107:8-11.<br><br>Dispute Plaintiffs' assertion that Ivan Cintrón of SCPRL "'got on the phone and called people in Houston …' to obtain approval." Mr. Cintrón specifically denied that he "[needed] approval to buy from [HOVIC]" and instead testified that he only called Houston "[b]ecause they have to inspect the tankers."  Barnhart Decl. Ex. 3(a), Cintrón Dep. 56:2-7.<br><br>Dispute Plaintiffs' assertion that "On December 9, 1994, Ray Thomas of Shell Atlantic Services, accepted an offer from Hess to gasoline to [Sol (f/k/a SCPRL)]."  There is no evidence to support this assertion at O'Reilly Decl., Ex. 6.<br><br>Dispute Plaintiffs' assertion that "Shell Atlantic, conducted all contract negotiations with Hess on behalf of [Sol (f/k/a SCPRL)]. There is no evidence to support this assertion at O'Reilly Decl., Ex. 6.  To the contrary, there is evidence demonstrating that SCPRL had final approval over the terms of the supply agreement with HOVIC.  Reyna Reply Declaration ¶ 2, Ex. 11(a) |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Finally, Shell Oil was a direct "consignee" of a 1998 shipment from Hess to Shell PR of 109,961 bbls of mid-grade with .58 % MTBE and 80,242 bbls of premium gasoline with 1.65% MTBE. (O'Reilly Decl., Ex. 5.)<br><br>**i.      Shell's Deer Park Refinery**<br><br>Shell Oil owned Deer Park from 1979 to 1993. (O'Reilly Decl. ¶ 10; P. Bloomer Decl. (filed Set. 26, 2014) at 3.)<br>Deer Park started blending MTBE into gasoline in November 1979. *Id*. Deer Park blended MTBE it manufactured with gasoline from 1994 to 2003. (O'Reilly Decl. ¶ 17, Shell Defendants' Resp. to First ROGs at 3(a); *see also* O'Reilly ¶ 10; P. Bloomer Decl. at 2.) All of the neat MTBE manufactured by Deer Park was blended into gasoline. (O'Reilly Decl. ¶ 19 Shell Defendants' Resp. to First ROGs at 3(b).)<br><br>**ii.      Shell's Norco Refinery**<br><br>Shell Oil owned Norco from 1992 to 1998, and then Motiva owned Norco from 1998 to the present. (O'Reilly ¶ 10; P. Bloomer Decl. at 2.) Norco started blending MTBE into gasoline in October 1980. (*Supra*.) MTBE manufactured at Norco was blended into gasoline from 1995 to 2003. (O'Reilly Decl. ¶ 19, Shell Defendants' Resp. to First ROGs at 3(a)-3(b); *see also* O'Reilly Decl. ¶ 10; P. | through 11(f). *See* O'Reilly Decl., Ex. 6(a) and 6(c) through 6(g) (identifying SCPRL as buyer).<br><br>Dispute Plaintiffs' assertion that "Again, in January 1996, Shell Atlantic contacted Hess on behalf of [Sol (f/k/a SCPRL)] regarding 'Term Gasoline Sale to Shell Puerto Rico.'" There is no evidence to support the assertion that Shell Atlantic contacted Hess at O'Reilly Decl., Ex. 6.<br><br>Dispute Plaintiffs' assertion that "Shell Atlantic again negotiated the terms …." There is no evidence to support the assertion that Shell Atlantic "negotiated the terms" at O'Reilly Decl., Ex. 6.<br><br>Dispute Plaintiffs' assertion that "Shell Atlantic also negotiated with Hess concerning the 'Proposed Revisions to the Term Gasoline Agreement with Shell Puerto Rico." There is no evidence to support this assertion at O'Reilly Decl., Ex. 6.<br><br>Dispute Plaintiffs' suggestion that Shell Atlantic purchased gasoline from Hess for importation to Puerto Rico during the 1995 to 1997 time period. There is no evidence to support this assertion at O'Reilly Decl., Ex. 6. To the contrary, there is evidence that Sol (f/k/a SCPRL) purchased gasoline directly from HOVIC during this |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Bloomer Decl. at 2.)<br><br>Shell admits that for "six to twelve months in the mid-1990's, conventional gasoline was supplied from the NORCO Refinery and delivered to" Shell PR.  (O'Reilly Decl. ¶ 10.)  Spreadsheets prepared by Shell show that from 1995 to 1998 (the mid-1990s) the MTBE content of gasoline manufactured by Norco varied from 0% to 11.23%, and was even as high as 15.44%.  (Barnhart Decl. Ex. 2, Bloomer Depo. at 49:22-23, 50:16-51:10, 52:23-53:7, 106:1-107:18, 130:1-15.].  Bloomer could not deny that this gasoline may have gone Shell PR.  As noted above, Shell specifically identified numerous "conventional gasoline" products as containing MTBE.  (*Supra*.)<br><br>Motiva admits that Norco shipped gasoline to Puerto Rico during the time Motiva owned it.  (*See* ¶ 62.)  Ivan Cintron confirmed that Norco shipped gasoline to Shell PR between 2002 and 2008.  (Barnhart Decl., Ex. 3, Cintron Depo. at 57:9-58:1.)<br><br>**iii.      Shell Atlantic Services**<br><br>Ivan Cintron stated that when "Hess approached him about supplying gasoline to Shell PR, he "got on the phone and called people in Houston . . ." to obtain approval.  (Barnhart Decl., Ex. 3, Cintron Depo at 55:6-12.)  If he wanted to purchase gasoline from | time.  Reyna Reply Declaration ¶ 2, Ex. 11(a) through 11(f).  *See* O'Reilly Decl., Ex. 6(a) and 6(c) through 6(g) (identifying SCPRL as buyer).<br><br>Dispute Plaintiffs' assertion that "[t]he correspondence makes it clear that Shell Atlantic, a 'division of Shell Oil Company,' negotiated for substantial supplies of gasoline from Hess for [Sol (f/k/a SCPRL)].  There is no evidence to support that assertion.  Plaintiffs refer to unauthenticated hearsay in the form of correspondence from a non-Shell entity.<br><br>Dispute Plaintiffs' suggestion that Mr. Cintrón's testimony that he communicated with Houston "almost every week" related in any way to Shell Atlantic.  To the contrary, Mr. Cintrón stated that he only called Houston "[b]ecause they have to inspect the tankers."  Barnhart Decl. Ex. 3(a), Cintrón Dep. 56:2-7.<br><br>Dispute Plaintiffs' assertion that "[SOC] was in the chain of supply for gasoline delivered to [Sol (f/k/a SCPRL)], and substantial amounts of this gasoline contained MTBE." |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | any entity off-island then he had to "notify [Houston] immediately" so they could inspect tankers.  (*Id.* at 56:2-9.)<br><br>On December 9, 1994, Ray Thomas of Shell Atlantic Services, accepted an offer from Hess to gasoline to Shell PR.  (O'Reilly Decl., Ex. 6.)  Shell Atlantic, conducted all contract negotiations with Hess on behalf of Shell PR.  (*Id.*)  Hess sent the final supply contract to Shell Atlantic for execution.   (*Id.* at Ex. 6.)<br><br>Again, in January 1996, Shell Atlantic contacted Hess on behalf of Shell PR regarding "Term Gasoline Sale to Shell Puerto Rico."  (O'Reilly Decl., Ex. 6.)  Shell Atlantic again negotiated the terms and received the final contracts for Shell PR.  (*Id.*).  Shell Atlantic also negotiated with Hess concerning the "Proposed Revisions to the Term Gasoline Agreement with Shell Puerto Rico." (O'Reilly Decl., Ex. 6).<br><br>Finally, in January 1997 Hess wrote to Shell Atlantic stating "[w]e refer to the above agreement, pursuant to which you purchase from Hess . . . ., among other products, Low Sulfer Diesel . . . for importation into Puerto Rico." (O'Reilly Decl., Ex. 6.)<br><br>The correspondence makes it clear that Shell Atlantic, a "division of Shell Oil Company," negotiated for substantial supplies of gasoline | |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | from Hess for Shell PR.  Mr. Cintron said he communicated with Houston "about supply issues in Puerto Rico" . . . "almost every week."  (Barnhart Decl., Ex. 4, Cintron Depo at 56:23-25.)<br><br>During the 1995 contract period, Hovic supplied six shipments of gasoline to Shell PR with MTBE concentrations ranging from 0.17% to 2.39%.  (Short Decl.)  From August 1996 to July 1997, Hovic supplied 17 additional shipments with MTBE concentrations ranging from 0.17% to 8/9%.  (*Id.*)<br><br>Shell Oil was in the chain of supply for gasoline delivered to Shell PR, and substantial amounts of this gasoline contained MTBE. | |
| 4.     Sol Investments Limited acquired all of the stock of SCPRL on June 13, 2006 and subsequently changed the name of SCPRL to Sol.  R. Reyna Decl. ¶ 14. | 4.     Undisputed, but irrelevant to any issue in this motion.<br><br>Contrary to the Shell Defendants' representations, the stock purchase by Sol in 2006 represented a change in Shell PR operations. Plaintiff's 56.1 ¶¶ 12-13. | 4.     Plaintiffs do not dispute this fact. |
| 5.     Sol clearly and unequivocally expressed its commitment to accept responsibility and liability, if it is proven, for the operations of SCPRL in this litigation.  R. Reyna Decl.  ¶  4, Ex.  2, Plaintiffs'   Supplemental Responses to Defendants' First Set   of   Contention Interrogatories   and   Requests for Production of Documents, Interrogatory No. 2, p. 19 (Mar. | 5.     Disputed.<br><br>The contractual agreement between the Shell defendants and Sol as to allocation of liability arising from MTBE contamination does not shield the Shell defendants from liability to the Commonwealth for Shell's own torts.  "A strictly liable defendant *cannot reduce or eliminate its responsibility to the plaintiff for all injuries* caused by a defective product by shifting | 5.     **Fails to raise triable facts relevant to Defendants' Motion.**<br><br>Plaintiffs do not actually dispute the Shell Defendants' Undisputed Material Fact No. 5. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 14, 2014); *Id.* ¶ 2, Ex. 1, Declaration of Dario E. Amadeo, ¶ 2. | blame to other parties in the product's chain of distribution who are ostensibly more at 'fault,' and therefore may be negligent as well as strictly liable. ***The defendant's recourse, if not precluded by good faith settlement principles, lies in an indemnity action.''*** *Bostick v. Flex Equip. Co.*, 147 Cal. App. 4th 80, 92, 54 Cal. Rptr. 3d 28, 38 (2007) (emphasis added)<br><br>The Shell Defendants are directly liable for their own tortuous conduct in supplying MTBE gasoline to Shell PR, failing to warn Shell PR about the environmental risks of MTBE, and failing to ensure that underground storage tanks at Shell service stations in Puerto Rico, including the Shell Trial site undertook appropriate precautions to prevent releases from USTs. | |
| 6.    Plaintiffs contend in response to interrogatories that in January 1995, "Shell purchased 130,862.23 Barrels (5,496,213.66 U.S. gallons) of … gasoline, with an MTBE content of 6.84% from Hess Oil Virgin Islands Corp. [HOVIC]."  R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests for Production of Documents, Interrogatory No. 2, p. 14 (Mar. 14, 2014). | 6.    Disputed.<br><br>As noted in ¶ 3 Shell Int'l had an evergreen contract with Shell PR that included supplying gasoline from Hess/Hovic/Hovensa.  Shell Int'l admitted in discovery responses that it supplied gasoline to Shell PR from third parties such as Hess/Hovic/Hovesan "up to 1998." .<br><br>Additionally, as noted in ¶ 3, to the extent Shell PR was the buyer for this particular shipment from Hess, the evidence shows that Shell Atlantic, a division of Shell Oil located in Houston, brokered the purchase. | 6.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 6, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Plaintiffs mischaracterize deliveries of gasoline with MTBE from Hess/Hovic/Hovensa to SCPRL as being pursuant to "evergreen contract" between SIPC and Sol (f/k/a SCPRL).  Indeed, there is no evidence that the "evergreen contract" included supplying |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | | gasoline from Hess/Hovic/Hovensa. To the contrary, during the 1995 to 1997 time period, SCPRL contracted directly with HOVIC for the supply of gasoline. Reyna Reply Declaration ¶ 2, Ex. 11(a) through 11(f). *See* O'Reilly Decl., Ex. 6(a) and 6(c) through 6(g) (identifying SCPRL as buyer).<br><br>Dispute Plaintiffs' assertion that "the evidence shows that Shell Atlantic, a division of Shell Oil located in Houston, brokered the purchase." There is no evidence to support that assertion. Plaintiffs refer to unauthenticated hearsay in the form of correspondence from a non-Shell entity. |
| 7. Plaintiffs allege that gasoline supplied to Sol (f/k/a SCPRL) by non-Shell sources, including other Defendants, contained MTBE. R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests for Production of Documents, Interrogatory No. 2, pp. 19-21 (Mar. 14, 2014). | 7. Disputed.<br><br>The Commonwealth does not allege that all MTBE gasoline was supplied by parties other than the Shell Defendants. As explained in detail above, there is substantial evidence that the Shell defendants were a primary source of MTBE gasoline supplied to Shell PR from 1985 to at least 2006. Shell is responsible for its supply of this gasoline to Puerto Rico, and it is irrelevant to the Shell Defendants' liability if other parties contributed some of the MTBE gasoline that Shell PR delivered to the trial site or any other Shell station in Puerto Rico. (*See* Plaintiff's Opposition to Defendants Motion for Summary Judgment for Lack of Causation.) | 7. **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 7, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' assertion that the Shell Defendants "were a primary source of MTBE gasoline supplied to [Sol (f/k/a SCPRL)] from 1985 to at least 2006." |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 8.       SCYI is a Puerto Rico company formed in 2001 to acquire and operate the refinery and terminal facility located at State Road 901, Km 2.7, Camino Nuevo Ward in Yabucoa, Puerto Rico (the "Yabucoa Facility"). Declaration of Juan M. Lopez Vicente ("J. Lopez Decl.") ¶ 4. On December 31, 2001, SCYI acquired the Yabucoa Facility from the Puerto Rico Sun Oil Company ("PRSOC").  *Id.* ¶ 4. | 8.       Disputed.<br><br>As evidenced by the agreements outlined in 99 below between Shell Yabucoa and Shell PR, the Commonwealth disputes that Shell Yabucoa was formed solely to "acquire and operate the refinery and terminal facility . . .." | 8.       **Fails to raise triable facts relevant to Defendants' Motion.**<br><br>Plaintiffs do not actually dispute the Shell Defendants' Undisputed Material Fact No. 8. |
