# Exhibit E

Excerpt: Offer to Purchase
(November 9, 2000)

Offer to Purchase for Cash
All of the Outstanding Shares of Common Stock
of

# GETTY PETROLEUM MARKETING INC.

at
$5.00 Net Per Share
by

# MIKECON CORP.

an Indirect Wholly Owned Subsidiary
of

# OAO LUKOIL

> THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, DECEMBER 8, 2000, UNLESS THE OFFER IS EXTENDED.

THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE BEING VALIDLY TENDERED AND NOT PROPERLY WITHDRAWN PRIOR TO THE EXPIRATION OF THE OFFER A NUMBER OF SHARES OF COMMON STOCK, PAR VALUE $0.01 PER SHARE (THE "COMMON STOCK"), OF GETTY PETROLEUM MARKETING INC. (THE "COMPANY"), WHICH REPRESENT AT LEAST A MAJORITY OF THE OUTSTANDING SHARES OF COMMON STOCK ON A FULLY DILUTED BASIS, AND (II) ALL APPLICABLE WAITING PERIODS UNDER THE HART-SCOTT-RODINO ANTI-TRUST IMPROVEMENTS ACT OF 1976, AS AMENDED (THE "HSR ACT"), HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO CONDITIONED UPON THE SATISFACTION OF CERTAIN OTHER TERMS AND CONDITIONS DESCRIBED IN SECTION 13 — "CONDITIONS OF THE OFFER".

THE OFFER IS AN INTEGRAL PART OF THE TRANSACTIONS CONTEMPLATED BY, AND IS BEING MADE PURSUANT TO, THE AGREEMENT AND PLAN OF MERGER (THE "MERGER AGREEMENT"), DATED AS OF NOVEMBER 2, 2000, BY AND AMONG OAO LUKOIL, LUKOIL INTERNATIONAL GMBH, LUKOIL AMERICAS CORPORATION, MIKECON CORP. AND THE COMPANY. SEE SECTION 11 — "PURPOSE OF THE OFFER; PLANS FOR THE COMPANY; CERTAIN AGREEMENTS".

THE BOARD OF DIRECTORS OF THE COMPANY, BY UNANIMOUS VOTE OF THE DIRECTORS, AND AFTER REVIEW OF PARTS OF THE TRANSACTION BY A SPECIAL COMMITTEE COMPRISED OF THE INDEPENDENT DIRECTORS, HAS (I) DETERMINED THAT EACH OF THE MERGER AGREEMENT, THE OFFER AND THE MERGER ARE FAIR AND IN THE BEST INTERESTS OF THE COMPANY'S STOCKHOLDERS; (II) APPROVED THE MERGER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE OFFER AND THE MERGER; (III) DECLARED THE MERGER AGREEMENT ADVISABLE; AND (IV) RECOMMENDED THAT THE COMPANY'S STOCKHOLDERS ACCEPT THE OFFER, TENDER THEIR SHARES OF COMMON STOCK PURSUANT TO THE OFFER AND APPROVE THE MERGER.

LUKOIL AMERICAS CORPORATION AND MIKECON CORP. HAVE ENTERED INTO SEPARATE SUPPORT AGREEMENTS WITH CERTAIN STOCKHOLDERS OF THE COMPANY WHO OWN AN AGGREGATE OF APPROXIMATELY 40% OF THE OUTSTANDING SHARES OF COMMON STOCK. SUCH STOCKHOLDERS HAVE, SUBJECT TO THE PROVISIONS OF THE SUPPORT AGREEMENTS, AGREED, AMONG OTHER THINGS, TO VALIDLY TENDER (AND NOT WITHDRAW) ALL SUCH SHARES PURSUANT TO THE OFFER.

November 9, 2000

## SUMMARY TERM SHEET

Mikecon Corp. is offering to buy all of the outstanding shares of Common Stock of Getty Petroleum Marketing Inc. The tender price is $5.00 per share, in cash. Set out below are some of the questions you, as a stockholder of Getty Petroleum Marketing Inc., may have and answers to those questions.

The information in this summary term sheet is not complete. This Offer to Purchase and the Letter of Transmittal contain additional important information. We urge you to carefully read all of the material about our offer that is sent to you before you decide whether to accept our offer.

- *Who is offering to buy my securities?*

Our name is Mikecon Corp. We are a Delaware corporation formed for the purpose of making this offer. We are a wholly owned subsidiary of Lukoil Americas Corporation, a Delaware corporation. We and Lukoil Americas Corporation are both indirect wholly owned subsidiaries of OAO LUKOIL, a Russian open joint stock company which is Russia's largest oil company. See the "Introduction" and Section 8 — "Certain Information Concerning the Lukoil Entities" of this Offer to Purchase.

- *What are the classes and amounts of securities sought in the offer?*

We are offering to buy all of the outstanding shares of Common Stock of Getty Petroleum Marketing Inc. See the "Introduction" to this Offer to Purchase.

- *How much are you offering to pay and what is the form of payment for my securities?*

We are offering to pay $5.00 per share, net to you, in cash.

- *Will I have to pay any fees or commissions?*

If you are the record owner of your shares of Common Stock and you tender your shares of Common Stock to us in the offer, you will not have to pay brokerage fees or similar expenses. If you own your shares of Common Stock through a broker or other nominee, and your broker tenders your shares of Common Stock on your behalf, your broker or nominee may charge you a fee for doing so. You should consult your broker or nominee to determine whether any charges will apply. See the "Introduction" to this Offer to Purchase.

