UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re: Methyl Tertiary Butyl Ether Products Liability Litigation | Master File No. 1:00-1898 MDL 1358 (SAS) |
| This document pertains to: | M21-88 |
| *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.,* No. 07 Civ. 10470 (SAS) | Civil Action |

**AMENDED REPLY DECLARATION OF RUBEN F. REYNA
IN SUPPORT OF THE SHELL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Ruben F. Reyna, under penalty of perjury, declares as follows:

1.      I am an attorney admitted to practice before this Court and am an attorney at

Sedgwick LLP, attorneys of record for Defendants Shell Oil Company, Motiva Enterprises LLC,

Equilon Enterprises LLC, Shell Trading (US) Company, TMR Company, Shell Chemical

Yabucoa, Inc., Shell International Petroleum Company Limited, and Shell Western Supply and

Trading Limited (collectively the "Shell Defendants").  This Declaration is based on my personal

knowledge and, if called as a witness, I could testify competently thereto.

2.      Attached hereto as Exhibit 11 are true and correct copies of the following

documents:

> a.  Fax from John F. Connors (Amerada Hess) to The Shell Company (Puerto Rico) Ltd. ("SCPRL") dated January 12, 1995[1] (HOVIC 01346-48).

---

[1] Pursuant to the Revised Confidentiality Order, dated September 24, 2004, and pursuant to agreement with Defendant HOVIC, the Shell Defendants hereby file this Amended Reply Declaration of Ruben F. Reyna in Support of the Shell Defendants' Motion for Summary Judgment and its attached exhibits.

The following exhibits have been redacted:
        Exh. 11(a) - Fax from John F. Connors to SCPRL dated January 12, 1995 (HOVIC 01346-48).
*Continued on next page*

b.  Fax from Ivan Cintrón (SCPRL) to John F. Connors (Amerada Hess) dated January 12, 1995 (HOVIC_01368-69).

c.  Agreement between Hess Oil Virgin Islands Corp. ("HOVIC") and SCPRL dated February 1, 1995 (HOVIC 01387-89).

d.  Agreement between HOVIC and SCPRL dated January 24, 1996 (HOVIC 03765-67).

e.  Agreement between HOVIC and SCPRL dated May 9, 1997 (HOVIC 02870-73).

f.  Letter from Ruben Vasquez (SCPRL) to Darius Sweet (Amerada Hess) dated September 5, 1997 (HOVIC 02913-14).

3.  Attached hereto as Exhibit 12 are true and correct copies of the following documents:

a.  Shell Retail International Franchise Agreement between Shell Retail International and SCPRL dated January 1999 (SOL CONFIDENTIAL 121-37).

b.  Marketing and Distribution Services Agreement between SCPRL and Shell Chemical Yabucoa, Inc. ("SCYI") dated October 24, 2003 (SH-PR-YAB001848-49 and SH-PR-YAB001860).

4.  Attached hereto as Exhibit 13 are true and correct copies of the relevant portions of the following documents:

a.  Transcript of the deposition of Brenda Toraño taken in this matter on September 26, 2013, at 39:9-22; 52:21-53:4.

b.  Transcript of the deposition of David Lewis taken in this matter on November 22, 2013, at 58:1-14.

c.  Transcript of the deposition of Ian Charman taken in this matter on November 21, 2013, at 51:9-52:6; 59:13-60:4.

d.  Transcript of the deposition of Juan Lopez taken in this matter on November 12, 2013, at 74:6-75:13.

5.  Attached hereto as Exhibit 14 are true and correct copies of the relevant portions of the following documents:

---

Exh. 11(c) - Agreement between HOVIC and SCPRL dated February 1, 1995 (HOVIC 01387-89).
Exh. 11(d) - Agreement between HOVIC and SCPRL dated January 24, 1996 (HOVIC 03765-67).
Exh. 11(e) - Agreement between HOVIC and SCPRL dated May 9, 1997 (HOVIC 02870-73).

a. McKinnon & Dyksen, "Removing Organics From Groundwater Through Aeration Plus GAC," *Journal of the American Water Works Association,* at 43 (May 1984).

b. EPA's TSCA Section 8(e) Reporting Guide (June 1991).

c. Transcript, *South Tahoe Pub. Util. Dist. v. Atl. Richfield Co*., Oct. 2-3, 2001, at 698-99, 713-14 (Stanley testimony).

d. Memorandum from M.J. O'Neal to J.A. Eslick regarding Odor and Taste Thresholds for Methyl t-Butyel Ether (MTBE) and Diisopropyl Ether (DIPE) (Project 84027) dated June 4, 1981 (EQMODK06109-10).

e. Memorandum from B.N. Bastian to HS&E Data Evaluation & Prioritization Team regarding Gasoline Components Health/Environmental Assessment dated April 1, 1982 (EQWHCS004723, EQWHCS004798, and EQWHCS004802).

6.    Attached hereto as Exhibit 15 is a true and correct copy of the relevant portions of Plaintiffs' Supplemental Responses to Defendants' First Set of Contention Interrogatories dated March 14, 2014.  A complete copy of these responses can be made available upon the Court's request.


On this 26th day of January 2015, I declare under penalty of perjury under the laws of the United States that the above statements are true and correct to the best of my knowledge, based on personal information and belief or upon review of available business records.


   /s/ Ruben Reyna          
Ruben F. Reyna

Exhibit 11a

Redacted

*Inx 7132416418*



# AMERADA HESS TRADING COMPANY

### COMMUNICATION REQUEST

'85 JAN 12 PM 3: 51

**DATE: JANUARY 12, 1995**
**ORIGINATING DEPARTMENT:  AHTC**
**REQUESTED BY: JOHN F. CONNORS**


**TO:**    THE SHELL COMPANY (PUERTO RICO) LTD.
**ATTN:**
**FROM:**   JOHN F. CONNORS;  AMERADA HESS TRADING COMPANY
           A DIVISION OF AMERADA HESS CORPORATION

           PLEASE NOTE REVISION ON THIS CONTRACT.  THE RFG CLAUSE
           HAS BEEN INCLUDED.

**TEXT:**
           WE ARE PLEASED TO CONFIRM THE FOLLOWING TRANSACTION
           CONCLUDED ON JANUARY 10, 1995.

           HOVIC CONTRACT NO. <u>95SH-2127</u> WILL COVER THIS TRANSACTION.

**AAA. SELLER:**  HESS OIL VIRGIN ISLANDS CORP.

**BBB. BUYER:**   THE SHELL COMPANY (PUERTO RICO) LTD.

**CCC. PRODUCT/**
     **QUANTITY:** A)   UNL. 87 OCTANE GASOLINE 80,000 BBLS. PLUS OR
                  MINUS 5% BUYER'S OPTION.
                  B)   UNL. 93 OCTANE GASOLINE 130,000 BBLS. PLUS OR
                  MINUS 5% BUYER'S OPTION.

**DDD. QUALITY:** A)   UNL. 87 OCTANE GASOLINE - MEETING COLONIAL P/L
                 S-4 SPECS. 10.5 RVP MAX - UNDYED
                 B)   UNL. 93 OCTANE GASOLINE - MEETING COLONIAL P/L
                 V-4 SPECS. 10.5 RVP MAX, DYED RED

**EEE. DELIVERY TERMS AND CONDITIONS:** VIA BUYERS VESSEL LOADING FOB
SELLERS ST. CROIX, U.S. VIRGIN ISLANDS REFINERY.

**FFF. DATE:**     JANUARY 28-30, 1995 - TIME IS OF THE ESSENCE ON
                 THIS LOADING.

     **BASIS:**     FOB

**GGG. PRICE:**   A) UNL. 87 OCTANE GASOLINE
                AVERAGE OF PLATTS USGC WATERBORNE MEAN POSTING FOR
                UNL. 87OCT. GAS. IN EFFECT ON A THREE DAY AVERAGE.
                B/L, PLUS ONE DAY, MINUS ONE DAY, PLUS ███████ PER
                GALLON.

HOVIC 01346



B) UNL. 93 OCTANE GASOLINE
AVERAGE OF PLATTS USGC WATERBORNE MEAN POSTING FOR
UNL. 93 OCTANE GASOLINE IN EFFECT ON A THREE DAY
AVERAGE, B/L PLUS ONE DAY/MINUS ONE DAY, PLUS ███
PER GALLON.

SPLIT WEEKEND I.E. SATURDAY B/L DATE IS CALCULATED
AS AVERAGE OF THURSDAY, FRIDAY, MONDAY.  SUNDAY B/L
DATE IS FRIDAY, MONDAY, TUESDAY.

HHH. PAYMENT TERMS:
    30 DAYS FROM BILL OF LADING DATE, WITH THE BILL OF
    LADING DATE COUNTING AS DAY ZERO.

III: INSPECTION:    ON LOADING, HALF AND HALF.

JJJ: DEMURRAGE:    AT CHARTER PARTY RATE

KKK:  LAYTIME:    TANKSHIPS- THIRTY SIX (36) HOURS COMMENCING
    EARLIER OF VESSEL ALL FAST AT DOCK OF
    EXPIRATION OF SIX (6) HOURS AFTER NOTICE OF
    READINESS IS GIVEN, SUNDAYS AND HOLIDAYS
    INCLUDED, PRO RATA FOR PART CARGO.

