F1FFMTBC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    In Re: METHYL TERTIARY BUTYL
3        ETHER ("MTBE") PRODUCTS          00 CV  1898 (SAS)
         LIABILITY LITIGATION
4   ------------------------------x

5                                   New York, N.Y.
                                    January 15, 2015
6                                   2:30 p.m.

7   Before:

8            HON. SHIRA A. SCHEINDLIN

9                                   District Judge

10

11          APPEARANCES

12  LIAISON COUNSEL FOR PLAINTIFFS:

13  ROBIN GREENWALD, ESQ.
    LEONARD KAUFMAN, ESQ.
14  MICHAEL AXLINE, ESQ.
    DUANE MILLER, ESQ.
15  JOHN GILMOUR, ESQ.
    WILL PETIT, ESQ.
16  WILLIAM JACKSON, ESQ.
    NATHAN SHORT, ESQ.
17  STEPHEN CORR, ESQ.

18  LIAISON COUNSEL FOR DEFENDANTS:

19  JAMES PARDO, ESQ.
    STEPHEN RICCARDULLI, ESQ.
20  MICHAEL DILLON, ESQ.
    LISA GERSON, ESQ.
21  PAMELA HANEBUTT, ESQ.
    WILLIAM STACK, ESQ.
22  MARK LILLIE, ESQ.
    STEVE LEIFER, ESQ.
23  CARLOS BOLLAR, ESQ.
    JAMES TUITE, ESQ.

24

25

F1FFMTBC

```
 1              (Case called)

 2              (In open court)

 3              THE COURT:  I understand there's a couple of people on

 4    the phone.  I may want to say hello to them first and then they

 5    can stay quiet.  This is Judge Scheindlin.  Can you hear me on

 6    the phone?

 7              MR. CEPEDA:  Yes, your Honor I can hear.

 8              THE COURT:  All right, can you just identify yourself,

 9    just the two folks on the phone.

10              MR. CEPEDA:  This is Alejandro Cepeda on behalf of Sol

11    Puerto Rico, Limited.

12              MR. CARTER:  Clem Carter, McGuire Woods, on behalf of

13    Western Refining Yorktown, Inc.

14              THE COURT:  Because I have a lot of folks in the

15    courtroom and it's difficult to participate by phone as I

16    understand it you folks will just be listening but will not be

17    speaking today.  So I'm now going to greet the folks who are

18    here.  Ms. Greenwald, good afternoon.  Mr. Axline, good

19    afternoon.  Mr. Miller, good afternoon Mr. Petit, good

20    afternoon.  Mr. Gilmour, good afternoon.  Mr. Kaufman, good

21    afternoon.  Mr. Corr, good afternoon.

22              COUNSEL:  Good afternoon, your Honor.

23              THE COURT:  That's for the plaintiff's group.

24              You know what, I'll say good afternoon to you at the

25    end, all of you at once.  Mr. Pardo, Mr. Riccardulli,
```

F1FFMTBC

1    Mr. Lilliie, Ms. Hanebutt, Mr. Tuite, Mr. Leifer, Mr. Dillon,

2    Mr. Bollar, Mr. Stack, Mr. Bongiorno, Ms. Gerson, Mr. Correll.

3              COUNSEL:  Good afternoon, your Honor.

4              THE COURT:  And to everybody else whose names I

5    haven't read off but I obviously see you, I know you're

6    present.  We do have a court reporter obviously.  When somebody

7    speaks please say your name for the record.  I may know all of

8    your names or at least most of you who are seated at the table,

9    but the court reporter does not see you as often as I do and so

10   it would be best if you would identify yourself each time.

11             So in terms of the agenda that I thought we were going

12   to have today, it begins with the New Jersey matter and the

13   question of what is to be remanded and then we go on to the

14   Pennsylvania case and there's some issues there as to whether

15   the so-called insurance case should stay in the MDL or go back

16   to the District of Pennsylvania and what to do about the

17   pending motions.  And then maybe there's a need for an update

18   in the Puerto Rico case.  I think I missed one item that we've

19   been discussing in the Pennsylvania matter that's the issue of

20   the personal jurisdiction motion with respect to the company

21   known as Lukoil Americas Corporation and we'll discuss that

22   too.  That was all that I had on the agenda.

23             Did anybody think there was any other item that you

24   had planned to discuss today or would like to discuss today?

25             MR. PARDO:  Not for us, your Honor.  Jim Pardo,

F1FFMTBC

 1    liaison counsel for defense.  No, your Honor.

 2             THE COURT:  That's for you.  Anybody else have any

 3    other items they wanted to bring up?  No.  Then we will start

 4    with the New Jersey matter.  The plaintiffs say the full case

 5    is ready to return to New Jersey and the defendants say not so

 6    fast you should do it in part and there's precedent for doing

 7    it in part, you should only send back that which is ready to be

 8    tried and you should leave the remainder here as part of the

 9    MDL for continued discovery and/or resolution which may well be

10    affected by the trial of the bellwether sites.

11             So who wishes to be heard first?  All right, Mr.

12    Pardo, that's fine.

13             MR. PARDO:  First on my feet.  Well, good afternoon,

14    your Honor.  It actually feels like some time in which we've

15    been here.  I think it was October, is that right?

16             THE COURT:  That's unusually long for us but that's

17    right.

18             MR. PARDO:  Well, happy new year.  Yes, we agree with

19    the defendants in this respect the 19 or 20 focus sites which

20    we picked back in 2010 -- I know, right? -- are ready to go

21    back and should go back.  And the purpose of selecting those

22    focus sites is that so they would go back.  We would try those

23    to a verdict or come to some other resolution I suppose back

24    there, and that would be guidance for us and for the plaintiffs

25    back in this courtroom.  And that's the key point, your Honor.

F1FFMTBC

1    Because at the time that we set this up, and you can go back

2    and look at the transcripts just as we can, we had a discussion

3    about this, about what should go back, how many, and we, the

4    defendants, actually suggested to you at that time that maybe

5    we want to send some more back when we do this, okay?  Maybe it

6    should be these 20 and some others so that the trial judge can

7    pick from others and try a few more and you said in no

8    uncertain terms, no way no how.  The trial judge will be

9    permitted to try 20 or fewer but she will not be permitted to

10   try more.  Not as part of that first tranche that I'm going to

11   send back.  And the only way that that can be assured is if

12   only the 20 in fact go back, which is what you and I believe

13   the parties contemplated all along.

