UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                        :
IN RE: METHYL TERTIARY BUTYL                            :
ETHER ("MTBE") PRODUCTS                                 :
LIABILITY LITIGATION                                    :
------------------------------------------------------- :
                                                        :
This document relates to:                               :
                                                        :
*Commonwealth of Puerto Rico, et al. v.*                :
*Shell Oil Co., et al.*, 07 Civ. 10470                  :
                                                        :
                                                        :
------------------------------------------------------- X



**CORRECTED OPINION
AND ORDER**

**Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

This is a consolidated multi-district litigation ("MDL") relating to

contamination – actual or threatened – of groundwater from various defendants'

use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary

butyl alcohol, a product formed by the breakdown of MTBE in water.  In this case,

the Commonwealth of Puerto Rico (the "Commonwealth") alleges that defendants'

use and handling of MTBE has contaminated, or threatened to contaminate

groundwater within its jurisdiction.  Familiarity with the underlying facts is

presumed for the purposes of this Order.

Currently before the court is a two-pronged motion for summary

judgment premised on the Commonwealth's alleged failure to trace certain

defendants' gasoline to the trial sites at which those defendants are allegedly liable.[1]  *First*, Certain Defendants move for partial judgment on the Commonwealth's claims for negligence and strict liability at specific trial sites at issue in this phase of the action.[2]  *Second*, defendants affiliated with Chevron (the "Chevron Defendants") move for full judgment on all of the Commonwealth's claims.[3]  For the following reasons, the motion for summary judgment is GRANTED in part and DENIED in part.

---

[1]     *See* Case Management Order No. 117 (the "Trial Site Matrix"), Dkt. 457 (charting the claims asserted against each defendant at each trial site at issue).

[2]     For a list of the defendants moving for partial summary judgment, *see* Ex. A to the Memorandum of Law in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Def. Mem.").  I will refer to these movants collectively as "Certain Defendants."  Separately, in support of the motion for partial summary judgment, some of the Certain Defendants have filed two motions to strike, which I address and decide in connection with my discussion of the partial summary judgment motion.  Defendants Shell Oil Company, Shell International Petroleum Company Limited, and Shell Western Supply and Trading Limited (collectively, the "Shell Defendants") join in the motion for partial summary judgment on the ground that the Commonwealth has not traced MTBE from the Shell Defendants to any trial site.  However, the facts relevant to the Shell Defendants are set forth in their separate motion for summary judgment on all claims asserted against them.  *See* Dkt. 467.  I will, if necessary, address causation as it relates to the Shell Defendants when I rule on their separate summary judgment motion.

[3]     For a list of all of the Chevron Defendants, *see* Def. Mem. at n.3.

## II.   BACKGROUND[4]

The first phase of this action requires the Court to determine the liability of a number of defendants at five different trial sites.[5]  The instant summary judgment motion relies on defendant-specific facts at each trial site in attempting to disprove, as a matter of law, the causal connections the Commonwealth must prove to support certain of its claims.  In this section, I will review the facts underlying the motion for each defendant seeking judgment.[6]

### A.   Gasoline Supply Chain in Puerto Rico

A brief note on the general workings of the gasoline supply chain in Puerto Rico is helpful to contextualizing the defendant-specific facts relevant to the instant motion.  For the most part, gasoline in the Commonwealth is segregated,

---

[4]   The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

[5]   *See* Trial Site Matrix.

[6]   The voluminous Rule 56.1 submissions, which are chock-full of disputed facts and statistics, are difficult to distill into one section of an opinion.  This section therefore provides an overview of the most pertinent facts, not a comprehensive summary of all of the facts.  As the Court has repeatedly cautioned the parties to this MDL, summary judgment is only available when there are no genuine disputed issues of material fact.

not commingled.[7]  Therefore, during certain time periods, with limited exceptions, gasoline service station retailers obtained their gasoline supply from a particular, readily-identifiable supplier.[8]  While the records maintained by the moving defendants with regard to tracing gasoline – from manufacturers to traders to wholesalers to retail stations – are relatively sparse for transactions pre-dating 1995 and incomplete even for more recent years, it is generally clear that "two [groups of] manufacturers of gasoline to the island dominated their supply chain during their respective eras."[9]  From 1982 through the mid 1990s, Chevron Phillips Chemical Puerto Rico Core LLC ("CORE") and Conoco Phillips Company ("COP") (collectively, the "Core Defendants") combined to serve as the primary supplier to the island.[10]  From 1995 to 2005, Hess Oil Virgin Islands Corporation ("HOVIC") and HOVENSA LLC ("HOVENSA") combined to serve as the primary supplier.[11]  Defendants dispute the extent of both groups' influence on the

---

[7]    *See* Plaintiff's Rule 56.1 Statement in Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. 56.1") ¶ 20.

[8]    *See, e.g.*, *id.* ¶¶ 20, 64.

[9]    Plaintiff's Memorandum of Law in Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. Mem.") at 8.

[10]    *See id.*

[11]    *See id.*

supply chain.  I turn now to the facts regarding each of the Certain Defendants'
alleged supply of gasoline to the trial sites at issue.

### 1.  Exxon Mobil Corporation

One of the Certain Defendants moving for partial summary judgment
on the Commonwealth's strict liability and negligence claims is Exxon Mobil
Corporation ("ExxonMobil").  The Commonwealth brings claims against
ExxonMobil at the two Esso Standard Oil Company ("Esso") trial sites, Esso CO-
364 ("Trial Site No. 5") and Esso CO-242 ("Trial Site No. 6"), to which the
Commonwealth contends that it can trace both ExxonMobil's neat MTBE and
MTBE gasoline.

