

Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Peter John Sacripanti
Chairman
psacripanti@mwe.com
+1 212 547 5583

**BY HAND DELIVERY AND ELECTRONIC MAIL**                    April 21, 2015

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York  10007-1312

>    Re:    Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358
>           *Defendants' Pre-Conference Reply Letter for April 24, 2015 Status Conference*

Dear Judge Scheindlin:

　　Defendants respectfully submit this reply letter in advance of the April 24 conference.[1]

**PLAINTIFFS' AGENDA ITEMS**

**I.    *Commonwealth of Pennsylvania*: Initial Case Management Order**

　　Attached at Exhibit A is a side-by-side comparison of the parties' proposals which highlights the disputed issues.  The most substantive of those issues are discussed below.

　　The Site List Proposals: During the course of a meet-and-confer, Plaintiffs' counsel represented that the universe of **gasoline** release sites in the Commonwealth is roughly comparable to the *New Jersey* case – *i.e.*, several thousand sites.  However, unlike in New Jersey, reformulated gasoline was not required throughout Pennsylvania.  As such, it cannot be assumed that every gasoline release site is also an MTBE release site.  And, it is clear from meet-and-confer conversations that **Plaintiffs have no meaningful understanding of the number of sites or wells in the state that have actually been impacted by MTBE**.[2]  Despite the fact that the

---

[1] Defendants respectfully request an extension of the page limits for reply letters given the length of Plaintiffs' opening letter and Plaintiffs' inclusion of what amounts to two pre-motion letters.

[2] Plaintiffs state that they should not have to identify impacted wells because "the costs of identifying all such wells that have been impacted by MTBE is an element of the Commonwealth's damages, and not a component of the Commonwealth's discovery obligations."  *Pls.' Ltr.*  at 3.  This statement ignores Plaintiffs' allegation that "MTBE has been found throughout the Commonwealth … in both public water supply wells and private domestic wells," (*Am. Compl.* ¶ 229), and the request to recover past costs of treating such wells (*see generally Prayer for Relief*).  Defendants are justifiably asking Plaintiffs to identify such

U.S. practice conducted through McDermott Will & Emery LLP.

**340 Madison Avenue New York New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com**

The Honorable Shira A. Scheindlin
April 21, 2015
Page 2

Commonwealth first gave notice of its intent to sue four years ago, the Commonwealth suggests that Defendants – and the Court – wait years before Plaintiffs identify the sites they believe are at issue. Indeed, Plaintiffs are now less than halfway through scanning the "USTIF" files that supposedly *may* identify some of the sites and are "just beginning" to collect "millions of pages" of DEP files. *Pls.' Ltr.* at 1-2. This is all basic investigation that could have and should have been performed before initiating a lawsuit. Plaintiffs' production of a database is no answer to this problem, particularly where Plaintiffs' counsel has represented that the database at issue typically does not indicate whether or not MTBE has been detected.[3]

While the amended complaint identifies 73 sites where MTBE has been detected in groundwater, the total number of MTBE sites Plaintiffs have put at issue in this litigation is unknown. That number will inform next steps for case management and, Defendants submit, is something that Plaintiffs should have known before bringing this action. In short, what Defendants anticipate and seek to avoid is a situation such as *Puerto Rico*, where significant time and effort went into discovery regarding sites that did not belong in the case because there was no evidence of MTBE at those sites.[4] For this reason, Defendants believe it is appropriate for Plaintiffs who initiated this suit to compile and confirm where MTBE has been detected (subject to receiving the readily accessible data Defendants have committed to produce).

Defendants' Proposed §§ III(A)(8)-(12) – These paragraphs would require Plaintiffs to produce readily accessible electronic data generally covering three topics: (1) Plaintiffs' ownership interest in UST sites (*e.g.*, state refueling facilities, DOT facilities, etc.); (2) Plaintiffs' involvement, if any, in the supply or distribution chain for MTBE gasoline; and (3) MTBE release or remediation information from Plaintiff-owned or Plaintiff-operated sites. These requests are almost verbatim from what Plaintiffs have requested of Defendants. Plaintiffs cannot justify their refusal to produce this readily accessible data.

Plaintiffs' Proposed §§ III(A)(9)-(11) – Plaintiffs' proposal includes three broad requests that are premature and inappropriate for the initial exchange of readily accessible electronic data – particularly given that the scope of this case is still very much an open question. Defendants should not be required to produce licensing, branding and franchise information for every station

---

locations to the extent in their possession, custody or control. *See, e.g.*, *Mar. 30, 2011 Conf. Tr.* at 58 (THE COURT: "It [plaintiff] has to locate the wells. It's its job. It brought the lawsuit. It has to do it. … It's its obligation to locate the sites of the wells.").

[3] The quotation in Plaintiffs' letter from the January 7, 2010 status conference, (*Pls.' Ltr.* at 2) refers to a discussion of Defendants' ability to extract from the New Jersey "HazSites" database a list of all sites at which MTBE has been detected. The HazSites database was unique to New Jersey and was used by New Jersey, in the ordinary course of its business, to collect groundwater sampling data. Pennsylvania says it has no such database.

[4] To this end, Defendants are requesting identification of the highest and most recent MTBE detections. Defendants are not requesting the first MTBE detection. *See Pl.'s Ltr.* at 1.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 3

throughout the state before Plaintiffs identify what sites are at issue.  This data will not aid in identifying MTBE sites in the state; nor will market share data or promotional materials. Defendants should not be burdened by producing the requested information for countless stations – dating back to 1979 – unless and until Defendants know what stations are at issue in this case.

Plaintiffs' Proposed § III(C) – The day before preconference letters were due, Plaintiffs added section III(C) – proposing to require Defendants to sign a consent form instructing their environmental consultants to produce certain readily accessible data to Plaintiffs.  Plaintiffs' proposed section is both unnecessary and premature.  Defendants already have agreed to produce readily accessible electronic data regarding MTBE remediation sites, including that which is in the possession of their current environmental consultants.  Nor has there been a need for such a consent in prior MDL actions.  Unless and until Plaintiffs can show that Defendants' productions are inadequate, there is no reason for the Court to impose this extraordinary relief.

Plaintiffs' Proposed § V – Plaintiffs propose to open discovery on general liability issues on May 29, 2015 – before they have identified the sites at which MTBE has been detected. Defendants believe that determining the scope of this case should be the first priority.

## II.   *Commonwealth of Pennsylvania*: Status of Lukoil Jurisdictional Discovery

The Court permitted Plaintiffs "limited discovery" from LUKOIL Americas Corp. ("LAC").  *Mar. 5, 2015 Conf. Tr.* at 11:24; *see also id.* at 27:9-13.  Contrary to that direction, the Commonwealth has served four separate sets of document requests on LAC and certain of its current and former officers—sets containing more than 80 requests in all.  The Commonwealth has made little effort to tailor those requests, which often call for the production of thousands of documents; for example: "documents in your possession which mention, concern or refer to the need to restructure, refinance, transfer, or sell [Getty Petroleum Marketing Inc. ('GPMI')]," and [a]ll DOCUMENTS relating to the 2009 restructuring of LAC, including but not limited to…." When LAC twice asked the Commonwealth to refine its requests in light of this Court's March 30 choice-of-law decision, the Commonwealth refused, asserting that the order had no effect on its requests—all of which were drafted and served before this Court issued its decision.

The Commonwealth's intransigence notwithstanding, LAC has produced an enormous amount of information.  By April 15, the day *before* the Commonwealth's pre-conference letter, LAC had produced to Plaintiffs over 6,000 pages of documents, including documents not specifically requested until an April 13 letter.  That total does not include the documents shared with the Commonwealth during pre-motion correspondence, nor nearly 300 pages turned over on April 20.  Accordingly, LAC has produced far more than the Commonwealth needs to respond to LAC's motion to dismiss, including deposition, trial, and arbitration testimony that addresses, among other things, the relationship between LAC and GPMI.[5]

---

[5] LAC has also advised the Commonwealth that it is continuing to supplement its production.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 4

Yet the Commonwealth persists, contending that an allegedly fraudulent conveyance in 2009 might authorize haling LAC into court to answer for the pre-2007 use of MTBE by former LAC subsidiary GPMI. That contention lacks merit. Maryland law would not permit piercing GPMI's veil concerning MTBE use unless LAC's *exercise of control* over GPMI had caused any such use. The 2009 conveyance at issue here did not cause GPMI's pre-2007 use of MTBE: time marches forward, not backwards.

In any event, to grant the Commonwealth's request for even more extensive jurisdictional discovery, this Court would need to confront several questions, including whether: (1) the bankruptcy court has exclusive jurisdiction over the Commonwealth's fraudulent-conveyance claim; (2) a creditor may use a fraudulent-conveyance claim as an unlimited veil-piercing weapon, permitting the creditor to seek recovery for *any* tort in *any* amount, so long as the tort occurred before the conveyance at issue; and (3) *specific* personal jurisdiction, concerning pre-2007 alleged torts, could possibly be based on 2009 conduct. Resolution of these and related issues would require, at minimum, another round of briefing. All of which can wait for another day. There is no hint of a fraudulent conveyance by LAC in the Commonwealth's operative complaint, let alone particularized allegations of an LAC "fraud." Fed. R. Civ. P. 9(b). That is reason enough to deny discovery concerning the 2009 conveyance at this juncture. And, because the conveyance is the only way in which the Commonwealth attempts to show compliance with Maryland veil-piercing law, it is reason enough to end veil-piercing discovery altogether.

