UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/28/15
```

-------------------------------------------------- X
            :

IN RE: METHYL TERTIARY BUTYL    :
ETHER ("MTBE") PRODUCTS      :
LIABILITY LITIGATION          :
-------------------------------------------------- :
            :

This document relates to:       :
            :

*Commonwealth of Puerto Rico v.*   :
*Shell Oil Co., et al.*, 07 Civ. 10470   :
            :

-------------------------------------------------- X

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.**

## I.    INTRODUCTION

      This is a consolidated multi-district litigation ("MDL") relating to

contamination — actual or threatened — of groundwater from various defendants'

use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary

butyl alcohol, a product formed by the breakdown of MTBE in water.  In this case,

the Commonwealth of Puerto Rico ("Commonwealth") alleges that defendants' use

and handling of MTBE has contaminated, or threatened to contaminate,

groundwater within its jurisdiction.  Familiarity with the underlying facts is

presumed for purposes of this Opinion.

      Currently before this Court is a motion for summary judgment

brought by defendants Shell Chemical Yabucoa, Inc. ("SCYI"), Shell Oil

Company ("SOC"), Motiva Enterprises LLC ("Motiva"), Equilon Enterprises LLC

("Equilon"), TMR Company ("TMR"), Shell Trading (U.S.) Company ("STUS"),

Shell International Petroleum Company Limited ("SIPC"), and Shell Western

Supply and Trading Limited ("Shell West"), pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  Defendants (collectively, the "Shell Defendants") move

on the grounds that the Commonwealth cannot show that the "Shell Defendants

were responsible for any site at issue in this case," including Phase I Trial Site No.

3 ("Shell Site"), or "that [Shell Defendants] manufactured, supplied, or discharged

any allegedly defective gasoline with MTBE that could have been a substantial

factor in causing damages at . . . any site in Puerto Rico."[1]  For the reasons stated

below, the Shell Defendants' motion is **GRANTED** in part and **DENIED** in part

with respect to the Commonwealth's Phase I claims.

## II.    BACKGROUND[2]

---

[1]    Defendants' Motion for Summary Judgment at 1.  *See also* 9/12/14 Case Management Order No. 117 ("Trial Site Matrix"), Dkt. 457 (charting the claims asserted against each defendant at each trial site at issue).

[2]    The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks*, 548 U.S. 521, 529–30 (2006).

While the instant motion argues that the Commonwealth cannot prove that the Shell Defendants caused the Commonwealth's injuries, the central issue here, which also bears on causation, is whether the Commonwealth has produced evidence that the Shell Defendants manufactured, supplied, or distributed gasoline containing MTBE. This question turns largely on whether supplying gasoline with MTBE concentrations below 0.50% by volume ("the *de minimis* threshold") is permissible as a matter of Puerto Rico law.[3] As a matter of undisputed fact, SCYI, Motiva, Equilon, TMR, and STUS never manufactured, distributed, sold, or imported shipments of gasoline containing concentrations of MTBE greater than the *de minimis* threshold.[4]

### A.    The *De Minimis* Threshold

MTBE is an oxygenate — an octane enhancing substance — that

---

[3]    *See* 10 Laws of Puerto Rico Annotated ("L.P.R.A.") § 4172 (Puerto Rico's statutory proscription of gasoline containing MTBE at any level). *But see* Regulations of Puerto Rico ("P.R. Regs.") Department of Consumer Affairs ("DACO") § 8198 (stating that gasoline containing MTBE at concentrations above 0.50% is a violation of Puerto Rico law).

[4]    "Shipments" refers to "cargoes of gasoline of a given grade delivered by vessel. A vessel could include two or more shipments." Defendants' Memorandum of Law in Support of Summary Judgment ("Def. Mem.") at 3. There is no fixed quantity of gasoline contained in a shipment — the size of a shipment may vary from purchase to purchase. A single shipment may contain substantial amounts of gasoline. For example, in one shipment "[Shell PR] purchased 130,862.23 Barrels (5,496,213.66 US gallons) of . . . gasoline." *Id*.

gasoline manufacturers began using as an additive to replace lead.[5]  Manufacturers typically blended MTBE into their product at concentrations between 1% and 7% by volume, but some refineries used MTBE at concentrations as high as 10% to 12% by volume.[6]  Because MTBE loses its octane enhancing qualities at concentrations lower than 1% by volume, the Shell Defendants claim that it would "never make sense for a refiner to blend" MTBE into gasoline at concentrations below 0.50% by volume.[7]

Pursuant to Section 4172 of Title 10 of the Puerto Rico Code ("Section 4172"), "[n]o natural or legal person shall import, sell, dispense or offer for sale gasoline containing [MTBE]."[8]  Through Section 4175 of Title 10 of the Puerto Rico Code ("Section 4175"), the Puerto Rico Legislature delegated the task of enforcing this "statutory ban on MTBE" to the Department of Consumer Affairs ("DACO").[9]  "Correspondingly, DACO implemented Regulation No. 8198

---

[5]     *See* Defendants' Reply 56.1 Statement in Support of Summary Judgment ("Reply 56.1") ¶ 45.

[6]     *See id.*

[7]     *Id.* ¶ 50.

[8]     10 L.P.R.A. § 4172.

[9]     Defendants' Memorandum of Law in Support of Motion to Strike the Declaration of Luis Pagan Rodriguez ("Def. Mem. Mot. Strike"), Special Assistant to the Secretary of DACO, at 4.  *See* 10 L.P.R.A. § 4175 ("DACO shall promulgate, within a period of thirty (30) days from the effective date of this Act,

("DACO regulation") to further illustrate [section 4172]."[10]  By implementing the

DACO regulation, and issuing Administrative Order No. 2012–020 ("DACO

order") to supplement it, "DACO takes the position that gasoline coming into

Puerto Rico is allowed to [contain] MTBE . . . , but [only] at levels below 0.5[0]

percent by volume."[11]

      The Shell Defendants argue that  Puerto Rico law "expressly permit[s]

*de minimis* levels of MTBE up to 0.5[0]% by volume."[12]  Such levels of MTBE in

gasoline, the Shell Defendants claim, are "inevitable," and "most likely result[]

from the presence of MTBE in some components of the refining or distribution

systems . . . which inadvertently mixes with [MTBE-free] gasoline."[13]

Accordingly, the Shell Defendants ask this Court to grant summary judgment on

all claims based on the presence of "mere *de minimis* levels of MTBE in

---

the regulations needed, if any, to ensure their effective realization.").

    [10]      Def. Mem. Mot. Strike at 4.  *See* P.R. Regs. DACO § 8198.

    [11]      11/14/13 Deposition of Luis Pagan Rodriguez ("Pagan Dep."), Ex. 2 to Declaration of Carlos M. Bollar, Attorney for Exxon Mobil Corporation and Esso Standard Oil Company (P.R.), in Support of Motion to Strike Pagan Decl. ("Bollar Decl.") at 96 (referencing the level of MTBE permissible in gasoline under DACO Administrative Order 2012–020, which supplements P.R. Regs. DACO § 8198).

    [12]      Def. Mem. at 14.

    [13]      *Id.*  The Shell Defendants also assert that the existence of such trace amounts of MTBE in gasoline is "unintentional."  *Id.*

gasoline."[14]

  The Commonwealth counters that the Shell Defendants "confuse the law banning MTBE with [the] DACO regulation implementing the law."[15] "DACO did not purport to change the ban [articulated by section 4172] or permit *de minimis* levels of MTBE," the Commonwealth argues.[16]  Rather, DACO passed a regulation and order in its exercise of "prosecutorial discretion in carrying out laws and determining when and whether to enforce and impose fines and penalties."[17]  The Commonwealth relies on the declaration of its expert, Luis Pagan Rodriguez — the Special Assistant to the Secretary of DACO — to support its ultimate conclusion that "there is no acceptable level of MTBE" permissible in gasoline "[u]nder the statutory laws of Puerto Rico" — section 4172 "bans MTBE[,] period."[18]  In his declaration, Pagan stated that the DACO regulation and order were promulgated because "DACO recognized that residual levels of MTBE

---

[14] *Id.*

[15] Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Mem.") at 17.  *See* 10 L.P.R.A. § 4172.  *See also* P.R. Regs. DACO § 8198.

