F4OAMTBCps

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3                                      00 MDL 1358
   IN RE:  METHYL TERTIARY BUTYL       00-cv-01898 (SAS)
4  ETHER ("MTBE") PRODUCTS             04-cv-04968 (SAS)
   LIABILITY LITIGATION                07-cv-10470 (SAS)
5                                      14-cv-06228 (SAS)

6  ------------------------------x

7                                      April 24, 2015
                                       2:30 p.m.
8
   Before:
9
                        HON. SHIRA A. SCHEINDLIN,
10
                                       District Judge
11
                            APPEARANCES
12
   MILLER, AXLINE & SAWYER
13      Attorneys for Plaintiffs
   BY:  MICHAEL D. AXLINE, ESQ.
14      DUANE MILLER, ESQ.

15 JACKSON GILMOUR & DOBBS, PC
        Attorneys for Plaintiffs
16 BY:  JOHN D.S. GILMOUR, ESQ.
        WILLIAM J. JACKSON, ESQ.
17
   WEITZ & LUXENBERG, P.C.
18      Plaintiffs' Liaison Counsel
   BY:  ROBIN GREENWALD, ESQ.
19
   McDERMOTT, WILL & EMERY
20      Attorneys for Defendants Exxon Mobil Corp.
        and Defendants' Liaison Counsel
21 BY:  JAMES A. PARDO, ESQ.
        ANTHONY A. BONGIORNO, ESQ.
22      STEPHEN J. RICCARDULLI, ESQ.

23 SEDGWICK LLP
        Attorneys for Defendant Mobil Oil Corporation
24 BY:  PETER C. CONDRON, ESQ.

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

F4OAMTBCps

1                      APPEARANCES (Cont'd)

2    BEVERIDGE & DIAMOND, P.C.
          Attorneys for Defendant Exxon Mobil Corporation
3    BY:  DANIEL MARK KRAININ, ESQ.

4    ARCHER & GREINER PC
          Attorneys for Defendant Exxon Mobil Corporation
5    BY:  WILLIAM J. STACK, ESQ.

6    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
          Attorneys for Defendant Exxon Mobil Corporation
7    BY:  JEFFREY J. PARKER, ESQ.

8    MOUND COTTON WOLLAN & GREENGRASS
          Attorneys for Defendants Trammo Caribbean, Inc. and
9         Trammo Petroleum, Inc.
     BY:  BARRY R. TEMKIN, ESQ.
10
     AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
11        Attorneys for Defendant Lukoil Americas Corporation
     BY:  JAMES P. TUITE, ESQ.
12
     SEPULVADO & MALDONADO PSC
13        Attorneys for Total Outre Mer, S.A.
     BY:  ALBENIZ COURET FUENTES, ESQ.
14
     THOMPSON & KNIGHT LLP
15        Attorneys for Defendant Petrobras America, Inc.
     BY:  DAVID C. SCHULTE, ESQ.
16
     KING & SPALDING LLP
17        Attorneys for Defendant Chevron
     BY:  CHARLES CORRELL, ESQ.
18
     EIMER STAHL KLEVORN & SOLBERG
19        Attorneys for Defendant Citgo Petroleum Corporation
     BY:  LISA MEYER, ESQ.
20

21

22

23

24

25

F4OAMTBCps

```
 1              (In open court)

 2              THE COURT:  Good afternoon, Ms. Greenwald.

 3              MS. GREENWALD:  Good afternoon.

 4              THE COURT:  Mr. Axline.

 5              MR. AXLINE:  Good afternoon, your Honor.

 6              THE COURT:  Mr. Miller.

 7              MR. MILLER:  Good afternoon.

 8              THE COURT:  Mr. Gilmour.

 9              MR. GILMOUR:  Good afternoon, your Honor.

10              THE COURT:  Mr. Jackson.

11              MR. JACKSON:  Good afternoon, your Honor.

12              THE COURT:  And Mr. Pardo.

13              MR. PARDO:  Good afternoon, your Honor.

14              THE COURT:  Mr. Bongiorno.

15              MR. BONGIORNO:  Good afternoon, your Honor.

16              THE COURT:  Mr. Riccardulli.

17              MR. RICCARDULLI:  Good afternoon, your Honor.

18              THE COURT:  Ms. Meyer.

19              MS. MEYER:  Good afternoon, your Honor.

20              THE COURT:  Mr. Tuite, Tuite.  Mr. Schulte.

21              MR. SCHULTE:  Good afternoon, your Honor.

22              THE COURT:  Mr. Couret.

23              MR. COURET FUENTES:  Good afternoon, your Honor.

24              THE COURT:  Mr. Temkin.

25              MR. TEMKIN:  Good afternoon, your Honor.
```

F4OAMTBCps

|   |   |
|---|---|
| 1 | THE COURT:  Mr. Parker. |
| 2 | MR. PARKER:  Good afternoon, your Honor. |
| 3 | THE COURT:  Mr. Correll. |
| 4 | MR. CORRELL:  Good afternoon, your Honor. |
| 5 | THE COURT:  Ms. Weirick. |
| 6 | MS. WEIRICK:  Weirick.  Good afternoon, your Honor. |
| 7 | THE COURT:  Weirick.  And Mr. Condron. |
| 8 | MR. CONDRON:  Good afternoon, your Honor. |
| 9 | THE COURT:  All right.  And good afternoon to |
| 10 | everybody else.  And the people on the cellphone -- no, they're |
| 11 | not on the line. |
| 12 | Hello, folks on the phone?  Can you hear me? |
| 13 | VOICES: yes, your Honor. |
| 14 | THE COURT:  OK.  And I understand that you know that |
| 15 | you're just going to be listening in.  But it's too |
| 16 | complicated, I think, to actually participate, but you'll be |
| 17 | hopefully able to hear, at least, what I say.  You may not be |
| 18 | able to hear every lawyer, but I will ask them to speak up. |
| 19 | A VOICE:  Thank you, your Honor.  We understand. |
| 20 | THE COURT:  So, with that, we have an agenda submitted |
| 21 | on April 16, jointly.  We have plaintiff's preconference letter |
| 22 | and exhibit from April 16, defendants' preconference letter and |
| 23 | exhibit, April 16, and then a reply letter from both sides |
| 24 | dated April 21. |
| 25 | The agenda begins with Orange County, then turns to |

F4OAMTBCps

1    Pennsylvania, and ends with Puerto Rico.  So those are the

2    three geographic areas we're going to focus on, three cases.

3              And starting with Orange County, it sounds like the

4    parties agree that it's time to remand the focus plume sites to

5    the Central District of California for trial.  So that's not an

6    issue.  But there is an issue that plaintiffs have raised with

7    respect to the judgment as to BP and Shell.  The plaintiffs

8    feel that the Court should revise its earlier order to state

9    that the order barred only Orange County continuing-nuisance

10   causes of action that are based on harm that was incurred

11   before the BP and Shell consent judgments were entered, but

12   obviously not after.  Alternatively, if the Court is not

13   inclined to revise its own order, then Orange County asked for

14   a final judgment be entered pursuant to 54(b), citing a recent

15   Supreme Court case and asking that appellate review be

16   permitted that so that if in fact there are continuing nuisance

17   claims against BP and Shell they could proceed to trial maybe,

18   with whatever the trial schedule to come is in the Central

19   District of California.

20             The defendants oppose both requests and say, surely

21   you shouldn't let them move to reconsider your own decision.

22   It was a long time ago.  There was a cutoff to do that.

23   Motions for reconsideration were due at the deadline, and

24   that's long been missed, and this is really just a motion for

25   reconsideration and the argument that somehow it might allow

F4OAMTBCps

these two defendants to join the trial is not a good argument

because it would probably take too long for appellate review

for that to happen.  Also, the defendants say that 54(b)

doesn't make sense either because it would result in piecemeal

appeals and there would be no particular efficiency, again for

the reason that it's not going to affect this trial.

I am willing to hear from you, but I read the

submissions and I sort of get the point.  My sense is that a

motion for reconsideration or whatever you want to call it

would not make sense at the district court level.  I think I

did clearly address the issue already, even the issue you

stated was now ready, but I think a 54(b) does make some kind

of sense.  I can't predict the future.  I wish it were the case

that when you remand, the trial is scheduled for a week later.

But it often takes a year till everybody is actually in the

courtroom ready for trial, and it's possible, if an appeal were

filed promptly and if you explained the urgency and the

decision that you're willing to have it expedited, maybe the

Second Circuit could get it done in time for these defendants

to join any trial in California if everything fell right.  So

who knows.  So I don't think it's a bad idea.  And I'm not

terribly worried about piecemeal appeals.  This is a very

discrete issue, unrelated to the many issues that will go on.

And it could take years for a final judgment because this is

only the focus case.  If I really thought that one trial was

F4OAMTBCps

1    going to wrap things up and then the appeal could go forward,

2    that's one thing, but it isn't.  This is only the remand of

3    focus sites.  This case goes on.

4         So I'm not opposed to a 54(b).  So since one side lost

5    one issue and one side won one issue, would anybody feel a

6    terrible need to be heard further?

7         MR. CONDRON:  Your Honor, I would like to be heard on

8    the 54(b) issue.

9         THE COURT:  Mr. Condron.

10        MR. CONDRON:  I understand what you're saying.  The

11   issue that I think needs to be addressed here is the notion

12   that the Second Circuit is likely to address this prior to the

13   trial.  It's unlikely.

14        THE COURT:  I got that.

15        MR. CONDRON:  In addition, in terms of piecemeal

16   appeal, we're also going to be left with a situation now where,

17   when there is a final judgment in this case, it will likely be

18   heard by the Ninth Circuit.

19        THE COURT:  I realize that too.

20        MR. CONDRON:  So we're essentially setting up a

21   circuit split.

