UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

                                       :

IN RE: METHYL TERTIARY BUTYL    :
ETHER ("MTBE") PRODUCTS        :
LIABILITY LITIGATION               :

------------------------------------------------- :

                                         :

This document relates to:          :

                                         :

*Commonwealth of Puerto Rico, et al. v.*  :
*Shell Oil Co., et al.*, 07 Civ. 10470    :

                                         :

------------------------------------------------- X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 6/16/15

OPINION AND ORDER

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

        This is a consolidated multi-district litigation ("MDL") relating to

contamination – actual or threatened – of groundwater from various defendants'

use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary

butyl alcohol, a product formed by the breakdown of MTBE in water.  In this case,

the Commonwealth of Puerto Rico (the "Commonwealth") alleges that defendants'

use and handling of MTBE has contaminated, or threatened to contaminate

groundwater within its jurisdiction.  Familiarity with the underlying facts is

presumed for the purposes of this Order.

        Currently before the Court are two motions for summary judgment on

Counts I (strict products liability) and IV (negligence) of the Complaint, arguing

that certain defendants' neat MTBE and MTBE-blended gasoline ("MTBE Gasoline") were not defectively designed, and that any inadequate warnings about MTBE Gasoline did not actually harm the Commonwealth.[1]  In the first motion (the "Main Motion"), defendants highlight alleged evidence deficiencies pertaining to the Commonwealth's product design and warning claims.[2]  A subset of those defendants (the "Sophisticated Purchaser Defendants") bring a separate, second motion (the "Sophisticated Purchaser Motion") on the much narrower ground that they had no duty to warn their customers, which were exclusively major oil companies, of risks about which those companies were already aware.[3]  For the following reasons, the Main Motion is GRANTED in part and DENIED in part, and the Sophisticated Purchaser Motion is GRANTED.

## II.   BACKGROUND[4]

---

[1]      *See* Case Management Order No. 117 (the "Trial Site Matrix"), Dkt. 457 (charting the claims asserted against each defendant at each trial site at issue).

[2]      For a list of the Main Motion defendants, see Ex. A to the Memorandum of Law in Support of Certain Defendants' Motion for Summary Judgment on Counts I and IV ("Def. Mem.").  I will refer to these movants collectively as "defendants."

[3]      For a list of all Sophisticated Purchaser Defendants, see Certain Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment Based on the Sophisticated Purchaser Defense ("SP Def. Mem.) at 1.

[4]      The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with

Determining whether MTBE Gasoline was defectively designed requires the resolution of significant technical questions about the safety and viability of various octane enhancers and additives available for use in gasoline. To address these questions, the parties consulted a range of sources, including experts, oil industry reports, and defendants' employees and documents. Defendants argue that the Commonwealth's defective design claims must fail because it has not shown, through its own experts, that defendants could have produced gasoline in sufficient quantities without using MTBE.

Similarly, defendants complain that the expert testimony of Marcel Moreau, the Commonwealth's expert, is insufficient to withstand a motion for summary judgment on the Commonwealth's failure-to-warn claims. Even if his testimony is sufficient, the Sophisticated Purchaser Defendants maintain in a separate motion that they had no duty to provide warnings to their customers.

I next provide an overview of the facts most relevant to evaluating (1) the defective design claims and (2) the failure-to-warn claims, as well as the affirmative defense thereto.[5]

---

these motions, and the exhibits attached thereto. These facts are undisputed unless otherwise noted. Where disputed, the facts are viewed in the light most favorable to the nonmoving party. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

[5]    For a full recitation of defendants' version of the facts pertaining to the Main Motion, see Rule 56.1 Statement in Support of Certain Defendants'

A.     **Gasoline Composition and Alternatives to MTBE**

The key factual inquiry in determining the existence of a design defect centers on the availability of feasible alternatives to MTBE for use in gasoline supplied to Puerto Rico. As a starting point, it is important to note that gasoline has no standard composition.[6] Further, the composition of gasoline has changed significantly over the years – the result of a variety of factors ranging from economic forces to political events to regulatory initiatives.[7] Industry standards, regulatory requirements, and individual refiner limitations are just some of the many considerations bearing on manufacturers' decisions about how to make

