F6IKMTBC                    Conference

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3                                      00 MDL 1358
   IN RE:  METHYL TERTIARY BUTYL       00-cv-01898 (SAS)
4  ETHER ("MTBE") PRODUCTS             04-cv-04968 (SAS)
   LIABILITY LITIGATION                07-cv-10470 (SAS)
5                                      14-cv-06228 (SAS)

6  ------------------------------x

7                                      June 18, 2015
                                       2:30 p.m.
8
   Before:
9
                      HON. SHIRA A. SCHEINDLIN,
10
                                       District Judge
11
                          APPEARANCES
12
   MILLER, AXLINE & SAWYER
13       Attorneys for Plaintiffs
   BY:  MICHAEL D. AXLINE, ESQ.
14       DUANE MILLER, ESQ.

15 JACKSON GILMOUR & DOBBS, PC
        Attorneys for Plaintiffs
16 BY:  JOHN D.S. GILMOUR, ESQ.

17 WEITZ & LUXENBERG, P.C.
        Plaintiffs' Liaison Counsel
18 BY:  WILLIAM A. WALSH, ESQ.

19 COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
        Attorneys for New Jersey Plaintiffs
20 BY:  LEONARD Z. KAUFMANN

21 McDERMOTT, WILL & EMERY
        Attorneys for Defendants Exxon Mobil Corp.
22      and Defendants' Liaison Counsel
   BY:  JAMES A. PARDO, ESQ.
23      ANTHONY A. BONGIORNO, ESQ.
        STEPHEN J. RICCARDULLI, ESQ.
24
   SEDGWICK LLP
25      Attorneys for Defendant Mobil Oil Corporation
   BY:  PETER C. CONDRON, ESQ.

F6IKMTBC                    Conference

1                        APPEARANCES (Cont'd)

2   ARCHER & GREINER PC
         Attorneys for Defendant Exxon Mobil Corporation
3   BY:  CARLOS BOLLAR
         WILLIAM STACK, ESQ.
4
    SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
5        Attorneys for Defendant Exxon Mobil Corporation
    BY:  JEFFREY J. PARKER, ESQ.
6
    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
7        Attorneys for Defendant Lukoil Americas Corporation
    BY:  JAMES P. TUITE, ESQ.
8
    KING & SPALDING LLP
9        Attorneys for Defendant Chevron
    BY:  JEREMIAH ANDERSON, ESQ.
10
    EIMER STAHL KLEVORN & SOLBERG
11       Attorneys for Defendant Citgo Petroleum Corporation
    BY:  PAMELA HANNEBUT, ESQ.
12
    ARNOLD & PORTER LLP
13       Attorneys for Defendants Atlantic Richfield Company, BP
    Products North America Inc., Atlantic Richfield Company, BP
14  Products North America, Inc.
    BY:  STEPHANIE WEIRICK
15

16

17

18

19

20

21

22

23

24

25

F6IKMTBC                    Conference

```
 1                THE COURT:  All right, hello.  Who is on the phone?
 2   I'll read the names.  I have Mr. Ehrlich.
 3                MR. EHRLICH:  Yes, your Honor.
 4                THE COURT:  Mr. Dunham.
 5                MR. DUNHAM:  Yes, your Honor.
 6                THE COURT:  Mr. Cameron?  Is there a Mr. or
 7   Ms. Cameron?  Camerson.
 8                MR. McMANUS:  Hello, your Honor.  This is Keith
 9   McManus.  I work with Mr. Camerson, and he won't be joining us
10   today.
11                THE COURT:  That's helpful to know.
12                Mr. Cepeda Diaz?
13                MR. CEPEDA DIAZ:  Yes, I'm here, your Honor.
14                THE COURT:  Ms. Maldonado?
15                MS. MALDONADO:  Yes, your Honor.  Good afternoon.
16                THE COURT:  Good afternoon.
17                Mr. Couret?
18                MR. COURET:  Yes, your Honor.  Good afternoon.
19                THE COURT:  Ms. Smitha or Ms. Smith?
20                MS. SMITH:  Yes, your Honor.
21                THE COURT:  Ms. Hirsch?
22                MS. HIRSCH:  Yes, your Honor.
23                THE COURT:  Mr. Carter?
24                MR. CARTER:  Yes, your Honor.
25                THE COURT:  Ms. Farley?
```

F6IKMTBC                         Conference

| 1 | MS. FARLEY:  Good afternoon, your Honor. |

1     MS. FARLEY:  Good afternoon, your Honor.

2     THE COURT:  Ms. Hall?

3     MS. HALL:  Yes, your Honor.

4     THE COURT:  Mr. Covey?

5     MR. COVEY:  Yes, your Honor.

6     THE COURT:  And Mr. McCall?  Is there a Mr. McCall on

7  the phone?  Duke McCall?  No?

8     Okay, so the folks on the phone, I think, are just

9  going to be listening in but will not be participating because

10 there's a lot of lawyers in the room; it would be difficult to

11 have the participation.  So I hope you can hear most of what

12 goes on.  I'll ask the lawyers to speak up and hopefully you'll

13 hear.

14     So we have Mr. Walsh?

15     MR. WALSH:  Good afternoon, your Honor.

16     THE COURT:  Good afternoon, Mr. Axline.

17     MR. AXLINE:  Good afternoon, your Honor.

18     THE COURT:  Mr. Miller.

19     MR. MILLER:  Good afternoon.

20     THE COURT:  Mr. Gilmour.

21     MR. GILMOUR:  Good afternoon, your Honor.

22     THE COURT:  Mr. Parisi.

23     MR. PARISI:  Good afternoon.

24     THE COURT:  That's it for the plaintiffs' side, right?

25     MR. PARISI:  No, I'm not on the plaintiffs' side.

F6IKMTBC                    Conference

```
 1              THE COURT:  Oh.  The way they put it on the seating
 2   chart, it looked that way.  Okay.  So, for the plaintiffs,
 3   there are four lawyers here, that's it, right, Walsh, Axline,
 4   Miller, Gilmour?
 5              MR. AXLINE:  Correct.
 6              THE COURT:  Mr. Pardo.
 7              MR. PARDO:  Good afternoon, your Honor.
 8              THE COURT:  Mr. Bongiorno.
 9              MR. BONGIORNO:  Good afternoon, your Honor.
10              THE COURT:  Mr. Riccardulli.
11              MR. RICCARDULLI:  Good afternoon, your Honor.
12              THE COURT:  Mr. Parker.
13              MR. PARKER:  Good afternoon, your Honor.
14              THE COURT:  Mr. Anderson.
15              MR. ANDERSON:  Good afternoon.
16              THE COURT:  Mr. Tuite.
17              MR. TUITE:  Good afternoon, your Honor.
18              THE COURT:  I'm sorry, I'm having trouble with that.
19              Mr. Stack.
20              MR. STACK:  Yes, your Honor.  Good afternoon.
21              THE COURT:  Good afternoon.
22              Mr. Bollar.
23              MR. BOLLAR:  Good afternoon, your Honor.
24              THE COURT:  Ms. Hannebutt.
25              MS. HANNEBUTT:  Good afternoon, your Honor.
```

F6IKMTBC                    Conference

 1            THE COURT:  Mr. Condron.

 2            MR. CONDRON:  Good afternoon, your Honor.

 3            THE COURT:  Ms. Weirick.

 4            MS. WEIRICK:  Good afternoon, your Honor.

 5            THE COURT:  Now Mr. Parisi.

 6            MR. PARISI:  Good afternoon.

 7            THE COURT:  Everybody else who's here, if any of you

 8    do end up speaking -- and I recognize many of you -- please,

 9    everybody, be sure to state your name each time.  It's

10    difficult for the court reporter.  I know you folks for years

11    but he doesn't, so each time, stand and say, "this is

12    Mr. Axline and" or "this is Mr. Pardo and" each time, so we get

13    a pretty clear record.

14            We actually have a fair amount of business today, and

15    I hope to move through it as efficiently as possible.  I am

16    starting with Pennsylvania.  There are questions about the

17    final preparation of the case management order, and there is

18    some disagreement as to language and not just language but what

19    has to be done by whom and when.  And so I will try to move

20    through all of that.

21            There's a disagreement in proposed section 2(a)

22    regarding MTBE release site lists, and defendants want the CMO

23    to require plaintiff to identify every release, a site report

24    of the commonwealth or of which the commonwealth is otherwise

25    aware.  And the commonwealth wants to limit the list to only

F6IKMTBC                       Conference

1   those reported to it.

2            It seems to me this is a small disagreement and can be

3   resolved by the following language: "By December 31st, 2015,

4   plaintiff shall identify every release site reported to the

5   commonwealth or which the commonwealth discovered through its

6   own investigation." And that's it. Forget the word "aware";

7   it's too vague. So I'd be happy to read that again. "Or which

8   the commonwealth discovered through its own investigation." So

9   either reported to it or you've already discovered it and

10  you've probably made a record of that somewhere if you've

11  discovered it, but I'm not going to "aware of" to it.

