83B5OCWM                        motion

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ORANGE COUNTY WATER DISTRICT,

4                    Plaintiff,

5              v.                          04 Civ. 4968 (SAS)

6    UNOCAL, et al.,

7                    Defendants.

8    ------------------------------x

9                                         March 11, 2008
                                          11:05 a.m.
10   Before:

11                    HON. SHIRA A. SCHEINDLIN,

12                                        District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

83B5OCWM                              motion

APPEARANCES

MILLER, AXLINE & SAWYER
        Attorneys for Plaintiff
BY:  MIKE AXLINE

MCDERMOTT, WILL & EMERY
        Attorneys for Defendant Exxon Mobil Corp/Defendants'
Liaison Counsel
BY:  STEPHEN J. RICCARDULLI

ARNOLD & PORTER, L.L.P.
        Attorneys for Defendant BP Products North America, Inc.,
BP West Coast Products LLC and Atlantic Richfield, Co.
BY:  MATTHEW HEARTNEY

KING & SPALDING, L.L.P.
        Attorneys for Defendant Chevron U.S.A., Inc.
BY:  CHARLES C. CORRELL, JR.

MUNGER, TOLLES & OLSON, L.L.P.
        Attorneys for Defendant Shell
BY:  WILLIAM D. TEMKO

WALLACE, KING, DOMIKE & REISKIN
        Attorneys for Defendant Shell, Texaco, Chevron and Unocal
BY:  RICHARD E. WALLACE, JR.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

83B5OCWM                              motion

```
 1              (Case called)

 2              THE COURT:  Mr. Axline.

 3              MR. AXLINE:  Good morning, your Honor.

 4              THE COURT:  Mr. Riccardulli, good morning.

 5              MR. RICCARDULLI:  Good morning.

 6              THE COURT:  Mr. Heartney.

 7              MR. HEARTNEY:  Good morning, your Honor.

 8              THE COURT:  Is there a Mr. Correll?

 9              MR. CORRELL:  Good morning, your Honor.

10              THE COURT:  Mr. Temko.

11              MR. TEMKO:  Good morning, your Honor.

12              THE COURT:  And Mr. Wallace.

13              MR. WALLACE:  Good morning, your Honor.

14              THE COURT:  Good morning.

15         Well, I thought we had a telephone conference and my

16    clerk said *you made them come in all the way from California.*

17    I guess I did.  I'm sorry about that.  Mr. Axline has just said

18    if it is a serious dispute of promotion issue it is still kind

19    of hard to do on the phone.  Still, I'm sorry.  I came in

20    thinking it was by phone.

21              MR. AXLINE:  I have a daughter here, your Honor, so it

22    gives me an opportunity --

23              THE COURT:  That makes me feel much better.

24         In any event, I have a letter dated February 19th --

25    and forgive my lack of voice, it is an asthma situation --
```

 1    anyway, February 19th from the plaintiff asking for a

 2    pre-motion conference stating its intent to request leave to

 3    file an amended complaint and to request an extension of time

 4    to file the Orange County Water District's brief on the statute

 5    of limitations.

 6            It seems the parties don't disagree on a small change

 7    with respect to paragraphs 104 and 106 which is, the defense

 8    says all they accepted, but there is a bigger change that

 9    plaintiffs want to make which is to replace the term

10    "groundwater" with such terms as "public drinking water

11    supplies" and "principal aquifer."

12            The defense wrote a letter dated February 22nd, 2008

13    saying they had thought they negotiated an agreement on an

14    amended complaint.  They had no problem, again, with paragraphs

15    104 and 106, but they think the change with respect to the

16    phrase "groundwater resources," which has been around since the

17    beginning of this case but certainly since the briefing on the

18    statute of limitations motion, is a major change and it

19    implicates the Court's reasoning in the earlier statute of

20    limitations decision and in the permission to have supplemental

21    briefing.

22            So, the defense writes, and I quote, by replacing the

23    term groundwater with phrases such as "principal aquifer,"

24    "public drinking water supplies" and "usable water," the

25    District evidently hopes to salvage its statute of limitations

1    opposition by arguing that its jurisdiction is limited only to

2    parts of the groundwater basin under its management and only

3    some of the groundwater found there.

4            And, they oppose the amendment saying it is dilatory

5    and it is prejudicial.

6            So, that's the summary of the letter writing.  I

7    thought it would be useful to hear you orally.  I don't want to

8    say any more if I can possibly help it.  If I could switch the

9    talking to you folks it would be a lot better.

10           So, they say you have the burden Mr. Axline, so and in

11   a sense you didn't have a chance to reply to their February

12   22nd letter.  So, in the nature of reply in further support of

13   the application, can you explain why the Court should allow it?

14           MR. AXLINE:  I will, your Honor.  And I will do so by

15   explaining my reasoning.

