0CG8ORAC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ORANGE COUNTY WATER DISTRICT,

4                  Plaintiff,

5           v.                          04 Cv. 4968 (SAS)

6   UNOCAL CORP., et al.,

7                  Defendants.

8   ------------------------------x
                                       December 16, 2010
9                                      2:35 p.m.

10  Before:

11                 HON. SHIRA A. SCHEINDLIN

12                                     District Judge

13                    APPEARANCES

14  MILLER AXLINE & SAWYER
         Attorneys for Plaintiff
15  BY:  MICHAEL AXLINE

16  KING & SPALDING LLP
         Attorneys for Defendant Chevron USA, Inc.
17  BY:  CHARLES CORRELL

18  ARNOLD & PORTER LLP
         Attorneys for Defendants BP and Atlantic Richfield
19  BY:  MATTHEW T. HEARTNEY

20  SHEPPARD MULLIN RICHTER & HAMPTON LLP
         Attorneys for Exxon Mobil Corporation
21  BY:  JEFFREY J. PARKER

22  BLANK ROME LLP
         Attorneys for Defendant Lyondell Chemical
23  BY:  JEFFREY MOLLER
         JOHN J. DiCHELLO, JR.

24

25

0CG8ORAC

```
1                (Case called)

2                THE COURT:  Good afternoon, Mr. Axline.

3                MR. AXLINE:  Good afternoon.

4                THE COURT:  Good afternoon, Mr. Correll.

5                MR. CORRELL:  Good afternoon.

6                THE COURT:  Good afternoon, Mr. Heartney.

7                MR. HEARTNEY:  Good afternoon.

8                THE COURT:  Good afternoon, Mr. Parker.

9                MR. PARKER:  Good afternoon.

10               THE COURT:  I recognize you.

11               MR. MOLLER:  Jeffrey Moller for Lyondell Chemical.

12               MR. DiCHELLO:  John DiCello, also for Lyondell.

13               MR. CORRELL:  Mr. Wallace may be joining us in person.

14  He was caught on the tarmac a couple of hours ago at National.

15  We checked our BlackBerries in downstairs, but he said he was

16  going to try and make it.  He may come a few minutes later.

17               THE COURT:  He is always welcome.

18               This is Judge Scheindlin.  Who is on the phone?

19               MR. CONDRON:  Peter Condron from Wallace King.  I

20  believe you have about eight other parties on the phone as

21  well.

22               THE COURT:  They are going to have to identify

23  themselves one by one, but I must say, Mr. Condron, I assume

24  you are just a live audience and don't intend to speak because

25  you're familiar with the difficulties of our phone system.  I
```

0CG8ORAC

1   have to keep it on speaker so that the court reporter can take

2   anything you do say, but the way the phone system works, and I

3   have told you this before I think, if you're speaking there is

4   absolutely no way for you to hear my voice.  One voice cancels

5   the other so I can't interrupt you.  In real live court I give

6   a stern look and say, all right, thank you, Mr. Heartney, sit

7   down, and he will.  But I can't say that to you because you are

8   on the phone.  So I really can't have eight lawyers on the

9   phone being heard.  You're welcome to listen in, and I don't

10  think you're welcome to say anything.

11          That said, you can state your appearances.

12          So Mr. Condron has given his appearance.

13          MR. ANDERSON:  Jon Anderson of Latham & Watkins for

14  Conocophilips.

15          MR. WILFARB:  David Wilfarb of Munger, Tolles & Olson

16  on behalf of Shell defendants.

17          MS. DOYLE:  Colleen Doyle on behalf of the Tesoro

18  defendants.

19          MR. PEREZ:  Ed Perez of Bracewell & Giuliani for the

20  Valero defendants.

21          MR. PARDO:  Jim Pardo on behalf of Exxon Mobil.

22          MS. VU:  Monica Vu on behalf of G&M Oil.

23          THE COURT:  Anybody else?

24          OK.  We have got the eight appearances on the phone.

25  For your own information, in the courtroom is Mr. Axline all

0CG8ORAC

alone for the plaintiffs, Mr. Correll for Chevron, Mr. Heartney
for Arco and BP, Mr. Parker for Exxon Mobil, Mr. Moller and his
colleague for Lyondell.  That's who is in the courtroom.

          We are waiting potentially -- we are not waiting.  We
are expecting, hopefully, maybe, Mr. Wallace depending on his
flight from Washington which was delayed.

          Having now managed to get through all the appearances,
we turn to the issue of the premotion conference, which is that
the plaintiff Orange County -- who joined the conference?

          MR. TEMKO:  Bill Temko on behalf the Shell defendants.
I am sorry I am a minute late.

          THE COURT:  You didn't hear the speech, but basically
you're a passive audience.  I won't be able to hear the nine
people or so who are on the phone contribute to the argument,
but you are welcome to listen in.

          I started to say the topic of the conference is the
plaintiff's request to make a motion for summary judgment, or
maybe it's partial summary judgment, and they wrote a letter
dated December 8 explaining their views.  Then a response came
in on December 13 from Arco explaining the defense views, more
particularly Arco's views, but I think the defense views.

          The letters did raise some interesting and important
issues.  The two that I consider procedural up front are, one,
the timing of the motion, and, two, who should decide the
motion.  The defense is arguing that the transferee court,

0CG8ORAC

1    that's me, should not decide the summary judgment, but that it

2    should be sent back to the transferor court to decide.

3            There is also an issue of timing, in that I say in

4    every case, even in this complex MDL but every other case too,

5    you don't get multiple shots at summary judgment.  If you think

6    you're ready now, that's fine, but if you lose, you can't make

7    it again on a better record.

8            So if the plaintiff is confident that now is the time,

9    then now is the time.  But plaintiff must realize that winning

10   is one thing, but losing is another.  You don't get a second

11   shot.  You know that, Mr. Axline, right?

12           MR. AXLINE:  Yes, your Honor.

13           THE COURT:  That's really, I would say, plaintiff's

14   choice more than any ruling I would make.  If the plaintiff

15   feels this is a right time, an opportune time, and the record

16   is developed enough to support the position, then I certainly

17   would allow it at this time.

18           With respect to the second procedural issue, what

19   court should decide it, I don't know that defendants' argument

20   is that as a matter of law this court cannot do it.  I think

21   the argument is discretion.

22           Is that right, Mr. Correll?

23           MR. CORRELL:  Yes, your Honor.  It's your discretion.

24   You have jurisdiction to do it.  But as we set forth in the

25   letter, what developing MDL case law says --

0CG8ORAC

1          THE COURT:  You read my face.  He read my face for the

2     people on the phone.  I gave him a funny little nod at the

3     notion of developing case law.  Basically, you cited two recent

4     district court opinions that have to do with an employment

5     case, where every plaintiff, it would have to be decided what

6     job category that plaintiff falls in with UPS.  I don't know

7     that that's really a developing trend.

8          I did look into this issue a little bit in terms of

9     actually the plain language of the MDL rules, the governing

10     statute 28 U.S.C. 1407 and the rules developed since then, and

11     whatever annotations I could find as to what existed up till

12     now.  And while I am happy to hear you, I have to say I don't

13     think these two cases of the UPS show any developing trend at

14     all.  The point is there would be thousands of these little

15     fact specific plaintiffs, what category are you in.

16          The rules assume that summary judgment will in fact be

17     decided by the transferee court prior to remand, and whatever

18     little case law there was that reached to the circuit courts

19     also said, of course, the transferee court certainly has the

20     power, which you're not arguing, certainly has the power to do

21     it.

22          I also note that the court, at the defendants'

23     request, did decide a summary judgment in the Orange County

24     case.  The defense made a summary judgment motion based on

25     statute of limitations.  It was a complicated motion.  I think

0CG8ORAC

1    we had to brief it twice.  It took a couple of years in the

2    end, but it was made and decided, certainly without objection

3    by the defendants since the defendants brought it in the

4    transferee court.  So in this particular case, I would find it

5    troubling that it was OK for the defendants to bring their

6    statute of limitations summary judgment, but somehow it isn't

7    OK for the plaintiff to bring its motion for full or partial

8    summary judgment.  That would bother me in the same case to

9    take an inconsistent view.

