13BUORAC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   --------------------------------x

 3   ORANGE COUNTRY WATER DISTRICT,

 4                  Plaintiff,

 5            v.                           04 CV 4968(SAS)

 6   UNOCAL, et al.,

 7                  Defendants.

 8   --------------------------------x
                                       New York, N.Y.
 9                                     March 11, 2011
                                       3:30 p.m.
10
     Before:
11
                    HON. SHIRA A. SCHEINDLIN
12
                                       District Judge
13
                    APPEARANCES (Via Telephone)
14
     MILLER, AXLINE & SAWYER
15        Attorneys for Plaintiff
     BY:  DUANE C. MILLER
16
17   STRASBURGER & PRICE, LLP
          Attorneys for Defendant 7-Eleven
18   BY:  MICHAEL WALSH
          COURTNEY KIEFFER
19
20   EIMER STAHL KLEVORN & SOLBERG LLP
          Attorneys for Defendant CITGO
21   BY:  NATHAN P. EIMER
          PAMELA R. HANEBUTT
22
23
24
25
```

 1          (Case called)

 2          THE COURT:  I have a court reporter, so if you speak,

 3   would you state your name first before you speak because we

 4   won't know who is speaking otherwise.

 5          I have this motion before me about the good faith

 6   settlement of the 7-Eleven defendant in the Orange County Water

 7   District case and it is opposed by CITGO.  And I am trying to

 8   find a little more about CITGO's opposition.  That is not

 9   entirely clear to me.

10          The problem that CITGO seems to raise is that the

11   settlement seems to be based solely on 7-Eleven's role, so to

12   speak, as a retailer, owning, running retail stores.  And it

13   even says that the $1.7 million settlement is broken down as

14   follows.

15          There are two 7-Eleven stores against whom the county

16   is currently asserting a claim, and that is worth $725,000.

17          There are six stores with releases that have obtained

18   regulatory closure, and that is worth 575,000.

19          And there are seven stores with no reported releases,

20   although MTBE was on the market at the time, and that is

21   335,000.

22          There are four stores that didn't sell any gasoline --

23   I'm sorry -- that discontinued selling gasoline prior to 1986,

24   so that is 20,000.

25          And there is one store where 7-Eleven never sold

1    gasoline, but is remediating the presence of MTBE anyway.  That

2    is $10,000.

3              It seems accurate what CITGO is saying that the entire

4    settlement figure is based on 7-Eleven's roles, so to speak, as

5    an owner or manager of retail stores.  But what CITGO seems to

6    be saying is that 7-Eleven also was a refiner or distributor.

7    According to CITGO, 7-Eleven owned all or part of CITGO during

8    most of the relevant time period, even made the decision to

9    require the blending of MTBE into gasoline and to build an MTBE

10   unit, etc.

11             So I wasn't sure that I was done with my summary so

12   just one more second.  So let me think about this last thought.

13             Ms. Hanebutt ends her reply brief by saying that

14   plaintiff's argument now is that CITGO's liability is greater

15   than 7-Eleven's because of CITGO's role as a distributor and

16   failure to warn.  And all of that can't be ripe because this

17   settlement is solely in one capacity, that of retailer, and

18   doesn't seem to take account of 7-Eleven's role as a

19   refiner-distributor.  So I am a little confused about this and

20   would like to hear from the parties.

21             MR. EIMER:  This is Nate Eimer, on behalf of CITGO.

22             I just thought the first place to start is to maybe

23   clarify CITGO's position so that we are all on the same page.

24             I think there are probably three components to our

25   concern at this point.  The first is, I would think that in

13BUORAC

1   evaluating the fairness of settlement, the Court would need to

2   effectively have a fraction and the enumerator would be the

3   amount that 7-Eleven is paying.

4           THE COURT:  Which I do know.

5           MR. EIMER:  Which you do know.

6           And the denominator would be the some rough estimate

7   of the potential exposure for all the defendants, which we

8   don't know.

9           THE COURT:  Is that right, Mr. Axline, you don't know?

10          MR. AXLINE:  No.  That is not correct, your Honor.  We

11  have an admittedly wide range of potential damages, but the

12  declaration that we submitted with our response, the costs that

13  are associated with remediating MTBE that has traveled up-site

14  at 7-Eleven stations, and those costs range from the relatively

15  minimal cost of putting in a single CPT unit to determine

16  whether in fact the MTBE has traveled off-site to putting in

17  actual off-site remediation systems themselves which may cost

18  as much as $1 million.

19          THE COURT:  I didn't understand that to be Mr. Eimer's

20  idea of the denominator.  I thought he said that the

21  denominator would be the rough estimate of the total exposure

22  in the case.

23          MR. EIMER:  To which CITGO and 7-Eleven and anyone

24  else is.

25          The way I view it, your Honor, is that the Orange

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

13BUORAC

1   County Water District was maybe claiming damages broader than

2   just whatever mediation or monitoring is necessary, damage to

3   their perfunctory interest in the aquifer.  If so, we have no

4   idea what that is.

5          If all that is being claimed against all of the

6   7-Eleven related parties -- and I would say that would be

7   CITGO, perhaps, and the people who supply gasoline to CITGO

8   because CITGO is only the intermediary here, and that would be

9   Tower and whoever Tower bought it from.  If all of those

10  parties collectively are all responsible, I think, the range is

11  10,000 to a couple of million dollars.  And if that is the

12  maximum of the denominator for all of these parties, then

13  that's fine and then I understand that issue.  But I do not

14  think that's what the Orange County Water District is going to

15  be saying.

16         THE COURT:  First of all, Mr. Eimer, you didn't say

17  your name, so the court reporter lost a bit in the beginning

18  because she didn't know who was speaking.

19         So I remind everybody to please say their name.  I

20  knew it, but she didn't so it was hard to correct it.

21         Listening to what you say, Mr. Axline, it is still not

22  clear to me what this denominator should be.  Is it the total

23  rough estimate of all of the exposure in this entire vast

24  Orange County Water case or is it just the total of the portion

25  of the case in which CITGO might conceivably have any

13BUORAC

