Ea69mtbc                          Telephone Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------x

3   IN re MTBE (ORANGE COUNTY WATER DISTRICT)

4
                                        04 CV 4968(SAS)
5

6   ---------------------------------x
                                    New York, N.Y.
7                                   October 6, 2014
                                    2:37 p.m.
8
    Before:
9
                       HON. SHIRA A. SCHEINDLIN
10
                                        District Judge
11
                    APPEARANCES (Via Telephone)
12

13  MIKE AXLINE
    DUANE MILLER
14  TRACEY O'REILLY
         Attorneys for Plaintiff Orange County Water District
15
    LISA GERSON
16       Liaison Counsel & Exxon Mobil Corporation for Defendant

17  JEFF PARKER
    WHITNEY ROY
18       Attorneys for Defendant Exxon Mobil

19  JOHN ANDERSON
         Attorney for Defendant ConocoPhillips
20
    JEREMIAH ANDERSON
21  CHARLES CORREL
         Attorneys for Defendant Chevron
22
    KEN EHRLICH
23       Attorney for Defendant G&M

24  JOHN DICHELLO
         Attorney for Defendant Lyondell
25

Ea69mtbc                              Telephone Conference

1    APPEARANCES (Via Telephone)

2    DIANA MARTIN
          Attorney for Defendant Tesoro
3
     STEPHANIE WEIRICH
4         Attorney for Defendant BP

5    SAMANTHA CASE
          Attorney for Defendant USA Gasoline
6
     PETER CONDRON
7         Attorney for Defendant Shell

8    WILLIE EPPS
          Attorney for Defendant Valero
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In chambers)

2          THE COURT:  Good afternoon.  I'm just going to call

3     the roll.  I have a court reporter here.  Many of you have been

4     on conference calls with me you know it's very important you

5     state your name every single time before you speak.  Right now

6     just say "here."

7          (Roll called)

8          Is there anybody who I didn't call on?

9          Okay.  Silence means there's nobody I didn't call on.

10          So I know this is somewhat inefficient to try to have

11     an oral argument on a telephone conference which is so

12     difficult because of the difficulty of reporting it.  The

13     telephone, as you know, when you're speaking it cancels my

14     voice so it's very hard for me to interrupt with a question.

15     So I ask you to speak slowly and pause a lot.

16          I should have I guess had this oral argument when you

17     were all here last week.  I kind of missed that beat.  Wasn't

18     up to speed yet on the briefs.  But when I did get up to speed

19     I realized an oral argument would be useful.

20          The issue is not surprisingly -- I can quote from CMO

21     No. 60 at page three.  The issue is whether each release site

22     identified as part of a focus plume contributed to

23     contamination of the wells associated with that plume.  If OCWD

24     provides no proof that a particular release site contributed to

25     such contamination and OCWD will not drop the release site from

1    the focus plume, then defendants may file a motion for summary

2    judgment.  That was CMO No. 60

3        So the question is:  Has Dr. Wheatcraft's model met

4    that test of proof that a particular release site contributed

5    to such contamination?

6        And that's a problem, given what he said.  He says in

7    his declaration that he has not, "Done any models in which we

8    isolated a particular source and ran only that source."

9        He does say, however, that he used MTBE release data

10   from each individual defendant in creating his model -- I don't

11   quite know how he did that but he says he did that -- and that

12   that data about each individual station helped him create the

13   model.  But then he, of course, goes on to say, "We've not done

14   any models in which we isolate a particular source and ran only

15   that source."

16       So the problem is his model seems to potentially

17   connect a group of defendants' MTBE releases to a production

18   well but it doesn't seem to show that any particular station's

19   MTBE release caused OCW's injury.

20       Look, everything turns on my answering this question

21   because if Wheatcraft fails to make that connection there's a

22   whole lot of motions I don't need to reach.  Everybody will be

23   out based on that failure.

24       So it's a fairly important issue and I didn't want to

25   decide it without giving counsel an opportunity to be heard.

1              So Mr. Axline, Mr. Miller, or Ms. O'Reilly, which of

2      the three of you would like to sort of defend what Wheatcraft

3      does and whether he meets the standard that I set forth about a

4      particular release site; that is, a station having contributed

5      to the threatened or actual contamination.

6              Who wants to start?

7              MR. AXLINE:  This is Mike Axline, your Honor.  I will

8      give it a go.

9              THE COURT:  Okay.

10             MR. AXLINE:  Part of my response to that is going to

11     try to make sure that I fully explain what Mr. Wheatcraft did.

12             THE COURT:  Let me interrupt you already with a

13     question.  I assume that I'm on the right track in saying that

14     it's either Wheatcraft or nothing?  You're not going to rely on

15     anything else for that, are you, to answer the question?

16             MR. AXLINE:  With respect to CMO 60, no.

17             However, we did submit additional causation evidence

18     in the form of Mr. Herndon's declaration stating that each

19     station that was within the capture zone of a well or group of

20     wells will contribute MTBE to those wells.

21             So, with respect to CMO 60 we're relying on

22     Mr. Wheatcraft.  But with respect to causation more generally

23     of the type that's involved in the City of New York case we

24     also have the declaration of Roy Herndon.

25             THE COURT:  I think the case that is most analogous

1    now is Fresno.  Is this the same as Fresno and should be

2    dismissed?

3            Now I realize the difference is you've got yourself a

4    fate and transport expert, which is Wheatcraft, but then the

5    answer is all Wheatcraft.

6            Okay.  Let's get started.

7            MR. AXLINE:  So Mr. Wheatcraft's task was to identify

8    whether the stations that we had identified contributed to a

9    plume.

