UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**

This Document Relates To:

The Honorable Shira A. Scheindlin

*Commonwealth of Pennsylvania v. Exxon Mobil*
*Corporation, et al.*, Case No. 14-CV-06228

## PLAINTIFF COMMONWEALTH OF PENNSYLVANIA'S OPPOSITION TO DEFENDANT LUKOIL AMERICAS CORPORATION'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM

## **Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   Pennsylvania Has Jurisdiction Over LAC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    LAC's Motion to Dismiss Mischaracterizes the Commonwealth's Complaint and
            Consequently Ignores Key Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.    LAC's Use of GPMI As an Agent for LAC Provides a Basis for Pennsylvania to
            Exercise Jurisdiction Over LAC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            1.    The Evidence Demonstrates LAC Used GPMI for LAC's Pecuniary
                  Benefit in Pennsylvania. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            2.    LAC's Domination Over GPMI Meets the Test for Ascribing GPMI's
                  Conduct to LAC for Jurisdictional Purposes. . . . . . . . . . . . . . . . . . . 18

      C.    The Extent of LAC's Control Over GPMI is Demonstrated by LAC's Fraudulent
            Transfer of GPMI's Properties Two Year Prior to Steering GPMI into
            Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.    The Commonwealth Supports LAC's Request for an Evidentiary Hearing. . . . . . . . . . 22

VI.   The Complaint Adequately Pleads a Cause of Action Against LAC. . . . . . . . . . . . . . 22

      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## Table of Authorities

### Cases

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 555 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Colandrea v. Colandrea*,
   42 Md. App. 421 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Commonwealth ex rel. Pappert v. TAP Pharmaceuticals Products, Inc.*,
   868 A.2d (Pa. Commw. Ct. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*Daval Steel Prod. v. M/V Fakredine*,
   951 F.2d (2d. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 21

*Dixon v. Process Corp.*,
   38 Md. App. 644, 382 A.2d  (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gao v. JPMorgan Chase & Co.*,
   No. 14 Civ. 4281 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hildreth v. Tidewater Equip. Co.*,
   378 Md. 724, 838 A.2d (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re GPMI*,
   No. 11-02941-scc, (Bankr. S.D.N.Y.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re GPMI*,
   No. 11-15606-scc, (Bankr. S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Lupron Marketing and Sales Practices Litigation*,
   245 F. Supp.2d (D. Mass. 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14

*In re MTBE*,
   No. 1:00-1898, 2008 WL 3163634 (S.D.N.Y. 8/06/08) . . . . . . . . . . . . . . . . . . 24

*In re MTBE*, No. 1358,
   959 F.Supp.2d (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mylan Laboratories, Inc. v. Azko, NV.*,
   2 F3d. (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18

*Schlossberg v. Bell Builders Remodeling, Inc.*,
    441 Md. 671, 109 A.3d  (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Walden v. Fiore*,
    134 S.Ct. 1115 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**<u>Statutes</u>**

11 U.S.C. Sect. 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

42 Pa. C.S.A. § 5322. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 11

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

iii

## I.    INTRODUCTION.

Lukoil Americas Corporation (LAC) is not simply a holding company.  Rather, LAC actively conducts the business of OAO Lukoil, its parent corporation, in the United States, including in Pennsylvania.  LAC's activities between 2000 and 2011 included marketing MTBE contaminated gas stations for sale in Pennsylvania and directing operations of Getty Petroleum Marketing, Inc. (GPMI), at MTBE contaminated gas stations in Pennsylvania.  Accordingly, LAC is subject to the jurisdiction of Pennsylvania courts under Pennsylvania's long arm statute, 42 Pa. C.S.A. § 5322.

LAC's assertion that it merely "hold[s] stock and facilitat[es] financing for its subsidiaries" (Motion to Dismiss (hereafter "Mot.") at 3) is directly contradicted by LAC's own actions and admissions, including in these MDL proceedings.  LAC admits in its' Master Answer, for example, that: "Since October, 2000, LAC admits that, for certain periods during an individual year, LAC, by and through its wholly owned subsidiary, GPMI, purchased and distributed gasoline containing MTBE . . . ."  Declaration of Molly McGinley Han (hereafter "Han Decl."), Ex. 1-a (Master Answer at 1-2) and 1-b (Second Amend. Master Answer at 1-2).[1]

LAC also affirmatively represented to lenders, in order to obtain multi-million dollar lines of credit between 2000 and 2011, that:  "Lukoil's management is fully committed to playing a significant role in the management of Getty given its extensive experience in the retail gasoline business and as part of its strategy to expand into the U.S.  Lukoil is active in the decision making

---

[1] LAC filed its Second Master Answer in the New Jersey matter.  In New Jersey, LAC did not move to dismiss based on lack of personal jurisdiction, but instead acknowledged that "LAC, by and through its wholly owned subsidiary, GPMI, purchased and distributed gasoline containing MTBE . . . ." .  *Id.*  The SAC alleges LAC is responsible for liabilities of both GPMI and Lukoil North America.  Both entities owned stations and did business in Pennsylvania.  LAC admitted in its Interrogatory Responses that LNA has over 50 MTBE release sites in Pennsylvania (Han Decl. Ex. 3-a).

and strategic planning processes at Getty (such as the rebranding campaign, modernization of existing sites and expansion into the blending and supply business)." Han Decl., Ex. 2-a (Calyon Loan) at LAC002457.

The stations LAC managed included more than 100 MTBE-contaminated stations in Pennsylvania. *See, e.g.*, Han Decl., Ex. 3-a & 3-b. Many of these stations were rebranded "Lukoil" at the direction of LAC. Han Decl. Ex. 4-a (LAC Unanimous Written Consent (2/06/03) (directing $3 million to be infused to GPMI to rebrand Getty stations with the Lukoil trademark(s)); *see also* Han Decl., Ex. 2-a (Calyon Loan) at LAC002476, stating, "As a result of its purchase of Getty and acquisition of certain ConocoPhillips gas stations, **Lukoil owns a total of 2,035 stations in the U.S. as of January 1, 2005**" (emphasis added). LAC was clearly aware of potential liability for MTBE contamination at these stations. Han Decl., Ex. 13-a.

