UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*Commonwealth of Pennsylvania, et al. v. Exxon Mobil Corporation, et al.,*<br>Case No. 1:14-cv-06228 SAS | Master File No. 1:00-1898<br>MDL 1358 (SAS) |

## DECLARATION OF MOLLY MCGINLEY HAN IN SUPPORT OF PLAINTIFF COMMONWEALTH OF PENNSYLVANIA'S OPPOSITION TO LUKOIL AMERICAS CORPORATION'S MOTION TO DISMISS

### UNREDACTED EXHIBITS

I, Molly McGinley Han, declare:

1.     I am an active member of the State Bar of California and an attorney at Miller & Axline, counsel of record for The Commonwealth of Pennsylvania. I have been involved in the discovery and pretrial proceedings in this action. I make this declaration based on my personal knowledge and, if called as a witness, I could testify competently thereto.

2.     Consistent with this Court's rules, the attached exhibits are relevant excerpts of documents, but the full document of each exhibit attached to the Declaration is available and can be provided at the Court's request. In compliance with the Court's rules, the exhibits are limited to no more than 15 pages per exhibit, however, because the Plaintiff is required to show a prima facie case in response to LAC's motion and because LAC has suggested it is entitled to an evidentiary hearing to rebut the Commonwealth's evidence, some exhibits include excerpts of multiple documents in an effort to provide the Court with a more thorough understanding of the relationship between LAC and GPMI. In other filings in this MDL where factual proofs have been required, it has been the practice of both plaintiff and defendant parties alike to combine excerpts of multiple documents into single exhibits in order to provide a more complete understanding of the facts.

3.     Attached hereto as Exhibit 1 are true and correct copies of excerpts of: (1-a) "Lukoil Americas Corporation's Master Amended Answer and Affirmative Defenses" in *In re MTBE: Albertson Water Dist. v. Amerada Hess Corp.*, MDL No. 1358, Doc. #1854 (5/29/08); and (1-b) "Defendant Lukoil Americas Corporation's Second Amended Master Answer and Affirmative Defendants, and Cross-Claims," in *In re*

*MTBE: New Jersey Dept. of Envt. Prot. v. Atlantic Richfield Company*, MDL No. 1358, Doc. #133 filed in No. 08-CV-312 (2/28/11).

4.      Attached hereto as Exhibit 2 are true and correct copies of: (2-a) Excerpts from the "Confidential Information Memorandum" regarding Lukoil and GPMI Revolving Credit Facility and Term Loan Facility (Aug., 2005); and (2-b) [Filed Under Seal] Excerpts from the "Credit Agreement" & "Guarantee & Collateral Agreement" among LAC, GPMI, et al. (5/19/04).[1]

5.      Attached as Exhibit 3 are true and correct copies of: (3-a) Excerpts from LAC's Response No. 7 to Plaintiff's First Set of Special Interrogatories; and (3-b) Getty Properties Corp.'s CMO 119 "Release Site" Identification.

6.      Attached hereto as Exhibit 4 are true and correct copies of: (4-a) the "Unanimous Written Consent of Directors of Lukoil Americas Corporation" (2/06/03); (4-b) Excerpts from the "Lukoil Pennsylvania Offering 2008"; and (4-c) Excerpts from the Lukoil "Southern Book".

7.      Attached hereto as Exhibit 5 are true and correct copies of: (5-a) *In re GPMI: Adversary Proceeding*, No. 11-02941-scc, 5/28/13 Transcript of the testimony of Mr. Vadim Gluzman; and (5-b) *In re GPMI: Adversary Proceeding*, No. 11-02941-scc, 6/10/13 Transcript of the testimony of Semyon Logovinsky.

8.      Attached hereto as Exhibit 6 are true and correct copies of: (6-a) Excerpts from the "Offer to Purchase" GPMI; (6-b) Excerpts from the "Unanimous Written

---

[1]      Plaintiff disputes the characterization of LAC's designation of this document as "confidential" and further disputes each of the documents LAC has designated as "confidential" which is attached to this Declaration. Some documents attached hereto are marked "confidential" but LAC has since removed that designation. If LAC has not removed the "confidential" designation on the document, it is noted herein and is being lodged with the Court under seal per the 2004 Revised Confidentiality Agreement.

2

Consent in Lieu of Special Meeting of the Board of Directors of Lukoil Americas Corporation" (10/30/00); and (6-c) Form 15 filed with the Securities and Exchange Commission, changing GPMI designation from a public company to a private company (1/25/01).

9.      Attached hereto as Exhibit 7 are true and correct copies of: (7-a) [Filed Under Seal] LAC Board Minutes transferring GPMI stock to LNA (11/13/09) and LNA Board Minutes transferring GPMI stock to LAC (11/27/09); and (7-b) Excerpts from a document identifying the officers and directors of LAC, GPMI and LNA (11/09/09).

10.      Attached hereto as Exhibit 8 are true and correct copies of: (8-a) a facsimile letter from Lukoil Americas to Pennsylvania Governor Rendell (2/15/10); (8-b) [Filed Under Seal] Lukoil Americas Corporation Unanimous Written Consent (6/20/06); and (8-c) GPMI Throughput Agreement with Sunoco.

11.      Attached hereto as Exhibit 9 are true and correct copy of: (9-a) [Filed Under Seal] Excerpts of the Stock and Purchase Agreement between LAC and Cambridge Holdings; and (9-b) 1/14/09 E-mail from M. Hantman to S. Nekrasov.

12.      Attached hereto as Exhibit 10 are true and correct copies of: (10-a) OAO Lukoil Board Minutes (JX-183-T) (3/26/09); (10-b) Letter Opinion from HoulihanLokey (11/13/09); (10-c) 9/30/09 "Lukoil Americas Corporation Restructuring Plan"; (10-d) *In re GPMI: Adversary Proceeding*, No. 11-02941-scc, 6/05/13 Transcript of testimony of D. Driscoll; and (10-e) 1/11/11 E-mail from M. Hantman to V. Gluzman.

13.      Attached hereto as Exhibit 11 are true and correct copies of: (11-a) 8/31/07 E-mail string between A. Pozdnyakov (GPMI) and K. Gotsmy (Lukoil), discussing the review and edits of "unanimous consents" of Lukoil and GPMI; (11-b)

12/28/05 E-mail from A. Pozdnyakov to L. Adams; and (11-c) 4/11/05 E-mail from A. Pozdnyakov to O. Klemenchukova.

14.    Attached hereto as Exhibit 12 are true and correct copies of: 12(a) the 4/11/11 Transcript of the testimony of Mr. Vadim Gluzman before the American Arbitration Assn. in the matter of *GPMI v. Bionol Clearfield LLC*; (12-b) *In re GPMI: Adversary Proceeding*, No. 11-02941, 6/06/13 Transcript of testimony of L. Ryan; and (12-c) *In re GPMI: Adversary Proceeding*, No. 11-02941, 5/30/13 Transcript of testimony of S. Gatto.

15.    Attached hereto as Exhibit 13 are true and correct copies of: (13-a) [Filed Under Seal] Excerpts of the 11/13/09 Purchase and Sale Agreement between GPMI and LNA; and (13-b) [Filed Under Seal] Excerpts of the 11/16/09 Services Agreement between GPMI and LNA.

16.    Attached hereto as Exhibit 14 are true and correct copies of:  (14-a) [Filed Under Seal] Excerpts of LAC Twenty-year Financial Projection (12/17/07); (14-b) [Filed Under Seal] LAC Proforma Consolidated Balance Sheets as of June 30, 2007; and (14-c) an 1/06/09 e-mail from C. Gaites to A. Polynkoav with attachments.

17.    Attached hereto as Exhibit 15 are true and correct copies of: (15) Excerpts of two letters from T. Knets of Chartis to M. Lewis (both dated 7/15/2011).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of February, 2016, at Sacramento, California.

MOLLY MCGINLEY HAN

4

# EXHIBIT 1

# EXHIBIT 1-a



20018572
May 29 2008
11:26AM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 – 1898
MDL 1358 (SAS)

This document refers to:

*Albertson Water District v. Amerada Hess Corp., et al (07-CV-2406)*
*City of Glen Cove Water District v. Amerada Hess Corp., et al (07-CV-2403)*
*City of Greenlawn Water District v. Amerada Hess Corp., et al (07-CV-2407)*
*Town of Huntington/Dix Hills v. Amerada Hess Corp., et al (07-CV-2405)*

## DEFENDANT LUKOIL AMERICAS CORPORATION'S
## MASTER ANSWER AND AFFIRMATIVE DEFENSES

Pursuant to the Master Answer agreement among the parties, CMO #6 and the Court's instructions during the January 13, 2005 status conference, LUKOIL Americas Corporation ("LAC") answers the complaints in MDL 1358 cases for which an answer is presently required, and in which it has been properly named and served, as follows:

I.   **ADMISSIONS AND STATEMENTS REGARDING SELECT ALLEGATIONS**

A.   **Basic Defendant Information**

LAC is a Delaware corporation incorporated on October 19, 2000.  LAC maintains a principal place of business in East Meadow, New York.  LAC has never manufactured pure or neat MTBE, nor has LAC produced MTBE gasoline for sale in the United States.  Getty Petroleum Marketing Inc. ("GPMI") is a wholly owned subsidiary of LAC.  LAC is a wholly owned subsidiary of LUKOIL Oil Company, a foreign corporation.

B.   **Sale or Distribution of Gasoline with MTBE or TBA to States in Question**

Since October, 2000, LAC admits that, for certain periods during an individual year, LAC, by and through its wholly owned subsidiary, GPMI, purchased and distributed

gasoline containing MTBE in the following states (in which one or more plaintiffs have pending cases in MDL 1358 requiring an answer at the present time): New York.  Prior to January 18, 2005, GPMI did not manufacture or refine gasoline containing MTBE for delivery to these states.

**C.**    <u>Allegations Regarding Production of MTBE or TBA</u>

At no time since beginning operations in October, 2000 did LAC manufacture MTBE or TBA.

**D.**    <u>Allegations Regarding Properties and Behavior of MTBE</u>

LAC denies knowledge or information sufficient to form a belief regarding the properties and behavior of MTBE except LAC admits, upon information and belief, that MTBE is an aliphatic ether that does not occur naturally, that there are various methods for the production of MTBE and that one method of production is from methanol and isobutylene.

LAC further admits, upon information and belief, that solubility and mobility are relative properties and that while MTBE and other ethers may be more soluble and mobile in water than certain gasoline components, such as the BTEX compounds, they are less soluble and mobile in water than other components sometimes blended into gasoline, such as ethanol.  LAC further admits, upon information and belief, that MTBE's behavior in the environment -- and its behavior relative to BTEX -- is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

Upon information and belief, LAC further admits that while under certain conditions MTBE may biodegrade less readily than some other components of gasoline, MTBE has been found to naturally attenuate and biodegrade in numerous ways.

# EXHIBIT 1-b



36185918
Feb 28 2011
5:30PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In Re: Methyl Tertiary Butyl Ether ("MTBE")          Master File No. 1:00 – 1898
Products Liability Litigation                         MDL 1358 (SAS)

**This document refers to:**

*New Jersey Department of Environmental Protection,
et al v. Atlantic Richfield Company, et al (08-CV-312)*

## DEFENDANT LUKOIL AMERICAS CORPORATION'S
## SECOND AMENDED MASTER ANSWER
## AND AFFIRMATIVE DEFENSES AND CROSS-CLAIMS

Pursuant to the Master Answer agreement among the parties, CMO #6 and the

Court's instructions during the January 13, 2005 status conference, LUKOIL Americas

Corporation ("LAC") answers the complaints in MDL 1358 cases for which an answer is

presently required, and in which it has been properly named and served, as follows:

**I.      ADMISSIONS AND STATEMENTS REGARDING SELECT ALLEGATIONS**

    **A.      Basic Defendant Information**

LAC is a Delaware corporation incorporated on October 19, 2000.   LAC

maintains a principal place of business in East Meadow, New York.   LAC has never

manufactured pure or neat MTBE, nor has LAC produced MTBE gasoline for sale in the United

States.  Getty Petroleum Marketing Inc. ("GPMI") is a wholly owned subsidiary of LAC.  LAC

is a wholly owned subsidiary of LUKOIL Oil Company, a foreign corporation.

    **B.      Sale or Distribution of Gasoline with MTBE or TBA to States in Question**

Since October, 2000, LAC admits that, for certain periods during an individual

year, LAC, by and through its wholly owned subsidiary, GPMI, purchased and distributed

gasoline containing MTBE in the following states (in which one or more plaintiffs have pending

cases in MDL 1358 requiring an answer at the present time): New York.  Prior to January 18,

2005, GPMI did not manufacture or refine gasoline containing MTBE for delivery to these

states.

> **C.**    **Allegations Regarding Production of MTBE or TBA**

At no time since beginning operations in October, 2000 did LAC manufacture

MTBE or TBA.

> **D.**    **Allegations Regarding Properties and Behavior of MTBE**

LAC denies knowledge or information sufficient to form a belief regarding the

properties and behavior of MTBE except LAC admits, upon information and belief, that MTBE

is an aliphatic ether that does not occur naturally, that there are various methods for the

production of MTBE and that one method of production is from methanol and isobutylene.

LAC further admits, upon information and belief, that solubility and mobility are

relative properties and that while MTBE and other ethers may be more soluble and mobile in

water than certain gasoline components, such as the BTEX compounds, they are less soluble and

mobile in water than other components sometimes blended into gasoline, such as ethanol.  LAC

further admits, upon information and belief, that MTBE's behavior in the environment -- and its

behavior relative to BTEX — is dependent on a variety of factors, including the nature or method

of its release, the geological setting, and environmental and microbial factors.

Upon information and belief, LAC further admits that while under certain

conditions MTBE may biodegrade less readily than some other components of gasoline, MTBE

has been found to naturally attenuate and biodegrade in numerous ways.

# EXHIBIT 2

# EXHIBIT 2-a

CONFIDENTIAL INFORMATION MEMORANDUM

 

# $220,000,000 Senior Unsecured Revolving Credit Facility

# $255,000,000 Senior Unsecured Term Loan Facility

**August 2005**

> **EXHIBIT**
>
> **JX713**
>
> Adv. Proc. No. 11-02941 (SCC)



CRÉDIT AGRICOLE GROUP
Joint Lead Arranger & Bookrunner



Joint Lead Arranger & Bookrunner

SPECIAL NOTICE: This Confidential Information Memorandum may contain material non-public information concerning the Company or its securities. By accepting this Confidential Information Memorandum, the Recipient agrees to use any such information in accordance with its compliance policies, contractual obligations and applicable law, including federal and state securities laws.



*CONFIDENTIAL*

## Contact List

**Getty Petroleum Marketing Inc.**
LUKOIL Plaza
1500 Hempstead Turnpike
East Meadow, NY 11554

### Management

| Name | Title | Phone/Fax | E-mail |
|------|-------|-----------|--------|
| Vincent J. De Laurentis | President & Chief Operating Officer | +1 516 542-5100 / +1 516 832-8440 | vdelaurentis@getty.com |
| Michael K. Hantman | SVP & Chief Financial Officer | +1 516 542-5010 / +1 516 832-8675 | mkhantman@getty.com |

**OAO LUKOIL**
11 Sretensky Blvd.
Moscow, 101000
Russian Federation

### Management

| Name | Title | Phone | E-mail |
|------|-------|-------|--------|
| Alexander Matytsyn | Vice President | +7 095 927 45 51 / +7 095 927 45 54 | |
| Sergey Nekrasov | Head of Banking Relations and Financial Markets | +7 095 927 14 87 / +7 095 933 92 41 | snekrasov@lukoil.com |
| Nikita Orlov | Head of Long Term Finance | +7 095 927 15 85 / +7 095 927 90 63 | OrlovNR@lukoil.com |

**LUKOIL Americas Corporation**
LUKOIL Plaza
1500 Hempstead Turnpike
East Meadow, NY 11554

### Management

| Name | Title | Phone | E-mail |
|------|-------|-------|--------|
| Vadim Gluzman | President and Chief Executive Officer | +1 212 421-4141 / +1 212 541-4704 | vgluzman@getty.com |

\* Primary contact.

- [APG] -



AG0040578

JX0713-0007
LAC 002446



CONFIDENTIAL

quarter ended March 31, 2005. Not incidentally, COP currently owns 12.6% of Lukoil's common shares and has announced its intention to further increase its shareholding over time.

For the year ended December 31, 2004, Getty generated revenues and EBITDA of $2,695.4 million and $73.6 million, respectively (includes approximately 7 months of performance data related to the acquired Mobil stations). For the three months ended March 31, 2005, Getty generated revenues and EBITDA of $894.5 million and $10.9 million, respectively.

**Getty's Marketing Network**







1. Excludes inactive sites and bay leases.
2. Corresponds to the twelve months ended January 31, 2000.

1. Corresponds to the twelve months ended January 31, 2000.
2. Retail unit EBITDA includes Delivery and Terminal Units' charges and LUKOIL service agreement

## D.    Strategy

Getty's business strategy employs a multi-pronged approach covering the enhancement of its existing asset base as well as vertical expansion into related businesses. Specifically, Getty has been modernizing the original Getty branded sites, installing canopies and credit card readers and upgrading signs, lighting and pumps to make the stations more attractive to customers. Getty is also rebranding the acquired Mobil stations to the Lukoil brand. Approximately 50% of all Getty-owned stations already carry the Lukoil brand, another 25% will be rebranded in 2005, another 25% in 2006 and the remainder in 2007. The rebranding will be supported by a significant marketing and advertising campaign (approximately $10MM per year) to be funded by Lukoil, which should increase brand awareness as a tier one brand and position Lukoil gasoline as a non-Middle Eastern gasoline alternative. Getty has the license to use the Mobil brand until 2010.



- [APG] -



CONFIDENTIAL

AG0040588

JX0713-0017
LAC 002456



Rebranding also serves the purpose of reducing costs as this would progressively eliminate (i) the need to pay Mobil royalty fees and (ii) the obligation to purchase 75% of Getty's Mobil-branded volume through ConocoPhillips at Platt's Barge Mean (vs. Platt's Barge Low). Getty estimates that the rebranding will save between $0.0122 and $0.0238 per gallon of gasoline, approximating 12.5% of Getty's 2004 retail margin per gallon).

Getty is also expanding into the blending business, the process of creating U.S. specification grade gasoline for sale on a wholesale basis. To this end, Lukoil procured a lease on 500,000 barrels of storage and blending capacity at New York harbor in the first quarter of 2005 and plans to lease another 500,000 barrels of storage which will allow Getty to blend over 1.2 billion gallons per year of A-76 (a gasoline blending component) with high octane additives to produce U.S. spec gasoline. Getty currently purchases A-76 from the open market and therefore expects the blending operations to save $0.0270 per gallon, or roughly $30 million per year. Getty anticipates to eventually import and purchase A-76 from Lukoil's refineries in Russia, Romania and Bulgaria.

Lukoil's broad U.S. strategy is to develop this market as an alternative to selling its [production / refined products] in the lower margin Russian market. As Lukoil represents the first step in this effort. As Lukoil increases its exports of refined product to the U.S., Getty will increasingly become the U.S. marketing arm of an international, vertically-integrated petroleum supply chain and will drive increasing volumes of product through its network.

**E.     Management**

Getty and Lukoil America management have substantial experience in the gasoline distribution business. Vadim Gluzman, Director and CEO of Lukoil Americas, joined Lukoil in 1992. Vincent J. De Laurentis, President and COO of Getty, has been with the Company since August 1997 and has over 11 years of retail gasoline experience including 8 years as regional general manager and VP at Sunoco. Michael K. Hantman, Senior Vice President and Chief Financial Officer, joined Getty in 1985 after a distinguished accounting career at Arthur Young and Company (predecessor to Ernst and Young LLP).

Lukoil's management is fully committed to playing a significant role in the management of Getty given its extensive experience in the retail gasoline business and as part of its strategy to expand into the U.S. Lukoil is active in the decision making and strategic planning processes at Getty (such as the rebranding campaign, modernization of existing sites and expansion into the blending and supply business). Furthermore, to date Lukoil has made over $50 million in capital contributions to Getty and plans for additional contributions going forward.

*Please refer to Section IV, Company Overview, for select Management biographies.*



- [APG] -



AG0040589

JX0713-0018
LAC 002457



CONFIDENTIAL

Getty is strategically important to Lukoil, providing it with the ability to help achieve its goal of increasing exports of refined products and diversifying its revenue stream. Lukoil's expansion of its refining and marketing business partially mitigates the higher inherent risks of the upstream segment while vertical integration allows it to profit across the entire value chain. In addition, Lukoil's expansion into the U.S. reduces the dependency on oil coming from the Middle East. As part of the acquisition of the Mobil branded outlets, Lukoil provided a capital contribution of $50 million to help fund the acquisition and has provided additional capital contributions as part of the rebranding effort.

## C.    Experienced Management Team

Management has substantial experience in the gasoline distribution business. Vadim Gluzman, Director and CEO of Lukoil Americas, joined Lukoil in 1992. Vincent J. De Laurentis, President and COO of Getty, has been with the Company since August 1997 and has over 11 years of retail gasoline experience including 8 years as regional GM and VP of Sunoco. Michael K. Hantman, Senior Vice President and Chief Financial Officer, joined Getty in 1985 after a distinguished accounting career at Arthur Young and Company (predecessor to Ernst and Young LLP).

## D.    Expected Cost Savings

Getty's expansion into the blending and supply business is expected to produce cost savings of $0.0270 per gallon (close to $30 million per year). In connection with the expansion, the Company has leased, as of March 31, 2005, 509,000 barrels of terminal storage space in New Jersey under a five year operating lease. Getty intends to increase its terminal storage capacity to approximately one million barrels as space becomes available, which will allow Getty to blend over 1,200 million gallons per year of A-76, a gasoline blending component.

As a result of rebranding the Mobil stations to Lukoil stations, Getty will be able to reduce its costs due to the lower brand license fees payable to Mobil and the reduction in its obligation to purchase Mobil-branded volume through ConocoPhillips. Without the obligation to pay royalties for the Mobil brand, Getty estimates cost savings of between $0.0122 and $0.0238 per gallon of gasoline. Getty also estimates a $0.0025 per gallon reduction in the cost of product as it replaces purchases from ConocoPhillips.



CORPORATE AND INVESTMENT BANK

CRÉDIT AGRICOLE GROUP

- [APG] -

CONFIDENTIAL

AG0040592



**CONFIDENTIAL**

| | | | | | | |
|---|---|---|---|---|---|---|
| Export of crude oil using Transneft export routs | 65,662 | 8,958 | 285,204 | 38,909 | 240,150 | 32,763 |
| Export of crude oil bypassing Transneft | 19,659 | 2,682 | 54,161 | 7,389 | 39,342 | 5,367 |
| Total crude oil export | 85,321 | 11,640 | 339,365 | 46,298 | 279,492 | 38,130 |

* Including own export of affiliates

**Strategy**

Following the acquisition by ConocoPhillips, the Board of Directors of Lukoil adopted a revised long-term strategy for the period of 2005-2014. Lukoil has a focused strategy of increasing its market capitalization, unlike other oil majors which seek to reward their shareholders with large dividends and share repurchases. Lukoil's main objectives are to:

- Maintain its production growth rate above 5% per annum and further diversify its upstream portfolio by developing several international production centers;
- Become Russia's second largest gas producer;
- Increase reserves by maintaining an organic replacement ratio of around 130%;
- Increase the market share on its traditional downstream markets and leverage the Lukoil brand;
- Optimize returns by developing export infrastructures and maximizing export sales of crude oil and refined products;
- Improve the efficiency of its operations and investments by reducing costs and disposing of non-core assets.

Lukoil's strategy differentiates itself from its peers due to its downstream focus, aimed at bridging the gap with the international oil majors in terms of market valuation. Unlike its competitors who are in the process of restructuring or scaling down their downstream and petrochemicals businesses, Lukoil is seeking to expand its Refining & Marketing segment, which accounted for 37% of the group's total capital expenditures during the first nine months of 2004, against approximately 25% on average in the industry.

Expanding into the U.S. has also been a strategic objective of Lukoil, as it is the world's largest consumer of petroleum products, accounting for 25% of global consumption or 20.5 million barrels per day. Lukoil believes that the completion of the Vysotsk Export Terminal and the increased capacity of the Baltic Pipeline System provide Lukoil with the ability to further expand its exports of refined product to the U.S. and Europe, which will result in significantly lower transport costs and annual costs savings of between $40 million to $50 million. As a result of its purchase of Getty and acquisition of certain ConocoPhillips gas stations, Lukoil owns a total of 2,035 stations in the U.S. as of January 1, 2005. Sales of Lukoil petroleum products in the U.S. in 2004 reached a record level of 1.9 billion gallons (8.64 billion liters). Revenue from sales (without excise) was $2.6 billion and net profit was $11.7 million.



- [APG] -

AG0040608

JX0713-0037
LAC 002476



CONFIDENTIAL

The Company has assumed three month LIBOR rates to average as follows:

| Year | Rate |
|---|---|
| Second half 2005 | 3.75% |
| 2006 | 4.38% |
| 2007 | 5.00% |
| 2008 | 5.38% |
| 2009 and thereafter | 5.50% |

The Company's capital expenditure plan is as follows (in millions):

|  | 2005 Business Plan | 2005 Proforma Plan | 2006 | 2007 | there-after |
|---|---|---|---|---|---|
| Capital expenditures | $10.8 | $15.5 | $16.0 | $16.5 | $17.0 |
| Rebranding costs: |  |  |  |  |  |
| Mobil branded outlets | 9.7 | 9.7 | 9.7 | 19.4 | .0 |
| Getty branded outlets | 1.9 | 1.9 | .0 | .0 | .0 |
| Corporate jet | .0 | 14.2 | .0 | .0 | .0 |
| Total | $22.4 | $41.3 | $25.7 | $35.9 | $17.0 |

The projection assumes an income tax provision of 41.825%.

The projection assumes that the following distributions will be paid to the Company's parent, Lukoil Americas Corporation ("LAC"), through the maturity of the term loan in 2010 (in millions).

| | |
|---|---|
| 2nd half 2005 | $3.5 |
| 2006 | 7.5 |
| 2007 | 8.2 |
| 2008 | 8.7 |
| 2009 | 23.1 |
| 2010 | 11.1 |



- [APG] -

CONFIDENTIAL

AG0040638

JX0713-0067
LAC 002506

# EXHIBIT 2-b

EXECUTION COPY

$360,000,000

# CREDIT AGREEMENT

among

**LUKOIL AMERICAS CORPORATION,**
as Holdings,

**GETTY PETROLEUM MARKETING INC.,**
as Borrower,

**The Several Lenders**
**from Time to Time Parties Hereto,**

**LEHMAN BROTHERS INC.,**
as Arranger,

**BNP PARIBAS,**
as Syndication Agent,

**SOCIÉTÉ GÉNÉRALE,**
as Documentation Agent,

**BNP PARIBAS,**
as Revolving Credit Administrative Agent,

and

**LEHMAN COMMERCIAL PAPER INC.,**
as General Administrative Agent

**Dated as of May 19, 2004**

---

EXHIBIT

JX709

Adv. Proc. No. 11-02941 (SCC)

LUK0539424

CONFIDENTIAL

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0709-0001
LAC 005561

CREDIT AGREEMENT, dated as of May 19, 2004, among LUKOIL AMERICAS CORPORATION, a Delaware corporation ("Holdings"), GETTY PETROLEUM MARKETING INC., a Maryland corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN BROTHERS INC., as advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), BNP PARIBAS, as syndication agent (in such capacity, the "Syndication Agent"), SOCIÉTÉ GÉNÉRALE, as documentation agent (in such capacity, the "Documentation Agent"), BNP PARIBAS, as revolving credit administrative agent (in such capacity, the "Revolving Credit Administrative Agent") and LEHMAN COMMERCIAL PAPER INC., as general administrative agent (in such capacity, the "General Administrative Agent").

W I T N E S S E T H:

WHEREAS, the Borrower intends to acquire (the "Acquisition") from ConocoPhillips Company (the "Seller") (i) approximately 308 MOBIL branded gasoline retail stations owned or leased by the Seller and (ii) contracts to supply gasoline to approximately 471 additional MOBIL branded stations located in New Jersey and Pennsylvania (collectively, the "MOBIL Assets");

WHEREAS, the Borrower intends to finance the Acquisition and the related fees and expenses and to refinance certain of its indebtedness with $360,000,000 of senior secured credit facilities; and

WHEREAS, the Lenders are willing to make such credit facilities available upon and subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

SECTION 1.  DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Account Debtor": a Person obligated to the Borrower under an Account of the Borrower.

"Accounts": as defined in the Guarantee and Collateral Agreement.

"Acquisition": as defined in the recitals hereto.

"Acquisition Agreement": Agreement of Purchase, Sale and Assignment of Marketing Assets, dated as of January 26, 2004 between the Seller and the Borrower, as amended, supplemented or otherwise modified from time to time in accordance with Section 7.15.

"Acquisition Documentation": collectively, the Acquisition Agreement and all schedules, exhibits, annexes and amendments thereto and all side letters and agreements

CONFIDENTIAL

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

LUK0539429

JX0709-0006
LAC 005566

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A, as the same may be amended, supplemented or otherwise modified from time to time.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit), if to induce the creation of such obligation of such other Person the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors": the collective reference to Holdings and the Subsidiary Guarantors.

"Hedge Agreements": all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrower or its Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Hedged Eligible Inventory Value": at the time of any determination thereof, the total value of all Eligible Inventory of the Borrowing Base Parties, as determined by the pricing

CONFIDENTIAL

LUK0539446

JX0709-0023
LAC 005583

Mortgaged Properties as to which such flood insurance as required by Regulation H has been obtained and is in full force and effect as required by this Agreement).

4.22   Gasoline Taxes.  As of the Closing Date, certain obligations of the Borrowing Base Parties in respect of gasoline taxes and tolls paid by gasoline delivery truck drivers and other obligations of the Borrowing Base Parties incurred in their day-to-day business activities as required by, or as may be necessary under, applicable law are supported by surety bonds issued by Fidelity and Deposit Company of Maryland, an affiliate of Zurich Insurance, for the benefit of the beneficiaries of such surety bonds in the aggregate amount of $32,128,219 (collectively, the "Surety Bonds").  As of Closing Date, the Borrowing Base Parties have provided a Letter of Credit in the Face Amount of $10,000,000 in favor of Fidelity and Deposit Company of Maryland to secure their reimbursement obligations in connection with such surety bonds.

## SECTION 5.  CONDITIONS PRECEDENT

5.1   Conditions to Initial Extension of Credit.  The agreement of each Lender to make the initial extension of credit requested to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)   Loan Documents.  The General Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Revolving Credit Administrative Agent, Holdings and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of Holdings, the Borrower and each Subsidiary Guarantor, (iii) a Mortgage covering each of the Mortgaged Properties (other than any Post-Closing Mortgaged Property), executed and delivered by a duly authorized officer of each party thereto and (iv) a Lender Addendum executed and delivered by each Lender and accepted by the Borrower.

(b)   Acquisition, etc.  The following transactions shall have been consummated or have occurred, in each case on terms and conditions reasonably satisfactory to the Lenders:

(i)   the Acquisition shall have been consummated in all material respects in accordance with all applicable law and the Acquisition Documentation, and no material provision thereof shall have been amended, waived or otherwise modified without the prior written consent of the General Administrative Agent (such consent not to be unreasonably withheld or delayed);

(ii)   Holdings shall have received at least $50,000,000 from the proceeds of an intercompany loan or loans made to Holdings by OAO Lukoil or any of its Affiliates, and such proceeds shall have been contributed to the Borrower as common equity or surplus, which intercompany loan or loans shall be subordinated to payment of the Obligations hereunder pursuant to Subordinated Debt Documentation in form and substance reasonably satisfactory to the General Administrative Agent;

CONFIDENTIAL

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

LUK0539485

JX0709-0062
LAC 005622

GUARANTEE AND COLLATERAL AGREEMENT

made by

LUKOIL AMERICAS CORPORATION

GETTY PETROLEUM MARKETING INC.

and certain of its Subsidiaries

in favor of

LEHMAN COMMERCIAL PAPER INC.,

as General Administrative Agent

Dated as of May 19, 2004

EXHIBIT

JX710

Adv. Proc. No. 11-02941 (SCC)

CONFIDENTIAL

AG0136641

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0710-0001
LAC 005683

GUARANTEE AND COLLATERAL AGREEMENT, dated as of May 19, 2004, made by each of the signatories hereto (together with any other entity that may become a party hereto as provided herein, the "Grantors"), in favor of LEHMAN COMMERCIAL PAPER INC., as General Administrative Agent (in such capacity, the "General Administrative Agent") for the banks and other financial institutions (the "Lenders") from time to time parties to the Credit Agreement, dated as of May 19, 2004 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among LUKOIL AMERICAS CORPORATION, a Delaware corporation ("Holdings"), GETTY PETROLEUM MARKETING INC., a Maryland corporation (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to the Credit Agreement (the "Lenders"), LEHMAN BROTHERS INC., as advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), BNP PARIBAS, as syndication agent (in such capacity, the "Syndication Agent"), SOCIÉTÉ GÉNÉRALE, as documentation agent (in such capacity, the "Documentation Agent"), BNP PARIBAS, as revolving credit administrative agent (in such capacity, the "Revolving Credit Administrative Agent") and the General Administrative Agent.

