**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------- X
                        :

**IN RE: METHYL TERTIARY BUTYL**   :
**ETHER ("MTBE") PRODUCTS**      :
**LIABILITY LITIGATION**              :
-------------------------------------------------- :
                        :

**This document relates to:**        :
                        :

*Commonwealth of Pennsylvania, et al. v.*   :
*Exxon Mobil Corporation, et al.*, 14 Civ.   :
6228                            :
                        X
----------------------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/4/16

**OPINION AND ORDER**

**Master File No. 1:00-1898**
**MDL 1358 (SAS)**
**M21-88**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

        This is a consolidated multi-district litigation ("MDL") relating to

contamination – actual or threatened – of groundwater from various defendants'

use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary

butyl alcohol, a product formed by the breakdown of MTBE in water.  In this case,

the Commonwealth of Pennsylvania ("the Commonwealth") alleges that

defendants' use and handling of MTBE has contaminated, or threatens to

contaminate groundwater within its jurisdiction.  Familiarity with the underlying

facts is presumed for the purposes of this Order.

        Defendant LUKOIL Americas Corporation ("LAC") inadvertently

1

disclosed certain emails in the present litigation that it now asserts are covered by attorney-client privilege.  The Commonwealth asserts variously that the documents are not privileged, privilege was waived, and that the crime fraud exception applies.  The parties agreed that the Court should conduct an *in camera* review. Having now done so, I find that while the documents are privileged, they are covered by the crime fraud exception.

## II.    BACKGROUND

During discovery in the present litigation, LAC produced, "pursuant to a stipulation and order[,] . . . all of the non-privileged [] documents" in the possession of the bankruptcy trustee for its former subsidiary Getty Petroleum Marketing Inc. ("GPMI").[1]  Included in this production are certain emails that LAC claims are covered by the attorney-client privilege.[2]

The emails are between LAC employees, GPMI employees, and Michael Lewis who served as the general counsel for both organizations.[3]  At the

---

[1]    LUKOIL Americas Corporation's Letter in Support of Attorney-Client Privilege ("LAC Letter") at 5 n.1.

[2]    *See id.*  Because the parties have entered into a clawback agreement, plaintiff does not argue waiver as a result of the inadvertent production of allegedly privileged documents.

[3]    *See id.* at 1.

time of the emails, GPMI was a wholly owned subsidiary of LAC.[4]  The emails are important because the Commonwealth asserts that this Court has jurisdiction over LAC, inter alia, as a result of piercing GPMI's corporate veil.[5]  GPMI entered bankruptcy in December, 2011 and subsequently dissolved.[6]

In December, 2008, when the emails were sent, LAC was attempting to restructure and spin-off GPMI.  The Commonwealth alleges that this plan was an attempt by LAC to fraudulently strip profitable assets from an unprofitable company.  In the emails, an LAC officer emailed Lewis (at Lewis's "getty.com" email) to ask why outside counsel's legal fees – related to "[LUKOIL North America ('LNA')], restructuring and Getty Master Lease negotiations" – are being paid by LAC and not GPMI.  Lewis responded that "[i]f they billed [GPMI], a purchaser or [bankruptcy] trustee could be privy to our discussions" about restructuring.[7]

---

[4]     *See id*.

[5]     *See generally* Plaintiff Commonwealth of Pennsylvania's Opposition to Defendant LUKOIL Americas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim.

[6]     *See* Declaration of Vincent De Laurentis, former President and Chief Operating Officer of GPMI, in Support of LUKOIL Americas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim ("De Laurentis Decl.") ¶ 48.

[7]     Documents At-Issue ("Emails") at LUK0064375.

Another LAC officer on the email chain suggested that GPMI or LNA should pay the bill and LAC could reimburse them.  Lewis responded that the safer legal approach for preserving privilege is a complex payment scheme where "[GPMI] can pay LUKOIL USA (LUSA) per the services agreement, LUSA can pay LAC for monies owed and LAC can use those funds to satisfy [counsel's] restructuring invoices."[8]  Lewis concluded, "[t]he reason for all this juggling is that we want LAC to hold the privilege for all our confidential communications concerning the restructuring so that we maintain control, regardless of who ultimately controls [GPMI]."[9]

### A.    LAC's Purchase of GPMI

To fully understand the Commonwealth's allegations it is necessary to explain LAC's relationship with GPMI.  In December, 2000, LAC acquired a controlling interest in GPMI from Getty Petroleum Corp. ("Getty").[10]  Getty "created and spun off GPMI in order to divest itself of its distribution and marketing network (retail service stations, terminals, and other operating assets) so

---

[8]    *Id*. at LUK0064374.

