g3temtbec

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In Re: METHYL TERTIARY BUTYL        00 MDL 1358 (SAS)
                ETHER ("MTBE") PRODUCTS   00 CV  1898 (SAS)
 4            LIABILITY LITIGATION
                                         Telephone Conference
 5   ------------------------------x

 6                                       New York, N.Y.
                                         March 29, 2016
 7                                       2:35 p.m.

 8   Before:

 9          HON. SHIRA A. SCHEINDLIN

10                                       District Judge

11          APPEARANCES

12   MILLER AXLINE & SAWYER
             Attorneys for Plaintiffs
13   BY:  DUANE C. MILLER
          MICHAEL AXLINE
14
     JACKSON, GILMOUR & DOBBS
15           Attorneys for Plaintiffs
     BY:  JOHN D.S. GILMOUR
16
     COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
17           Attorneys for Plaintiffs
     BY:  LEONARD Z. KAUFMAN
18
     WEITZ & LUXENBERG, P.C.
19           Attorneys for Plaintiffs
     BY:  WILLIAM J. WALSH
20
     McDERMOTT WILL & EMERY LLP
21           Attorneys for ExxonMobil
     BY:  JAMES A. PARDO
22
     SEDGWICK LAW
23           Attorneys for Shell Oil Company
     BY:  PETER CONDRON
24
     EIMER STAHL
25           Attorneys for CITGO Petroleum
     BY:  LISA MEYER
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g3temtbec

                    APPEARANCES (continued)

JAMES B. HARRIS
        Attorney for Petrobas America

OBSERVING FOR DEFENDANTS:
        Ira Matesky
        Daniel Krainin
        Chad Higgins
        Jessica Farley
        Stephanie Weirick
        Pamela Hanebutt
        Albeniz Fuentes
        Jeremiah Anderson
        Andrew Langan
        James Tuite
        Meghana Shah
        Barry Goheen
        Matthew Conley
        Robert Wilson
        Susan Dean

OBSERVING FOR DEFENDANTS VIA TELEPHONE:
        Kelly Murrie
        Jennifer Aspinall
        Stephanie Hall
        Steve Dillard
        Dawn Ellison
        Alejandro Cepeda
        Amy Parker
        Michael Regan
        William Stack
        Edward Goolsby
        Matthew Parisi

g3temtbec

```
 1            (In open court)

 2            THE COURT:  Good afternoon, Mr. Walsh.

 3            MR. WALSH:  Good afternoon, your Honor.

 4            THE COURT:  Mr. Miller, Mr. Axline, Mr. Kaufman,

 5   Mr. Gilmour.

 6            Mr. Pardo.

 7            MR. PARDO:  Good afternoon, your Honor.

 8            THE COURT:  Ms. Meyer, Mr. Condron.

 9            MR. CONDRON:  Good afternoon, your Honor.

10            THE COURT:  Mr. Harris.

11            MR. HARRIS:  Good afternoon, your Honor.

12            THE COURT:  Mr. Langan, there you are.

13            MR. LANGAN:  Good afternoon, your Honor.

14            THE COURT:  Mr. Anderson?

15            MR. ANDERSON:  Good afternoon, your Honor.

16            THE COURT:  Ms. Hanebutt.

17            MS. HANEBUTT:  Good afternoon.

18            THE COURT:  Mr. Krainin.

19            MR. KRAININ:  Good afternoon, your Honor.

20            THE COURT:  I have your agenda.

21            Oops, the phone.  Who's on the phone?

22            Good afternoon.  This is Judge Scheindlin.  There are

23   eleven of you on this phone call, so I won't be greeting you by

24   name, but I will give this list to the court reporter so she

25   will know who has been on the phone.  And I should say that to
```

g3temtbec

1    the other folks who I didn't greet, but your names are on the

2    appearance sheet and will be on the record.

3              So if you don't have too long an agenda for today.

4    It's primarily New Jersey and Puerto Rico.  And in some sense

5    it's much the same issue in both.

6              Starting with New Jersey, I was told I would get an

7    update, if there is any update, on the phase one remand.  And

8    then we should talk about structuring phase two.

9              So, Mr. Kaufman, did you want to start?

10             MR. KAUFMAN:  Your Honor, if I might give you an

11   update.  Literally as I was leaving my office this afternoon to

12   come here, I got a call from Judge Wilson's chambers.  She's

13   the judge in New Jersey to whom this has been assigned.  To

14   make a long story short, the upshot is that the case is being

15   referred to magistrates.  And there will be a case management

16   conference scheduled sometime sooner, rather than later, so

17   that we can set a schedule for everything that needs to be done

18   in order to try the case.  So I've informed defendants about

19   that as well when I arrived here today.

20             So that's the status on phase one.  It looks like it

21   is starting to move and hopefully will get to a trial sooner,

22   rather than later, in that matter.

23             THE COURT:  What is the structure of the phase one

24   trial as you understand it?  What will be tried in phase one?

25             MR. KAUFMAN:  We will try all issues of liability and

g3temtbec

1    damages for the trial sites.

2              THE COURT:  All issues.  So it's an all-issues trial?

3              MR. KAUFMAN:  That's my understanding, yes.

4              THE COURT:  Okay.  So that's the update.  Does anybody

5    have anything to add about the update that Mr. Kaufman just

6    gave?  No?  Of course.

7              So let's talk a little bit about phase two.  You have

8    written letters back and forth as to how you think it should be

9    structured.  The plaintiffs' letter starts with two alternative

10   ideas.  One is what they call a statistical extrapolation

11   approach, which was pretty much used in New Hampshire.  And as

12   I understand it, it did reach the highest court of

13   New Hampshire.  And the verdict stood, so to speak.  So that's

14   one possibility.

15             The second proposal from the plaintiff is that the

16   phase two proceeding be a bifurcated trial that first

17   determines liability and punitive damages, and then after that

18   verdict would take up compensatory damages.  But I didn't

19   understand the details in this second alternative as to how

20   many or which sites would be tried.  I understand bifurcation.

