# McDermott Will & Emery

Boston Brussels Chicago Dallas Düsseldorf Frankfurt Houston London Los Angeles Miami
Milan Munich New York Orange County Paris Rome Seoul Silicon Valley Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

James A. Pardo
Attorney at Law
jpardo@mwe.com
+1 212 547 5353

**BY ELECTRONIC MAIL AND HAND DELIVERY**               April 18, 2016

The Honorable Shira A. Scheindlin
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

      Re:    Master File C.A. No. 1:00-1898 (SAS), M21-88, MDL No. 1358
              *Defendants' Pre-Conference Letter for April 26, 2016 Status Conference*

Dear Judge Scheindlin:

      Defendants respectfully submit this letter in advance of the April 26 conference.[1]

## JOINT AGENDA ITEMS

**I.**   *New Jersey*: **Phase II Issues**

      **A.**    **The Parties Must Determine What the Rest of the Case Looks Like.**

      Defendants' proposal, as set forth in the accompanying CMO, would focus on three crucial steps before any decision is made about Phase II case or trial structure: (i) updating site data and certain prior productions; (ii) compiling a master site list; and (iii) eliminating sites that Plaintiffs do not intend to pursue or for which they do not have viable claims. Defendants' position remains that a determination about Phase II structure can more prudently be made after these steps have been taken such that the parties, and the Court, have a more accurate picture of what the rest of the New Jersey case looks like. Importantly, the discovery that Defendants propose is necessary under any case structure approach that ultimately is taken. Moreover, Defendants' CMO largely parallels the discovery that has been proposed by Plaintiffs – so both sides agree that it needs to be done. Once these steps are completed, meaningful discussions and decisions about case structure can take place.

      The prudence of Defendants' approach is evident from the limited updated discovery that already has occurred. The Court will recall that, in connection with the CITGO settlement (Feb. 2014), Plaintiffs disclosed that 90% of their total alleged damages were attributable to 498 sites where – based on data through approximately 2011 – the then most recent reported MTBE

---

[1] Given the breadth and importance of the issues to be addressed, Defendants respectfully request a short extension of the page limit for preconference letters.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue New York New York 10173-1922 Telephone: +1 212 547 5400 Facsimile: +1 212 547 5444 www.mwe.com

The Honorable Shira A. Scheindlin
April 18, 2016
Page 2

detections exceeded 700 ppb. Plaintiffs now have updated the relevant dataset through 2014. That updated data shows only 84 sites, with reported groundwater data since 2010, remain with a maximum MTBE detection above 700 ppb – an 83% reduction based on just three years of updated sampling information. And every one of those 84 sites either has been "closed" by NJDEP (14 sites) or is being actively remediated by a responsible party under the State's LSRP or supervised remediation programs (70 sites). In short: for the relatively small number of sites that the State says generate the bulk of its alleged damages, the State's own remedial programs are working – there is not a single "orphan," publicly-funded site in this category.[2]

The importance of exchanging updated site and testing information to understand what really remains at issue in this case is underscored by the limited private well testing data that Plaintiffs have produced. Although more than five years old, this data shows that – for 85,109 private wells tested – a mere 0.05% (44 total) have ever had an MTBE detection above New Jersey's MCL. In fact, 98.2% of the private wells have reported MTBE levels of non-detect (90.4%) or less than 1.0 ppb (7.8%). With Plaintiffs now pushing the private well issue, getting updated private well testing data is imperative to understanding what remains in dispute.

Basic information like this is critical for determining an appropriate case structure going forward. Understanding which sites currently fall below the State's risk-based groundwater cleanup standard (70 ppb);[3] which sites have been "closed" by the State; and which sites are located near sensitive receptors – just to give a few examples – will assist the parties to focus on dispositive motions that may eliminate large parts of the case, or settlement discussions for particular categories of sites. It also will assist to focus further discovery efforts in anticipation of trial. This basic information allows the parties to determine what's really driving the rest of

---

[2] Defendants continue to analyze the updated dataset (HazSites), but it appears that this significant downward trend in the maximum MTBE detection also will apply to the second category of sites (max detection between 70-700 ppb) that Plaintiffs used in their valuation analysis for the CITGO settlement. Plaintiffs' old dataset put 650 sites into this category. The updated data indicates that only 179 sites remain at these levels, a 72% reduction based on just two years of additional data. At bottom, it appears that the vast majority of sites remaining in this case will fall into the sub-70 ppb category for which Plaintiffs' trial experts have declined to work up damage estimates.

