

**WEITZ & LUXENBERG**

A PROFESSIONAL CORPORATION
• L A W   O F F I C E S •

700 BROADWAY        •        NEW YORK, NY 10003
TEL. 212-558-5500                FAX  212-344-5461
WWW.WEITZLUX.COM

April 18, 2016

**VIA HAND DELIVERY**
**& ELECTRONIC MAIL**

The Honorable Shira A. Scheindlin
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007-1312

     Re:    <u>MDL 1358 / MTBE – April 26 Status Conference</u>

Dear Judge Scheindlin:

    Plaintiffs respectfully submit this letter in advance of the scheduled April 26, 2016 Status Conference. Plaintiffs wish to address certain issues identified for the agenda.

**Joint Agenda Item 1 & 2:  New Jersey & Puerto Rico**
       *Update & Phase II Case Management Order*

**I.    PHASE I UPDATE – New Jersey**

    The parties had a telephone conference with U.S.M.J. Goodman on April 13. She directed that the parties meet and confer, and submit a proposed comprehensive Case Management Order no later than May 31, 2016. That order should address matters such as requests for additional discovery or dispositive motions, and when the parties will be ready for the pre-trial conference, with the Pre-Trial Order having been completed. She also requested that the parties individually advise her on their position as to mediation. The next conference is scheduled for June 15.

Honorable Shira A. Scheindlin
April 18, 2016
Page 2

## II.   **PHASE II – New Jersey & Puerto Rico**

The New Jersey and Puerto Rico Plaintiffs respectfully request that this Court enter Case Management Orders establishing that there will be only one trial in the next phase of each case, which would resolve all remaining issues. This is consistent with the Court's statements made during the last Status Conference on March 29.[1] (A transcript is attached as Exhibit "A" for the Court's convenience).

We attach as Exhibits B and C our proposed Case Management Orders (CMOs). They permit (indeed, require) the parties to begin working on Phase II immediately. They also provide your Honor's successor with a plan for efficient resolution of the remainder of the cases, while, at the same time, giving her the opportunity to case manage specific issues as they arise.

The proposed order for each case:

- Mandates a single Phase II trial resolving all issues;
- Suggests special jury verdicts as a method of resolving key issues;
- Sets forth initial discovery to be exchanged, including gathering information toward the creation of a "master list" of sites, as suggested by the Court (7:11-17);
- Requires that the parties meet and confer within a short, but reasonable, time frame to establish the specific method of trying the remaining issues, and that they present joint or competing plans to the Court for decision. All subsequent discovery and case management will be focused to meet the broad goal of a single trial resolving all issues, and the specific method resulting from this meet and confer and the Court's subsequent direction.

We have provided a copy of the proposed CMOs to defendants. We have already engaged in one meet and confer regarding the New Jersey case, but as of the time of this pre-conference letter we have not heard back from defendants regarding the Puerto Rico case. We expect to meet and confer regarding each case at least one time prior to the Status Conference. To the extent the proposed CMOs are revised as a result, we will so advise the Court in the Reply letter.

---

[1]      *See, e.g,* Exh. A at 6:18-21 (stating that "It is certainly better to structure phase two in some way that makes it not only the second trial but the last trial, if there's a way to do that …"). *See also id.* at 7:1-4; 8:17-20.

Honorable Shira A. Scheindlin
April 18, 2016
Page 3

**Joint Agenda Item 3 & Plaintiffs' Agenda Item 1:  Pennsylvania**
   *CMO and Enforcement of Third-Party Subpoenas*

The parties had several meet-and-confer sessions to discuss a possible joint proposed CMO to govern discovery and other matters in the next phase of the case, but to date have not agreed on a unified approach.  The Commonwealth's proposed CMO is attached as Exhibit D.

The Commonwealth's proposed CMO sets dates for new defendants to respond to current discovery and establishes several processes intended to make future discovery more efficient for all parties.  It provides for the disclosure of facts that should not be controversial, such as defendants' relationship to MTBE release sites (information which the Court directed to be added to the current MTBE Release Site list) and market share information for Pennsylvania.  This is type of information which was utilized in prior cases to structure future discovery and trial, and it is important for purposes of settlement.  It also calls for the parties to meet and confer on developing an approach to selecting focus sites that would make discovery manageable, without prejudicing the ability and right of the parties to develop a method of trial that would allow resolution of all claims in a single trial.

Defendants' environmental consultants, generally, have cooperated with the Commonwealth in producing documents and electronic data in response to the Commonwealth's subpoenas.  There are a handful of consultants, however, who have refused to respond to the subpoenas.  As with prior subpoena issues which related to cases in the MDL, the Commonwealth requests that the Court refers any disputes over these subpoenas to the Special Master or to the Court's Magistrate.  This will ensure that any disputes will be handled efficiently and consistently with this Court's prior rulings.  The Commonwealth's CMO also seeks permission to serve subpoenas for hard copy materials on consultants who did not have electronic data.

Plaintiffs look forward to discussing the issues on the Agenda with the Court on Tuesday, April 26, 2016.

Respectfully submitted,

*[signature]*

William A. Walsh
Weitz & Luxenberg, P.C.
700 Broadway
New York, New York 10003
(212) 558-5836

Attachments
cc:     All Counsel of Record (electronic mail)

# Exhibit A

g3temtbec

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re: METHYL TERTIARY BUTYL          00 MDL 1358 (SAS)
             ETHER ("MTBE") PRODUCTS       00 CV  1898 (SAS)
4            LIABILITY LITIGATION
                                          Telephone Conference
5   ------------------------------x

6                                         New York, N.Y.
                                          March 29, 2016
7                                         2:35 p.m.

8   Before:

9            HON. SHIRA A. SCHEINDLIN

10                                        District Judge

11           APPEARANCES

12  MILLER AXLINE & SAWYER
         Attorneys for Plaintiffs
13  BY:  DUANE C. MILLER
         MICHAEL AXLINE
14
    JACKSON, GILMOUR & DOBBS
15       Attorneys for Plaintiffs
    BY:  JOHN D.S. GILMOUR
16
    COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
17       Attorneys for Plaintiffs
    BY:  LEONARD Z. KAUFMAN
18
    WEITZ & LUXENBERG, P.C.
19       Attorneys for Plaintiffs
    BY:  WILLIAM J. WALSH
20
    McDERMOTT WILL & EMERY LLP
21       Attorneys for ExxonMobil
    BY:  JAMES A. PARDO
22
    SEDGWICK LAW
23       Attorneys for Shell Oil Company
    BY:  PETER CONDRON
24
    EIMER STAHL
25       Attorneys for CITGO Petroleum
    BY:  LISA MEYER

g3temtbec

                    APPEARANCES (continued)

1

2   JAMES B. HARRIS
          Attorney for Petrobas America

3
    OBSERVING FOR DEFENDANTS:
4         Ira Matesky
          Daniel Krainin
5         Chad Higgins
          Jessica Farley
6         Stephanie Weirick
          Pamela Hanebutt
7         Albeniz Fuentes
          Jeremiah Anderson
8         Andrew Langan
          James Tuite
9         Meghana Shah
          Barry Goheen
10        Matthew Conley
          Robert Wilson
11        Susan Dean

12  OBSERVING FOR DEFENDANTS VIA TELEPHONE:
          Kelly Murrie
13        Jennifer Aspinall
          Stephanie Hall
14        Steve Dillard
          Dawn Ellison
15        Alejandro Cepeda
          Amy Parker
16        Michael Regan
          William Stack
17        Edward Goolsby
          Matthew Parisi

18

19

20

21

22

23

24

25

g3temtbec

1          (In open court)

2          THE COURT:  Good afternoon, Mr. Walsh.

3          MR. WALSH:  Good afternoon, your Honor.

4          THE COURT:  Mr. Miller, Mr. Axline, Mr. Kaufman,

5    Mr. Gilmour.

6          Mr. Pardo.

7          MR. PARDO:  Good afternoon, your Honor.

8          THE COURT:  Ms. Meyer, Mr. Condron.

9          MR. CONDRON:  Good afternoon, your Honor.

10          THE COURT:  Mr. Harris.

11          MR. HARRIS:  Good afternoon, your Honor.

12          THE COURT:  Mr. Langan, there you are.

13          MR. LANGAN:  Good afternoon, your Honor.

14          THE COURT:  Mr. Anderson?

15          MR. ANDERSON:  Good afternoon, your Honor.

16          THE COURT:  Ms. Hanebutt.

17          MS. HANEBUTT:  Good afternoon.

18          THE COURT:  Mr. Krainin.

19          MR. KRAININ:  Good afternoon, your Honor.

20          THE COURT:  I have your agenda.

21          Oops, the phone.  Who's on the phone?

22          Good afternoon.  This is Judge Scheindlin.  There are

23    eleven of you on this phone call, so I won't be greeting you by

24    name, but I will give this list to the court reporter so she

25    will know who has been on the phone.  And I should say that to

g3temtbec

1    the other folks who I didn't greet, but your names are on the

2    appearance sheet and will be on the record.

