G4qWmtbC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
ETHER ("MTBE") PRODUCTS                Master File
LIABILITY LITIGATION                   No. 1:00-1898(SAS)

------------------------------x

                                       New York, N.Y.
                                       April 26, 2016
                                       2:30 p.m.

Before:

                    HON. SHIRA A. SCHEINDLIN,

                                       District Judge

                           APPEARANCES




WEITZ & LUXENBERG PC
     Plaintiffs' Liaison Counsel
BY:  WILLIAM A. WALSH

MILLER & AXLINE LLP
     Attorneys for Puerto Rico
     and New Jersey Plaintiffs
BY:  MICHAEL AXLINE
     DUANE C. MILLER
     -and-
JOHN K. DEMA
SCOTT E. KAUFF
NATHAN SHORT

G4qWmtbC

                              APPEARANCES (cont'd)


COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
     Attorneys for New Jersey Plaintiffs
BY:  LEONARD Z. KAUFMANN

RICHARD ENGEL
     Deputy Attorney General of the State of New Jersey

JACKSON GILMOUR & DOBBS PC
BY:  JOHN D.S. GILMOUR
     WILLIAM J. JACKSON

BERGER & MONTAGUE PC
     Attorneys for Commonwealth
     of Pennsylvania Plaintiffs
BY:  DANIEL BERGER
     TYLER WREN
     –and–
COHEN PLACITELLA & ROTH PC
BY:  MICHAEL COREN



McDERMOTT, WILL & EMERY LLP
     Attorneys for Defendants Exxon Mobil Corp.
     and Defendants' Liaison Counsel
BY:  JAMES A. PARDO
     ANTHONY A. BONGIORNO
     LISA A. GERSON
     –and–
ARCHER & GREINER, PC
BY:  WILLIAM J. STACK

SEDGWICK LLP
     Attorneys for Defendants Shell Oil Co.
     and Motiva Enterprises
BY:  RICHARD E. WALLACE, Jr.

G4qWmtbC

1                          APPEARANCES (cont'd)

2    NORTON ROSE FULBRIGHT US LLP
          Attorneys for Defendants
3         Conoco Phillips and Chevron Phillips
          Chemical Puerto Rico Core LLC
4    BY:  STEPHEN C. DILLARD
          -and-
5    KING & SPALDING LLP
     BY:  CHARLES C. CORRELL, Jr.
6
     EIMER STAHL LLP
7         Attorneys for Citgo Defendants
     BY:  LISA S. MEYER
8
     THOMAS & KNIGHT LLP
9         Attorneys for Defendant
          Petrobas America, Inc.
10   BY:  JAMES B. HARRIS

11   SEPULVADO & MALDONADO PSC
          Attorneys for Defendant
12        Total Petroleum Puerto Rico Corp.
     BY:  ALBENIZ COURET-FUENTES
13
     MOUND COTTON WOLLAN & GREENGRASS
14        Attorneys for Defendant Trammo
     BY:  ROBERT S. GOODMAN
15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon, Mr. Wallace, Mr. Axline,

2     Mr. Miller, Mr. Gilmour, Mr. Engel, Mr. Pardo, Mr.Bongiorno,

3     Ms. Gerson, Mr. Running, Ms. Meyer, Mr. Harris, Mr. Couret,

4     Mr. Stack, Mr. Dillard, Wallace, Mr. Correll, and Mr. Goodman.

5     And all the rest of you who have come to court today, welcome.

6          Good afternoon to the folks on the phone -- there's a

7     group of you; I have a list here -- Mr. Bollar, Mr. Drake,

8     Mr. Garcia-Diaz, Mr. Goheen, Ms. Judge, Mr. Novoa, Mr. Parisi,

9     Mr. Wall, and Mr. Zorn.  I hope that all the folks on the phone

10    realize that all you can do pretty much is observe and not

11    participate.

12         Ms. Burke, you're also on the phone.  I'm sorry I

13    didn't mention you.  In any event, please realize that you

14    can't participate.  There are too many lawyers to allow for

15    on-the-phone participation, though you're welcome to listen in.

16         I was just getting started in saying we have a pretty

17    full agenda for today's conference.  I received letters on

18    April 18; a joint agenda; and then the plaintiffs'

19    preconference letter, four exhibits, which were primarily

20    proposed CMOs in New Jersey, Puerto Rico, and Pennsylvania; as

21    well as the transcript of the last status conference.  And

22    defendants' preconference letter of the same date, April 18,

23    also attached a proposed New Jersey CMO; and then a letter from

24    defense counsel, Ms. Gerson, to plaintiffs' counsel,

25    Mr. Axline, regarding Puerto Rico nontrial site discovery.

1    Then there were two reply letters both of April 21.  The

2    plaintiffs attached exhibits again.  The first was of a

3    December 22 conference before the Court.  The second is the

4    defendants' interrogatories that they would like to have

5    answers with respect to the Puerto Rico nontrial site

6    discovery; a letter from Mr. Axline to Ms. Gerson regarding

7    their meet-and-confer sessions with respect to those

8    interrogatories; and then a reply letter from Ms. Gerson to

9    Mr. Axline regarding those meet and confers; and then

10   defendants' reply letter, which attached several exhibits,

11   including a letter from April 20 from defense counsel to Puerto

12   Rico plaintiffs' counsel regarding the phase II trial and

13   proposed CMOs, and then also attaching another proposed CMO and

14   a proposed Pennsylvania CMO.

15           That's a recapping of the submissions to the Court.

16   Our issues begin with the Puerto Rico case, focusing on

17   discovery, then turning to the New Jersey and Puerto Rico case

18   but with respect to phase II issues, and then the third topic

19   will be Pennsylvania.  That's how I see the agenda.  OK?

20   Anybody disagree?  No.

21           We begin with Puerto Rico, and it starts by referring

22   back to the December 22 conference.  I had a telephone

23   conference with the parties talking about how discovery should

24   proceed following the Court's reinstatement of certain

25   defendants, and I ordered the commonwealth to produce certain

```
 1      discovery related to all defendants for statute of limitations

 2      purposes at all the remaining 354 sites, but limited to certain

 3      issues, hopefully, which defendants are at which site and when

 4      did the commonwealth have knowledge of that participation, so

 5      to speak.  It was not supposed to be full site discovery, and

 6      it needed to happen immediately.  After that, on March the 4th,

 7      2016, the defendants served four interrogatories, and the

 8      commonwealth objects to the scope of three of them, the first

 9      three, in fact, as being beyond what I authorized and beyond

10      really the point of these interrogatories.

11              With respect to the fourth interrogatory, which is the

12      most specific in a way, as to when the commonwealth had

13      knowledge, the commonwealth says it can respond, but it needs

14      information from the defendants to properly respond.  And of

15      course defendants say it doesn't matter what information they

16      have; the statute of limitations is triggered when the

17      commonwealth has information.  And then the commonwealth also

18      asks for more time to respond.  Let's start with the simplest

19      question.  What time does the commonwealth propose to respond,

20      and then we'll talk about the scope of it, but what time frame

21      does the commonwealth respond?  Who is speaking for the

22      commonwealth?  Mr. Axline.

23              MR. AXLINE:  As usual, I am, your Honor.

24              THE COURT:  OK.

25              MR. AXLINE:  The commonwealth proposed to respond
```

1   within 90 days of the service.

2           THE COURT:  That's true.  That was in your letter, but

3   what is the defense thought?  It's not exactly speedy.  These

4   are old cases.  Why does it have to be 90 days?  And is there

5   any objection to 90 days?  That's another thing.  What's the

6   defendants' view of 90 days?

7           MR. HARRIS:  Your Honor, I had the sort of laboring

8   oar at the December 22 telephone conference on discovery

9   issues.  We don't object to 90 days, so long as we actually get

10  answers, your Honor.  One of the things that has concerned us

11  is, as I think you saw from the email exchange, we said if

12  you're going to answer all of the interrogatories as written

13  without objection, 90 days is fine.  If you have objections,

14  we'll give you an additional seven days.  We heard nothing from

15  the plaintiffs in that respect, and we're just concerned, your

16  Honor, that what we're going to get after 90 days are

17  objections.  In our discussions with the commonwealth, as I

18  understand their comments, they plan to rewrite our fourth

19  interrogatory and answer the question they want to ask

20  themselves, not the question that we have put to them.

21          THE COURT:  All right.  I see that starting with the

22  time frame may not be further productive.  With respect to

23  document production, I didn't anticipate document production at

24  this point in time.  I thought we should focus on responses to

25  the interrogatories, basically figure out what defendants are

at what site, and that was that at this time, and not to have

full classic discovery, so I didn't even anticipate at this

point talking about documents.

Now, Mr. Axline, is Mr. Harris right that you don't

propose to answer No. 4 as written?  I thought No. 4 was the

one that wasn't in dispute.  It was just a matter of time.

MR. AXLINE:  No, he's incorrect.  We plan to answer it

as written and without objections.  No. 4 we have no problem

with.

THE COURT:  Why didn't you know that, Mr. Harris?

MR. HARRIS:  Because it's the first time I've heard

it.  In the meet-and-confer we had, I understood that what the

commonwealth was planning to respond was the first time that

they were aware of MTBE.  The question that we've asked goes to

facts that were in their possession, and if I misunderstood the

commonwealth, as I recall that conversation, they said we will

answer No. 4 as to when we are aware, which is not the question

we asked.

THE COURT:  It's not the question you asked.  You

asked for the first written report or any other communication

that discussed the presence of MTBE.

You should answer that as written and that you

received a laboratory report.  You should answer that.  And

that's the whole interrogatory, (a) and (b).

MR. AXLINE:  That's what we're intending to answer,

1    your Honor.

2              MR. HARRIS:  That's taken care of, your Honor.

3              THE COURT:  That's taken care of, so now let's look at

4    one, two, and three and figure out what the problem is.  The

5    first one says for each site identify the defendants against

6    whom each cause of action is being asserted.  The statute of

7    limitations is the same for all the causes of action, right?

8              MR. HARRIS:  I'm not sure.

9              THE COURT:  It's one year for all of them.

10             MR. HARRIS:  I'm not sure that's the commonwealth's

11   position, your Honor.

12             THE COURT:  I'm asking you.

13             MR. HARRIS:  Our position is yes, that the statute of

14   limitations is one year for all the causes of action.

15             THE COURT:  Why does it need to be divided by cause of

16   action at all?  No. 4 is going to tell you this with respect to

17   sites.  No. 4(a) says at the site.

18             MR. HARRIS:  I think it gets to an issue we discussed

19   on December 22, your Honor, which is we're trying to also at

20   this point in time understand which sites plaintiffs claim the

21   defendants are tied to.

