UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00 - 1898
MDL 1358
M21-88

**This Document Relates to:**

*New Jersey Department of Environmental
Protection, et al. v. Atlantic Richfield Co., et al.*
No. 1:08-cv-00312

## PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE
## FIFTH AMENDED COMPLAINT

Pursuant to FRCP 15(a)(2), plaintiffs New Jersey Department of Environmental Protection, *et al.*, hereby move for an order granting leave to file a Fifth Amended Complaint to add three defendants, all related to current defendants Getty Petroleum Marketing Inc. ("GPMI") and Lukoil Americas Corporation ("LAC"),[1] and to amend the complaint with respect to the Lukoil-entities to include allegations regarding (1) the direct responsibility of these entities; (2) the responsibility of these entities through their agents; and (3) responsibility of these entities by piercing the corporate veil. The proposed Fifth Amended Complaint is attached hereto as Exhibit 1. This Court previously authorized these amendments and the Lukoil entities do not oppose this motion.[2] See Ex. 2, attached (6/10/16 Email from J. Tuite to M. Axline); see also 6/18/15 Trans. at 12, 27-28.

"On motion or on its own, the court may at any time, on just terms, add or drop a party." FRCP 21. The Fourth Amended Complaint was filed in 2011. Since that time, defendant GPMI filed for bankruptcy. Over the course of the past year, hundreds of thousands of GPMI documents and ESI have been produced in the MDL and review of those documents has revealed new information regarding the relationship between GPMI, LAC and the new Lukoil-related entities. Recent opinions issued by Judge Scheindlin make clear that the relationship between GPMI, LAC and the new Lukoil-related entities are intertwined and the new Lukoil-entities are appropriate defendants in this New Jersey matter. *See, e.g., In re MTBE*, No. 1:00-

---

[1] The Fifth Amended Complaint adds: **Lukoil North America, LLC**, the successor to defendant Getty Petroleum Marketing Inc. ("GPMI"), **Lukoil Oil Company** (a/k/a OAO Lukoil a/k/a Public Joint Stock Company Oil Company Lukoil a/k/a PJSC Oil Company Lukoil) (hereafter "OAO Lukoil"), the corporate parent of defendant Lukoil Americas Corporation ("LAC") and GPMI, and **Lukoil Pan Americas**.

[2] The Lukoil entities do not concede the validity of the assertions in this motion.

1

1898, 2016 WL 1367226 (April 5, 2016) (ordering crime-fraud exception applies to the attorney-client privilege) & *In re MTBE*, No. 1:00-1898, 2016 WL 1367226 (April 29, 2016) (denying LAC's Motion to Reconsider April 5, 2016 order).

FRCP 15(a)(2) provides that leave to amend should be freely given "when justice so requires." *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 367 (5th Cir. 2001) (policy favoring leave to amend "a necessary companion to notice pleading and discovery"). This policy is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

The party seeking leave to amend need only establish the reason why amendment is required, and the burden is then on the party opposing the motion to convince the court that justice requires denial. *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989). Absent prejudice, or a strong showing of any reason for denying leave to amend, "there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital*, 316 F.3d at 1052 (original emphasis). Here, no party opposes the amendment.

The proposed Fifth Amended Complaint was circulated to counsel for all parties, including the Lukoil entities. No party has objected to the filing of the Complaint, and counsel for the Lukoil entities has affirmatively represented that they do not oppose the filing of the Complaint, although they (and GPMI) reserve all rights to dispute and/or seek dismissal of the allegations and the claims contained in the Fifth Amended Complaint. Lukoil Americas Corporation and GPMI also reserve all rights to dispute and/or seek dismissal of the new allegations contained in the complaint.

For the foregoing reasons, plaintiffs respectfully request that the Court grant Plaintiffs'

2

Motion for Leave to File a Fifth Amended Complaint.

Dated: June 28, 2016

Respectfully submitted,

MICHAEL AXLINE, State Bar #229840
*Special Counsel for Plaintiffs*
MILLER & AXLINE
A Professional Corporation
1050 Fulton Avenue, Suite 100
Sacramento, CA  95825-4225
Telephone:  (916) 488-6688
Facsimile:  (916) 488-4288

Dated: June 28, 2016

/s/_____
GWEN  FARLEY
Deputy Attorney General
*Counsel for Plaintiffs*
CHRISTOPHER S. PORRINO
Acting Attorney General
Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NJ 08625-0093
Telephone:  (609) 984-2845

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: Methyl Tertiary Butyl Ether ("MTBE")
Products Liability Litigation

Master File No. 1:00-1898 (SAS)
MDL 1358 (SAS)
M21-88

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION; THE
COMMISSIONER OF THE NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION; and THE
ADMINISTRATOR OF THE NEW
JERSEY SPILL COMPENSATION FUND,

Plaintiffs,

v.

ATLANTIC RICHFIELD COMPANY;
BP AMERICA, INC.;
BP AMOCO CHEMICAL COMPANY;
BP AMOCO CORPORATION;
BP PRODUCTS NORTH AMERICA, INC.;
CHEVRON CORPORATION;
CHEVRON U.S.A., INC.;
CITGO PETROLEUM CORPORATION;
COASTAL EAGLE POINT OIL
COMPANY;
CONOCOPHILLIPS COMPANY;
CROWN CENTRAL PETROLEUM
CORPORATION;
CUMBERLAND FARMS, INC.;
DUKE ENERGY MERCHANTS, LLC;
EL PASO CORPORATION;
EQUILON ENTERPRISES, LLC;
EXXONMOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
GEORGE E. WARREN CORPORATION;
GETTY PETROLEUM MARKETING,
INC.;
GETTY PROPERTIES CORP.;
GIANT YORKTOWN, INC.;
GULF ACQUISITION LLC;
GULF OIL LIMITED PARTNERSHIP;

Case No. 08 Civ. 00312 (SAS)

FIFTH AMENDED
COMPLAINT

Jury Trial Demanded

HESS CORPORATION;                                      )
KEWANEE INDUSTRIES, INC.;                              )
LYONDELL CHEMICAL COMPANY;                             )
LYONDELL-CITGO REFINING, LP;                           )
LUKOIL AMERICAS CORPORATION,                           )
individually and as f/k/a, d/b/a and/or                )
successor in liability to Getty Petroleum              )
Marketing Inc., Lukoil North America LLC               )
and/or Lukoil Oil Company;                             )
LUKOIL NORTH AMERICA LLC,                              )
individually and as f/k/a, d/b/a and/or                )
successor in liability to Getty Petroleum              )
Marketing Inc., Lukoil Americas Corporation            )
and/or OAO Lukoil;                                     )
LUKOIL OIL COMPANY, a/k/a OAO                          )
Lukoil a/k/a Public Joint Stock Company Oil            )
Company Lukoil a/k/a PJSC Oil Company                  )
Lukoil, individually and as f/k/a, d/b/a and/or        )
successor in liability to Getty Petroleum              )
Marketing Inc., Lukoil Americas Corporation            )
and/or Lukoil North America, LLC;                      )
LUKOIL PAN AMERICAS, LLC;                              )
  MARATHON OIL CORPORATION;                            )
MARATHON PETROLEUM COMPANY,                            )
LLC;                                                   )
MOBIL CORPORATION;                                     )
MOTIVA ENTERPRISES, LLC;                               )
THE PREMCOR REFINING GROUP, INC.;                      )
ROSEMORE INC.;                                         )
SHELL OIL COMPANY;                                     )
SHELL OIL PRODUCTS COMPANY LLC;                        )
SHELL TRADING (US) COMPANY;                            )
SUNOCO, INC.;                                          )
SUNOCO, INC.(R&M);                                     )
TOTAL PETROCHEMICALS USA, INC.;                        )
ULTRAMAR ENERGY, INC.;                                 )
ULTRAMAR LIMITED;                                      )
UNOCAL CORPORATION;                                    )
VALERO ENERGY CORPORATION;                             )
VALERO MARKETING AND SUPPLY                            )
COMPANY;                                               )
VALERO REFINING COMPANY-NEW                            )
JERSEY;                                                )
VALERO REFINING & MARKETING                            )
COMPANY;                                               )

2

VITOL S.A.;                                    )
WESTERN REFINING, INC.; and                    )
"DOES" 1-99 (Names Fictitious),                )
                                               )
                    Defendants.

_____

     Plaintiffs New Jersey Department of Environmental Protection ("DEP"), the Commissioner of the New Jersey Department of Environmental Protection ("Commissioner"), and the Administrator of the New Jersey Spill Compensation Fund ("Administrator") (collectively "the Plaintiffs"), having their principal offices at 401 East State Street in the City of Trenton, County of Mercer, State of New Jersey, file this Fifth Amended Complaint (the "Complaint") against the above-named defendants (collectively "the Defendants"); and allege as follows:

### SUMMARY OF THE CASE

1.      Plaintiffs DEP and the Administrator bring this action under the Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10-23.11 to -23.24, and the common law, and plaintiff Commissioner brings this action under the Water Pollution Control Act (the "WPCA"), N.J.S.A. 58:10A-1 to -35, in order to protect and to remedy important state interests affected by widespread contamination of the waters of the State of New Jersey (the "State") with methyl tertiary butyl ether ("MTBE"), a chemical used in some gasoline.   In addition to seeking treatment of contaminated water used for public and private drinking water, the plaintiffs also seek, among other things, the costs to restore all MTBE contaminated waters of the State to their pre-discharge condition as well as damages for the loss of value of the waters of the State pursuant to the Spill Act and New Jersey common law.   Plaintiff, DEP, is vested with the authority to protect and seek compensation for any injury to these valuable resources on behalf of the State, which is the trustee, for the benefit of its citizens, of all natural resources within its borders or subject to its jurisdiction.   The State's interests under the Spill Act are not dependent upon the economic use of the waters of the State.

2.      The "waters of the State" include all ground waters and all fresh potable surface waters, which include Class FW and Class PL surface waters, within the boundaries of this State or subject to its jurisdiction.   See N.J.S.A. 58:10A-3t; see also N.J.A.C. 7:9B-1.4 & 1.12. "Waters of the State" also include all source waters that could impact the quality of ground waters or Class FW or Class PL surface waters.   It is possible to determine whether particular geographic portions of surface water bodies fall within Class FW or Class PL by reference to N.J.A.C. 7:9B-1.15.  For purposes of this Complaint, Class SE and SC waters, which are defined by the New Jersey Surface Water Quality Standards as saline coastal waters and estuaries,

4

N.J.A.C. 7:9B-1.4, are not "waters of the State." For purposes of this Complaint, "waters of the State" do not include ground waters underlying or surface waters on federally owned properties, such as army and navy bases.

3.      MTBE discharges have been detected in waters of the State at service stations, refineries, and terminals throughout New Jersey. Defendants know the location of sites where MTBE has been discharged. The waters of the State that have been affected by these discharges include waters located directly beneath, on, or adjacent to these discharge sites, and waters that are hydrogeologically connected to waters beneath, on, or adjacent to these discharge sites. Defendants are aware of sites where waters of the State have been impacted by discharges because Defendants are required by law to investigate impacts to waters at sites where discharges have occurred, including potential impacts to wells used to supply drinking water.

4.      The waters of the State constitute limited, precious and invaluable public natural resources that are held in trust for the benefit of all New Jersey citizens, and for which plaintiffs DEP, the Administrator, and the Commissioner have the authority and responsibility to protect, conserve and manage in the interest of present and future generations of its citizens. The plaintiffs seek relief in this case for all MTBE contaminated or threatened waters of the State.

5.      The Defendants in this action are major oil and chemical companies that designed and/or manufactured MTBE and/or supplied gasoline containing MTBE within the State, and/or affecting waters of the State. The Defendants include MTBE manufacturers and refiners and major-brand marketers of gasoline containing MTBE, which was entered and continues to be entered into the stream of the State's commerce and which has injured and continues to injure the waters of the State.