| 9.       SCYI never owned or operated any gasoline service stations or underground storage tanks in Puerto Rico.  *Id.* ¶ 5. The Yabucoa Facility did not have underground storage tanks.  *Id.* ¶ 5. | 9.       Disputed.<br><br>In October 2003, Shell PR assigned all of its "Dealer Agreements" to Shell Yabucoa in order to transfer all "supply and delivery" obligations to Shell Yabucoa. (O'Reilly Decl., Ex. 7.)  Shell Yabucoa thus had a direct relationship with the service stations, including responsibility for making deliveries of gasoline to the USTs.  At the same time, Shell PR and Shell Yabucoa signed a Marketing and Distribution Services Agreement which reduced Shell PR's role to provide marketing support for the sale of gasoline to Shell stations in Puerto Rico.  (O'Reilly Decl., Ex. 7.)  The Governing Guide states that Yabucoa was acquired to produce chemicals, and that Shell PR is assigning its dealer agreements to provide Shell Yabucoa with a market for its gasoline products. (O'Reilly Decl., Ex. 7.) | 9.       **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 9, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' assertion that the Shell Chemical Yabucoa, Inc. ("SCYI") was "[responsible] for making deliveries of gasoline to the USTs" at Sol (f/k/a SCPRL) service stations.  This assertion is wrong because pursuant to the Marketing and Distribution Services Agreement, SCPRL provided specified "marketing and distribution services" including "[d]istribution and delivery of the Products to customers, including loading activities at Cataño facilities ...."  Reyna Reply Declaration ¶ 3, Ex. 12(b). |
| 10.       SCYI began gasoline refining and blending | 10.       Undisputed. | 10.       No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| operations in or around June 2002 and used a loading rack for gasoline distribution by tanker truck to supply domestic customers as well as a small dock at the Yabucoa Facility for gasoline distribution by ship or barge to supply domestic, U.S. and foreign customers. *Id.* ¶ 6. | | |
| 11.     From 2002 to 2008, SCYI refined gasoline at the Yabucoa Facility for sale and distribution in Puerto Rico. *Id.* ¶ 7.  When the refinery was in operation, most of the gasoline sold by SCYI was manufactured from crude refined in Yabucoa.  Gasoline was occasionally imported to supplement production in order to meet demand. *Id.* ¶ 7. | 11.     Disputed.<br><br>Shell Yabucoa imported substantial amounts of gasoline during this time period, primarily from U.S. based refineries, including both Deer Park and Norco.  (O'Reilly Decl., Ex. 7.)  Since a number of large shipments in 2002 (150,000 to 140,000 BBLs) were never tested for MTBE content, it is not reasonable to infer that it was not present, particularly for US based refineries.  (*Id.*)  Overall, Shell Yabucoa imported 4,904,399 BBLs of gasoline during this time period. | 11.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 11, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' suggestion that "it is not reasonable to infer that [MTBE] was not present," particularly in light of the facts that (1) the supply agreements controlling the gasoline imported by SCYI contained provisions prohibiting MTBE above *de minimis* levels and (2) the relatively few imported shipments containing any MTBE, only contained MTBE at *de minimis* levels.  *See* Shell Defendants' Undisputed Material Fact Nos. 25, 28, and 29. |
| 12.     In May 2008, SCYI decided to cease refinery production at the Yabucoa Facility by shutting down the crude oil processing facilities at the Yabucoa Facility. *Id.* ¶ 8. This cessation of production of refined products was put into | 12.     Undisputed. | 12.     No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| effect by July 2008. *Id.* ¶ 8. Thereafter, SCYI continued to operate the Yabucoa Facility as a terminal and continued to import refined products for storage, blending, and sale from the truck loading rack. *Id.* ¶ 8. | | |
| 13.    In December 2010, SCYI was sold to Buckeye Caribbean Holdings Limited and SCYI became Buckeye Caribbean Terminals LLC. *Id.* ¶ 9. | 13.    Undisputed. | 13.    No reply necessary. |
| 14.    SCYI never made, stored, blended, used or marketed MTBE or gasoline with MTBE, apart from a few imported shipments containing MTBE below trace *de minimis* levels of 0.5% by volume. *Id.* ¶ 10. | 14.    Disputed. *See* ¶ 11. | 14.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 14, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 11. |
| 15.    SCYI never manufactured neat MTBE, which is MTBE in its pure form, not a part, constituent or component of another substance. *Id.* ¶ 11.  At least since SCYI acquired the Yabucoa Facility, neat MTBE was never manufactured at the Yabucoa Facility.  *Id.* ¶ 11. | 15.    Undisputed. | 15.    No reply necessary. |
| 16.    SCYI never imported, received or acquired neat MTBE. *Id.* ¶ 12.  When SCYI owned and operated the Yabucoa Facility, neat MTBE was not imported to the | 16.    Undisputed. | 16.    No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| Yabucoa Facility. *Id.* ¶ 12. | | |
| 17.     SCYI never blended, mixed, or added MTBE to gasoline or otherwise produced gasoline containing MTBE. *Id.* ¶ 13.  When SCYI owned and operated the Yabucoa Facility, neat MTBE was never blended, mixed, or added into gasoline produced at the Yabucoa Facility. *Id.* ¶ 13. | 17.     Undisputed, but irrelevant to any issues in this motion. | 17.     Plaintiffs do not dispute this fact. |
| 18.     SCYI never stored neat MTBE at the Yabucoa Facility. *Id.* ¶ 14. | 18.     Undisputed. | 18.     No reply necessary. |
| 19.     Because SCYI never stored, used, or blended MTBE in the production of gasoline, the Yabucoa Facility is not a site where MTBE could have been discharged. *Id.* ¶ 15. | 19.     Undisputed, but irrelevant to any issues in this motion. | 19.     Plaintiffs do not dispute this fact. |
| 20.     Pursuant to EPA regulations of fuels and fuel additives, refiners are required to prepare annual written representations regarding the refinery's blending activities ("Management Representation Letters"). *Id.* ¶ 16.  The Management Representation Letters prepared by SCYI for the years 2002 through 2007 were prepare and maintained in the normal course of business and confirm that SCYI did not blend any oxygenates, including MTBE, into any gasoline. *Id.* ¶ 16.  Declaration of Ruben F. Reyna ("R. Reyna Decl.") ¶ 5, Ex. 3, Management Representation Letters for the years 2002 through 2007 (SH-PR-YAB000975 - 977; SH-PR-YAB000978 - 980; SH-PR- | 20.     Undisputed, but irrelevant to any issues in this motion. | 20.     Plaintiffs do not dispute this fact. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| YAB000981 - 983; SH-PR-YAB000984 – 986; SH-PR-YAB000987 - 90; SH-PR-YAB000991 - 95). | | |
| 21.    For every batch of gasoline manufactured at Yabucoa, SCYI also prepared a Reformulated Gasoline and Anti-Dumping Batch Report (EPA Form 3520-20C).  J. Lopez Decl. ¶ 17.  On this form, refiners are required to identify the properties of the specific batch of gasoline including, among other properties, the volume percent of MTBE.  *Id.* ¶ 17.  Every Batch Report submitted by SCYI from 2002 through 2008 confirms that Yabucoa only blended conventional gasoline and never used MTBE.  *Id.* ¶ 17. | 21.    Undisputed, but irrelevant to any issues in this motion. | 21.    Plaintiffs do not dispute this fact. |
| 22.    Between 2002 and 2008, while the Yabucoa Facility was operated as a refinery, SCYI occasionally imported gasoline into the Yabucoa Facility to supplement production in order to meet demand in Puerto Rico, but the imported gasoline generally represented a small part of the total gasoline distributed from the Yabucoa Facility.  *Id.* ¶ 18.  Most of the gasoline sold from the Yabucoa Facility was manufactured from crude refined in the Yabucoa Facility and imported gasoline typically represented no more than 17% and at times, less than 10%.  *Id.* ¶ 19. | 22.    Disputed.  *See* ¶ 11. | 22.    **Disputed.**  Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 22, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 11. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 23.     Moreover, the imported gasoline would be stored with other gasoline in the Yabucoa Facility. *Id.* ¶ 20.  The imported gasoline was not segregated from the gasoline manufactured by SCYI. *Id.* ¶ 20.  In effect, the intermittent shipments of imported gasoline would be blended with the manufactured gasoline. *Id.* ¶ 20. | 23.     Undisputed, but irrelevant as to any issues in this motion. | 23.     Plaintiffs do not dispute this fact. |
| 24.     After SCYI ceased refining operations at the Yabucoa Facility in July 2008, SCYI continued to operate the facility as a terminal and imported gasoline for sale from the Yabucoa Facility.  *Id.* ¶ 21.  However, SCYI never imported gasoline that contained MTBE above *de minimis* trace levels (0.5% vol.).  *Id.* ¶ 21. | 24. | 24.     No reply necessary. |
| 25.     The supply contracts controlling the content specifications for gasoline supplied to the Yabucoa Facility specifically prohibited gasoline with MTBE above *de minimis* trace levels (0.5% vol). *Id.* ¶ 22.  R. Reyna Decl. ¶ 6, Ex. 4, April 2002 Product Sales Agreement between Pecten Chemicals Inc. and SCYI (SH-YAB-ESI 0000814-44); January 2007 Amended and Restated Product Sales Agreement between Shell Chemicals Americas Inc. and SCYI (SH-PR-KS 002040-61). | 25.     Disputed.<br><br>Shell Yabucoa has not produced, and does not attach, any of its contracts for the gasoline it imported from US based refiners. There is thus *no evidence* that these refiners were prohibited from shipping gasoline to Shell Yabucoa above "*de minimis*" MTBE levels. *See* ¶ 11.  Evidence shows that even *de minimis* MTBE can cause substantial harm.  Plaintiff's Rule 56.1 ¶¶ 17-21. | 25.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 25, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' suggestion that the supply agreements identified Undisputed Material Fact No. 25 did not control the content specifications for gasoline supplied to the Yabucoa Facility.  *See* Lopez Decl. ¶ 22; Bloomer Decl. ¶¶ 11 and 24. |
| 26.     While the supply contracts controlling the | 26.     Disputed.<br>*See* ¶¶ 11, 25 and 45. | 26.     **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| content specifications for gasoline supplied to SCYI permitted MTBE up to *de minimis* trace levels to be present, SCYI did not specify that gasoline it acquired pursuant to these agreements should contain MTBE, and did not otherwise deliberately or intentionally obtain gasoline with MTBE for import into Puerto Rico.  J. Lopez Decl. ¶ 23.  Rather, to the extent that gasoline which SCYI acquired contained MTBE at any level, that was only because SCYI had no feasible alternative but to accept gasoline with trace levels of MTBE.  *Id.* ¶ 23.  Some trace amounts of MTBE in some shipments of gasoline received pursuant to the supply contracts were likely inevitable, given that the sources of this supply, mainly refineries in the U.S. Gulf Coast and the St. Croix refinery, produced gasoline with MTBE for delivery to areas of the U.S. where MTBE was used to comply with the federal oxygenate mandate.  *Id.* ¶ 23.  SCYI did not request or want such trace levels of MTBE in the gasoline it obtained pursuant to the supply contracts.  *Id.* ¶ 23.  Rather, to the extent SCYI received gasoline with low levels of MTBE, that was only because SCYI had no practical or feasible alternative.  *Id.* ¶ 23. | | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 26, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 27.     Between 2002 and | 27.     Disputed. | 27.     **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 2010, there were 161 shipments of conventional gasoline imported to the Yabucoa Facility. *Id.* ¶ 24. With the exception of a few shipments that contained MTBE below *de minimis* levels (0.5% vol), those shipments of gasoline did not contain MTBE at all. *Id.* ¶ 24. | *See* ¶¶ 11, 25 and 45. | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 27, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 28.     Certificates of analysis ("COAs") provide information on the chemical composition of the gasoline shipments. *Id.* ¶ 25. The COA Chart Section I, "Yabucoa COA Chart" which summarizes the MTBE data from COAs for the shipments of gasoline imported to the Yabucoa Facility accurately summarizes and represents the data contained in the COAs regarding the MTBE content, if any, in each shipment listed in the Yabucoa COA Chart. *Id.* ¶ 25. R. Reyna Decl. ¶ 7, Ex. 5, COA Chart, Section I, "Yabucoa COA Chart." | 28.     Disputed.<br><br>The chart submitted by Shell Yabucoa does not accurately reflect the total volume of MTBE gasoline imported by Shell Yabucoa because substantial volumes were never tested for MTBE content, and Shell heeled Puerto Rico like the U.S. in terms of its need for MTBE gasoline. *See* ¶¶ 11, 25 and 45. | 28.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 28, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 29.     The data in the COAs, as shown in the Yabucoa COA Chart, shows that of the total of 161 shipments of gasoline imported into the Yabucoa Facility, COAs were located for 135 shipments. J. Lopez Decl. ¶ 26. Of those 135 shipments, 127 (94%) contained no MTBE at all and only 8 (6%) contained MTBE, all at levels which are a fraction | 29.     Disputed.<br><br>*See* ¶ 28. | 29.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 29, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| of the *de minimis* level of 0.5% by volume. *Id.* ¶ 26. More specifically, the 8 shipments that contained any MTBE contained the following percentages by volume of MTBE: | | Undisputed Material Fact No. 28. |

| Shipment Date | MTBE Content |
|---|---|
| 6/25/2004 | 0.02% |
| 7/15/2004 | 0.02% |
| 1/7/2005 | 0.17% |
| 2/20/2007 | 0.11% |
| 2/20/2007 | 0.04% |
| 12/21/2008 | 0.08% |
| 12/17/2009 | 0.16% |
| 12/24/2009 | 0.10% |

*Id.* ¶ 26.