- *Do you have the financial resources to make payment?*

Yes. Lukoil Americas Corporation will make a capital contribution to our company in an amount sufficient to purchase all of the shares of Common Stock that may be tendered in our offer and acquired in the merger that follows. Lukoil Americas Corporation has sufficient funds to make this capital contribution.

- *Is your financial condition relevant to my decision on whether to tender in the offer?*

We do not think our financial condition is relevant to your decision whether to tender shares of Common Stock and accept our offer because:

- our offer is being made for all outstanding shares of Common Stock;
- our offer is solely for cash;
- our offer is not subject to any financing condition; and
- if we are successful with our offer, we will acquire all remaining shares of Common Stock for the same cash price in the merger of Mikecon Corp. with and into Getty Petroleum Marketing Inc.

- *How long do I have to decide whether to tender in the offer?*

Our offer will expire at 12:00 midnight, New York City time, on Friday, December 8, 2000, unless we extend our offer. Please note that, if you cannot deliver everything that is required in order to accept our offer

by that time, you may be able to use a guaranteed delivery procedure. The guaranteed delivery procedure is described later in this Offer to Purchase. See Section 1 — "Terms of the Offer" and Section 3 — "Procedures for Tendering Shares" of this Offer to Purchase.

- *Can the offer be extended, and under what circumstances?*

    Yes. We may extend our offer if all of the conditions to our offer have not been satisfied. We also will extend our offer if all of the conditions to the tender have not been satisfied and Getty Petroleum Marketing Inc. requests us to extend our offer. In each case, our offer may be extended for up to ten additional business days for each such extension. In addition, we may extend our offer even if all the conditions to our offer have been satisfied, but in this instance we may do so only once for up to an additional ten business days and we have to waive all conditions, except the condition that at least a majority of the outstanding shares of Common Stock of Getty Petroleum Marketing Inc. (assuming the exercise of all outstanding stock options) have been properly tendered and the condition that we would not violate the law by accepting the shares of Common Stock for payment. Our offer may not be extended past January 25, 2001.

    The merger agreement and Rule 14d-11 under the Securities Exchange Act of 1934 permit us to provide one or more subsequent offering periods following the expiration of our offer of up to an aggregate of 20 business days. A subsequent offering period is an additional period of time from 3 to 20 business days in length, beginning after we purchase shares of Common Stock tendered in our offer, during which stockholders of Getty Petroleum Marketing Inc. may tender shares of Common Stock not tendered in our offer. You will not have withdrawal rights during any subsequent offering period.

    See Section 1 — "Terms of the Offer" of this Offer to Purchase.

- *How will I be notified if the offer is extended?*

    If we extend the offer, we will inform American Stock Transfer & Trust Company, the depositary for the offer, of that fact. We will also make a public announcement of the extension, not later than 9:00 a.m., New York City time, on the next business day after the day on which our offer was scheduled to expire. See Section 1 — "Terms of the Offer" of this Offer to Purchase.

- *What are the most significant conditions to the offer?*

    We are not obligated to buy any shares of Common Stock unless:

    - at least a majority of the outstanding shares of Common Stock of Getty Petroleum Marketing Inc. (assuming the exercise of all outstanding stock options) are validly tendered and not withdrawn prior to the expiration of our offer; and

    - we receive U.S. federal antitrust clearance for the acquisition.

    Our offer is also subject to a number of other conditions. See the "Introduction" and Section 13 — "Conditions of the Offer" of this Offer to Purchase. Our offer is not conditioned on our receiving financing.

- *How do I tender my shares of Common Stock?*

    If you wish to accept our offer, this is what you must do:

    - If you are a record holder and have your stock certificates, you must complete and sign the enclosed Letter of Transmittal and send it with your stock certificate to the depositary for the offer or follow the procedures described in the offer for book-entry transfer. These materials must reach the depositary before the offer expires. Do not sign the back of the stock certificate(s). Detailed instructions are contained in the Letter of Transmittal and Section 3 — "Procedures for Tendering Shares" of this document.

    - If you are a record holder but your stock certificate is not available or you cannot deliver it to the depositary before the offer expires, you may be able to tender your shares of Common Stock using the

enclosed Notice of Guaranteed Delivery. Please call our information agent D.F. King & Co., Inc. at (800) 290-6429 (toll free). See Section 3 — "Procedures for Tendering Shares" for further details.

- If you hold your shares of Common Stock through a broker or bank, you should contact your broker or bank and give instructions that your shares of Common Stock be tendered. See Section 3 — "Procedures for Tendering Shares" of this Offer to Purchase.

• *Until what time can I withdraw previously tendered shares of Common Stock?*

You can withdraw shares of Common Stock at any time until our offer has expired. In addition, if we have not accepted your shares of Common Stock for payment by January 7, 2001, you can withdraw them at any time after that date until we accept shares of Common Stock for payment. See Section 1 — "Terms of the Offer" and Section 4 — "Withdrawal Rights" of this Offer to Purchase.

• *How do I withdraw previously tendered shares of Common Stock?*

To withdraw shares of Common Stock, you must deliver a written notice of withdrawal, or a copy of one, with the required information to American Stock Transfer & Trust Company, the depositary for our offer, while you still have the right to withdraw the shares. If you tendered your shares of Common Stock by giving instructions to a broker or nominee, you must instruct your broker or nominee to arrange for the withdrawal of your shares. See Section 4 — "Withdrawal Rights" of this Offer to Purchase.