**RFG AND CG COMPLIANCE AND DOCUMENTATION:**
SELLER AND BUYER SHALL COMPLY WITH ALL FEDERAL, STATE AND
LOCAL REGULATIONS FOR REFORMULATED GASOLINE AND BLENDSTOCKS
(INDIVIDUALLY AND JOINTLY "RFG") AND CONVENTIONAL GASOLINE
("CG") COVERED BY THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO
REGULATIONS IN 40 CFR PART 80, AS THEY MAY BE REVISED OR
AMENDED FROM TIME TO TIME.  SELLER CERTIFIES THAT ALL RFG
AND/OR CG, THE CUSTODY OF OR TITLE TO WHICH IS TRANSFERRED
PURSUANT TO THIS AGREEMENT, COMPLIES WITH APPLICABLE
REGULATIONS WHEN TRANSFERRED TO BUYER, AND THE DOCUMENTATION
REGARDING EACH SUCH TRANSFER ALSO COMPLIES WITH APPLICABLE
REGULATIONS.  SELLER SHALL PROVIDE BUYER WITH ALL TRANSFER
DOCUMENTS REQUIRED BY 40 CFR §80.77 FOR RFG TRANSFERS AND BY
40 CFR §80.106 FOR CG TRANSFERS.  SELLER AND BUYER EACH HAS IN
EFFECT AND SHALL MAINTAIN A QUALITY ASSURANCE PROGRAM AS
REQUIRED BY 40 CFR §80.79 (c).  EACH PARTY SHALL PROVIDE
EVIDENCE OF SUCH QUALITY ASSURANCE PROGRAM TO THE OTHER PARTY
UPON REQUEST.  BUYER SHALL MAKE ANY FURTHER TRANSFER OF
CUSTODY OR TITLE TO RFG AND/OR CG IN COMPLIANCE WITH ALL
APPLICABLE REGULATIONS.

**GASOLINE ADDITIVES:**
SELLER AND BUYER SHALL COMPLY WITH ALL FEDERAL, STATE AND
LOCAL REGULATIONS FOR GASOLINE ADDITIVES, INCLUDING BUT NOT
LIMITED TO REGULATIONS IN 40 CFR PART 80.  SELLER CERTIFIES
THAT GASOLINE TRANSFERRED TO BUYER UNDER THIS AGREEMENT
COMPLIES WITH APPLICABLE REGULATIONS.  BUYER SHALL ADDITIZE
GASOLINE TRANSFERRED UNDER THIS AGREEMENT IN COMPLIANCE WITH
APPLICABLE REGULATIONS PRIOR TO SALE TO ULTIMATE CONSUMERS.



LLL: ALL OTHER TERMS AND CONDITIONS PER HESS OIL VIRGIN ISLANDS
CORP. PART II GENERAL PROVISIONS, FOB SALES, ST. CROIX, U.S.
VIRGIN ISLANDS  DATED 4/94.

**MMM. ENTIRE AGREEMENT:**
THIS TELEX CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES
WITH RESPECT TO THE SUBJECT MATTER HEREOF AND ALL PROPOSALS,
NEGOTIATIONS AND REPRESENTATIONS WITH REFERENCE THERETO ARE
MERGED HEREIN.

**NNN.** HESS OIL VIRGIN ISLANDS CORPORATION SALE CONTRACT NO. 95SH-
2127 WILL COVER THIS TRANSACTION.

PLEASE ACKNOWLEDGE YOUR CONCURRENCE WITH THE ABOVE VIA RETURN
TELEX; ALSO GIVE NAME, ADDRESS, TELEX NUMBER AND TO WHOM
INVOICE SHOULD BE SENT.

HOVIC 01348

# Exhibit 11b



1995 JAN 12 AM 8:50

MAIL MESSAGE
PRINTED:      Jan 12, 1995    7:12 AM EST
ADDR:         (212) 536-8390
SEQ # :       JAN12.0001
ATTEMPT:      1

Posted: Thu, Jan 12, 1995   7:12 AM EST
Msg:    LDJF-5269-8721/20
From:   (C:USA, ADMD:TELEMAIL, PRMD:SHELL, O:SHELL SAN JUAN, OU:WPO, SN:CINTRON,
         FN:IVAN)
To:     (FAX:2125368390)  (RECEIPT) (DELIVERY)
CC:     (FAX:7132416418)  (RECEIPT) (DELIVERY)
Subj:   HOVIC CONTRACT NO.95SH-2127

HOVIC 01368
CONFIDENTIAL - FOR OUTSIDE COUNSEL EYES ONLY

01/12/95 07:08:37  ---- FAXGWY007->  212 536 8396  Total Pages: 2  Page 002

THE SHELL COMPANY (PUERTO RICO) LIMITED
P.O. BOX 366697 OPERATIONS N.Y.
SAN JUAN, PUERTO RICO 00936-6697
TEL.809-729-1720 FAX 809-729-1755

000528

X.400:"C=US;ADMD=TELEMAIL;P=SHELL;O=SHELL;SANJUAN;OU=WPO;
S=CINTRON;G=IVAN"

TO:
AMERADA HESS TRADING COMPANY
ATTENTION: Mr. JOHN F. CONNORS
URGENT


DATE:
JANUARY 12, 1995.

FROM:
IVAN CINTRON
SUPPLY ADMINISTRATOR

TO:
Amerada Hess Trading Company
Attention: Mr. John F. Connors

RE:
HOVIC CONTRACT NO. 95SH-2127

The Shell Company (Puerto Rico) Limited accepts terms and conditions
offered under HOVIC CONTRACT NO. 95SH-2127.

All communications and documents related to this contract should be
sent to:
 THE SHELL COMPANY (PUERTO RICO) LIMITED
 P.O. BOX 366697
 SAN JUAN, PUERTO RICO 00936-6697
 ATTENTION: OPERATIONS DEPARTMENT-OMS

Our main telephone number is 809-721-0150
Mr. Ivan Cintron-Supply Administrator, direct telephone number
809-729-1720
Mr. Ruben Vazquez- Operations Manager telephone number 809-729-1712

 Fax 809-729-1755


REGARDS

IVAN CINTRON
SUPPLY ADMINISTRATOR

copy: SHELL ATLANTIC SERVICES
      Mr. RAY THOMAS

HOVIC 01369
CONFIDENTIAL - FOR OUTSIDE COUNSEL EYES ONLY

# Exhibit 11c

# Redacted

95SH-2144

$\frac{cl}{2/9/95}$

Agreement made as of the 1st day of February, 1995 between Hess Oil Virgin Islands Corp., P.O. Box 127, Kingshill, U.S. Virgin Islands 00851 ("Seller") and The Shell Company (Puerto Rico) Limited, P.O. Box 366697, San Juan, Puerto Rico 00936-6697 ("Buyer").

Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase, take delivery of and pay for Conventional Premium Unleaded Gasoline and Conventional Regular Unleaded Gasoline in accordance with the following terms and conditions.

1.   **Product.**

Conventional Premium Unleaded Gasoline, 93 Octane, R+M / 2.
Conventional Regular Unleaded Gasoline, 87 Octane, R+M / 2.

2.   **Term.**

February 1, 1995 through July 31, 1995.  Buyer has the option, declarable by May 15, 1995, to extend the term of this Agreement for an additional five months, August through December 1995.

3.   **Quantity.**

One cargo per month, each consisting of the following:

87 Octane Gasoline:  90,000 Barrels, $\pm$ 10%, Buyer's option.
93 Octane Gasoline:  120,000 Barrels, $\pm$ 10%, Buyer's option.

4.   **Delivery.**

F.O.B. Buyer's vessels at Seller's terminal at St. Croix, U.S. Virgin Islands. Lifting schedules shall be mutually agreed between Buyer and Seller.  Product sold under this Agreement is solely for export from the Virgin Islands.

5.   **Price.**

87 Octane Gasoline:  Platt's waterborne mean USGC Unleaded 87 Octane plus ▇▇▇ per gallon.

93 Octane gasoline:   The higher of (a) Platt's waterborne mean USGC Unleaded 93 Octane price plus ▇▇▇ per gallon or (b) Platt's waterborne mean Unleaded 87 Octane price plus ▇▇▇ per gallon.

The pricing basis is the average of the Bill of Lading date, one day prior to the Bill of Lading Date and one day after the Bill of Lading date.  In the case of a

HOVIC 01387

weekend Bill of Lading date, a Saturday Bill of Lading date is calculated as the average of Thursday, Friday and Monday prices; a Sunday Bill of lading date is calculated as the average of the Friday, Monday and Tuesday prices.

The Platt's prices used shall be those with lowest RVP designation.

**6.     Payment Terms.**

Buyer will pay thirty (30) days from Bill of Lading date (Bill of lading date is day zero) against Seller's invoice and copy of the Independent Inspector's certificate of loaded quantity and quality.  Buyer shall make payment by telegraphic transfer in federal funds to a bank and account designated by Seller.  Buyer shall advise name, address and telex number to which invoices shall be sent. For any missing shipping documents, Seller will provide a letter of indemnity in a format acceptable to Buyer.