14           That is the most efficient approach.  You can see the

15   case law as well as we can.  It is replete with examples of

16   Courts in cases like this, sometimes multiple cases but also

17   large cases, large MDLs and this case is larger than most MDLs

18   are.  These sites are in many ways like their own cases, okay?

19   Different defendants, different causes of action, somewhat

20   unique facts but common facts as well.

21           THE COURT:  I guess my question is what would you

22   think we would do here in the MDL court if and when the 20 are

23   resolved but it doesn't lead to a global settlement?  What

24   would be the next step here?  Would we just begin discovery on

25   a second tranche of 20 or what?  What would you envision?

F1FFMTBC

1    Would there be more new motion practice?  I realize it might

2    depend on what that verdict is, but nonetheless, what do you

3    envision if trying the 20 doesn't end the entire New Jersey

4    case, then what would you envision?

5           MR. PARDO:  Well, it's a discussion we've started to

6    have, okay?  Obviously, your point is the one we've dwelled on

7    as well.  That is the answer to that depends in large part on

8    what we get out of that first trial.  We may come away with

9    guidance, verdicts, whatever, that make this a much, much

10   smaller case, we think, and that may guide us in how we

11   structure the rest of those cases here.  Maybe we do a larger

12   tranche, maybe we do something else.  But I think I can say

13   with some confidence that we are looking for other ways, we are

14   contemplating other ways of working up those cases besides just

15   picking another 20 focus sites.  I think that that is, that is

16   and was the right way, the best way, the most efficient way to

17   start this but it's not necessarily the right, best or

18   efficient way to continue it if in fact we have to.  I think

19   the next step may be to try to come up with some maybe broader

20   categories of cases from which we can then make some selections

21   for either discovery or remand for trial that would provide

22   more focused guidance for purposes of those categories.  I

23   don't believe now that we, at least defendants would come back

24   to you and suggest that the next step is another 20 sites.

25   Because to do that, you'll be 160 years old when we finish this

F1FFMTBC

case.  Obviously, that won't happen.  We can't do it that way
and we don't need to do it that way.  There will be a better
way to do it.

        But until we get that verdict or verdicts in that
initial trial I don't know that we can predict or say right now
with certainty what those charges are.

        THE COURT:  Let me say it this way.  If it takes a
year, for example, to get that verdict would we be doing
nothing here in the MDL court with respect to the New Jersey
case?  It would just be sitting here sort of resting so it
doesn't matter which court it's resting in or would we be
moving it forward in some way or other?

        MR. PARDO:  Well, that's a great question.

        THE COURT:  I know.

        MR. PARDO:  We could stay them, but I don't know if
that makes -- again, this is a discussion that we as the
defendants have started to have.  We still need to speak with
plaintiffs about what their ideas and preferences are as well.
But not necessarily would we have to, they don't necessarily
have to be stayed, your Honor.  There may be some preliminary
type, broader discovery that we could use akin to almost like a
Lone Pine approach --

        THE COURT:  A what?

        MR. PARDO:  A Lone Pine, preliminary discovery that we
could use to take those other 5,245 cases whatever it is and

F1FFMTBC

1    start putting them into buckets.  I don't know how long that

2    would take.  I don't know that it would take --

3          THE COURT:  I don't mind that.  But if there's no

4    activity at all versus some activity it might affect my view on

5    whether it's appropriate to sever it, to sever the trial ready

6    bellwether cases and keep the remainder here with some

7    activity, but if it simply languishes as a statistic while

8    you're waiting for this trial to be resolved that may be a

9    little more difficult.  You used the word "she."  Do you

10   actually know whose case this is?

11         MR. PARDO:  Judge Wolfson, your Honor.  Frieda

12   Wolfson, your Honor.

13         MR. KAUFMAN:  It was assigned to her.  It was assigned

14   the MDL.

15         THE COURT:  Years ago?

16         MR. KAUFMAN:  We don't know if it will go back to her

17   but she was the last one to have it.

18         MR. PARDO:  I don't think this would languish, your

19   Honor.  I think there are ways which we could do it very

20   efficiently, some sort of higher level discovery, maybe even in

21   an informal type setting because I know both sides are going to

22   be busy, many of us back in front of Judge Wolfson aimed at at

23   least starting to take that mass of cases, over 99 percent of

24   the cases let's start getting them into some buckets that we

25   can then begin to focus on.

F1FFMTBC

1                THE COURT:  Who wants to be heard for the plaintiffs?

2                MR. AXLINE:  Mike Axline, your Honor.  I want to start

3      by saying I want to say we had a different understanding of why

4      we identified the bellwether sites than Mr. Pardo represents.

5      The idea was to conduct complete discovery for those sites and

6      then send those sites back for trial but it wasn't like you

7      said we're only going to permit 20 sites to go back for trial,

8      you said I'm not going to impose more than 20 sites on the

9      trial judge so there was no discussion of what we were going to

10     do when we arrived at the point where we are now.  So we were

11     quite sincerely surprised when the defendants after having said

12     six months ago that the case was ready for remand said well,

13     only part of the case is ready for remand.  So I'll just put

14     that on the record.

15                In terms of the practical management of the case going

16     forward, your Honor, in thinking about the consequences of

17     going each route, it does seem to me like a couple of things

18     are virtual certainties.  One, the case is likely to be

19     somewhat smaller by the time it gets to Judge Wolfson.  There

20     are likely to be some additional settlements.

21                THE COURT:  Sure.

22                MR. AXLINE:  We don't know how many sites are going to

23     be involved even before trial much less after trial now.

24     Second, Judge Wolfson is going to get a view of the New Jersey

25     claims that this Court has not yet had because she's going to

F1FFMTBC

1    do the trial.  She's also going to I think understand because

2    of that what the possibilities are going forward in a way that

3    this Court cannot, so in terms of managing the case post trial

4    Judge Wolfson is going to have not only the benefit of your

5    rulings in this case because you've got all that but she is

6    going to have something you will not have and that is having

7    gone through a trial with the cases.

8              THE COURT:  Well, maybe yes, maybe no.  My experience

9    is that sometimes while everybody expects a trial no trial will

10   occur.  These 20 sites will somehow miraculously settle on the

11   eve of trial or slightly before the eve and in fact she will

12   not have any exposure to the case and there will still be 5,000

13   sites that will need to be looked up.  She will have done

14   nothing in the MTBE case.  This is a possibility.  You know

15   yourself trials are rare and things happen.  So I can't predict

16   which it will be.  I know on my docket it looks like trial,

17   trial, then miraculously no trial.  I don't know what

18   experience you will have at the end of the day or won't have.