The parties do not dispute that, since 1979, ExxonMobil has had very
limited contacts with Puerto Rico.[12]  For instance, it has never owned, operated, or
leased any gasoline service station in Puerto Rico, including the Esso trial sites.[13]
In the past thirty-five years, ExxonMobil has supplied only thirteen shipments of
gasoline to Puerto Rico, and it has never transported or delivered gasoline to any

---

[12]    *See* Def. Mem. at 7.

[13]    *See* Rule 56.1 Statement in Support of Certain Defendants' Motion for
Summary Judgment for Lack of Causation ("Def. 56.1") ¶ 10.

*service stations* within Puerto Rico, including the Esso trial sites.[14]  The presence of MTBE was confirmed in a lone April 1995 shipment of gasoline containing six percent MTBE by volume to the Cataño Puerto Rican terminal.[15]  The Commonwealth has provided no evidence demonstrating that this lone shipment was linked to the delivery of gasoline at either of the Esso trial sites.[16]

These limited contacts extend to transactions related to the sale of neat MTBE.  From 1982 to 1985, Exxon Chemical International Supply, S.A. ("ECIS"), an independent Panamanian corporation, sold limited amounts of neat MTBE to the Core Defendants, which they then shipped to their facility in Puerto Rico.[17] Shortly thereafter, ECIS was dissolved.[18]  ECIS was not the only company that sold neat MTBE to the Core Defendants' Puerto Rico facility during that three-year span.[19]

The Commonwealth also points to a 1982 exchange agreement (the "Exchange Agreement") between Esso and Phillips 66 Company ("Phillips") as

---

[14]     *See id.* ¶¶ 13, 17.

[15]     *See id.* ¶ 19.

[16]     *See id.* ¶¶ 19-21.

[17]     *See id.* ¶ 15.

[18]     *See id.*

[19]     *See id.* ¶ 16.

potential evidence of ExxonMobil's liability.[20]  Pursuant to the Exchange

Agreement, Phillips agreed to deliver product to Esso in Guayama, Puerto Rico,

and in return, Esso agreed to provide equal volumes of gasoline to Phillips in

Baytown, Texas.[21]  ExxonMobil was not a direct party to the Exchange Agreement,

nor to its subsequent amendments.[22]  There is no document before the Court

indicating that ExxonMobil paid for the gasoline supplied to Esso under that

Agreement.  However, Esso did enter into a separate sales contract in 1982 with

ExxonMobil, whereby Esso purchased gasoline from ExxonMobil and that

gasoline was delivered to COP in the mainland United States.[23]  ExxonMobil states

that Esso drew up this separate sales agreement so that it could meet *its* obligations

under the Exchange Agreement, to which ExxonMobil was not a party.[24]

### 2. Core Defendants

---

[20]    *See* Exxon Mobil Corporation's Memorandum of Law in Support of Motion to Strike Plaintiffs' New Theory of Liability in Opposition to Defendants' Motion for Summary Judgment for Lack of Causation ("Def. ExxonMobil MTS Mem.").

[21]    *See* Exchange Agreement, Ex. A to 11/26/14 Reply Declaration of Lisa A. Gerson, counsel for ExxonMobil, in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Gerson Reply Decl.").

[22]    *See id.*

[23]    *See* Reply Memorandum in Further Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Reply Mem.") at 3-4.

[24]    *See id*.

The Core Defendants also seek partial summary judgment at the Esso trial sites, as well as at the Shell ("Trial Site No. 3") and Total ("Trial Site No. 9") trial sites.  As noted above, from 1982 through the mid 1990s, the Core Defendants served as the primary supplier of MTBE gasoline to Puerto Rico.  According to one of the Commonwealth's experts, all of the gasoline manufactured by the Core Defendants during the time period from 1982 to 1994 contained some volume of MTBE.[25]  The Core Defendants discontinued blending MTBE with gasoline in March 2000, but their records reflect that MTBE was present in its distribution system and in at least some of its finished gasoline until at least the end of May 2000.[26]

From 1982 to 2000, the Core Defendants sold over 115 million barrels of gasoline – close to five billion gallons – to customers on the island of Puerto Rico.[27]  For ten years, from 1982 to 1992, they were the primary supplier of

---

[25]     *See* Pl. 56.1 ¶ 17.  Defendants do not dispute the expert opinion as stated, but attack the assumption on which it rests as being unsupported by direct evidence.

[26]     *See id.* ¶ 10.

[27]     *See id.* ¶ 18.  Because the parties dispute the exact totals, the figures recited above reflect the minimums conceded by defendants.  Defendants also dispute that all of that gasoline contained MTBE.

gasoline to Esso, providing Esso with more than a billion gallons.[28]  Esso also

received gasoline from another supplier, Arochem, in 1990 and 1991, though in

vastly smaller quantities.[29]  While it was standard practice for the Core Defendants

to use MTBE in their gasoline, there is no evidence that Arochem's gasoline

contained MTBE.[30]  As a general matter, Esso purchased only enough gasoline

from its suppliers to supply the Esso retail outlets in Puerto Rico – roughly 95 to

98 percent of Esso's sales of gasoline went to its branded stations.[31]

 A similar set of facts and allegations govern the Core Defendants' sale

of gasoline to USA Petroleum Corporation ("USA") and Idemitsu Apollo

Corporation ("IAC").[32]  USA, a California corporation, formed Gasolina de Puerto

Rico ("GPR") in the 1970s.[33]  In 1992, IAC purchased GPR's stock from USA, and

GPR was re-named Total Petroleum Puerto Rico Corp. ("Total").[34]

 While the Core Defendants dispute whether they could be classified as

---

[28] *See id.* ¶¶ 21-22.