The Commonwealth also requests information concerning how certain "environmental liabilities" were "allocated in sales and purchase agreements executed subsequent to LAC's proposed discovery cut-off date of 2006…." *Walsh Ltr.* at 4 (Apr. 16, 2015). That is an effort to create a dispute where none exists. LAC's "proposed discovery cut-off date" concerns the time after which information is irrelevant to *veil piercing* under Maryland law.[6] Except for one attachment, LAC has already produced the entire 2009 GPMI-LNA purchase and sale agreement, as LAC advised it would do on April 15. The lone attachment is a separate 2004 agreement with ConocoPhillips, which contains a confidentiality provision. As LAC also advised, LAC is seeking the necessary consent, and, if obtained, LAC will produce the attachment. Finally, LAC is seeking to locate the other 2004 agreement to which the Commonwealth refers and anticipates producing it in due course after compliance with any applicable confidentiality procedures.

## III.    *OCWD*: Plaintiff's Request for "Clarification or Certification Under Rule 54(b)

OCWD's Rule 54(b) request is an untimely and improper attempt to reargue the Court's September 16, 2014 Opinion and Order Granting Summary Judgment for the Shell and BP Defendants on Res Judicata. *In re MTBE*, 46 F.Supp.3d 440 (S.D.N.Y. 2014) (the "Summary Judgment"). OCWD's request is procedurally defective and substantively baseless. No briefing

---

[6] As noted, piercing is allowed only for damages caused by a parent's *exercise* of control. Thus, if the conduct giving rise to those damages stopped by 2006, the post-2006 relationship between the parent and subsidiary is irrelevant.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 5

is needed; OCWD's request should be denied.

OCWD seeks to "clarify" the Summary Judgment to permit assertion of "continuing nuisance causes of action that accrued after the [Orange County District Attorney ("OCDA")] Consent Judgments were entered." *Pls.' Ltr.* at 6. The Summary Judgment, however, expressly determined that "OCWD has not suffered any new MTBE-related harm subsequent to entry of the [Consent Judgments] … that would give rise to a new action not covered by the [OCDA] settlements." 46 F. Supp. 3d at 450 n.72. In reality, therefore, OCWD seeks reconsideration of the Summary Judgment, which unambiguously adjudicated all claims against BP and Shell. *Daventree Ltd. v. Republic of Azerbaijan,* 2005 WL 2585227, *1 (S.D.N.Y. 2005) (motion for clarification seeking to alter court order is really motion for reconsideration). Reargument, reconsideration, and "clarification," to the extent even permitted,[7] are governed by Local Rule 6.3, which requires that such motions "shall be served within fourteen (14) days after the entry of the Court's determination of the original motion…." LR 6.3; *Daventree,* 2005 WL 2585227 at *1 (rejecting motion made after 30 days). OCWD's request is more than six months too late.[8]

OCWD's request is also defective because it does not set forth any "matters or controlling decisions which … the Court has overlooked," as LR 6.3 requires. *Bank Leumi Trust Co. v. Istim, Inc.,* 902 F. Supp. 46, 47 (S.D.N.Y. 1995) (interpreting prior LR 3(j)). The rule precludes "advancing new facts, issues or arguments not previously presented to the court 'because, by definition, material not previously presented cannot have been "overlooked" by the court.'" *Id.* (quoting *Heil v. Lebow*, 1995 WL 231273, *1 (S.D.N.Y. 1995)).

OCWD cannot meet the LR 6.3 standard because it never raised the argument it advances now. Neither the phrase "continuing nuisance" nor any of the decisions it cites in its letter appear anywhere in OCWD's summary judgment brief. And as the Court specifically found, "the District does not dispute[ ] that both the BP Defendants and the Shell Defendants stopped adding MTBE to gasoline made in California upon or before entering into final judgments," so that "OCWD has not suffered any new MTBE-related harm subsequent to entry of the [Consent Judgments] … that would give rise to a new action not covered by the [OCDA] settlements." 46 F. Supp. 3d at 450 n.72. This Court, therefore, overlooked nothing. Having failed to raise its newly-minted argument when opposing summary judgment, OCWD cannot raise it now, or on appeal. *Zherka v. DiFiore*, 412 Fed. App'x 345, 348 (2d Cir. 2011).

Most importantly, OCWD's argument lacks any substance. Although OCWD concedes, as it must, that claims for continuing nuisance can be resolved by settlement and judgment, (*Pl.*

---

[7] *See In re MTBE*, 593 F.Supp.2d 549, 569 (S.D.N.Y. 2008) (federal and local rules contain no provision for "clarification" of a court's order).

[8] Tellingly, OCWD first stated its newfound position to BP and Shell on April 15, the day before preconference letters were due, after OCWD had been discussing remand of the OCWD focus sites for nearly two months without including BP or Shell in the discussions.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 6

*Ltr.* at 6), OCWD assiduously avoids discussing those portions of the Consent Judgments that did precisely that.  The OCDA asserted claims for continuing and permanent nuisance against both BP and Shell.  *See* 46 F. Supp. 3d at 443, 449 (noting that OCDA complaint alleged that MTBE contamination "constitutes a continuing nuisance"); BP 1st Am. Compl. ¶¶ 117, 120, 122 (alleging continuing nuisance claims); ¶ 121 (alleging permanent nuisance claim); Shell 1st Am. Compl. ¶¶ 29, 32, 34 (alleging continuing nuisance claims); ¶ 33 (alleging permanent nuisance claim) (Ex. B).  Both the BP and Shell Consent Judgments resolved **all** claims that were, or could have been, asserted based on the facts alleged in the complaints against them, which necessarily includes claims for continuing nuisance, and all damages or relief flowing from such claims.  In particular, OCWD entirely fails to mention ¶ 9.0 of the Shell Consent Judgment and ¶ 6.0 of the BP Consent Judgment, which disposed of **all** claims the OCDA asserted or could have asserted:

> [T]his Final Judgment is a final and binding judgment, release, resolution and settlement of all claims, violations, or causes of action that **were alleged in the First Amended Complaint against Settling Defendants, or could have been asserted based on the facts alleged in the First Amended Complaint**….  (Ex. C).

OCWD also abbreviates its citation to ¶ 9.1 and ¶ 6.1 of the Shell and BP Consent Judgments, respectively, to avoid operative language that disposed of all actual and potential claims that were or could have been asserted against Shell and BP based on the facts at the sites at issue:

> ¶ 9.1: This Final Judgment also constitutes a release from known or unknown, past or present claims, violations, or causes of action that **were or could have been asserted in the First Amended Complaint against the Covered Defendant Parties** with regard to:  any and all existing or potential demands, causes of action, equitable or legal claims, obligations, damages, losses, fines, penalties and liabilities related to underground storage tank systems, the unauthorized release of petroleum product, or additive or constituent of such petroleum product…, the use of MTBE … in gasoline, or any failure to assess, remediate, or otherwise take corrective action in response to any such unauthorized release, **whether asserted or unasserted, or known or unknown, arising out of or connected with any act, cause, matter, or thing stated, claimed, alleged, or that could have been alleged in any pleading, records, or other papers filed in this lawsuit or that may be based upon, related to or connected with any of the matters referred to in any such pleadings, records, or other papers**.  (*Id*).

Neither Consent Judgment preserved any future claim for nuisance arising from the facts alleged in the OCDA lawsuits.  *Moulton v. U.S. Steel Corp*., 581 F.3d 344 (6th Cir. 2009), which OCWD cites in its letter (at p. 6), reveals the fallacy of OCWD's argument.  In *Moulton*, plaintiffs objected to a settlement of continuing nuisance claims arguing that the settlement would amount to an "unconscionable" release of future tort claims.  The court rejected the argument because "by releasing future claims only for presettlement conduct, the [settlement] agreement sensibly—and reasonably—accommodates U.S. Steel's interest in protecting itself from suits based on identical claims that existed at the time of the complaint (and settlement)…."

The Honorable Shira A. Scheindlin
April 21, 2015
Page 7

*Id*. at 349-50. This is exactly what happened here. All claims for nuisance asserted by the OCDA against BP and Shell were subsumed by and merged into the Consent Judgments, and res judicata bars OCWD's belated efforts to revive such claims now in any form whatsoever.

Finally, OCWD falls far short of establishing a basis for Rule 54(b) certification, which requires the Court to make an express finding that there is "no just reason for delay." *Capitol Dist. Physician's Health Plan v. O'Higgins*, 951 F. Supp. 352, 364 (N.D.N.Y. 1997), *citing Ginett v. Computer Task Group, Inc.*, 962 F.2d 1058, 1091 (2d Cir. 1992). Nothing in the record supports "expressly determin[ing] that there is no just reason for delay" under Rule 54(b).