[16] Pl. Mem. at 17.  *See also* 10 L.P.R.A. § 4175.

[17] Pl. Mem. at 17.  *See also* 10 L.P.R.A. § 4175.

[18] Plaintiff's Memorandum of Law in Opposition to Motion to Strike Declaration of Luis Pagan Rodriguez ("Pl. Mem. Mot. Strike") at 2. *See* Declaration of Luis Pagan Rodriguez ("Pagan Decl.") ¶¶ 1–7.

might be present due to the commingling of product in barges."[19]  However, he stated that DACO's policy of non-enforcement with respect to gasoline with MTBE concentrations below 0.50% does not change the fact that manufacturers of such gasoline still violate the plain language of section 4172, and therefore Puerto Rico law.[20]

The Shell Defendants move to strike Pagan's declaration pursuant to the "sham issue of fact" doctrine on the ground that Pagan's declaration "flatly contradicts prior deposition testimony."[21]  At this deposition, Pagan was asked why DACO decided to implement a "level of tolerance to MTBE in gasoline coming into Puerto Rico" and why that level was set at 0.50% MTBE by volume?[22]  His answers to both questions were, "I do not know."[23]  He stated that he is "not an expert" with respect to why DACO implemented a level of tolerance of MTBE.[24]

**B.      Sol Puerto Rico Limited f/k/a Shell Company (P.R.) Limited**

From 1947 until June 2006, the Shell Company (P.R.) Limited ("Shell

---

[19]     Pagan Decl. ¶ 6.

[20]     *Id.*

[21]     Def. Mem. Mot. Strike at 1–2.

[22]     Pagan Dep. at 93–95.

[23]     *Id.* at 94.

[24]     *Id.*

PR") was "part of the international web of Shell owned and operated companies."[25]
By 2006, Shell PR owned and operated seventy-two "Shell-branded service stations in Puerto Rico, including the underground storage tanks ("USTs") and dispensing equipment located at the stations."[26]  Shell PR also "leased bulk storage tanks at Cataño Terminal ("Cataño"), located just outside of San Juan."[27]  Cataño was used as a facility where Shell PR received shipments of gasoline, at least some of which was Shell-branded.[28]

On June 13, 2006, Sol Investments Limited "acquired all of the stock of [Shell PR] . . . and subsequently changed [its] name to Sol Puerto Rico Limited ("Sol")."[29]  Upon acquisition, Sol assumed ownership, operation, or leasing obligations for all seventy-two Shell-branded gasoline stations.[30]  Sol also acquired

---

[25]    Pl. Mem. at 4.

[26]    *Id.  See also* Reply 56.1 ¶ 3.

[27]    Pl. Mem. at 4.  *See also* Reply 56.1 ¶ 3.

[28]    *See* Pl. Mem. at 5 ("Shell PR was supplied MTBE gasoline by a number of inter-related Shell entities, including [SIPC], Shell West[], [SOC], [Motiva], [and SCYI].").  No gasoline — with or without MTBE — was manufactured at Cataño, nor is it alleged that neat MTBE was stored at Cataño. *See id.*

[29]    Def. Mem. at 1.

[30]    *See id.*  Sol also assumed ownership of the USTs and dispensing equipment at those stations.  *See id.*

Cataño, where it continued to receive shipments of gasoline from several Shell Defendants.[31]  The shipments of gasoline received at and distributed from Cataño, by both Shell PR and Sol, contained varied levels of MTBE — including several shipments of gasoline containing MTBE at levels above the *de minimis* threshold.[32]

The parties dispute whether "liability and responsibility . . . for the operations of [Shell PR]," if proven, may be allocated to Sol via a contractual agreement between those entities.[33]  The Shell Defendants claim that "Sol is responsible for any liability that is attributable to Shell PR."[34]  The Shell Defendants point to the acknowledgment by both Sol and the Commonwealth that Sol "bears liability for claims associated with ownership or operation of Shell-branded stations in Puerto Rico."[35]  However, the Commonwealth claims that "the

---

[31]   *See id.*

[32]   *See*, *e.g.*, Reply 56.1 ¶ 100 (Shell PR received ten shipments of gasoline from Shell West containing MTBE at concentrations above the *de minimis* threshold).

[33]   *Id.* ¶ 5.

[34]   Def. Mem. at 2.

[35]   *Id.  See* 3/14/14 Plaintiff's Supplemental Responses to Defendants' First Set of Contention Interrogatories and Requests for Production of Documents ("Contention Interrogatories"), Ex. 2 to Declaration of Ruben F. Reyna, Attorney for Shell Defendants, in Support of Motion for Summary Judgment ("Reyna Decl.") at 19 ("As it relates to Case No. 07-CV-10470, Sol is responsible for any liability that is attributable to [Shell PR]").  *See also* Trial Site Matrix at 1–5 (identifying Sol as liable for nuisance, trespass, and RCA claims for

contractual agreement among the Shell Defendants and Sol as to the allocation of liability arising from MTBE contamination does not shield the Shell Defendants from liability to the Commonwealth for [Shell PR]'s own torts."[36]  Rather, the Commonwealth argues that the Shell Defendants are "directly liable for their own conduct in supplying MTBE gasoline to Shell PR, failing to warn Shell PR about the environmental risks of MTBE, and failing to ensure . . . [Shell PR] undertook appropriate precautions to prevent releases from USTs."[37]

## C.    Remaining Shell Defendants

The Commonwealth asserts six claims in its Complaint against certain Shell Defendants.[38]  These claims include: strict products liability under a theory of

_____

the Shell Site, while not listing any of the Shell Defendants).

[36]    Reply 56.1 ¶ 5.

[37]    *Id.*

[38]    For a list of the Shell Defendants and the claims asserted against them, *see* Defendants' Reply Memorandum in Support of Summary Judgment ("Reply Mem.") at 1.  *See also* Complaint ("TAC") ¶¶ 96–173.  The Shell Defendants seek dismissal of several Defendants from this lawsuit.  *See* Def. Mot. at 1.  However, for purposes of this Opinion, I will only address the claims as they relate to Phase I of the litigation.  But because the Commonwealth has agreed to dismiss Equilon, TMR, and STUS entirely, as none of these entities were involved in Puerto Rico's gasoline market, these entities are hereby dismissed.  *See* Pl. Mem. at 16 n.17.  The Commonwealth has also agreed to dismiss all claims against Motiva with respect to Phase I.  *See* Def. Mem. at 7.  *See also* Trial Site Matrix at 7.  Therefore, the claims against Motiva are dismissed from Phase I.

defective design and failure to warn (Count I) asserted against SOC, SCYI, SIPC, and Shell West;[39] negligence (Count IV) asserted against SOC, SCYI, SIPC, and Shell West;[40] Environmental Public Policy Act ("EPPA") violations (Count V) asserted against SOC, SCYI, SIPC, and Shell West;[41] public nuisance claim (Count II) asserted against SIPC;[42] trespass claim (Count III) asserted against SIPC;[43] and Toxic Substance Control Act ("TSCA") violations (Count VII) asserted against SOC.[44]

### 1.   SCYI

SCYI is a Puerto Rico corporation, "formed in 2001 to acquire and operate" the Yabucoa Facility ("Yabucoa") — "an existing petrochemical plant

---

[39]   *See* Reply Mem. at 1.  *See also* TAC ¶¶ 96–107.

[40]   *See* Reply Mem. at 1.  *See also* TAC ¶¶ 140.  The negligence claims are brought pursuant to 31 L.P.R.A. § 5141.

[41]   *See* Reply Mem. at 1.  *See also* TAC ¶¶ 144–156.  The EPPA claims are brought pursuant to 24 L.P.R.A. § 591.  *See* 24 L.P.R.A. §§ 595, 599.

[42]   *See* Reply Mem. at 1.  *See also* TAC ¶ 114.  The public nuisance claim is brought pursuant to 32 L.P.R.A. § 2761.

[43]   *See* Reply Mem. at 1.  *See also* TAC ¶ 125.  The Trespass claim is brought pursuant to 31 L.P.R.A. § 5141.

[44]   *See* Reply Mem. at 1.  *See also* TAC ¶ 159.  The TSCA claim is brought pursuant to 14 U.S.C. § 2607(e).