22        THE COURT:  But this is a very discrete issue.  This

23   isn't the appeal of the merits and the many decisions and the

24   many issues that might actually occur at trial, if there is not

25   a settlement, which is even more likely.  But I think this is

F4OAMTBCps

1    discrete.  It has to do with an old settlement and what that

2    old settlement covered or couldn't cover.  It's not going to be

3    a dispute for the Ninth Circuit on the merits on the rest of

4    the case.  So I don't think we're setting up a circuit split at

5    all.  It's a nice argument, but I don't think it works.

6         MR. CONDRON:  The other issue we have, your Honor, is

7    that some of your earlier rulings in the case are wrapped up in

8    what has happened in connection with the issues on our summary

9    judgment motion.

10         THE COURT:  On this particular aspect?  What the

11    settlement, the old settlement of BP and Shell -- what year was

12    that settlement?

13         MR. CONDRON:  Ours was 2005 and BP was 2002.

14         THE COURT:  Yes.  I don't think anything I've been

15    doing -- it really is a matter of interpreting the breadth of

16    that settlement, and if I'm right that's good, if I'm wrong

17    that's OK too.  But we might as well get the appellate court to

18    rule on it.  If they don't get it done in time, well then, no

19    harm done from the Court's perspective.  The lawyers have spent

20    time briefing, but that's your business.  I just don't see the

21    harm in trying to get it done.

22         MR. CONDRON:  The only other point I'd make, your

23    Honor, is that there are some underlying decisions in the OCWD

24    case that inform the issues you've decided in our case, such

25    as, what are OCWD's rights, in terms of property rights and

F4OAMTBCps

1  water, what the nuisance might be or might not be, etc.  And

2  those are other decisions that you've issued in the case that

3  could or could not, depending on how the Second Circuit might

4  proceed, be wrapped up in the ruling that they issue on

5  anything dealing with our summary judgment.

6          THE COURT:  I think I need a response from one of the

7  plaintiff's lawyers on that, because I'm not sure those issues

8  would have to be decided in determining the scope of the

9  previous settlement release.  But go ahead, Mr. Axline.

10          MR. AXLINE:  Yes.  I do think that the question on

11  appeal is solely going to go to what's the scope in this

12  specific language that are in these two specific settlement

13  agreements.

14          THE COURT:  I think so too.  Is that the way you

15  briefed the appeal?

16          MR. AXLINE:  Yes.

17          THE COURT:  Is that the plan?

18          MR. AXLINE:  Yes.

19          THE COURT:  They say, the narrow issue we're asking

20  you to decide is whether Judge Scheindlin was basically right

21  or wrong in interpreting the scope of these agreements.

22          MR. AXLINE:  Yes.  And the issues that we briefed to

23  you, in that res judicata motion, would be the issues that we

24  would brief on appeal.

25          THE COURT:  Right.  But do they address all the issues

F4OAMTBCps

1    Mr. Condron is worried they're going to address, which are

2    beyond the scope of those settlements and releases then and

3    raise issues that are common throughout the case and that

4    therefore raises the risk of a circuit split: the Second

5    Circuit does one thing about the underlying issues, the Ninth

6    Circuit does another, we create chaos?  Or do you really think

7    it's a matter of interpreting a settlement in the case?

8         MR. AXLINE:  I think it's just a matter of

9    interpreting the settlement.  Now, it does require as a

10   predicate some understanding of the Orange County Water

11   District and the Orange County District Attorney's Office, but

12   those were not really controversial matters in any of your

13   prior opinions.  The liability issues are not implicated by the

14   scope of the release language, other than, as we said, in our

15   72-hour letter, the nature of the continuing nuisance claim.

16        MR. CONDRON:  Your Honor, I think that in and of

17   itself was an issue, because first of all they never even

18   briefed the issue of continuing nuisance in connection with our

19   motion, so if they're planning on raising that in the Second

20   Circuit, that absolutely is going to implicate other defendants

21   as well.

22        THE COURT:  Well, I would think if they try to raise

23   that -- first of all, don't you have a preconference letter

24   with the Second Circuit?

25        MR. CONDRON:  Yes, your Honor.

F4OAMTBCps

```
1          THE COURT:  Well, tell the person who's conferencing

2     it that it's outside the record of the district court case and

3     therefore the certification can't possibly apply to an issue

4     that was never before the district court, and get that person

5     to say they can't brief that.  If you're right that it was not

6     raised, Mr. Axline, you can't raise an issue on appeal that was

7     not before the District Court.  You know that.

8          MR. AXLINE:  Correct, your Honor.  However, the issue,

9     in our 72-hour letter, is, was this before the Court.  The

10    issue that was briefed to you was whether the releases

11    precluded any of the district's claims, not whether it

12    precluded all of the claims.  And as we were looking at remand

13    and evaluating what was going to go back to California, we

14    realized that the harm, for continuing usage, is under

15    California law considered to create a new claim every day that

16    the nuisance continues.

17         THE COURT:  You just realized that?  I mean, you

18    didn't realize that since my opinion came out, was it

19    September?

20         MR. CONDRON:  September.

21         THE COURT:  September, yes.

22         MR. AXLINE:  It came out in September.  There were

23    other pending summary judgment motions at the time.

24         MR. CONDRON:  Which were decided in December, your

25    Honor.
```

F4OAMTBCps

1          MR. AXLINE:  Which were decided in December.  And then

2     we went through the process of deciding remand, however we were

3     going to push for it, meeting and conferring with the

4     defendants about that.  So we didn't really get to the number

5     of what was going to be remanded.  And frankly maybe we could

6     have looked at this a little more closely earlier.  But this is

7     what triggered our attention to the question of, well, what

8     claims does the district have remaining, potential claims.

9          So the district could have filed a new lawsuit based

10    upon continuing everyday harm.  That's what you do with

11    continuing nuisance.  Oddly enough we could not file a claim

12    for damages that occurred, say, last week, based on the same

13    continuing nuisance claim that we filed our complaint on in

14    2003.

15         The defendants waited ten years, ten years, before

16    they brought their res judicata motion.  We had to go through

17    extensive discovery with respect to all the stations that are

18    now subject to their res judicata opinion, your res judicata

19    opinion, because of the defendants' delay.  We are now asking

20    you to give us the opportunity to brief --

21         THE COURT:  Well, do you have a new harm that happened

22    last week?

23         MR. AXLINE:  Yes.  Well, yes.  Under California law,

24    and frankly under your prior opinions on the nature of

25    continuing nuisance in California, a new harm is created every

F4OAMTBCps

day.  And we could not have sought, we could not have brought

an action for damages based upon that same plume.  Let's say a

plume of contamination started in 2003 and it's spreading, as

is happening in the Orange County Water District case.  We

could not have brought a cause of action for damages for the

incremental harm that was caused by that plume subsequent to

the day the damages were awarded for an initial continuing

nuisance claim, because you have to bring successive claims for

continuing uses.

Now, the way it works in reality, of course, is that

somebody brings a continuing nuisance claim, and typically, you

know, there is either a settlement or determination of

liability, and then it all gets resolved.

THE COURT:  Yes.  And I think the argument is that's

exactly what happened.  You brought a continuing nuisance

claim, and it's been settled going forward.  You obviously

anticipated the plume wouldn't stop on the day of the

settlement.

MR. AXLINE:  But the question we're asking you to

address under 54(b), which does give you the power to revise

your orders at any time prior to final judgment, is to take a

look at the scope of the release --

THE COURT:  Yes, I think I did.  I have done that

already.  You may disagree with the outcome.  But it's not like

I didn't look at it.

F4OAMTBCps

1          MR. AXLINE:  There was an ambiguity.  In our view, the

2     outcome doesn't preclude these new claims that arose after that

3     release, because the release did not say anything about future

4     claims.

5          THE COURT:  Well, maybe that's an argument you make to

6     the district court at trial, in California.

7          MR. AXLINE:  We thought we should bring it to you

8     first, your Honor.  We'll be happy to make it to the trial

9     court in California.

10          THE COURT:  I mean, that's sort of a third

11     alternative.  You brought it to me and I rejected the idea that

12     I should do a do-over of the district court.  Then you said,

13     well let's do a 54(b), but maybe it's not really a 54(b)

14     because your adversary says you'd be raising a new matter

15     before the circuit that you didn't present to the district

16     court.  And maybe it's a trial court issue where you said to

17     the trial court, well, look, this is Judge Scheindlin's opinion

18     but we see an ambiguity, it's really for you to decide, Judge

19     So-and-So.  So maybe these claims can go forward under

20     California law, even given your opinion, because they're a new

21     claim for a new event and you couldn't have brought a damages

22     claim then.  If it's the same arguments you just made, maybe

23     that's made to the trial judge and you win or lose.  And then

24     if you lose, you maybe can get a quick hearing in the Ninth.

25          MR. AXLINE:  We did consider that option, your Honor.

F4OAMTBCps

1   We thought we should present it to you first.

2          THE COURT:  Well, yes.  I rejected that idea.  I was

3   leaning toward accepting the 54(b), but I further thought, if

4   you're going to go outside the record, the circuit won't be

5   happy, your adversary is going to point that out, and I think

6   you're asking the circuit to hear something that the district

7   court has never heard, that would be kind of maybe competing.

8   Maybe your only option is to tell the trial court that picks up

9   the case upon remand for trial what you think should be in and

10  what should be out, and litigate it there.  That is not redoing

11  my thing.  It's trying to say, OK, we have this opinion but

12  that doesn't solve the issue now what claims against these

13  defendants are still viable.

14          MR. AXLINE:  One of the reasons we -- well, we thought

15  we should bring it to you first, just as a matter of comity --

16          THE COURT:  I appreciate it.  You gave me a chance to

17  correct myself if I was wrong.  Apparently I'm declining the

18  option to say that.  But I understand why you want to go

19  forward.  You have two locations to go.  You can go to the

20  Second Circuit or you can go to the trial court there, which

21  would lead to an appeal to the Ninth Circuit, and maybe that

22  makes sense.  You can get it probably before the trial court.