_____

Motion for Summary Judgment on Plaintiffs' [sic] Counts I and IV ("Def. 56.1"). For a full recitation of the Commonwealth's version of the facts, which includes its opposition to defendants' version, see Plaintiff's Consolidated Opposition to Defendants' Rule 56.1 Statement in Support of Motion for Summary Judgment on Counts I and IV and Plaintiff's Separate Rule 56.1 Statement in Support of Plaintiff's Opposition to Motion for Summary Judgment ("Pl. 56.1"). For a full recitation of defendants' version of the facts pertaining to the Sophisticated Purchaser Motion, see First Amended Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment Based on the Sophisticated Purchaser Defense ("SP Def. 56.1"). For plaintiff's, see Plaintiff's Consolidated Rule 56.1 Statement in Opposition to Defendants' First Amended Rule 56.1 Statement in Support of Certain Defendants' Motion for Summary Judgment Based on the Sophisticated Purchaser Defense ("SP Pl. 56.1").

[6]     *See* Def. Mem. at 3.

[7]     *See id.*

4

specific gasoline products.[8]  Also governing particular gasoline specifications – the physical and chemical characteristics that define a particular gasoline grade or quality – are factors relating to cost, infrastructure, technology, and socioeconomic developments.[9]  Complex refineries often have as many as ten or more hydrocarbon streams and other blendstocks, such as MTBE, toulene or xylene, from which to choose when deciding how to blend gasolines to satisfy demand for a particular market.[10]  In a nutshell, a lot goes into making gasoline – literally and figuratively.

The only expert the Commonwealth retained to opine on matters relating to gasoline production is Bruce Burke.  He did not undertake any analysis of the gasoline specifications for Puerto Rico generally, the feasability of alternatives to MTBE, or which alternate octane boosters any defendant should have used instead of MTBE.[11]  On that issue, the Commonwealth insists that the testimony of *defendants' experts* indicates that defendants' use of MTBE was

---

[8]     *See id.* at 10-11.

[9]     *See id.*

[10]    *See id.*

[11]    *See* Def. 56.1 ¶¶ 31-35.

chiefly profit-motivated.[12]

Unlike Burke, defendants' experts thoroughly evaluated alternative octane enhancers and concluded, based on a variety of economic and non-economic factors, that they were much less viable than MTBE. One such expert, John O'Brien, stated that while MTBE was only one of many octane enhancers available to gasoline refiners, non-MTBE options were "not typically available in large volumes" in Puerto Rico.[13]  O'Brien also noted that other commercially-available alternative enhancers, including tertiary butyl ether, ethyl tertiary butyl ether, tertiary amyl methyl ether, di-isopropyl ether, and methanol, could not be produced in large enough quantities and presented significant safety hazards.[14] Another option theoretically available to refiners was to invest in more downstream processes to increase the octane of gasoline blending components, but according to O'Brien, this approach was "less desirable" and likely to lead to

---

[12]     *See* Plaintiff Commonwealth of Puerto Rico and Commonwealth of Puerto Rico By and Through the Environmental Quality Board's Opposition to Certain Defendants' Motion for Summary Judgment on Counts I and IV ("Pl. Mem.") at 6.

[13]     4/7/14 Expert Report of John B. O'Brien ("O'Brien Rep."), Ex. 3 to the Declaration of Michael J. Dillon, counsel for defendants, in Support of Certain Defendants' Motion for Summary Judgment on Plaintiffs' [sic] Counts I and IV ("Dillon Decl.") ¶ 47.