12           All right, next, there's a disagreement about potable

13  wells with MTBE detections. And the defendants' position is

14  that the commonwealth needs to identify every well that has a

15  detection or even, I guess, that could have a detection.

16  Plaintiff says, you know, unlike a lot of these cases, we don't

17  own or operate these wells, and if we were to go out and be

18  required to test every well, there are a million of them, and

19  that would be $100 million spent, and we don't think we should

20  have to do that.

21           And there's a dispute about who's going to pay for

22  that too. The defendants say in their letter, whether

23  plaintiff can recover from the cost of searching out and

24  sampling wells is an issue for another day. Plaintiffs say,

25  well, not really, not if you're going to tell me I've got to go

1    out and do a million wells at the cost of a million dollars.

2            So I think the answer to this at this time is that

3    plaintiff only needs to identify the information that is

4    currently in its possession, custody or control.  That's the

5    usual rule in discovery.  They don't have to create a record of

6    that which does not exist.

7            So if they have a documentation in their possession,

8    custody or control, that has to be defined carefully, regarding

9    wells that have detections or have been tested or have no

10   detection, whatever it is, they have to turn over such records,

11   but they're not directed that they're required to test a

12   million wells.

13           Now, whether there is going to be a question down the

14   road as to whether by not identifying something they will have

15   waived a claim, I think that is an issue for another day.  In

16   other words, if they're not aware of a detection and a

17   detection occurs six months from now or five years from now,

18   that may be a new and timely claim.  So I'm not about to rule

19   on that issue, as to whether by their failing to identify a

20   particular well today they have waived a claim forever.

21           I can say on the record that I doubt it, that if and

22   when they detect something, a claim may materialize at that

23   time, but that's not a ruling, that is my inclination, but it

24   may not be for me.  Who knows when that is going to occur?  It

25   could occur 30 years from now, who knows, but that's my ruling

F6IKMTBC                    Conference

 1    for now on the wells issue.

 2            The third dispute at section 2(c) has to do with

 3    really a related issue:  Defendants want the plaintiff to

 4    produce the maximum and most recent MTBE detection data for

 5    each release site and each well.  Now, I think one response

 6    that the plaintiff gives is that defendants actually have done

 7    MTBE sampling for release sites that they own or operate.

 8            So I think the ruling is directed to both sides:

 9    Everybody has a date that you will negotiate and pick for the

10    CMO, at which they have, to both sides have to, identify the

11    maximum and most recent MTBE detection date or for each release

12    and each well, to the extent that they have possession, custody

13    or control over such a record.

14            So if the defendants own and operate -- you know the

15    rule:  If you want to confer, raise your hand, say, can I

16    please confer?  Because I find it distracting for you to confer

17    while I'm speaking.  If you want a moment, I'm happy to take a

18    break.  You want a moment?

19            MR. BONGIORNO:  Sorry, your Honor.  No.

20            THE COURT:  If you need one, just say so.

21            In any event, both defendants and plaintiff are

22    directed to identify any record they have of any sampling data

23    period.  So, for the defendants, it will probably be the sites

24    they own and operate.  For the plaintiff, it would be those

25    that are reported or which they investigated, and it can be the

F6IKMTBC                    Conference

same date.  And that advances the ball for everybody.

CMO4 declarations -- and I'm using your language as a
shorthand but I think the lawyers here know what that means --
the plaintiffs wants to at a provision that requires the
defendants to produce CMO4 declarations regarding information
on the shipment and distribution of gasoline into and within
Pennsylvania to sort of, how shall I say it, aid everybody in
getting things identified.  The defendants say, well, the most
reliable way to identify release sites is through a review of
the Department of Environmental Protection's site remediation
files and the Underground Storage Tank Indemnification Fund
files, USTIF, and I agree that that is good.

So the plaintiff, commonwealth, must review the DEP
files, the USTIF files, and I think you knew that, but the
question is:  Do the defendants have to do the CMO4
declarations?  And I think the answer is yes.  The only issue
is timing.

One could say, oh, sure, eventually defendants have to
do it, but why does it have to be part of the CMO, because the
CMO should be settling a schedule all around?  So I realize
that date may be further out than a date for more easily
accessible information, but it has to be done.  So I do think
these declarations should be filed, but you need to negotiate
when in the process.  Eventually, I'm sure, you knew you were
going to be asked to do those declarations; you've done them in

other cases.

So it's only a matter of when.  And I'm not ordering a date right now.  I'm telling you, put it in, work it out, talk it through, figure out who goes first, what's logical.  And I already said that the records from DEP and USTIF are probably more readily available and should come first.  But that doesn't mean you shouldn't work out these declarations eventually.  I've explained where you should.

You want to say something, Mr. Pardo?

MR. PARDO:  I wanted to ask for your permission just to confer for five seconds.

THE COURT:  Okay, good.

(Pause)

MR. PARDO:  Thank you.

THE COURT:  Okay.  So we go on.

Now, motion to amend the complaint:  Now, here, the commonwealth wants to file a motion to amend the complaint.  The first thing I'd like to do, at all costs, is avoid another motion.  I'd like to just talk about amending the complaint, if we could here.

First of all, they want to amend the USTIF claim, and I already said they could.  I put it in the opinion, if you have things to add to that claim, I dismissed it with leave to replead, so you have leave to replead that.  That's easy.

Then you want to add two new corporate entities

F6IKMTBC                    Conference

related to LUKOIL.  And to individual defendants related to

LUKOIL, you want to add a fraudulent transfer claim against

LUKOIL America and new defendants, LUKOIL North America and

LUKOIL Oil Company and individual defendants, again, and they

you want to beef up the veil-piercing claim to include

additional allegations.

         Some of these seem yes, and some of these seem no.  I

think the short answer is:  It is futile to add a fraudulent

conveyance claim because 11, U.S.C., Section 544(b) says that

the trustee in bankruptcy has exclusive right to bring such an

action, and did, and it's done, and the plaintiff can't do it

because their trustee did it.  So I think that's pretty

straightforward.  I think the fraudulent conveyance action is

out because it was done by the liquidating trustee in the GPM

bankruptcy.

         So, as far as the veil-piercing, yes, I don't see why

you can't beef up allegations.  It's just an amended complaint.

It doesn't mean you're winning anything, but everybody should

always plead the best and fullest complaint they can.  So if

you have new allegations, you should put them in.  I know LAC

says, under Maryland law, you're never going to prevail.  But

I'm not prepared to decide that.  I'll decide that when it's

fully briefed.

         So, add the allegations.  They'll move to dismiss that

claim under Maryland law, and if they're right, they'll win and

F6IKMTBC                         Conference

1    that's the end of it.  But you might as well plead the best set

2    of claims you can.  So I have no problem with your amending to

3    add veil-piercing claims.

4            I also note that it might be actually direct liability

5    that you're now pleading as to LUKOIL North America LNA because

6    you say you've discovered evidence that they may have directly

7    owned sites.  If you haven't, you haven't, so you can certainly

8    add that.

9            I already mentioned fraudulent conveyance, no?  I

10   think that's it.

11           Well, then the individual defendants wouldn't be

12   added.  If you can't add the fraudulent conveyance claim, you

13   aren't going to be adding the individuals either.  So,

14   actually, I think I just talked of everything but Pennsylvania.

15           Now that I did, anybody want to say anything?

16           UNIDENTIFIED SPEAKER:  Yes.

17           THE COURT:  A person on the phone does?  I thought you

18   folks were just observing.  Who said yes?  Maybe she wasn't

19   speaking to me.

20           Anybody present in the courtroom want to say anything

21   about Pennsylvania, or did I take care of the problem for now?

22           Mr. Miller?

23           MR. MILLER:  Good afternoon, your Honor.  You've

24   substantially helped us.

25           THE COURT:  Good.

1           MR. MILLER:  But I need to explain something.  It may

2    relate to timing, it may relate to the ultimate form of how we

3    approach the problem.

4           We have -- the Department of Environmental Protection

5    has approximately 16,000 reported releases and tens of millions

6    of documents concerning those releases located at six different

7    facilities, each of which resembles a warehouse.  Within those

8    documents, there are undoubtedly references to detections of

9    MTBE in a well.  The time required to review tens of millions

10   of documents to find each private well that was near a service

11   station and was tested by the environmental consultant, which

12   had nothing to do with the state other than the fact that these

13   investigations must be reported to the state -- we weren't

14   running the investigation.

15          THE COURT:  Let me interrupt.  These are not

16   electronically searchable?

17          MR. MILLER:  We could scan all those documents.  We

18   certainly intend to make the documents available if the

19   defendants want to copy them, but even if we scan them -- let's

20   say we scan for MTBE as a term --

21          THE COURT:  Then could you OCR?  Could you do it just

22   by looking for the word?