16           We were working cooperatively in response to a

17   suggestion from the Court to amend the Orange County Water

18   District Act language in the complaint, and we did reach an

19   agreement on that.  Simultaneously with that work our office

20   has been working on the supplemental brief on the statute of

21   limitations.

22           Reading back over the briefs and this Court's opinions

23   on primary jurisdiction and some of the work that has happened

24   in this case --

25           THE COURT:  Yes.

83B5OCWM                              motion

1           MR. AXLINE:   -- although I think the initial

2     complaint was accurate and still is accurate with respect to

3     the scope of the Orange County Water District's jurisdiction,

4     the nature of the claims that it is making in this case has

5     been clarified through briefing hearings with the Court.

6           For example, as the Court and defendants know, the

7     District injects sea water at a certain point along the

8     coast -- or injects, I'm sorry, water at a certain point along

9     the coast to hold back sea water.  And although the District

10    has jurisdiction over the groundwater that is present in the

11    area between those injection wells and the coast, the District

12    is not asserting in this case any injury to that groundwater.

13          Similarly, in the briefing on primary jurisdiction the

14    District explained, and the Court agreed, that with respect to

15    discharges that are currently being remediated by the regional

16    water quality control board, although the District has

17    jurisdiction over those discharges it has a memorandum of

18    understanding with the regional board and therefore is not

19    asserting claims in this case for discharges that are being

20    remediated by the regional water quality control board.

21          In addition to that, some of the discharges may have

22    occurred in what are called perched aquifers where there is, it

23    is a narrow band of groundwater close to the surface that

24    doesn't present a threat to the principal aquifer that the

25    drinking water supply that the District is concerned with.

83B5OCWM                              motion

 1              To be candid about my thinking, it may have been

 2      fine -- I think it probably would have been to leave the

 3      complaint as it was and simply argue these points with regard

 4      to describing the District's injuries.  But, I thought as I was

 5      working through this and looking at the complaint in a way that

 6      it would benefit all parties if the District took advantage of

 7      this point where we are and amended the language of the

 8      complaint to clarify in the complaint itself more precisely the

 9      nature of the District's injuries.

10              So, that was the thinking behind that.

11              THE COURT:  Would you agree it is a narrowing of the

12      claim?

13              MR. AXLINE:  Yes.

14              THE COURT:  It is a limiting of the claim?

15              MR. AXLINE:  Yes.

16              THE COURT:  That's what it sounds like.

17              MR. AXLINE:  Yes.

18              THE COURT:  What about answering their point about

19      prejudice?

20              MR. AXLINE:  I will let them explain that in more

21      detail.  I frankly don't see it, your Honor.  I don't think

22      that anything we are saying here is inconsistent with what

23      we've presented to the Court today in the briefing on the case.

24              THE COURT:  Well, relating it to the statute of

25      limitations I guess it affects the date of known or should have

83B5OCWM                              motion

1    known; right?

2            MR. AXLINE:  Well, I think that it takes out of the

3    defendant's concerns discharges in the areas that I've been

4    talking about on the coast or confined to aquifers and so it is

5    not just the statute of limitations.

6            THE COURT:  That's why I said it does sound like a

7    narrowing.  It is a narrowing of the claim.

8            MR. AXLINE:  Yes.

9            THE COURT:  It is a limitation of the claim.  So, to

10   that extent, the defendants should be happy.  On the other

11   hand, it probably pushes the date as to when you knew or should

12   have known of the injury forward.  Because with the broad term

13   groundwater, there was certain proof in some instances that

14   there was no way no way you didn't know.  There was litigation,

15   there was an injury.  They think you are trying to get out of

16   that problem by this newer definition.

17           MR. AXLINE:  That may be what they think is prejudice,

18   your Honor.  I don't think it is because it is perfectly

19   consistent with our prior briefing.

20           We have taken the position in all of the prior

21   briefing on the statute of limitations and on primary

22   jurisdiction that the District is not harmed until

23   contamination escapes remediation efforts in amount sufficient

24   to threaten drinking water.  And that's what we are seeking to

25   amend the complaint to specify as well.

1        THE COURT:  So now are you saying it is a matter of

2    having the pleadings conform to the proof?  Which is an old

3    concept and not an unheard of one; that the proof that you have

4    been eliciting in the discovery process is that while there may

5    be groundwater contamination, we aren't injured until the

6    drinking water is affected and that's why we want to change

7    those words in the complaint.  We want to conform our pleadings

8    to what the case really is.

9        MR. AXLINE:  Yes, your Honor.  And I can understand

10   the defendants have done an excellent job of seizing on that

11   word groundwater.

12       THE COURT:  Correct; because it is broader.

13       MR. AXLINE:  It is broader and it does describe the

14   District's jurisdiction but it is too broad for what this case

15   is about.