10          So I have to say, while I am happy to hear you, I am

11    inclined to do it, and I think up till now I have done all the

12    summary judgments, but go ahead.

13          MR. CORRELL:  Two points.  The reason I say developing

14    case law, if you look at the Nuvaring Products Liability case,

15    what the judge there says is, "Like other MDL judges before me,

16    I find such case specific rulings are neither the purpose nor

17    the forte of a court presiding over multidistrict litigation.

18    An MDL seeks to promote judicial economy and litigation

19    efficiency by allowing the transferee court to preside over

20    matters common among cases.  Given this function, the

21    transferee court typically does not rule on cumbersome case

22    specific legal issues."

23          And he cites a couple of cases.  That's why I said

24    developing law.  He cites two or three.  Then specifically to

25    the In re Orthopedic Bone Screw Products case, in which there

0CG8ORAC

1   is a finding that adjudication of summary judgment motions

2   pertaining to state law claims would slow down the MDL process,

3   thereby deferring state law dispositive motions to the

4   transferor courts.  And I think the reason that they do it is

5   because when this case gets back to California, the trial court

6   is going to have to figure out how to try this case.  He is

7   going to have to come up with jury instructions, he is going to

8   have to rule on evidentiary issues, and a lot of times these

9   case specific summary judgment motions will aid in that

10   process.

11          If we look at the motions that the plaintiffs are

12   talking about, they don't go to all defendants, they don't go

13   to all the sites, and they are not even complete summary

14   judgments at those sites.  So, therefore, at the end of the day

15   when we go through this, you will have basically the case in

16   the same posture going back whether or not you decide these

17   motions, and they won't have docket-wide implications.  The

18   OCWD in all this briefing proclaims how different it is from

19   the other California plaintiffs.  The OCWD act is in no other

20   motions and it doesn't provide water.  It's in a unique

21   position.

22          As far as the defendants' motion for summary judgment,

23   if your Honor will recall, in the four focus cases it was

24   ordered that certain motions be brought on a schedule, and the

25   defendants complied with that order.

0CG8ORAC

1          THE COURT:  But defendants didn't say, we are happy to

2     bring the motion, but we don't think it belongs in the

3     transferee court; we think we should make that motion in the

4     transferor court and you should send it back for that purpose.

5     It's true I issued a schedule, but you didn't raise this whole

6     question.

7          Anyway, have you made enough of a record?  I can't

8     imagine in the exercise of discretion this could ever be a

9     reversible problem, but I am not inclined to send it there.  To

10    me, pretrial proceedings means pretrial proceedings.  I intend

11    to complete the pretrial proceedings in this case.  I have had

12    long familiarity with this case.  I have dealt with every issue

13    in this case.  Frankly, I think we will get it done faster than

14    any district court in California, given the familiarity with

15    the case, given the backlog and other people's dockets, given

16    the known speed of this court in resolving motions.

17         I think given that, Mr. Axline, so far your flight

18    wasn't worth it.  You haven't gotten to say a word.  Hopefully,

19    that will change.

20         MR. AXLINE:  So far it is worth it, your Honor.

21         THE COURT:  You didn't get to argue anything.  You

22    just got to watch and smile from time to time.

23         Now, given the fact that I think I ought to do it,

24    even though there are perfectly good arguments for not doing

25    it, I do respect that, I think we ought to turn to the motion.

0CG8ORAC

1          First of all, it is partial summary judgment.  Your

2     adversary is right.  Is that true?

3          MR. AXLINE:  That is correct, your Honor.

4          THE COURT:  I misspoke earlier on the record.  It's

5     clearly partial.  And he says it's not even against all

6     defendants and all sites, right?

7          MR. AXLINE:  That is correct, your Honor.

8          THE COURT:  Fair enough.

9          I understand there is an argument about the fact that

10    it may involve 20 sites but in your premotion letter you only

11    address one representative site, and the defense seemed

12    troubled by that.  Once again, I seem less troubled by that.

13    It is a premotion conference.  He would have had to write

14    essentially 20 two-and-a-half-page letters to get fact specific

15    on each.  I think what he is saying is the Arco example is

16    representative of the issues, and if he can, at least for the

17    premotion purpose, deal with the generic issues in this

18    discussion, those generic issues apply to the 20 sites.

19          Now, when the briefing actually comes, I don't know,

20    Mr. Axline, if your intention was to only move with respect to

21    Arco and then say, and you should apply this ruling to 19 other

22    sites, or were you planning to try to do one omnibus motion

23    that did address facts?

24          MR. AXLINE:  The latter, your Honor.  We think, as you

25    can probably tell from the letter, that there are common types

0CG8ORAC

1   of evidence, a common pattern at all of these gas station

2   sites, that will tee up the question of whether, given the

3   property ownership, UST ownership, franchise control and

4   control over the remedial process, and the uncontested fact of

5   MTBE above the MCL at the site, is that adequate partial

6   summary judgment with respect to nuisance, trespass and the

7   Orange County Water District Act.

8           THE COURT:  Right.  But those are the facts in common.

9   There are also facts that would diverge somewhat.  So you would

10  address each of the 20 sites in the motion.

11          MR. AXLINE:  Correct.

12          THE COURT:  Separately.

13          Does that meet your objection on that ground, Mr.

14  Correll?

15          MR. CORRELL:  It does not, your Honor.  The reason is

16  obviously Mr. Axline knows what sites he is talking about.

17          THE COURT:  I didn't realize that.  You don't know

18  which the 20 sites are that he would intend to move on?  I

19  didn't appreciate that.  I thought the defense knew.

20          MR. AXLINE:  We haven't actually done the motion.

21          THE COURT:  Of course not.  But you must know the

22  sites you intend to move on.

23          MR. AXLINE:  There are a couple that we are still

24  evaluating.  We can tell the defendants now before we file the

25  motion I suppose.

0CG8ORAC

1             THE COURT:  Tell them right now.

2             MR. AXLINE:  I don't know them off the top of my head.

3             THE COURT:  You didn't bring any piece of paper with

4     you that tells you that?  I bet you did.

5             MR. AXLINE:  I did not.  However, I can do it

6     tomorrow.

7             THE COURT:  But not for today's discussion.  All

8     right.  Sadly, send him the list, but I thought you actually

9     did know and you know which defendants would be involved in the

10    motion.

11            MR. AXLINE:  I do, and I identified the defendants.

12            THE COURT:  That we do know.

13            MR. AXLINE:  That I did.  Obviously, they can figure

14    it out.  They know which stations they own and franchise.  But

15    I will send them the list.

16            THE COURT:  How many sites will it be?

17            MR. AXLINE:  19, possibly one or two more.

18            THE COURT:  Between 19 and 21.  He said he has told

19    you which defendants will be involved in the motion, and he

20    will identify the sites before actually making the motion.  But

21    in terms of the premotion conference construct, while I

22    appreciate your objection, it doesn't pay to put this off

23    longer to discuss the 19 or 21 sites individually.  There

24    certainly are some common facts, as he said, and he did list

25    them out.  They were, all the sites are owned or leased by one

0CG8ORAC

1    of the defendants, in each site the contamination has exceeded

2    the MCL for a period of time, and in each case the defendant,

3    who owns or leases, has engaged in apparently some amount of

4    remediation.  So those at least are common.

5         Now, Mr. Axline, you're not done.  I think you have to

6    answer some of the attacks, so to speak, that came in Arco's

7    letter that weren't procedural.  One is this notion of to

8    establish a nuisance or a trespass as a continuing nuisance or

9    trespass it must be, and this is a new English language word,

10   it must be abatable.  If it's not abatable, then it's, I guess,

11   not continuing, it's permanent or done; it became permanent

12   when it was not abatable.

13        So what do you have to say about this word abatable?

14        MR. AXLINE:  Several things, your Honor.

15        One is that under the Orange County Water District

16   Act, the act statutorily creates a presumption that the

17   district's cost of investigation and remediation are reasonable

18   and puts the burden on the defendants.

19        THE COURT:  I think you're seguing to a slightly

20   different topic.  I didn't want to turn to the act, and I

21   didn't want to turn to the shifting burdens.  I wanted to

22   really deal in a sense with the notion of continuing tort and

23   time bar.  So this concept of abatable is more in the common

24   law claims of nuisance and trespass.  I wasn't ready to move to

25   the statutory claims and shifting burdens.  Could we stay with

0CG8ORAC

1   my question?