1    liability?

2              MR. AXLINE:  It is the latter, your Honor.  It is the

3    7-Eleven sites.  As your Honor may recall, the sites are

4    treated independently under your statute of limitations ruling.

5    You analyze each site independently.  We are settling with

6    7-Eleven.  Those are the only sites where CITGO is implicated

7    in the case.

8              THE COURT:  OK.  That is helpful.  If those are the

9    only sites that CITGO is implicated in what is, again, the

10   figure, the rough estimate of the total exposure with respect

11   to those sites only?

12             MR. AXLINE:  It is the estimate that I gave you.

13             THE COURT:  Mr. Axline, just say the number again.

14   What is it?

15             MR. AXLINE:  It is a range, your Honor.

16             THE COURT:  What is --

17             MR. AXLINE:  It ranges from a low of a single CPT

18   which would be 17,000 at a site up to as much as 5 million at a

19   site where a lot of MTBE --

20             THE COURT:  That's ridiculous.  I cannot deal with

21   that.  5 million a site times how many sites?

22             MR. AXLINE:  There are only two sites where there is a

23   major release and that --

24             THE COURT:  Mr. Axline, you are not making this easy.

25   I don't care about major or minor.  I am trying to get the

13BUORAC

1    denominator.  How many sites could CITGO be possibly liable for

2    in this case?  How many sites?

3             MR. AXLINE:  Two.

4             THE COURT:  What is the maximum CITGO could be liable

5    for?

6             MR. AXLINE:  22.

7             THE COURT:  Very good.  With those 22, should I

8    multiply 22 times 5 million as the denominator?  Is that their

9    outside maximum exposure?

10            MR. AXLINE:  No.  You should multiply two sites by 5

11   million.

12            THE COURT:  That is two sites by 5 million?

13            MR. AXLINE:  Then you should multiply 6 sites by

14   17,000, with the understanding that this is just a rough

15   approximation.

16            THE COURT:  I understand it, but I have to do it too.

17            That is 120,000.  Go ahead.  And that is at 8 sites

18   out of 22?

19            MR. AXLINE:  Yes.  I am trying to find it.

20            And then -- let's see -- actually, your Honor, that

21   should be 7 sites that are multiplied by 17,000.

22            THE COURT:  That's OK.

23            MR. AXLINE:  And then there are 7 sites that should be

24   multiplied by 200,000.

25            THE COURT:  1.4 million.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

13BUORAC

1          Go ahead.  I still have six sites to go.

2          MR. AXLINE:  And those six sites should be multiplied

3     by 500,000.

4          THE COURT:  And that is 3 million.

5          So, roughly, the denominator is 14 and a half to 15

6     million.

7          MR. AXLINE:  And that's within potential range.

8          THE COURT:  I understand.

9          Now, Mr. Eimer, we have got that far.  We now know the

10    numerator is 1.7 million.  The denominator is, let's say, a

11    range of up to 15 million.  Where does that leave us,

12    Mr. Eimer?

13         MR. EIMER:  Nate Eimer.

14         It leaves me a little bit confused, I guess, because,

15    first of all, I don't know where all of these sites come from

16    in terms of exposure for CITGO in this case, as your Honor

17    asked the question.

18         THE COURT:  Because they are all 7-Eleven sites.

19    That's all.  He is saying, for the 22 7-Eleven sites in the

20    Orange County Water District case, that is the maximum number

21    of sites in which they seek to hold CITGO responsible.  That is

22    not hard, and you asked for an numerator and denominator, you

23    now have one.  It is 1.7 over 15.

24         MR. EIMER:  It is only confusing in the sense that

25    there are no 7-Eleven focus sites in the Orange County Water

13BUORAC

1    District case, and only two sites have been reported at all as
2    being potential sites in the case.

3                THE COURT:  I'm sorry.  I don't understand.  This is a
4    settlement.  So they are settling with 7-Eleven for all its
5    potential exposure in the Orange County Water District case.
6    Obviously, they took in all of the 7-Eleven sites, whether they
7    are focus sites or not.  What does it matter?  7-Eleven wants
8    to buy peace in a litigation where it is a named defendant.  It
9    has a right to do that.

10               My only role is to assess whether it is a good faith
11   settlement.  You have challenged that because you fear that,
12   without being able to pursue 7-Eleven for contribution or
13   indemnity.

14               This is an unfair position and I am trying to
15   understand why.  I thought that we were trying to get
16   somewhere, but you are raising things I think are irrelevant.
17   How many focus sites, not focus sites -- doesn't matter --
18   7-Eleven is settling the whole case against them.

19               MR. EIMER:  Right.  But 20 of the 22 sites are not in
20   the case, according to what Orange County Water District
21   reported to the Court.  The Court ordered the plaintiffs to
22   report the sites that are in the case, whether they are focus
23   sites or not.

24               THE COURT:  So I can only turn back to Mr. Axline and
25   say, why are you using 22 sites instead of 2?  Are the other 20

13BUORAC

1    sites in this case?

2              MR. AXLINE:  They are sites that 7-Eleven is concerned

3    about liability for and asked to settle.  So they are within

4    the Orange County Water District's service area and, yes, I

5    would say they are within the case.

6              THE COURT:  7-Eleven may be concerned about them, but

7    are you suing CITGO and seeking recovery from them with respect

8    to these 20 sites?  Either these other 20 sites are in the case

9    or not.  I understand that 7-Eleven wanted to buy a broad

10   release.  That's fine.  But are you seeking damages from CITGO

11   in this case with respect to 2 sites or 22 sites?  You know the

12   answer to that.

13             MR. WALSH:  Your Honor, this is Mike Walsh.

14             I do ask to address this issue after Mr. Axline.

15             THE COURT:  All right.

16             Right now I am talking to Mr. Axline.  Are you

17   pursuing CITGO for 22 sites in this case or for 2 sites in this

18   case?

19             MR. AXLINE:  Mr. Eimer is correct that you asked us to

20   identify the sites that were in the case in the sense that they

21   were ripe, your Honor, and that is an important distinction.

22             THE COURT:  So at this time you have causes of action,

23   so to speak, against CITGO for two sites.  Are those the two $5

24   million exposure sites?

25             MR. AXLINE:  Yes.

13BUORAC