10           THE COURT:  Right.

11           MR. AXLINE:  And then whether that plume contaminated

12   wells.

13           We base our understanding not -- just on CMO 60 itself

14   but also on the runup to CMO 60 which involved a fair amount of

15   back and forth between the defendants and the plaintiffs as to

16   how to frame the case.

17           The defendants started off complaining that we had too

18   many plumes and stations and that the case was unmanageable for

19   that reason.  So, we made the point that regardless of whether

20   an individual station contaminated an individual well we were

21   also going to have other stations that contaminated the same

22   well and that we've only identified one station and one well,

23   the defendants were then going to start pointing fingers at

24   each other saying well that contamination came from station X,

25   Y, or Z not from station A which is my station.

Ea69mtbc                    Telephone Conference

1          So, to solve that problem, in part, we shifted to the

2     idea of plumes where we were going to identify the plumes that

3     would include the stations that we thought were culpable for

4     the contamination in a well, which we did.

5          We then asked Mr. Wheatcraft to look at whether the

6     releases at each individual station that was associated with an

7     plume contributed MTBE to that plume.  And he did.  He looked

8     at all of the results from each station, modeled where that

9     MTBE was going, and concluded that each station did, in fact,

10    contribute to the identified plumes.

11         Now, once it gets to a plume it's sort of like a

12    passenger getting on a train.  At the station the passenger is

13    on the train.  The next stop is the well.

14         And this is uncontested in terms of the evidence

15    because the defendants submitted no expert testimony or

16    declarations in support of their motion.

17         Once the MTBE is on the train, so to speak, it's got

18    to plume.  Then there's nothing that stands between that

19    passenger getting on at the plume station and getting off at

20    the well station, which is where Mr. Wheatcraft concluded the

21    plumes would have an impact.

22         So that is all --

23         THE COURT:  So let me just ask the question.  So I

24    understand.

25         So are there 31 stations in play here.  Basically are

1   you saying Wheatcraft's testimony is that each of these 31

2   contributed to the plume in its area and that plume is going to

3   contaminate the production well.  So he doesn't --

4                MR. AXLINE:  Yes.

5                THE COURT:  So he doesn't have to say station A

6   contributed X amount or X quality but just I know that station

7   A is part of plume A, something like that?

8                MR. AXLINE:  Yes.

9                THE COURT:  Well then why did he say he's not done any

10  models in which we isolated a particular source and ran only

11  that source?  What does that statement mean?

12               MR. AXLINE:  Well, what the defendants are saying is

13  that he --

14               THE COURT:  I didn't ask you that.  Wait.  Wait.

15  Wait.  Wait.  I don't care what the defendants are saying.  I

16  want to know what that statement means to you.

17               He said in his declaration, and I'm quoting.  He's not

18  done any models in which we isolated a particular source and

19  ran only that source.

20               So I'm just asking you:  What does that mean?  Your

21  witness said it.

22               MR. AXLINE:  That means I think pretty

23  straightforwardly that he didn't break out individual stations

24  and trace only that station to only individual wells.

25               THE COURT:  I'm still a little confused.  You're

1    saying he does affirmatively know that station A contributed to

2    plume A?  But what doesn't he know?

3              MR. AXLINE:  Yes.

4              THE COURT:  Then what doesn't he know about station A?

5              MR. AXLINE:  Well, he didn't determine, for example,

6    how much of the contamination from station A it will be.  He

7    might have been able to determine that if it had been his

8    responsibility to do so.  But that wasn't his task.  That's

9    what he didn't do.  He didn't do a quantification.  That's in

10   the defendants' camp when the liability is joint.

11             THE COURT:  Right.  So when he says we didn't do any

12   models in which we isolated a particular source and ran only

13   that source, you think that that's all that that means; that we

14   can't say that the plume that eventually hits the well is five

15   percent made up from station A.  That's what he can't do?

16             MR. AXLINE:  He didn't do that.  That's correct.

17             THE COURT:  You think that's all the statement in the

18   declaration means?

19             MR. AXLINE:  Yes.

20             THE COURT:  But you think he affirmatively does

21   testify either at deposition or declaration or expert report

22   that station A's release is part of the plume that's going to

23   hit production well B?  It has hit or will hit?

24             MR. AXLINE:  Absolutely.  Yes.

25             In appendix A he identifies the stations that are

Ea69mtbc                        Telephone Conference

 1   associated with each plume.

 2          THE COURT:  He identifies the station that's

 3   associated with each plume?

 4          MR. AXLINE:  Yes.

 5          And then in his declaration at paragraph 8, carrying

 6   over -- starts on page 1 and carries on to page 2 -- he

 7   indicates which plumes are hitting which wells.

 8          THE COURT:  Okay.  So that was my question to you,

 9   Mr. Axline and that was helpful.

10          Which defense counsel would lake to take the lead in

11   saying why that isn't sufficient to meet the requirements of

12   CMO 60.

13          MR. PARKER:  Thank you, your Honor.

14          This is Jeff Parker.  I will take the lead, although

15   you are obviously aware there are a lot of defendants involved

16   in this motion so it's possible someone else may add something.

17          THE COURT:  Okay.

18          MR. PARKER:  Directly addressing your Honor's issue.

19   This goes back to the March '07 conference when Mr. Miller

20   defined a plume and he defined it to be gasoline that

21   commingles at the well.  And your Honor --

22          THE COURT:  At the well.  Wait.  Wait.  Wait.  Wait a

23   second.  You mean at the production well?

24          MR. PARKER:  That is what he said at the March 1, 2007

25   conference.  That's on page 13.