LAC directly marketed gas stations in Pennsylvania (including MTBE-contaminated stations), without any mention of GPMI. LAC offered for sale "All Sites Located Throughout The State Of Pennsylvania," including "89 Prime Retail Gasoline Sites," consisting of "61 Fee Simple Properties" and "28 Leased Properties" that were "Branded Lukoil." Han Decl., Ex. 4-b & 4-c. Contrary to the assertion by Mr. DeLaurentis that "LAC has never represented itself as GPMI," and that LAC "has officers and directors, but has never had any non-officer employees," monthly reports to Russia represented that it was "Lukoil Americas Corporation" that owned more than a thousand service stations and had hundreds of employees. *Compare* Delaurentis Decl. at ¶ 13 & ¶ 34 *with* Han Decl. Ex. 14-c ("2008 Monthly Report" indicating that Lukoil Americas Corporation had 1571 gas stations and 709 employees in December, 2008).

LAC's direct involvement in business activities in Pennsylvania began even before it acquired GPMI. Prior to purchasing GPMI in 2000, LAC itself negotiated directly with GPMI's then-owner Getty Realty (a/k/a Getty Properties Corporation) to alter the terms of the Master Lease governing GPMI gas stations, including stations contaminated with MTBE in Pennsylvania. Han Decl., Ex. 5-a *(In re GPMI Adv. Proc.* 5/28/13 Trans. of V. Gluzman (hereafter "5/28/13 Gluzman Trans.") at 967- 968). After obtaining concessions for the Master Lease, LAC then purchased GPMI and immediately took the company private. Han Decl., Ex. 6-c. Between 2000 and 2011 LAC managed GPMI for the benefit of LAC and OAO Lukoil, treating GPMI as either an agent for or a division of Lukoil rather than as an independent, separately owned business.[2]

LAC's motion to dismiss for lack of personal jurisdiction should be denied. LAC's direct activities and control of businesses in Pennsylvania more than satisfies Pennsylvania's long arm statue, 42 Pa. C.S.A. § 5322.

LAC also argues that the allegations in the Second Amended Complaint ("SAC") are too "cursory" to state a claim. Mot. at 23. Although the Federal Rules require only notice pleading, Fed. R. Civ. P. 8(a), the SAC is replete with specific allegations about LAC, including 51 new paragraphs based upon jurisdictional discovery conducted by the Commonwealth subsequent to the filing of the initial complaint. *See* SAC at 100-110, ¶¶ 296-347.

## II.    STATEMENT OF THE CASE.

On December 14, 2014, LAC moved to dismiss the First Amended Complaint based on lack

---

[2]    Although the Commonwealth believes the evidentiary hearing requested by LAC is unnecessary given the extensive evidence of LAC's business activities in Pennsylvania, the Commonwealth would welcome such a hearing. Having LAC's principals testify under oath before the Court would help clarify for the Court the extent to which LAC was not simply "holding stock and arranging financing for subsidiaries," but rather directly participating in the management and operations of GPMI.

of jurisdiction.  Plaintiff sought, and was granted, time to pursue jurisdictional discovery.[3]  The Commonwealth subsequently obtained over 433,000 documents (approximately 750,000 pages), including relevant documents that had been silently migrated from GPMI to LAC in 2009 and which LAC did not acknowledge or identify until the Commonwealth inquired about them after reviewing documents filed by the Trustee in GPMI's bankruptcy.[4]

Based in part upon this discovery, the Commonwealth filed its Second Amended Complaint, adding 51 paragraphs under a new section titled, "The Lukoil Defendants Are Directly and Vicariously Liable for GPMI's Environmental Liabilities." (SAC at 100-110, ¶¶ 296-347).   In addition, the SAC added claims against LAC's subsidiary Lukoil North America, LLC ("LNA") and against LAC's parent company, OAO Lukoil n/k/a PJSC Lukoil.

## III.   FACTS.

As noted above, in 2000, LAC began direct negotiations with Getty Realty to purchase GPMI.  As part of those negotiations, LAC demanded changes to the "Master Lease" governing Getty gas stations, including stations in Pennsylvania. Han Decl., Ex. 5-a (5/28/13 Gluzman Trans. at 967-968).   LAC and its CEO, Mr. Gluzman, negotiated amendments that directly impacted leases for gasoline stations throughout the Commonwealth, including the allocation of environmental

---

[3]  In jurisdictional discovery the Commonwealth sought documents and a 30(b)(6) deposition from LAC. The 30(b)(6) deposition has not yet been taken because approximately 750,000 pages of documents were provided in November and December, 2015, including approximately 400,000 documents of ESI materials from GPMI and are still being reviewed and the parties are still meeting and conferring regarding LAC's claim of privilege of withheld materials. If the Court is inclined to allow an evidentiary hearing, the Commonwealth requests permission to take the 30(b)(6) deposition prior to the hearing.

[4]  LAC has asserted an "attorney-client" privilege for documents shared with GPMI, even though GPMI as a corporate entity no longer exists. Such a position is directly contrary to LAC's representations in this Court that GPMI was separate from and independent of LAC.

liabilities at those stations. *Id.* at 1084 (by Mr. Gluzman: "I bought – I personally selected the company, I personally worked and bought the company in 2000"). *See also* Han Decl. Ex. 6-a ("Offer to Purchase" at 18 ("Background of the Offer").

When LAC acquired GPMI in 2000, GPMI was a publically traded corporation. On the day LAC bought GPMI, however, LAC announced to the S.E.C. that because GPMI was now a wholly-owned company, it was no longer required to submit public reports to the S.E.C. Han Decl., Ex. 6-c. From that day until 2011, LAC and OAO Lukoil treated GPMI as a private division and/or agent of LAC, carrying out the explicit goals of LAC and OAO Lukoil in the Northeast United States, including Pennsylvania, even when those goals were not in the best interests of GPMI itself.

In 2003, for example, LAC directed GPMI to "rebrand" Getty stations with Lukoil trademarks, and gave GPMI $3 million to carry out the rebranding (including at stations in Pennsylvania). Han Decl., Ex. 4-a.

In 2004 LAC signed a $360,000,000 Credit Agreement so that GPMI could purchase service stations, including stations in Pennsylvania. Han Decl., Ex. 2-b (Excerpts of 2004 "Credit Agreement & Guarantee). Most of these stations were purchased from ConocoPhillips and many of them were (and still are) contaminated with MTBE. Han Decl., Ex. 3-a. The 2004 Credit Agreement's Guarantee identifies LAC as a "Grantor" and states that "the Borrower [GPMI] and the other Grantors [including LAC] are engaged in related businesses, and each Grantor [including LAC] will derive substantial direct and indirect benefit from the extensions of credit under the Credit Agreement . . . ." Han Decl., Ex. 2-b at LAC005687.