## W I T N E S S E T H :

WHEREAS, pursuant to the Credit Agreement, the Lenders have severally agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, the Borrower is a member of an affiliated group of companies that includes each other Grantor;

WHEREAS, the proceeds of the extensions of credit under the Credit Agreement will be used in part to enable the Borrower to make valuable transfers to one or more of the other Grantors in connection with the operation of their respective businesses;

WHEREAS, certain of the Qualified Counterparties may enter into Specified Hedge Agreements with one or more of the Grantors;

WHEREAS, the Borrower and the other Grantors are engaged in related businesses, and each Grantor will derive substantial direct and indirect benefit from the extensions of credit under the Credit Agreement and from the Specified Hedge Agreements; and

WHEREAS, it is a condition precedent to the obligation of the Lenders to make their respective extensions of credit to the Borrower under the Credit Agreement that the Grantors shall have executed and delivered this Agreement to the General Administrative Agent;

NOW, THEREFORE, in consideration of the premises and to induce the General Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to make their respective extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the General Administrative Agent, for the benefit of the Secured Parties, as follows:

CONFIDENTIAL

AG0136645

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0710-0005
LAC 005687

# EXHIBIT 3

# EXHIBIT 3-a



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In Re: Methyl Tertiary Butyl Ether ("MTBE")*     **Master File No. 1:00 – 1898**
*Products Liability Litigation*     **MDL 1358 (SAS)**
                                                **M21-88**

**This Document Relates To:**

***Commonwealth of Pennsylvania, et al. v.
Exxon Mobil Corp., et al., No. 1:14-CV-06228-SAS***

### DEFENDANT LUKOIL AMERICAS CORPORATION'S OBJECTIONS AND RESPONSES TO PLAINTIFF COMMONWEALTH OF PENNSYLVANIA'S FIRST SET OF SPECIAL INTERROGATORIES TO DEFENDANTS

Defendant LUKOIL Americas Corporation ("LAC") hereby makes its objections and responses to Plaintiff's First Set of Special Interrogatories to Defendants. LAC collectively refers to those interrogatories, including all related definitions and instructions, as "the Interrogatories." LAC reserves the right to amend and/or supplement these objections and responses, and to object (on any ground) to the use of these responses in any proceeding.

### GENERAL OBJECTIONS

1.     LAC objects to the Interrogatories to the extent they purport to impose obligations other than or in addition to those required under the Federal Rules of Civil Procedure, the Local Civil Rules, or Orders of the Court.

2.     LAC objects to the Interrogatories because the allegations in Plaintiff's operative complaint are inadequate to justify the compulsion of any discovery from LAC whatsoever: this Court may not exercise personal jurisdiction over LAC.

purchased by an LAC officer for use in that officer's car, even if travelling for business purposes.

**INTERROGATORY NO. 4:**

State the last date that any entity supplied YOU with MTBE GASOLINE SOLD in PENNSYLVANIA.

**RESPONSE:**

None. *See* Response to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

IDENTIFY each entity (including YOU, if applicable) that supplied YOU with MTBE GASOLINE FOR SALE in PENNSYLVANIA.

**RESPONSE:**

None. *See* Response to Interrogatory No. 3.

**INTERROGATORY NO. 6:**

IDENTIFY each refinery (including YOU, if applicable) that supplied YOU with MTBE GASOLINE SOLD in PENNSYLVANIA.

**RESPONSE:**

None. *See* Responses to Interrogatory Nos. 1 and 3.

**INTERROGATORY NO. 7:**

IDENTIFY each PENNSYLVANIA gasoline station that YOU owned, operated, leased and/or branded at any time since 1979 where MTBE has been detected in soil or groundwater.

**SPECIFIC OBJECTION:**

In addition to the general objections set out above, LAC specifically objects to this Interrogatory to the extent it requests information that it is not currently available in any sort of existing compilation of data. Conducting a site-by-site assessment at this time would be overly broad and/or unduly burdensome and oppressive to LAC. By way of further response, the Case Management Order that the parties are currently negotiating

5

contemplates production of similar information limited to readily available electronic data. LAC further objects to this Interrogatory to the extent it seeks site-specific information at this time because the Court has not yet opened site-specific discovery.

**RESPONSE:**

Subject to and without waiving its objections, LAC is producing information concerning current and former LNA sites in Pennsylvania. That information was derived from searches of existing electronic databases in LAC's possession, custody, and control. The information in LAC's possession, custody, and control may not be comprehensive; for example, it may not include: (1) MTBE detections occurring at a station LNA eventually acquired, but before LNA acquired it; and (2) detections at certain sites that LNA has sold. Based upon the search of readily available electronic databases within LAC's possession, custody, and control, the following is a list of current or former LNA sites for which there is a record of MTBE detection:

| LNA Site # | Address | City |
|---|---|---|
| 69201 | 1 W City Ave | Bala Cynwyd |
| 69204 | 607 Ridge Pike | Conshohocken |
| 69205 | 1209 Wilmington Pike | West Chester |
| 69207 | 305 Street Rd | Feasterville |
| 69209 | 411 MacDade Blvd | Glenolden |
| 69210 | 729 Highland Ave | Chester |
| 69211 | 483 Easton Rd | West Norristown |
| 69215 | 5756-74 Baltimore Ave | Philadelphia |
| 69218 | 3006 Grant Ave | Philadelphia |
| 69219 | 1243 S Broad St | Philadelphia |
| 69221 | 402 Adams Ave | Philadelphia |
| 69223 | 8 E Main St | Lansdale |
| 69230 | 496 Easton Rd | Horsham |
| 69234 | 200 W Lincoln Hwy | Penndel |
| 69235 | 3401 W MceLand Rd | Willow Grove |
| 69236 | 495 Main St | Harleysville |
| 69237 | Route 202 & County Line Rd | Chalfont |
| 69238 | 681 E Broad St | Souderton |

| 69239 | 2500 Bethlehem Pike | Hatfield |
|---|---|---|
| 69240 | 350 W Bridge St | New Hope |
| 69241 | 630 Bethlehem Pike | Glenside |
| 69242 | 1457 Pottstown Pike | West Chester |
| 69244 | 7959 Roosevelt Blvd | Philadelphia |
| 69245 | 105 Greenwood Ave | Wyncote |
| 69248 | 1450 Old York Rd | Abington |
| 69249 | 12001 Knights Rd | Philadelphia |
| 69250 | 6901 Marshall Rd | Upper Darby |
| 69251 | 2600 W Ridge Pike | Trooper |
| 69252 | 100 E Lancaster Ave | Paoli |
| 69253 | 802 Bath Rd | Bristol |
| 69254 | 501 S Oxford Valley Rd | Fairless Hills |
| 69256 | 1165 Valley Forge Rd | Wayne |
| 69258 | 7500 Algon Ave | Philadelphia |
| 69264 | 2600 Easton Rd. | Willow Grove |
| 69265 | 9499 Roosevelt Blvd | Philadelphia |
| 69269 | 440 Swamp Rd | Doylestown |
| 69701 | 825 Paoli Pike | West Chester |
| 69702 | 4400 City Line Ave | Philadelphia |
| 69704 | 518 Pennsylvania Ave | Fort Washington |
| 69705 | 598 N York Rd | Hatboro |
| 69706 | 315 Penn Ave | West Reading |
| 69708 | Delaware Ave & Spring Garden St | Philadelphia |
| 69709 | 152 E Maple Ave | Langhorne |
| 69710 | 401 Bethlehem Pike | Fort Washington |
| 69711 | 507 W Lancaster Ave | Strafford |
| 69714 | 913 Bethlehem Pike | North Wales |
| 69715 | 80 W Germantown Pike | East Norriton |
| 69716 | 558 Church Ln | Yeadon |
| 69717 | 1685 Sumneytown Pike | Kulpsville |
| 69719 | 2201 York Rd | Jamison |
| 69720 | 130 Wilmington Pike | West Chester |
| 69723 | 807 E. Balitmore Pike | Kennett Square |
| 69726 | 501 E Baltimore Pike | Media |
| 69732 | 659 N. Easton Road | Doylestown |
| 90210 | 3502 West Chester Pike | Newtown Square |
| 69201 | 5 West City Line Avenue | Bala Cynwyd |
| 69212 | 2607 Easton Road | Willow Grove |
| 69208 | 20 S West End Boulevard | Quakertown |

# EXHIBIT 3-b



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                                      )   Master File No. 1:00-1898
IN RE METHYL TERTIARY BUTYL ETHER                     )   MDL No. 1358 (SAS)
PRODUCTS LIABILITY LITIGATION                         )   M21-88
--------------------------------------------------------------  )
**This document pertains to:**                        )
                                                      )
*Commonwealth of Pennsylvania, et al. v.*             )
*Exxon Mobil Corp., et al.,* No. 1:14-CV-06228-SAS    )
--------------------------------------------------------------x

### DEFENDANT GETTY PROPERTIES CORP.'S
### CASE MANAGEMENT ORDER NO. 119 "RELEASE SITE" IDENTIFICATION

Defendant, Getty Properties Corp. ("Getty Properties"), by and through its attorneys,

Rawle & Henderson LLP, and pursuant to the Federal Rules of Civil Procedure and Local Rules

of the Southern District of New York, hereby submits the following "Release Site"

identifications as required by Case Management Order No. 119.

Getty Properties' compliance in providing the below list of properties is not an admission

as to the cause or existence, past or current, of MTBE at any of the sites listed, does not waive

any of Getty Properties' defenses and does not waive any of its claims against Getty Petroleum

Marketing, Inc., other parties or non-parties, as being liable for any or all alleged contamination

at any or all of the sites listed below. By way of further response, Getty Properties conducted a

good faith search to identify "release sites" and reserves the right to supplement or amend this

list as discovery continues. Without waiving any of said reservations, Getty Properties identifies

the following sites:

| Station No. | Street Address | City | State | Facility ID No. |
|---|---|---|---|---|
| 69497 | RT 272 POPLAR STREET | ADAMSTOWN | PA | 36-22488 |
| 67227 | 3050 LEHIGH STREET | ALLENTOWN | PA | |

9000616

| Station No. | Street Address | City | State | Facility ID No. |
|---|---|---|---|---|
| 69682 | MAIN & S. HIGH STREETS | ARENDTSVILLE | PA | 01-11701 |
| 69688 | 45 E. HANOVER ST | BONNEAUVILLE | PA | 99-1175 |
| 67243 | 596 LANCASTER AVE. & PENN ST. | BRYN MAWR | PA | 23-21984 |
| 67639 | 816 W. HIGH STREET | CARLISLE | PA | 21-26025 |
| 69685 | 1070 TRINDLE ROAD | CARLISLE | PA | 29-11695 |
| 67367 | 5300 SPRINGFIELD ROAD | CLIFTON HGTS. | PA | |
| 67432 | ROUTE #309 & FAIRMOUNT STREET | COOPERSBURG | PA | |
| 67636 | 3730 CARLISLE RD | DOVER | PA | 67-26051 |
| 67433 | MAIN RT #611 & EAST ST. | DOYLESTOWN | PA | |
| 67599 | 2425 NO. MARKET ST | ELIZABETHTOWN | PA | |
| 67623 | RT 116 & ORRTANNA ROAD | FAIRFIELD | PA | 01-26-21 |
| 69419 | 200 NORTH 4TH STREET | HAMBURG | PA | 06-41536 |
| 67627 | 103-121 CARLISLE ST (MIDTOWN) | HANOVER | PA | 67-26022 |
| 67647 | 918 YORK STREET | HANOVER | PA | 67-26043 |
| 67269 | 427 WEST COUNTY LINE ROAD | HATBORO | PA | |
| 69428 | 3596 EAST NEWPORT ROAD | INTERCOURSE | PA | |
| 69466 | 839 FERN AVENUE | KENHORST | PA | 06-232710 |
| 67416 | 3796 OXFORD VALLEY RD | LEVITTOWN | PA | 09-23892 |
| 67598 | 2300 MARKET ST | LINWOOD | PA | 23-32133 |
| 69690 | ROUTE 16 | MCCONNELLSBURG | PA | 29-11699 |
| 67642 | 4601 CARLISLE PIKE | MECHANICSBURG | PA | 21-26059 |

2

9000616

| Station No. | Street Address | City | State | Facility ID No. |
|---|---|---|---|---|
| 67272 | 401 EAST BALTIMORE AVENUE | MEDIA | PA | |
| 67654 | 911 EISENHOWER BLVD | MIDDLETON-HIGHSPIRE | PA | 22-26026 |
| 69504 | 312 WEST MAIN STREET | NEW HOLLAND | PA | |
| 69439 | 203 S. THIRD STREET | OXFORD | PA | 15-32225 |
| 67617 | 3650 WILLIAM PENN HWY | PALMER TOWNSHIP | PA | 48-42322 |
| 67596 | 3471 LINCOLN HWY. EAST | PARADISE | PA | 23-23939 |
| 67435 | 192 DURHAM RD. | PENNDEL | PA | |
| 97199 | ROOSEVELT BLVD.,MASCHER & | PHILADELPHIA | PA | 51-23928 |
| 67265 | 5700 RIDGE AVE & SHURS | PHILADELPHIA | PA | 51-23901 |
| 67276 | 7800 RIDGE AVE | PHILADELPHIA | PA | 51-21991 |
| 67201 | 3103-03 WEST CLEARFIELD STREET | PHILADELPHIA | PA | |
| 67409 | 8797 FRANKFORD AVE. & MAGARGEE | PHILADELPHIA | PA | |
| 67266 | 8244-8256 LOWBER AVENUE | PHILADELPHIA | PA | |
| 67423 | 183 SOUTH WEST END BOULEVARD | QUAKERTOWN | PA | |
| 69420 | 300 MORGANTOWN ROAD | READING | PA | 06-22487 |
| 69672 | 1248 N. 9TH STREET | READING | PA | 06-11544 |
| 67434 | 778 2ND STREET PIKE | RICHBORO | PA | 09-23948 |
| 67398 | 1442 EASTON ROAD | ROSLYN | PA | |
| 69676 | SECOND STREET | SAINT CLAIR | PA | 54-11546 |

3

9000616

| Station No. | Street Address | City | State | Facility ID No. |
|---|---|---|---|---|
| 67382 | CHESTER PIKE & CLIFTON AVE. | SHARON HILL | PA | 23-21998 |
| 67611 | 550 SOUTH MAIN STREET | SHREWSBURY | PA | 67-11492 |
| 69476 | 602 S. MAIN STREET | SHREWSBURY | PA | 67-23715 |
| 67425 | 301-303 HARLEYSVILLE PIKE | SOUDERTON | PA | 46-23960 |
| 67288 | RT 1 & OLD LINCOLN HWY. | TREVOSE | PA | 09-21989 |
| 67428 | STATE RD & HIGHLAND | UPPER DARBY | PA | 23-23957 |
| 67632 | 2890 EAST PROSPECT STREET | YORK | PA | 67-26028 |
| 69443 | 644 EAST MAIN STREET | EPHRATA | PA | |
| 67215 | 40th STREET AND POWLETON AVE. | PHILADELPHIA | PA | |
| 67217 | 6900 FRANKFORD AVE. | PHILADELPHIA | PA | |
| 67418 | 2391 DURHAM RD. | LANGHORNE | PA | 09-22004 |
| 67426 | 798 SUMNEYTOWN | LANSDALE | PA | |
| 67603 | 2324 N. GEORGE ST. | YORK | PA | 67-63268 |
| 67607 | 7002 WOODLAND AVE. | PHILADELPHIA | PA | 51-43218 |
| 69680 | 3901 PERKIOMEN AVE. | REIFFTON | PA | |
| 97211 | ROUTES 413 AND 232 | WRIGHTSTOWN | PA | 09-23963 |
| 67275 | 301 WEST MACDADE BLVD. | MILMONT PARK | PA | 23-23933 |
| 67282 | 3024 NEW RODGERS RD | BRISTOL | PA | 09-23935 |
| 69408 | 1505 PEMBROKE RD | BETHLEHEM | PA | 48-21736 |
| 69005 | 721 ALLEGHENY ST | DAUPHIN | PA | 22-11687 |
| 69447 | 629 WEST ORANGE STREET | LANCASTER | PA | 36-23707 |
| 752 | 1201 IVY HILL RD | PHILADELPHIA | PA | 51-23887 |

4

9000616

| Station No. | Street Address | City | State | Facility ID No. |
|---|---|---|---|---|
| 67663 | 3031 MOUNT CARMEL AVE. | GLENSIDE | PA | 46-09134 |
| 69426 | 1301 WEST BROAD ST. | BETHLEHEM | PA | 39-22493 |
| 67638 | 50 NORTH MAIN STREET | GLEN ROCK | PA | 67-26052 |
| 67437 | 301 EAST JOHNSON HIGHWAY | NORRITON | PA | |

RAWLE & HENDERSON LLP

By:

John C. McMeekin II, Esquire (JM8956)
Susan M. Dean, Esquire
The Widener Building
One South Penn Square
Philadelphia, PA  19107
Phone: 215-575-4324

Dated: 2/2/2016

Attorneys for Defendant,
Getty Properties Corp.

9000616

5

# EXHIBIT 4

# EXHIBIT 4-a

## UNANIMOUS WRITTEN CONSENT OF DIRECTORS OF

## LUKOIL AMERICAS CORPORATION

### (Delaware, U.S.A)

### Dated as of February 26, 2003

In accordance with Protocol No. 1 dated March 25, 2002 of the Supervisory Board of Lukoil International GmbH, as amended, the undersigned, being all of the members of the board of directors (the "Board of Directors") of Lukoil Americas Corporation, a company organized under the laws of the U.S.A. (the "Company"), do hereby waive notice and consent that when they shall have signed this consent, the following resolutions shall then be deemed to be adopted, to the same extent and with the same force and effect as if adopted by unanimous vote at a formal meeting of the Board of Directors, duly called and held for the purpose of acting upon the proposal to adopt such resolutions, all in accordance with applicable law:

NOW, THEREFORE, BE IT RESOLVED that the Corporation has received three million U.S. dollars ($3,000,000.00) as a charter capital contribution from its immediate parent company, LUKOIL AMERICAS L.L.C. to be used as paid-in capital to increase the share capital in turn of GETTY PETROLEUM MARKETING INC. to be used to rebrand Getty stations with the Lukoil trademark(s).

Each officer of the Company is hereby directed and authorized to implement the above and take all other related acts and actions in the best interests of the Corporation.

Date: February 26, 2003

Vadim Gluzman, Director

Alexander Matytsyn

Vincent DeLaurentis

CONFIDENTIAL

LAC 003045

# EXHIBIT 4-b

| From: | Lou Maschi |
|---|---|
| Sent: | Tuesday, August 19, 2008 12:23 PM |
| To: | Sem Logovinsky |
| Subject: | Project PA |
| Attachments: | L U K O I L   O F F E R I N G PA 2008.doc; PA Offering spreadsheet.xls |

Sem,

Here is the offering we want to send Mr. LoPiccolo.  If you are OK with it, I suggest we send it certified mail, Return Receipt Requested.

Any questions, please call me on my cell.  Dave and I are stepping out of the office.

Lou

**EXHIBIT**

**JX825**

Adv. Proc. No. 11-02941 (SCC)

CONFIDENTIAL

LUK0199752

JX0825-0001
LAC 001954

PRIVILEGED AND CONFIDENTIAL

# PENNSYLVANIA
# L U K O I L O F F E R I N G

- 89 PRIME RETAIL GASOLINE SITES
  - FULLY RE-IMAGED IN 2006
    - BRANDED LUKOIL
- MAJORITY OCCUPIED AND OPERATING
- ALL SITES LOCATED THROUGHOUT THE STATE OF PENNSYLVANIA

THESE SITES CONSIST OF THE FOLLOWING PROPERTY TYPES:

- 61 FEE SIMPLE PROPERTIES
- 28 LEASED PROPERTIES

THE FACILITIES CONSIST OF THE FOLLOWING:

| | |
|---|---|
| 3 BAY FACILITIES | 50 MARTS |
| 15 BAY/SNACK SHOPS | 3 MART/BAYS |
| 2 CAR WASHES | 2 MART/CAR WASH |
| 9 C-STORES | 1 SNACK SHOP/CAR WASH |
| 2 C-STORES/CAR WASH | 2 SNACK SHOPS |

TOTAL 2007 ANNUAL FUEL VOLUME:

- 100,944,940 GALLONS

2007 ANNUAL RENT INCOME:

- $5,272,399

2007 ANNUAL RENT EXPENSE:

- $2,585,190

2007 ANNUAL PROPERTY TAXES:

CONFIDENTIAL

LUK0199753

JX0825-0002
LAC 001955

PRIVILEGED AND CONFIDENTIAL

- $1,185,296

Assets to be acquired:  100% of the assets in the offering including Eighty-Nine (89) Lukoil Branded retail fuel stations, together with all real and personal property associated therewith, free and clear of all claims, liens and other encumbrances.

Purchase Price:  Offer to be submitted by buyer on an "All Cash" deal with No financing contingencies.

Due Diligence Period:  Buyer shall have a period of Sixty (60) days within which to review information or conduct additional due diligence.

Closing:  Closing shall occur within Thirty (30) days after completion of Buyer's due diligence.

Fuel Supply:  Buyer shall enter into a marketing agreement and branding agreement to continue Lukoil branded product supply for a period of 15-years at a competitive Rack Pricing deal.  Seller shall secure this position by recording a deed restriction on each fee property for the supply of fuel for 15-years.

Environmental:  To be determined by Seller and Buyer and included in the Purchase Sale Agreement (PSA).

Letter Of Intent (LOI):  Buyer is to submit a LOI to Seller within 10-days of receipt of this offering indicating Buyer's intention to purchase for a listed purchase price.

Purchase Sale Agreement (PSA):  Once purchase offer is made and accepted, Seller and Buyer will enter into Purchase Sale Agreement 15-days after receipt of LOI by Seller at which time Buyer must submit a 10% non-refundable cash deposit.

Attachments:  Excel spreadsheet of all sites that fall within the offering providing site number, location, annual volume, rent income, rent expense, real estate taxes, site value, underlying lease terms, sub-tenant lease terms.

The foregoing sets forth a basic outline of Seller's offer.  Neither Seller nor Buyer shall have any obligation to one another until such time as a comprehensive, binding agreement for purchase and sale has been approved and executed by both parties.

CONFIDENTIAL

LUK0199754

JX0825-0003
LAC 001956

# EXHIBIT 4-c



GETTY PETROLEUM MARKETING INC., a subsidiary of LUKOIL Oil Company

**Sam Logovinsky**
*Vice President*
Getty Petroleum Marketing Inc.
1500 Hempstead Turnpike
East Meadow, NY 11554

*Phone: 516-542-5200*
*Fax: 516-832-8440*

EXHIBIT

JX756

Adv. Pros. No. 11-02941 (SCC)

Confidential                                  7/30/2007

CONFIDENTIAL

# SOUTHERN BOOK

## 162 Controlled Properties

Breakdown:

### New Jersey
| | |
|---|---|
| Fees | 52 |
| Leases | 21 |

### Pennsylvania
| | |
|---|---|
| Fees | 61 |
| Leases | 28 |

 

GETTY PETROLEUM MARKETING INC., a subsidiary of LUK OIL Oil Company

CONFIDENTIAL

LUK0768406
JX0756-0002
LAC 001781

# EXHIBIT 5

# EXHIBIT 5-a

Page 948

1

2    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------------X

4    In Re:                    Chapter 11

5    GETTY PETROLEUM            No. 11-15606 (SCC)
     MARKETING, INC., et al.,

6         Debtors.             (Jointly Administered)

7    ------------------------------------------------X

8    GETTY PETROLEUM
     MARKETING, INC., et al.,

9         Plaintiffs,

10        vs.                   Adversary Proceeding

11   LUKOIL AMERICAS            No. 11-02941 (SCC)
     CORPORATION, LUKOIL NORTH

12   AMERICA LLC, OAO LUKOIL,
     VINCENT DE LAURENTIS, VADIM

13   GLUZMAN, MICHAEL HANTMAN,
     MICHAEL LEWIS and SIMON

14   LOGOVINSKY,

15        Defendants.

16   ------------------------------------------------X

17            TRANSCRIPT OF PROCEEDINGS

18            New York, New York

19              May 28, 2013

20   BEFORE:

21        The Hon. SHELLEY C. CHAPMAN
          Bankruptcy Court Judge

22

23

24   Reported by:
     Bonnie Pruszynski, RMR

25   JOB NO. 61545

Page 955

Gluzman - Cross - Kirpalani

1  
2  have -- we were selling products from, from
3  Pacific Northeast from our -- from California
4  coast to Russia.
5      Q     And were you involved in Lukoil's          10:21
6  acquisition of GPMI in any way?
7      A     Yes, absolutely.
8      Q     And can you explain to the court your
9  involvement there?
10     A     At some point in time, I was               10:21
11 introduced to Sem Logovinsky, and Sam knew Vince
12 DeLaurentis, so Sem introduced me to Vince
13 DeLaurentis, and then we started talking with
14 Vince first, and then Vince introduced me to
15 Liebowitz, and that's how we start negotiating.   10:21
16     Q     And do you recall what year this was?
17     A     '99, 2000.
18     Q     And did you -- did, did Lukoil
19 ultimately acquire GPMI?
20     A     Yes, yes.  Lukoil bought GPMI I            10:21
21 believe late 2000.  And GPMI was a publicly held
22 company.  It was a New York Stock Exchange
23 company.  That was -- that was the first time that
24 Russian company had acquired a publicly traded
25 company in the United States.  We had to go        10:22

TSG Reporting - Worldwide  877-702-9580

---

Page 956

Gluzman - Cross - Kirpalani

1  
2  through numerous exercises with Securities and
3  Exchange Commission.  So, we got all the
4  approvals, and we were -- we successfully bought
5  the company.                                       10:22
6      Q     Now, what was your plan for senior
7  management of GPMI after Lukoil acquired the
8  company from Getty?
9      A     Well, I looked at the management, I
10 thought that the management was pretty good.       10:22
11 Vince DeLaurentis had at that time probably over
12 30 years of experience, working for Sunoco and
13 Getty, writing gasoline stations, so I promoted
14 him to the president of the company.
15          Michael Hantman was corporate             10:22
16 controller.  I thought very highly about Michael's
17 ability, so Michael became a senior vice president
18 and chief financial officer.  Sem Logovinsky
19 became a vice president and the head for sort of
20 new business opportunities.  Donna Baumgardner     10:23
21 became a corporate controller.
22          The only person didn't stay with the
23 company was an attorney who was very old, and he
24 pretty much retired, and we hired outside attorney
25 working for Getty.                                 10:23

TSG Reporting - Worldwide  877-702-9580

---

Page 957

Gluzman - Cross - Kirpalani

1  
2          And that was pretty much it.  So, we
3  didn't really touch anyone.
4      Q     The outside attorney that you hired,
5  you hired him as your general counsel?            10:23
6      A     Yes.
7      Q     Is that Michael Lewis?
8      A     No, no.  It was another lady working
9  for us for several years, and then she went
10 somewhere else, so we needed another attorney and 10:23
11 we hired Michael Lewis after that.
12     Q     And what about your role, sir?  What
13 was your role at GPMI from inception?
14     A     Well, in the beginning, we looked for
15 the company -- we looked to the company, we were   10:24
16 breaking it apart, in terms of understanding
17 what's good, what's bad.  It was sort of
18 old-fashioned running company, by Liebowitz.  The
19 company didn't have computers and it was run by
20 pen and pencil.  So we did a lot of work to sort   10:24
21 of modernize the operations, technologically.
22          And also, they had not as good supply
23 as the supply I worked on, and I brought a new
24 supply agreement from British Petroleum, so that
25 helped the company, and pretty much we were, you   10:24

TSG Reporting - Worldwide  877-702-9580

---

Page 958

Gluzman - Cross - Kirpalani

1  
2  know, getting to know the management, getting to
3  know dealers.  I personally took trips around the
4  whole operations, all 13 states, and then I met
5  people in the region.  I met dealers, vendors.     10:25
6          So, it took me like half a year
7  running around the country and meeting, meeting
8  the people.
9          And then later on, I was trying to
10 link the operations of Getty into Lukoil's         10:25
11 production, as Getty was just a jobber, just a
12 distributor, so Getty didn't have any extra
13 opportunities to work with any producing oil
14 company.  So, when Lukoil became an owner of
15 Getty, I was trying to establish the link to bring 10:25
16 Lukoil's crude to the United States.
17          Lukoil had a pretty substantial
18 production in the northern part, northern Arctic,
19 so, the delivery from there to the East Coast of
20 the United States would be probably 30 percent of  10:26
21 the lag from Middle East to United States.  So, it
22 was logistically feasible to do that.
23          And I was trying to buy refineries in
24 the United States.  We had several negotiations.
25 We didn't end up buying the refinery for several   10:26

TSG Reporting - Worldwide  877-702-9580

Page 959

Gluzman - Cross - Kirpalani

1
2  reasons, but that's what I was trying to do in
3  those years.
4       Q    So, those years that you are
5  referring to, were you predominantly working for   10:26
6  GPMI, or were you working for OAO?
7       A    No, at that time I was only working
8  for GPMI. I'm talking from the time we acquired
9  the company, for the next couple, three years.
10      Q    And so, were you responsible also for   10:26
11 GPMI's efforts to expand its gas station
12 footprint?
13      A    Well, not really. Vince had, like I
14 said, 30 years' experience. I think Sem had even
15 more. Sem started his own company and grew it to   10:26
16 a very big company. And so, combined they had
17 60 years of experience.
18           I gave them instructions. I knew
19 that by having management in Getty Petroleum,
20 Getty could buy another thousand, maybe even 1500   10:27
21 stations without adding any overhead. So the goal
22 was -- the strategy was to go and get stations, to
23 go lease stations, without adding overhead. So
24 pretty much adding revenues at no expense
25 worldwide.                                          10:27

Page 960

Gluzman - Cross - Kirpalani

1
2           So, that was sort of the growing
3  strategy within the company.
4       Q    And who was involved in locating the
5  opportunity to buy the ConocoPhillips stations in   10:27
6  2004?
7       A    I'm not sure whether it's Vince or
8  Sem was indirect, it was indiractly Sem's
9  responsibility to look for new opportunities. I
10 think ConocoPhillips, they had to divest of sites   10:27
11 due to their requirement from FTC, after the
12 merger. I think they made it public, and Vince
13 and Sem looked at the opportunity. They present
14 it to me. It looked very good. I told them go
15 ahead and got it done.                              10:28
16      Q    Last week you testified that you had
17 other roles from 2004, 2005, all the way through
18 2008, at OAO Lukoil, and you were traveling a lot.
19 Do you recall that testimony?
20      A    Yes. It started in 2003.                  10:28
21      Q    Okay. So can you explain for the
22 Court what you were doing, what you were doing
23 with a lot of your time during that mid 2000
24 period, when you were traveling?
25      A    I worked on sevaral, several deals,       10:28

Page 961

Gluzman - Cross - Kirpalani

1
2  sizable deals for Lukoil. I worked on two big
3  corporate deals. My first deal I worked was a
4  deal with ConocoPhillips which became a part of
5  the transaction. At that time it was the largest   10:29
6  transaction by any American companies investing in
7  Russia.
8           ConocoPhillips became 20 percent
9  shareholder in Lukoil. ConocoPhillips and Lukoil
10 put together a big production joint venture in      10:29
11 northern parts of Russia. So, it took me
12 18 months to negotiate that deal.
13      Q    Can we just stay with ConocoPhillips
14 for a second, just because I want the record to be
15 clear.                                              10:29
16           Any connection at all between the
17 ConocoPhillips gas station business and the
18 ConocoPhillips corporate transaction you are
19 talking about?
20      A    No. I was working on the corporate        10:29
21 transaction. It's completely unrelated. It just
22 happened to be pretty much in the same time. I
23 think ConocoPhillips' stations acquisition in the
24 United States was around 2004, and I work on the
25 corporate deal from 2003, and we closed that deal,  10:29