[9]    *Id*.

[10]    *See* De Laurentis Decl. ¶ 15(e).

that it could focus exclusively on managing its real estate holdings."[11]  Getty, now

known as Getty Realty Corp., rented the land on which the GPMI-owned gas

stations stood in a unitary "Master Lease"[12] – which meant "that portfolio of

stations and terminals could not be sold on an individual facility basis or in

pieces."[13]

### B.    LAC's Account of GPMI's Bankruptcy

Vincent De Laurentis, the former President and Chief Operating

Officer of GPMI, tells the story of GPMI's bankruptcy in his declaration.  De

Laurentis avers that in 2005 GPMI's profitability declined due to a number of

"longer-term market trends" though the immediate impact of Hurricane Katrina

marked the beginning of GPMI's unprofitability.[14]  These market trends were

exacerbated by "automatic annual rent escalations" on the gas station properties

contained in the Master Lease.[15]  The rent gap on these properties would eventually

---

[11]     *Id.* ¶ 10.

[12]     *Id*.

[13]     *Id.* ¶ 40.  It is worth noting that this lease was entered into after LAC purchased GPMI.  "In late 2000, GPMI and Getty . . . entered into a Consolidated, Amended and Restated Master Lease . . . to reflect LAC's purchase of GPMI's stock."  *Id.* ¶ 16.

[14]     *Id.* ¶ 37.

[15]     *Id*. ¶ 38.

"exceed[] $20 million annually."[16]  In addition, by 2007, GPMI had approximately

$600 million in debt from various projects including the purchase and rebranding

of seven hundred ConocoPhillips gas stations.[17]  "In order for GPMI to obtain this

financing at the lowest possible interest rate, OAO Lukoil guaranteed the debt."[18]

In 2009, GPMI "participated in a series of transactions designed to

raise funds, reduce debt, and strengthen its balance sheet."[19]  Among these

transactions are the sales characterized by the Commonwealth as asset stripping.

In particular, GPMI sold its "blending and supply business to an affiliated entity

for $25.4 million."[20]  GPMI then sold its "heating oil business and various non-

Master Lease stations" to LNA for "$120 million and the assumption of

approximately $60 million in liabilities."[21]  In addition, De Laurentis testified that

LAC contributed approximately $340 million in capital to pay off existing debt,[22]

although the record indicates the capital originated with OAO Lukoil and was

---

[16]     *Id.*

[17]     *See id.* ¶¶ 35, 39.

[18]     *Id.* ¶ 39.

[19]     *Id.* ¶ 42.

[20]     *Id.*

[21]     *Id.*

[22]     *Id.*

passed through LAC.[23]

The sale to LNA was consummated November, 2009.[24]  An investment bank, Houlihan Lokey Howard & Zukin Financial Advisors which was hired by GPMI, opined that this was a fair price,[25] although the record indicates that this opinion was based on unverified financial information provided by GPMI.[26]  The emails at issue occurred nearly a year earlier in December 2008 and referenced contemplation of this sale, stating "we still owe Houlihan [Lokey] financial info and will want their opinion to be issued closer to when we sell to LNA to avoid the opinion becoming stale."[27]

After these transactions, De Laurentis says GPMI was "virtually debt-free."[28]  Yet, it faced "another potential roadblock to financial health" due to a

---

[23]     See Bankruptcy Testimony of Sem Logovinsky, GPMI Director, Ex. 5-b to Declaration of Molly McGinley Han, Counsel to the Commonwealth, in Support of Plaintiff Commonwealth of Pennsylvania's Opposition to LUKOIL Americas Corporation's Motion to Dismiss ("Han Decl."), 24:17-18 ("You -- were you aware of $340 million that GPMI received from OAO LUKOIL in August of 2009?"); LUKOIL Americas Corp. Restructuring Plan, Ex. 10-c to Han Decl. ("OAO Lukoil equity infusion of $340 million and a $40 million revolver.").

[24]     See De Laurentis Decl. ¶ 42.

[25]     See id.

[26]     See Houlihan Lokey Opinion, Ex. 10-b to Han Decl., at 2-3.