21   I understand trying liability and punitive damages first and

22   compensatory damages second.  But I don't understand what the

23   sites are that you're pointing out.

24             So the plaintiffs also go on in their submissions to

25   suggest that defendants should stipulate to certain facts about

g3temtbec

ownerships of sites and suppliers to those sites and who paid

for remediation of those sites.  And then the plaintiffs ask

this Court to direct the parties to draft a case management

order for how to resolve all the remaining claims in a single

additional trial.

          Defendants were not entirely clear as to what approach

they would take, but they said we shouldn't even be talking

about phase two until after phase one is completed.  But if

they're forced to talk about it, they're leaning towards

something called an enhanced focus site approach.  And this is

the idea of putting sites into three categories, or buckets.

And so you'd have these three subcategories where the sites

would be separated by fact patterns or other criteria.  And

they say that doing that, we can try more than the 20 sites in

phase one.  But more would not get us anywhere near, I assume,

5,000.  So there really has to be a way to do this.

          So my thought is that, of course, plaintiffs have the

better of it in the sense of we can't have endless trials.  It

is certainly better to structure phase two in some way that

makes it not only the second trial but the last trial, if

there's a way to do that; because trials, if they occur, are

expensive and long for the Court.  They're an imposition on the

Court when they're very long; three months, six months, nine

months.  They're very difficult things.  You can't keep trying

them.  Even 50 at a time won't get you there when you're

g3temtbec

1    talking about 5,000 sites.  So it's not realistic to have a

2    second trial, a third, and then 20th and 50th trial.  It just

3    can't be done.  The Court really can't accommodate that.  The

4    Court's system can't accommodate that.

5        So there has to be some way to do less than all but

6    more than you do in phase one.  And it wouldn't be a bad idea

7    to understand now to some extent what approach is taken so that

8    the discovery, which remains in the purview of the MDL Court,

9    can be organized toward that goal of a meaningful phase two

10   trial.

11       Now, while the Court can't and won't order anybody to

12   stipulate to things -- people aren't ordered to stipulate;

13   that's a voluntary act, so I can't order people to stipulate --

14   but a master list, sites where there is knowledge, should be

15   created that names the site and the ownership and the supplier

16   and remediator per site for all known locations.  That at least

17   would be a start.

18       But how to really structure a phase two trial is a big

19   topic.  The statistical extrapolation approach is something

20   that I think not only New Hampshire has proved, but there was a

21   recent Supreme Court decision this week in a very different

22   context, *Tyson Foods* -- you saw that.  *Tyson Foods* had to do

23   with overtime hours and donning and doffing uniforms.  But the

24   point was the Supreme Court accepted the notion that you could

25   do it by statistical extrapolation.  And it was the only

g3temtbec

```
 1    realistic way to do it.  Every worker and every location is
 2    going to have different uniforms to take on and off and is
 3    going to take a different amount of time.  And the Court
 4    recognized that that was not a feasible way to proceed.
 5           So there is some now Supreme Court authority, albeit
 6    distinguishable and different contexts.  I'm sure defendants
 7    will want to write long briefs telling me that it's totally
 8    different.  I get that.  But the concept of statistical
 9    extrapolation was addressed.  So that's certainly one thought.
10           I don't mind the defense notion of enhanced focus
11    sites by subcategories, if they would agree that if you tried
12    the -- let's say three or four buckets' worth of categories,
13    you would agree to that, extrapolate those findings, the
14    remaining sites that could fall into those buckets.  That's
15    okay, too, but there would have to be an agreement in advance.
16    The parties would negotiate how many categories, how many sites
17    they want to try per category.  Then they would agree that
18    whatever findings come out of that jury trial, they would agree
19    in advance to apply to the remainder that fall into that
20    category.  Even over time, even if the site turns up later but
21    can then be assigned to one of the categories, the findings
22    would apply.  And we've done that here in the Southern District
23    of New York in big cases, agreed in advance to apply findings
24    to futures cases.
25           But that is an approach, too.  It's not really the
```

g3temtbec

same as statistical extrapolation.  It's a common sense

approach, where the parties negotiate and agree that certain

findings can be applied going forward, once they figure out the

categories.

So those are probably the two approaches that make the

most sense to me.  I don't agree with the defendants that I or

my successor shouldn't even be discussing this until after

phase one is done.  Why put it off?  I mean, we need to proceed

with discovery, even as you're getting ready to try this big

phase one case.

And so I turn briefly -- and of course I'll hear from

you in a minute, but I might as well cover Puerto Rico, because

it's not all that different.  Puerto Rico has the same issue,

too, in a way.  We don't know anything about a phase one trial,

because the remand was just issued.  So it's probably much too

early to even expect a report on phase one.

But would you agree, Mr. Axline, with what Mr. Kaufman

said, that phase one is meant to be an all-issues trial for the

focus sites?

MR. AXLINE:  Yes.

THE COURT:  So in that sense it's the same.  And so,

again, you said you've been having some meet and confers on

that particular case.  And your letter states that you will

update the Court on the status of your discussions at the

conference.  So I think I should pause from speaking and ask if

g3temtbec

 1    you have any update as to the results of your meet and confer

 2    as to how to structure phase two.

 3            MR. AXLINE:  All I can tell you is that we're

 4    continuing to meet and confer.  We haven't reached a

 5    resolution, but I think --

 6            THE COURT:  What ideas are you kicking around?

 7            Ms. Meyer, if you want to confer, the usual approach

 8    here is to say, may I have a moment, then confer, so I was not

 9    talking over you.

10            So what are some of the thoughts that are being kicked

11    around as to how to conduct a phase two trial?

12            MR. AXLINE:  With respect to a phase two trial and

13    discovery, we've discussed getting together to draft CMOs,

14    potentially conflicting CMOs, but trying to identify areas of

15    commonality.