[3] In granting partial summary judgment for the Ridgewood trial site, the Court ruled that if a site already had been cleaned up to the State's risk-based corrective action standard (70 ppb), to recover additional investigation or remediation costs for getting the site to "pre-discharge conditions" (<1 ppb, according to Plaintiffs' interrogatory responses) the State must prove that the additional costs are justified by the benefits, or that public health would be harmed without the effort. *In re MTBE*, 2014 WL 630636, at *3 (S.D.N.Y. Feb. 18, 2014), *citing N.J. Dep't of Envtl. Prot. v. Essex Chem. Corp.*, 2012 WL 913042m at *7 (N.J. Super. Ct. App. Div. Mar. 20, 2012). Based on the updated HazSites database production, it appears that thousands of sites – the vast majority of what remains of this case – likely will be subject to this ruling.

The Honorable Shira A. Scheindlin
April 18, 2016
Page 3

this case and, perhaps more importantly, what is <u>not</u>. Only then can the parties, and the Court, determine what sort of Phase II case or trial structure is best suited to resolve what remains.

### B. The Parties Should Use the Updated Data to Define and Narrow the Case Before Determining How to Try It.

Getting the information necessary to discuss an appropriate case structure is straight-forward and, in fact, already underway. Plaintiffs recently produced an update to their HazSite database, which provides basic MTBE detection information. To more fully understand the status of impacted sites, groundwater resources, and private wells, Defendants propose (and Plaintiffs have agreed) to also update their prior production of several other electronic databases kept by the State. *See Proposed CMO* § 1(a) (at Ex. A).[4] Defendants also are updating their MTBE release site lists and/or other databases.[5] Where available for a particular site, Defendants propose to provide information about dates of ownership, operation and/or supply; the time period (if any) when the Defendant conducted investigation and remediation; any MTBE sampling data not already produced; information on regulatory status; information on well sampling; and identification of sensitive receptors within a specified radius of the site. *Id.* § 1(b).

Using these reciprocal exchanges of information, the parties can create the Master Site List suggested by the Court at the last status conference. *Mar. 29, 2016 Conf. Tr.* at 7:14-17. This Master List will include certain basic information for each site (*see Proposed CMO*, § 2(a)) and will eliminate, once and for all, any questions about which sites allegedly remain at issue in this case – *i.e.*, the "full scope" of the case will be definitively known.

Using this Master List, the parties can discuss with each other and the Court opportunities for narrowing the case without further discovery – *i.e.*, the "common sense" approach suggested by Your Honor at the last status conference. For example, of the 19 sites remanded to the District of New Jersey for the Phase I trial, Plaintiffs last week advised the trial court that they do not intend to try any of the nine defendant-selected sites (Plaintiffs' damages experts declined to work up damage estimates for these sites because any theoretical damages are too low to justify the effort). Accordingly, a category consisting entirely of sub-70 ppb sites – which Defendants believe comprise the vast majority of sites in this case – may be particularly appropriate for resolution at this stage. Similarly, the parties can discuss opportunities to eliminate or resolve other categories of sites based on, for example, prior settlements; ownership or operation by the State; formal closure notice already obtained; etc.

Once these common sense efforts have been completed, some number of sites will

---

[4] Defendants provided their proposed CMO to Plaintiffs today, and will attempt to meet and confer with them prior to the April 26 conference.

[5] Per agreement of the parties, a site list is to be produced if one exists or can be readily created by manipulating existing data. Otherwise, updated CMO 45 productions will be made.

The Honorable Shira A. Scheindlin
April 18, 2016
Page 4

remain. Whatever that number is, at that point in time the parties and Court truly will be informed about what remains of the case and can meaningfully discuss how to structure the case for any further discovery or trial.

### C. Statistical Extrapolation Presents Myriad Legal Hurdles.

Although Defendants believe that the time for making a Phase II case or trial structure decision is not here yet, we acknowledge the value of thinking about possible approaches now and appreciate the Court's suggestion that we consider whether "statistical extrapolation" might be used to resolve entire categories or sub-categories of Phase II sites. Plaintiffs also have vaguely proposed such a "statistical extrapolation" approach (albeit without the use of categories), but have yet to provide an explanation of how it might work in practice.[6]

Defendants have no desire to individually try each of the 5,000+ sites that remain (for now) in this case. We have no desire to see this litigation continue for years, with each passing day adding to our costs and expenses. We are open to considering any approach that might streamline the resolution of this case without forfeiting fundamental protections, including due process, guaranteed to us by the Constitution and case law. To that end, we have thoroughly evaluated the statistical extrapolation issue, but the case law simply does not support such an approach here.