3        So if you don't have too long an agenda for today.

4    It's primarily New Jersey and Puerto Rico.  And in some sense

5    it's much the same issue in both.

6        Starting with New Jersey, I was told I would get an

7    update, if there is any update, on the phase one remand.  And

8    then we should talk about structuring phase two.

9        So, Mr. Kaufman, did you want to start?

10        MR. KAUFMAN:  Your Honor, if I might give you an

11    update.  Literally as I was leaving my office this afternoon to

12    come here, I got a call from Judge Wilson's chambers.  She's

13    the judge in New Jersey to whom this has been assigned.  To

14    make a long story short, the upshot is that the case is being

15    referred to magistrates.  And there will be a case management

16    conference scheduled sometime sooner, rather than later, so

17    that we can set a schedule for everything that needs to be done

18    in order to try the case.  So I've informed defendants about

19    that as well when I arrived here today.

20        So that's the status on phase one.  It looks like it

21    is starting to move and hopefully will get to a trial sooner,

22    rather than later, in that matter.

23        THE COURT:  What is the structure of the phase one

24    trial as you understand it?  What will be tried in phase one?

25        MR. KAUFMAN:  We will try all issues of liability and

g3temtbec

1   damages for the trial sites.

2           THE COURT:  All issues.  So it's an all-issues trial?

3           MR. KAUFMAN:  That's my understanding, yes.

4           THE COURT:  Okay.  So that's the update.  Does anybody

5   have anything to add about the update that Mr. Kaufman just

6   gave?  No?  Of course.

7           So let's talk a little bit about phase two.  You have

8   written letters back and forth as to how you think it should be

9   structured.  The plaintiffs' letter starts with two alternative

10  ideas.  One is what they call a statistical extrapolation

11  approach, which was pretty much used in New Hampshire.  And as

12  I understand it, it did reach the highest court of

13  New Hampshire.  And the verdict stood, so to speak.  So that's

14  one possibility.

15          The second proposal from the plaintiff is that the

16  phase two proceeding be a bifurcated trial that first

17  determines liability and punitive damages, and then after that

18  verdict would take up compensatory damages.  But I didn't

19  understand the details in this second alternative as to how

20  many or which sites would be tried.  I understand bifurcation.

21  I understand trying liability and punitive damages first and

22  compensatory damages second.  But I don't understand what the

23  sites are that you're pointing out.

24          So the plaintiffs also go on in their submissions to

25  suggest that defendants should stipulate to certain facts about

g3temtbec

1   ownerships of sites and suppliers to those sites and who paid

2   for remediation of those sites.  And then the plaintiffs ask

3   this Court to direct the parties to draft a case management

4   order for how to resolve all the remaining claims in a single

5   additional trial.

6          Defendants were not entirely clear as to what approach

7   they would take, but they said we shouldn't even be talking

8   about phase two until after phase one is completed.  But if

9   they're forced to talk about it, they're leaning towards

10  something called an enhanced focus site approach.  And this is

11  the idea of putting sites into three categories, or buckets.

12  And so you'd have these three subcategories where the sites

13  would be separated by fact patterns or other criteria.  And

14  they say that doing that, we can try more than the 20 sites in

15  phase one.  But more would not get us anywhere near, I assume,

16  5,000.  So there really has to be a way to do this.

17         So my thought is that, of course, plaintiffs have the

18  better of it in the sense of we can't have endless trials.  It

19  is certainly better to structure phase two in some way that

20  makes it not only the second trial but the last trial, if

21  there's a way to do that; because trials, if they occur, are

22  expensive and long for the Court.  They're an imposition on the

23  Court when they're very long; three months, six months, nine

24  months.  They're very difficult things.  You can't keep trying

25  them.  Even 50 at a time won't get you there when you're

g3temtbec

1   talking about 5,000 sites.  So it's not realistic to have a

2   second trial, a third, and then 20th and 50th trial.  It just

3   can't be done.  The Court really can't accommodate that.  The

4   Court's system can't accommodate that.

5          So there has to be some way to do less than all but

6   more than you do in phase one.  And it wouldn't be a bad idea

7   to understand now to some extent what approach is taken so that

8   the discovery, which remains in the purview of the MDL Court,

9   can be organized toward that goal of a meaningful phase two

10  trial.

11         Now, while the Court can't and won't order anybody to

12  stipulate to things -- people aren't ordered to stipulate;

13  that's a voluntary act, so I can't order people to stipulate --

14  but a master list, sites where there is knowledge, should be

15  created that names the site and the ownership and the supplier

16  and remediator per site for all known locations.  That at least

17  would be a start.

18         But how to really structure a phase two trial is a big

19  topic.  The statistical extrapolation approach is something

20  that I think not only New Hampshire has proved, but there was a

21  recent Supreme Court decision this week in a very different

22  context, *Tyson Foods* -- you saw that.  *Tyson Foods* had to do

23  with overtime hours and donning and doffing uniforms.  But the

24  point was the Supreme Court accepted the notion that you could

25  do it by statistical extrapolation.  And it was the only

g3temtbec

1   realistic way to do it.  Every worker and every location is

2   going to have different uniforms to take on and off and is

3   going to take a different amount of time.  And the Court

4   recognized that that was not a feasible way to proceed.

5          So there is some now Supreme Court authority, albeit

6   distinguishable and different contexts.  I'm sure defendants

7   will want to write long briefs telling me that it's totally

8   different.  I get that.  But the concept of statistical

9   extrapolation was addressed.  So that's certainly one thought.

10         I don't mind the defense notion of enhanced focus

11  sites by subcategories, if they would agree that if you tried

12  the -- let's say three or four buckets' worth of categories,

13  you would agree to that, extrapolate those findings, the

14  remaining sites that could fall into those buckets.  That's

15  okay, too, but there would have to be an agreement in advance.

16  The parties would negotiate how many categories, how many sites

17  they want to try per category.  Then they would agree that

18  whatever findings come out of that jury trial, they would agree

19  in advance to apply to the remainder that fall into that

20  category.  Even over time, even if the site turns up later but

21  can then be assigned to one of the categories, the findings

22  would apply.  And we've done that here in the Southern District

23  of New York in big cases, agreed in advance to apply findings

24  to futures cases.

25         But that is an approach, too.  It's not really the

g3temtbec

1    same as statistical extrapolation.  It's a common sense

2    approach, where the parties negotiate and agree that certain

3    findings can be applied going forward, once they figure out the

4    categories.

5            So those are probably the two approaches that make the

6    most sense to me.  I don't agree with the defendants that I or

7    my successor shouldn't even be discussing this until after

8    phase one is done.  Why put it off?  I mean, we need to proceed

9    with discovery, even as you're getting ready to try this big

10   phase one case.

11           And so I turn briefly -- and of course I'll hear from

12   you in a minute, but I might as well cover Puerto Rico, because

13   it's not all that different.  Puerto Rico has the same issue,

14   too, in a way.  We don't know anything about a phase one trial,

15   because the remand was just issued.  So it's probably much too

16   early to even expect a report on phase one.

17           But would you agree, Mr. Axline, with what Mr. Kaufman

18   said, that phase one is meant to be an all-issues trial for the

19   focus sites?

20           MR. AXLINE:  Yes.

21           THE COURT:  So in that sense it's the same.  And so,

22   again, you said you've been having some meet and confers on

23   that particular case.  And your letter states that you will

24   update the Court on the status of your discussions at the

25   conference.  So I think I should pause from speaking and ask if

g3temtbec

1   you have any update as to the results of your meet and confer

2   as to how to structure phase two.

3        MR. AXLINE:  All I can tell you is that we're

4   continuing to meet and confer.  We haven't reached a

5   resolution, but I think --

6        THE COURT:  What ideas are you kicking around?

7        Ms. Meyer, if you want to confer, the usual approach

8   here is to say, may I have a moment, then confer, so I was not

9   talking over you.

10       So what are some of the thoughts that are being kicked

11  around as to how to conduct a phase two trial?

12       MR. AXLINE:  With respect to a phase two trial and

13  discovery, we've discussed getting together to draft CMOs,

14  potentially conflicting CMOs, but trying to identify areas of

15  commonality.