22             THE COURT:  It's absolutely the point, which

23   defendants are at which site.  But the way you phrased it, tell

24   me the defendant against whom each cause of action is being

25   asserted, it's all about the one-year statute.  That's all.  If

```
1    you look at No. 4 and you find out when, the only question left

2    is who, so they do need to know which defendants are at which

3    site.

4              MR. AXLINE:  That's a much more difficult question for

5    the commonwealth to answer.  These are 354 sites, not an

6    inconsequential number.

7              THE COURT:  I'm aware of that.

8              MR. AXLINE:  In order to determine and make sure that

9    we know which defendant is at which site, we need to conduct

10   discovery as well, so we can tell them when the commonwealth

11   received the information that they're asking about and became

12   aware of MTBE at each of these sites without having to conduct

13   that discovery against where they sent their product and who

14   was at each site, but we can't do the "who" part of it nearly

15   as quickly as we can do the "when" part of it.

16             THE COURT:  Putting aside how quickly you can do it,

17   can you do it?  I mean, you've sued.  At this point, you don't

18   know which defendants are at which site?

19             MR. AXLINE:  We've not been allowed to conduct

20   item-wide discovery on that topic, your Honor.  We've actually

21   been conducting discovery on focus sites, and frankly, it's

22   taken us quite a bit of time and effort to find out and make

23   sure that we know which defendants are at which the focus

24   sites, so we can do it.  We haven't done it.  That's part of

25   phase II.  And frankly, our thought was that we would come up
```

with a CMO that would govern how that discovery would come

about, and at that point defendants jumped the gun and

shoehorned in these additional issues to something you

authorized them to do on a very narrow basis, which was to ask

about the timing.

THE COURT:  But the timing as to who.  They still need

to know which defendants are at risk at each site, so to speak,

and whether it's time barred.

MR. AXLINE:  I'm not sure they do, your Honor.

THE COURT:  How else can they move to dismiss or get

to agreement to dismiss when it's time barred?  Or are you

saying, We'll admit that this whole site is time barred because

we knew about this contamination in 2004 and we didn't sue

until 2010, so obviously we're past a year, so it doesn't

matter who is there; the site is gone?

MR. AXLINE:  That's sort of the way we've been doing

it, on a site-by-site base.

THE COURT:  The whole site is time barred, we know it,

and we drop that site.

MR. AXLINE:  That's what I thought we were discussing

in December, and that's the thing that makes the most sense to

me, if you're going to accelerate some part of the discovery.

THE COURT:  To reduce the number of sites from 354, or

whatever that number was, down based on time bar.

MR. AXLINE:  Yes.

```
 1              THE COURT:  And it doesn't really matter who, the site
 2    is gone.
 3              MR. AXLINE:  There is one aspect, and this is
 4    discussed in our letter on the statute of limitations issue on
 5    which we need discovery from defendants, and I think they've
 6    agreed to give that to us, but we need to get their repair
 7    records, other records that might show additional releases.  If
 8    there's a site that there's a statute of limitations problem,
 9    we then get to look at whether there may have been subsequent
10    releases that would have started the clock running anew.
11              THE COURT:  True, but to do that, you would wait until
12    you could identify the sites that are otherwise time barred.
13    Hopefully that's a smaller number than 354.  Some of them are
14    obviously not time barred, but in the number that is, let's say
15    it's 50, you would have to go back and say we would have to
16    concede if that's the only spill, it's time barred, so we now
17    are entitled to know whether there were subsequent releases at
18    that site.
19              MR. AXLINE:  Fair point.
20              THE COURT:  To do that for all 354 now doesn't make
21    sense because there will be some agreement that some are not
22    barred.
23              MR. AXLINE:  We could sequence that.
24              THE COURT:  Yes, you could sequence that, but going
25    back to identifying which defendants, that takes us to
```

interrogatory No. 2 because we also want to know the supplier
or suppliers at each site, and you're going to say, I suppose,
that's the same as knowing which defendants are at each site.

        MR. AXLINE:  Yes.

        THE COURT:  And it raises the same problem, you need
them to tell you who supplied each location.

        MR. AXLINE:  Yes.

        THE COURT:  And over what period of time.

        MR. AXLINE:  And as you know, in New Jersey and in
Pennsylvania, we've been talking about collectively working on
a master list of sites in which the defendants would give us
that type of information.  That enterprise hasn't begun in
Puerto Rico, but we think it should.  This is not the way to go
about it, though.

        THE COURT:  Well, because you don't have the
information, is what you're saying.

        MR. AXLINE:  Right.  They haven't been instructed to
give it to us.

        THE COURT:  You don't have it.

        MR. AXLINE:  Right.

        THE COURT:  You couldn't answer No. 2, no matter how
much time you have.  You don't know the suppliers and when.

        MR. AXLINE:  We might at some sites but certainly not
354 sites.

        THE COURT:  How about the sites you do know, because

1    No. 3 says when you're unable to answer the preceding first

2    site, then you should identify what information you need.  Now

3    that you just said maybe we know at some sites, maybe the

4    defendants are right, for those sites where you know, you

5    should identify, These are the suppliers we know of, these are

6    the dates we know of releases; putting it together it's either

7    barred or not barred as to that supplier.  The same with other

8    defendants:  As to this site right now we can tell you, forgive

9    me for picking on you, Exxon or Shell were there, but don't

10   know anybody else who was there; it could be Conoco, it could

11   not be, but we don't know that now.  That would lead you to No.

12   3.  Then you could say for these 100 sites we don't know

13   anything, frankly.  We know there's a release.  We know when it

14   occurred, but we don't know which defendants and we don't know

15   which suppliers, so it does seem that the burden should fall

16   first on you when you can do it.  As you just stood and said,

17   there are some sites where we know.  Then they could at least

18   see the universe of sites that you don't know, and then it

19   would be appropriate for them to produce information to you.

20           Going backward, one, two, and three, I think they

21   should be answered for those sites where you know the answer,

22   and No. 4 you already promised to answer as written.  There's

23   my ruling.  You set the time frame.  In 90 days you should

24   answer one, two, and three for where you do know, and No. 3 for

25   the sites you don't know, you don't have to identify what

1    information and/or documents you need.  It's patent what he

2    needs.  He needs to know who supplied the site and from what

3    date to what date, and he needs to know whose site it was, if

4    it can be identified as one of the operators.  You know what he

5    needs, so I don't really think that the second half of three is

6    really needed.  They don't have to identify the documents they

7    need; I just did.  So in 90 days, answer one, two, and three as

8    amended by me in No. 3, without objections.  Then the burden

9    shifts to the defendants for those sites where you can to

10   provide supplier identities and dates, and the same thing with

11   other defendants whose material was present at that site.

12           MR. AXLINE:  May I add one caveat to that, your Honor?

13           THE COURT:  Yes.

14           MR. AXLINE:  That, frankly, sounds fine to me, but

15   sometimes we will know who owned a site at one point in time

16   but not another point in time.

17           THE COURT:  Right.

18           MR. AXLINE:  As long as it's clear.

19           THE COURT:  If you put the dates, that's clear.  You

20   can say:  Our information is that Shell controlled this site

21   from 1994 to 1998.  The site is still operating today, and we

22   are unaware of who supplied or who owned the site from 1998 on.

23   As long as you're specific in identifying what you do know and

24   what you don't know, the burden then shifts to the defendant to

25   supply information back to you.

 1          MR. AXLINE:  So the defendants will fill in the

 2   blanks.

 3          THE COURT:  I'm hopeful.  I'm hopeful, but you do have

 4   to answer No. 4.  You do have to say when you received a lab

 5   report or when you received a written report or communication

 6   as to each site.

 7          MR. AXLINE:  Understood.

 8          THE COURT:  All right.  90 days, but it's not for

 9   Mr. Harris to write out long objections.  That's not what it's

10   for.  It's to answer the questions, all of them.

11          MR. AXLINE:  That's our intent.

12          MR. HARRIS:  Your Honor, if I might be heard just

13   briefly on the request for production.

14          THE COURT:  Yes, but let's just pick a specific date.

15   Since today is Tuesday, we'll say July 19.  Got that, July 19?

16   It's a Tuesday, so I'm sure it's 90 days, give or take.

17          MR. AXLINE:  Thank you, your Honor.  And then how long

18   for the defendants to fill in the blanks?

19          THE COURT:  We'll get to that in one moment.

20          You were going to say something else, Mr. Harris.

21   What were you going to say?

22          MR. HARRIS:  With respect to the four requests for

23   production, your Honor, the reason they were in there, we had

24   anticipated that the commonwealth would have reviewed documents

25   in order to answer the interrogatories, and we simply wanted to

```
 1    see those documents that were germane to the answers to the

 2    interrogatories.  I don't think there's anything additional.

 3              THE COURT:  You mean if they received a lab report,

 4    they should produce the lab report.

 5              MR. HARRIS:  Yes, your Honor.

 6              THE COURT:  That's easy.  If they received a written

 7    report, they should produce the written report, but it's not

 8    broader than that.  It's not anything else right now.

 9              MR. HARRIS:  That's correct.

10              THE COURT:  If it's just No. 4(a) and (b), if there's

11    a physical paper that gave them the notice, sure, that's how

12    they answer the question:  Yes, we received a lab report on

13    January 10, 1994.  If you know you received it, copy it and

14    produce it.

15              MR. HARRIS:  Right.

16              THE COURT:  That's just to four, not to one, two, or

17    three.

18              MR. HARRIS:  I think virtually all of these sites are

19    subject to a regulatory remediation program.  They're being

20    cleaned up even as we sit here today, and I think we also were

21    interested in knowing any documents that identified the case

22    manager, the person that was in charge.

23              THE COURT:  That is not the purpose of this at this

24    time.  The purpose of this at this time is to drop sites

25    because they're time barred either in total or against other
```

```
 1    defendants.  Then we have a master list of sites in play.  Then
 2    you can answer that.  Now we'll turn to Mr. Axline's question.
 3    Once he supplies the information on July 19, the tables turn.
 4    At that point he says, These 150 sites, we simply don't have
 5    the information, but we believe the defendants have information
 6    for some or all sites.  You need to respond back to them.  Can
 7    you do that in 60 days, because it will be far less than 354?
 8              MR. HARRIS:  I may turn that over to Mr. Pardo.  I
 9    hate to be glib, but in the case of my client, Petrobas
10    arranged transportation from point A to point B, we've given
11    them everything we have.
12              THE COURT:  That may be.
13              MR. HARRIS:  It stops at the port.
14              THE COURT:  That may be.  Who wants to answer the
15    question whether 60 days from July 19 is reasonable?  This is
16    going to be a smaller number than 354.  It's limited
17    production.  You have to talk about supply and ownership.
18    That's about it.  You should know which of you supplied and
19    which of you owned a particular site, and it's going to be
20    identified by site.  I would think two months from that point
21    is plenty.
22              MR. PARDO:  I rise reluctantly, because I haven't
23    vetted this, obviously, with my group, your Honor, but 60 days
24    sounds like it should work.  If I get significant pushback from
25    someone after this conference, I'll be sure to confer with the
```

1  plaintiffs and come back to you, but for now we'll be happy

2  with 60 days.