5

6.     The Defendants' manufacture or use of MTBE in gasoline has created an unprecedented threat to waters of the State, including many public and private drinking water supplies, all of which the State holds in trust for the benefit of its citizens.  This includes the costs to treat MTBE contaminated water used by public community water supply wells, public non-community water supply wells, and private domestic water supply wells.  The plaintiffs also seek the costs to restore all MTBE contaminated waters of the State to their pre-discharge condition as well as damages for the loss of value of the waters of the State pursuant to the Spill Act and New Jersey common law.

7.     Unlike other gasoline constituents, MTBE contaminates and spreads in water resources quickly, and hides and resists removal and treatment, thereby presenting a serious threat to the waters of the State.  MTBE has already contaminated numerous drinking water sources in the State and threatens to contaminate many more, as a result of normal and foreseen storage and the purchase and use of gasoline by the State's residents.

8.     In addition to producing and/or supplying MTBE or gasoline containing MTBE for importation into and/or sale within the State, the Defendants knowingly and willfully promoted, marketed and sold MTBE and gasoline and other petroleum products (hereinafter collectively, "gasoline") containing MTBE, when they knew or reasonably should have known that MTBE would be discharged into the environment and pollute the waters of the State in violation of New Jersey law, and would interfere with the Plaintiffs' interests in protecting and preserving such waters and threaten public health and welfare and the environment, as has occurred and is continuing to occur within the State.

9.     The Defendants, among other things:

6

(a) designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State), such that discharges of MTBE contaminate and threaten the waters of the State;

(b) were legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Complaint;

(c) participated in one or more enterprises to promote MTBE and/or gasoline containing MTBE, despite the availability of reasonable alternatives and their actual or constructive knowledge that the pollution alleged herein would be the inevitable result of their conduct; and

(d) in doing the tortious and wrongful acts alleged in this Complaint, acted in the capacity of joint-venturer, partner, agent, principal, successor-in-interest, surviving corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator, licensee, licensor, patent holder and/or indemnitor of each of the named Defendants.

10.     At all times relevant to this action, the Defendants together controlled virtually the entire market for gasoline containing MTBE in New Jersey.

11.     To the extent any act or omission of any of the Defendants is alleged in this Complaint, the officers, directors, agents, employees or representatives of each such Defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or

7

control of the affairs of such Defendants, and did so while acting within the scope of their duties, employment or agency.

12.     MTBE can cause significant adverse health effects, and, even at very low concentrations, can render drinking water foul, putrid and unfit for human consumption.  As a result of these properties, MTBE and other products have caused, are causing, and will continue to cause harm to the waters of the State.  Remedying such harm has cost, is costing, and will cost the State a tremendous amount of financial and human resources that ultimately will adversely impact the State's financial and human resources, including those of the plaintiff DEP and the New Jersey Spill Compensation Fund ("the Spill Fund"), for years to come.

13.     Under New Jersey law the Defendants are strictly liable for manufacturing and supplying a defective product and failing to provide adequate warnings in connection therewith; liable for creating a public nuisance; strictly liable for discharging MTBE into the waters of the State or for being in any way responsible for the MTBE that was discharged into the waters of the State; liable for trespass upon the waters of the State; liable for negligently causing damage to the waters of the State; liable for unfair and deceptive business acts; and liable for all resulting damages, including all costs to investigate, clean up and remove, monitor, prevent, abate, contain, and otherwise respond to any contamination or threatened contamination from MTBE, to restore and protect waters of the State, and to compensate the State for the lost interim value and benefits of the waters of the State as a result of the contamination of the waters of the State. The Plaintiffs also allege that certain Defendants are liable for enhanced damages to reflect the aggravating circumstances of such Defendants' wanton, malicious and oppressive conduct.

8

**PLAINTIFFS**

14.     Plaintiff DEP is a principal department within the Executive Branch of the State government, vested with the authority to conserve and protect natural resources, protect the environment, prevent pollution, and protect the public health and safety. N.J.S.A. 13:1D-9. In addition, the State is the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction, for which plaintiff DEP is vested with the authority to protect this public trust and to seek compensation for any injury to the natural resources of this State. N.J.S.A. 58:10-23.11a.

15.     Plaintiff Commissioner is the Commissioner of plaintiff DEP. N.J.S.A. 58:10-23.11b. and N.J.S.A. 58:10A-3. In this capacity, plaintiff Commissioner is vested by law with various powers and authority, including those conferred by plaintiff DEP's enabling legislation, N.J.S.A. 13:1D-1 to -19.

16.     Plaintiff Administrator is the chief executive officer of the Spill Fund. N.J.S.A. 58:10-23.11j. As chief executive officer of the Spill Fund, plaintiff Administrator is authorized to approve and pay any cleanup and removal costs plaintiff DEP incurs, N.J.S.A. 58:10-23.11f.c. and d., and to certify the amount of any claim to be paid from the Spill Fund, N.J.S.A. 58:10-23.11j.d.

17.     The State also has a significant property interest in the waters of the State and plaintiffs DEP and the Commissioner have statutory obligations to protect the quality of such waters. The contamination of waters of the State by MTBE constitutes injury to the environment and to property held in public trust by the State for which the State, through plaintiffs DEP and the Administrator, seeks damages as parens patriae and under the public trust doctrine.

18.     Plaintiffs DEP and the Administrator seek the recovery of any costs and damages that any private or public well owner has incurred and will incur as a result of discharges of

9

MTBE.

19.     To the extent that plaintiffs DEP and the Administrator have previously settled with one or more of the Defendants for particular natural resource damages at certain sites, such natural resources at such sites are not included in this Complaint.

### DEFENDANTS

20.     Atlantic Richfield Company ("ARCO") (d/b/a ARCO Products Company, f/k/a ARCO Petroleum Co. and a/k/a ARCO) is a Delaware corporation with its principal place of business at 515 S. Flower Street, Los Angeles, California.  Defendant BP Amoco Corporation acquired ARCO in 2000.

21.     BP America, Inc. ("BP America") is a Delaware corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois.

22.     BP Amoco Chemical Company ("BP Amoco Chemical") is a Delaware corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois,

23.     BP Amoco Corporation ("BP Amoco") is an Indiana corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois.

24.     BP Products North America, Inc. ("BP Products NA") is a Maryland corporation with its principal place of business at 4101 Winfield Road, Warrenville, Illinois. The term "BP" as used in this Complaint refers to BP America, BP Amoco Chemical, BP Amoco, and BP Products NA.

25.     Chevron Corporation ("Chevron Corp.") is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. Defendant Chevron Corp. is the successor-in-interest to ChevronTexaco Corporation, and successor-in-interest to Texaco, Inc. ("Texaco, Inc.").

10

26.    Chevron U.S.A., Inc. ("Chevron U.S.A.") is a Pennsylvania corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California. The term "Chevron" as used in this Complaint refers to Chevron Corp. and Chevron U.S.A.

27.    Citgo Petroleum Corporation ("Citgo") is a Delaware Corporation with its principal place of business at 6100 South Yale Avenue, Tulsa, Oklahoma.

28.    Coastal Eagle Point Oil Company ("Coastal Eagle") is a Delaware corporation with its principal place of business at Routes 130 and I-295, Westville, New Jersey. Defendant Sunoco, Inc. acquired defendant Coastal Eagle in 2003.

29.    ConocoPhillips Company ("ConocoPhillips") is a Delaware corporation with its principal place of business at 600 North Dairy Ashford, Houston, Texas. ConocoPhillips was formed as a result of a merger in 2002 of Conoco, Inc. and Phillips Petroleum Company, and is the successor to Conoco, Inc. and Phillips Petroleum Company. Defendant ConocoPhillips is also the successor to Tosco Corporation, including its subsidiary Tosco Refining, LP, which was acquired by Phillips Petroleum Company in 2001.

30.    Crown Central Petroleum Corporation ("Crown Central") is a Maryland corporation with its principal place of business at 1 North Charles Street, Baltimore, Maryland.

31.    Duke Energy Merchants, LLC ("Duke Energy Merchants") is a Delaware limited liability company with its principal place of business at 5400 Westheimer Court, Houston, Texas.

32.    El Paso Corporation ("El Paso") is a Delaware corporation with its principal place of business at 1001 Louisiana Street, Houston, Texas. Defendant El Paso is the successor to El Paso Merchant Energy Petroleum Company and El Paso Marketing, L.P.

33.    Equilon Enterprises, LLC ("Equilon") is a Delaware limited liability company with its principal place of business at 1100 Louisiana Street, Houston, Texas. Defendant Equilon

11

does business as Shell Oil Products US both individually and as successor to a merger to Equiva Service, LLC.

34.     ExxonMobil Corporation ("ExxonMobil Corp.") is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas.   Defendant ExxonMobil was formed as a result of a merger in 1999 of Mobil Oil Corporation and Exxon Corporation.

35.     ExxonMobil Oil Corporation ("ExxonMobil Oil") is a New Jersey corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas.   The term "ExxonMobil" as used in this Complaint refers to defendants ExxonMobil Corp., ExxonMobil Oil, and Mobil Corporation.

36.     George E. Warren Corporation ("George E. Warren Corp.") is a Massachusetts corporation with its principal place of business at 3001 Ocean Drive, Vero Beach, Florida.

37.     Defendant Getty Petroleum Marketing Inc. ("GPMI") is a Maryland corporation with its last principal place of business at 1500 Hempstead Turnpike, East Meadow, New York. During the relevant time period, from 1997 until 2000, GPMI was a wholly-owned subsidiary of Getty Petroleum Corporation, also known as Getty Realty Corporation, and from 2001 until 2011, GPMI was a wholly-owned subsidiary of Lukoil Americas Corporation.  GPMI filed for bankruptcy in December, 2011.  At all times relevant herein, GPMI purchased policies of insurance, paid the appropriate premiums and was entitled to a defense and indemnity for the claims brought in this action.  New Jersey's claim against GPMI is limited to recoverable insurance proceeds.  GPMI was also known as and did business as OAO Lukoil, Lukoil Americas Corporation and was predecessor in liability to Lukoil North Americas, and successor

12

in liability to Getty Petroleum Corporation and Getty Properties Corporation also known as Getty Realty Corporation.

38.     Getty Properties Corp. ("Getty Properties") is a Delaware corporation with its principal place of business at 125 Jericho Turnpike, Jericho, New York.

39.     Giant Yorktown, Inc. ("Giant Yorktown") is a Delaware corporation with its principal place of business at 23722 N. Scottsdale Road, Scottsdale, Arizona.

40.     Gulf Acquisition LLC ("Gulf Acquisition") is a Delaware limited liability company with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts. Gulf Acquisition is the general partner of Gulf Oil Limited Partnership.

41.     Gulf Oil Limited Partnership ("Gulf Oil") is a Delaware limited partnership with its principal place of business at 90 Everett Avenue, Chelsea, Massachusetts.   Cumberland Farms, Inc. ("Cumberland Farms"), is a Delaware corporation with its principal place of business at 100 Crossing Boulevard, Framingham, Massachusetts.   The term "Gulf" as used in this Complaint refers to defendants Gulf Oil, Gulf Acquisition, and Cumberland Farms.

42.     Hess Corporation ("Hess") is a Delaware corporation with its principal place of business at 1185 Avenue of the Americas, New York, New York.

43.     Kewanee Industries, Inc. ("Kewanee") is a Delaware corporation with its principal place of business at 2711 Centerville Road, Suite 400, Wilmington, Delaware.

44.     Lyondell Chemical Company ("Lyondell Chemical") is a Delaware corporation with its principal place of business at 1221 McKinney Street, Suite 700, Houston, Texas.

45.     Lyondell-Citgo Refining, LP ("Lyondell-Citgo") is a Texas limited partnership with its principal place of business at 12000 Lawndale, Houston, Texas.  Defendant Lyondell-

13

Citgo is a wholly owned subsidiary of and is controlled by defendant Lyondell Chemical. The term "Lyondell," as used in this Complaint, refers to Lyondell Chemical and Lyondell-Citgo.