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 30.    Because imported gasoline would have been stored in the same tanks with gasoline manufactured at the Yabucoa Facility or other batches of imported gasoline, the MTBE content of these shipments, in all likelihood, would have been diluted prior to sale or distribution from the Yabucoa Facility. *Id.* ¶ 27. | 30.    Disputed. Shell Yabucoa does not provide any inventory records or other documentation that substantial volumes of imported gasoline were, in fact, commingled with gasoline manufactured by Shell Yabucoa.  As the table reflects, many of the imported shipments were well over 100,000 BBLs. | 30.    **Disputed.** Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 26, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Dispute Plaintiffs' suggestion that there is no evidence that imported gasoline was stored in the same tanks with gasoline manufactured at the Yabucoa Facility.  *See* Reyna Reply Decl. ¶ 4, Ex. 13(d), Lopez Dep. 74:6-75:13. |
| 31.    From 2002 through November 2003 and from September 2006 to December 2010, SCYI supplied gasoline to the Shell Company Puerto Rico Limited (SCPRL), now known as Sol Puerto Rico | 31.    Disputed.  Shell Yabucoa not only supplied Shell PR, but undertook to supply service stations directly. *See* ¶ 9. | 31.    **Disputed.** Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 26, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex* |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| Limited, which is a separate defendant in this case.  *Id.* ¶ 28. | | *Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 9. |
| 32.     The supply agreement between SCYI and Sol (f/k/a SCPRL) contained product specifications that explicitly prohibited supplying gasoline with MTBE above *de minimis* trace levels (0.5% vol).  *Id.* ¶ 29.  R. Reyna Decl. ¶ 8, Ex. 6, August 31, 2006 Non-Exclusive Sales Contract for Branded Products between SCYI and Sol (f/k/a SCPRL) (SH-PR 000001-18); Amended and Restated Non-Exclusive Sales Contract for Branded Products between SCYI and Sol (f/k/a SCPRL) (SH-PR-SP000017-59). | 32.     Undisputed, but irrelevant to any issue in this motion. | 32.     Plaintiffs do not dispute this fact. |
| 33.     In October 2003, SCYI entered into a Marketing and Distribution Services Agreement ("Agreement") with Sol (f/k/a SCPRL) whereby Sol agreed to provide marketing and distribution services in connection with the sale of products in Puerto Rico.  J. Lopez Decl. ¶ 30.  In connection with the Agreement, any supply agreements that Sol had with individual gasoline service stations in Puerto Rico were assigned to SCYI.  *Id.* ¶ 30.  Also in connection with the Agreement, SCYI purchased any gasoline that Sol had in inventory at the Cataño | 33.     Undisputed.<br><br>*See* ¶ 9. | 33.     No reply necessary.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 9. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| Terminal as of November 1, 2003.  *Id.* ¶ 30. | | |
| 34.    For a relatively brief time after November 1, 2003, SCYI received imported gasoline shipments into the Cataño Terminal.  *Id.* ¶ 31.  In total, SCYI received 29 shipments into the Cataño Terminal.  *Id.* ¶ 31. | 34.    Undisputed. | 34.    No reply necessary. |
| 35.    The COA Chart Section II, "Cataño COA Chart" which summarizes the MTBE data from COAs for the shipments of gasoline imported to the Cataño Terminal accurately summarizes and represents the data contained in the COAs regarding the MTBE content, if any, in each shipment listed in the Cataño COA Chart.  *Id.* ¶ 32.  R. Reyna Decl. ¶ 7, Ex. 5, COA Chart, Section II, "Cataño COA Chart." | 35.    Undisputed. | 35.    No reply necessary. |
| 36.    The data in the COAs, as shown in the Cataño COA Chart, shows that of the total of 31 shipments of gasoline imported into the Cataño Terminal, COAs were located for all 31 shipments, 29 (94%) contained no MTBE and only 2 (6%) contained MTBE, both at levels below the *de minimis* level of 0.5% by volume.  J. Lopez Decl. ¶ 33.  More specifically, the 2 shipments that contained any MTBE contained the following percentages by volume of MTBE: | 36.    Undisputed. | 36.    No reply necessary. |

| Shipment Date | MTBE Content |
|---|---|
| | |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|---|
| 1/29/2004 | 0.11% | | |
| 2/23/2004 | 0.21% | | |
| *Id.* ¶ 33. | | | |
| 37.      Because these two shipments of gasoline would have been stored in the same tanks with other shipments of gasoline with no MTBE at all, the MTBE content of these two shipments would likely have been diluted prior to sale or distribution from the Cataño Terminal.  *Id.* ¶ 34. | | 37.      Disputed.<br><br>Shell Yabucoa does not provide any inventory records or other documentation that substantial volumes of imported gasoline were, in fact, commingled with non-MTBE gasoline. | 37.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 37, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' suggestion that there is no evidence that imported gasoline was stored in the same tanks with gasoline manufactured at the Yabucoa Facility.  *See* Reyna Reply Decl. ¶ 4, Ex. 13(d), Lopez Dep. 74:6-75:13. |
| 38.      The Yabucoa Facility has never been included in any of Plaintiffs' lists of sites at issue in this litigation.  R. Reyna Decl. ¶ 12. | | 38.      Undisputed. | 38.      No reply necessary. |
| 39.      SOC does not own or operate any facilities to make, store, or distribute gasoline, including refineries, terminals, distribution systems and gasoline service stations, in Puerto Rico, nor has it ever done so.  Declaration of Patrick Bloomer ("P. Bloomer Decl.") ¶ 2. | | 39.      Undisputed, but irrelevant to any issue in this matter.<br><br>Shell Oil does not have to own or operate any retail facilities in Puerto Rico to be liable for MTBE contamination in Puerto Rico.  The evidence contained in Plaintiff's Rule 56.1 ¶ 1-13 shows that Shell Oil supplied substantial amounts of MTBE gasoline which was delivered to the Shell Trial Site and all Shell stations in Puerto Rico. | 39.      Plaintiffs do not dispute this fact.<br><br>The majority of Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement.<br><br>*See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 1-13. |
| 40.      SOC never owned or operated any refining or | | 40.      Undisputed, but irrelevant to any issue in this matter. | 40.      Plaintiffs do not dispute this fact. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| manufacturing facilities in Puerto Rico. *Id.* ¶ 3. | | |
| 41.    SOC never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and never handled gasoline in Puerto Rico, with or without MTBE, and therefore could never have caused a release of gasoline in Puerto Rico, with or without MTBE. *Id.* ¶ 4. | 41.    Undisputed, but irrelevant to any issue in this matter. *See* ¶ 39. | 41.    Plaintiffs do not dispute this fact. |
| 42.    Prior to 1996, SOC owned the Norco Refinery ("Norco") in Louisiana. *Id.* ¶ 5. | 42.    Disputed.  Shell's own declarations state that Shell Oil owned Norco from 1992 to 1998, and then it was owned by Motiva from 1998 to the present. (O'Reilly Decl., Ex. 4 at 2.) | 42.    **Disputed.**  Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 42, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Dispute Plaintiffs' assertion that SOC owned Norco from 1992 to 1998.  The declaration to which Plaintiffs refer does not confirm Plaintiffs' assertion and is not contrary to the Shell Defendants' Undisputed Material Fact No. 42. The Declaration of James Dargan merely states that "[d]uring part of the relevant time period, the [Norco refinery] was owned by Shell Norco Refining Company, a subsidiary of Shell Oil Products Company." O'Reilly Decl., Ex. 4. |
| 43.    Based on anecdotal information, Norco provided at least one and possibly as many as a half-dozen shipments of conventional gasoline to Sol | 43.    Disputed.  The evidence shows that Norco was blending substantial quantities of MTBE, including MTBE it | 43.    **Disputed.**  Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 43, and thus fails to make "an |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| (f/k/a SCPRL) at some point between 1995 and 1998.  *Id.* ¶ 6. | manufactured, into all types of gasoline during the 1995 to 1998 time period.  *See* ¶ 3.  The evidence shows that the MTBE content varied from 0% to 11.23%, and was even as high as 15.44%.  (Barnhart Decl. Ex. 2, Bloomer Depo. at 49:22-23, 50:16-51:10, 52:23-53:7, 106:1-107:18, 130:1-15.)  Bloomer was thus unable to deny that Norco shipped MTBE gasoline to Shell PR.  (Id.)  Shell PR records show that Shell PR was importing MTBE gasoline until the mid-1990s.  *See* ¶ 3. | affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). <br><br> Dispute Plaintiffs' assertion that "Norco was blending substantial quantities of MTBE, including MTBE it manufactured, into all types of gasoline during the 1995 to 1998 time period.  *See* the Shell Defendants' Reply to Plaintiffs' Response to the Shell Defendants' Undisputed Material Fact No. 3. <br><br> Dispute Plaintiffs' suggestion that any conventional gasoline blended with MTBE was actually shipped to Puerto Rico from Norco in the 1995 to 1998 time period.  There is no evidence to support this suggestion. <br><br> Dispute Plaintiffs' assertion that Patrick Bloomer "could not deny that Norco shipped MTBE gasoline to [Sol (f/k/a SCPRL)]."  Mr. Bloomer was never asked to admit or deny anything of the sort.  During his deposition, Plaintiffs' counsel inquired about batch report data representing all the blends Norco made for each of the years 1995 to 1998.  In response to the question "But you don't have a way of knowing which batch was used to fulfill a shipment to Puerto Rico?" he stated "That's correct."  Barnhart Decl. Ex. 2(a), Bloomer Dep. 107:8-11. |
| 44.    Batch reports are | 44.    Disputed.  *See* ¶ 3. | 44.    **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| created and maintained by refineries to track the chemical composition of the gasoline manufactured at the facility. *Id.* ¶ 7.  The Norco Batch Report Charts provide the chemical composition data, particularly the MTBE content, for each batch of conventional gasoline manufactured at Norco from 1995 to 1998. *Id.* ¶ 7.  R. Reyna Decl. ¶ 10, Ex. 8, Norco Batch Report Charts. The Norco Batch Report Charts confirm that, Norco manufactured both conventional gasoline with MTBE and conventional gasoline without MTBE.  P. Bloomer Decl. ¶ 8. | | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 44, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 45.     There is no reason why Norco would have shipped gasoline intentionally blended with MTBE to Puerto Rico. *Id.* ¶ 9. | 45.     Disputed.<br><br>A 2006 draft review  of Shell global oxygenate use states that "oxygenates [were] used in [the] Americas . . . [because] countries like . . . Puerto Rico were the same as the U.S., namely the big cities within these countries have high pollution levels and MtBE was added to reduce exhaust emission." (O'Reilly Decl., Ex. 10.)<br><br>Defendants' motion for summary judgment of the Commonwealth's strict liability claims, asserts that MTBE was the only readily available "octane enhancer" that Shell and other refiners could utilize for gasoline distributed to Puerto Rico.  (Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment on | 45.     **Disputed.**<br><br>Dispute Plaintiffs' assertion that "2006 draft review  of Shell global oxygenate use states that 'oxygenates [were] used in [the] Americas . . . [because] countries like . . . Puerto Rico were the same as the U.S., namely the big cities within these countries have high pollution levels and MtBE was added to reduce exhaust emission.'"  There is nothing to support this assertion at O'Reilly Decl., Ex. 10 or even at O'Reilly Decl., Ex. 8 which provides an excerpt from a document titled "Oxygenates in Gasoline outside the US."<br><br>Dispute Plaintiffs' statement that Defendants asserted "that MTBE was the only readily available |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | Plaintiffs' [sic] Counts I and IV at ¶¶ 19-23.)  Defendants assert that, with respect to US refineries, when lead was phased out in 1995 "MTBE became the preferred choice of most refiners and blenders" and that "**MTBE was typically used as an octane enhancer in conventional gasoline in a concentration in the range of 1-7 Vol. %"**  (Id. at ¶ 23.)  Shell thus asserts to this Court that MTBE was necessary as an octane enhancer for conventional gasoline, the very same type of gasoline that was purportedly shipped to Puerto Rico by NORCO starting in 1995. Shell's own judicial admission thus directly contradicts Shell purportedly "undisputed" fact that there was no reason Shell would have shipped MTBE gasoline to Puerto Rico from 1995 to 1998.  *See also* ¶ 3. | 'octane enhancer' that Shell and other refiners could utilize for gasoline distributed to Puerto Rico."  The actual representation made in support of Certain Defendants' Motion for Summary Judgment on Plaintiffs' Counts I and IV was that "Prior to the introduction of new cleaner-burning RFG gasoline in 1995, MTBE was typically used as an octane enhancer in conventional gasolines in a concentration range of 1-7 Vol.%."  Local Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment on Plaintiffs' Counts I and IV at ¶ 23.  This representation is neither contrary to nor inconsistent with Shell's assertion that Norco did not have a reason to ship MTBE gas to Puerto Rico in the 1995 to 1998 time period.  *See also* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 46.     SOC is the general partner of Deer Park Refining L.P., which operates a refinery located at Deer Park, Texas ("Deer Park").  *Id.* ¶ 10. Between 2002 and 2008, Deer Park intermittently supplied gasoline to the Yabucoa Facility.  *Id.* ¶ 10.  However, Deer Park never sent the Yabucoa Facility gasoline that contained MTBE above *de minimis* trace levels (0.5% vol.)  *Id.* ¶ 10. | 46.     Disputed. The Commonwealth's expert and other evidence demonstrates that 0.5% MTBE in millions of barrels of gasoline translates into millions of gallons of pure MTBE.  Thus, a release of gasoline with 0.5% MTBE to groundwater contains over 416,000 times the limit set in Puerto Rico's cleanup standard.  Plaintiff's Rule 56.1 ¶¶ 17-21. | 46.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 46, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). |
| 47.     The supply contracts | 47.     Disputed as irrelevant.  *See* | 47.     Plaintiffs do not dispute |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| controlling the content specifications for gasoline supplied to the Yabucoa Facility specifically prohibited gasoline with MTBE above *de minimis* trace levels (0.5% vol). *Id.* ¶ 11. *See* ¶ 24 supra. These contracts controlled the content specifications for gasoline supplied to the Yabucoa Facility from Deer Park. P. Bloomer Decl. ¶ 11. | ¶ 46. | this fact.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 46. |
| 48.      Accordingly, gasoline sent from Deer Park to the Yabucoa Facility could not and did not contain MTBE above *de minimis* levels (0.5% vol.). *Id.* ¶ 12. | 48.      Undisputed, but irrelevant to any issue in this motion. *See* ¶ 46. | 48.      Plaintiffs do not dispute this fact. |