• *What does the Getty Petroleum Marketing Inc. board of directors recommend with respect to the offer?*

We are making our offer pursuant to an agreement and plan of merger among OAO LUKOIL, Lukoil International GmbH, Lukoil Americas Corporation, us and Getty Petroleum Marketing Inc. The board of directors of Getty Petroleum Marketing Inc., by unanimous vote of the directors and after review of parts of the transaction by a special committee comprised of the independent directors, has:

- determined that each of the merger agreement, our offer and the merger is fair to and in the best interests of you and the company's other stockholders,

- approved the merger agreement and the transactions contemplated by it, including our offer and the merger,

- declared the merger agreement advisable, and

- recommended that you and the other stockholders of Getty Petroleum Marketing Inc. accept our offer, tender your shares of Common Stock and approve the merger. See the "Introduction" to this Offer to Purchase.

• *If a majority of the shares of Common Stock are tendered and accepted for payment, will Getty Petroleum Marketing Inc. continue as a public company?*

No. If the merger takes place, Getty Petroleum Marketing Inc. will no longer be publicly owned. Even if the merger does not take place and we purchase all of the tendered shares of Common Stock, there may be so few remaining stockholders and publicly held shares of Common Stock that:

- Getty Petroleum Marketing Inc.'s Common Stock will no longer meet the published guidelines of the New York Stock Exchange for continued listing and may be taken off the New York Stock Exchange;

- there may not be a public trading market for shares of Common Stock; and

- Getty Petroleum Marketing Inc. may cease making filings with the Securities and Exchange Commission or otherwise cease being required to comply with the rules of the Securities and Exchange Commission relating to publicly held companies.

See Section 12 — "Effect of the Offer on the Market for the Shares; Exchange Act Registration" of this Offer to Purchase.

- *Will the tender offer be followed by a Merger if all of Getty Petroleum Marketing Inc.'s shares of Common Stock are not tendered in the offer?*

If we accept for payment and pay for at least a majority of the outstanding shares of Common Stock of Getty Petroleum Marketing Inc., we will be merged with and into Getty Petroleum Marketing Inc. If that merger takes place, Lukoil Americas Corporation will own all of the shares of Common Stock of Getty Petroleum Marketing Inc. and all remaining stockholders of Getty Petroleum Marketing Inc., other than those who properly assert appraisal rights, will receive $5.00 per share in cash. See the "Introduction" to this Offer to Purchase.

- *If I decide not to tender, how will the offer affect my shares?*

After we have accepted the shares of Common Stock for payment in our offer, the merger will occur subject to holding a stockholders meeting, if necessary, and the fulfillment of other corporate formalities. When the merger takes place, stockholders who do not tender in our offer will receive the same amount of cash per share that they would have received had they tendered their shares of Common Stock in our offer (subject to their right to pursue appraisal under Maryland law, if available). Therefore, if the merger takes place, the only difference to you between tendering your shares of Common Stock and not tendering your shares of Common Stock is that you will be paid earlier if you tender your shares.

If the merger does not take place, the number of stockholders of Getty Petroleum Marketing Inc. and of shares of Common Stock which are still in the hands of the public may be so small that there no longer will be an active public trading market (or, possibly, there may not be any public trading market) for the shares. Also you should note the following:

- the shares of Common Stock may no longer be eligible to be traded on the New York Stock Exchange; and

- Getty Petroleum Marketing Inc. may cease making filings with the Securities and Exchange Commission or otherwise being required to comply with the rules of the Securities and Exchange Commission relating to publicly held companies.

See the "Introduction" and Section 12 — "Effects of the Offer on the Market for the Shares; Exchange Act Registration" of this Offer to Purchase.

- *What is the market value of my shares of Common Stock as of a recent date?*

On November 2, 2000, the last trading day before we announced our offer and the possible subsequent Merger, the last sale price of Getty Petroleum Marketing Inc. shares of Common Stock reported on the New York Stock Exchange was $3.44 per share. Between January 31, 2000 and November 2, 2000, the price of Common Stock ranged between $2 and $4.88 per share. On November 8, 2000, the last full trading day prior to the date of this Offer to Purchase, the last reported closing sales price of Common Stock was $4.88 per share. We suggest that you obtain a recent quotation for shares of Common Stock in deciding whether to tender your shares. See Section 6 — "Price Range of Shares; Dividends" of this Offer to Purchase.

- *Who can I talk to if I have questions about the tender offer?*

You can call:

- D.F. King & Co., Inc. at (800) 290-6429 (toll free).

D.F. King & Co., Inc. is acting as our information agent. See the back cover of this Offer to Purchase.

To the Holders of Common Stock of Getty Petroleum Marketing Inc.:

## INTRODUCTION

Mikecon Corp. (the "Purchaser"), a Delaware corporation and a wholly owned subsidiary of Lukoil Americas Corporation ("Parent"), a Delaware corporation, hereby offers to purchase all of the issued and outstanding shares of Common Stock, par value $0.01 per share (the "Common Stock"), of Getty Petroleum Marketing Inc. (the "Company"), a Maryland corporation, at a price of $5.00 per share of Common Stock, net to the seller in cash, without interest thereon (the "Offer Price"), upon the terms and subject to the conditions set forth in this Offer to Purchase and in the related Letter of Transmittal (which, as they may be amended and supplemented from time to time, together constitute the "Offer").

Tendering holders of shares of Common Stock ("Holders") whose shares of Common Stock are registered in their own names and who tender directly to American Stock Transfer & Trust Company, as depositary (the "Depositary"), will not be obligated to pay brokerage fees or commissions or, except as set forth in Instruction 6 of the Letter of Transmittal, stock transfer taxes on the purchase of shares of Common Stock pursuant to the Offer. The Purchaser will pay all fees and expenses of the Depositary and D.F. King & Co., Inc. as Information Agent (the "Information Agent"), in each case incurred in connection with the Offer. See Section 15 — "Fees and Expenses".

THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE BEING VALIDLY TENDERED AND NOT PROPERLY WITHDRAWN PRIOR TO THE EXPIRATION OF THE OFFER A NUMBER OF SHARES OF COMMON STOCK WHICH REPRESENTS AT LEAST A MAJORITY OF THE OUTSTANDING SHARES OF COMMON STOCK ON A FULLY DILUTED BASIS (THE "MINIMUM CONDITION") AND (II) ALL APPLICABLE WAITING PERIODS UNDER THE HSR ACT HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO CONDITIONED UPON THE SATISFACTION OF CERTAIN OTHER TERMS AND CONDITIONS DESCRIBED IN SECTION 13 — "CONDITIONS OF THE OFFER".

THE BOARD OF DIRECTORS OF THE COMPANY, BY UNANIMOUS VOTE OF THE DIRECTORS, AND AFTER REVIEW OF PARTS OF THE TRANSACTION BY A SPECIAL COMMITTEE COMPRISED OF THE INDEPENDENT DIRECTORS, HAS (I) DETERMINED THAT EACH OF THE MERGER AGREEMENT, THE OFFER AND THE MERGER ARE FAIR AND IN THE BEST INTERESTS OF THE COMPANY'S STOCKHOLDERS; (II) APPROVED THE MERGER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE OFFER AND THE MERGER; (III) DECLARED THE MERGER AGREEMENT ADVISABLE; AND (IV) RECOMMENDED THAT THE COMPANY'S STOCKHOLDERS ACCEPT THE OFFER, TENDER THEIR SHARES OF COMMON STOCK PURSUANT TO THE OFFER AND APPROVE THE MERGER.

THE COMPANY HAS ADVISED PARENT THAT ING BARINGS LLC, THE FINANCIAL ADVISOR TO THE COMPANY, HAS DELIVERED TO THE BOARD OF DIRECTORS OF THE COMPANY ITS OPINION, DATED NOVEMBER 2, 2000, THAT THE OFFER PRICE TO BE RECEIVED BY HOLDERS, PURSUANT TO THE OFFER AND THE MERGER, IS FAIR FROM A FINANCIAL POINT OF VIEW TO SUCH HOLDERS. A COPY OF THE OPINION OF ING BARINGS LLC, WHICH SETS FORTH THE ASSUMPTIONS MADE, FACTORS CONSIDERED AND SCOPE OF REVIEW UNDERTAKEN BY ING BARINGS LLC, IS CONTAINED IN THE COMPANY'S SOLICITATION/RECOMMENDATION STATEMENT ON SCHEDULE 14D-9 (THE "SCHEDULE 14D-9"), WHICH IS BEING MAILED TO HOLDERS CONCURRENTLY HEREWITH. HOLDERS ARE URGED TO READ THE FULL TEXT OF THAT OPINION.

The Offer is being made pursuant to an Agreement and Plan of Merger (the "Merger Agreement"), dated as of November 2, 2000, by and among OAO LUKOIL, a Russian open joint stock company ("LUKOIL"), Lukoil International GmbH, an Austrian corporation and direct wholly owned subsidiary of LUKOIL ("Lukoil International"), Parent, the Purchaser (collectively, the "Lukoil Entities") and the

1

Company. The Merger Agreement provides that, upon consummation of the Offer and upon the terms and subject to the conditions of the Merger Agreement and in accordance with the General Corporation Law of the State of Maryland (the "MGCL") and the General Corporation Law of the State of Delaware (the "DGCL"), the Purchaser will be merged with and into the Company. Following the effective time of the Merger (the "Effective Time"), the Company will continue as the surviving corporation and become a wholly owned subsidiary of Parent and the separate corporate existence of the Purchaser will cease. At the Effective Time, except for (i) shares of Common Stock which are held, directly or indirectly, by Parent, all of which shall cease to be outstanding and be canceled and none of which shall receive any payment with respect thereto and (ii) shares of Common Stock held by Holders exercising their rights to seek appraisal rights in accordance with the MGCL, to the extent such rights are available, each share of Common Stock issued and outstanding immediately prior to the Effective Time and all rights in respect thereof shall, by virtue of the Merger and without any action on the part of the Holder thereof, forthwith cease to exist and be converted into and represent the right to receive an amount in cash, without interest thereon, equal to $5.00. The Merger Agreement is more fully described in Section 11 — "Purpose of the Offer; Plans for the Company; Certain Agreements". Approval of the Merger requires the affirmative vote of the holders of at least a majority of the Common Stock. If the Purchaser acquires at least 90% of the issued and outstanding Common Stock, the Purchaser does not believe that it will be necessary under the MGCL to hold a stockholders meeting so long as a notice of the Merger be given to each minority stockholder not less than 30 days before the Merger is effected. A notice of the Merger (the "Notice of Merger") of the Purchaser into the Company is included with this Offer to Purchase as Schedule II.