**7.     Specifications.**

87 Octane:     Colonial Pipeline Grade S-3 with 10.5 RVP maximum.

93 Octane:     Colonial Pipeline Grade V-3 with 10.5 RVP maximum.

**8.     RFG and CG Compliance and Documentation**

Seller and Buyer shall comply with all Federal, state and local regulations for reformulated gasoline and blendstocks (individually and jointly "RFG") and conventional gasoline ("CG") covered by this Agreement, including but not limited to regulations in 40 CFR Part 80, as they may be revised or amended from time to time.  Seller certifies that all RFG and/or CG, the custody of or title to which is transferred pursuant to this Agreement, complies with applicable regulations when transferred to Buyer, and the documentation regarding each such transfer also complies with applicable regulations.  Seller shall provide Buyer with all transfer documents required by 40 CFR §80.77 for RFG transfers and by 40 CFR §80.106 for CG transfers.  ~~Seller and Buyer each has in effect and shall maintain a Quality Assurance Program as required by 40 CFR §80.79 (e).  Each party shall provide evidence of such Quality Assurance Program to the other party upon request.~~  Buyer shall make any further transfer of custody or title to RFG and/or CG in compliance with all applicable regulations.

**9.     Gasoline Additives.**

Seller and Buyer  shall comply with all Federal, state and local regulations for gasoline additives, including but not limited to regulations in 40 CFR Part 80.

HOVIC 01388

Seller certifies that gasoline transferred to Buyer under this Agreement complies with applicable regulations.  Buyer shall additize gasoline transferred under this Agreement in compliance with applicable regulations prior to sale to ultimate consumers.

10.   **Taxes.**

Buyer shall pay Seller the amount of all excise, gross receipts, motor fuel, superfund and spill taxes, and all other federal, state and local taxes, however designated, other than taxes on income, paid or incurred by Seller directly or indirectly with respect to the product being sold hereunder and/or the value thereof.

11.   **Other Provisions.**

Hess Oil Virgin Islands Corp. General provisions, F.O.B. Sales, St. Croix, U.S. Virgin Islands 4/94 are incorporated herein by reference.

12.   **Entire Agreement.**

This document and any documents incorporated by reference contain the entire agreement between the parties with respect to the subject matter hereof and all proposals, negotiations and representations with reference thereto are merged herein.

**SELLER:**

**HESS OIL VIRGIN ISLANDS CORP.**

BY: _____

**BUYER:**

**THE SHELL COMPANY (PUERTO RICO) LIMITED**

BY: _____

Shell-mogas: January 25, 1995                 3

HOVIC 01389

# Exhibit 11d

# Redacted

96SH–2290

2/8/96

Agreement made as of the 24th day of January, 1996 between Hess Oil Virgin Islands Corp., P.O. Box 127, Kingshill, U.S. Virgin Islands 00851 ("Seller") and The Shell Company (Puerto Rico) Limited, P.O. Box 366697, San Juan, Puerto Rico 00936-6697 ("Buyer").

Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase, take delivery of and pay for Conventional Mid-Grade Unleaded Gasoline and Conventional Premium Unleaded Gasoline in accordance with the following terms and conditions.

1.   **Products.**

   Conventional Mid-grade Unleaded Gasoline, 89 Octane, R+M / 2.
   Conventional Premium Unleaded Gasoline, 93 Octane, R+M / 2.

2.   **Term.**

   February 15, 1996 through July 31, 1996.

3.   **Quantities.**

   89 Octane Gasoline:   5,600 Barrels per calendar day, ± 10%, Buyer's option.
   93 Octane Gasoline:   5,900 Barrels per calendar day, ± 10%, Buyer's option.

4.   **Delivery.**

   F.O.B. Buyer's barges at Seller's terminal at St. Croix, U.S. Virgin Islands.  One barge loading of approximately 120,000 barrels every 10 to 12 days with each loading consisting of approximately 50% 89 Octane Gasoline and 50% 93 Octane Gasoline.  Lifting schedules shall be mutually agreed between Buyer and Seller. Product sold under this Agreement is solely for export from the Virgin Islands.

5.   **Prices.**

   89 Octane Gasoline:   Platt's waterborne mean USGC Unleaded 89 Octane plus ▮▮▮ per gallon.

   93 Octane gasoline:   Platt's waterborne mean USGC Unleaded 93 Octane price plus ▮▮▮ per gallon.

   The pricing basis is the average of the Bill of Lading date, one day prior to the Bill of Lading Date and one day after the Bill of Lading date.  In the case of a weekend Bill of Lading date, a Saturday Bill of Lading date is calculated as the average of

Shell-mogas: January 25, 1996

1

HOVIC 03765

Thursday, Friday and Monday prices; a Sunday Bill of lading date is calculated as the average of the Friday, Monday and Tuesday prices.

The Platt's prices used shall be those with lowest RVP designation.

6.   **Payment Terms.**

Buyer will pay thirty (30) days from Bill of Lading date (Bill of lading date is day zero) against Seller's invoice and copy of the Independent Inspector's certificate of loaded quantity and quality. Buyer shall make payment by telegraphic transfer in federal funds to a bank and account designated by Seller. Buyer shall advise name, address and telex number to which invoices shall be sent. For any missing shipping documents, Seller will provide a letter of indemnity in a format acceptable to Buyer.

7.   **Specifications.**

89 Octane:   Colonial Pipeline Grade T-2 with 10.5 RVP maximum, 124 V/L minimum.

93 Octane:   Colonial Pipeline Grade V-2 with 10.5 RVP maximum, 124 V/L minimum.

8.   **RFG and CG Compliance and Documentation**

Seller and Buyer shall comply with all Federal, state and local regulations for reformulated gasoline and blendstocks (individually and jointly "RFG") and conventional gasoline ("CG") covered by this Agreement, including but not limited to regulations in 40 CFR Part 80, as they may be revised or amended from time to time. Seller certifies that all RFG and/or CG, the custody of or title to which is transferred pursuant to this Agreement, complies with applicable regulations when transferred to Buyer, and the documentation regarding each such transfer also complies with applicable regulations. Seller shall provide Buyer with all transfer documents required by 40 CFR §80.77 for RFG transfers and by 40 CFR §80.106 for CG transfers. Seller and Buyer each has in effect and shall maintain a Quality Assurance Program as required by 40 CFR §80.79 (c). Each party shall provide evidence of such Quality Assurance Program to the other party upon request. Buyer shall make any further transfer of custody or title to RFG and/or CG in compliance with all applicable regulations.

Shell-mogas: January 25, 1996

2

HOVIC 03766

9.   **Gasoline Additives.**

Seller and Buyer shall comply with all Federal, state and local regulations for gasoline additives, including but not limited to regulations in 40 CFR Part 80. Seller certifies that gasoline transferred to Buyer under this Agreement complies with applicable regulations.   Buyer shall additize gasoline transferred under this Agreement in compliance with applicable regulations prior to sale to ultimate consumers.

10.   **Taxes.**

Buyer shall pay Seller the amount of all excise, gross receipts, motor fuel, superfund and spill taxes, and all other federal, state and local taxes, however designated, other than taxes on income, paid or incurred by Seller directly or indirectly with respect to the product being sold hereunder and/or the value thereof.

11.   **Other Provisions.**

Hess Oil Virgin Islands Corp. General provisions, F.O.B. Sales, St. Croix, U.S. Virgin Islands 4/94 are incorporated herein by reference.

12.   **Entire Agreement.**

This document and any documents incorporated by reference contain the entire agreement between the parties with respect to the subject matter hereof and all proposals, negotiations and representations with reference thereto are merged herein.

**SELLER:**                                    **BUYER:**

**HESS OIL VIRGIN ISLANDS CORP.**        **THE SHELL COMPANY (PUERTO RICO) LIMITED**

BY: _____        BY: _____

Shell-mogas: January 25, 1996

3

HOVIC 03767

# Exhibit 11e

# Redacted

# AGREEMENT

Agreement made as of the 9th day of May, 1997 between Hess Oil Virgin Islands Corp., P.O. Box 127, Kingshill, U.S. Virgin Islands 00851 ("Seller") and The Shell Company (Puerto Rico) Limited, P.O. Box 366697, San Juan, Puerto Rico 00936-6697 ("Buyer").  Seller's contract number for this Agreement is  97SH-2461.

Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase, take delivery of and pay for the following product in  accordance with the following terms and conditions.

1.  **Products.**

   Conventional Mid-grade Unleaded Gasoline, 89 Octane, R & M / 2.
   Conventional Premium Unleaded Gasoline, 93 Octane, R & M / 2.
   Low Sulfur No. 2 Oil.

2.  **Term.**

   A)   August 1, 1997 through January 31, 1998.
   B)   Buyer has option to extend the Agreement an additional six months (February 1, 1998 through July 31, 1998). Buyer to declare option by December 1, 1997.

3.  **Quantity.**

   89 Octane Gasoline:      4,600 Barrels per calendar day plus or minus 10% Buyer's option.

   93 Octane Gasoline:      4,900 Barrels per calendar day plus or minus 10% Buyer's option.

   Low Sulfur No. 2 Oil:    2,000 Barrels per calendar day plus or minus 10% Buyer's option.

4.  **Delivery.**

   F.O.B. Buyer's barges at Seller's terminal at St. Croix, U.S. Virgin Islands. One barge loading of approximately 120,000 barrels every 10 to 12 days.  Lifting schedules shall be

97SH-2461: May 19, 1997

1

HOVIC 02870

mutually agreed between Buyer and Seller.   Products sold under this Agreement are solely for export from the Virgin Islands.