19             MR. AXLINE:  I understand that possibility, your

20   Honor, but I think the probability is unless the case is

21   settled as a whole she's going to try these sites.  Every

22   settlement that has come down the pike so far has been a global

23   settlement.  Nobody to date has settled just one site.  So

24   while it's a possibility I think it unlikely.  So in any event

25   if we're trying to make judgments about how to manage the case

F1FFMTBC

1    going forward in the face of uncertainty, I do think that the

2    way this case is structured now she's going to try these sites

3    and she's going to get a very closeup view --

4              THE COURT:  You keep saying that.  I say only with a

5    trial in her courtroom.

6              MR. AXLINE:  With that caveat.

7              THE COURT:  Yes and if there isn't a trial in her

8    courtroom for some reason then she's really not in a position

9    to go forward and if it takes a long time for that trial to get

10   scheduled and tried and there's dead time in between, I don't

11   know her, I don't know her docket and I don't know her court,

12   but what if you all go back and she says oh, looking at my

13   trial calendar this is a long one this is going to take three

14   or four months, I can't try this until March of 2016.  I'm just

15   making that up.  If she says that then the whole case is dead

16   and really is for 16 months because she can't do any of it.

17   This as you know is long, long running, all of us have much

18   experience to have it move forward, there's no reason to have

19   any dead time here which is why I questioned Mr. Pardo.  If I

20   followed his idea would I just be a babysitter for a stay

21   period of however long it takes to get to it, try it, get a

22   verdict not to mention post trial issues?  Or can we accomplish

23   something pretrial which is what the MDL is designed for.

24   Those are some of the considerations I have.  Right now this

25   judge is not working with this and I don't know how fast she

F1FFMTBC

1    can reach it.  You haven't yet been before her yet for a

2    conference to find that out.  Not yet, right?

3              MR. AXLINE:  No.

4              THE COURT:  Of course not yet.  One thing an MDL judge

5    can always do is reach out to her.  I can judge to judge and

6    just find out what things look like.  How long do you think

7    this case would take to try in its current posture?  I would

8    think several months.  What do you think?

9              MR. AXLINE:  I think several months is a good

10   estimate.  We have some track record now to look to, that's

11   what it often takes.

12             THE COURT:  That's what it often takes.

13             MR. AXLINE:  I'll make one other point unless your

14   Honor has any other questions and that is that the purpose of

15   the bellwether obviously goes without saying is so that you can

16   get to that stage in the whole process and then stop and

17   evaluate based on that experience.  So we have set this up that

18   way up until now.

19             THE COURT:  Absolutely.

20             MR. AXLINE:  It does seem to me going back to the

21   beginning because what the defendants were pushing for at the

22   beginning was to do the case as a whole and that's where you

23   said no, we're not doing that, that's unmanageable, but now

24   they're kind of pushing that way again.

25             THE COURT:  Not exactly.  Now they're thinking along

F1FFMTBC

1    the lines of categories I think the word used was buckets,

2    where it takes some meeting and some thinking maybe there would

3    end up being ten buckets which would have representative types

4    of sites and within those ten buckets it may be that one site

5    per bucket would have an approach long ago, a good approach now

6    and maybe those ten cases would have to begin in some way to

7    move forward both general and specific in terms of discovery.

8    So those are some thoughts I have.

9         Let me ask you this:  If you wanted me -- you might

10   just be seated for a minute.  If you wanted me to tell you my

11   impressions based on the letters and this brief argument I will

12   do that.  If you think this requires and is worth the time for

13   a briefing schedule I will do that, but I suspect that a

14   briefing schedule will probably lead to the same result that I

15   think is appropriate today, so since you're anxious to get to

16   the nearby bordering state of New Jersey, you probably want me

17   to tell you what I think now.

18        MR. AXLINE:  We would welcome your thoughts, your

19   Honor.  I don't know about the defendants but --

20        THE COURT:  Well, as opposed to full briefing.

21        MR. PARDO:  We'd welcome your thoughts now as well

22   too.

23        THE COURT:  My thought was to get the case that is

24   going to be tried to New Jersey as promptly as possible and the

25   best way to do that is to sever it and I would send back the

F1FFMTBC

1   case in part, the bellwether trial case so that she can have a

2   conference with you, she can schedule a trial with you, you can

3   see what the schedule really looks like in reality.  When you

4   tell a judge you're going to be on trial three to four months

5   it's not as easy for them to calendar it compared to one week.

6   Tell a judge you have a one-week trial, they'll find you a

7   week, but three or four months is harder to find.  The sooner

8   you get there and talk about trial dates whether or not there's

9   any last minute trial work to do that's fine.  It also focuses

10  the mind on settlement.  Once you're back in New Jersey facing

11  the judge and you have a trial date that as you already

12  suggested will probably lead to more settlements.  In the

13  meantime, given all the experience in the MDL with all the

14  other cases and all the parties on a second track we should be

15  following up with the suggestion of how to move the remainder

16  forward even while the bellwether trial is being scheduled and

17  maybe held one of these months.  But this idea of categories

18  and buckets and how to work with that, prioritizing maybe, at

19  least those ideas could be generated and followed through here.

20  So my thought would be to sever it and get it back there fast.

21  If you're going to fight for the whole then I think there's

22  going to have to be full briefing because the defendants oppose

23  it.  I always said briefing takes between six and ten weeks for

24  any motion and another eight weeks to decide so you're losing

25  five more months just waiting around to get sent back where you

F1FFMTBC

1    could be sent back tomorrow and be in New Jersey.  That's where

2    I would come out on this one.  Anybody want to be heard

3    further.  Mr. Axline?

4              MR. AXLINE:  I appreciate you sharing your thoughts,

5    your Honor.  I do have one reaction and that is that in terms

6    of case management I do think it would be useful before making

7    a final decision about this to have a conversation with Judge

8    Wolfson.  Obviously the plaintiffs would not have any problem

9    with that, I doubt the defendants would.  If the case is going

10   to be in two jurisdictions at the same time that sort of

11   communication is probably a good idea anyway.

12             THE COURT:  Well, sure, no question about it.  I would

13   reach out to her immediately today or tomorrow.

14             MR. PARDO:  We would have no objection to that, your

15   Honor.  The approach that you've laid out, I know it's not a

16   ruling, is of course consistent with I think where the

17   defendants want to go.  So we see no need at this point for

18   briefing.