[29] *See id.* ¶ 24.

[30] *See id.*  ¶ 25.

[31] *See id.*  ¶ 61.

[32] *See id.* ¶¶ 29-36.

[33] *See id.* ¶ 75.

[34] *See id.* ¶¶ 74, 76.

a "primary" supplier to USA and IAC, it is undisputed that from 1985 to 1992, the

Core Defendants supplied a significant amount of gasoline to USA, just as they did

to IAC from 1992 until at least 1997.[35]  These companies, like Esso, also received

much smaller amounts of gasoline from another supplier, namely Puerto Rico Sun

Oil Company, which may or may not have added MTBE to its gasoline.[36]  The

gasoline the Core Defendants sold to USA and IAC ultimately reached at least

some of the GPR stations.[37]

Lastly, the Core Defendants supplied over thirteen million barrels of

gasoline to the Shell Company (PR) Ltd. ("SCPRL") from 1983 to 1995.[38]

According to the Commonwealth's expert, all of the gasoline the Core Defendants

sold to SCRPL contained MTBE.  Most, if not all, of the Core Defendants'

---

[35]    *See id.* ¶ 30.

[36]    *See id.* ¶¶ 31-34.

[37]    *See id.* ¶ 82.  The Core Defendants contest the Commonwealth's
allegation that IAC supplied gasoline directly to GPR's *retail stations*,
acknowledging only that IAC sold gasoline to GPR generally.  *See* Defendants'
Response to Plaintiff's Rule 56.1 Statement in Opposition to Certain Defendants'
Motion for Summary Judgment for Lack of Causation ("Def. Reply 56.1") ¶ 82.
The Core Defendants also refute any implication that their gasoline specifically
reached Trial Site No. 9.  *See id.*

[38]    *See* Def. Reply 56.1 ¶ 37.  As with USA, IAC, and Esso, the Core
Defendants were not the only suppliers to SCRPL, but they were the largest
suppliers.

10

gasoline SCRPL received was delivered to the Cataño Puerto Rican terminal.[39]

And, according to SCRPL, almost all of the gasoline supplied to the Shell trial site,

Trial Site No. 3, was transported and delievered by Camioneros Cooperativa de

Transporte de Carga from the Cataño terminal.[40]

### 3.    HOVIC/HOVENSA Defendants

HOVIC and HOVENSA move for partial summary judgment on the

Commonwealth's negligence and strict liability claims asserted against them at the

Shell and Texaco ("Trial Site No. 10") trial sites, as well as one of the two Esso

trial sites (Trial Site No. 6).[41]  I turn next to the facts relevant to HOVIC and

HOVENSA's supply of gasoline to these trial sites.[42]

---

[39]      *See id.* ¶ 39.

[40]      *See id.* ¶ 95.

[41]      It bears mentioning that HOVIC and HOVENSA do not move for partial summary judgment for lack of causation as to the other Esso trial site (Trial Site No. 5).

[42]      In support of its opposition, the Commonwealth provides charts summarizing data reflecting (1) the annual distribution of gasoline on the island of Puerto Rico by majors drawn from a report of the Department of Consumer Affairs (the "DACO Report") and (2) data reflecting the annual supply of gasoline to majors by HOVIC and HOVENSA.  *See* Ex. 1 to 11/7/14 Declaration of Nathan P. Short, counsel to the Commonwealth, in Support of Plaintiff's Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Summary Charts") ("Short Decl.").  Included in the charts is a comparison of these two data sets, providing the percentage that HOVIC and HOVENSA's supply bears to the annual distributions of gasoline on the island by the majors.  HOVIC

HOVIC owned the St. Croix refinery until October 1998, at which time ownership was transferred to HOVENSA.[43]  Defendants do not dispute that HOVIC first shipped gasoline containing MTBE to Puerto Rico in November 1994, and HOVENSA last shipped gasoline containing MTBE to Puerto Rico in February 2005.[44]  According to Esso's experts, from 1997 to 2008, HOVIC and HOVENSA accounted for eighty-three percent of all of Esso's gasoline supply.[45]  These experts also state that Esso received smaller volumes of gasoline from other suppliers, but that none of these suppliers used MTBE in gasoline after 1992.[46]  As noted above, Esso generally purchased only enough gasoline from its suppliers to supply the Esso-branded retail stations, such that almost all of Esso's sales of gasoline went to these stations.

The Commonwealth separately points to the Summary Charts as proof

---

and HOVENSA vigorously dispute the relevance and admissibility of those charts in a separate motion to strike.  *See* Defendants Hess Oil Virgin Island Corp.'s and Hovensa L.L.C.'s Memorandum of Law in Support of Motion to Strike Plaintiffs' Exhibit 1 Attached to Nathan Short's Declaration ("HOVIC/HOVENSA MTS Mem.").  The Short Declaration was so contested that the parties have burdened the Court not only with extensive briefing, but also *four* separate post-briefing letters squabbling over new arguments raised in HOVIC and HOVENSA's reply brief.