On the contrary, OCWD delayed some seven months in seeking Rule 54(b) certification. Although Rule 54(b) contains no precise time frame for seeking certification, a leading treatise explains: "Prudent practitioners will seek a Rule 54(b) determination promptly, and within the 28-day period allotted for alterations or amendments to 'judgments' … as prompt action… comports with the Rule 54(b) objective of permitting some piecemeal appeals where delay would be unduly harsh or unjust." *Federal Civil Rules Handbook* (2015 ed.) at p. 1091. *Cf. Bank of N.Y. v. Hoyt,* 108 F.R.D. 184, 185-86 (D.R.I. 1985) (declining to adopt "inflexible" time limit, but noting that "thumb-twiddling is itself some evidence that the disappointed suitor considers delay in seeking appellate review to be a tolerable circumstance"). OCWD proffers no reason for its lengthy delay, which alone is a sufficient basis for denial of OCWD's request.

More fundamentally, OCWD's delay is antithetical to any determination that no just reason for delay exists. In this context, the Court is to act as a "dispatcher," taking "into account judicial administrative interests as well as the equities involved." *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980). Given OCWD's delay, no equities favor certification. Contrary to OCWD's assertion, it is unlikely that immediate appellate review would allow for inclusion of Shell and BP in upcoming proceedings following remand even if OCWD were somehow successful.[9] Immediate appeal is unlikely to avoid judicial hardship or have any other positive effect at the trial court level. *See Litton Indus., Inc. v. Lehman Bros.*, 1989 WL 162315, *9 (S.D.N.Y. 1989) ("The only claim of hardship alleged… is that expensive pre-trial discovery and litigation may be avoided… [but] this is not the type of hardship contemplated by Rule 54(b)").

OCWD's request is also at odds with federal judicial policy disfavoring "piecemeal litigation" – "delaying appeal is favored where 'the adjudicated and pending claims are closely related and stem from essentially the same factual allegations.'" *Cullen v. Margiotta*, 618 F.2d 226, 228 (2d Cir. 1980). Here, there is a close relationship between the Summary Judgment and the Court's prior rulings, cited in that Order, which would not be subject to appellate review if Rule 54(b) certification were granted. *See, e.g.,* 46 F. Supp. 3d at 450 n.69 (primary injury that OCWD must show to establish public nuisance is injury to the *public* rather than "special" injury to its property) (*citing In re MTBE,* 824 F.Supp.2d 524, at 539 (S.D.N.Y. 2011)); *id.* at 452 n.90

---

[9] In *City of New York*, for example, Exxon filed its notice of appeal on October 13, 2010. The Second Circuit did not issue its decision until July 26, 2013.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 8

("As explained above and in my prior ruling, the District's usufructuary rights are appropriative and therefore subordinate to the state," citing *In re MTBE,* 824 F. Supp. 2d at 546-47).  In other words, OCWD cannot overcome the policy disfavoring piecemeal litigation as required in order to obtain Rule 54(b) certification.  *See Brunswick Corp. v. Sheridan*, 582 F.2d 175, 183-85 (2d Cir. 1978) (reflecting "general policy disfavoring piecemeal appeals" in reversing judgment improperly certified under Rule 54(b)).

**IV.**     *Puerto Rico I & II*: **Request for Briefing Schedule on Prescription**

Plaintiffs' proposal regarding Defendants' prescription summary judgment motion(s) requires comment for several reasons, not the least of which is that they never raised their proposal in the parties' discussions concerning prescription and summary judgment briefing.  Also missing from Plaintiffs' two-page request is that Plaintiffs are unwilling to concede that *any* site at issue in either *Puerto Rico* action is time-barred.[10]  Both of these facts inform Defendants' response to Plaintiffs' proposal.

First, with regard to Plaintiffs' request for a single summary judgment motion on prescription:  one size does not fit all.   As addressed in Defendants' opening letter, Defendant Petrobras will move for summary judgment on the grounds that this Court's ruling on the Trammo/ Vitol limitations motions requires Petrobras' dismissal.  (At least one other Defendant may join this motion.)[11]  Other Defendants have different limitations arguments, premised on different facts.  While an "omnibus" summary judgment motion (with enhanced page limits) might serve to present *certain* Defendants' arguments, all Defendants should not be required to combine disparate motions into one to ease Plaintiffs' "burden" in responding.

Second, Plaintiffs' proposed briefing schedule is entirely unrealistic and objectionable.  Plaintiffs would require Defendants to file their initial brief on May 1, 2015 – a week after the conference – while also asking Defendants to merge their respective "complex" legal arguments and "myriad" facts into a single brief.  Defendants propose the following:  the remaining Defendants (*i.e.*, not Petrobras) will agree to submit an "omnibus" brief so long as the page-extension proposed by Plaintiffs is acceptable to the Court; and will submit initial papers on May 15; Plaintiffs' Response due on June 15; Defendants' Reply on June 29.  No sur-reply is warranted.[12]  As to Puerto Rico II, Defendants propose that Rule 12 motion practice proceed with Defendants' initial papers due on May 22; Plaintiffs' Responses due on June 5; and Defendants' Reply papers on June 19.

---

[10] The Court may recall directing the parties to confer to determine if "some of these motions are even necessary" and "what's barred and what's not barred."  *Jan. 15, 2015 Conf. Tr.* at 37.

[11]   As to Defendant Petrobras's motion for summary judgment, Plaintiffs have agreed to the briefing schedule proposed in Defendants' opening preconference letter.  *Defs.' Ltr. at 5*.

[12]  Plaintiffs have offered no legitimate grounds to merit a sur-reply at this juncture – the "complexity" of the issues or the possible "impact" of this Court's decision do not suffice.

The Honorable Shira A. Scheindlin
April 21, 2015
Page 9


***

  As always, we appreciate your Honor's attention to this matter and ask that this letter be docketed by the Clerk's Office so that it is part of the Court's file.



Sincerely,

*Peter John Sacripanti*

Peter John Sacripanti


cc:  All Counsel of Record by LNFS, Service on Plaintiffs' Liaison Counsel

# EXHIBIT A

| DEFENDANTS' PROPOSAL | PLAINTIFFS' PROPOSAL |
|---|---|

**DEFENDANTS' PROPOSAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY
LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS) M21-88

This document relates to:

*Commonwealth of Pennsylvania, etc. v. Exxon
Mobil Corporation, et al.*, Case No. 1:14-cv-
06228 SAS

SHIRA A. SCHEINDLIN, U.S.D.J.

**[PROPOSED] CASE MANAGEMENT ORDER NO.**

This Case Management Order ("CMO") defines the scope of initial disclosures in
the above-captioned case (hereinafter the "*Pennsylvania case*"). Additional discovery
will be addressed in subsequent CMOs.

**I.  IDENTIFICATION OF COVERED PERSONS**

By May 29, 2015, parties who have not yet done so in MDL 1358 shall identify
"covered persons" in accordance with Sections 2(b) and 2(c) of the Court's 2005 Order
for Preservation of Documents.

**II.  INITIAL DISCLOSURES BY PLAINTIFFS:**

    A.    By August 30, 2015, Plaintiffs shall identify every "release" site (by name,
address and site identification number) within the Commonwealth at which Plaintiffs
contend neat MTBE or gasoline with MTBE was released.

    B.    By August 30, 2015, Plaintiffs shall identify every potable well (by name,
address, GIS coordinates, and Public Well System identification number) within the
Commonwealth where MTBE was detected.

PLS.
DELETED

1

**PLAINTIFFS' PROPOSAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY
LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS) M21-88

This document relates to:

*Commonwealth of Pennsylvania, etc. v. Exxon
Mobil Corporation, et al.*, Case No. 1:14-cv-
06228 SAS

SHIRA A. SCHEINDLIN, U.S.D.J.

**[DRAFT] CASE MANAGEMENT ORDER NO.**

This Case Management Order ("CMO") defines the scope of initial disclosures in
the above-captioned case (hereinafter the "*Pennsylvania case*"). Additional discovery will
be addressed in subsequent CMOs.

**I.  IDENTIFICATION OF COVERED PERSONS**

By May 29, 2015, parties who have not yet done so in MDL 1358 shall identify
"covered persons" in accordance with Sections 2(b) and 2(c) of the Court's 2005 Order for
Preservation of Documents.

**II.  INITIAL DISCLOSURES BY PLAINTIFFS:**

    A.    By July 30, 2015, Plaintiffs shall produce to Defendants any and all
electronic data in their possession, custody or control, or in the possession, custody or
control of any agency or Department of the Commonwealth, regarding the following, to
the extent such data are readily available in electronic format:

        1.    The presence and concentration of MTBE or TBA in any public
water supply wells in Pennsylvania, including, but not limited to,
any detections reported in any Safe Drinking Water Information

1

## DEFENDANTS' PROPOSAL

**[margin note: PLS. DELETED]**

C.  By August 30, 2015, for each site or well identified in response to Sections II.A and II.B above, Plaintiffs shall identify:

    1.  The most recent date MTBE was detected in groundwater at each site or well, and the concentration of MTBE detected on such date; and

    2.  The maximum concentration of MTBE detected, at any time, at each site or well, and the date of such detection.

D.  In responding to Sections II.A through II.C, Plaintiffs shall not limit their responses to information contained in readily accessible electronic data (as defined below).