and refinery" located in Puerto Rico.[45]  SCYI also imported gasoline shipments to Cataño.[46]  MTBE gasoline was never "manufactured or stored . . . at [either] Yabucoa" or Cataño, nor did SCYI own or operate any service stations in Puerto Rico.[47]  However, records documenting the quality of gasoline received at Yabucoa and Cataño between 2002 and 2010 show that SCYI imported shipments of gasoline containing MTBE at concentrations below the *de minimis* threshold.[48] Specifically, MTBE ranging in concentrations between 0.02% to 0.17% by volume was detected in eight shipments of gasoline received at Yabucoa between 2002 and 2010, and MTBE at concentrations of 0.11% and 0.21% by volume were detected in two shipments received at Cataño in 2004.[49]

## 2.   SOC

SOC is based in the United States and "does not own or operate any facilities to make, store, or distribute gasoline, including refineries, terminals, distribution systems and service stations [] in Puerto Rico, nor has it ever done

---

[45]   Pl. Mem. at 5.  *See* Reply 56.1 ¶¶ 3, 15–19, 21.

[46]   *See* Reply 56.1 ¶ 36.

[47]   Pl. Mem. at 5.  *See* Reply 56.1 ¶¶ 3, 15–19, 21, 29, 32.

[48]   *See* Pl. Mem. at 10.  *See also* Reply 56.1 ¶¶ 27–29.

[49]   *See.* Reply 56.1 ¶¶ 29–36.

so."[50]  However, the Commonwealth claims that SOC owned and operated two oil refineries that produced and directly shipped  MTBE gasoline to Puerto Rico.[51]  In addition, the Commonwealth claims that SOC exercised control over "core elements" of Shell PR's daily operations in Puerto Rico.[52]  Furthermore, the Commonwealth asserts that SOC failed to comply with requirements set forth by the TSCA.[53]

### a.    Supply of MTBE Gasoline

SOC owned the Norco Refinery ("Norco"), located in Louisiana.[54] The parties disagree with respect to when SOC owned Norco.[55] The Commonwealth claims SOC first acquired Norco in 1992 and owned it until 1998, when it transferred ownership to another Shell Defendant, but the Shell Defendants contend SOC owned Norco only until 1996.[56]  Notwithstanding this factual dispute, "Norco Batch Report Charts [("Norco Batch Report")] confirm that []

---

[50]    *Id.* ¶ 39.  *See also* Def. Mem. at 6.

[51]    *See* Pl. Mem. at 6–7.  *See also* Reply 56.1 ¶ 3.

[52]    *See* Pl. Mem. at 6–7.

[53]    *See id.* at 23–24.

[54]    Def. Mem. at 6.

[55]    *See* Reply 56.1 ¶ 42.  *See also* Def. Mem. at 6.

[56]    *See* Reply 56.1 ¶ 42.

Norco manufactured both conventional gasoline with MTBE and conventional gasoline without MTBE" between 1992 and 1998.[57]  However, Norco provided, at most, six shipments of gasoline to Shell PR and the Norco Batch Report does not provide any evidence showing that those shipments contained even trace amounts of MTBE.[58]  Rather, the Commonwealth presents circumstantial evidence, to support its claim that it is more likely than not that the gasoline received by Shell PR from Norco contained MTBE at concentrations greater than the *de minimis* threshold.[59]

---

[57]     *Id*.  *See also* 9/26/14 Norco Batch Report, Ex. 8 to Reyna Decl. at 1–4 (documenting batches of gasoline manufactured at Norco containing MTBE at concentrations up to 15.4% by volume).  *See also* Declaration of Patrick Bloomer, Supply Chain Strategy Advisor for Shell Downstream Inc., in Support of Motion to Dismiss ("Bloomer Decl.") ¶¶ 7–8.

[58]     *See* Reply 56.1 ¶¶ 43–45.  Furthermore, the Norco Batch Report shows that Norco mostly produced MTBE-free gasoline.  *See* Norco Batch Report at 1–4.

[59]     Specifically, the Commonwealth points to testimony given by Shell declarant and witness, Patrick Bloomer, as evidence that SOC shipped MTBE gasoline to Shell PR in the 1990s.  *See* Bloomer Decl. ¶¶ 7–8.  *See also* 11/13/13 Deposition of Patrick Bloomer ("Bloomer Dep."), Ex. 2(a) to Declaration of Bryan Barnhart, Attorney for the Commonwealth, in Opposition to Summary Judgment ("Barnhart Decl.") at 52–53 (testifying that he "was not able to find any shipping records to Puerto Rico" after searching through the Norco Batch Report).   The Commonwealth claims that Bloomer "conceded at his deposition that some or all of the gasoline containing MTBE produced at Norco was potentially shipped to Puerto Rico."  Pl. Mem. at 8.  Shell Defendants claim that the Commonwealth's characterization of Bloomer's deposition "twists" his testimony and that Bloomer "simply acknowledged that he cannot determine which batch of gasoline from

SOC is also the "general partner" of Deer Park Refining L.P., which operates a refinery ("Deer Park") in Texas.[60]  Between 2002 and 2008, Deer Park supplied twenty-two shipments of gasoline to SCYI, received at Yabucoa, pursuant to a supply contract.[61]  According to the terms of the contract, SOC was "specifically prohibited" from shipping gasoline with MTBE concentrations above the *de minimis* threshold.[62]  Of the twenty-two shipments of gasoline received by SCYI at Yabucoa from Deer Park, two shipments contained MTBE at concentrations below the *de minimis* threshold.[63]

### b.    Involvement in Chain of Distribution

The Commonwealth claims that a division of SOC — Shell Atlantic Services Company ("Shell Atlantic") — conducted and approved all supply contracts with Amerada Hess ("Hess"), on behalf of Shell PR, for twenty-three shipments of gasoline produced at Hess Oil Virgin Islands Company's ("HOVIC")

---

Norco was shipped to Puerto Rico."  Def. Mem. at 4.

[60]    *See* Reply 56.1 ¶ 46.

[61]    *See id.* ¶¶ 46–47, 51.

[62]    *Id.* ¶ 47.

[63]    *See* Def. Mem. at 7.  *See also* Reply 56.1 ¶ 48.  MTBE was detected at a concentration of 0.02% by volume in both shipments.  *See id.*

St. Croix refinery ("St. Croix"), to be sent to Cataño between 1995 and 1997.[64]

The concentrations of MTBE in these gasoline shipments ranged from 0.17% to

8.9%.[65]  It is not alleged, nor is there any evidence to show, that Shell Atlantic ever

took title to these shipments.[66]

Ivan Cintron, the former Shell PR employee responsible for "spot

purchases," testified with respect to Shell Atlantic's involvement in the negotiation

and finalization of supply contracts between Shell PR and Hess.[67]  Cintron testified

that Hess initiated supply contract discussions when Hess representatives called

him and asked if Shell PR would be interested in purchasing gasoline.[68]  Following

this conversation, Cintron "immediately" contacted Shell Atlantic's headquarters

in Houston.[69]  Cintron testified that, as Shell PR's spot purchaser, he was required

---

[64]    *See* Pl. Mem. at 9–10.

[65]    *See* 11/7/14 Total Annual Supply of Gasoline to Puerto Rico by
HOVIC ("HOVIC Supply Data"), Ex. 1 to Declaration of Nathan Short, Attorney
for the Commonwealth, in Opposition of Motion for Summary Judgment at 4–17.

[66]    *See* Reply Mem. at 5 ("There is no evidence or indication that Shell
Atlantic ever held title to or otherwise exercised control over the product, [or] . . .
that it was [] ever a party to the supply agreements.").

[67]    9/27/14 Deposition of Ivan Cintron, former Shell PR Employee, Ex. 3
to Barnhart Decl. at 56.

[68]    *Id.* at 54–56.

[69]    *Id.* at 56.

to contact Shell Atlantic because Shell Atlantic "inspect[s] the tankers" used for import to Puerto Rico to determine that they are "suitable transport carriers."[70] Cintron testified that he communicated with Shell Atlantic with respect to supply issues "almost every week."[71]

The Commonwealth argues that Shell Atlantic's approval was required for the supply contract between Hess and Shell PR to come to fruition, placing Shell Atlantic squarely within the "chain of [distribution] for [MTBE] gasoline delivered to [Puerto Rico]."[72] The Commonwealth references correspondence between Hess and Shell Atlantic that make clear that Shell Atlantic "negotiated for substantial supply of [MTBE] gasoline from Hess for Shell PR."[73]

By contrast, the Shell Defendants accuse the Commonwealth of overstating Shell Atlantic's role in negotiating and finalizing supply contracts between Hess and Shell PR, insisting that Shell Atlantic was merely contacted to

---

[70]    *Id.*

[71]    *Id.*

[72]    Pl. Mem. at 10.  *See also* HOVIC Supply Data at 4–17.