23          MR. AXLINE:  I understand what you're saying, your

24  Honor.  What I can see coming from the trial judge, though, is,

25  why are you asking me to determine the scope of Judge

F4OAMTBCps

1    Scheindlin's opinion, shouldn't you be asking --

2            THE COURT:  No, because you're saying that wasn't

3    before her, going forward, new harms that arise because of the

4    continuing nuisance that could come well after even her

5    opinion.  It happens every day, with all new claims.  And it's

6    California law and it's here for trial.  Maybe they could say,

7    hey, you're a better lawyer than I am, you'll tell them why

8    they should hear it.  So maybe that's the route.

9            But I will stick with giving you permission on the

10   54(b), but maybe after this conference you think about it and

11   say, I'm really better off with the other suggestion of going

12   to the trial judge, win or lose, and then appealing quickly to

13   the Ninth Circuit.  And they may want to move quickly so that

14   the trial is efficient.  They may have more of an incentive

15   than the Ninth Circuit.

16           So you'll think about it.  You don't have to file any

17   brief today.

18           MR. AXLINE:  That's very kind of you.  I see the

19   choice.  We'll try to make that choice rapidly and inform you.

20           THE COURT:  Yes.  That's fine.

21           MR. CONDRON:  Your Honor, if I could be heard on your

22   last suggestion, please.

23           THE COURT:  I don't know why you should be heard on my

24   last suggestion, because my last suggestion wouldn't be in my

25   court.  So you can be heard in opposition if they file a motion

F4OAMTBCps

1    before the trial judge in California.

2              MR. CONDRON:  But the problem with that suggestion is,

3    we've been dismissed here and we are out.  The motion was for

4    summary judgment on all claims that the district could assert

5    against us, and that motion was granted.  So we're not in the

6    case anymore.

7              THE COURT:  Well, they'll tell that judge that you

8    should be brought in for trial because -- and they try to

9    explain it.  And maybe that's why they'll opt not to take that

10   direction.  So I don't know which they'll do.  I'm sure they

11   can find a procedural way to get it done if they want to try it

12   there.  If not they'll go here.  But I'm not going to prevent

13   them from bringing it.

14             MR. CONDRON:  Thank you, your Honor.

15             THE COURT:  But he did tell you to decide quickly,

16   Mr. Axline, because once you submit the papers on the remand,

17   you'll want to propose a schedule for this if you want to try a

18   54(b) here.  I think you're going to have difficulty with it if

19   it's outside the record of the district court.  I still suggest

20   that you're going to have a problem in the Second Circuit.

21             Yes, Mr. Parker.

22             MR. PARKER:  Thank you, your Honor.  With respect to

23   the mechanism of the remand, I just wanted to alert your Honor

24   that we are working on a remand order and we're going to meet

25   and confer with Mr. Axline to get that and submit it to the

F4OAMTBCps

```
 1    Court.  If there are any issues with it, we'll raise it at the
 2    next conference.
 3          THE COURT:  All right.  But we've managed to do this
 4    in New Jersey.
 5          MR. PARKER:  Yes.
 6          THE COURT:  It took some work, it took some thinking,
 7    but we got it done.
 8          MR. PARKER:  I'm very hopeful that will happen here.
 9          THE COURT:  And the MDL panel went along with it.  So
10    there's a corrective in this MDL for splitting the case between
11    the portion that can be remanded and the portion that
12    remains -- which of course raises another issue in the OCWD
13    case, and that is, what is the mechanism for continuing to move
14    the remainder of the case along, here in the district court?
15          MR. AXLINE:  We're meeting and conferring on that
16    topic also, your Honor.  And I think we'll have either a
17    suggestion or a reply and dispute to present to you at the next
18    conference.
19          THE COURT:  But that's not ready for today.
20          MR. AXLINE:  No.
21          THE COURT:  OK.  Well, that takes us to the
22    Pennsylvania matter.  And this is a real problem because it has
23    to do with identifying the site at issue.  And defendants say
24    plaintiffs have an obligation to do it and plaintiff should do
25    it, plaintiff should do it very promptly and certain other
```

F4OAMTBCps

1   discovery shouldn't proceed until plaintiff has done it.  And

2   plaintiffs say, well, it may be our burden, but it's always

3   required us to obtain information from defendants before we are

4   able to identify all of the sites.  So I have sort of sympathy

5   for both sides on this.  I realize it's plaintiff's obligation

6   but plaintiff can't do it until they get the cooperation of

7   defendants in providing the material they need to identify all

8   those sites.

9        So the date proposed by the defendants is unrealistic,

10  by the end of August.  I don't think the plaintiff can do the

11  list of all sites and wells at which MTBE has been detected,

12  and sampling.  It's beyond what they could possibly achieve in

13  that amount of time.

14        (Pause)

15        THE COURT:  I think somebody hung up on us.  Some of

16  you are still on the phone, though, I assume.

17        So in any event, I think there has to be a date, but

18  there has to be a schedule within the time frame as to what

19  plaintiff will need in order to get to that goal.  So I think

20  the right date is no later than the end of 2015.  So the

21  identification of sites and sampling results and everything for

22  all the sites in issue needs to be December 31st, 2015.  But

23  within the months remaining, May through whatever, November, to

24  be ready to put it all together in December is to identify what

25  is still needed from defendants to make this viable.

F4OAMTBCps

1              While I'm busy talking about that, I will say that

2     there are specific disputes about some of the sections in the

3     plaintiff's proposed CMO in the case and defendant's proposed

4     CMO in the case, and it's a little hard to go through that

5     without discussing the specifics a little more, but I will go

6     through the last group, plaintiff's proposed section 5 of the

7     CMO.  Defendants object to plaintiff's proposals of open

8     discovery on general liability issues before plaintiff has

9     identified the sites at which MTBE has been detected.  I don't

10    agree with the defendants on that one at all.  General

11    liability and site-specific liability don't relate to each

12    other.  And I don't see why the general liability issues have

13    to await the identification of every site.  That's not what

14    general liability means.  General liability is what you know,

15    when did you know it, who shipped in, who shipped out.  You

16    know, we've all been together for a decade.  So we know what

17    we're talking about.  There's no reason to hold up general

18    liability discovery.  So I think plaintiff's proposed section 5

19    is OK.

20             But the other section, which I am happy to discuss

21    with you one by one, I'm prepared to do it.  For example,

22    plaintiff's proposed section 3C, defendants object to

23    plaintiff's request to sign a consent form instructing their

24    environmental consultant to produce certain readily accessible

25    data because defendants have already agreed to produce readily

F4OAMTBCps

1    accessible electronic data regarding MTBE remediation sites,

2    including that which is in the possession of their current

3    consultant.  So I don't know that there is really a dispute

4    left on that one.  Mr. Axline, you can tell me if you -- or is

5    it you again for Pennsylvania?

6            MR. AXLINE:  I think Mr. Miller is doing this.

7            THE COURT:  I'm not sure that you dispute that,

8    Mr. Miller, on section 3C, because apparently defendants are

9    agreeing to produce data regarding remediation sites, including

10   what the consultants have, so until you see what you get, this

11   may not be ripe on that particular one.

12           MR. MILLER:  They're saying they're preparing to do so

13   only for their current consultants.  And we anticipate, even

14   after serving subpoenas on the consultants, that they're going

15   to say, we cannot turn the data over because we do not have

16   permission from our clients.  And we want to get that

17   cooperation.  And it's part of our effort to get what we need

18   on the defendants' sites.

19           THE COURT:  Yes.  But I'm not following what the

20   objection is going to be.  They say that they're going to turn

21   over what's in the possession of their current consultant.  Are

22   you saying that there is no former consultant?

23           MR. MILLER:  They have many sites where their

24   consultants have done work in the past but they are not

25   currently consulting for the defendant with respect to that

F4OAMTBCps

1    site.

2              THE COURT:  So that's why you used the term

3    "environmental consultants" and they used the term "current

4    consultant."  Is that all the fight is about, current versus

5    past?

6              MR. MILLER:  As I understand it, yes.

7              THE COURT:  Mr. Bongiorno?

8              MR. BONGIORNO:  Thank you, your Honor.  Tony Bongiorno

9    for the defendants.  I'm not sure there is a fight.  I think

10   you just laid it out.  If he wants to serve a subpoena on our

11   prior consultants, God speed him.

12             THE COURT:  OK.  Well then --

13             MR. BONGIORNO:  I just didn't, I'll be frank, your

14   Honor, I did not understand the regimen.  I'm not trying to be

15   flip.  But we have to give a permission to serve a subpoena.  I

16   didn't get that.

17             THE COURT:  Well, I guess he wants the client to

18   consent to allowing its consultants to produce the information.

19   Sometimes information is confidential; without client consent

20   the response to the subpoena is, we would if we could but we

21   have to have permission from our client.  All he's saying is,

22   if you or the other defendants are clients, you should inform

23   all the consultants that you've used at the various sites that

24   they have your permission to respond to the subpoena and not

25   withhold it on the ground that we need our client's permission.

F4OAMTBCps

1          MR. BONGIORNO:  Yes.  I do not think we would want to

2     come back in this courtroom having told our consultants, don't

3     comply with the subpoena.

4          THE COURT:  It's not that they're telling them, don't

5     comply.  It's that they're going to say, we can't comply unless

6     our client gives us permission.  So if you're saying on this

7     record, which could then be sent along with the subpoena, dear

8     consultant, you have our permission to release the information

9     sought by plaintiffs in this litigation, and they can attach

10    that page of the transcript to every subpoena, then you've

11    consented.

12         MR. BONGIORNO:  Certainly, on behalf of Exxon Mobile,

13    we have no objection to that, your Honor.

14         THE COURT:  That's on the record.  So if you have that

15    attached to your subpoenas, is it still a problem, Mr. Miller?

16         MR. MILLER:  No.  That's very helpful.

17         THE COURT:  All right.  I have other defendants in the

18    room.  Are there other people who will stand up and say, on

19    behalf of so-and-so, we consent to allowing our consultants to

20    produce the information?  Anybody else want to stand?