[14]     *See id.* ¶ 49.

increased, harmful emissions.[15]  Kenneth Stern, an expert for defendant Phillips CORE, acknowledged that MTBE was used in blending gasoline at that defendant's petrochemical facility in part because "there are potentially higher-value uses for mixed xylenes and even toluene than gasoline."[16]  Nonetheless, he ultimately concluded that mixed xylenes and toulene "would not have been [] viable option[s]"[17]  because they would "increase toxic emissions,"[18] and their use would effectively "abandon[] the very purpose of the petrochemical facility."[19]

**B.    Warnings Concerning MTBE Gasoline**

Operators of the trial sites at issue were not warned specifically about the dangers of MTBE, testifying that they did not know that MTBE could contaminate drinking water wells.[20]  These operators had a general understanding that any release of gasoline, regardless of its content, could have a harmful impact

---

[15]      *Id.* ¶ 46.

[16]      Pl. 56.1 ¶ 77.

[17]      4/7/14 Expert Report of Kenneth M. Stern ("Stern Rep."), Ex. 10 to the Dillon Decl. ¶ 14.

[18]      *Id.* ¶ 111.

[19]      *Id.* ¶ 110.

[20]      *See* Pl. 56.1 ¶ 78.

on the environment.[21]  But Moreau, an expert in underground petroleum storage systems, has testified that defendants should have provided better training and education to trial site operators and employees regarding the specific dangers of MTBE.[22]

The circumstances surrounding the station operators' testimony regarding warnings, or their ability to respond to warnings had they received them, vary from trial site to trial site.  Defendant Chevron Puerto Rico, LLC ("CPR") owned the underground storage tanks ("USTs") at Texaco #800, and the local retailers at that trial site, unlike those at the others described below, could not make changes or alterations to the USTs without the owner's consent.[23]  At the Esso Standard Oil Company ("Esso") trial sites, local operators did not receive any special instructions for handling MTBE, generally following a uniform protocol for any leak event at their stations.[24]  One operator of the Total Petroleum Puerto Rico Corp. ("Total") trial site did not recall receiving any information at all about

---

[21]    *See* Defendants' Response to Plaintiffs' [sic] Rule 56.1 Statement in Opposition to Certain Defendants' Motion for Summary Judgment on Counts I and IV ("Def. Reply 56.1") ¶¶ 78-86.

[22]    *See* Def. Mem. at 6.

[23]    *See* Def. 56.1 ¶¶ 51-53.

[24]    *See* SP Pl. 56.1 ¶¶ 73-74.

MTBE, while another acknowledged that he might have taken extra precautions had he known they could have helped to prevent MTBE contamination.[25]  The station operator at the Shell trial site testified that he was never told by the site owner that gasoline sold there contained MTBE, or that MTBE could get into drinking water.[26]

However, there is one important caveat to the evidence relating to warnings.  The Sophisticated Purchaser Defendants manufactured MTBE Gasoline and sold it only to large oil companies and related entities (the "Sophisticated Purchasers").[27]  By the Commonwealth's own admissions in its Complaint and at a July 15, 2014 status conference in this MDL, each of the Sophisticated Purchasers knew about the alleged hazards posed to groundwater resources by MTBE.[28]  In certain years at issue in this lawsuit, the Sophisticated Purchasers contracted with

---

[25]     *See* Def. Reply 56.1 ¶¶ 81, 85.  This operator expressed skepticism, however, that his taking additional precautions if appropriately warned could have helped to prevent MTBE contamination.

[26]     *See* SP Pl. 56.1 ¶ 72.

[27]     *See* SP Def. Mem. at 2.  The Sophisticated Purchasers are Esso, Total, CPR, and Sol Puerto Rico Limited ("Sol").

[28]     *See id.* at 2-3; SP Def. 56.1 ¶¶ 4, 11-13, 18-19, 25, 28; 7/15/14 Transcript of Status Conference ("Conference Tr.") at 63:20-65:1.

local retailers to sell the Sophisticated Purchasers' gasoline at their gas stations.[29]

Even so, the Sophisticated Purchasers were still responsible for establishing safety

procedures and protocols at the stations they owned, and for addressing any

environmental impacts at the sites.[30]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the

evidence in the light most favorable to the non-movant and drawing all reasonable

inferences in that party's favor, there is 'no genuine issue as to any material fact

and . . . the movant is entitled to judgment as a matter of law.'"[31]  "A fact is

material if it might affect the outcome of the suit under the governing law, and an

issue of fact is genuine if the evidence is such that a reasonable jury could return a

---

[29]      *See* SP Pl. 56.1 ¶¶ 85-90.  The Commonwealth argues that because the Sophisticated Purchasers were merely "intermediaries" between manufacturers and unsophisticated trial site operators, the Sophisticated Purchaser Defendants were not relieved of their duty to warn the local operators about the MTBE Gasoline they ultimately received.  Plaintiff's Opposition to Certain Defendants' Motion for Summary Judgment Based on the Sophisticated Intermediary Defense ("SP Pl. Mem.") at 1.