23          MR. MILLER:  Let's say you scan for MTBE for a well.

24   All the monitoring wells would show up being referred to on

25   every page.

1           So unless they use the term "private well," which

2    seems unlikely, they may use a name for it like the property

3    owners, it would be very difficult even if we scanned every

4    document and did discrete searches.  So we're literally talking

5    about reading every page.  The burden is extraordinary.

6           THE COURT:  Burden?

7           MR. MILLER:  Yes.

8           There is a solution.  I don't think that -- given the

9    number of wells we're talking about, a million private wells,

10   only half of which, 450,000, we know the location, I don't

11   think we're going to ever --

12          THE COURT:  I'm sorry, I didn't understand the last

13   thing.  Does that mean you don't know the location of the other

14   550,000?

15          MR. MILLER:  That's correct.

16          THE COURT:  Oh, okay.  Go ahead.

17          MR. MILLER:  They're historical wells before the

18   registration program was started.

19          THE COURT:  Now I understand the statement.  You know

20   the location of only 450,000 of 1 million?

21          MR. MILLER:  Yes.

22          I don't think we're ever going to have a day when we

23   present individual evidence on each private well that was

24   impacted by MTBE and which station did it, and we can still

25   make a valid claim.  I'm going --

F6IKMTBC                    Conference

1              THE COURT:  A claim for what?

2              MR. MILLER:  For -- let's just talk about New

3      Hampshire for just a moment because they presented their

4      evidence in three months, not three plus years, which would be

5      a discussion of individual gas stations, every single one in

6      Pennsylvania and every well, you're talking about a trial in

7      inestimable length.

8              THE COURT:  But we have not been doing that.  We've

9      tried to do a bellwether type trials anyway or focused case

10     type trials anyway.

11             MR. MILLER:  Yes.  This comment I'm about to make

12     doesn't relate to a bellwether trial, which is clearly much

13     shorter.  But what if the bellwether trial doesn't resolve the

14     issue and a statewide claim proceeds against those who have not

15     settled?

16             In that event, what New Hampshire did in their case is

17     they presented evidence that they took a statistically

18     representative subset of private wells and used the results

19     from that subset to estimate scientifically and accurately, in

20     our view, the total damage statewide, and they didn't need to

21     go out and test every well in New Hampshire, because if you do

22     a representative sample and say 12 percent of the wells have

23     MTBE in it, you can apply that percentage to the total.

24             They did --

25             THE COURT:  That sounds good for damages, but not for

F6IKMTBC                    Conference

1    remediation.

2                MR. MILLER:  Remediation is a smaller group.  We have

3    16,000 releases.  So that's easier to do.  It's a different

4    issue, but at the moment, I'm talking about wells.

5                So if we go and spend unbelievable effort and a lot of

6    money to identify individual wells, will it affect the trial if

7    we have a strategy to do a trial in a more reasonable period of

8    time that focuses on a statistical approach to estimating the

9    damage claim?  I can't see how it will ever help them.

10               THE COURT:  How it will ever?

11               MR. MILLER:  Help them understand our claim.  That's

12   going to become very clear when the experts testify.  And we

13   can talk about how to approach the problem of making sure that

14   that expert's testimony is adequately previewed with the

15   defendants so they can prepare for it.  That's a separate

16   issue.

17               But the idea of developing a comprehensive list by

18   going through tens of millions of pages, reading until you go

19   blind, trying to find a single entry that is very difficult to

20   identify electronically through scanning the documents, which

21   even if we did that, we could not possibly do it in 2015, even

22   if we were lucky in the electronic interpretation of the

23   records.

24               So I'm suggesting to you that at this point in time,

25   if you require us to do a list, we need a much longer time

F6IKMTBC                    Conference

1      period, and I'm suggesting that doesn't further the case, it

2      doesn't help the defendants.  They are the ones who hired the

3      consultants that tested those private wells, frankly, in many

4      of the release sites.  Not all, but many.  So they already have

5      that information.

6             THE COURT:  Well, couldn't there be a combination of

7      ideas?  One, you have the statistical sampling type proof from

8      the point of view of proving damages, but you're always going

9      to have to try some releases and the wells that are impacted,

10     and that's a matter of focus -- well, focus releases that we've

11     done before in other cases, and then all the wells associated

12     with focused releases, so to speak, I think, as we call them

13     focused sites, but then on those wells, you'd have to produce

14     it.

15            MR. MILLER:  If we decide with the Court, whatever you

16     order, to do focused sites, there's no question in my mind

17     that's a manageable burden.  We can identify the wells --

18            THE COURT:  Right.

19            MR. MILLER:  -- given adequate time, and we can do

20     that.  That's not what I'm discussing.

21            THE COURT:  No, no.  You would have a combination of a

22     statistical approach, but you'd also have a number of sites

23     where you fully discover every well you say is impacted as a

24     result of the release of that site, every well.  And in those

25     instances, whether it's 20, or 40, or however many we choose,

F6IKMTBC                     Conference

```
1    then you have to go for every well in the focus sites, and you
2    say you can do it?
3              MR. MILLER:  Yes.  No question.  That's manageable.
4              THE COURT:  Right.  Okay.
5              Mr. Pardo.
6              MR. PARDO:  Your Honor, before we get too far down
7    that road, I want to make sure I know you're not ruling today,
8    there's no ruling here, I haven't heard any ruling.
9              THE COURT:  You haven't heard any rulings, but you
10   heard some rulings.
11             MR. PARDO:  No, no, no, on this issue --
12             THE COURT:  Okay.
13             MR. PARDO:  -- of statistical extrapolation.
14             THE COURT:  Correct.
15             MR. PARDO:  I just want to be clear.  We're taking
16   about New Hampshire.  As you, I think, know, that case is up on
17   appeal right now.  And we do not believe that statistical
18   extrapolation is a constitutionally fair way to determine
19   damages, nor to determine any of the other issues that have
20   always been the subject of normal discovery, normal proofs in
21   this case, causation --
22             THE COURT:  Is that one of the issues on appeal?
23             MR. PARDO:  It is.
24             THE COURT:  Statistical sampling was the right
25   approach?
```

F6IKMTBC                    Conference

1              MR. PARDO:  That is one of the issues.

2              THE COURT:  Where is this pending, the highest court

3     of New Hampshire?

4              MR. PARDO:  Correct.  New Hampshire Supreme Court,

5     your Honor.  Correct, your Honor.

6              THE COURT:  Where is that up to?  Argument, brief?

7              MR. PARDO:  Just argued.

8              THE COURT:  Argued?

9              MR. PARDO:  So I know you haven't ruled on this.  This

10    would be something that it would be a sea change from how we've

11    done the cases for many, many years on this MDL, and I would

12    respectfully submit that if we were even thinking of going in

13    that direction, we ought to have briefing -- the opportunity to

14    brief you on this because there are, in our view, some serious

15    constitutional --

16             THE COURT:  Well, it's also interesting to know what

17    the New Hampshire Supreme Court has to say.  Since it's been

18    argued, it would be interesting to see how it comes out.

19             MR. PARDO:  But I've heard --

20             THE COURT:  Also, the numbers here might far surpass

21    New Hampshire.  Pennsylvania is a big state.  And even if it

22    was acceptable there, which is not what you hope will be the

23    outcome of the appeal, but even if it is, you would still have

24    an argument here that it's a different case anyhow.  So I

25    understand you certainly don't want that issue to be decided

 1   without full briefing.  I understand that.  I understand that.

 2            MR. PARDO:  Right.

 3            Now, we know, or I guess plaintiff knows, where

 4   450,000 of these private wells are.  There's another 550,000

 5   that I guess they don't.  I would submit if they don't know

 6   where those wells are, maybe they shouldn't be in this case,

 7   okay.  But for the 450,000 that they do know where they are,

 8   maybe those are the private wells they start with.

 9            THE COURT:  But did you hear the numbers?  Even if it

10   was half of the numbers that Mr. Miller described, it's a huge

11   number of records, huge, and from the plaintiffs' perspective,

12   and maybe even mine, we'd all like it to be done within our

13   lifetime.

14            Now, you're younger than I am, so your lifetime is

15   longer, mine is shorter, so I want to get it done, and so

16   that's the problem.  Even 45 percent of the numbers that

17   Mr. Miller said is a long, long task and very extensive.  The

18   issue is does it have to be done.  We've always taken the focus

19   site approach with the associated wells.  Now he's saying he's

20   got another suggestion for statewide statistical proof, which

21   apparently was used in New Hampshire.  I know nothing,

22   actually, about it except what I heard today.