16       THE COURT:  May be.  But you pled.

17       MR. AXLINE:  Yes.

18       THE COURT:  It may be too broad, but you put them

19   through four or five years of discovery with respect to a word

20   that you now say is too broad.  They say that not only does it

21   affect the statute of limitations motions but we may have to

22   have a "do-over" of earlier motions like primary jurisdiction.

23       MR. AXLINE:  I don't agree with that, your Honor.  I

24   think, in part, this reflects the Court's opinion and the

25   briefing on the primary jurisdiction motion.

83B5OCWM                          motion

1           The fact that the regional board is operating at some

2     sites is, I mean the Court's opinion on that is what it is and

3     nothing in this proposed amendment would suggest you have to

4     revisit that.  In fact it is intended to account for it.  If

5     they can explain how it inaccurately accounts for it I guess I

6     could respond to that.

7           THE COURT:  Okay.  Then who wants to start.

8     Mr. Heartney?

9           MR. HEARTNEY:  Yes, your Honor.  Thank you.

10          I guess to explain our concerns I would like to go

11    back to the spring of 2006 when we were about to file the

12    statute of limitations motion.

13          THE COURT:  That's two years ago.

14          MR. HEARTNEY:  Two years ago.

15          THE COURT:  Oh dear.

16          MR. HEARTNEY:  At that time we were developing our

17    motion and deciding what arguments to make in our motion,

18    obviously, and what we had in front of us were on the one hand

19    the complaint that the District had already filed which did use

20    the term "groundwater" and made other statements, and we had

21    other statements by the District some of which we cited in our

22    letter such as their December 2005 statement that the District

23    is charged with protecting all groundwater in its jurisdiction.

24          Beyond that, when we looked at the complaint and we

25    looked at their case and we said what is it that this case is

83B5OCWM                          motion

 1    about?  What have they said that is the crux of their case?

 2    What they said was that there are 400 MTBE release sites that

 3    are contaminating and threatening to contaminate the

 4    groundwater in the District.  And we had, through your Honor's

 5    assistance, gotten a list of those and they included every

 6    single underground storage tank release site in the District's

 7    territory as tabulated by the regional water quality control

 8    board.

 9            So, when we filed the motion we focused it on the two

10    injuries that we understood them to be asserting because

11    that's -- obviously from our accrual standpoint we had to focus

12    on the injuries that they were making the basis of their --

13            THE COURT:  You say two injuries, two injuries

14    being --

15            MR. HEARTNEY:  Two injuries in fact.  Injury in fact

16    number one is when they are injured -- when MTBE or TBA

17    contaminates groundwater that they're managing it, groundwater

18    that is within their jurisdiction that they're managing.  And

19    we coupled that in our minds in this first injury with their

20    statement that they're charged with protecting all groundwater

21    in the district.

22            The other injury was their need to investigate,

23    remediate, take steps, spend money, expend resources to focus

24    on the MTBE release sites, the 400 sites which they identified

25    as the crux of their case.  And their complaint stated at that

 1   time that the District is required to investigate every UST

 2   release site in its territory.  That statement is in the

 3   complaint.  In fact, I think it is still in the present

 4   complaint, I don't think they've taken that one out.

 5          But, so, we said based on this that what they're doing

 6   is focusing on these underground storage tank release sites.

 7   And so, we developed a factual record that focused on those.

 8   And we showed that with a view few exceptions all of them had

 9   been known, they existed, they were known either to the

10   District directly or they were -- the District was charged with

11   that knowledge but they were known in the regional board sites.

12          THE COURT:  I'm sorry.  Known on the --

13          MR. HEARTNEY:  Regional board field, your Honor.

14          THE COURT:  Okay.

15          MR. HEARTNEY:  So, that's what we focused our motion

16   on.

17          Then, in the supplemental briefing, we kept the same

18   focus.  Your Honor asked for certain things to be examined.

19   First, had the MTBE reached groundwater?  And we were able to

20   show that in all about again a very, very small number of cases

21   before May 6, 2000 at these sites it had in fact reached

22   groundwater.  And the second issue was had it reached

23   groundwater in levels sufficient to constitute an injury.  And

24   so, we compared it to the regulatory standard and in virtually

25   all cases, again, the MTBE that was known to exist at these

83B5OCWM                          motion

release sites before May 6, 2000 exceeded the regulatory

standard.

          And so, your Honor, the problem we have with these

amendments, we are familiar with the arguments that the

District started to make in its supplemental briefing and said,

well, we have a new four-part test that we believe should be

used.  We, of course, dispute that that four-part test is

appropriate.  In part that's based on the complaint that we

were working with and it is based on the statement that had

been made to us before we filed our motion.  But, it is also

based on the statutes that the District has which don't make

any distinction between protecting drinking water and

protecting other water.  The statutes, at least as interpreted

by the District as quoted by the District, they refer to any

contamination of groundwater.