2          MR. AXLINE:  Certainly, your Honor.  I do want to make

3   the point, however, that the valuation of the abatement issue

4   is colored by the nature of the district and its powers.

5          Now, the leading case, in our view, on the abatement

6   issue is the Mangini case in the California Supreme Court, and

7   there the court did say that, in responding to a statute of

8   limitations claim, a plaintiff asserting nuisance and trespass

9   has the burden of establishing that the nuisance and trespass

10  are abatable at a reasonable cost.

11         THE COURT:  That's right.

12         MR. AXLINE:  So the district is going to have the

13  burden, and I think the thing we would like to brief to you is,

14  when did that burden arise?  Because we believe that it's

15  appropriate to make the nuisance and trespass determination,

16  and then the defendants raise the statute of limitations issue,

17  and then the response to the statute of limitations at that

18  point is, well, it can be reasonably abated.

19         THE COURT:  I don't have any problem with the notion

20  that statute of limitations is always an affirmative defense.

21  So I think you're probably right that defendants raise it.

22         That was not really my question.  My question is, is

23  this amenable to summary judgment?  Because whenever you hear

24  the word reasonableness, you immediately think a fact

25  determination or a judgment call or a jury; somebody has to

0CG8ORAC

1   make a judgment call usually involving expert testimony and

2   fact-finding.  How am I going to do that on summary judgment

3   and say as a matter of law something is reasonable?  And even

4   if I could do that, are we ready now without the expert

5   testimony?

6           MR. AXLINE:  Well, two responses.  One is that we

7   would like the opportunity to brief in a summary judgment

8   motion to you why the district's abatement powers make that a

9   question that is not a fact question in this case.

10          THE COURT:  Can you develop that a little more for

11  this record?

12          MR. AXLINE:  Yes.  Because the damage remedy that the

13  district is seeking is abatement itself.  So the damages that

14  are ultimately going to be presented to the jury, as well as

15  the question of whether the nuisance and trespass is

16  continuing, will be presented to the jury at the time of trial.

17          THE COURT:  So what am I deciding?

18          MR. AXLINE:  The thing we want you to decide is that

19  the evidence that we will present to you, the uncontested

20  evidence that we will present to you on our motion shows that

21  there is a nuisance, a trespass and a violation of the act at

22  these stations.

23          THE COURT:  But then I don't understand how you

24  respond to the expected affirmative defense of statute of

25  limitations without getting to this question of whether it is a

0CG8ORAC

```
 1    continuing nuisance and therefore they are not time-barred.
 2    You're sort of saying that the abatability question is down the
 3    road for the jury; the reasonableness of the treatment is for
 4    the jury later.  But otherwise how am I going to deal with
 5    their statute of limitations issue?
 6            MR. AXLINE:  You're not, your Honor.  I don't think
 7    you need to.  You have given guidance generally on the
 8    application of the statute of limitations to the common law
 9    products liabilities claim.  But it's clear from the Mangini
10    case, and, frankly, the cases that the defendants cite, that
11    the process for determining nuisance, trespass and continuation
12    is a linear process.  You first determine whether there is a
13    trespass or a nuisance, and then you determine whether the
14    statute of limitations applies, and then you determine whether
15    or not it's continuing based on evidence.
16            THE COURT:  Somehow you must be missing the notion of
17    the word judgment in summary judgment.  What can I decide if I
18    can't decide that there is a timely claim of nuisance because
19    it's continuing?  Judgment is in the word summary judgment.
20    What judgment can I give you?  I can't give you just an
21    advisory opinion on an element of a claim.  What is the
22    judgment?
23            I am not saying that every summary judgment is
24    judgment on every claim in every case, but even partial summary
25    judgment to me usually means some claims or some parties.
```

0CG8ORAC

1    That's what makes it partial.  It's not the whole case.  But I

2    have never heard of one element of one claim being amenable to

3    a judgment.

4             MR. AXLINE:  It is an interesting question.  The

5    amendments to rule 56 that just went into effect encourage the

6    court, where it can, to identify discrete issues or claims,

7    such as this, to treat them as on partial summary judgment

8    grounds.  In our view, and we will brief this to your Honor if

9    you permit us to, the judgment will say that the district,

10   assuming you agree with us, has proven its nuisance and

11   trespass claims at these sites, but reserve for later the

12   defendants' affirmative defense and the question of

13   abatability.  That's the way it would play out.

14            THE COURT:  Let me interrupt you then.

15            What does the defense think of that?

16            Mr. Heartney.

17            MR. HEARTNEY:  Your Honor, I think it simply misses

18   the point, as your Honor was indicating, of the motion as it

19   was described to us.  What we had described to us was a partial

20   summary judgment based on liability.  We can't get to liability

21   if an affirmative defense is out there and hasn't been

22   adjudicated.

23            THE COURT:  So you don't think he can sever out, so to

24   speak, the affirmative defense and just say, if it turns out at

25   the end of hearing the affirmative defense that it was timely

0CG8ORAC

 1    and continuing because it was abatable, then the Court has

 2    already found that there was as a matter of law a trespass or a

 3    nuisance merely because the water was contaminated above the

 4    MCLs?

 5            MR. HEARTNEY:  I think what your Honor would be

 6    talking about then would not be a partial summary judgment of

 7    liability.  What your Honor would then be talking about would

 8    be severing out a discrete element of a claim.

 9            THE COURT:  That's right.

10            MR. HEARTNEY:  What I would urge then is this is a

11    very different kind of procedure than the summary judgment

12    motion that the defendants asserted, because the summary

13    judgment motion of the defendants actually decided something

14    that determined that a claim was good or was not good.

15            THE COURT:  Right.

16            MR. HEARTNEY:  Simply picking out a single element of

17    a claim and saying this element is established does not advance

18    the ball.  There is a very large amount of work, both factual

19    and legal, that undoubtedly would happen if we had to take 20

20    stations and go through a briefing process.  I think the

21    premotion conference process that your Honor has put in place

22    allows us to get to this and say, is this worth the candle, are

23    we doing something that makes sense?

24            THE COURT:  It might be too easy.  It might be that

25    you agree that, if it's timely, if it's abatable, which are the

0CG8ORAC

1    real issues to be tried, there is no question that

2    contamination above the MCL would be a nuisance or a trespass,

3    if it's abatable and therefore timely.  Since that's what is

4    left to be decided, nobody much cares to brief the other half

5    of it.  If the contamination is above the MCL and everything

6    else were in place, it's a nuisance.

7         MR. HEARTNEY:  I think even there we would say, if the

8    nuisance is confined to the shallow groundwater right in the

9    area underneath the station, it's not being used for drinking

10   water, there is no beneficial use for that water where it is,

11   and if that's all the contamination they are pointing to, there

12   is authority under California law to say that's not a nuisance.

13        MR. AXLINE:  I don't think there is any such

14   authority, your Honor.

15        THE COURT:  Maybe Mr. Heartney knows it.  What

16   authority do you think that is?

17        MR. HEARTNEY:  I think it is cited in our papers.

18        THE COURT:  Why don't you tell us what it is?

19        MR. HEARTNEY:  It's the Beck Development case, 44

20   Cal.App.4th (1996).  I can describe the facts.

21        THE COURT:  Take a minute.  Mr. Axline heard the name

22   of the case and maybe has it with him.

23        Do you have that one, Beck?

24        MR. AXLINE:  I am familiar with that case.

25        THE COURT:  Go ahead.

0CG8ORAC

1            MR. HEARTNEY:  In that case, there was a property that
2   had been used as a railroad, and the railroad had a big pit,
3   and it had poured a lot of fuel oil onto this pit years ago,
4   and the pit had then been covered over and it was being used
5   for farming, and so for many years the fuel oil that had been
6   poured into the pit that was in the ground had been there.
7   Then down the road the property was sold.  The new owner got
8   this piece of property and it was told to develop it he was
9   going to have to go in and remove all the fuel oil.  And the
10  new property owner sued the railroad saying this is a nuisance,
11  and this is a continuing nuisance, the same kind of argument
12  here.  It was a long time ago, but there is not a statute of
13  limitations, it's a continuing nuisance.