```
 1              THE COURT:  So then the denominator would change to 10
 2    million.  It would be 1.7 over 10 million.
 3              Now, assuming that's the case, Mr. Eimer, that that is
 4    all that he is pursuing you for now, meaning, if you want to
 5    sit down and negotiate a settlement like 7-Eleven did, you also
 6    may want a release as to 22, and that is up to you, but in the
 7    lawsuit on the table are two sites with a maximum exposure of
 8    10 million, so it is 1.7 over 10 million.
 9              Now what, Mr. Eimer?
10              MR. EIMER:  Now I understand that, and that's very
11    clear now.
12              The second point is that they have given no basis, I
13    believe, for the allocation of their $1.7 million among the 22
14    sites.
15              THE COURT:  What do you mean?  I read it out to you at
16    the beginning of this.  Remember I said, how many dollars for
17    the retail sites for this or for that?  I can do it all over,
18    but do you remember I said it at the beginning of this
19    conversation?
20              MR. EIMER:  If I can use my rough math, and maybe
21    there is no objection now that we understand it better,
22    Two-thirds of the liability is found in the two sites in the
23    case, 10 million out of 15 and yet less than half of the money
24    is being allocated to those sites.
25              THE COURT:  You mean when I said two 7-Eleven stores
```

13BUORAC

1   against whom OCWD is currently asserting claims they are

2   valuing that at 725?

3           MR. EIMER:  Correct.

4           THE COURT:  So your point, that is less than 50

5   percent of the 1.7 million settlement?

6           MR. EIMER:  Yes.

7           THE COURT:  But your point?  What's your point?

8           MR. EIMER:  Your Honor, two-thirds of the liability is

9   directed at those two sites.  Yet only -- I don't know what the

10  number is -- 40 percent of the settlement is directed towards

11  those two sites, right?

12          THE COURT:  Two-thirds of the 15 million is 10

13  million, but of the settlement you said 40 percent --

14          MR. EIMER:  I didn't multiply out, but it is 725 out

15  of a million.

16          THE COURT:  About a million 7.  So what percentage is

17  that, roughly?

18          MR. EIMER:  It is less than half.

19          THE COURT:  Yes.  You said roughly 40 percent.  But

20  roughly 40 percent of the settlement is allocated to those two

21  sites.

22          MR. EIMER:  Right.

23          THE COURT:  So you are saying that at the end of the

24  day is not fair to CITGO?

25          MR. EIMER:  Right.

13BUORAC