Ea69mtbc                    Telephone Conference

1          THE COURT:  Why is that a problem?  If it's part of

2     the plume that hits the well.  That's okay.  It still makes

3     that release site a part of the problem, so to speak.

4          So worrying about allocation or damages is a different

5     issue.  But liability, so long as material from the release

6     site is part of the plume that hits the well, that sounds like

7     liability.  You can argue later that you can't figure out the

8     percentage of liability and, therefore, you can't calculate

9     damages.  But that's a different motion than saying there is no

10    proof of liability.

11         MR. PARKER:  I understand that, your Honor.

12         And the next step in looking at this is the Court

13    actually set that bar at the March 4, 2010 conference when

14    Mr. Axline attended and said exactly, and this is Exhibit 79 in

15    our papers, attached to Ms. Roy's declaration, said exactly

16    what the plaintiff had to do.  And that is they have -- is

17    going to produce at some point a report that says these are the

18    sources impacting this particular site.  Mr. Axline went on and

19    said:  So we will be providing an expert report linking each

20    station to the well.

21         THE COURT:  But he still is.  Isn't he saying that

22    station A is contributing material to plume -- let's call it

23    plume B and plume B is hitting production well C.  So there's a

24    direct link between A and C that way.

25         MR. PARKER:  That's what Mr. Axline said.

1          THE COURT:  Right.

2          MR. PARKER:  That's actually not what Dr. Wheatcraft

3     said.  And I think it's important -- for instance plume 1, as

4     they've -- Mr. Axline just identified.  It lists numerous

5     stations.

6          THE COURT:  Right.

7          MR. PARKER:  That it attributes.

8          THE COURT:  Right.

9          MR. PARKER:  Well on the map, if you were to draw a

10    wide V, bigger than 90 degrees.

11         THE COURT:  Right.

12         MR. PARKER:  The well -- pointing straight down.

13         The well MBTAMB is straight down at the point of that

14    V.  One station is 4,000 feet to the northeast.  Another

15    station is 6,000 feet to the northwest.  Those are two trains

16    that are never going to hit unless you actually bring them to

17    the well.  And that's what he did not do.

18         THE COURT:  No, he didn't.  But he says they both

19    contributed to the plume.  And the plume hits the well -- I

20    mean what I can't do, obviously, Mr. Parker, is try the case on

21    a motion.  I have to always repeat that for all summary

22    judgment motions.  That's the one thing I can't do.

23         So if there is an expert who is not later stricken on

24    your *Daubert* analysis, which will be a different motion -- but

25    if there is an expert who says:  I realize that A is to the

Ea69mtbc                        Telephone Conference

 1   northeast and B is to the northwest and one is 4,000 feet and

 2   one is 6,000 feet, but their material comes together in the

 3   same plume and will hit the well.  If that's what he says it's

 4   not for me to quarrel with him unless he's stricken by *Daubert*

 5   before the trial.

 6           But at this point, summary judgment, if that's the

 7   evidence of record, then it seems to me they've solved the

 8   causation problem with acceptable proof.

 9           MR. PARKER:  Your Honor, I understand that.

10           The reason I was pointing to plume 1 as an example is

11   because those two points, the direct line from those two wells

12   never meet unless he actually tracks from the station into the

13   well.

14           THE COURT:  No.  No.  Why not into the plume?

15           MR. PARKER:  Because the plumes are coming different

16   directions.  If they're on a straight line coming radially

17   towards a well -- they're coming from opposite sides.  So the

18   only way to meet is actually to meet in the well.  And he never

19   says that.  He says I never traced from any individual --

20           THE COURT:  I don't understand that.  You're skipping

21   the plume.

22           I don't understand why they both -- both release sites

23   can't release material that finds its way into the plume, even

24   if the plume, so-called, is the last three feet -- I mean

25   that's a silly example -- but the last three feet before the

Ea69mtbc                        Telephone Conference

 1   well, as long as he says in his expert opinion -- you can

 2   challenge it when the time comes, either a *Daubert* or a

 3   trial -- that that material from those totally different

 4   geographic sources came together at the plume and then the

 5   plume hits the production well.

 6           So it's true he can't go from the station to the well.

 7   But he goes from the station to the plume and then insists that

 8   the plume hits the well.

 9           MR. PARKER:  But, your Honor, the premise of their

10   plume concept, going back to what they said in court, was the

11   typical -- they said typical of California and your Honor noted

12   also typical of New York.  The four corners with a station on

13   each and a well a long ways away, so they all get together near

14   the stations and then move towards the well.

15           THE COURT:  Right.

16           MR. PARKER:  My point of this, and of his entire

17   exercise, what Dr. Wheatcraft did, is that's not what he has

18   done.  They have taken wells on -- stations on opposite sides

19   of the well.

20           THE COURT:  I heard that.  But the whole point of fate

21   and transport is he's going to, I guess, give expert testimony

22   that because of the way the material moves through the

23   groundwater, whatever, it got at some point to the same plume.

24           Now, I'm no expert.  I don't know how it could do

25   that.  And I don't know whether that testimony will turn out to

1    be credible or whether it will even survive *Daubert*.

2          But if that's what he says now, you know the summary

3    judgment standard.  I've got to believe him and I have to draw

4    the inference in favor of the nonmoving party.  So it may

5    strike you as impossible, and that would be for *Daubert*.  But I

6    need to decide summary judgment.

7          Unless you think, Mr. Parker, that's not what he's

8    saying.  I thought that was what he's saying and maybe

9    Mr. Axline has to jump back in.

10          Mr. Axline, do I correctly describe what he's saying?

11          MR. AXLINE:  Yes, your Honor.

12          THE COURT:  I do.  He says from the completely

13    different geographic sources somehow the material comes

14    together in the same plume.  Mr. Axline.