In 2005, LAC affirmatively represented that it was part of the management team of GPMI in order to obtain a multi-million dollar line of credit. LAC emphasized the role of *LAC's*

*management* and the experience of Mr. Gluzman, the "Director and CEO of Lukoil Americas," and his "substantial experience in the gasoline distribution business." Han Decl., Ex. 2-a at LAC002457 & LAC002460. This representation was made at a time when Mr. Gluzman testified he was working for Lukoil and not GPMI. Han Decl. Ex. 5-a, 5/28/13 Gluzman Trans. at 962-63.

LAC explained to the lender that it was rebranding the stations to be acquired as Lukoil stations, as part of Lukoil's efforts to expand Lukoil's operations. "The rebranding will be supported by a significant marketing and advertising campaign (approximately $10MM per year) to be funded by Lukoil." *Id.* at LAC002457. To insure LAC control, money from the credit line was paid directly to LAC, not GPMI, and then funneled by LAC to GPMI. *Id.* at LAC002506 ("the projection assumes the following distributions will be paid to the Company's parent, Lukoil Americas Corporation ("LAC") through the maturity of the term loan in 2010 (in millions).") *Id.*

LAC also participated in supplying third parties with gasoline, including gasoline "additives." A 2005 agreement with Sunoco, for example, states: "Sunoco agrees to pay Getty $0.0030 per gallon *for LAC additive* and 0.0040 per gallon *140% LAC* as product is loaded at the rack into their trucks." Han Decl., Ex. 8-c (emphasis added). While the Commonwealth is still reviewing the several hundred thousands of pages of documents LAC provided in December, there is plainly evidence that LAC was involved in supply activities.

In 2007, LAC developed a plan to get out from under GPMI liabilities, while retaining GPMI's valuable assets. The plan was expressly approved by OAO Lukoil and involved LAC transferring 100% of its GPMI stock to LNA, LNA stripping GPMI of profitable stations in Pennsylvania (and elsewhere), then transferring 100% of GPMI stock, along with GPMI's money losing stations, back to LAC some two weeks later. Han Decl., Ex. 7-a & 10-a. Lukoil would then

6

sell GPMI for $1 dollar and keep it afloat just long enough to avoid a bankruptcy trustee clawing back the profitable stations. Han Decl., Ex. 14-a. *See* 11 U.S.C. § 548 ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition").

Despite the fact that this Plan plainly was <u>not</u> in the best interests of GPMI, this is precisely what happened. After selling GPMI's profitable stations in 2009, in February of 2011 LAC, consistent with the Plan, sold its entire stock in GPMI to Cambridge Petroleum Holdings for a grand total of $1. DeLaurentis Decl. at 17, ¶ 46. Mr. DeLaurentis fails to mention that, as part of the $1 sale (and consistent with the Plan), LAC arranged for OAO Lukoil to provide $25 million in funding to Cambridge to keep GPMI afloat until two years after the transfer of profitable stations to LNA. Han Decl., Ex. 9-a. On December 5, 2011, just two years and a few days after the November 13, 2009 transfer of assets from GPMI to LNA, GPMI declared bankruptcy in the Southern District of New York. *In re GPMI*, No. 11-15606, Doc. #1 (Bankr. S.D.N.Y.).

The Plan hatched by LAC in 2007 and carried out between then and 2011, however, ultimately did not protect LAC from a claim by the bankruptcy Trustees for fraudulent transfer of assets, including service stations in Pennsylvania. *In re GPMI Adversary Proceeding*, No. 11-02941, Doc. #1 (Bankr. S.D.N.Y.). In 2013, after several weeks of trial, LAC settled the adversary proceeding with the Trustees for GPMI for $93M. *In re GPMI*, No. 11-15606, Doc. #911, Settlement Agreement at 3 (7/29/13).

Mr. Gluzman's testimony in bankruptcy court regarding who he worked for was confusing at best. At one point he testified that for three years after LAC purchased GPMI: "I was only working for GPMI. I'm talking from the time we acquired the company [GPMI] for the next couple,

7

three years." Han Decl. Ex. 5-a, 5/28/13 Gluzman Trans. at 959. Mr. Gluzman then testified that

he undertook several major campaigns on behalf of OAO Lukoil after 2003, including negotiating

for ConocoPhillips to become a 20% shareholder in Lukoil. *Id.* at 961. During this same period of

time LAC represented to potential lenders that it was directly involved in the management and

operations of GPMI, which included managing MTBE contaminated stations in Pennsylvania.  The

bankruptcy court was certainly confused by Mr. Gluzman's testimony.  It inquired:

> THE COURT: Okay.  But at this – at that time frame, who
> was your employer?
> THE WITNESS: GPMI.
> THE COURT: Okay.  But you just – in response to what Mr. Kirpalani asked
> you, you indicated that you worked on a corporate deal for OAO Lukoil.
> THE WITNESS: Correct.
> THE COURT: And did OAO Lukoil compensate you for that work?
> THE WITNESS: I was – I was given sort of option for – stock option for the
> deal, yes.

Han Decl. Ex. 5-a, 5/28/13 Gluzman Trans. at 962.

One thing that Mr. Gluzman's testimony <u>did</u> make clear was that GPMI's finances were

completely controlled by Lukoil.  He testified: "Lukoil had their very, very strict reporting

system, not [just] to GPMI, to every subsidiary. . . . GPMI had to report operational data and

financial data on many different levels." *Id.* at 964.

The extent of Lukoil's control over GPMI is evidenced not only by LAC's (and GPMI's)

admissions when seeking funding, but also by the fact that GPMI had no independent budgeting

authority.  Rather, GPMI had to obtain approval from Lukoil for any expenditure.  As Mr. Gluzman

testified:

> Budgeting was one of the difficult, difficult situations, for not only GPMI but
> for every subsidiary [of OAO Lukoil].  Budget was very vigorously attacked by the
> parent company on every subsidiary to make sure that the subsidiary stays within

8

budget.

So, there was special forms, thousands of different forms, spreadsheets in Russia. So I had to hire actually an additional person who became an accountant for me.

Q.    Who was that?

A.    Elana Picman [sic. *Yelena Bitman*], and she was in charge of communications with Moscow and to make sure that all the reports were going to Moscow on time. . . . And every quarter she had to go to Moscow to defend the budget, because any deviation in budget was like an earthquake for them.

Han Decl. Ex. 5-a, 5/28/13 Gluzman Trans. at 965. While Mr. Gluzman's testimony with respect to who he was working for at any given time was confusing, it is clear that he was acting on behalf of (and as an agent for) LAC at all times. He testified in bankruptcy court, for example, that: "We were advised [by Lukoil] to move most of the liabilities to LNA [Lukoil North America], but I was still an officer and a director of GPMI." *Id.* at 1030.