Page 962

Gluzman - Cross - Kirpalani

1
2  I believe in September 2004.
3       Q    Okay. And so --
4           THE COURT: So, I'm confused. So, on
5  behalf of GPMI, you worked to acquire the          10:30
6  ConocoPhillips stations for GPMI?
7           THE WITNESS: Vincent and Sem did
8  that deal. I wasn't really doing that. I
9  was in Europe at that time.
10          THE COURT: Okay. But at this -- at   10:30
11 that time frame, who was your employer?
12          THE WITNESS: GPMI.
13          THE COURT: Okay. But you just -- in
14 response to what Mr. Kirpalani asked you,
15 you indicated that you worked on a corporate  10:30
16 deal for OAO Lukoil.
17          THE WITNESS: Correct.
18          THE COURT: And did OAO Lukoil
19 compensate you for that work?
20          THE WITNESS: I was -- I was given    10:30
21 sort of option for -- stock option for the
22 deal, yes.
23          THE COURT: Stock option for what?
24          THE WITNESS: For that deal,
25 corporate deal with ConocoPhillips.           10:31

Page 963

Gluzman - Cross - Kirpalani

1
2          THE COURT:  So, in compensation for
3     working on the corporate-level deal in which
4     ConocoPhillips acquired a 20 percent
5     interest in Lukoil, you were given stock      10:31
6     options in Lukoil?
7          THE WITNESS:  Correct.
8          THE COURT:  Okay, go ahead.
9  BY MR. KIRPALANI:
10         Q     In your capacity -- well, did you    10:31
11    have a title at any point at OAO Lukoil?
12         A     While I was working on the first
13    corporate deal with Lukoil while I was negotiating, I needed some
14    title with Lukoil while I was negotiating, because
15    I was primary -- the only negotiator, the only   10:31
16    person negotiating that deal.  So, if it would
17    look -- it would look strange if I would give my
18    business card where it says Getty Petroleum
19    Marketing.
20         So I got a title with OAO Lukoil, so   10:31
21    I was giving my card to people.
22         Q     Putting aside why you got it, what
23    was your title?
24         A     I was vice president of Lukoil.
25         Q     And as vice president of OAO Lukoil,  10:32

TSG Reporting - Worldwide  877-702-9580

Page 964

Gluzman - Cross - Kirpalani

1
2     were you an officer of OAO Lukoil?
3          A     No.
4          Q     What is your understanding, sir, of
5     what an officer is?                           10:32
6          A     Well, officers are running the
7     company.  They are making decisions on the
8     company.  I didn't make any decisions for Lukoil.
9     I was primary M&A person for Lukoil negotiating
10    the deal.  I wasn't making all the decisions, so,  10:32
11    I was not an officer.
12         Q     Was your title at OAO Lukoil related
13    to your role at GPMI?
14         A     No.
15         Q     How was the relationship between OAO   10:32
16    Lukoil as shareholder, ultimate shareholder, and
17    GPMI governed?
18         A     Lukoil had their very, very strict
19    reporting system, not to GPMI, to every
20    subsidiary.  Every subsidiary was very equal.  So   10:33
21    GPMI had to report operational data and financial
22    data on many different levels.
23         So, we reported monthly our
24    operational data.  I believe the monthly financial
25    report was sent to Moscow.  Then quarterly reports   10:33

TSG Reporting - Worldwide  877-702-9580

Page 965

Gluzman - Cross - Kirpalani

1
2     were sent to Moscow, semi-annual, and annual
3     reports.
4          Budgeting was one of the difficult,
5     difficult situations, for not only GPMI but for   10:33
6     every subsidiary.  Budget was very vigorously
7     attacked by the parent company on every subsidiary
8     to make sure that the subsidiary stays within
9     budget.
10         So, there was special forms,           10:33
11    thousands of different forms, spreadsheets in
12    Russia.  So I had to hire actually an additional
13    person who became an accountant for me.
14         Q     Who was that?
15         A     Elana Picman, and she was in charge   10:34
16    of communications with Moscow and to make sure
17    that all the reports were going to Moscow on time.
18    It was a job, and she couldn't even get it
19    herself, so we had more people.  I had to hire
20    another person, a Russian-speaking person who    10:34
21    helped her to do that.
22         And every quarter she had to go to
23    Moscow to defend the budget, because any deviation
24    in budget was like an earthquake for them.
25         Q     Were you engaged in any other       10:34

TSG Reporting - Worldwide  877-702-9580

Page 966

Gluzman - Cross - Kirpalani

1
2     strategic transactions for OAO Lukoil, or was
3     ConocoPhillips the only one?
4          A     No.  I worked on several other
5     transactions.  I worked on another big transaction   10:34
6     with a Spanish oil company Repsol, that took me
7     about two, three years, and I worked on a couple
8     of big gas deals, one with U.S., big U.S. oil
9     company, Marathon Oil.
10         And I also did a couple sizable deals   10:35
11    for -- asset deals for Lukoil in Europe.  That all
12    happened between 2003 and sort of late 2008.
13         Q     And so during the first three years,
14    is it correct that during the first three years
15    you were principally working at GPMI, and then   10:35
16    from 2003 to 2008, you were dividing your
17    responsibilities?  Is that a fair
18    characterization?
19         A     Yes.  Before 2003, I only worked for
20    GPMI, and I didn't really travel anywhere.  2003,  10:35
21    Mr. Ilya Borodin, he knew my abilities to do M&A
22    deals, so he wanted me to take leading role and
23    negotiate deal with ConocoPhillips.  So I was
24    introduced to ConocoPhillips at that time, and I
25    worked with him for year-and-a-half to do the   10:35

TSG Reporting - Worldwide  877-702-9580

Page 967

Gluzman - Cross - Kirpalani

```
1      deal.
2             So that time I spent pretty much all
3      the time in Europe.
4             Q      What was the relationship between      10:36
5      GPMI and Getty Realty before Lukoil acquired GPMI?
6             A      It used to be one company.  I believe
7      in 1997, GPMI was spun off from Getty Properties,
8      and it became two, two companies, with pretty much
9      the same shareholding base and management.        10:36
10            And then later on, Liebowitz was
11     marketing GPMI, trying to set it, and that's what
12     Lukoil end up buying.
13            Q      So, when Lukoil ended up buying GPMI,
14     what was the term of the master lease at that       10:36
15     point?  How long was the master lease when Lukoil
16     acquired GPMI?
17            A      When Lukoil acquired GPMI, we
18     renegotiated the master lease and we put together
19     a new restated inventory master lease for 15       10:36
20     years.
21            Q      At any time was OAO Lukoil a party to
22     the master lease?
23            A      No.  Lukoil was never party to a
24     master lease, but OAO Lukoil had guaranteed the     10:37
25
```

T&O Reporting - Worldwide   877-702-9580

Page 968

Gluzman - Cross - Kirpalani

```
1      lease, the initial performance of the lease, for
2      first three years.  Getty Realty also had an
3      option to extend the guarantee for an extra year
4      on certain financial conditions.                   10:37
5             Q      And that was a negotiated provision
6      between Getty Realty and GPMI and OAO Lukoil?
7             A      Yes.
8             Q      How did GPMI perform in the early
9      years after being acquired by Lukoil Americas?      10:37
10            A      GPMI performed really well.  By the
11     virtue of change in supply to British Petroleum,
12     it brought an extra series of revenues.  So we
13     outperform pretty much every year of GPMI for --
14     before our acquisition, up until 2005.             10:38
15            Q      And during the entire time that
16     Lukoil owned GPMI, did GPMI ever remit dividends
17     to the parent company?
18            A      No, no, GPMI never remit dividends,
19     because the goal was to grow the business in the    10:38
20     United States, and to rebrand stations around
21     New York, around New York City, northern New
22     Jersey, sort of southern Upstate, where the most
23     sort of traffic of -- people traffic is.
24            So, Lukoil had -- so we invested            10:38
25
```

T&O Reporting - Worldwide   877-702-9580

Page 1028

```
 1              Gluzman - Cross - Kirpalani
 2      may be that I ask you for half-an-hour
 3      variances here and there.  If there are any
 4      better times and worse times, morning versus
 5      the afternoon -- one option is that I fit      11:46
 6      others within a lunch hour, which would mean
 7      that we just have to propose a predictable
 8      lunch hour on you.
 9              But I just want to float it out
10      there, the storm clouds are gathering, and     11:46
11      we are going try to figure out who needs
12      what.
13              See you at about five of.
14         (Recess taken.)
15         THE COURT:  Please have a seat.             11:49
16         MR. KIRPALANI:  All set, your Honor?
17         THE COURT:  Ready when you are.
18   BY MR. KIRPALANI:
19      Q    Mr. Gluzman, in your own words, can
20   you describe for the Court what was the purpose  12:04
21   the 2009 sale of ConocoPhillips' assets to LNA?
22      A    The purpose was to generate as much
23   as GPMI could possibly do, and ask the parent
24   company to give the difference, I would always
25   prefer the equity, so GPMI would pay its debts and 12:04
```

Page 1029

```
 1              Gluzman - Cross - Kirpalani
 2      continue to perform, continue to pay its
 3      obligations on the master lease.
 4         Q    Did you plan to put GPMI into
 5      bankruptcy one year after the sale to LNA?    12:05
 6         A    I thought I already mentioned that so
 7      many times.  Bankruptcy really wasn't in my mind,
 8      no.  So the answer is no, I was never planning to
 9      do bankruptcy in the first place.
10              THE COURT:  But when Mr. Kirpalani    12:05
11      talks about bankruptcy, I just want to be
12      sure, when you say you weren't thinking
13      about bankruptcy, do you mean you were --
14      bankruptcy as an option with respect to the
15      master lease issues as opposed to, we have    12:05
16      seen lots of references to the possibility
17      that as part of the restructuring, or
18      incident to the restructuring, there might
19      be a bankruptcy in a year.
20              So, when you say that you really      12:05
21      weren't thinking about that, what exactly do
22      you mean?
23              THE WITNESS:  I mean that I -- after
24      the restructuring, after the sale to LNA, I
25      was never intending to do anything with the   12:06
```

Page 1030

```
 1              Gluzman - Cross - Kirpalani
 2      bankruptcy.  I was continuing to negotiate
 3      with Leo and Driscoll to improve the master
 4      lease.
 5              THE COURT:  But I don't understand     12:06
 6      that statement, Mr. Gluzman, because after
 7      the restructuring, you were then going to be
 8      an officer of LNA; correct?
 9              THE WITNESS:  Yes, but we had the
10      service agreements, your Honor, between two    12:06
11      companies.  We were advised to move most of
12      the liabilities to LNA, but I was still an
13      officer and a director of GPMI.  My payroll
14      was coming from LNA, but I still held the
15      position of chairman of the board and CEO of  12:06
16      GPMI until the day of sale to Cambridge.
17   BY MR. KIRPALANI:
18      Q    Mr. Gluzman, did you intend to limit
19   any of GPMI's retail operations after the sale
20   to LNA?                                           12:06
21      A    Yes.  Our plan was to -- at that
22   time, we already, GPMI already sublet New England,
23   everything outside of New York, so New York was
24   the only area where GPMI had operations.  So, the
25   intention was that -- to close those operations,  12:07
```

Page 1031

```
 1              Gluzman - Cross - Kirpalani
 2      it was difficult, very challenging -- sublease it
 3      to the jobbers like we did in New England and
 4      south.
 5              And in that case, it would be flat      12:07
 6      loss of just slightly over $10 million a year, and
 7      we put together a plan for the parent that
 8      $10 million a year would be loss for the remaining
 9      of the lease, until the end of the lease in 2015.
10      So, my calculation of the equity bringing in, it  12:07
11      had to be enough money to cover liability until
12      the end of the lease.
13              And while I was doing that, they
14      didn't want to entertain that idea with their
15      operations, because they said today is still okay  12:08
16      margin, tomorrow margin will drop again, and there
17      will be not $10 million a year but $20 million a
18      year.
19              So then we decided that we'd just
20      have to sublease closed operations, so all GPMI   12:08
21      would receive checks from their jobbers and give
22      one check to Getty Realty, and that would be it.
23      In that case, the loss would be fixed at, I
24      believe like 10.3 million a year.
25              So, when the equity came, there was    12:08
```

Page 1037

```
 1            Gluzman - Cross - Kirpalani
 2   BY MR. KIRPALANI:
 3        Q    If you can look -- you can look at
 4   either version, Mr. Gluzman, but we are going to
 5   look at JX-183-T, the English translation.      12:14
 6             Can you tell the Court what this
 7   document is?
 8        A    Well, this document is a typical
 9   protocol of the meeting between those individuals,
10   and the head of their meeting Mr. Nekrasov was     12:15
11   basically ordering certain people to do certain
12   things.
13        Q    So this is on March 26, 2009;
14   correct?
15        A    Yes.                                     12:15
16        Q    And if you can look at section five
17   of paragraph five, it says, "To instruct Vice
18   President V.S. Gluzman," and then it goes on."  Do
19   you see that paragraph?
20        A    Yes.                                     12:15
21        Q    Can you explain to the Court what
22   instructions you were being given?
23        A    Mr. Matytsyn is the head of corporate
24   finance, so I was given instructions, pretty much
25   ordered to go and refinance the debt on -- in the  12:16
```

Page 1038

```
 1            Gluzman - Cross - Kirpalani
 2   marketplace, and without parent's contribution,
 3   and in the event that it was unsuccessful, then I
 4   had to apply the materials to special
 5   restructuring committee within oil, Lukoil, for    12:16
 6   consideration of -- for consideration of our
 7   internal financing.
 8        Q    And we are going to come back to this
 9   later, but while we are here, take a look at
10   paragraph four.  There is a reference to you       12:16
11   appealing to President Alekperov in order to
12   resolve an issue.
13             Can you just tell the Court what that
14   is about?
15        A    This was a part of their transfer,       12:16
16   part of the restructuring, transferring blending
17   and supply business from GPMI to Litasco
18   subsidiary, LPA.
19        Q    And what is it that you were
20   appealing?                                         12:17
21        A    I thought I testified to that, that I
22   did not believe that LPA was capable of supplying
23   GPMI, so I thought they would be detrimental to
24   GPMI's performance if this blending/supply
25   organization, which was an internal part of their  12:17
```

Page 1039

```
 1            Gluzman - Cross - Kirpalani
 2   GPMI business, transferred to a third party, even
 3   sister company.
 4             And I told Mr. Nekrasov, I don't want
 5   to do that, and then he told me, my decision is to 12:17
 6   do it.  If you want to change, you have to go
 7   appeal to my boss.  So I --
 8        Q    Let's stay now with the section five
 9   on investigating the possibility of financing.
10   Let's look back at the original Joint Exhibit 183, 12:17
11   the cover e-mail.  It's JX-0183--001.
12        THE COURT:  Mr. Kirpalani --
13        MR. KIRPALANI:  Yes.
14        THE COURT:  -- are you going to come
15   back to 183-T in any more detail?                  12:18
16        MR. KIRPALANI:  Probably not.  If
17   your Honor has any questions about that, go
18   ahead and ask.
19        THE COURT:  Could we go back to
20   183-T, and under the decided, number one, it       12:18
21   says, "To generally approve," et cetera, and
22   there is a reference to an appendix one.
23        Mr. Kirpalani, my document doesn't
24   have appendix one.
25        MR. KIRPALANI:  Your Honor, we         12:18
```

Page 1040

```
 1            Gluzman - Cross - Kirpalani
 2   searched for this through all the documents
 3   produced in the case.  None of us could find
 4   it at Quinn.
 5        THE WITNESS:  It's probably the          12:18
 6   bubble chart, one of the bubble charts,
 7   because it says in Russian -- well, there is
 8   an English transcript -- "generally
 9   approved."  That's what it says.  It says
10   generally approved their -- the theme,          12:19
11   approved their, their --
12        THE COURT:  But there is no -- so
13   there is no appendix one, okay.
14        THE WITNESS:  Okay.
15        THE COURT:  Can you turn the page,        12:19
16   please.  Can you explain paragraph 6.2.  So
17   when there is a reference there to the
18   business reorganization plan of Lukoil
19   Americas, is that the same thing as the
20   reorganization of the retail business in the    12:19
21   U.S.A.?
22        THE WITNESS:  Your Honor, 6.2 refers
23   to Mr. Fedotov, who had in my view a very
24   unique position and situation.  He was the
25   head of budgeting for entire company.          12:19
```

Page 1169

1

2

3                       C E R T I F I C A T E
4    STATE OF NEW YORK        )
5                             : SS.
6    COUNTY OF NEW YORK       )

7

8              I, BONNIE PRUSZYNSKI, a Notary

9    Public with and for the State of New York,

10   do hereby certify:

11        That the foregoing transcript of

12   proceedings is a true record of the testimony

13   given and the proceedings had in the

14   foregoing matter;

15        I further certify that I am not related

16   to any of the parties to this action by

17   blood or marriage, and that I am in no way

18   interested in the outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 28th of May, 2013.

21

22                        _____

23                        Bonnie Pruszynski

24

25

# EXHIBIT 5-b

Page 1

1      UNITED STATES BANKRUPTCY COURT

2      SOUTHERN DISTRICT OF NEW YORK

3

4      - - - - - - - - - - - - - x

5      GETTY PETROLEUM MARKETING, INC.

6      and LIQUIDATING TRUSTEE,            Cause No. 11-15606-scc

7              Debtors.

8      - - - - - - - - - - - - - x

9      GETTY PETROLEUM MARKETING, INC.,

10     ET AL                               Adversary Proceeding

11     v                                   Cause No. 11-02941-scc

12     LUKOIL AMERICAS CORPORATION,

13     ET AL

14     - - - - - - - - - - - - - x

15                             U.S. Bankruptcy Court

16                             One Bowling Green

17                             New York, New York

18

19                             June 10, 2013

20                             10:03 AM

21

22     B E F O R E :

23     HON. SHELLEY C. CHAPMAN, ESQ.

24     U.S. BANKRUPTCY JUDGE

25     ECRO:  F. FERGUSON

## Page 2

```
 1    HEARING Re Advorsary Proceeding 11-02941-scc, Getty
 2    Petroleum Marketing, Inc., et al v LUKOIL Americas
 3    Corporation, et al, TRIAL
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Transcribed by:  Sheila Orms and Sherri Breach.
```

## Page 3

```
 1    A P P E A R A N C E S :
 2    QUINN EMANUEL
 3        Attorneys for Directors and Officers
 4        51 Madison Avenue
 5        22nd Floor
 6        New York, NY  10010
 7
 8    BY:  KATHRYN LYDON, ESQ.
 9         CHRISTOPHER KERCHER, ESQ.
10         SUSHELL KIRPPALANI, ESQ.
11
12    WILMER CUTLER PICKERING HALE AND DORR LLP
13        Attorneys for Plaintiff
14        7 World Trade Center
15        250 Greenwich Street
16        New York, NY  10007
17
18    BY:  CHARLES C. PLATT, ESQ.
19         ANDREW GOLDMAN, ESQ.
20         MICHAEL BONGIORNO, ESQ.
21
22
23
24
25
```

## Page 4

```
 1                  P R O C E E D I N G S
 2         THE COURT:  All right.  How is everybody?  Ready
 3    for a nice long week together?  I have to take a break today
 4    at 12:30 to welcome the interns to the court, so that'll be
 5    our stopping point for lunch today.  All right.  Ready when
 6    you are.
 7         MR. BONGIORNO:  Good morning, Your Honor.
 8         THE COURT:  Good morning.
 9         MR. BONGIORNO:  The plaintiff calls Sem
10    Logovinsky.
11         THE COURT:  Good morning, would you raise your
12    right hand, please?
13         SEM LOGOVINSKY, WITNESS, SWORN
14         THE COURT:  Please have a seat.
15                  DIRECT EXAMINATION
16    BY MR. BONGIORNO:
17    Q    Good morning, Mr. Logovinsky.
18    A    Good morning, Mr. Bongiorno.
19    Q    Could you tell us --
20         THE COURT:  Mr. Logovinsky -- excuse me, Mr.
21    Bongiorno.  Would you pull that microphone a bit towards
22    you, please?  Thank you.
23    Q    Mr. Logovinsky, when did you join GPMI?
24    A    I joined GPMI in 2001, February of 2001.
25    Q    And what was your title at GPMI?
```

Page 10

BY MR. BONGIORNO:

1  Q   And you worked -- I'm sorry, you resigned last year; is
2  that right?
3  A   Yes, that's right.
4  Q   Okay.  You had titles at other LUKOIL entities as well,
5  didn't you?
6  A   No, I don't.
7  Q   You never had any title at any other LUKOIL entity?
8  A   No, I don't.
9  Q   Okay.
10      MR. BONGIORNO:  Why don't we take a look at Joint
11  Exhibit 488 in the book.
12      (Video clip played)
13      MR. BONGIORNO:  Sorry.
14  Q   Can you find that on the tab in the binder in front of
15  you, sir?
16  A   488?
17  Q   488.  Do you see on the first page of that, which is
18  also up on the screen, LUKOIL USA, Inc.  Are you familiar
19  with that entity, sir?
20  A   Yes.
21  Q   Okay.  And were you not the Vice-President of Wholesale
22  and New Business Development at that entity?
23  A   As it is, it's written here.
24  Q   Is that news to you?

Page 11

1  A   It is.
2  Q   Okay.  What about the next page, LUKOIL America's
3  Corporation, LAC?  Are you aware that you were the Vice-
4  President of Wholesale and New Business Development at LAC,
5  sir?
6  A   No, I don't.
7  Q   You didn't know that?
8  A   No, I didn't.
9  Q   Okay.  Now about Getty Petroleum Marketing, Inc.,
10  you're certainly aware that you had a title there, right?
11  A   Yes.
12  Q   Okay.  And you're also aware that you were on the board
13  there, now -- at least now that you look at this?
14  A   Yes.
15  Q   Okay.  On the next page, there's an entity called Getty
16  Terminals Corp.  Do you see that?
17  A   Yes.  Yes.
18  Q   Okay.  Are you aware that you were on the board of
19  directors of that entity?
20  A   No, I didn't.
21  Q   You didn't know that?
22  A   No, I don't.
23  Q   Okay.  What about Kingston Oil Supply Corp, ever hear
24  of that entity?
25  A   No, I don't, same answer.

Page 12

1  Q   You never heard of that one?
2  A   No, I heard about it, I didn't know I was on the board
3  of directors.
4  Q   Okay.  So you're familiar with the entity, you just
5  didn't know you were on the board.
6  A   Yes.
7  Q   Okay.  How about Gasway, Inc., do you know whether you
8  were on the board of that entity, sir?
9  A   No, I don't.
10  Q   Okay.  Why don't we turn the page and see.  Were you on
11  the board of that entity?
12  A   According to this, yes.
13  Q   Okay.  But this doesn't refresh your memory in that
14  regard?
15  A   No.
16  Q   No.  Is the same true of Petro USA, Inc., which is page
17  7 of this exhibit, did you know you were on the board of
18  that?
19  A   No, I don't.
20  Q   Okay.  How about PT Petro Corp, have you ever heard of
21  PT Petro Corp?
22  A   Yes, I did.
23  Q   Okay.  Did you know you were on the board?
24  A   No, I don't.
25  Q   Okay.  What about LUKOIL American Headquarters, do you

Page 13

1  know whether or not you're on the board of that entity?
2  A   No, I don't.
3  Q   Finally, LUKOIL North America, Inc., LNA, do you know
4  whether you're on the board of that entity?
5  A   No, I don't.
6  Q   You don't know either way?
7  A   No, I don't.
8  Q   Okay.  Why don't we turn to a different topic then,
9  sir.  You're familiar with the phrase, the southern assets?
10  Do you know what I'm talking about when I say the southern
11  assets?
12  A   Yes, I do.
13  Q   Okay.  Those were assets in southern Jersey and in
14  Pennsylvania; is that right?
15  A   Yes.
16  Q   And those were gas stations that GPMI owned?
17  A   Yes.
18  Q   Those were assets that they acquired, GPMI acquired
19  from ConocoPhillips; is that right?
20  A   Yes.
21  Q   Okay.  And you were involved in attempting to sell the
22  southern assets; isn't that true, sir?
23  A   That's true.
24  Q   Was that your responsibility at GPMI?
25  A   Yes.

Page 23

1   A   Yes, I could.

2   Q   So you could look at say, a hundred -- if you were

3   trying to figure out how much 150 gas stations were worth in

4   a portfolio, you could look through your windshield at 15 or

5   20 of them, and get a ballpark of what they were all worth,

6   couldn't you?

7   A   Ballpark, yes.

8   Q   Yeah.  You could do that, right?

9   A   Yes.

10   Q   That's because you've been in this industry a long

11   time, right?

12   A   That's correct.

13   Q   Let's look at Joint Exhibit 183-T in your book.  These

14   are -- sir, these are the minutes of a meeting from March

15   26th, 2009 in Moscow, and you're listed on the first page as

16   one of the attendees at this meeting.  Do you recall

17   attending this meeting, sir?

18   A   Yes.

19   Q   And Mr. Nekrasov, the First Vice-President of LUKOIL

20   Oil Company was also in attendance, was he not?

21   A   Yes, he was.

22   Q   A Mr. Fedotov was also in attendance at that meeting,

23   right?

24   A   Yes.

25   Q   He was the Vice-President and the Director of the Main

Page 24

1   Department of Economics and Planning, is that his title?

2   A   Yes.

3   Q   Okay.  What about Mr. Pachinko (ph), was he there?

4   A   Yes, he was.

5   Q   Okay.  And the purpose of this meeting was

6   consideration of the retail business reorganization plan in

7   the USA; is that right?

8   A   That's correct.

9   Q   Okay.  And a decision was made after having heard the

10   information about the reorganization plan at that meeting,

11   that these folks at the meeting decided to generally approve

12   the proposed arrangement for the reorganization of the

13   retail business in the USA.  Is that what happened?

14   A   Yes.

15   Q   And you recall attending that meeting, right?

16   A   Right.

17   Q   You -- were you aware of $340 million that GPMI

18   received from OAO LUKOIL in August of 2009?

19   A   I was not aware about exact amount, I knew that GPMI

20   received the money, but about the amount I wasn't aware.

21   Q   Okay.  You were on the Board of GPMI at the time,

22   right?

23   A   That's correct.

24   Q   But you don't know the exact amount GPMI received, is

25   that your testimony?

Page 25

1   A   That's correct.

2   Q   Okay.  And you didn't really know what the money was

3   for, did you?

4   A   According to this meeting --

5   Q   Sir, I just want to know whether you know whether --

6   what that money was for, just yes or no.

7   A   I don't know.

8   Q   And you don't know whether it was equity, do you?

9   A   I believe it was equity money was given to prime

10   company to --

11   Q   As you sit here today, you think that money, that $340

12   million was equity, is that your testimony?

13   A   That's -- yes, it is.

14   Q   Are you sure about that?

15   A   No, I'm not.

16   Q   You don't know, do you, sir?

17   A   I don't know.

18   Q   And that's because never told you, did they?

19   A   I can't recall.

20   Q   Okay.  And you're not even sure where the $340 million

21   came from, are you?

22   A   Money came from --

23   Q   I'm just asking whether or not you know, sir, you don't

24   have to tell me if you know.

25   A   I don't.

Page 26

1   Q   You don't know, do you?

2   A   I do know.

3   Q   You know where that $340 million came from today?

4   A   Today, yes.

5   Q   Okay.  But at your deposition, you didn't know, did

6   you?

7   A   I couldn't remember.

8   Q   You couldn't remember then, but you can remember now?

9   A   I can remember now.

10   Q   Okay.  And you're not sure whether or not the GPMI

11   Board was ever even consulted about that, are you?

12   A   I don't understand the question.

13   Q   The $340 million that came into GPMI, you're not even

14   sure whether or not the GPMI Board was consulted about that

15   money, are you?

16   A   I'm not aware of it.

17   Q   I'm sorry, I couldn't hear you, sir.

18   A   I'm not aware about it.

19   Q   You're not aware of whether or not the GPMI board was

20   consulted about that 340 million, is that your testimony?

21   A   It was discussed, on the board it was discussed, I

22   remember it was discussed about money coming in and its

23   infusion into the company.  What it was equity or any other

24   it wasn't my responsibility.

25   Q   You don't know whether or not the $340 million was ever

Page 155

1

CERTIFICATION

2

3          I, Sheila G. Orms and Sherri Breach, certify that

4    the foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter.

7

Dated:   June 11, 2013

8

9    **Sheila**          Digitally signed by Sheila Orms
                          DN: cn=Sheila Orms, o, ou,
10   **Orms**             email=digital1@veritext.com,
                          c=US
                          Date: 2013.08.07 12:08:37
11                        -04'00'

Signature of Approved Transcriber

12

13   **Sherri L**        Digitally signed by Sherri L
                          Breach
14   **Breach**          DN: cn=Sherri L Breach, o, ou,
                          email=digital1@veritext.com,
                          c=US
15                        Date: 2018.08.07 12:09:09
                          -04'00'

16   SHERRI L. BREACH

17   AAERT Certified Electronic Reporter & Transcriber

18   CERT*D -397

19

20   Veritext

21   200 Old Country Road

22   Suite 580

23   Mineola, NY 11501

24

25

# EXHIBIT 6

# EXHIBIT 6-a

Offer to Purchase for Cash
**All of the Outstanding Shares of Common Stock**
of

# GETTY PETROLEUM MARKETING INC.

at
**$5.00 Net Per Share**
by

# MIKECON CORP.

**an Indirect Wholly Owned Subsidiary**
of

# OAO LUKOIL

---

**THE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON FRIDAY, DECEMBER 8, 2000, UNLESS THE OFFER IS EXTENDED.**

---

THE OFFER IS CONDITIONED UPON, AMONG OTHER THINGS, (I) THERE BEING VALIDLY TENDERED AND NOT PROPERLY WITHDRAWN PRIOR TO THE EXPIRATION OF THE OFFER A NUMBER OF SHARES OF COMMON STOCK, PAR VALUE $0.01 PER SHARE (THE "COMMON STOCK"), OF GETTY PETROLEUM MARKETING INC. (THE "COMPANY"), WHICH REPRESENT AT LEAST A MAJORITY OF THE OUTSTANDING SHARES OF COMMON STOCK ON A FULLY DILUTED BASIS, AND (II) ALL APPLICABLE WAITING PERIODS UNDER THE HART-SCOTT-RODINO ANTI-TRUST IMPROVEMENTS ACT OF 1976, AS AMENDED (THE "HSR ACT"), HAVING EXPIRED OR BEEN TERMINATED. THE OFFER IS ALSO CONDITIONED UPON THE SATISFACTION OF CERTAIN OTHER TERMS AND CONDITIONS DESCRIBED IN SECTION 13 — "CONDITIONS OF THE OFFER".

THE OFFER IS AN INTEGRAL PART OF THE TRANSACTIONS CONTEMPLATED BY, AND IS BEING MADE PURSUANT TO, THE AGREEMENT AND PLAN OF MERGER (THE "MERGER AGREEMENT"), DATED AS OF NOVEMBER 2, 2000, BY AND AMONG OAO LUKOIL, LUKOIL INTERNATIONAL GMBH, LUKOIL AMERICAS CORPORATION, MIKECON CORP. AND THE COMPANY. SEE SECTION 11 — "PURPOSE OF THE OFFER; PLANS FOR THE COMPANY; CERTAIN AGREEMENTS".

THE BOARD OF DIRECTORS OF THE COMPANY, BY UNANIMOUS VOTE OF THE DIRECTORS, AND AFTER REVIEW OF PARTS OF THE TRANSACTION BY A SPECIAL COMMITTEE COMPRISED OF THE INDEPENDENT DIRECTORS, HAS (I) DETERMINED THAT EACH OF THE MERGER AGREEMENT, THE OFFER AND THE MERGER ARE FAIR AND IN THE BEST INTERESTS OF THE COMPANY'S STOCKHOLDERS; (II) APPROVED THE MERGER AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING THE OFFER AND THE MERGER; (III) DECLARED THE MERGER AGREEMENT ADVISABLE; AND (IV) RECOMMENDED THAT THE COMPANY'S STOCKHOLDERS ACCEPT THE OFFER, TENDER THEIR SHARES OF COMMON STOCK PURSUANT TO THE OFFER AND APPROVE THE MERGER.