[27]     Emails at LUK0064373.

[28]     De Laurentis Decl. ¶ 43.

2006 contract with Bionol Clearfield LLC ("Bionol") which "obligated GPMI to purchase substantial volumes of ethanol . . . [for] substantially above-market prices."[29]  In addition, it held the Master Lease gas station portfolio which prevented unprofitable gas stations from being sold individually.

On February 28, 2011, LAC sold GPMI for one dollar[30] to Cambridge Petroleum Holdings Inc. ("Cambridge"), "an independent third party," with the hopes that Cambridge could renegotiate the unfavorable Bionol contract and Master Lease that bound together GPMI's remaining gas stations.[31]  In 2011, an arbitration panel ordered GPMI to pay Bionol $230 million related to the ethanol supply contract dispute.[32]  According to De Laurentis, this drove GPMI into bankruptcy.

## C.    The Commonwealth's Account of GPMI's Bankruptcy

The Commonwealth alleges that LAC attempted to "fraudulently strip GPMI of its valuable assets and steer it into bankruptcy in order to escape

---

[29]     *Id.* ¶ 44.

[30]     *See* LAC Financial Projections, Ex. 14-a to Han Decl., at LUK0011834.

[31]     De Laurentis Decl. ¶ 46.

[32]     *See id.*

8

liabilities, including environmental damage at MTBE contaminated stations."[33]

Indeed, this is precisely the claim that the GPMI trustees made in the bankruptcy

complaint against LAC and LNA in an attempt to clawback the assets sold to

LNA.[34]

      The former CEO of Getty Real Estate, David Driscoll, testified at the

GPMI bankruptcy proceedings that the Chairman and CEO of LAC and GPMI,

Vadim Gluzman, explained the GPMI restructuring plan to him.  He stated that

Gluzman explained the plan as leverage "to get . . . concessions from [Getty Real

Estate] with respect to reduced rent [for the Master Lease] and relief from his

*environmental obligations*."[35]

      Driscoll described the plan communicated to him as one to "remov[e]

the assets from GPMI, then . . . to hold it for one year, which [Gluzman] assured

me that the lawyers were requiring . . . then the intention was to sell GPMI to

---

[33]    The Commonwealth of Pennsylvania's Letter Opposing Assertion of Attorney-Client Privilege ("Commonwealth Letter") at 5.

[34]    *See* Bankruptcy Complaint, *In re GPMI Adversary Proceeding*, No. 11-2941, Dkt. No. 1 (Bankr. S.D.N.Y.) ¶ 1 ("Ignoring that GPMI was insolvent at the time, LAC and LNA entered into a series of corporate transactions in November 2009 transferring substantially all of GPMI's properties, subleases and subsidiaries with value and positive cash flow from GPMI to LNA.").

[35]    Transcript of David Driscoll Bankruptcy Testimony ("Driscoll Tr."), Ex. 10-d to Han Decl., at 1813:15-17 (emphasis added).

anyone they could."[36]  An email from Michael Hantman, Vice President and CFO of GPMI, to Gluzman – sent in January, 2011, one month before LAC sold GPMI – supports the narrative that LAC sought to strip profitable assets from GPMI. Hantman wrote, "[a]ttached is data on 95 non master lease sites contained in Getty portfolio. The analysis indicates that Getty is losing money on these sites which is precisely the reason they were not originally included in the sale to LNA."[37]

        Driscoll testified that OAO Lukoil, the ultimate Lukoil family parent company, planned to hold GPMI for at least a year and that Gluzman told him that GPMI would remain current on its Master Lease obligations so long as OAO Lukoil owned GPMI.[38]  GPMI, which now consisted primarily of the bad Master Lease portfolio of properties as well as other unprofitable gas stations and the unfavorable Bionol contract, would be sold for little consideration to someone who would "take [GPMI] into bankruptcy  . . . and attempt[] to challenge the unitary nature of the Master Lease."[39]  The Commonwealth alleges that the reason for LAC continuing to hold GPMI, and then causing OAO Lukoil to infuse capital into the

---

[36]     *Id.* at 1810:6-13.

[37]     Hantman Email, Ex. 10-e to Han Decl.

[38]     *See* Driscoll Tr. at 1810:14-1811:4.