16            You will recall that in December there was a meeting

17    with some of the readded defendants who came back into the

18    case.  And your Honor ordered us to provide some information to

19    the defendants.  We're in the process of doing that.  But in

20    terms of anything specific that I could say on behalf of my

21    client in Puerto Rico or the defendants with respect to phase

22    two, we don't have --

23            THE COURT:  What is your notion of the best approach

24    for phase two?  Do you, again, agree with Mr. Kaufman that

25    so-called phase two should be the last trial?

g3temtbec

1          MR. AXLINE:  Yes.  That is the position the

2    Commonwealth is taking.

3          THE COURT:  So assuming that, how do you try the vast

4    number of sites that there are?  I don't know if the number is

5    as big as New Jersey or smaller, but whatever the number is,

6    what is your approach as to how you try that?

7          MR. AXLINE:  Well, it's quite a bit smaller than

8    New Jersey.  But nevertheless, I think it's large enough to

9    warrant using a statistical approach or a bifurcation.  I think

10   those are the two --

11         THE COURT:  Or a bifurcation.  What does that mean?

12         MR. AXLINE:  Where you try liability first and then

13   damages.  So the --

14         THE COURT:  For what sites?

15         MR. AXLINE:  Well, you would try liability in terms of

16   the defendants' liability for delivering MTBE to sites that are

17   not questionable whether the defendants delivered to sites in

18   Puerto Rico, and then the number of sites I think and the

19   extent of the damage at sites would determine the damages.

20   So --

21         THE COURT:  So when it becomes site specific would not

22   be until the damages part of the bifurcation, is that what

23   you're saying?

24         MR. AXLINE:  Correct.  Yes.

25         THE COURT:  So in the first part of the bifurcation in

g3temtbec

1    phase two, it's not site specific?

2            MR. AXLINE:  Right.  You'd get a special verdict on

3    product liability and have the jury try that.

4            THE COURT:  And so the only time -- I'm sure I'm

5    repeating that you get -- site specific is on the damages phase

6    of the second trial?

7            MR. AXLINE:  Correct.

8            THE COURT:  So then you'd have to have full discovery

9    on every site in Puerto Rico?

10           MR. AXLINE:  Not if you took a statistical approach.

11   So you could --

12           THE COURT:  But in the bifurcated approach that you

13   just described --

14           MR. AXLINE:  Yes.

15           THE COURT:  -- you would have to?

16           MR. AXLINE:  No.  No.  These the not mutually

17   exclusive, your Honor.

18           THE COURT:  I see.

19           MR. AXLINE:  So you can try on liability.  Assuming

20   liability was found, and the special verdict form would look a

21   lot like the New Hampshire form that we submitted as an

22   exhibit, then you would present the statistical evidence to the

23   jury on the likely number of wells impacted, release sites and

24   so on.

25           THE COURT:  What are the numbers in New Jersey -- in

g3temtbec

 1   Puerto Rico?

 2               MR. AXLINE:  They're roughly 400.

 3               THE COURT:  Okay.  Thank you, Mr. Axline.

 4               Who wants to be heard from the defense side about the

 5   phase two in either of these jurisdictions, either or both?

 6               MR. PARDO:  I'll begin, your Honor.

 7               THE COURT:  Okay.

 8               MR. PARDO:  With respect to the statewide statistical

 9   extrapolation approach, my colleagues, Ms. Meyer, Mr. Condron,

10   may also have items to add.  But I'll begin.

11               THE COURT:  Okay.

12               MR. PARDO:  Can I just step us back, though, for one

13   second about the focus site approach; because not only do I

14   want to explain why the defendants are going towards an

15   enhanced focus site idea, but I want you to understand that the

16   approach that you put in place -- because this was your idea

17   ten years ago -- has worked, okay?  Has worked.  More

18   importantly, it has not come to fruition yet.

19               THE COURT:  Well, that's true.

20               MR. PARDO:  We're not saying that it's premature to be

21   talking about phase two case structuring.  Obviously we're

22   talking about it now, and we've had meet and confers with

23   plaintiffs.  What we're saying is that it's premature to commit

24   ourselves to taking the focus site approach, declaring it a

25   failure, which I think is what the plaintiffs are doing, and

g3temtbec

1   putting it into the trash can, just as --

2           THE COURT:  I don't think so at all.  I thought

3   it's -- that's phase one.  They're not putting it in the trash

4   can.  They're ready to try the focus site approach, I thought.

5           MR. PARDO:  They will.  But what they're saying is it

6   hasn't and it won't work for phase two.  And what I want to

7   tell you is that I think it will, okay.  When you think about

8   what you've accomplished, what your idea has done here in the

9   New Jersey case, one of the biggest cases the State of

10  New Jersey has probably ever seen, ever will see, okay, you

11  haven't even had your first focus trial yet.  You have not even

12  had a trial yet.  And more than half your defendants are out.

13          THE COURT:  That's true.  Out -- they've settled.

14          MR. PARDO:  They've settled.  There's 107 million

15  plus --

16          THE COURT:  Yes, indeed.

17          MR. PARDO:  -- that's been paid to the state.

18          THE COURT:  Right.

19          MR. PARDO:  It's a lot of money.  It's a lot of

20  parties.

21          THE COURT:  Yes.

22          MR. PARDO:  The whole point of the approach was to get

23  this case -- not up to trial, but through trial, and then to

24  see where we're at.

25          THE COURT:  That's true.

g3temtbec

1          MR. PARDO:  That process needs to play itself out, I

2    think, before we commit ourselves to doing a 180 and

3    throwing -- it is a 180.  What they're proposing is completely

4    different from anything that we've ever done in this MDL, that

5    really has been done almost anywhere.

6          THE COURT:  I don't agree with that.  What they're

7    saying is phase one is the approach that we've taken, as you've

8    said, for ten years.  It will go to trial.  If that does not

9    resolve in a global settlement, we need to be ready to proceed

10   to wrap this case up.  That's a good idea.  Cases should not be

11   permanent, like permanent revolution, permanent litigation.