The fundamental legal problem with statistical extrapolation (and the State's alternative proposal to try only certain liability issues first and in the abstract) is that it would (1) excuse Plaintiffs from having to prove the most fundamental elements of their claims, and (2) deprive Defendants of their opportunity to present dispositive, site-specific defenses, simply because Plaintiffs chose to file a big case. Due process cannot be sacrificed in the name of expediency. Although Plaintiffs attempt to dismiss basic elements of proof – such as causation and injury – as merely "administrative matter[s]," *Mar. 29, 2016 Conf. Tr.* at 26:19-20, these cannot be dispensed with merely because Plaintiffs have bundled thousands of otherwise individualized and unique claims in one massive action and labeled itself *parens patriae*.

Any decision on case or trial structure, and certainly any decision to impose such a novel and sweeping approach as statistical extrapolation, should only be made after full briefing and argument. Defendants reserve their right to fully respond to such a case structuring proposal if one is ever made by Plaintiffs here. Until then, though, the critical problems we have identified so far can be summarized as follows:

---

[6] Plaintiffs have been both vague and contradictory about how they intend to proceed, generally referencing *New Hampshire* but then suggesting certain means of proof that were not used in that case, and referring to claims for wells and well-testing even though New Jersey has been focused on release sites and site-specific NRD claims. Unlike this case, in *New Hampshire* the State did not seek NRD and, moreover, dropped all claims for sites where the most recent MTBE detection was below that state's MCL.

The Honorable Shira A. Scheindlin
April 18, 2016
Page 5

- Statistical extrapolation from a small number of sites or wells to determine statewide injury and damages constitutes an impermissible trial by formula. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Supreme Court's opinion in *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146 (Mar. 22, 2016), rested on the very different facts and circumstances of a Fair Labor Standard Act case where the defendants had violated their statutory duty to keep the very records necessary to prove plaintiffs' overtime claims, and does not authorize Plaintiffs' use of extrapolation here.

- Class action authority, including rulings in this MDL, recognizes the individualized nature of proving injury and causation. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 329-44 (S.D.N.Y. 2002) (denying certification of class of private well owners and users because of "differences in the level of contamination…, the source of contamination, how the contamination affects each plaintiff, and the nature of relief that each will require"). *See also In re Zyprexa Prods. Liab. Litig.*, 671 F. Supp. 2d 397, 402 (E.D.N.Y. 2009) (Weinstein, J.) (reviewing dozens of federal cases and rejecting State of Mississippi's proposed use of aggregate proof and statistical extrapolation to prove claims brought in a *parens patriae* capacity; because State's claim was "structured on the foundation of many thousands of conceptually separate claims," it effectively was a "surrogate" class action and federal case law prohibits use of statistical proofs in almost all such class actions).

- *Parens patriae* is a standing doctrine and does not permit Plaintiffs to sidestep their burden of proof or disregard the legal requirements to prove their case with individualized proof.

- Due process requires that Defendants have the ability to present site-specific defenses. Plaintiffs' proposed statewide extrapolation would not permit Defendants to assert affirmative defenses or to exculpate themselves at specific sites, as has commonly occurred in the MTBE focus site cases. To the extent the claims proceed to trial, site specific issues also are critical, including, for example, in offsetting any damages due to the cost of treating substances other than MTBE. *See, e.g., In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 126 (2d. Cir. 2013) (affirming jury instruction for offset of damages award for cost of treating other contaminants).

- The New Hampshire trial approach should not apply here. That approach, which is presently under petition for U.S. Supreme Court review, was based on a specific New Hampshire statute regarding the State's trustee powers that is inapplicable outside of New Hampshire. It also erroneously presumed that a single release anywhere in the State caused indivisible harm to all waters of the state.