16       You will recall that in December there was a meeting

17  with some of the readded defendants who came back into the

18  case.  And your Honor ordered us to provide some information to

19  the defendants.  We're in the process of doing that.  But in

20  terms of anything specific that I could say on behalf of my

21  client in Puerto Rico or the defendants with respect to phase

22  two, we don't have --

23       THE COURT:  What is your notion of the best approach

24  for phase two?  Do you, again, agree with Mr. Kaufman that

25  so-called phase two should be the last trial?

g3temtbec

1          MR. AXLINE:  Yes.  That is the position the

2    Commonwealth is taking.

3          THE COURT:  So assuming that, how do you try the vast

4    number of sites that there are?  I don't know if the number is

5    as big as New Jersey or smaller, but whatever the number is,

6    what is your approach as to how you try that?

7          MR. AXLINE:  Well, it's quite a bit smaller than

8    New Jersey.  But nevertheless, I think it's large enough to

9    warrant using a statistical approach or a bifurcation.  I think

10   those are the two --

11         THE COURT:  Or a bifurcation.  What does that mean?

12         MR. AXLINE:  Where you try liability first and then

13   damages.  So the --

14         THE COURT:  For what sites?

15         MR. AXLINE:  Well, you would try liability in terms of

16   the defendants' liability for delivering MTBE to sites that are

17   not questionable whether the defendants delivered to sites in

18   Puerto Rico, and then the number of sites I think and the

19   extent of the damage at sites would determine the damages.

20   So --

21         THE COURT:  So when it becomes site specific would not

22   be until the damages part of the bifurcation, is that what

23   you're saying?

24         MR. AXLINE:  Correct.  Yes.

25         THE COURT:  So in the first part of the bifurcation in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

g3temtbec

1   phase two, it's not site specific?

2           MR. AXLINE:  Right.  You'd get a special verdict on

3   product liability and have the jury try that.

4           THE COURT:  And so the only time -- I'm sure I'm

5   repeating that you get -- site specific is on the damages phase

6   of the second trial?

7           MR. AXLINE:  Correct.

8           THE COURT:  So then you'd have to have full discovery

9   on every site in Puerto Rico?

10          MR. AXLINE:  Not if you took a statistical approach.

11  So you could --

12          THE COURT:  But in the bifurcated approach that you

13  just described --

14          MR. AXLINE:  Yes.

15          THE COURT:  -- you would have to?

16          MR. AXLINE:  No.  No.  These the not mutually

17  exclusive, your Honor.

18          THE COURT:  I see.

19          MR. AXLINE:  So you can try on liability.  Assuming

20  liability was found, and the special verdict form would look a

21  lot like the New Hampshire form that we submitted as an

22  exhibit, then you would present the statistical evidence to the

23  jury on the likely number of wells impacted, release sites and

24  so on.

25          THE COURT:  What are the numbers in New Jersey -- in

g3temtbec

1  Puerto Rico?

2          MR. AXLINE:  They're roughly 400.

3          THE COURT:  Okay.  Thank you, Mr. Axline.

4          Who wants to be heard from the defense side about the

5  phase two in either of these jurisdictions, either or both?

6          MR. PARDO:  I'll begin, your Honor.

7          THE COURT:  Okay.

8          MR. PARDO:  With respect to the statewide statistical

9  extrapolation approach, my colleagues, Ms. Meyer, Mr. Condron,

10  may also have items to add.  But I'll begin.

11          THE COURT:  Okay.

12          MR. PARDO:  Can I just step us back, though, for one

13  second about the focus site approach; because not only do I

14  want to explain why the defendants are going towards an

15  enhanced focus site idea, but I want you to understand that the

16  approach that you put in place -- because this was your idea

17  ten years ago -- has worked, okay?  Has worked.  More

18  importantly, it has not come to fruition yet.

19          THE COURT:  Well, that's true.

20          MR. PARDO:  We're not saying that it's premature to be

21  talking about phase two case structuring.  Obviously we're

22  talking about it now, and we've had meet and confers with

23  plaintiffs.  What we're saying is that it's premature to commit

24  ourselves to taking the focus site approach, declaring it a

25  failure, which I think is what the plaintiffs are doing, and

g3temtbec

1    putting it into the trash can, just as --

2              THE COURT:  I don't think so at all.  I thought

3    it's -- that's phase one.  They're not putting it in the trash

4    can.  They're ready to try the focus site approach, I thought.

5              MR. PARDO:  They will.  But what they're saying is it

6    hasn't and it won't work for phase two.  And what I want to

7    tell you is that I think it will, okay.  When you think about

8    what you've accomplished, what your idea has done here in the

9    New Jersey case, one of the biggest cases the State of

10   New Jersey has probably ever seen, ever will see, okay, you

11   haven't even had your first focus trial yet.  You have not even

12   had a trial yet.  And more than half your defendants are out.

13             THE COURT:  That's true.  Out -- they've settled.

14             MR. PARDO:  They've settled.  There's 107 million

15   plus --

16             THE COURT:  Yes, indeed.

17             MR. PARDO:  -- that's been paid to the state.

18             THE COURT:  Right.

19             MR. PARDO:  It's a lot of money.  It's a lot of

20   parties.

21             THE COURT:  Yes.

22             MR. PARDO:  The whole point of the approach was to get

23   this case -- not up to trial, but through trial, and then to

24   see where we're at.

25             THE COURT:  That's true.

g3temtbec

1    MR. PARDO:  That process needs to play itself out, I

2    think, before we commit ourselves to doing a 180 and

3    throwing -- it is a 180.  What they're proposing is completely

4    different from anything that we've ever done in this MDL, that

5    really has been done almost anywhere.

6        THE COURT:  I don't agree with that.  What they're

7    saying is phase one is the approach that we've taken, as you've

8    said, for ten years.  It will go to trial.  If that does not

9    resolve in a global settlement, we need to be ready to proceed

10   to wrap this case up.  That's a good idea.  Cases should not be

11   permanent, like permanent revolution, permanent litigation.

12   I'm sure Chairman Mao would agree it shouldn't be forever in

13   litigation.

14       So the question is:  How do you wrap it up if, at the

15   end of phase one, there is not a settlement, global settlement?

16   And they say you don't want to address that that day because

17   then you lose another two years waiting to be ready.  So all

18   they're saying is the approach should be thought about now so

19   that you're on two tracks:  One, some team is getting ready for

20   trial; but another team is moving forward to be ready to deal

21   with the remainder, if there's not a global settlement.

22       MR. PARDO:  And we agree.  We agree.  We don't

23   disagree.  That's, again, why we're having the conversation.

24       What I'm saying is our approach says, we believe the

25   focus site approach has worked.  Let's not throw it away.

g3temtbec

1    THE COURT:  We're not throwing it away.

2    MR. PARDO:  Let's take it, let's enhance it.  Let's

3  make it more efficient.  Let's make it more focused.  And let's

4  do the next phase --

5    THE COURT:  That's fine, if you took my additional

6  idea on top of it.  And if you said, in phase two we will use

7  the categories approach, we'll use these buckets.  We'll put a

8  lot more sites in because we're going to have not just 20 from

9  one trial; we'll have buckets of 20, buckets of 30.  So maybe

10  we're not going to try as much as 90, but that leaves 4,500.

11  So unless we are willing to agree up front that after we try

12  these categories with common fact patterns and we have

13  verdicts, we will agree to apply those verdicts and wrap this

14  thing up.

15    MR. PARDO:  I appreciate the ideas, yes.  It's not a

16  bad one.  It's one we haven't talked about, of course, as a

17  defense group.  Certainly haven't talked about it with

18  plaintiffs.

19    But let me be clear:  No one on either side of the

20  table here is suggesting to you or to the next judge or to

21  anyone that 5,250 sites are going to be tried.  You're right,

22  there has to be a way to do it, get resolution on all of those

23  without actually trying them all.

24    THE COURT:  That's right.

25    MR. PARDO:  But there has to be a way to do it that

g3temtbec

1    respects what you have said for 15 years in this case, 15

2    years.

3              THE COURT:  Which is?

4              MR. PARDO:  That sites matter.  That every site is

5    different.  That there are individual issues, okay.

6              THE COURT:  But that would be the benefit of your

7    suggestion about the buckets.  Every site is different, but

8    they're not that different.  In other words, the detail is

9    different, but the categories can be made to be similar.  And

10   if you pick enough buckets -- not limited to three, it could be

11   five -- I think every site can be in one of those buckets.  I

12   really do.  They have common characteristics that puts them in

13   the bucket.  Then you try those common buckets, and maybe

14   that's not one trial but four.  Let's say you pick four

15   buckets.  The Court could live with four more trials.  But if

16   at the end of those four -- they could be simultaneous.  They

17   could be parceled out to different judges in the building.  Who

18   knows?  But when they're tried, that's it.  Then it's just a

19   matter of assigning the remaining sites to one of the buckets

20   and agreeing to apply the findings.  That's my view.