3      MR. HARRIS:  I would add from the limited discussion

4  I've had with other defendants, a lot of them believe they have

5  already supplied information.

6      THE COURT:  Certain ones may have, but once it's site

7  specific, once they identify to you the ones they don't have

8  any information, as I said now for the third time, it's a

9  smaller number for the whole.  It's very specific.  Look in

10 your records.  You can figure it out.  We'll say mid-September,

11 just to pick a date, September 16.

12     That takes us to the not-so-easy topic of the phase II

13 issues in New Jersey and Puerto Rico, and there's a big split

14 in the camps here on how to construct a CMO that everyone can

15 live with.  I have already opined that it's my belief that the

16 phase II trial should be the final trial and that we can't have

17 100, 200, or 300 follow-on trials.  The real issue is how to

18 structure that second phase II trial.  Is it going to be

19 another focus site-type trial with these buckets of certain

20 parameters per bucket and everybody will agree that any case in

21 that bucket will then be governed by the verdict for that

22 bucket, so we have five buckets, based either on defendants'

23 proposal of the size of the contamination, or buckets of the

24 script of terms that describe the type of site or the type of

25 release, but that everybody would say once we've tried that

phase II that has carefully picked sites to fall into each

bucket, we're going to just agree to follow on from there and

apply the verdict, so to speak, to all the other ones that fall

into that bucket?  If we take that approach, then all the open

sites, in Puerto Rico or New Jersey, should be assigned to one

of the buckets so we know in advance bucket one has 42 sites;

we agree to try three of those in each bucket, but the

remaining 39 will be governed by the three that are tried.

        That is one way to do this, but whether that's the

best way is not something, I think, we can resolve without full

briefing, because the defendants have said they think there are

due process issues; they don't think a statistical sampling

approach applies.  The idea of a bellwether trial is another

way to do this, one of each kind that sets either settlement

parameters, or something.  It's not a dissimilar bucket

approach, it's similar, but there has to be some good faith

effort to say whichever method we select will govern the

remaining sites.  You can't expect the court system to try this

300 times.  That's for sure.  So there you know my view on

that.  But since the defense has raised what they call due

process issues, I'm afraid those issues must be fully briefed,

and that will not fall to this Court to decide the due process

problems that the defendant sees.  All I can say, and I'm sure

it will be helpful to the next judge, is it should be one trial

phase II that resolves all the issues in the case.

1             Having said that, let me add that this leads to this

2    question of what you might call the common issues that they

3    talked about for a verdict sheet, and I know that I have that

4    here in my notes somewhere, such as:  Is gasoline containing

5    MTBE a defective product?  Did the defendant provide adequate

6    warnings concerning MTBE?  Was the defendant negligent?  Did

7    the defendant know that the gasoline containing MTBE created a

8    high probability of harm?  Was the defendant in any way

9    responsible?  Maybe the fifth of those is site specific and is

10   not really a nonsite specific question, but the first four are

11   generic, and they're tried once and then that finding applies.

12   You can't try the question "is gasoline containing MTBE a

13   defective product" over and over again.  It's not something I

14   believe any lawyer in this room wants to do.  You air it out

15   fully once.  You put all your experts and witnesses on the

16   stand, the jury says it is or it isn't, and it has to apply

17   over and over again.  That's a generic question.  It is not

18   site specific.

19             "Was the defendant negligent," probably not site

20   specific.  "Adequate warnings," I suppose the warnings could

21   differ by site, but not really.  They probably differ by time

22   frame.  There probably were some warnings in effect in the

23   earlier period and in the middle period and in the later

24   period, and I know the warnings were different to owners or

25   managers.  There were different warnings depending on the type

of person being warned.  But once you take into account those

variations, both time frame and the recipient of the warnings,

it doesn't change.  It's the same over and over again.

"Did the defendant know that gasolines containing MTBE

created high probability of harm," those are defendants'

documents.  I've already seen them in the one trial I had.

That's not something you can try over and over again either.

Now, I obviously didn't hear the evidence as to every single

different defendant in the room.  I only heard it as to one

defendant, but sooner or later, there's a discrete set of

documents that shows the defendants' knowledge.  And since a

lot of defendants are meeting together in industry groups, then

they knew the same things at the same time, but in any event,

to the extent it's defendant specific, fine, but you wouldn't

try that over and over again.  So while I can't, because it

would be inappropriate for me to write a special verdict form

now when we don't even know the structure of the phase II

trial, I can't and won't do it, but I am putting on the record

my views, that a common issue, like "is it a defective

product," is tried once and then it binds you; everybody got a

chance to be heard.  There's no reason it shouldn't have

reached res judicata effect.  I'm sure the plaintiffs like

that, but I have no idea if defendants do.  And maybe it's a

misnomer to call it a ruling, but that is the guidance that I

can give.  Does anyone want to be heard further on the

1    so-called special verdict form, or do you at this point have to

2    say that you'll accept the guidance that I just gave on the

3    record?

4              MR. PARDO:  It's guidance, correct, your Honor?

5              THE COURT:  It has to be.  I can't write a special

6    verdict form for a phase II trial that we haven't structured

7    yet, but I am saying loud and clear for anybody to quote to a

8    judge who is less familiar with the 16 years that I've now been

9    on the MTBE cases, I am putting on the record some issues can't

10   be retried over and over again.  Who wants to be heard?

11             MR. PARDO:  Thank you, your Honor.  I appreciate that

12   these are for guidance purposes, and not rulings.  I understand

13   that.  I don't know that we would agree with all of those

14   rulings.  For example, negligence, I don't think, is something

15   that can be divorced.

16             THE COURT:  I think I backtracked on negligence.  I

17   said that may be site specific.

18             MR. PARDO:  Failure to warn, certainly, depending on

19   how they want to do it.

20             THE COURT:  I don't think failure to warn is site

21   specific, and I told you why.  Warnings differ depending on

22   recipients.  Sometimes you deal with defendants, from what I

23   learned from the case I did try, because they already knew

24   that.  They have known that forever.  There's no reason to say

25   that again.  Those people were, in fact, giving warnings to the

next guy down the line.  So warnings differ depending on

recipient and warnings may differ depending on time frame.

Earlier they may have read differently than the middle and

later, but once you sort out those categories of time frame and

recipient, it doesn't differ.  That's my view.

        MR. PARDO:  Fair enough.  There are many possible

recipients.

        THE COURT:  Possible, but by category.  It's still by

category.  It's not Mr. Jones, Ms. Smith, Mr. Brown, Ms. Black.

It's not like that.  It's suppliers, owners, operators.  It's

categories.

        MR. PARDO:  Whether gasoline with MTBE was a defective

product, you're right.  But remember in some cases they have

defective failure-to-warn claims, which may vary again by site.

        THE COURT:  We talked about that.  There's no point

going over failure to warn again.  I said it twice already,

time frame and recipient.

        MR. PARDO:  With the caveat, as I understand, your

Honor, that this is guidance for the next court, I don't think

I have anything else to say.

        THE COURT:  Mr. Kaufmann.

        MR. KAUFMANN:  Thank you, your Honor.  I, too, accept

that your comments regarding special jury verdict questions are

guidance and there's no reason to today set forth questions

that might be asked of the jury years in the future.  And we

1    also agree with your general principle that common questions

2    get tried once.  With that being guidance, we have no problem

3    with that.  I would suggest that your comment as to there will

4    be one trial to resolve all issues, that you do have the

5    ability to make that a ruling, and that was something that we

6    request be in a case management order that comes out of this

7    Court.

8                THE COURT:  Isn't that where they have the due process

9    arguments that are not yet briefed?  I think they deserve an

10   opportunity to brief something which they claim is

11   constitutional in nature.  Due process is a constitutional

12   right.  I hesitate to interpret a constitutional defense

13   without briefing.  That's the problem.

14               MR. KAUFMANN:  Sure.

15               THE COURT:  Yes, I think there should be only one more

16   trial, but to say that a bellwether trial or bucket-approach

17   trial must govern all the cases in that bucket or all the cases

18   that look similar to bellwether, which may be saying the same

19   thing twice, must govern it, I don't know that I have the

20   authority to do that.  I don't know after they write the brief

21   saying I don't and you respond to that brief what some judge

22   will recommend.

23               MR. KAUFMANN:  We are not asking you to do that.  We

24   are not asking you to say today that it must be a bellwether,

25   it must be this particular statistical approach.

1          THE COURT:  But if it's a single trial, your only

2     other option is a trial that lasts two or three years and that

3     tries 400 sites individually in one trial.  Do you really think

4     you can do that in one trial?

5          MR. KAUFMANN:  We are not going to try 5,000 sites.

6          THE COURT:  So that means you're trying less than all

7     sites, either by bellwether or bucket.  I may be actually

8     saying the word twice, I don't know.  But you are asking that I

9     say that since you say you cannot try 5,000 sites individually

10    in one trial.  If the defense says we have a due process

11    challenge to a statistical extrapolation approach or bellwether

12    approach as binding -- it's one thing if we take it as

13    guidance.  You try a bellwether case, you get a verdict, you

14    find out the numbers.  You see what's going on with the GM

15    cases.  You need to know what the settlement values are, and

16    they voluntarily say those are good exercises; we tried six

17    bellwethers; we're really prepared to wrap this up.  That's

18    voluntary, but to impose a "you must fall into this verdict" as

19    a matter of law with no further opportunity to be heard, site

20    by site, where there might have been defenses, to eliminate

21    that right without briefing and the chance to write a

22    significant or serious opinion, I don't see how I can do that

23    today.

24         MR. KAUFMANN:  Our concern is if you don't have the

25    guidance of a ruling that says focus your discussion and focus

1    your discovery and focus your activities on finding a way so

2    that we're not going to have a phase III, phase IV, phase V, so

3    that it goes on forever, that it will indeed go on forever.

4            THE COURT:  You want a ruling that says I rule that

5    you should focus your conversations, your meet-and-confer on

6    finding a way to achieve a goal.  You want me to write that?

7    I'm happy to write that.  I think it's almost meaningless, but

8    I'm happy to write that, that you should focus your

9    meet-and-confer efforts on finding a way to have a single trial

10   that wraps up these cases.

11           MR. KAUFMANN:  That's a step forward.

12           THE COURT:  Is it?

13           MR. KAUFMANN:  I think so, because I'm not sure that

14   that would be the goal of the defendants, so I would take that

15   as a step forward.

16           THE COURT:  Mr. Axline.

17           MR. AXLINE:  Your Honor, if I could offer a slightly

18   different perspective on this.

19           THE COURT:  From Mr. Kaufmann?

20           MR. AXLINE:  It's a nuance to Mr. Kaufmann.

21           THE COURT:  A nuance is better than a different

22   perspective.