46.     Defendant Lukoil Americas Corporation ("LAC") is a Delaware corporation with its principal place of business at 505 Fifth Avenue, 9th Floor, New York, New York 11554. LAC is an indirect subsidiary of OAO Lukoil. Defendant Lukoil Americas Corporation was formerly known as, did business as, and/or is the successor in liability to Defendants Getty Petroleum Marketing, Inc., Lukoil North America LLC and Lukoil Oil Company.   LAC was a direct parent of GPMI from January, 2001 until February, 2011.

47.     Defendant Lukoil North America LLC ("LNA") is a Delaware corporation with its principal place of business at 505 Fifth Avenue, New York, New York 11554. LNA is a wholly-owned subsidiary of defendant Lukoil Americas Corporation and an indirect subsidiary of OAO Lukoil. LNA was formerly known as, did business as and/or is the successor in liability to Getty Petroleum Marketing Inc., Lukoil Americas Corporation and/or OAO Lukoil. LNA is the successor-in-interest to certain assets of GPMI. LNA owns property in the State of New Jersey and operates service stations in New Jersey.

48.     Defendant Lukoil Oil Company, also known as OAO Lukoil, Public Joint Stock Company Oil Company Lukoil, PJSC Oil Company Lukoil, (hereafter "OAO Lukoil") is an Open Joint Stock Company domiciled in Russia. OAO Lukoil is publically traded on global stock exchanges, including the NASDAQ, under the name of Lukoil (OAO) a/k/a Lukoil Holding Co. ("LUKOY"). OAO Lukoil sells depository receipts through the Bank of New York Mellon which allows investors in the United States to invest in OAO Lukoil. OAO Lukoil is the parent corporation of a vertically integrated company and Defendants LAC and LNA are subsidiaries of OAO Lukoil. OAO was the indirect parent of GPMI between 2000 and 2011.

14

OAO Lukoil itself and through its subsidiaries engages in the production of crude oil and operates refineries and storage terminals in several countries. The term "Lukoil" as used in this Complaint refers to Defendant Lukoil Americas Corporation, Lukoil North America, LLC, Lukoil Oil Company, also known as OAO Lukoil, and its related entity Getty Petroleum Marketing, Inc.

49.     Defendant Lukoil Pan Americas, LLC is a Delaware limited liability company with its principal place of business is 1095 Avenue of the Americas, 33rd Floor, New York, New York 10036.

50.     Marathon Oil Corporation ("Marathon") (d/b/a Marathon Oil Company ("Marathon Oil")) is a Delaware limited liability company with its principal place of business at 5555 San Felipe Road, Houston, Texas.

51.     Marathon Petroleum Company, LLC ("Marathon Petroleum") is a Delaware limited liability company with its principal place of business at 539 South Main Street, Findlay, Ohio. Defendant Marathon Petroleum was formerly known as Marathon Ashland Petroleum Company, LLC.

52.     Mobil Corporation ("Mobil") is a Delaware corporation with its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas.

53.     Motiva Enterprises, LLC ("Motiva") is a Delaware limited liability company with its principal place of business at 700 Milam Street, Houston, Texas. Defendant Motiva is a successor in interest to certain entities related to defendant Shell Oil Company, and is owned and/or controlled by defendant Shell Oil Company.

54.     The Premcor Refining Group, Inc. ("Premcor") is a Delaware corporation with its principal place of business at 1700 East Putnam Ave., Old Greenwich, Connecticut.

55.     Rosemore Inc. ("Rosemore") is a Maryland corporation with its principal place of business at 1 North Charles Street, Baltimore, Maryland.

56.     Shell Oil Company ("Shell Oil") (d/b/a Shell and Shell Development Co. Div.) is a Delaware corporation with its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas.

57.     Shell Oil Products Company LLC ("Shell Oil Products") is a Delaware limited liability company with its principal place of business at 910 Louisiana Street, Houston, Texas.

58.     Shell Trading (US) Company ("Shell Trading US") is a Delaware corporation with its principal place of business at 910 Louisiana Street, Houston, Texas.  The term "Shell" as used in this Complaint refers to defendants Shell Oil, Shell Oil Products, Shell Trading US, and Motiva.

59.     Sunoco, Inc. ("Sunoco, Inc.") (d/b/a Sunoco and/or Sunoco Chemicals) is a Pennsylvania corporation with its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania.

60.     Sunoco, Inc. (R&M) ("Sunoco R&M") is a Pennsylvania corporation with its principal place of business at 1801 Market Street, Philadelphia, Pennsylvania. The term "Sunoco" as used in this Complaint refers to defendants Sunoco, Inc. and Sunoco R&M.

61.     Total Petrochemicals USA, Inc. ("Total") is a Delaware corporation with its principal place of business at Total Plaza, 1201 Louisiana Street, Suite 1800, Houston, Texas.

62.     Ultramar Energy, Inc. ("Ultramar Energy") is a Delaware corporation with its principal place of business at 512 Brooklyn Street, Morrisville, Vermont.

63.     Ultramar Limited ("Ultramar") is a Canadian corporation with its principal place of business at 2200 McGill College, Montreal, Quebec, Canada.

64.     Unocal Corporation ("Unocal") (f/k/a, Union Oil Company of California) is a Delaware corporation with its principal place of business at 2141 Rosencrans Avenue, Suite 4000, El Segundo, California.  Unocal is a wholly owned subsidiary of Chevron Corporation.

65.     Valero Energy Corporation ("Valero Energy") (f/k/a Saber Energy, Inc. and Valero Refining and Marketing Company), is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas.

66.     Valero Marketing and Supply Company ("Valero Marketing") is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas.

67.     Valero Refinery Company – New Jersey ("Valero N.J.") is a Delaware corporation with its principal place of business at 800 Billingsport Rd., Paulsboro, New Jersey.

68.     Valero Refining & Marketing Company ("Valero Refining and Marketing") is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas. The term "Valero" as used in this Complaint refers to defendants Valero Energy, Valero Marketing, Valero N.J., and Valero Refining and Marketing.

69.     Vitol S.A. ("Vitol") is a Swiss corporation with its principal place of business at 1100 Louisiana Street, Suite 5500, Houston, Texas.  Defendant Vitol also does business as Vitol S.A., Inc. or is alternately known as Vitol S.A., Inc.  The term "Vitol" as used in this Complaint refers to defendant Vitol and Vitol S.A., Inc.

70.     Western Refining, Inc. ("Western Refining") is a Delaware corporation with its principal place of business at 6500 Trowbridge Drive, El Paso, Texas.

71.     "Does" 1 through 99 are corporations, partnerships, associations, natural persons or other entities that are not presently known to the Plaintiffs, certain of which are corporate successors to, predecessors of, assigns of, or are otherwise related to other Defendants, and as

17

well are manufacturers, refiners, blenders, distributors, suppliers, marketers, and retailers of MTBE. The true names and identities of Does 1 through 99 are not known to the Plaintiffs, and therefore the Plaintiffs sue said Defendants by fictitious names.

## THE LUKOIL DEFENDANTS ARE DIRECTLY AND VICARIOUSLY LIABLE FOR GPMI'S ENVIRONMENTAL LIABILITIES

72.   Lukoil Oil Corporation a/k/a OAO Lukoil ("OAO Lukoil"), Lukoil Americas Corporation ("LAC"), Lukoil North Americas ("LNA") and GPMI directly, indirectly, and through agents and/or officers, transacted business in the State of New Jersey.

73.   From 1998 forward, OAO Lukoil registered several trademarks for "Lukoil" with the U.S. Patent and Trademark Office. OAO Lukoil used those trademarks to conduct business related to the sale of motor fuel in New Jersey and elsewhere through subsidiaries that held themselves out as Lukoil, including GPMI, LAC, and LNA.

74.   In October 2000, OAO Lukoil created LAC. OAO Lukoil and/or its subsidiary Lukoil Americas LLC n/k/a Lukoil Americas Corporation, entered into a gasoline supply agreement with BP North American Petroleum. This supply agreement was subsequently assigned to Getty Petroleum Marketing, Inc.

75.   In November 2000, OAO Lukoil moved into the United States gasoline market by acquiring GPMI, heralding the acquisition as the first by a Russian company of a publically held U.S. company. The Agreement and Plan of Merger to acquire was between GPMI and OAO Lukoil and OAO Lukoil subsidiaries Lukoil International GmbH, Lukoil Americas Corporation and Mikecon Corporation. The Agreement and Plan of Merger designated Lukoil Americas Corporation to receive all notices and communications on behalf of "any Lukoil entity."

76.   After LAC acquired GPMI in 2001, GPMI became a wholly owned subsidiary of LAC and an indirect wholly owned subsidiary of OAO Lukoil. OAO Lukoil and LAC took

18

GPMI private and no longer filed reports with the U.S. Securities and Exchange Commission. GPMI was registered and authorized to do business in New Jersey. Thereafter, LAC and OAO Lukoil ran GPMI as a division of Lukoil while fraudulently representing to creditors and regulatory entities that GPMI was an independent entity.

77.     As part of the acquisition and merger transaction, LAC and OAO Lukoil, acting through GPMI, entered into an Amended Master Lease for service stations in New Jersey and elsewhere and an environmental indemnity agreement with Getty Realty Corporation a/k/a Getty Properties Corporation ("Getty") for the lease of hundreds of service stations and a petroleum storage and distribution network in the United States, including in New Jersey. In these transactions GPMI acted as agent for, and at the direction of, OAO Lukoil and LAC.

78.     At the time that LAC and OAO Lukoil, by and through GPMI, executed the Amended Master Lease with Getty, OAO Lukoil guaranteed GPMI's financial obligations under the Amended Master Lease for three years. The "Guaranty of Lease" executed by OAO Lukoil provides that the "Guarantor [OAO Lukoil] will derive substantial direct and indirect benefits from Tenant's [GPMI's] entering into the [Amended Master] Lease." OAO Lukoil affirmatively promised that it "absolutely, unconditionally, irrevocably, jointly and severally guarantees, *as principal* and not as indemnitor to Landlord [Getty Realty Corporation], in accordance with and pursuant to this Guaranty, Tenant's full and punctual payment of all Guaranteed Obligations. . . . Guarantor's liability under this Guaranty *shall be primary* and not secondary and *Landlord may, at Landlord's option . . . join Guarantor in any action or Proceeding* commenced by Landlord against Tenant in connection with the Guarantied [sic.] Obligations." (Emphasis added.)

19

79.     OAO Lukoil put the Lukoil trademarks on service stations in New Jersey, on GPMI letterhead, and on credit cards offered to and used by New Jersey customers of Lukoil service stations.

80.     At all relevant times, GPMI, LAC, OAO Lukoil and LNA held themselves out as "Lukoil" in signage, advertising, contracts, sponsorships, and other business activities.  LAC owned 100% of the stock of GPMI from January 25, 2001 until February 28, 2011, with the exception of two weeks in November 2009, when OAO Lukoil, LAC and LNA coordinated a stripping of the only profitable assets of GPMI to evade GPMI's obligations to creditors, including the New Jersey.  At all relevant times, GPMI, LAC and LNA acted as agents for OAO Lukoil with respect to operation of GPMI leased service stations in New Jersey.

81.     In 2004, with the approval and at the direction of OAO Lukoil and LAC, GPMI obtained a loan and line of credit for $360 million.  The purpose of the loan and line of credit was to finance the acquisition of service stations in New Jersey and Pennsylvania from ConocoPhilips and to provide working capital associated with the acquisition.  The Executive Summary of the transaction documents stated, "Lukoil [OAO Lukoil] has acquired downstream assets in Europe and the U.S. (including the $73 million acquisition of Getty announced in November 2000).  This Acquisition [to buy the ConocoPhillips stations with the loan proceeds] is the next step in Lukoil's strategy to aggressively expand its U.S. Downstream operations."  The loan documents referred to GPMI as "the foundation of Lukoil's [OAO Lukoil's] U.S. downstream operations – a presence that Lukoil anticipates will expand dramatically in the next few years."  The loan and line of credit also stated, "The Acquisition represents more than a financial investment for Lukoil, it is the foundation of a strategy to dramatically expand Lukoil's presence in the U.S."