| 49.      While the supply contracts controlling the content specifications for gasoline supplied to SCYI permitted MTBE up to *de minimis* trace levels to be present, SCYI did not specify that gasoline it acquired from Deer Park should contain MTBE. *Id.* ¶ 13. Deer Park did not otherwise deliberately or intentionally supply gasoline with MTBE to SCYI. *Id.* ¶ 13. Rather, to the extent that gasoline which Deer Park supplied SCYI contained MTBE at any level, that was only because Deer Park had no feasible alternative but to supply gasoline with trace levels of MTBE. *Id.* ¶ 13. Some trace amounts of MTBE in some shipments of gasoline from Deer Park were likely inevitable, given that Deer Park | 49.      Disputed. *See* ¶ 45. | 49.      **Disputed.**<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 45. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| produced gasoline with MTBE for delivery to areas of the U.S. where MTBE was used to comply with the federal oxygenate mandate and also for delivery to Mexico where MTBE was used. *Id.* ¶ 13. Deer Park did not want such trace levels of MTBE in the gasoline it supplied to SCYI. *Id.* ¶ 13. Rather, to the extent Deer Park supplied gasoline with low levels of MTBE to SCYI, that was only because Deer Park had no practical or feasible alternative. *Id.* ¶ 13. | | |
| 50. Generally, it would never make sense for a refiner to blend a *de minimis* level of MTBE into gasoline. *Id.* ¶ 14. Gasoline blended to meet oxygenate regulations would normally contain MTBE in the range of 10 to 12%. *Id.* ¶ 14. Hence, the existence of trace amounts of MTBE in gasoline most likely results from the presence of MTBE in some component or components of the refining or distribution systems, such as lines, tanks, vessels, barges, or the like, which inadvertently mixes with ordinary gasoline. *Id.* ¶ 14. | 50. Disputed. *See* ¶ 49. | 50. **Disputed.** <br><br> *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 49. |
| 51. Between 2002 and 2008, Deer Park sent 22 shipments to the Yabucoa Facility. *Id.* ¶ 15. During that time period, Deer Park sent only two shipments that contained MTBE at any level. *Id.* ¶ 15. Those two shipments contained MTBE well below *de* | 51. Disputed. <br><br> The chart submitted by Shell does not accurately reflect the total volume of MTBE gasoline imported from Deer Park because substantial volumes were never tested for MTBE content. | 51. **Disputed.** <br><br> Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 51, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| *minimis* levels (0.5% vol.).  *Id.* ¶ 15. | | |
| 52.      The COA Chart Section I, "Yabucoa COA Chart" which summarizes the MTBE data from COAs for the shipments of gasoline imported to the Yabucoa Facility accurately summarizes and represents the data contained in the COAs regarding the MTBE content, if any, in each shipment listed in the Yabucoa COA Chart. *Id.* ¶ 16.  *See* ¶ 27 supra. | 52.      Disputed.<br><br>*See* ¶¶ 28, 49, and 51. Evidence shows that even *de minimis* MTBE can cause substantial harm. Plaintiff's Rule 56.1 ¶¶ 17-21. | 52.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 52, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 28, 49, and 51.<br><br>Dispute Plaintiffs' assertion that "even de minimis MTBE can cause substantial harm."  *See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 17-21. |
| 53.      The data in the COAs, as shown in the Yabucoa COA Chart, shows that of the total of 22 shipments of gasoline Deer Park sent to the Yabucoa Facility, COAs were located for 20 shipments.  P. Bloomer Decl. ¶ 17.  Of those 20 shipments, 18 (90%) contained no MTBE at all and 2 (10%) contained MTBE below the *de minimis* level of 0.5% by volume. *Id.* ¶ 17.  More specifically, the 2 shipments that contained any level of MTBE contained the following percentages by volume of MTBE: | 53.      Disputed.<br><br>The two shipments with MTBE at 0/2% contained 200,000 ppb of MTBE which is well above water cleanup standards.  *See also* ¶¶ 28, 49, and 51. | 53.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 53, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 28, 49, and 51. |

| Shipme nt Date | MTB E Content |
|---|---|
| | |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|---|
| 6/25/2004 | 0.02% | | |
| 7/15/2004 | 0.02% | | |
| *Id.* ¶ 17. | | | |
| 54.　The COAs confirm that the shipments of gasoline from Deer Park to the Yabucoa Facility either did not contain MTBE at all or only contained MTBE below *de minimis* levels (0.5% vol.).  *Id.* ¶ 18. | | 54.　Disputed.  *See* ¶¶ 28, 49, and 51. | 54.　**Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 54, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 28, 49, and 51. |
| 55.　Motiva is a Delaware limited liability company that owns and operates certain refining and marketing assets in the Western United States contributed by Shell Oil Company, Saudi Refining Inc. and Texaco Refining and Marketing (East) Inc. upon its formation in July 1998. *Id.* ¶ 19.  These assets include refineries, terminals, and certain Shell- and Texaco-branded gasoline stations in the Eastern United States, including Norco. *Id.* ¶ 19. | | 55.　Undisputed. | 55.　No reply necessary. |
| 56.　Motiva currently is owned by subsidiaries of Shell Oil Company and Saudi Refining Inc. *Id.* ¶ 20.  Motiva does not own or operate any facilities to make, store, or distribute gasoline, including refineries, terminals, distribution systems and | | 56.　Undisputed, but irrelevant as to any issue in this motion. | 56.　Plaintiffs do not dispute this fact. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| gasoline service stations, in Puerto Rico, nor has it ever done so. *Id.* ¶ 20. | | |
| 57.  Motiva never owned or operated any refining or manufacturing facilities in Puerto Rico. *Id.* ¶ 21. | 57.  Undisputed, but irrelevant as to any issue in this motion. | 57.  Plaintiffs do not dispute this fact. |
| 58.  Motiva never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and never handled gasoline in Puerto Rico, with or without MTBE, and therefore could never have caused a release of gasoline in Puerto Rico, with or without MTBE. *Id.* ¶ 22. | 58.  Undisputed, but irrelevant as to any issue in this motion. | 58.  Plaintiffs do not dispute this fact. |
| 59.  Between 2002 and 2007, Norco provided intermittent supply of gasoline to the Yabucoa Facility. *Id.* ¶ 23.  During that time period, Norco supplied only two shipments that contained MTBE at any level. *Id.* ¶ 23. Those two shipments contained MTBE well below *de minimis* levels (0.5% vol.). *Id.* ¶ 23. | 59.  Disputed.<br><br>The chart submitted by Shell does not accurately reflect the total volume of MTBE gasoline imported from Deer Park because substantial volumes were never tested for MTBE content. *See also* ¶ 28, 49, 51. | 59.  **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 59, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 28, 49, and 51. |
| 60.  The supply contracts governing the imports to the Yabucoa Facility also controlled the content specifications for gasoline supplied to the Yabucoa Facility from Norco. *Id.* ¶ 24. The product specifications in those contracts explicitly prohibited supplying gasoline with levels of MTBE above *de* | 60.  Disputed. *See* ¶¶ 11, 25, and 45. | 60.  **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 60, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| *minimis* levels (0.5% vol). *Id.* ¶ 24. *See* ¶ 24 supra. | | to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 61.     While the supply contracts controlling the content specifications for gasoline supplied to SCYI permitted MTBE up to *de minimis* trace levels to be present, SCYI did not specify that gasoline it acquired from Norco should contain MTBE. *Id.* ¶ 25.  Norco did not otherwise deliberately or intentionally supply gasoline with MTBE to SCYI. *Id.* ¶ 25. Rather, to the extent that gasoline which Norco supplied SCYI contained MTBE at any level, that was only because Norco had no feasible alternative but to supply gasoline with trace levels of MTBE. *Id.* ¶ 25.  Some trace amounts of MTBE in some shipments of gasoline from Norco were likely inevitable, given that Norco produced gasoline with MTBE for delivery to areas of the U.S. where MTBE was used to comply with the federal oxygenate mandate. *Id.* ¶ 25. Norco did not want such trace levels of MTBE in the gasoline it supplied to SCYI. *Id.* ¶ 25. Rather, to the extent Norco supplied gasoline with low levels of MTBE to SCYI, that was only because Norco had no practical or feasible alternative. *Id.* ¶ 25. | 61.     Disputed. *See* ¶¶ 11, 25, and 45. | 61.     **Disputed.** Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 61, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 62.     Between 2002 and | 62.     Disputed. *See* ¶ 11, 25, and | 62.     **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 2007, Norco sent 11 shipments to the Yabucoa Facility. *Id.* ¶ 26.  With the exception of only two shipments that contained MTBE below *de minimis* levels (0.5% vol.), those shipments of gasoline did not contain MTBE at all. *Id.* ¶ 26. | 45. | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 62, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 63.      The COA Chart Section I, "Yabucoa COA Chart" which summarizes the MTBE data from COAs for the shipments of gasoline imported to the Yabucoa Facility accurately summarizes and represents the data contained in the COAs regarding the MTBE content, if any, in each shipment listed in the Yabucoa COA Chart. *Id.* ¶ 16.  *See* ¶ 27 supra. | 63.      Disputed.  *See* ¶¶ 11, 25, and 45. | 63.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 63, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 64.      The data in the COAs, as shown in the Yabucoa COA Chart, shows that of the total of 11 shipments of gasoline Norco sent to the Yabucoa Facility, COAs were located for 7 shipments.  P. Bloomer Decl. ¶ 27.  Of those 7 shipments, 5 (71%) contained no MTBE at all and only 2 (29%) contained MTBE below the *de minimis* level of 0.5% by volume. *Id.* ¶ 27.  More specifically, the 2 shipments that contained any MTBE contained the following percentages by volume of | 64.      Disputed.  *See* ¶¶ 11, 25, and 45. | 64.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 64, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| MTBE: <table><tr><td>Shipment Date</td><td>MTBE Content</td></tr><tr><td>2/20/2007</td><td>0.11 %</td></tr><tr><td>2/20/2007</td><td>0.04 %</td></tr></table> *Id.* ¶ 27. | | |
| 65.      The COAs confirm that the shipments of gasoline from Norco to the Yabucoa Facility either did not contain MTBE at all or only contained MTBE below *de minimis* levels (0.5% vol). *Id.* ¶ 28. | 65.      Disputed.  *See* ¶ 11, 25, and 45. | 65.      **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 65, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 11, 25, and 45. |
| 66.      STUSCO is a trading company formed in August 1998. *Id.* ¶ 29.  Beginning in December 2010, STUSCO arranged supplies of gasoline from third-parties to Sol (f/k/a SCPRL) for import into Puerto Rico. *Id.* ¶ 29.  Prior to December 2010, STUSCO was never involved with gasoline supply to Puerto Rico or any other aspect of the gasoline market in Puerto Rico.  *Id.* ¶ 29. | 66.      Undisputed.<br><br>The Commonwealth agrees to dismiss Shell Trading (US) Company. | 66.      No reply necessary. |
| 67.      The gasoline supplied by STUSCO did not and does not contain MTBE.  *Id.* ¶ 29. | 67.      Undisputed. *See* ¶ 66. | 67.      No reply necessary. |
| 68.      The supply agreements between STUSCO and Sol controlled the content specifications for gasoline supplied to Sol by STUSCO. | 68.      Undisputed. *See* ¶ 66. | 68.      No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| *Id.* ¶ 30.  These contracts specifically prohibited gasoline with MTBE above 0.3% volume, well below *de minimis* levels (0.5% vol.).  *Id.* ¶ 30. | | |
| 69.      STUSCO does not own or operate any gasoline service stations in Puerto Rico, nor has it ever done so.  *Id.* ¶ 31. | 69.      Undisputed.  *See* ¶ 66. | 69.      No reply necessary. |
| 70.      STUSCO never owned or operated any refining or manufacturing facilities in Puerto Rico, and thus never made gasoline in or for the Puerto Rico market, with or without MTBE.  *Id.* ¶ 32. | 70.      Undisputed.  *See* ¶ 66. | 70.      No reply necessary. |
| 71.      STUSCO never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and thus never handled gasoline in the Puerto Rico market, with or without MTBE.  *Id.* ¶ 33. | 71.      Undisputed.  *See* ¶ 66. | 71.      No reply necessary. |
| 72.      STUSCO never caused a release of gasoline in Puerto Rico, with or without MTBE.  *Id.* ¶ 34. | 72.      Undisputed.  *See* ¶ 66. | 72.      No reply necessary. |
| 73.      Equilon is a Delaware limited liability company that owns and operates certain refining and marketing assets in the Western United States contributed by Shell Oil Company and Texaco Refining and Marketing Inc. upon Equilon's formation in January 1998.  *Id.* ¶ 35.  These assets include refineries, terminals, and certain Shell- and Texaco-branded gasoline stations in the Western United States.  *Id.* ¶ 35.  Equilon is now a wholly- | 73.      Undisputed.<br><br>The Commonwealth agrees to dismiss Equilon Enterprises. | 73.      No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| owned, indirect subsidiary of Shell Oil Company. *Id.* ¶ 35. | | |
| 74.     Equilon has never supplied gasoline to Puerto Rico or participated in any other aspect of the gasoline market in Puerto Rico. *Id.* ¶ 36.  Specifically, Equilon does not own or operate any facilities to make, store, or distribute gasoline, including refineries, terminals, distribution systems and gasoline service stations, in Puerto Rico, nor has it ever done so. *Id.* ¶ 36. | 74.     Undisputed. *See* ¶ 73. | 74.     No reply necessary. |
| 75.     Equilon never made gasoline in or for the Puerto Rico market, with or without MTBE. *Id.* ¶ 37. | 75.     Undisputed. *See* ¶ 73. | 75.     No reply necessary. |
| 76.     Equilon never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and thus never handled gasoline in the Puerto Rico market, with or without MTBE. *Id.* ¶ 38. | 76.     Undisputed. *See* ¶ 73. | 76.     No reply necessary. |
| 77.     Equilon never caused a release of gasoline in Puerto Rico, with or without MTBE. *Id.* ¶ 39. | 77.     Undisputed. *See* ¶ 73. | 77.     No reply necessary. |
| 78.     TMR was formerly known as Texaco Refining and Marketing Inc. and is the successor by merger to defendant Texaco Refining and Marketing (East) Inc.  *Id.* ¶ 40. In 2002, the stock of Texaco Refining and Marketing (East) Inc. was acquired by affiliates of Defendant Shell Oil Company.  *Id.* ¶ 40. | 78.     Undisputed.<br><br>The Commonwealth agrees to dismiss TMR Company. | 78.     No reply necessary. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| Thereafter, Texaco Refining and Marketing (East) Inc. became known as TRME Company and was merged into TMR. *Id.* ¶ 40.  TMR no longer engages in active operations. *Id.* ¶ 40. | | |