The Company has informed the Purchaser that, as of November 2, 2000, there were (i) 14,002,866 shares of Common Stock issued and outstanding and (ii) options issued and outstanding, representing in the aggregate the right to purchase 771,835 shares of Common Stock. As a result, as of such date, the Minimum Condition would be satisfied if at least 7,387,351 shares of Common Stock are validly tendered and not properly withdrawn prior to the Expiration Date (as hereinafter defined). To the best of the Company's knowledge, all of its executive officers, directors and affiliates currently intend to tender all shares of Common Stock which are held of record or beneficially owned by such persons pursuant to the Offer, other than shares of Common Stock, if any, held by such persons which, if tendered, could cause such person to incur liability under the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**THIS OFFER TO PURCHASE AND THE LETTER OF TRANSMITTAL CONTAIN IMPORTANT INFORMATION WHICH SHOULD BE READ CAREFULLY BEFORE ANY DECISION IS MADE WITH RESPECT TO THE OFFER.**

# THE TENDER OFFER

**Section 1. Terms of the Offer.**

Upon the terms and subject to the conditions of the Offer (including, if the Offer is extended or amended, the terms and conditions of any extension or amendment), the Purchaser will accept for payment and pay for all shares of Common Stock validly tendered prior to the Expiration Date (as hereinafter defined) and not withdrawn in accordance with Section 4 — "Withdrawal Rights". The term "Expiration Date" means 12:00 midnight, New York City time, on December 8, 2000, unless and until the Purchaser (subject to the terms of the Merger Agreement) shall have extended the period of time during which the Offer is open, in which event the term "Expiration Date" shall mean the latest time and date at which the Offer, as so extended by the Purchaser, shall expire.

The Offer is conditioned upon, among other things, satisfaction of the Minimum Condition and the HSR Condition (as defined in Section 13 of this Offer to Purchase). The Offer is also subject to certain other conditions set forth in Section 13 — "Conditions of the Offer". If these or any of the other conditions referred to in Section 13 — "Conditions of the Offer" are not satisfied or any of the events specified in Section 13 — "Conditions of the Offer" have occurred or are determined by the Purchaser to have occurred prior to the Expiration Date, the Purchaser, subject to the terms of the Merger Agreement, expressly reserves the right to (i) decline to purchase any of the shares of Common Stock tendered in the Offer and terminate the Offer, and return all tendered shares of Common Stock to the tendering Holders, (ii) waive or amend any or all conditions to the Offer and, to the extent permitted by the Merger Agreement and applicable law and applicable rules and regulations of the Securities and Exchange Commission (the "Commission"), purchase all shares of Common Stock validly tendered or (iii) subject to the limitations described below, extend the Offer and, subject to the right of a tendering Holder to withdraw its shares of Common Stock until the Expiration Date, retain the shares of Common Stock which have been tendered during the period or periods for which the Offer is extended; provided, however, that the Minimum Condition may not be waived by the Purchaser without the Company's prior written consent.

Subject to the terms of the Merger Agreement, the applicable rules and regulations of the Commission and to applicable law, the Purchaser expressly reserves the right, at any time and from time to time, to extend the period of time during which the Offer is open by giving notice of such extension to the Depositary and by making a public announcement thereof, not later than 9:00 a.m. New York City time, on the next business day after the day on which the Offer was scheduled to expire. During any such extension, all shares of Common Stock previously tendered and not withdrawn will remain subject to the Offer, subject to the rights of a tendering Holder to withdraw its shares of Common Stock. See Section 4 — "Withdrawal Rights".

Subject to the terms of the Merger Agreement, the applicable rules and regulations of the Commission and to applicable law, the Purchaser also expressly reserves the right, in its sole discretion, at any time and from time to time (i) to delay acceptance for payment of, or, regardless of whether such shares of Common Stock were theretofore accepted for payment, payment for, any shares of Common Stock (a) if any applicable waiting period under the HSR Act has not expired or been terminated or (b) in order to comply in whole or in part with any other applicable law, (ii) to terminate the Offer and not accept for payment any shares of Common Stock if any of the conditions referred to in Section 13 — "Conditions of the Offer" are not satisfied or any of the events specified in Section 13 — "Conditions of the Offer" has occurred and remains in effect, and (iii) to waive any condition or otherwise amend the Offer in any respect by giving oral or written notice of such delay, termination, waiver or amendment to the Depositary and by making a public announcement thereof.

Subject to the terms of the Merger Agreement, the applicable rules and regulations of the Commission and to applicable law, the Purchaser reserves the right to modify the terms of the Offer including, without limitation, except as provided below, the right to extend the Offer beyond any scheduled expiration date, but in no event later than January 25, 2001; provided that, without the prior written consent of the Company, the Purchaser may not (i) decrease the Offer Price payable in the Offer, (ii) decrease the number of shares of Common Stock sought pursuant to the Offer or change the form of consideration payable in the Offer,

3

(iii) change or amend the conditions to the Offer or impose additional conditions to the Offer, (iv) change the Expiration Date of the Offer or (v) otherwise amend or add any term or condition of the Offer in any manner materially adverse to the Holders. If on any scheduled Expiration Date of the Offer all conditions to the Offer have not been satisfied, the Purchaser may extend, and at the request of the Company shall extend, the expiration date of the Offer for additional periods each of which may be up to ten business days; and provided, further, that the Purchaser may extend the Offer for any period required by any rule, regulation, interpretation or position of the Commission applicable to the Offer. If all conditions to the Offer have been satisfied on any scheduled Expiration Date of the Offer, the Purchaser may elect to extend the Offer for up to ten additional business days so long as the Purchaser waives all conditions of the Offer other than (i) the Minimum Condition and (ii) the condition described in clause (b) of Section 13 — "Conditions of the Offer" solely to the extent Parent or the Purchaser would violate any statute, rule, regulation, judgment, order or injunction. So long as the Minimum Condition has been met, the Purchaser may elect to waive any other conditions to the Offer that have not been met and accept for payment the shares of Common Stock validly tendered and not properly withdrawn. The Purchaser may not extend, and the Company may not cause the Purchaser to extend, the Expiration Date beyond January 25, 2001.