5.      **Price.**

Unleaded 89 Octane Gasoline: Platt's waterborne USGC mean price for Unleaded 89 Octane Gasoline plus ████████ per gallon.

Unleaded 93 Octane Gasoline : Platt's waterborne USGC mean price for Unleaded 93 Octane Gasoline plus ████████ per gallon.

Low Sulfur No. 2 Oil: Platt's waterborne USGC mean price for Low Sulfur No. 2 Oil plus ████████ per gallon.

The pricing basis for each product is the average of the Bill of Lading date, one day prior to the Bill of Lading date and one day after the Bill of Lading date. If the Bill of Lading date falls on a Saturday or a Wednesday, Thursday or Friday holiday, the Platt's prices to be used shall be the effective published prices for the two days prior to the Bill of Lading date and one day after the Bill of Lading date. If the Bill of Lading date falls on a Sunday or a Monday or Tuesday holiday, the Platt's prices to be used shall be the effective published prices for the one day prior to the Bill of Lading date and two days after the Bill of Lading date.

The Platt's prices (for gasoline) used shall be those with the RVP designation closest to the RVP of the product lifted (10.5 RVP).

6.      **Payment Terms.**

Buyer will pay within  thirty (30) days from Bill of Lading date against Seller's  invoice and a copy of the Independent Inspector's certificates of loaded quantity and quality. Buyer shall make payment by telegraphic transfer in federal funds to a bank and account designated by Seller.   Buyer shall advise name, address and telex number to which invoices shall be sent. For any missing shipping documents, Seller will provide a letter of indemnity in a format acceptable to Buyer.

7.      **Specifications.**

89 Octane Gasoline: Colonial Pipeline Grade T-2 Grade with 10.5 RVP maximum, 124 V/L Minimum

97SH-2461: May 19, 1997

2

HOVIC 02871

93 Octane Gasoline: Colonial Pipeline Grade V-2 Grade with 10.5 RVP maximum, 124 V/L Minimum

Low Sulfur No. 2 Oil: Colonial Pipeline Company 74 Grade with maximum Cloud Point of 24° F.

8.  **RFG and CG Compliance and Documentation**

Seller and Buyer shall comply with all Federal, state and local regulations for reformulated gasoline and blendstocks (individually and jointly "RFG") and conventional gasoline ("CG") covered by this Agreement, including but not limited to regulations in 40 CFR Part 80, as they may be revised or amended from time to time. Seller certifies that all RFG and/or CG, the custody of or title to which is transferred pursuant to this Agreement, complies with applicable regulations when transferred to Buyer, and the documentation regarding each such transfer also complies with applicable regulations. Seller shall provide Buyer with all transfer documents required by 40 CFR §80.77 for RFG transfers and by 40 CFR §80.106 for CG transfers. Seller and Buyer each has in effect and shall maintain a Quality Assurance Program as required by 40 CFR §80.79 (c). Each party shall provide evidence of such Quality Assurance Program to the other party upon request. Buyer shall make any further transfer of custody or title to RFG and/or CG in compliance with all applicable regulations.

9.  **Gasoline Additives.**

Seller and Buyer shall comply with all Federal, state and local regulations for gasoline additives, including but not limited to regulations in 40 CFR Part 80. Seller certifies that gasoline transferred to Buyer under this Agreement complies with applicable regulations. Buyer shall additize gasoline transferred under this Agreement in compliance with applicable regulations prior to sale to ultimate consumers.

10.  **Taxes.**

Except as provided in the following two sentences, Buyer shall pay Seller the amount of all excise, gross receipts, motor fuel, superfund and spill taxes, and all other federal, state and local taxes, however designated, other than taxes on income, paid or incurred by Seller directly or indirectly with respect to the product being sold hereunder and/or the value thereof. In the event a portion of the Low Sulfur Diesel sold by Seller to Buyer under this contract is dutiable, in whole or in part, Seller shall provide Buyer with appropriate documentation to permit Buyer to make a proper entry of that cargo under

HOVIC 02872

the customs laws of the Commonwealth of Puerto Rico.  Buyer will pay any customs duties payable in  Puerto Rico on such cargo and Seller will reimburse Buyer for the amount of any such customs duties paid by Buyer on the cargo.

**11.   Other Provisions.**

Hess Oil Virgin Islands Corp. General provisions, F.O.B. Sales, St. Croix, U.S. Virgin Islands 4/94 are incorporated herein by reference, with the following amendment:  the reference in Section 3.7 of such General Provisions is hereby amended by deleting the reference in the third line to "ONE HUNDRED TWENTY (120) DAYS" and substituting "NINETY (90) DAYS".

**12.   Entire Agreement.**

This document and any documents incorporated by reference contain the entire agreement between the parties with respect to the subject matter hereof and all proposals, negotiations and representations with reference thereto are merged herein.

**SELLER:**                                              **BUYER:**

**HESS OIL VIRGIN ISLANDS CORP.**       **THE SHELL COMPANY (PUERTO RICO) LIMITED**

BY: _____                  BY: _____

97SH-2461: May 19, 1997

4

HOVIC 02873

# Exhibit 11f



**The Shell Company (Puerto Rico) Limited**

5 September, 1997

Oficina Principal
PO BOX 366697
SAN JUAN PR 00936-6697
Teléfono: (809) 721-0150

Mr. Darius Sweet
Hess Oil Virgin Island
PO Box 127
Kingshill, U.S.V.I. 00851

RE: <u>CONTRACT AGREEMENT NO. 97SH 2461</u>

Dear Mr. Sweet:

Reference is made to our conversations of the last two days regarding the aforementioned agreement. Accordingly, we would like to confirm the following:

1.    As discussed, we hereby declare our option to extend the agreement an additional six months through 31 July 1998 as per Clause 2 (B).

2.    Because of the reorganization of Shell Group Companies in the region, we wish to novate the aforementioned agreement with effect from 10 September 1997 to our affiliate Shell Trading Caribbean Limited of Barbados, who will coordinate and consolidate our supply function in the future. Contacts in Shell Trading are as follows:

> Supply & Trading Director:  Jim Gretton
> Telephone 1 246 431 4901
> Fax 1 246 429 5088

> Main Products Manager:  Carmetta Wiggins
> Telephone 1 246 431 4902

For operational purposes (nominations, etc.) we will still contact you directly, with copies to Shell Trading. Please confirm your agreement to this novation.

3.    Furthermore, we would like to investigate the possibility of increasing the volumes supplied under this contract, effective 15 October 1997 as follows:

- 87 Octane        1000 BPCD +/-10%
- 89 Octane        0 BBLS
- 93 Octane        2000 BPCD +/-10%
- Low Sulphur      500 BPCD +/-10%
- No. 2 Oil

Registered in England No. 174144 Registered office Shell Centre, London, SE1 7NA

HOVIC 02913
CONFIDENTIAL - FOR OUTSIDE COUNSEL EYES ONLY



We confirm that these incremental volumes would be discharged for Puerto Rico.  Please advise whether such volumes would be available.

Very truly yours,

**FOR THE SHELL COMPANY (PUERTO RICO) LIMITED**

Rubén Vázquez
Operations Manager


**FOR SHELL TRADING CARIBBEAN LIMITED**

J. R. Gretton
Supply & Trading Director

Registered in England No. 174144 Registered office Shell Centre, London SE 17NA

HOVIC 02914
CONFIDENTIAL - FOR OUTSIDE COUNSEL EYES ONLY

 **Pecten Trading Company**
One Shell Plaza
PO Box 1487
Houston TX 77251-1487

June 10, 1997

Phone (713) 241-1893
Telex 3724014 PTC-HOU
Fax (713) 241-7249

From: Brian Curtis

To:     Amerada Hess Corp.
        1185 Avenue of the Americas
        New York, New York 10036
        Attn: Darius Sweet

Subj: HESS OIL VIRGIN ISLANDS CORP. CONTRACT 97SH-2461

Dear Darius,

Thank you for your letter dated May 15, 1997 with the new contract for Shell Company
(Puerto Rico) Ltd.

We are pleased to have concluded our discussions for the renewal of the subject contract.
Pursuant to the Services Agreement between Pecten Trading Company and Shell
Company (Puerto Rico) Ltd., attached are the two original contracts signed by Shell
Puerto Rico.

Please return to me a fully executed, signed original.