19             MR. AXLINE:  Could I have a moment to consult with my

20   colleagues?

21             THE COURT:  Sure.

22             MR. AXLINE:  Your Honor, Mr. Kaufman made an excellent

23   point which is before we commit to something like that we

24   probably should check with the client.  They're very interested

25   in every aspect of the case, so if we could have a couple of

F1FFMTBC

1    days to discuss with them whether they think briefing would be

2    desirable or not, we'd appreciate that.

3            THE COURT:  Sure.  There's no reason to delay, though,

4    in my contacting Judge Wolfson, right?

5            MR. AXLINE:  I see no reason.

6            THE COURT:  Okay.  So I'll do that.

7            MR. AXLINE:  And frankly, your Honor, if there's

8    anything that you think would be useful to share with the

9    parties after that conversation, we'd welcome it.

10           THE COURT:  I know who the counsel are.

11           That takes us to the Pennsylvania case.  I think we

12   begin with that motion to sever the so-called insurance case.

13   Somebody, yes, sorry your name is?

14           MR. LILLIE:  Good afternoon, your Honor.  Mark Lillie

15   on behalf of BP.  The Court's agenda asked for an update on the

16   procedural posture.  Let me give you a quick snapshot of where

17   that is.  It actually goes back to the summertime but a more

18   recent snapshot shows that in the MTBE case the state of

19   Pennsylvania tacked on three new claims at the end of October

20   and so while you've got the traditional MTBE claims in the

21   original complaint you now have this entirely different set of

22   claims here.  Those claims are three.  They are subrogation

23   under Pennsylvania law, unjust enrichment under Pennsylvania

24   law and a claim under the State Tank Fund statute, if you will.

25   And this all has to do with basically commercial insurance

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1FFMTBC

1    issues and I'm not sure if the Court has familiarity with one

2    of these state tank funds but typically how they work as it

3    does in Pennsylvania is that the marketer of gasoline pays a

4    fee for every gallon of gasoline that goes into a tank it's

5    held in trust by the State Tank Fund to help facilitate

6    cleanups when they're needed and under a very strict regimen

7    that is in the tank fund statute people who have spills from

8    their tanks are able to petition for, if they're eligible, for

9    reimbursement.  It doesn't necessarily cover all the costs, it

10   may cover some of them and there is a cap above which in any

11   event the state will not reimburse.

12        So that's the fundamental statutory framework that

13   brings us here.  These claims that are now the three additional

14   claims brought against certain of these defendants were

15   originally in a separate lawsuit filed in state court in

16   Pennsylvania.

17        THE COURT:  But removed by the defendants under the

18   Energy Policy Act?

19        MR. LILLIE:  That's correct, Judge and there are

20   different sets of lawyers involved for the different sides.

21   Our fundamental premise is that the starting point as to

22   whether these claims should be in MDL 1358 is to go to the

23   transfer order that was issued by the JPML in 2000 and that

24   order establishing a products liability MDL here speaks to two

25   very different issues from the ones that are pled in this

F1FFMTBC

complaint.  That order says that this MDL is established for

common questions of fact concerning, one, whether defendants

knew about and misrepresented the nature of MTBE and conspired

to market MTBE without disclosing its risks to downstream

users, the federal government or the public and, secondly,

whether plaintiffs sustained drinking water contamination as a

result of MTBE contamination.  Neither of those mandates from

the JPML fit the claims that are on these added on claims

counts seven, eight and nine in the new complaint.

THE COURT:  How much of the discovery would be in

common?  In other words, if you pursue this tank fund claim or

the unjust enrichment or I forget the third one you mentioned,

how much would you have to learn that is going to be learned in

the main so-called MTBE case.  Remember as we just discussed in

the New Jersey matter the MDL is a pretrial situation, it tries

to coordinate pretrial discovery across the board.  If the

discovery is going to be repetitive to some extent, not in

full, but were there spills, were there cleanups, who is at

fault, who has to pay, if some of those are in common what's

the problem of keeping the case as a whole for the pretrial

purposes but then it may well be that those claims shouldn't go

to trial, the product liability claims when the time comes but

you don't depose the people twice, you don't have duplicative

experts, etc. I'm not arguing with you, I'm merely asking you

that.

F1FFMTBC

1          MR. LILLIE:  Yes, your Honor.  I think there's no

2    question but is there some sliver of evidence that could be

3    common.

4          THE COURT:  Sliver?  Or is there significant overlap?

5          MR. LILLIE:  No, I don't think it's a significant

6    overlap.  What would be most relevant in the MTBE case are the

7    documents relevant to the decision to use MTBE, the marketing

8    strategy, the way in which product gets into the particular

9    state, the risks of using MTBE and so on and so forth.  In our

10   insurance docket what's relevant is what were the commercial

11   insurance policies that these companies had, the people who

12   managed those risk management policies, if you will, are

13   different from --

14         THE COURT:  Let me interrupt you.  You seem to be

15   highlighting the differences.  I'm looking for the overlaps.

16   Do you remember seeing those graphs, where there's circles and

17   the middle circle has the gray where they overlap?  I'm looking

18   for the overlap.  You don't have to insure anything if there

19   isn't a spill, there's been no harm.  If there's been harm

20   there's a damage, somebody has to pay for it.  You have to

21   apportion who is going to pay what, the overlap is in the

22   middle.  I appreciate the difference but I haven't heard you

23   address the overlap, whether it's a sliver or a mountain I

24   don't know but could you address the overlap?

25         MR. LILLIE:  I can address it to some extent.  We're

F1FFMTBC

1   at a very early stage, no discovery has happened.

2           THE COURT:  I know.

3           MR. LILLIE:  Yes for the tank fund issues it would be

4   relevant to know when did the spill take place, what was the

5   corner at which it took place and how much was paid by the

6   party cleaning up the site and how much was paid by the state.

7           THE COURT:  And who might be the responsible party for

8   the spill?  Can the responsible party be identified?  Right?

9   Who it might be, whether it really caused any harm.  These

10  might be issues also in the insurance.

11          MR. LILLIE:  I think that the environmental harm is

12  already assumed with respect to these tank fund claims because

13  it's already been demonstrated that there's been a leak.  That

14  leak took place at a particular point in time which the statute

15  covers and the administrator at the State Tank Fund made a

16  determination that these kind of claims were eligible.