[43]   *See* Pl. 56.1 ¶ 44.

[44]   *See id.* ¶¶ 43, 45.

[45]   *See id.* ¶ 49.

[46]   *See id.* ¶ 51.

that HOVIC and HOVENSA supplied massive quantities of gasoline containing MTBE to SCPRL and Shell Western, as well as to Texaco Puerto Rico Inc. ("Texaco"), which were delivered to the Shell and Texaco trial sites, respectively. With respect to SCRPL and Shell Western, the Commonwealth's Summary Charts display HOVIC and HOVENSA supplying nearly 440 million gallons of gasoline containing MTBE from 1995 to 2004.[47]  As discussed above, the Commonwealth's expert traces this gasoline to the Cataño terminal and, by extension, Trial Site No. 3.  Additionally, the Summary Charts reflect HOVIC and HOVENSA supplying nearly 525 million gallons of gasoline containing MTBE to Texaco from 1995 to 2005, accounting for nearly all of Texaco's gasoline supply from 1998 to 1999 and from 2002 to 2005.[48]  Texaco's gasoline was delivered to the Texaco trial site in Texaco-owned tanker-trailers driven by contractors' trucks.[49]

**B.     History of Leaking Underground Storage Tanks at the Trial Sites During the Relevant Supply Periods**

Each of the trial sites had underground storage tanks ("USTs"), which housed the gasoline supplied to that trial site.  In this section, I review the facts regarding the USTs at each trial site for the relevant supply periods.

---

[47]     *See id.* ¶ 53.

[48]     *See id.* ¶¶ 57, 59.

[49]     *See id.* ¶ 111.

### 1.      Trial Site No. 6

According to Marcel Moreau, a Commonwealth expert, Trial Site No.

6, one of the two trial sites at issue operated by Esso, has had a long history of

releases and contamination throughout the 1980s and 1990s, with low level leaks

continuing to the present.[50]  Two of the USTs at this trial site were in operation for

over forty years before being replaced in 1994 and, in the expert's view, leaked

continuously before 1994.[51]  Further contamination readings from 2012 "indicate

residual leaking from the new tank system after 1994, particularly implicating top

fittings, fill pipe, submersible turbine pump and adjacent piping."[52]  Historical

MTBE levels at the trial site allegedly stemming from the leaking USTs are not

known with any degree of precision because Esso refused to sample for MTBE

until 2004, at which point MTBE was detected.[53]

### 2.      Trial Site No. 5

As with Trial Site No. 6, Moreau documents a history of leaking

USTs at Esso's Trial Site No. 5, potentially resulting in ongoing MTBE

---

[50]      *See id.* ¶ 67.

[51]      *See id.*

[52]      Pl. Mem. at 18.

[53]      *See id.* at 19.

contamination at the site from the 1990s to today.[54]  For instance, in 1991, an Esso

witness confirmed that soil contamination at the site was discovered during the

replacement of the site's USTs, indicating potential releases from the UST

system.[55]  Then in 1998, there was a ninety gallon spill during a UST and piping

removal and replacement process.[56]  An Esso witness even acknowledged that the

contamination discovered in the 1990s was likely attributable to leaking USTs.[57]

In 2007, soil samples revealed the presence of MTBE.[58]

### 3.   Trial Site No. 9

Moreau also points to a history of releases and contamination at

Total's Trial Site No. 9 over the life of the facility.  For instance, in 1992, the

installation of groundwater monitoring wells revealed significant soil

contamination which, according to Moreau, likely resulted from faulty piping and

tank top fitting of the five USTs on site.[59]  Accordingly, Moreau believes that there

were likely multiple releases from these components that occurred intermittently

---

[54]   *See* Pl. 56.1 ¶ 72.

[55]   *See id.*

[56]   *See id.*

[57]   *See* Pl. Mem. at 20.

[58]   *See* Pl. 56.1 ¶ 72.

[59]   *See id.* ¶ 87.

since the USTs first began operations in 1978.[60]  In 1997, a corrosion evaluation revealed further leaking USTs.[61]  From 2001 to late 2003, contaminants were observed in all five on-site groundwater monitoring wells – the Commonwealth's expert attributes this contamination to releases from two spill containment manholes on the premium tanks, which would have been intermittent and associated with fuel deliveries.[62]  Additional contamination was detected in monitoring wells in 2004.[63]  At that time, MTBE was finally sampled – and detected – in the groundwater.[64]

### 4.   Trial Site No. 3

A history of gasoline releases at Shell's Trial Site No. 3 dates back to at least July 1988, when a safety audit uncovered gasoline leaking from gaps in the pavement close to the gas pump islands.[65]  In 1991, a contractor responded to a leak detector alarm and, though finding no conclusive evidence of a release,

---

[60]     *See id.*

[61]     *See id.* ¶ 88.

[62]     *See id.* ¶¶ 89-90.

[63]     *See id.* ¶ 91.

[64]     *See id.* ¶¶ 92-93.