### III. INITIAL PRODUCTION OF SITE FILES AND ELECTRONIC DATA

A.  By July 30, 2015, Plaintiffs shall produce to Defendants any and all readily accessible electronic data (*i.e.*, databases or other files created for the purpose of centralizing or aggregating storage of information) in their possession, custody or control, or in the possession, custody or control of any agency or Department of the Commonwealth, regarding the following:

**[margin note: DEFS. HAVE CLEAR DEFINITION OF READILY ACCESSIBLE ELECTRONIC DATA]**

    1.  The presence and concentration of MTBE or TBA in any public water supply wells in Pennsylvania, including, but not limited to, any detections reported in any Safe Drinking Water Information System (SDWIS) database;

    2.  The presence and concentration of MTBE or TBA in any groundwater or surface waters in Pennsylvania;

    3.  The presence and concentration of MTBE or TBA in any private water supply well(s) or potable spring(s) in Pennsylvania, including, but not limited to, data (if any) in the Commonwealth's possession compiled by Bucks, Chester, Delaware, Montgomery and Philadelphia Counties (and all other counties which may also compile such data);

    4.  The payment of public funds for the investigation, removal, remediation, monitoring or treatment of MTBE or TBA in Pennsylvania (to the extent that data related to the payment of

**[margin note: DEFS ADD UNDERLINED TEXT TO ADDRESS POTENTIAL THAT MTBE/TBA NOT SPECIFIED IN PUBLIC FUND DATA]**

2

## PLAINTIFFS' PROPOSAL

System (SDWIS) database, to the extent such data is stored uniquely by plaintiffs;

2.  The presence and concentration of MTBE or TBA in any groundwater or surface waters in Pennsylvania;

3.  The presence and concentration of MTBE or TBA in any private water supply well(s) or potable spring(s) in Pennsylvania, including, but not limited to, data (if any) in the Commonwealth's possession compiled by Bucks, Chester, Delaware, Montgomery and Philadelphia Counties (and all other counties which may also compile such data);

4.  The payment of public funds for the investigation, removal, remediation, monitoring or treatment of MTBE or TBA in waters of the Commonwealth;

5.  Public funds used to pay for the remediation, cleanup or treatment of MTBE or TBA in the waters of Pennsylvania, and any cost, damages or injury allegedly sustained by Plaintiffs as a result of the presence of MTBE or TBA in the waters of Pennsylvania;

6.  Any site remediation reports related to releases of MTBE, TBA or gasoline containing MTBE or TBA where such releases allegedly caused contamination of soils and/or groundwater in the Commonwealth.

B.  Production of the electronic data shall be made on a "rolling" or continuing basis starting no later than May 29, 2015.

C.  If any of the foregoing electronic data or files also contain data or information about chemicals or substances other than MTBE, such data or information shall be produced and not withheld or redacted.

D.  For each site that Plaintiffs do or may contend is implicated in this matter, Plaintiffs shall produce to Defendants any site files from the Underground Storage Tank Indemnity Fund (USTIF) on or before July 30, 2015.

### III. INITIAL DISCLOSURES BY DEFENDANTS

2

## DEFENDANTS' PROPOSAL

public funds is not maintained so as to identify MTBE and/or TBA, Plaintiffs shall produce such data for reformulated gasoline or gasoline containing MTBE);

5. The amount of public funds used to pay for the remediation, cleanup or treatment of MTBE or TBA in Pennsylvania, the locations at which such public funds were expended, and any costs, damages or injury allegedly sustained by Plaintiffs as a result of the presence of MTBE or TBA in Pennsylvania (to the extent that data related to the expenditure of public funds is not maintained so as to identify MTBE and/or TBA, Plaintiffs shall produce such data for reformulated gasoline or gasoline containing MTBE);

6. The concentration of gasoline constituents in groundwater at any release site identified in response to Section II.A above including, but not limited to, MTBE or TBA; and

PLS DELETED

7. Any site remediation reports related to releases of MTBE, TBA or gasoline containing MTBE or TBA where such releases allegedly caused impacts to soils and/or groundwater in the Commonwealth.

8. The location and ownership interest, including leases, that the Commonwealth, including any agency or department thereof, has or had in any underground storage tank which stored gasoline and any terminal or refinery which was engaged in the refining, distribution, storage or sale of neat MTBE, reformulated gasoline, or gasoline containing MTBE;

9. The location and ownership, including leases, interest that the Commonwealth, including any agency or department thereof, has or had in any pipeline or delivery system (e.g., railcar, barge, tanker or tank truck) engaged in the delivery of neat MTBE, reformulated gasoline, or gasoline containing MTBE for distribution or sale in Pennsylvania;

10. The identity of parties with whom the Commonwealth, including any agency or department thereof, had supply contracts to deliver gasoline containing MTBE, reformulated gasoline, or neat MTBE to Pennsylvania, including exclusive supply contracts, and contracts with delivery services, franchisees, lessees, lessors, jobbers, common carriers (including, but not limited to, pipelines), distributors, terminals, other refiners, or any other entities;

11. The location, dates, volumes, sources and causes of any releases of gasoline containing MTBE, reformulated gasoline, or neat MTBE, by the Commonwealth, including any agency or department

PLS DELETED PARAGRAPHS 8-12; THESE REQUESTS ARE IDENTICAL TO THOSE REQUESTED OF DEFS. DEFS ARE ATTEMPTING TO OBTAIN INFORMATION AS TO PLS.' ROLE AS A SITE OWNER.

## PLAINTIFFS' PROPOSAL

A. By July 30, 2015, each Defendant shall produce to Plaintiffs any and all electronic data in its possession, custody or control regarding the following, to the extent such electronic data is readily available:

1. The location and ownership interest, including leases, that responding Defendant has or had in any service station, underground storage tank system ("USTs") motor fuel terminal or refinery in Pennsylvania which was engaged in the refining, distribution, storage or sale of neat MTBE, any reformulated gasoline, or any gasoline containing MTBE;

2. The location and ownership, including leases, interest that responding Defendant has or had in any pipeline or delivery system (e.g., railcar, barge, tanker or tank truck) engaged in the delivery of neat MTBE, or reformulated gasoline, or gasoline containing MTBE for distribution or sale in Pennsylvania;

3. The identity of parties with whom the responding Defendants had supply contracts to deliver gasoline containing MTBE, reformulated gasoline, or neat MTBE to Pennsylvania, including exclusive supply contracts, and contracts with delivery services, franchisees, lessees, lessors, jobbers, common carriers (including, but not limited to, pipelines), distributors, terminals, other refiners, or any other entities;

4. The name, grade, product codes, blend information and other identifying information for gasoline containing MTBE, reformulated gasoline, or neat MTBE that was distributed by the responding Defendant in Pennsylvania;

5. The location, dates, volumes, sources and causes of any releases of gasoline containing MTBE, reformulated gasoline, or neat MTBE, by Defendant, into soil, ground water or surface water within Pennsylvania;

6. Any site remediation reports related to releases of MTBE, reformulated gasoline, or gasoline containing MTBE at sites that are or were owned and/or operated by the responding Defendants at the time of release and where such releases caused MTBE contamination of soils and/or groundwater;

7. The volumes of neat MTBE, reformulated gasoline, and gasoline containing MTBE that the responding Defendant refined, distributed, stored, blended, supplied to or sold in the Commonwealth of Pennsylvania.

3

## DEFENDANTS' PROPOSAL

thereof, into soil, ground water or surface water within Pennsylvania; and

12. Any site remediation reports related to releases of MTBE, reformulated gasoline, or gasoline containing MTBE at sites that are or were owned and/or operated by the Commonwealth, including any agency or department thereof, at the time of release and where such releases caused MTBE impacts to soils and/or groundwater.

B. Production of the electronic data shall be made on a "rolling" or continuing basis starting no later than May 29, 2015.

C. If any of the foregoing electronic data or files also contain data or information about chemicals or substances other than MTBE, such data or information shall be produced and not withheld or redacted.

D. For each site that Plaintiffs do or may contend is implicated in this matter, Plaintiffs shall produce to Defendants any site files from the Underground Storage Tank Indemnity Fund (USTIF) on or before July 30, 2015.