[73]    Reply 56.1 ¶ 3.  *See also* 1/23/95 Letter from HOVIC to Shell Atlantic ("Evergreen Contract Letter"), Ex. 6(a) to Declaration of Tracey L. O'Reilly, Attorney for the Commonwealth, in Opposition to Motion for Summary Judgment ("O'Reilly Decl.") at 1.

inspect the quality of the tankers used for transporting gasoline shipments.[74] Significantly, it is undisputed that Shell Atlantic never took title to the relevant shipments.[75]  Accordingly, the Shell Defendants argue that Shell Atlantic's role in the transactions between Hess and Shell PR is best described as that of a "broker," and therefore not within the "chain of distribution."[76]

### c.    The TSCA Claim

The Commonwealth alleges that SOC "has been in violation of TSCA for decades" due to its failure to disclose "'information which reasonably supports the conclusion that' MTBE and MTBE gasoline 'present[] a substantial risk of injury to health or the environment'" to the Administrator of the Environmental Protection Agency ("EPA").[77]  Specifically, the Commonwealth claims that SOC failed to disclose information relating to MTBE's potential to "create taste and odor problems in public drinking water supplies," which SOC knew following the release of MTBE gasoline in Rockaway, New Jersey in 1981 ("the Rockaway spill").[78]  SOC disclosed to the American Petroleum Institute — but not to the EPA

---

[74]    *See* Reply Mem. at 4.  *See also* Reply 56.1 ¶ 3.

[75]    *See* Reply Mem. at 4.

[76]    *Id.*

[77]    Pl. Mem. at 24 (quoting 15 U.S.C. §§ 2607(e), (f)).

[78]    *Id.*

— that "MTBE was detectable (by drinking) in 7 to 15 parts per billion ("ppb") so even if [there was no health effect], it still had to be removed to below the detectable amount in order to use the water."[79]  Moreover, the Commonwealth accuses SOC of misleading the EPA by using its position as a participating member on the Oxygenated Fuel's Association's MTBE Committee — a committee "organized to submit comments in response to an EPA notice announcing its intention to designate MTBE for priority testing consideration under TSCA" — to proffer the false conclusion that "MTBE does not represent a drinking water hazard."[80]

The Shell Defendants claim that the EPA, "pursuant to its authority under TSCA," had access to information documenting Rockaway's "experience with MTBE, including taste and odor issues" as of 1987 when it compiled a docket of materials including an article published in the Journal of the American Water Works Association co-authored by the Rockaway Township engineer.[81]  This

---

[79]     *Id.*

[80]     Defendants' Additional Reply 56.1 Statement ("Add. Reply 56.1") ¶ 23.  SOC submitted the following statement to the MTBE Committee: "We believe that the information provided supports the conclusion that MTBE does not represent a drinking water hazard."  2/27/87 Comments of the MTBE Committee on the EPA's Recommendations Concerning MTBE, Ex. 10 to O'Reilly Decl. at 2.

[81]     Add. Reply 56.1 ¶¶ 23, 26.  *See also* Ronald J. McKinnon and John E. Dyksen, "Removing Organics From Groundwater Through Aeration Plus

-19-

article provided details with respect to precise threshold levels at which MTBE altered the taste and odor of water in Rockaway's wells.[82]  Furthermore, the Shell Defendants counter that SOC did not "mislead" the EPA as a member of the MTBE Committee — rather, because of "significant confusion," SOC understood MTBE's taste and odor threshold "to be in the range of 700 ppb."[83]  Accordingly, the Shell Defendants argue that the EPA was "adequately informed" for purposes of section 8(e).[84]

### 3.    SIPC

SIPC is a "U.K. company" that has never owned any refining or manufacturing facilities in Puerto Rico.[85]  The Commonwealth claims that one of SIPC's subsidiaries — Shell International Trading Company ("SITC") — supplied Shell PR with substantial amounts of MTBE gasoline.[86]  Furthermore, the Commonwealth claims that SIPC — through its subsidiary Shell Retail

---

GAC," *Journal of the American Water Works Association* (May 1984) ("Rockaway Article"), Ex. 14(a) to Reply Declaration of Ruben Reyna ("Reyna Reply Decl.") at 42–47.

[82]    *See* Rockaway Article at 42–47.

[83]    Add. Reply 56.1 ¶ 26.

[84]    *Id.*

[85]    *Id.* ¶¶ 83–85.

[86]    *See* Pl. Mem. at 5–6.

International ("Shell Retail") and alleged subsidiary Shell Caribbean and Central
America ("SCCA") — "played a substantial role in controlling [Shell PR's] site
specific activities and policies related to [USTs], environmental compliance, and
budgeting for environmental and engineering projects," such that SIPC was "a
substantial factor in causing MTBE contamination throughout the
Commonwealth."[87]

### a.    Supply of MTBE Gasoline

From February 1988 until at least 1995, SITC supplied Shell PR with
gasoline produced at Petroleos de Venezuela S.A.'s ("PDVSA") Curaçao refinery
("Curaçao"), pursuant to an "evergreen contract."[88]  It is undisputed that gasoline
containing MTBE at concentrations above the *de minimis* threshold was produced

---

[87]     *Id*. at 15–16.  "There is a disputed fact based upon various Shell
employees' testimon[ies] as to how [S]CCA functioned and its relationship to Shell
PR and SIPC."  *Id*. at 13 n. 5.  For purposes of this motion, whether SCCA was a
"separate company from [SIPC]" is irrelevant — "[S]CCA operated as . . . an
informal cluster of managers from various Shell entities working together to
comply with [SIPC]'s Shell-wide policies."  *Id.*  For consistency's sake, I will refer
to SCCA as an SIPC "affiliate."

[88]     *Id*. at 5.  *See also* 9/15/87 Product Supply Contract Memorandum,
Ex. 1(b) to O'Reilly Decl. at 1.  Prior to 1985, Curaçao was owned by Shell
Curaçao NV ("SCNV"), "when the refinery was sold to the Netherlands Antilles
Government."  Def. Mem. at 8–9.  *See* Reply 56.1 ¶ 86.  Soon after, the refinery
was leased by PDVSA.  *See id.* ¶ 88.

at Curaçao and shipped to Shell PR at Cataño.[89]  However, there is no direct evidence showing that SITC provided such gasoline to Shell PR.[90]  Further, the evergreen contract permitted, *but did not require*, the presence of MTBE .[91]

The Commonwealth also alleges that, after 1994, SIPC supplied Shell PR with "substantial volumes of MTBE gasoline" produced at St. Croix.[92] However, HOVIC Supply Data neither indicates that SIPC was a party to the transaction, nor does it show that SIPC ever held title to the shipments of gasoline at issue.[93]  Consequently, the Shell Defendants claim that the Commonwealth "fail[s] to identify any evidence of agreements between HOVIC and [SIPC] for the supply of gasoline to [Shell PR]."[94]

## b.   SIPC's Involvement with Shell PR Daily Operations

The Commonwealth claims that, beginning in 1999, SIPC's "direct

---

[89]      *See* Reply 56.1 ¶¶ 86–88.

[90]      *See* Pl. Mem. at 5.

[91]      *See* Product Supply Contract Memorandum at 1 (permitting, but not requiring, MTBE concentrations up to 10% by volume).

[92]      *See* Reply 56.1 ¶¶ 91–92.  *See also* 11/07/14 HOVIC Supply Data at 3 (documenting total annual distribution of gasoline by volume, supplied by HOVIC from 1998 to 2005).  The data merely shows that HOVIC supplied Shell PR with several shipments before 1998.  *See id.*

[93]      *See* Reply 56.1 ¶¶ 91–92.

[94]      *Id.* ¶ 92.