21    Mr. Condron?

22         MR. CONDRON:  Of course, your Honor.  On behalf of

23    Shell, I will allow our consultants to produce information that

24    is being sought by the plaintiff.

25         THE COURT:  Anybody else?

F4OAMTBCps

1           That's only two defendants.  Who else?  What other

2     defendants are here, by name?

3           MR. CORRELL:  Your Honor, Charles Correll for Chevron.

4     We have a problem with doing that just because we don't know

5     the content: were these consultants assisting in prior

6     litigation or something like that.  What I would like is if the

7     objection gets raised, we address it at that point.

8           THE COURT:  Well, no.  I would say much more

9     efficiently, what if you were sent a courtesy copy of the

10    subpoena, next week or the day it's ready, and say, now that

11    you've seen it, can you add your consent to the other two?  I

12    don't want to go through the slowdown of having the objections

13    of the consultant.  Take a look at the subpoena.  Go over it

14    with your client.  If there is no objection, so state so they

15    know they can comply.

16          MR. CORRELL:  OK.  So they then will give us the

17    subpoena first.

18          THE COURT:  That way, Mr. Miller, no harm done.

19          MR. MILLER:  Of course.

20          THE COURT:  Yes, you're a lawyer.  There's no problem.

21          MR. CORRELL:  We'll consent to that.

22          THE COURT:  Good.  Are there any others?

23          MR. KRAININ:  Yes, your Honor.  Dan Krainin for

24    Sunoco.  With that proviso, I would suggest that we be allowed

25    to preview it.

F4OAMTBCps

1          THE COURT:  Sure.  And with your consent you would be

2    done.

3          And you are?

4          MS. WEIRICK:  Stephanie Weirick for the BP defendants.

5    We have no problem with that approach.

6          MS. MEYER:  Lisa Meyer for Citgo Petroleum

7    Corporation.  We have very limited site material because we

8    don't operate stations generally, but we would agree to the

9    same circumstances that were just laid out.

10          THE COURT:  That's fine.

11          So you get the idea, Mr. Miller, of how to get this

12    accomplished promptly.

13          MR. MILLER:  Yes, your Honor.  Thank you for your

14    help.

15          THE COURT:  All right.  So that takes care of 3C.

16          Now, plaintiffs' proposal on section 3A, 9 through 11,

17    defendants object to plaintiffs' request for defendants to

18    produce licensing, branding, and franchise information for

19    every station throughout the state before the plaintiff

20    identifies which sites are at issue.

21          Mr. Miller, this one sounds like it might have merit.

22    What's the point of doing that for every station in the state

23    of Pennsylvania?  Or how about Mr. Axline?  What happened?

24    It's a shell game.  No pun intended.

25          Anyway, Mr. Axline.

F4OAMTBCps

1           MR. AXLINE:  Yes, your Honor.  This entire list is

2      predicated by the term "readily available electronic

3      information," so to the extent they have this in databases...

4           THE COURT:  Well, it's not even so.  What's the point?

5      I mean, there must be, I'm guessing 50,000 stations in all of

6      Pennsylvania.  It's an enormous number of stations.  Without

7      having any reason to believe that a station has any issues, or

8      has ever had an issue at that site, what's the point of

9      gathering all that up?

10          MR. AXLINE:  If it's in readily available electronic

11     information, we know enough --

12          THE COURT:  It won't tell you anything that will help

13     you with the site identification.  I do want to help you to get

14     ready, for sure, by the end of December.  But knowing that

15     somebody has branded a particular station with their brand

16     doesn't help you know the answer to whether there's been a

17     problem at that site.  What you want is remediation data, and

18     we're going to get to that, but I don't see how the licensing

19     branding and franchising moves you along to identifying sites

20     that have been impacted in some way other another.

21          MR. AXLINE:  It doesn't tell us which sites have been

22     impacted.  But it does gives us a jump, and we think an easily

23     provided jump.

24          THE COURT:  How does it do that?

25          MR. AXLINE:  Because the vast majority of these

F4OAMTBCps

1    stations are likely to have MTBE problems.  And if we know

2    early on and are able to electronically search for which

3    defendants supplied which stations --

4         THE COURT:  So they supplied it.  How does that show

5    that there was any leak or report of leak or contamination?

6    Just knowing that BP or Shell or Exxon or somebody supplied it

7    doesn't tell you anything, does it?

8         Now you both are up.  OK, Mr. Miller.

9         MR. MILLER:  Your Honor, if we know it's a

10   Shell-branded station, we will know when Shell had MTBE in the

11   gasoline.  And they were among the first two, as an example,

12   that used MTBE starting in 1979.  So that information helps us

13   determine the likelihood that MTBE was in the gasoline that was

14   released.

15        THE COURT:  But that's assuming a release.  That's the

16   problem.  That's working in a circular fashion.  Without a

17   release it hardly matters that it was -- whoever you said was

18   first.  Who was the example you said?

19        MR. MILLER:  For the period between 1970 --

20        THE COURT:  Which company?

21        MR. CONDRON:  Shell, your Honor.

22        THE COURT:  Yes, Shell.  So you know it was Shell.

23   But that doesn't imply anything about whether or not there was

24   ever a release.  So Shell used MTBE, I get that, at the Shell

25   station.

F4OAMTBCps

1              MR. MILLER:  If it were a different defendant, they

2      would also know for the same year they didn't have MTBE in

3      their gasoline.  So that basic information helps us focus on

4      stations that had MTBE gas during the time we received a report

5      that gasoline was released, not MTBE gasoline.  That's the

6      nature of the problem.  The reports generally do not say

7      whether the gasoline released was MTBE or not, and that piece

8      of information helps.

9              THE COURT:  OK.  So you could work it another way.  If

10     there are gasoline releases reported in any station, then you

11     can ask for licensing branding and franchise for that station.

12     And if there's a database, they can quickly supply it.  It is

13     not a problem.

14             Mr. Bongiorno?

15             MR. BONGIORNO:  There is another issue, your Honor.

16     And that is --

17             THE COURT:  Oh, there's always another issue.  But

18     what's this one?

19             MR. BONGIORNO:  Understood.  An issue here, your

20     Honor, is that Pennsylvania had five RFG counties over here and

21     then, don't quote me on the percentage, but a huge percentage

22     of the state that did not opt into the program.  So it doesn't

23     solve the problem.  And what we're trying to avoid is going

24     down rabbit holes for sites that won't be in the case.  When we

25     get a site list, this is fair game.

F4OAMTBCps

1          THE COURT:  I appreciate that.  But I understood what

2     Mr. Miller just said was about the release of gasoline, not a

3     release of MTBE-containing gasoline.  I don't think that's a

4     problem.  Because once he collects the reports of gasoline

5     releases of a station, then the knowledge of whose it might be

6     does tell him something about whether that release could have

7     contained MTBE or not depending on which company gets it and

8     when they added it.  But he still has to go first.  He still

9     has to figure out the site where there are reported releases.

10    Then he can get the information for those sites.

11         MR. BONGIORNO:  Understood, your Honor.  It doesn't

12    get him there, though, because it still might not be MTBE --

13         THE COURT:  I know that, but he's got a right to

14    investigate it.  Let's say he's got a report of a release in

15    1982.  Maybe at that time only a Shell station was adding it,

16    because they apparently started in '79, if that's what you

17    said.  So, you know, I understand.  But he still has to go

18    first.  He's got to collect all these release reports, and then

19    he can seek the information from those stations.

20         Mr. Condron.

21         MR. CONDRON:  Just to clarify, your Honor, *some* Shell

22    gasoline started in 1979 with MTBE.  I just wanted that to be

23    clear on the record.

24         THE COURT:  So, Mr. Miller, I don't think I would have

25    it be done for every station throughout the state.  I think

F4OAMTBCps

that's just more work and more information than you're entitled

to.

MR. MILLER:  I understand we have a list of

approximately 16,000 sites since 1988 where gasoline releases

were reported that we can supply to the defendants and that,

within a reasonable period of time after they receive that

information, they should supply us the supplemental information

about branding, etc., that we discussed thereafter.

THE COURT:  OK.  Good.

MR. MILLER:  I would suggest that sequence, your

Honor.

THE COURT:  That's fair.  It's still a big number, but

at least you'll know whose gasoline according to brand name or

franchising or licensing.  And then we go from there.

MR. MILLER:  Yes.

THE COURT:  So big numbers, a big state.  But at least

you may be reducing some 15 to 16 thousand.  I don't know.

Yes, Mr. Bongiorno.

MR. BONGIORNO:  Your Honor, if I'm reading his

proposed CMO language correctly and he's talking about readily

available data, then we hear you.  We're on the same page.

THE COURT:  Good.  All right.

So now we're down to defendants' proposed section 3A,

8 through 12.  It requires the plaintiff to produce readily

accessible electronic data covering plaintiff's ownership

F4OAMTBCps

1    interest in UST sites, plaintiff's involvement in the supply

2    distribution for MTBE gasoline, and MTBE release or remediation

3    information from plaintiff-owned or -operated sites.

4    Mr. Miller, what's wrong with that proposal?  Or -- I can't get

5    it right today -- Mr. Axline.

6            MR. AXLINE:  My apologies, your Honor.  So at least

7    it's easy to distinguish us physically.

8            THE COURT:  Yes.  I was going to say the same thing.

9            MR. AXLINE:  This was sort of a late edition by the

10   defendants, to which we objected initially.  I think as long as

11   this is "cabined" by the qualifier that Mr. Bongiorno just

12   noted, that it is readily available electronic data, we can

13   provide him with this.  In fact, I think it's probably going to

14   be in what we give them on MTBE releases in any event.

15           THE COURT:  On MTBE releases?  But I thought you

16   couldn't do that till the end of December.

17           MR. AXLINE:  We're not going to be able to give them a

18   comprehensive list until the end-of-December date, which I

19   would like to discuss more with you.  But we have agreed to and

20   we will provide them with readily available electronic data

21   before the end of December, some of it on a rolling basis, but

22   certainly all of it before the end of December.  So in that

23   information will be information that is --

24           THE COURT:  Well, if it's readily accessible

25   electronic data covering the topics I already read into the

F4OAMTBCps

1    record, I don't even see why it requires waiting for the fuller

2    list.  You should be able to just do it.  And there should be a

3    file-earlier date.