[30]      *See* SP Def. 56.1 ¶¶ 32-52.

[31]      *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F. 3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

verdict for the nonmoving party."[32]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[33]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[34] and "may not rely on conclusory allegations or unsubstantiated speculation."[35]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[36]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

---

[32]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[33]     *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[34]     *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[35]     *Id.* (quotation marks and citations omitted).

[36]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

of a judge.'"[37]

## IV.   APPLICABLE LAW

### A.   Design Defect

#### 1.   Strict Liability

Puerto Rico courts follow California law in evaluating whether to hold

a manufacturer strictly liable for a defectively-designed product.[38]  In *Barker v.*

*Lull Engineering Co.*, the California Supreme Court established two tests for

determining design defects.[39]  The first is known as a "consumer expectations test,"

and the second, a "risk-utility test."[40]  Under the former, "a product may be found

defective in design if the plaintiff establishes that the product failed to perform as

safely as an ordinary consumer would expect when used in an intended or

reasonably foreseeable manner."[41]  Under the latter test,

> a product may alternatively be found defective in design if

---

[37]     *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[38]     *See, e.g.*, *Collazo-Santiago v. Toyota Motor Corp.*, 937 F. Supp. 134, 136-39 (D.P.R. 1996) (collecting cases).

[39]     573 P.2d 443, 446 (Cal. 1978).

[40]     *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 77 (1st Cir. 2002).

[41]     *Barker*, 573 P.2d at 446.

the plaintiff demonstrates that the product's design proximately caused his injury *and the defendant fails to establish*, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.[42]

Courts are instructed to apply the consumer expectations test when a consumer "would . . . know what to expect," or "have [a good] idea how safe the product could be made."[43]  However, "the availability of the [consumer expectations] test depends not on the challenged product itself, but on the complexity of the alleged defect."[44]  Therefore, when the "ultimate issue of design calls for a careful assessment of feasibility, practicality, risk and benefit, the case should not be resolved simply on the basis of ordinary consumer expectations."[45]

The risk-utility test is characterized by burden-shifting.  First, plaintiff must "establish a prima facie case of causation."[46]  If plaintiff meets that burden, then defendants must prove that the "overall utility [of the product] exceeds the overall risk."[47]  Whether defendants can carry their burden depends on a number of

---

[42]     *Id.* (emphasis added) (quotation marks and citations omitted).

[43]     *Id.* at 454.

[44]     *Quintana-Ruiz*, 303 F.3d at 77.

[45]     *Id.*

[46]     *Collazo-Santiago*, 937 F. Supp. at 140.

[47]     *Quintana-Ruiz*, 303 F.3d at 73.

13

factors, including

> the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.[48]

It is not necessary for a plaintiff . . . to furnish the Court with expert witness testimony in order to have its case submitted to a jury."[49]

### 2.    Negligent Design

To prevail on a negligent design claim, "[p]laintiff[] must establish that (1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) the negligent act or omission caused the plaintiff's harm."[50] Under Puerto Rico law, "[p]laintiff bears the burden of establishing the applicable standard of care and proving that the defendant acted below the standard."[51]

### B.    Defective Warnings

---

[48]    *Barker*, 573 P.2d at 455.

[49]    *Collazo-Santiago*, 937 F. Supp. at 141.

[50]    *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 313 F. Supp. 2d 61, 73 (D.P.R. 2004), *aff'd*, 405 F.3d 36 (1st Cir. 2005).