23            So I don't know whether that's a good idea or not, and

24   what a state high court is at least going to tell us doesn't

25   bind me, but it would be interesting to know.  But we could

F6IKMTBC                    Conference

1    certainly start with the focus approach and find some way to

2    select geographically, let's say, around the state of

3    Pennsylvania, so we can get all the different kinds of areas,

4    you know, urban, suburban, rural, near water, not near water,

5    however you wanted to choose 50 or whatever sites, and start

6    with that.  That's what we've done before.  But to tell him

7    he's got to do it for 450,000 sites of which he knows the

8    location, it may be the burden outweighs the benefit at this

9    point.

10            So you're right that I'm not ruling, but I probably

11   said enough to give both sides a lot to talk about in any

12   meet-and-confer on how to continue, and then if you're at an

13   impasse, and they insist on this sampling idea and want to

14   start briefing even before the New Hampshire high court rules,

15   so be it, it will have to be briefed because I don't know

16   anything about the technique and why it would be valid or

17   wouldn't be valid.

18            I assume there were experts in that case that said it

19   was valid?

20            MR. MILLER:  Yes, your Honor, of course.

21            THE COURT:  Sure.  But there were defense experts who

22   said it wasn't?

23            MR. MILLER:  Of course.

24            THE COURT:  Sure.

25            No, I understand that.

 1          MR. MILLER:  It's all predictable.

 2          THE COURT:  Yes.

 3          MR. PARDO:  For me, your Honor, and maybe for some of

 4    the other defendants, this is not what you're doing, but it's a

 5    little frustrating to hear this, because, of course, we have a

 6    complaint in this case that alleges that there are private

 7    wells that have been impacted.

 8          THE COURT:  Oh, but there are.  They know there are

 9    private wells that have been impacted.  They don't know how

10    many, they don't know how many locations.  They surely know

11    there are -- it's a correct statement that there are private

12    wells that have been impacted.  It doesn't mean all 1 million.

13    So that's the issue.  They say -- did they plead each and every

14    private well in the State of Pennsylvania?  No.  I understand.

15          MR. PARDO:  But let me generally push back on that.

16    They say that, and we say we know that to be true, but I don't

17    know that to be true.  I haven't seen that.

18          THE COURT:  Wait, wait.  You're talking in

19    generalities.  You don't know that there's any private well

20    that's been impacted?  You think it could be zero?

21          MR. PARDO:  Well, it could be.  I doubt it, to be

22    honest.

23          THE COURT:  I doubt it, too.

24          MR. PARDO:  Of course.  But my point is he has to

25    know -- to assert that in his complaint, he has to know that

```
 1    there are wells out there that have been --
 2                THE COURT:  I'm sure he does know there are wells, the
 3    question is does he know about 20, or a hundred thousand, or
 4    700,000?  I don't know what he knows, but I'm sure he knows
 5    there are some.
 6                Now, the question is, how many does he have to tell
 7    you about now, or does he have to research, does he have to go
 8    through -- what was it?  How many millions of documents in six
 9    locations?
10                What was that number?
11                MR. MILLER:  Tens of millions.  I can't give you a
12    precise number.
13                THE COURT:  Tens of millions is good enough.
14                So there's tens of millions of pieces of paper,
15    there's six locations.  They're paper, they're not even
16    electronic at this point.  That's what I know.
17                So he could do it at great cost and delay, but you
18    know those twin words, cost and delay, are what we try not to
19    do.  So I'm trying to see if there's an approach that can be
20    taken that would eliminate undue cost and delay.
21                And, actually, identifying every single private well
22    that's been impacted seems to me almost a tactic to make sure
23    litigation can't move at all.  So -- okay, you're paid to be
24    tactical, I get that, but let's see if there's a solution that
25    works, and I think you think it's not statistical sampling.
```

F6IKMTBC                    Conference

1          MR. PARDO:  I'm certain it's not.

2          THE COURT:  Well, from the defense point of view, I

3    know your position, I'll be curious what the New Hampshire

4    Supreme Court -- and it could go higher than that.  But in any

5    event, that's for another day.

6          The focus approach, though, we have used repeatedly in

7    this litigation, so I think you need to talk to each other.

8          MR. MILLER:  Your Honor, I'm happy to confer with

9    counsel, and as soon as we identify the focus sites, I think we

10   can work on a good description of what we owe them.  It will be

11   generally consistent with what we've done in the past.  It

12   shouldn't be hard for us to work out.

13         THE COURT:  I think we took that approach in

14   New Jersey, which is also a big state.

15         MR. MILLER:  Yes.

16         MR. PARDO:  We'll be happy to talk.

17         THE COURT:  That's all we can do today because like

18   you, Mr. Pardo, I didn't know this argument was coming about

19   this sampling, and how it was done in New Hampshire, and the

20   experts.  I'm just not up to speed.

21         MR. PARDO:  Fair enough.

22         THE COURT:  Which does take us to New Jersey.

23         MR. AXLINE:  I'm sorry, your Honor.

24         THE COURT:  Go ahead, Mr. Axline.

25         MR. AXLINE:  There was one other point which you

F6IKMTBC                     Conference

 1    touched on that I'd like to respond to, and that's the

 2    fraudulent transfer.

 3              THE COURT:  Oh, I didn't touch on that.  I think I

 4    said it was over because the trustee brought the action, and

 5    under the bankruptcy statute, exclusive jurisdiction and

 6    whatever, that's it.

 7              MR. AXLINE:  So under 544(b), which was cited to us by

 8    the defendants for the first time in their reply letter --

 9              THE COURT:  Is that the bankruptcy statute that I

10    cited?

11              MR. AXLINE:  Yes.  11 U.S.C. --

12              THE COURT:  544(b), there it is.

13              MR. AXLINE:  Yes.

14              The entities that we want to sue for fraudulent

15    transfer are not the bankrupt party, they are the other

16    entities that were not involved in the bankruptcy that

17    participated in the fraudulent transfer.  I guess what I'd like

18    is to ask for a little time to look at this issue more closely

19    and perhaps submit a short letter brief to you on the question

20    of whether 544(b) applies to claims against nonbankrupt

21    parties.

22              THE COURT:  I think that's only fair.  That was raised

23    at the end, and I even had in my notes to ask you if you could

24    show me why that doesn't foreclose it, and that's exactly what

25    you're saying, give me a little while to write a letter

F6IKMTBC                    Conference

1   researching this point and explain why it may not foreclose

2   this action.  But it was a fraudulent conveyance action, which

3   raises the same issues, and it was brought by the liquidating

4   trustee in the GPMI bankruptcy.  So I understand what you're

5   saying, that these were not bankrupt entities, but it may be

6   that the action raised the same issues, I don't know.

7              And you, Mr. Tuite?

8              MR. TUITE:  Tuite.

9              THE COURT:  Tuite, I know that.  I know that.

10             MR. TUITE:  Thank you, your Honor.  On behalf of

11  LUKOIL Americas Corporation, we don't have any problem with his

12  submitting a brief --

13             THE COURT:  He said a letter for now.

14             MR. TUITE:  -- a letter brief, but I do want to point

15  out that the same parties they want to sue in this action were

16  the parties that were sued in the bankruptcy court.

17             THE COURT:  That's what I thought.  They may not have

18  been in bankruptcy, but they were the same parties that the

19  liquidating trustee moved against.  I thought so.  I think it's

20  really the same action.

21             But, Mr. Axline, to his credit, said let me look at

22  this action in the next few days, let me research it and dig

23  down, and see if I can make the argument or not.  And I guess

24  if his research tells him he can't, he won't, but he hasn't had

25  really a chance to respond to the statutory argument that says

F6IKMTBC                    Conference

 1   that a fraudulent conveyance claim is foreclosed.  He may reach

 2   that conclusion, I don't know.

 3          MR. TUITE:  Thank you, your Honor.

 4          THE COURT:  If he doesn't reach that conclusion, not

 5   surprisingly, and you need to submit a surreply, so to speak,

 6   letter, that's okay because I want to understand the issue.

 7   And then we talk about it anyway, that's not a full briefing,

 8   it's letters.  And we all like to learn things in the law most

 9   days.  So we'll see.

10          Yes, Mr. Bongiorno?

11          MR. BONGIORNO:  Thank you, your Honor.  Before we move

12   on, might I confer with Mr. Pardo on a couple of things before

13   we say all set?

14          THE COURT:  Yes.

15          MR. BONGIORNO:  Thank you.

16          (Pause)

17          MR. BONGIORNO:  Thank you for indulging us, your

18   Honor.  We are now all set.

19          THE COURT:  Good.  Okay.

20          So we go to New Jersey.  I went back to the bankruptcy

21   statute.

22          All right.  The New Jersey plaintiffs also want to add

23   this same fraudulent transfer claim, and I think it's the

24   identical issue, whether you're foreclosed by the trustees --

25   liquidating trustees' action in the GPMI bankruptcy.  You may

F6IKMTBC                        Conference

1    well be, so I think you need to confer with Mr. Axline and

2    together decide whether there's a letter to be written or

3    whether you concede the point.  So that's fair?