          And so, your Honor, from our perspective if they now

say -- if they're now permitted to say, well, our case is not

about the 400 plumes that were the basis that were in our

complaint originally and they've actually changed the

allegations that relate to those to now say that only some of

those plumes are at issue, they don't identify which one which

was not what they said before.  But, if they're allowed to

change that focus, then the motion that we made is not aimed at

what they've now made the basis of their case.  They have, by

stepping in a different direction, they have stepped away from

1    the target of our motion even though the target of our motion,

2    I believe I can demonstrate, was very much on point at the time

3    that we presented it.

4            And so, we believe that there are many admissions by

5    the District that would block it and discovery, other factual

6    materials that can't be changed by just changing the

7    allegations of your complaint, that would mean that they're

8    really stuck with the old focus.  But, if they were to succeed

9    in changing the focus, then what that would mean is we would

10   have to start over with a different statute of limitations

11   argument because we would be facing a different target.

12           THE COURT:  Right.

13           But, one question I have is if you have a case where

14   somebody says there are 400 releases that have injured me and

15   then they amend the complaint to say there are 30 releases that

16   injured me; generally speaking, one would think the defense

17   would be happy about that because it takes out of the case a

18   huge number of releases that theoretically the plaintiff would

19   press for damages, to recover damages based on those releases.

20   So, generally, a narrowing or cutting back is a good thing.

21           The only reason, I suppose, that troubles me, is the

22   impact on the statute of limitations.  Because if they want to

23   rule out a lot of alleged bad conduct, so to speak, and not

24   seek recovery for it, that's with prejudice.  I mean, that's a

25   pretty powerful thing.  And they're now willing to say we are

83B5OCWM                              motion

 1    not pursuing that and not just for today we are not pursuing

 2    it, we want to focus only on that which threatens the drinking

 3    water.  We don't want to talk about contamination of the

 4    groundwater.  It is a narrower case.

 5         So, while I agree that there is a lot of effort that

 6    the defense and the lawyers put into preparing a motion

 7    targeted at the old complaint, one should maybe consider the

 8    compensation for all that time.  It is really not a bad thing

 9    to narrow a complaint.  And, it is not unheard of.

10         As I said before, we often have this notion of

11    conforming the pleadings to the proof.

12         So, Mr. Axline, when he mentioned that it is not all

13    400 anymore, it is only some, can you give the Court any idea

14    of how many is the some?

15         MR. AXLINE:  I can't give you a precise idea.

16         THE COURT:  I didn't ask for precise.  Do you have any

17    idea?  Because I'm talking about a narrowing and am telling

18    them that's kind of a good thing but I don't know if you are

19    narrowing by very little or by something substantial.

20         MR. AXLINE:  Well, I do know that there were several

21    stations in the coastal area that we previously informed both

22    the defendants and the Court we are not making claims with

23    respect to.

24         Your Honor also said in your opinion that not every

25    release to groundwater constitutes an injury and the reason is

83B5OCWM                              motion

1    because we did brief this precise issue before.

2            We have, by agreement, narrowed the focus of the case

3    for present purposes to 10 bellwether plumes.

4            THE COURT:  That's bellwether, that is not with

5    prejudice of writing off the other 390 releases.

6            MR. AXLINE:  Correct.  But we have been focusing on

7    those for purposes of the current briefing.

8            THE COURT:  I know that.

9            MR. AXLINE:  That's why I can't give you a -- I can't

10   give you any kind of a precise number.  All I can say is it

11   will narrow it.  Stations that are being remedied by the

12   regional board now are not going to be the subject of a current

13   claim.

14           THE COURT:  Stations that are being remedied by the

15   regional board now are not going to be the subject of?

16           MR. AXLINE:  -- of a current claim where there is no

17   evidence that the plume has escaped that remedial effort.

18           Now, I do want to say that if the District later finds

19   out that that plume has escaped and is threatening drinking

20   water, then we would not agree that we would be dismissing

21   those claims.  But, we are working now to narrow -- and we are

22   doing this in the context of statute of limitations briefing

23   this month.

24           THE COURT:  Yes.

25           MR. AXLINE:  That's one of the reasons why we asked

83B5OCWM                              motion

1    for some additional time.

2              THE COURT:  Right.

3              MR. AXLINE:  To assess these a little more closely so

4    that we can explain, in more detail, the status of each

5    station.  And, I do expect that there will be some stations

6    that will be taken out of the mix as a result of that closer

7    assessment.

8              THE COURT:  But you can't tell me about the 400 -- how

9    far down the 400 is going.

10             MR. AXLINE:  No, I can't tell you.  Off the top of my

11   head I would be very reluctant to even attempt that.