14           And the court looked at this and said, under
15  California law, the mere presence of the contamination there is
16  not a nuisance.  It's going to be necessary for you to prove
17  that it creates a harm of the kind that constitutes a nuisance.
18  And you would have needed to show, because this was a case -- I
19  may not be right on this procedural point, but I believe it was
20  after a trial or at least after some kind of hearing where all
21  these facts had come out.  You would have had to have shown
22  that that fuel oil that's down there is either going to
23  contaminate a drinking water aquifer or cause harm to people on
24  the surface because they might come into contact with it.  It's
25  very far down.  It's five or six feet down.  You haven't

0CG8ORAC

1   pointed to harm that's being caused by that, and because of

2   that, you don't have a nuisance.

3          THE COURT:  Mr. Axline said about two and a half

4   minutes ago, I don't think there is any such authority, and I

5   don't think Mr. Heartney can cite it.  Well, he has, and how

6   has he miscited it?

7          MR. AXLINE:  In <u>Beck</u> there was failure of evidence.

8   None of the agencies had -- in fact, all the agencies had

9   declined to take any action with respect to the Beck property

10  because they didn't think there was a contamination problem;

11  they didn't think there was any harm at those sites.  Here the

12  defendants themselves affirmatively convinced you that there is

13  harm at the sites that we want to seek summary judgment on.  So

14  <u>Beck</u> simply is distinguishable on its facts.

15         THE COURT:  Because you're going to say the defendants

16  have already conceded harm?

17         MR. AXLINE:  Correct.

18         THE COURT:  How did they concede harm, by saying so or

19  by taking action to abate the harm?

20         MR. AXLINE:  Both.  And by asking you to find as a

21  matter of law that there was harm for purposes of the statute

22  of limitations.  Now they want to do an about-face and say,

23  well, there was really no harm for purposes of nuisance and

24  trespass.

25         More importantly, there is a more recent case that we

0CG8ORAC

1    cited to you.  It's a Ninth Circuit case applying California

2    law, <u>California v. Campbell</u>, in which the court said, and I am

3    quoting from it now, "To state a claim under California law,

4    California need not prove that trichloroethylene migrated from

5    the release property to other areas.  It is enough that the

6    water under the release property itself was contaminated."

7              THE COURT:  Read that again.

8              MR. AXLINE:  I will give you the pinpoint cite here.

9    This is 138 F.3d 772, at 782.

10             "Thus, to state a claim under California law,

11   California need not prove that trichloroethylene migrated from

12   the 20th Street property to other areas.  It is enough that the

13   water under the 20th Street property itself was contaminated."

14             THE COURT:  Does that decision talk about the word

15   harm?  I understand the water underneath the property was

16   contaminated.  Mr. Heartney already said in <u>Beck</u> it said, that

17   may be, but unless it causes harm, just the mere fact that it's

18   contaminated is not enough.  That the water in <u>Beck</u> apparently

19   wasn't going to be used for anything, wasn't going to affect

20   drinking water, it was just sitting there contaminated, and the

21   court said, so what, essentially.  Does this case talk about

22   what is the impact of the fact that the water underneath the

23   site is contaminated?

24             MR. AXLINE:  It does under California law.  And it

25   grants summary judgment to the plaintiff.

0CG8ORAC

```
1              THE COURT:  Maybe it discussed harm.

2              MR. AXLINE:  It didn't discuss harm in a lot of detail

3    but --

4              THE COURT:  If I did a word search, would I find the

5    word harm?

6              MR. AXLINE:  I suspect you would.

7              THE COURT:  What does it say?

8              MR. AXLINE:  There is another point I want to make

9    here, which is that when the defendants moved for summary

10   judgment, we argued to the court that the district is not

11   harmed until the contamination moves off-site and threatens

12   drinking water, and that's a fact dispute that we are entitled

13   to put on evidence regarding.  The Court rejected that argument

14   at the defendants' insistence.  Now Mr. Heartney is saying that

15   there isn't harm.  He is making the argument we were making in

16   opposition of the motion on the statute of limitations in which

17   he rejected.

18             THE COURT:  And he then said that the harm was the

19   mere contamination.  The impact is there.  There is

20   contamination and that's harm.  That's what he said then.

21             MR. AXLINE:  Correct.

22             MR. HEARTNEY:  To respond to that, your Honor, I guess

23   what I would say is that our summary judgment motion was based

24   on what the plaintiff's case was.  And they took the position,

25   the fundamental interest that they were talking about in the
```

0CG8ORAC

1   case was to say that we own all the groundwater, we have a

2   property right to all the groundwater.  We didn't agree that

3   they have that, but that's what they said, and your Honor had

4   assumed that that was true in dealing with the cognizable

5   interest claims that we had.  We said, if that's the

6   fundamental interest that you have in the case, then having

7   MTBE in your property would be a harm.

8           That I think is different from, is there a nuisance?

9   I think those are distinct points.  But whether they are or

10  not, the defendants, of course, we were simply taking a

11  position that flowed from what the plaintiffs had told us was

12  the interest that they claimed that they were building their

13  case around.

14          MR. AXLINE:  Your Honor, may I?

15          We went through an elaborate exercise, again at the

16  defendants' insistence, of amending our complaint to make it

17  clear that what we were talking about in the complaint was

18  drinking water.  And the defendants still made their argument.

19  We responded that the district wasn't harmed until it moved

20  off-site and threatened drinking water, and again that was

21  rejected.

22          THE COURT:  All right.  So where are we left?  All I

23  said was that the part that you're seeking summary judgment on

24  then might be terribly simple and not worth the cost of making

25  a motion because it gets you only so far.  It gets you to the

1    point, that if indeed there is contamination above the MCL at a

2    certain site, if everything else falls into place, you have a

3    nuisance or a trespass or both.  But that's all it gets you.

4    It doesn't get you judgment on that claim because there is an

5    affirmative defense, and it will require possibly fact-finding

6    or at least another determination after there is more evidence.

7    So I don't know if the game is worth the candle because it gets

8    you so little.  It's almost as if, if you're right about this

9    harm question now, you win, but you win the small point, so to

10   speak.

11           MR. AXLINE:  Your Honor, I think it significantly

12   advances the ball if we get that determination.  If the

13   defendants are willing to stipulate, I suspect they won't, but

14   if they were willing to stipulate, given these facts, there is

15   a nuisance and a trespass at the site --

16           THE COURT:  Assuming everything else falls into place.

17           MR. AXLINE:  Assuming everything else falls into

18   place.  But given the fact that I started with, which is that

19   the district is charged with abating these nuisances, and given

20   the fact that you don't have to completely abate a nuisance in

21   order to be entitled to recover for the damages of at least

22   partially abating it -- under common law and under the statute

23   by the way -- we think it's going to significantly advance the

24   likelihood of settlement, one, and two, it's going to

25   significantly narrow the issues to be tried to the issue of

0CG8ORAC

1   abatement only.

2           THE COURT:  Which you admit has to be tried before

3   there could be judgment on the trespass or nuisance claim?

4           MR. AXLINE:  Well, your Honor, we would like the

5   opportunity to present to you the argument that, given the

6   district's powers and the relationship between the act and the

7   nuisance and trespass claims, the statutory presumption, and

8   what we know about the defendants' answers -- the answers that

9   the defendants filed here said in almost every case this kind

10  of contamination is remedial, that's what the defendants

11  conceded in their answers.

12          Now, they were doing that in response to a fear of a

13  market share claim, but that's a judicial admission.  We would

14  like the opportunity to make the pitch that, at least at some

15  of these sites, it's appropriate to find as a matter of law

16  that the costs of abatement are reasonable.  If that gets

17  rejected, we go to trial on it.

18          THE COURT:  Do you agree that expert testimony would

19  be quite pertinent to that determination of this abatability

20  issue?