```
 1              THE COURT:  Because you are overexposed percentage
 2    wise?
 3              MR. EIMER:  Correct.
 4              THE COURT:  But I understand that 7-Eleven has offered
 5    to reallocate.
 6              MR. EIMER:  If they do that, that helps.
 7              THE COURT:  So if there is a 1.7 million settlement
 8    and they say OK, I don't really care, you can allocate
 9    two-thirds to reflect the 10 million compared to the 15 million
10    max for the 22 sites, so you can allocate two-thirds of 1.7
11    million -- and I don't know what it is, but 1.1 million or 1.2
12    million -- to those two sites, then do you still object to the
13    fairness of this settlement?
14              MR. EIMER:  Then I don't know whether they anticipate
15    that the rest of the liability --
16              THE COURT:  Mr. Eimer, again, what?
17              MR. EIMER:  Then I am only concerned about the rest of
18    the liability, in other words, there is 9 million roughly left
19    unaccounted for which I assume they are pursuing somebody for,
20    so they believe that is CITGO's liability or they believe it is
21    liability for CITGO and somebody else?
22              THE COURT:  I don't know the answer, but Mr. Axline
23    does.
24              Mr. Axline, for the remainder, 8.8 million, which is
25    10 million minus 1.2 million, for the remaining 8.8, are you
```

13BUORAC

1    looking only to CITGO for that or are there other defendants at

2    those two sites?

3              MR. AXLINE:  There are other defendants, your Honor,

4    who supplied the gas to CITGO --

5              THE COURT:  That's the answer.

6              Do you know how many those are?

7              MR. AXLINE:  We do not yet know, only CITGO does.

8              THE COURT:  But that's the other defendants, CITGO

9    suppliers?

10             MR. AXLINE:  Correct.

11             THE COURT:  If they are not known, are they sued?

12             MR. EIMER:  To my --

13             THE COURT:  Who is speaking?

14             MR. EIMER:  Nate Eimer.

15             To my knowledge, our gasoline all came from a company

16   called Tower, and Tower has not been sued.

17             THE COURT:  So you have the answer, Mr. Eimer.  They

18   would be happy to have other defendants potentially liable

19   along with you for that 8.8 million, but they have not yet sued

20   those people because, I guess you say you have not identified

21   them or they haven't found them, I don't know which.  But the

22   other defendants they would sue along with you for that 8.8

23   potential exposure include Tower.  That's all I know.  Now

24   what?

25             MR. EIMER:  Now, the only one -- the last issue is the

1   issue that your Honor identified which is the relative

2   culpability of the parties.

3           THE COURT:  Let me pause before we turn to that issue

4   to see if Mr. Walsh objects to this reallocation because I

5   understood they didn't really care.  It was 1.7 million.  It

6   can be allocated whatever way seems appropriate, and it is not

7   a problem.  Is that true, Mr. Walsh?

8           MR. WALSH:  Yes.  We have no problem with that.  But

9   the issue of what is and what is not in the case is something I

10  needed to address.  I mentioned that earlier.

11          In my conversations with Wayne Miller about settling

12  this case, the issue of what was in the case included the 22

13  stores, but I understand Mr. Axline said no and maybe that is

14  what is in the documents but the district filed with the court,

15  but from the district's perspective, it was represented to me

16  that testing would be done at any store, 7-Eleven store and we

17  would be absolutely responsible for that, and that's why it was

18  considered in the case and settled.

19          THE COURT:  I am afraid that might just be semantics.

20          Mr. Axline or Mr. Miller have correctly said, those

21  stores are in our district.  We can test them at any time and

22  we may well find MTBE or we know it is remediated.  I can tell

23  that from the settlement papers.  But the current lawsuit in

24  terms of what is ripe for adjudication now is only the two.

25  But he is saying, you have exposure for the whole 22 because

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    they could get added in at any time that they become ripe.  So

2    I think it is a semantic issue.  They are not in the case this

3    minute, but they are very potentially in this case.  That's the

4    best I can do.

5              Let me go back to Mr Eimer then.

6              So, Mr. Eimer, we got as far as reallocating.  We are

7    going to allocate 1.2 to the two active cases, so to speak, the

8    two ripe cases, now what?  You want to know how that allocation

9    occurred -- no, that percentage of liability?

10             MR. EIMER:  Yes.  The relative culpability of CITGO

11   and 7-Eleven.

12             THE COURT:  So, in other words, you think that for me

13   to approve the good faith settlement, I have to have a

14   justification presented to me for the determination in the

15   settlement effort by plaintiff's counsel as to the relative

16   culpability as between 7-Eleven and CITGO and/or its suppliers?

17             MR. EIMER:  Correct.

18             MR. AXLINE:  Your Honor, this is Mike Axline.

19             That is absolutely not correct.  These settlements can

20   become mini trials on liability, but I will point out, as we

21   did in our papers, that the non-settling party here, one party

22   who has objected to the settlement, CITGO has a right of

23   contribution against its suppliers.

24             THE COURT:  That I know.  It does.

25             MR. AXLINE:  So asking you to determine the relative

13BUORAC

1    percentages of culpability, which is what a jury would do at

2    this early settlement stage, is not something that is required.

3    I don't think it is appropriate.

4            THE COURT:  I guess the point is, if a case is settled

5    for value that is just too small, given the exposure and given

6    the relative culpability of the remaining parties, then it is

7    not a good faith settlement.  For example -- it is obviously a

8    hypothetical here -- had you decided to settle for half a

9    million dollars or less, let's say, and make it even more

10   dramatic, $50,000 for 7-Eleven, CITGO says that has got to be

11   ridiculous because 7-Eleven owned us and 7-Eleven made all the

12   decisions and 7-Eleven added the MTBE, etc., etc., and that

13   doesn't seem fair.  It would be grossly disproportionate.

14           MR. AXLINE:  I understand what that argument is, but

15   even more importantly there is --

16           THE COURT:  Wait a minute, Mr. Axline.  But there is

17   this term "grossly disproportionate" in the case law.  I would

18   have to at least be sure it is not grossly disproportionate.

19           MR. AXLINE:  I agree.  I think that is the enumerator

20   and denominator.

21           THE COURT:  And that comes to less than 20 percent,

22   right, 1.7 over 10 -- that is easy, I guess it is 17 percent.

23           MR. AXLINE:  That leads me to my next point, which is

24   that if the other settlements have occurred in this case, the

25   entire liability has been assigned to the manufacturers and

13BUORAC

```
 1    distributors such as CITGO, and CITGO has not objected to that,

 2    the liability of retailers --

 3               THE COURT:  Wait.  But that is the whole problem.  You

 4    are labeling 7-Eleven a retailer.  Mr. Eimer's entire argument

 5    is that they are not just a retailer.  You are ignoring the

 6    fact that they in fact owned CITGO and they were a --

 7               MR. WALSH:  Judge, this is Mike Walsh.

 8               But that statement, that is not in evidence and there

 9    is no evidence of that, Judge.  It was raised in their letter.