15          MR. AXLINE:  I'm sorry.

16          I thought you were asking if you were correctly

17    representing what Mr. Wheatcraft said.

18          THE COURT:  Yes, I am.  I am asking that.  Is that

19    what he's saying, that these two very different geographic

20    location stations that Mr. Parker is talking about, somehow the

21    material from both somehow gets to the same plume?

22          Is that what he's saying?  Is that what Wheatcraft is

23    saying?

24          MR. AXLINE:  Yes.

25          MR. PARKER:  Exhibit 79 is where -- the deposition

1    excerpts from Dr. Wheatcraft.  And the plaintiff's

2    characterization in their papers is different than his

3    testimony under oath and, frankly, different than his

4    declaration which says -- he didn't isolate each station.  And

5    the way the model works is they're not mixed at a long distance

6    like in a tank, for instance.

7            THE COURT:  No.

8            MR. PARKER:  He said they're from different spots.

9            THE COURT:  Yes.

10           MR. PARKER:  The way the modeling experts do this is

11   they can isolate each station and show that a station, actually

12   its contamination got there.

13           THE COURT:  You can't say "got there."  Got where?

14           MR. PARKER:  Got to the well.

15           THE COURT:  But he's not.

16           He's stopping at the plume.  And he is saying -- I

17   mean -- I don't know how many times I should say it.  He may be

18   wrong.  It may not even be a possible theory that can survive

19   *Daubert*.  But what he is saying is that somehow the material

20   from the two very distinct stations that are geographically

21   separated got to the same plume, joined together, created one

22   plume and that plume got to the well.  That's his theory.

23           MR. JOHN ANDERSON:  Your Honor, this is John Anderson.

24   If I may just add one point?

25           THE COURT:  Right.

Ea69mtbc                    Telephone Conference

1          MR. JOHN ANDERSON:  That points is -- I'm the one who

2     took Dr. Wheatcraft's deposition.  I've been through this in a

3     lot of detail.

4          What Dr. Wheatcraft did not say in his attempt to

5     salvage what he did in trying to defeat this motion is he does

6     not say that the entire plume or any defined amount of the

7     plume will ever get to the well.  All he says is it goes into

8     the plume and the plume contaminates the well.

9          THE COURT:  Right.

10          MR. JOHN ANDERSON:  And if you juxtapose that against

11     his testimony under oath in the deposition.  In the deposition

12     he acknowledged that he did not establish that any MTBE from

13     any station itself got to the well.  So what he's done in

14     assessing the issue is simply said that some part of the plume

15     will get to the well.  He does not say that the parts that were

16     contributed by the individual --

17          THE COURT:  I know.  But that takes me back a decade.

18     I mean that takes me back to the commingled product theory.  I

19     don't think you can disentangle material that's combined in a

20     plume and say okay I know that these following -- that releases

21     at six stations got together to form a plume but then I can't

22     tell you which station's material is the part of the plume that

23     hit the well.  That would be impossible because it's as if it's

24     a tank.  That plume is like a tank.  It's now got material from

25     six different sources all mixed up in one big tank.  And to

1    say -- wait.  If you had a tank and you siphoned off one gallon

2    into somebody's well or car or something you wouldn't know

3    whose molecules were in that gallon and that's what I said

4    years ago.  This is a combined gas or liquid, whatever I said,

5    I said then and I still believe that.

6          So if all these releases from six places got all

7    commingled in one plume, I don't think anybody can say when it

8    hit the well.  Oh, that must have been only from station A but

9    not B through E.  That's impossible.  It's all mixed up.

10         So that's at least my image.  I'm not a scientifically

11   sophisticated person.  But that's my image of "coming together

12   in the plume."

13         MR. JOHN ANDERSON:  This is not a tank.  This is a

14   geographic area that covers many, many square miles.

15         THE COURT:  Right.

16         MR. JOHN ANDERSON:  And the laws of hydrogeology, the

17   laws of physics apply to each molecule.

18         THE COURT:  Right.

19         MR. JOHN ANDERSON:  I will represent to you, and I

20   don't think Mr. Axline will deny this and, in fact,

21   Dr. Wheatcraft testified.  He is, in fact, capable of doing

22   that analysis of those molecules from each station.  This is

23   not a situation where you have a tank, got all jumbled up and

24   we can't identify what came out the spigot.  This is a very

25   large and very diverse geographic area.

1            THE COURT:  That's what a plume is?

2            MR. JOHN ANDERSON:  I'm saying that this plume that

3     he's talking about.

4            THE COURT:  Right.

5            MR. JOHN ANDERSON:  Is a large, multi-square-mile

6     area.  Mr. Parker actually has the map.  He can tell you the

7     tremendous amount of area that Dr. Wheatcraft is including in

8     this model.

9            My point is that Dr. Wheatcraft acknowledged that he

10    did not determine whether molecules from my station or

11    Mr. Parker's station or Mr. Condron's station did or ever will

12    get to a well.

13           THE COURT:  Wait.  I do want -- hold on.  I understand

14    that.  But what you've added is that -- you're saying he also

15    testified that he could have done it but didn't.  That's the --

16           MR. JOHN ANDERSON:  But did not.

17           THE COURT:  That's the surprise to me.  He said he

18    could have done that.  In other words, he traces it as far as

19    the plume.  And then he kind of quits and says the plume hits

20    the well but I could have figured out whether station A's

21    material was in the part that hit the well but I didn't bother.