Lukoil's control over the operations of GPMI is also evidenced by Mr. Gluzman's testimony that he was acting on behalf of Lukoil when he carried out the plan to strip GPMI of its valuable assets. When reviewing an example of a Lukoil memo, Mr. Gluzman explained the memo was "typical" of instructions given by Lukoil with respect to GPMI. *Id.* at 1037:8 & Han Decl., Ex. 10-a (OAO Lukoil meeting minutes). Mr. Gluzman testified that this document "was basically ordering certain people to do certain things." Han Decl. Ex. 5-a, 5/28/13 Gluzman Trans. at 1037:10-12. The bankruptcy court had a number of questions about this document, including the following:

THE COURT:    Could I ask you, the reference there to implement the business reorganization of Lukoil Americas, is that the same proposed reorganization arrangement for the retail business in the USA, or is that different?

THE WITNESS:    No, no. <u>That's the same</u>.

*Id.* at 1041:2-9 (emphasis added). Lukoil's "retail business in the USA" was primarily, if not exclusively, GPMI.

9

The fact that GPMI operated as an agent or division of LAC is also evidenced by the fact that "unanimous consent" resolutions for the Board of GPMI had to be submitted to Lukoil for review and editing before they could be adopted by GPMI. Han Decl., Ex. 11-a. The extent to which LAC used GPMI as an agent or division is also evidenced in e-mails, such as the e-mail in which Alex Pozdnyakov, an employee of GPMI, instructed another GPMI employee: "Could you send out an email to persons who have cell phones that in compliance with the decision of the president of OAO Lukoil Oil Company, Getty will not be providing mobile phone services to participants of the management exchange." Han Decl. Ex. 11-c.

Finally, Mr. Gluzman, who was President and CEO of LAC and GPMI simultaneously, testified under oath in another matter that his boss was the C.E.O. of Lukoil, Mr. Alekperov, and his perspective was that Getty was "partners" with the Commonwealth of Pennsylvania as it relates to Getty's contract with Bionol and that he met with Governor Rendell about the deal. Han Decl. Ex. 12(a), *GPMI v. Bionol Clearfield*, 4/11/11 Trans. of V. Gluzman at LAC005363, 5445-46 & 5450. *See also* Han Decl., Ex. 8-a (Correspondence from S. Logovinsky to Gov. Rendell with a bold, large-font "Lukoil" trademark on the letterhead and facsimile stamp from "Lukoil Americas LLC" and Ex. 8-b (describing 6/20/06 merger of LACLLC and LAC)).

## IV.   PENNSYLVANIA HAS JURISDICTION OVER LAC.

The Commonwealth asserts both general and specific jurisdiction over LAC. Pennsylvania courts have general jurisdiction over LAC because LAC has a substantial connection with the forum state through its own activities and through the activities of its agent, GPMI. Pennsylvania courts also have specific jurisdiction over LAC because LAC controlled many of the MTBE contaminated stations at issue in this case and arranged to supply gasoline and gasoline additives to third parties,

including in Pennsylvania.

Pennsylvania's long-arm statute states in pertinent part:

A tribunal may exercise personal jurisdiction over a person . . . Who acts directly or by an agent, as to a cause of action or other matter arising from such person: (1) Transacting any business in this Commonwealth. . . . [including] (I) . . . a series of similar acts for the purpose of thereby realizing pecuniary benefit . . . (ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit . . . (iii) The shipping of merchandise directly or indirectly into or through this Commonwealth. (iv) The engaging in any business within this Commonwealth, whether or not such business requires licence or approval by any government unit of this Commonwealth. (2) Contracting to supply services or things in this Commonwealth. (3) Causing harm or tortious injury by an act or omission in this Commonwealth. (4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth. (5) having an interest in, using, or possessing real property in this Commonwealth."

42 Pa. C.S.A. § 5322(a)(1)-(5).

Cases applying Pennsylvania's long arm statute have looked to federal veil piercing when jurisdictional issues involve relationships between ostensible parents and subsidiaries. *See Commonwealth ex rel. Pappert v. TAP Pharmaceuticals Prod., Inc.*, 868 A.2d 624, 633-644 (Pa. Commw. Ct. 2005) (approving of and applying the federal jurisdictional veil-piercing test set out in *In re Lupron Marketing and Sales Practices Litig.*, 245 F. Supp.2d 280, 291-92 (D. Mass. 2003)).

In *Lupron* the court found personal jurisdiction over a parent company that had "utilized the subsidiary in such a way that the agency between the two corporations can be perceived–and that is enough."); *see also Mylan Laboratories, Inc. v. Azko, NV.*, 2 F3d. 56, 61 (4th Cir. 1993) ("Maryland Court of Appeals ... has adopted the so-called 'agency' test in deciding whether to pierce the veil separating parent corporations from their subsidiaries for jurisdictional purposes."). The central inquiry is "whether significant decisions of the subsidiary must be approved by the parent." *Id.* In determining whether it is appropriate to assert jurisdiction based upon a parent's relationship with

11

a subsidiary, the court examines a number of factors, including whether the parent "knew, *or should have known*, that its conduct would have some impact in [the relevant state]." *Mylan*, 2 F.3d at 61–62 (emphasis added).  This test is easily satisfied here, as shown by evidence supplied by LAC itself.[5]

LAC directly negotiated the terms of a lease that applied to service stations contaminated with MTBE throughout Pennsylvania.  It subsequently directed and financed the purchase of additional stations (including MTBE contaminated stations), and directed the transfer of those stations between different LAC subsidiaries for the purpose of LAC's pecuniary gain.  LAC also directed (and paid for) the re-branding of stations in Pennsylvania to "Lukoil" for the purpose of LAC's pecuniary gain.  Acting by and through its agent/division GPMI, it directed operations at MTBE contaminated gas stations throughout Pennsylvania.  LAC also was apparently involved in supplying "additives" to gas being sold by GPMI to third parties, such as Sunoco, which owned and operated MTBE contaminated gas stations in Pennsylvania.  LAC represented to lenders that it was managing and directing GPMI in order to obtain hundreds of millions of dollars in loans to purchase gas stations (including MTBE contaminated gas stations in Pennsylvania) and it controlled the funds from those loans.  It also directly marketed gas stations in Pennsylvania to prospective buyers when it wanted to rid GPMI of money losing stations. And as explained in part II. B, below, LAC did not observe corporate formalities with respect to GPMI, but rather managed and operated GPMI as a division of, or agent for, LAC.