LUKOIL AMERICAS CORPORATION AND MIKECON CORP. HAVE ENTERED INTO SEPARATE SUPPORT AGREEMENTS WITH CERTAIN STOCKHOLDERS OF THE COMPANY WHO OWN AN AGGREGATE OF APPROXIMATELY 40% OF THE OUTSTANDING SHARES OF COMMON STOCK. SUCH STOCKHOLDERS HAVE, SUBJECT TO THE PROVISIONS OF THE SUPPORT AGREEMENTS, AGREED, AMONG OTHER THINGS, TO VALIDLY TENDER (AND NOT WITHDRAW) ALL SUCH SHARES PURSUANT TO THE OFFER.

November 9, 2000

banking days before the beginning of the relevant three-month period plus 2% per annum. The loan also requires Parent to repay the principal amount of the loan according to a repayment schedule upon demand by Lukoil Finance Limited, and Parent is to make its first repayment of principal on June 30, 2001. The last payment of interest and principal will be made on September 30, 2008. Once Purchaser has been merged with the Company and the Company is no longer a publicly traded company, the Company will pledge all of the shares of the Company to Lukoil Finance Limited in order to secure its payment obligations under the loan. In addition, Parent has pledged all of the shares of the Purchaser to Lukoil Finance Limited to secure the loan. Parent expects to service loan payments from dividends received from the Company after the Merger.

**Section 10. Background of the Offer.**

In early 1999, representatives of the Company approached LUKOIL regarding its interest in exploring a possible investment in or combination with the Company, to which LUKOIL expressed no interest at that time.

On June 16, 1999, Lukoil USA Inc., a wholly owned indirect subsidiary of LUKOIL ("Lukoil USA") contacted the Company by letter and indicated that Lukoil USA was now prepared to indicate its interest in pursuing a controlling investment in or an acquisition of the Company at a premium to Company's market capitalization, subject to due diligence. The Company and Lukoil USA entered into a Confidentiality Agreement on July 7, 1999, after which Lukoil USA began a preliminary business diligence review and held preliminary discussions with the Company's management. During late July and early August representatives of Lukoil USA and the Company discussed possible terms of an investment in, or business combination transaction with, the Company.

On or about August 16, 1999, at the Company's request, ING Barings began distributing a confidential information memorandum containing general information about the Company, including the Company's business, management, strategy and growth initiatives and historical and projected financial information, to LUKOIL or its representatives.

Thereafter, Mr. Leo Liebowitz, the Company's Chief Executive Officer and Chairman of the Board, had discussions with representatives of Lukoil USA in which he communicated concerns expressed by the Company's Board of Directors regarding the price and terms being indicated by Lukoil USA, as well as certain concerns raised by Getty Properties Corp. regarding guarantees or credit support for its master lease with the Company in the event LUKOIL acquired control of the Company. On August 26, 1999, the Company's senior management and its financial and legal advisors met with representatives of Lukoil USA (including its financial and legal advisors) to discuss a potential business transaction. Lukoil USA again expressed that its only interest was in becoming a majority owner of the Company. After much discussion, the parties were unable to come to an agreement on price or deal structure. In October 1999, representatives of ING Barings, Lukoil USA and the Company's legal advisors held further discussions but were unable to find any basis for agreement.

On April 18, 2000, Mr. Liebowitz met again with representatives of Lukoil USA at Lukoil USA's offices to discuss a potential purchase of the Company by Lukoil USA. No specific terms were discussed. However, the parties agreed to have their respective financial and legal advisors meet to discuss the potential structure of such a transaction. On April 20, 2000, representatives of the companies and their respective legal advisors met telephonically to discuss whether Lukoil USA would provide credit support (potentially including parent company guarantees and/or a letter of credit covering the lease payments) under the master lease. While no transaction structure or price was discussed, Lukoil USA agreed to consider providing some form of credit support.

On or about April 21, 2000, ING Barings, at the Company's request, distributed a revised confidential information memorandum describing the Company, its business and certain financial information to Lukoil USA and its representatives.

On April 24, 2000, representatives of the Company met with representatives of Lukoil USA to discuss Lukoil USA's interest in purchasing the Company, and then met with its financial and legal advisors. On

April 28, 2000, the Company received from Lukoil USA a written preliminary non-binding offer to acquire the Company at a price of $3.50-$4.00 per Share, subject to due diligence, which set forth certain terms and conditions of the offer, including Lukoil USA's ability to negotiate changes to certain terms of the master lease.

On June 6, 2000, ING Barings and the Company presented to Lukoil USA and its financial and legal advisors a management presentation. On June 7, 2000, ING Barings and the Company gave Lukoil USA and its financial advisors a tour of several of the Company's service stations and one of its petroleum terminals. Lukoil USA and its financial and legal advisors also began a due diligence review of the information contained in the Company's data room. The Company and Lukoil USA also discussed certain diligence issues, including Lukoil USA's requested environmental review of the Company's leased properties, and other terms of the purchase proposal, including an indicated offer price range of $4.25 to $4.50 per Share.

On June 19, 2000, representatives of Lukoil USA expressed to representatives of ING Barings Lukoil USA's desire for an agreement with the Company whereby the Company would agree to forego discussions with other companies regarding the sale of the Company during Lukoil USA's more extensive diligence review of the Company, including real estate and environmental diligence, for a period of 60-90 days. Lukoil USA also requested that the Company reimburse Lukoil USA for its expenses relating to its diligence and pay Lukoil USA a fee under certain circumstances, including upon consummation of a transaction with another prospective purchaser within a specified time period. The Company asked Lukoil USA, through ING Barings, for an estimate of the due diligence expenses it would incur. On June 20, 2000, Lukoil USA supplied the Company with an estimate of due diligence expenses.

Several discussions were held between senior management (along with its financial and legal advisors) and Lukoil USA and its financial and legal advisors concerning the terms of the expense reimbursement proposal. On July 21, 2000, and continuing on August 2, 2000, members of the Board of Directors of Getty Realty Corp., the parent of Getty Properties Corp., discussed potential modifications to the master lease with representatives of Lukoil USA.

Concurrently, the Company and its advisors continued to discuss the terms of an exclusivity arrangement with Lukoil USA, including the terms and structure of a possible transaction.

Following a series of discussions between representatives of the Company and representatives of Lukoil USA and their respective advisors on August 3, 2000, Lukoil USA proposed a two-step transaction at a cash price of $5.00 per share of Common Stock.

On August 8, 2000, after further negotiations, the Company and Lukoil USA entered into the Letter Agreement providing that, for the period of Lukoil USA's diligence review of the Company (45 days with an additional period of up to 45 days under certain circumstances), the Company would not engage in discussions concerning an acquisition proposal with any third party other than with certain identified acquirors with whom the Company had previously had discussions or with others if necessary for the Board to comply with its duties under applicable law. The Letter Agreement provided for payment by the Company of a fee to Lukoil USA of $3 million and reimbursement of Lukoil USA's reasonable documented out-of-pocket diligence expenses up to a maximum of $1.5 million under certain circumstances.

After execution of the Letter Agreement, Lukoil USA began an extensive due diligence review of the Company's operations, including financial information, business operations, contracts and other items. On August 14, 2000, the Company's legal advisors gave to Lukoil USA a draft of a merger agreement, and from September through November 2, 2000 representatives of the Company, representatives of Lukoil USA and their respective legal and financial advisors negotiated the terms of the agreement. On September 22, 2000, pursuant to the Letter Agreement, Lukoil USA extended the exclusivity period for an additional 45 days.

During October 2000, representatives of the Company conducted extensive negotiations with representatives of Lukoil USA regarding the Merger Agreement, and, along with representatives of Getty Properties Corp., the master lease amendment and related documents.

18

The Merger Agreement, the Support Agreements and the related documents were executed, and the Offer and Merger were publicly announced, on November 2, 2000.

On November 9, 2000, in accordance with the Merger Agreement, the Purchaser commenced the Offer.

## Section 11.  Purpose of the Offer; Plans for the Company; Certain Agreements.

### Purpose of the Offer

The purpose of the Offer is to enable Parent to acquire as many outstanding shares of Common Stock as possible as a first step in acquiring the entire equity interest in the Company. The purpose of the Merger is for Parent to acquire all remaining shares of Common Stock not purchased pursuant to the Offer. Upon consummation of the Merger, the Company will become a wholly owned subsidiary of Parent and an indirect wholly owned subsidiary of LUKOIL. The Offer is being made pursuant to the Merger Agreement.

### Plans for the Company

Subject to certain matters described below, it is currently expected that, initially following the Merger, the business and operations of the Company will generally continue as they are currently being conducted. Parent will continue to evaluate all aspects of the business, operations, capitalization and management of the Company during the pendency of the Offer and after the consummation of the Offer and the Merger and will take such further actions as it deems appropriate under the circumstances then existing.

The shares of Common Stock are currently traded on the NYSE. Following the consummation of the Merger, the shares of Common Stock will no longer be listed on the NYSE and the registration of the shares of Common Stock under the Exchange Act will be terminated. Accordingly, after the Merger there will be no publicly-traded equity securities of the Company outstanding and the Company may no longer be required to file periodic reports with the Commission. See Section 12 — "Effects of the Offer on the Market for the Shares; Exchange Act Registration".

Except as otherwise discussed in this Offer to Purchase, Parent has no present plans or proposals that would result in any extraordinary corporate transaction, such as a merger, reorganization, liquidation involving the Company or any of its subsidiaries, or purchase, sale or transfer of a material amount of assets of the Company or any of its subsidiaries or in any other material changes to the Company's capitalization, corporate structure, business of the Company or the management of the Company, except that Parent intends to review the composition of the boards of directors (or similar governing bodies) of the Company and its subsidiaries and to cause the election to such boards of directors (or similar governing bodies) of certain of its representatives as contemplated by the Merger Agreement.

### Certain Agreements

#### Merger Agreement

The following is a summary of the material terms of the Merger Agreement. The summary is qualified in its entirety by reference to the Merger Agreement, a copy of which has been filed with the Commission as an exhibit to the Schedule TO. The Merger Agreement may be inspected at, and copies may be obtained from, the same places and in the manner set forth in Section 7 — "Certain Information Concerning the Company — Available Information," except that it may not be available at the regional offices of the Commission.

*The Offer.*  The Merger Agreement provides that as soon as practicable but no later than seven business days after the public announcement of the Merger Agreement, the Purchaser will commence the Offer and that the obligation of the Purchaser to consummate the Offer and to accept for payment and to pay for any shares of Common Stock validly tendered pursuant to the Offer and not withdrawn shall be subject to only those conditions set forth therein. Subject to the terms of the Merger Agreement, the applicable rules and regulations of the Commission and to applicable law, the Purchaser reserves the right to modify the terms of the Offer, provided that, without the prior written consent of the Company and except as provided below, the Purchaser may not (i) decrease the Offer Price payable in the Offer, (ii) decrease the number of shares of

19

# EXHIBIT 6-b

UNANIMOUS WRITTEN CONSENT IN LIEU OF
SPECIAL MEETING OF THE BOARD OF DIRECTORS
OF
LUKOIL AMERICAS CORPORATION

As of October 30, 2000

The undersigned, being the sole member of the Board of Directors (the "Board") of Lukoil Americas Corporation, a Delaware corporation (the "Company"), does hereby consent that when he shall have signed this consent, or identical counterparts hereof, the following Resolutions shall then be deemed to be adopted, to the same extent and to have the same force and effect as if adopted by unanimous vote at a formal meeting of the Board duly called and held for the purpose of acting upon the proposal to adopt such Resolutions, all in accordance with Section 141 of the General Corporation Law of the State of Delaware:

**Authorization of Loan and Pledge Agreements**

**WHEREAS,** Lukoil Finance Limited, a Gibraltor corporation ("Lukoil Finance"), has agreed to loan to the Company $56 million pursuant to that certain Loan Agreement by and between the Company and Lukoil Finance ("Loan Agreement") substantially in the form attached hereto as **Exhibit A**;

**WHEREAS,** the obligation of Lukoil Finance to make the loan is conditioned upon the Company entering into that certain Pledge Agreement (the "Pledge Agreement") substantially in the form attached hereto as **Exhibit B**;

**RESOLVED,** that the Company is authorized to enter into the Loan Agreement and the Pledge Agreement, which are hereby approved in all respects, in such form, and with such changes, modifications or additions thereto, as the officers of the Company, or any of them, shall approve, such approval to be conclusively established by execution thereof by any such officer; and

**FURTHER RESOLVED,** that the officers of the Company be, and each of them hereby is, authorized and directed to execute and deliver, for and on behalf of the Company, the Loan Agreement and the Pledge Agreement, to negotiate, cause to be prepared, execute and deliver, for and on behalf of the Company, any amendment to the Loan Agreement or the Pledge Agreement to which the Company is a necessary party, and to take such further action as they or any of them may deem necessary or advisable to carry out the terms of the Loan Agreement or the Pledge Agreement, such determination to be conclusively evidenced by the taking of any such further action;

**Series A Preferred Stock**

**WHEREAS,** the Company has authorized 500 shares of preferred stock, par value $0.01, pursuant to its Certificate of Incorporation dated as of October 19, 2000;

052191.0001 NEW YORK 216707v4

CONFIDENTIAL

LAC 003016

or change the special powers, preferences, rights privileges, restrictions and conditions of the Series A Preferred Stock.

7.  **Miscellaneous.**

(a)   There is no sinking fund with respect to the Series A Preferred Stock.

(b)   The shares of the Series A Preferred Stock shall not have any preferences, voting powers or relative, participating, optional, preemptive or other special rights except as set forth above in this Designation and in the Certificate of Incorporation of the Corporation, as amended.

## Subscription Agreement

**WHEREAS,** Lukoil Finance desires to subscribe for 50 shares of the Series A Preferred Stock pursuant to that certain Subscription Agreement dated October 30, 2000 (the "Subscription Agreement") substantially in the form attached hereto as Exhibit C;

**RESOLVED,** that the Company is authorized to enter into the Subscription Agreement, which is hereby approved in all respects, in such form, and with such changes, modifications or additions thereto, as the officers of the Company, or any of them, shall approve, such approval to be conclusively established by execution thereof by any such officer; and

**FURTHER RESOLVED,** that the officers of the Company be, and each of them hereby is, authorized and directed to execute and deliver, for and on behalf of the Company, the Subscription Agreement, to negotiate, cause to be prepared, execute and deliver, for and on behalf of the Company, any amendment to the Subscription Agreement to which the Company is a necessary party, and to take such further action as they or any of them may deem necessary or advisable to carry out the terms of the Subscription Agreement, such determination to be conclusively evidenced by the taking of any such further action; and

**FURTHER RESOLVED,** that the Stated Value (as defined in the Certificate of Designations) shall be $372,000 per share.

## Restricted Covenant on Getty Petroleum Marketing, Inc. Indebtedness

**WHEREAS,** as further inducement to Lukoil Finance to enter into the Subscription Agreement, the Company has agreed to place certain restrictions on the ability of Getty Petroleum Marketing, Inc. to incur indebtedness for borrowed money once the Company beneficially owns all the issued and outstanding capital stock of Getty Petroleum Marketing, Inc.;

**RESOLVED,** that the Company is authorized to enter into that certain letter agreement between the Company and Lukoil Finance (the "Letter Agreement"), substantially in the form attached hereto as Exhibit D, which is hereby approved in all respects, in such form, and with

052191.0001 NEW YORK 216707v4

6

CONFIDENTIAL

LAC 003021

such changes, modifications or additions thereto, as the officers of the Company, or any of them, shall approve, such approval to be conclusively established by execution thereof by any such officer; and

FURTHER RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and directed to execute and deliver, for and on behalf of the Company, the Letter Agreement, to negotiate, cause to be prepared, execute and deliver, for and on behalf of the Company, any amendment to the Letter Agreement to which the Company is a necessary party, and to take such further action as they or any of them may deem necessary or advisable to carry out the terms of the Letter Agreement, such determination to be conclusively evidenced by the taking of any such further action.

## Common Stock Issuance

RESOLVED, that the Company hereby accepts the Lukoil Americas L.L.C., a Delaware limited liability company, subscription for 183 shares of Common Stock and the Company shall issue to Lukoil Americas L.L.C. 183 shares of Common Stock in consideration for $1.83 in cash, which consideration has been received in full by the Company.

## Reimbursement Agreement

RESOLVED, that in connection with the subscription of the Series A Preferred Stock, the Company is authorized to enter into that certain Reimbursement Agreement between the Company and Lukoil Cayman Trading Ltd. (the "Reimbursement Agreement") substantially in the form attached hereto as Exhibit E.

## General

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered, in the name and on behalf of the Company, to do or cause to be done any and all such acts and things and to make, execute, acknowledge or verify, deliver and record or file, any and all such certificates, notices, statements, consents, instruments, documents or papers, and to transfer such funds of the Company, as they may deem necessary or desirable in order to consummate the transactions approved in, and effect all other things intended by, the foregoing resolutions, the necessity and desirability of each such certificate, notice, statement, consent or other instrument, document or paper, payment of money, or other act or thing, to be conclusively evidenced by the execution and delivery thereof by any such officer or by his taking such action, and each officer of the Company is hereby authorized and empowered, in the name and on behalf of the Company, to attest or join in the execution of any or all such certificates, notices, consents, and other instruments, documents or papers which shall be so signed on behalf of the Company by any officer of the Company, to join in the acknowledgment or verification of such certificates, notices, statements, consents, and other instruments, documents or papers, to deliver or join in delivering the same, and to execute and deliver any certificates or statements which may be appropriate in connection therewith; and

7

CONFIDENTIAL                                                                    LAC 003022

# EXHIBIT 6-c

```
<DOCUMENT>
<TYPE>15-12B
<SEQUENCE>1
<FILENAME>0001.txt
<DESCRIPTION>FORM 15 RE GETTY PETROLEUM MARKETING INC.
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISION
WASHINGTON, D.C. 20549
----------

FORM 15

CERTIFICATION  AND NOTICE OF TERMINATION OF REGISTRATION  UNDER SECTION 12(g) OF
THE SECURITIES  EXCHANGE ACT OF 1934 OR SUSPENSION OF DUTY TO FILE REPORTS UNDER
SECTIONS 13 AND 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

Commission File Number: 1-14990
-------

Getty Petroleum Marketing Inc.
--------------------------------------------------------
(Exact name of registrant as specified in its charter)

125 Jericho Turnpike
Jericho, New York 11753
(516) 338-6000
--------------------------------------------------------
(Address, including zip code, and telephone number, including
area code, of registrant's principal executive offices)

Common Stock, Par Value $0.01 Per Share
-----------------------------------------
(Title of each class of
securities covered by this Form)

None
--------------------------------------------------------
(Titles of all other classes of securities for which a duty to file
reports under section 13(a) of 15(d) remains)

Please  place an X in the box(es) to  designate  the  appropriate  rule
provision(s) relied upon to terminate or suspend the duty to file reports:

Rule 12g-4(a) (1) (i)      [X]          Rule 12h-3(b) (1) (i)      [X]
Rule 12g-4(a) (1) (ii)     [ ]          Rule 12h-3(b) (1) (ii)     [ ]
Rule 12g-4(a) (2) (i)      [ ]          Rule 12h-3(b) (2) (i)      [ ]
Rule 12g-4(a) (2) (ii)     [ ]          Rule 12h-3(b) (2) (ii)     [ ]
                                        Rule 15d-6                 [ ]

Approximate  number of holders of record as of the  certification or notice
date:

Common Stock - 20,000,000 Shares

Lukoil  Americas  Corporation  is  the  sole  holder  of  record  of  the
securities listed above as of the date hereof.

<PAGE>

SIGNATURE

Pursuant  to  the  requirements  of  the  Securities  Exchange Act of 1934,
Getty Petroleum Marketing Inc. has caused this certification/notice to be signed
on its behalf by the undersigned duly authorized person.

GETTY PETROLEUM MARKETING INC.

Date:  January 25, 2001          By:    /s/ Vincent J. DeLaurentis
                                        ---------------------------------------
                                        Vincent J. DeLaurentis
                                        President and Chief Operating Officer

</TEXT>
</DOCUMENT>

# EXHIBIT 7

# EXHIBIT 7-a

11/13/9

### UNANIMOUS WRITTEN CONSENT OF
### THE BOARD OF DIRECTORS OF
### LUKOIL AMERICAS CORPORATION
#### (a Delaware corporation)

Pursuant to Section 141(f) of the
Delaware General Corporation Law

The undersigned, being all of the directors of the Board of Directors (the "*Board*") of LUKOIL Americas Corporation, a Delaware corporation (the "*Company*"), do hereby consent to the adoption of the following resolutions, which resolutions shall be deemed to be adopted as of the date hereof to the same extent and to have the same force and effect as if such resolutions were adopted by a unanimous vote at a duly convened meeting held for such purpose.

**Transfer of Getty Stock to LUKOIL North America LLC**

**WHEREAS,** the Company is currently the sole stockholder of Getty Petroleum Marketing Inc., a Maryland corporation ("*Getty*");

**WHEREAS,** the Board has determined that it is advisable and in the best interests of the Company to transfer to LUKOIL North America LLC, a Delaware limited liability company ("*LNA*"), 20,000,000 shares of common stock of Getty that are currently held in the name of the Company (the "*Transfer*"); and

**WHEREAS,** following the Transfer, LNA will become the sole stockholder of Getty.

**NOW, THEREFORE, BE IT RESOLVED,** that the Transfer is hereby approved and adopted in all respects; and be it further

**RESOLVED,** that the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer and the Corporate Secretary of the Company (each an "*Officer*") be, and each of them individually hereby is, authorized and empowered, in the name and on behalf of the Company, to sign, execute, certify, verify, acknowledge, deliver, accept, file and record any and all other instruments and documents (the "*Documents*") and to take, or cause to be taken, any and all other actions, as any such Officer may deem necessary or appropriate to effect the purposes and intent of the foregoing resolutions, the signing, execution, certification, verification, acknowledgement, delivery, acceptance, filing and recording of any such Documents, and the taking of any such actions, to establish conclusively such Officer's authority therefor and the approval and ratification by the Board of the Documents so executed and the actions so taken; and be it further

**RESOLVED,** that any and all instruments and documents executed and delivered, and any and all actions taken, by any Officer prior to the date of adoption of the foregoing resolutions which would have been authorized by the foregoing resolutions but for the fact that such instruments and documents were executed and delivered, and such actions were taken, prior

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009364

to such date, be, and each hereby is, approved, adopted and ratified as a duly authorized act of the Board in all respects and for all purposes; and be it further

      **RESOLVED**, that this consent may be executed in multiple counterparts, all of which shall be considered one and the same consent and shall become effective when signed by all members of the Board.

**[Signature page follows]**

2

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009365

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Board of Directors of the Company, have executed this Unanimous Written Consent as of this 13ᵗʰ day of November 2009.

Vadim Gluzman

Vincent J. DeLaurentis

Vadim Vorobyev

[Signature Page to Unanimous Written Consent of LUKOIL Americas Corporation Board of Directors re Transfer of OPMI Stock to LNA]

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009366

### WRITTEN CONSENT OF
### THE BOARD OF DIRECTORS OF
### LUKOIL NORTH AMERICA LLC
### (a Delaware limited liability company)

Pursuant to Sections 18-302(d) and 18-402 of the
Delaware Limited Liability Company Act

The undersigned, being all of the directors of the Board of Directors (the "*Board*") of LUKOIL North America LLC, a Delaware limited liability company (the "*Company*"), do hereby consent to the adoption of the following resolutions, which resolutions shall be deemed to be adopted as of the date hereof to the same extent and to have the same force and effect as if such resolutions were adopted by a unanimous vote at a duly convened meeting held for such purpose.

**Distribution to Member**

WHEREAS, LUKOIL Americas Corporation, a Delaware corporation (the "*Member*"), is the sole equity member of the Company;

WHEREAS, pursuant to Section 15 of the Company's limited liability company agreement, distributions shall be made to the Member at the times and in the aggregate amounts determined by the Board;

WHEREAS, the Company is currently the sole stockholder of Getty Petroleum Marketing Inc., a Maryland corporation ("*Getty*");

WHEREAS, the Board has determined that it is advisable and in the best interests of the Company to make a distribution to the Member in the form of 20,000,000 shares of common stock of Getty that are currently held in the name of the Company (the "*Distribution*"); and

WHEREAS, following the Distribution, the Member will become the sole stockholder of Getty.

NOW, THEREFORE, BE IT RESOLVED, that the Distribution is hereby approved and adopted in all respects; and be it further

RESOLVED, that the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer and the Corporate Secretary of the Company (each an "*Officer*") be, and each of them individually hereby is, authorized and empowered, in the name and on behalf of the Company, to sign, execute, certify, verify, acknowledge, deliver, accept, file and record any and all other instruments and documents (the "*Documents*") and to take, or cause to be taken, any and all other actions, as any such Officer may deem necessary or appropriate to effect the purposes and intent of the foregoing resolutions, the signing, execution, certification, verification, acknowledgement, delivery, acceptance, filing and recording of any such Documents, and the taking of any such actions, to establish conclusively such Officer's authority therefor and the approval and ratification by the Board of the Documents so executed and the actions so taken; and be it further

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009367

**RESOLVED,** that any and all instruments and documents executed and delivered, and any and all actions taken, by any Officer prior to the date of adoption of the foregoing resolutions which would have been authorized by the foregoing resolutions but for the fact that such instruments and documents were executed and delivered, and such actions were taken, prior to such date, be, and each hereby is, approved, adopted and ratified as a duly authorized act of the Board in all respects and for all purposes; and be it further

**RESOLVED,** that this consent may be executed in multiple counterparts, all of which shall be considered one and the same consent and shall become effective when signed by all members of the Board.

**[Signature page follows]**

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009368

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Board of Directors of the Company, have executed this Unanimous Written Consent as of this 25th day of November 2009.

_____
Vadim Gluzman

_____
Michael G. Lewis

_____
Andrey Bychenko

[Signature Page to Written Consent of LUKOIL North America LLC Board re Distribution of GPMI Stock to LUKOIL Americas Corporation]

CONFIDENTIAL (PER 2004 MDL 1358 Order)

LAC 009369

# EXHIBIT 7-b

11/9/2009

## LUKOIL AMERICAS CORPORATION
### (Inc. Delaware 10/20/00)

**Directors**

Vadim Gluzman
Vincent J. DeLaurentis

Vadim Vorobyev
**Officers**

Chairman and Chief Executive Officer
    Vadim Gluzman
President and Chief Operating Officer
    Vincent J. DeLaurentis

Senior Vice President and Chief Financial Officer
    Michael K. Hantman

Vice President of Wholesale and New Business Development
    Sem Logovinsky

Vice President, General Counsel and Corporate Secretary
    Michael G. Lewis

Assistant Corporate Secretary
    Joseph Colangelo

[AF]

CONFIDENTIAL

AG0000081

JX0488-0002
LAC 002195

11/9/2009

## GETTY PETROLEUM MARKETING INC
### (Inc. Maryland 10/1/96)
### OFFICERS AND DIRECTORS

**DIRECTORS**

Vadim Gluzman
Sem Logovinsky

Vincent DeLaurentis

Ilya Borodin

**OFFICERS**

Chairman of the Board and Chief Executive Officer
    Vadim Gluzman

President and Chief Operating Officer
    Vincent J. DeLaurentis

Senior Vice President and Chief Financial Officer
    Michael K. Hantman

Vice President, Wholesale & New Business Development
    Sem Logovinsky

Vice President, General Counsel and Corporate Secretary
    Michael G. Lewis

Treasurer
    Linda A. Raynor

Assistant Corporate Secretary
    Joseph Colangelo

[AF]

CONFIDENTIAL

AG0000082

JX0488-0003
LAC 002196

11/9/2009

## LUKOIL NORTH AMERICAS LLC
### (LLC Delaware 6/26/07)

**Sole Member**

Lukoil Americas Corporation

**Board of Directors**

Vadim Gluzman

Michael G. Lewis

Audrey Bychenko

**Officers**

| | |
|---|---|
| Chairman of the Board | Vadim Gluzman |
| Chief Executive Officer | Vadim Gluzman |
| President | Vincent DeLaurentis |
| Chief Operating Officer | Vincent DeLaurentis |
| Chief Financial Officer | Michael Hantman |
| Senior Vice President | Michael Hantman |
| Vice President | Sem Logovinsky |
| Vice President | Michael G. Lewis |
| Treasurer | Linda Raynor |
| Secretary | Michael G. Lewis |
| Assistant Secretary | Joseph Colangelo |

[AF]

CONFIDENTIAL

AG0000089

JX0488-0010
LAC 002203

# EXHIBIT 8

# EXHIBIT 8-a

02/15/2010 13:56 FAX 2124214704          LUKOIL AMERICAS LLC                          ☒001





GETTY PETROLEUM MARKETING INC., a subsidiary of LUKOIL Oil Company

Sem Logovinsky
Vice President Wholesale/New Business Development

February 15, 2010

BY FACSIMILE

Governor Edward G. Rendell
225 Main Capitol Building
Harrisburg, PA 17120

Clearfield, PA Ethanol Plant

Dear Governor Rendell:

Thank you for taking the time to meet with me last Friday. As requested, I would like to present two potential solutions that would secure the future of Pennsylvania's first ethanol plant and permit Getty Petroleum Marketing Inc. (Getty) to purchase the offtake at competitive market prices::

1.   The State buys 100% of the outstanding debt at a discount (i.e., $205MM less discount to be negotiated with lenders) and becomes the majority owner of the Clearfield plant. The plant will sell ethanol to Getty under its long term contract at market prices. Under this scenario, the State would recover its initial investment with 8% interest within 5 to 7 years. Thereafter, the State will benefit from $25MM to $30MM cash flow per year.

2.   Alternatively, the State invests an additional $25MM to $50MM to reduce the amount of the outstanding debt. The State and Bionol Clearfield LLC would negotiate with lenders to discount the principal and extend the maturity of the loans. The plant will sell the ethanol to Getty under its long term contract at market prices. The State would guaranty repayment of the restructured debt in return for a majority stake in the plant. After repayment of the new loan, the State and Bionol will benefit from $25MM to $30MM cash flow per year.

These proposals and the financial models that support them are complex. Therefore, it is essential that we meet again soon prior to engaging all parties. I will call you on Monday to discuss.

I sincerely appreciate your efforts to help resolve this important matter.

Respectfully

Sem Logovinsky

Lukoil Plaza ■ 1500 Hempstead Turnpike ■ East Meadow, New York 11554 ■ Tel: (516) 542-5200 ■ Fax: (516) 832-8440

CONFIDENTIAL                                                          LUK0289667

JX0959-0002
LAC 001969

EXHIBIT 8-b

# UNANIMOUS WRITTEN CONSENT
# IN LIEU OF SPECIAL MEETING OF
# THE BOARD OF DIRECTORS
# OF

## LUKOIL AMERICAS CORPORATION

The undersigned, being all the members of the Board of Directors (the "*Board*") of LUKOIL AMERICAS CORPORATION, a Delaware corporation (the "*Company*"), do hereby consent that upon execution of this consent, or identical counterparts hereof, by all such members, the following Resolutions shall be adopted, to the same extent and to have the same force and effect as if adopted by unanimous vote at a duly convened meeting of the Board duly called and held for the purpose of acting upon the proposal to adopt such Resolutions, all in accordance with Section 141(f) of the General Corporation Law of the State of Delaware.

WHEREAS, the Company is considering a merger (the "*Merger*") of LUKOIL AMERICAS, L.L.C., its sole parent company and a Delaware limited liability company (the "*Parent*"), with and into the Company, pursuant to a proposed Merger Agreement (the "*Merger Agreement*") between the Company and the Parent, a copy of which is attached hereto as Exhibit A;

WHEREAS, the Board has determined that the Merger, the Merger Agreement and the transactions contemplated thereby are advisable and in the best interests of the Company and its stockholders and the Board desires to approve the Merger, the Merger Agreement and the transactions contemplated thereby.

NOW, THEREFORE, BE IT

RESOLVED, that the Board declares the Merger, the Merger Agreement and the transactions contemplated thereby to be advisable and in the best interests of the Company and its stockholders; and be it further

RESOLVED, that the Board does hereby accept, adopt, approve and ratify the form, terms and provisions of the Merger Agreement and the transactions contemplated thereby, including the Merger; and be it further

RESOLVED, that the Board recommends that the holders of the Company's outstanding stock entitled to vote thereon (i) accept, adopt, approve and ratify the form of the Merger Agreement; (ii) authorize and direct any of the officers of the Company to execute and deliver the Merger Agreement on behalf of the Company with such changes as such person executing the same shall approve, such approval to be conclusively evidenced by such execution; and (iii) authorize and direct the Company to perform in full its obligations, covenants and agreements as set forth in the Merger Agreement; and be it further

1

CONFIDENTIAL

LAC 003070

RESOLVED, that the Company is authorized to issue (and does hereby reserve for issuance thereunder), pursuant to the Merger Agreement, 100 shares of the Company's common stock, par value $0.0001, and the officers of the Company are authorized and directed to take all actions necessary, proper or advisable in order to carry out and effectuate such issuance; and be it further

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and directed to execute and deliver, for and on behalf of the Company, the Merger Agreement, to negotiate, cause to be prepared, execute and deliver, for and on behalf of the Company, any and all documents, agreements and instruments, including any amendment to the Merger Agreement, and to take such further action as they or any of them may deem necessary or advisable to carry out the purpose and intent of and to consummate any of the actions contemplated by any of the foregoing resolutions in the name and on behalf of the Company, such determinations to be conclusively evidenced by the taking of any such further action; and be it further

RESOLVED, that the acts taken prior to the date hereof by the officers of the Company on behalf of the Company in connection with the actions contemplated hereby, are hereby ratified, approved, adopted and confirmed in all respects; and be it further

RESOLVED, that the officers of the Company be, and each of them hereby is, authorized and empowered, in the name and on behalf of the Company, to certify and furnish copies as may be necessary of this and the foregoing resolutions and statements as to the incumbency of the corporate officers of the Company, if reasonably requested, and any person receiving such a certified copy or statement is and shall be authorized to rely upon the contents thereof. The officer of the Company having charge of the books and records of the Company is hereby ordered to file a copy of this Consent with the minutes of proceedings of the Board.

**[Signature Page Follows]**

2

CONFIDENTIAL

LAC 003071

IN WITNESS WHEREOF, the undersigned have set their hands to be effective as of the date set forth below.

_____

Vadim Gluzman
Date: _June 20_, 2006


_____

Vincent J. De Laurentis
Date: _June 20_, 2006


_____

Alexander Matytsyn
Date: _____, 2006

7602007

CONFIDENTIAL

LAC 003072

IN WITNESS WHEREOF, the undersigned have set their hands to be effective as of the date set forth below.

_____
Vadim Gluzman
Date: _____, 2006


_____
Vincent J. De Laurentis
Date: _____, 2006


_____
Alexander Matytsyn
Date: _____, 2006

7602007

CONFIDENTIAL

LAC 003073

# EXHIBIT 8-c

# GETTY PETROLEUM MARKETING INC. (GETTY)  THROUGHPUT AGREEMENT

WITH: Sunoco, Inc. (R&M)   (Sunoco)
    1735 Market Street
    Philadelphia, PA  19103

GETTY AGREEMENT:

DATE: 3/11/05
   Revised 11/1/07

Sunoco delivers to:   **Getty, Newark, NJ**   approximately

| BARRELS PER MONTH | OF | PRODUCT | VIA | PIPELINE | BARGE | TRUCK |
|---|---|---|---|---|---|---|
| As Agreed | | RBOB | | X | X | X |
| As Agreed | | PBOB | | X | X | X |
| As Agreed | | Ethanol | | | X | X |

Sunoco delivers to:   **Getty, Rensselaer**   approximately

| BARRELS PER MONTH | OF | PRODUCT | VIA | PIPELINE | BARGE | TRUCK |
|---|---|---|---|---|---|---|
| 220 | | RBOB | | | X | |
| 27 | | PBOB | | | X | |
| 27 | | Ethanol | | | X | X |
| As agreed | | ULSD | | | X | |

and Sunoco withdraws this product in the form of ethanol blended RFG and ULSD for which Sunoco pays a throughput fee of:

1) 35.7 cents per barrel delivered into Getty, Newark, NJ          Other

2) 29.4 Cents per barrel withdrawn from Rensselaer NY

1) Sunoco agrees to pay Getty $0.0030 per gallon for LAC additive and $0.0040 per gallon 140% LAC as product is loaded at the rack into their trucks.

2) Getty, Newark NJ has a max. draft of 11 feet mean low water. Rensselaer NY has a draft of XXXXXX Please schedule barges accordingly.

3) Cold flow additive will be injected to ULSD at Throughputters option at a fee of $0.025 per gallon.

TERMINAL COMPANY: Getty Petroleum Marketing Inc.

THROUGHPUTTING COMPANY: Sunoco, Inc. (R&M)

Period: Five and one half months commencing on November 1, 2007 and concluding on April 15, 2007.  The Agreement will remain in effect  unless either party provides to the other a written notice of cancellation at least sixty (60) days prior to the expiration of the initial or any time there after. No changes to the terms and conditions of this Agreement shall become effective unless they are in writing and signed by the parties hereto. In the event of either party withdrawing from Marketing in the area supplied by the terminal, the withdrawing party may in writing give the other party sixty (60) days notice to cancel this Agreement.  In the event Terminal Company decides to sell or close it's terminal, Terminal Company must give Throughputting Company sixty (60) day written notice to cancel this Agreement and in such event, Terminal Company will make best efforts to provide for terminalling services for Throughputting Company.

PRODUCT SPECIFICATIONS:  1) RBOB & PBOB - Meeting Colonial Pipeline Specifications for RBOB & PBOB to be blended with either 10% ethanol or 5.7% ethanol for Rensselaer and Newark. Both parties to this Agreement agree that the product shall conform to the prevailing Buckeye Pipeline Company specification for RBOB & PBOB delivered to the Long Island System.
2) ETHANOL - Meeting ASTM D-4806 Specifications for Ethanol.

ACCOUNTING INSTRUCTIONS:
Getty forwards supporting documents to:

Sunoco, Inc. (R&M)
1818 Market Street
Philadelphia, PA  19103

ATTN: Wayne Freas
PHONE: 215-246-8534
FAX: 877-532-6396

Sunoco, Inc. (R&M)
forwards supporting documents to:

Getty Petroleum Marketing Inc.
1500 Hempstead Turnpike
East Meadow, NY  11554

ATTN: Accounting
PHONE:  516-542-5060
FAX:    516-832-8672

Terminal Company will issue a Product Throughput Statement on a monthly basis; reconciliation is required within 10 days of receipt of the Product Throughput Statement.  In the event that this agreement is canceled, the Throughputting Company shall be liable for all charges up to and including the date of cancellation.

ADDITIONAL PROVISIONS:          See ATTACHMENTS A & D
Attachments A & D are hereby made a part of this Agreement.

PLEASE RETURN ONE SIGNED COPY TO ISSUING OFFICE

SUNOCO, INC. (R&M)

GETTY PETROLEUM MARKETING INC.

CONFIDENTIAL

LUK0024187

BY:                    DATE:                                              BY: Andrew Paymer      DATE:

TITLE:    Mgr Distribution Planning                                      TITLE:  Director of Product Supply & Trading

The remaining provisions of this Agreement are attached to this sheet unless otherwise noted.

CONFIDENTIAL

LUK0024188

# EXHIBIT 9

EXHIBIT 9-a

EXECUTION VERSION

**STOCK PURCHASE AGREEMENT**

by

and

among

**CAMBRIDGE PETROLEUM HOLDING INC.**

and

**LUKOIL AMERICAS CORPORATION**

**Dated: February 11, 2011**

100542931 v10

EXHIBIT

JX965

Adv. Proc. No. 11-02941 (SCC)

CONFIDENTIAL

AG0237138

JX0965-0001
LAC 003102

CONFIDENTIAL

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this *"Agreement"*), dated February 11, 2011, is by and among Cambridge Petroleum Holding Inc., a Delaware corporation (*"Buyer"*) and LUKOIL Americas Corporation, a Delaware corporation (*"Seller"* and, together with Buyer, the *"Parties"*).

## RECITALS

A.    Seller owns all of the outstanding shares of common stock, par value $.01 per share (the *"Shares"*) of Getty Petroleum Marketing Inc., a Maryland corporation (the *"Company"*).

B.    Buyer desires to purchase from Seller all of the Shares, and Seller desires to sell to Buyer all of the Shares, in accordance with this Agreement's terms and conditions.

C.    It is the intention of the Parties that, following the Closing (as hereinafter defined), Buyer shall (i) use reasonable best efforts to negotiate settlements (which settlements shall include a full and complete release of Seller and its affiliates, in each case in the form attached hereto as <u>Annex A</u>) with each of Bionol Clearfield LLC (*"Bionol"*) and Getty Properties Corp. (*"Realty"*) and (ii) otherwise continue to operate the Company in a commercially reasonable manner.

## AGREEMENT

NOW, THEREFORE, in consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## ARTICLE 1
## PURCHASE AND SALE OF SHARES

**1.1    Purchase and Sale of Shares.**  On and subject to the terms and conditions of this Agreement, Buyer hereby purchases from Seller, and Seller hereby sells to Buyer, all of the Shares for the consideration specified in <u>Section 1.2</u>.

**1.2    Purchase Terms**

(a)    <u>Purchase Price</u>.  The purchase price for the Shares shall be an amount equal to $1.00 (the *"Purchase Price"*), payable by Buyer to Seller on the Closing Date (as hereinafter defined) by cash or wire transfer of immediately available funds to the account or accounts designated by Seller.

(b)    <u>Equity Infusion</u>.  Subject to clause (iii) of this <u>Section 1.2(b)</u>, at the Closing Seller shall provide to the parties described below an amount equal to an aggregate of $25 million (the *"Equity Infusion Amount"*), such funds to be made available for the purposes and in the manner set forth below:

100542931 v10

CONFIDENTIAL

AG0237141

JX0965-0004
LAC 003105

CONFIDENTIAL

# EXHIBIT 9-b

| From: | Michael Hantman |
|---|---|
| Sent: | Wednesday, January 14, 2009 4:49 PM |
| To: | Sergei Nekrasov (E-mail) |
| Cc: | Alexander Pletnev (E-mail); Gleb Kiparisov (E-mail); Vadim Gluzman; Vincent De Laurentis; Sem Logovinsky |
| Subject: | Getty Financing |

Dear Sergei,

Vadim Gluzman requested that I send you an e-mail memorializing a conversation he had with you concerning financing of the Getty Petroleum Marketing Inc ("GPMI" or the "Company") operations.

1.  The Company will not be furnishing 2007 audited consolidated financial statements to the lenders under its credit facilities because Mr. Gluzman believes it will hurt the Company's negotiation with its landlord, Getty Realty Corp. Accordingly, we will continue to require waivers from the banks for non-compliance with this provision of our loan facilities.

2.  After the restructuring of our Company, whereby the non-master lease operations will be sold by GPMI to Lukoil North America, LLC., GPMI will continue to operate for a period of not less than one year. We anticipate that GPMI will require a 364 day revolver in the approximate amount of $255 million. Due to the lack of audited financial statements, we do not believe that the Company will be able to obtain third party bank financing. Accordingly, Mr. Gluzman indicated that OAO Lukoil will need to provide interim financing directly to GPMI for such one year period.

Regards,
Michael

CONFIDENTIAL

LUK0048604

# EXHIBIT 10

# EXHIBIT 10-a

April 14, 2099 14:11                                           No. 5628        p. 1

# LUKOIL
OIL COMPANY

## MINUTES No. *VN-25p*
of the meeting of First Vice President V.I. Nekrasov

March 26, 2009                                                        Moscow

PRESENT:

| | |
|---|---|
| Vice President – Director of the<br>Main Department of Economics and Planning | G.S. Fedotov |
| Deputy Director of the<br>MDEP – Director of Department of Refinement and Sales Economy | A.A. Bychenko |
| Director of the DIAOI | A.V. Gaydamaka |
| Director of the Strategic Development Department | A.B. Stepanov |
| Vice President of LUKOIL-Americas | S. Logovinsky |

1. Consideration of the Retail Business Reorganization Plan in the USA.

Having heard information about the Reorganization Plan

DECIDED:

1. To generally approve the proposed arrangement for the reorganization of the retail business in the USA and the program to improve the efficiency of business units taking into account the debt financing scheme (Appendix 1).

2. Note the environmental and property risks arising when sub-leasing gas stations to third parties. Instruct Vice President V.S. Gluzman to conduct work to assess and minimize such risks.

3. Instruct Vice President V.S. Gluzman to provide the MDEP and GUSRIA with additional analytical materials containing the dynamics of commercial, general and administrative expenses