[39]     *Id*. at 1812:5-15.

company after removing the assets, was to avoid the power of a bankruptcy trustee to clawback property transferred within two years of filing for bankruptcy under 11 U.S.C. § 548.[40]

At the GPMI bankruptcy proceeding, an expert testified that following the November, 2009 sale of assets to LNA, GPMI was insolvent, although he did not opine on the state of GPMI prior to the transactions.[41]  As noted, in February 2011, LAC in fact sold GPMI for one dollar and infused $25 million into GPMI as a term of the sale as well as agreeing to provide an additional $40 million if certain contingencies related to the Master Lease and Bionol dispute were met.[42]  Finally, on December 29, 2011, GPMI filed for bankruptcy, barely two years after the date of the asset transfer.

## III.   APPLICABLE LAW

Whether the attorney-client privilege applies to these emails involves three issues:  (1) whether New York or Pennsylvania law applies, (2) whether the communications are covered by the attorney-client privilege, and (3) whether the

---

[40]     Section 548 governs "Fraudulent transfers and obligations" and describes the conditions under which a trustee may clawback transfers that occurred prior to bankruptcy.

[41]     *See* Expert Testimony, Ex. 12-b to the Han Decl., at 35:16-24.

[42]     *See* Stock Purchase Agreement, Ex. 9-a to Han Decl; De Laurentis Decl. ¶ 46.

crime fraud exception applies to the communication based on the accusation that

the restructuring was intended to defraud GPMI's creditors.[43]

### A.     Choice of Law

Under Federal Rules of Evidence 501, "in a civil case, state law

governs privilege regarding a claim or defense for which state law supplies the rule

of decision."  I have previously held, and the parties do not dispute, that

Pennsylvania choice of law rules apply to this case.[44]  The only dispute is whether

Pennsylvania choice of law rules direct this Court to apply New York or

Pennsylvania privilege law.

---

[43]     LAC also argues that discovery of these documents should not be
permitted under Rule 26(b)(1) because they are not relevant or proportional to the
needs of the case.  This argument is meritless.  "Proportionality focuses on the
marginal utility of the discovery sought."  *Vaigasi v. Solow Mgmt. Corp.*, No. 11
Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (citing *Zubulake v.
UBS Warburg, LLC*, 217 F.R.D. 309, 322-23 (S.D.N.Y. 2003)).
          The evidence goes directly to a scheme that demonstrates LAC
domination of GPMI sufficient to justify veil piercing – the Commonwealth's
defense to LAC's motion to dismiss.  Furthermore, the evidence in the record
related to the GPMI restructuring scheme discusses environmental liabilities facing
GPMI, *i.e.*, MTBE liability.  Without veil piercing, LAC would have no liability
nor would the Court have jurisdiction over LAC, making the marginal utility of
such discovery high.

[44]     *See In re MTBE Prods. Liab. Litig.*, No. 14 Civ. 6228, 2015 WL
1500181 (S.D.N.Y. Mar. 30, 2015) (holding the present suit maintained "its
state-law identity" despite removal to this Court based on a federal defense).  *See
also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (holding that
federal courts apply the conflicts rules of the forum state).

I find that New York law applies.  Under Pennsylvania choice of law rules, a court must conduct an interest analysis.  This requires a court to first "determin[e] whether the laws of the competing states actually differ."[45]  "If a true conflict exists, the Court must then determine which state has the 'greater interest in the application of its law.'"[46]  Here, the parties agree that New York and Pennsylvania attorney-client privilege law differ.[47]  The only question is which state has the greater interest in the application of its law.

In order to determine who has the greater interest, a court must "'weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue.'"[48]  "The contacts are relevant only if they relate to the 'policies and interests underlying the particular issue before the court.'"[49]  *Carbis Walker, LLP v. Hill, Barth & King, LLC*, a Pennsylvania

---

[45]     *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 702 (Pa. Super. Ct. 2000).

[46]     *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007) (quoting *Ratti*, 758 A.2d at 702).

[47]     *See* LAC Letter at 2-3; Commonwealth Letter at 2.

[48]     *Hammersmith*, 480 F.3d at 231 (quoting *Shields v. Consolidated Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)).

[49]     *Suchomajcz v. Hummel Chem. Co., Newark, New Jersey*, 524 F.2d 19, 23 (3d Cir. 1975) (quoting *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 21 (1964)).