12   I'm sure Chairman Mao would agree it shouldn't be forever in

13   litigation.

14          So the question is:  How do you wrap it up if, at the

15   end of phase one, there is not a settlement, global settlement?

16   And they say you don't want to address that that day because

17   then you lose another two years waiting to be ready.  So all

18   they're saying is the approach should be thought about now so

19   that you're on two tracks:  One, some team is getting ready for

20   trial; but another team is moving forward to be ready to deal

21   with the remainder, if there's not a global settlement.

22          MR. PARDO:  And we agree.  We agree.  We don't

23   disagree.  That's, again, why we're having the conversation.

24          What I'm saying is our approach says, we believe the

25   focus site approach has worked.  Let's not throw it away.

g3temtbec

1          THE COURT:  We're not throwing it away.

2          MR. PARDO:  Let's take it, let's enhance it.  Let's

3    make it more efficient.  Let's make it more focused.  And let's

4    do the next phase --

5          THE COURT:  That's fine, if you took my additional

6    idea on top of it.  And if you said, in phase two we will use

7    the categories approach, we'll use these buckets.  We'll put a

8    lot more sites in because we're going to have not just 20 from

9    one trial; we'll have buckets of 20, buckets of 30.  So maybe

10   we're not going to try as much as 90, but that leaves 4,500.

11   So unless we are willing to agree up front that after we try

12   these categories with common fact patterns and we have

13   verdicts, we will agree to apply those verdicts and wrap this

14   thing up.

15         MR. PARDO:  I appreciate the ideas, yes.  It's not a

16   bad one.  It's one we haven't talked about, of course, as a

17   defense group.  Certainly haven't talked about it with

18   plaintiffs.

19         But let me be clear:  No one on either side of the

20   table here is suggesting to you or to the next judge or to

21   anyone that 5,250 sites are going to be tried.  You're right,

22   there has to be a way to do it, get resolution on all of those

23   without actually trying them all.

24         THE COURT:  That's right.

25         MR. PARDO:  But there has to be a way to do it that

g3temtbec

```
 1   respects what you have said for 15 years in this case, 15

 2   years.

 3              THE COURT:  Which is?

 4              MR. PARDO:  That sites matter.  That every site is

 5   different.  That there are individual issues, okay.

 6              THE COURT:  But that would be the benefit of your

 7   suggestion about the buckets.  Every site is different, but

 8   they're not that different.  In other words, the detail is

 9   different, but the categories can be made to be similar.  And

10   if you pick enough buckets -- not limited to three, it could be

11   five -- I think every site can be in one of those buckets.  I

12   really do.  They have common characteristics that puts them in

13   the bucket.  Then you try those common buckets, and maybe

14   that's not one trial but four.  Let's say you pick four

15   buckets.  The Court could live with four more trials.  But if

16   at the end of those four -- they could be simultaneous.  They

17   could be parceled out to different judges in the building.  Who

18   knows?  But when they're tried, that's it.  Then it's just a

19   matter of assigning the remaining sites to one of the buckets

20   and agreeing to apply the findings.  That's my view.

21              Anyway, you said it's new, so it's something to think

22   about at least.

23              MR. PARDO:  It's something to think about.  But even

24   under that approach, that approach would be a significant

25   change from what we've done.  And from what you've said again
```

g3temtbec

1    and again and again, going all the way back -- I'll give you a

2    name of a case that maybe you'll remember:  Lasouza.

3              THE COURT:  What's the name?

4              MR. PARDO:  Lasouza, remember?  Parisha, Berry and

5    Lasouza (phonetic), 2001, and initial class actions.

6              THE COURT:  I don't.

7              MR. PARDO:  I think I was an associate.

8              THE COURT:  Okay.

9              MR. PARDO:  I had a lot more hair, too.  These were

10   the New York private wells.  They were a class.  They were a

11   putative class.  And the problem was they couldn't tell the

12   Court, they couldn't tell us if their wells had ever been

13   actually impacted.  They couldn't tell if there was any injury

14   or any damage.

15             THE COURT:  That would be down the road, because this

16   is a quasi focus site effort.  When you create these buckets or

17   categories, those wells, you will know.  Those are known wells.

18   It's only after that with the remainder, when you're trying to

19   put them in buckets, that you could then say, this well doesn't

20   belong in any bucket, because you haven't given us any proof

21   that it's ever been impacted.  That's like a claims resolution

22   procedure.  It's been used and used.  You know, it was used in

23   Dalkon Shields, used in asbestos, used in big settlements all

24   the time.  People know what to do after the first few trials.

25   It's just a matter of applying it in a claims resolution type

g3temtbec

process.  There's minimum proof needed.  And if the proof isn't there, that site falls out.  If the proof is there, it goes in one of the four buckets or five or three, whatever the number is.  And you apply the findings from the trial to that bucket.

So it's just a matter of being creative and thinking it through.  But you're probably right that some sites will be essentially no-pay sites.  That's fine.  It will work itself out.

MR. PARDO:  Right. in fact, I think there will be many sites that are --

THE COURT:  Maybe there will be some disputes.  I have that in securities fraud cases, where, when the claims process starts, there are challenges to reliance, for some investors probably didn't rely they should get anything.  We work it out.  We have a process.  But there's no more trials.

The liability trials you call them, Mr. Axline, up front that's determined that now we're essentially in the second site-by-site damages phase.  But we shouldn't do it by trial in New Jersey, once we try a focus group in the bucket.  So I think it's a good idea, but we're not going to solve it today, anyway; is putting out there a good process, a suggestion based on your letters and my experience and thinking.  And I want you to take it under advisement.  And we'll see what we can do.