Plaintiffs also have vaguely suggested a bifurcated trial where certain general, non-site specific liability issues (*e.g.,* whether gasoline containing MTBE is a "defective product") and punitive damages (*e.g.,* whether defendants acted with malice) are tried first in the abstract – *i.e.,* without any proof of causation, injury or damage. This proposal defies so many due process (and common sense) principles that it is hard to know where to begin, but not the least of the

The Honorable Shira A. Scheindlin
April 18, 2016
Page 6

problems is that "liability" cannot be fairly adjudicated without also determining causation and injury. Moreover, although Plaintiffs propose using a single jury for both the first and second phases (apparently mindful of the Seventh Amendment), they fail to explain how bifurcation with a single jury promotes convenience or efficiency as required by Rule 42.

Given what is known so far (*e.g.*, 83% reduction in "highly contaminated" sites; a mere 0.05% of private wells with MTBE above the MCL), it is imperative for the parties to conduct the discovery necessary to determine what truly remains at issue in this case. Not only do all of these important facts matter for purposes of determining an appropriate Phase II case or trial structure, they would get swept aside in a statewide, statistical extrapolation approach that is fraught with constitutional and other legal infirmities. Only by understanding the facts can the parties, and the Court, craft an appropriate plan for the efficient and fair resolution of Phase II.

### II.     *Puerto Rico*: Phase II Discovery & Next CMO

Each case in this MDL has unique factual and legal underpinnings that require discovery, case structure and trial structure to be addressed on an individual basis. While the above section provides a general overview of the concerns with extrapolation, Puerto Rico law makes any such plan even more unworkable. Moreover, case structure in Puerto Rico will be unique due to the relatively small size of the case.

The parties have yet to meet and confer about a next-phase CMO for Puerto Rico, as Plaintiffs chose to focus on *New Jersey* first. Defendants received Plaintiffs' proposed Phase II CMO late in the afternoon of April 12, with a suggestion of an initial conference call on Friday, April 15. That short turn-around time did not work for Defendants. However Defendants commit to conferring with Plaintiffs prior to the conference and will shortly be sending a letter expanding on Defendants' position that the proposed CMO is unacceptable because it fails to take into account the unique legal and factual status of claims in Puerto Rico – *e.g.*, that only 354 sites remain in the case, and that this number likely will be significantly reduced after prescription discovery is completed. Indeed, the Court recognized the importance of resolving the prescription issue first, before launching into full discovery at the remaining sites, and previously ordered Defendants to serve limited site-specific discovery on that defense. *See Dec. 22, 2015 Tel. Hrg. Tr.* at 18:5-12 (requiring all Defendants to serve discovery related to "which sites and when did the Commonwealth know"). Defendants' discovery was served March 4, 2016, and Plaintiffs should be directed to completely respond to the same.[7]

---

[7] Plaintiffs have stated that they believe Defendants' discovery goes beyond what was authorized by the Court. *But see infra* n.8; *see also Ltr. from L. Gerson to M. Axline* (Mar. 21, 2016) (at Ex. B). Plaintiffs requested 90 days to respond to only one of four interrogatories and, even as to that interrogatory, stated an intention to re-define the request before responding. Defendants countered that a 90-day extension was acceptable if Plaintiffs intended to provide substantively complete answers to all the requests (four interrogatories; four requests for production); but told Plaintiffs that if they merely intended to object that such objections were due by April 11 – *i.e.*,

The Honorable Shira A. Scheindlin
April 18, 2016
Page 7

In addition to the limited number of sites (comparatively speaking) and the existence of prescription, there does not appear to be any support in Puerto Rico for recognition of market share liability in connection with causation, nor for the use of statistics to establish injury. Indeed, under Puerto Rico's unique Civil Law system, there is no indication that a Puerto Rico court would ever eliminate the requirement that a plaintiff must prove a defendant caused an actual injury before holding such defendant liable for damages. Yet, Plaintiffs' CMO assumes this would occur.

Defendants advised the Plaintiffs of a commitment to meet and confer, and will be providing a proposed CMO for discussion. In the interim, Defendants believe that the parties should focus on the pending discovery,[8] which will pave the way for a determination of which claims at which sites are barred by prescription. Additionally, Defendants want to explore with Plaintiffs the creation of a matrix that provides necessary information about each remaining Phase II site and will permit future categorization of those sites not barred by prescription. Defendants believe that much of the needed information is readily available to the Commonwealth because of its regulatory oversight of the remediation of leaking underground storage tanks. Only after the above steps are taken, and the parties have identified how many sites are actually in play, would it be efficient to discuss further case structure and/or how any Phase II trials should be handled.