21              Anyway, you said it's new, so it's something to think

22   about at least.

23              MR. PARDO:  It's something to think about.  But even

24   under that approach, that approach would be a significant

25   change from what we've done.  And from what you've said again

g3temtbec

1   and again and again, going all the way back -- I'll give you a

2   name of a case that maybe you'll remember:  Lasouza.

3               THE COURT:  What's the name?

4          MR. PARDO:  Lasouza, remember?  Parisha, Berry and

5   Lasouza (phonetic), 2001, and initial class actions.

6               THE COURT:  I don't.

7          MR. PARDO:  I think I was an associate.

8               THE COURT:  Okay.

9          MR. PARDO:  I had a lot more hair, too.  These were

10  the New York private wells.  They were a class.  They were a

11  putative class.  And the problem was they couldn't tell the

12  Court, they couldn't tell us if their wells had ever been

13  actually impacted.  They couldn't tell if there was any injury

14  or any damage.

15              THE COURT:  That would be down the road, because this

16  is a quasi focus site effort.  When you create these buckets or

17  categories, those wells, you will know.  Those are known wells.

18  It's only after that with the remainder, when you're trying to

19  put them in buckets, that you could then say, this well doesn't

20  belong in any bucket, because you haven't given us any proof

21  that it's ever been impacted.  That's like a claims resolution

22  procedure.  It's been used and used.  You know, it was used in

23  Dalkon Shields, used in asbestos, used in big settlements all

24  the time.  People know what to do after the first few trials.

25  It's just a matter of applying it in a claims resolution type

g3temtbec

1   process.  There's minimum proof needed.  And if the proof isn't

2   there, that site falls out.  If the proof is there, it goes in

3   one of the four buckets or five or three, whatever the number

4   is.  And you apply the findings from the trial to that bucket.

5          So it's just a matter of being creative and thinking

6   it through.  But you're probably right that some sites will be

7   essentially no-pay sites.  That's fine.  It will work itself

8   out.

9          MR. PARDO:  Right. in fact, I think there will be many

10  sites that are --

11         THE COURT:  Maybe there will be some disputes.  I have

12  that in securities fraud cases, where, when the claims process

13  starts, there are challenges to reliance, for some investors

14  probably didn't rely they should get anything.  We work it out.

15  We have a process.  But there's no more trials.

16         The liability trials you call them, Mr. Axline, up

17  front that's determined that now we're essentially in the

18  second site-by-site damages phase.  But we shouldn't do it by

19  trial in New Jersey, once we try a focus group in the bucket.

20  So I think it's a good idea, but we're not going to solve it

21  today, anyway; is putting out there a good process, a

22  suggestion based on your letters and my experience and

23  thinking.  And I want you to take it under advisement.  And

24  we'll see what we can do.

25         Now, whether we can do anything in the remaining 30

g3temtbec

1   days that I happen to be the judge, I don't know.  It would be

2   nice, nice legacy for MTBE cases to have some kind of a thought

3   for how to resolve it.  And if not, such is life.  But I would

4   like to try to see where we could go.

5        MR. PARDO:  This issue is important enough, I think,

6   that it's safe to say, speaking for the defendants, we think it

7   would require a fair amount of time on briefing and argument,

8   your Honor.

9        THE COURT:  I'm not sure you want to do that.

10  Briefing?  What's there to brief?  You're going to say the

11  statistical approach denies us due process?  I'm not even

12  proposing a statistical approach.  But I think you'd have a

13  little trouble anyway between the Supreme Court and

14  New Hampshire.

15        But putting that aside, I'm not even proposing that.

16  Don't reject what might be the right way to go reflexively.

17  Obviously, whoever you are lucky enough to get next is never

18  going to have the 15 years of experience that we just spoke

19  about on knowledge of these cases.  So if we could have some

20  intensive discussions in the remaining time, that would be

21  good.  The more we know where we're heading with the remaining

22  discovery, the more efficient it is.  And efficiency should be

23  prized.

24        And it's really not to defend -- I don't think it's

25  really to defendants' advantage to delay and delay and delay.

g3temtbec

1   I don't see how that's particularly good for your companies.

2   If you can wrap this long-running litigation up, there is

3   advantages to that, too.  So don't reflexively reject ideas and

4   put us on an organized track to someday conclude these

5   litigations.  That should be the plaintiffs' goal and the

6   defendants' goal.  I'm sure it is the plaintiffs' goal.  That's

7   obvious.  But it should be your goal, too, Mr. Pardo.

8           MR. PARDO:  It is my goal, your Honor.

9           THE COURT:  Good.  Then in that case, as far as I'm

10  concerned, we can meet again in two weeks to discuss this idea

11  further.  I'm serious.

12          Anyway, it would be so nice to see you again.

13          MR. PARDO:  It would be nice to see you, too, again,

14  your Honor.

15          THE COURT:  I hope that will be the case.

16          MR. AXLINE:  It's hard to say good-bye.

17          THE COURT:  Yes, indeed.

18          But in any event, so who else wants to be heard?  You

19  implied that Ms. Meyer might want to be heard?

20          MR. PARDO:  It really depended on where the

21  conversation between us went.  I don't know if my colleagues --

22          THE COURT:  Somebody might want to comment as to why

23  you think there's a need for briefing.  I mean, briefing would

24  come in if you were going to challenge, I think, the

25  statistical extrapolation approach, because the other approach

g3temtbec

1   is not a matter of challenging.  It's a matter of whether it's

2   a structure that makes sense.  There's nothing about it that

3   can work without some agreement, those approaches.

4          But the statistical approach could be imposed on you.

5   And that's why briefing would be required; if somebody was

6   going to try to impose that on you, the statistical

7   extrapolation approach.  But this approach is quite different.

8   And maybe it's thoughtful.  And maybe, as I said, some defense

9   company out here might actually make their clients happy by

10  trying to wrap this up.

11          MR. PARDO:  And I want to be clear --

12          THE COURT:  Someday.

13          MR. PARDO:  -- I'm not rejecting that.  I hope I

14  didn't say something to suggest to you that I was knee-jerk

15  rejecting your idea.  I'm not.  It's just one we haven't

16  discussed as a defense group.

17          THE COURT:  I understand.

18          So does anybody else wish to be heard?

19          MR. CONDRON:  Your Honor, Peter Condron.

20          The approach you've outlined today, I think, merits

21  some serious consideration on our part.  I will say we would

22  reject the statistical extrapolation.

23          THE COURT:  I kind of thought you would like that the

24  least.  I have some understanding of why.

25          MR. CONDRON:  Yes.  But I think we do need to talk to

g3temtbec

1   our clients.  We need to talk to each other and take it under

2   advisement.

3              THE COURT:  For sure.  I appreciate that, Mr. Condron.

4              Anybody else wish to be heard?

5         MS. MEYER:  I would echo that, your Honor.  And I

6   think if you would like to hear more about the problems that we

7   see with the statistical extrapolation approach --

8              THE COURT:  Sure.

9         MS. MEYER:  -- I'm happy to go into that.  But we can

10  also save that for briefing down the line.

11             THE COURT:  Then I probably won't get to hear it, so

12  I'd like a little preview.

13             MS. MEYER:  I think the number one problem is the due

14  process clause.  As these cases have been tried over the last

15  10 to 15 years, the defendants have had the opportunity to put

16  on site-specific defenses that range from statute of

17  limitations, lack of injury, lack of causation, sometimes lack

18  of failure to warn at a site like you just found in the Puerto

19  Rico sites.  And those defenses disappear in any kind of

20  statistical extrapolation approach, because the defendants

21  simply do not have a chance to make those arguments.

22             THE COURT:  Those site-specific arguments.

23             But in Mr. Axline's proposal, he said the second half

24  of the second phase would be a site-specific damages approach.

25  It would just be bifurcated.  So liability would be out of the

g3temtbec

1    way.  Earlier letters had said liability and punitive damages,

2    but, okay, would be out of the way.  And then phase two of

3    the -- not phase two; the second half, the bifurcation in phase

4    two would be a site-specific damages approach.  That's possible

5    for Puerto Rico, where there's no more than 400 sites.  It's

6    probably impossible in New Jersey, where there's 5,000, because

7    if they're contested, you really are asking the courts, in this

8    case the federal courts, to somehow have 5,000 minitrials.