23           MR. KAUFMANN:  I'm always happy to have Mr. Axline

24   correct me.

25           THE COURT:  No, no.  He said he just wants to put a

1    footnote, which is otherwise called a nuance.  Go ahead.

2              MR. AXLINE:  One has to look at it from the other end

3    of the telescope.  It is the plaintiffs' prerogative to decide

4    how they're going to put on their case, your Honor.  Ordinarily

5    a plaintiff would decide how many witnesses they're going to

6    put on, even how many claims they're going to take to a jury.

7              THE COURT:  If you want to drop 4,500 of the 5,000

8    sites, the defendants won't object.

9              MR. AXLINE:  I'm sure they wouldn't, but we're never

10   going to get to the point where we're talking about options

11   such as that unless the Court says to the plaintiffs, Do this

12   in one trial, and then it's up to us to figure out a way that

13   doesn't violate due process and that allows us to make the

14   claims that we want to make.  That burden is on us.  But until

15   we get an instruction from this Court, and you are the Court to

16   do it since you have been overseeing this.

17             THE COURT:  For 16 years.  I checked today.

18             MR. AXLINE:  By the way, I'll just take this

19   opportunity to say we're going to miss you.

20             THE COURT:  Thank you.  I'll miss you, Mr. Axline.

21             MR. AXLINE:  But if you can say that, then there can

22   be subsequent briefing to whoever replaces you on strategy, due

23   process, all of those things, but you know how things can drag

24   on unless there's some overarching direction from the MDL

25   judge, and this is one instance where I think that direction is

1   both appropriate and probably necessary.

2          THE COURT:  All right.  Mr. Pardo.

3          MR. PARDO:  Your Honor, your opinion that this should

4   be one more trial is on the record.

5          THE COURT:  It is.

6          MR. PARDO:  This should not be reduced to a ruling.

7   It can't be.  Think about what they're saying to you.  They

8   can't even tell us how that trial would work.

9          THE COURT:  Mr. Axline concedes that.  All he's saying

10  is the ruling that it is the plaintiffs' burden to come up with

11  a way that satisfies the constitutional obligations and, of

12  course, includes due process and that is workable so that a

13  court can manage this trial, as long as they can come can up

14  with a method for doing that, the ruling is only one trial.

15  Now you figure out how to do it without violating either the

16  Court's ability to try it or the Constitution.

17         MR. PARDO:  There are obviously very serious due

18  process issues.

19         THE COURT:  He understands that.

20         MR. PARDO:  But here's the problem.  With all due

21  respect, I think it's a bit of a trap.  In their view, there's

22  only one way to do a single trial.

23         THE COURT:  And that is?

24         MR. PARDO:  Statewide statistical extrapolation.  You

25  heard it at the last conference and you heard it at the

```
1    conference before, New Hampshire.  So with you saying and you

2    issuing a ruling that it shall be one trial, what they think

3    you're saying is it shall be statistical extrapolation.

4              THE COURT:  No.  If it's helpful, I am not saying it

5    should be statistical extrapolation.  That may indeed be an

6    approach that the next judge approves, I have no idea, but I'm

7    not saying that.  I'm just saying all things come to an end and

8    after the phase I trial, there's really only court resources

9    for one more trial.

10             I think Mr. Pardo's still speaking, then Mr. Kaufmann.

11             MR. KAUFMANN:  I'm sorry.

12             THE COURT:  No.  Then Mr. Kaufmann.  Go ahead.

13             MR. PARDO:  Thank you, your Honor.  What I wanted to

14   say is, again, I submit to you we are not at this decision

15   point where we should be directing a future MDL judge or future

16   trial judge that it shall be this, that, or the other thing.

17   We don't object today, we're not challenging today any

18   particular approach.

19             THE COURT:  Your letters talk about the due process

20   problems in doing a statistical approach or even a binding

21   bellwether approach.  Your position now is an impossible one;

22   it's we're entitled to a trial on every site.  Nobody has time

23   for 5,000 trials.

24             MR. PARDO:  Actually, that's not.

25             THE COURT:  What is your suggestion for getting this
```

```
1    done?

2              MR. PARDO:  For example, it may be informational

3    bellwethers.

4              THE COURT:  May be what?

5              MR. PARDO:  Informational bellwethers.

6              THE COURT:  And that is?

7              MR. PARDO:  An approach where you put the sites into

8    categories.

9              THE COURT:  That's the bellwether.

10             MR. PARDO:  We're borrowing from your idea.  The

11   results are not binding, but they're just like the focus site

12   approach, which I said to you last time I think has worked

13   extremely well.  I think it's being way too hard on the Court

14   to come in and suggest it hasn't worked and kick it to the

15   curb.  You've resolved 130 cases on this docket, in 16 years,

16   that's a lot of time, but you got a lot of work done with the

17   focus site approach.  It did work.  This is a modified focus

18   site approach.  To be clear, what we're saying to you today is

19   that decision doesn't need to be made yet, and here's why,

20   because we don't know what the rest of this case looks like.

21   The parties agree there's reciprocal discovery that needs to

22   happen.  Once that's done, we will be able to step back and

23   assess what's really left, what's really in dispute.  Based on

24   just the limited data, which isn't even fully updated yet, I

25   can tell you this case doesn't look anything like what it
```

looked like in 2010, 5,000 sites, 498 above 700.  That number's
down to seven, and that's based on data that's still three,
four years old.  That's my point.  This case is changing.
While we're sitting here all these years arguing about it,
there's hundreds of LSRPs out there that are remediating these
sites.  There are hundreds, probably thousands of sites in this
case that are nondetect or below one.

          Our position is they shouldn't be here.  We haven't
teed that issue up yet.  We need the updated data, but we may
at the end of this preliminary discovery be looking at a case
that's 50 sites, 100 sites, maybe 150.  At that point, the MDL
judge or the trial judge can say, You know what, that's too
big, you guys better figure out how you're going to do it
constitutionally.  Or they may say it's a 50-site case, we do
this all the time.  I'm going to put you on a clock, you each
get six weeks to do it.  We don't know, but there will be a way
that they do it.  There will be a way that it gets figured out.
What we shouldn't do now is tie that judge's hands by directing
him or her that it shall be this, that, or the other thing.  By
the way, I know what you're saying today, but at the last
conference, you said if we go categories it may be that we need
to have three or four.  That was your position last time.  I
understand it may have changed, but you left open the
possibility there may be more than one trial.  It's a decision
that doesn't need to be made now because this case is changing.

1    It's different.  It's pivoted.  Their theories are changing.

2    The facts are changing.  The facts in the field are changing.

3    It looks a lot different and it will look even more different

4    once we get that updated data.  It's a decision you don't have

5    to make today.

6            THE COURT:  Mr. Kaufmann, you were next.

7            MR. KAUFMANN:  Thank you, your Honor.  I wanted to

8    correct one statement, that somehow we were trying to trap

9    somebody into a statistical analysis trial.

10           THE COURT:  Right.

11           MR. KAUFMANN:  We did not suggest that that must be,

12   and in fact our proposed case management order indicates that.

13   We agree with the Court that there should be one trial to

14   resolve all issues, and that is what we have in our proposed

15   case management order section No. 1.  We agree with the Court,

16   and I think with defendants, that the particular structure of

17   that trial cannot and should not be decided today and that it

18   should be developed after we have the data that's necessary and

19   with consultation with the defendants and with allowing the

20   parties to do whatever it is they need to do to protect their

21   rights as they may see them.  And that is why in sections five

22   and six of our proposed order, we have written that in.  We

23   haven't asked for anything else.  We understand the limits of

24   what should be done today and what you can do today if you were

25   staying on the bench and if you weren't staying on the bench,

so that's really the limited amount that we are asking for in

terms of future.  There were some other discussions about

things that are due now and what the next step of discovery is

going to be, and perhaps we should air that later, but just in

terms of where we're going in the future and the general

contours, all we're asking really is an order memorializing

what you yourself have said today, and I respectfully submit

when we fashioned our proposed case management order, we tried

to get sections one, five, and six to reflect that, and we

would ask that that be entered, and we think that would be

appropriate to give us guidance, to give us purpose and give us

focus as Mr. Axline was talking about and also to give some

direction to the next MDL judge.

THE COURT:  Mr. Harris, and then I think we need to

move on.

MR. HARRIS:  Real quickly, your Honor, Puerto Rico,

and I'm speaking about Puerto Rico because that's the only case

that my client's involved in, both from the number of sites and

the prescription issue presents an entirely different

proposition for the Court, and in that regard, let's not be

mistaken.  When they take about one trial, it's a proxy for

market share and statistical analysis.  Mr. Kaufmann says it

doesn't have to be that way, but you know that's the direction

that the plaintiffs are going to be headed.

THE COURT:  That they may be urging.  It doesn't mean

1    the judge will accept it.

2            MR. HARRIS:  But it will make the case legally much

3    more complicated, your Honor.  On the other hand, and I have

4    some involvement in the proposed CMO from the defendants from

5    Puerto Rico, what we're saying is on the first site, let's

6    figure out what happens on prescription, let's do it relatively

7    quickly, I think the Court has said by September, and we also

8    said let's put together a matrix, sort of a Lone Pine order for

9    sites, and do that within a limited period of time and then

10   let's see where we are, because at that point we may find that

11   maybe one trial will work or maybe we can do this combined

12   focus approach that the Court was suggesting last week, but at

13   least we'll have the data to do it.  If we get "let's put it

14   all in one trial," it's tying the hands of the trial judge.

15           THE COURT:  This is one phase II trial.  It does

16   follow the focus trial.  We're talking about phase II.

17           MR. HARRIS:  Right.

18           THE COURT:  So it's already the second trial.

19           MR. HARRIS:  I'm sorry.

20           THE COURT:  I just had to make that clarification.

21           MR. HARRIS:  But I think it's going to legally

22   complicate matters in a situation where we may find ourselves

23   not in disagreement once what we propose in our CMO is

24   accomplished.

25           THE COURT:  OK.  I think I've heard enough on this

1    argument and I'll reach a decision, so to speak.

2              With respect to discovery as to phase II, are you

3    still in disagreement as to producing updated site data,

4    creating the master list that we're talking about, working

5    toward voluntary dismissals, or are you working together on

6    those issues?

7              MR. KAUFMANN:  We are working together on those

8    issues.  We have reached some agreement.  I confess to the

9    Court that that's really still in a state of flux.

10             THE COURT:  The defendants' reply letter said the

11   parties are reaching agreement and will update the Court if

12   they are unable to resolve whatever issues remain with respect

13   to discovery, so maybe I should hear from them first to see if

14   there are some issues that are agreed on and there are a few,

15   hopefully, that need resolution and maybe I can help.

16             MR. PARDO:  Thank you, your Honor.  I'm actually a

17   little more optimistic than Mr. Kaufmann.  I think we've

18   reached agreement on a lot.