20

82.     The 2004 loan and line of credit were guaranteed by LAC.  Vincent De Laurentis,
president of both LAC and GPMI, signed for the loan and line of credit on behalf of GPMI, and
signed the guarantee on behalf of LAC.  OAO Lukoil made a $50 million capital contribution to
LAC to fund the acquisition and another $10 million as a "structural measure to provide near
term financing liquidity."

83.     In May 2004, OAO Lukoil, through GPMI, used funds from the loan and line of
credit to acquire 767 Mobil-branded stations in New Jersey and Pennsylvania from
ConocoPhillips for $269.5 million.  The title of the purchase agreement is "OAO Lukoil Getty
Petroleum Marketing Inc. Purchase of Marketing Assets from Conoco Phillips Company and
Related Financings."  OAO Lukoil and LAC directed and participated in the acquisition of
service stations from ConocoPhillips.  OAO Lukoil and LAC guaranteed loans for the purpose of
purchasing stations and property located in New Jersey, expanding their market share in New
Jersey, and bringing the Lukoil name to New Jersey by rebranding New Jersey service stations as
Lukoil stations.

84.     In 2005, GPMI obtained a loan and line of credit for $475 million to replace the
2004 loan and to finance additional expansion efforts and to rebrand the acquired stations to
Lukoil stations.  The 2005 loan and line of credit were guaranteed by OAO Lukoil.  The loan
documents stated, "Expanding into the U.S. has also been a strategic objective of Lukoil . . . .
Sales of Lukoil petroleum products in the U.S. reached a record level of 1.9 billion gallons (8.64
billion liters).  Revenue from sales (without excise) was $2.6 billion and net profit was $11.7
million."  Distributions for that loan and line of credit went directly to LAC, not GPMI.

85.     The 2005 "Guaranty" signed and agreed to by OAO Lukoil, stated that OAO
Lukoil's "obligations hereunder are primary, not secondary. . . the obligations of the Guarantor

. . . are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce such obligations, irrespective of whether any action is brought against the Borrower or any other Person . . . ." The Guaranty also included "Affirmative Covenants" which described not only OAO Lukoil's financial obligations, but also significant commitments to the operation of its subsidiaries, including commitments that OAO Lukoil would cause each subsidiary to "do, or cause to be done all things necessary to (a) preserve, renew and keep in full force and effect its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business . . . ." OAO Lukoil also committed to cause each subsidiary to "keep and maintain all property material to the conduct of its business in good working order and condition . . . ."

86.     As part of its effort to increase the Lukoil brand awareness and increase its profits, OAO Lukoil directly funded a rebranding effort with a $10 million per year marketing and advertising campaign directed at customers in New Jersey and Pennsylvania.

87.     OAO Lukoil regularly transferred millions of dollars through its intermediate subsidiaries to LAC, who then funneled those dollars to GPMI. For example, in 2005 and 2006, LAC received $2.5 million dollars quarterly from one or more of the OAO Lukoil subsidiaries, including Lukoil Americas LLC (which merged with LAC in 2006), and Lukoil Europe Holdings B.V.. LAC would then immediately transfer that money to GPMI.

88.     By 2005, GPMI was losing vast sums of money because the GPMI legacy stations bound by the Amended Master Lease were losing money and GPMI could not pay the rent owed to Getty Realty Corporation. At a number of these stations GPMI was exposed to environmental liability, including liability to New Jersey for MTBE contamination. By 2006, GPMI was operating at a loss and it would never again be solvent.

22

89.     In 2007, the C.E.O. of LAC, GPMI and LNA, Vadim Gluzman, on behalf of and as agent for OAO Lukoil, told the owner of Getty Realty Corporation that if Getty did not renegotiate the Amended Master Lease, GPMI would sell off assets to a sister company, hold GPMI for one-year and then sell GPMI to anyone who would take it.

90.     In 2007, OAO Lukoil directed LAC to create LNA for the purpose of obtaining GPMI's only profitable assets (the ConocoPhillips stations not bound by the Amended Master Lease) in a future transaction that would keep those ConocoPhillips stations within the Lukoil family and drive the remainder of GPMI into bankruptcy.

91.     LAC created LNA in June 2007 as directed by OAO Lukoil and has always owned 100% of LNA's stock.

92.     Environmental and property risks associated with the gasoline stations in the United States were assessed and considered by OAO Lukoil, including risks associated with stations in New Jersey, when OAO Lukoil directed the restructuring of LAC and its subsidiaries and the fraudulent transfer of assets from GPMI to LNA.  By 2008, GPMI's total liabilities exceeded its total assets resulting in an accumulated deficit of $248 million.  GPMI was dependent on money from OAO Lukoil to survive.

93.     In 2009, OAO Lukoil directed LAC, LNA and GPMI to transfer GPMI's only profitable assets, including the former ConocoPhillips service stations in New Jersey, to the newly created LNA. Some assets were also transferred to Lukoil Pan Americas.

94.     In November 2009, LAC and LNA, acting at the direction of OAO Lukoil, undertook a three-step process to effectuate that transfer.

23

95.     On November 13, 2009, LAC transferred 100% of its GPMI stock to LNA.  Upon information and belief, LNA did not give adequate consideration for the transfer of GPMI stock from LAC.  The transfer of GPMI stock to LNA had no legitimate business purpose for GPMI.

96.     On November 16, 2009, while under LNA ownership, GPMI transferred stations, including the former ConocoPhillips stations, to LNA.  OAO Lukoil, LAC and LNA are successors in liability for the MTBE contamination at these stations.  This transfer was fraudulent and to the detriment of GPMI.

97.     The GPMI and LNA documents effecting the transfer of the ConocoPhillips stations from GPMI to LNA were all signed by the same person, the president of both GPMI and LNA, Vincent De Laurentis, on behalf of GPMI and LNA.

98.     The price LNA paid for GPMI's profitable assets was a fraction of the fair market value of those assets and was inadequate for GPMI's creditors.

99.     On November 27, 2009, two weeks after LAC transferred GPMI's stock to LNA, LNA transferred all of its GPMI stock back to LAC as a dividend.  By this time, however, GPMI no longer owned the profitable former ConocoPhillips stations, which LNA kept.  The result was a GPMI that was hemorrhaging cash and had rent obligations to Getty Realty Corporation that it could not afford (and that were no longer subject to OAO Lukoil's 2000 Guaranty of Lease).  LNA continued, without interruption, the operations of the former ConocoPhillips stations, including management, personnel, physical locations, and sale of motor fuel.

100.    OAO Lukoil, LAC and LNA controlled the transfer of the ConocoPhillips stations from GPMI to LNA, and ignored the corporate formalities that would ordinarily accompany such a transfer.  There was no legitimate business reason for GPMI to transfer these stations to LNA.

24

In transferring the stations, GPMI acted as an agent of OAO Lukoil, LAC and LNA, and not in the interests of GPMI.

101.    OAO Lukoil and LAC directed gasoline blending operations in which GPMI, acting as an agent for OAO Lukoil and LAC, blended MTBE gasoline for sale in New Jersey and elsewhere.

102.    In 2011, OAO Lukoil directed LAC to sell GPMI to Cambridge Holdings Petroleum for one dollar.  At that time, OAO Lukoil also agreed to provide millions of dollars as a cash infusion to Cambridge in order to keep GPMI temporarily afloat.

103.    No officer of GPMI knew of or participated in the sale of GPMI to Cambridge. Upon the sale, OAO Lukoil ordered all GPMI officers to resign their positions with GPMI.

104.    GPMI owned USTs in New Jersey at the time of the sale to Cambridge.

105.    OAO Lukoil, LAC, and LNA filed claims in the bankruptcy proceeding of GPMI for indemnity by GPMI for "damages relating to purchase and sale agreement" (*e.g.*, the November, 2009 sale of assets from GPMI to LNA). *In re GPMI Bankruptcy*, No. 11-15606-SCC (S.D.N.Y.).  LNA also filed claims relating to stations covered by the Amended Master Lease and the Purchase and Sale Agreement between LNA and GPMI including stations in New Jersey.

106.    The GPMI bankruptcy trustee filed an adversary proceeding against OAO Lukoil, LAC and LNA, for the fraudulent transfer of assets between GPMI and LNA.  OAO Lukoil, LAC and LNA settled the bankruptcy trustee's fraudulent transfer claim for $93 million in cash to be paid to the GPMI Trust.

107.    LNA owns underground storage tanks and service stations in New Jersey, some or all of which are sources of ongoing MTBE contamination.

108.   Every corporate officer of GPMI held the same position with LAC and LNA, indicative of the fact that these entities were operating as a single entity.

109.   Vadim Gluzman was the Chairman of the Board and Chief Executive Officer of GPMI, LAC, and LNA.  Mr. Gluzman reported to the Chief Executive Officer of OAO Lukoil and was a vice-president of OAO Lukoil from 2007 to 2009.

110.   Vincent De Laurentis was the President and Chief Operating Officer of GPMI, LAC, and LNA.

111.   Michael Hantman was the Senior Vice President and Chief Financial Officer of GPMI, LAC, and LNA.

112.   Semyon Logovinsky, was the Vice-President for Wholesale and New Business Development of GPMI, LAC, and LNA.

113.   GPMI, LAC, and LNA had the same principal place of business:  Lukoil Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554.

114.   OAO Lukoil, LAC, LNA, and GPMI failed to observe corporate separateness and acted as alter-egos and/or as if GPMI was a department of OAO Lukoil and LAC and not a separate entity.  OAO Lukoil, LAC, and LNA wholly ignored the separate status of GPMI and controlled and dominated its affairs such that its separate existence was a sham and façade.

115.   Throughout the ten years that LAC owned GPMI, neither LAC nor GPMI observed corporate formalities, held regular board meetings, or prepared or maintained regular board minutes.  Business decisions of GPMI and LAC were made through "written consents" signed by three board members, including a designated board member from OAO Lukoil.

116.    LAC and OAO Lukoil's actions made clear that they did not view or operate GPMI as an independent entity, but rather as a mere instrument for Lukoil to do business in its own interest and routinely emphasizing Lukoil's interests rather than GPMI's interests.

117.    OAO Lukoil prevented GPMI from obtaining financing without its approval.

118.    OAO Lukoil and LAC required GPMI to submit financial reports to OAO Lukoil.

119.    OAO Lukoil regularly called Vadim Gluzman and other GPMI, LAC and LNA officers to the headquarters of OAO Lukoil in Moscow so OAO Lukoil could tell them how to manage GPMI, LAC, and LNA. By their actions as aforesaid and otherwise, the defendants OAO Lukoil, LAC and LNA, failed to observe GPMI's separate corporate entity, operated GPMI and/or dealt with GPMI's property as if it were their own, used GPMI as a mere shield to escape liability to New Jersey and otherwise to evade legal obligations to New Jersey.

120.    As described above, OAO Lukoil, LAC, LNA and GPMI had a unity of ownership, a unified administrative and financial control, and similar or supplementary business functions, and OAO Lukoil, LAC, LNA so dominated GPMI that GPMI did not have a true separate existence.

121.    As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability for MTBE contamination which was the result of releases that occurred at GPMI-lease sites prior to January 25, 2001.

122.    As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability for MTBE contamination which was the result of releases at GPMI-lease sites that occurred on or after January 25, 2001.

123.    Under the totality of the circumstances, as described above, a paramount injustice would occur if LAC, OAO Lukoil, and LNA were allowed to escape liability for their and

27

GPMI's environmental liabilities. In addition, under the totality of the circumstances, public policy demands that OAO Lukoil, LAC and LNA not be permitted to avoid their and GPMI's legitimate legal obligations to New Jersey. No innocent parties will be prejudiced by holding LAC, OAO Lukoil, and LNA liable for their and GPMI's environmental liabilities.