| 79.      TMR has never been involved with gasoline supply to Puerto Rico or any other aspect of the gasoline market in Puerto Rico. *Id.* ¶ 41. Specifically, TMR does not own or operate any facilities to make, store, or distribute gasoline, including refineries, terminals, distribution systems and gasoline service stations, in Puerto Rico, nor has it ever done so. *Id.* ¶ 41. | 79.      Undisputed. *See* ¶ 78. | 79.      No reply necessary. |
| 80.      TMR never owned or operated any refining or manufacturing facilities in Puerto Rico, and thus never made gasoline in or for the Puerto Rico market, with or without MTBE. *Id.* ¶ 42. | 80.      Undisputed. *See* ¶ 78. | 80.      No reply necessary. |
| 81.      TMR never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and thus never handled gasoline in the Puerto Rico market, with or without MTBE. *Id.* ¶ 43. | 81.      Undisputed. *See* ¶ 78. | 81.      No reply necessary. |
| 82.      TMR never caused a release of gasoline in Puerto Rico, with or without MTBE. *Id.* ¶ 44. | 82.      Undisputed. *See* ¶ 78. | 82.      No reply necessary. |
| 83.      SIPC is a UK company. Declaration of Ian Charman ("I. Charman Decl.") ¶ 2. | 83.      Undisputed. | 83.      No reply necessary. |
| 84.      SIPC does not own or | 84.      Disputed. | 84.      **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| operate any facilities to make or store gasoline, including refineries, terminals, distribution systems and gasoline service stations, in Puerto Rico, nor has it ever done so. *Id.* ¶ 3. | The Commonwealth's undisputed evidence shows that, prior to 2006, Shell Int'l had involvement in the operation of retail stations owned by Shell PR in Puerto Rico. Shell Caribbean and Central America cluster, which oversaw Puerto Rico, approved expenditures for replacement and upgrades to USTs in Puerto Rico.  Shell Int'l also imposed health, safety, and environmental guidelines on Shell PR, and required Shell PR to operate its business in accordance with Shell Int'l policies. *See* Plaintiff's 56.1 ¶¶ 1-13. | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 84, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>The majority of Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement.<br><br>Dispute Plaintiffs' assertion that "[SIPC] had involvement in the operation of retail stations owned by [Sol (f/k/a SCPRL)] in Puerto Rico".<br><br>Dispute Plaintiffs' assertion that Shell Caribbean and Central America cluster "oversaw Puerto Rico."<br><br>Dispute Plaintiffs' assertion that "[SIPC] imposed health, safety, and environmental guidelines on [SCPRL], and required [SCPRL] to operate its business in accordance with [SIPC] policies."<br><br>*See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 1-13. |
| 85.     SIPC never owned or operated any refining or manufacturing facilities in Puerto Rico, and thus never made gasoline in or for the Puerto Rico market, with or | 85.     Disputed. *See* ¶ 84. | 85.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 85, and thus fails to make "an affirmative showing on all |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| without MTBE. *Id.* ¶ 4. SIPC never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and thus never handled gasoline in the Puerto Rico market, with or without MTBE. *Id.* ¶ 4. SIPC never caused a release of gasoline in Puerto Rico, with or without MTBE. *Id.* ¶ 4. | | matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 84. |
| 86.     Prior to 1995, Sol (f/k/a SCPRL) was supplied, in part, from a refinery on the island of Curaçao. *Id.* ¶ 5. Until 1985, when the refinery was sold to the Netherlands Antilles' Government, Shell Curaçao NV (SCNV) owned and operated the refinery and sales were made by SCNV directly to SCPRL. *Id.* ¶ 5. | 86.     Undisputed. *See* ¶ 84. | 86.     No reply necessary.<br><br>*See* also the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 84. |
| 87.     In 1985, after the sale by Shell, the refinery was leased by the Venezuelan state-owned company Petróleos de Venezuela S.A., or PDVSA. *Id.* ¶ 6. PDVSA used their affiliate company, Maraven, to operate the refinery until 1997, after which date PDVSA took over direct operating control of the refinery. *Id.* ¶ 6. | 87.     Undisputed. *See* ¶ 84. | 87.     No reply necessary.<br><br>*See* also the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 84. |
| 88.     For the ten-year period, from 1985 until 1995, a division of SIPC known as Shell International Trading Company (SITCO) provided trading and supply services whereby it acquired gasoline from a third party and supplied that gasoline to Sol (f/k/a | 88.     Disputed.<br><br>The gasoline delivered to Shell PR from the Curacao refinery was purchased by a division of Shell Int'l and then delivered to Shell PR so Shell Int'l was in the direct chain of supply. The evidence demonstrates, moreover, that all of | 88.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 88, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| SCPRL). *Id.* ¶ 7.  More specifically, during this period prior to 1995, SIPC acquired gasoline from the Curaçao refinery and supplied that gasoline to Sol (f/k/a SCPRL). *Id.* ¶ 7.  The title, or ownership, of the gasoline passed to Sol (f/k/a SCPRL) at the loading dock in Curaçao. *Id.* ¶ 7.  Sol (f/k/a SCPRL) in turn imported that gasoline into Puerto Rico and supplied gasoline to Shell-branded service stations in Puerto Rico. *Id.* ¶ 7.  SIPC did not deliver gasoline directly to Puerto Rico and did not own, store or distribute gasoline in Puerto Rico.  *Id.* ¶ 7. | this gasoline was distributed as Shell "branded gasoline" to Shell stations in Puerto Rico, including the Shell Trial Site.  *See* ¶ 3. | Dispute Plaintiffs' assertion that "all of [the gasoline delivered to SCPRL from the Curaçao refinery] was distributed as Shell 'branded gasoline' to Shell stations in Puerto Rico, including the [Sol] Trial Site."  There is no evidence tracing any gasoline SCPRL received from the Curaçao refinery to the Sol Trial Site.  Indeed, SCPRL received gasoline from various suppliers during 1985 to 1995 time period.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 89.    Almost all of the gasoline that SIPC supplied for delivery to Puerto Rico was acquired from the Curaçao refinery. *Id.* ¶ 8.  Sol (f/k/a SCPRL) always took title to the gasoline SIPC supplied outside of Puerto Rico, typically, if not always, at the loading dock of the Curaçao refinery. *Id.* ¶ 8. | 89.    Undisputed, but irrelevant as to issue raised in this motion.  *See* ¶ 88. | 89.    Plaintiffs do not dispute this fact. |
| 90.    Prior to 1985, the Curaçao refinery did not use MTBE. *Id.* ¶ 9.  Diagrams and descriptions of the facilities of the Curaçao refinery after 1985 do not indicate the existence of facilities there for the manufacture, storage or blending of MTBE. *Id.* ¶ 9. | 90.    Disputed.<br><br>The declaration submitted by Shell does not identify a single document purportedly reviewed by the witness, nor were these "documents" produced by Shell in discovery in this matter.  The "testimony" by Charman, therefore, is purely speculative, hearsay, and entirely inadmissible. Shell, moreover, never asserted in its discovery responses that the Curacao refinery did not utilize | 90.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 90, and thus fails to make "an affirmative showing on all matters placed in issue."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' assertion that the Commonwealth was deprived of the opportunity to conduct discovery on the issue of whether |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | MTBE to produce gasoline thus depriving the Commonwealth of the opportunity to conduct discovery on this issue. Evidence that has been produced in discovery by other defendants, to the contrary, shows that MTBE was present at substantial concentrations in 1991-1992. *See* ¶ 3. | the Curaçao refinery used MTBE to produce gasoline. *See* Reyna Reply Decl. ¶ 4, Ex. 13(c), Charman Dep. 51:9-52:6; 59:13-60:4.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 91.     SIPC was not the sole supplier of gasoline to Sol (f/k/a SCPRL) prior to 1995. *Id.* ¶ 10.  To the contrary, Sol acquired gasoline from other sources unrelated to Shell during and after that period. *Id.* ¶ 10.  R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests for Production of Documents, Interrogatory No. 2, pp. 19-21 (Mar. 14, 2014); *Id.* ¶ 2, Ex. 1, Declaration of Dario E. Amadeo, ¶¶ 6-7. | 91.     Undisputed, but irrelevant to any issue in this motion.<br><br>The evidence unequivocally shows that Shell Int'l was in the direct chain of supply for MTBE gasoline to Shell PR for well over a decade, that Shell Int'l was contractually obligated to supply substantial quantities of gasoline to Shell PR on a daily basis (3,000 barrels per day of premium and 5,000 barrels per day regular gasoline), and that numerous shipments of gasoline supplied by Shell Int'l to Shell PR contained substantial quantities of MTBE.  *See* ¶ 3. | 91.     Plaintiffs do not dispute this fact.<br><br>Dispute Plaintiffs' assertion that SIPC "was in the direct chain of supply for MTBE gasoline to [Sol (f/k/a SCPRL)] for well over a decade."<br><br>Dispute Plaintiffs' suggestion that MTBE gasoline was actually supplied pursuant to the supply contract between SIPC and Sol (f/k/a SCPRL) "on a daily basis (3,000 barrels per day of premium and 5,000 barrels per day regular gasoline)."<br><br>Dispute that "numerous shipments of gasoline supplied by [SIPC] to [Sol (f/k/a SCPRL)] contained substantial quantities of MTBE."<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 92.     From January 1995 to September 1997, Sol (f/k/a SCPRL) purchased gasoline directly from HOVIC, another defendant in this case.  I. Charman Decl. ¶ 10. | 92.     Disputed.<br>As explained in ¶ 3, the evidence shows that Shell Int'l had not cancelled its evergreen contract with Shell PR, that Shell Int'l routinely purchased gasoline from | 92.     **Disputed.**<br><br>Dispute Plaintiffs' assertion that deliveries of gasoline with MTBE from HOVIC to Sol (f/k/a SCPRL) during the 1994 to 1996 |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | HOVIC for Shell PR, and Shell Int'l admitted in discovery that it supplied gasoline to Shell PR "up to" 1998. Shell Int'l admits in ¶ 89 that even though Shell Int'l bought the gasoline Shell PR took title at the Hovic refinery. | time period as being pursuant to the evergreen contract between SIPC and Sol (f/k/a SCPRL). Plaintiffs fail to identify any evidence of agreements between HOVIC and SIPC for the supply of gasoline to Sol (f/k/a SCPRL). To the contrary, the evidence demonstrates that during this time period, Sol (f/k/a SCPRL) contracted directly with HOVIC for the supply of gasoline. Reyna Reply Declaration ¶ 2, 11(a) through 11(f). *See* O'Reilly Decl., Ex. 6(a) and 6(c) through 6(g) (identifying SCPRL as buyer).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 93.     Furthermore, the volume of gasoline SIPC supplied to SCPRL declined during the time period between 1985 and 1995. *Id.* ¶ 11. | 93.     Disputed. *See* ¶ 92. | 93.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 93, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 92. |
| 94.     Therefore, even if gasoline with MTBE had been delivered to Sol or to Shell-branded stations in Puerto Rico prior to 1995, that gasoline with MTBE could have, and in all likelihood must have, come from a supplier other than SIPC. *Id.* ¶ 12. | 94.     Disputed.<br><br>Shell Int'l does not submit any competent evidence in support of this statement. Shell Int'l can no longer produce any analytical statements or data proving that MTBE was not present in gasoline supplied by Shell Int'l to Shell PR. Shell Int'l instead asks the Court to | 94.     **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 94, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | draw inferences from the lack of data which is improper.  Mr. Charman's declaration is inadmissible because it is based on speculation, hearsay, and lacks foundation.  Mr. Charman, for example, is attempting to opine about the present or lack of MTBE at the Curacao refinery for a time period when he did not work there.  Shell Int'l's assertion is directly contradicted by the evidence set forth in ¶ 3. | The majority of Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement.  *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 95.      Shell West is a Barbados company.  *Id.* ¶ 13. | 95.      Undisputed. | 95.      No reply necessary. |
| 96.      Shell West does not own or operate any facilities to make or store gasoline, including refineries, terminals, distribution systems and gasoline service stations, in Puerto Rico, nor has it ever done so.  *Id.* ¶ 14.  Shell West never owned or operated any refining or manufacturing facilities in Puerto Rico, and thus never made gasoline in or for the Puerto Rico market, with or without MTBE.  *Id.* ¶ 15. | 96.      Undisputed, but irrelevant to any issue in this motion.  The evidence set forth in ¶ 3 shows that Shell Western was a substantial source of MTBE gasoline delivered to Shell PR, which was then distributed to Shell stations, including the Shell Trial Site.  Shell Western is thus in the direct chain of supply. | 96.      Plaintiffs do not dispute this fact.  *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 97.      Shell West never owned or operated any underground storage tanks, service stations or other gasoline storage facilities in Puerto Rico, and thus never handled gasoline in the Puerto Rico market, with or without MTBE.  *Id.* ¶ 15.  Shell West never caused a release of gasoline in Puerto Rico, with or without MTBE.  *Id.* ¶ 15. | 97.      Undisputed, but irrelevant to any issue in this motion. | 97.      Plaintiffs do not dispute this fact. |
| 98.      Between September 1997 and October 2003, Shell | 98.      Disputed.  *See* ¶¶ 3 and 98. | 98.      **Disputed.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| West provided trading and supply services, similar to those previously provided by SIPC, to Sol (f/k/a SCPRL). *Id.* ¶ 16.  Also between November 2003 and October 2004, and between September 2008 and December 2010, Shell West provided similar services to SCYI.  *Id.* ¶ 16. Shell West did not deliver gasoline directly to Puerto Rico, and did not own, store or distribute gasoline in Puerto Rico.  *Id.* ¶ 16. | | Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 98, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Plaintiffs' reference to their response to Undisputed Material Fact No. 98 is nonsensical.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 99.      All of the gasoline that Shell West supplied to Sol (f/k/a SCPRL) and nearly all of the gasoline Shell West supplied to SCYI for delivery to Puerto Rico was acquired from the St. Croix refinery, which was owned and operated by other defendants in this case, HOVIC and HOVENSA. *Id.* ¶ 17.  Sol (fka SCPRL) and SCYI always took title to the gasoline Shell West supplied outside of Puerto Rico, typically if not always at the loading dock of the St. Croix refinery. *Id.* ¶ 17. | 99.      Undisputed, but irrelevant to any issue in this motion. *See* ¶¶ 3 and 98. | 99.      Plaintiffs do not dispute this fact.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact Nos. 3 and 98. |