The Merger Agreement and Rule 14d-11 under the Exchange Act permit the Purchaser to commence subsequent offerings. In order to take advantage of this rule, the Purchaser would be required to accept and promptly pay for the shares of Common Stock tendered and not withdrawn in the Offer at the Expiration Date. The Purchaser would publicly announce the results of the Offer by 9:00 a.m. on the next business day after the Expiration Date, commence the subsequent offering, offer to purchase any outstanding shares of Common Stock at the same price offered herein and accept for payment shares of Common Stock as they are tendered. Any subsequent offering period could range from three to up to 20 business days, and the Merger Agreement provides that such subsequent offering periods may not exceed 20 business days in total.

Rule 14e-1(c) under the Exchange Act requires the Purchaser to pay the consideration offered or return the shares of Common Stock tendered promptly after the termination or withdrawal of the Offer and (ii) the Purchaser may not delay acceptance for payment of, or payment for, any shares of Common Stock upon the occurrence of any of the conditions specified in Section 13 — "Conditions of the Offer" without extending the period of time during which the Offer is open.

During any such extension, all shares of Common Stock previously tendered and not withdrawn will remain subject to the Offer, subject to the right of a tendering Holder to withdraw its shares of Common Stock. Any such extension, delay, termination, waiver or amendment will be followed by a public announcement thereof, with such announcement in the case of an extension to be made no later than 9:00 a.m., New York City time, on the next business day after the previously scheduled expiration date. Subject to applicable law (including Rules 14d-4, 14d-6 and 14e-1 under the Exchange Act, which require that material changes be promptly disseminated to Holders in a manner reasonably designed to inform them of such changes) and without limiting the manner in which the Purchaser may choose to make any public announcement, the Purchaser will have no obligation to publish, advertise or otherwise communicate any such public announcement other than by issuing a press release or as otherwise may be required by applicable law.

If the Purchaser makes a material change in the terms of the Offer or the information concerning the Offer, or if it waives a material condition of the Offer, the Purchaser will extend the Offer to the extent required by Rules 14d-4, 14d-6 and 14e-1 under the Exchange Act. The minimum period during which an offer must remain open following material changes in the terms of the Offer or information concerning the Offer, other than a change in price or a change in the percentage of shares of Common Stock sought, will depend upon the facts and circumstances then existing, including the relative materiality of the changed terms or information. With respect to a change in price or a change in the percentage of shares of Common Stock sought, a minimum period of ten business days is generally required to allow for adequate dissemination to Holders and investor response.

The Company has provided the Purchaser with the Company's stockholder list and security position listing in respect of the shares of Common Stock for the purpose of disseminating the Offer to Purchase, the

4

Letter of Transmittal and other relevant materials to Holders. This Offer to Purchase, the Letter of Transmittal and other relevant materials will be mailed to holders of record of shares of Common Stock whose names appear on the Company's list of holders of shares of Common Stock and will be furnished, for subsequent transmittal to beneficial owners of shares of Common Stock, to brokers, dealers, commercial banks, trust companies and similar persons whose names, or the names of whose nominees, appear on the Company's list of stockholders of the shares of Common Stock or, where applicable, who are listed as participants in the security position listing of The Depository Trust Company ("DTC").

**Section 2. Acceptance for Payment and Payment for Shares of Common Stock.**

Upon the terms and subject to the conditions of the Offer, the Merger Agreement and applicable law (including, if the Offer is extended or amended, the terms and conditions of any such extension or amendment), the Purchaser will purchase, by accepting for payment, and will pay for, all shares of Common Stock validly tendered prior to the Expiration Date (and not properly withdrawn in accordance with Section 4 — "Withdrawal Rights") as promptly as practicable after the later to occur of (i) the Expiration Date and (ii) the satisfaction or waiver of the conditions set forth in Section 13 — "Conditions of the Offer", including, but not limited to, the regulatory conditions specified in Section 14 — "Certain Legal Matters; Regulatory Approvals". Subject to applicable rules of the Commission and the terms of the Merger Agreement, the Purchaser expressly reserves the right, in its sole discretion, to delay acceptance for payment of, or payment for, shares of Common Stock in order to comply, in whole or in part, with any applicable law or satisfaction of the Minimum Condition.

In all cases, payment for shares of Common Stock purchased pursuant to the Offer will be made only after timely receipt by the Depositary of (i) (A) the certificates evidencing such shares of Common Stock (the "Certificates") or (B) timely confirmation of a book-entry transfer (a "Book-Entry Confirmation") of such shares of Common Stock into the Depositary's account at DTC (the "Book-Entry Transfer Facility"), in each case pursuant to the procedures set forth in Section 3 — "Procedures for Tendering Shares", (ii) the Letter of Transmittal (or a copy thereof), properly completed and duly executed with any required signature guarantees, or an Agent's Message (as hereinafter defined) in connection with a book-entry transfer and (iii) any other documents required to be included with the Letter of Transmittal under the terms and subject to the conditions thereof and to this Offer to Purchase.

The term "Agent's Message" means a message, transmitted by the Book-Entry Transfer Facility to, and received by, the Depositary forming a part of a Book-Entry Confirmation system, which states that the Book-Entry Transfer Facility has received an express acknowledgment from a participant in the Book-Entry Transfer Facility tendering the shares of Common Stock that such participant has received and agrees to be bound by the terms of the Letter of Transmittal and that the Purchaser may enforce such agreement against such participant.