Respectfully,

Brian W. Curtis
Manager, Products/Feedtocks Trading

HOVIC 02915
CONFIDENTIAL - FOR OUTSIDE COUNSEL EYES ONLY

# Exhibit 12a

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

# SHELL RETAIL INTERNATIONAL
# FRANCHISE AGREEMENT



PLAINTIFF'S
EXHIBIT NO. Charmang
FOR IDENTIFICATION
DATE: 11/21/13   RPTR: JCP

**SOL CONFIDENTIAL 121**

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

# SHELL RETAIL INTERNATIONAL FRANCHISE

**THIS AGREEMENT** is made the first day of January 1999 by and between Shell Retail International (hereinafter called "SRI") a division of Shell International Petroleum Company Limited  (hereinafter called "SIPC") whose registered office is at Shell Centre  London SEI 7NA and The Shell Company of Puerto Rico whose registered office is at 450 Ponce de Leon Avenue, Puerta de Tierra, San Juan 00901, Puerto Rico (hereinafter called "the Franchisee")

WHEREAS:

A.  SRI has substantial retailing expertise, qualifying it to franchise specialist advice and services and add specific value by initiating new business activities for  Shell Operating Companies throughout the world that have a Retail Business  (the "Franchisees"). SRI can provide access to retailing skills, the co-ordination of learning and knowledge, and the management of global procurement programmes for the development of products and services;

B.  SRI has been appointed by SIPC as Franchisor of the SRI Retail Franchise to fulfil the objective of assisting the growth of the Franchisees' Retail Business (collectively described as the Global Retail Business) and assisting    all Franchisees to become first class retailers;

C.  The Franchisee is a party to a separate agreement for a range of  services to be provided by SIPC (the "Service Agreement").   From the Commencement Date all retail services will be provided to the Franchisee under the terms of this Agreement which shall replace the Service Agreement in so far as it applies to the Franchisee's Retail Business;

D.  The range of services provided under the Service Agreement have hitherto been made available to the Franchisee under a cost sharing arrangement and SRI intends to continue this cost sharing arrangement on the provision of services under this Agreement.

E.  The Franchisee operates a Retail Business and wishes to receive SRI's assistance in the development of its retail capabilities and operational effectiveness.  The Franchisee also wishes to benefit from global procurement initiatives and effective customer marketing propositions, and from the inter relationship with other Franchisees participating in the collective activity of the Franchise  for which purpose the Franchisee has entered into this Agreement with SRI, and other Franchisees will enter into agreements on the same or similar terms.

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

**1. DEFINITIONS**

Certain capitalised words or phrases used in this agreement are defined in Appendix One.

**2.    THE SHELL RETAIL FRANCHISE SYSTEM**

2. (1) SRI has developed for the benefit of all Franchisees a System to enable the swift and effective pooling of expertise and resources across the Global Retail Business and the transparent and efficient allocation of development and support resources. The System provides:-

(a)   Global Support and development programmes for products and services;

(b)   The creation and management of a knowledge base to facilitate the application of best practice through the medium of the SRI Web Site and through workshops;

(c)   The foundation for the establishment and growth of customer perception of each Retail Unit being operated as a first class retail business;

(d)   A mechanism for Franchisee self-appraisal of its retail professional capability.

(2) The methods and process for the Franchisee to apply the System are detailed in clause 8 of this Agreement.

**3.    TRADE MARKS**

3. (1) The provisions for the use of the Trade Marks are detailed in a separate licence or letter of agreement between SIPC and the Franchisee.

(2) The Franchisee acknowledges the importance of conformance of the Global Retail Business to the Trade Mark provisions and that obligations which arise from the Trade Marks are an essential condition of this Agreement. The Franchisee will use the Trade Marks in carrying out its Retail Business in accordance with the requirements of the licence, or letter of agreement, as the case may be, and failure to do so will give the Council the rights set out in clause 19 (3).

**4.    THE PRINCIPLES OF THE FRANCHISE**

4. (1) SRI and the Franchisee agree that the following are the principles of the Franchise and that each party will uphold and follow these principles:

(i)    the key focus of all Franchise activities must be the end customer and all systems and structures are and shall be designed to support this interface;

(ii)   the scope of the Franchise extends to all potential retail opportunities on the Retail Units;

SOL CONFIDENTIAL 123

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

    (iii)   the Franchise will develop through learning from experience, experimenting, problem solving, learning from others, disseminating knowledge, and open effective communication;

    (iv)   cultural differences will be respected and incorporated in the Franchise;

## 5.    ESSENTIAL ELEMENTS OF THE FRANCHISE

5.(1) Having regard to the Trade Marks and general legislative requirements, and in order to protect and build the value of the Franchise, and its representation to Franchisee's customers, certain core elements of the Franchise are accepted by SRI and the Franchisee as central to the achievement of common standards throughout the Franchise, and therefore essential to be observed by both parties.  These are limited to;

    (i)    Shell visual identity and retail brand values;

    (ii)   HSE core standards; and

    (iii)   adherence to fit for purpose performance specifications for equipment and systems; and

    (iv)   the use of common performance measures and information architecture.

  (2) SRI will from time to time Publish guidelines on the above essential elements together with details on how to acquire the relevant specification and standards documents, taking into account the capabilities of the Franchisee, and the Franchisee agrees to comply with the guidelines.  Further essentials can only be added if they are endorsed by the Council.

## 6.    RESPONSIBILITIES OF SRI

6.(1) SRI shall provide the Facilities  and in the course of doing so will offer comprehensive advice and  business support for products and services in the following generic areas (the "Generic Areas")

    (i)    Customer and retail  brand management

    (ii)   Format and category management

    (iii)   Engineering design

    (iv)   Network planning and asset management

    (v)    Retail cultural change

    (vi)   Site operations and training

    (vii)   Supply chain and logistics

    (viii)  Management information and systems

    (viiii)  Development of the Franchise business and knowledge base

**SOL CONFIDENTIAL 124**

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

(2) SRI will ensure that there is transparent and efficient allocation of development and support resources across the Global Retail Business and that all Franchisees are aware of the Facilities available and also of the focal points within SRI who will be available for general or specific consultation.

(3) The support will fall broadly into one of the following categories:

(a)   **Global Support**

The SRI Web Site will be the central information point for the Franchise and the method by which SRI provides information and documents, and reports on the inter-change of knowledge and learning between Franchisees.

The Global Support and the process by which it will be provided is as follows:

(i)     access to functional expertise by personal contact, by electronic mail, or by telephone with identified SRI retailing experts;

(ii)    the dissemination of current learning and best practice in Retail Businesses throughout the Franchise, either by direct contact by SRI personnel or by Publication;

(iii)   The provision, on request of the Franchisee, of current SRI developed tool kits and templates in the Generic Areas;

(iv)   the opportunity to become a party to SRI negotiated central agreements such as procurement or third party consultancy services details of which will be Published;

(v)    the receipt on a regular basis, of details of current programmes and concluded initiatives which have been developed either solely by SRI or in conjunction with Franchisees;

(vi)   access to management information utilised in the Retail Business of Franchisees and generally relevant to the Franchise which SRI will either Publish or circulate;

(vii)  the management of development and design programmes operated by the Core Teams, to improve business performance and capability, and the Publication of the results and recommendations.

(b)   **Specific Support**

Specific Support will be available through any one, or all, of the following Facilities; it can be provided at the request of a Franchisee, or on the acceptance by a Franchisee of a recommendation from SRI:

(i)     As a direct service to individual Franchisees who can choose the type and scope from a list of specific services Published each Year;

(ii)    As services carried out for a group of Franchisees ("the Project Group") by specialists in SRI who will work on projects nominated by any Franchisee, provided   that SRI is satisfied that the activity will substantially benefit the Project Group and have a general impact on the

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

Franchise.  Should SRI be unable to provide sufficient specialists for the nominated project they may arrange support from personnel working in the Retail Business of a Franchisee, from Core Team members, or third parties;

(iii)   In  training and best practice workshops on request from Franchisees, provided there is sufficient demand.

## 7.   FRANCHISEE RESPONSIBILITIES

7.(1) The Franchisee continues to be responsible for the day to day and  financial management of its Retail Business using the Facilities available through the Franchise to optimise performance and efficiency.

(2) In the operation of its Retail Business the Franchisee will seek to ensure it follows the principles detailed in clause 3  and the essential elements set out in clause 5 of this Agreement, and apply practices which are likely to enhance the overall value of the Franchise.

(3) In the interests of upholding the Franchise principles the Franchisee will:-

(i)    at reasonable intervals carry out self appraisal of its operational performance within the overall context of performance appraisal conducted by the relevant Zone.

(ii)   appraise the feasibility of participating in  Franchise global procurement alliances and where this is beneficial, participate in these.

(4) In the interest of the development of the Franchise the Franchisee will:-

(i)    provide voluntarily where appropriate, or at SRI's request, in-put and resources to Franchise activities the apportionment of costs of which will be agreed with SRI on a case by case basis,  in order to assist SRI to identify and build the future development of the Global Retail Business;

(ii)   ensure all major local initiatives are communicated to SRI in order to reduce duplication of effort amongst Franchisees and increase the effectiveness of development investment;

(iii)  share with other Franchisees the experiences gained from minor local initiatives and any prototypes and pilot schemes associated with them.

(5) Where assistance is sought by SRI for the participation by the Franchisee in trialling and testing new concepts considered to be of benefit to the Franchise, or where the Franchisee is selected by SRI as suitable to provide a resource and skill base for the design and development of the Franchise, the Franchisee will, in the spirit of mutual benefit, co-operate whenever this is feasible.

(6) The Franchisee will also take the initiative to Publish any developments occurring on a local basis which could have global Franchise application.

SOL CONFIDENTIAL 126

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

## 8.   COMMUNICATIONS AND KNOWLEDGE MANAGEMENT

8.(1) SRI will build on the SRI Web Site an information base to capture and share knowledge throughout the Franchise to ensure that all Franchisees have access at any time and from any place to a consistent centre of knowledge.

(2) In addition to the electronically provided information SRI will circulate printed or film material to supplement the SRI Web Site information base.