17          THE COURT:  That may be for the tank fund claim.  You

18  mentioned two other claims.  One you said was unjust enrichment

19  I forget what you said the third one.

20          MR. LILLIE:  The third one is the subrogation claim.

21  They all revolve around the basic set the facts and the basic

22  claim is that these companies that had spills filed coverage

23  litigation in varying places and monetized those policies and

24  in essence the allegation is that they double dipped.  They got

25  paid there for certain environmental claims and now they're

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1FFMTBC

```
1    also getting paid by the State Tank Fund.  That's the essence

2    of the claim.  So with those basic statements the State claims

3    a subrogation point in count seven claiming that they as the

4    subrogee have a claim against us as the subrogor, we're now

5    getting into the Rule 12 motion which I guess we'll address a

6    little bit later, but there's a problem with that.  The unjust

7    enrichment claim is the same basic set of facts giving rise to

8    their claim of a double dip and the statutory claim falls

9    within the specific provisions of the statute.

10            THE COURT:  Let me hear from somebody on the

11   plaintiff's side about whether the insurance claims so to speak

12   should remain as part of the main case.

13            MR. CORR:  Good afternoon, your Honor.  Steven Corr on

14   behalf of the Commonwealth of Pennsylvania.

15            THE COURT:  Are you with a law firm?

16            MR. CORR:  With Stark & Stark.  I guess my view of

17   slivers is a little bigger than Mr. Lillie's, unfortunately I

18   probably eat that way too.  The motion -- Mr. Lillie started on

19   the procedural process here and where we filed originally was

20   in the state court in Pennsylvania.  The removal was based

21   solely on a relation to MTBE.

22            THE COURT:  It was under the Energy Policy Act.

23            MR. CORR:  And specifically that section that dealt

24   with MTBE.

25            THE COURT:  I understand but that just gives the Court
```

F1FFMTBC

1    federal jurisdiction.  They have their reason for preferring to

2    be in a federal court.  That's okay as long as the Court has

3    jurisdiction, but that doesn't necessarily mean that it should

4    be part of the MDL as opposed to a federal court in

5    Pennsylvania.  But go ahead.

6          MR. CORR:  I appreciate that difference too.  What the

7    Commonwealth felt was that when both cases were removed to

8    federal court that it was efficient not just for the court

9    system but also the state to have them consolidated.  That's

10   why the ultimate decision was made when the MTBE claims were

11   sent to the MDL.  The state then decided to dismiss their case

12   without prejudice in the Eastern District of Pennsylvania,

13   consolidate here for the very fact that the USTIF, the

14   Underground Storage Tank Indemnification Fund, the USTIF, all

15   of those claims will have to be looked at, all of those claim

16   files will be the same claim files for the insurance claims as

17   they will for the MTBE.  The overlap among the insurance claims

18   of MTBE will be significantly different.  Many of the insurance

19   claims will involve MTBE.  They will have MTBE pollution.  So

20   any file that's going to be pulled out they'll be looking at

21   those documents because it is exactly what the claim was for,

22   why they filed a claim with USTIF was pollution that included

23   MTBE.  It was then cleaned up.

24          THE COURT:  Yes, but what's the issue left to

25   litigate?  In other words your adversary says the spill is

F1FFMTBC

acknowledged, it's been cleaned up, so it's not about whether there was a spill or who caused it.  He's saying that's a given now.  Now you're talking about covering issues.

MR. CORR:  And your Honor made a great point with Mr. Lillie because the fact is we're looking at pretrial and discovery standpoint.  What is more efficient for the Courts?

THE COURT:  I'm asking you where the overlap of discovery is.

MR. CORR:  I'm saying these files, the people that are in the USTIF, the people in the Commonwealth that are going to be deposed, they're all going to be the same, they'll all come from the same departments, the same people that deal with it. The actual number of people at USTIF who are involved with these claims whether they're MTBE or not MTBE is very few. They will be the same people who are going to be deposed.  The same record keepers, custodians who are going to have to come testify this is what these records are this is what it means. Certainly those records may separate out at some point where the insurance claims go in a different direction but for pretrial purposes and convenience purposes to have one federal judge overseeing that discovery is the better route to go.  And ultimately if the decision is made to sever we also then, the Commonwealth feels that there would not be federal jurisdiction because the jurisdiction is based solely on the MTBE claim.

THE COURT:  You keep calling it the MTBE claim but it

F1FFMTBC

1    is the Energy Policy Act.  They understand, the defense

2    understands that some of these are MTBE, no fighting about

3    that.

4              MR. CORR:  That's true.  We agree with that there is

5    some overlap.

6              THE COURT:  So there will be jurisdiction if it goes

7    back because it is under the Energy Policy Act.  All right,

8    again as I did in the first case I think it's probably wise to

9    tell you my view on this and again if it's worth the time for

10   full briefing I can't say you shouldn't do it, but my view is

11   always one of efficiency both for the case, the litigants and

12   the court system.  And it does seem to me that the pretrial

13   discovery purposes it is best to keep the case as a single case

14   and to coordinate the discovery in one, before one judge and in

15   one courtroom and not have it in two different places.  That

16   may sound to you inconsistent with the prior ruling but I don't

17   think it is.  This is the place where we've been handling

18   pretrial proceedings for a long time.  And while I do think

19   there are many differences, Mr. Lillie, I agree, there are some

20   issues that have never been here before and will never be here

21   again, I understand that, but because there's a fair amount of

22   overlap I just don't think two different federal judges should

23   be doing the same thing at the same time, possibly having

24   conflicting schedules of discovery with many of the same

25   witnesses and many of the same documents.  So my inclination is

F1FFMTBC

1   to keep it together for pretrial purposes and then to sever it

2   out as need be down the road potentially in motions if they

3   don't relate to the issues that are generally here.  That's

4   where I would come out short of full briefing.  I'd be happy to

5   hear your views, Mr. Lillie, now that I told you what I think I

6   would do at this point.

7           MR. LILLIE:  I appreciate the insight, Judge.  I think

8   what probably makes the most sense from my perspective is to go

9   back to my group which is a different group from the MTBE

10  group.

11          THE COURT:  I realize that.

12          MR. LILLIE:  And advise them where the Court is and to

13  make a determination whether we should move in a different

14  direction.  If that's acceptable to the Court?

15          THE COURT:  It is.  I think what I would suggest you

16  realize you're going to have to go through pretrial discovery

17  one place or another doesn't really matter very much.  It's

18  just an effort to coordinate those witnesses that do overlap,

19  those issues that do overlap to the extent there are separate

20  issues sobeit down the road will have to be handled separate.