[65]     *See id.* ¶ 101.

advised continued monthly monitoring.[66]  And, in 2001, after UST removal, significant contamination was detected in soil and rainwater samples.  Additional contamination was present in soil samples in 2002 and 2003.[67]  In 2005, MTBE was detected in a groundwater sample.[68]

### 5.    Trial Site No. 10

According to Moreau, Texaco used "inferior methods of leak detection on its aging bare steel UST systems [at Trial Site No. 10] in the 1980s and 1990s."[69]  Ultimately, when the USTs were removed in 2006, and soil contamination was identified, Texaco acknowledged that a release occurred.[70]  MTBE was first detected in October 2009 upon the installation of monitoring wells, and it was detected again in 2010.[71]

### C.    Chevron Defendants

The Chevron Defendants move for summary judgment on all claims against them due to lack of causation on various grounds.  They allege that (1)

---

[66]    *See id.* ¶ 102.

[67]    *See id.* ¶¶ 104-105.

[68]    *See id.* ¶ 106.

[69]    *Id.* ¶ 112.  Defendants dispute this characterization.

[70]    *See id.* ¶ 113.

[71]    *See id.* ¶ 114.

there is no evidence that they refined, marketed, or supplied gasoline or products containing MTBE in Puerto Rico, (2) there is no evidence that they owned or operated gasoline service stations or USTs in Puerto Rico that discharged gasoline containing MTBE, (3) they are not successors-in-interest to non-party refinery owners, and (4) there is no evidence that they caused the Commonwealth any injuries.

The key factual inquiry relevant to the Chevron Defendants' motion is whether they are successors-in-interest to, or otherwise managed, the Bayamon Refinery in Puerto Rico. Among several documents the Commonwealth offers to support such a finding is a report from the United States Environmental Protection Agency ("EPA"), which, according to the Commonwealth, implicates Chevron Corporation and Chevron USA in operating, owning, or controlling the Bayamon Refinery.[72] Specifically, in describing the Bayamon Refinery, the EPA report lists "Chevron Corporation" under a column entitled "Other (Former) Names of the Site."[73] The Commonwealth also relies on a 1985 press clipping in which Chevron Corporation announced that it was seeking bids for its gasoline business in Puerto

---

[72]     *See* Plaintiff's Response to Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Pl. Reply 56.1") ¶¶ 61, 65-66, 69.

[73]     *Id.* ¶ 65.

-18-

Rico, including for the Bayamon Refinery.[74]  Finally, the Commonwealth cites a

District of Puerto Rico court opinion from 1991 in a wrongful termination case

involving a former Chevron employee as further evidence of the Chevron

Defendants' control over operations in Puerto Rico.[75]  The opinion states that "in

April 1984, Chevron Corporation assumed control of Gulf operations worldwide,

including those in Puerto Rico."[76]

The Chevron Defendants dismiss the Commonwealth's evidence as

irrelevant and inadmissible, insisting that they did not own or operate the Bayamon

Refinery.[77]  Instead, they state that the Bayamon Refinery was owned by the

Caribbean Gulf Refining Corporation, which was merely an indirect subsidiary of

Chevron Corporation.[78]

## III.   LEGAL STANDARD

---

[74]      *See id*; Press Clipping, Ex. 2 to 11/7/14 Declaration of Dave E. Blum, counsel for Commonwealth, in Support of Plaintiff's Opposition to Certain Defendants' Motion for Summary Judgment for Lack of Causation ("Blum Decl.").

[75]      *See* Pl. 56.1 ¶ 69; *Marti v. Chevron U.S.A. Inc. et al.*, 772 F. Supp. 700 (D.P.R. 1991).

[76]      *Marti*, 772 F. Supp. at 702.

[77]      *See* Def. Mem. at 15-17.

[78]      *See id.* at 16.

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[79]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[80]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[81]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the

---

[79]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F. 3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[80]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[81]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

material facts,"[82] and "may not rely on conclusory allegations or unsubstantiated speculation."[83]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[84] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[85]

## IV.   APPLICABLE LAW

Causation is a necessary element of the Commonwealth's strict product liability and negligence claims.[86]  Plaintiff has the burden of proving

---

[82]   *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[83]   *Id.* (quotation marks and citations omitted).

[84]   *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[85]   *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[86]   *See, e.g.*, *In re MTBE*, 591 F. Supp. 2d 249, 266 (S.D.N.Y. 2008).

causation by a preponderance of the evidence.[87]  Under Puerto Rico law, to prove

causation, the "Plaintiff must introduce evidence which affords a reasonable basis

for the conclusion that it is *more likely than not* that the conduct of the defendant

was a *substantial factor* in bringing about the result."[88]  This burden can be met

with circumstantial evidence.[89]

Significantly, in *City of New York v. Exxon Mobil Corporation*, a

related MTBE proceeding in this MDL, I denied defendants' motion for judgment

as a matter of law in refusing to overturn a jury verdict that relied on circumstantial

evidence to identify manufacturer defendants responsible for MTBE

---

[87]      *See id.*  The Commonwealth has stated that it will rely only on
traditional causation, not on a commingled products theory, to trace defendants'
gasoline directly to a station at issue.  *See* Def. 56.1 ¶ 2.  Ultimately, this requires
the Commonwealth to show that defendants' MTBE gasoline was present at the
stations at issue when releases occurred.  *See In re MTBE ("City of Fresno")*, 980
F. Supp. 2d 425, 457 (S.D.N.Y. 2013).

[88]      *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61, 76
(D.P.R. 2004) (emphasis added).