**IV.   INITIAL DISCLOSURES BY DEFENDANTS**

A. By July 30, 2015, each Defendant shall produce to Plaintiffs any and all readily accessible electronic data (*i.e.*, databases or other files created for the purpose of centralizing or aggregating storage of information) in its possession, custody or control regarding the following:

1. The location and ownership interest, including leases, that responding Defendant has or had in any service station, underground storage tank system ("USTs") motor fuel terminal or refinery in Pennsylvania which was engaged in the refining, distribution, storage or sale of neat MTBE, reformulated gasoline, or gasoline containing MTBE;

2. The location and ownership, including leases, interest that responding Defendant has or had in any pipeline or delivery system (*e.g.*, railcar, barge, tanker or tank truck) engaged in the

4

## PLAINTIFFS' PROPOSAL

8. Lists of Pennsylvania MTBE release sites

9. Licensing, branding and franchise agreements for gasoline sales in Pennsylvania.

10. Market share of the wholesale and retail gasoline market in Pennsylvania.

11. Promotional material related to reformulated gasoline or the use of MTBE as a gasoline additive, including but not limited to advertisements (all media), press kits, public relations statements, whitepapers and press kits.

*[Margin note:]* DEFS. OBJECT TO THESE INITIAL DISCLOSURES AS IRRELEVANT OR PREMATURE

B. Production of the electronic data described above shall be made on a "rolling" or continuing basis starting no later than May 29, 2015.

C. Defendants will sign a consent form instructing environmental consulting firm(s) retained by defendants to remediate Pennsylvania gasoline sites to provide the Commonwealth with access to readily available electronic data concerning: (1) concentrations of MTBE and/or BTEX in soil and groundwater at release sites and (2) consulting reports regarding release sites.

*[Margin note:]* DEFS OBJECT TO THIS ADDITION AS UNNECESSARY & UNWARRANTED. DEFS INFORMED PLS THAT THEY WOULD OBTAIN READILY ACCESSIBLE DATA FROM THEIR CURRENT RETAINED CONSULTANTS.

**IV.   ELECTRONIC LOOSE FILES**

A. With respect to the electronic data to be produced pursuant to Parts II and III of this Order, the parties need not produce Electronic Loose Files ("ELF").

B. For purposes of this Order, ELF includes any electronic files that do not consist of files or data from systems created to centralize or aggregate storage of a party's information (*i.e.* databases).   Discrete word processed documents (*e.g.* memoranda, correspondence), PDFs, images, emails and their attachments, and the like are considered ELF.

**V.   OTHER DISCOVERY PERMITTED**

4

**DEFENDANTS' PROPOSAL**

**PLAINTIFFS' PROPOSAL**

DRAFT – 2/18/2015

delivery of neat MTBE, reformulated gasoline, or gasoline containing MTBE for distribution or sale in Pennsylvania;

3. The identity of parties with whom the responding Defendants had supply contracts to deliver gasoline containing MTBE, reformulated gasoline, or neat MTBE to Pennsylvania, including exclusive supply contracts, and contracts with delivery services, franchises, lessees, lessors, jobbers, common carriers (including, but not limited to, pipelines), distributors, terminals, other refiners, or any other entities;

4. The name, grade, product codes, blend information and other identifying information for gasoline containing MTBE, reformulated gasoline, or neat MTBE that was distributed by the responding Defendant in Pennsylvania;

5. The location, dates, volumes, sources and causes of any releases of gasoline containing MTBE, reformulated gasoline, or neat MTBE, by Defendant, into soil, ground water or surface water within Pennsylvania;

6. Any site remediation reports related to releases of MTBE, reformulated gasoline, or gasoline containing MTBE at sites that are or were owned and/or operated by the responding Defendants at the time of release and where such releases caused MTBE impacts to soils and/or groundwater;

7. The volumes of neat MTBE, reformulated gasoline, and gasoline containing MTBE that the responding Defendant refined, distributed, stored, blended, supplied to or sold in the Commonwealth of Pennsylvania.

8. Lists of Pennsylvania MTBE release sites.

B. In responding to paragraphs (A)(1)-(A)(7), above, Defendants need produce readily accessible electronic data for "reformulated gasoline" only where the requested information is not available specifically for gasoline containing MTBE.

PLS DELETED

C. Production of the electronic data described above shall be made on a "rolling" or continuing basis starting no later than May 29, 2015.

---

Beginning on May 29, 2015, the parties may engage in written discovery, subject to any and all appropriate objections, as to the following:

A. Damages Plaintiffs allege;

B. General liability discovery; and

C. Discovery related to Defendants' affirmative defenses.

DEFS. OBJECT TO BROADER DISCOVERY OPENING BEFORE THE SCOPE OF THE CASE HAS BEEN DETERMINED AND BEFORE PLS. HAVE COMPLETED THEIR INITIAL DISCLOSURES.

**VI. FUTURE DISCOVERY**

The parties shall meet and confer to discuss:

A. The timing for completion of the production of electronic files that are not readily available pursuant to Parts III and IV, and any further discovery the parties propose, taking account of the electronic data the parties produce pursuant to section III and IV of this CMO;

B. Production of paper or non-electronic site remediation files; and

C. Methods for management of future discovery.

SO ORDERED

*D R A F T*

DATED: New York, New York
          March ___, 2015

_____
Shira A. Scheindlin
U.S.D.J.

**DEFENDANTS' PROPOSAL**                              **PLAINTIFFS' PROPOSAL**

V.   **ELECTRONIC LOOSE FILES**

A.     With respect to the readily accessible electronic data to be produced pursuant to Parts III and IV of this Order, the parties need not produce Electronic Loose Files ("ELF").

B.     For purposes of this Order, ELF includes any electronic files that do not consist of files or data from systems created to centralize or aggregate storage of a party's information (*i.e.* databases).   Discrete word processed documents (*e.g.* memoranda, correspondence), PDFs, images, emails and their attachments, and the like are considered ELF.

VI.   **FUTURE DISCOVERY**

The parties shall meet and confer after August 30, 2015 to discuss:

A.     The timing for completion of the production of electronic files that are not readily available pursuant to Parts III and IV, and any further discovery the parties propose, taking account of the electronic data the parties produce pursuant to section III and IV of this CMO;

B.     Production of paper or non-electronic site remediation files; and

C.     Methods for management of future discovery.

SO ORDERED

DATED:  New York, New York                    _____
             April ___, 2015                          Shira A. Scheindlin
                                                              U.S.D.J.

# EXHIBIT B

1  TONY RACKAUCKAS, District Attorney
   Orange County, State of California
2  BRUCE PATTERSON, Senior Assistant District Attorney
   ROBERT C. GANNON, JR., Assistant District Attorney
3  Consumer and Environmental Protection Unit
   BY:   MICHELLE M. LYMAN (State Bar #121780)
4        Deputy District Attorney
   401 Civic Center Drive
5  Santa Ana, California 92701-4575
   Telephone:   (714) 347-8706
6  Facsimile:   (714) 568-1250

7  Attorneys for Plaintiff

8

                   SUPERIOR COURT OF THE STATE OF CALIFORNIA
9
                         FOR THE COUNTY OF ORANGE
10

11 THE PEOPLE OF THE STATE OF        )   **Case No. 80-40-31**
   CALIFORNIA                        )
12                                   )   [Assigned for All Purposes to the Hon. Stuart
              Plaintiff,             )   Waldrip]
13                                   )
          vs.                        )   **FIRST AMENDED COMPLAINT,**
14                                   )   **COMPLAINT FOR INJUNCTION,**
   SHELL OIL COMPANY, a Delaware     )   **COMPLIANCE ORDER, CIVIL**
   corporation doing business as SHELL; and ) **PENALTIES AND OTHER RELIEF**
15 DOES 1 through 100, inclusive,    )
                                     )
16            Defendants.            )
                                     )   Date Action Filed:   Jan. 6, 1999
17                                       Trial Date:  None

18

19 _____

20

21        Plaintiff, the People of the State of California, by and through Tony Rackauckas, District

22 Attorney for the Orange County, alleges:

23                       <u>VENUE AND JURISDICTION</u>

24        1.     Tony Rackauckas, the District Attorney of the Orange County by Michelle M.

25 Lyman, bring this action to protect the public from health and safety hazards, and from unfair,

26 unlawful or fraudulent business practices, and to protect the environment of Orange County, and

27

28                                    1

1  the ownership and operation of underground storage tanks within Orange County (which in

2  numerous instances they did not do), they should have taken additional leak prevention and detection

3  measures given the fact they were conducting business on top of one of the largest below-ground

4  drinking water sources in the state of California, given the unreliability of underground storage tank

5  systems meeting minimum mandatory requirements in preventing and detecting leaks and given the

6  risks posed by MTBE once released to groundwater.  SHELL, alone and/or in partnership or other

7  types of business relationships with all other Defendants, and each of them, and the other Defendants

8  as well individually and together, knew or should have known that many of the underground storage

9  tank systems they owned and/or operated in Orange County were (and are) located directly above

10  one of the largest below ground drinking water sources in California, which should have prompted

11  them to take additional containment, leak detection and cleanup measures.

## FIRST CAUSE OF ACTION
### VIOLATION OF CIVIL CODE SECTIONS 3479 AND 3480
#### [Public Nuisance Against All Defendants]

14        28.    The People reallege and incorporate by reference paragraphs 1 through 27, inclusive

15  as though set forth fully and at length herein.