involvement with" Shell PR's daily operations, shows that "Shell PR and [SIPC]
acted as one coherent confidential business organization with ultimate decision-
making authority and control with [SIPC]."[95]  As a result, the Commonwealth
concludes that SIPC effectively owned or operated the seventy-two Shell-branded
service stations in Puerto Rico and was a "substantial factor" in causing MTBE
contamination.[96]  Accordingly, SIPC should be assigned all liability attached to
Shell PR from 1999 until 2006.[97]  The Commonwealth relies on the activities of
Shell Retail and SCCA, a SIPC subsidiary and SIPC affiliate respectively, as
evidence that SIPC "exercised substantial control" over Shell PR operations.[98]

*First*, in January 1999, Shell PR entered into a Franchise Agreement
with Shell Retail.[99]  In accordance with the Franchise Agreement, Shell PR "agreed

---

[95]     Pl. Mem. at 11, 14.  *See also* Plaintiff's Rule 56.1 Statement (Pl. 56.1
¶¶ 1–13.

[96]     Pl. Mem. at 14.  *See also* 1/1/99 Shell Retail International
Franchise Agreement ("Franchise Agreement"), Ex. 9(a) to O'Reilly Decl. at 1.
*See also* Pl. 56.1 ¶¶ 1–5.  *See* 9/26/13 Deposition of Brenda Torano ("Torano
Dep."), Former Shell PR and SCCA Employee, Ex. 3(c) to Barnhart Decl. at 26
("[Shell PR] operated — reported to England as part of their operating unit.").  *See
also* Pl. Mem. at 13 (SIPC is based in England).

[97]     *See* Pl. Mem. at 13–14

[98]     *Id.* at 14.  *See also* Pl. 56.1 ¶¶ 1–13.  *See also* Torano Dep. at 89–92
(stating that Shell PR had access to "yellow guides" — the environmental
standards published by Shell Retail).

[99]     Pl. Mem. at 11.

to comply with certain core elements" of Shell Retail's operation standards, including its "[Health, Safety, and Environment ("HSE")] core standards and adherence to . . . performance specifications of equipments and systems."[100] Furthermore, the terms of the agreement also required Shell Retail to "provide 'comprehensive advice and business support for products and services' regarding '[e]ngineering design' and '[s]ite operations and training.'"[101]

Second, in accordance with the Franchise Agreement, SCCA was responsible for "advising all of the business in the [Caribbean and Central American] cluster with respect to their retail stations" — including Shell PR.[102] SCCA was responsible for "working with" retail stations to ensure compliance with "SIPC's Shell-wide policies regarding various issues, including environmental policies."[103]  Among other things, the Commonwealth claims that Shell PR's "capital projects . . . need[ed] approval [from SCCA] in order to have the expenditures."[104]  For instance, in 2000 and 2001, Shell PR "had to seek

---

[100]    Id. (quoting Pl. 56.1 ¶ 1).  See Franchise Agreement at 1.

[101]    Pl. 56.1 ¶ 1 (quoting Franchise Agreement at 2–3).

[102]    Pl. Mem. at 13.

[103]    Id. at 13 n.5.

[104]    Pl. 56.1 ¶ 8.

approval from [S]CCA to upgrade [USTs] at Shell stations, including [Site 3]."[105]

The Shell Defendants contest this claim on several grounds. As an initial matter, the Shell Defendants argue that the Commonwealth should be estopped from asserting that "[SIPC] is vicariously liable for [the] operations of Shell PR" because the Commonwealth "neither pled any such theory of liability and never disclosed such a theory in response to Defendants' First Set of Contention Interrogatories."[106] Furthermore, the Shell Defendants claim that even if the Commonwealth's assertion of vicarious liability was not estopped and its characterization of SIPC's role in Shell PR's operation were accurate — which the Shell Defendants maintain it is not — the Commonwealth's argument fails because SIPC did not exercise control over Shell PR as a matter of law.[107]

### 4.   Shell West

---

[105]   Pl. Mem. at 14.

[106]   Reply Mem. at 5. *See also* 3/14/14 Plaintiff's Supplemental Response to Defendants First Set of Interrogatories ("Interrogatories No. 1"), Ex. 15 to Reyna Reply Decl. at 19–23. *See also In re MTBE*, MDL No. 1358, 2014 WL 494522, at *2 (S.D.N.Y. Feb. 6, 2014) ("Contention interrogatories are treated as judicial admissions which usually estop the responding party from later asserting positions not included in its answers."); *id.* at *4 (neither bad faith nor prejudice are prerequisites for preclusion on the basis of failure to disclose).

[107]   Reply Mem. at 6. *See also Morales v. Digital Equip. Corp.*, 669 F. Supp. 1173, 1182 (D.P.R. 1987), *aff'd*, 843 F. 2d 613 (1st Cir. 1988) ("[A]uthority to approve or reject the plans of [a] subsidiary does not establish . . . control").

Shell West is a Barbados company that has "never owned or operated any underground storage tanks, service stations, or other gasoline storage facilities in Puerto Rico."[108]  However, "between September 1997 and December 2010, Shell West supplied five-hundred-sixteen shipments of gasoline to [Shell PR] and one-hundred-forty shipments of gasoline to SCYI," mainly from St. Croix.[109] At least ten gasoline shipments provided to Shell PR contained MTBE at concentrations greater than the *de minimis* threshold of 0.50%.[110]  Shell West purchased these shipments from Hess, briefly acquiring title or ownership to the shipments.[111] Soon after purchasing these shipments, Shell West sold the shipments to Shell PR — title always transferred to Shell PR "outside of Puerto Rico, typically at the loading dock of [St. Croix]."[112]

---

[108]    Reply 56.1 ¶¶ 95–96.

[109]    *Id.* ¶ 100.  These gasoline shipments were made pursuant to "trading and supply services" agreements made by Shell West with Shell PR and SCYI.  *Id.* ¶ 98.  Shell West supplied Shell PR with gasoline between September 1997 and October 2003.  *See id.*  Shell West supplied SCYI with gasoline between November 2003 and December 2010.  *See id.*

[110]    *See id*. ¶ 102.  Of the six-hundred-fifty-six total shipments of gasoline provided by Shell West to Shell PR and SCYI, 24% had MTBE concentrations less than the *de minimis* threshold.  *See id.*  "Shell Western's contracts permitted the use of oxygenates such as MTBE."  Pl. Mem. at 7.

[111]    *See* Def. Mem. at 10.

[112]    *Id.*  In particular, it is undisputed that title to all ten gasoline shipments containing MTBE at concentrations greater than the *de minimis*

The Commonwealth claims that a finder of fact could reasonably conclude that Shell West purposefully added MTBE to gasoline at concentrations greater than the *de minimis* threshold because it was permitted by Shell West's supply contracts and consistent with Shell West's business practices.[113] Conversely, the Shell Defendants dispute that Shell West "supplied" Shell PR and SCYI with MTBE gasoline.[114]  Rather, the Shell Defendants claim they "merely helped make [MTBE gasoline] available outside Puerto Rico and thus should not be said to have participated in the Puerto Rico MTBE gasoline market."[115] Accordingly, the Shell Defendants argue that Shell West "was the equivalent of just a broker."[116]

Separately, the Shell Defendants trumpet a lack of causation, claiming that there is "no evidence" that any gasoline from the ten shipments with MTBE concentrations above 0.50% by volume "was ever delivered to any Trial Site . . . at issue" or that this gasoline "was discharged, much less that a discharge of the

threshold transferred to Shell PR at St. Croix.  *See* Reply 56.1 ¶ 103.

[113]    *See* Pl. Mem. at 7.  *See also* Reply 56.1 ¶ 3.

[114]    Def. Mem. at 17.

[115]    *Id.*  The Shell Defendants rely on the fact that Shell West only took title to the gasoline for brief periods of time.  *See id*.

[116]    *Id.*

-27-

product caused the [Commonwealth] any damages."[117]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[118]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[119]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[120]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to

---

[117]    *Id.*

[118]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[119]    *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[120]    *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

the material facts,"[121] and "may not rely on conclusory allegations or
unsubstantiated speculation."[122]

In deciding a motion for summary judgment, "[t]he role of the court is
not to resolve disputed issues of fact but to assess whether there are any factual
issues to be tried."[123] "'Credibility determinations, the weighing of the evidence,
and the drawing of legitimate inferences from the facts are jury functions, not those
of a judge.'"[124]

## IV.   APPLICABLE LAW

### A.   Essential Elements of the Tort Claims Under Puerto Rico Law

Almost all of the Commonwealth's claims require proof that the Shell
Defendants actually supplied or discharged MTBE or gasoline containing MTBE,
in Puerto Rico.[125]  Under Puerto Rico Law, "tort plaintiffs . . . . must introduce

---

[121]   *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation
marks and citations omitted).