4              MR. AXLINE:  Well, this is not segregated information

5    in the ways that the defendants have listed them.  The

6    defendants keep track of this information this way, but we

7    don't.

8              THE COURT:  The sites you don't?

9              MR. AXLINE:  The commonwealth doesn't.

10             THE COURT:  The commonwealth doesn't know their own

11   sites, or operated sites?

12             MR. AXLINE:  It does know that, but it's not

13   necessarily all and readily available electronic data.  If

14   there's a database that contains all these sites where gasoline

15   may have been released, we'll be happy to provide that.  I

16   don't think there is one.

17             THE COURT:  What about just your ownership?  Putting

18   aside the word "release."  Doesn't the commonwealth know what

19   it owns, operates?

20             MR. AXLINE:  As with stations, your Honor, as you just

21   pointed out with respect to the defendants, they're not going

22   to be relevant unless there's been an MTBE release at the

23   station.  So it wouldn't serve any purpose for the commonwealth

24   to provide the database for all the property we own.

25             The relevance, as the defendants pointed out, is, was

F4OAMTBCps

1   there an MTBE release there.

2           THE COURT:  Well, I guess I understand.  But I guess

3   what I don't have any handle on is, are you a large percentage

4   of the total or a small percentage of the total?

5           MR. AXLINE:  Very small, very small.

6           THE COURT:  That's what I thought.  It was different

7   from what you asked them.  I thought you were going to answer

8   "very small."  In that case, you should do all, because then

9   everybody knows which they are.  You just said very small, not

10  just small, but very small.  So this list might be not 16,000

11  but less than a thousand.  And I don't know what it is.

12          MR. AXLINE:  Well, it might be, but it's -- I don't

13  know either, frankly, your Honor.

14          THE COURT:  Maybe you should look into that.  Why

15  don't we ask you by the next conference to determine from your

16  client what size we're talking about, what burden we're talking

17  about, and what's readily accessible.  And then we'll be able

18  to talk with more knowledge.

19          MR. AXLINE:  I can do that.  I would be happy to.

20          THE COURT:  All right.  Next conference we'll go back

21  to this one.  All right.

22          And when we do that, then I can set a date for

23  production.  Now, you wanted to quarrel with end of the year?

24          MR. AXLINE:  I don't want to quarrel, your Honor, but

25  I do want to request this.  What we had proposed to the

F4OAMTBCps

defendants in a meet-and-confer just before coming in here was

that once the initial round of discovery has been completed and

everybody has the readily available electronic information, we

then give ourselves 30 days to look at that, make some

realistic determination of what it is going to take to extract

the list that the defendants want from that, and then come back

to you and say, here's the amount of time we think we need to

produce that list, at which point you could say, that's not

reasonable, or, given what you just told me about the

logistics, that seems reasonable, or an alternative date.  But

I think December 15th, that's a lot, a lot of work, to do --

given the fact that we haven't really even received anything

from the defendants yet, we don't know what the scope of what

they're going to provide is.  We do have a sense of what we

have, and it's enormous.  So I would request that rather than

setting a hard date now, you order the parties to, within 30

days of whatever the cutoff date for an initial discovery

period is, that you order the parties to, within 30 days of

that date, come back to you with a proposal for a time frame

for a final order.

          THE COURT:  I'm happier with setting December 15th as

the date and then you have the burden to explain why I should

extend it.  But I really think we need a goal that is in place

and should be met.  It's two thirds of a year.  We start with

April 15th.  That's a lot of months.  It should be eight.

F4OAMTBCps

1   That's a lot of months.  So it's a matter of where you put your

2   resources.  Your firm is clearly very busy with a lot of places

3   and a lot of cases -- OTWB, Puerto Rico, New Jersey.  You're

4   very extended.  But that's not a reason not to move this case

5   forward.  So I'm going to leave December 15th as the date, with

6   you having the burden to explain why I should extend it.

7           MR. AXLINE:  As long as we have the option of coming

8   back and pleading our case, your Honor.

9           THE COURT:  You always do.  Whether you have the

10  option or not, you do come back and plead.

11          MR. AXLINE:  I think one of my colleagues is about to

12  say that you had initially suggested December 31st.

13          THE COURT:  True.  He listened hard.  OK, done.

14          Now we're up to this troublesome issue about Lukoil,

15  Getty and all the rest of it, and where we're up to.

16          Mr. Bongiorno.

17          MR. BONGIORNO:  Your Honor, I apologize.  Before we

18  move on, my co-counsel and friend Mr. Stack just remanded me of

19  one thing.  It's not a change of position.  On the subpoena

20  issue -- and we still agree -- we just have to reserve work

21  product and attorney-client issues.

22          THE COURT:  I think Mr. Miller knows that, and there

23  could be disputes down the road.  We'll worry about them.

24          MR. BONGIORNO:  Thank you, your Honor.

25          THE COURT:  That's fine for the record.

F4OAMTBCps

1          Now, this issue about personal jurisdiction discovery,

2     I think I need you to explain, "you" being the plaintiff, what

3     additional discovery you need, in view of the fact that in your

4     reply letter from the defendants they say they're going to

5     produce much of what you seem to be asking for.  So I'm not

6     sure what's left.  The LAC claims that it produced the entire

7     2009 GPM ILMA purchase and sale agreement.  And it says it will

8     produce the missing attachments, and it will produce the 2004

9     agreement when it obtains the consent of the parties to allow

10    it to be produced, which overrides the confidentiality

11    agreement.  So when that show is up, what does that leave?

12          MR. AXLINE:  Several things, your Honor.  First and

13    foremost, we would like to know who was paying the salaries,

14    that is, which bank, which bank account was paying the salaries

15    of Mr. Guzman and Mr. de Laurentis during this time period.

16          THE COURT:  Which time period?

17          MR. AXLINE:  The entire time period from 2001 through

18    to the end of the transaction with L&A.

19          THE COURT:  Which is?

20          MR. AXLINE:  2009, the end of -- through the end of

21    2009.  And frankly we don't want just the employment

22    agreements.  We would like to know where the money was coming

23    from, whose account the money was coming from to pay those

24    gentlemen's salary, who were so instrumental in this entire

25    series of transactions.

F4OAMTBCps

1          THE COURT:  Who is the lawyer who is going to respond

2     to this?

3          MR. AXLINE:  That's one.  I have others.

4          THE COURT:  I know.  I just want to know who I'm

5     looking at.  Who are you again?

6          MR. TUITE:  James Tuite, your Honor, representing

7     Lukoil Americas Corporation.  I believe yesterday we did

8     produce bank account information for a couple of years at

9     least, 2005, 2006.  I don't think we produced all the bank

10    account information for Lukoil Americas Corp. or GPMI for this

11    entire 2001 to '9 period.

12         THE COURT:  But he said which account was paying the

13    salaries for these two individuals from 2001 to 2009.

14         MR. TUITE:  We did produce the employment agreement

15    for Mr. Guzman, and that employment agreement was between him

16    and GPMI.  And my understanding is that, from the client, is

17    that they received compensation, both Mr. de Laurentis's and

18    Mr. Guzman, only from getting Getty Petroleum Marketing, and

19    were not paid anything by Lukoil Americas Corporation.  But we

20    can, you know, I'm not sure we can produce every single, and

21    whether that's necessary, to produce every single bank account,

22    or monthly bank account.

23         THE COURT:  He asks you to identify the bank account

24    from which the money came that generated the salaries of these

25    individuals for an eight-year period.  He didn't say he wanted

F4OAMTBCps

1   every monthly bank account statement.

2           MR. TUITE:  Well, we can do that, your Honor.

3           THE COURT:  OK.  That's one of them, OK.  We're ready

4   for the next one.  Because number one you just won.

5           MR. TUITE:  But let me just clarify one thing.  While

6   we can provide information about which bank account, which

7   company's bank account paid these, the salaries that he's

8   identified, to the extent we're required to produce or even let

9   them see GPMI's individual bank statements or whatever, we

10  don't have the GPMI material, because he sold the company in

11  February 2011.  That's all, your Honor.

12          THE COURT:  Well, who has control of it?  Do you know

13  who has control of it?

14          MR. TUITE:  The company was sold to an unrelated third

15  party named Cambridge Petroleum.  But Getty Petroleum

16  Marketing, in December 2011, went into bankruptcy.  There is a

17  trustee.  I assume that the trustee has control over whatever

18  records there are of GPMI.

19          THE COURT:  That was one of my questions, was about

20  bankruptcy court jurisdiction.

21          But anyway, you understood his qualifier.  He can't

22  produce what he doesn't have possession, custody, and control

23  over.  That which he does have possession, custody, or control

24  over, he agrees to produce, on this one topic, the bank

25  account.  But he's telling you that certain such accounts he

F4OAMTBCps

1    doesn't have -- so long to say those three words -- PCC over.

2    So you have to figure out who does.  And he has tried to help

3    you figure out who that might be.

4             MR. AXLINE:  Those were originally, I guess -- GPMI's

5    records were originally GPMI records.

6             THE COURT:  Of course.

7             MR. AXLINE:  However, a lot of that was provided in

8    the dispute, in the creditors' representative's dispute in the

9    bankruptcy proceeding, to LAC, to the other parties.  I assume

10   LAC had access to those.  If he is now representing he either

11   didn't see them or didn't retain copies of them, that's one

12   thing.  But what he's saying is, well, those aren't really our

13   records.

14            THE COURT:  No.  I think he's saying he doesn't have

15   them, he doesn't have PCC over them.

16            MR. TUITE:  Your Honor, to the extent we do have them,

17   either because we have duplicates that stay with the company or

18   we got them in this other proceeding, we've been able to

19   produce them.  But some things we don't have.