[51]    *Fremaint v. Ford Motor Co.*, 258 F. Supp. 2d 24, 28 (D.P.R. 2003).

To sustain a claim for strict liability based on a defective warning, plaintiff must prove that

> (1) the manufacturer knew, or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate, (3) the absence of warnings made the product inherently dangerous; [and] (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury.[52]

A negligent failure-to-warn claim requires a showing that defendants "fail[ed] to exercise due diligence to avoid foreseeable risks."[53]  Both types of defective warning claims demand proof that "it is more likely than not" that defendants' failure to provide an adequate warning "was a substantial factor" in bringing about plaintiff's injuries.[54]

To this end, the California Supreme Court has adopted a sophisticated purchaser doctrine for both negligent and strict liability failure-to-warn claims, which provides that "[a] manufacturer is not liable to a sophisticated user of its product for failure to warn of a risk, harm, or danger, if the sophisticated user knew

---

[52]     *Carrelo v. Advanced Neuromodulation Sys.*, 777 F. Supp. 2d 303, 311-12 (D.P.R. 2011).

[53]     *Malave-Felix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir. 1991).

[54]     *Prado Alvarez*, 313 F. Supp. 2d at 76.

or should have known of that risk, harm, or danger."[55]  "The rationale supporting this defense is that the failure to provide warnings about risks already known to a sophisticated purchaser usually is not a proximate cause of harm resulting from those risks suffered by the buyer's employees or downstream purchasers."[56]

## V.   DISCUSSION

### A.   The Commonwealth's Design Defect Claims Fail for Lack of Evidence

#### 1.   Strict Liability

Because the production of gasoline is too complex for an ordinary consumer to have a strong sense of "how safe [it] could be made," the risk-utility test governs the analysis of the Commonwealth's strict liability design defect claims.[57]  For the same reason, testimony from experts and industry insiders plays an important, if not indispensable, role in evaluating the design of MTBE Gasoline. Here, based on defendants' experts' testimony – and the Commonwealth's

---

[55]    *Johnson v. American Standard, Inc.*, 179 P.3d 905, 914 (Cal. 2008). While the Supreme Court of Puerto Rico has not yet weighed in on this doctrine, a federal district court in Puerto Rico has embraced it and predicted that the Puerto Rico Supreme Court would adopt it.  *See Torres v. National Starch and Chem. Corp.*, 896 F. Supp. 71, 73-74 (D.P.R. 1995).  In any event, as noted above, Puerto Rico courts follow California products liability law.

[56]    *Johnson*, 179 P.3d at 911 (quotation marks and citation omitted).

[57]    *Barker*, 573 P.2d at 454.

-16-

complete failure to rebut that testimony – it must be accepted that the utility of

MTBE Gasoline outweighed its risks, especially given the lack of viable

alternatives.

        In their briefing, defendants misconstrue the risk-benefit test, which

requires "*defendant[s]*," not plaintiff, "to establish, in light of the relevant factors,

that, on balance, the benefits of the challenged design outweigh the risk of danger

inherent in such design."[58]  Urging the Court to reverse the burdens and demand

that plaintiff produce expert evidence on the risk-benefit question, defendants rely

on cases where (1) plaintiffs offered no expert testimony and (2) the benefits of the

challenged products *indisputably* outweighed the risks.[59]  The factual records in

these cases were one-sided because defendants' evidence uniformly demonstrated

that the benefits outweighed the risks, and plaintiffs submitted insufficient

evidence to the contrary to create a factual dispute.  For these reasons – and not

because plaintiffs shouldered the burden of proof or were required to submit expert

---

[58]    *Id.* at 455 (emphasis added).  There is no dispute over the sufficiency
of evidence in the record that MTBE Gasoline could have caused the
Commonwealth's harm.  *See In re MTBE*, 488 F.3d 112, 131 (2d Cir. 2007)
(noting that MTBE is "a highly dangerous compound" that poses threats to human
health).