4           MR. KAUFMANN:  Leonard Kaufmann, for New Jersey

5    plaintiffs.  Thank you, your Honor.  Yes, Mr. Axline is also

6    counsel for New Jersey.  So we certainly will do that.

7           THE COURT:  Thank you.  So I won't say more about that

8    today.

9           On the other hand, LNA, which is LUKOIL North America,

10   the plaintiff now believes they have direct liability because

11   of new discovery that it owned sites in New Jersey in which

12   there's been releases.  So to the extent that there's proof --

13   that they think they have proof of a direct liability, you can

14   amend to add that.

15          So as I understand the amendment, the fifth amended

16   complaint would only be with respect to LNC and related

17   entities, and now at this point in time, the commission is only

18   as to direct liability.  You'll be discussing this fraudulent

19   transfer issue?

20          MR. KAUFMANN:  Leonard Kaufmann.  Yes, your Honor.

21          THE COURT:  Okay, good.

22          And then the only other New Jersey issue -- thank you

23   for coming for such a short time, but the only other issue with

24   you folks is that you agree that a number of documents were not

25   docketed, you're going to create a joint list, apparently some

F6IKMTBC                    Conference

1   CMOs were not, some pretrial orders, some letter briefs, and

2   you jointly requested they be added to the docket, and, of

3   course, I agree with that.  So all you've got to do is come up

4   with your joint list, and we'll add them.

5              THE LAW CLERK:  They have them.

6              THE COURT:  Oh, they have them.  I didn't know that.

7              That takes us to the Orange County Water District.

8              This one is also in the process of being remanded, and

9   there are a couple of issues.  One, I think, is minor, one is

10  far more major that has to do with the declaratory relief,

11  we'll get to that in a minute.  But with respect to the one

12  that I think is somewhat minor, defendants want to add a

13  sentence that says something like, "All other claims for relief

14  were either decided against plaintiff or stipulated as

15  dismissed on the terms set forth in the applicable stipulations

16  subject to the right of appeal, so no other claims or

17  defendants remain at these sites for the purposes of trial

18  after remand."

19             The plaintiff opposes that sentence saying it would

20  cause confusion because there's some rights that's not being

21  remanded instead of what is being remanded.  I side with the

22  defendants on this one.  I don't think it creates confusion.  I

23  think it clarifies for the judicial panel what claims and what

24  defendants remain in the case.  No confusion, I think it should

25  be added.

F6IKMTBC                    Conference

1           Who am I looking at?  OCWD.  So I think that's the

2    easier one.  You'll leave with that, and that's the ruling.

3           Now, the bigger one.  This whole question about

4    declaratory relief and the history of what this Court has said

5    on different occasions apparently has caused a great deal of

6    confusion.  Declaratory relief was brought as a cause of

7    action, I'm filing an action for declaratory -- no, for

8    declaratory judgment.  Standard cause of action, we used to

9    call it a DJ action.  And then declaratory relief is also an

10   available remedy in many cases, and we don't usually find it

11   until the back end of a complaint saying, and we seek a

12   declaration that as a remedy.  So I understand the difference

13   between a cause of action and a remedy, although I'm not sure

14   it has a whole lot of real meaning.

15           But in any event, in 2006, I authored an opinion which

16   dismissed the cause of action for declaratory relief entitled

17   "Cause of Action:  Declaratory Relief Act Claim," but the basis

18   for that dismissal was I said, well, that remedy was available

19   under the Orange County's common-law causes of action, so it's

20   essentially duplicative.  And then OCWD asked for a

21   clarification and I wrote:  "If any of OCWD's remaining causes

22   of action are determined to require declaratory relief, such

23   relief remains available under those causes of action."  And

24   then later down the road, in 2011, now five years after the

25   first ruling, I wrote:  "The claims that survived included

declaratory relief with respect to future expenses OCWD may

incur."

Now, that is a classic use of declaratory judgment,

you know, I want a declaration that for future expenses, the

defendants have to pay for.  It's got nothing to do with

nuisance or being duplicative, it's a classic declaratory

judgment claim, and I said that one of the claims that survived

is declaratory relief with respect to future expenses.

Then there was CMO116, that is 116, written in July of

2014, and that CMO set forth the remaining claims and which

defendants were at each focus site as of that date, July 16,

2014, and that CMO did include declaratory relief as a

remaining claim at various focus sites.  Well, the defendants

say, oh, you didn't really mean what you wrote, this only was

supposed to reflect what OCWD intended to pursue at the trial,

and we didn't think we needed to move against it because it was

just a list, so we didn't object at the time.  And now the

defendants say, look, the water district can ask the transferor

court, the trial court, to allow the remedy of declaratory

relief for continuing nuisance, but this is somewhat

problematic because if the trial court says it's not a remedy

for continuing nuisance or there is no such claim, that

wouldn't take care of all the declaratory relief sought in the

OCWD action.  That just has to do with the nuisance claim.  And

I specifically said there may be declaratory relief outside of

F6IKMTBC                    Conference

1     that particular common-law claim.

2             So the county says, look, it does remain available as

3     a cause of action, you only ruled on a limited context, and the

4     basis of your ruling was duplicative on the continuing nuisance

5     claim, which the defendants are going to tell the trial court

6     needs to be struck, and the trial court might agree, but that

7     wouldn't eliminate all declaratory relief.

8             In fact, as I read the letters, defendants are going

9     to say that Article III courts have no inherent authority to

10    order declaratory relief.  I don't even know what that means,

11    as we do it all the time.

12            So the long and short of this one is actually I think

13    it can be part of the remand that there is declaratory relief

14    still in the case, and there is no reason for me to say they

15    can't put that in based on the 2006 ruling which has been

16    clarified many times since.  So that's where I come out on that

17    one, and you can do all the rest of your arguing to the poor

18    judge who is the one who gets the pleasure of trying the OCWD

19    case.

20            So you can speak afterward, but I might as well finish

21    OCWD because there's another big issue.  The other big issue

22    has to do with the water district's request for clarification

23    about the res judicata fact on the continuing nuisance claims

24    from the Court's September 16, 2014 ruling on the BP and Shell

25    defendants' motion for summary judgment.  We discussed last

F6IKMTBC                    Conference

time how best to deal with this question.  There were several

options.  There was the option of a 54(b) certification, there

was an option of a 1292, I think, certification, and there was

a punt which said, oh, well, just give it to the trial court

and tell the trial court that the MDL judge was wrong, and that

the trial judge should essentially ignore the law of the case

and overrule, so to speak, the MDL court.  And that's the

direction I think I was heading in at that time.

But I have to say, after reading these letters, I've

come around to a different view.  I now think that actually

54(b) may be the right way to go.  And the only big objection

to it in the water district's letters is they say, if you allow

that, it's going to trigger an appeal of all the prior rulings

as to these defendants, not just the res judicata/continuing

nuisance issue.

So my question for the crowd today is:  Is that a red

herring, or is that an issue?  In other words, will you be

raising bunches of other challenges with bunches of other

rulings, or is that just a red herring, and, really, this is

the one you want to take up?  So, in other words, it could

trigger -- it could trigger the right to appeal other issues,

so does either the water district or the defendants intend to

raise other issues just because the right to do so is

triggered?  If you get what I'm trying to say.

MR. AXLINE:  I'll handle that, your Honor.  Mike

```
 1    Axline, for the Orange County Water District.

 2                THE COURT:  Okay.

 3                MR. AXLINE:  Yes, I have to correct what I told you

 4    last time in one sense.  I told you we only wanted to take this

 5    one issue up on appeal.  We thought that should be the only one

 6    to go up.  I think, however, in looking at it afterwards, doing

 7    some research on this, if we go up on a 54(b) final judgment

 8    against Shell and BP, we are obligated to raise every issue --

 9                THE COURT:  What are these every issue?  What's there?

10                MR. AXLINE:  There are statute of limitations rulings.

11                THE COURT:  Now we're talking about BP and Shell?

12                MR. AXLINE:  Yes.

13                THE COURT:  Not anybody else.  So what was the statute

14    of limitations ruling?

15                MR. AXLINE:  Well, your Honor ruled that the statute

16    of limitations precluded a common-law claims other than

17    continuing nuisance where there were detections at a station

18    prior to the bar date, which I think was May 6 of 2000.

19                THE COURT:  That's those two defendants.  There could

20    have been claims against those two defendants.

21                MR. AXLINE:  Yes.

22                THE COURT:  Okay.  So that's one.

23                MR. AXLINE:  There were also -- and the defendants can

24    speak to what they may want to raise.

25                THE COURT:  I'll surely give them their turn.  Go
```

F6IKMTBC                    Conference

1    ahead.

2              MR. AXLINE:  Then there was a ruling on the causation

3    issue.  We moved for summary judgment on causation and

4    nuisance.  You granted us summary judgment with respect to

5    causation at stations where a defendant --

6              THE COURT:  Well, you wouldn't be appealing anything

7    if you won.