12             MR. HEARTNEY:  Your Honor, as I hear your question

13   suggests and it is very much on point, yes, if there was going

14   to be a meaningful substantial reduction in the case, that is

15   something we would obviously see as a benefit.

16             THE COURT:  Right.

17             MR. HEARTNEY:  Our belief is that the terms that have

18   been adopted to replace the concept of groundwater are --

19   they're very multitudinous, there are many different words and

20   they mean different things -- usable water, public drinking

21   water supplies, common water supplies of the district.

22             Our problem is we don't think that a standard has been

23   adopted here which does create a meaningful narrowing.  We

24   think that there is still so much flexibility in these terms

25   for the district that what we have is a sidestep that is more

83B5OCWM                              motion

conceptual in its basis and not concrete.  If we, in fact, had

a list that said it has gone from 500 to 20, then it would be a

whole different story.

THE COURT:  You know, I think after all of these

years -- and I don't remember the year that this case began,

maybe '03?  Does somebody remember?

MR. HEARTNEY:  '03.

MR. AXLINE:  Yes.

THE COURT:  After five years, Mr. Axline, I think it

is -- what is a good word for it -- I was going to say

chutzpah -- it is kind of chutzpah to say at this point I want

to change the case after five years and after five years of

discovery and five years of effort by the defendants without

giving something back which would be rather specific narrowing.

So, I think that if you are going to make this motion

and they're going to have to oppose this motion because, after

all, this is only a pre-motion conference, I'm not inclined to

grant it unless it is very specific as to how it narrows the

case.  It is just unfair five years later to change the focus

to avoid the statute of limitations problem, which I think you

have, and I think you have come to realize you have.

But, one way around it is to focus on getting rid of

the overbroad -- what you called earlier the overbroad term

groundwater and looking more narrowly at the idea of the public

drinking water and then being able to defend on the statute of

83B5OCWM                            motion

 1   limitations ground when we knew or should have known that the

 2   threat, that there was threat to the actual drinking water.

 3          So, everybody knows why you want to do it but I would

 4   like to know and I think the defense might be satisfied if they

 5   saw how it took a broader case and made it narrower.  But, if

 6   it is just theoretical and you don't want to identify sort of

 7   the benefit of the change, I don't think you are just entitled

 8   to, willy-nilly, use a bunch of new words that are vague and

 9   don't create a bright-line cutoff for what is in the case and

10   not in the case.  There has to be a benefit if, after five

11   years, you get to change the theory such that you avoid the

12   statute of limitations problems but we don't know what is in

13   the case and what's outside the case.

14          So, I think a bright-line is needed as to what those

15   terms mean rather than a bunch of amorphous terms that don't

16   cut things out and leave things in.

17          MR. AXLINE:  I understand what you are saying, your

18   Honor.  I disagree with the defendants that we are changing the

19   case in any way.

20          THE COURT:  You are narrowing it.  You said before the

21   term "groundwater" is overbroad.  You conceded that on this

22   record.

23          MR. AXLINE:  Correct.

24          THE COURT:  All right.  So, you are trying to narrow,

25   you are trying to be more specific than this broad term

1    "groundwater" and you realize that that means that certain

2    spills/releases will be out of the case because of that.  You

3    said we are not going for releases on the coast, big releases

4    that were years ago and clearly we knew and they're being

5    remediated, etc.

6            So, you know you are cutting something out but you, at

7    this point, decline to say what.  And, you also decline to come

8    up with one bright-line term of what you are talking about.

9    They say you float between "public drinking water supplies,"

10   "principal aquifer," "usable" and maybe other terms.  They're

11   saying if you are going to make this kind of major change after

12   five years, you should be held to a bright-line test of what is

13   in and what is out.

14           If you want to talk about public drinking water rather

15   than groundwater, that's one change.

16           If you want to -- I mean, I don't know some of the

17   terms, but if you want to talk about principal aquifer as

18   opposed to everything else, that's a specific term.

19           To be able to sort of use all terms such that you can

20   expand or contract at will is really not fair.  It is just not

21   fair to the years that they've been litigating the case and I

22   have been making decisions.  It is not fair to either of us.

23           So, you know, I'm not going to allow the proposed

24   amended complaint as I see it attached to these letters.  It is

25   going to have to be some level of specificity that is a benefit

83B5OCWM                          motion

1    at the same time to the defense as it is to you, both sides

2    benefit.  Because, to narrow a case is a good thing.

3            Now, it may be that after you narrow it they will lose

4    the statute of limitations motion.  But, they will have won

5    something.  A percent of the case that was once there is not

6    there and will not be there because you have conceded it is not

7    there.  And then the statute of limitations continues to run

8    all these other years and you can't do it.