21          MR. AXLINE:  I think if we do not prevail on our

22  arguments that you can determine it as a matter of law, then,

23  yes, I think there will ultimately be some expert testimony on

24  that.  Although, frankly, your Honor, it's not rocket science

25  anymore as to how you go about remediating and what it's going

0CG8ORAC

```
 1      to cost.
 2                THE COURT:  Mr. Heartney.
 3                MR. HEARTNEY:  I don't think that the type of evidence
 4      that Mr. Axline is talking about gets to what the abatability
 5      issue is really about.
 6                We have two cases on that.  The Beck case I think is
 7      the one that I would point to most prominently, because what it
 8      points to there was a situation in which a judgment based on
 9      continuing nuisance got reversed because the site had not been
10      sufficiently characterized.  There had not been enough expert
11      and other scientific analysis of just what was the problem, how
12      big is it, where is it going, what is going to happen to it,
13      and there was not enough evidence of the methods and costs of
14      what it would take to remediate it.
15                THE COURT:  Was that a bifurcated judgment?  You
16      couldn't even have liability without getting to the details of
17      the costs which is damages?
18                MR. HEARTNEY:  This wasn't damages, your Honor,
19      because this is an affirmative defense.  You have got to
20      remember here, if you don't have permanent nuisance, then you
21      have to show that it's abatable.  And the abatability analysis
22      requires that you say, here is the problem, we have
23      characterized it, we know what it is, this is what we say will
24      remedy it, and here is our arguments as to why this is a
25      reasonable means and a reasonable cost.
```

1      So the reasonableness pieces come in, and they come in

2  after the plaintiff has shown, as a matter of fact, here is the

3  animal we are talking about.  That's not going to be possible

4  unless we do get into evidence that goes far beyond what Mr.

5  Axline is suggesting here.  And I don't think that the entirely

6  separate statutory presumption that's limited only to the costs

7  recovery statute that they have, I think we will have to deal

8  with that presumption when we are dealing with the statutory

9  cost recovery claim, but it has nothing to do with nuisance and

10  trespass.

11      THE COURT:  I don't know that you can say it has

12  nothing to do with it because he is saying, as a matter of law,

13  abatement has to happen, and, frankly, as a matter of law, the

14  costs of doing so is reasonable because it has to be done under

15  statute.  That's the summary of the argument.

16      MR. AXLINE:  And one other distinction I would make

17  between the <u>Beck</u> case that Mr. Heartney relies on and our case

18  is a distinction that was present in the <u>California v. Campbell</u>

19  case that I quoted to you earlier.  And that is, in the <u>Beck</u>

20  case and the other cases that they rely on, you had private

21  actors and they were seeking damages.  Admittedly, some of them

22  also sought injunctive relief ordering abatement, but the

23  primary focus was on damages.  What was the cost to you of the

24  diminution of your property value?  We don't have that here.

25  The district's sole focus is, how do we get this problem

0CG8ORAC

1    cleaned up?  And in the California v. Campbell case, the Ninth

2    Circuit had no trouble saying, state, you have shown

3    contamination of water beneath that site, you get partial

4    summary judgment.

5          One other point that occurred to me --

6          THE COURT:  When you say partial summary judgment, was

7    that liability as opposed to damages?  It didn't have this

8    issue of nuisance or trespass and continuing versus permanent?

9          MR. AXLINE:  No.

10         THE COURT:  It was a statutory claim?

11         MR. AXLINE:  Yes.

12         One other thing that occurred to me as Mr. Heartney

13   was talking is that I think we have the presumption under the

14   Orange County Water District Act that the costs are reasonable.

15   I think that is particularly appropriate for a summary judgment

16   motion here.  The defendants are still going to want to try,

17   perhaps, or maybe they will settle, but they are going to want

18   to try whether the costs are reasonable.  They are going to try

19   to overcome --

20         THE COURT:  They are going to try to?

21         MR. AXLINE:  Overcome our presumption at trial.

22         THE COURT:  It is a rebuttable presumption?

23         MR. AXLINE:  It is rebuttable presumption, correct.

24         So that issue is going to be tried later anyway.  The

25   purpose of a partial summary judgment motion, as long as you're

0CG8ORAC

1    looking at claims and whether you can preclude an entire claim,

2    and especially in an MDL setting, is to narrow the things --

3          THE COURT:  You can't preclude the entire claim.  You

4    really mean an element of the claim at best.  You can't end the

5    debate over whether at the end of the day you're going to be

6    successful on a trespass or nuisance claim because there still

7    is the issue of abatability.

8          MR. AXLINE:  Correct.

9          THE COURT:  So at best you could foreclose the trial

10   on an element of that claim.

11         MR. AXLINE:  Yes.  I would suggest that it's not an

12   element of our claim; it's an element of a defense.  That's why

13   I keep referring to the Mangini case, because in the Mangini

14   case, the California Supreme Court made a point at the

15   beginning of the opinion, and I will give you the pinpoint cite

16   to this as well.  This is 12 Cal.4th 1087 and the jump cite is

17   1097.  The court went out of its way to say, at trial -- this

18   came up after trial -- the question of whether any nuisance was

19   a continuing nuisance was presented to the jury as an element

20   of plaintiff's cause of action for a continuing nuisance.  The

21   question was not presented to the jury in the context of a

22   defense or excuse by plaintiffs to avoid Aerojet's statute of

23   limitations defense.  The court then goes on to say, on appeal

24   no party complains of the manner in which the matter was

25   submitted to the jury, as an element of plaintiff's cause of

1    action rather than as an exception to the statute of

2    limitations defense, which we believe is the logical way it

3    should be presented.  Thus, we need not consider whether there

4    were any technical defects in the manner of presentation.

5           To me, that signals that, had it been raised, it

6    should have been treated as a response to an affirmative

7    defense rather than an element.

8           THE COURT:  All right.  Is there more to say about the

9    trespass and nuisance claims?

10          MR. HEARTNEY:  No, your Honor.  To us the key point is

11   that it doesn't lead to partial summary judgment on liability.

12          THE COURT:  It doesn't, and I need to research whether

13   a court can do it on less than the claim.  And then, assuming

14   the court can, should the court?  Does it make any sense?

15          Let's go on to the Water District Act question.  There

16   I thought the argument is that plaintiffs can only recover

17   costs that they have already incurred for cleanup, containment

18   or abatement.

19          Has the district already incurred costs for cleanup,

20   containment or abatement at all these sites?  Because there is

21   no declaratory judgment language in the act.  I know you

22   analogize it to CERCLA, but, in fact, CERCLA mentions

23   declaratory relief and the Orange County Water District Act

24   does not.  My first question is factual.  Has the district

25   already incurred costs?

0CG8ORAC

| | |
|---|---|
| 1 | MR. AXLINE:  Yes. |
| 2 | THE COURT:  It has.  At all of these sites? |
| 3 | MR. AXLINE:  It has. |
| 4 | THE COURT:  I thought the defendants thought |
| 5 | otherwise. |
| 6 | Mr. Heartney, did you think otherwise? |
| 7 | MR. HEARTNEY:  Your Honor, we believe that what the |
| 8 | district has said are costs that it has incurred are simply |
| 9 | litigation consultants that it has -- |
| 10 | THE COURT:  The shorter answer is? |
| 11 | MR. HEARTNEY:  No. |
| 12 | THE COURT:  You thought otherwise. |
| 13 | Go ahead, Mr. Axline.  Tell me how you have incurred |
| 14 | costs. |
| 15 | MR. AXLINE:  We cited the Key Tronic case, which was |
| 16 | admittedly a CERCLA case. |
| 17 | THE COURT:  That's a good point.  I told you already |
| 18 | CERCLA has a declaratory judgment. |
| 19 | MR. AXLINE:  I mean for purposes of costs. |
| 20 | THE COURT:  But it's a different act. |
| 21 | MR. AXLINE:  The act authorizes the district to |
| 22 | recover incurred remedial costs. |
| 23 | THE COURT:  Which act? |
| 24 | MR. AXLINE:  The Orange County Water District Act. |
| 25 | Not simply after cleanup is completed. |

0CG8ORAC

1        THE COURT:  But it says incurred.

2        MR. AXLINE:  We have incurred nonlitigation

3    investigation and characterization costs at each of these

4    sites.  The defendants say they think they are only litigation

5    related, but they are not.  They are costs that the district

6    incurred in the normal course of attempting to figure out what

7    needs to be done ultimately to clean up these sites.

8        THE COURT:  Do you know about that, Mr. Heartney?  He

9    says in each case the district has spent money on investigation

10    and characterization which are required, in essence, to get to

11    the point of remediation.  You can't get there until you take

12    the first two steps.