10    They threw it in there.  This litigation has been going around

11    for 10 years.  There have been countless witnesses, countless

12    documents, and there is no evidence of that, Judge, and we

13    can't go down that road.  We ought not permit them to go down

14    this road because they have not met the burden even to make

15    that accusation.  If they wanted to make it, there is plenty of

16    evidence.  They could have called it.  The reason that they

17    didn't call any evidence on this point is because it doesn't

18    exist.

19               THE COURT:  Mr. Walsh, let me go back over that.

20    Let's just go sentence by sentence.

21               In Ms. Hanebutt's papers which she signed as an

22    attorney, she says:  "7-Eleven owned all or part of CITGO

23    during much of the relevant time period."

24               Do you dispute that, Mr. Walsh?

25               MR. WALSH:  I just want to make sure that I am looking
```

13BUORAC

1   at the right document.

2              THE COURT:  Page 3 of the surreply dated March 7,

3   2011.  I just want to go sentence by sentence.

4              So the first sentence I am asking you to affirm or

5   deny:  "7-Eleven owned all or part of CITGO during much of the

6   relevant time period."

7              MR. WALSH:  I deny that and --

8              THE COURT:  Wait.  Slow.  This is a telephone

9   conference.  I can have you all fly in; it doesn't matter to

10  me, but I have to do it slowly if we are on the phone.  You do

11  or you do not deny that?

12             MR. WALSH:  This is Mike Walsh.

13             We deny that.

14             THE COURT:  You deny that.  Just stop there.  You deny

15  completely you didn't own any part of CITGO during the relevant

16  time period?

17             MR. WALSH:  If I could be a little more specific,

18  Judge, I am happy to.  7-Eleven owned CITGO from '83 -- I think

19  we have this in my response.  I think I put it in a footnote of

20  the relative ownership.  It is footnote 4 of my letter.  From

21  '83 to '86, CITGO was a wholly-owned subsidiary.

22             THE COURT:  So why did you tell me you denied it when

23  I said --

24             MR. WALSH:  Well, Judge --

25             THE COURT:  Mr. Walsh.

13BUORAC