22    That's what you're describing.

23           MR. JOHN ANDERSON:  Correct.

24           THE COURT:  Well that's surprising.

25           Okay.  Mr. Axline, could you respond to that, that he

 1    could have done it but just gave up or laid back or just didn't

 2    bother.

 3          MR. AXLINE:  Well, it's not quite that simple as you

 4    might imagine, your Honor.

 5          The defendants initially when we began this case

 6    complained that we were going to be doing exactly what

 7    Mr. Anderson described and that that was far too much and that

 8    we needed to take a different approach.  And that different

 9    approach was to identify plumes.

10          And the plumes were defined not as Mr. Parker

11    described it to you but, rather, formally in CMO 25 because of

12    the dispute over what the impact of having these different

13    stations would be.  And CMO 25 states in subpart (b) that

14    OCWD's reply submission shall identify the, quote, plumes of

15    which OCWD is currently aware.  The term "plume" is now

16    understood to mean a mass of contaminant originating from one

17    or more sources.

18          THE COURT:  Okay.  My question to you is Mr. Anderson

19    just argued, that's fine, you've got the station material as

20    far as the plume.  But he could have -- he could have then said

21    yes, the plume hits the well -- not all of it, it's hundreds of

22    square miles, so the tip of it, the southern tip, the northern

23    tip -- some part of it begins to hit the well.  And he could

24    have figured out whose material was in the part that hit the

25    well.

1          Is that true or not true?  Did he acknowledge he could

2     have but just didn't?  That's what I wanted your response to.

3          MS. O'REILLY:  Your Honor, this is Ms. O'Reilly.  I

4     can address that question very briefly.  I worked with

5     Dr. Wheatcraft on his modeling.

6          THE COURT:  Well then go ahead.

7          MS. O'REILLY:  What Dr. Wheatcraft said is it may be

8     possible.  It's very -- nearly impossible because of the way

9     the model is constructed and the way you have to track it.

10    Every time you run a fate and transport model you have to run

11    all of the production wells that are running.  And you have to

12    run all of the groundwater.

13         So to track an individual station is -- you can

14    potentially run it, but then you have all of these other

15    complications, all of the other MTBE coming in and you can't do

16    a point-to-point tracking like they are suggesting given the

17    size of the model and the size of the area.

18         And what we Wheatcraft explained is if defendants

19    wanted -- their experts got it.  He said if you want to try and

20    do it, you can try and do it.  Their experts didn't do it.

21         THE COURT:  But Wheatcraft said he could do it or

22    he --

23         MS. O'REILLY:  He said it may be possible if you

24    have -- they didn't ask him what was required to do it.  And

25    it's a very complex process in order to do that.  And they

1   didn't ask him what it would take to do that.  They simply

2   asked him the question:  Is it possible?  He said:  It may be

3   possible.  But it's a very complex process and they didn't ask

4   him what it would require to do that.

5           THE COURT:  Well do you agree with Mr. Anderson that

6   only a part of a plume actually then is in contact with the

7   well and that it is possible that one could isolate whose

8   material is in that part of the plume?  Because it still sounds

9   strange to me, but I'm not deep into science and you and

10  Mr. Anderson are.

11          MS. O'REILLY:  No, I don't agree.  But it's not

12  realistic.  It's not reality.  And what Wheatcraft did was

13  model was the reality is.

14          THE COURT:  And the reality, according to you, is that

15  you really can't disentangle the identity of the molecules in

16  the part of the plume that hit the well?  Is that the reality?

17          MS. O'REILLY:  Yes, your Honor.  Just as you described

18  it in your discussion with Mr. Anderson.

19          THE COURT:  Okay.  So that is your theory.

20          MR. AXLINE:  Mr. Wheatcraft's declaration in paragraph

21  10 also makes the point -- I'm reading from his declaration

22  now -- that "The only exit for water from the aquifer is

23  through production levels.  OCWD's 2009 groundwater management

24  plan indicates that 98 percent of water in the aquifer will

25  eventually exit to production wells."

1          So even if Mr. Anderson were correct, Mr. Wheatcraft

2     makes it plain that the MTBE that was released from these

3     stations is going to impact production wells like --

4          THE COURT:  And you said "is going to," is going to.

5     In this case you're talking about actual harm and threatened

6     harm?

7          MR. AXLINE:  Yes.

8          THE COURT:  Okay.  Go ahead.

9          Now, Mr. Parker, I think what was next?

10         MR. PARKER:  Yes.  Thank you, your Honor.

11         To answer the specific question you posed to

12    Mr. Axline and Ms. O'Reilly, Dr. Wheatcraft was asked in his

13    deposition, and this is Exhibit 73, page 58 of the PDF filing

14    but his transcript page 116 starting.  The question starts on

15    line 2.  And in the question:  "Are you able, based on your

16    modeling, to identify which service station caused the

17    contamination which resulted in MTBE arriving in and being

18    detected in individual wells?"

19         The answer:  "The model could be used to do that.  I

20    have not been asked to do that and I have not done it.  I

21    haven't done so."

22         He goes on to ask about modeling individual sites.

23    And he repeatedly says:  We did not analyze or isolate a

24    particular station in the course of our modeling.

25         So he admits in the pages in the record that he could

1  have done it and this model could be used for it.  He admits

2  that he didn't do it.

3         And it's their burden to show normal causation, it's

4  not possible to show another way, before going on to some

5  alternative method.  He admits right there that they made a

6  choice to not analyze it in that way.

7         THE COURT:  But given Mr. Axline's last argument, it's

8  not as if only a tip of an iceberg is what hits the well.