---

[5]  LAC cites *Walden v. Fiore*, 134 S.Ct. 1115 (2014) as supporting its motion, but that case supports the Commonwealth.  In *Walden*, the Court reiterated that "although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State – either by the defendant in person or *through an agent*, goods, mail, or some other means –is certainly relevant contact."  *Id*. at 1122 (internal citations omitted) (emphasis added).

A.   **LAC's Motion To Dismiss Mischaracterizes The Commonwealth's Complaint And Consequently Ignores Key Facts.**

LAC's motion to dismiss is based upon two erroneous assumptions. First, LAC assumes the Commonwealth's case is simply and only a product liability case. *See, e.g.*, Mot. at 11. Based on this erroneous assumption, LAC argues it cannot be subject to personal jurisdiction in Pennsylvania because it was not involved in GPMI's decisions to sell MTBE gasoline.[6] Mot. at 1, 16. LAC's liability, however, arises not simply from product liability, but also from LAC's direct control over service stations contaminated with MTBE in Pennsylvania. Thus, even if LAC's mantra that it was not involved in the decision to use MTBE gasoline were true (and it is not), LAC's control over MTBE contaminated stations in Pennsylvania provides an independent basis for jurisdiction over LAC with respect to claims arising from contamination at those stations.

Second, LAC assumes that the Commonwealth bases its claims on LAC's fraudulent transfer of GPMI property to another LAC subsidiary in 2009. Mot. at 18-21. Based on this erroneous assumption, LAC argues that the fraudulent transfer did not cause MTBE contamination and therefore does not provide a basis for jurisdiction. *Id.* The Commonwealth, however, has never asserted that the fraudulent transfer caused MTBE contamination. Rather, the fraudulent transfer is evidence (and particularly strong evidence) of the extent to which LAC treated GPMI as an agent or division. The fraudulent transfer helped LAC and OAO financially but was a disaster for GPMI. It ultimately contributed to GPMI's bankruptcy. Although the event occurred after MTBE was no longer in gasoline, it is indicative of the extent of LAC's control of GPMI throughout the entire period that LAC owned GPMI. *See, e.g. Daval Steel Prod. v. M/V Fakredine*, 951 F.2d 1357 (2d.

---

[6] LAC argues, for example, that whether GPMI has purposefully availed itself of the benefits of the Pennsylvania forum is "of no moment, because its contacts may not be attributable to LAC." Mot. at 4.

Cir. 1991) (finding that "information concerning financial transactions and movements of corporate

assets subsequent to the transaction [at issue] was evidence admissible on the issue of alter ego

liability . . . .")

**B.    LAC's Use of GPMI As An Agent For LAC Provides A Basis For Pennsylvania To Exercise Jurisdiction Over LAC.**

**1.    The Evidence Demonstrates LAC Used GPMI For LAC's Pecuniary Benefit in Pennsylvania.**

Because LAC has used GPMI to carry out LAC's business in Pennsylvania, LAC can be

haled into court under the Commonwealth's long arm statute. *Commonwealth ex. rel. Pappert,*

*supra,* 868 A.2d at 633-34; *In re Lupron. Supra,* 245 F. Supp. 2d at 291-92. As the court stated in

*Lupron:* "jurisdiction has been premised on a finding of control–not merely the degree of control

innately inherent in the family relationship, but the exercise of control by the parent 'greater than that

normally associated with common ownership and directorship.'" (citations omitted).) Evidence that

LAC's control of GPMI went far beyond that "normally associated with ownership and directorship"

includes the following.

*Corporate Formalities.* Neither LAC nor GPMI observed corporate formalities. Neither held

board meetings where minutes were taken. Instead, both entities acted through "unanimous consent"

decrees signed by the directors. These consents had to be edited and approved by Lukoil before they

could be adopted by GPMI. Han Decl., Ex. 11-a. LAC "regularly made decisions by unanimous

consent rather than by convening a meeting." See DeLaurentis Decl. at ¶ 15(c); *see also id.* at ¶ 33.

*Absence of Corporate Records.* The Commonwealth in discovery sought all board minutes

from LAC, but LAC provided no board minutes. Instead, LAC produced "unanimous consents" of

the LAC board. See Delaurentis Decl. at ¶ 15(c) and ¶ 33 ("It was not the practice of either LAC or

14

GPMI to keep board minutes"). While documents are still being reviewed, it is clear from the evidence reviewed so far that *both GPMI and LAC* submitted draft board "unanimous consents" to OAO Lukoil for review and editing prior to execution by the GPMI and LAC boards. See Han Decl., Ex. 11-a.

*Selection and maintenance of officers.* Contrary to DeLaurentis' Declaration that at the time of the merger, GPMI continued to run as before the merger, when LAC bought GPMI, LAC controlled selection and assignment of GPMI's executive personnel. LAC's Gluzman testified that he appointed the president (DeLaurentis) and Vice-President and C.F.O. (Michael Hantman) and even hired the law firm to be used by GPMI. Han Decl., Ex. 5-a at 5/28/13 Trans. of V. Gluzman at 956-57. Moreover, the officers for LAC and GPMI, and subsequently LNA, were essentially identical and interchangeable. Han Decl. Ex. 7-c at LAC002195-2196; *see also* Han Decl., Ex. 15 (*LAC's* D&O insurance covers *GPMI* officers). Not surprisingly, at least one GPMI officer admitted to being completely ignorant of the fact that he was an officer of LAC. Han Decl., Ex. 5-b *(In re GPMI Adversary Proc.*, 6/10/13 Trans. of S. Logovinsky at 11.

*Sharing of Headquarters.* LAC and GPMI shared the same address and office equipment at Lukoil Plaza in New York City. See Han Decl., Ex. 2-a at LAC002446.

*Control over day-to-day operations.* GPMI did not operate as an independent company, but rather GPMI operated as an agent or division of LAC. All of GPMI's monthly, quarterly, semi-annual and annual reports had to be sent to Moscow (OAO Lukoil) and GPMI's accountant was required to travel to Moscow every quarter to defend the company's budget. Han Decl. Ex. 5-a at 5/28/13 Trans. of V. Gluzman at 965. While electronic information is still being reviewed, there is evidence that OAO Lukoil president would direct and manage certain GPMI operations, including

15

directions regarding cell phone usage. Han Decl., Ex. 11-c (4/11/05 e-mail from A. Pozdnyakov, "in compliance with the decision of the president of OAO Lukoil Oil Company, Getty will not be providing mobile phone services to participants of the management exchange."). Contrary to DeLaurentis' Declaration ¶ 31, officers did not "make clear in external communications the particular company for which such officer was speaking." *See, e.g.*, Han Decl., Ex. 11-b (12/28/05 e-mail from A. Pozdnyakov, identifying himself as GPMI but addressing business relating to the dissolution of another Lukoil company, Lukoil Cayman Trading.); *see also id.* at Exs. 4-b, 4-c & 15.