```
EXHIBIT

JX183T

Adv. Proc. No. 11-02941 (SCC)
```

JX0183T-0001
LAC 002111

of LUKOIL-Americas in the format proposed by GUSRIA – the actual level since 2004 and the targets for the period 2009-2013 per ton of retail sales and for 1 gas station.

4. Instruct Vice President V.S. Gluzman to appeal to JSC LUKOIL President V.Y. Alekperov in order to resolve the issue of whether it is advisable to preserve blending operations within the sphere of responsibility of LUKOIL-Americas.

5. Instruct Vice President V.S. Gluzman jointly with Vice President A.K. Matytsyn and GUPO Director I.A. Maslyaev to investigate the possibility of financing the proposed Restructuring Plan without a contribution to charter capital. In the event it is necessary to increase charter capital, submit this matter to the Restructuring Committee of the LUKOIL Group for consideration along with the appropriate feasibility study.

6. Taking into account the decisions adopted on clauses 1-5, instruct:

   6.1. Vice President V.S. Gluzman to present the MDEP with an updated draft budget for LUKOIL-Americas for 2009 on a quarterly basis in order to ensure the implementation of the approved program to improve the efficiency of the company's business units as well as the schedule for repaying outstanding loans and interest thereon (financial model).

   6.2. Vice President G.S. Fedotov to earmark the funds in the current budgets and Investment Program that are required to implement the business reorganization plan of LUKOIL-Americas.

   6.3. Instruct Vice President A.K. Matytsyn to ensure the provision of financing for the activities of LUKOIL-Americas in accordance with the budgets and loan repayment schedules that were coordinated in the prescribed manner.

7. Instruct Vice President V.N. Vorobyov and MDEP DRSE Director A.A. Bychenko to monitor the unconditional implementation of the deadlines and results when carrying out the measures described in the Restructuring Plan.


First Vice President                     [signed]                      V.I. Nekrasov

JX0183T-0002
LAC 002112



STATE of NEW YORK            );

                             }

COUNTY of NEW YORK           )

### CERTIFICATE OF ACCURACY

This is to certify that the attached document, *"JX0183-0004 – JX0183-0005"*, originally written in *Russian* is, to the best of our knowledge and belief, a true, accurate, and complete translation into *English*.

Dated: May 19, 2013

Seth Wargo
Consortra Translations

Sworn to and signed before ME this
____ day of _____
2013.

Notary Public

JAMES G MAMERA
Notary Public, State of New York
No. 01MA6157195
Qualified in New York County
Commission Expires Dec. 4, 2014

JX0183T-0003
LAC 002113

# EXHIBIT 10-b



# HOULIHAN LOKEY

As of November 13, 2009

Board of Directors
Getty Petroleum Marketing Inc.
1500 Hempstead Turnpike
East Meadow, NY 11554

Dear Members of the Board of Directors:

　　　　We understand that Getty Petroleum Marketing Inc. (the "Company") and LUKOIL North America LLC (the "Acquiror") propose to enter into the Agreement (defined below) pursuant to which, among other things, the Acquiror will (i) purchase fee simple interests in 161 parcels of real property, (ii) purchase 164 leasehold interests of the Company, (iii) take an assignment of and assume all of the Assumed Operator and Supply Agreements (as defined in the Agreement), including all of the Company's rights and obligations to supply 178 additional properties, which the Company neither owns or leases, (iv) purchase certain equipment and other personal property assets of the Company associated with the Purchased Premises (as defined in the Agreement) or any other premises to which an Assumed Operator and Supply Agreement relates, (v) take an assignment of 9 mortgages of the Company relating to certain retail motor fuel facilities located in New Jersey and purchase certain notes secured thereby (the "Notes"; such assets described in clauses (i) through (v), the "Assets"), (vi) acquire all of the outstanding capital stock of Kingston Oil Supply Corp. ("KOSCO"), (viii) sublease the LUKOIL, Getty and other trademarks licensed to the Company pursuant to the Trademark License Agreements (as defined in the Agreement), (viii) purchase the Lukoil Americas Headquarters LLC property located at 1500 Hempstead Turnpike, New York, NY 11754 and take assignment of the Getty Headquarters Lease (as defined in the Agreement), (ix) take an assignment of and assume the office lease at 302 Harper Drive, Moorestown, NJ and (x) assume certain liabilities specified in the Agreement relating to the Assets (the "Liabilities") (collectively, the "Transaction") for $130,753,000 in cash (the "Consideration"), subject to certain adjustments as provided for in the Agreement.

　　　　You have requested that Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") provide an opinion (the "Opinion") as to whether, as of the date hereof, the Consideration to be received by the Company in the Transaction pursuant to the Agreement is fair to the Company from a financial point of view.

　　　　In connection with this Opinion, we have made such reviews, analyses and inquiries as we have deemed necessary and appropriate under the circumstances. Among other things, we have:

1. reviewed the following agreements and documents:

    a. Purchase and Sale Agreement dated as of November 13, 2009 by and between the Company and the Acquiror (the "Original Agreement");

245 Park Avenue, 20th Floor   •   New York, New York 10167   •   tel.212.497.4100   •   fax.212.661.3070   •   www.HL.com
Broker/dealer services through Houlihan Lokey Howard & Zukin Capital.          Investment advisory services through Houlihan Lokey Howard & Zukin Financial Advisors.

As of November 13, 2009

    b.   Amendment No. 1 to the Purchase and Sale Agreement dated as of November 13, 2009 by and between the Company and the Acquiror (the "Amendment" and, together with the Original Agreement, the "Agreement");

    c.   Appraisal (the "Headquarters Appraisal") dated November 11, 2009 relating to the building valuation at 1500 Hempstead Turnpike, East Meadow, NY (the "Headquarters");

2.   reviewed certain information relating to the historical, current and future operations, financial condition and prospects of KOSCO made available to us by the Company, including financial projections prepared by the management of the Company relating to KOSCO for the fiscal years ending 2009 and 2010;

3.   reviewed certain information relating to the historical, current and future operations of the Assets prepared by the management of the Company, including assumptions relating to the future revenue and operating costs associated with the Assets (the "Asset Model");

4.   spoken with certain members of the management of the Company regarding the respective businesses, operations, financial condition and prospects of KOSCO and the Assets, the Transaction and related matters;

5.   compared the financial and operating performance of KOSCO with that of public companies that we deemed to be relevant;

6.   considered the publicly available financial terms of certain transactions that we deemed to be relevant;

7.   reviewed a certificate addressed to us from senior management of the Company which contains, among other things, representations regarding the accuracy of the information, data and other materials (financial or otherwise) provided to, or discussed with, us by or on behalf of the Company; and

8.   conducted such other financial studies, analyses and inquiries and considered such other information and factors as we deemed appropriate.

We have relied upon and assumed, without independent verification, the accuracy and completeness of all data, material and other information furnished, or otherwise made available, to us, discussed with or reviewed by us, or publicly available, and do not assume any responsibility with respect to such data, material and other information. In addition, management of the Company has advised us, and we have assumed, that the financial projections reviewed by us have been reasonably prepared in good faith on bases reflecting the best currently available estimates and judgments of such management as to the future financial results and condition of KOSCO and the revenue and operating costs associated with the Assets, and we express no opinion with respect to such projections, the assumptions on which they are based or the assumptions underlying the Asset Model. We have relied upon and assumed, without independent verification, that there has been no change in the (i) business, assets, liabilities, financial condition, results of operations, cash flows or prospects of KOSCO since the date of the most recent financial statements provided to us and (ii) revenue and operating costs associated with the Assets since August 31, 2009, in each case that would be material to our analyses or this Opinion, and that there is no information or any facts that would make any of the information reviewed by us incomplete or

2

As of November 13, 2009

misleading. We have not considered any aspect or implication of any transaction to which the Company may be a party (other than as specifically described herein with respect to the Transaction).

We have relied upon and assumed, without independent verification, that (a) the representations and warranties of each party to the Agreement and all other related documents and instruments that are referred to therein are true and correct, (b) each party to the Agreement and other related documents and instruments will fully and timely perform all of the covenants and agreements required to be performed by such party, (c) all conditions to the consummation of the Transaction will be satisfied without waiver thereof, and (d) the Transaction will be consummated in a timely manner in accordance with the terms described in the agreements and documents provided to us, without any amendments or modifications thereto. We also have relied upon and assumed, without independent verification, that (i) the Transaction will be consummated in a manner that complies in all respects with all applicable international, federal and state statutes, rules and regulations, and (ii) all governmental, regulatory, and other consents and approvals necessary for the consummation of the Transaction will be obtained and that no delay, limitations, restrictions or conditions will be imposed or amendments, modifications or waivers made that would have an effect on the Company that would be material to our analyses or this Opinion.

Furthermore, in connection with this Opinion, we have not been requested to make, and have not made, any physical inspection or independent appraisal or evaluation of any of the assets, properties or liabilities (fixed, contingent, derivative, off-balance-sheet or otherwise) of the Company, the Acquiror or any other party, including the Liabilities, nor were we provided with any such appraisal or evaluation, other than the Headquarters Appraisal. For purposes of this Opinion, we have a received a copy of the Headquarters Appraisal, and we have relied upon and assumed, without independent verification, the accuracy of the conclusions set forth therein. We are not real estate appraisers, and do not express any opinion with respect to such subject matter. If the conclusions set forth in said appraisal are not accurate, the conclusion set forth in this Opinion could be materially affected. We have assumed, with your consent, that the value of the non KOSCO related working capital adjustments, together with the value of the non KOSCO related Liabilities is, in the aggregate, no less than $41.660 million. In addition, we have assumed, with your consent, that (i) the aggregate value of the Notes are equal to their aggregate face value, and (ii) the Delayed Closing (as defined in the Amendment), will occur on a date that will not result in a material dimunition of value of the Purchase Price in light of our analysis not applying any present value discount to the amount of such Purchase Price to be paid at the Delayed Closing. We did not estimate, and express no opinion regarding, the liquidation value of any entity. We have undertaken no independent analysis of any potential or actual litigation, regulatory action, possible unasserted claims or other contingent liabilities, to which the Company or the Acquiror is or may be a party or is or may be subject, or of any governmental investigation of any possible unasserted claims or other contingent liabilities to which the Company or the Acquiror is or may be a party or is or may be subject.

We have not been requested to, and did not, (a) initiate or participate in any discussions or negotiations with, or solicit any indications of interest from, third parties with respect to the Transaction, the assets, businesses or operations of the Company or any other party, or any alternatives to the Transaction, (b) negotiate the terms of the Transaction, or (c) advise the Board of Directors of the Company or any other party with respect to alternatives to the Transaction. This Opinion is necessarily based on financial, economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. We have not undertaken, and are under no obligation, to update, revise, reaffirm or withdraw this Opinion, or otherwise comment on or consider events occurring after the date hereof.

3

As of November 13, 2009

This Opinion is furnished solely for the use and benefit of the Board of Directors of the Company in connection with its consideration of the Transaction and may not be relied upon by any other person or used for any other purpose without our prior written consent. This Opinion should not be construed as creating any fiduciary duty on Houlihan Lokey's part to any party. This Opinion is not intended to be, and does not constitute, a recommendation to the Board of Directors of the Company, any security holder or any other person as to how to act or vote with respect to any matter relating to the Transaction. This Opinion may not be disclosed, reproduced, disseminated, quoted, summarized or referred to at any time, in any manner or for any purpose, nor shall any references to Houlihan Lokey or any of its affiliates be made, without the prior written consent of Houlihan Lokey.

In the ordinary course of business, certain of our affiliates, as well as investment funds in which they may have financial interests, may acquire, hold or sell, long or short positions, or trade or otherwise effect transactions, in debt, equity, and other securities and financial instruments (including loans and other obligations) of, or investments in, the Company, the Acquiror, or any other party that may be involved in the Transaction and their respective affiliates or any currency or commodity that may be involved in the Transaction.

Houlihan Lokey has in the past provided and is currently providing investment banking, financial advisory and other financial services to the Company, for which Houlihan Lokey has received, and may receive, compensation. Houlihan Lokey may provide investment banking, financial advisory and other financial services to the Company and other participants in the Transaction and certain of their respective affiliates in the future, for which Houlihan Lokey may receive compensation.

In addition, we will receive a fee for rendering this Opinion, which is not contingent upon the successful completion of the Transaction. The Company has agreed to reimburse certain of our expenses and to indemnify us and certain related parties for certain potential liabilities arising out of our engagement.

We have not been requested to opine as to, and this Opinion does not express an opinion as to or otherwise address, among other things: (i) the underlying business decision of the Company, the Acquiror, their respective security holders or any other party to proceed with or effect the Transaction, (ii) the terms of any arrangements, understandings, agreements or documents related to, or the form or any other portion or aspect of, the Transaction or otherwise (other than the Consideration to the extent expressly specified herein), (iii) the fairness of any portion or aspect of the Transaction to the holders of any class of securities, creditors or other constituencies of the Company or the Acquiror, or to any other party, except as expressly set forth in the last sentence of this Opinion, (iv) the relative merits of the Transaction as compared to any alternative business strategies that might exist for the Company, the Acquiror or any other party or the effect of any other transaction in which the Company, the Acquiror or any other party might engage, (v) the fairness of any portion or aspect of the Transaction to any one class or group of the Company's or any other party's security holders vis-à-vis any other class or group of the Company's or such other party's security holders (including, without limitation, the allocation of any consideration amongst or within such classes or groups of security holders), (vi) whether or not the Company, the Acquiror, their respective security holders or any other party is receiving or paying reasonably equivalent value in the Transaction, (vii) the solvency, creditworthiness or fair value of the Company, the Acquiror or any other participant in the Transaction under any applicable laws relating to bankruptcy, insolvency, fraudulent conveyance or similar matters, or (viii) the fairness, financial or otherwise, of the amount or nature of any compensation to or consideration payable to or received by any officers, directors or employees of any party to the Transaction, any class of such persons or any other party, relative to the Consideration or otherwise. Furthermore, no opinion, counsel or interpretation is

4

As of November 13, 2009

intended in matters that require legal, regulatory, accounting, insurance, tax or other similar professional advice. It is assumed that such opinions, counsel or interpretations have been or will be obtained from the appropriate professional sources. Furthermore, we have relied, with your consent, on the assessments by the Company, the Acquiror, their respective advisers, as to all legal, regulatory, accounting, insurance and tax matters with respect to the Company, the Acquiror and the Transaction. The issuance of this Opinion was approved by a committee authorized to approve opinions of this nature.

Based upon and subject to the foregoing, and in reliance thereon, it is our opinion that, as of the date hereof, the Consideration to be received by the Company in the Transaction pursuant to the Agreement is fair to the Company from a financial point of view.

Very truly yours,

HOULIHAN LOKEY HOWARD & ZUKIN FINANCIAL ADVISRORS, INC.

*Houlihan Lokey Howard & Zukin Financial Advisors, Inc.*

5

# EXHIBIT 10-c

ATTORNEY-CLIENT PRIVILEGED - DO NOT FORWARD WITHOUT PERMISSION

**Lukoil Americas Corp.**
**Restructuring Plan**
**Based on Financial Data as of September 30, 2009**



**Summary:**

- Getty will retain 963 outlets, of which 836 are under a master lease with Getty Realty Corp, 48 are leased from other third parties and 79 are under supply contracts with distributors. Negotiations to restructure the master lease to improve the economics of this operation have been unsuccessful. Therefore, except for those outlets currently operated by wholesalers and certain closed sites, Getty will market the remaining outlets to distributors over an 18 month period. Getty will supply petroleum products to certain of the outlets transferred and will attempt to collect rental income equal to the rent and real estate taxes paid under the master lease. The first such transfer occurred on June 1, 2009 to Green Valley LLC.

  Getty will sell or assign 78 other outlets (2 fee, 55 leased and 21 supply contracts) to two distributors.

- Getty will sell all of its remaining operations, including 511 outlets, the KOSCO heating oil business and its corporate headquarters building to LNA at fair value, which is estimated to be $120 million (assets of $194 million less environmental and other liabilities of $74 million).

- Getty and LNA will buy their petroleum product requirements principally from Lukoil International Trading and Supply Company ("LITASCO"), an indirect wholly owned subsidiary of OAO Lukoil.

- LNA will enter into credit agreements comprised of a $77 million term loan and $80 million revolver to acquire the operations from Getty. OAO Lukoil has committed capital of $70 million to LNA.

- Getty will use net sales proceeds of $120 million and an August 2009 cash infusion of $340 million from its parent to extinguish $146 million of long-term debt. Outstanding amounts under the $325 million revolving credit facilities were extinguished in September 2009.

**NEW FINANCING RECAP (in millions):**

| GETTY: | | LNA: | |
|---|---|---|---|
| EQUITY | $340 | EQUITY | $70 |
| REVOLVER | 40 | TERM LOAN | 77 |
| | $380 | REVOLVER | 80 |
| | | | $227 |



# EXHIBIT 10-d

Page 1739

1
2      UNITED STATES BANKRUPTCY COURT
       SOUTHERN DISTRICT OF NEW YORK
3      -----------------------------X
4      In Re:                          Chapter 11
5      GETTY PETROLEUM                  No. 11-15606 (SCC)
       MARKETING, INC., et al.,
6         Debtors.                      (Jointly  Administered)
7      -----------------------------X
8      GETTY PETROLEUM
       MARKETING, INC., et al.,
9               Plaintiffs,
10              vs.                      Adversary Proceeding
11     LUKOIL AMERICAS                   No. 11-02941 (SCC)
       CORPORATION, LUKOIL NORTH
12     AMERICA LLC, OAO LUKOIL,
       VINCENT DE LAURENTIS, VADIM
13     GLUZMAN, MICHAEL HANTMAN,
       MICHAEL LEWIS and SIMON
14     LOGOVINSKY,
15              Defendants.
16     -----------------------------X
17              TRANSCRIPT OF PROCEEDINGS
18                New York, New York
19                 June 5, 2013
20
21     BEFORE:
22           The Hon. SHELLEY C. CHAPMAN
             Bankruptcy Court Judge
23
       Reported by:
24     Bonnie Pruszynski, RMR
       JOB NO. 61548
25

LAC 001506

Page 1808

Driscoll - Direct - Davis

1    Driscoll - Direct - Davis
2    obligations.
3        Q    Did Mr. Gluzman ever tell you whether
4    GPMI's ultimate parent, OAO Lukoil, had approved
5    of this plan to either renegotiate the master    11:19
6    lease or restructure GPMI?
7        A    Yes. I was actually given a
8    timeline. There was a whole long period of time
9    where we had to agree or it was going to be
10   considered in Moscow, and then once it was    11:20
11   decided, there was no turning back from the road.
12   And I was aware of -- I can recall conversations
13   where I was being told, okay, we are going to go
14   decide, so if you guys aren't going to do it, then
15   fine, once we make the decision, it's irrevocable. 11:20
16       Q    Did you ever summarize in writing
17   what Mr. Gluzman had initially told you about his
18   intentions to restructure GPMI if Getty Realty
19   didn't agree to renegotiate the master lease?
20       A    Yes. I am not a big memo writer, but 11:20
21   I do occasionally write memos or e-mails to people
22   summarizing conversations. I'm sure that I sent
23   one or two of those to Mr. Liebowitz, who was the
24   chief executive officer of the company at the
25   time.    11:20

Page 1809

1    Driscoll - Direct - Davis
2        Q    If you could turn to Exhibit JX-549
3    in your witness binder.
4        A    Okay.
5        Q    Mr. Driscoll, do you recognize    11:21
6    Exhibit JX-549?
7        A    Yes, I do.
8        Q    And what is this exhibit?
9        A    It's one of my rare memos, that I
10   wrote on December 4th, 2007, to Mr. Liebowitz,    11:21
11   summarizing what I think was a meeting but may
12   have been a phone call. My recollection is it was
13   a lunch meeting with Mr. Gluzman.
14       Q    And when does this memo date from?
15       A    December 4th, 2007.    11:21
16       Q    What was your understanding of what
17   would happen to GPMI if Getty Realty didn't agree
18   to renegotiate the master lease and GPMI was then
19   restructured in the manner that Mr. Gluzman had
20   explained to you?    11:21
21       A    Well, I mean -- they would -- it's in
22   bullet two. GPMI will sell whatever non-Getty
23   assets to a sister company and continue to
24   operate.
25       Q    Did Mr. Gluzman ever make any    11:22

Page 1810

1    Driscoll - Direct - Davis
2    representations to you about OAO Lukoil's
3    intentions to continue to serve as the ultimate
4    parent of GPMI?
5        A    No. He made it clear, Mr. Gluzman    11:22
6    made it clear that if this plan went forward, then
7    once they completed their restructuring of
8    removing the assets from GPMI, then the plan would
9    be to continue to hold it for one year, which he
10   assured me that the lawyers were requiring him to 11:22
11   do, and then that he would then -- then the
12   intention was to sell GPMI to anyone they could
13   sell it to.
14       Q    Did Mr. Gluzman ever tell you that
15   Lukoil was going to allow GPMI to file for    11:22
16   bankruptcy while it was owned by Lukoil?
17       A    You know, there were various
18   iterations of that. Early on, I think prior to
19   this memo, there was conversation around the fact
20   that the parent could not continue to support    11:23
21   these losses forever, and it was possible that
22   GPMI might have to file for bankruptcy.
23       When we turned up the volume, if you
24   will, on that, and the questioning on that, it
25   was -- Mr. Gluzman made it clear and continued to 11:23

Page 1811

1    Driscoll - Direct - Davis
2    make it explicitly clear that so long as OAO
3    Lukoil owned GPMI, GPMI would remain current on
4    all its obligations under the master lease.
5        Q    Did you believe that Mr. Gluzman    11:23
6    would be able to carry out his plan to restructure
7    GPMI as he had described it to you?
8        A    I thought it would be very difficult
9    for them to do so. There is a reference in this
10   memo where I suggested that they would -- they    11:23
11   were willing, essentially, to implicitly give it
12   away for little or no consideration.
13       One of the things I challenged him
14   on, when he told me they were going to sell GPMI,
15   was that, you know, who would want to buy a    11:24
16   company that is losing as much money as you tell
17   me it's losing, and that's when we had the
18   conversation around, you know, there are people
19   and you won't like them very much, but there is
20   lots of people that do that sort of thing.    11:24
21       And, you know, we just -- that was
22   sort of the nature of the conversations that we
23   had back and forth.
24       Q    And the reference to someone you
25   won't like very much, was it your understanding    11:24

LAC 001524

Page 1812

Driscoll - Direct - Davis

1
2  that the implication was that GPMI would be sold
3  to someone who would take the company into
4  bankruptcy?
5        A    More than that, but -- not only take   11:24
6  it into bankruptcy, but if you are -- if you were
7  sitting in our shoes strategically at that
8  particular point in time, the risk was an
9  aggressive litigator going -- taking it into
10  bankruptcy, from our perspective, and attempting   11:25
11  to challenge the unitary nature of the master
12  lease, which would theoretically permit then the
13  new tenant to cherrypick assets and keep the ones
14  they wanted to keep and not keep the ones they
15  didn't want to keep.            11:25
16        Q    Why did you think that the plan to
17  restructure GPMI as described to you by
18  Mr. Gluzman would not be easy to achieve?
19        A    Well, among other things, we had --
20  we were pretty sure it was a pretty good master -- 11:25
21  unitary lease. Based on the financials they had
22  showing us, the company was losing a lot of money.
23  There aren't a lot of people that want to step
24  into that right away.
25             And there was also the issue of   11:25

Page 1813

Driscoll - Direct - Davis

1
2  GPMI's balance sheet having -- we didn't have
3  specific numbers on this, but having, you know,
4  plus or minus 400 to 500 million dollars worth of
5  debt on it that we knew, only because you could   11:26
6  see it on Bloomberg, it was not in the financial
7  disclosure they had given us, but we knew because
8  of that, that had been guaranteed by the parent.
9        Q    What was your understanding of why
10  Mr. Gluzman was threatening to restructure GPMI in 11:26
11  the manner that he described to you?
12        A    What was my understanding of why he
13  was doing that?
14        Q    Yes, sir.
15        A    He was trying to get us --       11:26
16  concessions from us with respect to reduced rent
17  and relief from his environmental obligations.
18        Q    And to your understanding, how would
19  this plan to renegotiate or to restructure GPMI
20  have created negotiating leverage with Realty?   11:26
21        A    Well, I believe that Mr. Gluzman
22  thought that Realty was relying on the fact that
23  the parent would support GPMI's obligations, and
24  therefore, that if we were solely looking to the
25  assets of the company that was losing money, that 11:26

Page 1814

Driscoll - Direct - Davis

1
2  we might be more amenable to making concessions to
3  them.
4        Q    Did GPMI eventually carry out the
5  restructuring plan that had been conveyed to you  11:27
6  by Mr. Gluzman?
7        A    Yes, they did.
8        Q    When did they do that?
9        A    November of 2009.
10        Q    What is your understanding of the   11:27
11  restructuring of GPMI that occurred in
12  November 2009?
13        A    My understanding is that -- that the
14  assets were transferred to -- ultimately to LNA.
15  There was a several-step transaction that I didn't 11:27
16  quite understand, and the debt, the guaranteed
17  debt by Lukoil was paid -- the debt that Lukoil
18  had been guaranteeing had been paid off, and what
19  was left in GPMI at that time was simply our
20  assets.                  11:27
21             I didn't realize there were other
22  things left in GPMI at that particular point in
23  time.
24        Q    And what were the other things that
25  you just made reference to that you didn't at   11:28

Page 1815

Driscoll - Direct - Davis

1
2  least at that time realize had been left with
3  GPMI?
4        A    Primarily what I was thinking of when
5  I said that was the agreement with Bionol.     11:28
6        Q    If you could turn to Exhibit JX-1014
7  in your witness binder.
8        A    Yes.
9        Q    Mr. Driscoll, do you recognize
10  Exhibit JX-1014?            11:28
11        A    It does look like the Getty Realty
12  2009 annual report.
13        Q    If you could turn to page eight of
14  the exhibit, I direct your attention to the last
15  paragraph on page eight.           11:28
16        A    Yes.
17        Q    Can you read to the Court the first
18  sentence of that paragraph, please?
19        A    Certainly.
20             "In connection with GPMI's announced  11:29
21  restructuring, we believe the elimination of debt
22  by GPMI has increased GPMI's liquidity and
23  improved its balance sheet."
24        Q    What did Getty Realty mean when it
25  made this statement in the 2009 annual report?  11:29

20

LAC 001525

**Page 1952**

Driscoll - Cross - Kercher

Subject to any redirect, I have no further questions, your Honor. Thank you.

THE COURT: I withdraw my earlier commentary about your time estimate.

MR. KERCHER: Glad I have my credibility, your Honor.

MR. DAVIS: Your Honor, plaintiff has no redirect.

THE COURT: Very excellent.

Mr. Driscoll, thank you very much. You can step down.

Okay. So, we are done for today, yes. So that gives you a head start on what we need to accomplish tonight. We will assume that you will be here at 2 o'clock, unless we hear from you otherwise,