Superior Court case, is directly on point.[50]  There the court held that the key to the interest analysis for attorney-client privilege is a "connection between the communication which the plaintiff sought and the Commonwealth of Pennsylvania" rather than a connection between the underlying lawsuit and Pennsylvania.[51]

New York has the greater interest.  Lewis and the two LAC executives were located in New York, and the legal work they discussed occurred in New York.[52]  The communication lacks a "direct and explicit connection" to Pennsylvania.[53]  Although the Commonwealth seeks to use the emails as evidence in the present litigation, a post hoc connection to litigation brought in Pennsylvania unrelated to the substance of the communication does not implicate the policy justifying the attorney-client privilege as the interest analysis demands.

**B.    Attorney-Client Privilege**

Under New York law, attorney-client privilege applies "when the

---

[50]    *See* 930 A.2d 573 (Pa. Super. Ct. 2007).

[51]    *Id.* at 581.

[52]    *See* LAC Letter at 3 ("Michael Lewis was based [in New York], as were email recipients Vadim Gluzman and Vincent De Laurentis, and the Akin Gump attorneys involved in giving the advice for which the fees were incurred.").

[53]    *Carbis Walker*, 930 A.2d at 581.

communication is made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship.  The communication itself must be primarily or predominantly of a legal character."[54]  "'That nonprivileged information is included in an otherwise privileged lawyer's communication to its client—while influencing whether the document would be protected in whole or only in part—does not destroy the immunity.'"[55]

## C.    Crime Fraud Exception

In New York the party seeking privileged communications under the crime fraud exception must demonstrate "a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime."[56]  This covers "'a fraudulent scheme, an alleged breach of fiduciary duty or an accusation of some other wrongful conduct.'"[57]  Therefore, a court will find the crime fraud

---

[54]     *Spectrum Sys. Int'l Corp. v. Chemical Bank*, 78 N.Y.2d 371, 378 (1991).

[55]     *Vector Capital Corp. v. Ness Techs., Inc.*, No. 11 Civ. 6259, 2014 WL 171160, at *2 (S.D.N.Y. Jan. 9, 2014) (quoting *Spectrum Sys.*, 78 N.Y.2d at 379).

[56]     *In re New York City Asbestos Litig.*, 109 A.D.3d 7, 10 (1st Dep't 2013) (citing *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997)).

[57]     *Id*. (quoting *Art Capital Group LLC v. Rose*, 54 A.D.3d 276, 277 (1st Dep't 2008).

exception applicable where "'a prudent person ha[s] a reasonable basis to suspect the perpetration or attempted perpetration of a . . . fraud.'"[58]  In addition, "the moving party must also establish probable cause that the disputed communications 'were intended in some way to facilitate or to conceal the [fraudulent] activity.'"[59]

At least two provisions of the New York Debtor and Creditor Law addressing fraudulent conveyance are relevant to the Commonwealth's allegations. *First*, Section 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.[60]

*Second*, Section 274 provides:

> Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such

---

[58]    *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121, 2014 WL 3767034, at *6 (S.D.N.Y. July 25, 2014) (quoting *Chevron Corp. v. Donziger*, No. 11 Civ. 691, 2013 WL 1087236, at *25 (S.D.N.Y. Mar. 15, 2013)) (brackets in original).

[59]    *Id.* (quoting *Jacobs* 117 F.3d at 88) (brackets in original).

[60]    N.Y. Debt. & Cred. Law § 273.

business or transaction without regard to his actual intent.[61]

Therefore, the crux of the crime fraud exception, for the purposes of this opinion, is probable cause to believe that GPMI did not receive fair consideration in the sale of its assets.

## IV.   DISCUSSION

### A.    The Communications Are Privileged[62]

The communications at issue involved the general counsel of LAC and GPMI giving legal advice to employees of LAC and GPMI about how best to protect the attorney-client privilege.  Lewis was acting in his role as general counsel and providing specific advice to his clients on a clear legal issue.  The Commonwealth asserts that the emails are primarily of a business character because they mention payment to a consultant.  It is well established, however, that "the privilege is not lost merely by reason of the fact that it also refers to certain

---

[61]    *Id*. § 274.

[62]    The Commonwealth asserts that LAC waived privilege by sharing the documents with GPMI.  *See* Commonwealth Letter at 5.  However, because the Commonwealth has failed to provide sufficient factual allegations about the circumstances and nature of that disclosure, the Court is unable to make a determination about waiver.  The Commonwealth does not argue that disclosure in the present case waived privilege because the parties have entered into a clawback agreement.  *See* LAC Letter at 5 n.1.

nonlegal matters."[63]  This is particularly true here where the specific legal advice –

preservation of privilege – related directly to the GPMI restructuring transaction

discussed by Lewis.