Now, whether we can do anything in the remaining 30

g3temtbec

```
 1    days that I happen to be the judge, I don't know.  It would be

 2    nice, nice legacy for MTBE cases to have some kind of a thought

 3    for how to resolve it.  And if not, such is life.  But I would

 4    like to try to see where we could go.

 5            MR. PARDO:  This issue is important enough, I think,

 6    that it's safe to say, speaking for the defendants, we think it

 7    would require a fair amount of time on briefing and argument,

 8    your Honor.

 9            THE COURT:  I'm not sure you want to do that.

10    Briefing?  What's there to brief?  You're going to say the

11    statistical approach denies us due process?  I'm not even

12    proposing a statistical approach.  But I think you'd have a

13    little trouble anyway between the Supreme Court and

14    New Hampshire.

15            But putting that aside, I'm not even proposing that.

16    Don't reject what might be the right way to go reflexively.

17    Obviously, whoever you are lucky enough to get next is never

18    going to have the 15 years of experience that we just spoke

19    about on knowledge of these cases.  So if we could have some

20    intensive discussions in the remaining time, that would be

21    good.  The more we know where we're heading with the remaining

22    discovery, the more efficient it is.  And efficiency should be

23    prized.

24            And it's really not to defend -- I don't think it's

25    really to defendants' advantage to delay and delay and delay.
```

g3temtbec

```
 1    I don't see how that's particularly good for your companies.
 2    If you can wrap this long-running litigation up, there is
 3    advantages to that, too.  So don't reflexively reject ideas and
 4    put us on an organized track to someday conclude these
 5    litigations.  That should be the plaintiffs' goal and the
 6    defendants' goal.  I'm sure it is the plaintiffs' goal.  That's
 7    obvious.  But it should be your goal, too, Mr. Pardo.
 8              MR. PARDO:  It is my goal, your Honor.
 9              THE COURT:  Good.  Then in that case, as far as I'm
10    concerned, we can meet again in two weeks to discuss this idea
11    further.  I'm serious.
12              Anyway, it would be so nice to see you again.
13              MR. PARDO:  It would be nice to see you, too, again,
14    your Honor.
15              THE COURT:  I hope that will be the case.
16              MR. AXLINE:  It's hard to say good-bye.
17              THE COURT:  Yes, indeed.
18              But in any event, so who else wants to be heard?  You
19    implied that Ms. Meyer might want to be heard?
20              MR. PARDO:  It really depended on where the
21    conversation between us went.  I don't know if my colleagues --
22              THE COURT:  Somebody might want to comment as to why
23    you think there's a need for briefing.  I mean, briefing would
24    come in if you were going to challenge, I think, the
25    statistical extrapolation approach, because the other approach
```

g3temtbec

```
 1    is not a matter of challenging.  It's a matter of whether it's
 2    a structure that makes sense.  There's nothing about it that
 3    can work without some agreement, those approaches.
 4              But the statistical approach could be imposed on you.
 5    And that's why briefing would be required; if somebody was
 6    going to try to impose that on you, the statistical
 7    extrapolation approach.  But this approach is quite different.
 8    And maybe it's thoughtful.  And maybe, as I said, some defense
 9    company out here might actually make their clients happy by
10    trying to wrap this up.
11              MR. PARDO:  And I want to be clear --
12              THE COURT:  Someday.
13              MR. PARDO:   -- I'm not rejecting that.  I hope I
14    didn't say something to suggest to you that I was knee-jerk
15    rejecting your idea.  I'm not.  It's just one we haven't
16    discussed as a defense group.
17              THE COURT:  I understand.
18              So does anybody else wish to be heard?
19              MR. CONDRON:  Your Honor, Peter Condron.
20              The approach you've outlined today, I think, merits
21    some serious consideration on our part.  I will say we would
22    reject the statistical extrapolation.
23              THE COURT:  I kind of thought you would like that the
24    least.  I have some understanding of why.
25              MR. CONDRON:  Yes.  But I think we do need to talk to
```

g3temtbec

```
1    our clients.  We need to talk to each other and take it under

2    advisement.

3              THE COURT:  For sure.  I appreciate that, Mr. Condron.

4              Anybody else wish to be heard?

5         MS. MEYER:  I would echo that, your Honor.  And I

6    think if you would like to hear more about the problems that we

7    see with the statistical extrapolation approach --

8              THE COURT:  Sure.

9         MS. MEYER:  -- I'm happy to go into that.  But we can

10   also save that for briefing down the line.

11             THE COURT:  Then I probably won't get to hear it, so

12   I'd like a little preview.

13             MS. MEYER:  I think the number one problem is the due

14   process clause.  As these cases have been tried over the last

15   10 to 15 years, the defendants have had the opportunity to put

16   on site-specific defenses that range from statute of

17   limitations, lack of injury, lack of causation, sometimes lack

18   of failure to warn at a site like you just found in the Puerto

19   Rico sites.  And those defenses disappear in any kind of

20   statistical extrapolation approach, because the defendants

21   simply do not have a chance to make those arguments.

22             THE COURT:  Those site-specific arguments.

23             But in Mr. Axline's proposal, he said the second half

24   of the second phase would be a site-specific damages approach.

25   It would just be bifurcated.  So liability would be out of the
```

g3temtbec

```
1    way.  Earlier letters had said liability and punitive damages,
2    but, okay, would be out of the way.  And then phase two of
3    the -- not phase two; the second half, the bifurcation in phase
4    two would be a site-specific damages approach.  That's possible
5    for Puerto Rico, where there's no more than 400 sites.  It's
6    probably impossible in New Jersey, where there's 5,000, because
7    if they're contested, you really are asking the courts, in this
8    case the federal courts, to somehow have 5,000 minitrials.
9          And that can't be.  Courts have an obligation to
10   manage their dockets.  And that's well established in the law,
11   too.  So while you have rights to due process, of course, the
12   courts have to survive a mass tort case.  And they've worked
13   out creative ways over the years to survive mass tort type
14   cases.  And I think the higher courts are going to be pretty
15   elastic, pretty reasonable in accepting whatever approach it
16   has worked out, because the Court has to manage its docket.
17   And that's important, too.  We serve many clients.
18         MS. MEYER:  I agree with that, your Honor.  And I
19   think that's -- my client is no longer in the New Jersey
20   matter.  But what I've heard the defendants suggest as an
21   alternative is something that would lead to a conclusion of the
22   case in advance of having to try 5,000 sites.
23         THE COURT:  That's what I was picking up on in what I
24   spoke about as a combination of the ideas.
25         MS. MEYER:  I would submit, your Honor, there are many
```