### III. *Pennsylvania*: Next CMO

Following an in-person meet and confer session several weeks ago, Defendants sent Plaintiff a proposed CMO for the next steps of discovery in *Pennsylvania*. Defendants received Plaintiff's competing proposal late in the day last Wednesday and will be conferring with Plaintiff prior to the conference. Defendants hope to provide an update on these discussions in our Reply letter, and certainly will be prepared to do so at the conference.

### DEFENDANTS' AGENDA ITEMS

### I. *Pennsylvania*: Dismissal Request for Newly Added ExxonMobil Entities

Plaintiffs provided a proposed stipulation of dismissal just prior to filing. ExxonMobil is reviewing the same, and will elaborate on this issue in Defendants' reply letter if not resolved.

\*\*\*

We look forward to discussing these issues with the Court next week.

---

one week after the deadline set by the Federal Rules. Plaintiffs served no compliant objections by the 11th· but, rather, simply told Defendants that they were taking a 90-day extension.

[8] This includes Plaintiffs' April 5, 2016 set of site-specific Document Requests to Defendants. Clearly, Plaintiffs are not limiting their own discovery to what was authorized by the Court on December 22 (since Plaintiffs were not authorized to take any discovery), thereby further undermining their inaccurate basis for refusing to answer each of Defendants' requests.

The Honorable Shira A. Scheindlin
April 18, 2016
Page 8

                                                 Respectfully submitted,

                                                 *James A. Pardo*
                                                 James A. Pardo

cc:    Plaintiffs' Liaison Counsel (by email)
       All Counsel of Record (by LNFS)

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*, No. 08 Civ. 00312 | Master File No. 1:00-1898<br>MDL 1358 (SAS)<br>M21-88 |

**SHIRA A. SCHEINDLIN, U.S.D.J.**

### [PROPOSED] CASE MANAGEMENT ORDER NO. ___

This Case Management Order ("CMO") establishes a process for the exchange and analysis of information relevant to the resolution of the remaining sites and issues in the above-referenced case. The process below is focused on: (1) the exchange of updated site information by the parties; (2) the creation of a Master Site List, including information necessary to categorize sites according to common characteristics; (3) dismissal of certain sites or claims voluntarily or by motion; and (4) the creation of an appropriate Phase II discovery or trial structuring plan based upon the scope of the case, the categories of sites remaining following completion of the above steps, and the goal of resolution of the remaining sites in the case in as few trials as necessary.

1) **EXCHANGE OF INITIAL DISCOVERY:**

   a) **By Plaintiffs:** By July 1, 2016, Plaintiffs shall supplement their prior productions of the following State databases:

   i) NJEMS

   ii) SDWIS (Safe Drinking Water Information System)

   iii) PWTA (Private Well Testing Act)

   iv) Potable Well Letters

   v) Spill Fund

   vi) UST Fund

   vii) Public Funding Tracking

1

b) **By Defendants**: By September 1, 2016, each Defendant shall produce the following information for each site on Plaintiffs' April 13, 2010 MTBE release site list to the extent each Defendant has such information within its possession, custody or control:

   i)  The dates/time periods during which defendant owned the underground storage tanks;

   ii) The dates/time periods during which defendant operated the site;

   iii) The dates/time periods during which defendant supplied gasoline that may have contained MTBE to the site;

   iv) The dates/time periods during which defendant conducted environmental investigation and/or remediation;

   v)  Any groundwater sampling data that relates to any sites on the list referenced in Part 1(b), above, that has not already been produced in this action or is not included in the 2016 Hazsites database update. To the extent such data are maintained in electronic format that allows users to sort or filter the data (such as Excel or Access), such data shall be produced in such format;

   vi) The regulatory status (NFA, RAO, or open/closed spill numbers);

   vii) Whether an LSRP has been assigned;

   viii) Any public or private well sampling associated with the site; and

   ix) Any sensitive receptors within ½ mile of the site, as identified in site-related reports.