9            And that can't be.  Courts have an obligation to

10   manage their dockets.  And that's well established in the law,

11   too.  So while you have rights to due process, of course, the

12   courts have to survive a mass tort case.  And they've worked

13   out creative ways over the years to survive mass tort type

14   cases.  And I think the higher courts are going to be pretty

15   elastic, pretty reasonable in accepting whatever approach it

16   has worked out, because the Court has to manage its docket.

17   And that's important, too.  We serve many clients.

18           MS. MEYER:  I agree with that, your Honor.  And I

19   think that's -- my client is no longer in the New Jersey

20   matter.  But what I've heard the defendants suggest as an

21   alternative is something that would lead to a conclusion of the

22   case in advance of having to try 5,000 sites.

23           THE COURT:  That's what I was picking up on in what I

24   spoke about as a combination of the ideas.

25           MS. MEYER:  I would submit, your Honor, there are many

g3temtbec

1   other legal challenges that we would make to a statistical

2   extrapolation approach that, even under this bifurcated

3   proposal, I don't see how plaintiffs would be proving causation

4   and injury to key elements to any claim proving product

5   liability or failure to warn in the abstract, without

6   discussing actual causation and injury, with respect to any

7   sites and --

8           THE COURT:  Mr. Axline, I think, needs to answer that.

9           She is saying that in the first half of the second

10  phase of the bifurcation, if it's general and not

11  site-specific, how do you deal with such things as causation

12  and injury?  When you talk about liability, you can't have

13  liability without it.

14          MR. AXLINE:  Understood, your Honor.  And I do need to

15  correct the record slightly.

16          I believe when you asked me about the second phase in

17  the Puerto Rico example, I did say that we would want to look

18  at using statistical evidence on damages.  So there may be some

19  site-specific evidence, but there may also be some use of

20  statistical evidence.  So --

21          THE COURT:  On the second half.

22          MR. AXLINE:  On the second half.

23          THE COURT:  But in the first half, what Ms. Meyer is

24  saying is, how do you even try liability, the generality, when

25  there are site-specific elements that you have to prove

g3temtbec

1    affirmatively, or that they have to defend by site?  And she

2    mentions in terms of your burden of proof causation and injury.

3           MR. AXLINE:  Well, it's a matter of degree, your

4    Honor.  I think the problem she's pointing out would -- the

5    argument she's making would be made in the case of the bucket

6    approach as well.  At some point you have to --

7           THE COURT:  Well, not necessarily, because in that

8    approach, it's site-specific for every site in the bucket,

9    right?  That is site specific.  So whether it's 30 cases per

10   bucket or 40 or 20, they're specific.  All I, then, propose is

11   that you do have to agree in advance that you apply the

12   findings to anything -- any other site that can fairly be put

13   in that bucket.  That should have assured Mr. Pardo that some

14   sites won't be in any bucket, because they will defend those

15   sites by saying there's no damage at all.  Respond.  That's

16   happened in all these claims, big claims cases.  Some claims

17   are full out.  There's no proof of an injury.  So there is a

18   chance to prove no injury or a statute of limitations has run.

19          MR. AXLINE:  Understood.  So that I think of as almost

20   an administrative matter, your Honor, frankly.

21          But in the New Jersey case they were able to try the

22   case to a jury.

23          THE COURT:  New Hampshire.

24          MR. AXLINE:  I'm sorry, New Hampshire.  Try the case

25   to a jury with a special verdict that looked -- that didn't

g3temtbec

1   have any individual sites but, rather, looked at the degree of

2   culpability of the defendants for the failure to warn.  And

3   that was common to all the defendants.  You don't go site by

4   site and say, did you fail to warn at the site, because they

5   didn't issue warnings to anybody at any time.  And then you

6   take a look at their market share, the commingling of products

7   going into the relevant geographic area, the market share that

8   each of them had, and you assign responsibility for the total

9   damages --

10           THE COURT:  No, I understand --

11           MR. AXLINE:  -- based upon market share.

12           THE COURT:  I understand that.  But that doesn't deal

13   with causation and injury individually.  It deals with failure

14   to warn.  I get that.  But it has to have caused the

15   contamination and injury to the site.

16           MR. AXLINE:  But I think it does deal with causation

17   and injury, because it is the state that is the plaintiff.

18   There's no question, as the New Hampshire court pointed out,

19   that the state has been injured.  In fact, it's been injured in

20   a very big way.  And the injury which these defendants caused,

21   assuming that's the verdict, is so large that it's difficult

22   for the plaintiff to use anything other than statistical

23   evidence to get its arms around the entire damages.

24           So I think that's the sort of thing we'd like to talk

25   to you more about and maybe do another letter brief before a

g3temtbec

1    two-week meeting on.  Because the reality is when you have a

2    state as a plaintiff -- especially Pennsylvania, New Jersey, to

3    some extent Puerto Rico -- the damage caused by these

4    defendants is so massive that you've got to find a creative

5    way, once you've found liability, to allow a jury to consider

6    what is an appropriate amount to award as damages.  And that

7    may not involve --

8              THE COURT:  Wait.  Are you saying that it's not site

9    by site, because the owner of all the sites is the same owner,

10   so it almost doesn't matter if 50 out of the 400 sites are not

11   actually contaminated?  It doesn't matter, is that what you're

12   saying, because the other 350 are damaged and they're all owned

13   by the same owner, namely the state?  You work out one big

14   damages figure; it's not a site-by-site payment?

15             MR. AXLINE:  Yes.  Yes.  And as with any injury, you

16   use statistics to do that, particularly when you're talking

17   about what is going to be the impact on the state in the

18   future.  That was the category of damages in the New Hampshire

19   case.  Because one of the elements of the damage is that the

20   state doesn't have the money to spend to find out what the full

21   impacts are.  It's got to sit back and wait for it to reveal

22   itself over the years.  So that's something that the jury

23   awarded a specific category of damages for.  And the other

24   states face that as well.

25             So the other aspect of this is that --

g3temtbec

1  THE COURT:  What did you think of my sort of qualified

2  bucket approach; in other words, starting with that idea and

3  then applying it to the remainder?

4  MR. AXLINE:  Do you mind if Mr. Miller responds?

5  Because he has some thoughts on that.

6  THE COURT:  I don't mind at all.

7  MR. MILLER:  Thank you, your Honor.

8  New Jersey is a little different.  You haven't heard

9  much about the statistics that go beyond the 5,000 sites.  I'm

10  going to explain this very briefly to illustrate why the

11  defendants' approach is less workable.

12  There are 440,000 private wells in New Jersey.  When

13  any home is sold, it is required that they test for MTBE, among

14  other things.  We now have data on testing 118,000 out of the

15  440,000 wells.  Out of that about 12 percent were contaminated,

16  which, if extrapolated to the larger population, is 55,000

17  wells.

18  So it's not just a claim that's related to what's

19  going on at the gasoline station?  What do we have to do to

20  clean it up?  How much has been done to clean it up?  Is there

21  anything left, so therefore there's no injury?  It's not that.

22  And when you talk about a bucket, it only makes sense to try a

23  bucket if you assume that a relatively small group is

24  representative of the whole.

25  THE COURT:  That's right.

g3temtbec

1      MR. MILLER:  And that's exactly --

2      THE COURT:  By characteristics.

3      MR. MILLER:  That's right.  Otherwise --

4      THE COURT:  Common characteristics.

5      MR. MILLER:  Otherwise, the bucket approach totally

6  fails.

7      THE COURT:  Oh, well, no.  I said that.  That's why I

8  called it the modified bucket approach, is that you would be

9  able to do that.  You would have common characteristics -- that

10  is the bucket -- and you put focus sites into that bucket where

11  there is 20, 30 or 40 per bucket.  But then you have to apply

12  it to whatever is common to that group of characteristics.  So

13  it's a combination of both approaches.

14      MR. MILLER:  Right.  But there are several claims that

15  aren't as directly tied to the gas station itself.  And I gave

16  you an example, which means that at the end of the day, if

17  you're trying to get a representative, manageable group to try

18  and to apply it to project a much larger number that applies to

19  the whole universe, which would you rather use:  What I call

20  outdated bucket technology, or mathematics that predict

21  accurately that if you take a sample randomly, you're going to

22  pick up a known injury site; you're going to pick up a statute

23  of limitations site?  And you can use that to make the best

24  estimate you can.

25      At the end of the day, with the size of this case, all

g3temtbec

1   we will ever have is an estimate.  There will never be a

2   number.