19             THE COURT:  Maybe, but what's left?  Where are you in

20   disagreement?

21             MR. PARDO:  For example, we agree on the need to take

22   discovery, and we agree on the need to update the master site

23   list, the list of sites that are in the case.  Defendants'

24   position is that we have had a site list, as you know, in the

25   New Jersey case since, I think, April of 2010.  We've had it

1   for six years now.  Our view is that that list should be

2   updated.  Plaintiffs have said to us that what they want is

3   information from us that may allow them to add new sites to

4   that list that have never been part of this case, to the extent

5   that they're identified somehow by us.

6        THE COURT:  Of course they're part of this case, but

7   not specifically identified.  The case involved all the New

8   Jersey sites at which there have been releases that are

9   actionable, so in that sense, they've always been part of the

10  case.  That they have not been on a master site list before, I

11  accept, but that's why you yourself said we think it should be

12  updated.  There are two kinds of updating.  One is taking sites

13  out and one is putting sites in, but the case was always about

14  the state of New Jersey.

15       MR. PARDO:  It was.  That's fair point, your Honor,

16  but it was because it was so amorphous, the state of New

17  Jersey, that you directed them to prepare a site list.

18       THE COURT:  I understand, but they never, I think,

19  committed that it can never have any additions as more

20  information is produced.  It doesn't change the case.  The case

21  was the whole state of New Jersey.  In discovery, you learned

22  about additional sites.  You added to the list.  I don't think

23  that they're producing a site list to cabin them off from

24  adding any.

25       MR. PARDO:  That may be, but here's the problem,

because then it becomes a bit of a moving target, much like we
saw in Puerto Rico, where they came back and said we found some
more sites.  We said, Wait a second, and I think you said this,
at some point the case has got to be in the box, we've got to
know what we're dealing with, and something that wasn't put in
the box by a certain time period is another case, maybe, but
it's not this case.

THE COURT:  That may depend if it was outside the time
frame.  If the release occurred for the first time in 2016,
that may be another case, but if they now discover that there
was a release in 2010 but they didn't learn about it until now,
that's in the case, it seems to me, so it's all a matter of a
cutoff on future releases.  This is not a case of futures, as
we used to say in the personal injury side.  A release that has
not yet occurred and may not occur until 2020 is not in this
case.  It can't be a continually moving target in that sense,
but if they first learned of a release that is in the time
frame, then it is part of the case.

MR. PARDO:  Remember, as you know, a release in 2010
wouldn't be part of this case because, of course, gasoline
wouldn't have MTBE in it.

THE COURT:  That's true too.  Wait a minute.  A
release that occurred in 2010, it may have been material that
was delivered long before but has just wasn't released.

MR. KAUFMANN:  Just wasn't released.

```
 1              THE COURT:  Right, but why it was still there ten
 2   years later, I don't know.  When was it used?
 3              MR. PARDO:  2004.
 4              THE COURT:  What's the number?
 5              MR. KAUFMANN:  2006.
 6              THE COURT:  So it is possible that four years later, I
 7   suppose, it's first released into the ground.  I don't know why
 8   it would be around for four years, but it's possible.  Of
 9   course, you're certainly right at some point it becomes less
10   and less likely.
11              MR. PARDO:  It's possible, and if there was some
12   release of MTBE gasoline that occurred in 2010, I would take
13   your point, but I would still say that the purpose of that site
14   list that they were directed to create in 2010 that we've all
15   been talking about all these years, 5,200-some-odd sites, was
16   to put the case in a box so we knew what we were dealing with.
17              THE COURT:  Yes.
18              MR. PARDO:  The idea now that we're going to add sites
19   on to that list now, I think, just complicates the case.  It
20   makes this a moving target.
21              THE COURT:  I don't think so.  The remaining nonfocus
22   sites haven't even had site specific discovery.  There's no
23   harm done.  In a way it circles back to how to try phase II,
24   because there's no harm.  You have had no discovery as to
25   thousands of cases on that site list anyway.  Adding five more
```

```
 1   doesn't change much.  You still have to figure out how to try

 2   all the remaining nonfocus sites once, in my view.

 3           Mr. Kaufmann, there does have to be some kind of a

 4   date cutoff.  I can see adding sites where you learn of

 5   releases that occurred a while back that you didn't know about,

 6   but what if a release happens tomorrow?  You can't continually

 7   add.  Then you'd have a futures case.

 8           MR. KAUFMANN:  I agree.

 9           THE COURT:  Where does the date come?

10           MR. KAUFMANN:  I'd be reluctant to say that today

11   because I want to confer with my client, but I don't disagree

12   with the principle the Court has set down.  We agree there

13   should be a master list.

14           THE COURT:  Yes, of course, there was a master list.

15   The question is adding or subtracting.

16           MR. KAUFMANN:  Correct, and I don't disagree with

17   anything that you have said about that list so far, so I think

18   with that we can certainly work together to create an

19   appropriate master list with a cutoff date.  I'm just not

20   prepared today to say what it is.  I think that I need to talk

21   to my clients and my colleagues.

22           THE COURT:  Are you considering both additions and

23   subtractions, hopefully?

24           MR. KAUFMANN:  I think that both should be considered,

25   yes.
```

1          THE COURT:  There are going to be subtractions, as

2     well as additions?

3          MR. KAUFMANN:  I'm almost sure that there will be

4     additions.

5          THE COURT:  You should be equally sure that there are

6     going to be subtractions since there are nondetect sites all

7     over the place.  There might be time barred sites, who knows,

8     but there should be plenty of reasons for subtractions too.

9          MR. KAUFMANN:  If there's no reason to keep it on the

10    list, we have no interest in keeping it on the list.  If

11    there's a statute of limitations problem, it should be off the

12    list.

13         THE COURT:  If turns out there is no contaminant

14    anyway, that's a reason too.

15         MR. KAUFMANN:  Right.  Corrected data, it's off the

16    list.

17         THE COURT:  Right.

18         MR. KAUFMANN:  We're not interested in making this

19    5,045 sites as opposed to 5,035 sites.

20         THE COURT:  Right.

21         But when you first stood, Mr. Pardo, I said what are

22    the remaining issues to be resolved, and the first one was

23    preparing and closing the door at some point on additions for

24    sure, and subtractions I think can always be ongoing because

25    what's the harm.  As I said, if they want to dismiss hundreds

1    of sites, I don't see the problem, but no more additions after

2    a date certain does seem to me to be fair.

3         First, Mr. Kaufmann, you need to figure out what is

4    that date cutoff that I just discussed and you don't want to

5    tell me until you discuss it with your clients, but once you

6    determine that, there really has to be the closed box Mr. Pardo

7    talked about.  What do you propose?  Is it 60 days from now and

8    that's the list, in terms of additions?  You can always take

9    them off, and nobody's going to argue that their site was

10   dismissed, but in terms of adding on, you have had this case

11   running for years.  There comes a point where there's no more

12   excuse to add.

13        MR. KAUFMANN:  I think that the process that we had in

14   mind, and I don't think there was a disagreement about this,

15   was that there was certain information that was going to be

16   exchanged between the parties, and I think we're somewhere

17   between 85 and 90 percent, depends who we're talking about,

18   what that's going to be, and the idea was, and I thought we had

19   agreement on this, once we exchange that initial discovery that

20   we were talking about that we would work together to have a

21   master list.

22        THE COURT:  What's the time schedule on that

23   discovery?

24        MR. KAUFMANN:  We haven't agreed on that.

25        THE COURT:  Where is the dispute?  What do you

1   propose?  What does he propose?

2          MR. KAUFMANN:  I think it was somewhere between August

3   and October, were dates being thrown around.

4          THE COURT:  That makes it easy.  We'll make it the

5   same September 19 date that we just had for the other case.

6   That's all.  I'm serious.  It's not a laughing matter.  By

7   September 19, that discovery has to close, and then by one

8   month later, which is October 14, the site list has to close,

9   other than subtractions, but that's it, and that's a ruling.

10  That's a ruling, so the discovery finishes discovery 19.  The

11  master site list is complete October 14, and there will be no

12  further additions.  Now, that's New Jersey.  Do we need the

13  same thing for Puerto Rico or not?

14         MR. PARDO:  Puerto Rico is significantly different,

15  where that case is.

16         THE COURT:  Just tell me what is in dispute and I'll

17  see if I can rule.

18         MR. PARDO:  OK.  I'm not sure.  We have not had a

19  chance to meet and confer about the CMO  That's the problem.

20         THE COURT:  That's a problem.  I can't help you then.

21         MR. AXLINE:  On this topic, your Honor, I think it

22  makes sense to take a similar approach.  The commonwealth

23  should be allowed to conduct discovery as to sites that the

24  defendants may know of but that we don't know about.  The state

25  has outstanding administrative orders to some defendants to

1    test at certain sites that have never been tested.

2            THE COURT:  You mean the commonwealth?

3            MR. AXLINE:  I'm sorry?

4            THE COURT:  The commonwealth?

5            MR. AXLINE:  Yes, the commonwealth.  I'm sorry.

6            THE COURT:  That's OK.  You confused me, but go ahead.

7            MR. AXLINE:  I think we should follow a similar

8    approach.

9            THE COURT:  Can we follow the same schedule, that this

10   discovery exchange will be complete by September 19 and the

11   master list will be closed by October, whatever I said, 14?

12           MR. AXLINE:  I think it could with one caveat, your

13   Honor, and that is this.  Several years ago, we discussed these

14   lists, and the commonwealth said it would issue orders to test

15   at some of the defendants' sites for MTBE that have not been

16   tested.  The commonwealth did that.  One of the defendants then

17   challenged that administrative order to test in administrative

18   proceedings, and that is still hung up in administrative

19   proceedings.

20           THE COURT:  In Puerto Rico.

21           MR. AXLINE:  In Puerto Rico.

22           THE COURT:  I can't do anything about that.  Subject

23   to that problem, that whatever those administrative tests may

24   show, which could reopen the door for adding, but solely for

25   that reason, the schedule will be the same.  With that one

1    exception, the list closes October 14, so long as the discovery

2    closes September 19.

3         Mr. Harris.

4         MR. HARRIS:  Puerto Rico presents a unique aspect

5    because of the one year, your Honor.  We have Puerto Rico 2,

6    which brings the other one down.  To the extent they knew of

7    sites and knew about them a year ago, they shouldn't be added.

8         THE COURT:  No, but you're going to have that

9    information from the previous ruling.  Remember your four

10   interrogatories and the ruling on those four interrogatories,

11   and Mr. Axline pretty much conceded, if it's barred, it's

12   barred, but if he doesn't have any information, remember that's

13   when you have the 60 days to come back and fill in the gaps.  I

14   set all those dates already.

15        MR. HARRIS:  All I was getting to is it sounds as

16   though they have until September to tell us sites that aren't

17   currently on the list.