124.     Each Defendant has done, or is doing, business in New Jersey at all times relevant to this Complaint.

## THEORIES OF LIABILTY

125.     Each Defendant is jointly and severally liable to the Plaintiffs for the claims set forth in this Complaint and for all damages arising therefrom. In addition, or in the alternative to joint and several liability, market share liability, including the commingled product theory, may be an appropriate theory for liability in this case. Market share liability means that for all acts, omissions, and conduct set forth in this Complaint, and for all damages arising therefrom, each Defendant is liable to the Plaintiffs in an amount equal to its respective share of the United States national market for the MTBE and gasoline containing MTBE.

126.     Market share liability applies to this case to the extent that it may be impossible to identify the manufacturer or manufacturers who produced gasoline containing MTBE that has been distributed in New Jersey because the MTBE in such gasoline is fungible and because the Defendants control a substantial share of the market for such gasoline.

127.     Identification may be impossible because the Defendants trade, barter, or otherwise exchange gasoline containing MTBE with one another such that even when the source of an MTBE plume is identified, the identity of the manufacturer or manufacturers of the products forming the plume cannot be determined.

**MTBE, ITS CHARACTERICS, AND ITS RISK TO WATERS OF THE STATE**

128.    MTBE is a chemical compound produced by combining methanol, a derivative of natural gas, and isobutylene, a by-product of the gasoline refining process.  Because methanol and isobutylene are readily available compounds, MTBE is inexpensive to manufacture.  As used in this Complaint, MTBE consists not only of methyl tertiary butyl ether, but also the degradation byproducts of, and contaminants in, commercial grade MTBE, including tertiary butyl alcohol.

129.    One way that MTBE contaminates the environment is through discharges, releases, leaks, overfills, and spills from gasoline storage and delivery systems, including gasoline stations and gasoline storage, transfer, delivery, and dispensing systems ("gasoline storage and delivery systems").

130.    As a result of its physical characteristics, MTBE finds unique pathways into the environment from gasoline storage and delivery systems and is more readily discharged from such systems than conventional gasoline components.

131.    Once discharged to the environment, MTBE's unique characteristics cause extensive environmental contamination and a corresponding threat to the public health and welfare beyond that caused by gasoline that does not contain MTBE.  In particular, the fate and transport of MTBE in the subsurface differs significantly from that of gasoline constituents that have historically been of environmental and/or toxicological concern, specifically the "BTEX compounds" (i.e., benzene, toluene, ethylbenzene, and xylene).

132.    When discharged into the environment, MTBE separates from other gasoline constituents in the presence of moisture.  In contrast to the BTEX compounds, MTBE has a

strong affinity for water, is easily dissolved and does not readily adhere to soil particles, making it more mobile and able to penetrate great distances from the source of the discharge.

133.   In water, MTBE moves freely at approximately the rate of the water's movement, unlike BTEX compounds, which tend to adhere to soil and float on the surface of water. This makes MTBE more difficult to find and more difficult to remove or treat than BTEX compounds.

134.   MTBE is also more persistent than BTEX compounds because it does not readily biodegrade in ground water. As a result, MTBE is relatively more difficult and more expensive to remove from ground water.

135.   In sum, when MTBE is discharged into the environment, it migrates farther and faster through soil and water, penetrates deeply into aquifers, resists biodegradation and results in persistent contamination that is more costly to address. As a result of these properties, MTBE has contaminated, and continues to contaminate and threaten, vast quantities of the waters of the State.

136.   MTBE also contaminates surface waters through discharges, releases, leaks, overfills and spills of gasoline associated with, or incident to, certain consumer and commercial activities. This surface water contamination often threatens to injure or injures waters of the State.

137.   It is likely that not all of the MTBE contamination of waters of the State can be traced to a specific source.

**HISTORY OF MTBE PRODUCTION AND SALE BY THE DEFENDANTS**

138.    Oil companies began blending MTBE into gasoline in the late 1970s.  Initially used as an octane enhancer, MTBE was used throughout the 1980s at low concentrations in some gasoline by some refiners, primarily in high-octane grades.

139.    In or about the late 1970s, the United States Environmental Protection Agency registered MTBE as a fuel additive that does not cause or contribute to the failure of any emission control device or system, pursuant to section 211 of the Clean Air Act, 42 U.S.C.A. § 7545 ("the CAA").  Such registration did not, and does not, constitute endorsement, certification, or approval of MTBE as a fuel additive by any agency of the United States.

140.    Refiners, including the Defendants, significantly increased their use of MTBE in gasoline after 1990.  In 1990, Congress established the Reformulated Gasoline Program ("RFG Program") in section 211(k) of the CAA, 42 U.S.C.A. § 7545(k).  The RFG Program requires the use of reformulated gasoline in certain metropolitan areas with high carbon monoxide ("CO") levels.

141.    The CAA requires areas of the country with the highest levels of ozone air pollution ("severe" non-attainment of the National Ambient Air Quality Standards ("NAAQS")) to implement the RFG Program.  As of January 1, 1995, nine severe ozone non-attainment areas (including part of New Jersey) were required to implement this program.  Although optional for Cape May and Atlantic counties, New Jersey implemented the RFG program statewide, for ease of gasoline distribution.

142.    Refiners, including the Defendants, were not required to add MTBE to their gasoline, but could introduce any oxygenate including ethanol.

143.    Reformulated gasoline containing significantly higher quantities of MTBE has been sold on a virtually universal basis throughout New Jersey since 1995.

31

**IMPACT OF MTBE ON THE WATERS OF THE STATE**

144.   MTBE contamination has injured, and continues to injure and threaten, the waters of the State, and threatens the health, safety and welfare of the citizens of the State.

145.   Federal and other studies link MTBE to a variety of adverse health effects.

146.   The State has established a health-based Primary Maximum Contaminant Level ("MCL") for MTBE of 70 parts per billion ("ppb").

147.   The establishment of the health-based MCL for MTBE triggers certain state regulatory requirements if that level is exceeded in drinking water supplies.   Such state requirements include required investigatory and remedial action to protect public health and the environment and remedial actions by public water suppliers.

148.   In addition to the health and environmental risks posed by MTBE in drinking water supplies, MTBE can render water supplies undrinkable by changing the taste and odor of water.   Many individuals can smell and/or taste MTBE in drinking water at levels well below the health-based MCL of 70 ppb.

149.   MTBE has been found in drinking water supplies throughout the State in varying concentrations and at varying times.   MTBE has been detected in point of entry samples of 15% of public water supplies that have been tested statewide.   MTBE also has been detected in private domestic wells statewide.   On behalf of the citizens of New Jersey, the Plaintiffs seek to recover the costs to treat such MTBE contaminated water in public supplies and domestic wells.

150.   The injuries to the waters of the State caused and/or threatened by the Defendants' conduct as alleged herein constitute an unreasonable interference with natural resources that the State holds in trust for the benefit of its citizens.   Such injuries also constitute damages to limited, precious and invaluable public natural resources in which the State has a

32

significant property and quasi-sovereign interest. The State's unique interest in protecting the quality of its waters constitutes a reasonable basis for the Plaintiffs to seek damages for restoration of such waters.

### STATE REGULATION OF MTBE

151.   MTBE is regulated as a hazardous substance under environmental statutes, including N.J.S.A. 58:10-23.11 to -23.24, as well as under other statutes and rules designed to protect the State's waters.

152.   MTBE contamination is associated with all transportation, storage and use of gasoline containing MTBE.

153.   Plaintiffs DEP and the Administrator provide funding for remediation, including investigation, individual third-party damages, water treatment, water lines, and other activities related to MTBE contamination in the State through State-administered pollution reimbursement funds, such as the Spill Fund under N.J.S.A. 58:10-23.11i, and through general funding.

154.   Plaintiffs DEP and the Administrator have incurred, are incurring, and will continue to incur, significant costs and expenses in addressing discharges of MTBE into the environment and into waters of the State.

### DEFENDANTS WERE AWARE OF THE HARMS MTBE'S ADDITION INTO GASOLINE AND PLACEMENT IN NEW JERSEY'S STREAM OF COMMERCE WOULD CAUSE THE WATERS OF THE STATE

155.   Among other things, the Defendants knew, or reasonably should have known, that:

(a)   the gasoline distribution and retail system throughout the State contained leaking gasoline storage and delivery systems;

33

(b)   MTBE is more readily discharged from gasoline storage and delivery systems than the constituents of conventional gasoline; and

(c)   discharges of MTBE into the environment would be an inevitable consequence of placing MTBE into the stream of commerce in the absence of precautionary measures to prevent or mitigate such discharges - measures that the Defendants failed to take.

156.   The Defendants also knew, or reasonably should have known, that, unlike the constituents of conventional gasoline, MTBE, when discharged into the environment, would move great distances, mix easily with water, resist biodegradation, render drinking water unsafe and/or non-potable, and require significant expenses to find and remove from public and private drinking water supplies.

157.   Despite knowing the devastating risk of drinking water contamination posed by MTBE, and despite the availability of reasonable alternatives, including adequate warnings, the Defendants failed to warn customers, retailers, regulators or public officials, including the Plaintiffs, and failed to take any other precautionary measures to prevent or mitigate such contamination.   Instead, the Defendants promoted MTBE, and gasoline containing MTBE, as environmentally sound products appropriate for widespread use.   Moreover, certain Defendants engaged in separate and joint activities to suppress, conceal and/or discredit studies and other information regarding the hazards of MTBE.   The Defendants' wrongful conduct, among other things, encouraged the State to participate in the federal reformulated gasoline program without a full understanding of the risks to the waters of the State, which resulted in:

(a)   a dramatic increase in the use and presence of gasoline containing MTBE in the State;

34

(b)     the consequent injuries to the waters of the State; and

(c)     the substantial damages incurred by plaintiffs DEP and the Administrator in response thereto.

158.    At all relevant times, the Defendants have represented to purchasers of MTBE and/or gasoline containing MTBE, as well as to the public and government agencies, that such products were environmentally sound and appropriate for widespread production, distribution, sale and use.   Indeed, the Defendants represented that gasoline containing MTBE could be handled in the same fashion as conventional gasoline, and required no special measures to protect against, respond to, or mitigate suspected discharges to the subsurface.

159.    The Defendants knew, or reasonably should have known, that:

(a)     MTBE would escape from gasoline storage and delivery systems more readily than the constituents of conventional gasoline;

(b)     gasoline storage and delivery systems in the State were not designed to prevent any and all leakage of gasoline containing MTBE; and

(c)     the operators and users of gasoline storage and delivery systems either: (i) were unaware of the special hazards posed by MTBE and the steps necessary to eliminate or mitigate those hazards; or (ii) would fail to take such steps.

160.    The Defendants further exacerbated the situation by continued unreasonable and negligent acts, including providing gasoline containing MTBE to gasoline stations without either providing appropriate warnings or taking other precautions adequate to prevent or mitigate discharges of MTBE to the subsurface.   The Defendants did so despite the fact that they knew, or reasonably should have known, that discharges of MTBE were substantially certain to occur, because a substantial percentage of those gasoline stations would and, in fact, did:

35

(a)     place the gasoline into inadequate and leaking gasoline storage and delivery systems;

(b)     suffer the routine spillage of appreciable quantities of gasoline containing MTBE in connection with the filling of storage tanks and the use of gasoline dispensing systems;

(c)     fail to take adequate measures to monitor, detect, report, and respond to discharges of MTBE; and

(d)     fail to take adequate precautions to investigate, contain, and clean up and remove discharges of MTBE.

161.    The widespread problems of gasoline spillage and leaking gasoline storage and delivery systems were well known to the Defendants prior to the introduction of MTBE into the State.  At least as early as the mid-1960s, the Defendants knew, or reasonably should have known, that gasoline storage and delivery systems generally suffer significant and widespread leaks and failures, and discharge gasoline products into the environment, including into ground water.