| 100.     Between September 1997 and December 2010, Shell West supplied 516 shipments of gasoline to Sol (f/k/a SCPRL) and 140 shipments of gasoline to SCYI mainly from and at the St. Croix refinery. *Id.* ¶ 18. | 100.     Undisputed.<br><br>The evidence shows that a substantial number of these shipments contained MTBE. *See* ¶ 3. | 100.     Dispute that evidence shows that a "substantial number" of these shipments contained MTBE.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 101.     The COA Chart Section III, "Shell West COA Chart" which summarizes the MTBE | 101.     Disputed<br><br>The evidence shows that a | 101.     Dispute that evidence shows that a "substantial number" of these shipments |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| data from COAs for the shipments of gasoline that Shell West supplied to both Sol (f/k/a SCPRL) and SCYI accurately summarizes and represents the data contained in the COAs regarding the MTBE content, if any, in each shipment listed in the Shell West COA Chart. *Id.* ¶ 19. R. Reyna Decl. ¶ 7, Ex. 5, COA Chart, Section III, "Shell West COA Chart." | substantial number of these shipments contained MTBE. *See* ¶ 3. | contained MTBE.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 102.    The data in the COAs, as shown in the Shell West COA Chart, shows that of the total of 656 shipments of gasoline that Shell West supplied to Sol (f/k/a SCPRL) and SCYI for delivery to Puerto Rico, COAs were located for 638 shipments; of those 638 shipments, 477 (75%) contained no MTBE at all, 151 (24%) contained MTBE below the *de minimis* level of 0.5% by volume; and only 10 contained MTBE above the *de minimis* level. I. Charman Decl. ¶ 20. Even then, the 10 shipments that contained MTBE above *de minimis* levels were only slightly above the threshold of 0.5% by volume. *Id.* ¶ 20. More specifically, those shipments contained the following percentages by volume of MTBE: | 102.    Disputed.<br><br>Shell Western's chart demonstrates that MTBE was present in at approximately 25% of the shipments. Additional evidence shows that, in fact, a substantial number of these shipments contained MTBE. *See* ¶ 3. | 102.    Dispute that evidence shows that a "substantial number" of these shipments contained MTBE.<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |

| Shipment Date | MTBE Content |
|---|---|
| 4/11/1998 | 2.43% |
| 4/11/1998 | 2.60% |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 4/23/1998 — 1.43 % <br> 4/23/1998 — 1.44 % <br> 11/26/1998 — 3.93 % <br> 11/26/1998 — 4.30 % <br> 4/20/2000 — 0.70 % <br> 10/14/2000 — 0.58 % <br> 8/29/2003 — 0.66 % <br> 9/12/2003 — 0.68 % <br> *Id.* ¶ 20. | | |
| 103.    All 10 shipments were obtained from the St. Croix refinery of defendants HOVIC and HOVENSA and were provided to Sol (f/k/a SCPRL) at that refinery. *Id.* ¶ 21.  Shell West merely arranged the purchase and sale. *Id.* ¶ 21. | 103.    Undisputed, but irrelevant to any issue in this motion. *See* ¶¶ 3 and 98. | 100.    Plaintiffs do not dispute this fact. <br><br> *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 104.    The data in the COAs, as shown in the Shell West COA Chart, shows that the combined shipments of all gasoline that Shell West supplied to Sol (f/k/a SCPRL) and SCYI for delivery to Puerto Rico contained only trace levels of MTBE on average, well below the *de minimis* level of 0.5% by volume. *Id.* ¶ 22.  The average MTBE content of all these shipments of gasoline was only 0.08% by volume. *Id.* ¶ 22. | 104.    Disputed. <br> Even at an average concentration of 0.8%, gasoline supplied by Shell Western contained approximately 800,000 ppb of MTBE which is several orders of magnitude greater that Puerto Rico's water cleanup standard of 12 ppb. <br> *See also* ¶¶ 3 and 98.  *See also* Plaintiff's Rule 56.1 ¶¶ 14-21. | 104.    **Disputed.** <br><br> Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 104, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). <br><br> Plaintiffs' reference to their response to Undisputed Material Fact No. 98 is makes no sense. <br><br> *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 105.    Shell West followed an express policy of not supplying MTBE gasoline into Puerto | 105.    Disputed. <br><br> Shell Western fails to explain that | 105.    **Fails to raise triable facts relevant to Shell Defendants' Motion.** |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| Rico. *Id.* ¶ 23.  As an example, Shell West acquired a cargo destined for Puerto Rico in May 2002, but discovered that the cargo contained MTBE. *Id.* ¶ 23.  Upon considering the question whether the shipment could be delivered to Puerto Rico under the applicable company policy, Shell West concluded that the shipment should not be delivered to Puerto Rico because that would have offended company policy, and thus the shipment was diverted elsewhere. *Id.* ¶ 23. | the "express policy" was not adopted until 2002. | Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement and does not raise triable facts relevant to Shell Defendants' Motion. |
| 106.    Throughout the period when Shell West supplied gasoline for delivery into Puerto Rico, the only economically viable source of gasoline for import to Puerto Rico was the St. Croix refinery. *Id.* ¶ 24.  Shell West did not specify that gasoline it acquired from the St. Croix refinery should contain MTBE, and did not otherwise deliberately or intentionally obtain gasoline with MTBE for delivery into Puerto Rico. *Id.* ¶ 24.  Rather, to the extent that gasoline which Shell West acquired from the St. Croix refinery contained MTBE at any level, that was only because Shell West had no feasible alternative but to accept gasoline with trace levels of MTBE. *Id.* ¶ 24.  Some trace amounts of MTBE in some shipments of gasoline from the St. Croix refinery were likely | 106.    Disputed.<br><br>The Commonwealth disputes Shell Western's assertion that St. Croix was the only viable source.  As demonstrated by the Commonwealth's opposition to defendants' motion for summary judgment based on lack of causation, gasoline was routinely imported to Puerto Rico from a number of sources across the Caribbean, South and Central America, as well as the United States.<br><br>The evidence shows that, in fact, numerous shipments <u>did contain</u> MTBE.  Shell Western does not deny that it received copies of shipping information showing that the gasoline it purchased for Shell PR contained MTBE.  Thus, even though Shell Western knew that the gasoline it supplied Shell PR, Shell Western did nothing to obtain alternative supplies to prevent | 106.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 106, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>The majority of Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| inevitable, given that the St. Croix refinery produced gasoline with substantial volumes of MTBE for delivery to areas of the U.S. where MTBE was used to comply with the federal oxygenate mandate. *Id.* ¶ 24. Shell West did not request or want such trace levels of MTBE in the gasoline it obtained from the St. Croix refinery. *Id.* ¶ 24. Rather, to the extent Shell West received gasoline with low levels of MTBE from the St. Croix refinery, that was only because Shell West had no practical or feasible alternative. *Id.* ¶ 24. | MTBE gasoline from being shipped to Shell PR until 2002. | |
| 107.    Shell West entered supply contracts with HOVIC/HOVENSA. *Id.* ¶ 25. From September 1997 through May 2002 and from March 2003 through July 2004, the supply contracts governing the gasoline Shell West supplied to SCPRL were made on an annual term basis. *Id.* ¶ 25.  At other times, the supply contracts between Shell West and SCPRL or SCYI were made on a spot basis. *Id.* ¶ 25. None of these supply contracts ever contained any specifications calling for MTBE. *Id.* ¶ 25.  With regard to the quality of gasoline, the contracts typically referenced Colonial Pipeline specifications which themselves stated "Oxygenate Allowed," and "This product may, but is not | 107.    Disputed.<br><br>Shell Western's contracts did not prohibit the addition of MTBE to gasoline purchased for Shell PR. Shell's own witness admitted that the Colonial codes referenced in these agreements specifically permit the use of oxygenates such as MTBE.  *See* ¶ 3. | 107.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 107, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Dispute Plaintiffs' suggestion that the absence of a prohibition on MTBE gasoline in Shell West's supply agreements with HOVIC/HOVENSA is evidence that gasoline should contain MTBE.<br><br>Dispute Plaintiffs' mischaracterization of Shell witness' testimony regarding Colonial Pipeline specifications. During his deposition, Plaintiffs' counsel inquired about the |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| required to, contain blends of aliphatic ethers." *Id.* ¶ 25. Hence, the Colonial Pipeline specifications referenced in the Shell West supply contracts did not call for MTBE. *Id.* ¶ 25. | | Colonial Pipeline specifications. In response to the question "And is that consistent with your understanding or recollection that a … Colonial grade conventional could allow an oxygenate to be present?" Ian Charman stated "And I don't know the answer." (Barnhart Decl. Ex. 1(b), Charman Dep. 77:7-12).<br><br>*See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3. |
| 108.    Plaintiffs admit that none of the Shell Defendants, other than SCYI, owned, operated, or controlled any facility in Puerto Rico. *Id.* ¶ 9, Ex. 7, Plaintiffs' Revised Responses to Shell's First Requests for Admissions, Responses 1-6, 12-14, 20-25, 31-33, 39-44, 50-52, 57-62, 68-70, 75-80, 86-88, 93-98, 104-106, 111-116. | 108.    Undisputed, but irrelevant to any issues in this motion. | 108.    Plaintiffs do not dispute this fact. |
| 109.    Plaintiffs admit that SOC, Motiva, STUSCO, Equilon, and TMR never owned or operated any sites in Puerto Rico, and never made or stored gasoline in Puerto Rico with or without MTBE, and never directly delivered gasoline to any service station in Puerto Rico. *Id.* ¶ 9, Ex. 7, Plaintiffs' Revised Responses to Shell's First Requests for Admissions, Responses 50-52, 54, 57-63, 65, 68-70, 72, 75-81, 83, 86-88, 90, 93-99, 101, 104-106, 108, 111-117, 119, 122-124, 126. | 109.    Disputed.<br><br>As stated in ¶ 2, *supra*, Shell Int'l was intimately involved with the day-to-day operations of Shell PR. | 109.    Plaintiffs do not actually dispute the Shell Defendants' Undisputed Material Fact No. 109 which does not discuss SIPC.<br><br>Dispute that SIPC was "intimately involved" with the day-to-day operations of SCPRL. Plaintiffs provide no evidence. *See* the Shell Defendants' Reply to Plaintiffs' Response to Undisputed Material Fact No. 3 and the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 1-3. |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| 110.    Plaintiffs admit that their claims pursuant to the Resource Conservation and Recovery Act only apply to Defendants that owned or operated sites or equipment.  R. Reyna Decl. ¶ 4, Ex. 2, Plaintiffs' Second Supplemental Responses to Defendants' First Set of Contention Interrogatories, Interrogatory No. 19, pp. 14-15 (Feb. 7, 2014). | 110.    Disputed.<br><br>*See* Plaintiff's Rule 56.1 ¶¶ 18-25. | 110.    **Disputed.**<br><br>Plaintiffs do not identify any evidence that actually disputes Undisputed Material Fact No. 110, and thus fails to make "an affirmative showing on all matters placed in issue." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).<br><br>Disputed as irrelevant because Plaintiffs agreed to dismiss their RCRA claim against the Shell Defendants.<br><br>*See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact Nos. 18-25. |
| 111.    No Plaintiffs' expert has traced any gasoline containing MTBE from the Shell Defendants to any Trial Sites, or to any site in Puerto Rico. *Id.* ¶ 15. | 111.    Disputed.<br>The Commonwealth is not required to retain an expert to "trace" gasoline.  The evidence shows that ALL gasoline supplied by the Shell Defendants was utilized by Shell PR to supply Shell stations in Puerto Rico, including the Trial site. *See* ¶ 3. | 111.    Plaintiffs do not actually dispute the Shell Defendants' Undisputed Material Fact No. 111.<br><br>Dispute Plaintiffs' assertion "that ALL gasoline supplied by the Shell Defendants was utilized by [Sol (f/k/a SCPRL)] to supply Shell stations in Puerto Rico, including the [Sol] Trial site". Plaintiffs have failed to identify any evidence tracing the Shell Defendants' gasoline to the Sol Trial Site, in particular Plaintiffs have provided no evidence that MTBE gasoline supplied by SIPC or SOC was ever delivered to the Sol Trial Site. |
| 112.    No fact witness or document traces any gasoline containing MTBE from SCYI to any Trial Site, or any site in Puerto Rico. *Id.* ¶ 16. | 112.    Disputed as irrelevant and a misstatement of the law. *See* ¶¶ 110 and 111. | 112.    Dispute that this fact is irrelevant to the Shell Defendants' motion.<br><br>Dispute that this fact is a |

| SHELL DEFENDANTS' UNDISPUTED MATERIAL FACTS | PLAINTIFFS' RESPONSE | SHELL DEFENDANTS' REPLY |
|---|---|---|
| | | "misstatement of the law." |
| 113.    In 2012, Puerto Rico passed a law prohibiting the import, sale, or distribution of gasoline containing MTBE, but expressly permitted *de minimis* levels of MTBE up to 0.5% by volume.  R. Reyna Decl. ¶ 11, Ex. 9, Puerto Rico Law Number 16-2012, Department of Consumer Affairs ("DACO") Regulation Number 8198, and DACO Administrative Order Number 2012-020. | 113.    Disputed.  *See*  Pagan Decl. *See* also Plaintiff's Rule 56.1 ¶ 16. | 113.    **Disputed.**  The majority of Plaintiffs' response is comprised of argument inappropriate for inclusion in a 56.1 statement.  The Declaration of Luis Pagán Rodriguez is subject to a separate motion to strike.  *See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact No. 16. |
| 114.    On June 18, 2007, Plaintiffs served a notice on SOC and TMR of their intent to bring a claim for alleged TSCA violations.  R. Reyna Decl. ¶ 17, Ex. 10, June 18, 2007 letters from John K. Dema to SOC and TMR. | 114.    Undisputed. | 114.    No reply necessary. |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| 1.    On January 1, 1999, Shell Retail International, a <u>division of</u> Shell Int'l, entered into a Shell Retail International Franchise Agreement, with Shell PR ("the Franchisee") to provide "franchise specialist advice and services . . . for Shell Operating Companies throughout the world that have a Retail Business (the "Franchisees")." (O'Reilly Decl., Ex. 9, at 1.)  The agreement states that Shell PR had previous "agreement for a range of services to be provided by" Shell Int'l, but Shell has failed to produce this document.  (*Ibid.*)  According to the agreement, Shell Retail Int'l and Shell PR agreed to comply with certain core elements as "central to the achievement of common standards throughout the [Shell global network of retail businesses]….These…[included]:…(ii) [***Health, Safety and Environment] core standards***; | 1.    **Disputed.**  Admit that the statements were quoted from the January 1999 Shell Retail International Franchise Agreement ("Franchise Agreement") between Shell Retail International ("SRI"), a division of SIPC, and Sol (f/k/a SCPRL), which speaks for itself, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.  The quoted language is irrelevant for purposes of evaluating Defendants' motion because there is no language in the Franchise Agreement suggesting that SRI or SIPC would control any aspect of SCPRL's business.  To the contrary, at Article 7(1), the Franchise Agreement clearly provides |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| and (iii) adherence to…*performance specifications for equipment and systems*…." (*Ibid.*)  Shell Retail Int'l was required to "[p]ublish guidelines on…[Health, Safety and Environment core standards] together with details on how to acquire the relevant specification and standards documents…and Shell PR agree[d] to comply with the guidelines." (*Ibid.*)  The agreement also required Shell Retail Int'l to provide "comprehensive advice and business support for products and services" regarding "[e]ngineering design" and "[s]ite operations and training," among other things. (*Ibid.*)  The Shell Retail Int'l website was "the central information point for [Shell PR] and the method by which [Shell Retail Int'l] provide[d] information and documents, and reports…." (*Ibid.*) | that "[Sol (f/k/a SCPRL)] continues to be responsible for the day to day and financial management of its Retail Business …."  Reyna Declaration ¶ 3, Ex. 12(a), Franchise Agreement (SOL CONFIDENTIAL 121-37). |