For purposes of the Offer, the Purchaser will be deemed to have accepted for payment (and thereby purchased) shares of Common Stock validly tendered and not properly withdrawn if, as and when the Purchaser gives oral or written notice to the Depositary of the Purchaser's acceptance for payment of such shares of Common Stock pursuant to the Offer. Upon the terms and subject to the conditions of the Offer, payment for shares of Common Stock accepted pursuant to the Offer will be made by deposit of the purchase price therefor with the Depositary, which will act as agent for tendering Holders for the purpose of receiving payments from the Purchaser and transmitting payments to such tendering Holders whose shares of Common Stock have been accepted for payment. **UNDER NO CIRCUMSTANCES WILL INTEREST ON THE PURCHASE PRICE FOR SHARES OF COMMON STOCK BE PAID BY THE PURCHASER, REGARDLESS OF ANY DELAY IN MAKING SUCH PAYMENT OR EXTENSION OF THE EXPIRATION DATE.**

If any tendered shares of Common Stock are not accepted for payment for any reason pursuant to the terms and conditions of the Offer, or if Certificates are submitted evidencing more shares of Common Stock than are tendered, Certificates evidencing shares of Common Stock not purchased will be returned, without expense to the tendering Holder (or, in the case of shares of Common Stock tendered by book-entry transfer

5

banking days before the beginning of the relevant three-month period plus 2% per annum. The loan also requires Parent to repay the principal amount of the loan according to a repayment schedule upon demand by Lukoil Finance Limited, and Parent is to make its first repayment of principal on June 30, 2001. The last payment of interest and principal will be made on September 30, 2008. Once Purchaser has been merged with the Company and the Company is no longer a publicly traded company, the Company will pledge all of the shares of the Company to Lukoil Finance Limited in order to secure its payment obligations under the loan. In addition, Parent has pledged all of the shares of the Purchaser to Lukoil Finance Limited to secure the loan. Parent expects to service loan payments from dividends received from the Company after the Merger.

**Section 10. Background of the Offer.**

In early 1999, representatives of the Company approached LUKOIL regarding its interest in exploring a possible investment in or combination with the Company, to which LUKOIL expressed no interest at that time.

On June 16, 1999, Lukoil USA Inc., a wholly owned indirect subsidiary of LUKOIL ("Lukoil USA") contacted the Company by letter and indicated that Lukoil USA was now prepared to indicate its interest in pursuing a controlling investment in or an acquisition of the Company at a premium to Company's market capitalization, subject to due diligence. The Company and Lukoil USA entered into a Confidentiality Agreement on July 7, 1999, after which Lukoil USA began a preliminary business diligence review and held preliminary discussions with the Company's management. During late July and early August representatives of Lukoil USA and the Company discussed possible terms of an investment in, or business combination transaction with, the Company.

On or about August 16, 1999, at the Company's request, ING Barings began distributing a confidential information memorandum containing general information about the Company, including the Company's business, management, strategy and growth initiatives and historical and projected financial information, to LUKOIL or its representatives.

Thereafter, Mr. Leo Liebowitz, the Company's Chief Executive Officer and Chairman of the Board, had discussions with representatives of Lukoil USA in which he communicated concerns expressed by the Company's Board of Directors regarding the price and terms being indicated by Lukoil USA, as well as certain concerns raised by Getty Properties Corp. regarding guarantees or credit support for its master lease with the Company in the event LUKOIL acquired control of the Company. On August 26, 1999, the Company's senior management and its financial and legal advisors met with representatives of Lukoil USA (including its financial and legal advisors) to discuss a potential business transaction. Lukoil USA again expressed that its only interest was in becoming a majority owner of the Company. After much discussion, the parties were unable to come to an agreement on price or deal structure. In October 1999, representatives of ING Barings, Lukoil USA and the Company's legal advisors held further discussions but were unable to find any basis for agreement.

On April 18, 2000, Mr. Liebowitz met again with representatives of Lukoil USA at Lukoil USA's offices to discuss a potential purchase of the Company by Lukoil USA. No specific terms were discussed. However, the parties agreed to have their respective financial and legal advisors meet to discuss the potential structure of such a transaction. On April 20, 2000, representatives of the companies and their respective legal advisors met telephonically to discuss whether Lukoil USA would provide credit support (potentially including parent company guarantees and/or a letter of credit covering the lease payments) under the master lease. While no transaction structure or price was discussed, Lukoil USA agreed to consider providing some form of credit support.

On or about April 21, 2000, ING Barings, at the Company's request, distributed a revised confidential information memorandum describing the Company, its business and certain financial information to Lukoil USA and its representatives.

On April 24, 2000, representatives of the Company met with representatives of Lukoil USA to discuss Lukoil USA's interest in purchasing the Company, and then met with its financial and legal advisors. On

17

April 28, 2000, the Company received from Lukoil USA a written preliminary non-binding offer to acquire the Company at a price of $3.50-$4.00 per Share, subject to due diligence, which set forth certain terms and conditions of the offer, including Lukoil USA's ability to negotiate changes to certain terms of the master lease.

On June 6, 2000, ING Barings and the Company presented to Lukoil USA and its financial and legal advisors a management presentation. On June 7, 2000, ING Barings and the Company gave Lukoil USA and its financial advisors a tour of several of the Company's service stations and one of its petroleum terminals. Lukoil USA and its financial and legal advisors also began a due diligence review of the information contained in the Company's data room. The Company and Lukoil USA also discussed certain diligence issues, including Lukoil USA's requested environmental review of the Company's leased properties, and other terms of the purchase proposal, including an indicated offer price range of $4.25 to $4.50 per share.

On June 19, 2000, representatives of Lukoil USA expressed to representatives of ING Barings Lukoil USA's desire for an agreement with the Company whereby the Company would agree to forego discussions with other companies regarding the sale of the Company during Lukoil USA's more extensive diligence review of the Company, including real estate and environmental diligence, for a period of 60-90 days. Lukoil USA also requested that the Company reimburse Lukoil USA for its expenses relating to its diligence and pay Lukoil USA a fee under certain circumstances, including upon consummation of a transaction with another prospective purchaser within a specified time period. The Company asked Lukoil USA, through ING Barings, for an estimate of the due diligence expenses it would incur. On June 20, 2000, Lukoil USA supplied the Company with an estimate of due diligence expenses.