(3) The Franchisee will on a regular basis contribute to the knowledge base in order that best practice and experiences are exchanged within the Franchise and work with SRI towards the achievement of:

(i)    Higher turnover and better business results for itself and all Franchisees;

(ii)   The avoidance of duplication of mistakes, research, documents, and projects;

(iii)  The adoption of best practice to improve the scope and quality of project work;

(iv)   Inter Franchise debates and discussions

(4) The SRI Web Site will also act as the Franchise manual, and SRI will Publish regularly up dated reports from SRI on Franchise progress, and recommendations of Franchise criteria for operational excellence to be adopted by Franchisees.

## 9.   THE FRANCHISE COUNCIL

9.(1) Prior to the Commencement Date SIPC has appointed the Franchise Council (the "Council") to be the governing body of the Franchise. Council members will be the Director of Strategy and Business Services of SIPC (chairman), the President of SRI, and a senior representative from the two geographical zones (being South and East) who will be nominated from time to time by the zone Directors, together with a senior representative from Shell Europe Oil Products BV ("SEOP") nominated by the President of SEOP.

(2) The Council will meet annually in the third Quarter of each Year, and in one other Quarter in the same Year. At the third Quarter meeting it will approve and agree the SRI budget and proposed programme of Facilities for the Franchise for the forthcoming twelve months as endorsed by the Council. In the event of a failure to achieve unanimity in respect of either of these matters they will be referred to the Oil Products Committee (or any authority which may replace it) for adjudication.

(3) The Council will be the sole authority for endorsing Specific Support projects detailed in clause 6 (3) b, and the focus and direction of the Franchise through the SRI programme of Facilities, the addition of any essential elements to the Franchise, and will decide on the acceptance of new members or the retention of existing members of the Franchise in the circumstances provided for in clause 19 (3) of this Agreement.

SOL CONFIDENTIAL 127

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

### 10.   THE FUNDING OF THE FRANCHISE

10.(1)   SRI will, at the third Quarter meeting in each Year, submit to the Council for approval, in respect of the following Year:

    (i)   full details of the budgeted expenditure for the Franchise and a comprehensive programme of planned Facilities.

    (ii)   the proposed basis for charging Franchise fees.

    (2)   The approved expenditure, programme of Facilities and  the basis on which the Franchise fees will be charged, will then apply for the following Year, and SRI will notify the Franchisee of the approved  budget as soon as practicable following the meeting of the Council.

    (3)   Should SRI receive any payments from third parties  for similar services, or for the right to use information,  SRI will off set the payments either against costs if these are directly attributable to specific Retail Businesses,  or against the total costs of the provision of the Facilities.

### 11.   GENERAL FRANCHISE FEE

11.(1)   The general franchise fee is for the provision of Global Support and must be paid by all Franchisees.  It will be made up of two components which are:

    (i)   The Base Component and

    (ii)   The Franchise Investment Contribution Component.

The amount to be paid by the Franchise's will be calculated as follows:

The share which the Franchisee bears of the actual total cost incurred in each Quarter in  respect of SRI's provision of the Global Support Facilities,  and which shall be in direct proportion to the ratio between the Sales Proceeds of the Franchisee  compared with the aggregate Sales Proceeds of all Franchisees for the relevant Quarter.

If, by the third Quarter meeting SRI's estimate of actual expenditure on the provision of the facilities for the Year exceeds the approved budget it will present proposals for Council approval to redress the situation.

### 12.   SPECIFIC FRANCHISE FEES

    (1)   When Specific Support Facilities are provided by SRI  the following charges will apply:

    (i)   Fee for Direct Services

Should   the Franchisee notify SRI that it wishes to receive direct Specific Support a quotation will be prepared by SRI and submitted for the Franchisees approval and acceptance.

The basis for the amount to be charged will be ;

**SOL CONFIDENTIAL 128**

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

The total cost of the Specific Support Facilities provided by SRI being (I) those costs which can be allocated directly and (ii) an allocation of direct salary and labour burden costs and (iii) indirect costs attributable to direct labour costs , but not including any element for profit.   The costs will be computed using SIPC's accounting system in accordance with customary accounting principles and practices, which system is applied consistently.

(ii)    Contribution Fee for Specific Support Franchise Investment

Where Specific Support relates to project based activities carried out for the Project Group detailed in clause 6 (3) b, the overall cost will be shared on a basis agreed between the Project Group.   The basis of charges will be proposed to and endorsed by the Council on a project specific basis and notified to the Project Group prior to any work being put in hand.

If the project work is subsequently developed into activities which are made available to all or some Franchisees other than the Project Group, then, if appropriate, a formula will be included by SRI in the proposal to be endorsed by the Council for a general charge to be made to all participating Franchisees and for a rebate to be paid to each member of the Project Group.

## 13.    PAYMENT OF FRANCHISE FEES

13.1(1)SRI will invoice the Franchisee for the general Franchise fees for the provision of Global Support on a Quarterly basis, and will issue invoices within sixty (60) days after the end of each Quarter, and payment must be made by the Franchisee within thirty (30) days of the date of the invoice.

The frequency of invoicing and method of charging fees for the provision of Specific Support will form part of the SRI proposal in each case, but in all other respects the provisions of this clause 13 apply

The Franchisee must pay all amounts due in the manner, at the place, and into the account nominated in writing by SRI.  The Franchisee is responsible for obtaining all consents, permissions, and approvals with respect to  all payments due under the terms of this Agreement.

All amounts payable under the terms of this Agreement should, where applicable, be subject to the addition of value added tax (" VAT").

(2) SRI incurs its costs in pounds sterling and will therefore invoice all fees and charges in that currency unless otherwise agreed and the Franchisee must make payment in the invoiced currency

Should SRI make any disbursement or payment in currencies other than pounds sterling then the conversion will be at the relevant Reuters mean rates of exchange on the invoice date.

(3) Any overdue payment hereunder shall bear interest, from the date it falls due until such time as SRI has received payment from the Franchisee at the Default Rate applicable on the date payment falls due.

(4) Any taxes, levies or charges of whatever kind payable which are not the Commencement Date, or any time thereafter, the Franchisee may be required

OR CONFIDENTIAL 129

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

to pay in respect of the execution of the Agreement , or  may be required to withhold in respect of any amount due to SRI under the Agreement, shall be for the account of the Franchisee and the Franchisee shall pay such a sum as to yield to SRI a net amount equal to that amount but for such taxes, levies or charges would have been received by SRI..

(5) In case the Franchisee disagrees with the amount invoiced the Franchisee shall advise SRI in writing of the amount being disputed and the reason the Franchisee considers the charge not properly made.   SRI may, at its discretion, permit the Franchisee to defer payment of the disputed item, and only that item, if the disagreement cannot be resolved before the normal due date.

13.2 SRI shall on a yearly basis furnish to the Franchisee a certificate by its statutory independent external auditors.   This certificate shall certify that the amounts charged represent only the costs plus relevant overlay described and that they have been allocated in accordance with this Agreement.   Such certificate shall be conclusive as to the amounts certified.

SRI will provide the Franchisee with any information needed for fiscal reasons under local laws and regulations.

## 14.    GENERAL PROVISIONS

### 14.    Liability and Indemnity

(1) If any Facilities provided under this Agreement are not satisfactorily performed or not performed in whole or in part then so far as may be reasonably practicable SRI will cause the deficient part of such Facilities to be correctly performed at no extra expense to the Franchisee.

(2) SRI shall have no liability other than stated in Clause 14 (1) above to the Franchisee in contract, tort or otherwise for any loss or damage whatsoever arising out of the Agreement except for direct loss or damage for which SRI shall be liable only if and to the extent the Franchisee establishes that such direct loss or damage has been caused by Gross Misconduct of SRI. Neither party shall be liable to the other for indirect or consequential loss or damage including but not limited to loss of property, loss of profits, loss of interest, loss of products, costs of delays or business interruption.

(3) Except for the obligations of SRI pursuant to Clause 14 (1) above, any and all liability of SRI  in contract or in tort or otherwise for any loss or damage whatsoever arising out of or relating to this Agreement shall for each  Year be limited in aggregate to 50% of the general franchise fee SRI under Clause 11 (1) for the Year in which such loss(es) or damage(s) become(s) apparent. For any specific franchise fee such limit shall be 50% of the remuneration for the individual direct service, or the services provided to the Project Group as the case may be.

(4) The Franchisee undertakes to hold SRI free from and to keep SRI indemnified against any demand, claim, action or proceeding brought or instituted by any third party (including but not limited to personnel of the Franchisee ) for any liability in contract or at law for any loss or damage whatsoever arising relating to this Agreement, even if the third party claim was based on

SOSI CONFIDENTIAL 130

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

negligence of SRI or any party to whom services have been delegated under Clause 17 (2).

(5) Where the reason for third party claim was the Gross Misconduct of SRI, then the Franchisee's indemnity hereunder shall apply only above the limit of liability mentioned in clause 14 (3) and SRI shall be liable up to such limit.

(6) If SRI has the right to indemnity both from the Franchisee and other Franchisees SRI shall apportion the amount claimed between the Franchisee and those other Franchisees.

(7) Any obligation or liability of SRI for faulty work or for an act (including an omission to act) which constitutes Gross Misconduct shall expire two years after the date on which such faulty work or act occurred or first came to light if later, and no claim, demand, action or proceeding shall be brought or instituted by the Franchisee against SRI thereafter.