21  But those are my thoughts on that issue.

22          MR. LILLIE:  Thank you.

23          THE COURT:  Okay.  And now the Lukoil personal

24  jurisdiction issue.  Who wants to speak about that?

25          MR. TUITE:  Your Honor, James Tuite representing

F1FFMTBC

1  Lukoil Americas Corporation.  We filed a motion to dismiss for

2  lack of personal jurisdiction because Lukoil Americas

3  Corporation is a holding company that has no contacts with the

4  state of Pennsylvania.  Now, the recent letters --

5         THE COURT:  Yes, the real issue is whether to allow

6  jurisdictional discovery.

7         MR. TUITE:  Without jurisdiction.  It's a 12(b)(2)

8  motion saying the because state courts would lack jurisdiction

9  over Lukoil Americas Corporation that this Court lacks

10  jurisdiction over Lukoil Americas Corporation.

11         THE COURT:  Right.  But the question on this case

12  always becomes should jurisdictional discovery be allowed.  Is

13  there enough in the pleadings to warrant that.  It doesn't have

14  to rise to the level of a prima facie case yet.  I took a few

15  moments to check the law at least in this circuit which may be

16  different than the Third, but it doesn't have to make the

17  showing yet.  But it has to be more than conclusory non-fact

18  specific allegations and there has to be some showing and the

19  question is is there enough of a showing here to at least get

20  the ball rolling, have this jurisdictional discovery and it may

21  be, I don't know whether -- your name again?

22         MR. CORR:  Steven Corr.

23         THE COURT:  I don't know if whether Mr. Corr after

24  seeing some of that discovery will say I've got the wrong

25  Lukoil entities, it's not the holding company I should have,

F1FFMTBC

1    it's the such and such company, it may be that it will quickly

2    bring the matter to a head.  Sometimes parties name the wrong

3    company when there's a lot of companies with the same name and

4    then they correct it and get it right.  Again, this is again my

5    inclination here is to allow some jurisdictional discovery to

6    clean up the issue.  If you're right you win quickly and you're

7    gone.

8            MR. TUITE:  That's correct, your Honor.  I sort of

9    anticipated that's where you would head on this issue.  What I

10   would like to address, though, is to make that discovery

11   productive and meaningful and not have it be excessive and

12   burdensome.

13           THE COURT:  I agree with that.

14           MR. TUITE:  I'd like to address the time period

15   discovery should cover.  Lukoil provided documents to plaintiff

16   to support this, didn't come into existence until the end of

17   2000.  It acquired Getty Petroleum marketing stock at the

18   beginning of 2001, so that's the beginning point.  And the end

19   point is when MTBE, the use of it was discontinued in 2005.  So

20   it's our view is that if there's going to be jurisdictional

21   discovery then it should be focused on that issue.  Because at

22   the end of the day --

23           THE COURT:  It may be that it begins when you say.

24   I'm not so sure it ends when you say because there are

25   consequences to the use that continued past the point of that

F1FFMTBC

1   use.  So I don't know that 2005 is the cutoff.  I can see --

2               MR. TUITE:  Excuse me.  If you want to get into issues

3   of potential liability later on but in terms of whether either

4   Lukoil Americas used MTBE gasoline itself, which it didn't,

5   it's a holding company, it doesn't have operations, or it

6   should be held responsible for --

7               THE COURT:  Is that's why I wasn't ready to agree to

8   the four-year period.

9               MR. TUITE:  I think it should be, the discovery ought

10  to be principally focused on the period of 2000 to 2005.

11              THE COURT:  I've already told you I don't agree with

12  the cutoff date.  I agree with the start date.  Let me hear

13  from Mr. Miller.  Do you agree with this?

14              MR. MILLER:  Your Honor, there are some events that

15  precede 2001 that we need discovery on.

16              THE COURT:  Actually your adversary said 2000 but go

17  ahead.

18              MR. MILLER:  Yes.  And we're not as confident as he is

19  on the 2005 cutoff date.

20              THE COURT:  Neither am I.  You're ahead on that

21  already.  What would be your suggestion of a cutoff date, if

22  any?

23              MR. MILLER:  Your Honor, we intend to ask discovery

24  for the relevant period.

25              THE COURT:  Namely?

F1FFMTBC

1          MR. MILLER:  I'm not -- we estimate at the moment that

2    2000 to 2006 will probably cover most of the transactions.  But

3    until we see the documents I can't say that with confidence.  I

4    can tell you that we are going to focus our discovery on what

5    we consider to be the relevant events and the time period

6    associated with that and we have no interest in going into a

7    larger issue.

8          THE COURT:  Okay.  Well, stop now.  That's sort of

9    good.  It may be an extra year on each end from where you

10   started but that's just like ordinary bargaining and

11   negotiation you started from '01 to '05 you end up with 2000 to

12   2006.  Yes I appreciate, Mr. Miller, that was not a commitment

13   that was a goal.  It depends on what discovery shows.  It may

14   be he'll be back here saying the six years wasn't enough I need

15   this, I need that the door is pretty much open on that but he's

16   agreeing on focusing at least starting now with 2000 to 2006

17   and seeing where the discovery goes.

18         MR. MILLER:  Yes, your Honor.  My colleague reminded

19   me that in 2007 the related bankruptcy and fraudulent transfers

20   occurred so we may need to include that period as well as our

21   letter brief explained.

22         MR. TUITE:  Excuse me, your Honor, actually, your

23   Honor, the transaction they're talking about occurred the end

24   of 2009 which is well past the 2006 period.  I think what

25   really makes sense here is to come up with what we think is the

F1FFMTBC

1    most likely period of relevance.  Sounds like 2000 to 2006.

2              THE COURT:  Correct.

3              MR. TUITE:  If we conduct discovery on that and

4    there's still some questions we can address them at that point

5    in time.

6              THE COURT:  Correct.

7              MR. TUITE:  But let's focus on what is the biggest

8    bang for the buck here 2000 to 2006.

9              THE COURT:  I agree, Mr. Tuite.  Mr. Axline?

10             MR. AXLINE:  I'm sorry, I don't usually do this.  I

11   did prepare this part of the letter.

12             THE COURT:  You mean you're going to contradict

13   Mr. Miller?

14             MR. MILLER:  I'm going to supplement Mr. Miller.  I

15   would never think of contradicting.