[89]      *See Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50, 55 n.10 (1st Cir.
1998) (noting that "strict liability claimants may resort to an array of circumstantial
evidence"); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 525, 9
P.R. Offic. Trans. 687 (1980) (stating that "the law does not require that a fact be
proved with mathetmatical accuracy, and that circumstantial evidence is
intrinsically the same as direct evidence").

contamination.[90]  There, New York law, like Puerto Rico law here, required plaintiff to show that the conduct of the manufacturer or supplier or seller was a *substantial factor* in causing plaintiff's injuries.[91]

By contrast, in *City of Fresno v. Chevron USA*, another related MTBE proceeding in this MDL, defendants prevailed on a causation motion similar to the one brought here where plaintiff, unable to rely on a commingled products theory, provided only vague evidence of gasoline deliveries post-dating reported discharges at the service stations at issue.[92]  In *City of Fresno*, plaintiff also relied on Moreau to opine on UST leaks and MTBE releases, and I noted that his general testimony that "spills or leaks occurred on a regular basis" was, "*[w]ithout more*," insufficient to defeat summary judgment.[93]

## V.     DISCUSSION

### A.     No Genuine Issue of Material Fact Precludes Judgment in Favor of ExxonMobil on Claims of Negligence and Strict Liability

ExxonMobil's liability hinges on whether ExxonMobil was a party to

---

[90]     *See* 739 F. Supp. 2d 576, 588 (S.D.N.Y. 2010), *aff'd*, 725 F.3d 65 (2d Cir. 2013).

[91]     *See id.*

[92]     *See* 980 F. Supp. 2d at 458.

[93]     *Id.* at 460 (emphasis added).

the Exchange Agreement such that the gasoline supplied in Puerto Rico by the

Core Defendants to Esso "should be attributed as being supplied" to ExxonMobil.[94]

This is because no reasonable jury could assign liability to ExxonMobil on the

basis of limited neat MTBE sales by a separate Exxon entity to the Core

Defendants, or on account of a lone shipment of gasoline to a terminal from which

gasoline was distributed to hundreds of service stations.[95]

ExxonMobil moves to strike the Commonwealth's supposed "new

theory of liability" – that ExxonMobil was a party to the Exchange Agreement and

is therefore liable for the gasoline the Core Defendants supplied to Esso – on the

grounds that the Commonwealth's contention interrogatories were insufficient to

put ExxonMobil on notice of this theory, and that the theory was disclosed too

late.[96]  The Commonwealth opposes the motion to strike by noting, correctly, that

the Exchange Agreement argument is not in and of itself a novel theory of liability

– the Exchange Agreement is merely a piece of evidence bearing on whether, as

the Commonwealth has alleged all along, ExxonMobil supplied MTBE gasoline to

---

[94]     *See* Pl. Mem. at 10.

[95]     *See City of Fresno*, 980 F. Supp. 2d at 458.  The Commonwealth does not seriously contest this proposition.  *See* Pl. Mem. at 10-11.

[96]     *See generally* Def. ExxonMobil MTS Mem.

the Esso trial sites.[97]  However, the Commonwealth devotes the bulk of its motion

to strike opposition to dredging up old discovery disputes.[98]  While this discussion

tends to show that ExxonMobil should have known for quite some time that the

Commonwealth intended to pursue an Exchange Agreement-related theory, it also

exposes the weak foundation on which the Commonwealth's characterization of

the Exchange Agreement rests.

> At bottom, the evidence in the record does not present a genuine issue

of fact over whether ExxonMobil was a party to the Exchange Agreement.  The

relevant documents show that the parties to the Exchange Agreement were Esso

and Phillips, not ExxonMobil, and that the separate sales agreement between Esso

and ExxonMobil entailed delivering gasoline to Phillips on the mainland, not in

Puerto Rico.  Based on these undisputed facts, the Commonwealth offers only

speculation that the Exchange Agreement and separate sales agreement combined

to place ExxonMobil "within the chain of supply of [the Core Defendants'] MTBE

---

[97]     *See* Memorandum of Law in Opposition to Exxon Mobil
Corporation's Motion to Strike Plaintiff's Evidence in Opposition to Defendants'
Motion for Summary Judgment for Lack of Causation ("Pl. ExxonMobil MTS
Mem.") at 8.

[98]     *See generally id.*

gasoline to Esso."[99]  That speculation, unmoored from the record before the Court, is insufficient to withstand the summary judgment motion as it relates to ExxonMobil.[100]  Therefore, summary judgment is granted to ExxonMobil on the Commonwealth's negligence and strict liability claims.[101]

**B.    Genuine Issues of Material Fact Preclude Judgment for the Core Defendants and HOVIC and HOVENSA**

Whether the Core Defendants and HOVIC and HOVENSA are liable for the Commonwealth's negligence and strict liability claims, however, present issues for a jury to resolve because the factual underpinnings of the causation inquiry are heavily disputed.  In resolving those disputes of fact in the

———————————

[99]    Pl. Mem. at 11.  As ExxonMobil accurately observes, the case the Commonwealth relies on to support its supply chain theory is inapposite.  In *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981), the court examined whether defendants' sales occurred "in commerce," as that term is used in the Robinson-Patman Act.  Putting aside the fact that the instant motion has nothing to do with antitrust, the sales agreement to which ExxonMobil was a party, unlike the underlying agreement in *Hasbrouck*, was not an exchange agreement, and it did not cover the gasoline involved in this case.  *See* Reply Mem. at 4 n.4.

[100]    *See Brown*, 654 F.3d at 358 ("Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact.") (citations and quotations omitted).

[101]    Because the Commonwealth's theory that ExxonMobil could be held liable via the Exchange Agreement was neither novel nor unfairly surprising, ExxonMobil's motion to strike is denied.