16        29.    The unauthorized release of gasoline and/or MTBE to groundwater and to soil where

17  such releases are likely to reach groundwater, constitutes a nuisance.  Each such gasoline and MTBE

18  release is a continuing nuisance unless and until the gasoline and/or MTBE has been removed from

19  groundwater and soil.  Gasoline and MTBE contamination may be abated at the source of release

20  ("source zone").  Groundwater contaminated with gasoline and MTBE surrounding the source zone

21  may also be captured ("capture zone") and treated at the release site which is typically a gas station.

22  As MTBE contamination migrates away from the source and capture zones into deeper aquifers, it

23  becomes far more difficult if not impossible to abate, thereby changing from a continuing nuisance

24  to a permanent nuisance.  Once MTBE contamination reaches a production well or the aquifer from

25  which such wells draw, the damage to water is complete.  Abatement measures at this stage are

26  extremely difficult, costly and time consuming.  As in Santa Monica, a treatment system may be

27  utilized at the wellhead in an attempt to clean MTBE contaminated water, but replacement water

28

9

SB 262184 v1, 08695-0001

1  must be obtained to make up for the lost water supply at a far greater expense (approximately three

2  and one half times the cost).

3        30.    At times relevant herein, Defendants SHELL, alone and/or in partnership or other

4  types of business relationships with all other Defendants, and each of them, and the other Defendants

5  as well individually and together, created and/or maintained a public nuisance at numerous gasoline

6  release sites in the Orange County where BTEX and/or MTBE have contaminated, continue to

7  contaminate and threaten to contaminate groundwater and soil in close proximity to groundwater in

8  violation of Civil Code sections 3479 and 3480, including, but not limited to, those sites specified in

9  Exhibit "B".

10        31.    At times relevant herein Defendants SHELL, alone and/or in partnership or other

11  types of business relationships with all other Defendants, and each of them, and the other Defendants

12  as well individually and together, aided, abetted, assisted and acted in concert with each other

13  Defendant in the creation and maintenance of the nuisances as described in paragraphs 29 and 30

14  herein.

15        32.    Each site where MTBE and/or gasoline (including its constituents BTEX)

16  contaminates, or threatens to contaminate, groundwater or drinking water supplies constitutes a

17  separate and continuing nuisance subject to abatement.

18        33.    Any site where MTBE and/or gasoline (including its constituents BTEX),

19  contaminates, or threatens to contaminate, groundwater or drinking water supplies constitutes a

20  separate and continuing nuisance subject to abatement constitutes a permanent nuisance justifying an

21  award of damages.

22        34.    In addition to the MTBE and gasoline contaminant plumes in groundwater

23  constituting a public nuisance, underground storage tank systems owned and/or operated by

24  Defendants including Defendants SHELL, alone and/or in partnership or other types of business

25  relationships with all other Defendants, and each of them, and the other Defendants as well

26  individually and together, which are not properly designed, constructed, installed, maintained or

27

28                          10

SB 262184 v1, 08695-0001

operated so as to adequately prevent the release of gasoline and MTBE to the environment constitute a continuing public nuisance.

## SECOND CAUSE OF ACTION
### VIOLATION OF *HEALTH AND SAFETY CODE* SECTION 25249
### Proposition 65: Unlawful Discharge to Drinking Water Against All Defendants

35.   The People reallege and incorporate by reference paragraphs 1 through 34 inclusive, as though set forth fully and at length herein.

36.   Beginning at a time as yet unknown to Plaintiff, but occurring within the applicable statutory period and continuing up to the time of the filing of this complaint, Defendants have engaged in and continue to engage in certain acts in violation of *Health and Safety Code* section 25249.5, to wit, Defendants have in the course of doing business knowingly discharged or released a chemical known by the State to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water including Benzene and Toluene.

37.   Defendants violations of law as alleged in Paragraph 36, above have occurred and continue to occur at specified locations within Orange County, including but not limited to, the site locations listed on Exhibit "B" attached hereto and incorporated by reference as though set forth full and at length herein.  Plaintiff will amend this complaint as Plaintiff becomes informed of other site locations where Defendants have engaged in violations of *Health and Safety Code* §25249.5.  However, Plaintiff excludes from this cause of action the sites identified in Exhibit "C", which is attached hereto and incorporated by reference as though set forth fully and at length herein.

38.   The actions of Defendants in committing and continuing to commit violations of *Health and Safety Code* §25249.5 are inimical to the health and welfare of the public and a threat to sources and potential sources of drinking water of this state and unless enjoined by order of this court, there is a substantial threat that Defendants will continue to commit such actions and violations of law.  As such, Defendants are liable to Plaintiff for civil penalties in an amount up to $2,500 per day per each violation of *Health and Safety Code* section 25249.5

11

FIRST AMENDED COMPLAINT FOR INJUNCTION, CIVIL PENALTIES, OTHER EQUITABLE RELIEF

TONY RACKAUCKAS, District Attorney
County of Orange, State of California
JAN C. STURLA, Senior Assistant District Attorney
ROBERT C. GANNON, JR., Assistant District Attorney
Consumer and Environmental Protection Unit
BY:    MICHELLE M. LYMAN (Bar No. 121780)
       Deputy District Attorney
401 Civic Center Drive West, 5th Floor
Santa Ana, California 92701-4575
Telephone:    (714) 347-8706
Facsimile:    (714) 796-0476

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

RECEIVED
NOV - 6 2000

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

OCT 05 2000

RECEIVED   ALAN SLATER, Clerk of the Court

DEC 1 2000   BY:   N. ABURTO   ,DEPUTY

LEGAL ENV.   D-9/14/00

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE-CENTRAL JUSTICE CENTER

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) CASE NO. 80-40-30 |
| | ) ASSIGNED FOR ALL PURPOSES TO: |
| Plaintiff, | ) JUDGE JOHN C. WOOLLEY |
| | ) DEPARTMENT C6 |
| vs. | ) |
| | ) |
| ATLANTIC RICHFIELD COMPANY, a Delaware | ) FIRST AMENDED COMPLAINT |
| corporation doing business as ARCO; BP AMOCO | ) FOR INJUNCTION, COMPLIANCE |
| CORPORATION; ARCO CHEMICAL COMPANY; | ) ORDER, CIVIL PENALTIES |
| LYONDELL CHEMICAL COMPANY; THRIFTY | ) AND OTHER RELIEF |
| OIL COMPANY; DOES 5 through 200, inclusive, | ) |
| | ) |
| Defendant. | ) |

Plaintiff, the People of the State of California, by and through Tony Rackauckas, District

Attorney for the County of Orange, alleges:

## VENUE AND JURISDICTION

1.     Tony Rackauckas, the District Attorney of the County of Orange ("District

Attorney") brings this action on behalf of the People of the State of California ("the People") to:

(1) protect the public from health and safety hazards,  (2) prevent destruction of Orange County's

groundwater resources and otherwise protect the environment, and (3) protect the People from

unfair, unlawful and fraudulent business practices.

2.     The District Attorney brings this action pursuant to Code of Civil Procedure

section 731, Civil Code sections 3479 and 3480, Health and Safety Code sections 25299,

25299.01, 25299.37, 25299.76, 25249.5, 25249.7, 25189.2(c), Water Code sections 13285 and

systems were in apparent compliance with minimum structural and operational requirements. ARCO, ARCO Chemical, Lyondell, BP and Thrifty knew or should have known that compliance with minimum state and federal requirements pertaining to the construction and operation of underground storage tank systems could not be relied upon to prevent, minimize or detect widespread leaks from underground storage tank systems.

114.   Not only should ARCO and Thrifty have complied with minimum state and federal requirements pertaining to the ownership and operation of underground storage tanks in Orange County (which in numerous instances they did not do), they should have taken additional leak prevention and detection measures given the apparent unreliability of underground storage tank systems that actually are in compliance with minimum requirements in preventing and detecting leaks and given the risks posed by MTBE once released to groundwater.  ARCO and Thrifty knew or should have known that many of the underground storage tank systems they owned and/or operated in Orange County were (and are) located directly above one of the largest below ground drinking water sources in California which should have prompted them to take additional containment, leak detection and cleanup measures.

115.   ARCO Chemical and Lyondell prior to the sale and distribution of MTBE should have recommended additional containment and leak detection measures be taken by gasoline suppliers and retailers given their knowledge of the widespread occurrence of gasoline releases to the environment from leaking underground storage tank systems and the risks posed by MTBE once released to groundwater.

## FIRST CAUSE OF ACTION

## VIOLATION OF CIVIL CODE SECTIONS 3479 AND 3480

### Public Nuisance Against All Defendants

116.   The People reallege and incorporate by reference paragraphs 1 through 115, inclusive, as though set forth fully and at length herein.

117.   The unauthorized release of gasoline and/or MTBE to groundwater, and to soil where such releases are likely to reach groundwater, constitutes a nuisance.  Each such gasoline

and/or MTBE release is a continuing nuisance unless and until the gasoline and/or MTBE has been removed from groundwater and soil.  Gasoline and MTBE contamination may be abated at the source of release ("source zone").  Groundwater contaminated with gasoline and MTBE surrounding the source zone may also be captured ("capture zone") and treated at the release site (typically a gas station).  As MTBE contamination migrates away from the source and capture zones into deeper aquifers, it becomes far more difficult if not impossible to abate, thereby changing the nuisance from continuing to permanent.  Once MTBE contamination reaches a production well or the aquifer from which such wells draw, the damage to water is complete. Abatement measures at this stage are extremely difficult, costly and time consuming.  As in Santa Monica, a treatment system may be utilized at the well head in an attempt to clean MTBE contaminated water, but replacement water must be obtained to make up for the lost water supply at a far greater expense (approximately three and one half times the cost).