[122]   *Id.* (quotation marks and citations omitted).

[123]   *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir.
2012).

[124]   *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir.
2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir.
2012)).

[125]   *See, e.g.*, *Fagot Rodriguez v. Republic of Costa Rica*, 139 F. Supp. 2d
173, 181 (D.P.R. Mar. 19, 2001), *aff'd*, 297 F.3d 1 (1st Cir. 2002) (trespass);
*Carballo-Rodriguez v. Clark Equip. Co.*, 147 F. Supp. 2d 66, 71 (D.P.R. 2001)

evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result."[126]  Courts have held that a defendant's conduct "could only have been a substantial factor if it played *more than an infinitesimal or theoretical part* in bringing about" injury, damage, or loss.[127]  As I recently held, this burden can be met with circumstantial evidence, but mere "speculation, unmoored from the

---

(strict products liability and negligence); 12 L.P.R.A. § 8004a(4) (the EPPA claims); and 32 L.P.R.A. § 2761 (nuisance).

[126]  *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 66, 73 (D.P.R. Apr. 5, 2004).  The Commonwealth's argument to the contrary with respect to the EPPA claims is unfounded.  *See* Pl. Mem. at 22.  In interpreting the Comprehensive Environmental Rehabilitation, Compensation, and Liability Act — a federal environmental protection statutory scheme analogous to the EPPA — the Supreme Court held that an entity could not be held liable . . . merely for selling a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 610 (2009).  *Accord Freeman v. Glaxo Wellcome, Inc.*, 189 F.3d 160, 164 (2d Cir. 1999).  Furthermore, defendants' knowledge that "its product will be leaked, spilled, dumped, or otherwise discarded . . . alone is insufficient to prove that an entity planned for the disposal, particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. at 612.  Similarly, the EPPA requires that the "person responsible" is the one who was the "cause of [an] environmental injury." 12 L.P.R.A. § 8004i.  This requirement mandates that the Commonwealth show some causal nexus between the injury it suffered and the Defendants' supply and distribution of MTBE gasoline.

[127]  *Kennedy v. Southern Cal. Edison Co.*. 268 F.3d 763, 770 (9th Cir. 2001) (quotation marks omitted) (emphasis added).  *See also Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969 (1997).

-30-

record before the Court, is insufficient."[128]

The act of supplying or discharging gasoline — proof of which is necessary to sustain the Commonwealth's tort claims — can also be established by showing that the defendant was within the "chain of distribution."  A defendant is within the chain of distribution of MTBE gasoline when it manufactures, sells, or distributes MTBE gasoline, or when it owns and/or operates a service station dispensing MTBE gasoline.[129]  Whether a "broker" — a party that "facilitat[es] a transaction between seller and purchaser" without holding title to the product — is within the chain of distribution is a more difficult determination.[130]  In *Oscar Mayer Corp. v. Mincing Trading Corp.*, the District of New Jersey held that a "broker" cannot be "strictly liable in tort," because a broker is not "in a position to exert pressure to ensure the safety of the product."[131]  Although this case involved

---

[128]    *In re MTBE*, MDL No. 1358, 2015 WL 996405, at *7 (S.D.N.Y. Mar. 5, 2015) (citing *Brown*, 654 F. 3d at 358.  *Accord Perez-Trujillo v. Volvo Car Corp.*, 137 F.3d 50, 55 n.10 (1st Cir. 1998) (noting that "strict liability claimants may resort to an array of circumstantial evidence").  *See also Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 525, 9 Puerto Rico Official Translator ("P.R. Offic. Trans.") 687 (1980).

[129]    *See* 5 Am. L. Prod. Liab. §§ 22, 25.

[130]    *See* Reply Mem. at 5.  *See also Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F. Supp. 79 (D.N.J. 1990).

[131]    *Oscar Mayer Corp.*, 744 F. Supp. at 84.

-31-

the interpretation of New York and New Jersey law and pertains to strict products liability law, its guiding principles are relevant here.  Where a party takes title to a product — for however long— and "act[s] in its own name and as an independent legal entity," that party "transcend[s] the role of a mere broker."[132]  However, where a defendant has not taken title to the product, the Commonwealth must point to some intentional and affirmative act that places the defendant within the chain of distribution for MTBE gasoline in Puerto Rico.[133]

## B.   Disclosure Under the Rules of Civil Procedure

In the Southern District of New York, contention interrogatories "are designed to assist parties in narrowing and clarifying the disputed issues in advance of summary judgment practice or trial."[134]  "A party answering a

---

[132]   *Straley v. U.S.*, 887 F. Supp. 728, 743–44 (D.N.J. 1995).

[133]   *See supra* note 127.  While I will address products liability law more thoroughly in a separate opinion, it bears mentioning here that under Puerto Rico law, where there is "no technical, let alone commercially feasible means to completely remove" a potentially harmful substance from a product, there is no defect.  *Prado Alvarez*, 313 F. Supp. 2d at 75.  A design is only defective as a matter of law if it "proximately caused [plaintiff's] injuries."  *Fremaint v. Ford Motor Co.*, 258 F. Supp. 2d 24, 29 (D.P.R. 2003).

[134]   *Pasternak v. Klim*, No. 10 Civ. 5045, 2011 WL 4552389, at *3 (S.D.N.Y. Sep. 28, 2011) (citing *Erchonia Corp. v. Bissoon*, No. 07 Civ. 8696, 2011 WL 3904600, at *8 (S.D.N.Y. Aug. 26, 2011)), *aff'd*, 458 Fed. App'x 58 (2d Cir. 2012) (quotation marks omitted).  *See* Local Rule of Civil Procedure 33.3(c).

contention interrogatory is obligated to respond truthfully and completely."[135]

Contention interrogatories are treated as judicial admissions which usually estop

the responding party from later asserting positions not included in its answers,

"unless the failure was substantially justified or is harmless."[136]  Failure to amend a

contention interrogatory pursuant to Federal Rule of Civil Procedure 26(e) can bar

use of a theory of liability, especially when such failure results in prejudice to the

adverse party.[137]  However, prejudice is not required for preclusion under Rule

37(c)(1), nor does Rule 37(c)(1) require a showing that the omission was made in

bad faith.[138]

---

[135]    *Wechsler v. Hunt Health Sys. Ltd.*, No. 94 Civ. 8294, 1999 WL
672902, at *2 (S.D.N.Y. Aug. 27, 1999) (quoting *Weiss v. Chrysler Motors Corp.*,
515 F. 2d 449, 456 (2d Cir. 1975)) (quotation marks omitted).

[136]    Fed. R. Civ. P. 37(c)(1).  *See Design Strategy, Inc. v. Davis*, 469 F.3d
284, 296 (2d Cir. 2006) (upholding district court's exclusion of evidence where
defendant would have been prejudiced by having to obtain additional expert
testimony after the close of discovery); *Unigene Labs v. Apotex, Inc.*, No. 06 Civ.
5571, 2010 WL 2730471, at *6 (S.D.N.Y. July 7, 2010), *aff'd*, 655 F.3d 1352 (Fed.
Cir. 2011) ("[W]here there is substantial prejudice to the Plaintiffs — namely, not
being advised of the contours of [a] claim until long after the termination of
discovery and the filing of dispositive motions — the Defendants' failure to amend
their contentions results in [a] claim being deemed waived.").

[137]    *See* Fed. R. Civ. P. 26(e).

[138]    *See Wechsler*, 1999 WL 672902, at *2 ([P]roof of unfair prejudice . . .
is not a prerequisite to preclusion.  The estoppel principles applied in [the Second]
Circuit to contention interrogatory responses implicitly presume unfair prejudice
will result if the responding party subsequently alters [its] position.") (citing *Prince*

C.     **The TSCA Claim**

The TSCA authorizes any person — including the Commonwealth —
to "commence a civil action against violators."[139]  Sections 2607(e) and (f)
("section 8(e) and 8(f)") of Title 15 of the United States Code articulate the
obligations of a chemical manufacturer and distributor under the TSCA.  In
relevant part, section 8(e) states that a

> person who manufactures, processes, or distributes in commerce a
> chemical substance or mixture and who obtains information which
> reasonably supports the conclusion that such substance or mixture
> presents a substantial risk of injury to health or environment must
> immediately inform the [EPA] Administrator.