20            THE COURT:  Right.  So you just need to talk with each

21   other.  And if he doesn't have it, at least then if he can help

22   you figure out who does he will, and otherwise you'll have to

23   figure it out.

24            That's one.

25            MR. AXLINE:  Just also to clarify, your Honor, I do

F4OAMTBCps

1    want to say that you're correct.  We're not asking for all bank

2    records.  What I'd really like to see is a Xeroxed copy of the

3    employment checks that were sent to Mr. Guzman and

4    Mr. de Laurentis.

5              THE COURT:  The actual check showing which account it

6    came from?

7              MR. AXLINE:  Where it came from, exactly.

8              THE COURT:  Yes.

9              MR. AXLINE:  The next thing, your Honor, is

10   depositions.  These two individuals were deposed extensively in

11   several proceedings, including the proceeding alleging fraud in

12   the transfer of the GPMI assets.

13             THE COURT:  You want those transcripts?

14             MR. AXLINE:  Well, we wanted to depose Mr. Guzman and

15   Mr. de Laurentis.  But as a way to make it more efficient we

16   said, please give us their prior depositions, we'll let you

17   know if there is anything else we need.

18             THE COURT:  OK.  And?

19             MR. TUITE:  We have produced those transcripts.

20             Excuse me, your Honor.  Just to be clear, we produced

21   the Guzman and de Laurentis transcripts in the other

22   proceedings.  We produced their trial testimony.  And we also

23   produced their testimony in an arbitration that he asked for.

24             MR. AXLINE:  And they're highly redacted versions, so,

25   yes, they produced them, but they didn't really produce the

F4OAMTBCps

1    stuff that we're the most interested in.  We've offered time

2    and again to enter into a confidentiality agreement.

3          THE COURT:  Why are they highly redacted?

4          MR. TUITE:  The only thing that is redacted is

5    privileged material, for my client.

6          THE COURT:  In other words, that might require *in*

7    *camera* review, because he says that they're so highly redacted

8    that they're useless.  I don't think you can be the only

9    arbiter of what is privileged.  So if need be, I'm going to

10   have to ask for them to be submitted, redacted and unredacted,

11   so that I or someone I appoint can review them.

12         MR. TUITE:  Let me just give a little context for why

13   there are redactions in the depositions.  In the bankruptcy

14   proceeding, when the GPMI trustee brought the fraudulent

15   conveyance action in 2013, the trial in 2013, relating to the

16   conveyance that occurred at the end of 2009, the trustee not

17   only named various corporate entities; it also named the

18   directors and officers of Getty Petroleum Marketing.  And one

19   of their defenses was advice of counsel.  And there was a

20   determination made in the case that between the trustee, GPMI,

21   and the defendants in the case there was a shared privilege.

22   And so basically the trustee could see anything and everything,

23   even the attorney-client material.  However, third parties

24   could not.  And that's why the judge sealed parts of the trial

25   testimony.

F4OAMTBCps

 1              But we can submit this information for you to take a

 2      look at.  But much of the -- what's redacted is discussions of

 3      attorney-client material.

 4              Now, there's a lot of material not redacted.

 5              THE COURT:  I have a feeling that Mr. Axline has --

 6      and he claims it's so heavily redacted it's pretty well

 7      useless.  Now, you're talking about trial testimony.  There

 8      were depositions, maybe no judge there says it has to be

 9      sealed.  I just don't know how many different transcripts we're

10      talking about.  But the bottom line is, they should be produced

11      to the fullest extent possible, and that which is withheld

12      should probably be submitted for *in camera* review, redacted and

13      unredacted, and I'll have to look at it.

14              That's the best I can do for you, Mr. Axline.

15              MR. AXLINE:  Thank you, your Honor.  I appreciate it.

16              THE COURT:  Yes.  I think all I can say is, you must

17      produce depositions of all these people.

18              MR. TUITE:  Let me ask one other thing, your Honor,

19      which is that the redacted information relates to this 2009

20      transaction, which, under Maryland law, is not relevant to the

21      veil piercing issue that is presented by our motion to dismiss

22      based upon personal jurisdiction.  And as a matter of fact, not

23      only is it not relevant under Maryland law; there is nothing in

24      their complaint, not one word, about this alleged fraudulent

25      conveyance in 2009.  So until there is something in their

F4OAMTBCps

1    complaint about it --

2              THE COURT:  Well, but I think it's the commonwealth's

3    argument that he needs even the 2009 agreement to understand

4    how environmental liabilities were initially distributed and

5    where the distribution of liability changed with that

6    transaction.  They have a right to follow the transaction.

7              MR. TUITE:  There is no testimony in these depositions

8    or the redacted material about environmental liability.

9              THE COURT:  That may be so, but it's the first time I

10   know that.

11             MR. TUITE:  But we did give them the 2009 purchase and

12   sale agreement that addresses which companies -- addresses who

13   bought what stations and who is responsible for the

14   environmental liability for those stations.  So we've given

15   them that information.

16             There's another sale where they're interested in the

17   same questions.  That's the one in 2004.  And we're in the

18   process of getting that agreement, going through the consent

19   procedure, and we'll get that to them as well.

20             So to the extent they're looking for information about

21   who owns the stations and who has the environmental liability,

22   we're giving them that information.  To the extent they want a

23   lot of information about this alleged fraudulent conveyance in

24   2009, that has nothing to do, under Maryland law, with being

25   able to pierce the veil.

F4OAMTBCps

1           THE COURT:  All I know is it says Maryland law

2      applies.  Whether this has anything to do with -- under

3      Maryland law, I can't know that.

4           Mr. Axline, how does the transaction years later

5      affect your theory of the environmental liabilities and the

6      transfer of the fraudulent conveyance?  How does that all play

7      out?

8           MR. AXLINE:  One of the veil-piercing inquiries under

9      Maryland law, your Honor, under Maryland law, is, "The courts

10     may consider a corporation as unencumbered by the fiction of

11     corporate entity and deal with substance rather than form as

12     though the corporation did not exist in order to prevent

13     evasion of legal obligations."  What happened in 2 thousand --

14     and by the way, the case that they cite from Maryland law, that

15     *Colandrea* case, C-o-l-a-n-d-r-e-a, was a divorce case.  The

16     wife had a couple of corporations that she owned separately.

17     There was an agreement in year X, let's say, that she would pay

18     the husband out of corporation number one.  A couple of years

19     later she transferred all the assets out of corporation number

20     one and then, among other things, sought to pierce the veil,

21     and the court said, yes, you can do it under those

22     circumstances because what she's trying to do by moving those

23     assets is to not be able to pay you.  And that's exactly what

24     happened in 2009, when this whole thing that was orchestrated

25     by LAC happened.  They took a company with assets.  They sold

F4OAMTBCps

1   it to one of their other subsidiaries.

2           THE COURT:  The took the assets so the company

3   couldn't pay.  I get it.

4           MR. AXLINE:  Sent it back.  Lo and behold a year later

5   that company is out of money, we're out of luck.  So that's

6   what we're interested in exploring.

7           MR. TUITE:  Your Honor, that's nothing about that in

8   the complaint.

9           THE COURT:  Well, I don't know that that's

10  dispositive, because at that point in time, they didn't know

11  what events and what law would apply.  I don't know that they

12  had to plead with that level of specificity.  We're up to now.

13  You want them to amend.  That's fine.  But they're telling you

14  the theory of why the 2009 transaction is important.  And I

15  must say it sounds important to me to.  They have a right to

16  follow the money or the lack of it.  So I would say you do have

17  to do it.  You've already begun to do it anyhow.  You've

18  produced these depositions or trial transcript but in redacted

19  form.  We've already covered that.  I will look at it.

20          Now, I do want it go over, you say you had more topics

21  besides the depositions, besides the bank accounts.  What's

22  next?  Or have we covered it?

23          MR. AXLINE:  May I consult, your Honor?

24          THE COURT:  Yes.

25          MR. AXLINE:  I guess, as my colleague is pointing out,

F4OAMTBCps

1   we would like to reserve the right to take a deposition if

2   necessary after you've had a chance to review the transcripts

3   in camera and we've had a chance to assess what Lukoil has just

4   now produced in the last several days.

5           THE COURT:  OK.  We can always take it up at any time

6   you request a conference after you've looked at what you have

7   gotten, and if you request a deposition then and they oppose

8   it, I'll hear about it and rule.  I don't want to do it in

9   advance.  And you don't either.  You want to review what you

10  have.

11          MR. AXLINE:  And that completes our wish list, your

12  Honor.

13          THE COURT:  OK.  But the defendants have raised some

14  issues on this with respect to the jurisdictional discovery.

15  One, it says the Court would have to rule on whether the

16  bankruptcy court has exclusive jurisdiction over the

17  commonwealth fraudulent conveyance claim?  I'm not quite sure

18  what you mean by that.

19          MR. TUITE:  The theory of the complaint in this case

20  has to do with harm caused by the use of MTBE gasoline.

21          THE COURT:  Right.

22          MR. TUITE:  But the harm they're complaining about now

23  is harm that flows, allegedly, from this transaction that

24  occurred in 2009, saying that --

25          THE COURT:  Well, not really.  That's why the Court

F4OAMTBCps

```
 1    has jurisdiction over the defendants.  It's a predicate

 2    argument.  Obviously the claim is for MTBE contamination.

 3    They're not displacing the bankruptcy court and trying to

 4    recover on a fraudulent conveyance claim.  What they're saying

 5    is, if you follow the money or the lack of it, you will

 6    eventually decide there's personal jurisdiction.  That's all

 7    they're talking about.

 8         MR. TUITE:  Well then, I think, your Honor, we ought

 9    to have some briefing whether, under Maryland law, this

10    transaction is relevant to the veil piercing that they're

11    trying to do.

12         THE COURT:  And he just said orally and in summary

13    fashion why he thinks so, and I'm sure in the briefing you're

14    saying more and he's saying more.

15         MR. TUITE:  The cases under Maryland law talk about

16    how the domination or control in order to pierce the veil has

17    to relate to the transaction at issue and the control has to be

18    used such that the transaction at issue in this case has got to

19    be the one that's alleged in the complaint, and that the harm

20    complained of has to be the result of the use of the domination

21    and control in order to pierce the veil.  And everything that

22    he has identified in terms of the alleged harm, you know, GPMI

23    being able to respond to its MTBE liability because he's

24    allegedly been stripped of his assets, none of that is in the

25    complaint.
```

1           MR. AXLINE:  Your Honor, the defendant we're talking

2     about here is Lukoil Americas Corporation, not GPMI.  And

3     Lukoil Americas Corporation has not declared bankruptcy and is

4     not in bankruptcy court.