[59]    *See, e.g.*, *Quintana-Ruiz*, 303 F.3d 62; *Fremaint*, 258 F. Supp. 2d 24,
*Prado-Alvarez*, 313 F. Supp. 2d 61.

evidence on risk-benefit questions – defendants met *their* burden and prevailed.[60]

This case is remarkably similar to those cases.  Defendants retained a number of experts on gasoline production and tasked them with exploring the availability of alternative octane enhancers in Puerto Rico.  For a host of reasons, they all agreed that the benefits of MTBE outweighed its risks.  Significantly, these experts uniformly testified that it would be infeasible for refiners to use alternatives because they were not available in sufficient quantities in Puerto Rico.[61]  And even had they been available, the alternative octane enhancers could have posed additional health and safety risks, as well.[62]  The Commonwealth cannot survive summary judgment by cherry-picking a few isolated statements by defendants' experts about the economic benefits of using MTBE into a full-blown factual dispute where none genuinely exists.  Therefore, summary judgment on the Commonwealth's strict liability claim that MTBE Gasoline was defectively designed is granted.[63]

---

[60]    In theory, a material dispute could arise from defendants' own evidence.

[61]    *See, e.g.*, O'Brien Rep. ¶ 47; Stern Rep. ¶ 110.

[62]    *See, e.g.*, O'Brien Rep. ¶ 49; Stern Rep. ¶ 111.

[63]    In addition, defendants' request for summary judgment on the Commonwealth's claims that *neat MTBE* was defectively designed, which the Commonwealth barely opposes, is granted.  There is insufficient evidence in the

### 2. Negligence

Likewise, the Commonwealth has no evidence to meet *its burden* of proving that the design of MTBE Gasoline fell below the appropriate standard of care for its negligent design claim.  While the Commonwealth may be able to rely on various sources, including its own experts and those of defendants, to establish the applicable standard of care, the uncontested and unequivocal testimony of defendants' experts offers no support for the suggestion that MTBE Gasoline was negligently designed.  Accordingly, summary judgment on the Commonwealth's claims that MTBE Gasoline was negligently designed is granted.[64]

### B. The Facts Regarding Defendants' Warnings, or Lack Thereof, Are Largely in Dispute, But the Defective Warning Claims

---

record regarding neat MTBE and whether defendants even manufactured it in the first place.  *See* Def. Mem. at 1.

[64]    Defendants attempt to argue that the Puerto Rico regulation permitting *de minimis* levels of MTBE, which I discussed at length in an April 28, 2015 Opinion granting in part the Shell Defendants' motion for summary judgment, effectively absolves defendants of liability for negligent design claims.  *See, e.g.*, *In re MTBE*, No. 07 Civ. 10470, 2015 WL 1931168 (S.D.N.Y. Apr. 28, 2015); Reply Mem. at 5-6.  However, as noted in that Opinion, the regulation simply establishes that gasoline containing *de minimis* levels of MTBE, inadvertently mixed with gasoline, cannot be said to play a sufficiently substantial role in causing tort injury.  *See in re MTBE*, 2015 WL 1931168, at *11.  With that exception, Puerto Rico completely bans gasoline containing MTBE.  *See* 10 L.P.R.A. § 4172.  Therefore, the statutory scheme does not foreclose a negligent design claim premised on defendants' intentional blending of MTBE in gasoline. The claim fails simply for lack of evidence.

-19-

**Against the Sophisticated Purchaser Defendants Fail**

As a threshold matter, there is a material dispute of fact over the sufficiency of defendants' warnings regarding MTBE gasoline.  No expert testimony is needed to establish such a dispute, and even if it were, Moreau's expert opinions do the job.[65]  But defendants nonetheless contend that, even had adequate warnings been given, they would not have prevented the alleged harm caused by MTBE Gasoline.[66]

This is true for defendant CPR.  At the CPR-owned trial site, local retailers and operators needed CPR's consent to make any changes or alterations to the USTs.  Thus, had CPR given adequate warnings, they would have effectively served as warnings to CPR itself.  Because there can be no duty to warn oneself, there is no viable failure-to-warn claim against CPR, entitling it to summary judgment on the Commonwealth's failure-to-warn claims.