8              MR. AXLINE:  Right.  But you declined to grant summary

9    judgment on nuisance itself.

10             THE COURT:  Okay.  And you could appeal that.

11             MR. AXLINE:  Which is what we had moved for, yes.

12             So those are the two issues that come to mind that I

13   think we would be forced, if we went to 54(b) route rather than

14   the 1292(b) --

15             THE COURT:  I'll talk about that next.  I will turn to

16   1292.

17             What about the defendants?  If I were to allow the

18   54(b), Mr. Condron, what else might you need to raise.

19             MR. CONDRON:  Peter Condron, for the defendants.  Your

20   Honor, it largely depends on the scope of what OCWD would be

21   appealing.

22             THE COURT:  Well, they just said.

23             MR. CONDRON:  We won, so we would obviously defend on

24   res judicata grounds to the extent they attacked the set of

25   rejected rulings on the statute of limitations, causation

1    and --

2              THE COURT:  No, but that's responding.  Are there any

3    issues that you would be raising?

4              MR. CONDRON:  Affirmatively?  I can't imagine that we

5    would, your Honor.  Mr. Axline had mentioned about you're not

6    granting summary judgment to them on the nuisance claim.  I'm

7    not sure he could appeal that at this juncture.

8              THE COURT:  But if it's a final judgment as to BP and

9    Shell, that's his whole point, he needs to raise every claim

10   that could theoretically bring him back in.

11             MR. CONDRON:  Yes, I'm not sure that the denial of

12   summary judgment motion to the plaintiffs is something that

13   could be raised on appeal at that point in time, however.

14             THE COURT:  I see your point.

15             MR. CONDRON:  Yes.

16             And outside of that, again, since we would be

17   defending --

18             THE COURT:  That's probably right.

19             MR. CONDRON:  -- I think we're probably in a position

20   where we would be responding --

21             THE COURT:  So at most, it's three issues, not one?

22             MR. CONDRON:  Correct.

23             THE COURT:  Maybe even two, not one.

24             MR. CONDRON:  Depending upon what they raise.

25             THE COURT:  Well, no, because the summary judgment may

F6IKMTBC                    Conference

1    not really be an appealable issue.

2             MR. CONDRON:  Correct.

3             THE COURT:  That it was denied, the opposite of denied

4    is granted.  I don't see how that brings back -- if the statute

5    of limitations takes you out or if the nuisance takes you out,

6    it doesn't matter.

7             MR. CONDRON:  I think you're right.

8             THE COURT:  Right.

9             So at most, it sounds like two issues, possibly three.

10   It's still not as burdensome, I think, as sending it back to

11   the trial court as to dismissed defendants.  There was supposed

12   to be some finality being dismissed.  I understand appeals.

13   Believe me, I understand appeals, but they're supposed to have

14   some finality from the rulings to put them in the remand

15   bucket, so to speak, where they're forced to almost all over

16   again litigate an issue they won here.  And, by the way, if the

17   judge starts saying, yeah, well, I disagree with that judge on

18   this, that's sort of a field day for both sides to say, oh,

19   well, I see we've got a good shot here, let's reraise

20   everything done in the last 12 years, and keep this judge busy

21   for years, and never have a trial.

22            So I'm not sure sending it back is really what you

23   want either because it could open the door to that judge

24   reconsidering everything, both issues you won and issues you

25   lost.  So I'm not keen on that.

F6IKMTBC                    Conference

1              So what I'd like to turn to is 1292 and revisit that.

2     So if we don't do 54(b), what do the parties think of 1292?

3     Because I do think this issue should get heard.  After all,

4     finally these people aren't there, and they're big companies,

5     and you want them there, so it should get heard, and hopefully

6     fast.  I think it will be faster to do an appeal right here.

7     So what do you think of 1292 versus 54(b)?

8              MR. AXLINE:  We would prefer 1292(b) to 54(b).

9              I do want to add one thing that Mr. Condron maybe

10    overlooked or forgot.  There was a ruling on primary

11    jurisdiction, that's one that we won, and that they may decide

12    to raise on appeal, so --

13             THE COURT:  No, he didn't say it.  He usually doesn't

14    need you as co-counsel.

15             MR. AXLINE:  If you're stacking up issues under 54(b)

16    versus issues --

17             THE COURT:  I know, but let him figure out his own.

18             In any event, Mr. Axline?

19             MR. AXLINE:  So, in any event, I think that the issues

20    to be resolved on appeal would be much more discrete and

21    targeted under 1292(b).

22             THE COURT:  It doesn't meet the standards?  Can I,

23    with a straight face, write a 1292(b) certification?

24             MR. AXLINE:  I think you can.  It's certainly

25    determinative as to these parties.  It's going to have a ripple

F6IKMTBC                    Conference

1    effects for all the other parties in the case.  There are

2    pretty compelling reasons for granting it.

3              I have a little concern that the Court of Appeals is

4    less receptive to 1292(b) certifications.

5              THE COURT:  Correct.  I think that's true.  They have

6    to take the 54(b) final judgment unless they say it's not, but

7    it is.

8              What do you think, Mr. Condron?

9              MR. CONDRON:  I think there is a problem with 1292(b)

10   certification on a couple of them, your Honor.  First of all,

11   I'm not sure it does actually meet the legal standard of

12   controlling question of law and substantial grounds, et cetera.

13             But, more importantly, 1292(b) has to involve an order

14   of the court that's being examined, and I think if the Second

15   Circuit were to look at the order that you issued on

16   res judicata, they would find nowhere in it the issue that the

17   plaintiffs want to raise.  And, therefore, I'm not sure that

18   that issue can be certified.

19             The Court of Appeals, and I looked at this last night

20   before coming up here, they take the order, they don't take the

21   issue.  So while you may recommend an issue that they look at,

22   they have to take it from the order, and there's nothing in

23   your order that discusses continuing nuisance because as we

24   know, the plaintiffs didn't raise it.

25             THE COURT:  Honestly, I don't remember that detail.

F6IKMTBC                    Conference

1   You studied it last night.  I did other work last night that

2   was a little more current for me, so I don't remember, to be

3   honest.

4            MR. CONDRON:  I understand.

5            THE COURT:  But you reviewed it, and you know what's

6   in that order, I don't.

7            Is he right, Mr. Axline, about the order itself?

8   Maybe you didn't have a chance to review it either.

9            MR. AXLINE:  Well, I didn't review it, but I'm

10  familiar with it.

11           THE COURT:  Well, sure.

12           MR. AXLINE:  And this issue that we asked you

13  initially to address, which is whether the order bars

14  continuing nuisance causes of action, which arise each day,

15  that arose after the consent judgments that they base their

16  motion on, that was not directly addressed to you in the

17  summary judgment briefing.

18           THE COURT:  So maybe it's never been decided.  Was

19  that decided?  And if so, where?

20           MR. AXLINE:  It has not been decided, your Honor.  And

21  in our view -- that's why we brought it to you seeking

22  clarification.

23           THE COURT:  Well, I denied that, but maybe that was

24  wrong.  If I have not decided what to do about postconsent

25  judgment -- releases, is that what you said?

F6IKMTBC                    Conference

1              MR. AXLINE:  Yes.

2              THE COURT:  If I never decided that squarely, it may

3     be I should and was wrong to deny the request for

4     clarification.

5              MR. AXLINE:  In fairness to Mr. Condron, and I am sure

6     he's going to argue this, he's going to say we should have

7     raised it in opposing their summary judgment motion.

8              THE COURT:  Yes, but that's not the best answer

9     because nothing to take up, as he just pointed out under 1292,

10    if I never decided it.  So the law has to be a little bit

11    flexible or we're all in the wrong business.  It needs to be

12    decided, and it should be decided here.

13             MR. AXLINE:  We think it's obviously very central.

14             THE COURT:  No, I understand why there was a consent

15    agreement, but then things happened afterward, is it barred or

16    not.  If I didn't squarely address that, Mr. Condron, maybe a

17    relatively short briefing schedule and an opinion targeted to

18    that would give us an order that if you win, the point can be

19    taken up on 1292 quickly, and if for some reason you lose the

20    point, and that would put you back in the case that's being

21    remanded, right?

22             MR. AXLINE:  That's correct.

23             THE COURT:  If they lose that point, and then they

24    could also seek or be the one to seek the 1292, but they can no

25    longer seek a 54(b), that's the problem.

1          But in any event, if I didn't squarely decide that, I

2     should.

3          MR. CONDRON:  Two points on that, your Honor.  Number

4     one, Mr. Axline is quite right, they didn't raise it, and our

5     position is that they should have because we moved for summary

6     judgment on all the claims in the complaint.

7          Secondly --

8          THE COURT:  I'm not going to stand on that.  I'll

9     consider it a technicality now.  I want to have a square

10    ruling.