9            So, there is a real narrowing here.  Has to be.  Has

10   to be.  It can't just be sort of a wordsmithing to get around a

11   motion.  I can't allow that at this date.  Too many years of

12   effort.

13           MR. AXLINE:  I have two responses, your Honor.

14           THE COURT:  Okay.

15           MR. AXLINE:  I do understand what you are saying and I

16   would like to figure out a little more precisely where to go

17   with it.

18           THE COURT:  Right.

19           MR. AXLINE:  I do want to say that our initial

20   complaint did refer to public drinking water and it used the

21   same terms.  It didn't use them consistently.  It switched back

22   and forth between groundwater and those terms.

23           As the course of the litigation has proceeded, the

24   District has refined its claims and so we, I think at this

25   point maybe everybody is in agreement that given that

83B5OCWM                          motion

1   refinement, it would benefit the defendants if we were able to

2   identify some release sites --

3          THE COURT:  Oh yes.

4          MR. AXLINE:  -- that are no longer within our

5   definition of injury.

6          THE COURT:  Correct.

7          MR. AXLINE:  And if that will assist with reducing

8   prejudice to the defendants and with the Court's decision on

9   the motion to amend, I think we can do that.

10          I do think, however, that the terminology that we have

11   used in this complaint is the correct terminology for

12   describing the actual injury that the District is suffering as

13   a result of MTBE releases in the District service area.

14          THE COURT:  Well, why do you need so many different

15   terms?  What is wrong with public drinking water supplies?

16          MR. AXLINE:  One of the terms, public drinking water

17   supplies defines the other term, principal aquifer in a

18   colloquial way because that is where the drinking water supply

19   comes from.

20          THE COURT:  What about usable water, very elastic.

21   What is usable water?

22          MR. AXLINE:  That, your Honor -- frankly, there are

23   going to be some aquifers -- this is a very complicated

24   hydrogeological setting.  There are going to be some usable

25   aquifers that don't -- that are not part of the principal

1  aquifer that drinking water supplies are taken from and --

2          THE COURT:  Well then public drinking water supplies.

3          MR. AXLINE:   -- or that where public drinking water

4  could be taken but is not currently taken.

5          THE COURT:  It still comes under public drinking water

6  supplies.  I think they're fearful once you start using "usable

7  water" how long that will last and it will come back to

8  groundwater.  They need to get a grip on the statute of

9  limitations motion after all these years.  And, they quote from

10 your second amended complaint several paragraphs where you do

11 talk about claiming damages, to investigate, monitor, prevent,

12 abate or contain any contamination of or pollution to

13 groundwaters.  That's not where you want to be now.

14         MR. AXLINE:  That, your Honor, is a separate matter.

15         The Orange County Water District Act, like CERCLA,

16 awards some costs that you would not be able to get under

17 common law claims, and that includes investigatory claims

18 whether they lead to evidence of a common law compensable claim

19 or not.  The Act is much broader than the underlying common law

20 claims.

21         THE COURT:  That may be but they may be time-barred.

22         MR. AXLINE:  But we have amended the Act to say we are

23 not going to request any investigatory costs --

24         THE COURT:  Okay.

25         MR. AXLINE:  -- that were incurred prior to May 6,

1   2000.  So, we have done that in the complaint.

2          THE COURT:  Which complaint?  The proposed amended

3   complaint?

4          MR. AXLINE:  The proposed amended complaint in the

5   paragraphs that we stipulated to.

6          THE COURT:  104 and 106.

7          MR. AXLINE:  Correct.  We have said we are not going

8   to claim those costs but going forward those costs are much

9   broader than the underlying claims.

10          THE COURT:  But I have to deal with the statute of

11   limitations.

12          So, where does this friendly conversation leave us?

13   Mr. Heartney did you address why you thought this amendment in

14   any form might lead to re-litigating older motions like primary

15   jurisdiction?

16          MR. HEARTNEY:  Your Honor --

17          THE COURT:  Do you have any thoughts?

18          MR. HEARTNEY:  -- I will say we alerted the Court to

19   this possibility.  We have not studied it to the point where I

20   can give you chapter and verse but, generally, here is the

21   thought:

22          The thought was that when we made our primary

23   jurisdiction motion the District portrayed itself as a co-equal

24   to the regional board having the same jurisdiction as the

25   regional board and therefore under no obligation to defer to

83B5OCWM                         motion

the regional board.  There is no reason why the Court need

await what the regional board is doing.  It doesn't need to

wait to tell the regional board it has finished its work

because the District is fully capable and has every right to go

and clean up the spills itself.  And, we have heard again from

Mr. Axline that we believe they have that jurisdiction.

          But now -- well, when we look at the complaint we see

and they're saying that's not our job.  Our real job is just to

protect drinking water supplies.