13        MR. HEARTNEY:  I guess what I am familiar with is the

14    answers to our interrogatories.  And the answers to our

15    interrogatories, when we said what costs have you incurred at

16    each one of these stations that you can contend are recoverable

17    under the Orange County Water District Act, the only thing that

18    was pointed to were reports that were done by the Comex

19    consulting firm and the Hargis consulting firm, both of which,

20    when we have tried to get discovery concerning them, we have

21    been told that their work is work product, and there have been

22    work product objections raised to that.  We view this as, they

23    were retained by the district's counsel, not by the district

24    itself, in at least the case of the first of those, the Comex.

25

0CG8ORAC

1          THE COURT:  Do you think you can get to the point of

2     remediation, which I define as cleanup, containment or

3     abatement, without doing an investigation and characterization?

4     Can you skip over that and just hire somebody and say, come in

5     and abate, I have no information for you, but please abate?

6     Don't you need to do an investigation and a characterization

7     first?

8          MR. HEARTNEY:  I think what we would say is the

9     question of whether these costs are potentially recoverable

10    here will have to do with whether that's their purpose.

11         THE COURT:  While they may be useful in litigation,

12    the fact is can you get to cleanup, containment and abatement

13    without having done an investigation and/or characterization?

14    Because it seems to me that, while it's not uncommon that

15    moneys spent for one purpose are also useful when you get

16    around to litigation, but that doesn't mean it wasn't spent

17    equally, so to speak, for another business purpose.  Here the

18    other business purpose is to set up the cleanup, containment

19    and abatement, even though it's perfectly useful in a

20    litigation.

21         I don't know that it loses its potential to help in

22    setting up the cleanup, containment and abatement just because

23    an attorney hired the consultant.  Although I think your work

24    product privilege point is interesting.  I don't know how the

25    plaintiff can protect it and then say, but this is our proof of

0CG8ORAC

1      the costs we have incurred.  If it's proof of costs, you won't

2      be able to protect it as work product.

3              MR. AXLINE:  If I may, Special Master Warner has

4      already addressed this issue.

5              THE COURT:  How has he come out?

6              MR. AXLINE:  He has come out by saying that a

7      consultant such as Comex and Hargis can wear two hats.  They

8      can do work that the district is going to use to investigate

9      and clean up, and they can also do litigation consultant work.

10             Here we have provided the Comex and the Hargis reports

11     to the defendants because, at least for the investigation and

12     characterization part of this, we are not claiming --

13             THE COURT:  OK.

14             MR. HEARTNEY:  I guess what I would say is the statute

15     itself sets a standard that I think goes beyond just the

16     sequencing fact question.  I acknowledge, your Honor, that if

17     what your goal is to do is to clean up, you're going to

18     investigate first.  I don't have any question about that.  The

19     act says that the costs that are going to be recovered have to

20     be actually incurred, they have to be necessary and reasonable

21     in amount, and they have to in fact have resulted in pollution

22     or contamination being cleaned up or remediated.

23             THE COURT:  So it's the third prong that you feel

24     hasn't been reached.

25             MR. HEARTNEY:  Here, your Honor, we have put testimony

0CG8ORAC

 1    from the end of fact discovery, no more fact discovery, this
 2    was right at the end, in which we asked questions.  We said,
 3    Are you planning to do any remediation?  Can you tell us what
 4    you want to do based on this work that you have done and what
 5    is coming next, because we want to know that for our case.
 6    What they told us was, Well, based on the advice of our
 7    consultant, the Hargis consulting firm, we have identified
 8    stations at which we are going to go forward and do work to
 9    investigate and get to the point where we will know what we
10    need to do, but this station isn't one of them.  And that
11    station was the one station that they provided information
12    about in their papers, Arco 1887.
13              THE COURT:  The premotion letters?
14              MR. HEARTNEY:  Correct.
15              So I think our problem here is that they may have done
16    these reports, and I think there is going to be a record in
17    which we are going to say, no, these aren't remediation
18    reports, this is in fact lawyer stuff, but the ultimate problem
19    is, are these being used in a way that they would have to be
20    used for them to be recoverable now?
21              It's one thing for the district to say, well, we need
22    to have them before we can decide how we are going to
23    remediate.  We then asked them, what are you going to do and
24    when are you going to do it?  And the evidence is attached
25    right to our letter.  The answers we got at the end of fact

0CG8ORAC

 1    discovery was we don't know what we are going to do.

 2           THE COURT:  Is that true for all these sites, Mr.

 3    Axline, that you don't know what you're going to do with the

 4    recommendation anyway?  And if so, how do you meet that third

 5    prong in the statute?

 6           MR. AXLINE:  It's not a third prong in the statute.

 7    They are just wrong about that.  I have got the statute right

 8    here, and I can read it to you.  Obviously, this would be

 9    briefed, but the statute says, it's a run-on sentence --

10           THE COURT:  Not unusual for legislators.

11           MR. AXLINE:  It says, "The person causing or

12    threatening to cause that contamination or pollution shall be

13    liable to the district, to the extent of the reasonable costs

14    actually incurred in cleaning up or containing the

15    contamination or pollution, abating the effects of the

16    contamination or pollution, or taking other remedial action."

17           THE COURT:  And your view is the other remedial action

18    is the investigation?

19           MR. AXLINE:  Right.  The defendants' reading of this

20    would eliminate the last two circumstances.  They would say

21    only after you finish completely cleaning up.

22           THE COURT:  No.  They would say, so long as you spent

23    money on cleaning up.  We are not arguing it has to be done,

24    but you have to have spent it to clean up, and you haven't yet

25    spent a penny to clean up.  What you have spent is money to

0CG8ORAC

```
1    prepare to clean up, at best, by investigating.  And you're
2    saying that falls in the third category of other remedial
3    action.
4              MR. HEARTNEY:  We say they haven't gotten to the point
5    of remedial actions yet.
6              THE COURT:  So this turns on the interpretation of the
7    word remedial action.  Is there legislative history what
8    remedial action means?  Is there case law?
9              MR. AXLINE:  Not in the Orange County Water District
10   Act, although we did provide the Court with one state court
11   opinion in an Orange County Water District case that our firm
12   handled, where the court found that the Orange County Water
13   District Act was in pari materia with CERCLA and the HSAA.
14             THE COURT:  In those acts the phrase remedial action
15   has been defined?
16             MR. AXLINE:  Similar phrases such as response costs.
17             THE COURT:  The answer is no.  The phrase remedial
18   action hasn't been defined anywhere.
19             MR. AXLINE:  Correct.
20             THE COURT:  Yes.
21             MR. PARKER:  If I could just add one point to what Mr.
22   Heartney mentioned.
23             THE COURT:  Just one second.
24             Mr. Parker.
25             MR. PARKER:  In the depositions of the district's
```

1    person most knowledgeable on the issues of this work they were

2    performing, the investigative work, we all specifically asked,

3    when you get these results back -- they hadn't even embarked on

4    any work.  The district's board had apparently authorized the

5    contract but nothing had been done.  And we asked them, What is

6    the next step when you do these four different cone

7    penetrometer borings?

8            THE COURT:  Say it again, please.

9            MR. PARKER:  It's shortened to CPT for cone

10   penetrometer testing.  It's a type of testing that's done.  And

11   the district's witness said, I don't know what we will do until

12   we get those results.  We may have to do more borings in

13   different places.  We may have to put in groundwater wells to

14   see what is there.  And we asked, Can you tell what remediation

15   will have to be done?  And the witness said, No, I can't tell

16   you until we go through these steps.

17           So your Honor's point about those steps maybe being

18   prefatory steps to remediation, the contrary is also true.  If

19   they determine that nothing needs to be done, or that a plume

20   that they thought extended way off-site in fact doesn't, there

21   may be ultimately no remediation done and that's our point.

22           THE COURT:  What about that, Mr. Axline?  If the

23   investigation shows that there is no need for further action,

24   has there still been remedial action?

25           MR. AXLINE:  Yes, because remedial action includes the

0CG8ORAC

1    cost of investigation and characterization.

2              THE COURT:  That finds no need for action.  That's

3    called remedial action?

4              MR. AXLINE:  Yes.

5              THE COURT:  What did it remediate?

6              MR. AXLINE:  In the very narrowest sense, perhaps it

7    confirms the remediation that has already occurred has taken

8    care of the problem.