```
 1              MR. WALSH:  But, Judge --
 2              THE COURT:  Mr. Walsh.  Stop.  I can't do it this way
 3    on the phone.  It won't do you any good to talk over me.  It
 4    truly won't.
 5              I asked you before to admit or deny the statement:
 6    "7-Eleven owned all or part of CITGO during much of the
 7    relevant time period."
 8              You said, I deny that.
 9              Now you say that it wholly owned CITGO from '83 to
10    '86.  Is that not part of the relevant time period?
11              MR. WALSH:  Judge, this is Mike Walsh.
12              I was addressing -- my point was, during much of the
13    relevant time period, the relevant time period of 1986 up until
14    the time that MTBE was off the market -- that was the point I
15    was attempting to make.
16              THE COURT:  You think that the relevant time period is
17    '86 until what?
18              MR. WALSH:  2003.
19              THE COURT:  Mr. Axline, do you agree that the relevant
20    time period is '86 to '03?
21              MR. AXLINE:  Yes, I do, your Honor.
22              THE COURT:  Well, Ms. Hanebutt, why did you write
23    that?
24              MS. HANEBUTT:  Why did I write what?
25              THE COURT:  Oh, my gosh.  We are just not getting
```

13BUORAC

1    anywhere.  I have read this for the third time.

2           "7-Eleven owned all or part of CITGO during much of

3    the relevant time period."

4           Now they say they owned it from '83 to '86 which is

5    virtually outside the time period.

6           MS. HANEBUTT:  Between --

7           THE COURT:  Excuse me, the relevant time period is '86

8    to '03.  What is the true statement?

9           MS. HANEBUTT:  Between '86 and 1990, they owned 50

10   percent of CITGO.

11          THE COURT:  Stop.  Let's see if Mr. Walsh admits that.

12   This is painful.  I am conducting a deposition.

13          Mr. Walsh, from '86 to '90, did 7-Eleven own 50

14   percent of CITGO?

15          MR. WALSH:  During that time period, 7-Eleven was a 50

16   percent shareholder of CITGO, yes.

17          THE COURT:  Then her statement was right in the first

18   place.

19          MR. WALSH:  From '86 to 1990.

20          THE COURT:  But she wrote:  "7-Eleven owned all or

21   part of CITGO during much of the relevant time period."

22          Four years, 50 percent owner, that is part.  That is

23   four years.

24          Now what happened after '90?

25          MR. WALSH:  It was just a customer.

13BUORAC

1          Mike Walsh again, Judge.

2              7-Eleven was a customer of CITGO.

3          THE COURT:  No more ownership?

4          MR. WALSH:  Correct.

5          THE COURT:  So the ownership ends in '90.  So now we

6    learn that for four years, 7-Eleven was a 50 percent owner of

7    CITGO, and that's during the relevant time period.

8              So what were you so excited about the record being

9    polluted by something that was not true?  What is not true?

10   Look at page 3 of the surreply there dated March 7th and what

11   is not true?

12         MR. WALSH:  Your Honor, if what we are talking about

13   is 7-Eleven's ownership of CITGO --

14         THE COURT:  We are.

15         MR. WALSH:  Then those statements that we are focusing

16   on right now, that is right.  I stand by my statements,

17   absolutely.

18         THE COURT:  What do you mean you are standing by your

19   statements?

20         MR. WALSH:  I think it is true.  My footnote in my

21   letter, I think pretty much states precisely what we are

22   talking about here.  And I apologize that we had to go down

23   this road, but it addresses that question.

24             What we are taking exception to, Judge, is the

25   inference that CITGO is attempting to make an inference without

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

13BUORAC

1    any evidence -- we don't think it needs to assert it for this

2    type of motion, just to come in and suggest that 7-Eleven has

3    liability for the decision to use MTBE.  I believe that's what

4    they are doing.

5            THE COURT:  No.  They are simply saying, 7-Eleven was

6    more than a retailer for four years during the relevant time

7    frame.  It was not just a retailer.  It was also a refiner and

8    distributor because it was the 50 percent owner of CITGO.

9    That's all it is saying.

10           MR. WALSH:  Judge, if 7-Eleven was a convenience store

11   operator.  It had a wholly-owned subsidiary that was a

12   refinery.  7-Eleven was not a refiner.

13           THE COURT:  No.  It had a 50 percent ownership

14   interest of a refiner, right?

15           MR. WALSH:  It had an ownership interest in a refiner.

16           THE COURT:  Yes, that's all.

17           MR. WALSH:  That was a separate free-standing -- has

18   always been a separate operating entity.

19           THE COURT:  Maybe I am missing the point.  It is still

20   a 50 percent owner of a refiner.

21           MR. WALSH:  What I am responding to is the statement

22   that 7-Eleven was a refiner.

23           THE COURT:  Again, I think it is semantics.  It is the

24   owner of a refiner, a 50 percent owner of a refiner.  I don't

25   see the difference.  Owner liability is nothing new.  It is a

13BUORAC

1   50 percent owner of a refiner.

2              Mr. Eimer, back to you.  Where is all this getting us?

3   It turns out that the statement is true, that for four years

4   7-Eleven is a 50 percent owner.  Does that make this 17 percent

5   allocation somehow grossly disproportionate?

6              MR. EIMER:  I think that the answer is yes, because

7   what comes out of their ownership of us is --

8              THE COURT:  Their 50 percent ownership of you?

9              MR. EIMER:  For a time period, which was the time in

10  1986 is when we built the MTBE plant, and it was their approval

11  of the MTBE plant that was happening around this very time.  It

12  was approved in 1986.  They had three seats on our board of

13  directors or half of it, all the way up to 1990.  Prior to

14  that, they had the entire board of directors.  Your Honor,

15  because of the relationship between CITGO and 7-Eleven, the

16  employees went back and forth between the two companies.  In

17  1987 they hired a lady from CITGO who was the supply manager

18  who was supplying them, who became an employee of 7-Eleven --

19             THE COURT:  This is a granular level that I don't need

20  to be at.  The point is, is this settlement grossly

21  disproportionate to their potential liability?  Is 17 percent

22  of the maximum exposure, now that we have reallocated, grossly

23  disproportionate?  I don't have enough of a basis to know why

24  it is grossly disproportionate, even if they were a 50 percent

25  owner of a refiner for the first four years.  I still don't

13BUORAC

1    know.

2              MR. EIMER:  I believe that the only claim that they

3    have against CITGO is the failure to warn claim.  Since we had

4    no choice but to buy the gasoline that they directed us to --

5              THE COURT:  Who is "they"?

6              MR. EIMER:  7-Eleven.  Sorry.

7              So we had a supply contract with them that gave them

8    the right to specify the gasoline to be supplied to them.  They

9    ordered the gasoline.  We ordered it, the appropriate gasoline

10   that they specified from suppliers and gave it to them.  The

11   only claim they could have against us --

12             THE COURT:  Who is "they"?

13             MR. EIMER:  7-Eleven or Orange County Water District.

14             THE COURT:  That is what I wondered.  So the only

15   claim that Orange County Water District has against you is

16   failure to warn.

17             MR. EIMER:  Failure to warn.

18             THE COURT:  All right.  So?

19             MR. EIMER:  And the only person that we could fail to

20   warn, your Honor, I believe, is 7-Eleven, and 7-Eleven had the

21   same knowledge we did.

22             THE COURT:  Isn't that for another day?  Isn't that a

23   motion?

24             MR. EIMER:  It may be another motion, but it is also

25   relative to fault.

13BUORAC