9  According to Mr. Axline, if I understood what he said,

10  eventually 98 percent of this material or this plume will, in

11  fact, eventually come in contact with the production well.

12  Unless I misunderstood.

13         Is that what you said, Mr. Axline?

14         MR. AXLINE:  That was correct.  That's paragraph 10 of

15  Mr. Wheatcraft's declaration.

16         THE COURT:  I just want to make sure I summarized it

17  correctly.

18         MR. AXLINE:  You did.

19         MR. PARKER:  Your Honor, based on that.  That is an

20  extremely broad general opinion not applicable to any

21  particular site.

22         THE COURT:  No.  It's applicable -- in the end it's

23  applicable to every site.  I mean I think I'm understanding

24  this.

25         Again, it may be theoretically possible.  It may not

1   be worth it because essentially all of the material that hits

2   the plume is either hitting the well now or will over time.

3   And if it's really as high as 98 percent there is this hot new

4   word called proportionality.  How much more would I require or

5   would plaintiffs have to spend if it's virtually all going to

6   get there even if it's over decades.  We faced this idea in the

7   City of New York case that things may not happen for 50, 60

8   years.  But the Circuit affirmed that notion of injury.  So

9   it's all going to get there sooner or later.  And if he can

10  trace it from the station to the plume, and that's what this

11  argument started out with, then it may be that causation is met

12  for now, for summary judgment.

13          Don't get me wrong.  You have many other motions.  I'm

14  just trying to focus on this one because it's the whole case.

15  There are still other motions and other attacks that have to be

16  reached if I get over this one.  And then you get another shot

17  at *Daubert*.  And then you get another shot at trial.  So it's

18  certainly not over.  It may be that when you get to trial, if

19  the plaintiff survives *Daubert*, the jury won't buy this.

20          MR. JOHN ANDERSON:  What Mr. Axline actually read from

21  Dr. Wheatcraft was, and I'm not sure if you read it correctly,

22  but what he said was that 98 percent of the water --

23          THE COURT:  Yes.

24          MR. JOHN ANDERSON:  -- will eventually --

25          THE COURT:  Yes.

1              MR. JOHN ANDERSON:  -- mix into drinking water wells.

2              THE COURT:  Yes.

3              MR. JOHN ANDERSON:  It was not any testimony about

4    this plume.  And it has no time limit on it whatsoever.

5              THE COURT:  Right.

6              MR. JOHN ANDERSON:  And we all know for this case that

7    we're talking about not tens of years.  There's water in the

8    aquifer that has been dated as hundreds and hundreds of years

9    old.

10             That statement was not about the plume.  And that

11   statement was not about any of the wells that are involved in

12   this case.

13             That statement was a general statement that if you go

14   indefinitely into the future eventually this water is going to

15   come out.

16             THE COURT:  Right.

17             MR. JOHN ANDERSON:  And if you think about that, the

18   concentration of MTBE in the entire aquifer that eventually

19   comes out as dozens or hundreds of wells would be parts per --

20   you can't even imagine how low that would be.

21             THE COURT:  Right.

22             MR. JOHN ANDERSON:  That was a statement that was not

23   directly involved in this particular case.  And we get back to

24   CMO 60 where we started off this argument.

25             THE COURT:  Right.

Ea69mtbc                      Telephone Conference

1          MR. JOHN ANDERSON:  The plaintiff had the burden of

2    showing that MTBE contamination from specific stations would

3    get to specific wells.  Dr. Wheatcraft admitted to me in the

4    deposition many times that he could have done it but he was not

5    asked to do so.  And as Mr. Parker accurately pointed out this

6    is the plaintiff's burden.  They did not meet it.

7          THE COURT:  I know you're an advocate and you have to

8    put it as strongly as that but I feel obviously somewhat stuck

9    in the middle here.  It may be I have to accept a supplemental

10   declaration where he explains what he meant by "I could have

11   done it."  What would it take to do it?  Would it take years?

12   Would it take billions of dollars?  Maybe he better explain

13   what he means by "could have been done."  Because

14   Ms. O'Reilly's argument and Mr. Axline's argument is sort of

15   there's a theoretical possibility but, no, we didn't require it

16   because it would be so -- so difficult as to come near the word

17   impossible.  At least that's how I'm hearing them.

18          But I don't know if that's true.  I may be making that

19   up.  It may be he could have done it in two months for not a

20   lot of costs or it would have taken years for a ridiculous

21   cost.  So I don't know the answer to that and I'm kind of stuck

22   without it.

23          So since I do care to get this right -- it's an

24   important case, it's been around a long time -- I'm not adverse

25   to allowing him to explain the answer that "it could have been

1    done."What would it take to do it?  Why didn't he do it?  And

2    maybe it does reach the point of near impossibility or maybe

3    not.  Maybe they just didn't want to go there because they

4    didn't want to meet their burden and find out who's in and

5    who's out.  But lawyers are submitting the declaration and

6    lawyers have ethical obligations.  So he can't just not face

7    that question.  He has to meet that question and explain what

8    it means to say it could have been done or could be done.  I

9    need to understand that.

10          Mr. Axline or Ms. O'Reilly, do you know the answer of

11   what he meant by it could have been done?

12          You implied, Ms. O'Reilly that you know the answer and

13   it's not realistic.  How do you know that?  What does that

14   mean?

15          MS. O'REILLY:  Well I don't know the answer

16   specifically.  I was at Dr. Wheatcraft's deposition.  I

17   defended it.  And my understanding was that it is nearly

18   impossible.