*Parent's Finance of Subsidiary's Ability to Set Up for Operations.* Although GPMI was already in existence when it was acquired by LAC, LAC provided a significant equity infusion when it acquired GPMI, as well as multiple equity infusions thereafter.[7] Han Decl., Exs. 4-a, 6-b & 2-b at LAC005622. LAC (not GPMI) hired financial consultant Houlihan Lokey who advised Lukoil "to recapitalize the company [GPMI]." Han Decl., Ex. 12-a at LAC005457. Again, significant decisions about GPMI were made by the parent, not internally at GPMI.

*Common Ownership.* LAC owned 100% of GPMI until 2011 with the exception of a two week period in November, 2009, when LAC transferred 100% of its stock in GPMI to its subsidiary LNA and LNA simultaneously transferred significant assets from GPMI to itself and then transferred the GPMI stock back to LAC 17 days later. Han Decl. Ex. 7-a; *see also* Ex.14-a.

Lukoil advertised that it owned and was in control of the service stations that LAC now claims were run solely by an independent GPMI. Han Decl., Ex. 2-a at LAC002476; *see also* (http://www.lukoilamericas.com/about-lukoil/history: "LUKOIL entered the United States market

---

[7] Due to limitations on the number of exhibits that may be submitted, not all documents have been provided. Numerous unanimous consents by LAC, however, demonstrate a regular flow of millions of dollars of cash infusions going from LAC to GPMI. These unanimous consents can be provided upon request.

in 2000 when it purchased New York-based Getty Petroleum Marketing Inc. and its network of
Getty-branded stations on the East Coast. The first LUKOIL-branded service station in the United
States opened in September 2003. In 2004, LUKOIL purchased a major portfolio of Mobil-branded
stations from ConocoPhillips Company in New Jersey and Pennsylvania, many of which
subsequently became LUKOIL-branded service stations.")

*Financing and Capitalization.* LAC does not dispute that it arranged for financing for GPMI.
*See, e.g.*, DeLaurentis Decl. at ¶19. Lukoil's financing arm provided capital to LAC and Mikecon
to purchase GPMI and as part of the agreement to finance the purchase of GPMI, LAC "agreed to
place certain restrictions on the ability of Getty Petroleum Marketing, Inc. to incur indebtedness for
borrowed money once the Company beneficially owns all the issued and outstanding capital stock
of [GPMI]." Han Decl. Ex. 6-b (LAC Unanimous Written Consent (10/30/00). In 2004, LAC
guaranteed a $320 Million loan from Lehman Brothers for GPMI to buy hundreds of gasoline
stations in Pennsylvania and New Jersey. Han Decl., Ex. 2-b. LAC also arranged for capitalization
and equity infusions to GPMI from OAO Lukoil or one of its sister corporations. *See, e.g.*, Han
Decl. Ex. 4-a.

*Financial Dependency of the Subsidiary on the Parent Corporation.* According to a
testifying expert in the bankruptcy adversary proceeding, Lauren Ryan (CPA and certified fraud
examiner and insolvency reorganization advisor), GPMI "didn't have any third party sources of
capital. There was a heavy dependency on Lukoil. In fact, many of the reports that were filed
monthly – we call them MD&As, managing discussion analysis – always had a paragraph that talked
about a going concern and a dependency on Lukoil and what would happen if they stopped funding
us. And its no guarantee that they are going to continue to fund our operations. This went on for

17

quite some period of time." Han Decl., Ex. 12-b, (*In re GPMI Adv. Proc.* 6-6-13 Trans. of L. Ryan at 32-33.) At the time GPMI transferred its valuable assets to LNA, GPMI was already insolvent. (*Id.* at 35) The transfer ultimately accelerated GPMI's insolvency and move towards bankruptcy.

*Holding the subsidiary out as an agent.* The Lukoil brand was integrated vertically from OAO Lukoil to LAC to GPMI. OAO Lukoil and LAC directed GPMI to carry out a $50 million dollar marketing campaign for the "Lukoil" brand. Han Decl. Ex. 2-a at LAC002460. GPMI's letterhead emphasized that it was a "Lukoil" company. While Mr. DeLaurentis attempts to downplay the letterhead (DeLaurentis Decl. at ¶ 31, "the letterhead expressly stated that GPMI was a subsidiary of Lukoil"), the "Lukoil" mark was in large font on the top left of the letterhead and was front and center of important documents such as marketing materials. *See, e.g.*, Han Decl. Ex. 8-a (Letter to Pennsylvania Gov. Rendell) and Han Decl., Ex. 4-b ("Lukoil Pennsylvania Offering") & Ex. 4-c. Companies knew that wanted to do business with GPMI meant doing business with Lukoil. *See* Han Decl., Ex. 12-c, *In re GPMI Adv. Proc.*, Trans. of S. Gatto at 154 (testifying he traveled to Moscow to discuss the Bionol-GPMI contract gasoline additive supply from the plant in Pennsylvania for with Lukoil officers).

Under either Pennsylvania or Maryland law governing personal jurisdiction, LAC cannot simply ask the Court to ignore LAC's own activities *or* LAC's relationship with and control over GPMI. Under the factors set forth in *Mylan Laboratories, supra*, the extent of LAC's control of GPMI's activities in Pennsylvania clearly supports an exercise of personal jurisdiction by Pennsylvania courts over LAC.

## 2.   LAC's Domination Over GPMI Meets the Test For Ascribing GPMI's Conduct To LAC For Jurisdictional Purposes.

As noted above, the test for jurisdictional veil-piercing in both Pennsylvania and Maryland

is based on **agency**, not on piercing the corporate veil nor paramount equity. LAC cites three cases for the proposition that the Commonwealth must prove that piercing GPMI's corporate veil would either 1) enforce a paramount equity or 2) prevent fraud. Mot. at 12-15. LAC's authorities, however, do not address jurisdiction at all, but rather address *substantive* veil-piercing or *alter* ego tests. In *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 838 A.2d 1204 (2003) a lessor sued a foreign corporation lessee and its sole shareholder, director, and officer individually for unpaid rent. The issue a trial was whether the principal could be held liable under the *alter ego* doctrine. The issue of personal jurisdiction was never raised. In *Schlossberg v. Bell Builders Remodeling, Inc.*, 441 Md. 671, 109 A.3d 1146 (2015), the issued was what must be alleged (and ultimately proven) to hold an individual liable for the obligation of corporate entity. Personal jurisdiction was not an issue and was not addressed by the court. Finally, in *Dixon v. Process Corp.*, 382 A.2d 893 (Md. App. 1978), plaintiff sought to obtain a decree that the properties and assets of a subsidiary were those of a parent so that a judgment lien against the *parent* could be collected from the subsidiary. Again, personal jurisdiction was not an issue.