And in the unlikely event that we have reason to believe that 2 o'clock is not a realistic start point, we will -- we will let you know, but I'm going to try my best to keep to that. All right?

Thank you very much. Have a good evening.

oOo

**Page 1953**

Driscoll - Cross - Kercher

CERTIFICATE

STATE OF NEW YORK    )
                     : SS.
COUNTY OF NEW YORK   )

I, BONNIE PRUSZYNSKI, a Notary Public with and for the State of New York, do hereby certify:

That the foregoing transcript of proceedings is a true record of the testimony given and the proceedings had in the foregoing matter.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th of JUNE, 2013.

_____

Bonnie Pruszynski

**Page 1954**

Driscoll - Cross - Kercher

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| DAVID DRISCOLL | 1777 | 1821 | |
| Confidential Portion 1899-1906 | | | |

EXHIBITS

| | |
|---|---|
| Joint Exhibit 701 | 1786 |
| Joint Exhibit 702 | 1787 |
| Joint Exhibit 706 | 1788 |
| Joint Exhibit 549 | 1809 |
| Joint Exhibit 1014 | 1815 |
| Joint Exhibit 1064 | 1822 |
| Joint Exhibit 730 | 1834 |
| Joint Exhibit 1055 | 1840 |
| Joint Exhibit 728 | 1841 |
| Joint Exhibit 733 | 1843 |
| Joint Exhibit 785 | 1845 |
| Joint Exhibit 782 | 1849 |
| Joint Exhibit 736 | 1851 |
| Joint Exhibit 794 | 1853 |
| Joint Exhibit 792 | 1855 |
| Joint Exhibit 807 | 1857 |
| Joint Exhibit 803 | 1864 |
| Joint Exhibit 1013 | 1872 |

**Page 1955**

Driscoll - Cross - Kercher

| | |
|---|---|
| Joint Exhibit 1014 | 1873 |
| Joint Exhibit 767 | 1879 |
| Joint Exhibit 549 | 1885 |
| Joint Exhibit 757 | 1907 |
| Joint Exhibit 766 | 1910 |
| Joint Exhibit 772 | 1912 |
| Joint Exhibit 793 | 1914 |
| Joint Exhibit 932 | 1915 |
| Joint Exhibit 824 | 1917 |
| Joint Exhibit 738 | 1921 |
| Joint Exhibit 773 | 1922 |
| Joint Exhibit 922 | 1925 |
| Joint Exhibit 1062 | 1928 |
| Joint Exhibit 884 | 1930 |
| Joint Exhibit 1014 | 1933 |
| Joint Exhibit 931 | 1934 |
| Joint Exhibit 957 | 1939 |
| Joint Exhibit 971 | 1946 |

TSG Reporting - Worldwide    877-702-9580

55

LAC 001560

# EXHIBIT 10-e

| | |
|---|---|
| From: | Michael Hantman |
| Sent: | Tuesday, January 11, 2011 8:44 AM |
| To: | Vadim Gluzman |
| Cc: | Vincent De Laurentis; Sem Logovinsky; Mike Lewis |
| Subject: | FW: GPMI - 95 Sites |
| Attachments: | 95 non grc properties.xls |

Dima,

Attached is data on 95 non master lease sites contained in Getty portfolio. The analysis indicates that Getty is losing money on these sites which is precisely the reason they were not originally included in the sale to LNA.

Regards,
Michael
-----Original Message-----
From: Janice Lipari
Sent: Tuesday, January 11, 2011 8:38 AM
To: mkhantman@getty.com
Subject: GPMI - 95 Sites

Michael,

Per your request, attached is the file containing information related to the 95 non GRC sites.

Janice

**EXHIBIT**

200

CONFIDENTIAL

LUK0291227

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

LAC 003993

# EXHIBIT 11

# EXHIBIT 11-a

| From: | Katharina Gotsmy |
|---|---|
| To: | Alex Pozdnyakov |
| Cc: | mpurser@lukoilaf.com; cbirch@lukoilaf.com; Thomas Trojan; Robert Gulla; NDensham@lukoilaf.com; Mike Lewis; Хорев Константин Павлович; Anton Mitrofanov (??. ?????); vkhomyakov@g-group.ru; Yelena Bitman |
| Subject: | RE: Capital contribution to LAC, LUSA, GPMI |
| Date: | Friday, August 31, 2007 8:35:57 AM |
| Attachments: | LAC.MIN 820.000.doc |
| | LUK USA.MIN 120.000.doc |
| | Getty.MIN.700.000.DOC |

Dear All,

After discussing this with Thomas, we have decided to add a clause to the attached resolutions that payment will be made directly from LIG to Getty and LUKOIL USA.

If it is preferable that payment is made to LAC instead, we can of course amend this clause!

Kind regards,

Katharina

-----Original Message-----
From: Katharina Gotsmy
Sent: Friday, August 31, 2007 5:03 PM
To: apozdnyakov@getty.com
Cc: 'mpurser@lukoilaf.com'; 'cbirch@lukoilaf.com'; Thomas Trojan; Robert Gulla;
NDensham@lukoilaf.com; Mike Lewis; Хорев Константин Павлович; 'Anton Mitrofanov (??. ?????)';
'vkhomyakov@g-group.ru'; 'ybitman@lukoilusa.com'
Subject: RE: Capital contribution to LAC, LUSA, GPMI

Dear Alex,

Please see attached the resolutions with my comments.

Kind regards,

Katharina

-----Original Message-----
From: Robert Gulla
Sent: Friday, August 24, 2007 9:26 PM
To: 'mpurser@lukoilaf.com'; 'cbirch@lukoilaf.com'; Thomas Trojan; Katharina Gotsmy
Subject: WG: Capital contribution to LAC, LUSA, GPMI

----- Originalnachricht -----
Von: Alex Pozdnyakov <apozdnyakov@getty.com>
An: Robert Gulla
Cc: Yelena Bitman <ybitman@lukoilusa.com>; Mike Lewis <mlewis@getty.com>; Khorev, Konstantin (E-mail) <khorevKP@lukoil.com>
Gesendet: Fri Aug 24 20:31:59 2007
Betreff: Capital contribution to LAC, LUSA, GPMI

Dear Robert:

Please find attached for your review, the unanimous written consents approving $821,000 capital contributions to LAC from LEHBV, and LAC's in turn contributions to LUSA and GPMI.  These

contributions are intended to restore capital expended for celebration of LUKOIL's 15th Anniversary in the USA and have been approved by Moscow.

They assume that the funds will flow to LAC out of an LIG account. Let me know if this is incorrect and I will redraft as necessary.

Please let me know if you have any questions or comments.

Thanks and kind regards,
Alex Pozdnyakov
Associate Counsel
Getty Petroleum Marketing Inc., a subsidiary of OAO LUKOIL
LUKOIL Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554
T: (516) 542-5059  F: (516) 832-8443 apozdnyakov@getty.com

## GETTY PETROLEUM MARKETING INC. ("Company")

ACTION BY UNANIMOUS WRITTEN CONSENT OF THE DIRECTORS OF THE COMPANY
MADE IN ACCORDANCE WITH THE COMPANY'S FOUNDATION DOCUMENTS AND SEC. 2-
408(C) OF MARYLAND GENERAL CORPORATION LAW

We, the undersigned, being all the Directors of the Company, consent to the adoption of the following
resolutions:

## CAPITAL CONTRIBUTION

WHEREAS, LUKOIL Americas Corporation ("LAC"), the Company's parent company and the sole
holder of the Company's stock, desires to make an additional contribution to capital surplus of the
Company ("Contribution").

WHEREAS, the directors of the Company have determined it to be in the best interests of the Company
to accept the Contribution from LAC.

NOW, THEREFORE, BE IT RESOLVED that the Contribution in the amount of US$ 700 000 to
be received from LAC without receiving any shares or any obligations of the Company in
exchange therefore on the effective date of this resolution be and is hereby approved and
accepted; and be it further

RESOLVED that the Company is authorized and directed to apply the Contribution to any proper
corporate purpose; and be it further

RESOLVED that the officers of the Company (or any of them) hereby are authorized in the name
and on behalf of the Company to take all actions as they shall determine to be necessary or
appropriate to carry out the intent and purposes of the foregoing resolutions and that all actions
heretofore taken consistent with the intent and purposes of the foregoing resolutions be, and are,
in all respects, hereby ratified, approved, confirmed and adopted.

FURTHER RESOLVED that the capital contribution will be transmitted directly from Lukoil
International Gmbh to the Company

---
Vadim Gluzman, DIRECTOR                   Date  _____

---
Andrey Bychenko, DIRECTOR                 Date  _____

---
Vincent DeLaurentis, DIRECTOR                    Date

Sem Logovinsky, DIRECTOR          Date

## LUKOIL AMERICAS CORPORATION ("Company")
### (a Delaware corporation)

ACTION BY UNANIMOUS WRITTEN CONSENT OF THE DIRECTORS OF THE COMPANY MADE IN ACCORDANCE WITH THE COMPANY'S FOUNDATION DOCUMENTS AND DELAWARE GENERAL CORPORATION LAW

We, the undersigned, being all the Directors of the Company, waive notice of meeting and consent to adoption of the following resolutions:

## CAPITAL CONTRIBUTION

WHEREAS, LUKOIL Europe Holdings B.V. ("LEHBV"), the Company's parent company and the sole holder of the Company's stock, desires to make an additional capital contribution to the Company.

WHEREAS, the directors of the Company have determined it to be in the best interests of the Company to accept the additional capital contribution from LEHBV.

NOW, THEREFORE, BE IT RESOLVED that the additional capital contribution in the amount of US$ 821,000.00 to be received from LEHBV without receiving any shares or any obligations of LUKOIL Americas Corporation in exchange therefore on the effective date of this resolution be and is hereby approved and accepted; and be it further

RESOLVED that, upon receipt of the above capital contribution from LEHBV, the Company make an additional capital contribution to capital surplus of its wholly-owned subsidiary, Getty Petroleum Marketing Inc., in the amount of US$ 700,000.00; and be it further

RESOLVED that, upon receipt of the above capital contribution from LEHBV, the Company make an additional capital contribution in the amount of US$ 121,000.00 to its wholly-owned subsidiary LUKOIL USA, Inc.; and be it further

RESOLVED that the capital contribution from LEHBV will be transmitted to ~~the Company~~ Getty Petroleum Marketing Inc. and LUKOIL USA, Inc. directly from LUKOIL ~~International~~ INTERNATIONAL GmbH, the parent company of LEHBV, and be deemed received and paid from LEHBV; and be it further

RESOLVED that the officers of the Company (or any one of them) hereby are authorized in the name and on behalf of the Company to take all actions as they shall determine to be necessary or appropriate to carry out the intent and purposes of the foregoing resolutions and that all actions heretofore taken consistent with the intent and purposes of the

LAC821000                                    1

foregoing resolutions be, and are, in all respects, hereby ratified, approved, confirmed and adopted.

_____          _____
Vadim Gluzman, DIRECTOR             Date


_____          _____
Alexander Matytsyn, DIRECTOR        Date


_____          _____
Vincent DeLaurentis, DIRECTOR       Date

LAC821000                      2

**LUKOIL USA, INC. ("Company")**
**(a Delaware corporation)**

ACTION BY UNANIMOUS WRITTEN CONSENT OF THE DIRECTORS OF THE COMPANY MADE IN ACCORDANCE WITH THE COMPANY'S FOUNDATION DOCUMENTS AND DELAWARE GENERAL CORPORATION LAW

We, the undersigned, being all the Directors of the Company, waive notice of meeting and consent to adoption of the following resolutions:

**CAPITAL CONTRIBUTION**

WHEREAS, LUKOIL Americas Corporation ("LAC"), the Company's parent company and the sole holder of the Company's stock, desires to make an additional capital contribution to the Company.

WHEREAS, the directors of the Company have determined it to be in the best interests of the Company to accept the additional capital contribution from LAC.

NOW, THEREFORE, BE IT RESOLVED that the additional capital contribution in the amount of US$ 121,000.00 to be received from LAC without receiving any shares or any obligations of the Company in exchange therefore on the effective date of this resolution be and is hereby approved and accepted; and be it further

RESOLVED, that the officers of the Company (or any one of them) hereby are authorized in the name and on behalf of the Company to take all actions as they shall determine to be necessary or appropriate to carry out the intent and purposes of the foregoing resolutions and that all actions heretofore taken consistent with the intent and purposes of the foregoing resolutions be, and are, in all respects, hereby ratified, approved, confirmed and adopted.

FURTHER RESOLVED that the capital contribution will be transmitted directly from LUKOIL INTERNATIONAL GmbH to the Company

Formatted: Font: Times New Roman, 11 pt

Formatted: Font: 11 pt

| | | |
|---|---|---|
| Vadim Gluzman, DIRECTOR | Date | _____ |
| Alexander Matytsyn, DIRECTOR | Date | _____ |
| Alexei Lambine, DIRECTOR | Date | _____ |

1

# EXHIBIT 11-b

| From: | Alex Pozdnyakov |
|---|---|
| To: | "Lori Adams" |
| Cc: | Jeanette Geyer; Mike Lewis; Yelena Bitman |
| Subject: | RE: Lukoil Cayman Trading, Ltd. |
| Date: | Wednesday, December 28, 2005 1:42:04 PM |
| Attachments: | Lukoil Cayman Trading.minutes.pdf |

Dear Lori

Please see attached in escrow for tomorrow's meeting, the minutes and liquidator's statement relating to LCT dissolution. If you find them to be in order, please request a dissolution certificate at your first convenience on Dec. 29. Let me know if there is anything further we can do. Thanks.

Kind regards,
Alex Pozdnyakov
Associate Counsel

Getty Petroleum Marketing Inc., a subsidiary of LUKOIL Oil Company
LUKOIL Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554
T: (516) 542-5059  F: (516) 832-8443 apozdnyakov@getty.com

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately, and delete the original message.

-----Original Message-----
**From:** Lori Adams [mailto:loria@Paget-Brown.com.ky]
**Sent:** Wednesday, December 28, 2005 9:51 AM
**To:** Alex Pozdnyakov
**Cc:** Jeanette Geyer; Mike Lewis; Yelena Bitman
**Subject:** RE: Lukoil Cayman Trading, Ltd.

Dear Alex,

Further to your email received on the 27th December regarding the Certificate of Dissolution, the date of the Final Meeting is set for the 29th December, as per your email below.

We would have to receive the signed copy of the Final Meeting and the Liquidator's Statement in order to advise the Registrar of Companies that the Company had been liquidated and request the Certificate of Dissolution. If we receive the signed Minutes on the 29th December, we can file the request with the Registrar of Companies on the same day but I cannot confirm to you what date the Registrar of Companies will date their Certificate of Dissolution.

I believe I sent drafts of the Final Meeting and Liquidator's Statement for your review but attach further copies below for ease of reference. I look forward to receipt of signed copies thereof at your earliest convenience:

<<Final Meeting.doc>> <<LiqStatement.doc>>
With kind regards

*Lori Adams*
**PAGET-BROWN TRUST COMPANY LTD.**
*P.O. Box 1111GT*
*Grand Cayman*
*Cayman Islands*
*B.W.I.*
*Tele:   (345) 949 5122*
*Fax:    (345) 949 7920*
*Email: loria@paget-brown.com.ky <mailto:loria@paget-brown.com.ky>*

-----Original Message-----
From: Alex Pozdnyakov [mailto:apozdnyakov@getty.com]
Sent: 16 November 2005 15:37
To: Lori Adams
Cc: Jeanette Geyer; Mike Lewis; Yelena Bitman
Subject: RE: Lukoil Cayman Trading, Ltd.

Thank you Lori. Could you please clear up the last paragraph: Dec. 31 is a Saturday – could we make it Dec. 28 or 29? Also, do I understand correctly that the filing deadline this Friday is the Gazette deadline we have been discussing?

We will put $4000 fee allowance in the liquidator's statement. Please send us a retainer-type bill for the amount or a similar instrument. Thanks.

Best regards,
Alex Pozdnyakov
Associate Counsel*
Getty Petroleum Marketing Inc., a subsidiary of LUKOIL Oil Company

T: 516 542-5059  F: 516 832-8443 Email: apozdnyakov@lukoilusa.com;
apozdnyakov@getty.com
Address: LUKOIL Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554
*admission in NY pending

NOTICE:  The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately, and delete the original message.

-----Original Message-----
From: Lori Adams [mailto:loria@Paget-Brown.com.ky]
Sent: Wednesday, November 16, 2005 3:02 PM
To: Jeanette Geyer
Cc: Alex Pozdnyakov; Mike Lewis
Subject: RE: Lukoil Cayman Trading, Ltd.

Dear Jeanette,
We cannot produce a final billing at this time as we charge on a timespent basis for all work done for the liquidation. As per the information on liquidations sent to you earlier, we estimate our time spent fees to be in the region of US$1,500 plus filing fees. Currently, there is an outstanding invoice in the amount of US$1,183.11 and work in progress of US$253.40. We would estimate that our final invoice would therefore not be in excess of US$4,000 (which would include disbursements). We would produce a final invoice more towards the time of the final meeting but we estimate that an allowance of US$4,000 to cover our fees would be sufficient.

We propose that the date of the final meeting would be the 31st December but as per my email below would need confirmation that you think this gives you sufficient time to meet the filing deadline of this Friday.

With kind regards
Lori Adams
PAGET-BROWN TRUST COMPANY LTD.
P.O. Box 1111GT
Grand Cayman
Cayman Islands
B.W.I.
Tele:   (345) 949 5122
Fax:    (345) 949 7920
Email: loria@paget-brown.com.ky <mailto:loria@paget-brown.com.ky>


-----Original Message-----
From:   Lori Adams
Sent:   Wednesday, November 16, 2005 2:27 PM
To:     'Jeanette Geyer'
Cc:     Alex Pozdnyakov; Mike Lewis
Subject:    RE: Lukoil Cayman Trading, Ltd.
Dear Jeanette,
The next available Gazette date is the 28th November. I will prepare amended Notices to be filed before the deadline of 18th November but will require you to advise me if one month from the 28th November will be sufficient for the date of the final meeting at which time the Liquidator's statement should be tabled. Can you let me know this before Friday please.

With kind regards
Lori Adams
PAGET-BROWN TRUST COMPANY LTD.
P.O. Box 1111GT
Grand Cayman
Cayman Islands
B.W.I.

Tele:   (345) 949 5122
Fax:    (345) 949 7920
Email: loria@paget-brown.com.ky <mailto:loria@paget-brown.com.ky>


-----Original Message-----
From: Jeanette Geyer [mailto:jgeyer@lukoilusa.com]
Sent: Friday, November 11, 2005 10:12 AM
To: Lori Adams
Cc: Alex Pozdnyakov; Mike Lewis
Subject: Lukoil Cayman Trading, Ltd.

Dear Lori,
    Attached find executed resolution regarding Voluntary Liquidation of Lukoil Cayman Trading, Ltd.  Could you please give us the closest available liquidation date, as well as your final invoice.  We need to accomplish this before the end of the year.  Thanks for your assistance.

 <<Lukoil Cayman Trading.Ltd. resolution.pdf>>
Jeanette Geyer
Senior Paralegal
Getty Petroleum Marketing Inc., a subsidiary of Lukoil Oil Company
Lukoil Plaza
1500 Hempstead Turnpike
East Meadow, New York  11554
Phone (516) 542-5057
Fax (516) 832-8443
email address:  jgeyer@getty.com


*********************************************

The information contained in this e-mail message, together with any attachments thereto, is intended only for the personal and confidential use of the addressee[s] named above.  The message and the attachments are or may be an attorney-client or other privileged or protected communication.  If you are not the intended recipient of this message, or authorized to receive it for the intended recipient, you have received this message in error. You are not to review, use, disseminate, distribute or copy this message, any attachments thereto, or their contents.  If you have received this message in error, please immediately notify us by return e-mail message, and delete the original message.  This notice is included in all e-mail messages leaving our firm.  Thank you for your cooperation.

*********************************************

<< File: Lukoil Cayman Trading.Ltd. resolution.pdf >>

# EXHIBIT 11-c

| From: | Alex Pozdnyakov |
| To: | "Olga.Klemenchukova@pasusa.com" |
| Cc: | Yelena Bitman |
| Subject: | RE: Cell phones |
| Date: | Monday, April 11, 2005 7:37:27 AM |

Thanks, Olga.

Could you send out an email to persons who have cell phones stating that in compliance with the decision of the president of OAO Lukoil Oil Company, Getty will not be providing mobile phone services to participants of the management exchange. As a result, the service on their lines has been suspended. Remind them that the phones are property of Getty. We will let them know shortly what to do about the phones.

Thanks.

Alex Pozdnyakov
Associate Counsel*
Getty Petroleum Marketing Inc., a subsidiary of LUKOIL Oil Company

T: 516 542-5059  F: 516 832-8443 Email: apozdnyakov@lukoilusa.com; apozdnyakov@getty.com
Address: LUKOIL Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554
*admission in NY pending

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately, and delete the original message.

-----Original Message-----
**From:** Olga.Klemenchukova@pasusa.com [mailto:Olga.Klemenchukova@pasusa.com]
**Sent:** Monday, April 11, 2005 10:36 AM
**To:** Alex Pozdnyakov
**Subject:** Re: Cell phones
**Importance:** High

Alex,
Per your request all 8 phones have been suspended from being used. We can restore the service in May. We are still responsible for monthly payments on those phones, but no one would be able to use them.

Kind regards,
Olga

# EXHIBIT 12

# EXHIBIT 12-a

1          Volume: 10, Pages 1863-2134

2

3          AMERICAN ARBITRATION ASSOCIATION

4

5          - - - - - - - - - - - - - - - - - -

6     GETTY PETROLEUM MARKETING, INC.,

7          Claimant,

8     V.           Case No. 50 198 T 00398 10

9     BIONOL CLEARFIELD LLC,

10          Respondent.

11    - - - - - - - - - - - - - - - - - -

12       Before:  J. Owen Todd

            David Evans

13          Suzanne Del Vecchio

14

15    Monday, April 11, 2011, 10:00 a.m.

16          McDermott, Will & Emery LLP

17          28 State Street

18          Boston, Massachusetts

19

20    ----Judith McGovern Williams, RPR, CRR, CLR, CSR----

21          K. L. GOOD & ASSOCIATES

22          Post Office Box 367

23          Swampscott, Massachusetts 01907

24          Tel. 781-367-0815  Fax 781-598-0815

EXHIBIT

JX510

Adv. Proc. No. 11-02941 (SCC)

GPMI/GettyPetroleum                                    Page  1863

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

1      Vince?

2   A.   It was not my decision.  My boss tells me what

3        to do, and I do that.

4   Q.   Who is your boss?

5   A.   The CEO.

6   Q.   Of?

7   A.   LUKOIL.

8   Q.   Is that Mr. Alekperov?

9   A.   That is correct.

10  Q.   Now at one point Mr. Manion asked you about

11       cost based.  You said more than once that cost

12       based is cost of raw materials.  Do you

13       remember that testimony?

14  A.   Yes.

15  Q.   Do you also remember that Judge Todd asked you

16       what you understood cost based to be?  Do you

17       remember he asked you this morning?

18  A.   Yes.

19  Q.   And you said in addition to the cost of raw

20       materials you said return on equity and paying

21       debt?  That's what you said to Judge Todd;

22       right?

23  A.   Right.

24  Q.   So you understood that, too?

GPMI/GettyPetroleum                                    Page  1937

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0510-0075
LAC 005363

1          ARBITRATOR TODD:  Now are you saying

2     that when you are talking in that framework

3     that Bionol and Getty Petroleum Marketing were

4     partners?

5          THE WITNESS:  That's the way Vince

6     presented it to me.

7          ARBITRATOR TODD:  Partners in what?

8          THE WITNESS:  Partners in the

9     project.

10         ARBITRATOR TODD:  Partners in the

11    Clearfield, Pennsylvania plant?

12         THE WITNESS:  Correct.

13         ARBITRATOR TODD:  All right.

14         THE WITNESS:  The state, the State of

15    Pennsylvania, Bionol Clearfield, and Getty

16    would be partners, because it is a joint

17    project.

18         ARBITRATOR TODD:  And yet you didn't

19    -- Getty didn't invest any money into this

20    partnership, did it?

21         THE WITNESS:  No.

22         ARBITRATOR TODD:  And Getty didn't

23    pay any part of building the plant, did it?

24         THE WITNESS:  No.

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0510-0157
LAC 005445

1          ARBITRATOR TODD:  And was there any

2     kind of an agreement that if Getty -- if

3     Bionol lost any money on this plant, Getty

4     would participate in those losses?

5          THE WITNESS:  I -- I -- I don't think

6     so.

7          ARBITRATOR TODD:  And if Getty lost

8     money in the operation of its stations, was

9     Bionol supposed to participate in those

10    losses?

11         THE WITNESS:  No.

12         ARBITRATOR TODD:  Is there any

13    agreement of partnership between Bionol and

14    Getty?

15         THE WITNESS:  It -- your Honor, it

16    was introduced when Vince -- when Vince

17    brought to it me the first -- the first time,

18    he wrote me a big letter.  It is somewhere.

19    It says, Dima we have got this great partner

20    that we are going to team up with.

21    Governor Rendell is with us.  We are going to

22    do just great project.

23         ARBITRATOR TODD:  I am really not

24    involved in whether or what Mr. de Laurentis

JX0510-0158
LAC 005446

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

1     they are going to exit worldwide, I remember

2     that I told my CEO, my boss, I said, "If Exxon

3     Mobil cannot deal with it, nobody can."

4          We have to get out of it as fast as

5     we can.  So we tried to sell it from day one.

6     We couldn't sell because Getty was very highly

7     debt burdened.  That is why LUKOIL -- the best

8     advice we had from Houlihan Lokey, who is one

9     of the biggest investment banks, you have to

10    recapitalize the company, because you will

11    never be able to sell it.

12         ARBITRATOR TODD:  In any event, you

13    and somebody from Cambridge Holdings got

14    together in 2010 at some point?

15         THE WITNESS:  Yes.  Yes.  Because the

16    company already was recapitalized.

17         ARBITRATOR TODD:  Yes.

18         THE WITNESS:  The company was better

19    by it.

20         ARBITRATOR TODD:  Then at some point

21    thereafter this initial meeting between you

22    and somebody from Cambridge Holdings,

23    negotiations started?

24         THE WITNESS:  Yes.

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0510-0169
LAC 005457

1       the Governor.  That is how it looked.  It --

2       it --

3           ARBITRATOR TODD:  I don't want to

4       argue with you, but there is no agreement of

5       sharing profits or losses?

6           THE WITNESS:  No.  There is no

7       agreement sharing profits or losses.  But the

8       Governor for the State of Pennsylvania granted

9       a lot of money for this.  Some agreements are

10      made on a handshake if you trust the party.  I

11      personally made an agreement with one of the

12      largest U. S. oil companies.  We had the deal.

13      We didn't have it signed, and we shook hands

14      and worked it for 10 days with no written

15      agreement.

16          ARBITRATOR TODD:  I understand.

17          THE WITNESS:  When you see the guy

18      and he is so impressive and he looks so good,

19      you don't really go -- when I took

20      Governor Rendell to the airport, I asked him.

21      I said -- because he apologized to me.  He

22      said, "Dima, I want to apologize to you.

23      Please pass my apology to" --

24          ARBITRATOR TODD:  Taking the risk of

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0510-0162
LAC 005450

1       C E R T I F I C A T E

2

3       I, Judith McGovern Williams, Notary Public and

4       Registered Professional Reporter in and for the

5       Commonwealth of Massachusetts, do hereby certify:

6       That the proceedings hereinbefore set forth on

7       pages 1863 through 2134, inclusive, were recorded

8       by me stenographically and transcribed by me; and

9       that such transcript is a true record of the

10      proceedings to the best of my knowledge, skill and

11      ability.

12          IN WITNESS WHEREOF, I hereunto set my hand

13      this 12th day of April, 2011.

14

15      _____

        Judith McGovern Williams

16      Registered Professional Reporter

        Certified Realtime Reporter

17      Certified LiveNote Reporter

        Certified Shorthand Reporter No. 130993

18

19

20      My commission expires:

        May 5, 2017

21

22

23

24

CONFIDENTIAL (per 2004 MDL 1358 Order) - FOR OUTSIDE COUNSEL ONLY

JX0510-0272
LAC 005560

# EXHIBIT 12-b

                                                          Page 1

1     UNITED STATES BANKRUPTCY COURT

2     SOUTHERN DISTRICT OF NEW YORK

3     Case No. 11-15606-scc

4     - - - - - - - - - - - - - - - - - - - - - - - - - x

5     In the Matter of:

6     GETTY PETROLEUM MARKETING, INC. AND LIQUIDATING TRUSTEE,

7                     Debtors.

8     - - - - - - - - - - - - - - - - - - - - - - - - - x

9     Adversary No.: 11-02941-scc

10    In the Matter of:

11    GETTY PETROLEUM MARKETING, INC., ET AL.,

12                     Plaintiffs,

13    v.

14    LUKOIL AMERICAS CORPORATION, ET AL.,

15                     Defendants.

16    - - - - - - - - - - - - - - - - - - - - - - - - - x

17                    United States Bankruptcy Court

18                    One Bowling Green

19                    New York, New York

20

21                    June 6, 2013

22                    2:06 p.m.

23    B E F O R E :

24    HON SHELLEY C. CHAPMAN

25    U.S. BANKRUPTCY JUDGE

Page 32

1    projecting under -- at various points in time.

2            And you can see that the first column shows 2009

3    was the actual -- it was a $57 million loss for the full

4    year.  Then the plans for 2010, whether you use Plan B, C, D

5    or E, ranged from a low of 54,992,000 to a high of

6    79,442,000.  This also shows the actual for 2010 which was

7    68,862,000.  So the -- it's interesting to note that the

8    actuals were within the range of the projections.

9    Q    Okay.  Let's take a look at slide 14.  And what else --

10   A    You're going back to the capital adequacy.  I think

11   you're in the cash flow test.

12   Q    Oh, I'm sorry.  Let's back up, then.  Let's go back to

13   slide 12.  What else did you look at to determine the --

14   GPMI's solvency under the capital adequacy test?

15   A    Okay.  So in addition to the projected cash losses, we

16   also looked at the cash balance because that helped, you

17   know, funding capital.  And there are two nice points here.

18   One is the project -- the company projected a negative

19   capital -- a negative cash balance in June of about $5.6

20   million.  It then also projected a negative cash balance by

21   the end of 2010 of over $47 million.

22           And the company really didn't have any third party

23   sources of capital.  There was a heavy dependency on LUKOIL.

24   In fact, many of the reports that were filed monthly -- we

25   call them the MDNA's, managing discussion analysis -- always

Page 33

1    had a paragraph that talked about a going concern and the

2    dependency on LUKOIL and what would happen if they stopped

3    funding us.  And it's no guarantee that they're going to

4    continue to fund our operations.  This went on for quite

5    some period of time.

6           And then, finally, there was a -- KPMG required

7    the parent company to provide a support letter, to provide

8    it an unqualified opinion when it was conducting its audit

9    because it couldn't -- it was suggesting that it could not

10   operate on its own as a -- in a qualified way.

11   Q    Okay.  And as a result of your analysis under the

12   capital adequacy test, did you come to a conclusion as to

13   whether or not GPMI was insolvent as of the transfer date?

14   A    Yes.  Under the capital adequacy test I determined -- I

15   concluded that GPMI was insolvent.

16   Q    I get my bankruptcy tutorials from Mr. Goldman every

17   once in a while, so --

18        (Laughter)

19   Q    And did you come to a determination as to whether or

20   not as a result of the asset transfer, GPMI was insolvent?

21   A    Yes.  I determined that GPMI was insolvent under the

22   capital adequacy test.

23   Q    Okay.  And do you hold that opinion to a reasonable

24   degree of certainty?

25   A    I do.

Page 35

1   deterioration of the cash position that --

2   Q     And --

3   A     -- was projected by --

4   Q     -- can you describe --

5   A     -- GPMI.

6   Q     Can you describe what this slide depicts, please?