###    B.    The Communications Are Subject to the Crime Fraud Exception

I find sufficient factual support for the allegation that the GPMI

restructuring was a fraudulent scheme to deprive creditors of GPMI's profitable

assets.  The very nature of the asset transfer from GPMI to LNA is suspicious.

LAC transferred all of the GPMI stock to LNA, then GPMI sold its profitable

assets to LNA, and finally LNA transferred all of GPMI's stock back to LAC.[64]

This all occurred in seventeen days from November 13, 2009 to November 30,

2009, and LAC does not provide any explanation for the structure of the

transaction.[65]  An expert testified at the bankruptcy proceedings that GPMI was

insolvent after the asset transfer, contrary to LAC's assertion that the arbitration

award drove GPMI into bankruptcy.[66]

---

[63]    *Rossi v. Blue Cross & Blue Shield of Greater New York*, 73 N.Y.2d
588, 594 (1989) (noting that "the nature of a lawyer's role is such that legal advice
may often include reference to other relevant considerations").

[64]    *See* Board Consent to Stock Transfer, Ex. 7-a to Han Decl.

[65]    *See id*.

[66]    *See* Expert Testimony at 35.

The record is replete with facts that indicate the profitable assets of GPMI were stripped and then GPMI was sold for the express purpose of taking it into bankruptcy.  Hantman's email to Gluzman strongly suggests LAC's intent to sell only profitable assets to LNA.  And while Houlihan Lokey opined that the consideration received in the sale of assets to LNA was fair, such an opinion was based entirely on unverified financial data provided by GPMI.  Driscoll's testimony also suggests LAC's intent to remove assets from GPMI such that GPMI would no longer be able to supports its obligations under the Master Lease.  Finally, Driscoll's testimony about LAC and OAO Lukoil's plan to support GPMI just long enough for the two-year clawback period under section 548 to expire, coupled with the fact that GPMI *in fact* filed for bankruptcy one month after the two-year period ended, suggests that the restructuring was intended to defraud creditors.

LAC argues that the allegations of fraudulent conveyance ignore the $340 million capital infusion made after the emails were sent.  This argument is unavailing given that these funds originated with OAO Lukoil, and De Laurentis concedes that OAO Lukoil guaranteed GPMI's debt, making it responsible for repayment regardless of whether GPMI entered bankruptcy.

Finally, LAC argues that the legal advice provided by Lewis is not "in

furtherance" of the alleged wrongdoing because the email chain does not concern the "restructuring itself."[67] This argument also fails. Lewis' advice, understood in the context of fraudulent asset stripping, is advice on how to prevent others from learning of that fraud by controlling who holds the attorney-client privilege. Indeed, the issue of which entity held the privilege would only be relevant in the event of the contemplated sale of GPMI which is explicitly referenced in the emails. Lewis' advice encourages, enables, and is in furtherance of the alleged wrongdoing.[68]

## IV.   CONCLUSION

For the foregoing reasons, I conclude that the inadvertently produced emails are covered by the attorney-client privilege but the crime fraud exception applies. Accordingly, the Commonwealth need not return these records and may use them in prosecuting this action.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

---

[67]   LAC Letter at 5 (internal quotations omitted).

[68]   *See Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) ("'[C]ommunications that enable or aid the client to commit a tort or crime . . . are not protected.'" (quoting *In re Heuwetter*, 584 F. Supp. 119, 127 (S.D.N.Y. 1984))).

Dated:      New York, New York
            April 4, 2016

**- Appearances -**

**Liaison Counsel for Plaintiffs:**

Robin Greenwald, Esq.
Robert Gordon, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500

**Counsel for the Commonwealth:**

Michael Axline, Esq.
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825
(916) 488-6688

**Liaison Counsel for Defendants:**

James A. Pardo, Esq.
Lisa A. Gerson, Esq.
McDermott, Will & Emery, LLP
340 Madison Avenue
New York, NY 10017
(212) 547-5400

**Counsel for LUKOIL Americas Corporation:**

James P. Tuite, Esq.
Katherine M. Katchen, Esq.
Matthew A. Scarola, Esq.
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 887-4000