g3temtbec

1  other legal challenges that we would make to a statistical

2  extrapolation approach that, even under this bifurcated

3  proposal, I don't see how plaintiffs would be proving causation

4  and injury to key elements to any claim proving product

5  liability or failure to warn in the abstract, without

6  discussing actual causation and injury, with respect to any

7  sites and --

8          THE COURT:  Mr. Axline, I think, needs to answer that.

9          She is saying that in the first half of the second

10 phase of the bifurcation, if it's general and not

11 site-specific, how do you deal with such things as causation

12 and injury?  When you talk about liability, you can't have

13 liability without it.

14         MR. AXLINE:  Understood, your Honor.  And I do need to

15 correct the record slightly.

16         I believe when you asked me about the second phase in

17 the Puerto Rico example, I did say that we would want to look

18 at using statistical evidence on damages.  So there may be some

19 site-specific evidence, but there may also be some use of

20 statistical evidence.  So --

21         THE COURT:  On the second half.

22         MR. AXLINE:  On the second half.

23         THE COURT:  But in the first half, what Ms. Meyer is

24 saying is, how do you even try liability, the generality, when

25 there are site-specific elements that you have to prove

g3temtbec

```
 1    affirmatively, or that they have to defend by site?  And she
 2    mentions in terms of your burden of proof causation and injury.
 3            MR. AXLINE:  Well, it's a matter of degree, your
 4    Honor.  I think the problem she's pointing out would -- the
 5    argument she's making would be made in the case of the bucket
 6    approach as well.  At some point you have to --
 7            THE COURT:  Well, not necessarily, because in that
 8    approach, it's site-specific for every site in the bucket,
 9    right?  That is site specific.  So whether it's 30 cases per
10    bucket or 40 or 20, they're specific.  All I, then, propose is
11    that you do have to agree in advance that you apply the
12    findings to anything -- any other site that can fairly be put
13    in that bucket.  That should have assured Mr. Pardo that some
14    sites won't be in any bucket, because they will defend those
15    sites by saying there's no damage at all.  Respond.  That's
16    happened in all these claims, big claims cases.  Some claims
17    are full out.  There's no proof of an injury.  So there is a
18    chance to prove no injury or a statute of limitations has run.
19            MR. AXLINE:  Understood.  So that I think of as almost
20    an administrative matter, your Honor, frankly.
21            But in the New Jersey case they were able to try the
22    case to a jury.
23            THE COURT:  New Hampshire.
24            MR. AXLINE:  I'm sorry, New Hampshire.  Try the case
25    to a jury with a special verdict that looked -- that didn't
```

g3temtbec

1   have any individual sites but, rather, looked at the degree of

2   culpability of the defendants for the failure to warn.  And

3   that was common to all the defendants.  You don't go site by

4   site and say, did you fail to warn at the site, because they

5   didn't issue warnings to anybody at any time.  And then you

6   take a look at their market share, the commingling of products

7   going into the relevant geographic area, the market share that

8   each of them had, and you assign responsibility for the total

9   damages --

10              THE COURT:  No, I understand --

11              MR. AXLINE:  -- based upon market share.

12              THE COURT:  I understand that.  But that doesn't deal

13   with causation and injury individually.  It deals with failure

14   to warn.  I get that.  But it has to have caused the

15   contamination and injury to the site.

16              MR. AXLINE:  But I think it does deal with causation

17   and injury, because it is the state that is the plaintiff.

18   There's no question, as the New Hampshire court pointed out,

19   that the state has been injured.  In fact, it's been injured in

20   a very big way.  And the injury which these defendants caused,

21   assuming that's the verdict, is so large that it's difficult

22   for the plaintiff to use anything other than statistical

23   evidence to get its arms around the entire damages.

24              So I think that's the sort of thing we'd like to talk

25   to you more about and maybe do another letter brief before a

g3temtbec

1   two-week meeting on.  Because the reality is when you have a

2   state as a plaintiff -- especially Pennsylvania, New Jersey, to

3   some extent Puerto Rico -- the damage caused by these

4   defendants is so massive that you've got to find a creative

5   way, once you've found liability, to allow a jury to consider

6   what is an appropriate amount to award as damages.  And that

7   may not involve --

8           THE COURT:  Wait.  Are you saying that it's not site

9   by site, because the owner of all the sites is the same owner,

10   so it almost doesn't matter if 50 out of the 400 sites are not

11   actually contaminated?  It doesn't matter, is that what you're

12   saying, because the other 350 are damaged and they're all owned

13   by the same owner, namely the state?  You work out one big

14   damages figure; it's not a site-by-site payment?

15           MR. AXLINE:  Yes.  Yes.  And as with any injury, you

16   use statistics to do that, particularly when you're talking

17   about what is going to be the impact on the state in the

18   future.  That was the category of damages in the New Hampshire

19   case.  Because one of the elements of the damage is that the

20   state doesn't have the money to spend to find out what the full

21   impacts are.  It's got to sit back and wait for it to reveal

22   itself over the years.  So that's something that the jury

23   awarded a specific category of damages for.  And the other

24   states face that as well.

25           So the other aspect of this is that --

g3temtbec

1          THE COURT:  What did you think of my sort of qualified

2     bucket approach; in other words, starting with that idea and

3     then applying it to the remainder?

4          MR. AXLINE:  Do you mind if Mr. Miller responds?

5     Because he has some thoughts on that.

6          THE COURT:  I don't mind at all.

7          MR. MILLER:  Thank you, your Honor.

8          New Jersey is a little different.  You haven't heard

9     much about the statistics that go beyond the 5,000 sites.  I'm

10    going to explain this very briefly to illustrate why the

11    defendants' approach is less workable.