2) **MASTER SITE LIST & CATEGORIZATION**

   a) Using the information above, by October 1, 2016, Plaintiffs shall supplement their April 13, 2010 list of MTBE release sites at issue in this litigation to include the categories of information set forth below for each site on the list, to create Plaintiffs' Draft Master Site List:

      i) MTBE sampling history (first MTBE, highest MTBE, last MTBE, last sample (including ND));

      ii) Ownership dates/defendant(s);

      iii) Operation dates/defendant(s);

      iv) Supply dates/defendant(s);

      v) Remediation dates/defendant(s);

2

      vi) Remediation/SRP status; and

      vii) Public or private well sampling associated with sites and first, last, highest MTBE detection and last sample.

  b) By November 1, 2016, Defendants shall identify in writing to Plaintiffs their objections, if any, to the inclusion of any site(s) on Plaintiffs' Draft Master Site List.

  c) If all objections are resolved on consent, the resulting list shall be the "Master List" of sites at issue in the case. If any objections remain unresolved by the parties 30 days following November 1, 2016, such objections shall be presented to the Court for decision, and the resulting list shall be the "Master List."

  d) PRIMARY CATEGORIZATION: Based on the 2016 production of the Hazsites database and any updates or corrections thereto, each site on the Master List shall be placed in one of the following four Primary Categories based on the most recent maximum detection of MTBE in groundwater: (i) <1 ppb; (ii) 1 ppb to < 70 ppb; (iii) 70 ppb to < 700 ppb; (iv) ≥ 700 ppb.

  e) SUB-CATEGORIZATION: The parties shall confer regarding proposed sub-categorization of sites within the Primary Categories. If agreement cannot be reach, the parties shall submit competing proposals to create sub-categories within each of the primary categories identified in Paragraph 2(d).

**3) VOLUNTARY/STIPULATED SITE/CATEGORY DISMISSALS**

  a) In light of Plaintiffs' dismissal of all Defendant-selected Phase 1 trial sites, within 30 days of the Master List being finalized, Plaintiffs shall serve a list of any additional sites that Plaintiffs will voluntarily dismiss.

  b) In light of Plaintiffs' settlement with a number of Defendants, the parties shall confer regarding sites for which all liability has been settled. Such sites will be removed from the Master Site List.

  c) The parties shall additionally confer regarding categories or sub-categories that may be amenable to stipulated dismissal (e.g., lack of injury or *de minimis* injury).

  d) In the absence of or in addition to such stipulated dismissals, Defendants may move for summary judgment or partial summary judgment as to certain sites, groups of sites, and/or claims. A scheduled for such motions shall be set by the Court.

**4) CASE/TRIAL STRUCTURE**

Following completion of the steps outlined above, including Court rulings on any dispositive motions filed in Part 3(d), and based on the number and types of sites then remaining on the Master List, the parties shall meet and confer on any additional discovery that may be necessary and a proposed Phase II case and/or trial structuring plan.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
       April __, 2016

# EXHIBIT B

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Rome  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Lisa Gerson
Attorney at Law
lgerson@mwe.com
+1 212 547 5769

March 21, 2016

**BY ELECTRONIC MAIL AND LNFS**

Michael Axline, Esq.
Miller, Axline & Sawyer PC
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

Re:   *Commonwealth of Puerto Rico, et al. v. Shell Oil Co., et al.* No. 07-cv-10470
      Defendants' First Set of Interrogatories and Requests for Production of Documents
      Regarding Non-Trial Sites

Dear Mike:

I am writing in response to your March 15, 2016 letter regarding the above-referenced discovery set (the "Non-Trial Site Discovery"). We are, of course, willing to confer with you regarding the scope of the Non-Trial Site Discovery. However, any conversation must begin with a fair[1] and complete reading of the December 22, 2015 transcript.

Regarding the number of sites for which discovery is sought, you are correct that Judge Scheindlin initially commented that she did not expect discovery on 400 sites.[2] *Dec. 22, 2015 Hrg. Tr.* at 4:3-6. However, Her Honor then clarified this initial position in two important ways. First, Her Honor explained that she was "not planning to have **full** site-specific discovery on 400 sites" and – contrary to what your letter suggests – described "full" discovery as follows: "full discovery, you know, what substances are found and what the hydrogeologists say and all of that...." *Id.* at 5:24-6:3 (emphasis added); *see also id.* 6:11-14 ("and you're not going to be interested in direction of flow and all that kind of stuff"). Second, although the number of sites **initially** being discussed for discovery was some number less than 400, this was based on the fact that the discovery was being sought solely by the reinstated defendants (*i.e.*, Vitol, Peerless and Petrobras) and, therefore, likely to encompass only a subset of remaining sites. *Id.* at 6:7-8.