3                THE COURT:  No, I realize that.

4                MR. MILLER:  And my client would prefer to have the

5   most accurate tool that can be used, which is scientifically

6   supported, to make that projection and still have something

7   that's manageable and triable.

8                THE COURT:  So what would you try, a selective sample

9   that -- a mathematically selected sample, a predictive sample?

10               MR. MILLER:  Well, let's say that for each claim you

11  might -- it depends.

12               THE COURT:  Each claim?  Are you using "claim" now to

13  be synonomous with bucket; in other words, each common

14  characteristic type claim, is that what you mean?

15               MR. MILLER:  Let me give you an example of public

16  wells.

17               THE COURT:  Okay.

18               MR. MILLER:  There are hundreds of public wells in

19  New Jersey with MTBE.  We could scientifically select among the

20  wells and project that to the well claim and select among the

21  sites and project that to the site claim.  Now, I'm not

22  suggesting which one should be done with which tool.  Depending

23  on the claim, it may make more sense to vary it from a

24  statistical approach even.  But if you want an accurate measure

25  that fits the claim being made -- and what is heartening to me

g3temtbec

1   is they finished the New Hampshire case in three months.

2   　　　　THE COURT:  I know.

3   　　　　MR. MILLER:  So I don't think you can get a better

4   tool.  And I think buckets ultimately don't work unless they're

5   representative.  So it's based on the same conceptual premise.

6   　　　　I think the parties need to sit down, discuss the

7   claims and the tools that would be used to resolve each of them

8   individually, as opposed to saying one size fits all.  But if

9   you're going to say any measure, any tool is most likely to be

10  usable as applied to everything, statistics work.  I mean, you

11  can predict the probability that you will be within 5 percent

12  or 10 percent by selecting very carefully the sample size.

13  　　　　THE COURT:  But that approach standing alone, to me,

14  doesn't account for different characteristics by category.

15  It's the best way I can put it.  It's the same idea, but you do

16  it four times.  That's all I'm saying.

17  　　　　MR. MILLER:  Yes.

18  　　　　THE COURT:  You do what you're proposing, but you

19  divide it into groups with common characteristics; because if

20  you do it across everything, I think you'd have too many

21  confounding factors in the mathematical analysis.  But if you

22  separate out -- I don't know whether the categories are private

23  wells, public wells, gas stations.  I don't know that.  That's

24  beyond my knowledge.  But if you do it that way, which is why I

25  called it the combined approach, or my approach, then it begins

g3temtbec

1    to make some sense to me that we can extrapolate.

2         But if you just put it all in one enormous bucket,

3    there's some unfairness about that, because they have such

4    different characteristics.  Now --

5         MR. MILLER:  I think you'll find more commonality if

6    you focus on groups of claims than you will if you focus on gas

7    stations, which is all --

8         THE COURT:  I wasn't recommending how to create the

9    buckets, because I don't have that knowledge.  But I still like

10   that approach that isn't a "one size fits all," but it still

11   uses the same tools and concepts you're talking about but does

12   it by category, which I think sounds fair, more fair.

13        MR. MILLER:  Yes, your Honor.

14        THE COURT:  That's why I'd like you to think about

15   what I was saying.  At least, again, as I said to the

16   defendants, don't reject it out of hand.  Think about it.

17        MR. MILLER:  Yes.  I encourage that, and I would also

18   encourage a meeting in two weeks.

19        THE COURT:  I'd like to do that.

20        MR. AXLINE:  If I might add to that, your Honor, I

21   think what happened in the New Hampshire case, if you look at

22   the verdict that's attached as Exhibit C to our reply letter,

23   is that the plaintiffs, in order to get a quicker trial, made

24   some cuts on the damages that they were claiming.  I'm not

25   suggesting that that would necessarily happen with New Jersey.

g3temtbec

1   And we are talking right now mostly about the discovery leading

2   to a trial, so --

3            THE COURT:  Yes, we are.

4            MR. AXLINE:  We want to have the trial in mind when we

5   consider the best approach to discovery, but the categories of

6   damages here are ones that lended themselves to a state-wide

7   either complete approach, which is -- for example, past

8   clean-up costs is on page two of the special verdict form, part

9   two.  So the state was able to put in --

10           THE COURT:  Wait.  Where is this?  I'm on page two, I

11  thought.

12           MR. AXLINE:  There are two parts to the verdict form.

13  The first one was the causation part.  And that --

14           THE COURT:  There it is.

15           MR. AXLINE:  That, by the way, has some answers to the

16  defendants' causation arguments.

17           THE COURT:  Now I'm on page two.  Damages.  You said

18  past --

19           MR. AXLINE:  Past clean-up costs, put on evidence of

20  what it actually costs the state so far.  Cost to characterize

21  and clean up the highest-risk sites, which was, I think, a

22  strategic choice that New Hampshire made about what damages it

23  was going to claim there.  Then sampling drinking water wells.

24  That's a number that you can put together statewide based on

25  the number of wells and what it would cost to conduct a sample

g3temtbec

1    at each well.  And then testing drinking water wells

2    contaminated with MTBE at or above the MCL.

3            THE COURT:  You meant treating, not testing.  That's

4    okay.  You said testing.

5            MR. AXLINE:  Yes.

6            THE COURT:  You said testing.  You meant treating,

7    according to the verdict sheet.  Treating?

8            MR. AXLINE:  Yes.  I'm sorry.  Treating.  Yes.

9            THE COURT:  Thank you.

10           MR. AXLINE:  Those were two separate categories, but

11   they were based upon the numbers that could be obtained pretty

12   easily.  And so that's another option -- I just wanted to point

13   that out -- that avoids the -- this is something that the

14   plaintiffs would have to think about one by one, of course.

15           But I do want to point out that there are ways to

16   slice the onion that, in fact, avoid the site-specific issues

17   altogether, or at least are able to give the jury site-specific

18   information in volume that is relevant to the damages.

19           THE COURT:  I would still personally feel that the

20   combined focus site approach with the statistical approach has

21   greater fairness to both sides, so they are hearing as an

22   example some site-specific type of evidence and defenses.  But

23   then if the verdict is in favor of the plaintiff, so to speak,

24   it's agreed to be applied through statistics to the remainder

25   that fall in that category.

g3temtbec

1    Well, I think we've probably gone as far today, since

2    there won't be an order today.  But the reason an order is

3    important is to have the appropriate discovery begin.  That's

4    the goal, is to have the appropriate discovery begin as to the

5    remaining parts of this case.  The nonremanded portion are in

6    the MDL.  And it's this Court, and not the remand court, at

7    this point that will figure out the discovery for the remaining

8    sites.

9        Yes.

10       MR. PARDO:  And to that point, your Honor, that has

11   started, as you know.  We have discovery that's going on in

12   New Jersey.  We have discovery that's going on in Puerto Rico.

13   The discovery in Puerto Rico is focused on --

14       THE COURT:  Do you remember I mentioned the master

15   list during this conversation?

16       MR. PARDO:  I do remember.

17       THE COURT:  So that's something that can be done and

18   can be begun sooner, rather than later.  So there are things

19   that can and should be done by the MDL court.  And it helps if

20   we structure how phase two would play out, because it helps to

21   focus the discovery.

22       So if we go with this combination approach that I've

23   been talking about for the last close to an hour, we would know

24   how many buckets, what defines the buckets and how many sites

25   per bucket.  So we would know things that would focus the

g3temtbec

1   discovery, so to speak.

2          Again, I don't know that we should do any more today.

3   We've had a good, fruitful conversation, as they say in

4   diplomatic circles when they've accomplished nothing.  They

5   said, we're very fruitful.  That's what they say, because it

6   means people at least began to talk.  And then come back --

7   even though it's fast, there's a reason for it to be fast

8   here -- in a couple weeks to see if we've refined our views,

9   any of the three of us; that is, the plaintiffs, the

10  defendants, the Court.  And that's all I can do.  And then it

11  goes to someone who's had no experience at all with the MDL

12  that you've all been living in for so many years.

13         And most of you, by the way, don't change, which is

14  good.  Most of you are players who have been playing for many,

15  many years.  So you do have a wealth of knowledge, the lawyers

16  do.  But the Court won't.

17         Okay.  Anything else we should take up today?

18         I understand that Pennsylvania was originally on the

19  agenda, but you worked out the dispute on that issue.  So that

20  isn't for the Court today.

21         Is there anything else, then, for the Court today?

22         MR. PARDO:  No.

23         MR. KAUFMAN:  Just, your Honor, are you going to set a

24  time for us to get back?

25         THE COURT:  I think that's not a bad idea.  I know

38

g3temtbec

1    Mr. Pardo doesn't seem to want to come back and see me.

2          MR. PARDO:  That is not accurate, your Honor.  I'm

3    happy to come back.