18        THE COURT:  No, you have until October.  What was

19   until September was the discovery exchange, similar to what we

20   just heard in New Jersey, that would allow them after the

21   exchange is complete another 30 days to produce the site list,

22   and after that point in time, subject to only these

23   administrative tests that you're litigating, no additions can

24   be made.  Subtractions can always be made.  That's the way I

25   see it.

1           MR. HARRIS:  And we would have limitations as to those

2      additional sites, the facts when they first knew about the

3      sites.

4           THE COURT:  Yes, that's interrogatory 4, which we did

5      an hour ago.

6           MR. HARRIS:  OK.

7           THE COURT:  Yes, Mr. Pardo.

8           MR. PARDO:  Your Honor, I'm sorry if I'm confused, but

9      we had had this argument about the site list in Puerto Rico a

10     couple years ago.

11          THE COURT:  Your memory is very good.  Mine isn't.

12          MR. PARDO:  Actually, I think your memory is better

13     than mine.

14          THE COURT:  Anyway.

15          MR. PARDO:  The point is at that time, there were

16     newly discovered sites, same thing kind of alluded to here, and

17     you said no, this box is closed.  That's going to be PR2.  PR1

18     is PR1, the 354 sites.

19          THE COURT:  And we already have a PR2 case.

20          MR. PARDO:  And we do have a PR2 case.

21          THE COURT:  Add it to the PR2 case.  If I said that

22     then and you created a second case to take care of the

23     after-discovered cases, then this recent ruling that I just

24     laid out applies solely to PR2.  That's where the more recent

25     cases will go, and I call them more recent not because of the

1    release but because of the discovery of the release.  It's the

2    same thing I said to Mr. Kaufmann.  You can't have a futures

3    case, but if you learn of a release that occurred three years

4    ago, it's not time barred, you add it to Puerto Rico 2.  That's

5    why Puerto Rico 2 was created.  You're right, and thank you for

6    your memory, but there's no problem.  It still stays on the

7    same schedule.  It doesn't get added to one, it gets added to

8    two for the later-discovered cases.  That's why there is a

9    Puerto Rico 2.

10           I think that takes us to Pennsylvania.

11           MR. KAUFMANN:  Your Honor.

12           THE COURT:  Yes, Mr. Kaufmann.

13           MR. KAUFMANN:  I'm sorry to add another wrinkle to New

14   Jersey.  We understand that the discovery has to be exchanged

15   by September 9.

16           THE COURT:  I thought I said 19th.

17           MR. KAUFMANN:  The 19th, but we haven't really agreed

18   on what that discovery will be.

19           THE COURT:  Mr. Pardo, what is not yet resolved, and

20   we didn't get past more than two items?  What is the dispute?

21   Please tee up the dispute.  What is in dispute?

22           MR. KAUFMANN:  If I may, I think that there are

23   certain things they have asked from us that we have agreed to

24   give to them.

25           THE COURT:  OK.  What's in dispute?

```
 1                MR. KAUFMANN:  There are some things that we've asked

 2    of them that we don't know that they are agreeing to.

 3                THE COURT:  Let's find out.

 4                MR. KAUFMANN:  They are, your Honor, essentially items

 5    two, three, and four in our proposed case management order,

 6    section 4(a), (b), two, three, and four.  And I don't think we

 7    have agreement that we will get that, and we would like to have

 8    it.

 9                THE COURT:  Where I do I find that?  On which exhibit?

10                MR. KAUFMANN:  That's Exhibit B.

11                THE COURT:  To which letter?

12                MR. KAUFMANN:  Plaintiffs' initial letter.

13                THE COURT:  The April 18 letter?

14                MR. KAUFMANN:  Yes, your Honor.

15                THE COURT:  You said which numbers?

16                MR. KAUFMANN:  Exhibit B.

17                THE COURT:  I've got B.  Which numbers?

18                MR. KAUFMANN:  Roman numeral IV, subsection (a), items

19    two.

20                THE COURT:  Two is sales information.

21                MR. KAUFMANN:  Two and four.

22                THE COURT:  Basically we're talking about sales

23    information and well information, right?

24                MR. KAUFMANN:  Yes, your Honor.

25                THE COURT:  OK, so in sales information you wanted
```

1    each defendant to provide all market share information

2    involving sales of MTBE, including, but not limited to,

3    Lundberg Survey reports; information reported to the energy

4    information administration concerning gasoline delivered for

5    sale in the state of New Jersey, including on form 7A2C;

6    consulting reports which mention or refer to market share of

7    gasoline containing MTBE.  What's the objection?

8            MR. PARDO:  The objection is it's not necessary to

9    determine what's at issue with the rest of the case.  We should

10   be focusing on what site, what the status of the sites are,

11   what the private wells are.  This is discovery to which they

12   might be entitled down the road, but remember what we're

13   talking about is the preliminary exchange of information that's

14   designed to allow both parties to put together an updated list

15   of what the sites are.  Why do they need this to do that?

16   That's my first objection.  My second objection is you

17   shouldn't be using, with all due respect to Mr. Kaufmann --

18           THE COURT:  I know.  We shouldn't be doing documents

19   in the CMO.  There should be a document request.

20           MR. PARDO:  Right.  Sorry.

21           THE COURT:  But there are only these two.  No. 4 says

22   each defendant shall provide information regarding risks posed

23   by MTBE released into the drinking water.  That's not site

24   specific at all.

25           MR. KAUFMANN:  I will say one thing, your Honor, that

1    we didn't see the CMO.  The purpose of the discovery in the CMO

2    has only been for the purpose of creating a master list.  It

3    was to be able to enable us to have that discussion about what

4    phase II is going to look like.  The whole purpose of this

5    exercise isn't merely to create a master list; it's to move us

6    forward.

7              THE COURT:  First of all, I absolutely agree with the

8    defendants that document requests should be done under Rule 34

9    of the Federal Rules of Civil Procedure and not by listing a

10   document request within a CMO  So to the extent that Nos. 1, 2,

11   3, and 4 purport to be document requests, they have to come out

12   of the CMO anyway.  To the extent that they have agreed on one

13   and three, that's good, but I think I take the defendants' side

14   on both two and four that when this trial is structured, when

15   we know what's being tried, it is worth turning to two and

16   four, but it doesn't help figure out the universe of remaining

17   sites, and that was the goal with respect to this phase II

18   problem.  Again, I'm not going to rule because you're going to

19   write a document request, and under Rule 34, you can object to

20   it, and somebody's going to rule on what discovery you get and

21   don't get, but my instinct is this is not the time for two and

22   four, but one and three should be answered, and apparently

23   that's the agreement.  What else is not agreed upon with

24   respect to discovery?

25             MR. PARDO:  My understanding is that is it.  I guess I

1    would like confirmation of what I think I've heard in our

2    meet-and-confers, and that is the databases that we've asked be

3    updated by the plaintiffs, I think they've agreed to updates,

4    produce those updated databases to us.

5         Is that right, Mr. Kaufmann?

6         MR. KAUFMANN:  Frankly, I don't see how that's

7    different than a document request, but we have agreed to do it.

8    That was part of our discussion.  They asked for it.  We said

9    we would do it without the necessity of a discovery request.  I

10   don't know that there's anything different, but we said we

11   would do it and we'll do it.

12        THE COURT:  OK.  That's what he sought.  He sought

13   your confirmation on the record.  You just gave it.  What else?

14        MR. KAUFMANN:  I'm sorry.  There's one other thing

15   that if you're making a case management order on, prior to the

16   last case management conference, there was some discovery that

17   we each asked of each other and agreed to provide.  The

18   defendants were to provide theirs by the end of this month.  We

19   don't have it yet, and I don't think there's any disagreement

20   about this, but we would just like that in the case management

21   order.  That is our 3(b), that by April 30 they'll provide a

22   list of discharge sites that they've agreed to give us.

23        THE COURT:  I'm sorry.  3(b)?

24        MR. KAUFMANN:  Yes, your Honor.

25        THE COURT:  By April 30, which is around the corner.

1        MR. KAUFMANN:  Right, and I don't think there's any

2   disagreement.

3        THE COURT:  That's, what, this weekend?  Yes, it is.

4   The defendants should provide the list of MTBE discharge sites.

5        I don't know what work is to be done to do that,

6   Mr. Pardo.  Do you?

7        MR. PARDO:  I can't speak for all defendants, your

8   Honor, but I do know that we agreed previously with the

9   plaintiffs that that information would be provided to them on

10  or before the end of April.

11       THE COURT:  That's all I can call it, is confirmation,

12  but it applies to all defendants so all other defendants in the

13  room are bound by that date also, which clearly means Monday,

14  not Saturday, so make it May 2.  Are we not ready for

15  Pennsylvania?

16       MR. HARRIS:  Your Honor, on Puerto Rico, we have not

17  had a meet-and-confer with respect to their proposed CMO or

18  these requests.  It's my understanding the first request

19  involving station information may be contained within their

20  fifth set of requests for documents, which is addressed in our

21  proposed CMO and has the date that the Court has provided, but

22  I don't think there's been any discussion on three.  Sometimes

23  you lose site of the fact that Puerto Rico is out there, sort

24  of tagging along.

25       THE COURT:  I'm not sure what you said.  There hasn't

1      been any discussions on three what?

2              MR. HARRIS:  I'm sorry.  The CMO the plaintiffs have

3      proposed for Puerto Rico is virtually identical.

4              THE COURT:  I know, you picked out one particular

5      paragraph.

6              MR. HARRIS:  Right, and Mr. Pardo can correct me, but

7      I think in Roman numeral III, phase II discovery, item one,

8      station information, I believe there's a request, and

9      Ms. Gerson can correct me, a document request that the

10     plaintiffs served on the defendants.

11             THE COURT:  They put these four requests in.

12             MR. HARRIS:  Not the four, just one.

13             THE COURT:  Just the station information.

14             MR. HARRIS:  Right.

15             THE COURT:  And assuming they gave you that document

16     request, what's the issue?

17             MR. HARRIS:  We have said we will respond to it within

18     the deadline we have, but as to the others, I just want to make

19     clear to the Court that we have not had a meet-and-confer.

20             THE COURT:  Forget about meet-and-confer, you don't

21     have a document request, and I just said they have to do it as

22     a formal document request.

23             MR. PARDO:  I'm sorry to whipsaw back to New Jersey,

24     but may I make a suggestion that might help?

25             THE COURT:  Of course.

1          MR. PARDO:  That we take your rulings, talk, try to

2    hand this to you before close of business Friday?

3          THE COURT:  Before the close of business Friday?  It

4    would be acceptable to me, but not close of business Friday.

5    If I'm going to be able to sign something, today's only

6    Tuesday, by noon Thursday, so I have a chance to look at it.

7          MR. PARDO:  Absolutely.

8          THE COURT:  I'll hold off issuing an order, because I

9    was going to immediately start turning to an order based on

10   this transcript, but we'll try to hold off until noon Thursday.