162.    Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Shell, Sunoco, Valero, BP, Unocal, and ARCO not only knew about the widespread problems of leaking gasoline storage and delivery systems generally, but, at all times relevant to this action, had first-hand knowledge and experience regarding leaking gasoline storage and delivery systems and discharges of MTBE to ground water therefrom.  These Defendants obtained such first-hand knowledge and experience because each of them owned and operated individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in the State, and/or exercised control over such gasoline stations through a variety of means,

36

including written agreements, inspection rights, prescribing certain procedures and operating practices, prescribing specifications for products, conditions on sale of branded goods, agreements obligating such stations to acquire, store and sell gasoline containing MTBE, and training. Despite the first-hand knowledge that contamination of waters of the State with MTBE was the inevitable result of their conduct, these Defendants continued to refine, market, promote, and supply gasoline containing MTBE.

### DEFENDANTS' PROMOTION OF MTBE

163. The Defendants, all of whom have promoted the use of gasoline containing MTBE for its purported environmental benefits, knew or should have known of the grave harm and threat to public health, safety and welfare and the environment represented by the proliferating use of MTBE, including widespread pollution of surface and ground water with MTBE; contamination of public and private drinking water supplies by this harmful and noxious compound; the rendering of drinking water supplies unfit and unusable for consumption; and increased costs to plaintiffs DEP and the Administrator in addressing MTBE contamination of waters of the State.

164. The manufacturers, refiners and suppliers of MTBE and gasoline containing MTBE had a duty and breached their duty to evaluate and test MTBE adequately and thoroughly to determine its environmental fate and transport characteristics and potential human health and environmental impacts before they produced and sold MTBE and gasoline containing MTBE. They also had a duty and breached their duty to minimize the environmental harm caused by MTBE and/or gasoline containing MTBE. Furthermore, they had a duty and breached their duty to take precautions, including warnings, necessary to ensure that gasoline containing MTBE was properly stored and that all necessary measures to promptly detect, contain, abate and respond to

37

spills and leaks were instituted.  The Defendants failed to adequately evaluate, test, store, warn, mitigate or otherwise ensure that gasoline containing MTBE would not contaminate waters of the State.  As a direct, indirect and proximate result of these failures, MTBE was discharged into the environment, causing, and threatening to cause, widespread contamination of the waters of the State.

165.    In addition to the negligent and/or reckless conduct alleged herein, defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Valero, BP, Unocal, ARCO, and Equilon also intentionally failed to warn downstream handlers, the public and government officials, including the Plaintiffs, as to the threat caused by MTBE and, by agreement and tacit understanding among them, each knowingly pursued or took an active part in a common plan, design and conspiracy to market and promote a product they knew to be dangerous to the environment.  In particular, the Defendants identified in this paragraph formed and participated in joint task-forces, committees and trade associations for the specific purposes of suppressing, concealing and minimizing information regarding MTBE hazards.  These Defendants also engaged in separate and joint activity to mislead government agencies, including plaintiff DEP, as well as the public, regarding these same dangers.  Such Defendants' common plan, design and conspiracy, and the acts taken in furtherance of such common plan, design and conspiracy, are a direct, indirect and proximate cause of the MTBE contamination of the waters of the State.

## COUNT I

### (Strict Product Liability Based On Defective Design Against All Defendants)

166.    The Plaintiffs reallege paragraphs 1 through 165 above, and by this reference incorporate them as though set forth in full.

167.    The Defendants designed, manufactured, formulated, promoted, marketed, distributed, exchanged and/or sold MTBE to refiners, including certain refiner/marketer Defendants, for use as a component of gasoline.

168.    The Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) gasoline containing MTBE that was delivered in the State (or areas affecting the waters of the State).

169.    The Defendants represented, asserted, claimed and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.

170.    The Defendants knew that MTBE and/or gasoline containing MTBE were to be purchased and used without inspection for defects.

171.    MTBE and/or gasoline containing MTBE are defective and unreasonably dangerous products because, among other things:

(a)    MTBE escapes more readily from gasoline storage and delivery systems than the constituents of conventional gasoline and other available and viable alternative gasoline additives.

(b)    MTBE causes extensive groundwater contamination when used in its foreseeable and intended manner.

(c)    Even at extremely low concentrations, MTBE renders drinking water putrid, foul, and unfit for purveying as drinking water to the public.

(d)    MTBE poses significant threats to the public health and welfare and the environment.

(e)    The Defendants failed to conduct reasonable, appropriate or adequate

39

scientific studies to evaluate the environmental fate and transport and the potential human health effects of MTBE.

(f) At all times relevant to this action, feasible alternatives to MTBE that would have eliminated the unreasonable danger posed by gasoline containing MTBE, without excessive costs or loss of product efficiency, were available to the Defendants.

(g) Commercial grade MTBE is defectively manufactured when it contains and/or degrades into unnecessary but environmentally harmful impurities such as tertiary butyl alcohol.

(h) Any limited utility provided by the use of MTBE as a gasoline additive is greatly outweighed by the risks and dangers associated with MTBE described herein.

172. At all times relevant to this action, MTBE and/or gasoline containing MTBE were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment posed by MTBE and/or gasoline containing MTBE outweighed the cost to the Defendants of reducing or eliminating such risk.

173. At all times relevant to this action, the distribution, storage, and/or use of MTBE and/or gasoline containing MTBE and the risks and dangers associated therewith including the risk of harm to public health and welfare and the environment outweigh any limited utility provided by MTBE and/or gasoline containing MTBE.

174. At all times relevant to this action, MTBE and gasoline containing MTBE were used in a manner in which they were foreseeably intended to be used and without substantial

change in their condition, and as a proximate result of the defects previously described, MTBE proximately caused the injuries and damages set forth in this Complaint.

175.   As a direct and proximate result of the Defendants' acts and omissions as alleged herein, plaintiffs DEP and the Administrator have incurred, and will continue to incur, investigation, cleanup and removal, restoration, treatment, monitoring, and other costs and expenses related to contamination of the waters of the State with MTBE, for which the Defendants are strictly, jointly and severally liable.

176.   As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, plaintiffs DEP and the Administrator have sustained and will sustain other substantial expenses and damages, for which the Defendants are strictly, jointly and severally liable.

177.   The injuries to the waters of the State caused and/or threatened by the Defendants' acts and omissions as alleged herein are indivisible.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs DEP and the Administrator pray that this Court:

a.   Enter declaratory judgment against the Defendants, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the State so that such waters are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State, including the costs of:

41

(1)     past and future testing all public and private drinking water supplies for the presence of MTBE;

(2)     past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)     past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

b.     Enter an order assessing the Defendants for all reasonable costs incurred related to the investigation, cleanup and removal, restoration, treatment, and monitoring,  directly or indirectly resulting from the contamination of the waters of the State with MTBE;

c.     Enter an order assessing the Defendants for all reasonable costs that will be incurred related to the investigation, cleanup and removal, restoration, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE;

d.     Enter an order assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

e.     Enter an order assessing the Defendants for all compensatory damages for the lost interim value of the waters of the State as a result of the contamination of such waters with MTBE;

42

f.      Enter an order assessing the Defendants for all other damages sustained by plaintiffs DEP and the Administrator as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the State;

g.      Enter an order against the Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State;

h.      Enter an order assessing the Defendants for punitive damages in an amount to be determined by this Court;

i.      Enter an order against the Defendants requiring them to compensate plaintiffs DEP and the Administrator to the extent the Defendants have been, or will be, unjustly enriched;

j.      Award plaintiffs DEP and the Administrator costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

k.      Award plaintiffs DEP and the Administrator such other relief as this Court deems appropriate.

## COUNT II

### (Public Nuisance Against All Defendants)

178.    The Plaintiffs reallege paragraphs 1 through 177 above, and by this reference incorporate them as though set forth in full.

179.    The negligent, reckless, intentional and ultrahazardous activity of Defendants alleged herein has resulted in the contamination and pollution of the waters of the State as alleged herein, and constitutes a public nuisance.

43

180.    The public nuisance caused, contributed to, maintained, and/or participated in by the Defendants has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the State's significant property and statutory obligations in and for the waters of the State, the State's ability, through the Plaintiffs, to protect, conserve and manage the waters of the State, which are by law precious and invaluable public natural resources held by the State in trust for the benefit of the public, as well as the rights of the people of the State to enjoy a water supply free from unacceptable health risk, taste, odor, pollution and contamination.

181.    Each Defendant, except Lyondell, has, at all times relevant to this action, caused, maintained, participated in and/or assisted in the creation of such public nuisance. Among other things, each Defendant except Lyondell is a substantial contributor to such public nuisance as follows:

(a)     All the Defendants, other than Lyondell, refined, marketed and/or otherwise supplied gasoline containing MTBE in the State (and areas affecting the waters of the State), when they knew, or reasonably should have known, that: (i) such gasoline would be placed into leaking gasoline storage and delivery systems; (ii) MTBE would be released even more readily than the constituents of conventional gasoline from gasoline storage and delivery systems; and (iii) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate ground water, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

(b)     Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Shell, Sunoco, Valero, BP, Unocal, and ARCO had first-hand knowledge

44

and experience regarding leaking gasoline storage and delivery systems and release of MTBE to ground water therefrom. These Defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or controlled individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in the State.

(c)    Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Valero, BP, Unocal, ARCO, and Equilon engaged in separate and joint activities to suppress, conceal and/or minimize information regarding the hazards of MTBE in order to mislead government agencies, including plaintiff DEP, and the public, regarding the hazards of MTBE.

182.    The public nuisance caused, contributed to, maintained, and/or participated in by the Defendants has caused and/or threatens to cause substantial injury to the waters of the State, in which the State has significant property rights, trust responsibilities, and statutory obligations.

183.    The contamination of the waters of the State with MTBE alleged herein has varied over time and has not yet ceased. MTBE continues to threaten, migrate into and enter the waters of the State.

184.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, plaintiffs DEP and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

(a)    the investigation and cleanup and removal of the discharged MTBE;

(b)    the restoration of waters of the State contaminated by discharges of MTBE and gasoline containing MTBE; and

45

(c)     the institution of corrective measures including monitoring of all public and private drinking water supplies for the presence of MTBE, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

185.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, plaintiffs DEP and the Administrator have sustained, are sustaining, and will sustain, other substantial expenses for which the Defendants are jointly and severally liable.

186.    The injuries to the waters of the State caused and/or threatened by the Defendants' acts and omissions as alleged herein are indivisible.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs DEP and the Administrator pray that this Court:

a.     Enter declaratory judgment against the Defendants, jointly and severally, for all costs to abate the nuisance, including the costs to investigate, clean up and remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the State so that such waters are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State;

46

b.    Enter an order assessing the Defendants for all reasonable costs incurred related to the abatement of the nuisance, including the costs of investigation, cleanup and removal, restoration, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

(1)    past and future testing all public and private drinking water supplies for the presence of MTBE;

(2)    past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)    past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

c.    Enter an order assessing the Defendants for all reasonable costs that will be incurred related to abatement of the nuisance, including the costs of the investigation, cleanup and removal, restoration, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

(1)    past and future testing all public and private drinking water supplies for the presence of MTBE;

(2)    past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

47

(3)   past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

d.   Enter an order assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

e.   Enter an order assessing the Defendants for all other costs sustained by plaintiffs DEP and the Administrator as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses incurred or to be incurred to abate the nuisance;

f.   Enter an order against the Defendants for all appropriate injunctive relief to investigate, abate, and mitigate the MTBE contamination of waters of the State;

g.   Enter an order against the Defendants requiring them to compensate plaintiffs DEP and the Administrator to the extent the Defendants have been, or will be, unjustly enriched;

h.   Enter an order assessing the Defendants for punitive damages in an amount to be determined by this Court;

i.   Award plaintiffs DEP and the Administrator costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

j.   Award plaintiffs DEP and the Administrator such other relief as this Court deems appropriate.