| 2.      A current document on Shell's website says the following describing its pre-2009 Health, Safety, Security and Environment ("HSSE") Standards:<br><br>          Previously our HSSE standards contained **detailed requirements**….A set of **mandatory manuals includes more detailed requirements** to help our staff put our standards into practice.  The manuals contain all of the HSSE and [Social Performance] **requirements** we have **followed in the past**….<br><br>The standards include "Global environmental standards," which included "Soil and groundwater monitoring/remediation," Volatile organic compounds," "Waste," and "Water in the environment." *See* "Previous Shell Health, Safety, Security and Environment Standards" (emphasis added), available at http://s08.static-shell.com/content/dam/shell/static/environment-society/downloads/previous-hsse-standards.pdf. | 2.      **Disputed.**<br><br>Admit that the statements were quoted from the document cited by Plaintiffs, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.  This has not been authenticated or raised in any deposition in this litigation.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because there is no language in the document suggesting that SRI or SIPC would control any aspect of SCPRL's business.  The mere fact that SRI or SIPC provided HSSE guidelines to SCPRL does not impose liability on SRI or SIPC.  *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 3.      David Lewis, was the Caribbean and Central America ("CCA"), Health Safety, Security, and Environmental ("HSSE") manager, from April | 3.      **Disputed.**<br><br>Admit that Mr. Lewis testified that he was the |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| 1999 to January 2002.  (Barnhart Decl., Ex. 3, Lewis Depo. at 12:1-2.)  CCA was "an informal cluster of the [Shell] operating companies [in the] Caribbean and Central America."  (Barnhart Decl., Ex. 1, Charman Depo. at 125:20-22.)  Mr. Lewis confirmed that as HSSE manager he was responsible for advising all of the businesses in the cluster on retail stations.  (Barnhart Decl., Ex. 3, Lewis Depo. at 14:3-11.) | Shell Caribbean and Central American cluster ("SCCA"), Health, Safety, Security, and Environmental ("HSSE") Manager from April 1999 to January 2002.<br><br>Admit that Mr. Charman testified that the SCCA was "an informal cluster of the operating companies in Caribbean and Central America."<br><br>Dispute Plaintiffs' assertion that Mr. Lewis "confirmed that as HSSE manager he was responsible for advising all of the businesses in the cluster on retail stations."  To the contrary, at his deposition, Mr. Lewis provided the following testimony "I was responsible for advising all of the businesses in the cluster in relation to HSSE, which would have included retail.  **I wasn't directly responsible for the retail business.**" Barnhart Decl., Ex. 3, Lewis Dep. at 14:3-11.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because the mere fact that the SCCA provided HSSE advice to SCPRL does not impose liability on the SCCA. *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 4.      Brendo Torano, Health, Safety, and Environmental manager for Shell PR after 2000, identified herself as a "Retail/Comm. Environmental Adviser" with the Shell CCA, when reporting information regarding USTs in Puerto Rico.  (Barnhart Decl., Ex. 3, Torano Depo. at 89:19-90:15; *see also* O'Reilly Decl., Ex. 9, Nov. 19, 2001, Email from B. Torano to J. Vasquez.) Mr. Lewis confirmed that Ms. Torano was an employee when she served as an Environmental Advisor for CCA.  (Barnhart Decl., Ex. 3, Lewis Depo. at 15:4-22.) | 4.      **Disputed.**<br><br>Dispute Plaintiffs' assertion that Ms. Toraño worked for the SCCA.  When questioned at her deposition about the same email Plaintiffs use to support their argument, Ms. Toraño testified that she worked for SCPRL and not the SCCA:<br>        Q:  Shell Caribbean and Central America. Was that your cluster group, or is that the company you were with?<br>        A:  It's the cluster group.<br>        Q:  Okay.  But you were employed by Shell |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| | Company Puerto Rico Limited, correct?<br>A: Correct.<br>Reyna Reply Decl. ¶ 4, Ex. 13(a), Toraño Dep. 52:21 - 53:4.<br>David Lewis, HSSE Manager for the SCCA, confirmed this as well. Barnhart Decl., Ex. 3, Lewis Dep. 15:4-17 ("She was always employed by Shell Puerto Rico"). |
| 5.      Mr. Lewis confirmed that in their roles as CCA Environmental Advisors, Ms. Torano and her predecessor, Vanessa Rodriguez, were responsible for working with the "retail business advising them" on how to conduct environmental investigations for retail stations. (Barnhart Decl., Ex. 3, Lewis Depo. at 18:17-19:21.) Ms. Torano and Ms. Rodriguez were considered "the local environmental expert" to provide advice to Shell PR. (*Id.* at 18:17-19:21.]. Ms. Torano specifically prepared a "Shell CCA Project Proposal, 5 Yr. Puerto Rico Site Remediation Plan" that had to be submitted to obtain budget approval to do the work. (*Id.* at 143:22-144:3, 144:8-144:17.) | 5.      **Disputed.**<br><br>Dispute Plaintiffs' suggestion that Ms. Toraño and her predecessor, Ms. Rodriguez, worked for the SCCA. *See* the Shell Defendants' Response to Plaintiffs' Additional Material Fact No. 4. Mr. Lewis also confirmed that Ms. Rodriguez worked for SCPRL as opposed to the SCCA. Barnhart Decl., Ex. 3, Lewis Dep. 15:18-20.<br><br>Admit that Mr. Lewis testified that Ms. Toraño and Ms. Rodriguez "would have been the person that would have worked with the retail business advising them on how to" conduct environmental investigations at retail stations and were considered "the local environmental expert" to provide advice to SCPRL, their employer. Barnhart Decl., Ex. 3, Lewis Dep. 143:22-144:3, 144:8-144:17.<br><br>Ms. Toraño testified that the SCCA only provided support to SCPRL. Reyna Reply Decl. ¶ 4, Ex. 13(a), Toraño Dep. 39:9-22. David Lewis echoed that fact when he testified about the ongoing dialogue between SCPRL and EPA/EQB "regarding the management of environmental affairs within Puerto Rico … that's something which we largely left them to handle on the basis of their professional judgment and wouldn't interfere directly in that process." Reyna Reply Decl. ¶ 4, Ex. 13(b), Lewis Dep. 58:1-14.<br><br>Dispute Plaintiffs' assertion that the five-year Puerto Rico Site Remediation Plan "had to be submitted to obtain budget approval to do the work." The cited deposition testimony does not |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
|  | support Plaintiffs' assertion because there is no discussion about submitting the plan to obtain budget approval to do the work. |
| 6.      Ms. Torano testified that, while Shell PR was a part of Shell Int'l, Shell PR had access to "Yellow Guides" concerning environmental guidelines that were available to Shell PR in both hard copy and via the internet.  (Barnhart Decl., Ex. 3, Torano Depo. at 89:19-90:15.)  Ms. Torano also testified that she communicated with Shell personnel in the Caribbean, Central America, and England, which she referred to as "our base."  (*Id.* at 17:24-18:1, 19:19-23, and 26:12-18.)  She referred to England as Shell PR's "base . . . because Shell Puerto Rico operated – reported to England as part of their operating unit."  (*Id.* at 26:19-21.) | 6.      **Disputed.**<br><br>Admit that the statements were made by Ms. Toraño, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because the mere fact that the SCCA made environmental guidelines available to SCPRL does not impose liability on the SCCA.  *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 7.      In April 2000, David Holden, Retail Network Manager for Shell CCA, advised Shell PR that the Retail Capital Proposal for Shell PR's "Tank Replacement Program" "has been approved."  (O'Reilly Decl., Ex. 9, April 3, 2000, Email from D. Holden (CCA) to B. Verbrug (Shell PR).)  Notably, Mr. Holden only approved a portion of the tank replacements proposed by Shell PR.  (*Id.* at UST Replacement Program 2000, Puerto Rico.) | 7.      **Disputed.**<br><br>Admit that the statements were quoted from the April 2000 email from Mr. Holden, which speaks for itself, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because the SCCA's budget approval over SCPRL's Tank Replacement Program does not impose liability on the SCCA.  *Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1181 (D.P.R. 1987), *aff'd*, 843 F.2d 613 (1st Cir. 1988) ("The mere fact that a parent corporation may assert authority to approve or reject plans of its subsidiary does *not* establish that the parent plans, implements or in any way controls the subsidiary's policies.") (emphasis in original); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| | status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 8.      Again, in 2001, Martin Miksits, Retail Network Manager for Shell CCA sent an email to Jose Melendez, Shell PR, regarding a proposal to upgrade underground storage tanks at Shell stations in Puerto Rico, including the Trial Site, which states that "the following capital sanction has been approved."  (O'Reilly Decl., Ex. 9.) | 8.      **Disputed.**<br><br>Admit that the quote originated from the 2001 email from Mr. Miksits, which speaks for itself, but dispute Plaintiffs' assertion that this was "regarding a proposal to upgrade storage tanks at [Sol (f/k/a SCPRL)] stations in Puerto Rico, including the Trial Site" because there is nothing in the document indicating that assertion.  Also dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because the SCCA's budget approval over SCPRL's HSSE Program does not impose liability on the SCCA. *Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1181 (D.P.R. 1987), *aff'd*, 843 F.2d 613 (1st Cir. 1988) ("The mere fact that a parent corporation may assert authority to approve or reject plans of its subsidiary does *not* establish that the parent plans, implements or in any way controls the subsidiary's policies.") (emphasis in original); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 9.      Angel Olivera confirmed that for any "capital projects . . . you need approval *outside* Puerto Rico in order to have the expenditures. . ." (Barnhart Decl., Ex. 1, Olivera Depo. at 43:22-44:2.) (emphasis added). | 9.      **Disputed.**<br><br>Admit that the statements were quoted from the transcript of Mr. Olivera's deposition, which speaks for itself, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context. |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| | The quoted language is irrelevant for purposes of evaluating Defendants' motion because the SCCA's budget approval over SCPRL's "capital projects" does not impose liability on the SCCA. *Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1181 (D.P.R. 1987), *aff'd*, 843 F.2d 613 (1st Cir. 1988) ("The mere fact that a parent corporation may assert authority to approve or reject plans of its subsidiary does *not* establish that the parent plans, implements or in any way controls the subsidiary's policies.") (emphasis in original); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 10.    In 1984 and 1985, Shell Int'l approved Shell PR expenditures for "major improvements to the Catano" dock, and also approved Shell PR's "proposal to increase expenditure" on this project. (O'Reilly Decl., Ex. 9.) | 10.    **Disputed.**<br><br>Admit that the statements were quoted from the 1984 and 1985 communications from SIPC to SCPRL, which speak for themselves, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>The quoted language is irrelevant for purposes of evaluating Defendants' motion because the SIPC's budget approval over SCPRL's proposed expenditures for "major improvements to the Cataño Oil Dock" does not impose liability on the SIPC. *Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1181 (D.P.R. 1987), *aff'd*, 843 F.2d 613 (1st Cir. 1988) ("The mere fact that a parent corporation may assert authority to approve or reject plans of its subsidiary does *not* establish that the parent plans, implements or in any way controls the subsidiary's policies.") (emphasis in original); *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) ("[A]ctivities that involve [a] facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| | performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability"). |
| 11.     In 2003, when Shell Chemical Yabucoa, Inc. ("Shell Yabucoa") entered into a Marketing and Distribution Services Agreement with Shell PR, the Agreement explicitly stated that Shell PR's "duty of care" must comply with "standard business practices . . . established by the Royal Dutch Shell Group."  (O'Reilly Decl., Ex. 7, at 2.3.)  The Governance Guide ("GG") which accompanied the Agreement further provided:<br><br>This document is intended to define the relationship between Shell Chemicals Yabucoa Inc. (SCYl) and The Shell Company (Puerto Rico) Limited (SCPRL) in the conduct of the business in the Commonwealth of Puerto Rico.  It follows the principles defined in the Royal Dutch Shell Group Governance Guide (RDSGG).<br><br> (*Id.* GG at.)  The GG also states that Shell Oil Products Latin America has "accountability" for "the return on investment and compliance with Group standards and policies" for Shell PR.  (*Ibid.*) Shell Yabucoa and Shell PR were, in fact, owned by the same Shell holding company which is traceable back to Shell Petroleum. (*Ibid*).  The GG also states that the Shell holding companies will provide "support for Capital Investment Proposals," and further states that "financing . . . will not be limited to existing corporate structures." (*Ibid.*) Finally, the GG expressly requires both Shell Yabucoa and Shell PR to adopt "The Group HSE Commitment and Policy," thus dictating health, safety, and environmental policy for both companies. (*Ibid.*)  Similarly, both companies are required to comply with "Group's Risk and Internal Control Policy."  (*Ibid*.) It is clear that the operations of both of these entities was controlled and tied up with the global Shell business, and were certainly not independent third party operators as | 11.     **Disputed.**<br><br>Admit that the statements were quoted from the Marketing and Distribution Services Agreement, which speaks for itself, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context. |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| portrayed by Shell in its motion. | |