Several discussions were held between senior management (along with its financial and legal advisors) and Lukoil USA and its financial and legal advisors concerning the terms of the expense reimbursement proposal. On July 21, 2000, and continuing on August 2, 2000, members of the Board of Directors of Getty Realty Corp., the parent of Getty Properties Corp., discussed potential modifications to the master lease with representatives of Lukoil USA.

Concurrently, the Company and its advisors continued to discuss the terms of an exclusivity arrangement with Lukoil USA, including the terms and structure of a possible transaction.

Following a series of discussions between representatives of the Company and representatives of Lukoil USA and their respective advisors on August 3, 2000, Lukoil USA proposed a two-step transaction at a cash price of $5.00 per share of Common Stock.

On August 8, 2000, after further negotiations, the Company and Lukoil USA entered into the Letter Agreement providing that, for the period of Lukoil USA's diligence review of the Company (45 days with an additional period of up to 45 days under certain circumstances), the Company would not engage in discussions concerning an acquisition proposal with any third party other than with certain identified acquirors with whom the Company had previously had discussions or with others if necessary for the Board to comply with its duties under applicable law. The Letter Agreement provided for payment by the Company of a fee to Lukoil USA of $3 million and reimbursement of Lukoil USA's reasonable documented out-of-pocket diligence expenses up to a maximum of $1.5 million under certain circumstances.

After execution of the Letter Agreement, Lukoil USA began an extensive due diligence review of the Company's operations, including financial information, business operations, contracts and other items. On August 14, 2000, the Company's legal advisors gave to Lukoil USA a draft of a merger agreement, and from September through November 2, 2000 representatives of the Company, representatives of Lukoil USA and their respective legal and financial advisors negotiated the terms of the agreement. On September 22, 2000, pursuant to the Letter Agreement, Lukoil USA extended the exclusivity period for an additional 45 days.

During October 2000, representatives of the Company conducted extensive negotiations with representatives of Lukoil USA regarding the Merger Agreement, and, along with representatives of Getty Properties Corp., the master lease amendment and related documents.

The Merger Agreement, the Support Agreements and the related documents were executed, and the Offer and Merger were publicly announced, on November 2, 2000.

On November 9, 2000, in accordance with the Merger Agreement, the Purchaser commenced the Offer.

**Section 11. Purpose of the Offer; Plans for the Company; Certain Agreements.**

*Purpose of the Offer*

The purpose of the Offer is to enable Parent to acquire as many outstanding shares of Common Stock as possible as a first step in acquiring the entire equity interest in the Company. The purpose of the Merger is for Parent to acquire all remaining shares of Common Stock not purchased pursuant to the Offer. Upon consummation of the Merger, the Company will become a wholly owned subsidiary of Parent and an indirect wholly owned subsidiary of LUKOIL. The Offer is being made pursuant to the Merger Agreement.

*Plans for the Company*

Subject to certain matters described below, it is currently expected that, initially following the Merger, the business and operations of the Company will generally continue as they are currently being conducted. Parent will continue to evaluate all aspects of the business, operations, capitalization and management of the Company during the pendency of the Offer and after the consummation of the Offer and the Merger and will take such further actions as it deems appropriate under the circumstances then existing.

The shares of Common Stock are currently traded on the NYSE. Following the consummation of the Merger, the shares of Common Stock will no longer be listed on the NYSE and the registration of the shares of Common Stock under the Exchange Act will be terminated. Accordingly, after the Merger there will be no publicly-traded equity securities of the Company outstanding and the Company may no longer be required to file periodic reports with the Commission. See Section 12 — "Effects of the Offer on the Market for the Shares; Exchange Act Registration".

Except as otherwise discussed in this Offer to Purchase, Parent has no present plans or proposals that would result in any extraordinary corporate transaction, such as a merger, reorganization, liquidation involving the Company or any of its subsidiaries, or purchase, sale or transfer of a material amount of assets of the Company or any of its subsidiaries or in any other material changes to the Company's capitalization, corporate structure, business of the Company or the management of the Company, except that Parent intends to review the composition of the boards of directors (or similar governing bodies) of the Company and its subsidiaries and to cause the election to such boards of directors (or similar governing bodies) of certain of its representatives as contemplated by the Merger Agreement.

*Certain Agreements*

*Merger Agreement*

The following is a summary of the material terms of the Merger Agreement. The summary is qualified in its entirety by reference to the Merger Agreement, a copy of which has been filed with the Commission as an exhibit to the Schedule TO. The Merger Agreement may be inspected at, and copies may be obtained from, the same places and in the manner set forth in Section 7 — "Certain Information Concerning the Company — Available Information," except that it may not be available at the regional offices of the Commission.

*The Offer.*  The Merger Agreement provides that as soon as practicable but no later than seven business days after the public announcement of the Merger Agreement, the Purchaser will commence the Offer and that the obligation of the Purchaser to consummate the Offer and to accept for payment and to pay for any shares of Common Stock validly tendered pursuant to the Offer and not withdrawn shall be subject to only those conditions set forth therein. Subject to the terms of the Merger Agreement, the applicable rules and regulations of the Commission and to applicable law, the Purchaser reserves the right to modify the terms of the Offer, provided that, without the prior written consent of the Company and except as provided below, the Purchaser may not (i) decrease the Offer Price payable in the Offer, (ii) decrease the number of shares of

19