## 15.   CONFIDENTIALITY

15.(1) The Franchisee and SRI undertake that during the currency of this Agreement and after its termination each will:-

(a)   preserve and cause its personnel to preserve the secrecy of any Confidential Information and Confidential Record;

(b)   not disclose to any third party any Confidential Information or Confidential Record except with the other party's prior written consent;

(c)   not use any Confidential Information or Confidential Record other than for the purpose for which it has been disclosed to it.

The forgoing undertakings shall continue in so far and for so long as the Confidential Information or Confidential Record in question has not:

(i)   become part of the public knowledge or literature without default on the part of the Franchisee or SRI

(ii)   been disclosed to the Franchisee or SRI by a third party (other than one disclosing on behalf of the Franchisee or SRI) whose possession of such information is lawful and who is under no secrecy obligation with respect to the same.

SRI and the Franchisee each give to the other its prior written consent to disclose, subject to confidentiality obligations equivalent to those in this Clause, Confidential Information and Confidential Record to other Franchisees.

(2) Upon the termination of this Agreement SRI and the Franchisee may each require the other to return or destroy all copies of any Confidential Record supplied by SRI or the Franchisee as the case may be, or on their behalf that are (i) in the other parties possession, or (ii) are in the possession of a third party to whom such Confidential Record was disclosed by SRI or the Franchisee pursuant to Clause 15 (1) (b).

**SOL CONFIDENTIAL 131**

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

(3) The copyright and property and any other industrial and intellectual property rights in any Confidential Record or other material supplied to the Franchisee under this Agreement shall, in the absence of any express provision to the contrary thereon, remain vested in SRI.

## 16.  FORCE MAJEURE

(1) Neither party shall be liable for any failure to fulfil any term of this Agreement, other than a failure by the Franchisee to pay any sum due to SRI under the provisions of this Agreement, if fulfilment has been delayed, hindered or prevented by circumstances beyond the reasonable control of the party in question including but not limited to observance of legal provisions of a mandatory nature to which the party affected may be subject and which are not for the risk of the party in question.

(2) The party whose performance of this Agreement is affected shall notify the other party as soon as reasonably practicable of the occurrence of such a circumstance together with an estimate of when performance can be resumed (which estimate shall be updated from time to time) and the party giving such notice shall be excused from the non-performance or unpunctual performance, as the case may be, of this Agreement until such circumstance ceases to apply.

## 17.  ASSIGNMENT AND DELEGATION

17.(1) Neither party shall assign its rights or transfer its obligations without the prior written consent of the other party  except that either party shall be free to assign any or all of its rights or transfer any or all of its obligations to an Affiliate.

(2) SRI may at its discretion procure from any third party certain information, advice and services which it renders under this Agreement or may delegate to any third party  the performance of its rights or obligations under this Agreement, in order to assist SRI in the efficient performance of this Agreement provided that the person or persons to whom delegation is made shall be capable of rendering services of a quality equal to what SRI is able to provide.

Where SRI contracts with a third party  for the provision of any information, advice or services or delegates the performance of its rights or obligations to such third party, and where the contract in question is for the benefit of the Franchisee, then SRI shall contract with such third party as agent for the Franchisee (where the Franchisee is an undisclosed principal) to give the Franchisee the right to pursue any claim for loss or damage it may suffer against such third party.

## 18.  PROVISION OF SERVICES BY THE FRANCHISEE

18.(1) Where SRI requests the Franchisee to provide advice and/or services either to SRI or via SRI to another Franchisee , then the Franchisee shall perform and SRI shall pay the performing Franchisee for such delegated obligations on a basis to be agreed at the relevant time.

SOL CONFIDENTIAL 132

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

(2) The Franchisee shall keep SRI informed about its activities covered by the Agreement and shall give SRI access to all commercial information relevant to such activities.

## 19.    DURATION AND TERMINATION

19.(1) This Agreement shall be deemed to have come into effect on the Commencement Date.

(2) This Agreement may be terminated by mutual agreement on twelve (12) months written notice.

(3) Should either party wish to unilaterally terminate this Agreement  for cause or convenience it must, prior to serving the requisite twelve months written notice on the other party, submit its reasons to the Council, with a copy to the other party.   The notice period will be deemed to begin from the date of the submission to the Council but service of the notice will not take place until either the Council has formally responded in writing or has discussed the matter with the parties.   Should the Council fail to respond or discuss by the date of expiry of twelve calendar months from the date of submission to the Council then the submission  shall be deemed to be a notice of termination and this Agreement will be deemed to have terminated on the expiry date.

Should this Agreement be terminated by SRI for cause under the provisions of this clause the Council reserve the right to review, and make appropriate representations to the board of SIPC in connection with, any benefits given to the Franchisee in respect of the Trade Marks.

(4) If SRI has not received any payment from the Franchisee required under the terms of this Agreement within a period of two (2) months of the date such payment fell due, SRI may suspend the provision to the Franchisee of any of the Facilities under the terms of the Agreement.

(5) SRI may immediately terminate this Agreement should SRI for whatever reason not have received any payment due from the Franchisee to SRI under this Agreement in the manner indicated therein within a period of three (3) months of the date such payment fell due.

(6) Either party may immediately terminate the Agreement upon any change in the legislation in force in the Territory or upon any change in either party's contractual relationships with third parties  which substantially affect the other parties activities or substantially restricts or tends to restrict either party's rights or obligations under the Agreement.

(7) The termination of this Agreement shall, except as specifically stated otherwise in this Agreement, not prejudice any obligations, rights or remedies accruing before, at or in consequence of its termination or any proceedings with respect to any obligations, rights or remedies including proceedings by way of arbitration arising out of or relating to this Agreement.

## 20.    NOTICES

20.(1) All notices and other communications to be sent by either party to the other shall  be  sent  to  the  other  party  at  its  address  as  stated  above  in   this

SOL CONFIDENTIAL 133

Agreement, provided that either party may at any time designate a different address to which notices and other communications are thenceforth to be sent.

## 21.  ARBITRATION AND APPLICABLE LAW

21.(1)  The parties shall endeavour to resolve any dispute, claim or controversy which may arise out of or in connection with this Agreement or the application, implementation, validity, breach or termination thereof through friendly consultation between them. Such consultation shall commence upon the written notification to that effect by one party to the other party. Any dispute between the parties that is not settled by such consultation within three (3) months of the from the date of the written notice will be finally and exclusively settled by arbitration in London in accordance with the rules of the London Court of  Arbitration by three arbitrators appointed in accordance with said rules. The arbitration shall be conducted in English. The arbitration award shall be final without appeal to the courts.

(2)  The validity, application, interpretation and implementation of this Agreement shall be exclusively governed by English law and English law shall exclusively govern the merits of any dispute arising under or in connection with this Agreement as referred to in Clause 21(1).

## 22.  MISCELLANEOUS

22.(1)  This Agreement constitutes the entire agreement between the parties with reference to its subject matter and supersedes any agreements, contracts, representations and understandings (oral or written) made prior to or at the signing of this Agreement.

(2)  No amendment, alteration, modification or waiver of any of the provisions of this Agreement, or the rights or obligations of the parties shall be valid and effective unless it is agreed to and signed by each of the parties.

(3)  If any provision of this Agreement shall be found to be illegal, unenforceable or otherwise invalid, then, notwithstanding any such invalidity this Agreement shall remain in full force and effect and such provision shall be deemed to be deleted from this Agreement and substituted by a valid provision which in its economic and legal effects comes so close to the invalid provision that it can be reasonably assumed that the parties would have contracted also with this new provision.

(4)  In case such a new provision cannot be agreed upon, the invalidity of one or more provisions of this Agreement will not affect the validity of this Agreement as a whole, unless the invalid provision is of such essential importance to this Agreement that it is to be reasonably assumed that the parties would not have entered into this Agreement without the invalid provision.

## 23.  HEADINGS

23.(1)  The headings of Clauses and sub-clauses are inserted for convenience only and shall not affect the meaning or operation of the Agreement.

**APPENDIX ONE**

SOL CONFIDENTIAL 134

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

**Definitions**

In this agreement where the context allows, the following terms shall have the following meanings:-

Affiliate of SIPC means:

(i) N.V.Koninklijke Nederlandsche Petroleum Maatschappij (a Netherlands Company), The "Shell" Transport and Trading Company p.l.c. (an English Company) and any company (other than SIPC and the Franchisee and Affiliates of the Franchisee) which is for the time being directly or indirectly affiliated with N.V. Koninklijke Nederlandsche Petroleum Maatschappij and The "Shell" Transport and Trading Company p.l.c. or either of them, and

(ii) any other company agreed between the parties to be an Affiliate of SIPC

For the purpose of this definition a particular company is directly affiliated to another company or companies holding shares carrying more than 50% of the voting rights at a general meeting (or equivalent) or more than 50% of the issued capital of the particular company, and a particular company is indirectly affiliated with a company or companies (hereinafter in this paragraph called the parent company or companies) if a series of companies can be specified, beginning with the parent company or companies and ending with the particular company, so related that each company of the series, except the parent company or companies, is directly affiliated with one or more of the companies earlier in the series.

"Agreement" means this Franchise Agreement and any appendices attached to it or added as amended from time to time.