16             THE COURT:  I didn't think so.

17             MR. AXLINE:  One of the absolute essential facts that

18   we need to look at is what happened at the 2009 spinoff of the

19   Getty assets at the time they had significant liability for the

20   MTBE contamination and whether Lukoil as alleged in the

21   bankruptcy proceedings spun those off in order to rid itself

22   of, well, they spun off the good assets kept the bad assets put

23   them into bankruptcy.  There was a 17-day trial on that.  We

24   would like access to the --

25             THE COURT:  I'm sorry there was a trial already?

F1FFMTBC

1          MR. AXLINE:  There was a 17-day trial that ended in a

2     $93 million settlement with Lukoil Americas Corporation, the

3     entity we named in our complaint agreed to pay the trustee

4     $93 million to settle claims about that transaction and we are

5     very interested in that transaction.  And getting access to the

6     trial transcripts and documents.

7          THE COURT:  Isn't that public?

8          MR. AXLINE:  No, they were sealed and they're

9     confidential.

10          THE COURT:  The trial transcript was sealed?

11          MR. AXLINE:  I think they were sealed.  I know a lot

12     of the key documents were.

13          THE COURT:  That may be so but the trial transcript?

14     Trials are usual public.

15          MR. TUITE:  Let me address that.  Some portions of the

16     testimony were sealed but much of the trial is public.

17          THE COURT:  I would think.

18          MR. TUITE:  And again, this transaction that was at

19     issue in this trial that occurred in 2013 had nothing to do

20     with environmental liabilities.

21          THE COURT:  Since most of the transcript is public,

22     Mr. Axline, I suggest you get it and start reviewing that which

23     is public and then if there's more to talk about there as to

24     what the discovery should be I'm sure you'll be better prepared

25     after you read the thousands of pages that you can get at to

F1FFMTBC

```
 1    make the argument.  But the bottom line is there's again some

 2    level of agreement.  I am going to permit jurisdictional

 3    discovery.  The best way to start such discovery is for the

 4    lawyers to meet and confer, to set up their own schedule.  If

 5    they can't agree then I'm happy to resolve disputes but they

 6    should try to talk about it for a reasonable time for that

 7    jurisdictional discovery and a reasonable scope for that

 8    jurisdictional discovery.  Do you have a thought Mr. Tuite or

 9    Mr. Axline as to how long this might take to do or are you

10    thinking we could complete jurisdictional discovery in two to

11    three months?  Does that sound like what you had in mind?

12             MR. AXLINE:  I would think three months would be

13    adequate, assuming there's cooperation on both sides.

14             MR. TUITE:  We would agree to cooperate.

15             THE COURT:  So then you think three months sounds

16    reasonable?

17             MR. TUITE:  Three months sounds reasonable.

18             THE COURT:  So we have a start here.  Meet and confer

19    quickly, see if you can set up a three-month schedule.  Come

20    back in mid-April, or sooner if you have a dispute.  If you

21    have no disputes come back in mid-April and tell me if you want

22    to have briefing on the jurisdictional issue.  It may be that

23    those facts, Mr. Axline, either you will be convinced there is

24    no personal jurisdiction or you would be ready to litigate it

25    with more facts at your disposal but at least you'll have the
```

F1FFMTBC

1    evidence one way or the other.  I'll be sure to agenda this one

2    before mid-April if I don't see you before that with disputes

3    on discovery.  All right?

4              MR. AXLINE:  Yes, your Honor.

5              THE COURT:  On the Pennsylvania case is there anything

6    else we should be discussing today?

7              MR. LILLIE:  Your Honor, Mark Lillie for BP.  The one

8    thing we didn't speak on any detail is our alternate motion

9    under Rule 12.  We have a motion to dismiss.  Your Honor set an

10   order back in October requiring any motions to dismiss be filed

11   by the 21st of December.  We did that.  Your Honor has set a

12   briefing schedule now on that.

13             THE COURT:  Right.

14             MR. LILLIE:  And the response brief from the

15   plaintiffs is due on February 20, our reply is due on March 20

16   and that motion raises three specific legal issues under

17   Pennsylvania law which we think probably do need to be

18   addressed.  I'd be happy to give you a preview of the motion

19   now if you'd like.

20             THE COURT:  This is the one where you said the plea

21   brief is March 20?

22             MR. LILLIE:  The response brief is February 20.

23             THE COURT:  February 20 and the reply March 20?  That

24   will be fully submitted March 20?

25             MR. LILLIE:  Correct, your Honor.

F1FFMTBC

| | |
|---|---|
| 1 | THE COURT:  You know, I will surely have forgotten by |
| 2 | March 20 what you tell me on January 15, so either we'll have |
| 3 | oral argument on this on the back end or the briefs will be |
| 4 | sufficient and I could let you know which it is after the |
| 5 | briefs come in whether I think oral argument will be helpful. |
| 6 | It's not that I don't like previews but it's like you either |
| 7 | see the movie or you see the preview.  I'll probably have to |
| 8 | see the movie on this one anyway. |
| 9 | MR. LILLIE:  Very well. |
| 10 | THE COURT:  I don't do premotion conferences on |
| 11 | motions to dismiss for that reason.  I have some success on |
| 12 | summary judgment on persuading some arguments or not but on |
| 13 | motions to dismiss I've learned to let the parties do what they |
| 14 | have do to do. |
| 15 | MR. LILLIE:  Very well.  We'll be happy to leave this |
| 16 | as is. |
| 17 | THE COURT:  Unless anybody thinks we should?  No.  So |
| 18 | I'll take a look at things, let's finish the briefing schedule |
| 19 | and if I think we need oral argument I'll call you in. |
| 20 | So that does take us to the Puerto Rico case, right? |
| 21 | I understand, sadly, in my opinion that by one vote lost, the |
| 22 | Supreme Court of Puerto Rico would not take the certification |
| 23 | here.  It was five to three.  What would have happened if it's |
| 24 | four to four.  What happens in a tie.  Anybody know the answer? |
| 25 | Nobody knows because I didn't know whether the loss was by one |

F1FFMTBC

1    vote or two.  If there had been a four-four vote wrongly I

2    assumed they would have taken it.  But anyway there's a motion

3    for reconsideration.  Who wants to, why should, what did the

4    Court miss?  In other words, if you fully brief something what

5    does reconsideration mean really?  Is it really reargument?