Commonwealth's favor, a rational jury could find by a preponderance of the evidence that these defendants' MTBE gasoline is directly traceable to the trial sites at issue.

This is a close call because the Commonwealth's product tracing theory depends on a jury connecting many pieces of circumstantial evidence to find the Core Defendants and HOVIC and HOVENSA liable at the trial sites where they are alleged to have contributed to MTBE contamination.  I am mindful of my opinion in *City of Fresno*, which signaled to MTBE plaintiffs that speculative arguments lacking substantial factual support cannot survive summary judgment motions for lack of causation in this MDL.  But there is just enough factual support in this case – more than in *City of Fresno* – for the Commonwealth to defeat a pre-trial motion for lack of causation as to the Core Defendants and HOVIC and HOVENSA.  This is especially true in light of Puerto Rico law, under which causation is satisfied as long as there is a "reasonable basis [to conclude] that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result."[102]

Unlike in *City of Fresno*, where the evidence concerning MTBE

---

[102]  *Prado Alvarez*, 313 F. Supp. 2d at 76; *see also City of New York*, 725 F.3d at 115-16 (upholding a finding of liability based on largely circumstantial evidence).

supply related to deliveries that occurred almost definitively *after* reported

discharges at the service stations at issue, there is considerable evidence here that

MTBE gasoline attributable to the Core Defendants and HOVIC and HOVENSA

reached the trial sites *before* and *contemporaneously with* documented releases of

gasoline due to UST leaks.[103]  This evidence is bolstered by the nature of the

gasoline supply system in Puerto Rico, where major suppliers were readily

identifiable by name and time period.[104]

For instance, at Trial Site No. 6, there is evidence that substantial

releases occurred throughout the 1980s and into 1990, both during and after the

Core Defendants' reign as a substantial – if not overwhelmingly dominant –

supplier of gasoline to the island of Puerto Rico.  2012 contamination readings

indicate possible residual leaks during the time period that HOVIC and

---

[103]     *See* Pl. 56.1 ¶¶ 67, 72, 84-93, 101-106, 112-116.

[104]     While I did not find Moreau's general testimony in *City of Fresno* regarding service station releases convincing enough to defeat summary judgment, his testimony in this case is more detailed and less speculative due to additional circumstantial evidence, especially concerning the realities of gasoline distribution and supply in Puerto Rico.  In *City of Fresno*, plaintiff repeatedly offered a bare, unsupported expert opinion that releases "were routine," without providing much in the way of specifics.  *See* Plaintiff City of Fresno's Opposition to Defendants' Motion for Summary Judgment for Lack of Evidence Pertaining to Causation, No. 04 Civ. 4973 (S.D.N.Y. Apr. 13, 2013) (Dkt. 193) at 22.  By contrast, the facts here support more specific conclusions about how and when releases occurred, as well as more general conclusions regarding the nature of the USTs.

HOVENSA supplied gasoline to the island.  Similar evidence regarding potential leaks throughout the 1990s at Trial Site Nos. 5 and 9 overlaps with the Core Defendants' supply of gasoline to Puerto Rico.  At Trial Site No. 3, gasoline releases dated as far back as 1988, when the Core Defendants supplied gasoline to the island, and quite possibly continued through HOVIC and HOVENSA's period of supply, with extensive contamination detected in 2001 after UST removal.  And at Trial Site No. 10, contamination detection coinciding with the 2006 removal of USTs, just one year after the end of the HOVIC and HOVENSA main supply period, indicates that their gasoline supply may have been a substantial factor in causing the MTBE contamination at the site.[105]

Through a motion to strike, HOVIC and HOVENSA ask the Court to disregard the Summary Charts, which contain data related to HOVIC and HOVENSA's significant supply of gasoline to Puerto Rico.  However, the Summary Charts are admissible under Rule 1006 of the Federal Rules of Evidence ("FRE") because all of the underlying documents, many of which HOVIC and HOVENSA in fact produced in discovery, are admissible.  The parties are engaged

---

[105]     Whether there was any actual injury at Trial Site No. 10 is the subject of a separate summary judgment motion, which I will address in a separate opinion.  *See* Dkt. 463.

in ongoing efforts to negotiate a stipulation for the authenticity of documents.[106]

The Court need not scrutinize the form of the Summary Charts at the summary

judgment stage provided that the contents of the charts are admissible.[107]  Here, the

contents are admissible.  Contrary to HOVIC and HOVENSA's contentions, the

DACO Report, which defendants also rely on in this action, is not untrustworthy.

The Summary Charts incorporating information from the DACO Report merely

reflect routine calculations of the type permitted by FRE 1006 demonstrating the

percentage that HOVIC and HOVENSA's gasoline supply bears to the annual

distributions of gasoline in Puerto Rico by the majors.  Lastly, all portions of the

Summary Charts are relevant inasmuch as they provide circumstantial support to

the Commonwealth's product tracing efforts.  Moreover, certain statistics

contained within them are corroborated by defendants' own expert.[108]

Accordingly, HOVIC and HOVENSA's motion to strike is denied.

   To be sure, successfully tracing the gasoline from a specific supplier

---

[106]  *See* Plaintiff's Opposition to Defendants HOVIC and HOVENSA's Motion to Strike Plaintiff's Exhibit 1 Attached to Nathan Short's Declaration ("HOVIC/HOVENSA MTS Opp.") at n.7.