118.    At times relevant herein, ARCO, BP and Thrifty created and/or maintained a public nuisance at numerous gasoline release sites in Orange County where Benzene, Toluene, Ethylbenzene and Xylene and/or MTBE have contaminated, continue to contaminate and threaten to contaminate groundwater and soil in close proximity to groundwater in violation of Civil Code sections 3479 and 3480.  There are approximately sixty (74) of these release sites owned and previously owned by ARCO and controlled by BP, and approximately forty-two (42) more owned by Thrifty which are leased to ARCO and controlled by BP.

119.    At times relevant herein ARCO Chemical and Lyondell aided, abetted, assisted and acted in concert with ARCO, BP, and Thrifty in the creation and maintenance of the nuisances as described in paragraphs 117 and 118 herein .

120.    Each site where MTBE and/or gasoline (including its constituents Benzene, Toluene, Ethylbenzene and Xylene) contaminates, or threatens to contaminate, groundwater or drinking water supplies constitutes a separate and continuing nuisance subject to abatement.

121.    Any site where MTBE and/or gasoline (including its constituents Benzene, Toluene, Ethylbenzene and Xylene) contamination has migrated offsite to a location or locations where such contamination is not subject to abatement constitutes a permanent nuisance justifying

an award of damages.

122.    In addition to the MTBE and gasoline contaminant plumes in groundwater constituting a public nuisance, underground storage tank systems owned and/or operated by defendants ARCO, BP and Thrifty which are not properly designed, constructed, installed, maintained or operated so as to adequately prevent the release of gasoline and MTBE to the environment constitute a continuing public nuisance.

## SECOND CAUSE OF ACTION

## VIOLATION OF HEALTH AND SAFETY CODE SECTION 25249.5

**Proposition 65: Unlawful Discharge to Drinking Water Against ARCO, BP and Thrifty**

123.    The People reallege and incorporate by reference paragraphs 1 through 122, inclusive, as though set forth fully and at length herein.

124.    At times relevant herein, ARCO, BP and Thrifty in the course of doing business knowingly discharged or released Benzene, a chemical known by the state to cause cancer, and Toluene, a chemical known by the state to cause reproductive toxicity, into water or onto land where such chemicals have passed or probably will pass into a source of drinking water at numerous gasoline release sites in Orange County.  There are approximately sixty (74) of these discharge sites owned by ARCO and controlled by BP and forty-two (42) more of these discharge sites owned by Thrifty which are leased to ARCO and controlled by BP.  However, Plaintiff excludes from its SECOND CAUSE OF ACTION the ARCO owned sites identified in Exhibit "C" and the Thrifty owned and ARCO operated sites identified in Exhibit "D" which exhibits are attached hereto and incorporated by reference as though set forth fully and at length herein.

125.    ARCO, BP and Thrifty knew that a substantial number of their underground storage tank systems had leaked, were leaking and would continue to leak gasoline, including benzene and toluene, into the groundwater of Orange County.  ARCO, BP and Thrifty failed to take appropriate action to prevent the initial releases of benzene and toluene from underground storage tank systems owned and/or operated by them, or to subsequently cleanup such releases. The failure of ARCO, BP and Thrifty to timely cleanup known releases of benzene and toluene

# EXHIBIT C

ORANGE COUNTY DISTRICT ATTORNEY
Tony Rackauckas, District Attorney
Bill Feccia, Senior Assistant District Attorney
Joe D'Agostino, Assistant District Attorney
Consumer and Environmental Protection Unit
Aleta Bryant; Bar No. 125381, Deputy District Attorney
401 Civic Center Drive
Santa Ana, CA 92701-4575
(714) 347-8720, FAX (714) 568-1250

Attorneys for Plaintiff
THE PEOPLE OF THE STATE OF CALIFORNIA

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JAN 0 5 2005

ALAN SLATER, Clerk of the Court
C. Carr
BY  C. CARR

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA<br><br>Plaintiff,<br><br>vs.<br><br>SHELL OIL COMPANY, a Delaware corporation doing business as SHELL; TEXACO REFINING AND MARKETING, INC.; EQUIVA SERVICES LLC; and EQUILON ENTERPRISES LLC<br><br>Defendants. | Case No.  80-40-31<br><br>Reassigned for all purposes to:<br>Judge David C. Velasquez<br>Department CX104<br><br>Complaint filed 1/6/99<br>First Amended Complaint filed 5/9/01<br><br>[PROPOSED] FINAL JUDGMENT PURSUANT TO STIPULATION AND ORDER THEREON |

1049605.1

[PROPOSED] FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

K.      Providing funds for the publication and distribution of written and audio/video materials to be used for recruitment purposes or other purposes by attorneys, investigators, and support staff.

7.4     The Prosecution Trust Fund shall be administered by three trustees consisting of the Chief Assistant District Attorney, the Senior Assistant District Attorney in charge of Felony Operations 2, and the Chief Investigator, Bureau of Investigation, Orange County District Attorney's Office, or their delegates.

## DISPUTE RESOLUTION

8.0     Except as otherwise expressly stated herein, in the event of a reasonable and bona fide dispute presented by any of the parties to this Final Judgment, the parties agree that the dispute will be mediated by Judge Daniel Weinstein.  The costs of said mediator in connection with the resolution of said dispute shall be borne by Settling Defendants; provided, however, that after the parties have mediated three separate disputes hereunder, the mediator can allocate the costs of mediation to Plaintiff if the mediator determines that such an allocation is equitable considering the reasonableness or unreasonableness of the Plaintiff's (or CONSULTANT's) position on the matter that was the subject of the dispute.  If the parties cannot reach resolution through the mediator, the dispute shall be submitted by noticed motion to the Honorable David C. Velasquez or his Court-appointed judicial successor for resolution.  Jurisdiction is retained over the parties to enforce this Final Judgment until performance in full of the terms of the Final Judgment, pursuant to California Code of Civil Procedure section 664.6.

## MATTERS COVERED BY THIS FINAL JUDGMENT

9.0     Except for the retained jurisdiction of the Court as set forth in Section 9.3 below, this Final Judgment is a final and binding judgment, release, resolution and settlement of all

claims, violations, or causes of action that were alleged in the First Amended Complaint against Settling Defendants, or could have been asserted based on the facts alleged in the First Amended Complaint, including all claims, violations, or causes of action in regards to the sites listed on Exhibit A.  This Final Judgment and the releases contained herein shall be final and binding against and shall inure to the benefit of each of the Settling Defendants and each of their subsidiaries, corporate parents, Affiliates, successors, heirs, assigns, and their respective officers, directors, partners, shareholders, members, employees, representatives, agents, dealers, franchisees, facility owners and facility operators of the sites listed on Exhibit A with the exception of Texaco, Inc. ("Covered Defendant Parties") as to all sites listed on Exhibit A.

This Final Judgment is subject to, and expressly conditioned upon, the following exceptions and limitations: (a) this Final Judgment shall not operate as a release, dismissal or retraxit as to any party not specifically identified as one of the Covered Defendant Parties; (b) Plaintiff's causes of action against Defendant Texaco, Inc., as set forth in the First Amended Complaint, shall not be affected by this Final Judgment, and are hereby expressly preserved; (c) Plaintiff does not dismiss, release, discharge or diminish any of its claims and actions against Defendant Texaco, Inc.; and (d) this Final Judgment shall not operate as a release, dismissal or retraxit with respect to any of Settling Defendants' obligations arising under this Final Judgment, including, but not limited to, Settling Defendants' obligations for the implementation of and compliance with the Plume Delineation Program set forth in Sections 3.0 through 3.10 above, payment of UST Program Payments under Section 6 above, payment into the PROSECUTION TRUST FUND under Sections 7.0 through 7.4 above, and injunctive relief as set forth in Sections 5.0 through 5.8 above.

The release set forth in this Section 9.0 shall become effective upon Settling Defendants' full payment of the amounts specified in Section 3.0, Section 6, and Section 7.0 above by the

deadline specified in those sections; provided, however, that Plaintiff shall retain the right to enforce Settling Defendants' full compliance with all the provisions of this Final Judgment pursuant to Section 9.3 below.

As used herein, "Affiliate" means a person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or entity specified.