To sustain its TSCA claim, the Commonwealth must "prove by a preponderance of
the evidence that defendants 'obtained information which reasonably supports the
conclusion that such substance or mixture . . . presents a substantial risk of injury
to health or environment.'"[140]  Once this prong is satisfied, "the defendants [must

---

*Group, Inc.*, No. 95 Civ. 1160, 1998 WL 273099, at *3; *Guadagno v. Wallack
Ader Levithan Assoc.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. Jan. 14, 1997), *aff'd*,
125 F.3d 844 (2d Cir. 1997)).  *See also Design Strategy, Inc.*, 469 F.3d at 296
(holding as a matter of first impression that Rule 37(c) does not require a showing
of bad faith).

[139]    15 U.S.C. § 2619(a).  *See In re MTBE*, 510 F. Supp. 2d 299, 316
(S.D.N.Y. 2007) (stating that a plaintiff state "plainly ha[s] standing to bring the
TSCA claim").

[140]    *In re MTBE*, 559 F. Supp. 2d 424, 435 (S.D.N.Y. 2008)
(quoting 15 U.S.C. § 2607(e)).

-34-

prove] by preponderance of the evidence that they had 'actual knowledge that the Administrator ha[d] been adequately informed of such information.'"[141]  "There are several kinds of information about which the [EPA] considers itself to be adequately informed for purposes of section 8(e)" including information "published in the open scientific literature."[142]

Section 2615(a) of Title 15 of the United States Code ("section 14(a)") gives the EPA a cause of action to seek damages from violators of the TSCA in the amount of up to $25,000 per violation.  However, the TSCA also confers standing upon "any person [to] commence a civil action against any person . . . who is in violation of [the TSCA]" through its citizen suit provision — 2619(a) of Title 15 of the United States Code ("section 20(a)").  While the EPA is entitled to damages when it brings an action under section 14(a), "the TSCA only authorizes citizen suits 'to restrain' violations of its substantive provisions."[143]  In other words, plaintiffs bringing suit under section 20(a) are limited to injunctive

---

[141]     *Id.* (quoting 5 U.S.C. § 2607(e)).

[142]     Add. Reply 56.1 ¶ 23 (quoting 6/1/91 EPA TSCA Section 8(e) Reporting Guide, Ex. 14(b) to Reyna Reply Decl. at 9).

[143]     *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp. 2d 48, 59 (N.D.N.Y. Mar. 17, 2003) (quoting 15 U.S.C. § 2619(a)(1)(B)).

-35-

relief for ongoing violations.[144]

## V.    DISCUSSION

### A.    Claims Predicated on Gasoline Containing *De Minimis* Levels of MTBE Cannot Survive Summary Judgment

The central disagreement presented in defendants' motion relates to whether the Shell Defendants who supplied and distributed gasoline with *de minimis* levels of MTBE can be held liable.  To resolve this disagreement, the parties have offered different interpretations of the Puerto Rico regulatory scheme governing MTBE and MTBE gasoline.[145]  These arguments are also the subject of a motion to strike, in which the Shell Defendants contend that Pagan's declaration contradicted his prior deposition testimony, in which he all but admitted that distributing and importing gasoline with *de minimis* amounts of MTBE was permissible under Puerto Rico law.[146]

*First*, reading Pagan's declaration together with his deposition testimony reveals the strength of the Shell Defendants' position.  There is little question that his declaration — in which he maintains that he "does not know" . . .

---

[144]    *See In re MTBE*, 559 F. Supp. 2d 424, 428 n.17 (S.D.N.Y. 2008) (citing *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49 (1987)(citizen suit provision of the TSCA only authorizes prospective relief for ongoing violations).

[145]    P.R. Regs DACO § 8198.

[146]    *See* Pagan Dep. at 93–95.

-36-

— completely contradicts his sworn statements at his prior deposition.  Because he expresses ignorance on the question in his declaration, I will rely on his deposition testimony in deciding how to assess the regulatory scheme governing MTBE content in gasoline.[147]

   *Second*, Puerto Rico's regulatory scheme is similar to that found in several states which address the inevitability that even MTBE-free gasoline will ultimately commingle with MTBE particles throughout the production, importation, and distribution process.[148]  In establishing a *de minimis* threshold, the government's goal is to ensure that the importation of gasoline to Puerto Rico is not discouraged by section 4172's blanket prohibition on the use of MTBE.  DACO's decision to set 0.50% as the *de minimis* threshold distinguishes gasoline that contains MTBE as the result of intentional blending, from gasoline that has unintentionally and inevitably commingled with residual MTBE particles.[149]  After

---

[147] *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  Accordingly, Shell Defendants' motion to strike Pagan's declaration is granted.

[148] *See, e.g.*, 13 California Code of Regulations § 2262.6 (a); 5 Florida Administrative Code § 5J–21.001(1)(c).

[149] *See* P.R. Regs. § 8198 (using the word "residual" to describe remaining MTBE content in gasoline containing MTBE below the *de minimis* threshold).

all, MTBE does not serve its intended octane enhancing purpose at such low concentrations.[150]  Furthermore, this regulation provides notice to parties in the chain of distribution of gasoline in Puerto Rico as to what quality of product satisfies Puerto Rico law.

To be sure, compliance with a regulatory guideline is not dispositive of liability, or lack thereof, for supplying or discharging gasoline containing MTBE.  However, courts can consider compliance as a factor in determining whether to impose liability.[151]  Further, while Puerto Rico statutory law prohibits the discharge of MTBE of any amount, the law is also clear that "conduct that plays nothing more than an infinitesimal or theoretical part in bringing about" an injury, cannot sustain a tort claim.[152]

The discharge of gasoline containing *de minimis* levels of MTBE plays, at best, nothing more than a minimal role in contributing to the Commonwealth's injury.  The Commonwealth has not furnished the Court with enough evidence to the contrary to survive summary judgment with respect to *de minimis* based claims.  In fact, the evidence shows that the Commonwealth's own

---

[150]   *See id.*

[151]   *See* Restatement (Second) of Torts § 288(c) (1965).

[152]   *See Prado Alvarez*, 313 F. Supp. 2d at 75.

regulatory scheme was designed to permit, perhaps even encourage, defendants to supply gasoline with trace levels of MTBE to the island of Puerto Rico.[153]  For these reasons, the Commonwealth's tort claims that are based solely on the shipment of gasoline with MTBE content measured below the *de minimis* threshold fail as a matter of law.[154]

### B.    SOC Is Entitled to Summary Judgment on All Phase I Claims

The Commonwealth asserts claims of nuisance, trespass, and violation of the EPPA against SOC based on two theories of liability.  *First,* the Commonwealth claims that SOC supplied Shell PR and SCYI with substantial amounts of gasoline from its Deer Park and Norco refineries.[155]  With respect to the gasoline produced at Deer Park, it is undisputed that MTBE was only detected in two shipments, and at levels well below the *de minimis* threshold.[156]  The

---

[153]    *See* P.R. Regs DACO § 8198.

[154]    Therefore SCYI is not liable for the Commonwealth's Phase I claims. There is no evidence — direct or circumstantial — from which a reasonable jury could find that SCYI imported any shipments of gasoline containing MTBE concentrations greater than 0.50%.  The highest MTBE concentration recorded in gasoline shipments received by SCYI was 0.21% by volume, and SCYI only imported ten shipments of gasoline containing any concentration of MTBE.  *See* Reply 56.1 ¶¶ 29–36.

[155]    *See* Pl. Mem. at 7–8.

[156]    *See id.* at 7.

-39-

Commonwealth fails to provide any direct evidence to support its claim that Norco supplied Puerto Rico with gasoline containing any amount of MTBE.  While the Norco Batch Report shows that Norco did use MTBE in high concentrations in some batches of gasoline, 155 of the 187 batches documented in the Norco Batch Report contained either *de minimis* amounts of MTBE or none at all.[157]  The remaining 32 batches had MTBE levels greater than the *de minimis* threshold. However, the Commonwealth has no evidence that any of those 32 batches actually reached Puerto Rico.