5           MR. TUITE:  Your Honor, we've already talked about the

6     fact that Lukoil Americas Corporation is a holding company, has

7     no operation, owns nothing in Pennsylvania.  The way they're

8     trying to bring Lukoil Americas Corporation into this case is

9     by piercing the veil of GPMI.  So that's what you have to look

10    at.  Was GPMI so dominated and controlled with respect to the

11    use of MTBE that Lukoil could be held responsible for that.

12    And this information he's seeking has nothing to do, this 2009

13    transaction, has nothing to do with that question.

14          Now, if they want to allege, amend their complaint and

15    allege that, well, wait a second, Pennsylvania was harmed by

16    the 2009 transaction, that's exactly what was litigated in the

17    bankruptcy court, where the GPMI trustee on behalf of creditors

18    or potential creditors attacked and challenged that 2009

19    transaction.  Pennsylvania had notice of that proceeding,

20    declined to participate.  But --

21          THE COURT:  What was the outcome of that proceeding?

22          MR. TUITE:  Pardon, your Honor?

23          THE COURT:  The outcome of that proceeding.

24          MR. TUITE:  It ended up there was a trial that lasted

25    17 days, and ultimately there was a settlement.

F4OAMTBCps

1          THE COURT:  A settlement.

2          MR. TUITE:  Yes.

3          So I guess my position on this is that they have not

4    shown, under Maryland law, that this 2009 transaction is

5    relevant.

6          THE COURT:  I don't think they can show it just yet.

7    That's the point of the discovery.  At the end of the discovery

8    there would be briefing to see if the Court should exercise

9    personal jurisdiction.  And the only way is by veil piercing

10   under Maryland law.  I don't think we're ready for that

11   briefing until they complete the discovery they feel is

12   necessary to lay the groundwork for the briefing.  And I just

13   allowed some of that discovery.  But so have you.  I mean,

14   you've agreed to look for those checks of employment.  You've

15   agreed to produce the deposition transcript.  And he said at

16   this point that completes his wish list.  So I think the

17   briefing suggestion is premature.

18         MR. TUITE:  Your Honor, one reason that we have tried

19   to be cooperative is to give them enough to see that the 2009

20   transaction and the trial in 2013 had nothing to do with

21   environmental liability.

22         THE COURT:  And Mr. Axline's response is, I don't have

23   enough just yet to make that conclusion, but we're producing,

24   it's coming.  Let him finish and we'll see if there's a

25   briefing on personal jurisdiction.  But I thought I resolved

F4OAMTBCps

this in two outstanding discovery disputes, which would take us

to Puerto Rico, which is anyway today better than even the

others.

        So let's talk about Puerto Rico.  So the Puerto Rico

Supreme Court, in a relatively close decision, won't take up

the issue.  They denied reconsideration of their earlier

decision five, three.  So that's over.  And so we have more

summary judgment motions coming on this, I should call it

time-bar issue.  And you talked about an omnibus brief and

plaintiff proposed a schedule, and that schedule is a little

unrealistic because it proposed a moving brief six or seven

days from now.  That doesn't make sense to me.  But the

defendants proposed pretty much a reasonable schedule:  They

move by May 15, a response by June 15, reply by June 29.  That

sounds pretty good.  But what I can't figure out is, this is

for an omnibus brief.  They asked for an extension.  Does that

mean that if I were to adopt that schedule and that page limit,

there are no individual motions?  It's all going to be in the

one omnibus motion?

        MR. PARDO:  Your Honor, Jim Pardo for the defendants.

Good afternoon.  The short answer is, no, I am aware of at

least, I think, one motion by the defendants that would not be

part of the "omnibus" brief.

        THE COURT:  What motion is that?

        MR. PARDO:  I believe that's the motion by Petrobras.

F4OAMTBCps

1          THE COURT:  Well, but that is a different story too.

2     Petrobras, I thought you were going to try to do it by

3     stipulation.  Why are we -- that's a do-over.

4          MR. GILMOUR:  Your Honor, John Gilmour on behalf of

5     the commonwealth.  We are working with Petrobras on the joint

6     stipulation.  They provided it to us.  That conversation

7     started again last week.  I believe we had it in our office,

8     sent it back this morning.  We are working on that.  We

9     anticipate that we will reach a stipulation.

10          To advise your Honor, we also were contacted yesterday

11    by one other corporate entity that may fall into that same

12    category, and we've begun those same discussions with that

13    entity.  And those are the only two that I'm aware of that may

14    not fall within this omnibus briefing.  But if there are any

15    others that fall within that, we are willing to talk to them

16    about stipulation.

17          THE COURT:  Mr. Condron?

18          MR. CONDRON:  We are the other entity, and in fact

19    we're going to see if we can work out something with the

20    plaintiffs.

21          THE COURT:  I want to hear about it in advance,

22    because if you can't, I'm not sure I can allow this other

23    briefing.  There are only so many briefs per year I want in the

24    MTBE cases.  So by doing an omnibus, that's the point, to get

25    it all done in one big briefing.

F4OAMTBCps

1              So before you can make a motion, I want a conference.

2       If you can't do it by stipulation I want to find out why.

3              MR. CONDRON:  Understood.  That's the same issue that

4       Petrobras had.

5              THE COURT:  I understand.  That should be worked out,

6       seems to me.  Preserve your appellate rights and agree to be

7       bound by the ruling.  Pretty straightforward stipulation.

8              Let's say we're going to one omnibus motion and there

9       won't be any separate ones.  If that's the case -- and who is

10      responding?  Mr. Gilmour?  OK.  If that's the case, what's

11      wrong with the proposed schedule, May 15, June 15, June 29?

12      And all these extensions on page limits, 120 pages of briefing.

13             MR. GILMOUR:  Your Honor, we met and conferred prior

14      to the CMC, your Honor, and we agreed to that schedule if

15      that's acceptable to your Honor.

16             THE COURT:  OK.  It is acceptable to me.  So it's

17      three briefs, 120 pages, certainly sounds enormous, but OK, on

18      those dates.  If you can do it in less pages, you get brownie

19      points for every page less than 50.

20             Then that takes us to the Rule 12 motion, which is

21      apparently a separate motion, in Puerto Rico too?

22             MR. GILMOUR:  Yes, your Honor.  Before we move on, may

23      I raise one issue that we were talking about?  We had been

24      talking about issues related to page numbers for exhibits, a

25      number of exhibits.  And we are continuing to have that

F4OAMTBCps

dialogue.  I just wanted to advise your Honor of that and let

you know that we may approach you afterwards regarding whatever

agreement we reach.

          THE COURT:  Yes.  I don't necessarily commit to

rubber-stamping your agreement.

          MR. GILMOUR:  Understood.

          THE COURT:  But I would sure like to know about it.

          MR. GILMOUR:  I just wanted to make sure you were

aware that that one issue remains and we are continuing to work

on it.

          THE COURT:  Right.  And I want to make sure you

understand I may not go along.

          MR. GILMOUR:  Yes, your Honor.

          THE COURT:  OK.  You're last.

          MR. SCHULTE:  David Schulte on behalf of Petrobras.

Just one note on PR I before we move on to PR II, which is, we

share the Court's optimism that we'll have this stipulation in

effect by May 8.  But if for some reason it's not, we would

request permission to file our summary judgment motion by --

          THE COURT:  Denied.  I just said, if you want to make

a motion, come into court, let's talk it over and find out

where was the problem on stipulation, because this should be

straightforward.  I don't need or want another motion.  The

outcome is predetermined.  You need to craft a stipulation

language.  So, no, you can't make a motion till I hear you, in

F4OAMTBCps

1    court.

2              MR. SCHULTE:  OK.  Thank you, your Honor.

3              THE COURT:  Now, yes, Mr. Pardo?

4              MR. PARDO:  One other point, your Honor, concerning

5    our motion, because I want to be clear with plaintiffs about

6    what we intend to do and make sure there's not a

7    misunderstanding about "omnibus."  The defendants' intent is to

8    move for summary judgment as to the trial sites, which show, I

9    believe there are five left now.  We believe that your Honor's

10   ruling as to those sites will have implications, and may have

11   implications for the other sites in the case.  But we don't

12   intend to ask for summary judgment on those other sites.

13             So "omnibus" means all the sites that are trial sites

14   and all the defendants that will be moving.  But it does not

15   mean all the sites that are still in the case right now.

16             THE COURT:  Well, plaintiffs may actually like that

17   idea.  Do you have any objection to that idea?

18             MR. GILMOUR:  No, your Honor.

19             THE COURT:  Right.  It seems to be beneficial to

20   everybody.  That's understood.

21             Now, Puerto Rico II.  What is the Rule 12 motion

22   there?  There is a different schedule than was proposed.  I

23   want to understand if it's a motion to dismiss as opposed to

24   summary judgment.

25             MR. PARDO:  I'm sorry, your Honor?

F4OAMTBCps

1          THE COURT:  What is this Rule 12 motion in Puerto Rico

2     II and why does it have a different schedule?  Why are there

3     different motions with just different defendants?  What is it?

4          MR. PARDO:  Well, it's a different case.

5          THE COURT:  Well, you say that, but I don't

6     understand.

7          MR. PARDO:  There's been no motions to dismiss yet.

8          THE COURT:  Right.  But I don't understand what makes

9     it different.  Is it overlapping defendants but different

10    sites?