Conversely, the testimony of the local operators at the other trial sites – who had a greater ability to make changes at those sites – creates, at minimum, a material dispute of fact over whether adequate warnings given by defendants Esso

---

[65]    *See In re MTBE*, 725 F.3d 65, 124-25 (2d Cir. 2013) (upholding jury verdict on failure-to-warn claims based in part on Moreau's testimony).

[66]    *See* Reply Mem. at 8-10.

and Total could have prevented harm.  It is ultimately for a jury to decide whether local operators, empowered with more knowledge about how to prevent MTBE contamination, could have succeeded in doing so.  Indeed, Moreau's testimony and that of station operators have contributed to at least three failure-to-warn verdicts against defendants.[67]  Thus, summary judgment on the Commonwealth's defective warnings claims against Esso and Total is denied.

However, the Commonwealth has admitted, both in its papers and in open court, that the Sophisticated Purchaser Defendants had no duty to warn the Sophisticated Purchasers – both groups were fully aware of the risks associated with MTBE.[68]  In a last-ditch effort to avoid summary judgment, the Commonwealth shifts its focus to the unsophisticated, local trial site operators, whom it deems the real "users" of MTBE Gasoline.[69]  Accordingly, the Commonwealth maintains that the Sophisticated Purchasers are merely intermediaries between the Sophisticated Purchaser Defendants and the ultimate users of their MTBE Gasoline, such that warnings must flow directly from refiner

---

[67]    *See* Pl. Mem. at 19; Pl. 56.1 ¶ 115 (identifying verdicts in favor of City of Merced, State of New Hampshire, and City of New York).

[68]    *See* Conference Tr. at 63:20-65:1.

[69]    SP Pl. Mem. at 1-2.

to local operator.[70]  This argument is a red herring.  The Sophisticated Purchasers

purchased, and took title to, MTBE Gasoline directly from the Sophisticated

Purchaser Defendants, and the Sophisticated Purchasers had responsibility for

overseeing the trial sites and the USTs, which they owned.  Under well-settled law,

the Sophisticated Purchasers are exactly the types of "sophisticated users" to whom

"[a] manufacturer is not liable . . . for failure to warn of a risk, harm, or danger"

because "the sophisticated user knew or should have known of that risk, harm, or

danger."[71]  As noted earlier, the Commonwealth may pursue its failure-to-warn

claims against most of the Sophisticated Purchasers.  However, the Sophisticated

Purchaser Defendants cannot be held liable for failing to warn equally

sophisticated entities about dangers already known to them.

## VI.    CONCLUSION

For the foregoing reasons, the Main Motion is GRANTED in part and

DENIED in part, and the Sophisticated Purchaser Motion is GRANTED.  The

Clerk of the Court is directed to close these motions (Dkt. Nos. 487, 493).

---

[70]    *See id.*

[71]    *Johnson*,179 P.3d at 914.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            June 16, 2015

**- Appearances -**

**Liaison Counsel for Plaintiffs:**

Robert J. Gordon, Esq.
Robin L. Greenwald, Esq.
William A. Walsh, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500

**Liaison Counsel for Defendants:**

Peter J. Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
Lisa A. Gerson, Esq.
McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
(212) 547-5583

**Counsel for the Commonwealth**:

Michael Axline, Esq.
Duane C. Miller, Esq.
Tracey L. O'Reilly, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

**Counsel for ExxonMobil, Esso, and Appearing on Behalf of Defendants:**

Peter J. Sacripanti, Esq.
James A. Pardo, Esq.
Stephen J. Riccardulli, Esq.
Lisa A. Gerson, Esq.

McDermott Will & Emery LLP
50 Rockefeller Plaza, 11th Floor
New York, NY 10020
(212) 547-5583

**Counsel for ConocoPhillips Company, Chevron Phillips Chemical Puerto Rico
Core LLC, and Appearing on Behalf of Sophisticated Purchaser Defendants:**

Stephen C. Dillard, Esq.
Fulbright & Jaworski LLP
1301 McKinney, Suite 5100
Houston, TX 77010
(713) 651-5151