11         MR. CONDRON:  This part isn't a technicality, your

12    Honor.  In a footnote in the brief, we are not -- I'm sorry, in

13    your opinion, you addressed the issue of whether or not there

14    was any continuing harm, and what your Honor found, which is

15    correct on the facts, is that after the consent judgments were

16    entered, when the BP judgment was entered in 2002, ours was

17    entered in 2005, we were no longer using MTBE in gasoline at

18    that point in California.  So any subsequent release of

19    gasoline didn't involve MTBE.

20         THE COURT:  But why?  It could have been used in 2001,

21    but didn't leak out, so to speak, till 2007.

22         MR. CONDRON:  No, that's not the way the system works,

23    your Honor.  The gasoline would have been long gone from the

24    tank prior to 2007, 2005.  Actually, we all took it out in

25    about 2002 to 2003 in California.  There was a ban on it in

F6IKMTBC                    Conference

1    2004.  And certainly the Shell consent order, which went into

2    place a year after that, would have long postdated any new

3    MTBE --

4                THE COURT:  So he's saying it's impossible.

5                MR. AXLINE:  And that's not accurate, your Honor.  It

6    misstates the law of continuing nuisance because under the

7    continuing nuisance doctrine, and this is what we'd like a

8    chance to brief, is that the cause of action continues until

9    the nuisance itself is abated.  It's not the date of release,

10   but it's the date of which the nuisance is abated that the

11   cause of action ends, and the nuisance has not been abated at

12   these sites.

13               THE COURT:  And, again, there's no ruling on that?

14               MR. AXLINE:  No.

15               MR. TUITE:  This wasn't briefed?

16               MR. AXLINE:  Well, your Honor, you have ruled on this

17   before, and we put your prior rulings into our letters to you

18   for this conference.  You said, and the defendants have not

19   denied this, that the rule is that there's a new cause of

20   action every day that there's a continuing nuisance until it's

21   abated.

22               So I really don't think there's going to be a big

23   fight about whether that's the legal rule.  I think the

24   defendants are hanging their hat -- Shell and BP are hanging

25   their hat on an argument that we didn't raise this in the

1    opposition to the summary judgment motion.

2            THE COURT:  But you're saying, in terms of preparing

3    56.1 type statements, there won't really be a back dispute,

4    you're going to concede that they didn't use it after X years,

5    but you're going to say it's a matter of releases or

6    contaminations that have not been abated, and that's a

7    continuing nuisance.

8            MR. AXLINE:  Exactly.

9            THE COURT:  So you should be able to agree on the

10   facts.  It's just becomes a legal question that you say I have

11   not squarely ruled on.

12           MR. AXLINE:  Correct.

13           MR. CONDRON:  Your Honor, I'm not sure that's entirely

14   correct.  If we're going to agree on that fact -- of course,

15   I'm looking at the three focus sites here.  The state agency in

16   California issued something called a low threat closure plan

17   for all three of the Shell sites.  There's a question in that

18   which says, does a nuisance exist as defined by Water Code

19   Section 13050.  For all three of the sites, the answer is no.

20   So we do have a factual dispute on that.  But setting that

21   aside, there's no evidence that there's any continuing nuisance

22   that was ever put in the record --

23           THE COURT:  He just said how he defines continuing

24   nuisance means the known nuisance has not yet been abated, and

25   he said as a matter of law, that equals a continuing nuisance.

F6IKMTBC                    Conference

1          MR. CONDRON:  We'll have the legal dispute on that

2     issue.

3          THE COURT:  Right.  But that's a legal dispute, that's

4     not as hard.  Then there would be the question of whether the

5     consent decree cuts it off anyway.

6          MR. CONDRON:  Correct.

7          THE COURT:  So there would be two steps to the legal

8     argument, whether that is the continuing nuisance because it

9     hasn't been abated and whether, in any event, it's cut off by

10    the consent decree because the consent decree should cover any,

11    I would think, contaminations that occurred up to the date of

12    the consent decree whether or not they have been abated.

13    That's what you bought when you settled, or at least that's

14    what you are going to argue.

15         MR. CONDRON:  Correct.

16         THE COURT:  I'm helping you frame your argument.

17         But in any event, the point is, shouldn't I squarely

18    rule so there's something to take up that does the trick?

19         MR. CONDRON:  Well, we believe that you have, your

20    Honor.

21         THE COURT:  Not really.  You just said, oh, no, you

22    don't believe.  You said I studied the order, and you never

23    ruled on the issue they would like heard.

24         MR. CONDRON:  You never ruled on that particular

25    issue.  You have found, however, that there was no continuing

F6IKMTBC                    Conference

1     harm in the footage in the opinion.

2              THE COURT:  Well, a footnote is a footnote.  Why don't

3     we just get this done real fast, so that there is an explicit

4     ruling on the open issue, so to speak, because the one you said

5     I never ruled on, you're the one who pointed it out in

6     reviewing --

7              MR. CONDRON:  On his explicit issue, not on the issue

8     that really should be this, the important one to be focused on,

9     which is a continuing harm, and you did rule on that.

10             THE COURT:  In this footnote?

11             MR. CONDRON:  Correct.

12             THE COURT:  Well, I don't know if that was a subject

13     of full briefing or not.

14             MR. CONDRON:  We certainly briefed it in our brief,

15     your Honor.

16             THE COURT:  Yes.

17             Since I think 54(b) is the best way to go, and even

18     better than 1292 -- I'm on the fence.  1292, as somebody

19     pointed out, they may not take it, and that doesn't advance

20     anything, but since I -- since I'm leaning toward 54(b), and

21     you say the order doesn't address the issue, then I would like

22     to squarely write on the issue as fast as I possibly can, which

23     would mean allowing briefing on a very limited issue.  And a

24     limited record, I think.  And I would think a joint 56.1

25     statement that can be presented without disputed issues of

F6IKMTBC                    Conference

1    fact.

2          Some facts are agreed here, like you were not using it

3    after a certain date, and their theory is that if it's not

4    abated, it continues.  And you, of course, would come back and,

5    say, even if that's true, the consent decree cuts it off.

6          All right.  Who's the moving party?  Where am I?

7          MR. AXLINE:  I think, fairly, the district, Mike

8    Axline, should be the moving party.

9          THE COURT:  I really like this one done fast because

10   this is about to be remanded.  This is holding us up.

11         MR. AXLINE:  We could file our motion in two weeks.

12         THE COURT:  You're reading my mind, Mr. Axline.  I was

13   thinking two weeks.  So today is June 18.  That's good, it's

14   before the holiday.  That's July 2nd.

15         MR. AXLINE:  July 2nd.

16         THE COURT:  And keep it as late as you can.  Obviously

17   I think it presents a discrete issue or two left over from the

18   major rulings already made.

19         How long would you need to respond?

20         MR. CONDRON:  Your Honor, I'm leaving the country on

21   July 5th for a week.

22         THE COURT:  Yes, but you're not doing it alone,

23   Mr. Condron.

24         MR. CONDRON:  No.

25         THE COURT:  I know you're not.  But, anyway, what were

F6IKMTBC                    Conference

1  you going to suggest?

2         MR. CONDRON:  I would just ask for three weeks, just

3  to give a little leeway on that.

4         THE COURT:  July 23rd and reply?

5         MR. AXLINE:  Ten days.

6         THE COURT:  Oh, you got it again.

7         Maybe you've been doing this with me so long, that you

8  know exactly what the schedule is going to be.  So that would

9  take you to August 3rd.  That's the best I can do.  And I

10 hopefully, maybe with luck, can try to squarely address this

11 fast.  If not, I'll get to it when I get to it, but I'll try to

12 go fast.

13        Okay.

14        MR. AXLINE:  So, your Honor, this raises a related

15 issue, and that is the suggestion to remand itself, which will

16 be, I think, impacted by your ruling.

17        THE COURT:  Of course.

18        MR. AXLINE:  I guess --

19        THE COURT:  I ruled on the declaratory half, and then

20 there's this darn issue.

21        MR. AXLINE:  Yes, I would suggest -- I think I would

22 like to hear from the defendants on this, but it would make

23 sense to hold off on the suggested remand until this gets

24 resolved.

25        THE COURT:  I think so.

F6IKMTBC                    Conference

1          MR. PARKER:  Your Honor, Jeff Parker.  I would like to

2     address the declaratory relief point, if I could, briefly.

3          In 2006, your Honor --

4          THE COURT:  I know all that.  I stated it.  I gave you

5     the whole history of all my rulings.  I understand what I said

6     on one day, and I understand what I said on another day, and I

7     reviewed each of my statements, and I conclude, I conclude,

8     that the appropriate thing to do is to leave it in as a claim

9     because I was told -- I went through all this already.  Why

10    should I repeat myself for the record?  You can read the

11    transcript.