          In that case we think we would need to look hard at

what happened on the primary jurisdiction motion with where we

were essentially saying wait until the regional board has

finished its work before you come in and start making claims.

This would also depend, in part, on what the universal sites

are that's left.  You know, it is hard to speak in the abstract

when we don't know the nature of the situations that they may

now want to focus their case on.

          It is, at this point, your Honor, I would simply say

we see it as a possibility because it seems to be a narrowing

of their powers or at least of their role vis-a-vis the

regional board compared to what they said in the primary

jurisdiction.

          I can't say more than that.

          THE COURT:  Mr. Axline, would this affect any of the

10 focused releases?  Do you know?

83B5OCWM                              motion

1         MR. AXLINE:  I believe that it is going to affect

2    several of the stations that have contributed to the 10 focused

3    plumes, yes.

4         THE COURT:  They would be out?

5         MR. AXLINE:  Yes.

6         THE COURT:  See, people need to know that I mean we

7    can't not know that and continue the briefing.

8         So, what comes next?  Your brief was due February

9    28th.

10         MR. AXLINE:  It is now due March 28th.

11         THE COURT:  Now due March 28th.

12         MR. AXLINE:  Yes, a couple of weeks.

13         THE COURT:  Are you going to make that date?

14         MR. AXLINE:  Yes, we are, your Honor.

15         THE COURT:  What about the amended complaint?  Do you

16    want to make the motion on that or do you want to negotiate

17    first?

18         MR. AXLINE:  I am happy to discuss this with the

19    defendants to see if we can come to an agreement on it.  I

20    think at a minimum those discussions might lead to me being

21    able to give you some more precision with respect to the

22    effects of the amendment that we are seeking in narrowing the

23    case after we discuss that with the defendants.

24         THE COURT:  Do you have another reply on this motion

25    after March 28th?

83B5OCWM                              motion

1              MR. HEARTNEY:  I believe the briefing schedule, your

2    Honor, is that the first supplemental briefing is March 28th,

3    it comes from the District.  21 days later we have an

4    opposition.  Two weeks after that, they have a reply.

5              There is three more briefs.

6              THE COURT:  Right.  The question is will you be in a

7    position to file your papers three weeks later if we don't know

8    what the complaint is?

9              MR. HEARTNEY:  It is very hard to say, your Honor,

10   without seeing what their paper is and what the next step would

11   be.

12             MR. AXLINE:  Your Honor, we are not going to be

13   presenting anything different or new beyond what we have done

14   in the prior briefing.  That's what, as I said at the

15   beginning, what I think our proposed amendments are consistent

16   with what we have said in the prior briefing on the statute of

17   limitations.

18             THE COURT:  So, why did you need an extra month?

19             MR. AXLINE:  Because we are going into much more

20   detail on specific sites in this additional briefing but it is

21   all consistent with what we have said before.

22             And, just to respond briefly to Mr. Heartney's comment

23   on the primary jurisdiction motion?  One of the reasons we have

24   gotten to where we are here is because of the outcome of the

25   primary jurisdiction motion.  And we said there and are saying

1   it again in all of our statute of limitations briefing

2   including what has been filed is that the District isn't

3   injured.  Even though it has jurisdiction it is not injured at

4   those sites unless and until the regional board's remedial

5   efforts fail and there is some indication that the contaminant

6   is threatening.

7            THE COURT:  So, in other words, you are saying you do

8   wait for the outcome of the regional board's efforts.

9            MR. AXLINE:  Correct.  Although I'm not sure "outcome"

10  is the right term.  If there is some indication, some testing

11  outside of the remedial area that the regional board oversees,

12  that contamination has escaped, then the district knows that it

13  is injured.  But, the District doesn't oversee the regional

14  board's remedial efforts and presumes, until it is given

15  information otherwise, that the Board's efforts are going to

16  address the problem.

17           THE COURT:  So, it doesn't claim injury until the

18  board is done.

19           MR. AXLINE:  Right.  And we have said that

20  consistently including prior briefing on the statute of

21  limitations motion.

22           THE COURT:  So, you think the schedule can be kept?

23           MR. AXLINE:  I do.

24           THE COURT:  March 28th; April 18th for the defense is

25  21 days; and then two more weeks, May 2.

1          That's fine.  That's good.  But, I'm not entirely sure

2     how this plays into the amended complaint issue.  I am not

3     entirely sure where we are heading with this.

4          MR. AXLINE:  I'm not sure, your Honor.  As I said it

5     myself, as I said at the beginning, this was an effort to

6     conform the pleadings to the proof and we think it does that.

7     We can certainly talk to the defendants about the uniform

8     phrase to use.

9          THE COURT:  And how it narrows the case.

10          MR. AXLINE:  And we can identify -- I'm not sure that

11     because it is so expert intensive I'm not sure that we can go

12     through all 400 release sites and say well --

13          THE COURT:  But maybe definitionally how it narrows

14     the case.