9              THE COURT:  I thought there are many sites here where

10   not a penny has been spent on remediation.

11             MR. AXLINE:  No.  I'm sorry?

12             THE COURT:  We started this because the investigation

13   or characterization, they are both used together, is the only

14   money that has been spent.  There hasn't been any money spent

15   on cleanup or abatement.  So you can't come up with the answer

16   that what has been spent so far is enough, we don't need to do

17   more.  I thought some of these places haven't spent any money.

18             MR. AXLINE:  Well, the defendants have been doing

19   remediation on-site is what I was referring to.

20             THE COURT:  So the report says, no need for anything

21   further.  We have investigated and we are satisfied that

22   whatever the defendants have spent is enough.  We don't have to

23   spend anything.

24             MR. AXLINE:  Under any other statute, CERCLA, the

25   HSAA, that would be considered a response cost regardless, and

0CG8ORAC

1    you would be able to recover that.

2            THE COURT:  Just to confirm that it's satisfactory

3    now, it doesn't need more?

4            MR. AXLINE:  Yes.  There was contamination there.  It

5    came from the defendants.  The district or any plaintiff I

6    guess had to do some investigation and characterization.  And

7    the defendants should thank their stars if that shows that no

8    further work is necessary.  I don't think that's going to be

9    likely in any of these cases, but regardless, that typically is

10   a recoverable cost, and we think it is under the act as well as

11   under CERCLA.

12           THE COURT:  Although while admitting at the same time

13   that it hasn't been construed yet specifically under the Orange

14   County Water District Act, the term remedial action has not yet

15   been construed.

16           MR. AXLINE:  I would suggest that it has by Judge

17   Colaw in the opinion that we attached.  I don't remember if he

18   parsed the phrase remedial action.  That was all briefed to

19   him, and he said in his opinion that we attached to our brief

20   or letter --

21           THE COURT:  Which was that?

22           MR. AXLINE:  It's Exhibit 6, the last exhibit to our

23   premotion letter.

24           THE COURT:  OK.  This was Orange County Water District

25   v. Northrop Corporation.

0CG8ORAC

1          MR. AXLINE:  Yes.  There I will represent to the Court

2     that the facts were as they are here.  No actual sort of pipes

3     and concrete remedial work had been done.  There had only been

4     investigation and characterization.  And Judge Colaw found that

5     both the Orange County Water District Act and the HSAA, and

6     case law interpreting those acts, authorized the district to

7     recover for incurred expenses of remediation and future costs.

8          THE COURT:  Well, I don't see that in the one page

9     decision.

10         MR. AXLINE:  It's admittedly brief.

11         THE COURT:  Where do you see it?

12         MR. AXLINE:  There is a first page that is sort of

13    notice.

14         THE COURT:  I am in the decision, pages 1 and 2 of the

15    decision.

16         MR. AXLINE:  Paragraph numbered 1.  I was reading the

17    second sentence.  Both the OCWDA and the HSAA and case law

18    interpreting those acts authorized the district to recover for

19    incurred expenses for remediation and future costs.

20         THE COURT:  I can't tell from that small statement

21    whether any moneys had been spent at the time the court wrote

22    that.  There may have been some money spent already.

23         Now, true, the phrase "and future costs," well, they

24    weren't spent yet.  I assume this is a trial court.  This is a

25    lower court.

0CG8ORAC

1           MR. AXLINE:  Yes, it was.  But the state of play at

2    the time of this decision was that the district, as here, had

3    spent some initial money investigating and characterizing.

4           THE COURT:  And that's all?

5           MR. AXLINE:  Yes.

6           THE COURT:  Do you know that case enough to know if

7    you agree with it?

8           MR. PARKER:  I do not.  I represent a defendant in

9    another case, the one that the defendants submitted the rulings

10   saying there is no declaratory relief and there is no future

11   costs recoverable under that.

12          THE COURT:  Which exhibit is yours?

13          MR. PARKER:  Exhibit C Mr. Heartney tells me.  C and

14   D.

15          THE COURT:  One second.

16          So C is the Sabic case?

17          MR. PARKER:  Yes.

18          THE COURT:  Where is the operative language?

19          MR. PARKER:  The operative language is --

20          THE COURT:  These courts are a model of short decision

21   writing.  I have a lot to learn from these courts.  One page.

22   I have got to change my ways.

23          MR. PARKER:  Exhibit C is the notice of ruling, and

24   then Exhibit A to the notice of ruling.  The top one, demur and

25   motion to strike, demur to first cause of action.  That is

0CG8ORAC

```
 1    where the judge held that declaratory relief was not available.

 2              THE COURT:  That's obvious because it's not a statute.

 3    But go ahead.

 4              MR. PARKER:  It was raised --

 5              THE COURT:  I know.  Plaintiffs can only recover costs

 6    that were already incurred for cleanup, containing or abating

 7    the contamination or other remedial acts.  Not a surprise

 8    because that's a direct quote of the statutory language.  That

 9    doesn't tell us how that court defines remedial acts that I

10    know of.

11              MR. PARKER:  Your Honor, what happened in between is

12    the district, in response to the ruling, amended their

13    complaint, and instead of seeking the recovery of future costs,

14    instead sought declaratory relief.  And that ruling by Judge

15    Nancy Wieben Stock, at paragraph 3 in the substantive part,

16    says, "Defendants' motion to strike OCWD's allegations

17    concerning declaratory relief in the first cause of action is

18    granted."  And that first cause of action was the Orange County

19    Water District Act claim.

20              So those two taken together support the point that the

21    district, represented by Miller Axline, asserting these same

22    claims under the act, the court found future costs are not

23    recoverable and declaratory relief for liability for future

24    costs is not recoverable.

25              THE COURT:  Is that right, Mr. Axline?
```

0CG8ORAC

1          MR. AXLINE:  Not exactly.

2          THE COURT:  In what way was it not right?

3          MR. AXLINE:  The district had a separate count for

4    declaratory relief under California's Omnibus Declaratory

5    Relief Act that's referred to in this language.  On demurs and

6    motions to strike in California the court is very particular

7    about separating out causes of action, and what Judge Wieben

8    Stock said here was, there is nothing in the act that provides

9    for declaratory relief, and I am not going to let you include

10   in this first cause of action a request for declaratory relief

11   under the act.  She did not address, although it has been

12   discussed with her in subsequent conferences, the sixth cause

13   of action, where we say we get declaratory relief under the

14   Omnibus Declaratory Relief Act once we have shown that we have

15   liability under the Orange County Water District Act.  So this

16   was merely a parsing of counts in the complaint.

17         MR. PARKER:  That's not true.  I agree that they pled

18   a claim under the California declaratory relief statute that

19   wasn't challenged on demur because it wasn't amenable to the

20   challenge.  But they sought specific relief under the Orange

21   County Water District Act and the court held as a matter of law

22   they were not entitled to that.  That is a ruling interpreting

23   this specific law here.  Regardless of whether under some other

24   claim they may have served they are entitled to declaratory

25   relief, that's a separate issue, and that's what is addressed

0CG8ORAC

1    in the other cause of action.  This is absolutely clear on the

2    record that declaratory relief and future costs are not

3    available under the act.

4              THE COURT:  Well, all right.  But that's only a part

5    of plaintiff's argument anyway.  Plaintiff argues that, I

6    think, Mr. Axline, you have already expended moneys, and that

7    comes to defining the term other remedial action.  As far as

8    you're concerned, the investigation and characterization costs

9    are already spent.

10             MR. AXLINE:  Yes.

11             MR. HEARTNEY:  Let me go to one other point that we

12   also raised.  As to those costs, you asked a very good question

13   and very important question when you said, all right, if all

14   that you have is money that was spent to investigate and it

15   hasn't led to any actual remediation, and it might end up

16   leading just to a report that says, well, actually, nothing

17   needs to be done, then, your Honor, I think that possibility

18   leads us directly to the point that under the act no defendant

19   may be required to pay money for a cost or expense until it has

20   been able to submit evidence to rebut whether the work was

21   necessary or the costs were reasonable.