```
 1              THE COURT:  But Mr. Axline correctly says, I don't
 2     have a trial on relative fault.
 3              MR. EIMER:  I agree with that.
 4              THE COURT:  So all I have is the standard of grossly
 5     disproportionate.
 6              MR. EIMER:  Right, and 80 percent of the liability
 7     here is being now allocated to CITGO --
 8              THE COURT:  Not exactly, but that is the maximum
 9     exposure.  But second of all, you have contribution rights
10     against your supplier who was Tower.
11              MR. EIMER:  That's correct.
12              THE COURT:  So it is not like 80 percent is being
13     allocated to you.
14              MR. EIMER:  But my contribution rights against
15     7-Eleven are being cut off.
16              THE COURT:  For sure.
17              MR. EIMER:  My point is that, to me, most of the
18     liability here is 7-Eleven because they are the ones that
19     specified the product and spilled it.
20              MR. WALSH:  Judge, this is Mike Walsh.
21              Mr. Eimer is making some of this up.  I think if we
22     are going to be getting into these types of factual assertions,
23     if the Court is going to take it into account on good faith
24     settlement, I don't see how we can do this without some
25     evidence.  And if we are going to reopen this so that we can
```

13BUORAC

1    start introducing new evidence, if that's what the Court wants

2    to do --

3             THE COURT:  What I don't want to do, Mr. Walsh, is be

4    intimidated into becoming a rubber stamp.  That, I am not going

5    to do.  I take the obligation to assess the good faith

6    settlements seriously.  Most of them are unopposed and, in a

7    sense, much easier.  You look at it, you get a rough sense.

8    You say fine, nobody is opposing it.  But when somebody is

9    opposing it, it is not the first time, then you look harder to

10   make sure that you think you are satisfied that it is not

11   grossly disproportionate, but it is not called being a rubber

12   stamp and it is not called being afraid to have an evidentiary

13   hearing if needed.  I have to be sure that the settlement is

14   fair to everybody, that's all.

15            MR. AXLINE:  Your Honor, this is Mike Axline.

16            If I could address --

17            THE COURT:  You don't really care what the allocation

18   is.  You could allocate 1.65 million to these two stations,

19   theoretically, which changes the -- we did 1.2 -- we did 1.7.

20   Never mind.

21            Go ahead.

22            So, essentially, we allocated the whole thing to this

23   because we are saying it is 1.7 over 10 million.  So we already

24   did the maximum allocation.

25            Mr. Axline, did you start to speak?

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

13BUORAC

1          MR. AXLINE:  Yes.  Just on the liability issue.  I

2    have a couple of points that are little amendments to what

3    Mr. Eimer said.

4          On liability, I want to stress the point that I made

5    earlier which is that, in figuring rough proportionality, I

6    think it is fair for the Court to acknowledge or to take into

7    account the fact that a prior settlement, the manufacturers and

8    refiners have taken all of their responsibility and retailer

9    qua retailers' percentage has been zero.

10          THE COURT:  I do understand that the point is the

11    characterization of 7-Eleven's role.  7-Eleven, at least for

12    four years, admittedly, in the relevant time period is a 50

13    percent owner of a refiner.

14          Mr. Eimer wants it to sound even bigger than this

15    because he is saying, on the cusp year of 1986 when these

16    decisions were made and what not and the board was composed --

17    it was all 7-Eleven.  But put that aside.  From '86 to '90, it

18    is certainly conceded they were a 50 percent owner.  All that

19    he is saying is, they should have a share of the refiner

20    liability.  You are saying, in the other cases, the refiners

21    took the 100 percent share.

22          MR. WALSH:  That is one point.

23          The other point is that in California, duty to warn

24    runs not just to retailers but to bystanders and third parties

25    who are injured by the product.  And Mr. Eimer said that the

13BUORAC

1   only duty to warn here was to 7-Eleven, and that is not

2   correct.

3           THE COURT:  What about Tower, Mr. Axline, why aren't

4   they a defendant?

5           MR. AXLINE:  Citgo has not disclosed to us, despite

6   repeated discovery requests, who their suppliers were and where

7   their suppliers got their gasoline.  I strongly suspect, your

8   Honor, that Tower got its gasoline from some of the other

9   refiner defendants in this case, and that if CITGO wanted to go

10  after them, it can do so.

11          MR. EIMER:  Your Honor, Nate Eimer.

12          I don't have all of our discovery responses here, but

13  I would be very surprised if they asked us who our supplier

14  was.

15          THE COURT:  Sorry?  You what?

16          MR. EIMER:  We would have every reason to disclose

17  that.

18          THE COURT:  You would have every reason to disclose

19  that?

20          MR. EIMER:  Sure.  Why wouldn't we?  I don't have our

21  responses here, but my impression is that --

22          THE COURT:  Again, we didn't hear that so keep --

23          MR. EIMER:  I can't warrant to the Court that we told

24  them that.  We certainly disclosed it to Mr. Miller in South

25  Tahoe because it was the same throughout California.  We have

              SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

13BUORAC