19          THE COURT:  But I don't have that in the record.

20   That's your understanding.

21          MS. O'REILLY:  They didn't ask that question.

22          THE COURT:  Well, they did.  They asked if it's

23   possible.  And he said a number of times it is possible, I

24   wasn't asked.  I mean that's in the record.

25          MS. O'REILLY:  They only asked once could it be done

Ea69mtbc                        Telephone Conference

1   and they didn't ask what it would take.

2           THE COURT:  Well I'm asking now.  I need to understand

3   why there is, forgive the phrase, that particular failure of

4   proof.  It may be because it's not realistically possible.  But

5   I need something in the record because if it's as easy as

6   snapping your fingers one would have thought he would have done

7   it.  I suspect it's not that easy.  But on a spectrum from

8   snapping your fingers to taking a decade, I don't know where in

9   the spectrum it would fall.

10          It is your burden.  Since you didn't do it I think you

11  need to at least go back to this guy and have him explain his

12  answer.

13          Mr. Axline first.

14          MR. AXLINE:  I understand what your Honor is saying.

15  We'll of course be happy to oblige.

16          I would just make the point, however, that

17  Mr. Wheatcraft's declaration was that the plume, not a portion

18  of the plume, but the plume would impact these specific wells.

19  And the defendants have not submitted a single declaration in

20  opposition to that or a declaration from one of their experts

21  saying that some portion of the plume that is their station is

22  not going to hit the wells.

23          THE COURT:  Well, I understand that.

24          But, look, they're saying it's your burden of proof.

25  And they are making the argument, at least, that a plume that's

1    50 square miles or something is not hitting a well, all 50

2    squares miles.  So it is a portion.  It is the geographic

3    portion that is closest to that production well.

4            And then the next part of the argument is if it's only

5    that portion it could be figured out whose material is in that

6    portion.  Now that is not what I pictured.  As I said, I

7    pictured a tank-like entity -- even though it's a very huge

8    tank -- where it's all mixed up and you could never disentangle

9    it and you could never know whose material is hitting the

10   production well.

11           But Mr. Anderson said I'm wrong and that if you

12   understand physics and other sciences you actually could know

13   which part of the plume has whose material and which part hits

14   the well.

15           You're saying that's his argument, but he doesn't have

16   any proof of that.  That's all well and good but he's saying

17   it's your burden of proof to show that the material from the

18   stations got to the well.

19           Now you're saying you've met it because Mr. Wheatcraft

20   uses the word "plume," the plume hits the well.  He doesn't say

21   a portion of the plume or the southernmost portion or the

22   portion geographically down-gradient closest.  He just says the

23   plume hits the well.

24           MR. AXLINE:  Yes.  And I also think we're entitled to

25   the presumption on the summary judgment motion.

Ea69mtbc                          Telephone Conference

 1            THE COURT:  Sure.

 2            MR. AXLINE:  I think currently where our evidence is

 3    unopposed that the -- you know, any inferences are going to be

 4    drawn in our favor.  Now somehow the defendants are trying to

 5    shift that.

 6            THE COURT:  Well because they're saying that I have a

 7    wrong image of a what plume looks like.  It's not one big tank.

 8    It's fifty square miles or a hundred square miles.  And it is

 9    hard to imagine that a hundred square miles hits something as

10    small as a production well all at the same time.  It obviously

11    doesn't.  Obviously there is a point, a point in that plume

12    that makes contact and not the whole thing at once.  So that --

13    okay.

14            MR. AXLINE:  Understood, your Honor.

15            THE COURT:  But assuming that's true, my new

16    understanding of plume, then it begs the question of whether

17    you can tell whose material is in that point of contact.  And

18    I'm not so sure that is possible, Mr. Anderson says it is.  And

19    he says that Mr. Wheatcraft says it is.  That's why I'm asking

20    for Mr. Wheatcraft to explain whether that's really accurate.

21            Is he saying that the initial point of contact between

22    a plume and a well, one could figure out whose material is in

23    that point of contact?

24            Still sounds surprising to me.  But if that's what he

25    says and that's what he means, I'd like to know it.

Ea69mtbc                         Telephone Conference

1              MR. JOHN ANDERSON:  Your Honor, John Anderson.  If I

2      may?

3              THE COURT:  Yes.

4              MR. JOHN ANDERSON:  First of all, I asked

5      Dr. Wheatcraft if he could do it as part of his model.  He said

6      yes, he could.  Mr. Parker read that testimony.

7              I will tell you I have ten or twelve years of

8      experience with Dr. Wheatcraft.  And we successfully had a

9      *Daubert* motion granted against him in the Crescenta Valley

10     case.  And we're not at that point yet.

11             I am not saying that Dr. Wheatcraft is capable of

12     predicting anything, if you look at the overall context

13     factually.  But that's not part of this motion.

14             But when he endeavors to model what happens to

15     contaminants when they get into the subsurface and into the

16     water, when he goes through that effort, he is capable as part

17     of that effort -- in fact, I will posit to you that it's

18     actually easier to model a single station than it is to model

19     the entire group of stations that he did.  He's capable of

20     breaking that out as part of the process.  And he did not do

21     so.

22             Within the context of what he did, he could have

23     modeled the individual stations so that the plaintiff could

24     have put on some kind of evidence -- we think it would have

25     been very weak -- but could have put on evidence on a

Ea69mtbc                    Telephone Conference

 1    station-by-station basis, but they chose not to do that.

 2            THE COURT:  Well Mr. Axline started with the history

 3    of that.  And he says while that may have been their initial

 4    approach, apparently the defendants objected in some way and

 5    said that was way too complex and they came back and said, all

 6    right, then we'll do it by plume.

 7            MR. JOHN ANDERSON:  I will defer to Mr. Parker or

 8    Mr. Correl to talk about that history.  But I am quite certain

 9    that that is not what happened in terms of the reasoning and

10    what went on for the identification --

11            THE COURT:  Well then why did we get involved with

12    plumes as opposed to going directly from station to well?

13            MR. PARKER:  That process started with them listing

14    550 plumes initially.  And we started to go down the

15    designation road from there.

16            And they didn't want a single well and station pair

17    with a plume coming from station X.  They wanted -- we were in

18    front of your Honor multiple times because the defendants

19    thought if you want a plume from station X, then let's identify

20    that plume and do discovery on that plume.

21            They then defined the plume as this -- as a well and

22    what comes in from all directions to it.

23            THE COURT:  Right.

24            MR. PARKER:  Which is how they were able to get more

25    stations in the mix.  Because we thought ten plumes means ten

Ea69mtbc                        Telephone Conference

1   stations.

2            THE COURT:  No.  I never understood that.  I always

3   thought a plume was a mixed entity; in other words, it drew

4   from many sources.  So I always understood it that way.

5            I think I've gained as much I can from this argument.

6   I do think that Mr. Axline should contact Mr. Wheatcraft and

7   have him explain the answer that he could have done something

8   that he didn't do, what does that mean.

9            MR. AXLINE:  Understood, your Honor.

10           But let me close my portion of this by making the

11  following point.  It was not our understanding that it was our

12  burden to make that kind of a showing.

13           THE COURT:  Well, wait a minute.  Wait, wait.

14           Mr. Axline you know I can't interrupt easily.  What do

15  you mean, it wasn't your understanding that you had to make

16  that showing?  Of course you had to try to identify which

17  stations contributed to the impact.  That's CMO 60.

18           MR. AXLINE:  Yes.

19           THE COURT:  So what the defense is saying is that

20  merely getting it to the plume is not sufficient to get it to

21  the well and that you could have gotten it to the well and just

22  quit on the last step, from plume to well.  That's what this

23  argument boils down to.

24           MR. AXLINE:  Right.  And I don't want to let the

25  hearing resolve without making clear that in our view it was

1    our burden to get it to the plume and then to get the plume to

2    the well, which we did.

3           So it is, as Ms. O'Reilly said, I think difficult to

4    make it from a station to a well.  We had a lot of stations.

5           So I just want to make it clear for the record that in

6    terms of our position of the summary judgment motion that was,

7    in our view, adequate.  We are, of course, going to do as your

8    Honor asked.

9           THE COURT:  Well and review this transcript and think

10   about it.

11          Can I get a little insight into that reference about

12   Crescenta Valley.  Was that after the remand?  There was a

13   *Daubert* --

14          MR. JOHN ANDERSON:  Yes.  We had written motions.  The

15   *Daubert* motion against Dr. Wheatcraft was one of them.  And

16   following the hearing on that written *Daubert* motion -- it was

17   actually a motion in limine -- the Court ordered that we would

18   have a full day of testimony by Dr. Wheatcraft and by

19   Dr. Wilson who is -- was the defendant's expert in that case.

20   And we had a full day of testimony, most of which was

21   Dr. Wheatcraft.  He was put on by Mr. Miller.  He was

22   cross-examined by me and Mr. Meadows.  And months later, at the

23   conclusion, the Court granted the *Daubert* motion and excluded

24   Dr. Wheatcraft from testifying in that case.  Now, it was

25   settled before it went to trial but he was excluded by court

1   order.

2           THE COURT:  Well I wondered what the end of the story

3   was.  What judge was that?

4           MS. O'REILLY:  Judge Tucker.

5           MR. JOHN ANDERSON:  Yes.  Judge Tucker.

6           Judge Tucker has since changed her last name, went

7   back to her maiden name.  That's why I was drawing a blank.

8           THE COURT:  What is her name now?

9           UNIDENTIFIED SPEAKER:  Staton.

10          THE COURT:  Now I know who that is.

11          So she ruled it out.  Then the case settled.  So it

12  was never reviewed on a higher level.  And that's what we know

13  about it.

14          Right.  That's what we know about it.  Okay.

15          Did he do a similar analysis to this in the Crescenta

16  Valley case, Mr. Axline or Ms. O'Reilly, I guess?

17          MS. O'REILLY:  It was a different issue, your Honor,

18  because there we were focused on a smaller number of stations

19  and directly on production models.

20          MR. CORREL:  There in that case he did exactly what he

21  said he could have done in this case.  He traced it by station

22  to various wells.

23          MS. O'REILLY:  It was a different --

24          THE COURT:  No.  I understand.

25          When was her decision, roughly?

Ea69mtbc                          Telephone Conference

1          MR. JOHN ANDERSON:  It was about two years ago.  I

2     don't remember the exact date.

3          THE COURT:  I guess one of you could forward it to my

4     clerk, right?

5          MR. JOHN ANDERSON:  That would be our pleasure.

6          THE COURT:  Okay.  Why don't you do that.

7          Okay.  In any event, as I said, I think I've gotten

8     what I can from this phonecall.  So I thank you all and remind

9     you that there will be a record.

10          Thank you.

11          MR. PARKER:  Your Honor, is the plaintiff to submit an

12     affidavit of their expert?

13          THE COURT:  Yes.

14          MR. PARKER:  Okay.  When the defendants get that --

15          THE COURT:  We'll see.  Let's see what we get.

16          Okay.  Thank you.  Bye-bye.

17          (Adjourned)

18

19

20

21

22

23

24

25