LAC argues that no court has ever applied Maryland law to disregard the corporate entity and deal with substance over form, as though the corporation does not exist, when necessary to prevent fraud or enforce a paramount equity. Mot. at 17-18. In *Colandrea v. Colandrea*, 42 Md. App. 421, 428-29 (1979), however, when the president of a corporation fraudulently transferred business of one corporation to a subsequent corporation, the court found the trial court was "clearly erroneous" in failing to find that paramount equity required looking behind the corporate veil. *Id.* at 429. For purposes of the motion to dismiss, however, the Commonwealth's main point is that LAC ignores applicable jurisprudence involving personal jurisdiction and instead relies upon inapplicable

19

jurisprudence involving substantive veil piercing.

### C. The Extent Of LAC's Control Over GPMI Is Demonstrated By LAC's Fraudulent Transfer of GPMI's Properties Two Years Prior To Steering GPMI Into Bankruptcy.

LAC's plan to siphon the good assets from GPMI and give them to sister company LNA, then float GPMI until the siphoned assets were protected from claw back in bankruptcy. This plan was revealed to the President of Getty Realty as early as 2007. Han. Decl., Ex. 9-b (1/14/09 email from M. Hantman to S. Nekrasov; Ex. 14-a (LAC 20–year projection) & Ex. 10-d (*In re GPMI Adv. Proc.*, Trans. of D. Driscoll at 1809:25 to 1812:15 ("Mr. Gluzman made it clear that if this plan went forward, then once they completed their restructuring of removing assets from GPMI, then the plan would be to continue to hold it for one year, which he assured me that the lawyers were requiring him to do, and then that he would then – then the intention was to sell GPMI to anyone they could sell it to." *Id.* at 1810:5-13.) Lukoil's plan unfolded just as described. A "Lukoil Americas Corporation Restructuring Plan" was developed which detailed the reassignment of properties, assets and liabilities from GPMI to LNA. Han Decl., Ex. 10-c ("Lukoil Americas Corporation Restructuring Plan");[8] *see also* Han Decl., Ex. 14-b (LAC Balance Sheets).

First, on November 13, 2009, LAC transferred ownership of GPMI (wholly owned subsidiary) to LNA (wholly owned subsidiary). Han Decl. Ex. 7-a, 11/13/09 LAC Unanimous consent). On that same date, GPMI sold its profitable assets to LNA, and the contract specifically stated that MTBE contamination may be found in the Underground Storage Tanks. Han Decl., Ex.

---

[8] LAC – not GPMI – hired Houlihan Lokey Financial Advisors to provide an opinion on whether the transaction was fair to GPMI from a financial point of view – an opinion dated November 13, 2009 (the same date as the transfer). The opinion included a number of disclaimers, including that the opinion did not include an "independent verification" of the representations, warranties or documents relied upon. Han Decl., Ex. 10-b at 2-3 (11/13/09 Houlihan Lokey Opinion).

20

13-a (11/13/09 Purchase and Sale Agreement between GPMI and LNA).  On November 16, 2009, GPMI and LNA entered into a Services Agreement wherein GPMI would act as LNA's agent for operational, financial and other activities, providing essentially a continuity of the business.  Han Decl. Ex.13-b (11/16/09 Services Agreement).

Just 17 days after LAC transferred GPMI to LNA, LNA transferred GPMI back to LAC.  Han Decl. Ex. 7-a.  When GPMI came back to LAC, it was without its profitable assets.  LAC officers would later admit that the purpose of the transfer was to save the profitable assets.  Han Decl. Ex. 10-e (1/11/11 Email from M. Hantman to V. Gluzman ("Attached is data on 95 master lease sites contained in the Getty portfolio. The analysis indicates that Getty is losing money on these sites which is precisely the reason they were not originally included in the sale to LNA.")  LAC's transfer of GPMI to LNA allowed it to have the appearance of being uninvolved with stripping the profitable assets.

LAC held GPMI stock for approximately one-year after the fraudulent transfer, then sold GPMI to Cambridge Petroleum (without GPMI's involvement), in February, 2011, for a single dollar ($1) and a promise by LAC to give an equity cash infusion to Cambridge of approximately $25 million dollars to keep it afloat for another year.  Han Decl., Ex. 9-a.  This was, at least in theory, just enough time to shield the 2009 asset transfer from claims in bankruptcy.

As noted above, the Commonwealth discusses these activities not because the fraudulent transfer of profitable stations caused MTBE contamination, but because they show the extent to which LAC dominated and controlled GPMI, and used GPMI as an agent for or division of LAC. See, e.g., Daval Steel Prod. v. M/V Fakredine, 951 F.2d 1357 (2d. Cir. 1991) (finding that "information concerning financial transactions and movements of corporate assets subsequent to the

transaction [at issue] was evidence admissible on the issue of alter ego liability . . . .")

## V. THE COMMONWEALTH SUPPORTS LAC'S REQUEST FOR AN EVIDENTIARY HEARING.

If this Court is not persuaded by the evidence provided by the Commonwealth demonstrating LAC's minimum contacts with Pennsylvania, then the Commonwealth supports LAC's request for an evidentiary hearing so that this Court can hear additional proof of the propriety of jurisdiction over LAC. Given inconsistencies in the prior sworn testimony of LAC officers and directors, the Commonwealth believes that having witnesses testify under oath before the Court would help the Court judge the credibility of LAC's witnesses.

## VI. THE COMPLAINT ADEQUATELY PLEADS A CAUSE OF ACTION AGAINST LAC.

Finally, LAC argues that the SAC fails to state a claim (Mot. at 23) because the allegations in the complaint are "conclusory." This argument is itself "conclusory," however, and entirely without merit. The Federal Rules require only notice pleading (Fed. R. Civ. P. 8) and not fact pleading. The complaint is nevertheless replete with specific allegations supporting both personal jurisdiction over LAC and each claim against LAC. SAC at 100-110, ¶¶ 296-247.

The SAC added 51 new factual claims against LAC, all of which must be taken as true and construed in favor of the plaintiff for purposes of a motion to dismiss. *In re MTBE*, No. 1358, 959 F.Supp.2d 476, 489-90 (S.D.N.Y. 2013). Further, the allegations are "plausible" and include "factual content that allows the court to draw the responsible inference that the defendant is liable for the misconduct alleged." *Id.* (internal citations omitted).

LAC asserts that the recitation of facts do not include four facts that LAC argues are "essential" to a sufficient pleading. Mot. at 23. These facts are not at all "essential" to a proper

notice pleading. Even if they were, a cursory review of the SAC demonstrates these facts are specifically alleged among the allegations. The SAC alleges, for example, that LAC itself used or had involvement with MTBE gasoline, including, but not limited to directing negotiations of the Master Lease with Getty Petroleum Corporation for stations in Pennsylvania and alleging LAC directed MTBE blending operations; SAC ¶¶ 301, 316, 326, 345-47 (alleging Lukoil knew about environmental risks associated with service stations in Pennsylvania and harmed the Commonwealth LAC); ¶¶ 123, 411-531 (alleging LAC wrongfully collected USTIF money); and ¶¶ 296, 304, 309, 339, 344-346 (alleging LAC is, in fact, responsible for MTBE use and contamination "directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability," SAC ¶ 345).

LAC's motion ignores the fact that the SAC is not limited to a single allegation that LAC is liable based on its ownership of GPMI. The SAC thoroughly alleges facts that LAC itself was conducting business in Pennsylvania through GPMI. SAC at ¶¶ 296, 304, 309, 339, 344-346.

LAC also suggests it cannot be subject to "group pleading" and cites this Court's opinion regarding the Commonwealth's UTPCPL claim. This Court's decision regarding "group pleading," however, was limited to the UTPCPL claims. That claim has now been replead and is subject to a separate briefing. See Plaintiff's Opposition to Certain Defendants' Motion to Dismiss regarding the UTPCPL claims. The arguments in the Commonwealth's brief opposing the motion to dismiss the UTPCPL claims are incorporated herein as if fully set forth herein. The allegations provide ample notice of the claims against LAC and therefore comport with Rule 8 with respect to both the UTPCPL claims as well as all other counts; *Gao v. JPMorgan Chase & Co.*, No. 14-CV-4281 (S.D.N.Y. 2015)(rejecting defendant's argument that group pleading is insufficient and stating, "Fed.R.Civ.P. 8 requires only that a complaint provide "the defendant [with] fair notice of what the

23

claim is and the ground upon which it rests. . . . These claims . . . and the grounds upon which they

rest, are clear from the complaint")(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

LAC also argues that it should not be held liable for "the use of mtbe gasoline" prior to

LAC's purchase of GPMI in 2000. Mot. at 23. The SAC alleges, however, that LAC is a successor

in liability for pre-2001 mtbe contamination, ¶ 345. Whether LAC or Getty Properties is liable for

pre-2000 mtbe contamination is a separate and distinct issue from the issues in this motion to

dismiss. We do note, however, that this Court previously held, in a dispute between Getty Properties

and GPMI (when GPMI was still owned by LAC), that the successor liability issue with respect to

MTBE contamination must be determined on a site-by-site basis. *In re MTBE*, No. 1:00-1898, 2008

WL 3163634 (S.D.N.Y. 8/06/08)(relating to *County of Suffolk v. Amerada Hess Corp.*)(denying

Getty Properties Corporation's (predecessor to GPMI) motion for summary judgment against GPMI

as a successor in interest). The Court noted that the Environmental Indemnity Agreement (which

was the subject of negotiations between LAC and Getty prior to LAC's purchase of GPMI), required

that "liability must be determined on a site-by-site basis." *Id*. at *3, 7-8.[9] LAC's request that the

Court now find, as a matter of law, that neither GPMI nor LAC has or had any liability for MTBE

contamination that occurred prior to 2000, should be denied.

## Conclusion

For the foregoing reasons, the Commonwealth respectfully requests that the Court deny

LAC's motion to dismiss based upon lack of personal jurisdiction.

DATED: February 5, 2016.                          Respectfully submitted,

---

[9] The Court also stated that a plaintiff can bring a claim against both the successor and
predecessor corporations. Here, all the corporations in the line of successorship have been
named: GPC, GPMI, LNA, LAC and Lukoil. As this Court stated, successor liability laws are
"designed to protect injured plaintiffs by ensuring them a source of recovery – not to protect
corporations that have transferred their assets from liability for their own torts." *Id*. at *4.

24

**PENNSYLVANIA OFFICE OF ATTORNEY GENERAL**

James A Donahue, III, Esquire
Executive Deputy Attorney General
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-0418
Email: jdonahue@attorneygeneral.gov

**MILLER & AXLINE, P.C.**

By: /s/ Michael Axline
      Michael Axline, Esquire
      Duane Miller, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
1050 Fulton Avenue, Suite 100
Sacramento, California  95825-4225
(916) 488-6688
Email: maxline@toxictorts.org
      dmiller@toxictorts.org

**COHEN, PLACITELLA & ROTH, P.C.**

Stewart L. Cohen, Esquire
Robert L. Pratter, Esquire
Michael Coren, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
Two Commerce Square
Suite 2900, 2001 Market St.
Philadelphia, Pennsylvania 19103
(215) 567-3500
Email: scohen@cprlaw.com
      rpratter@cprlaw.com
      mcoren@cprlaw.com

*Attorneys for Plaintiff*
*The Commonwealth of Pennsylvania*

**PENNSYLVANIA GOVERNOR'S OFFICE OF GENERAL COUNSEL**

Linda C. Barrett, Esquire
Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, Pennsylvania 17101
(717) 787-9347
Email: lbarrett@pa.gov

**BERGER & MONTAGUE, P.C.**

Daniel Berger, Esquire
Tyler E. Wren, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
Email: twren@bm.net
      danberger@bm.net

## PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE

*Commonwealth of Pennsylvania v. Exxon Mobil Corporation, et al.,*
United States District Court, Southern District of New York Case No. 14-cv-06228 (SAS)

    I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein referred to, over the age of 18 years and not a party to this action.  My business address is 1050 Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

    On the date below, I served the following document on all counsel in this action electronically through LexisNexis File & Serve:

**PLAINTIFF COMMONWEALTH OF PENNSYLVANIA'S OPPOSITION TO DEFENDANT LUKOIL AMERICAS CORPORATION'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**

    I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

    Executed on February 5, 2016, at Sacramento, California.

TONYA L. ZIMMERMAN