7   A     Sure.  So at the end of 2009 there was a positive cash

8   balance of about $23 million, but at -- you can see as the

9   year -- each quarter moves on through the year, it continues

10  to -- the losses or the negative cash position I should say,

11  not the loss, the negative cash position continues to grow.

12  So it goes from $5.6 million at the end of the second

13  quarter or in June of 2010.  It increases to $26 million,

14  and then finally by the end of the year there's the 46.6

15  million or 47 rounded up.

16  Q     And as a result of your analysis under the cash flow

17  test did you come to a conclusion as to whether or not GPMI

18  was rendered insolvent after the November 2009 asset

19  transfer?

20  A     Yes.  Under the cash flow test it's my conclusion that

21  GPMI was insolvent.

22  Q     And do you hold that opinion to a reasonable degree of

23  certainty as well?

24  A     Yes, I do.

25          MR. BONGIORNO:  May I just have one moment, Your

# EXHIBIT 12-c

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 11-15606-SCC

4   Adv. Case No. 11-02941-SCC

5   - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   GETTY PETROLEUM MARKETING, INC.

9   AND LIQUIDATING TRUSTEE,

10

11         Debtors.

12   - - - - - - - - - - - - - - - - - - - - - - - - - x

13   GETTY PETROLEUM MARKETING, INC.,

14   et al.,

15              Plaintiffs,

16         v.

17   LUKOIL Americas Corporation,

18   et al.,

19              Defendants.

20   - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22         U.S. Bankruptcy Court

23         One Bowling Green

24         New York, New York

25

Page 154

1    physical assets to another entity that would effectively

2    strip the remaining company of any ability to pay.  They

3    actually walked us through how they were going to do it.

4              From there obviously we got quite concerned, had

5    an internal conversation that led me to fly to Moscow over

6    night, meet with Valorey Sabuton (ph).  I meet with Valorey

7    with one of my board members and one of our investors.  We

8    had approximately an hour to an hour 15 minute meeting.  At

9    that meeting we were assured again that the contract was to

10   be assigned and that that contract was going to be with good

11   assets, and got an email back saying from Balerio (ph), and

12   I don't remember exactly what it said.

13             And then from there a series of conversations

14   ensued, and from which obviously LUKOIL had then decided to

15   make a change, which reported back to me that the chairman

16   of Rachete Alapara (ph) indicated to the chairperson of

17   ITERA that he was going to bankrupt Getty.

18   Q    Mr. Gatto, I didn't want to interrupt your answer and I

19   certainly do want to get back to this 2006/2007 time frame.

20   But just to follow up on this briefly.

21   A    Uh-huh.

22   Q    The meeting that you just described when you -- when

23   you learned these things, when exactly was it?

24   A    I don't recall.

25   Q    Do you recall what year it was?

# EXHIBIT 13

# EXHIBIT 13-a

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("Agreement") dated as of the 13th day of November 2009 (the "Effective Date"), is by and between Getty Petroleum Marketing Inc., a Maryland corporation ("Seller"), and LUKOIL North America LLC, a Delaware limited liability company ("Buyer").

# RECITALS

WHEREAS, Seller is the parent of Buyer; and

WHEREAS, Seller is primarily engaged in the business (the "Business") of, among other things, the distribution, supply and marketing of branded motor fuels to retail motor fuel service stations; and

WHEREAS, in connection with the Business, Seller is the owner of certain fee properties, leasehold interests and certain improvements and equipment that Seller desires to sell and is also a party to certain contracts that Seller desires to assign, and Buyer desires to purchase or take an assignment thereof; and

WHEREAS, in respect of such fee properties and leasehold interests, certain of such fee properties and leasehold interests (each hereinafter a "Purchased Premises") relate to branded retail motor fuel facilities located in various states within the United States, of which:

1.  Seller owns either the fee or leasehold interest in certain of the retail motor fuel facilities ("PMPA Lessee Dealer Premises") and such retail motor fuel facilities are operated by independent dealers ("PMPA Lessee Dealers") pursuant to PMPA Franchise Agreements (defined below);

2.  Seller owns either the fee or leasehold interest in certain of the retail motor fuel facilities ("Contract Operator Premises") and such retail motor fuel facilities are operated by contract operators (the "Contract Operators"), pursuant to contractor agreements and related and ancillary agreements, supplements, addenda, as may be amended (the "Contract Operator Agreements");

3.  Seller owns either the fee or leasehold interest in certain of the retail motor fuel facilities ("Commission Lessee Premises") and such retail motor fuel facilities are operated by commission lessee dealers (the "Commission Lessees"), each pursuant to lease and commission supply contracts, and related and ancillary agreements, supplements, addenda, as may be amended (the "Commission Lessee Agreements");

4.  Seller owns either the fee or leasehold interest in certain of the Purchased Premises (the "Non-Operated Premises"), which are currently not in operation; and

WHEREAS, Seller does not own either the fee or leasehold interest of thirty-seven (37) retail motor fuel facilities located in New Jersey (the "Reseller Premises"), which Reseller Premises are owned and operated by independent dealers pursuant to a PMPA Franchise Agreements (Reseller) (the "PMPA Reseller Dealers") and are directly supplied by Seller, of which nine (9) were sold by Seller to the certain independent dealers (or an Affiliate of such

NY1 446695v3 11/13/09

CONFIDENTIAL

**EXHIBIT**

**JX4**

Adv. Proc. No. 11-02941 (SCC)

AG0006589

JX0004-0001
LAC 002020

thereof by AEGON; or (ii) pay any prepayment premium arising in connection with the satisfaction of the AEGON Mortgage. LAHQ shall promptly request AEGON's consent to modify the AEGON Mortgage so as to permit Buyer to assume the obligations of LAHQ thereunder and under the AEGON Promissory Note and, upon receipt of AEGON's consent, Buyer shall be deemed to have irrevocably committed to purchase, and LAHQ shall be deemed to have irrevocably committed to sell, transfer and convey to Buyer, the Headquarters upon and subject to the terms described in this Section 2.5.

ARTICLE 3.
PURCHASE PRICE

3.1   Purchase Price for Assets Including Inventory.   In consideration of the sale of the Assets by Seller in accordance with the terms and conditions of this Agreement, Buyer shall at Closing pay to Seller, in accordance with Section 3.2, the sum of **One Hundred Twenty Million Seven Hundred Thirty-Five Thousand ($120,735,000.00) Dollars** (the "Purchase Price"), plus or minus any adjustments or prorations, as hereinafter provided. In addition, Buyer and Seller shall be responsible for the payment of taxes, costs and such other fees, as provided in Section 6.5, Section 10.2 and Section 10.3 of this Agreement.

3.2   Delivery of Purchase Price.   The Purchase Price, plus or minus any adjustments made as of the Closing Date, shall be paid in U.S. Dollars, by wire or account transfer of immediately available funds to a bank account designated by Seller in writing.

3.3   Refined Petroleum Products Inventory Count.   The Purchase Price includes the aggregate value Refined Petroleum Products Inventory present at each of the Contract Operator Premises and the Commission Dealer Premises as of the last Business Day immediately prior to the Closing Date, the aggregate value of which is **Eight Million Six Hundred Eighty-Four Thousand ($8,684,000.00) Dollars.** On the Closing Date for each Contract Operator Premises and Commission Dealer Premises, Seller and Buyer shall conduct a physical inventory of the Refined Petroleum Products Inventory present at each of the Contract Operator Premises and the Commission Dealer Premises and shall prepare an inventory statement for each of the Contract Operator Premises and Commission Dealer Premises setting forth the amount of the Refined Petroleum Products Inventory on the Closing Date. The inventory statement shall also reflect the corresponding value for the Refined Petroleum Products Inventory. The difference, if any, between the aggregate value as reflected in the Inventory Statement, less the aggregate value of Refined Petroleum Products Inventory included in the Purchase Price shall be paid to Seller by Buyer or refunded to Buyer by Seller, as the case may be, as an adjustment to the Purchase Price pursuant to Section 6.7.

3.4   Purchase Price Allocation.   The parties agree that the Purchase Price was determined and agreed on the basis of the entirety of the Assets being purchased and the entirety of the Assumed Liabilities being assumed, and not on an individual asset or liability basis. For the purposes of Section 1060 of the Code, however, the Purchase Price has been allocated amongst the Assets by reference to a particular Asset's classification, all as set forth on **Schedule 3.4** of the Disclosure Schedule. The asset classifications used to prepare **Schedule 3.4** of the Disclosure Schedule shall be land, buildings, equipment, and contract rights. The values of the Assets set forth in **Schedule 3.4** of the Disclosure Schedule are also the agreed values of the Assets for all purposes, including title insurance, the closing statements and payment of any

CONFIDENTIAL

AG0006595

JX0004-0007
LAC.002026

Material Title Objections to the reasonable satisfaction of Buyer or reach an agreement with Buyer as to the resolution of the Material Title Objections, at Seller's sole cost and expense, and Seller shall indemnify Buyer pursuant to Section 12.1. If Seller is unable to sell, convey and transfer a Purchased Premises due to a Material Title Objection, such Purchased Premises shall be added to Exhibit A to the Interim Lease (defined below) at Closing.

4.4     Condemnation.   If a proceeding is pending or threatened by a Governmental Entity for the public taking (a "Taking") of all or any portion of a Purchased Premises or the impairment of access to, or other interference with any Purchased Premises, then, at Closing, Seller shall assign to Buyer all of Seller's rights in and to the litigation and compensation in connection with such Taking. Schedule 4.4 of the Disclosure Schedule sets forth the list of Purchased Premises for which a Taking is pending or threatened ("Condemnation Litigation"), which shall Seller shall assign to Buyer at Closing Seller's rights in and to the litigation and compensation in connection with such Taking.

4.5     Casualty Loss.   If, prior to the Closing Date, there is a substantial loss or damage to any Purchased Premises by fire or other casualty which precludes (as of the date of such casualty) the continued operation of such Purchased Premises as a retail motor fuel facility, Seller shall assign to Buyer at the Closing Seller's interest, if any, in any insurance proceeds and shall deliver to Buyer any such proceeds actually paid, up to the total value of such Purchased Premises set forth in Schedule 3.4.

4.6     City Certification Statement.   For each property located in the City of Philadelphia, the Parties agree that a statement issued by the Department of Licenses and Inspections of the City of Philadelphia (each a "City Certification Statement") certifying that the zoning classification of such property under the Zoning Code of the City of Philadelphia is as set forth on Schedule 8.1(i), that the use of the Premises as a motor fuel facility is or is not in compliance with the provisions of the Zoning Code of the City of Philadelphia and whether there exists any notice of any uncorrected violation of the housing, building, safety or fire ordinances is required to be delivered by Seller on or prior to the Closing Date. Seller shall pay for any certificate required in connection with such City Certification Statement. Any violations noted in the City Certification Statement shall not be deemed (i) a Loss or a Claim covered by the either Section 12.1 or Section 13.1; or (ii) a title exception or other ground for objection to title by Buyer. Buyer agrees to purchase the Purchased Premises subject to any matters noted or issued in such City Certification Statement, including any violations noted in the City Certification Statement, perform or cause to be performed, correct and cure, or cause to be corrected and cured, any violation of the housing, building, safety or fire ordinances or other applicable Laws identified in any City Certification Statement, and pay or cause to be paid any fines or other costs arising therefrom.

4.7     Permits.   Seller shall cooperate with Buyer, at Buyer's expense, in executing all documents required in connection with Buyer's obtaining any Permits desired by Buyer.

## ARTICLE 5.
## ENVIRONMENTAL MATTERS

5.1     Baseline Report; Environmental Assessments.   Schedule 5.1 of the Disclosure Schedule identifies written agreement(s) with a Governmental Entity or other order from a

CONFIDENTIAL

AG0006597

JX0004-0009
LAC 002028

Governmental Entity directing Seller to perform Remediation at the Purchased Premises and certain environmental site assessments, groundwater, soil sampling and other environmental information for the Purchased Premises, including tank tightness testing of the UST Systems (the "Environmental Reports") that Seller has delivered to Buyer. Seller and Buyer agree that no provision of this Agreement or any Environmental Report shall be construed to be an admission of liability, wrongdoing or violation of the law by Seller or its predecessors, successors or assigns. The Environmental Reports shall constitute the Baseline Report for each of the Purchased Premises.

5.2     Control and Completion of Activities Regarding Covered Contamination. Subject to the terms, conditions and limitations set forth in this Agreement, and expressly excluding the Conoco Phillips Obligations to be assumed by Buyer at the Closing, Seller agrees to perform Remediation of Covered Contamination to the extent required by DEP to attain one or a combination of the non-residential remediation standards in accordance with all Environmental Laws until the Remediation Completion Date (as defined below). Subject to Article 15, Seller's obligation with respect to any Covered Contamination and any Losses related to the Environmental Condition or Release which is the subject of the Covered Contamination, shall terminate ("Remediation Completion Date"), upon the earliest to occur ("Closure") of:

(a)     the receipt of written notice or other written evidence from DEP or other Governmental Entity overseeing such Remediation that either:

(i)     state-specific regulatory closure has been granted;

(ii)     no further Remediation of Covered Contamination (or words of similar effect) is required; or

(iii)     that the approved plan for Remediation of Covered Contamination has been completed and the applicable Environmental Laws with respect to such Covered Contamination has have been met.

(iv)     approving the final report submitted by the Seller demonstrating attainment of one or a combination of the non-residential remediation standards;

(b)     the date of the report submitted to DEP or other Governmental Entity overseeing such Remediation and prepared by Seller's environmental consultant certifying that the Remediation has been completed in satisfaction of all applicable Environmental Laws; or

(c)     if Seller does not obtain Closure from DEP or other Governmental Entity overseeing such Remediation after requesting in writing that DEP or other Governmental Entity overseeing such Remediation approve Closure with respect to the Covered Contamination, twelve (12) months after the date Seller has submitted such request in writing to DEP or such other Governmental Entity overseeing such Remediation.

5.3     Buyer's Responsibilities in Respect of Covered Contamination. During the course of Remediation of Covered Contamination related to the Purchased Premises, Buyer hereby agrees, upon twenty-four (24) hours notice, to permit Seller to conduct audits of the Purchased Premises and equipment thereon to be assured of the integrity of the distribution and storage systems at the Purchased Premises. Buyer will procure access for Seller of all portions

CONFIDENTIAL

AG0006598

JX0004-0010
LAC 002029

of the facility and equipment related to the investigation of potential sources of Environmental Conditions or Releases and all petroleum inventory and maintenance records that are required to be maintained at the Purchased Premises under Environmental Law and to all tank tightness testing of UST Systems (including functional testing of the vapor recovery (State II) systems and monitoring systems), hydrostatic testing of the containment devices, monitoring certifications and facility inspections). During the period Seller is conducting Remediation of Covered Contamination at a particular Purchased Premises, Buyer shall promptly provide to Seller copies of any notices of violation, correspondence, environmental reports or other documents that (i) allege a violation of Environmental Law; (ii) relate to an Environmental Condition or Release at such Purchased Premises; (iii) require Remediation to be performed by Buyer at such Purchased Premises. In the event of an actual or suspected Environmental Condition or Release that is not Covered Contamination, upon fifteen (15) days prior notice by Seller, Buyer will conduct, at Buyer's sole cost and expense, such testing, audits, inspections or certifications of any component of the UST Systems as Seller deems reasonably necessary to evaluate whether such UST Systems are functioning in accordance with Environmental Laws. The results or reports of any testing, audits and inspections and copies of any certifications shall be provided within fifteen (15) days of the date of Buyer's receipt thereof.

5.4   Remediation  Activities  Arising  From  New  Contamination  and  Under ConocoPhillips Obligations.

(a)      Buyer shall perform Remediation of any New Contamination occurring at a Purchased Premises and, to the extent comprising the ConocoPhillips Obligations, shall assume responsibility of Seller for any and all Remediation Activities (as defined in the ConocoPhillips Agreement) and, to the extent required under Environmental Law, Buyer shall report all New Contamination to the applicable Governmental Entity and provide appropriate notification thereof to property owners. Until the Remediation Completion Date, Buyer shall provide Seller with prompt written notice of any New Contamination discovered by Buyer and submit to Seller all documentation relating to such New Contamination, including correspondence, description of the release or loss, operating records, tests and inventory records. In connection with any New Contamination, Buyer, at Buyer's expense, shall cause a reputable environmental consultant to conduct a reasonable level of environmental testing related to such New Contamination as reasonably requested by Seller and provide the results thereof to Seller.

(b)      If an Environmental Condition or Release is discovered by Buyer or Seller on a Purchased Premises undergoing Remediation to address Covered Contamination after the Closing Date, the Party discovering such Environmental Condition or Release shall immediately notify the other Party.   If an Environmental Condition or Release is discovered, such Environmental Condition or Release shall, subject to Section 5.4(c), be presumed to be New Contamination and Buyer shall act promptly to minimize the effects of such New Contamination after becoming aware of same.

(c)      If an Environmental Condition or Release is discovered by Seller at any of the Purchased Premises, Buyer shall bear the burden of proof to establish, by a preponderance of the evidence that such Environmental Condition or Release is not New Contamination or related to the ConocoPhillips Obligations, but rather solely Covered Contamination.   If an Environmental Condition or Release is not New Contamination or related to the ConocoPhillips Obligations, but solely Covered Contamination, provided that Seller's Remediation and

CONFIDENTIAL

AG0006599

JX0004-0011
LAC 002030

indemnification obligations have not terminated pursuant to this Agreement, Seller shall conduct Remediation of such Covered Contamination in accordance with the provisions of Section 5.2. Seller shall reimburse Buyer for the costs incurred by Buyer to minimize the effects of an Environmental Conditions that are determined to be Covered Contamination, provided that Seller's Remediation and indemnification obligations have not terminated pursuant to this Agreement.

(d)     Until the Remediation Completion Date for each particular Purchased Premises, Buyer shall promptly provide to Seller copies of any notices of violation, correspondence, environmental reports or other documents that (i) allege a violation of Environmental Law; (ii) relate to a Release or suspected Release at the Purchased Premises or an Environmental Condition associated with the Purchased Premises; and (iii) any Remediation to be performed by Buyer at the Property.

5.5     Environmental Responsibility for Commingled Contamination.

(a)     If both Seller and Buyer are performing Remediation at a Purchased Premises as required by this Agreement (such Remediation hereinafter referred to as "Commingled Remediation"), Buyer and Seller will attempt to determine and, if necessary, hire, at expense to be shared equally, an independent environmental consultant mutually acceptable to Buyer and Seller, to assess and determine a cost allocation of Remediation to the Parties based upon the respective responsibilities of the Parties hereunder and the evidence presented. This assessment shall include a review of the Remediation that had been done to date and the remaining cost to complete the Remediation, taking into account the cost of Remediation or other additional work that will be required due to New Contamination occurring after the Closing Date. Buyer and Seller shall each pay the fractional cost percentage of all further Commingled Remediation performed at the Purchased Premises, as determined by the Parties based upon the assessment.

5.6     Environmental Responsibility for Environmental Contamination under Conoco Phillips Agreement. At the Closing, Buyer shall undertake the performance, on behalf of Seller of all ConocoPhillips Obligations, only with respect to those certain Purchased Premises identified in Schedule S.1. Buyer covenants and agrees to perform all of the obligations of Seller under and pursuant to the Conoco Phillips Agreement from and after the Closing Date, subject to any allocation between Seller and Buyer for Commingled Remediation pursuant to Section 5.5. The Buyer acknowledges and agrees that the Purchase Price has been specifically negotiated and adjusted to take into account the assumption by Buyer of all responsibilities, obligations and liabilities (including Remediation obligations) of Seller in respect of the Conoco Phillips Agreement, including Environmental Remediation (as defined in the ConocoPhillips Agreement) at any of the Purchased Premises identified in Schedule 5.1. Buyer and Seller shall each promptly deliver all notices and other communications received by ConocoPhillips relating to the ConocoPhillips Agreement or any Governmental Entity relating to the ConocoPhillips Obligations.

5.7     Notice; Access; Cooperation.

(a)     Buyer shall cooperate with Seller's activities in respect of any Remediation which is being conducted or controlled by Seller pursuant to this Article 5 including

CONFIDENTIAL

AG0006600

JX0004-0012
LAC 002031

and validly authorized by all requisite action on the part of Buyer. This Agreement constitutes a legal, valid and binding agreement of Buyer enforceable against Buyer in accordance with its terms, except to the extent that enforcement hereof may be limited by: (a) bankruptcy, reorganization, moratorium, fraudulent conveyance or similar laws now or hereafter in effect relating to creditors' rights generally; and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

9.3   Consents.  To Buyer's knowledge, no consent, approval or authorization of any Person, nor any declaration, filing or registration with any Governmental Entity is required to be made or obtained by Buyer in connection with the execution, delivery and performance by Buyer of this Agreement and the transactions contemplated thereby, except for those consents which if not obtained would not prevent the consummation of the transactions contemplated by this Agreement.

9.4   Non-Contravention.  The execution, delivery or performance of this Agreement or any of the other agreements or instruments contemplated hereby will not (a) violate or conflict with any applicable Law to which Buyer is subject or by which any of its assets and properties may be bound or affected; (b) conflict with or result in the violation of any provision of the organizational documents of Buyer; or (c) conflict with or result in the violation of any agreement or contract to which Buyer is a party, other than in the case of clauses (a) and (c), any such conflicts or violations which, in the aggregate, would not prevent or materially delay the consummation of the transactions contemplated by this Agreement, or prevent Buyer from performing in all material respects its obligations under this Agreement.

9.5   Broker Involvement.  Buyer has not hired, retained or dealt with any broker or finder in connection with the transactions contemplated by this Agreement.

9.6   Environmental Due Diligence.  Buyer acknowledges that Seller makes no representation or warranty as to the accuracy of the Environmental Reports, Environmental Assessment Surveys, reports relating to tank tightness testing and that other environmental assessments, reviews and studies may have been performed concerning the Purchased Premises and may be available from Governmental Entities. Buyer acknowledges that Buyer has reviewed the Environmental Reports, Environmental Assessment Surveys, reports relating to tank tightness testing provided to it by Seller.

9.7   UST Systems.  Buyer acknowledges that, except as expressly set forth in this Agreement, Seller makes (a) no representation or warranty, express or implied, that the UST System and other equipment are free of oil, nonmerchantable petroleum residue, water or hazardous substance; or (b) no representation or warranty, express or implied, with reference to the present condition or state of repair or merchantability or fitness for a particular purpose or suitability for Buyer's intended use (or for any use whatsoever) of the UST Systems. Buyer understands and acknowledges that (a) any UST System may have or develop certain deficiencies, related but not limited to, the UST's reliability factor; the UST's wall strength; and the UST's striker plate, if any, such that this may result in the UST's buckling, creeping, deflecting, cracking, breaking, or failing and resulting in UST or line leaks; (b) if any UST was manufactured during or prior to 1986, such UST may not be compatible with certain types of fuel, fuel additives or chemicals, including, but not limited to, ethanol or MTBE; and (c) fiberglass underground storage tanks installed prior to 1981 have not been warranted by the manufacturer against

AG0006612

JX0004-0024
LAC 002043

IN WITNESS WHEREOF, the Parties have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GETTY PETROLEUM MARKETING, INC.

By: _~~~~~~~_____
Name: _Vincent J. DeLaurentis_
Title: _President & Chief Operating Officer_

BUYER:

LUKOIL NORTH AMERICA LLC

By: _~~~~~~~_____
Name: _Vincent J. DeLaurentis_
Title: _President & Chief Operating Officer_

**LUKOIL AMERICAS HEADQUARTERS LLC** hereby joins in this Agreement for the sole and express purpose stated in Section 2.5 and Schedule 2.5 and agrees to be bound by the terms thereof for the benefit of the Buyer:

LUKOIL AMERICAS HEADQUARTERS LLC

By: _~~~~~~~_____
Name: _Vincent J. DeLaurentis_
Title: _President & Chief Operating Officer_

[Signature Page to Purchase and Sale Agreement]

CONFIDENTIAL

AG0006625

JX0004-0037
LAC 002056

# EXHIBIT 13-b

## SERVICES AGREEMENT

AGREEMENT, dated as of November 16, 2009 by and between GETTY PETROLEUM MARKETING INC., a Maryland corporation ("Marketing") and LUKOIL NORTH AMERICA LLC, a Delaware limited liability company ("LNA").

## SUMMARY

Pursuant to the [Purchase and Sale Agreement], [Interim Sublease], [Trademark Sublicense Agreement], Assignment and Assumption Agreement, and the Bill of Sale, each dated as of November 16, 2009 (the "Transaction Agreements") between Marketing and LNA, Marketing is on the date hereof selling and subleasing, as the case may be, to LNA certain real properties in New York, New Jersey and Pennsylvania, assigning to LNA certain marketing agreements and transferring certain personal property, granting certain rights to use trademarks (collectively, "Assets"), all being primarily related to operation gasoline filling stations and related businesses at the Assets.  In order to facilitate the transition of responsibilities and management of the Assets to LNA, Marketing is willing to provide certain backoffice services to LNA during the transition and LNA is willing to accept and pay for such services.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants hereinafter set forth, and intending to be legally bound hereby, the parties agree as follows:

1. MARKETING SERVICES.  Marketing agrees, as agent for LNA, to utilize its employees and assets to provide certain services consistent with the type, quality and level of such services required by LNA and provided by Marketing to its operations in New York, New Jersey and Pennsylvania immediately prior to the date hereof, in connection therewith.  The services to be provided are set forth below.  Details of services to be provided in each category are set out more specifically in Attachment A which is hereby incorporated into this Agreement.  Marketing and LNA may amend the details of services to be provided from time to time by amending Attachment A by mutual agreement.

## SERVICES

*Operational*
General management and supervision
Retail marketing management
Wholesale marketing management
Transportation and terminals management
Engineering and environmental safety services
Product supply management
Fleet fueling management
Operations administration
Franchise support

*Financial*
Data processing/ computer technical support
Retail and wholesale accounting
Credit Card Processing
Accounts Payable
Accounts Receivable
Inventory
Cash Management
Treasury

CONFIDENTIAL

EXHIBIT
JX6
Adv. Proc. No. 11-02941 (SCC)

AG0007750

Credit
Financial reporting and analysis
Insurance
Audit
Tax

*Other*

Legal
Training
Office services
Purchasing
Public relations
Real estate
Marketing support

2. <u>CONSIDERATION.</u> Marketing shall invoice LNA once each month for the services performed during the prior month and LNA shall pay Marketing for such services not later than ten (10) days from the receipt of invoice.

3. <u>OUTSIDE SERVICES: ADJUSTMENTS TO CHARGES.</u> The foregoing services to be performed hereunder shall be all-inclusive of supplies and utilities required for such services, provided, however, that, if the level of activity for any service should increase above the level required prior to the date hereof, Marketing shall have the right to charge LNA for the additional supplies and utilities being used, on a cost-plus 10% basis. In the event that Marketing is required to retain outside consultant/contractor assistance to perform any of the services hereunder, Marketing shall first obtain the consent of LNA to such retention and LNA shall pay directly charges of such consultant/contractor. Marketing shall not be held responsible for the performance of such consultant/contractor services and LNA assumes the risk thereof. At any time LNA desires reports, software, files or the like, Marketing may provide them to LNA at cost.

The services to be performed hereunder shall be performed and used in compliance with the applicable provisions of the Transaction Agreements.

The parties hereto agree that forty five (45) days after the date of this Agreement, and no more than once every month thereafter, they will review the services provided this Agreement and, if it is mutually determined in good faith that certain services are no longer needed or that Marketing would require additional monthly charge(s) to continue rendering the services, such services will be terminated or the monthly charge(s) agreed by the parties, as the case may be.

4. <u>CONTRACTUAL RELATIONSHIP.</u> The relationship between LNA and Marketing under this Agreement shall be that of principal and agent in respect of the services to be performed hereunder. In no event is the relationship of the parties intended to be that of employer and employee and in no event is either party to be deemed or purported to be the partner or joint venturer of the other for any purpose whatsoever.

5. <u>TERM.</u> The term of this Agreement shall be _____ (__) days from the date hereof. Upon at least ten (10) days notice: (i) to LNA, Marketing shall have the right to terminate any or all of the services set forth in Paragraph 1; and (ii) to Marketing, LNA shall have the right to terminate any or all of the services set forth in Paragraph 1. In the event of partial termination, any monthly charge for such

CONFIDENTIAL

AG0007751

JX0006-0002
LAC 002059

IN WITNESS WHEREOF, each of LNA and Marketing has caused this Agreement to be executed by its duly authorized officer as of the date first above written.

LUKOIL NORTH AMERICA LLC

By: _____
Vincent J. DeLaurentis
President & Chief Operating Officer

GETTY PETROLEUM MARKETING INC.

By: _____
Vincent J. DeLaurentis
President & Chief Operating Officer

CONFIDENTIAL

AG0007754

JX0006-0005
LAC 002062

# EXHIBIT 14

# EXHIBIT 14-a

LUKOIL AMERICAS CORP.
Twenty-Year Financial Projection (2008 – 2027)
Assumptions Prepared as of December 17, 2007

Getty Petroleum Marketing Inc. (the "Company" or "GPM"), a wholly-owned subsidiary of Lukoil Americas Corp. ("LAC"), will restructure its business by separating its Getty and Lukoil operations effective June 30, 2008.

Effective June 30, 2008, the Company's operations will solely be comprised of the 890 service station outlets and ten distribution terminals and bulk plants leased from Getty Realty Corp. (as of September 30, 2007) under the Amended and Restated Master Lease Agreement dated as of December 9, 2000.

Effective June 30, 2008, the Company will divest its remaining operations to a new Lukoil entity which will be called Lukoil North America Inc. ("LNA"). LNA will be formed as a limited liability corporation, which is wholly-owned by LAC.

LNA's operations will principally consist of the following:

- Outlets acquired from ConocoPhillips ("COP") in Northern New Jersey, hereinafter referred to as "Northern COP outlets" – 161 outlets acquired from COP (64 fee, 97 leased*)
- 133 other outlets ( 2 fee, 131 leased)
- Contracts to supply petroleum products to 279 outlets (216 distributors and 63 contract dealers)
- Blending and supply business
- KOSCO heating oil business
- Corporate headquarters building

* Includes 9 Garden State Parkway outlets.

Effective March 15, 2008, the Company will sell the corporate jet at fair value, which is estimated to be $15 million.

Effective June 30, 2008, the Company will sell to a third party distributor, the outlets acquired from COP in Southern New Jersey and Pennsylvania, hereinafter referred to as "Southern COP outlets" – 160 outlets acquired from COP (109 fee, 51 leased) for $135 million.

LNA will enter into a 15 year supply contract with the distributor acquiring the Southern COP outlets.

The Company's long-term debt, which is expected to approximate $216.2 million as of June 30, 2008, will be reduced by the net proceeds of $150 million from the aforementioned sales.

CONFIDENTIAL

Effective June 30, 2009, the Company's operations will be sold to a third party for the price of $1, thereby eliminating the continuing losses under the Master Lease with Getty Realty Corp.

Sales prices per gallon used in the projection are based on the weighted average sales prices in effect for the nine months ended September 30, 2007.

Sales volume (in thousands of gallons):

|  | 2008 | 2009 (a) | 2010 (a) |
|---|---|---|---|
| Retail: |  |  |  |
|   Master lease outlets | 567,600 | 288,100 | 0 |
|   Southern COP outlets | 97,200 | 0 | 0 |
|   All other | 392,200 | 398,000 | 404,000 |
|   Sub-total | 1,057,000 | 686,100 | 404,000 |
| Wholesale: |  |  |  |
|   Master lease outlets | 140,900 | 71,500 | 0 |
|   Southern COP outlets | 97,200 | 197,300 | 200,300 |
|   All other | 222,400 | 225,800 | 229,100 |
|   Sub-total | 460,500 | 494,600 | 429,400 |
| Blending and supply | 840,000 | 1,000,000 | 1,015,000 |
| KOSCO | 24,600 | 25,000 | 25,400 |
|   Total | 2,382,100 | 2,205,700 | 1,873,800 |

Margins per gallon:

|  | 2008 | 2009 (a) | 2010 (a) |
|---|---|---|---|
| Retail: |  |  |  |
|   Master lease outlets | .1619 | .1643 | N/A |
|   Southern COP outlets | .0826 | N/A | N/A |
|   All other | .1236 | .1255 | .1273 |
|   Sub-total | .1409 | .1418 | .1273 |
| Wholesale: |  |  |  |
|   Master lease outlets | .0180 | .0183 | N/A |
|   Southern COP outlets | .0225 | .0225 | .0225 |
|   All other | .0261 | .0265 | .0269 |
|   Sub-total | .0229 | .0237 | .0248 |

CONFIDENTIAL

LUK0011834

| | | | |
|---|---|---|---|
| Blending and supply | .0500 | .0500 | .0500 |
| KOSCO | .4519 | .4587 | .4656 |

(a) Assumes annual increases of 1.5% per annum, except for 160 million gallon increase in Blending and supply volumes effective in 2009, and South COP and Blending and supply margins which are expected to remain constant.

Other information (in thousands) is as follows:

| | 2008 | 2009 (b) | 2010 (b) |
|---|---|---|---|

Direct operating expenses, primarily comprised of real estate taxes, environmental expense, maintenance expense and credit card expense, are as follows:

| | 2008 | 2009 (b) | 2010 (b) |
|---|---|---|---|
| Master lease outlets | $54,700 | $28,600 | N/A |
| Southern COP outlets | 2,100 | N/A | N/A |
| All others | 22,000 | 23,100 | $24,100 |
| KOSCO | 9,600 | 9,900 | 10,400 |
| Total | $88,400 | $61,600 | $34,500 |

Rental income:

| | | | |
|---|---|---|---|
| Master lease outlets | $40,800 | $21,000 | N/A |
| Southern COP outlets | 4,000 | 0 | N/A |
| All others | 11,300 | 11,800 | 12,100 |
| Total | $56,100 | $32,800 | $12,100 |

Rent expense:

| | | | |
|---|---|---|---|
| Master lease outlets | $60,900 | $31,000 | N/A |
| Southern COP outlets | 2,000 | N/A | N/A |
| All others | 23,400 | 24,500 | $25,200 |
| Blending and supply | 5,400 | 5,500 | 5,700 |
| Total | $91,700 | $61,000 | $30,900 |

| | | | |
|---|---|---|---|
| S,G&A expenses: | $57,500 | $51,100 | $32,300 |

(b) Assumes annual increases of 3% per year, except for rent expense on properties under the Master Lease Agreement with Getty Realty Corp., which increases at 2% per year.

Interest expense is principally comprised of interest on working capital borrowings under the revolver, the term loan and dealer security.  Interest on borrowings under the revolver

LUK0011835

assumes that the revolver is 50% utilized at an annual interest rate of LIBOR plus 60 basis points.  LIBOR rates are forecast to be 5.36%.  Interest on the term loan has been calculated on the basis that there are quarterly principal payments of $3.25 million.

Capital expenditures are projected to be $15 million in 2008 and $5 million per year thereafter.

Gain (loss) on dispositions of assets is as follows (in thousands):

Corporate Jet:

| | |
|---|---|
| Net proceeds | $15,000 |
| Estimated nbv | 10,212 |
| Estimated gain | $4,788 |

South COP outlets:

| | |
|---|---|
| Net proceeds | $135,000 |
| Estimated nbv | 128,600 |
| Estimated gain | $6,400 |

Master Lease Assets:

| | |
|---|---|
| Net proceeds | $0 |
| Estimated nbv | 66,659 |
| Estimated loss | ($66,659) |

CONFIDENTIAL                                                                    LUK0011836

# EXHIBIT 14-b

LUKOIL AMERICAS CORPORATION
PROFORMA CONSOLIDATED BALANCE SHEETS
AS OF JUNE 30, 2007
(IN THOUSANDS)

2/3/2016
12:32 PM

| | GPMI Balance Sheet prior to transaction | Net assets sold to Realty | Net assets retained by LAC | LAC Balance Sheet after transaction * |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $20,892 | $0 | $20,892 | $103,005 |
| Accounts receivable, net | 86,695 | 86,695 | 0 | 0 |
| Inventories | 136,328 | 136,328 | 0 | 0 |
| Deferred income taxes | 3,058 | 3,058 | 0 | 0 |
| Prepaid expenses and other current assets | 21,910 | 21,910 | 0 | 0 |
| Total current assets | 268,883 | 247,991 | 20,892 | 103,005 |
| Property and equipment, net | 341,332 | 323,310 | 18,022 (A) | 18,022 |
| Goodwill | 13,159 | 13,159 | 0 | 0 |
| Other intangible assets | 4,035 | 4,035 | 0 | 0 |
| Other assets | 5,498 | 5,498 | 0 | 0 |
| Total assets | $632,907 | $593,993 | $38,914 | $121,027 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current liabilities: | | | | |
| Short-term borrowings | $86,000 | $0 | $86,000 | $0 |
| Current portion of long-term debt | 15,632 | 0 | 15,632 | 0 |
| Accounts payable | 114,974 | 114,974 | 0 | 0 |
| Current portion of environmental remediation costs | 13,838 | 13,838 | 0 | 0 |
| Accrued expenses | 27,330 | 27,330 | 0 | 0 |
| Gasoline taxes payable | 26,567 | 26,567 | 0 | 0 |
| Total current liabilities | 284,341 | 182,709 | 101,632 | 0 |
| Long-term debt | 216,255 | 0 | 216,255 | 0 |
| Environmental remediation costs | 33,703 | 33,703 | 0 | 0 |
| Deferred income taxes | 3,058 | 3,058 | 0 | 0 |
| Other liabilities | 48,251 | 48,251 | 0 | 0 |
| Stockholders' equity | 47,299 | 0 | 47,299 | 121,027 |
| Total liabilities and stockholders' equity | $632,907 | $267,721 | $365,186 | $121,027 |
| Book value of net assets sold | | ($326,272) | $326,272 | |

* LAC uses $400,000 of proceeds from sale of GPMI to Realty to extinguish debt.

(A) Comprised of corporate jet of $11,320, corporate headquarters of $5,504 and LABS assets of $1,198.

| Supplemental information | | Sources and uses of cash | |
|---|---|---|---|
| Proceeds from sale of GPMI | $400,000 | Cash prior to transaction | $20,892 |
| Book value of net assets sold | 326,272 | Proceeds received | 400,000 |
| | | Extinguishment of debt | (317,887) |
| Gain on sale of GPMI | $73,728 | Cash after transaction | $103,005 |

LUKOIL AMERICAS CORPORATION
PROFORMA YEAR 1 OPERATING RESULTS
AFTER SALE OF GETTY PETROLEUM MARKETING INC.
(IN THOUSANDS)

2/4/2016
2:02 PM

| | WHOLESALE | LABS | CORPORATE (a) | TOTAL |
|---|---|---|---|---|
| VOLUME IN GALLONS | | | | |
| WHOLESALE: | | | | |
| LUKOIL BRANDED SUPPLY | 800,000 | 0 | 0 | 800,000 |
| UNBRANDED SUPPLY | 700,000 | 0 | 0 | 700,000 |
| BLENDING AND SUPPLY | 0 | 840,000 | 0 | 840,000 |
| VOLUME IN GALLONS | 1,500,000 | 840,000 | 0 | 2,340,000 |
| SALES | $3,120,000 | $1,747,200 | $0 | $4,867,200 |
| COST OF SALES | (3,091,500) | (1,709,400) | 0 | (4,800,900) |
| GROSS MARGIN BEFORE DIRECT OPERATING EXPENSES | 28,500 | 37,800 | 0 | 66,300 |
| DIRECT OPERATING EXPENSES | 0 | 0 | 0 | 0 |
| GROSS PROFIT | 28,500 | 37,800 | 0 | 66,300 |
| RENTAL INCOME | 0 | 0 | 0 | 0 |
| RENT EXPENSE | 0 | (5,400) | 0 | (5,400) |
| S,G&A EXPENSES | (11,250) | (510) | (1,380) | (13,140) |
| INCENTIVE COMPENSATION CHARGE | (2,854) | (5,742) | 0 | (8,596) |
| LUKOIL SERVICE AGREEMENT FEE | 0 | 0 | (2,500) | (2,500) |
| EBITDA | 14,396 | 26,148 | (3,880) | 36,664 |
| INTEREST EXPENSE | (2,980) | (2,980) | 0 | (5,960) |
| DEPRECIATION AND AMORTIZATION | 0 | (200) | (1,723) | (1,923) |
| EARNINGS (LOSS) BEFORE INCOME TAXES | 11,416 | 22,968 | (5,603) | 28,781 |
| PROVISION (CREDIT) FOR INCOME TAXES | 4,775 | 9,606 | (2,343) | 12,038 |
| NET EARNINGS (LOSS) | $6,641 | $13,362 | ($3,260) | $16,743 |

(a) CORPORATE CHARGES INCLUDE EXPENSES RELATED TO OPERATING THE CORPORATE JET, DEPRECIATION ON THE
CORPORATE HEADQUARTERS AND A SERVICE AGREEMENT FEE PAYABLE TO LUKOIL USA.

EXHIBIT 14-c

**Carolann Gaites**

| | |
|---|---|
| **From:** | Carolann Gaites |
| **Sent:** | Tuesday, January 06, 2009 9:01 AM |
| **To:** | 'polynkoav@lukoil.com' |
| **Subject:** | December 08 report |
| **Attachments:** | Russian Monthly Report 12. 08.doc |

Alexandra,
The December 08 report is attached.  Happy New Year.

Carolann

*Ms. Carolann Gaites*
*Director of Human Resources*
*Getty Petroleum Marketing Inc.*
*1500 Hempstead Turnpike*
*East Meadow, NY 11554*
*516-542-4999*

1/6/2009

| | Headcount | Gas filling stations | Oil depots | Oil product terminals | Hired and dismissed (during the last month) | Additional information |
|---|---|---|---|---|---|---|
| LUKOIL Americas Corporation | 709 | 1571 | N/A | 5 | 6 H/15D | |

December, 2008

| | Headcount | Gas filling stations | Oil depots | Oil product terminals | Hired and dismissed (during the last month) | Additional information |
|---|---|---|---|---|---|---|
| LUKOIL Americas Corporation | 716 | 1571 | N/A | 6 | 20 H/33D | |

# EXHIBIT 15

**Talis Knets**
Claims Analyst, D&O Mainstream
Financial Lines
Claims

212-458-1282 Telephone
866-908-8301 Facsimile

talis.knets@chartisinsurance.com



VIA EMAIL AND FIRST-CLASS MAIL,
July 15, 2011

Michael G. Lewis
Vice President and General Counsel
Lukoil North America LLC
1500 Hempstead Turnpike
East Meadow, NY 11554

| | | |
|---|---|---|
| Re: | Insured | : **Lukoil Americas Corporation** |
| | **Matter** | : Route 27, LLC |
| | **Policy #** | : 01-583-52-72 |
| | **Claim #** | : 550-055255-001 |

Dear Mr. Lewis,

Chartis Claims, Inc. ("CCI"), on behalf of National Union Fire Insurance Company of Pittsburgh, PA ("National Union" or "the Insurer"), is the claims administrator handling claims arising under insurance policy # 01-583-52-72 issued to Lukoil Americas Corporation ("Lukoil"). Please be advised that I am the adjustor handling this matter and all future correspondence should be directed to my attention. The purpose of this letter is to advise you of our position with respect to coverage for this matter.

We value you as a customer and appreciate your business; however, we must inform you that there is no coverage under the policy captioned above for the matters submitted, as more fully discussed below. After you have reviewed the letter, if there is additional information you would like me to consider, please forward such information to me. Also, if you have any questions about the letter, please contact me.

In considering your request for coverage, we have reviewed the insurance policy referenced above, as well as the allegations asserted. No other policies were considered. If you assert a right to coverage under another policy issued by any other member company of American International Group, Inc., please submit notice pursuant to the notice provisions contained in that policy.

*Summary of the Matter*

Based on the information we have received to date, the following sets forth a summary of the allegations in the second amended complaint filed in the Superior Court of New Jersey, Middlesex County, captioned: *Route 27, LLC, Baba Bishada Inc., Shiv Shivam, Inc Gill Petroleum, Inc., Wyckoff Motors, Inc., Best Management, Inc. Route 9 Ventures, LLC, G.Z. Service Corp., E Gas Inc., Maxpetro LLC, Giuseppe Papile, Tabibian Enterprises, Inc., Pennington Circle Petroleum, 3513 Rt. 1 South, LLC, Kehal Petroleum, Inc., HKK Super Service, Inc., Par's Fast Service, Inc., Fuel Max, Inc., ADPP Enterprises, Inc., Alen Service Corporation, TKA Management, LLC, Kevart, Inc., Garry Motor Works, Inc., William T. Rossnagle,*

Chartis
175 Water Street, 10th Floor
New York, NY 10038

www.chartisinsurance.com

CONFIDENTIAL

LUK0734930

7/15/2011
- 2 -

*Marwah Projects, Inc., Flanders Gas, LLC, Anil Enterprises, Inc., Shiv Shivangi, Inc., Creative Management, Inc., Passaic Mobile, Inc., and Karshan, LLC, v. Getty Petroleum Marketing, Inc., Lukoil North America LLC, Semyon Logovinsky, And Louis Maschi* (the "Second Amended Complaint"). This is the second amended complaint filed by the Plaintiffs in this Court. The First Amended Complaint was filed in this Court on May 24, 2010. Following removal to the United States District Court for the District of New Jersey, Plaintiffs filed a motion in federal court for leave to file a second amended complaint which is reportedly substantively identical to this Second Amended Complaint. That motion was granted by Order dated March 30, 2011.

Plaintiffs are 31 Individual Getty/Lukoil branded service station dealers that have or had leases and Petroleum Marketing Practices Act ("PMPA") franchise agreements with Getty Petroleum Marketing, Inc. ("Getty"). Getty has allegedly sold and assigned the interests it holds in Plaintiffs' service station premises to Defendant Lukoil North America, LLC ("Lukoil NA") without providing Plaintiffs a bona fide offer or right of first refusal to acquire Getty's interests in these premises, as required by Section 56:10-6.1(a) of the New Jersey Franchise Practices Act. These allegations alleged date back to the fall of 2009.

Plaintiffs alleged that Logovinsky, through mid-January 2010, was Vice President of Wholesale and Business Development at Getty. Subsequently, Logovinsky assumed the position of Vice President of Wholesale and Business Development at Lukoil NA.

Plaintiffs alleged that Maschi, through mid-January 2010 was Real Estate Manager at Getty. Subsequently, Maschi assumed the position of Real Estate Manager at Lukoil NA.

Plaintiffs brought five causes of action: 1) Violations of New Jersey's Franchise Practices Act against Getty, Lukoil NA and Logovinsky, 2) Conspiracy to Violate the Act against all Defendants, 3) Tortious Interference with the Performance of a Contract against all Defendants, 4) Tortious Interference with Prospective Economic Relationship against all Defendants and 5) Constructive Trust against Getty and Lukoil NA. Plaintiff seeks monetary damages, punitive damages, injunctive relief, attorney fees and costs.

*The Policy*

National Union issued a PrivateEdge Plus Insurance Policy, Policy no. 01-583-52-72 (the "Policy"), to Lukoil for the Policy Period February 28, 2011 to April 30, 2012 (the "Policy"). The Policy has a Twenty Five Million Dollar ($25,000,000.00) shared limit of liability which is subject to a self-insured retention amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for claims under the Directors and Officers ("D&O") Coverage Section. Relevant policy provisions are referenced below; please refer to the policy for its complete terms and conditions.

*Certain Policy Provisions*

The D&O Coverage Section shall pay the Loss of the Company arising from a: B(i) Claim first made against the Company, or B(ii) Claim first made against an Individual Insured during the Policy Period for any Wrongful Act.

Chartis
175 Water Street, 10th Floor
New York, NY 10038
www.chartisinsurance.com

CONFIDENTIAL

7/15/2011
- 3 -

The Complaint constitutes a Claim as that term is defined by Definition 2(b)(ii) of the D&O Coverage Section, as amended by Endorsement #20. Plaintiff has alleged a Wrongful Act as that term is defined by Definition 2(cc) of the D&O Coverage Section.

For the purposes of this coverage evaluation only, we will assume that Getty as an alleged wholly owned subsidiary of LAC and Logovinsky, allegedly as a vice president of Getty are Insureds under the Policy for their actions up to February 28, 2011.

We direct your attention to Endorsement #14, which precludes coverage for this matter and provides that the Insurer shall not be liable to make any payment for Loss arising from a Claim for an alleged Wrongful Act(s) which occurred prior to February 28, 2011. Loss arising out of Related Wrongful Acts shall be deemed to arise from the first such same or related Wrongful Acts. The Complaint is replete with alleged Wrongful Acts that occurred prior to February 28, 2011. Therefore, the above Endorsement operates to preclude coverage for this Claim.

*Reservation of Rights*

National Union's coverage position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by National Union or any of its affiliates. National Union expressly reserves all of its rights under the Policy, at law or in equity, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

Should you have any additional information that you feel would either cause us to review our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible. Also, if you are served with any additional demands or amended complaints or pleadings, please forward them to us immediately, so that we can review our coverage position.

If you have any other insurance policies which may respond to this claim asserted, you should report this matter to the issuing carrier[s] immediately.

In closing, allow me to reiterate that we value you as a customer and encourage you to contact us should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Regards,



Talis Knets
Directors & Officers Liability
Mainstream – East
Enclosure

cc:   marisa.godwin@willis.com

Chartis
175 Water Street, 10th Floor
New York, NY 10038
www.chartisinsurance.com

CONFIDENTIAL                                    LUK0734932

**Talis Knets**
Claims Analyst, D&O Mainstream
Financial Lines
Claims

212-458-1282 Telephone
866-908-8301 Facsimile

talis.knets@chartisinsurance.com



VIA EMAIL AND FIRST-CLASS MAIL,
July 15, 2011

Michael G. Lewis
Vice President and General Counsel
Lukoil North America LLC
1500 Hempstead Turnpike
East Meadow, NY 11554

| Re: | Insured | : Lukoil Americas Corporation |
|-----|---------|------------------------------|
|     | Matter  | : Route 27, LLC |
|     | Policy #| : 01-811-06-54 |
|     | Claim # | : 550-055240-001 |

Dear Mr. Lewis,

Please be advised that I am the adjustor handling this matter and all future correspondence should be directed to my attention. The purpose of this letter is to (1) advise you of the preliminary coverage position for this matter under the policy, which is subject to a mutual reservation of rights and (2) request additional information as more fully set forth below. Our coverage position is explained below.

Chartis Claims, Inc. ("CCI"), on behalf of National Union Fire Insurance Company of Pittsburgh, PA ("National Union" or "the Insurer"), is the claims administrator handling claims arising under insurance policy # 01-811-06-54 issued to Lukoil Americas Corporation ("Lukoil").

We would like you to know that we appreciate you as a customer and are committed to working closely with you in the defense of this matter. We expect that you may have questions after reading this letter regarding our position and the practical impact of the reservation of rights. Please feel free to contact me regarding any questions about our coverage position as well as to discuss a plan of action for the subject claim.

In considering your request for coverage, we have reviewed the insurance policy referenced above, as well as the allegations asserted. No other policies were considered. If you assert a right to coverage under another policy issued by any other member company of American International Group, Inc., please submit notice pursuant to the notice provisions contained in that policy.

*Summary of the Matter*

Based on the information we have received to date, the following sets forth a summary of the allegations in the second amended complaint filed in the Superior Court of New Jersey, Middlesex County, captioned: *Route 27, LLC, Baba Bishada Inc., Shiv Shivam, Inc Gill Petroleum, Inc., Wyckoff Motors, Inc., Best Management, Inc. Route 9 Ventures, LLC, G.Z. Service Corp., E Gas Inc., Maxpetro LLC, Giuseppe Papile, Tabibian Enterprises, Inc.,*

Chartis
175 Water Street, 10th Floor
New York, NY 10038

www.chartisinsurance.com

CONFIDENTIAL                                                                    LUK0734924

7/15/2011

- 2 -

*Pennington Circle Petroleum, 3513 Rt. 1 South, LLC, Kehal Petroleum, Inc., HKK Super Service, Inc., Par's Fast Service, Inc., Fuel Max, Inc., ADPP Enterprises, Inc., Alen Service Corporation, TKA Management, LLC, Kevart, Inc., Garry Motor Works, Inc., William T. Rossnagle, Marwah Projects, Inc., Flanders Gas, LLC, Anil Enterprises, Inc" Shiv Shivangi, Inc., Creative Management, Inc., Passaic Mobile, Inc., and Karshan, Llc, V. Getty Petroleum Marketing, Inc., Lukoil North America LLC, Semyon Logovinsky, And Louis Maschi* (the "Second Amended Complaint"). This is the second amended complaint filed by the Plaintiffs in this Court. The First Amended Complaint was filed in this Court on May 24, 2010. Following removal to the United States District Court for the District of New Jersey, Plaintiffs filed a motion in federal court for leave to file a second amended complaint which is reportedly substantively identical to this Second Amended Complaint. That motion was granted by Order dated March 30, 2011.

Plaintiffs are 31 Individual Getty/Lukoil branded service station dealers that have or had leases and Petroleum Marketing Practices Act ("PMPA") franchise agreements with Getty Petroleum Marketing, Inc. ("Getty"). Getty has allegedly sold and assigned the interests it holds in Plaintiffs' service station premises to Defendant Lukoil North America, LLC ("Lukoil NA") without providing Plaintiffs a bona fide offer or right of first refusal to acquire Getty's interests in these premises, as required by Section 56:10-6.1(a) of the New Jersey Franchise Practices Act. These allegations alleged date back to the fall of 2009.

Plaintiffs alleged that Logovinsky, through mid-January 2010, was Vice President of Wholesale and Business Development at Getty. Subsequently, Logovinsky assumed the position of Vice President of Wholesale and Business Development at Lukoil NA.

Plaintiffs alleged that Maschi, through mid-January 2010 was Real Estate Manager at Getty. Subsequently, Maschi assumed the position of Real Estate Manager at Lukoil NA.

Plaintiffs brought five causes of action: 1) Violations of New Jersey's Franchise Practices Act against Getty, Lukoil NA and Logovinsky, 2) Conspiracy to Violate the Act against all Defendants, 3) Tortious Interference with the Performance of a Contract against all Defendants, 4) Tortious Interference with Prospective Economic Relationship against all Defendants and 5) Constructive Trust against Getty and Lukoil NA. Plaintiff seeks monetary damages, punitive damages, injunctive relief, attorney fees and costs.

*The Policy*

National Union issued a PrivateEdge Plus Insurance Policy, Policy no. 01-811-06-54 (the "Policy"), to Lukoil for the Policy Period April 30, 2010 to April 30, 2011 (the "Policy"). However, pursuant to Endorsement #24, the Named Entity shall have the right to a period of Six year(s) (the " Run-Off Period") following the February 28, 2011, the Effective Time (herein referred to as the Discovery Period) in which to give written notice to the Insurer of Claims first made against the Insureds during the Run-Off Period for any Wrongful Acts occurring on or prior to the Effective Time and otherwise covered by this policy.

The Policy has a Twenty Five Million Dollar ($25,000,000.00) aggregate limit of liability which is subject to a self-insured retention amount of Two Hundred Fifty Thousand Dollars ($250,000.00) for claims under the Directors and Officers ("D&O") Coverage Section. Relevant policy provisions are referenced below; please refer to the policy for its complete terms and conditions.

Chartis
175 Water Street, 10th Floor
New York, NY 10038
www.chartisinsurance.com

CONFIDENTIAL                                          LUK0734925

7/15/2011
- 3 -
*Certain Policy Provisions*

The D&O Coverage Section shall pay the Loss of the Company arising from a: B(i) Claim first made against the Company, or B(ii) Claim first made against an Individual Insured during the Policy Period for any Wrongful Act.

The Complaint constitutes a Claim as that term is defined by Definition 2(b)(ii) of the D&O Coverage Section, as amended by Endorsement #20. Plaintiff has alleged a Wrongful Act as that term is defined by Definition 2(cc) of the D&O Coverage Section.

The Second Amended Complaint is dated March 31, 2011, after the Effective Time. Please provide the date of the filing of the initial complaint. The Insurer reserves all rights, including the right to deny coverage, with respect to the issue of timeliness of the Claim and the tendering of the claim for coverage under the Policy.

For the purposes of this coverage evaluation only, we will assume that Getty as an alleged wholly owned subsidiary of LAC and Logovinsky, allegedly as a vice president of Getty are Insureds under the Policy for their actions up to February 28, 2011.

All of the allegations alleged against LAC and Getty arise out of the contracts entered into between LAC, Getty and Plaintiff. We direct your attention to Exclusion 4(t)(iii) of the D&O Coverage Section, which provides that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against the Company alleging, arising out of, based upon or attributable to any actual or alleged contractual liability of the Company or any other Insured under any express contract or agreement.

As all of the allegations against LAC and Getty alleged, arise out of are based upon and/or are attributable alleged contractual liability of LAC and Getty, the above exclusion operates to preclude coverage LAC and Getty for this matter.

We also direct your attention to Exclusion 4(t)(ii) of the D&O Coverage Section, which further precludes coverage for the first two causes of action against Getty and provides that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against the Company for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships.

Plaintiff has alleged Conspiracy and Fraud. We direct your attention to Exclusion 4(c) of the D&O Coverage Section, as amended by Endorsement #22, which provides that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act, or dishonest act or any willful violation of any statute, rule or law, if any final adjudication in an action or proceeding other than an action or proceeding initiated by the Insurer to determine coverage under the policy establishes that such deliberate criminal or deliberate fraudulent act, or dishonest act or willful violation of any statute, rule or law, was committed.

Chartis
175 Water Street, 10th Floor
New York, NY 10038
www.chartisinsurance.com

CONFIDENTIAL                                                                LUK0734926

1

## PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE

2

*Commonwealth of Pennsylvania v. Exxon Mobil Corporation, et al.*,
United States District Court, Southern District of New York Case No. 14-cv-06228 (SAS)

3

4       I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein
referred to, over the age of 18 years and not a party to this action.  My business address is 1050
Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

5

6       On the date below, I served the following document on all counsel in this action
electronically through LexisNexis File & Serve:

7

8       **DECLARATION OF MOLLY MCGINLEY HAN IN SUPPORT OF**
**PLAINTIFF COMMONWEALTH OF PENNSYLVANIA'S OPPOSITION**

9       **TO LUKOIL AMERICAS CORPORATION'S MOTION TO DISMISS**

10      **UNREDACTED EXHIBITS**

11

12      I declare under penalty of perjury under the laws of the United States of America and the
State of California that the foregoing is true and correct.

13

14      Executed on March 14, 2016, at Sacramento, California.

15

16      TONYA L. ZIMMERMAN

17

18

19

20

21

22

23

24

25

26

27

28