12         There are 440,000 private wells in New Jersey.  When

13    any home is sold, it is required that they test for MTBE, among

14    other things.  We now have data on testing 118,000 out of the

15    440,000 wells.  Out of that about 12 percent were contaminated,

16    which, if extrapolated to the larger population, is 55,000

17    wells.

18         So it's not just a claim that's related to what's

19    going on at the gasoline station?  What do we have to do to

20    clean it up?  How much has been done to clean it up?  Is there

21    anything left, so therefore there's no injury?  It's not that.

22    And when you talk about a bucket, it only makes sense to try a

23    bucket if you assume that a relatively small group is

24    representative of the whole.

25         THE COURT:  That's right.

g3temtbec

1           MR. MILLER:  And that's exactly --

2           THE COURT:  By characteristics.

3           MR. MILLER:  That's right.  Otherwise --

4           THE COURT:  Common characteristics.

5           MR. MILLER:  Otherwise, the bucket approach totally

6    fails.

7           THE COURT:  Oh, well, no.  I said that.  That's why I

8    called it the modified bucket approach, is that you would be

9    able to do that.  You would have common characteristics -- that

10   is the bucket -- and you put focus sites into that bucket where

11   there is 20, 30 or 40 per bucket.  But then you have to apply

12   it to whatever is common to that group of characteristics.  So

13   it's a combination of both approaches.

14          MR. MILLER:  Right.  But there are several claims that

15   aren't as directly tied to the gas station itself.  And I gave

16   you an example, which means that at the end of the day, if

17   you're trying to get a representative, manageable group to try

18   and to apply it to project a much larger number that applies to

19   the whole universe, which would you rather use:  What I call

20   outdated bucket technology, or mathematics that predict

21   accurately that if you take a sample randomly, you're going to

22   pick up a known injury site; you're going to pick up a statute

23   of limitations site?  And you can use that to make the best

24   estimate you can.

25          At the end of the day, with the size of this case, all

g3temtbec

1    we will ever have is an estimate.  There will never be a

2    number.

3              THE COURT:  No, I realize that.

4              MR. MILLER:  And my client would prefer to have the

5    most accurate tool that can be used, which is scientifically

6    supported, to make that projection and still have something

7    that's manageable and triable.

8              THE COURT:  So what would you try, a selective sample

9    that -- a mathematically selected sample, a predictive sample?

10             MR. MILLER:  Well, let's say that for each claim you

11   might -- it depends.

12             THE COURT:  Each claim?  Are you using "claim" now to

13   be synonomous with bucket; in other words, each common

14   characteristic type claim, is that what you mean?

15             MR. MILLER:  Let me give you an example of public

16   wells.

17             THE COURT:  Okay.

18             MR. MILLER:  There are hundreds of public wells in

19   New Jersey with MTBE.  We could scientifically select among the

20   wells and project that to the well claim and select among the

21   sites and project that to the site claim.  Now, I'm not

22   suggesting which one should be done with which tool.  Depending

23   on the claim, it may make more sense to vary it from a

24   statistical approach even.  But if you want an accurate measure

25   that fits the claim being made -- and what is heartening to me

g3temtbec

1    is they finished the New Hampshire case in three months.

2              THE COURT:  I know.

3              MR. MILLER:  So I don't think you can get a better

4    tool.  And I think buckets ultimately don't work unless they're

5    representative.  So it's based on the same conceptual premise.

6              I think the parties need to sit down, discuss the

7    claims and the tools that would be used to resolve each of them

8    individually, as opposed to saying one size fits all.  But if

9    you're going to say any measure, any tool is most likely to be

10   usable as applied to everything, statistics work.  I mean, you

11   can predict the probability that you will be within 5 percent

12   or 10 percent by selecting very carefully the sample size.

13             THE COURT:  But that approach standing alone, to me,

14   doesn't account for different characteristics by category.

15   It's the best way I can put it.  It's the same idea, but you do

16   it four times.  That's all I'm saying.

17             MR. MILLER:  Yes.

18             THE COURT:  You do what you're proposing, but you

19   divide it into groups with common characteristics; because if

20   you do it across everything, I think you'd have too many

21   confounding factors in the mathematical analysis.  But if you

22   separate out -- I don't know whether the categories are private

23   wells, public wells, gas stations.  I don't know that.  That's

24   beyond my knowledge.  But if you do it that way, which is why I

25   called it the combined approach, or my approach, then it begins

g3temtbec

 1    to make some sense to me that we can extrapolate.

 2            But if you just put it all in one enormous bucket,

 3    there's some unfairness about that, because they have such

 4    different characteristics.  Now --

 5            MR. MILLER:  I think you'll find more commonality if

 6    you focus on groups of claims than you will if you focus on gas

 7    stations, which is all --

 8            THE COURT:  I wasn't recommending how to create the

 9    buckets, because I don't have that knowledge.  But I still like

10    that approach that isn't a "one size fits all," but it still

11    uses the same tools and concepts you're talking about but does

12    it by category, which I think sounds fair, more fair.

13            MR. MILLER:  Yes, your Honor.

14            THE COURT:  That's why I'd like you to think about

15    what I was saying.  At least, again, as I said to the

16    defendants, don't reject it out of hand.  Think about it.

17            MR. MILLER:  Yes.  I encourage that, and I would also

18    encourage a meeting in two weeks.

19            THE COURT:  I'd like to do that.

20            MR. AXLINE:  If I might add to that, your Honor, I

21    think what happened in the New Hampshire case, if you look at

22    the verdict that's attached as Exhibit C to our reply letter,

23    is that the plaintiffs, in order to get a quicker trial, made

24    some cuts on the damages that they were claiming.  I'm not

25    suggesting that that would necessarily happen with New Jersey.

g3temtbec

1   And we are talking right now mostly about the discovery leading

2   to a trial, so --

3           THE COURT:  Yes, we are.

4           MR. AXLINE:  We want to have the trial in mind when we

5   consider the best approach to discovery, but the categories of

6   damages here are ones that lended themselves to a state-wide

7   either complete approach, which is -- for example, past

8   clean-up costs is on page two of the special verdict form, part

9   two.  So the state was able to put in --

10          THE COURT:  Wait.  Where is this?  I'm on page two, I

11  thought.

12          MR. AXLINE:  There are two parts to the verdict form.

13  The first one was the causation part.  And that --

14          THE COURT:  There it is.

15          MR. AXLINE:  That, by the way, has some answers to the

16  defendants' causation arguments.

17          THE COURT:  Now I'm on page two.  Damages.  You said

18  past --

19          MR. AXLINE:  Past clean-up costs, put on evidence of

20  what it actually costs the state so far.  Cost to characterize

21  and clean up the highest-risk sites, which was, I think, a

22  strategic choice that New Hampshire made about what damages it

23  was going to claim there.  Then sampling drinking water wells.

24  That's a number that you can put together statewide based on

25  the number of wells and what it would cost to conduct a sample

g3temtbec

1    at each well.  And then testing drinking water wells

2    contaminated with MTBE at or above the MCL.

3           THE COURT:  You meant treating, not testing.  That's

4    okay.  You said testing.

5           MR. AXLINE:  Yes.

6           THE COURT:  You said testing.  You meant treating,

7    according to the verdict sheet.  Treating?

8           MR. AXLINE:  Yes.  I'm sorry.  Treating.  Yes.

9           THE COURT:  Thank you.

10          MR. AXLINE:  Those were two separate categories, but

11   they were based upon the numbers that could be obtained pretty

12   easily.  And so that's another option -- I just wanted to point

13   that out -- that avoids the -- this is something that the

14   plaintiffs would have to think about one by one, of course.

15          But I do want to point out that there are ways to

16   slice the onion that, in fact, avoid the site-specific issues

17   altogether, or at least are able to give the jury site-specific

18   information in volume that is relevant to the damages.

19          THE COURT:  I would still personally feel that the

20   combined focus site approach with the statistical approach has

21   greater fairness to both sides, so they are hearing as an

22   example some site-specific type of evidence and defenses.  But

23   then if the verdict is in favor of the plaintiff, so to speak,

24   it's agreed to be applied through statistics to the remainder

25   that fall in that category.

g3temtbec

1          Well, I think we've probably gone as far today, since

2     there won't be an order today.  But the reason an order is

3     important is to have the appropriate discovery begin.  That's

4     the goal, is to have the appropriate discovery begin as to the

5     remaining parts of this case.  The nonremanded portion are in

6     the MDL.  And it's this Court, and not the remand court, at

7     this point that will figure out the discovery for the remaining

8     sites.

9          Yes.

10          MR. PARDO:  And to that point, your Honor, that has

11     started, as you know.  We have discovery that's going on in

12     New Jersey.  We have discovery that's going on in Puerto Rico.

13     The discovery in Puerto Rico is focused on --

14          THE COURT:  Do you remember I mentioned the master

15     list during this conversation?

16          MR. PARDO:  I do remember.

17          THE COURT:  So that's something that can be done and

18     can be begun sooner, rather than later.  So there are things

19     that can and should be done by the MDL court.  And it helps if

20     we structure how phase two would play out, because it helps to

21     focus the discovery.

22          So if we go with this combination approach that I've

23     been talking about for the last close to an hour, we would know

24     how many buckets, what defines the buckets and how many sites

25     per bucket.  So we would know things that would focus the

g3temtbec

1    discovery, so to speak.

2              Again, I don't know that we should do any more today.

3    We've had a good, fruitful conversation, as they say in

4    diplomatic circles when they've accomplished nothing.  They

5    said, we're very fruitful.  That's what they say, because it

6    means people at least began to talk.  And then come back --

7    even though it's fast, there's a reason for it to be fast

8    here -- in a couple weeks to see if we've refined our views,

9    any of the three of us; that is, the plaintiffs, the

10   defendants, the Court.  And that's all I can do.  And then it

11   goes to someone who's had no experience at all with the MDL

12   that you've all been living in for so many years.

13             And most of you, by the way, don't change, which is

14   good.  Most of you are players who have been playing for many,

15   many years.  So you do have a wealth of knowledge, the lawyers

16   do.  But the Court won't.

17             Okay.  Anything else we should take up today?

18             I understand that Pennsylvania was originally on the

19   agenda, but you worked out the dispute on that issue.  So that

20   isn't for the Court today.

21             Is there anything else, then, for the Court today?

22             MR. PARDO:  No.

23             MR. KAUFMAN:  Just, your Honor, are you going to set a

24   time for us to get back?

25             THE COURT:  I think that's not a bad idea.  I know

g3temtbec

1  Mr. Pardo doesn't seem to want to come back and see me.

2  MR. PARDO:  That is not accurate, your Honor.  I'm

3  happy to come back.

4  MR. KAUFMAN:  We would like to see you at least one

5  more time.

6  THE COURT:  The reason I thought he didn't is because

7  it's so soon, he feels, to come to any real consensus as to how

8  to proceed.  But it can only do good to advance the

9  conversation.  And the shorter the time, the better.  So it

10  could also be three weeks.  I'm still here.  It doesn't really

11  matter.  If that helps, there's a little more time.  They have

12  a bigger group, much bigger than yours.

13  So let me glance at the calendar and see how it looks.

14  After all, today is not even April.  So April.  How about

15  Tuesday, April 26th?  That's as late as I can go.  And it gives

16  you the most time for a conversation.

17  MR. PARDO:  That's fine for us, your Honor.

18  THE COURT:  But I don't want -- what time did we meet

19  today?  2:30.  That's what I want again, 2:30.  2:30 on the

20  26th of April.

21  Okay.  Anything else?  All right.  It's good to see

22  you all.

23  Folks on the phone, the conference has just ended.

24  Thank you.

25  (Adjourned)