---

[1] For example, in one portion of your letter, you cite to the end of the transcript and then back to the beginning, when clearly the conversation – and Her Honor's opinions – had moved on from the initial discussion. *See M. Axline Ltr.* at 1.

[2] The actual number on which Defendants seek discovery is 354.

U.S. practice conducted through McDermott Will & Emery LLP.

340 Madison Avenue  New York  New York 10173-1922  Telephone: +1 212 547 5400  Facsimile: +1 212 547 5444  www.mwe.com

Michael Axline, Esq.
March 21, 2016
Page 2

But, as you know, Her Honor ultimately directed that **all defendants participate in this next round** of site-specific discovery. *Id.* at 18:1-4 ("I think this discovery, what you call this very limited discovery, should go forward as to all defendants"), 18:17-19:5 ("I'm saying it should be done for everybody...."). In so ordering participation by all Defendants, it is obvious that the Court moved off of its initial statement regarding the numerical scope of discovery.

On topical scope, we believe the record also is clear. Your letter states that Interrogatories Nos. 1-3 go beyond what was envisioned by the Court. But, again, your citation to the record leaves out key statements by the Court demonstrating that two issues were on the table for the so-called "limited discovery": "it is limited to **which sites and when** did the Commonwealth know. That's all. Not full site discovery, as I started out saying earlier in this conference, **just the issue of which sites and when**." *Id.* at 18:8-12 (emphasis added).[3] Interrogatories Nos. 1 and 2 seek to answer the question of "which sites," and Interrogatory No. 3 recognizes – as did Her Honor – that Plaintiffs may not be able to answer that question for all sites at this time. *See id.* at 13:20-14:4.

Relatedly, you state that there is additional information the Commonwealth would need to answer Interrogatory No. 4 (which, as you concede, is directed to the statute of limitations issue). We disagree. Remediation files in Defendants' possession that are not also in the Commonwealth's possession (to the extent any such files exist)[4] are irrelevant to the issue of statute of limitations – which hinges on the **plaintiff's** knowledge and not that of any particular defendant. In fact, one of Plaintiffs' arguments in opposition to Defendants' statute of limitations summary judgment motion was that the prescription period did not run unless and until MTBE detections were reported to the Commonwealth. *See, e.g., Pls.' Opp.* at 3-4. Interrogatory No. 4 properly asks about facts in the Commonwealth's possession.

Finally, you state that the Commonwealth will need substantially more than 30 days to respond. *See M. Axline Ltr.* at 1-2. As stated on page one of the Non-Trial Site Discovery, Defendants are amenable to a longer response time. Indeed, the Court understood that this may not be a quick process, but was firm that certain discovery should occur while the parties awaited the Phase I Trial. *See id.* 17:21-23 ("I think this is getting to be a terribly old case and it should move forward even as they're awaiting the remand period"); 18:7-8 ("enough time has to be allowed for plaintiffs to produce that kind of information"). Please propose a reasonable time period for Plaintiff's response, and we will consider that proposal promptly.

---

[3] The "which sites" topic was elaborated on earlier in the conference. *See, e.g., id.* at 4:16-18 (MR. HARRIS: "We just want to know what sites are we connected to and as to those sites, tell us when you discovered MTBE"); *id.* at 6:7-8 (COURT: "They should identify, as to Vitol, Peerless, and Petrobras, which sites we are talking about, and then ... when is it alleged to have been known.")

[4] We note also that, earlier in this case, the Commonwealth issued an administrative order to owner/operator defendants and a set of document request to defendants to get just this information for "non-test" sites. *See Administrative Order*, Case No. OA-12-AG-021; *see also Plaintiffs' First Set of Interrogatories and Requests for Production of Documents Regarding Non-Test Sites*.

Michael Axline, Esq.
March 21, 2016
Page 3

***

      In sum, Defendants' Non-Trial Site Discovery is squarely within the scope of what Judge Scheindlin ordered at the December 22 teleconference. Accordingly, a blanket refusal to answer this discovery would be improper and in defiance of Her Honor's clear orders. As stated above, we are available to confer with Plaintiff about these issues, and have set aside Wednesday, March 23 at 11 am EST, as proposed in your letter.

Sincerely,

*Lisa A. Gerson*

Lisa A. Gerson

cc:    All counsel of record by LNFS