4          MR. KAUFMAN:  We would like to see you at least one

5    more time.

6          THE COURT:  The reason I thought he didn't is because

7    it's so soon, he feels, to come to any real consensus as to how

8    to proceed.  But it can only do good to advance the

9    conversation.  And the shorter the time, the better.  So it

10   could also be three weeks.  I'm still here.  It doesn't really

11   matter.  If that helps, there's a little more time.  They have

12   a bigger group, much bigger than yours.

13         So let me glance at the calendar and see how it looks.

14   After all, today is not even April.  So April.  How about

15   Tuesday, April 26th?  That's as late as I can go.  And it gives

16   you the most time for a conversation.

17         MR. PARDO:  That's fine for us, your Honor.

18         THE COURT:  But I don't want -- what time did we meet

19   today?  2:30.  That's what I want again, 2:30.  2:30 on the

20   26th of April.

21         Okay.  Anything else?  All right.  It's good to see

22   you all.

23         Folks on the phone, the conference has just ended.

24   Thank you.

25         (Adjourned)

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
("MTBE") PRODUCTS LIABILITY
LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This document relates to:

*New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield Co., et al.,*
No. 08 Civ. 00312

SHIRA A. SCHEINDLIN, U.S.D.J.

## [PROPOSED] CASE MANAGEMENT ORDER NO. ___

This Case Management Order (CMO) establishes a structure and process, and directs the further discovery necessary, for resolving any and all claims that may remain in this case following trial of the trial sites remanded to the District of New Jersey by the April 7, 2015, Order of the Judicial Panel on Multidistrict Litigation (JPML) ("Phase I trial").

I.      Regardless of the number of defendants remaining after the Phase I trial, it is hereby ORDERED that any and all claims that remain following the Phase I trial shall be resolved in a single trial ("Phase II trial"). All further discovery shall be tailored to achieve the goals of facilitating prompt settlements and, if necessary, a manageable Phase II trial resulting in the just, speedy, and inexpensive disposition of this action.

II.     To the extent not determined in the Phase I trial, the Phase II trial will resolve at least the following special verdict questions:

A.      Is gasoline containing MTBE a defective product?

B.      Did the defendant provide adequate warnings concerning MTBE?

C.      Was the defendant negligent?

D.      Did the defendant know that gasoline containing MTBE created a high probability of harm to the waters of the State of New Jersey and act or fail to act with willful or wanton disregard of that harm?

E.      Was the defendant in any way responsible for the MTBE that contaminated the waters of the State of New Jersey?

III.   Previously Ordered Phase II Discovery

    A.    Plaintiffs have completed their update of the HazSites database as of the entry of this Order.

    B.    By April 30, 2016, defendants shall provide the lists of MTBE discharge sites pursuant to the agreement of the parties reached on February 26, 2016.

IV.   Further Phase II Discovery

    A.    Defendants' Disclosure Obligations

By July 7, 2016, each defendant shall provide plaintiffs with the following information for the relevant time period (1979-Present):

    (1)  Station Information

Each defendant shall provide a declaration identifying all stations and underground storage tanks in New Jersey at which the defendant had an ownership interest, a lease interest, a franchise interest, a branding interest, a supply agreement, and/or any other type of business relationship and the time periods during which these interests were in effect.  Each defendant shall provide the address, all unique identification numbers or equivalent for the stations and underground storage tanks (e.g., P.I. Number, Case Number, Site I.D., Preference I.D., Registration Number, internal identification numbers), a description of the business relationship, and the dates during which such relationship existed.  Each defendant shall also identify each such station or underground storage tank location for which that defendant has paid for or contributed to the cost of investigation and/or remediation of contamination or has been identified as a responsible party by the New Jersey Department of Environmental Protection and/or the U.S. Environmental Protection Agency.

    (2)  Sales Information

Each defendant shall provide all market share information in its possession involving sales of MTBE and gasoline containing MTBE in the State of New Jersey.  This shall include, but is not limited to, Lundberg Survey reports and information, information reported by or to the U.S. Energy Information Administration ("EIA") concerning gasoline delivered for sale in the State of New Jersey market, including on Form 782c, any consulting reports, whether internal or otherwise, which mention, concern or refer to market share of gasoline containing MTBE and/or MTBE in State of New Jersey.

    (3)  Distribution, Delivery and Exchange Agreement Information

Each defendant shall provide all gasoline supply agreements, branding agreements, agreements with distributors/jobbers and exchange agreement information in its possession for gasoline products and MTBE in the State of New Jersey.

(4)  Well Information

Each defendant shall provide all information in its possession regarding risks posed by MTBE releases to drinking water wells within the State of New Jersey, whether publicly or privately owned.  This information shall include, but not be limited to, both site-specific and non-site-specific vulnerability and risk assessments.

B.    Plaintiffs' Disclosure Obligations

By July 7, 2016, plaintiffs shall provide defendants with following information for the relevant time period (1979-Present):

(1)  Sales Information

Plaintiffs shall provide any and all information plaintiffs have received from EIA regarding sales of MTBE and gasoline containing MTBE in the State of New Jersey that has not already been provided to defendants, subject to any confidentiality requirements (e.g., produce for Outside Counsel eyes only).

(2)  Well Information

Plaintiffs shall update information previously provided to defendants regarding detections of MTBE in private and public wells, subject to the same confidentiality limitations previously ordered or agreed upon among the parties.  Plaintiffs shall also provide defendants with updated Source Water Assessments and water planning documents created since plaintiffs' last production of such information.

V.    Within 30 days of the entry of this Order, the parties shall begin meeting and conferring to develop a proposed approach to any necessary additional Phase II discovery and to a Phase II trial structure, including but not limited to methods for the presentation of evidence and claims, including, as may be appropriate, statistical evidence, alternative liability theories (e.g. market share liability and comingled product theories) and grouping of claims, that will permit a single Phase II trial.

VI.    By _____, 2016, the parties shall provide the Court with a joint proposed Case Management Order consistent with this Order. To the extent they cannot reach agreement, the parties shall submit two competing proposed Case Management Orders – one from plaintiffs and one from all of the defendants.

SO ORDERED:

DATED:  New York, New York
April___, 2016

_____
Shira A. Scheindlin
U.S.D.J.

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE METHYL TERTIARY BUTYL ETHER
("MTBE) PRODUCTS LIABILITY
LITIGATION

Master File No. 1:00-1898
MDL 1358 (SAS)
M21-88

This document relates to:

*Commonwealth of Puerto Rico v.*
*Shell Oil Co., et al.,*
No. 07 Civ. 10470

SHIRA A. SCHEINDLIN, U.S.D.J.

[PROPOSED] CASE MANAGEMENT ORDER NO. ___

This Case Management Order (CMO) establishes a structure and process, and directs the further discovery necessary, for resolving any and all claims that may remain in this case following trial of the sites remanded to the District of Puerto Rico by the Judicial Panel on Multidistrict Litigation on March 28, 2016 ("Phase I trial").

I.      Regardless of the number of defendants remaining after the Phase I trial, it is hereby ORDERED that any and all claims that remain following the Phase I trial shall be resolved in a single trial ("Phase II trial"). All further discovery shall be tailored to achieve the goal of a manageable Phase II trial.

II.     To the extent not determined in the Phase I trial, the Phase II trial will resolve at least the following special verdict questions:

   A.     Is gasoline containing MTBE a defective product?

   B.     Did the defendant provide adequate warnings concerning MTBE?

   C.     Was the defendant negligent?

   D.     Did the defendant know that gasoline containing MTBE created a high probability of harm to the waters of the Commonwealth of Puerto Rico and act or fail to act with willful or wanton disregard of that harm?

III    Phase II Discovery

    A.    Defendants' Disclosure Obligations

By July 7, 2016, each defendant shall provide plaintiff with the following information for the relevant time period (1979-Present):

    (1)  Station Information

Each defendant shall provide a declaration identifying all stations and underground storage tanks in the Commonwealth of Puerto Rico at which the defendant had an ownership interest, a lease interest, a franchise interest, a branding interest, a supply agreement, and/or any other type of business relationship and the time periods during which these interests were in effect. Each defendant shall provide the address, all unique identification numbers or equivalent for the stations and underground storage tanks (e.g., P.I. Number, Case Number, Site I.D., Preference I.D., Registration Number, internal identification numbers), a description of the business relationship, and the dates during which such relationship existed. Each defendant shall also identify each such station or underground storage tank location for which that defendant has paid for or contributed to the cost of investigation and/or remediation of contamination or has been identified as a responsible party by the Commonwealth of Puerto Rico and/or the U.S. Environmental Protection Agency.

    (2)  Sales Information

Each defendant shall provide all information in its possession involving sales of MTBE and gasoline containing MTBE in, or ultimately delivered to, the Commonwealth of Puerto Rico. This shall include, but is not limited to, Lundberg Survey reports and information, information reported by or to the U.S. Energy Information Administration ("EIA") concerning gasoline delivered for sale in the Commonwealth of Puerto Rico market, including on Form 782c, any consulting reports, whether internal or otherwise, which mention, concern or refer to market share of gasoline containing MTBE and/or MTBE in the Commonwealth of Puerto Rico.

    (3)  Distribution, Delivery and Exchange Agreement Information

Each defendant shall provide all distribution, delivery and exchange agreement information in its possession for gasoline products and/or MTBE in the Commonwealth of Puerto Rico.

    (4)  Well Information

Each defendant shall provide all information in its possession regarding risks posed by MTBE releases to drinking water wells within the Commonwealth of Puerto Rico, whether publicly or privately owned. This information shall include, but not be limited to, both site-specific and non-site-specific vulnerability and risk assessments.

B.    Plaintiff's Disclosure Obligations

By July 7, 2016, plaintiff shall provide defendants with following information for the relevant time period (1979-Present):

(1)    Sales Information

Plaintiff shall provide any and all information plaintiff has received from EIA regarding sales of MTBE and gasoline containing MTBE in the Commonwealth of Puerto Rico that has not already been provided to defendants, subject to any confidentiality requirements (e.g., produce for Outside Counsel eyes only).

(2)    Well Information

Plaintiff shall update information previously provided to defendants, if available, regarding detections of MTBE in private and public wells, subject to any applicable confidentiality limitations previously ordered or agreed upon among the parties.  Plaintiff shall also, if available, provide defendants with updated Source Water Assessments and water planning documents created since plaintiff's last production of such information.

IV.    Within 30 days of the entry of this Order, the parties shall begin meeting and conferring to develop a proposed approach to any necessary additional Phase II discovery and to a Phase II trial structure, including but not limited to methods for the presentation of evidence and claims, including, as may be appropriate, statistical evidence, alternative liability theories (e.g. market share liability and comingled product theories) and grouping of claims, that will permit a single Phase II trial.

V.    By _____, 2016, the parties shall provide the Court with a joint proposed Case Management Order consistent with this Order. To the extent they cannot reach agreement, the parties shall submit two competing proposed Case Management Orders – one from plaintiff and one from all of the defendants.

SO ORDERED:

_____

Shira A. Scheindlin
U.S.D.J.

DATED:  New York, New York
April___, 2016

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | Master File No. 1:00-1898 MDL 1358 (SAS) M21-88 |

This documents relates to:

*Commonwealth of Pennsylvania, et al. v. Exxon Mobil Corporation, et al.*, Case No. 1:14-cv-06228 SAS

SHIRA A. SCHEINDLIN, U.S.D.J.

## [PROPOSED] CASE MANAGEMENT ORDER NO.

**I.   CASE STRUCTURE:**

Pursuant to the Court's direction at the March 29, 2016, status conference, the parties will

meet and confer on a schedule to brief the use of statistical evidence to prove statewide claims.

**II.        NEWLY ADDED DEFENDANTS DISCOVERY RESPONSES:**

Those defendants joined in this matter after the First Amended Complaint ("Newly

Added Defendants") will provide responses to the Case Management Order 119 categories as

follows:

A.    Responses to Case Management Order 119 § I.: Responses shall be filed within

30 days of entry of this Order.

B.    Responses to Case Management Order 119 §§ III.B and III.C: Responses shall be

filed within 30 days of the entry of this Order.

C.    Responses to Case Management Order 119 § III.E: For Newly Added Defendants

who have previously served CMO declarations in an MDL 1358 case, responses

shall be filed within 90 days of the entry of this Order.  For Newly Added

Defendants who have not previously served CMO declarations in an MDL 1358 case, responses shall be filed within 120 days of entry of this Order.

**III.**   **MTBE RELEASE SITE LISTS:**

A. To the extent not already completed, each Defendant shall provide in Excel format updated CMO 119 § III.A Site Lists in compliance with the Court's direction at the February 16, 2016 status conference containing "Primary Facility" and "Facility ID" numbers, to the extent located after reasonable diligence.

B. Newly Added Defendants who are not related to a defendant already a party to this action each shall provide in Excel format their CMO 119 § III.A Site Lists, consistent with Paragraph A, within 90 days of entry of this Order. Defendants who are related to a defendant already a party to this action, shall provide in Excel format their CMO 119 § III.A Site Lists, consistent with Paragraph A, within 30 days of entry of this Order.

C. By April 12, 2016, Plaintiff shall provide in Excel format an updated CMO 119 § II.A Site List ("MTBE Release Site List") containing "Primary Facility" and "Facility ID" numbers, to the extent located after reasonable diligence.

D. Plaintiff shall provide to Defendants a list of environmental consultants on which Plaintiff has served subpoenas pursuant to CMO 119 § III.D and which Plaintiff asserts have not been responsive, either in whole or part. To the extent not already done, each Defendant agrees to and shall inform its environmental consultants that have been subpoenaed by Plaintiff that it does not object to the consultant producing responsive, non-privileged documents and expects the consultant to comply with its obligations under Federal Rule of Civil Procedure 45. To the extent that certain consultant responses (that provided only electronic

2

data) appear incomplete or inadequate, Plaintiff may serve additional subpoenas on them requesting hard copy documents and information concerning: (1) concentrations of MTBE and/or BTEX in soil and groundwater at release sites, and (2) consulting reports regarding release sites.

E.  Each Defendant shall provide in Excel format the following information regarding each site listed on the Commonwealth's most current MTBE Release Site List to the extent known to Defendant or in Defendant's possession, custody or control:

    i.  Whether Defendant or Defendant's predecessor had an ownership or lease interest in the property or any underground storage tanks at the site, including the dates of ownership;

    ii.  Whether Defendant or its predecessor had a franchise agreement, branding agreement, a supply agreement, or any other type of business relationship with the site whereby the Defendant supplied gasoline and/or MTBE to the site, including the dates of such supply;

    iii.  Whether Defendant or its predecessor paid for or contributed in any way to remediation activities at the site.

F.  Distribution, Delivery and Exchange Agreement Information:

Each Defendant shall provide all distribution, delivery and exchange agreement information [gasoline supply agreements], including retail supply contracts, branding agreements, branded jobber contracts, and unbranded jobber contracts which concern, refer, or relate to sites on the MTBE Release Site List.

**IV.  SALES AND MARKET SHARE INFORMATION:**

A.  Sales/Market Share Information:

Each Defendant shall provide all market share information in its possession, custody or control, involving the sales of MTBE and gasoline containing MTBE in the Commonwealth of Pennsylvania. This information shall include, but not be limited to, Lundberg Survey reports and information, information reported by or

3

to the United States Energy Information Administration concerning gasoline delivered for sale in the Commonwealth of Pennsylvania, including Form 782c, any non-privileged consulting reports, whether internal or otherwise, which mention, concern, or refer to market share of gasoline containing MTBE and/or MTBE gasoline in the Commonwealth of Pennsylvania.

B.  Retail Market Share:

Each Defendant shall provide all market share information in their possession, custody, or control concerning their ownership, leasing, branding, or franchising of retail gasoline service stations in the Commonwealth of Pennsylvania, including, but not limited to, Lundberg Survey Reports and information, and any non-privileged consulting reports, internal or otherwise.

C.  Exchange Agreements:

Each Defendant shall provide copies of exchange agreements in its possession, custody, or control for MTBE and gasoline containing MTBE distributed to the Commonwealth of Pennsylvania.

## V.  LIMITED SITE-SPECIFIC DISCOVERY:

The parties shall meet and confer to develop a process for selection of focus sites that are representative of Plaintiff's claims. Any additional site specific discovery shall be limited to information necessary to select focus sites. The parties shall present their proposal(s) for focus site selection (including use of statistical methods if applicable) in the form of a proposed CMO. Any proposed CMO shall also address proposed discovery related to selection and preparation for trial of focus sites. Selection of such sites shall not prejudice the right of any party to propose a method of trial that will resolve all claims in a single trial.

4

VI.     **ELECTRONICALLY STORED INFORMATION:**

The parties agree to confer regarding production of electronically stored information. To make such discussions productive, the parties shall exchange proposals for collection and production of electronically stored information within 30 days of entry of this Order.