11   Please, if you propose an order, put in all the dates I've

12   given during this conference as rulings, which means you'll

13   need a very fast transcript.

14         MR. PARDO:  This is out there as much for Mr. Kaufmann

15   as for you, the release site information that we are going to

16   be updating, obviously we have only that information that we

17   have for our own sites.  There are lots of sites out there for

18   which the state is either the responsible party, and that does

19   happen, or the state has information about sites that have

20   nothing to do with the defense.  Sites on that list, to the

21   extent they have that information, we'd like to try to get that

22   from them, because that's necessary to update all the sites on

23   the list.

24         THE COURT:  It's supposed to be an exchange of the

25   information.  To the extent that they have it and you don't,

1    they're supposed to supply it to you.

2              MR. KAUFMANN:  I'm not sure if Mr. Pardo is asking

3    whether we will give them something we have already agreed to,

4    in which case the answer is yes, or if he's asking for

5    something new, in which case I think it's most appropriate that

6    we talk about it.

7              THE COURT:  Off-line.

8              MR. KAUFMANN:  Yes.  We will give them what we said we

9    will give them.

10             THE COURT:  I can't know what you previously told him,

11   so you'll have to discuss it off-line, but he said there are

12   some sites that the state owns and only the state has

13   information about those sites, but that's odd because if

14   there's no defendants, those sites aren't in suit anyway.  I

15   wouldn't have thought no defendants involved, but in any event,

16   you need to talk about it off-line, because I'm probably saying

17   things that are confusing.

18             That does take us to Pennsylvania, I hope.  Now,

19   there's a pending motion to dismiss.  I understand that.  I

20   will not be deciding that.  That will go to the next judge.

21   With respect to the CMO, plaintiffs want to set dates for newly

22   added defendants to respond to current discovery, to have

23   protocols for future discovery, to require disclosures of

24   defendants' relationship with release sites and market share

25   information, and meet-and-confer how to select phase I sites.

1    Defendants first say they haven't even seen the proposal until

2    it was submitted to the Court, which isn't the best way to meet

3    and confer, but I guess they've seen it now.  Now that you've

4    seen the plaintiffs' proposed CMO, again, where are the

5    agreements, where are the disagreements?

6            Mr. Bongiorno.

7            MR. BONGIORNO:  Thank you, your Honor.  Tony

8    Bongiorno, for the defendants.  Your Honor, consistent with the

9    discussions you just had in Puerto Rico and New Jersey

10   regarding process, and I don't want to get hung up on process,

11   but we usually make the sausage before we come into the

12   courtroom.  We meet and confer, we give you a joint CMO with

13   areas of agreement, we brief the areas of disagreement, and you

14   decide.  We were not even in the middle of that process.  We

15   had started it, and we're making progress, and then lo and

16   behold, we see a proposed CMO attached to a letter.

17           THE COURT:  Right.

18           MR. BONGIORNO:  I don't want to whine and say they

19   jumped us and that's unfair, but it's a little early for that.

20   As we talked about, I think Mr. Kaufmann used the phrase the

21   "discussions were in flux," so I'm not ready to seek rulings in

22   New Jersey.  In effect, that's where we are.  If we had two

23   more conference calls, one more conference call, but a

24   conference call, we could get this Court or the next court a

25   proposed CMO with significant areas of agreement.  I'm not

1    suggesting we would agree on everything.  In fact, I predict we

2    won't.

3                THE COURT:  Can you identify any specific areas of

4    disagreement, given my limited involvement here, that I could

5    resolve so if you're going to write up a CMO that can be signed

6    because you agree on many now and you'll agree on more as you

7    have that conference call?  Can you tell me where you don't

8    agree?

9                MR. BONGIORNO:  Sure.  I can give you an easy one.

10               THE COURT:  Good.  An easy one would be very nice.

11               MR. BONGIORNO:  You just ruled that market share data

12   doesn't go in the CMO, that it's a request for production of

13   documents, and there's a mirror image in the plaintiffs'

14   proposal on market share of retail stations.

15               THE COURT:  Very simple.  They have to put it in a

16   Rule 34 request and not in a CMO.  That was easy.  Do you have

17   another one, a little harder.

18               MR. BONGIORNO:  We'll go up the scale, your Honor.

19               THE COURT:  All right.

20               MR. BONGIORNO:  For example, we suggest that nonfocus

21   site discovery should be open.

22               THE COURT:  Should be open?

23               MR. BONGIORNO:  Yes.

24               THE COURT:  Nonfocus site.

25               MR. BONGIORNO:  Discovery.

1          THE COURT:  Does that mean site discovery or nonsite

2     discovery?

3          MR. KAUFMANN:  I'm sorry.  Nonsite specific discovery.

4          THE COURT:  It's OK.  Now I know what you mean,

5     nonsite specific discovery.

6          MR. KAUFMANN:  Should now be open.

7          THE COURT:  Who disagrees with that?  Usually

8     plaintiffs would not disagree with that.  They would want to

9     complete the nonspecific site discovery.  What counsel is

10    speaking for Pennsylvania plaintiffs?

11         MR. AXLINE:  I am, your Honor.

12         THE COURT:  Mr. Axline, surely the plaintiffs would

13    want, I would think, nonsite specific discovery.  Don't you?

14         MR. AXLINE:  We do, but there's already provision in

15    CMO 119 that addresses the nonsite specific discovery that has

16    been occurring to date, and we see no reason to alter that

17    provision in CMO 119.

18         THE COURT:  Mr. Bongiorno, what is wrong with the

19    current order?  What do you need to supplement, because now

20    there's agreement that there's nonsite specific discovery going

21    forward?  Where's the disagreement?

22         MR. BONGIORNO:  Sure, so we're making progress, and

23    here is CMO 119.  It says here's what you can go forward on:

24    Nonsite specific discovery on damages that plaintiffs allege;

25    general liability; affirmative defenses; and identification of

1    additional defendants.  So we have some very smart and creative

2    lawyers in this courtroom.

3            THE COURT:  Many.

4            MR. BONGIORNO:  They could argue that almost any

5    nonsite specific discovery fits into those categories.

6            THE COURT:  True.

7            MR. BONGIORNO:  But Pennsylvania being such a

8    different state, all I've said to plaintiffs is I don't want to

9    argue every time we serve discovery whether or not it fits in

10   one of those four categories.  We're into the second CMO.

11   Let's just open nonsite specific discovery and not come to the

12   Court every time there's a request for discovery.

13           THE COURT:  As you said, those four sound broad enough

14   to cover all nonspecific site discovery.  What would I write

15   this time saying in addition to the four topic, anything else?

16           MR. BONGIORNO:  I would take the four topics out and

17   say it's open now.  They wanted to limit it the first time.

18   This was a narrowing on their part because they wanted some

19   understanding of what we were focused on.

20           THE COURT:  Read me the four again.

21           MR. BONGIORNO:  Sure.  Nonsite specific discovery on

22   damages plaintiffs allege.

23           THE COURT:  Damages.

24           MR. BONGIORNO:  General liability, defendants'

25   affirmative defenses, and identification of additional

1  defendants.

2          THE COURT:  What else is there, Mr. Axline?  Isn't

3  that the world?

4          MR. AXLINE:  I think it is the world in terms of

5  subject matter, and I want to take responsibility for

6  submitting this CMO, the commonwealth's CMO, to the Court

7  before this last conference.  It was my understanding from the

8  last conference that the Court wanted to make progress.

9          THE COURT:  Can I get back to the point?  If it's the

10  world, why not just eliminate the language and say nonsite

11  specific discovery goes forward?

12          MR. AXLINE:  Because the way that discovery gets

13  carried out is important.  For example, we have discussed with

14  the defendants in the last meet-and-confer session the idea of

15  putting a limitation on the number of depositions that would

16  occur each month.

17          THE COURT:  It doesn't change anything to take out the

18  four categories.  You would still be having discussion about

19  how many depositions to take.  One side wants to take out the

20  four categories because they really cover the world anyway, as

21  you just said, of nonsite specific discovery.  If it makes them

22  happy, and that's a goal here, for one side to make the other

23  side happy because it moves forward better, let's take out the

24  four phrases and move forward on all nonsite specific

25  discovery.  You'll still have to negotiate how many deps and

```
1    when they occur, and I don't see any difference.

2              MR. AXLINE:  In the New Jersey case, there was, for

3    example, in the CMO a limitation on the number of discovery

4    that.

5              THE COURT:  But that's not what we're talking about.

6    All he asked is to take out those categories.  He also cited it

7    as something that is in or out of the category.  I agree.

8    Nonsite specific discovery is going forward fully.  My

9    goodness, if you talk about damages, general liability, and

10   defenses, you've covered everything anyway.  Everything.  Sure,

11   let's make them happy.  Whatever is at issue, we'll take out

12   the subcategories.  You'll still have to negotiate, and should,

13   the schedule for getting it done, and a phased schedule: what

14   comes first; responses to document requests; the depositions;

15   how many; who is first; who is last.  All that stuff is

16   obviously going to be negotiated, but it's open.

17             MR. BONGIORNO:  Thank you, your Honor.  Consistent

18   with your theme of making parties happy, we were talking about

19   depositions.  We proposed ten each side a month.  Mr. Miller

20   said he thought eight each side a month is reasonable.  We said

21   we agree.

22             THE COURT:  Good.

23             MR. BONGIORNO:  So we have eight each side a month.

24             THE COURT:  Good.  What's left in dispute?

25             MR. BONGIORNO:  Yes.  If you'll indulge me so I can go
```

1   down the CMO, your Honor, there's a dispute on dates.  There's

2   a section that they propose on newly added defendants, and they

3   want certain deadlines for responses to CMO 119.

4          THE COURT:  That's true.

5          MR. BONGIORNO:  And they propose, first, there's a

6   deadline on covered persons, which is already covered by CMO

7   119.  CMO 119, the trigger date on the covered persons deadline

8   is a particular date from the time they're added.

9          THE COURT:  Right.

10          MR. BONGIORNO:  So I don't know.

11          THE COURT:  30 days.

12          MR. BONGIORNO:  That's done.

13          THE COURT:  That's done.  OK.

14          MR. BONGIORNO:  Then if you take their proposals (b)

15   and (c), they ask for 30 days.

16          THE COURT:  All right.

17          MR. BONGIORNO:  The original defendants were given 120

18   days.  Someone did the math.  I think that's right.  So the

19   newly added defendants say, Tony, we should get 120 days also,

20   every other defendant did.  So that's our request there.

21          THE COURT:  That's a big difference between 30 and

22   120.  Why are you so far apart on that?  Can the plaintiffs

23   defend why they originally allowed 120 days for the same

24   information and now only want 30, or only want to agree to 30?

25   Why was it once 120 and now 30?

1          MR. AXLINE:  The trigger for the newly added

2    defendants didn't start or wouldn't start until the CMO was

3    entered, so I think they already know.  They have had quite a

4    bit of time to see with the original defendants what it was

5    they were going to be asked to provide.

6          THE COURT:  Right, but they still have to take it out

7    and provide it.  My view is for a quick and dirty compromise of

8    60 days.  That's it.  That's plenty, because I do agree with

9    what Mr. Axline has just said, that they have known this was

10   coming for quite a while.  Now they have to dig it out.  60

11   days.

12         Next.  Did we talk about (e), the declarations?

13         MR. BONGIORNO:  Excuse me, your Honor?

14         THE COURT:  For the newly added defendants.

15         MR. BONGIORNO:  I apologize.  I don't see an (e).

16         THE COURT:  I thought there was a section 3(e).

17         MR. BONGIORNO:  Your Honor, that's the site list

18   section, section 3.  I was on section 2.

19         THE COURT:  You finished with two, and three we took

20   care of.

21         MR. BONGIORNO:  Three we haven't got to yet.

22         THE COURT:  I've got it.  OK.  Go ahead.  Now we're

23   turning to three?

24         MR. BONGIORNO:  Well, I wasn't going in order, your

25   Honor.  I was trying to take the easy ones first.

```
1              THE COURT:  I must inform you I'm probably running

2     short of time now in a serious way.  I don't know how much more

3     there is to do, but we have to wrap it up.

4              MR. BONGIORNO:  To me, your Honor, the other

5     sections --

6              THE COURT:  We could talk briefly about subpoenas.

7              MR. BONGIORNO:  Yes, we could.  Now that nonsite

8     specific discovery, if I get the phrase right, is open, we can

9     serve those subpoenas, we could ask the state to join in them,

10    they don't want to, we'll go at it alone.

11             THE COURT:  That's fine, and any disputes that arise

12    under them should be referred to the special master.

13             MR. BONGIORNO:  Sure.

14             THE COURT:  That's easy.

15             MR. BONGIORNO:  I guess one point that might not be

16    easy --

17             THE COURT:  You know, of course, under the newly

18    revised Rule 45 that any disputes can be transferred to the

19    court where the action is pending, so it doesn't have to be

20    just an action in the venue where the subpoena is.  It can be

21    back to this Court.

22             MR. BONGIORNO:  May I confer with Ms. Gerson for a

23    moment?  Your Honor, Ms. Gerson suggests that I might have

24    misunderstood your question, which wouldn't be the first time.

25    I apologize.  If you were referring to their subpoenas to our
```

1   environmental consultants --

2         THE COURT:  I was, yes.  That's true.

3         MR. BONGIORNO:  OK.  I was talking about a different

4   set of subpoenas.

5         THE COURT:  I see.  My fault.

6         MR. BONGIORNO:  No, no, no.  My bad.  Ms. Gerson is

7   going to address that issue.

8         MS. GERSON:  Your Honor, on the plaintiffs' subpoenas

9   to the environmental consultants, again, those were served on

10  third parties.  As I understand it, plaintiffs have been trying

11  to enforce it.  They think they may have to file motions to

12  compel.  They asked us if we object to those motions going to

13  Special Master Warner, and all we've said is we don't object,

14  but as you said, Rule 45 dictates the venue.

15        THE COURT:  Yes, the venue includes right here because

16  under the revised rule it permits the other court to transfer

17  the motion to the court where the action is pending.

18        MS. GERSON:  I thought it required the consent of the

19  subpoenaed party, and we were just saying can't consent.

20        THE COURT:  I don't believe so.  Whatever it says, it

21  says, but I believe it can be transferred back to this court,

22  and I have had this situation, but it may be the other court

23  that has to decide that.

24        MS. GERSON:  I believe that's right.  The only other

25  point is that plaintiffs have requested permission to serve

1   additional subpoenas.  We think that would be an unusual

2   process, to request permission to serve subpoenas.

3           THE COURT:  All you're saying is they don't need my

4   permission, just to serve them.

5           MS. GERSON:  And that we are obviously not waiving our

6   rights to get notice under Rule 45.

7           THE COURT:  That's right.  The answer is easy.  Don't

8   ask my permission.  Serve any subpoenas you want and give

9   notice to the defense.  Who is listening from the plaintiffs on

10  that?  All right, do it.  That was easy.

11          MR. BONGIORNO:  I think the remainder of the issues,

12  your Honor, we could make great progress by meeting and

13  conferring and agree or agree to disagree at that point.

14          MR. AXLINE:  There's one other provision, your Honor,

15  in the plaintiffs' version that I would appreciate your

16  attention to, and that's No. 5, limited site specific discovery

17  for the purpose of beginning to select focus sites.

18          THE COURT:  Oh, yes.

19          MR. AXLINE:  That's something that we had proposed,

20  and we added that this would be without prejudice to the right

21  of any party to propose a method of trial that would resolve

22  all claims.  But nevertheless, since focus sites have been the

23  process de jure for so long, I think we should start meeting

24  and conferring about that.  That would be an appropriate thing

25  in the CMO.

1          THE COURT:  To say that the parties are directed to

2     meet and confer on the issue of selecting focus sites or on the

3     discovery needed to select focus sites?

4          MR. AXLINE:  On a process for the selection, but that

5     would include the discovery.

6          THE COURT:  Sure.  Any defense counsel object to that?

7     That just tells you to start meeting and conferring on the

8     process and select focus sites.

9          MR. BONGIORNO:  As long as we're reserving all the

10    rights, your Honor, we're not acknowledging that the same thing

11    that worked in New Jersey would work in Pennsylvania or Suffolk

12    County or anything else.  We don't want to be bound to a

13    particular focus site process, but the generic meet-and-confer

14    is, of course, acceptable.

15         THE COURT:  It wouldn't say that.  It would say with

16    the goal of selecting focus sites.  Meet and confer to develop

17    a process to select focus sites, so in that language it kind of

18    is a presumption of the focus site approach.

19         MR. BONGIORNO:  May I confer one moment, your Honor?

20    That's fine, your Honor.  Thank you.

21         THE COURT:  OK.  Is there more with respect to

22    Pennsylvania?

23         MR. AXLINE:  Not for the commonwealth.

24         MR. BONGIORNO:  No.

25         THE COURT:  All right.  Then we've completed our

```
 1    lengthy agenda.  Let me see if I can just summarize what's to
 2    be done.  The hope is that by Thursday noon some proposal might
 3    come in that's jointly submitted.  In the absence of that, I
 4    will consider issuing an order based on the rulings made here,
 5    although a submission would be helpful to at least encapsulate
 6    the dates and rulings I did make.  Other issues are left to
 7    guidance.  With respect to Pennsylvania, I'm not sure if I'm to
 8    expect a physical submission at this point or simply work with
 9    the proposed CMO and annotate it according to what was said
10    here in court.
11              MR. BONGIORNO:  We're happy to meet your Thursday noon
12    deadline, your Honor.
13              THE COURT:  Let's try that.  That would be helpful.
14    Now are we done?
15              MR. PARDO:  Are we done with the agenda?
16              THE COURT:  I think we are.
17              MR. PARDO:  Can I just say something?
18              THE COURT:  Now we have speeches?  I've been waiting
19    for that.
20              MR. PARDO:  You set me up, because I don't actually
21    have a speech.
22              THE COURT:  Go ahead.
23              MR. PARDO:  Just on behalf of the defendants, you've
24    said this a couple times today, it's been 15 years.
25              THE COURT:  16 years, I said.
```

1           MR. PARDO:  16 years.  I had just gotten married.  Now

2    I have a kid going into high school.  I've often wondered which

3    one of us was going to blink first.

4           THE COURT:  We've talked about that.

5           MR. PARDO:  I'd bet it would be me.  As it turns out,

6    I guess it was you.  But we have not always agreed.  You

7    certainly have not always agreed with us, we have not always

8    agreed with you, but I do say I think you've always listened to

9    us.

10          THE COURT:  I've often agreed with you.  I think both

11   sides have won many issues here.

12          MR. PARDO:  You've always been very careful.  You've

13   always been very attentive.  You are the hardest-working judge

14   I've been before.  You may be one of the hardest-working people

15   I've ever met, and a privilege to know.  On behalf of all of us

16   on the defense side, and plaintiffs may want to say something,

17   but I can't speak for them.

18          THE COURT:  They certainly know how to speak in court,

19   so I'm sure one of them is willing to stand up and speak.

20          MR. PARDO:  We thank you, your Honor, for your time

21   and patience.

22          THE COURT:  You're most welcome.

23          MR. PARDO:  And we wish you godspeed in all you do.

24          THE COURT:  Thank you.  And I do have to say on the

25   record that I was sent some very lovely flowers.  I hope the

1    plaintiffs were aware of that yesterday.  They arrived from the

2    defendants.  I assure you that it did not influence any ruling

3    today at all, but I'm very appreciative for the beautiful

4    flowers.  They will be displayed tomorrow at a court-provided

5    party.

6           Yes, Mr. Kaufmann.

7           MR. KAUFMANN:  There is a certain advantage to

8    plaintiffs in going last, a disadvantage in that Mr. Pardo, of

9    course, has said a lot of the same things that we feel, and we

10   echo our sentiments.  I can tell you that I think the highest

11   praise that I personally can give to a judge is that you've

12   always been prepared and you've always decided, and as a

13   litigant, we have no right to expect anything more, and you

14   have given us that and more.  You've given us, I hate to use

15   the word "guidance" as opposed to ruling today, but you have

16   given us guidance, and I don't know that this case could have

17   progressed but for your firm, and very firm at times, hand on

18   it.  I personally thank you for all the courtesies that you've

19   given to us.  On behalf of, I think, all the plaintiffs and

20   certainly on behalf of my client, it was a professional

21   pleasure to be in your court.  Those of us who try cases, those

22   of us who are in court know that the quality of a judge is

23   extremely important, and unfortunately it varies quite a lot.

24          THE COURT:  Yes, it varies.

25          MR. KAUFMANN:  But I've always told my colleagues, if

1    you can get in Judge Scheindlin's court, you'd better be

2    prepared because she will hold you to high standards, but

3    that's only because she has the highest standards for herself,

4    and she always effectuates those standards.  We really do

5    appreciate it.  We wish you the best of everything in your

6    future endeavors, and it really is our hope that we get to see

7    you again.

8            THE COURT:  Thank you.  Very nice speeches.  You're

9    wonderful lawyers, all of you.  I've told many people that this

10   is the case to get because the lawyers are so fine.  Thank you

11   for your courtesies.  You have always been very courteous with

12   each other and with the Court, and it's been a pleasure to

13   preside over this case.  I will miss it.  I was hoping it would

14   be my last court appearance, but somebody snuck in saying, We

15   need one more conference, maybe one more argument.  I was asked

16   today, Is this your last conference, and I would have liked to

17   have said yes.  So, again, thank you.

18           (Adjourned)

19

20

21

22

23

24

25