48

## COUNT III

**(Strict Liability Under N.J.S.A. 58:10-23.11 to -23.24 Against All Defendants)**

187.   The Plaintiffs reallege paragraphs 1 through 186 above, and by this reference incorporate them as though set forth in full.

188.   Each Defendant is a "person" within the meaning of N.J.S.A. 58:10-23.11b.

189.   MTBE is a hazardous substance as defined in N.J.S.A. 58:10-23.11b.

190.   The discharge of any hazardous substance into the waters of the State, or onto the lands of the State, is prohibited.  N.J.S.A. 58:10-23.11c.

191.   Except as otherwise exempted under N.J.S.A. 58:10-23.11g.12, the discharge of hazardous substances is a violation of the Spill Act, for which any person who is the discharger of, or is in any way responsible for, any hazardous substance that is discharged, is strictly liable, jointly and severally, without regard to fault.  N.J.S.A. 58:10-23.11g.c.(1).

192.   Except as otherwise provided in N.J.S.A. 58:10-23.11g.12, any person who discharges a hazardous substance, or is in any way responsible for any hazardous substance that is discharged, shall be strictly liable, jointly and severally, without regard to fault for all cleanup and removal costs no matter by whom incurred.  N.J.S.A. 58:10-23.11g.(c).  Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by plaintiff DEP or a local unit pursuant to N.J.S.A. 58:10-23.11f.

193.   The Defendants are in any way responsible for MTBE and gasoline containing MTBE that was discharged into the waters or onto the land of the State in violation of N.J.S.A. 58:10-23.11 to -23.24.

194.    As a direct or indirect result of such violations, plaintiffs DEP and the Administrator have incurred, are incurring, and will continue to incur substantial costs including costs relating to:

(a)    the investigation and cleanup and removal of the discharged MTBE;

(b)    the restoration of waters of the State contaminated by discharges of MTBE and gasoline containing MTBE;

(c)    the compensation of the citizens of New Jersey for the lost interim value and benefits of the waters of the State as a result of the contamination of such waters with MTBE; and

(d)    the institution of corrective measures including monitoring of all public and private drinking water supplies for the presence of MTBE, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

195.    The costs and damages plaintiffs DEP and the Administrator have incurred, and will incur, are "cleanup and removal costs" within the meaning of N.J.S.A. 58:10-23.11b.

196.    The Defendants are strictly, jointly and severally liable for any and all such cleanup and removal costs and damages that plaintiffs DEP and the Administrator have incurred, are incurring, and will incur, as a result of the Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs DEP and the Administrator pray that this Court:

a.      Enter declaratory judgment against the Defendants, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor and otherwise respond to the discharge of MTBE into the waters of the State so that such waters are restored to their original condition, and for all other relief to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State.

b.      Enter an order assessing the Defendants for all reasonable costs incurred related to investigation, cleanup and removal, treatment, monitoring, and restoration, directly or indirectly resulting from the discharge of MTBE into the waters of the State, including the costs of:

      (1)      past and future testing of all public and private drinking water supplies for the presence of MTBE;

      (2)      past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

      (3)      past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

c.      Enter an order assessing the Defendants for all reasonable costs that will be incurred related to the investigation, cleanup and removal, restoration, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

51

(1)     past and future testing of all public and private drinking water supplies for the presence of MTBE;

(2)     past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)     past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

d.     Enter an order assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

e.     Enter an order assessing the Defendants for all other damages sustained by plaintiffs DEP and the Administrator as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the State.

f.     Enter an order against the Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State;

g.     Award plaintiffs DEP and the Administrator costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

h.     Award plaintiffs DEP and the Administrator such other relief as this Court deems appropriate.

52

## COUNT IV

### (Strict Liability Under N.J.S.A. 58:10A-1 to -35 Against All Defendants)

197.    The Plaintiffs reallege paragraphs 1 through 196 above and by reference incorporate them as though set forth in full.

198.    Each Defendant is a "person" within the meaning of N.J.S.A. 58:10A-3.

199.    MTBE and gasoline containing MTBE are "pollutants" as defined in N.J.S.A. 58:10A-3.

200.    Except as otherwise exempted pursuant to N.J.S.A. 58:10A-6d. and p., it is unlawful for any person to discharge any pollutant except to the extent the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit issued by plaintiff Commissioner pursuant to the Water Pollution Control Act, or pursuant to a valid National Pollutant Discharge Elimination System permit issued pursuant to the federal Water Pollution Control Act, 33 U.S.C.A. §§ 1251 to - 1387. N.J.S.A. 58:10A-6a.

201.    The unauthorized discharge of pollutants is a violation of the Water Pollution Control Act for which any person who is the discharger is strictly liable, without regard to fault. N.J.S.A. 58:10A-6a.

202.    Certain of the Defendants discharged pollutants to the waters of the State within the meaning of N.J.S.A. 58:10A-3e., which pollutants included MTBE and gasoline containing MTBE.

203.    As a direct or indirect result of such violations, plaintiff DEP has incurred, is incurring, and will continue to incur substantial costs including costs relating to:

(a)    the investigation and cleanup and removal of the discharged MTBE;

53

(b)    the restoration of waters of the State contaminated by discharges of MTBE and gasoline containing MTBE;

(c)    the compensation of the citizens of New Jersey for the lost interim value and benefits of the waters of the State as a result of the contamination of such waters with MTBE; and

(d)    the institution of corrective measures including monitoring of all public and private drinking water supplies for the presence of MTBE, provision of interim water supplies to residents whose water supplies have been contaminated due to such discharges, the establishment of acceptable sources of potable water to injured members of the public, and other necessary remedial actions, all at significant expense, loss, and damage.

204.    Plaintiff DEP also has incurred, and will continue to incur, costs and damages, including compensatory damages and all other actual damages for waters of the State that have been, or may be, lost or destroyed as a result of the discharge of MTBE and gasoline containing MTBE.

205.    The costs and damages plaintiff DEP has incurred, and will incur, are recoverable within the meaning of N.J.S.A. 58:10A-10c.(2)-(4).

206.    Certain of the Defendants discharged pollutants, which discharges were neither permitted pursuant to N.J.S.A. 58:10A-6a., nor exempted pursuant to N.J.S.A. 58:10A-6d. or N.J.S.A. 58:10A-6p., and are liable, without regard to fault, for all costs and damages, including compensatory damages and all other actual damages for waters of the State that have been, or may be, lost or destroyed as a result of the discharge of MTBE and gasoline containing MTBE. N.J.S.A. 58:10A-6a.

207.    Pursuant to <u>N.J.S.A.</u> 58:10A-10c., plaintiff Commissioner may bring an action in the Superior Court for injunctive relief, <u>N.J.S.A.</u> 58:10A-10c.(1); for the reasonable costs of any investigation, inspection, or monitoring survey which led to establishment of the violation, including the costs of preparing and litigating the case, <u>N.J.S.A.</u> 58:10c.(2); for any reasonable cost incurred by the State in removing, correcting, or terminating the adverse effects upon water quality resulting from any unauthorized discharge of pollutants for which action under this subsection may have been brought, <u>N.J.S.A.</u> 58:10A-10c.(3); for compensatory damages and any other actual damages for any natural resource of this State, including waters of the State, that has been, or may be, lost or destroyed as a result of the unauthorized discharge of pollutants, <u>N.J.S.A.</u> 58:10A-10c.(4); and for the actual amount of any economic benefits accruing to the violator from any violation, including savings realized from avoided capital or noncapital costs resulting from the violation, the return earned or that may be earned on the amount of avoided costs, any benefits accruing as a result of a competitive market advantage enjoyed by reason of the violation, or any other benefit resulting from the violation, <u>N.J.S.A.</u> 58:10A-10c.(5).

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, plaintiff Commissioner prays that this Court:

a.    Enter declaratory judgment against the Defendants, jointly and severally, for all costs to investigate, clean up and remove, restore, replace, treat, monitor and otherwise respond to the discharge of MTBE into the waters of the State so that such waters are restored to their original condition, and for all other relief to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State;

55

b.    Enter an order assessing the Defendants for all reasonable costs incurred related to investigation, cleanup and removal, treatment, monitoring, restoration, and replacement directly or indirectly resulting from the discharge of MTBE into the waters of the State, including the costs of:

(1)    past and future testing of all public and private drinking water supplies for the presence of MTBE;

(2)    past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)    past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

c.    Enter an order assessing the Defendants for all reasonable costs that will be incurred related to the investigation, cleanup and removal, restoration, replacement, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

(1)    past and future testing of all public and private drinking water supplies for the presence of MTBE;

(2)    past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)      past and future monitoring of other waters of the State to

detect the presence of MTBE and restoration of such waters to their pre-

discharge condition;

d.      Enter an order assessing the Defendants for all damages in an amount at

least equal to the full cost of restoring the waters of the State to their original

condition prior to the contamination of such waters with MTBE and for the

economic benefit enjoyed by such Defendants due to their violation of the Water

Pollution Control Act;

e.      Enter an order assessing the Defendants for all other damages sustained as

a direct and proximate result of the Defendants' acts and omissions alleged herein,

including   remedial,   administrative,   oversight   and   legal   expenses   and

compensation for damage to waters of the State.

f.      Enter an order against the Defendants for all appropriate injunctive relief

to abate or mitigate the MTBE contamination of waters of the State;

g.      Award plaintiff Commissioner her costs and fees in this action, including

reasonable attorneys' fees, incurred in prosecuting this action, together with

prejudgment interest, to the full extent permitted by law; and

h.      Award plaintiff Commissioner such other relief as this Court deems

appropriate.

## COUNT V

### (Trespass Against All Defendants)

208.    The Plaintiffs reallege paragraphs 1 through 207 above, and by this reference

incorporate them as though set forth in full.

57

209.    The State is the owner and actual possessor of property rights and interests in the waters of the State, which the State also holds in trust for the benefit of its citizens.  The State is in exclusive possession of these waters with the exception of times when the State grants a permit for certain limited uses of such waters.  These property rights and interests include, but are not limited to, plaintiff DEP's control over waters of the State and plaintiffs DEP's and the Administrator's statutory responsibilities to protect the quality of such waters from contamination and pollution.

210.    The Defendants manufactured, refined, marketed and/or otherwise supplied MTBE and/or gasoline containing MTBE.

211.    Among other things, the Defendants caused MTBE to enter, invade, intrude upon and injure the waters of the State, trespassing upon the State's exclusive possession of such waters, as follows:

(a)    Defendant Lyondell manufactured, promoted and supplied MTBE to refiners when it knew that it was substantially certain that: (i) the refiners would in turn blend the MTBE into gasoline; (ii) such gasoline containing MTBE would then be placed into leaking gasoline storage and delivery systems, including those in the State; (iii) MTBE would be discharged even more readily than the constituents of conventional gasoline from gasoline storage and delivery systems; and (iv) when discharged into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the State, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

58

(b)     The other Defendants refined, marketed and/or otherwise supplied gasoline containing MTBE that was delivered into the State (or areas affecting the waters of the State), when they knew that: (i) such gasoline would be placed into leaking gasoline storage and delivery systems; (ii) MTBE would be discharged even more readily than the constituents of conventional gasoline from gasoline storage and delivery systems; and (iii) when discharged into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate ground water, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

(c)     Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Shell, Sunoco, Valero, BP, Unocal, and ARCO had first-hand knowledge and experience regarding leaking gasoline storage and delivery systems and discharges of MTBE to ground water therefrom.  These Defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or controlled individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in the State.

(d)     The Defendants manufactured, refined, marketed, promoted and/or otherwise supplied MTBE to downstream handlers when they knew that it was substantially certain that MTBE would: (i) be discharged into the environment from commercial and consumer uses and sources in the State other than gasoline storage and delivery systems; and (ii) contaminate the waters of the State.

(e)     Despite their knowledge that water contamination with MTBE was the inevitable consequence of their conduct as alleged herein, the Defendants failed to

provide any warnings or special instructions, or take any other precautionary measures to prevent or mitigate such contamination.

(f)     Defendants Hess, Citgo, Chevron, ConocoPhillips, ExxonMobil, Gulf, Lyondell, Shell, Sunoco, Valero, BP, Unocal, ARCO, and Equilon engaged in separate and joint activities to suppress, conceal and/or minimize information regarding the hazards of MTBE in order to mislead government agencies and officials, including the Plaintiffs, and the public regarding the hazards of MTBE.

212.     The contamination of the waters of the State with MTBE alleged herein has varied over time and has not yet ceased.  MTBE continues to threaten, migrate into and enter the waters of the State.

213.     The State has not consented to, and does not consent to, the trespass alleged herein.  The Defendants knew or reasonably should have known that the State would not consent to this trespass.

214.     As a direct and proximate result of the Defendants' acts and omissions, plaintiffs DEP and the Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, restoration, treatment, and monitoring costs and expenses related to contamination of the waters of the State with MTBE, for which the Defendants are jointly and severally liable.

215.     As a further direct and proximate result of the acts and omissions of the Defendants, plaintiffs DEP and the Administrator have sustained and will sustain other substantial expenses and damages, for which the Defendants are jointly and severally liable.

216.     The injuries to the waters of the State caused and/or threatened by the Defendants' acts and omissions as alleged herein are indivisible.

60

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs DEP and the Administrator pray that this Court:

a.      Enter declaratory judgment against the Defendants, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor and otherwise respond to the discharge of MTBE into the waters of the State so that such waters are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State.

b.      Enter an order assessing the Defendants for all reasonable costs incurred related to investigation, cleanup and removal, treatment, monitoring, and restoration, directly or indirectly resulting from the discharge of MTBE into the waters of the State, including the costs of:

(1)      past and future testing of all public and private drinking water supplies for the presence of MTBE;

(2)      past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)      past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

c.      Enter an order assessing the Defendants for all reasonable costs that will be incurred related to the investigation, cleanup and removal, restoration,

61

treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

> (1)    past and future testing of all public and private drinking water supplies for the presence of MTBE;

> (2)    past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

> (3)    past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

d.    Enter an order assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

e.    Enter an order assessing the Defendants for all other damages sustained by Plaintiffs DEP and the Administrator as a direct and proximate result of the Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the State;

f.    Enter an order against the Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State;

g.    Enter an order assessing the Defendants for punitive damages in an amount to be determined by this Court;

h.      Enter an order against the Defendants requiring them to compensate plaintiffs DEP and the Administrator to the extent the Defendants have been, or will be, unjustly enriched;

i.      Award plaintiffs DEP and the Administrator costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

j.      Award plaintiffs DEP and the Administrator such other relief as this Court deems appropriate.

## COUNT VI

### (Negligence Against All Defendants)

217.    The Plaintiffs reallege paragraphs 1 through 216 above, and by this reference incorporate them as though set forth in full.

218.    The Defendants had a duty to plaintiffs DEP and the Administrator to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

219.    Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise distributed MTBE and gasoline containing MTBE that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the State, resulting in the damages alleged in this Complaint.

220.    The Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute public water supplies,

render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

221. Defendant Lyondell, among other things, manufactured, promoted and/or otherwise supplied MTBE to refiners when it knew, or reasonably should have known, that:

      (a)    the refiners would in turn blend the MTBE into gasoline;

      (b)    such gasoline containing MTBE would then be placed into leaking gasoline storage and delivery systems, including those in the State;

      (c)    MTBE would be discharged even more readily than the constituents of conventional gasoline from gasoline storage and delivery systems; and

      (d)    when discharged into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the State, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

222. The other Defendants among other things, refined, marketed and/or otherwise supplied gasoline containing MTBE that was delivered into the State and/or in areas affecting waters of the State, when they knew, or reasonably should have known, that:

      (a)    such gasoline would be placed into leaking gasoline storage and delivery systems;

      (b)    MTBE would be discharged even more readily than the constituents of conventional gasoline from gasoline storage and delivery systems; and

      (c)    when discharged into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate

waters of the State, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

223.    Defendants Hess, Citgo, Chevron, ConocoPhillips, El Paso, ExxonMobil, Gulf, Shell, Sunoco, Valero, BP, Unocal, and ARCO also had first-hand knowledge and experience regarding leaking gasoline storage and delivery systems and releases of MTBE to ground water therefrom.  These Defendants obtained such first-hand knowledge and experience because each of them owned, operated and/or controlled individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in the State.

224.    The Defendants manufactured, refined, marketed, promoted and/or otherwise supplied MTBE and/or gasoline containing MTBE to downstream handlers when they knew, or reasonably should have known, that MTBE would: (a) be discharged into the environment from commercial and consumer uses and sources in the State other than gasoline storage and delivery systems; and (b) contaminate the waters of the State.

225.    Despite their knowledge that water contamination with MTBE was the inevitable consequence of their conduct as alleged herein, the Defendants failed to provide any warnings or special instructions, or take any other precautionary measures to prevent or mitigate such contamination.

226.    In light of the facts alleged herein, the Defendants breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or gasoline containing MTBE.

227.    As a direct and proximate result of the Defendants' acts and omissions as alleged herein, plaintiffs DEP and the Administrator have incurred, are incurring, and will continue to incur investigation, cleanup and removal, treatment, monitoring, and restoration costs and

expenses related to contamination of the waters of the State with MTBE, for which the Defendants are jointly and severally liable.

228.   As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, plaintiffs DEP and the Administrator have sustained and will sustain other substantial expenses and damages for which the Defendants are jointly and severally liable.

229.   The injuries to the waters of the State caused and/or threatened by the Defendants' acts and omissions as alleged herein are indivisible.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs DEP and the Administrator pray that this Court:

a.   Enter declaratory judgment against the Defendants, jointly and severally, for all costs to investigate, clean up and remove, restore, treat, monitor and otherwise respond to the discharge of MTBE into the waters of the State so that such waters are restored to their original condition, and for all damages to compensate the citizens of New Jersey for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the State;

b.   Enter an order assessing the Defendants for all reasonable costs incurred related to investigation, cleanup and removal, treatment, monitoring, and restoration, directly or indirectly resulting from the discharge of MTBE into the waters of the State, including the costs of:

(1)   past and future testing of all public and private drinking water supplies for the presence of MTBE;

66

(2)     past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)     past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

c.     Enter an order assessing the Defendants for all reasonable costs that will be incurred related to the investigation, cleanup and removal, restoration, treatment, and monitoring, directly or indirectly resulting from the contamination of the waters of the State with MTBE, including the costs of:

(1)     past and future testing of all public and private drinking water supplies for the presence of MTBE;

(2)     past and future treatment of all drinking water supplies containing detectable levels of MTBE until restored to non-detectable levels and provision of alternate water supplies, where appropriate; and

(3)     past and future monitoring of other waters of the State to detect the presence of MTBE and restoration of such waters to their pre-discharge condition;

d.     Enter an order assessing the Defendants for all damages in an amount at least equal to the full cost of restoring the waters of the State to their original condition prior to the contamination of such waters with MTBE;

e.     Enter an order assessing the Defendants for all other damages sustained by plaintiffs DEP and the Administrator as a direct and proximate result of the

67

Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the State.

f.        Enter an order against the Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the State;

g.        Enter an order against the Defendants requiring them to compensate plaintiffs DEP and the Administrator to the extent the Defendants have been, or will be, unjustly enriched;

h.        Award plaintiffs DEP and the Administrator their costs and fees in this action, including reasonable attorneys' fees, incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.        Award plaintiffs DEP and the Administrator such other relief as this Court deems appropriate.

Plaintiffs are entitled to a trial by a jury and hereby demand a trial by a jury.

MILLER & AXLINE, APC
Attorneys for Plaintiffs
Special Counsel to the
Attorney General

By _____

   MICHAEL AXLINE, Esq.
   Special Counsel to the
   Attorney General
   1050 Fulton Ave., Ste. 100
   Sacramento, CA 95825
   Phone-(916) 488-6688
   Fax-(916) 488-4288


Dated: _____6/28/16_____

CHRISTOPHER S. PORRINO,
ACTING ATTORNEY GENERAL
Attorney for Plaintiffs

By: _____

   GWEN FARLEY, Esq.
   Deputy Attorney General
   R.J. Hughes Justice Complex
   25 Market St., PO Box 093
   7th Floor, West Wing
   Trenton, NJ 08625-0093
   Phone-(609) 984-4863
   Fax-(609) 984-9315

Dated: _____6/28/16_____

68

COHN, LIFLAND, PEARLMAN,
HERMANN & KNOPF, L.L.P.
Attorneys for Plaintiffs

LAW OFFICES OF JOHN K. DEMA, P.C.
Attorneys for Plaintiffs
Special Counsel to the
Attorney General

69

# EXHIBIT 2

| From: | Tuite, Jim |
|---|---|
| To: | Michael D. Axline (maxline@toxictorts.org) |
| Cc: | Molly McGinley Han (mhan@toxictorts.org); "Kathy Herron"; Matthew G. Parisi (MParisi@bpslaw.com); Katchen, Katherine Menapace |
| Subject: | New Jersey MTBE Litigation - Proposed Amended Complaint |
| Date: | Friday, June 10, 2016 9:26:27 AM |

Mike,

This email confirms the agreements reached during the telephone conversation that you, Matt Parisi, and I had yesterday.

First, Lukoil Americas Corporation, Lukoil North America LLC, Lukoil Pan Americas, LLC, and PJSC (formerly OAO) Lukoil agree that the State of New Jersey may file the proposed amended complaint in the New Jersey MTBE MDL without having to file a motion for leave to amend. The proposed amended complaint to which I refer was attached to your letter dated May 17, 2016.

Second, the consent given by the Lukoil entities is to the filing of the amended complaint only. The consent does not limit in any way the rights of the Lukoil entities to dispute and/or seek dismissal of the allegations and claims contained in the proposed amended complaint.

Third, the State of New Jersey understands and agrees that, while the Lukoil entities have consented to the filing of the proposed amended complaint without motion, they have otherwise reserved all rights with respect to their ability to dispute and/or seek dismissal of the amended complaint. The State of New Jersey also agrees that it will acknowledge the Lukoil entities' reservation of rights in the cover letter it submits to the court with the proposed amended complaint. Before submitting the cover letter and filing the proposed amended complaint, the State of New Jersey will give the Lukoil entities a reasonable opportunity to review the cover letter and make changes to it that are consistent with the agreements memorialized in this email.

Fourth, the State of New Jersey agrees that it will consent to any reasonable extension of time to respond (by Answer or motion) to the amended complaint requested by the Lukoil entities.

Please confirm as soon as you can that this email accurately expresses the agreements that the parties reached during their telephone conference yesterday.

Jim

**James P. Tuite**
**AKIN GUMP STRAUSS HAUER & FELD** LLP
1333 New Hampshire Avenue, N.W. | Washington, DC 20036-1564 | USA | Direct: +1 202.887.4406 | Internal: 24406
Fax: +1 202.887.4288 | jtuite@akingump.com | akingump.com | Bio

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

1

**PROOF OF SERVICE VIA LEXISNEXIS FILE & SERVE**
*New Jersey Department of Environmental Protection, et al. v. Atlantic Richfield Co., et al.*

2    United States District Court, Southern District of New York, Case No. 08 Civ. 00312 (SAS)

3        I, the undersigned, declare that I am, and was at the time of service of the paper(s) herein
referred to, over the age of 18 years and not a party to this action.  My business address is 1050

4    Fulton Avenue, Suite 100, Sacramento, CA  95825-4225.

5        On the date below, I served the following document on all counsel in this action
electronically through LexisNexis File & Serve:

6

7

**PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE
FIFTH AMENDED COMPLAINT**

8        I declare under penalty of perjury under the laws of the United States of America and the
State of California that the foregoing is true and correct.

9

10        Executed on June 28, 2016, at Sacramento, California.

11

12                                          KATHY HERRON

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28