| 12.     In 2004, when Shell PR had meetings with "the government" regarding of Shell PR's usage of MTBE, Shell PR was directed to "contact David Harrington . . . manager of external affairs in the U.S." so that "[h]e can best ensure that advocacy work in Puerto Rico is aligned with that in the US." (Barnhart Decl., Ex. 2, Bloomer Depo. at 89:9-91:4; and O'Reilly Decl., Ex. 9.)  Mr. Knight's email address, in fact, is SOPUS, i.e. Shell Oil Products US. | 12.     **Disputed.**<br><br>Admit that the statements were made, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>Irrelevant to the Shell Defendants' motion. |
| 13.     When Shell PR was sold to Sol, there were numerous changes in business operations. Ms. Torano testified, for example, that the "Yellow Guides" provided by Shell London  "were not the property of Sol," so Shell "took [them] with them . . . or destroyed" them.  (Barnhart Decl., Ex. 3, Torano Depo. at 90:16-91:17.) | 13.     **Disputed.**<br><br>Admit that the statements were made, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>Irrelevant to the Shell Defendants' motion. |
| 14.     Consistent with Ms. Torano's testimony, at the time of the sale to Sol, an email was circulated throughout Shell PR making it clear that the Shell global entities previously involvement in the Shell PR business was ending:<br><br>    "In preparation for the transition to SOL, it is required to formally protect Shell from unauthorized disclosure or misuse of information" classified as restricted or confidential . . . [e]ach individual is responsible for deleting classified information and communications . . . On **August 31st ALL** data stored in assigned computers will be wiped out . . . [t]he following services will not be available after cutover date . . "SWW Shell Wide Web Mobil Office . . . "access to Shell Group Reporting FASTER . ."<br>(O'Reilly Decl., Ex. 9,) (emphasis in original). | 14.     **Disputed.**<br><br>Admit that the statements were quoted from the cited email, which speaks for itself, but dispute Plaintiffs' argumentative characterization of the statements which has taken them out of context.<br><br>Irrelevant to the Shell Defendants' motion. |
| 15.  The Commonwealth's expert and other evidence demonstrates that 0.5% MTBE in millions of barrels of gasoline translates into millions of gallons of pure MTBE.  Thus, a release of gasoline with 0.5% MTBE to groundwater contains over | 15.     **Disputed.**<br><br>The statement is not one of "undisputed fact" as required by Local Rule 56.1, but is instead opinion testimony by one of Plaintiffs' retained litigation |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| 416,000 times the limit set in Puerto Rico's cleanup standard. | experts.  Because it is not a statement of fact, no response from the Shell Defendants is required.  To the extent a response is required, this opinion is irrelevant to the Shell Defendants' motion.<br><br>Plaintiffs' statements about the effect of a release of MTBE gasoline does not account for the field solubility of MTBE or site-specific characteristics, and Plaintiffs further fail to present evidence that any gasoline containing *de minimis* MTBE was ever spilled at any trial site or elsewhere. |
| 16.     A 2006 draft review prepared by Shell Int'l personnel states that "oxygenates [were] used in [the] Americas . . . [because] countries like . . . Puerto Rico were the same as the U.S., namely the big cities within these countries have high pollution levels and MtBE was added to reduce exhaust emission."  (O'Reilly Decl., Ex. 8 at 6.) | 16.     **Disputed**.<br><br>Dispute Plaintiffs' assertion that "2006 draft review  of Shell global oxygenate use states that 'oxygenates [were] used in [the] Americas . . . [because] countries like . . . Puerto Rico were the same as the U.S., namely the big cities within these countries have high pollution levels and MtBE was added to reduce exhaust emission.'"  There is nothing to support this assertion at O'Reilly Decl., Ex. 8.<br><br>Irrelevant to the Shell Defendants' motion. |
| 17.     DACO witnesses confirmed it is not the department responsible for environmental protection programs.  Indeed the witness states that "we are not experts in environmental issues, so simply what we do, that if the order says there can't be MTBE, we check that there is none." (Barnhart Decl., Ex. 2, Pagan Depo. (Nov. 14, 2014) at 60:11-14 (DACO Rule 30(b)(6).) | 17.     **Disputed.**<br><br>Irrelevant to the Shell Defendants' motion.<br><br>The Declaration of Luis Pagán Rodriguez is subject to a separate motion to strike. |
| 18.     Some 10% of the population can detect the presence of MTBE in water at levels of 1-2 ppb and 25% of the population can detect it at 3 ppb. (O'Reilly Decl., Ex. 10, Dec. 2, 2013, Expert Report of Harry T. Lawless at 4; Feb. 27, 2014, Rebuttal Report of Harry T. Lawless at 9.) | 18.     **Disputed.**<br><br>The statement is not one of "undisputed fact" as required by Local Rule 56.1, but is instead opinion testimony by one of Plaintiffs' retained litigation experts.  Because it is not a statement of fact, no response from the Shell Defendants is required.  To the extent a response is required, this opinion is irrelevant to the Shell Defendants' motion. |
| 19.     Over a decade ago, Exxon Research & Engineering Company's own environmental personnel explained that "[s]mall leaks of gasoline | 19.     **Disputed.**<br><br>Plaintiffs' description of Exxon's study is taken |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| (1 teaspoon) can translate into MTBE ground water concentrations above the taste and odor detectable threshold levels." (O'Reilly Decl., Ex. 10, March 30, 1999, MTBE Release Source Identification at Marketing Sites at 2). | out of context and distorted. Plaintiffs' summary of the "study" is simply an orchestrated attempt to exploit an irrelevant, but highly inflammatory illustration by an Exxon employee who made a simple calculation of the volume of MTBE that would result in a given concentration in a body of water. That illustration was a mathematical calculation, *not* a statement that MTBE released at any particular site would result in that concentration of MTBE in drinking water.<br><br>Irrelevant to the Shell Defendants' motion. |
| 20.    In the same time frame, defendant Shell Oil's environmental personnel concluded that "[v]ery small releases of MTBE . . . have the potential to adversely impact groundwater." (O'Reilly Decl., Ex. 10. Nov.3, 1998, Email from C. Stanley to J. Pedley at ¶ 1.) | 20.    **Disputed.**<br><br>Admit that the statement quoted from Mr. Stanley's email, which speaks for itself, but dispute Plaintiffs' argumentative characterization of that fact which has taken the statement out of context.<br><br>Irrelevant to the Shell Defendants' motion. |
| 21.    Any exposure can result in an increased long-term risk of cancer for humans." (O'Reilly Decl., Ex. 10, Dec. 6, 2013, Expert Report of Kenneth Rudo at 2.) | 21.    **Disputed.**<br><br>The statement is not one of "undisputed fact" as required by Local Rule 56.1, but is instead opinion testimony by one of Plaintiffs' retained litigation experts. Because it is not a statement of fact, no response from the Shell Defendants is required. To the extent a response is required, this opinion is irrelevant to the Shell Defendants' motion. |
| 22.    In addition, according to plaintiff's natural resource economics expert, Kevin J. Boyle, Ph.D., "it is very likely that the Puerto Rican public holds economic values for uncontaminated groundwater even if there is no use of the water. (O'Reilly Decl., Ex. 10, Feb. 28, 2014, Rebuttal Report to: "Non Site-Specific Expert Report of Dr. William H. Desvousges," Kevin J. Boyle, Ph.D. at 7.) | 22.    **Disputed.**<br><br>The statement is not one of "undisputed fact" as required by Local Rule 56.1, but is instead unsupported opinion testimony by one of Plaintiffs' retained litigation experts. Because it is not a statement of fact, no response from the Shell Defendants is required. To the extent a response is required, this opinion is irrelevant to the Shell Defendants' motion. |
| 23.    In October, 1980, MTBE released from a Shell gas station contaminated public drinking water supplies in Rockaway, New Jersey. As Curt Stanley, a hydrogeologist employed by Shell Oil | 23.    **Disputed.**<br><br>Irrelevant to the Shell Defendants' motion. |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| Company testified:<br><br>Q:   So is it fair to say by 1981 Shell Oil Company knew that MTBE could contaminate public drinking water supplies?<br><br>A:   Yes.<br><br>Q:   And is it also fair to say that they knew by that time that it created taste and odor problems in public drinking water supplies?<br><br>A:   Yes.<br><br>Q:   And did you report those facts to Shell management?<br><br>A:   Yes.<br><br>(Barnhart Decl., Ex.2, Stanley Depo. (May 6, 1999) at 8:15-24.) | Dispute Plaintiffs' suggestion that EPA was not in possession of data from the Rockaway spill suggesting that MTBE might be detectable in water at 7-15 parts per billion for over a quarter-century.  In 1987, pursuant to its authority under TSCA, EPA compiled a docket of materials in connection with the MTBE Testing Consent Order that Plaintiffs allude to in their brief.  (Opp. at 24-25)<br><br>One of the articles contained in that docket was published in the Journal of the American Water Works Association in May 1984.  The article was co-authored by the Rockaway Township engineer and described Rockaway's experience with MTBE, including taste and odor issues: "Diisopropyl ether (DIPE) and methyltertiary [sic] butyl ether (MTBE) were found at sufficiently high levels to cause severe taste and odor problems in the water.  Well 7 exhibited DIPE and MTBE levels from 70 to 100 µg/L and 25 to 40 µg/L, respectively.  **Taste and odor threshold concentrations for both of these compounds were determined to be between 5 and 15 µg/L.**"  Reyna Reply Declaration Ex. 14(a), McKinnon & Dyksen, "Removing Organics From Groundwater Through Aeration Plus GAC," *Journal of the American Water Works Association,* at 43 (May 1984) (emphasis added).<br><br>EPA's TSCA Section 8(e) Reporting Guide further provides that "[t]here are several kinds of information about which the Agency considers itself to be adequately informed for purposes of Section 8(e) of TSCA," including information "published in the open scientific literature."  Reyna Reply Declaration Ex. 14(b), EPA TSCA Section 8(e) Reporting Guide, p. 8 (June 1991). |
| 24.     In 1983, Shell responded to a survey regarding hydrocarbon pollution of groundwater conducted by the American Petroleum Institute (API) by emphasizing that:<br><br>In our spill situation, the MTBE was detectable (by drinking) in 7 to 15 | 24.     **Disputed.**<br><br>Irrelevant to the Shell Defendants' motion.<br><br>Dispute Plaintiffs' suggestion that EPA was not in possession of data from the Rockaway spill |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
| parts per billion so even if it were not a factor to health, it still had to be removed to below the detectable amount in order to use the water. (O'Reilly Decl., Ex. 10.) | suggesting that MTBE might be detectable in water at 7-15 parts per billion for over a quarter-century.  *See* the Shell Defendants Response to Plaintiffs' Additional Material Fact No. 23. |
| 25.      Despite this knowledge, Shell was a participant in the MTBE Committee, which was affiliated with the Oxygenated Fuels Association and submitted comments to EPA in response to an EPA notice announcing its intention to designate MTBE for priority testing consideration under TSCA.  (Barnhart Decl., Ex. 2, Dominguez Depo. (Sept. 12, 2000) at 155:12-156:2.) | 25.      **Disputed.**<br><br>Irrelevant to the Shell Defendants' motion.<br><br>Dispute Plaintiffs' suggestion that Shell withheld information or that EPA was not already in possession of data from the Rockaway spill suggesting that MTBE might be detectable in water at 7-15 parts per billion for over a quarter-century.  *See* the Shell Defendants Response to Plaintiffs' Additional Material Fact No. 23. |
| 26.      Remarkably, Shell permitted these comments to be submitted with the following conclusion:  "We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard."  (O'Reilly Decl., Ex. 10, Feb. 27, 1987, Comments of the MTBE Committee on the Interagency Testing Committee's Recommendations Concerning Methyl Tertiary Butyl Ether at 2.)  The Committee also relied upon data from Shell Oil to argue that MTBE has a higher detectability threshold of about 700 ppb in water.  (*Id.* at 11.)  Shell Oil had an opportunity to review the document and make any changes it saw fit prior to it being sent to the EPA. (Barnhart Decl., Ex. 2, Dominguez Depo. at 139:24-140:5; 148:17-22; 154:16-23; 155:12-156:2.) | 26.      **Disputed.**<br><br>Irrelevant to the Shell Defendants' motion.<br><br>Dispute Plaintiffs' suggestion that Shell somehow allowed the "MTBE Committee" (of which it was not a member) to "mislead" EPA into believing that the taste and odor threshold of MTBE was in the area of 700 ppb.  Contemporaneous documents demonstrate that this was precisely what Shell understood at the time.  As Mr. Stanley previously testified when questioned by Plaintiffs' counsel, there was significant confusion regarding MTBE's taste and odor threshold during the Rockaway incident because a second oxygenate, DIPE, was also present in the water.  (Reyna Reply Declaration ¶ 5, Ex. 14 (c), Transcript, *South Tahoe Pub. Util. Dist. v. Atl. Richfield Co.*, Oct 2-3, 2001, at 698-99, 713-14 (Stanley testimony).)  In the early 1980s, Shell scientists understood that DIPE – not MTBE – had a taste and odor threshold of 7-15 ppb, and that MTBE's taste and odor threshold was much higher, in the range of 700 ppb.  (Reyna Reply Declaration ¶ 5, Ex. 14(d) and 14(e)).<br><br>Dispute Plaintiffs' suggestion that EPA was not in possession of data from the Rockaway spill |

| ADDITIONAL MATERIAL FACTS ASSERTED BY PLAINTIFFS | SHELL DEFENDANTS' RESPONSE AND OBJECTIONS |
|---|---|
|  | suggesting that MTBE might be detectable in water at 7-15 parts per billion for over a quarter-century.  *See* the Shell Defendants Response to Plaintiffs' Additional Material Fact No. 23. |

Dated:  November 26, 2014

By:  _____/s/ Ruben Reyna_____
Richard E. Wallace, Jr.
Peter C. Condron
Ruben F. Reyna
SEDGWICK LLP
2900 K Street, N.W.
Harbourside, Suite 500
Washington, D.C.  20007
Telephone:  202.204.1000
Facsimile:  202.204.1001

Attorneys for Defendants:
Shell Oil Company, Motiva Enterprises LLC,
Equilon Enterprises LLC (d/b/a Shell Oil Products
US), Shell Trading (US) Company, TMR
Company (f/k/a Texaco Refining and Marketing
Inc.), Shell Chemical Yabucoa, Inc., Shell
International Petroleum Company Limited, and
Shell Western Supply and Trading Limited