"Affiliate of Franchisee" means any company which is directly a subsidiary of the Franchisee or indirectly a subsidiary of the Franchisee through one or more tiers of intermediaries, such that the Franchisee directly or indirectly holds shares carrying more than 50% of the votes at a general meeting (or equivalent) or more than 50% of the issued capital of such subsidiary.

"Commencement Date" means the date this Agreement comes into effect being 1st January 1999

"Core Team(s)" means a team selected by SRI and drawn from nominated employees working in the operating company of one or more Franchisees who have specialist knowledge and experience to contribute to any one of the series of projects to be undertaken by SRI for the benefit of all Franchisees.

"Confidential Information" means any knowledge or information disclosed to SRI by the Franchisee or disclosed to the Franchisee by SRI, or on behalf of SRI whether orally, in writing, drawings, computer programmes or in any other way as well as all data derived therefrom to the extent that at the time of such disclosure the knowledge or information is not

(a) already in possession of the Franchisee or SRI free of any restrictions as to use or disclosure; or

(b) part of the public knowledge or literature

**SOL CONFIDENTIAL 135**

"CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY"

as well as any knowledge or information disclosed to SRI or by the Franchisee, or by the Franchisees to each other as from time to time agreed between the parties.

Confidential Information includes Confidential Record.

"Confidential Record" shall mean any publications, printed matter, manuals, reports letters telexes drawings computer programmes, photographs, films, video, tape, diskette, CD-Rom and other information carriers or media conveying information and any other material containing Confidential Information.

"Default Rate means with respect to pounds sterling the one month London Interbank Offered Rate (L-IBOR) for pound sterling as quoted by the National Westminster Bank plc at the 10a.m. fixing on the first London banking day of the Month plus one per cent ( 1 %).

"Facilities" means all general and  specialist advice and services relevant to the Franchise provided to the Franchisee under the terms of this Agreement.

"Franchisees" mean the  Shell Operating Companies who have entered into an agreement on similar terms to this Agreement.

"Franchise" means the global network of Retail Businesses  individually operated by the Franchisees.

"Global Retail Business" means the collective businesses carried out by all the Franchisees through their Retail Businesses.

"Global Support" means the general  Facilities provided by SRI  to all Franchisees as standard, all charges for which are included in the general Franchise fee.

"Gross Misconduct" means an act or omission (not justified by any special circumstances) which demonstrates an intentional conscious or reckless disregard of avoidable and  harmful  consequences  which  should  have  been  reasonably anticipated by a person of ordinary prudence on the part of directors or senior supervisory staff while acting within the course of their function.

"Month" means calendar month.

"Publish" and "Publication" mean the publication of information on the SRI Web Site accessible only to Franchisees.

"Retail Business" means the business carried out by each individual Franchisee through its Retail Units.

"Retail Units" means all those  filling stations located in the Territory which sell motor fuel  under the Trade Mark and , where applicable, carry out the business of a convenience store in the shop located at the station or, in some cases, at separate premises.

"Sales Proceeds means the total net sums billed to customers for the supply of motor gasoline , non fuel retailing  shop goods, and non fuel retailing other revenues through its Retail Units by the Franchisee in each Quarter  as reported under the standard SIPC financial reporting procedure  from which shall be deducted all taxes

SOL CONFIDENTIAL 136

duties and imposts (other than income or profits tax) payable to any governmental port or local authority in respect of such supply.

"Specific Support" means the specialist Facilities provided by SRI to give added value to a Franchisee's Retail Business.

"System" means the system devised and developed by SRI in order to establish a basis for the operation of the Franchise.

"SRI Web Site" means the site on the Shell intranet dedicated to the Franchise, and to which only Franchisees have the access key, which acts as the knowledge base and communications centre fundamental to the functioning of the Franchise and which can be contributed to by all Franchisees.

"Trade Marks" means all of the manifestations, trade marks and service marks, house marks, and marks of ownership, trading names, brand names, service marks and names, distinctive colour schemes, devices, styles of labelling, emblems, and other manifestations associated with Shell.

"Territory" means the country or territory in which the Franchisee carries out its business.

"Quarter" means a consecutive period of three months commencing on January 1st, April 1st, July 1st, and October 1st in each Year.

"Year" means a period of twelve consecutive months of the Gregorian calendar commencing on the 1st January.

"Zone" means a specific geographic business area being either South, East, or Europe.


IN WITNESS WHEREOF the parties have signed this Agreement in two originals constituting one instrument.

For and on behalf of

THE SHELL COMPANY OF PUERTO RICO

..........................................................................................................

the...21st.....day of..September... 199 9


SHELL INTERNATIONAL PETROLEUM COMPANY LIMITED

..........................................................................................................

the 15th day of June 1999

SOL CONFIDENTIAL 137

# Exhibit 12b

## MARKETING AND DISTRIBUTION SERVICES AGREEMENT

This Agreement is entered into as of the 24th day of October, 2003, by and between Shell Chemical Yabucoa, Inc., a corporation organized under the laws of Puerto Rico (hereinafter referred to as "SCYI"), represented herein by Sven Erikson, and The Shell Company (Puerto Rico) Ltd., an entity organized under the laws of the United Kingdom (hereinafter referred to as "Shell PR"), represented herein by Juan Herman Colon.

1.  **DEFINITIONS**

    1.1  **Accounting Year** - Shall mean a 12-month period that begins on January 1 and ends on December 31.

    1.2  **Change in Ownership** - Shall have the meaning established in Section 4.2.2 of this Agreement.

    1.3  **Fee** - Shall mean the fee established pursuant to Section 3.2 of this Agreement.

    1.4  **Fiscal Quarter** - Shall mean each of three-month periods ended March 31, June 30, September 30 and December 31 of each calendar year.

    1.5  **Nominal Cost of Goods Sold - Oil Products** - Shall mean the cost of goods sold, determined by standard accounting practices, with respect to the Products, based upon a reference price established in accordance with Exhibit A hereof.

    1.6  **Nominal Gross Margin - Oil Products** - Shall mean the aggregate revenues derived by SCYI from the sale of the Products less the aggregate Nominal Cost of Goods Sold - Oil Products.

    1.7  **Products** - Shall mean the hydrocarbon products described in Exhibit B to be sold by SCYI for use or consumption within Puerto Rico. The parties may, by mutual consent, revise the enumeration in Exhibit B from time to time to include therein or delete therefrom products. Any such revised Exhibit B shall be clearly dated and initialed by an officer of each contracting party.

    1.8  **Quarterly Advance Amount** - Shall have the meaning set forth in Section 3.3 of this Agreement.

**CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY**

SH-PR-YAB001848

**1.9** **Quarterly Report** – Shall have the meaning set forth in Section 3.4 of this Agreement.

**1.10** **Services** – Shall mean the services to be rendered by Shell PR to SCYI pursuant to this Agreement, as set forth in Section 2 and Exhibit C of this Agreement.

**2.** **SERVICES TO BE RENDERED**

**2.1** **Specific Services** – Shell PR hereby agrees to provide to SCYI marketing and distribution services in connection with the sale of Products in Puerto Rico, including, but not limited to, the services enumerated in Exhibit C hereto. The parties may, by mutual consent, revise the enumeration in Exhibit C from time to time. Any such revised Exhibit C shall be clearly dated and initialled by an officer of each contracting party.

**2.2** **Marketing Plan and Budget** – On or before June 1st of each year, Shell PR shall submit to SCYI, for SCYI's approval, a complete Marketing and Distribution Plan with respect to the Products for the following Accounting Year, which plan shall include detailed information regarding:

- projected annual and monthly demand for each of the Products,
- marketing plans for each of the Products,
- budget of costs and expenses expected to be incurred in connection with the Services, by month and on an annual basis, and
- any other information requested by SCYI that is necessary or convenient in connection with SCYI's budgeting or production planning/scheduling functions.

SCYI's approval in writing shall be obtained prior to implementation of the Marketing and Distribution Plan for the Accounting Year. Prior to implementing any deviations from the approved Marketing and Distribution Plan for an Accounting Year, Shell PR shall obtain SCYI's approval in writing.

**2.3** **Duty of Care** – Shell PR shall exert due care in rendering the Services and in incurring expenses in connection therewith, in accordance with standard business practices in the jurisdiction and guidelines, if any, established by the Royal Dutch Shell Group.

2

**CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY**

SH-PR-YAB001849

## EXHIBIT C

## Specific Services

1.  Prospecting and development of potential customers on behalf of SCYI,

2.  Developing customer relationships with the customers of SCYI, including assistance in the event of litigation,

3.  Assistance in negotiation and drafting of contractual arrangements with customers, including recommendations to SCYI as to terms and conditions thereof, it being understood that final approval shall at all times remain with SCYI,

4.  Order taking and customer accounting,

5.  Credit management and collection of accounts receivable,

6.  Distribution and delivery of the Products to customers, including loading activities at Cataño facilities until such time as Yabucoa loading rack is operational,

7.  Development and maintenance of network of service station outlets,

8.  Assistance in development of pricing strategies and structures,

9.  Development and implementation of marketing, advertising and promotional activities,

10. Assistance in preparation of reports related to distribution, promotion and/or sale of the Products, including reports to government agencies,

11. Health, safety, security and environmental advice and support, and

12. Any other marketing and distribution services that SCYI and Shell PR may agree to in writing.

**CONFIDENTIAL MATERIALS (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY**

SH-PR-YAB001860