6    Are you going to tell them they really missed something?

7           MR. GILMOUR:  John Gilmour on behalf of the

8    Commonwealth, your Honor.  It's hard to say because in the

9    denial of certification the majority did not issue a

10   substantive opinion.

11          THE COURT:  I wondered about that.

12          MR. GILMOUR:  The minority did issue a substantive

13   opinion and said that the question as argued by the plaintiff

14   met all of the requirements both in code and the rules and

15   should have taken certification and also noted that the

16   defendants had missed their deadline for briefing despite the

17   fact that the Court had granted them an extension.  So given

18   that indication by the minority the Commonwealth felt it was

19   necessary to file for rehearing and did so within the ten days

20   permitted on January 7.

21          THE COURT:  So in other words it's possible that one

22   vote could get turned around.  So when will the full briefing

23   on the reconsideration be complete?

24          MR. DILLON:  Your Honor, Michael Dillon for defendants

25   in Puerto Rico.  The defendants will be submitting opposition

F1FFMTBC

1    for that motion for recertification.

2            THE COURT:  When is that, when is it due?

3            MR. DILLON:  It's due I believe a week from tomorrow.

4    It's ten working days from notice of the initial motion.  I

5    think defendants intend to file sooner than that.

6            THE COURT:  Do you get a reply then, Mr. Gilmour?

7            MR. GILMOUR:  No, your Honor.  I do not think we do.

8            THE COURT:  Just two briefs?

9            MR. GILMOUR:  That's correct.

10           MR. DILLON:  That's right.  Then the motion is fully

11   submitted.  I will note for the Court that local counsel

12   apprised me that if the Court were to deny that motion for

13   reconsideration plaintiffs are entitled to a second motion for

14   reconsideration to be filed as I understand it within three

15   working days from that denial.

16           THE COURT:  What does that one say?  You've been

17   wronged twice?

18           MR. DILLON:  I'm not certain, your Honor.

19           THE COURT:  That's a strange procedure.  So you get to

20   say you're wrong once and if you lose you get to say it again

21   to the same group of judges, right?

22           MR. GILMOUR:  This is the first that I've heard of our

23   second bite, your Honor.

24           THE COURT:  Well, apparently you do, within three

25   days.  Anyway, what this all adds up to is maybe in 30 days

F1FFMTBC

1    we'll know with finality.

2              MR. GILMOUR:  Yes, your Honor.

3              THE COURT:  Okay.  Wouldn't it make sense to put off

4    the statute of limitations briefing for 30 days and let the

5    Supreme Court of Puerto Rico play itself out hearing

6    reconsideration motions.  If that's their procedure, that's

7    their procedure.  That's what the plaintiffs suggest anyway,

8    right?

9              MR. GILMOUR:  Yes, your Honor.  That's our position.

10             THE COURT:  I'm with you on this one.  Let's let it

11   play itself out.  They did act fast.  I remember the argument

12   when you said, Mr. Gilmour, that you believed they would act

13   fast.  Some of defense counsel said, oh, no, it's going to take

14   a year.  It didn't.  They acted quickly so I assume they'll act

15   quickly on the reconsideration and the second reconsideration.

16   So why don't we just agenda it for a month from now.

17             Now, if they stick with their position then why are

18   some of these motions even necessary?  Why should the

19   defendants have to make some of the motions?  In other words,

20   shouldn't you meet and confer and say given the ruling, we

21   realize now what's barred and what's not barred?

22             MR. GILMOUR:  Your Honor, I think we would certainly

23   be open to meeting and conferring with defendants and seeing

24   the identified defendants and the identified evidence and

25   making that determination once it plays out in the Puerto Rico

F1FFMTBC

1   Supreme Court.

2            THE COURT:  I think that makes the most sense, too,

3   before you come back into court and say we want to make

4   different reconsideration motions and here's the schedule.  If

5   the ruling stands, as Mr. Dillon recognizes, it might be wise

6   to have the meet and confer first to see where there's

7   disagreement and where there might be agreement so that the

8   motions to reconsider may be less than they would otherwise be.

9            MR. DILLON:  I would point out that in our letters

10  that would also apply to the Puerto Rico 2 action.  It would

11  give us the opportunity to discuss that, too.

12           THE COURT:  I can't quarrel with that.  You agree,

13  right?

14           MR. GILMOUR:  Yes.

15           THE COURT:  Does it become appealable, however, some

16  day, somewhere?

17           MR. GILMOUR:  Yes.

18           THE COURT:  Where would that appeal be taken?

19           MR. GILMOUR:  It depends on the posture of the case,

20  your Honor.  If the case was finally adjudicated in this court

21  it would be taken to the Second Circuit.  If it is remanded for

22  trial to Puerto Rico and concludes there, it would be taken to

23  the First Circuit, your Honor.

24           THE COURT:  Well, it's got to go back to Puerto Rico

25  some day because this issue doesn't close every claim in both

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F1FFMTBC

```
 1   cases, does it?
 2                MR. GILMOUR:  No, your Honor.
 3                THE COURT:  So it sounds like that decision some day
 4   would go to the First Circuit, not the second.
 5                MR. GILMOUR:  Yes, your Honor.  And the only instance
 6   it would go to the Second Circuit is if the entire case with
 7   all defendants was adjudicated in this court on multiple bases
 8   but you're right this one issue would not resolve all of them.
 9                THE COURT:  And I'm sure the defense sees that too.
10                MR. DILLON:  We do, your Honor.
11                THE COURT:  Good.  So there's nothing to do but to set
12   another conference date.
13                Sounds like six weeks instead of four.  Usually we
14   meet in four but I'm thinking six so that the Puerto Rico case
15   is more advanced, maybe we'll have more to talk about in New
16   Jersey and maybe even in Pennsylvania the discovery will get
17   started and we'll see whether there are disputes or whether
18   everybody is getting along without the need for the Court, so I
19   think we should look in about six weeks.  That would be early
20   March, right?
21                MR. DILLON:  Yes, your Honor.
22                THE COURT:  Thursday, March 5 at 4:30, is that okay?
23   Thursday, March 5th?
24                MR. PARDO:  That's good for us.  Your Honor.
25                MR. GILMOUR:  I believe that's good for us, your
```

F1FFMTBC

1    Honor.

2         THE COURT:  That's what it is, Thursday, March 5th at

3    4:30.  Again, I have a trial scheduled for that week but my

4    trials seem to fold with regularity.  If it does we can move it

5    up to 2:30.  But right now it's 4:30.  All right, if there's

6    nothing further see you all in March.

7         (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25