[107]  *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003), *cert. denied*, 541 U.S. 937 (2004).

[108]  *See* HOVIC/HOVENSA MTS Opp. at 4 & n.4.

to a trial site, and proving that *that* supplier's gasoline contained MTBE *and* was present during a release at that trial site, is a tall order.  And some, though not nearly all, of the Commonwealth's arguments regarding leaking USTs are somewhat similar to the overly speculative ones I deemed insufficient to withstand summary judgment in *City of Fresno*.  But because there is stronger evidence here, I cannot, as defendants urge, rule on causation as a matter of law.  There is an important, fine-tuned distinction between the challenge of proving liability based on disputed circumstantial evidence at trial, and the burden a plaintiff must meet to survive summary judgment.  Defendants conflate the two.  A reasonable jury, resolving most or all of the factual disputes in the Commonwealth's favor, could arrive at a reasonable conclusion that the suppliers' conduct was, more likely than not, a substantial factor in bringing about the Commonwealth's alleged harm.  Simply put, there are important factual disputes that prevent the Court from granting summary judgment on *causation* as it pertains to the Core Defendants and HOVIC and HOVENSA.

**C.    Whether Chevron Corporation and Chevron USA Once Owned, Controlled or Managed the Bayamon Refinery Is Disputed**

At this stage, it is unclear whether Chevron Corporation and/or

Chevron USA owned, controlled, or managed the Bayamon Refinery.[109]  The

Commonwealth has submitted evidence which suggests a possibility that Chevron

Corporation and/or Chevron USA played, at minimum, a managerial role at the

refinery.  For instance, an EPA report lists "Chevron Corporation" under a column

entitled "Other (Former) Names of the Site."[110]  And while the District of Puerto

Rico court opinion on which the Commonwealth relies does not explicitly

reference the Bayamon Refinery, it does state that "in April 1984, Chevron

Corporation assumed control of Gulf operations worldwide, including those in

Puerto Rico."[111]  The Bayamon Refinery *is* explicitly mentioned in a press clipping

in which Chevron announced that it was seeking bids "for its gasoline business in .

. . Puerto Rico," including *"a refinery in Bayamon, Puerto Rico and 275 Gulf and

Chevron outlets on the island.*"[112]  Defendants' argument that these pieces of

---

[109]     The Commonwealth has not opposed summary judgment for Chevron International Oil Company, Inc., Chevron Caribbean Inc., and Chevron Estrella Puerto Rico Inc.  Accordingly, summary judgment is granted to those Chevron entities on all of the Commonwealth's claims.

[110]     Pl. 56.1 ¶ 65.

[111]     *Marti*, 772 F. Supp. at 702.

[112]     Press Clipping, Ex. 2 to the Blum Decl. (emphasis added).  The clipping quoted a senior vice president at *Chevron USA* – not Chevron Corporation.

evidence are irrelevant and inadmissible is not persuasive.[113]  Instead, the evidence

presents a material dispute of fact over the role Chevron Corporation and/or

Chevron USA played at the Bayamon Refinery.  Accordingly, summary judgment

on the Commonwealth's claims is denied as to Chevron Corporation and Chevron

USA.

## V.    CONCLUSION

For the foregoing reasons, the motion for summary judgment is

GRANTED in part and DENIED in part, and the motions to strike are DENIED.

The Clerk of the Court is directed to close the motions (Dkt. Nos. 474, 544, 568).


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             March 5, 2015


---

[113]       *See* Reply to Plaintiffs' Response to Rule 56.1 Statement in Support
of Certain Defendants' Motion for Summary Judgment for Lack of Causation ¶ 65.
This evidence is relevant to historical ownership or operation of the refinery –
taken together, each piece of evidence "has a tendency to make" the fact of
ownership or operation more probable.  FRE 401.

-33-

- **Appearances** -

**Liaison Counsel for Plaintiffs:**

Robert J. Gordon, Esq.
Robin L. Greenwald, Esq.
William A. Walsh, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500

**Liaison Counsel for Defendants:**

Peter J. Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
Lisa A. Gerson, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
(212) 547-5583

**Counsel for the Commonwealth**:

Victor L. Cardenas, Jr., Esq.
William J. Jackson, Esq.
John D.S. Gilmour, Esq.
Jackson Gilmour & Dobbs, P.C.
3900 Essex, Suite 700
Houston, TX 77027
(713) 355-5000

Carlos A. Del Valle Cruz, Esq.
Legal Counsel
Puerto Rico Department of Justice
Olimpo Street, Pda. 11
San Juan, PR 00907

John K. Dema, Esq.
Law Offices of John K. Dema
1236 Strand Street, Suite 103
Christiansted, St. Croix
U.S. Virgin Islands 008250

Orlando H. Martinez, Esq.
Orlando H. Martinez Law Offices
Centra de Seguros, Suite 413
701 Ponce de Leon Avenue
San Juan, PR 00907

Michael Axline, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

**Counsel for ExxonMobil and Appearing on Behalf of All Moving Defendants:**

Peter J. Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
Lisa A. Gerson, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
(212) 547-5583

**Counsel for ExxonMobil:**

William J. Stack, Esq.
Carlos M. Bollar, Esq.
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, N.J. 08033
(856) 795-2121

**Counsel for HOVIC and HOVENSA**:

Steven L. Leifer, Esq.
Baker Botts, L.L.P.
The Warner Building
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 639-7723