9.1     This Final Judgment also constitutes a release from any known or unknown, past or present claims, violations, or causes of action that were or could have been asserted in the First Amended Complaint by Plaintiff against the Covered Defendant Parties with regard to: any and all existing or potential demands, causes of action, equitable or legal claims, obligations, damages, losses, fines, penalties and liabilities related to underground storage tank systems, the unauthorized release of petroleum product, or additive or constituent of such petroleum product (including but not limited to TPH, BTEX, MTBE and other fuel oxygenates), the use of MTBE and/or other fuel oxygenates in gasoline, or any alleged failure to assess, remediate, or otherwise take corrective action in response to any such unauthorized release, whether asserted or unasserted, or known or unknown, arising out of or connected with any act, cause, matter, or thing stated, claimed, alleged, or that could have been alleged in any pleading, records, or other papers filed in this lawsuit or that may be based upon, related to or connected with any of the matters referred to in any such pleadings, records, or other papers.  This Final Judgment does not release any claims, violations, or causes of action against Defendant Texaco, Inc.

The release in this Section 9.1 is subject to all the exceptions and limitations set forth in Section 9.0 above, and to all the other provisions contained in this Final Judgment setting out Settling Defendants' obligations hereunder, including, but not limited to Sections 3.0 through

1049605.1

-20-

[PROPOSED] FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

204

1 ORANGE COUNTY DISTRICT ATTORNEY
  Tony Rackauckas, District Attorney
2 Bill Feccia, Senior Assistant District Attorney
  Joe D'Agostino, Assistant District Attorney
3 Consumer and Environmental Protection Unit
  **Aleta Bryant; Bar No. 125381,** Deputy District Attorney
4 401 Civic Center Drive
  Santa Ana, CA 92701-4575
5 (714) 347-8720, FAX (714) 568-1250
  — *In association with* —
6 **Mark P. Robinson, Jr., Esq.; Bar No. 054426**
  **Allan F. Davis, Esq.;   Bar No. 108269**
7 ROBINSON, CALCAGNIE & ROBINSON
  620 Newport Center Drive, 7th Floor
8 Newport Beach, CA 92660
  (949) 720-1288, FAX (949) 720-1292
9 — *and* —
  **Ramon Rossi Lopez, Esq.; Bar No. 86361**
10 **Thomas A. Schultz, Esq.; Bar No. 149578**
  LOPEZ, HODES, RESTAINO, MILMAN & SKIKOS
11 450 Newport Center Drive, 2nd Floor
  Newport Beach, CA 92660
12 (949) 640-8222, FAX (949) 640-8294

13

14 Attorneys for Plaintiff
  THE PEOPLE OF THE STATE OF CALIFORNIA

15

16        SUPERIOR COURT OF THE STATE OF CALIFORNIA

17       FOR THE COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

18

19 THE PEOPLE OF THE STATE OF         ) Case No.  80-40-30
   CALIFORNIA                        )
20                                   ) Assigned for all purposes to:
              Plaintiff,            )   Judge Raymond J. Ikola
21                                   )   Department CX105
          vs.                       )
22                                   ) Complaint filed 1/6/99
   ATLANTIC RICHFIELD COMPANY, a     ) 1st Amended Complaint filed 10/5/00
23 Delaware corporation doing business as )
   ARCO; BP AMOCO CORPORATION;       ) [PROPOSED] FINAL JUDGMENT
24 ARCO CHEMICAL COMPANY; LYONDELL  ) PURSUANT TO STIPULATION AND
   CHEMICAL COMPANY; THRIFTY OIL     ) ORDER THEREON
25 COMPANY; and DOES 5 through 200,  )
   inclusive;                        ) Trial Date: January 21, 2003
26                                   )
              Defendants.           )
27 _____ )

28

LA2:649652.2

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

DEC 1 7 2002

ALAN SLATER, Clerk of the Court
*Nora O'Bryan*
BY NORA O'BRYAN

RECEIVED
DEC - 9 2002
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
ALAN SLATER, Clerk of the Court

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

1   mediator can allocate the costs of mediation to Plaintiff if the mediator determines that such an

2   allocation is equitable considering the reasonableness or unreasonableness of the Plaintiff's (or

3   CONSULTANT'S) position on the matter that was the subject of the dispute.  If the parties

4   cannot reach resolution through the mediator, the dispute shall be submitted to Honorable

5   Raymond Ikola, or his court-appointed judicial successor for resolution.

## MATTERS COVERED BY THIS FINAL JUDGMENT

8       6.0     Except for the retained jurisdiction of the court as set forth in section 6.3 below,

9   this Final Judgment is a final and binding resolution and settlement of all claims, violations, or

10   causes of action that were alleged by the First Amended Complaint and Plaintiff's discovery

11   responses against Settling Defendants, or could have been asserted, based on the facts alleged in

12   the First Amended Complaint and Plaintiff's discovery responses, against:

14       (i) each of the Settling Defendants and each of their subsidiaries, corporate parents,

15   Affiliates (including, without limitation, BP West Coast Products LLC, BP Products North

16   America Inc., BP Company North America Inc., BP Corporation North America Inc., BP

17   America Inc., BP p.l.c., ARCO Pipeline Company, ARCO Oil and Gas Company, and ARCO Oil

18   Refining Company), successors, heirs, assigns, and their respective officers, directors, partners,

19   employees, representatives, and agents, dealers, franchisees, and facility operators of the stations

20   listed in Exhibit A ("Covered Defendant Parties"), or

22       (ii) Thrifty Oil Company, its Affiliates, and their respective officers, directors, partners,

23   employees, successors, assigns and Affiliates ("Thrifty Parties"), solely to the extent such claims,

24   violations or causes of actions arise from Settling Defendants' alleged violations of Operational

25   Compliance Requirements at  the stations listed in Exhibit B (which are stations owned by Thrifty

26   Oil Co. or its Affiliates and leased by Settling Defendants).  As used herein, "Operational

27   Compliance Requirements" means the legal obligations of Settling Defendants relating to the

day-to-day operation of underground storage tank equipment, as set forth in Sections 25284-25296 and 25298-25299 of the Health & Safety Code, and Sections 2630-2652 and 2660-2714 of title 23 of the California Code of Regulations.  Operational Compliance Requirements do not include legal obligations relating to corrective action or remediation of releases from underground storage tanks.

Except as set forth in Section 6.0(ii) and Section 6.1(ii): (a) this Final Judgment shall not operate as a release, dismissal or retraxit as to any party not specifically identified as a "Settling Defendant" in this judgment; (b) Plaintiff's causes of action as against Defendants Thrifty Oil Company and Lyondell Chemical Company ("Non-Released Parties") as set forth in the First Amended Complaint, shall not be affected by this Final Judgment; (c) it is not the intent of Plaintiff to dismiss, release, discharge or diminish Plaintiff's claims and actions against the Non-Released Parties, including Thrifty Oil Company and Lyondell Chemical Company; (d) Plaintiff would not be entering into this stipulated judgment if Plaintiff knew or suspected that the affect of the judgment would be to release, dismiss or discharge Plaintiff's actions or claims as against the Non-Released Parties; and (e) Plaintiff does hereby expressly preserve the Plaintiff's actions and claims against the Non-Released Parties.

The provisions of this section 6.0 are expressly conditioned on the Settling Defendants' full payment of the  amount specified in Section 3 above by the deadlines specified in the Section 3 above and their full satisfaction of the Plume Delineation Program; provided, however, that after full payment of such amount, the provisions of this section 6.0 will remain in full force and effect unless and until the Court makes a final determination that Settling Defendants have not fully satisfied Section 3.0 and the Plume Delineation Program.

As used herein, "Affiliate" means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person

LA2:649652.2 — - 12 - — FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON

specified  This Final Judgment shall be binding upon and shall inure to the benefit of the parties,

including the parties listed in subclauses (i) and (ii) above.

      6.1    This Final Judgment also constitutes a release from any known or unknown past or

present claims, violations, or causes of action that were or could have been asserted in the First

Amended Complaint against Covered Defendant Parties with regard to any and all existing or

potential demands, causes of action, equitable or legal claims, obligations, damages, losses, fines,

penalties and liabilities related to underground storage tank systems, the unauthorized release of

petroleum product, or additive or constituent of such petroleum product (including but not limited

to TPH, BTEX, MTBE and other fuel oxygenates); the use of MTBE and/or other fuel oxygenates

in gasoline, or any alleged failure to assess, remediate, or otherwise take corrective action in

response to any such unauthorized release, at the sites listed in Exhibit A, whether asserted or

unasserted or known or unknown, arising out of or connected with any act, cause, matter, or thing

stated, claimed, alleged, or that could have been alleged in any pleading, records, or other papers

filed in this lawsuit or that may be based upon, related to or connected with any of the matters

referred to in any such pleadings, records, or other papers.  This Final Judgment also constitutes a

release from any known or unknown past or present claims, violations, or causes of action that

were or could have been asserted in the First Amended Complaint against the Thrifty Parties

solely to the extent such known or unknown past or present claims, violations or causes of actions

arise from Settling Defendants' alleged violations of Operational Compliance Requirements at the

stations listed in Exhibit B.  Except as set forth in the preceding sentence, this Final Judgment

does not release any claims, violations, or causes of action against the Thrifty Parties.  The release

in this Section 6.1 does not include unknown future violations relating to the facilities listed on

Exhibit A.

FINAL JUDGMENT PURSUANT TO
STIPULATION AND ORDER THEREON