In fact, all that the Commonwealth offers is the testimony of Shell declarant and witness Patrick Bloomer, who testified that he did not know which batches of gasoline produced at Norco were shipped to Puerto Rico because the Norco Batch Reports did not provide enough detail.[158]  No reasonable jury could find, as the Commonwealth argues, that Bloomer's testimony is a "concession" that "some or all of the gasoline containing MTBE produced at Norco was potentially shipped to Puerto Rico."[159]  Rather, Bloomer's testimony illustrates the deficiency of evidence in the record — direct or circumstantial — that supports the

---

[157]    Norco Batch Report at 1–4.

[158]    Bloomer Dep. at 53.

[159]    Pl. Mem. at 8.

Commonwealth's assertion that SOC shipped gasoline containing substantial amounts of MTBE from Norco to Puerto Rico.

    *Second*, the Commonwealth claims that Shell Atlantic, a subsidiary of SOC, supplied Shell PR with MTBE gasoline — registering MTBE above *de minimis* levels — produced by HOVIC at St. Croix.[160]  Shell Atlantic was a broker to this transaction as it never held title to these gasoline shipments.[161]  However, the Commonwealth alleges that Shell Atlantic is in the chain of distribution because it functionally operated as Shell PR which purchased these shipments of MTBE gasoline.[162]  Specifically, the Commonwealth claims that Shell Atlantic negotiated and finalized two contracts resulting in the supply of MTBE gasoline from St. Croix to Shell PR.[163]

    However, as a matter of law, Shell Atlantic's conduct cannot place it in the chain of distribution.  The evidence in the record shows that Shell Atlantic only arranged the shipment of the gasoline — it did not have any role in determining the concentrations of the various additives Hess blended into the

---

[160]  *See id.* at 9–11.

[161]  *See* Reply Mem. at 5 ("There is no evidence or indication that Shell Atlantic ever held title to or otherwise exercised control over the product . . . .").

[162]  *See* Pl. Mem. at 10–11.

[163]  *See id.*

product, including MTBE.[164]  Thus, the Commonwealth's conclusions regarding Shell Atlantic's transactions with Shell PR are speculative.  The Commonwealth must prove that Shell Atlantic "transcend[ed] the role of a mere broker."[165]  The Commonwealth has failed to provide sufficient proof to withstand a motion for summary judgment.

The Commonwealth also asserts a TSCA claim against SOC for failing to disclose "substantial risk information" about MTBE's detectability in water (by taste) being 7 to 15 ppb — information which SOC attained in 1981 following the Rockaway spill.[166]  However, the EPA has been in possession of or had access to the same "substantial risk information" since 1987.  The Rockaway Article not only stated that water containing MTBE at thresholds greater than 7 to 15 ppb is not potable, but it also provided substantial detail in illustrating the impact of MTBE in Rockaway and the surrounding area.  Because the TSCA only authorizes citizen suits "to restrain" defendants allegedly in violation of the TSCA's provisions from committing ongoing violations, the Commonwealth's TSCA claim fails as a matter of law.

---

[164]    *See* Evergreen Contract Letter at 1.

[165]    *Oscar Meyer Corp.*, 744 F. Supp. at 79.

[166]    Pl. Mem. at 22.

## C.    SIPC Is Entitled to Summary Judgment on All Phase I Claims

The Commonwealth asserts nuisance, trespass, and EPPA claims against SIPC, offering two rationales.  *First*, the Commonwealth claims that SIPC's subsidiary, SITC, supplied Puerto Rico with substantial amounts of MTBE gasoline from St. Croix and Curaçao.[167]  As an initial matter, the Commonwealth's claims based on SIPC's supply of gasoline from St. Croix lack factual foundation — not only is there no evidence showing the MTBE content in the relevant shipments of gasoline, but there is also no evidence showing that SIPC was even a party, let alone a broker, to this transaction.  Likewise, there is no evidence showing that the gasoline shipped from Curaçao to Shell PR was MTBE gasoline.[168]  That the evergreen contract governing the supply of gasoline between SITC and Shell PR allowed gasoline containing MTBE concentrations of 10% does not show that it is more likely than not such gasoline contained MTBE above the *de minimis* threshold.[169]  The contract did not *require* that Curaçao blend 10% MTBE in the finished product.  By the terms of the contract, it is equally probable

---

[167]      *See id.* at 5–6.

[168]      *See* Curaçao Certificates of Quality at 17–20. Evidence showing MTBE gasoline was shipped by another company from the same refinery cannot satisfy the Commonwealth's evidentiary burden. *See supra* Part IV.C.

[169]      *See* Pl. Mem. at 6.

that the gasoline produced at Curaçao and shipped by SITC to Shell PR contained no MTBE.

*Second*, the Commonwealth claims that between 1999 and 2006, SIPC exercised ultimate decision making authority and control over core functions of Shell PR such that it effectively operated the seventy-two Shell-branded service stations, including the USTs, in Puerto Rico.[170]  The Commonwealth did not mention a vicarious liability theory in any way in its response to the Contention Interrogatories, nor did it amend its contentions to reflect this theory.[171]  The Commonwealth has not shown that this omission was harmless or provided a justification for it.  Accordingly, the Commonwealth cannot pursue its theory of vicarious liability.[172]

### D.    Shell West Is Not Entitled to Summary Judgment

The Commonwealth alleges that Shell West is liable for nuisance, trespass, and violation of the EPPA for supplying Shell PR with substantial amounts of MTBE gasoline.[173]  While it is undisputed that ten shipments of

---

[170]    *See id.* at 11–16.

[171]    *See* Contention Interrogatories at 19.

[172]    *See supra* note 139.

[173]    *See* Pl. Mem. at 6.

-44-

gasoline that Shell West provided contained MTBE levels above the *de minimis* threshold, the Shell Defendants claim that the Commonwealth fails to meet both its chain of distribution and causation requirements.[174]  The Shell Defendants argue that Shell West was merely a broker— that Shell West played a middle man role in Hess's sale of MTBE gasoline, produced at St. Croix, to SCYI and Shell PR.  This argument is unavailing.  Shell West purchased the shipments of gasoline directly from St. Croix, before selling them directly to SCYI and Shell PR.[175]  Such activity places Shell West squarely within the chain of distribution.

The Shell Defendants argue that even if Shell West supplied Shell PR with ten shipments of gasoline containing greater than *de minimis* levels of MTBE that was intended for distribution in Puerto Rico, the Commonwealth cannot show that this gasoline leaked from USTs and caused the Commonwealth injury.  While the chain of causation is rather tenuous, ten shipments of gasoline could have contained a massive amount of defective product — one shipment of gasoline typically contains as many as 100,000 barrels.[176]  Consequently, a reasonable jury could find, based on the sheer volume of gasoline potentially distributed in those

---

[174]     *See* Reply 56.1 ¶ 3.

[175]     *See* Def. Mem. at 10.

[176]     *See id.* at 3.

shipments, that it is more likely than not that Shell West's supply of MTBE

gasoline was a substantial factor in bringing about the Commonwealth's injury.[177]

## VI.   CONCLUSION

For the foregoing reasons, the Shell Defendants' motion for summary

judgment is GRANTED in part and DENIED in part.[178]   In addition, the Shell

Defendants' motion to strike the Pagan Declaration is GRANTED.   The Clerk of

Court is directed to close these motions (Docket Nos. 467 and 538).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 28, 2015

---

[177]      *See In re MTBE*, 2015 WL 996405, at *4 (detailing history of leakage
at USTs in Puerto Rico).

[178]      For a recitation of claims voluntarily dismissed by the
Commonwealth, *see supra* note 38.

-46-

**- Appearances -**

**Liaison Counsel for Plaintiffs:**
Robert J. Gordon, Esq.
Robin L. Greenwald, Esq.
William A. Walsh, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500

**Liaison Counsel for Defendants:**
Peter J. Sacripanti, Esq.
James A. Pardo, Esq.
Lisa A. Gerson, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
(212) 547-5583

**Counsel for the Commonwealth:**
Tracey Zimmerman, Esq.
Miller & Axline
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825-4225
(916) 488-4288

**Counsel for Shell Defendants:**
Richard E. Wallace, Jr., Esq.
Ruben F. Reyna, Esq.
Sedgwick LLP
Harbourside, Suite 500
Washington, DC 20007
(202) 204-1000