11         MR. PARDO:  Yes.

12         THE COURT:  Yes.

13         MR. PARDO:  Yes.  The short answer to that is yes.

14    It's overlapping defendants.  I think there are some different

15    defendants, and different sites.

16         THE COURT:  Does it change the prescription issue?

17         MR. PARDO:  I don't -- well --

18         THE COURT:  I mean, if it doesn't, why isn't it

19    covered by the first motion?  Then you can say, whatever you

20    rule there applies in Puerto Rico II to the extent it's the

21    same defendants.  Because it sounds like the same issue.

22    Assuming it's different sites it's the same issue.

23         MR. PARDO:  There's been no discovery, of course.

24         THE COURT:  Well, then talk to each other before you

25    make -- let's put off, then, the Rule 12 scheduling for one

F4OAMTBCps

```
 1   more meet-and-confer, and then we don't have to wait for the

 2   next conference.  We'll have a phone conference.  It may be

 3   that again there is a stipulation that would say, to the extent

 4   the legal issues are the same we'll all agree it will apply in

 5   Puerto Rico II, which then is different because there are

 6   different defendants with different dates of when things were

 7   null and they're not null.  That's a new motion.  But if it's

 8   the same defendants, if we're talking about Exxon and Shell all

 9   over again and whoever, I don't see why we do it twice.  Could

10   we reconvene after you meet and confer?

11          MR. PARDO:  There are a couple other, I'll call it

12   arguments or angles of attack that some other defendants,

13   including my client, may want to make beyond just the

14   prescription issue.

15          THE COURT:  A classic Rule 12 motion that is on a

16   different issue.

17          MR. PARDO:  Correct.

18          THE COURT:  OK.  Well, to the extent the issues are

19   different, then I don't have an overlapping problem, and you

20   proposed May 22, June 5, June 19.  That's fine.  No extension

21   of page limits.  Classic motion.  Just, it can be made.  But

22   what I'm more interested in is the overlap.  If there is

23   overlap, I'd like you to talk to each other and reach an

24   agreement.  I don't need a second motion that says the same

25   thing but that the ruling would apply.
```

F4OAMTBCps

1              MR. PARDO:  Understood.  May I -- we've conferred on

2    the schedule as well and had a slightly different schedule than

3    what was in the letters that we would like to propose to your

4    Honor.

5              THE COURT:  I bet it's later.

6              MR. PARDO:  It is, your Honor.

7              THE COURT:  What is it?

8              MR. PARDO:  Opening briefs on June 15th, response

9    briefs July 15th, and reply --

10             THE COURT:  Much later.

11             MR. PARDO:  I'm sorry.  July 13th.  Yes.  And reply

12   briefs on July, I had 27th.

13             MR. GILMOUR:  That's correct.

14             THE COURT:  That's a six-week change.  Why so much?

15             MR. PARDO:  I think because we wanted to avoid the

16   overlapping briefs with Puerto Rico I.

17             THE COURT:  You just did.  But they're not going to

18   overlap.  We already talked about that.  Could be different

19   issues raised.

20             I thought it could be tight.  You said the moving

21   briefs were to be June 15.  Before, the proposal was only a

22   two-week gap, not a month, for the response, and then two weeks

23   to reply, not a month.  So it makes it so long, the length of

24   time between briefs.  You know I like to get this work done.

25   So if the moving brief is June 15, why couldn't you have the

F4OAMTBCps

1    response by July 3, which is three weeks, not two, and then the

2    reply by July 17?  That's a little better.

3          MR. GILMOUR:  Your Honor, if I may, part of the

4    problem with the short window is we don't know how many motions

5    are going to be filed and on what basis.

6          THE COURT:  No, that's the problem too.  I want to

7    know that too.  I don't want to get flooded with seven

8    different motions.  Were you not thinking of consolidating

9    legal issues?  If you attack a complaint on legal grounds, it's

10   the same for everybody.  It's not a summary judgment.  We're

11   not going to start dealing with facts and attachments and

12   exhibits.  This is Rule 12.  This is a Rule 12 motion.  It's

13   across the board.  It's not fact-specific.  I didn't expect to

14   be hit with seven, eight, or nine, or five different motions.

15   I thought they were talking about one, again, consolidated

16   motion to dismiss on purely legal grounds on the face of the

17   complaint.  And this is putting prescription aside.  I think

18   that's going to be an overlap.

19         Go ahead, Mr. Pardo.

20         MR. PARDO:  Thank you, your Honor.  Sorry to interrupt

21   you.  We will, we might need some relief from the page limit if

22   we were to consolidate it.  But I guess we were thinking it

23   may -- we're still talking about which motions there would be.

24   And I don't think there's eight or nine.  There may be three or

25   four.  But they're so different that I don't know that it would

F4OAMTBCps

1    make sense to put them together.

2            THE COURT:  Different by defendant or different by

3    issue?  Because in every case there is a Rule 12 motion.

4    Lawyers raise three issues, and I don't give them three motions

5    to do it.  They fit it in.  Then we have other conference cases

6    in this building, every day, most of them are financial, but so

7    be it, and you get it done.  No matter how many issues they

8    raise under Rule 12 they get it done in one motion.  They don't

9    get one motion per issue.

10           MR. PARDO:  It is different defendants for certain

11   issues.  So you would have a brief with three or four discrete

12   issues.  There might be some defendants who are going to

13   challenge their being named here on the basis that they were

14   late named.

15           THE COURT:  OK.  That's prescription.  We talked about

16   that.  I thought we were going to put that aside for this

17   conversation.

18           MR. PARDO:  But there are one or two defendants that

19   may have jurisdictional challenges.  There are one or two

20   defendants that may even have a statute of limitations, a

21   site-specific statute of limitations argument that they want to

22   make, as a matter of law.

23           We could put that all together.  I just --

24           THE COURT:  Well, why don't we wait on the schedule,

25   then, but not long.  Why don't we say that we would have a

F4OAMTBCps

```
1    conference in the next ten days, either by phone or in person,

2    to discuss Puerto Rico II motion practice and give that a

3    little more time to consider what was said here and how to

4    organize it.

5              MR. PARDO:  I think that would be helpful.

6              THE COURT:  All right.  So today being April 24, we

7    need to have a conference no later than May 8.  You pick the

8    date.  You pick the time.  I'm pretty free.  Nobody wants to go

9    to trial, so I'm pretty free.  There aren't many trials going

10   anymore, but OK.  So what day would you like?  It doesn't

11   matter to me.  May 7, May 6, you want in person, you want by

12   phone?

13             MR. GILMOUR:  What day is May 7?

14             MR. PARDO:  It is a Thursday.  May 7 is a Thursday.

15             THE COURT:  What day is it?

16             MR. PARDO:  Thursday.

17             THE COURT:  In person or by phone?

18             MR. PARDO:  I think we could do this by phone, your

19   Honor.  I prefer in person myself, but for other defendants

20   who, for this, may just prefer to stay by phone.

21             THE COURT:  May 7 did you say?

22             MR. PARDO:  Yes, your Honor.

23             THE COURT:  You did.  That's fine.  So we could do it

24   at 3:30 on the phone.

25             MR. PARDO:  All right.  I don't have my calendar in
```

F4OAMTBCps

 1    front of me, but I'll make it work.

 2            THE COURT:  OK?

 3            MR. GILMOUR:  Yes, your Honor.

 4            THE COURT:  Then I'll put that down.  And that's

 5    solely for organizing this Rule 12 motion practice.

 6            MR. PARDO:  Thank you, your Honor.

 7            THE COURT:  Then let me see what's left on the agenda.

 8            Unjust enrichment, that's the only thing left.

 9    Defendants have attached proposed orders.  There is no

10    objection.  So I'll sign that order.

11            MR. GILMOUR:  Thanks, your Honor.

12            MR. PARDO:  Thank you.

13            THE COURT:  And I think that concludes the agenda.

14            MR. PARDO:  It does.

15            THE COURT:  Does anybody have anything else they want

16    to discuss?

17            MR. PARDO:  Do we want --

18            THE COURT:  A new date?

19            MR. PARDO:  Next date?

20            THE COURT:  What do you suggest?

21            MR. PARDO:  Second week in June, maybe.

22            I threw that out there, I'm sorry.

23            MR. AXLINE:  Mr. Miller will be out of the country the

24    second week.  Is it possible to make it the third week, your

25    Honor?

F4OAMTBCps

1          MR. PARDO:  Or the third week.  I thought I had

2     concessions on my side, but sorry.

3          THE COURT:  Is the third week the one that starts with

4     the 15th?

5          A VOICE:  Yes, your Honor.

6          THE COURT:  Again, they're pretty much all the same to

7     me, but that week allegedly has a trial, but I don't believe it

8     until I see it, but allegedly has one.  But I would have to say

9     4:30, until the case pleads, as it inevitably will.  Then I can

10    change the time.  But I don't care which day at 4:30 that week.

11         MR. GILMOUR:  Your Honor, John Gilmore.  I would

12    request if we could push it just back a day or two in that

13    week, simply because the 15th is the day that our responses are

14    due.

15         THE COURT:  When do you want me to push it back?

16    Which date do you want?

17         MR. GILMOUR:  I'm sorry.  I understood you to say that

18    it was June 15th.

19         THE COURT:  The week of June 15th.

20         MR. GILMOUR:  The week of.  As long as it's not the

21    15th.

22         THE COURT:  No, I said, pick your date you like that

23    week.

24         MR. PARDO:  18th, Thursday?

25         THE COURT:  18th, Thursday, 1:30, unless the trial

F4OAMTBCps

1    folds, and then I'll let everybody know through my clerk and we

2    can make it early.

3              MR. PARDO:  Thank you, your Honor.

4              THE COURT:  All right.  Now it sounds like we're all

5    done for today.  So, good to see everybody, and we're done.

6              MR. CONDRON:  Thank you, your Honor.

7              MR. GILMOUR:  Thank you, your Honor.

8              MR. PARDO:  Thank you, your Honor.

9                                 o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25