12         Go ahead.

13         MR. PARKER:  Your Honor, one thing, then:  With

14    respect to the 2011 opinion, they have represented in their

15    letter that your Honor held that debt relief was a viable

16    claim.  That's actually not what the opinion said.  This was in

17    the introduction, it was a preface leading into their motion,

18    which was their motion for summary judgment on the OCWD act,

19    public nuisance and trespass, which your Honor denied.  So it's

20    a statement at the beginning essentially laying the groundwork

21    or the backdrop against which you were deciding.  It was not

22    any ruling reinstating or overruling --

23         THE COURT:  No, no, I understand it wasn't reinstating

24    or overruling, but declaratory judgment, in some context, was

25    not ruled out, such as future expenses.  I pointed that out.

F6IKMTBC                 Conference

1          Also, it was in the list of claims.  For a host of

2     reasons, this is the better way to go.  Once it's back there,

3     and you want to move to dismiss that claim explaining this

4     whole history, go ahead, but I think given all the various

5     rulings I've made over time, this is the better way to go.

6          MR. PARKER:  Thank you, your Honor.  As long as we

7     have that clear in the record, that given the opportunity back

8     in the district court, we could move against that, we're fine.

9     Thank you.

10          THE COURT:  You can explain why you think it applies

11     across the board when the original opinion in '06 clearly said

12     it's duplicative of the continuing nuisance, and that's why I

13     was striking it.  But good luck, it's fine.  As I said, you've

14     got to keep that judge busy, too.

15          So I think that takes us to the Rule 12 motions in

16     Puerto Rico.  And I don't know if there's a lot to say there

17     except that defendants complain plaintiffs have basically been

18     too busy to talk to them, and that the plaintiffs have said,

19     after June 15th, we promise to sit down with you.  I realize

20     today is June 18th, which is all of three days later, but the

21     promise is there.  If everybody would sit down and try to be

22     sure that I don't have work I shouldn't have to do, the motion

23     to negotiate would be most appreciated.  I might even be

24     agreeable to letting the motion deadline slip by a week or so,

25     so you can continue these talks and be as efficient as possible

F6IKMTBC                    Conference

1    with what has to be briefed or not.  What more can I say today?

2    That seems to me that what I can say is that I want the

3    plaintiff to sit down with you and be as agreeable and

4    commonsensical as possible, and whatever is left over has to be

5    a motion.

6              MR. PARDO:  Okay.  That is actually very help.  Jim

7    Pardo, for Exxon Mobil, your Honor.  That's very helpful, your

8    Honor.

9              THE COURT:  I don't know why, but, good.

10             MR. PARDO:  No, it is because it's always helpful when

11   you encourage us to talk, but let me see if I can push it a

12   little further because I'd like a little more encouragement

13   from you to them.

14             THE COURT:  Okay.

15             MR. PARDO:  On May 7th, I talked to you about two

16   possible motions.  One dealt with the fact that several

17   defendants in this case just couldn't figure out why they were

18   here.  Those are conversations that should take place the next

19   couple of weeks.  Maybe we can get that worked out.

20             The other motion, though, pertains to these nonsite

21   specific I1Y claims that have been asserted in the second

22   Puerto Rico action.  They are identical or virtually identical

23   to the same island-wide nonsite specific claims that were

24   asserted --

25             THE COURT:  In Puerto Rico I?

F6IKMTBC                    Conference

1              MR. PARDO:  -- eight years ago in Puerto Rico I, okay.

2              Our argument -- and you had this discussion with

3    Ms. Hannebut and Ms. O'Reilly a year ago -- is they're either

4    barred by the statute of limitations, because they clearly knew

5    by 2007 when they filed the first case, or at a minimum,

6    they're barred by the prior pending action.  You said this an

7    hour ago, I don't need any more motions.  We don't want to

8    burden you with this motion, and a year ago, you said I don't

9    really want this to be a motion, they shouldn't be in the

10   second.

11             THE COURT:  I still think that, at least listening to

12   one side; it's always very convincing when one side is heard.

13   But you make it sound right, either prior pending or statute of

14   limitations, island-wide nonspecific site claims are gone.

15   They're seven years too late at least.  I understand your

16   point, but I'd like the plaintiff to get to that point

17   themselves or explain why not.

18             Mr. Gilmour.

19             MR. GILMOUR:  Yes, your Honor.  If I might just for a

20   moment talk about the May 7th teleconference that Mr. Pardo is

21   referencing.  We did have that conversation.  You may also

22   remember, your Honor, that Mr. Kauff explained to you, Scott

23   Kauff, that there were additional new defendants that were

24   added, either 12 to 18, and you yourself said, your Honor,

25   that -- we represented that we did not believe the prior

1    pending action doctrine would apply to them.  You yourself said

2    that sounds right to me, Mr. Pardo, do you agree.  He also

3    said, I think that's right.

4              THE COURT:  But there's still the statute of

5    limitations.

6              MR. GILMOUR:  Yes, your Honor.  And to the extent that

7    we can have those conversations with defendants, we will.

8              THE COURT:  Okay, good.  That's all I'm saying, do it

9    now, do it fast.  The motion date is June 29th.  I would be

10   amenable if they sit down with you quickly to letting that slip

11   by a week or so.  But this has got to get briefed, too, if I

12   have to do it.

13             MR. PARDO:  We don't want to have to do it.

14             THE COURT:  I agree.

15             MR. PARDO:  Let me say this, though.  I'm not afraid

16   to admit when I'm wrong.  When I said that the prior pending

17   action doctrine -- on that call, when I said, yeah, that sounds

18   right to me, I was wrong.

19             THE COURT:  Even if they weren't parties?

20             MR. PARDO:  Even if they weren't parties.  And there's

21   Southern District case law on this cited in our letter to them

22   on June 8th, you do not need identical parties between you.  We

23   got the same claims.  Basically the same parties because most

24   of the new parties are just subs or affiliates of parties from

25   the first action.  We got the same categories of parties.

F6IKMTBC                    Conference

1   Everything that needs to line up for invocation of the prior

2   pending action doctrine lines up here.

3           THE COURT:  They have two good answers.  You have to

4   see if this motion has to be made.  I'm not going to be real

5   happy if it's made, and it's open and shut.

6           MR. GILMOUR:  Understood.

7           THE COURT:  But you'll decide, Mr. Gilmour.

8           MR. GILMOUR:  Yes, your Honor, understood.  And,

9   again, we're happy to discuss it with them.

10          MR. PARDO:  Did we pick the date --

11          THE COURT:  Not yet.  If I hear that you sit down and

12  are really talking, and I get a joint letter saying we are

13  talking after the conference with you where you were so strong

14  in your encouragement we actually met, could we have another

15  ten days, I'm inclined to say yes, but I don't want to do it

16  now.  If they're not going to sit down with you, you have to

17  make a motion June 29.

18          MR. PARDO:  I like that approach.

19          THE COURT:  If they don't sit down in the next few

20  days, you start writing.

21          MR. PARDO:  All right.  Fair enough.

22          MR. GILMOUR:  Thank you.

23          THE COURT:  And that was the last -- I think the last

24  item on my agenda.

25          Is there anything else anyone of the vast number of

 1   lawyers here wants to raise?

 2            MR. AXLINE:  Next conference, your Honor?

 3            THE COURT:  That's always a good one.  Do you have a

 4   suggestion?  When will it be ripe, so to speak?  I'm trying to

 5   think what dates.  Nothing really was set here that would

 6   affect the next conference.  I want to get that CMO hammered

 7   out in Pennsylvania, I've given guidance on that.  So it sounds

 8   like the usual, one month.  Sort of mid to late July?

 9            MR. AXLINE:  Yes.

10            THE COURT:  When everybody's away.

11            MR. AXLINE:  Particularly for the CMO.  I think it's

12   more likely people will be gone in August.

13            THE COURT:  Okay.  It's nice that some people take

14   vacations.  Anyway mid to late July.

15            Any suggestions?  They're all the same to me.  You

16   know what days you prefer traveling.  You don't like Mondays

17   and Fridays, right?

18            MR. AXLINE:  Correct.

19            MR. PARDO:  No.

20            MR. AXLINE:  I don't have a calendar in front of me --

21            THE COURT:  Tuesday, Wednesday or Thursday.

22            MR. AXLINE:  Right, the last week in July.

23            MR. PARDO:  Well, that would be the 30th is a

24   Thursday, the 23rd is also a Thursday.  It's the third --

25            THE COURT:  I think one of those, I might be away.

F6IKMTBC                         Conference

1    The ABA has me for something.  One second.

2              Oh, ABA is the very last week, so I guess like the

3    29th.  So everything is good except the 29th and 30th.  Those

4    aren't good, but everything else is.

5              MR. PARDO:  The 28th is a Tuesday, your Honor.

6              THE COURT:  That's okay.  I like it.  28th at 2:30?

7              MR. PARDO:  Sure.

8              THE COURT:  Done.  July 28th at 2:30.

9              Okay.  Everyone, good to see you.

10             COUNSEL:  Thank you, your Honor.

11             (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25