15          MR. AXLINE:  Yes.  And maybe the defendants would

16     withdraw their opposition.  I don't know.  If they don't, we

17     are going to be back before you.

18          THE COURT:  Well you are going to be back.  We don't

19     need a pre-motion conference again, we need a briefing

20     schedule.

21          So, if you think -- today is March 11th.  Should it be

22     on the same schedule?  Should you submit the moving papers on

23     the motion to amend on the same date if you can't negotiate?

24     Or does that not give you enough time for negotiating?

25          MR. AXLINE:  I'm afraid that doesn't give us enough

83B5OCWM                          motion

1    time to negotiate or, more importantly, to come up with what I

2    hear your Honor saying would be useful which is a better

3    description of how this narrows the case.

4              THE COURT:  Yes.

5              Mr. Heartney?

6              MR. HEARTNEY:  Your Honor, the timing is everything,

7    of course, because we have this briefing coming up.  To the

8    extent that the amended complaint is intended to create a focus

9    that is a critical part of their or substantive part of the

10   briefing they're going to be filing on March 28th, it seems to

11   me we need to know -- we need to have it resolved whether that

12   new pleading will be accepted or not before we --

13             THE COURT:  I can't possibly resolve it by March 28th.

14   You can't possibly brief it by March 28th.

15             MR. HEARTNEY:  I guess what I --

16             THE COURT:  He says he can make his opposition

17   regardless.  The arguments are much the same.

18             MR. HEARTNEY:  Okay.  Then, your Honor, I suggest we

19   stick with the current schedule, although I would like to note

20   that if something unexpected comes up on March 28th, we may

21   need to ask the Court for some adjustment.

22             THE COURT:  That is always the case.  But, back to the

23   amended complaint.  If you can't negotiate successfully, what

24   do you propose as briefing schedule?

25             MR. AXLINE:  Your Honor, I guess what makes the most

83B5OCWM                              motion

 1   sense to me would be to say let's not set a briefing schedule

 2   now, let's do the briefing on the statute of limitations,

 3   see -- and maybe even await the Court's ruling on the statute

 4   of limitations.  And then, since we are simply trying to amend

 5   to conform to the proof as we see it, all parties are going to

 6   have a better sense of the Court's view of the proof.  And I

 7   don't think it is going to change the briefing at all because,

 8   at least in our minds, the complaint simply is consistent with

 9   the prior briefing.

10           THE COURT:  Maybe that's right.  When you get the

11   ruling you will see what is left in the case and maybe that

12   creates the amended complaint so to speak, it is what is left

13   of the old complaint.  It may come together that way.  In the

14   ruling certain things are ruled out because they're

15   time-barred.  Whatever is left, essentially, is the complaint.

16   And it may come to the same thing you are proposing.

17           MR. AXLINE:  I'm going to be candid with the Court --

18   as I think I have been since the beginning of this discussion.

19   My thinking on this was that we have, over the course of the

20   litigation, I think, become more precise in determining the

21   nature of the District's injury and the District has been very

22   forthcoming in describing the nature of the injury.

23           So, what I didn't want to happen was to, after all of

24   that process have, where we have already conceded, for example,

25   the stations in the coastal zone that don't affect drinking

1   water and are not in the case, that have that come back against

2   us because even though we have narrowed it in the briefing,

3   there is still the word "groundwater" in the complaint.

4          THE COURT:  Right.  But when you brief it you are not

5   going to try to defend the statute of limitations with respect

6   to such releases.

7          MR. AXLINE:  That's correct.  We are not.

8          THE COURT:  All right.  So that makes it easy for the

9   Court.

10          All right.  So, maybe it will sort itself out through

11   the decision on the statute of limitations motion.  That is the

12   better way to go.

13          Okay.  I don't have anything further unless you do.

14   Thank you.

15          MR. RICCARDULLI:  Thank you, your Honor.

16          MR. AXLINE:  Thank you, your Honor.

17          MR. HEARTNEY:  Thank you, your Honor.

18          THE COURT:  Oh.  One other thing my clerk asked me to

19   ask.  There was an order from the special master, pretrial

20   order No. 40, and the question is objections, if any, would be

21   due March 18th.  Is anybody planing to file any objections on

22   that order?  It was issued February 27th, 2008.

23          MR. AXLINE:  On the plaintiff's side we are not

24   planning on objecting.

25          MR. CORRELL:  If that's the order on the plaintiff's

83B5OCWM                              motion

1    motion to compel?

2              THE COURT:  Yes.

3              MR. CORRELL:  I don't think so.

4              MR. HEARTNEY:  No.

5              THE COURT:  Okay.  Good.  Thank you.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25