22             I think it's important here that California has a

23   comprehensive scheme to clean up pollution that covers the

24   whole state.  The Orange County Water District Act covers one

25   county.  California has a comprehensive scheme which puts

0CG8ORAC

1    responsibility for cleaning up in the Regional Water Quality

2    Control Boards.  They are already out there cleaning up.  They

3    are already out there requiring the defendants to clean up.

4    And I cannot imagine it will not be a disputed fact if Mr.

5    Axline was to come in and say, well, we decided that even

6    though the Regional Water Quality Control Board, the statewide

7    authority on this, was already cleaning up and already

8    controlling things, we weren't sure that they were doing a good

9    job so we wanted to do our own investigation.  We did and it

10   turned out we found out we didn't need to do anything, but we

11   still are entitled to recover that money from the defendants as

12   the necessary and reasonable costs.  I think we can readily

13   develop evidence, including expert evidence, that would say

14   that money was wasted.  There was no need for that money since

15   we had an expert regulator already doing this.  The expert

16   regulator for the state of California is throughout the state

17   doing this sort of thing.

18        So it's going to get to the same point.  We are still

19   going to be faced with an issue of whether, if they have not

20   done work that has led to or reached a conclusion on some

21   remedial work that actually needs to be done, whether they will

22   be able to get a summary judgment that will establish any

23   liability or move the ball forward in any sense.

24        THE COURT:  Certainly both proposed prongs of the

25   motion for partial summary judgment have pitfalls for

0CG8ORAC

1    plaintiff's side that may insnare them, but if they wish to

2    try, the usual practice is to say yes, you can go ahead and

3    make your motion, considering all that you have heard from the

4    premotion conference, but you won't be able to do it again.

5    Keep that in mind.  If you think that after listening to the

6    argument and the exchange of letters you have a reasonable

7    chance of prevailing and wish to bring the motion, in the face

8    of some of these difficulties, OK.  We set the schedule and you

9    go ahead.  My practice is to use this as essentially the oral

10   argument so everybody should congratulate themselves on being

11   clear today on the arguments.  Generally, then I take it on the

12   papers.

13         Assuming you wish to proceed, Mr. Axline, on both

14   prongs of this, I need a proposed schedule, and I want to talk

15   about page limits, because we have covered this many times and

16   everybody says their case is the big exception for page limits,

17   I can't possibly do this in 25 pages.  But I have to say, after

18   hearing this argument, there are very discrete and legal

19   issues, on both prongs.  On the first prong, the nuisance and

20   trespass, you basically say it's quite a simple motion, the

21   presumption under the statute means that my expenses are

22   reasonable and it is continuing and it's harm as a matter of

23   law, and I cite a couple of cases, I win.  On the second point,

24   your argument is also fairly straightforward, at least until

25   the rebuttal.  And it says, the statutory language, other

0CG8ORAC

```
 1    remedial action should be construed to include investigation

 2    and characterization, and I spent that money so I fall under

 3    the statute, and that's the ball game at this point, short of

 4    any actual damages.  It's a fairly straightforward and moving

 5    brief.  Then it gets complicated.  Once the arguments are

 6    raised, you might have a need for more pages on the reply than

 7    usual, but I think the motion is fairly straightforward, and I

 8    am not inclined to grant what I know is the inevitable request

 9    for extra pages.

10            When can you make the motion, Mr. Axline?  Assuming

11    you decide to proceed, when do you want to do it?

12            MR. AXLINE:  I think we can get it filed by the end of

13    January, say February 1st and on.

14            THE COURT:  So you need a lot of time.  You want six

15    weeks to file it.

16            MR. AXLINE:  Yes.  I say that not because there are

17    going to be a lot of pages.  I heard what you said about the

18    page limits.  But we do need to assemble just the excerpt pages

19    for each one of these stations.

20            THE COURT:  If it is limited to the mere fact of the

21    contamination above the MCL, or the mere fact that there has

22    been an investigation, that's not very many pages.  But if

23    that's what you say it takes, that will be Tuesday, February 1.

24            How long would the defense want to respond?

25            MR. HEARTNEY:  Taking into account that we don't know
```

0CG8ORAC

1    what stations we are talking about --

2            THE COURT:  You will know that tomorrow.

3            MR. HEARTNEY:  There are 20 stations.  There are

4    multiple defendants.  I know we are only going to get one

5    brief, and I recognize that.  But that makes it a little more

6    difficult to make sure we can pull everybody's stuff together.

7    I think we need at least 75 days, your Honor.

8            THE COURT:  Two and a half months?  I wouldn't even

9    dream about two and a half months.  I wasn't really dreaming

10   about six weeks, but if you said, in fairness, you gave them

11   six, how can you really give us less when we have to coordinate

12   with bunches of co-defendants.  The legal issues are uncommon

13   and they are well delineated now on this record.  I get the

14   point.  There are not a lot of cases to look at.  Some issues

15   of law go back 50 years and you end up looking at hundreds of

16   pages and various circuits and getting yourself completely

17   confused.  This isn't like that.  This is a California statute,

18   California law, virtually no case law, for example, on the

19   phrase other remedial action.  It's really kind of a first

20   impression.  Yes, you might analogize it, you might not.

21   That's for the court to decide.  But I don't think it's all

22   that complicated.  Nor did I think the other part was all that

23   complicated, because if you're right about needing to consider

24   the statute of limitations issues now, it might be that it

25   can't be disposed of on summary judgment and the short answer

0CG8ORAC

 1   is denied.

 2              I don't think it's all that complicated, and I think

 3   even six weeks is long and it's plenty.  So March 15.

 4              Mr. Axline, to reply?  And any pages you don't use you

 5   can add to the reply.  How long would you like?

 6              MR. AXLINE:  I will say three weeks.

 7              THE COURT:  That's a long schedule.  That's April 5.

 8   That's so long that I would ask you please not to ask for

 9   extensions.  I am not going to give them.  But if you want to

10   negotiate within those dates with each other, I am not going to

11   know and I am not going to care, as long as it's fully

12   submitted on April 5.  So that is the schedule.

13              What about these page limits?  I assume the defense is

14   coordinating on the legal arguments, but may need a small

15   number of extra pages per site to make the fact argument.  He

16   says hopefully three pages per cite.  If you really have 20

17   sites, you might need a 60 page appendix, separated out of the

18   25 page brief, where you simply say, we have to show you enough

19   facts per site for you to get our point.  But the legal issue,

20   there is no need to extend the pages at all.  I get it from

21   today.  As I say, there's not a lot of case law, not a lot of

22   years, not a lot of circuits.  It's only going to be in the

23   Ninth Circuit.  It's only one state.  So there can be a fact

24   appendix, so to speak, but the legal brief is 25 pages.  And

25   one brief.  Somebody will take the lead and everybody else will

0CG8ORAC

1   edit your work.

2          Anything else?

3          MR. AXLINE:  There is one other thing.  I just wanted

4   to preview for the Court and for the defendants that we have

5   reached a settlement in principle with a minor defendant in the

6   Orange County Water District case.  The papers are being drawn

7   up.

8          THE COURT:  Who might be this minor defendant?

9          MR. AXLINE:  Actually, they asked it not be disclosed

10  until the papers are filed.  So I am not at liberty to say

11  that.  But what I did want to preview is that when we file the

12  papers, both parties would like to get it done by the end of

13  the year, we will ask the Court to instruct the defendants to

14  indicate in a 10 or 12 day period whether they intend to object

15  or not.

16         THE COURT:  Do I have to do a good faith assessment?

17         MR. AXLINE:  Yes.  We would like you to direct the

18  defendants to indicate whether they intend to object.  If not,

19  then we would like to try to get it done by the end of the

20  year.

21         THE COURT:  Defendants will have two weeks from the

22  time they receive notice to decide whether to object or not.

23  If they decide affirmatively, then they can have two further

24  weeks to file any objections.  So you have a total of 30 days

25  to file, but two weeks to decide.

0CG8ORAC

1          MR. HEARTNEY:  If I could just ask for clarification,

2     not to change those times, but when we get notice, that we get

3     the necessary information, what the terms of the settlement

4     are.

5          THE COURT:  How else can you decide whether to object?

6          MR. AXLINE:  That will all be in the papers.

7          THE COURT:  All right.  I think we are done.

8          Thank you all for coming in and thank the folks on the

9     phone.  Obviously, the transcript must be ordered.  This is the

10    argument and I do need this.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25