```
 1   no refineries in California.  Our only customer in California
 2   is 7-Eleven or was 7-Eleven.  So Mr. Miller's office in the
 3   South Tahoe case, supplied by Tower.  I can't believe if they
 4   asked us in this case, we wouldn't tell them the same thing.
 5   They may have asked, I don't know.  I can't warrant to the
 6   Court we told them that, but I would be shocked if they asked
 7   and we didn't tell them.
 8               MR. WALSH:  Your Honor, it is a little tight because
 9   the right of CITGO to go after its suppliers is not dependent
10   upon those suppliers being named as defendants in this
11   lawsuit --
12               THE COURT:  Right.  I understand.  If CITGO is found
13   liable, it can pursue Tower.
14               MR. WALSH:  Correct.
15               THE COURT:  So then, the only question left is whether
16   there's enough of a record before the Court to say that, in
17   terms of gross disproportionality, 17 percent -- and that's a
18   full allocation, that's the 1.7 to two sites which we can't do,
19   so call it 17, 16 percent, but 16 percent attributed to
20   7-Eleven is not grossly disproportionate.
21               And I guess that the answer to that is to invite
22   supplemental submissions where you would make the record, I
23   suppose, Mr. Axline, as to other settlements and the shares
24   assigned to retailers versus refiners.  So even if 7-Eleven was
25   seen as a refiner -- and I know that Mr. Walsh says, we
```

13BUORAC

1    weren't, we were 50 percent owner of a refiner, but even if

2    they were a refiner for a four-year period, that there still

3    may be a proportionate -- certainly not a grossly

4    disproportionate share -- for a company that was a refiner for

5    a four-year period because, in other cases, the retailers were

6    at zero.  So whatever role they had or both, it is still not

7    grossly disproportionate.

8            Maybe you should make a supplemental submission,

9    Mr. Axline, and give me an evidentiary basis to find that.

10           MR. AXLINE:  Understood, your Honor.

11           THE COURT:  Maybe that's the way to go.  So I think I

12   will invite a further submission, but I realize that will

13   invite a response to it.  And I also know everybody is busy in

14   these MTBE cases, but I would like to get this off my desk.

15           So by when can you make such a supplemental

16   submission, Mr. Axline?  I think it is pretty limited, but I

17   would like an evidentiary basis, particularly based on today's

18   record which you can get, of course.

19           MR. AXLINE:  We should be able to do that by the end

20   of next week, your Honor.

21           THE COURT:  That would be helpful.  And that is the

22   18th of March.

23           Mr. Walsh, will you make a submission by the same date

24   or work with Mr. Miller?  You have reached a settlement, so

25   there is nothing improper about working together, I would

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

13BUORAC

```
1   think.
2           MR. WALSH:  No, there isn't.  I was not going to be
3   working next week, but if that's the deadline, that is the
4   deadline.
5           THE COURT:  It would be helpful.  Maybe Ms. Kieffer
6   can pick up with Mr. Axline and work together on that.
7           And if you do get a submission on the 18th, Mr. Eimer,
8   is it likely that you will want to respond?
9           MR. EIMER:  We may.  I am not sure we will.  A lot was
10  clarified here today on the total exposure.
11          THE COURT:  I agree.  I think a lot was clarified.  It
12  was a worthwhile call -- frustrating and difficult, but
13  worthwhile.
14          So if you wish to make a submission, why don't we say
15  March 25th.
16          MR. EIMER:  Can I ask for a couple of more days
17  because all of us are out for spring break?
18          THE COURT:  But that's what Mr. Walsh just said, and
19  he wasn't so happy with the 18th.
20          Why don't we just move the 18th to the 23rd and you
21  respond by the 30th.
22          MR. EIMER:  That would be fine.  I appreciate that.
23          THE COURT:  It may be that as you continue to talk to
24  each other, Mr. Eimer, you may withdraw your objection or, who
25  knows, you may negotiate your own settlement.  But anyway, if
```

13BUORAC

1   the picture changes either by withdrawing the objection or

2   further negotiation, please let the Court know at the earliest

3   possible time.

4           MR. EIMER:  We will.

5           And thank you for holding the call.  It clarified a

6   lot.

7           THE COURT:  I hope it did.

8           Anything else from anybody?

9           MR. WALSH:  This is Mike Walsh.

10          Does the Court anticipate addressing this 7-Eleven

11  ownership issue because it has really come up here for the

12  first time?

13          THE COURT:  I am only going to address your

14  concession, which is from '86 to '90, you were a 50 percent

15  owner of CITGO, that's all.  I am not going to say more or

16  less.  I am not going to get into the composition of the board

17  and whether the employees were coming or going and all of that

18  and who made the decision to blend MTBE -- I don't need to go

19  that far, but I do know that for a four-year period, you were a

20  50 percent owner because you said so.

21          MR. WALSH:  Right, your Honor.  But the question is,

22  that characterizes 7-Eleven as a refiner and that's not right.

23  And I would like to address that we were a shareholder, but we

24  were not a refiner.  I think when we look at the record --

25          THE COURT:  I think you will see every time in the

13BUORAC

| | |
|---|---|
| 1 | record, you will see me saying a 50 percent owner of a refiner. |
| 2 | That's what I said over and over again. |
| 3 | If you want to address as a matter of law what is the |
| 4 | potential exposure in terms of liability for a 50 percent owner |
| 5 | of a refiner, add to the submission Mr. Axline is submitting |
| 6 | with a couple of pages on the potential liability of a 50 |
| 7 | percent owner of a refiner. |
| 8 | That's all.  Maybe you will find law that an owner is |
| 9 | never responsible. |
| 10 | MR. EIMER:  We will address that in the briefing. |
| 11 | THE COURT:  Very good.  So we have those new dates. |
| 12 | It is the 23rd and the 30th. |
| 13 | And I expect that you will order the record, please, |
| 14 | because we will need it. |
| 15 | Thank you. |
| 16 | o    0    o |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |