# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE; METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | * * * * | Master File No. 1:00-1898 MDL NO. 1358 (SAS) |
| This document relates to | * * | **SECOND AMENDED COMPLAINT** |
| *Commonwealth of Pennsylvania, etc. v. Exxon Mobil Corporation, et al*, No. 1:14-cv-06228-SAS | * * | |

---

**THE COMMONWEALTH OF PENNSYLVANIA**, by and through Pennsylvania Attorney General Kathleen G. Kane, the Pennsylvania Insurance Department, the Pennsylvania Department of Environmental Protection and the Pennsylvania Underground Storage Tank Indemnification Fund,

Plaintiff,

v.

**EXXON MOBIL CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation, ExxonMobil Refining & Supply Corporation, and Exxon Company, U.S.A.;

**EXXONMOBILOIL CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Mobil Oil Corporation;

**EXXON COMPANY, U.S.A.**, individually and as d/b/a, a/k/a and/or as predecessor in liability to ExxonMobil Corporation

1

and/or ExxonMobil Oil Corporation;

**EXXONMOBIL REFINING & SUPPLY COMPANY,** individually and as d/b/a, a/k/a and as predecessor in liability to ExxonMobil Corporation and/or ExxonMobil Oil Corporation;

**MOBIL OIL CORPORATION,** individually and as predecessor in liability to ExxonMobil Oil Corporation;

**AMERICAN REFINING GROUP, INC.;**

**ATLANTIC RICHFIELD COMPANY,** individually and as f/k/a, d/b/a and/or successor in liability to Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware Corporation;

**BP AMERICA INC.,** individually and as f/k/a, d/b/a and/or successor in liability to BP Products North America Inc., BP West Coast Products LLC, Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation;

**BP AMOCO CHEMICAL COMPANY,** individually and as f/k/a, d/b/a and/or successor in liability to Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation;

**BP HOLDINGS NORTH AMERICA LIMITED,** individually and as f/k/a, d/b/a and/or successor in liability to BP America Inc., BP Products North America Inc., BP West Coast Products LLC,

2

Atlantic Richfield Company, BP Amoco
Corporation, Amoco Corporation, Amoco
Oil Company, BP Exploration & Oil Inc.,
Sohio Oil Company, Standard Oil of Ohio
(SOHIO), Standard Oil (Indiana), BP
Amoco plc, BP Oil Inc., BP Oil Company,
Atlantic Richfield Delaware Corporation,
Atlantic Richfield Company (a
Pennsylvania corporation), ARCO
Products Company, ARCO Chemical
Company, a division of Atlantic Richfield
Company, and ARCO Chemical
Company, a Delaware corporation;

**BP p.l.c.**, individually and as f/k/a, d/b/a
and/or successor in liability to BP
Holdings North America Limited, BP
America Inc., BP Products North America
Inc., BP West Coast Products LLC,
Atlantic Richfield Company, BP Amoco
Corporation, Amoco Corporation, Amoco
Oil Company, BP Exploration & Oil Inc.,
Sohio Oil Company, Standard Oil of Ohio
(SOHIO), Standard Oil (Indiana), BP
Amoco plc, BP Oil Inc., BP Oil Company,
Atlantic Richfield Delaware Corporation,
Atlantic Richfield Company (a
Pennsylvania corporation), ARCO
Products Company, ARCO Chemical
Company, a division of Atlantic Richfield
Company, and ARCO Chemical
Company, a Delaware corporation;

**BP PRODUCTS NORTH AMERICA
INC.**, individually and as f/k/a, d/b/a
and/or successor in liability to BP Amoco
Corporation, Amoco Corporation, Amoco
Oil Company, BP Exploration & Oil Inc.,
Sohio Oil Company, BP Oil Inc., BP Oil
Company, and BP North America
Petroleum;

**BP WEST COAST PRODUCTS LLC**,
individually and as f/k/a, d/b/a and/or
successor in liability to Atlantic Richfield
Company, Atlantic Richfield Company (a
Pennsylvania corporation), and ARCO
Products Company;

**BUCKEYE REFINING COMPANY,**

**LLC**, individually and as d/b/a, a/k/a and as predecessor in liability to Kinder Morgan Transmix Company, LLC;

**CHEVRON CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Chevron U.S.A. Inc., Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company;

**CHEVRON U.S.A. INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company;

**CITGO PETROLEUM CORPORATION**;

**CITGO REFINING AND CHEMICALS COMPANY L.P.**;

**COASTAL EAGLE POINT OIL COMPANY**;

**CONOCOPHILLIPS**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips 66, Phillips 66 Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**CONOCOPHILLIPS COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**CROWN CENTRAL LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Crown Central Petroleum Corporation;

**CUMBERLAND FARMS, INC.**;

**DEER PARK REFINING LIMITED PARTNERSHIP**;

**DUKE ENERGY MERCHANTS, LLC**;

**EL PASO MERCHANT ENERGY-PETROLEUM COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Coastal Refining and Marketing, Inc. and Coastal States

4

Trading, Inc.;

**ENERGY MERCHANT, LLC;**

**ENERGY TRANSFER PARTNERS,
L.P.,** individually and as f/k/a, d/b/a
and/or successor in liability to ETP
Holdco Corporation, Sunoco, Inc., Sun Oil
Company (PA) and Sun Oil Company;

**EQUILON ENTERPRISES LLC,**
individually and as f/k/a, d/b/a and/or
successor to Shell Oil Products US, Shell
Oil Products Company LLC, Shell Oil
Company, and Texaco Refining and
Marketing Inc.;

**ETP HOLDCO CORPORATION,**
individually and as f/k/a, d/b/a and/or
successor in liability to Sunoco, Inc., Sun
Oil Company (PA) and Sun Oil Company;

**GEORGE E. WARREN
CORPORATION;**

**GETTY PETROLEUM MARKETING
INC.,** individually and a/k/a and d/b/a
OAO Lukoil, Lukoil Americas
Corporation and as predecessor in liability
to Lukoil North Americas, and as
successor in liability to Getty Properties
Corporation a/k/a Getty Realty
Corporation;

**GETTY PROPERTIES
CORPORATION,** individually and a/k/a
and d/b/a Getty Realty Corporation;

**GULF OIL LIMITED PARTNERSHIP;**

**GUTTMAN REALTY COMPANY,**
individually and a/k/a, f/k/a, d/b/a, and/or
successor in liability to Bulk Terminal
Storage;

**HARTREE PARTNERS, LP,** individually
and a/k/a, f/k/a, d/b/a, and/or successor-in-
liability to Hess Energy Trading
Company, LLC;

**HESS ENERGY TRADING COMPANY,
LLC,** individually and a/k/a, d/b/a Hartree
Partners, LP;

**HESS CORPORATION,** individually and
as f/k/a, d/b/a and/or successor in liability
to Amerada Hess Corporation;

**HESS OIL VIRGIN ISLANDS**

**CORPORATION;**

**KINDER MORGAN, INC.,** individually and as f/k/a, d/b/a and/or successor in liability to El Paso Holdco LLC, El Paso Corporation, El Paso CGP Company LLC, El Paso Remediation Company, Coastal Corporation, Coastal Holding Corporation, CIC Industries Inc., Coastal Refining & Marketing Inc., Coastal Fuels Marketing Inc., Coastal Mart Inc., Derby Refining Co., Union Petroleum Corporation, Belcher Oil Company, Pester Marketing Company, and Coastal Branded Marketing, Inc.;

**LUKOIL AMERICAS CORPORATION,** individually and as f/k/a, d/b/a and/or successor in liability to Getty Petroleum Marketing Inc., Lukoil North America LLC and/or Lukoil Oil Company;

**LUKOIL NORTH AMERICA LLC,** individually and as f/k/a, d/b/a and/or successor in liability to Getty Petroleum Marketing Inc., Lukoil Americas Corporation and/or OAO Lukoil;

**LUKOIL OIL COMPANY,** a/k/a OAO Lukoil a/k/a Public Joint Stock Company Oil Company Lukoil a/k/a PJSC Oil Company Lukoil, individually and as f/k/a, d/b/a and/or successor in liability to Getty Petroleum Marketing Inc., Lukoil Americas Corporation and/or Lukoil North America, LLC;

**LUKOIL PAN AMERICAS, LLC;**

**MARATHON OIL CORPORATION,** individually and as f/k/a, d/b/a and/or successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum Corporation, Marathon Holdings, and Marathon Pipeline;

**MARATHON PETROLEUM COMPANY LP,** individually and as f/k/a, d/b/a and/or successor in liability to Marathon Petroleum Company, LLC and Marathon Ashland Petroleum Company LLC;

**MARATHON PETROLEUM**

6

**CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum, Marathon Holdings, and Marathon Pipeline;

**MOTIVA ENTERPRISES LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Shell Oil Products Company, LLC, Shell Oil Products Company, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East);

**NUSTAR TERMINALS OPERATIONS PARTNERSHIP LP**, individually and as f/k/a, d/b/a and/or successor in liability to Support Terminals Operating Partnership, LP and ST Services, Inc.;

**PENNZOIL COMPANY**, individually and as a/k/a, f/k/a, d/b/a and successor in liability to South Penn Oil Company, SOPUS Products and Equilon Enterprises LLC;

**PENNZOIL-QUAKER STATE COMPANY**, individually and as a/k/a, f/k/a, d/b/a and successor in liability to South Penn Oil Company and Pennzoil Company;

**PETROLEUM PRODUCTS CORPORATION;**

**PHILLIPS 66**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**PHILLIPS 66 COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**THE PREMCOR REFINING GROUP INC.;**

**PREMCOR USA INC.;**

**SHELL OIL COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability

7

to Deer Park Refining LP, Shell Oil, Shell
Oil Products, Shell Chemical, Shell
Trading US, Shell Energy Services,
Texaco Inc., The Pennzoil Company and
Pennzoil-Quaker State Company;

**SHELL OIL PRODUCTS COMPANY
LLC**, individually and as f/k/a, d/b/a
and/or successor in liability to Shell Oil
Products Company;

**SHELL TRADING (US) COMPANY;
STAR ENTERPRISE LLC;
SUN COMPANY, INC.**, individually and
as f/k/a, d/b/a and/or successor in liability
to Sunoco Inc.;

**SUNOCO, INC.**, individually and as f/k/a,
d/b/a and/or successor in liability to Sun
Oil Company (PA) and Sun Oil Company;

**SUNOCO, INC. (R&M)**, individually and
as f/k/a, d/b/a and/or successor in liability
to Sun Company, Inc. (R&M), Sun
Refining and Marketing Company, and
Sun Oil Company of Pennsylvania;

**SUNOCO PARTNERS MARKETING &
TERMINALS L.P.;
TEXACO INC.**, individually and as f/k/a,
d/b/a and/or successor in liability to
Texaco Refining and Marketing Inc.;

**TMR COMPANY,** individually and as
f/k/a, d/b/a and/or successor in liability to
Texaco Refining and Marketing Inc. and
TRME Company (f/k/a Texaco Refining
and Marketing (East), Inc.);

**TRMI-H LLC,** individually and as f/k/a,
d/b/a and/or successor in liability to TRMI
Holdings Inc., Texaco Refining and
Marketing Inc., Getty Refining and
Marketing Company, and Getty Oil
Company (Eastern Operations), Inc.;

**TOTAL PETROCHEMICALS &
REFINING USA, INC.;
TRANSMONTAIGNE PRODUCT
SERVICES, LLC;
ULTRAMAR DIAMOND SHAMROCK
CORPORATION,** individually and as
f/k/a, d/b/a, and a/k/a Diamond Shamrock
Incorporated and/or Diamond Shamrock

8

Refining and Marketing Company,
Ultramar Inc. and Valero Energy
Corporation;
**UNITED REFINING COMPANY**;
**VALERO ENERGY CORPORATION**,
   individually and as f/k/a, d/b/a and/or
   successor in liability to Premcor Inc.,
   Valero R&M, and Ultramar Diamond
   Shamrock Corporation;
**VALERO MARKETING AND SUPPLY
   COMPANY**;
**VALERO REFINING COMPANY –
   NEW JERSEY**, individually and n/k/a,
   d/b/a, a/k/a Paulsboro Refining Company,
   LLC;
**VALERO REFINING AND
   MARKETING COMPANY**;
**VITOL S.A., INC.**;
**WESTERN REFINING YORKTOWN,
   INC.**, individually and as f/k/a, d/b/a
   and/or successor in liability to Giant
   Yorktown, Inc.;
**WILCOHESS LLC**,

                              Defendants.

---

## SECOND AMENDED COMPLAINT

Plaintiff Commonwealth of Pennsylvania, by and through the Pennsylvania Attorney

General's Office, the Pennsylvania Department of Environmental Protection, the Pennsylvania

Insurance Department and the Pennsylvania Underground Storage Tank Indemnification Fund

(collectively the "Commonwealth"), files this Amended Complaint against the above-named

defendants and in support thereof alleges as follows:

### SUMMARY OF THE CASE

1.      As more specifically set forth herein, the Commonwealth brings this action to:

a.      redress injury and the threat of future injury to waters of the Commonwealth

caused by methyl tertiary butyl ether ("MTBE") and its derivative and breakdown products.

MTBE is a chemical additive used in gasoline that was widely distributed in Pennsylvania as a result of efforts of the MTBE Defendants identified below;

        b.     recover damages from the MTBE Defendants, including monies expended by the Commonwealth and its agencies (including the Pennsylvania Underground Storage Tank Indemnification Fund) ("USTIF" or the "Fund") and the Pennsylvania Department of Environmental Protection ("DEP") in investigating and remediating MTBE contamination caused by the MTBE Defendants;

        c.     recover appropriate civil penalties, restitution and other equitable relief for the MTBE Defendants' unfair and deceptive acts and practices in marketing MTBE and gasoline containing MTBE ("MTBE gasoline") in Pennsylvania (the foregoing collectively the "MTBE Claims"); and

        d.     recover monies paid by USTIF to the Insurance Defendants identified below (or to their contractors or vendors on those defendants' behalf) for claims relating to releases from underground storage tank systems  owned or operated by the Insurance Defendants, in instances where the  Insurance Defendants also received payment from their private insurers on the same claims (the "Insurance Claims").

<b>THE COMMONWEALTH'S MTBE CLAIMS</b>

        2.     Article I, § 27 of the Pennsylvania Constitution states: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment.  Pennsylvania's public natural resources are the common property of all the people, including generations yet to come.  As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

10

3.      The Commonwealth is vested with the authority under its Constitution and laws to protect and seek compensation and other remedies for injury, and threat of injury, to the natural resources of the Commonwealth, in its own right, in its *parens patriae* capacity on behalf of its citizens and as trustee of the Commonwealth's natural resources.

4.      The waters of the Commonwealth, both above and below ground, are an indivisible public natural resource in which the Commonwealth has substantial property and other interests and for which the Commonwealth acts as trustee for all its citizens.

5.      The Commonwealth has an interest as a sovereign in protecting the health, safety and well-being, both physical and economic, of its citizens with respect to the waters of the Commonwealth, which serve the statewide water needs of Commonwealth's citizens.

6.      The Commonwealth has the right and authority to protect, conserve, manage and redress injury, and threatened injury, to the waters of the Commonwealth for its own interests and the interests of its citizens and future generations.

7.      The injuries and threatened injuries from MTBE contamination of Pennsylvania waters are statewide and involve and affect in a substantial way a significant portion of the state's population.

8.      The Commonwealth's MTBE Claims seek to recover (i) the costs paid or incurred to date and in the future, including by USTIF and DEP, to detect, define the extent of, monitor, treat, abate, remove and/or otherwise remediate MTBE contamination and threatened contamination of groundwater and both public and private water wells (which are sourced from groundwater) throughout Pennsylvania, including the costs to restore all MTBE contaminated waters to their pre-discharge condition; (ii) damages to the waters of the Commonwealth from MTBE contamination, including the loss of use and diminution in value of waters of the

11

Commonwealth; and (iii) equitable remedies for harm caused by MTBE Defendants' unfair and deceptive acts and practices in the marketing of MTBE and MTBE gasoline.

9.     As a result of releases of MTBE from various gasoline stations and gasoline storage, transfer, delivery and dispensing systems ("gasoline storage and delivery systems"), MTBE has been detected in waters of the Commonwealth throughout the state.

10.     The waters of the Commonwealth that have been contaminated by these releases of MTBE include groundwater and other waters located directly beneath, on, or adjacent to these release sites, waters connected to waters beneath, on, or adjacent to these release sites, and public and private drinking water wells.

11.     MTBE is more persistent and mobile in groundwater than other constituents of gasoline.  As a result of these characteristics, MTBE spreads farther and contaminates more groundwater than other gasoline ingredients.

12.     MTBE can cause adverse health effects.  MTBE is a carcinogen.  MTBE can also render drinking water foul, putrid and unfit for human consumption at low concentrations.

13.     MTBE contamination has injured, continues to injure and threatens to injure the waters of the Commonwealth, and the health, safety and welfare of the citizens of Pennsylvania.

14.     MTBE Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, stored, marketed and/or otherwise supplied (directly or indirectly) MTBE and MTBE gasoline that was delivered, stored and sold in Pennsylvania (or to areas outside Pennsylvania affecting the waters of the Commonwealth) resulting in contamination of the waters of the Commonwealth.

15.     MTBE Defendants include MTBE manufacturers and MTBE gasoline refiners and major-brand gasoline marketers and distributors.  At all times relevant, MTBE Defendants

together controlled all or substantially all the entire market in Pennsylvania for MTBE and MTBE gasoline.

16.    MTBE Defendants acted as aforesaid with respect to MTBE and MTBE gasoline despite the availability of reasonable alternatives and the MTBE Defendants' actual or constructive knowledge that MTBE and MTBE gasoline was hazardous, would be released into the environment from various gasoline delivery and storage systems, and would contaminate the waters of the Commonwealth.

17.    MTBE Defendants knew or reasonably should have known that MTBE contamination would interfere with the Commonwealth's interests in protecting and preserving its public natural resources, including the waters of the Commonwealth, and otherwise impact and threaten the public health, safety and welfare, as has occurred and is continuing to occur within Pennsylvania.

18.    As a result of MTBE Defendants' acts as alleged herein, the Commonwealth has suffered damages to its water resources and has incurred and will incur costs in defining the extent of MTBE contamination throughout the state and in monitoring and remediating MTBE.

19.    MTBE Defendants are strictly liable for manufacturing and/or supplying defective products and failing to provide adequate warnings or instructions in connection with likely releases of the products.  MTBE Defendants are also liable for creating public nuisances by the foreseeable release of MTBE and MTBE gasoline into the waters of the Commonwealth, for trespass thereby upon the waters of the Commonwealth, for negligently causing damage to the waters of the Commonwealth and for all resulting damages from the release of MTBE and MTBE gasoline into the environment.  MTBE Defendants also are liable for punitive damages to reflect the aggravating circumstances of their wanton, malicious, oppressive and fraudulent

conduct as set forth herein and for civil penalties and equitable relief under the Pennsylvania

Unfair Trade Practices and Consumer Protection Law, 73 P. S. § 201-1 *et seq.*, ("UTPCPL")

based upon defendants' efforts to deceptively and unfairly market MTBE and MTBE gasoline as

safe for the environment.

### THE COMMONWEALTH'S INSURANCE CLAIMS

20.    The Pennsylvania General Assembly, through The Storage Tank and Spill

Prevention Act, Act 32 of 1989, 35 P. S. §§ 6021.101 *et seq.*, as amended ("STSPA" or "Act"),

created USTIF to assist underground storage tank ("UST") owners and operators in meeting the

financial responsibility requirements set forth in regulations established by the Pennsylvania

Department of Environmental Protection with respect to UST releases.

21.    The Insurance Defendants owned or operated USTs and associated dispensing

equipment ("UST systems") in Pennsylvania and, at all relevant times, were participants in

USTIF.

22.    Regulations adopted pursuant to the STSPA required at all times relevant that

USTIF participants be eligible for Fund coverage or corrective action costs. 25 Pa. Code § 977.1

*et seq.*  Regulations adopted pursuant to STSPA also establish release reporting, release

confirmation and corrective action requirements. 25 Pa. Code § 245.301 *et seq.*

23.    USTIF made claim payments to eligible UST owners or operators for corrective

action costs incurred as a result of an eligible claim upon the Fund.

24.    To be eligible for Fund coverage, a claimant who was a tank owner or operator

was required to meet the eligibility criteria set forth in 25 Pa. Code § 977.31, specifically:

a.    The claimant was the owner or operator of the tank which is the subject of the

claim;

14

     b.     All necessary state fees were paid;

     c.     The tank was registered as required by the Act;

     d.     The claimant had obtained all necessary permits or certifications under the Act;

     e.     The release that was the subject of the claim occurred after February 1, 1994;

     f.     The claimant cooperate, as defined in 25 Pa. Code § 977.32, with the Fund in its eligibility determination process, claims investigation, the defense of any suit, the pursuit of a subrogation action and other matters as requested; and

     g.     The claimant meet the notification requirements set forth in 25 Pa. Code § 977.34.

     25.     Pursuant to the Act, owners and operators of USTs were required to maintain financial responsibility and continuously participate in USTIF.  25 Pa Code § 245.704.

     26.     Pursuant to the Act, owners and operators are liable for corrective action costs, and nothing contained in the regulations is intended to limit or waive that liability.  25 Pa. Code § 245.705.

     27.     USTIF provided primary indemnity benefits for corrective action costs incurred as a result of an eligible claim.  25 Pa. Code § 977.38.

     28.     If a UST owner or operator fails to comply with the participant cooperation requirements set forth in 25 Pa. Code § 977.32, USTIF could deny payments on a claim.  25 Pa. Code § 977.40(b).

     29.     After any Fund payment, USTIF was subrogated to all of the rights of recovery of an owner or operator against any person for the costs of remediation or other indemnity payments by the Fund.  25 Pa. Code § 977.40(a).

     30.     All participants in USTIF, including the Insurance Defendants, were and are subject to the laws of Pennsylvania regarding indemnity claims made to the Fund, including, but

not limited to, Pennsylvania's common law, statutes, regulations and rules pertaining to the

Fund's subrogation rights and interests in or to any and all rights, actions and claims of an

insured relating to a subject indemnity claim.

31.     Each of the Insurance Defendants made one or more claims to USTIF for

indemnity payments to effect remediation of releases from their respective UST systems.  These

indemnity claims in turn resulted in the Fund making indemnity payments to the Insurance

Defendants.  Many of these UST releases were also the subject of claims by Insurance

Defendants to private insurers which resulted in Insurance Defendants receiving multiple

payments for the same remediation.  This occurred without the knowledge, consent or agreement

of USTIF and in violation of the Commonwealth's rights, including its right of subrogation to all

the claims, interests and rights of the Insurance Defendants with respect to payments made by

USTIF for the costs of remediation.

## JURISDICTION AND VENUE

32.     The MTBE Claims were removed to federal court by defendants pursuant to 28

USC § 1441 and the Court has supplemental subject matter jurisdiction under 28 USC § 1367 as

to the Insurance Claims.  The MTBE Claims and the Insurance Claims were originally asserted

in separate actions in the same Pennsylvania state court with the intention that the two actions

would be subsequently consolidated for discovery and trial purposes under Pennsylvania Rules

of Civil Procedure.  Before the cases could be consolidated both the MTBE Defendants and the

Insurance Defendants filed Notices of Removal to the United States District Court for the

Eastern District of Pennsylvania  pursuant to Section 1503 of the Energy Policy Act of 2005, 119

Stat. 594.  The action asserting the Insurance Claims was subsequently dismissed voluntarily by

Plaintiff under F.R.C.P. 41 (a).  The Insurance Claims are now being asserted along with the

MTBE Claims in this action through this Second Amended Complaint. The MTBE Claims and the Insurance Claims arise in substantial part out of a common nucleus of operative facts. Both sets of claims arise as a result of gasoline releases from defendants' UST systems in Pennsylvania.

33.     The transferor court (the United States District Court for the Eastern District for Pennsylvania) has personal jurisdiction over both MTBE Defendants and Insurance Defendants as they are either Pennsylvania corporations or entities authorized to do business in Pennsylvania, are foreign corporations or entities registered with the Pennsylvania Department of State to do business in the state, do sufficient business with sufficient minimum contacts in the state or otherwise intentionally avail themselves of the Pennsylvania market through the sale, manufacturing, distribution or processing of petroleum products in the state or have committed torts in this state so as to render the exercise of jurisdiction over all defendants consistent with notions of fair play and substantial justice.

34.     Venue is proper in the transferor court (the United States District Court for the Eastern District for Pennsylvania) under 28 USC § 1391 as both MTBE Defendants and Insurance Defendants either have their registered offices or principal place of business in the Eastern District or have regularly conducted business in the Eastern District, or a substantial portion of the events or omissions giving rise to the claims herein arose, or a substantial portion of the property that is the subject of the action, is situated in the Eastern District.

**PLAINTIFF**

35.     Plaintiff Commonwealth of Pennsylvania, pursuant to the Pennsylvania Constitution Art. 1, § 27, is charged with conserving and maintaining Pennsylvania's natural resources, including the waters of the Commonwealth, for the benefit of all its citizens. The

Pennsylvania Constitution provides that public natural resources, including the waters of the
Commonwealth, are the common property of the people, including those generations yet to
come.

36.    The Commonwealth brings this action as a trustee of the waters of the
Commonwealth and pursuant to its police powers, which include but are not limited to, its
powers to prevent and abate pollution of the waters of the Commonwealth, to prevent and abate
nuisances and to prevent and abate hazards to the public health, safety, and welfare, and to the
environment.

37.    The Commonwealth has a significant property interest in the waters of the
Commonwealth and a quasi-sovereign and a natural resource trustee interest in protecting the
waters of the Commonwealth from contamination.  The contamination of the waters of the
Commonwealth by MTBE and MTBE gasoline constitutes injury to the waters of the
Commonwealth which are held in trust by the Commonwealth on behalf of all its citizens.  The
Commonwealth brings this action directly in its own right, in its *parens patriae* capacity and as
trustee of the natural resources.

38.    The Pennsylvania Department of Environmental Protection ("DEP") is a
department within the Executive Branch of the Commonwealth government, vested with the
authority to protect the environment, prevent and remediate pollution and protect the public
health, comfort, safety and welfare.

39.    The Pennsylvania Insurance Department is a department within the Executive
Branch of the Commonwealth government which administers the Pennsylvania Underground
Storage Tank Indemnification Fund.  USTIF is a special, restricted fund of the State Treasury
and was created by the Storage Tank and Spill Prevention Act, Act 32 of 1989, 35 P. S.

18

§§ 6021.101 *et seq*., as amended for the purpose of making payments to eligible owners or operators of USTs for remedial action arising from releases therefrom.

40.      In addition to asserting its direct damage claims, the Commonwealth sues pursuant to its statutory right of subrogation under 25 Pa. Code § 977.40(a) to the third party claims against MTBE Defendants of the UST owners and operators who received payments under USTIF and pursuant to the third party insurance and indemnity rights, interests and claims of the Insurance Defendants who as USTIF indemnitees received insurance or other third party indemnification payments for the same costs for which they were paid by USTIF.  In its quasi-sovereign, *parens patriae,* trustee and other governmental capacities, the Commonwealth's interests in these claims are separate and apart from the interests of the private parties to which it is subrogated.

41.      To the extent that the Commonwealth has previously settled with one or more defendants for specific damages and losses resulting from MTBE releases at certain sites, such damages and losses are not sought to be recovered against the MTBE Defendants.  The Commonwealth also is not seeking to recover from any MTBE defendant monies expended by USTIF to define the extent of, monitor, treat and remediate MTBE releases from sites where any such defendant was a USTIF indemnified owner or operator of the site at the time of release or discovery of the release.

42.      The Commonwealth, through its Attorney General's office, also brings this action against the MTBE Defendants pursuant to the Commonwealth Attorneys Act, 71 P. S. § 732-204, and the UTPCPL to obtain equitable relief, restoration of moneys acquired by defendants by means of their violations of the statute, and civil penalties against defendants.

**DEFENDANTS**

43.    Defendant Exxon Mobil Corporation is a New Jersey corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039. Defendant Exxon Mobil Corporation was formerly known as, did business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A, ExxonMobil Refining & Supply Corporation, Exxon Company, U.S.A., Exxon Corporation and Mobil Corporation. The terms "Exxon" and "Mobil" as used in this Complaint refer to Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation and Exxon Company, U.S.A., and their related entities ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation.

44.    Defendant ExxonMobil Oil Corporation is a New York corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039. Defendant ExxonMobil Oil Corporation was formerly known as, did business as, and/or is the successor in liability to Mobil Oil Corporation.

45.    Defendant Exxon Company, U.S.A., is registered to do business in Pennsylvania. Its principal place of business is 800 Bell Street, Houston, Texas, 77002. Defendant Exxon Company, U.S.A. did business as, was also known as and/or was the predecessor in liability to ExxonMobil Corporation and/or ExxonMobil Oil Corporation.

46.     Defendant ExxonMobil Refining & Supply Corporation is registered to do business in Pennsylvania.  Its principal place of business is 5959 Las Colinas Blvd., Irving, Texas, 75039.  Defendant ExxonMobil Refining & Supply Corporation did business as, was also known as and/or was the predecessor in liability to ExxonMobil Corporation and/or ExxonMobil Oil Corporation.

47.     Defendant Mobil Oil Corporation is a Texas corporation with a principal place of business at 5959 Las Colinas Blvd., Irving, Texas 75039.  Defendant Mobil Oil Corporation was merged into ExxonMobil Oil Corporation and is the predecessor in liability to ExxonMobil Oil Corporation.

48.     Defendant American Refining Group, Inc. is a Pennsylvania corporation with a registered Pennsylvania office at 100 Four Falls Corporate Ctr., Ste. 215, West Conshohocken, Pennsylvania 19428, and its principal place of business at 77 N Kendall Ave., Bradford, Pennsylvania 16701.  The term "American Refining" as used in this Complaint refers to Defendant American Refining Group, Inc.

49.     Defendant Atlantic Richfield Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 1515 Market St., Philadelphia, PA  19102, and its principal place of business at 501 Westlake Park Boulevard, Houston, Texas 77079.  Defendant Atlantic Richfield Company was formerly known as, did business as, and/or is the successor in liability to Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation.

50.     BP America Inc. is a Delaware corporation with a registered Pennsylvania office

c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its

principal place of business at 4101 Winfield Road, Warrenville, Illinois 60555.  The term "BP

America" as used in this Complaint refers to Defendant BP America Inc.  Defendant BP America

Inc. was formerly known as, did business as, and/or is the successor in liability to Defendant BP

Products North America Inc., Defendant BP West Coast Products LLC, Defendant Atlantic

Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP

Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil

(Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware

Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products

Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO

Chemical Company, a Delaware corporation.

51.     Defendant BP Amoco Chemical Company is a Delaware corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 150 West Warrenville

Road, Naperville, Illinois 60563.  Defendant BP Amoco Chemical was formerly known as, did

business as, and/or is the successor in liability to Amoco Chemical Company, Amoco Chemicals

Company and Amoco Chemicals Corporation.  The term "BP Amoco Chemical" as used in this

Complaint refers to Defendant BP Amoco Chemical Company and its related entities Amoco

Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation.

52.     Defendant BP Holdings North America Limited is a corporation organized under

the laws of England and Wales with its principal offices in England.  In December 2006,

Defendant BP p.l.c. transferred all of its holdings in Defendant BP America Inc. to Defendant BP

22

Holdings North America Limited.  Defendant BP p.l.c. is the owner of all of the holdings of

Defendant BP Holdings North America Limited.  Defendant BP Holdings North America was

formerly known as, did business as, and/or is the successor in liability to Defendant BP America

Inc., Defendant BP Products North America Inc., Defendant BP West Coast Products LLC,

Defendant Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco

Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO),

Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield

Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO

Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and

ARCO Chemical Company, a Delaware corporation.

   53. Defendant BP p.l.c. is a corporation organized under the laws of England and

Wales with its principal offices at One St. James Square in London, England.  Defendant BP

p.lc. was formerly known as, did business as, and/or is the successor in liability to Defendant BP

Holdings North America Limited, Defendant BP America Inc., Defendant BP Products North

America Inc., Defendant BP West Coast Products LLC, Defendant Atlantic Richfield Company,

BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc.,

Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP

Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield

Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company,

a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware

corporation.

   54. Defendant BP Products North America Inc. is a Maryland corporation with a

registered Pennsylvania office c/o The Prentice-Hall Corporation System, Inc., 2595 Interstate

Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 28100

Torch Parkway, Warrenville, Illinois 60555. BP Products North America Inc. is a subsidiary of

BP America Inc. that manages, owns and operates the refining and retail marketing assets of BP

America Inc. in the United States. Defendant BP Products North America Inc. was formerly

known as, did business as, and/or is the successor in liability to BP Amoco Corporation, Amoco

Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, BP Oil Inc.,

BP Oil Company, and BP North America Petroleum. The terms "BP Products NA" and "BP

Amoco" as used in this Complaint refer to Defendants BP Holdings North America Limited, BP

p.l.c., BP Products North America Inc., and their related entities BP Amoco Corporation, Amoco

Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard

Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, and

BP North America Petroleum, a division of BP Products North America Inc.

     55.    Defendant BP West Coast Products LLC is a Delaware limited liability company

with its principal place of business at 4 Centerpointe Drive, La Palma, California 90623.

Defendant BP West Coast Products LLC was formerly known as, did business as, and/or is the

successor in liability to Atlantic Richfield Company, Atlantic Richfield Company (a

Pennsylvania corporation) and ARCO Products Company. The terms "BP West Coast Products"

and "ARCO" as used in this Complaint refer to Defendants BP West Coast Products LLC and

Atlantic Richfield Company, and their related entities Atlantic Richfield Delaware Corporation,

Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO

Chemical Company, an unincorporated division of Atlantic Richfield Company, and ARCO

Chemical Company, a Delaware corporation.

56.     Defendant Buckeye Refining Company n/k/a, a/k/a, d/b/a and predecessor in liability to Kinder Morgan Transmix Company, LLC ("KM Transmix") which is a Delaware Limited Liability Company that is registered to do business in Pennsylvania with a principal place of business located at 1001 Louisiana Street, Suite 1000, Houston, Texas, 77002.  KM Transmix was formerly known as, did business as, and/or is the successor in liability to Buckeye Refining Company, LLC.  The term "KM Transmix," as used in this Complaint, refers to Kinder Morgan Transmix Company, LLC and to Buckeye Refining Company, LLC.

57.     Defendant Chevron Corporation is a corporation organized under the laws of the State of Delaware with its principal offices at 6001 Bollinger Canyon Road in San Ramon, California 94583.  Defendant Chevron Corporation was formerly known as, did business as, and/or is the successor in liability to Defendant Chevron U.S.A. Inc. and its related entities Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

58.     Defendant Chevron U.S.A. Inc. is a Pennsylvania corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.  In approximately 1986, Chevron U.S.A. Inc. sold substantially all of its retail outlets and other marketing assets in the Northeast region of the United States to Cumberland Farms.  Defendant Chevron U.S.A. Inc. was formerly known as, did business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company.  The term "Chevron" as used in this Complaint refers to Defendants Chevron Corporation and Chevron

25

U.S.A. Inc., and their related entities Chevron Products Company, Gulf Oil Corporation of

Pennsylvania, and Gulf Oil Corporation.

59.    Defendant CITGO Petroleum Corporation is a Delaware Corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 1293 Eldridge Pkwy,

Houston, Texas 77077.  Defendant CITGO Petroleum Corporation is a wholly-owned subsidiary

of PDV America, Inc., an indirect, wholly-owned subsidiary of Petróleos de Venezuela, S.A., the

national oil company of the Bolivarian Republic of Venezuela.  The term "CITGO" as used in

this Complaint refers to Defendants CITGO Petroleum Corporation and CITGO Refining and

Chemicals Company L.P., and their related entities PDV America, Inc. and Petróleos de

Venezuela, S.A.

60.    Defendant CITGO Refining and Chemicals Company L.P. is a Delaware limited

partnership with its principal place of business at 1802 Nueces Bay Blvd., Corpus Christi, Texas

78469.

61.    Defendant Coastal Eagle Point Oil Company is a Delaware corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 1001 Louisiana Street,

Houston, Texas 77002.  The term "Coastal Eagle" as used in this Complaint refers to Defendant

Coastal Eagle Point Oil Company.

62.    Defendant ConocoPhillips is a corporation organized under the laws of the State

of Delaware with its principal offices in Houston, Texas.  Defendant ConocoPhillips was

formerly known as, did business as, and/or is the successor in liability to Defendants

ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their related entities Phillips

26

Petroleum Company, Conoco, Inc., Tosco Corporation and Tosco Refining Co. The term
"ConocoPhillips" as used in this Complaint refers to Defendants ConocoPhillips, ConocoPhillips
Company, Phillips 66 and Phillips 66 Company, and to their related entities Phillips Petroleum
Company, Conoco Inc., Tosco Corporation, and Tosco Refining Co.

63.     Defendant ConocoPhillips Company is a Delaware corporation with a registered
Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103,
Harrisburg, Pennsylvania 17110, and its principal place of business at 600 North Dairy Ashford,
Houston, Texas 77079. ConocoPhillips Company was formerly known as, did business as,
and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco
Corporation and Tosco Refining Co. The term "ConocoPhillips" as used in this Complaint refers
to Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company,
and to their related entities Phillips Petroleum Company, Conoco Inc., Tosco Corporation, and
Tosco Refining Co.

64.     Defendant Crown Central LLC is a Maryland limited liability company with a
registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite
103, Harrisburg, Pennsylvania 17110, and its principal place of business at One North Charles
Street, Baltimore, Maryland 21201. Defendant Crown Central LLC was formerly known as, did
business as, and/or is the successor in liability to Crown Central Petroleum Corporation. The
term "Crown Central" as used in this Complaint refers to Defendant Crown Central LLC and its
related entity Crown Central Petroleum Corporation.

65.     Defendant Cumberland Farms, Inc. is a Delaware corporation with a registered
Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg,
Pennsylvania 17101, and its principal place of business at 100 Crossings Boulevard,

27

Framingham, MA 01702.  In approximately 1986, Defendant Chevron U.S.A. Inc. sold

substantially all of its retail outlets and other marketing assets in the Northeast region of the

United States to Defendant Cumberland Farms, Inc.  The term "Cumberland Farms" as used in

this Complaint refers to Defendant Cumberland Farms, Inc.

66.    Defendant Deer Park Refining Limited Partnership is a Delaware limited

partnership that manufactured MTBE gasoline that was supplied to Pennsylvania.  Its principal

place of business is 5900 State Highway 225, Deer Park, Texas 77536.

67.    Defendant Duke Energy Merchants, LLC is a Delaware limited liability company

with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 5555 San Felipe Road,

Houston, Texas 77056.  The term "Duke Energy" as used in this Complaint refers to Defendant

Duke Energy Merchants, LLC.

68.    Defendant El Paso Merchant Energy-Petroleum Company is a Delaware limited

liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine

Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1001

Louisiana Street, Houston, Texas 77002.  Defendant El Paso Merchant Energy-Petroleum

Company was formerly known as, did business as, and/or is the successor in liability to Coastal

Refining and Marketing, Inc. and Coastal States Trading, Inc.  The term "El Paso" as used in this

Complaint refers to Defendants Kinder Morgan, Inc. and El Paso Merchant Energy-Petroleum

Company, and their related entities Coastal Refining and Marketing, Inc. and Coastal States

Trading, Inc.

69.    Defendant Energy Merchant, LLC is a Delaware limited liability company with a

registered Pennsylvania office c/o Lexis Document Services Inc., 2595 Interstate Drive, Suite

28

103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5 Lake Fanny Road,
Bel Air, Maryland 21014. The term "Energy Merchant" as used in this Complaint refers to
Defendant Energy Merchant, LLC.

70.     Defendant Energy Transfer Partners, L.P. is a publicly traded limited partnership
organized under the laws of the State of Delaware with its principal place of business at 3738
Oak Lawn Ave., Dallas, Texas 75219. On October 5, 2012, Defendant Energy Transfer Partners,
L.P. through its wholly owned subsidiary, Defendant ETP Holdco Corporation, merged with
Defendant Sunoco, Inc. Defendant Energy Transfer Partners, L.P. was formerly known as, did
business as, and/or is the successor in liability to Defendants ETP Holdco Corporation and
Sunoco, Inc., and their related entities Sun Oil Company (PA) and Sun Oil Company.

71.     Defendant Equilon Enterprises LLC is a Delaware limited liability company with
a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,
Harrisburg, Pennsylvania 17101, and its principal place of business at 910 Louisiana Street, Suite
2200, Houston, Texas 77002. Defendant Equilon Enterprises LLC was formerly known as, did
business as, and/or is the successor in liability to Shell Oil Products US, Shell Oil Products
Company LLC, Shell Oil Company and Texaco Refining and Marketing Inc. The term
"Equilon" as used in this Complaint refers to Defendant Equilon Enterprises LLC and its related
entities Shell Oil Products US, Shell Oil Products Company LLC, Shell Oil Company, and
Texaco Refining and Marketing Inc.

72.     Defendant ETP Holdco Corporation is a Delaware corporation with its principal
place of business at 3738 Oak Lawn Ave., Dallas, Texas 75219. On October 5, 2012, Defendant
Energy Transfer Partners, L.P. through its wholly owned subsidiary, Defendant ETP Holdco
Corporation, merged with Defendant Sunoco, Inc. Defendant ETP Holdco Corporation was

formerly known as, did business as, and/or is the successor in liability to Defendant Sunoco, Inc.,

and its related entities Sun Oil Company (PA) and Sun Oil Company.

73.    Defendant George E. Warren Corporation is a Massachusetts corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 3001 Ocean Drive, Vero

Beach, Florida 32963.  The term "George E. Warren" as used in this Complaint refers to

Defendant George E. Warren Corporation.

74.    Defendant Getty Petroleum Marketing Inc. ("GPMI") is a Maryland corporation

with its last principal place of business at 1500 Hempstead Turnpike, East Meadow, New York.

During the relevant time period, from 1997 until 2000, GPMI was a wholly-owned subsidiary of

Getty Petroleum Corporation, also known as Getty Realty Corporation, and from 2001 until

2011, GPMI was a wholly-owned subsidiary of Lukoil Americas Corporation.  GPMI filed for

bankruptcy in December, 2011.  At all times relevant herein, GPMI purchased policies of

insurance, paid the appropriate premiums and was entitled to a defense and indemnity for the

claims brought in this action.  The Commonwealth's claim against GPMI is limited to

recoverable insurance proceeds.  GPMI was also known as and did business as OAO Lukoil,

Lukoil Americas Corporation and was predecessor in liability to Lukoil North Americas, and

successor in liability to Getty Petroleum Corporation and Getty Properties Corporation also

known as Getty Realty Corporation.

75.    Defendant Getty Properties Corporation is a Delaware corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 125 Jericho Turnpike,

Jericho, New York 11753.

76.     Defendant Gulf Oil Limited Partnership is a Delaware limited partnership with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 100 Crossing Boulevard, Framingham, Massachusetts 01702.  Gulf Oil Limited Partnership is a subsidiary of Cumberland Farms, Inc. and is controlled by Cumberland Farms, Inc.  The term "GOLP" as used in this Complaint refers to Defendant Gulf Oil Limited Partnership and Cumberland Farms, Inc.

77.     Defendant Guttman Realty Company was also known as, formerly known as, did business as and/or is the successor-in-liability to Bulk Terminal Storage ("Guttman") is a Pennsylvania corporation.  Its principal place of business is 200 Speers Road, Belle Vernon, Pennsylvania 15012.

78.     Defendant Hartree Partners, LP was also known as, formerly known as, did business as, and is the successor-in-liability of and to Hess Energy Trading Company, LLC ("Hartree") is a Delaware limited partnership that is registered to do business in Pennsylvania. Its principal place of business is 1185 Avenue of the Americas, New York, New York 10003. The term "Hartree," as used in this Complaint, refers to Hartree Partners, LP and to Hess Energy Trading Company, LLC.

79.     Defendant Hess Energy Trading Company, LLC, is a Delaware limited liability company that supplied MTBE gasoline to other defendants in this action for ultimate delivery to gasoline stations in Pennsylvania.  In 2014, Hess Energy Trading Company, LLC's name was changed to Hartree Partners, LP.

80.     Defendant Hess Corporation is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1185 Avenue of the Americas, 40th

31

Floor, New York, New York 10036. Defendant Hess Corporation was formerly known as, did

business as, and/or is the successor in liability to Amerada Hess Corporation. The term "Hess"

as used in this Complaint refers to Defendants WilcoHess LLC and Hess Corporation, and their

related entity Amerada Hess Corporation.

81.    Defendant Hess Oil Virgin Islands Corporation ("HOVIC") is a wholly owned

subsidiary of defendant Hess Corporation that supplied MTBE gasoline to the Pennsylvania

market.

82.    Defendant Kinder Morgan Inc. is a corporation organized under the laws of the

State of Delaware with its principal offices at 500 Dallas Street, Suite 1000 in Houston, Texas

77002. Defendant Kinder Morgan, Inc. was formerly known as, did business as, and/or is the

successor in liability to El Paso Holdco LLC, El Paso Corporation, El Paso CGP Company LLC,

El Paso Remediation Company, Coastal Corporation, Coastal Holding Corporation, CIC

Industries Inc., Coastal Refining & Marketing Inc., Coastal Fuels Marketing Inc., Coastal Mart

Inc., Derby Refining Co., Union Petroleum Corporation, Belcher Oil Company, Pester

Marketing Company, and Coastal Branded Marketing, Inc.

83.    Defendant Lukoil Americas Corporation ("LAC") is a Delaware corporation with

its principal place of business at 505 Fifth Avenue, 9th Floor, New York, New York 11554.

LAC is an indirect subsidiary of OAO Lukoil. Defendant Lukoil Americas Corporation was

formerly known as, did business as, and/or is the successor in liability to Defendants Getty

Petroleum Marketing, Inc., Lukoil North America LLC and Lukoil Oil Company. LAC was a

direct parent of GPMI from January, 2001 until February, 2011.

84.    Defendant Lukoil North America LLC ("LNA") is a Delaware corporation with

its principal place of business at 505 Fifth Avenue, New York, New York 11554. It has a

registered Pennsylvania office at c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101.  LNA is a wholly-owned subsidiary of defendant Lukoil

Americas Corporation and an indirect subsidiary of OAO Lukoil.  LNA was formerly known as,

did business as and/or is the successor in liability to Getty Petroleum Marketing Inc., Lukoil

Americas Corporation and/or OAO Lukoil.  LNA is the successor-in-interest to certain assets of

GPMI.  LNA owns property in the Commonwealth of Pennsylvania and operates service stations

in Pennsylvania.

     85.    Defendant Lukoil Oil Company, also known as OAO Lukoil, Public Joint Stock

Company Oil Company Lukoil, PJSC Oil Company Lukoil, (hereafter "OAO Lukoil") is an

Open Joint Stock Company domiciled in Russia.  OAO Lukoil is publically traded on global

stock exchanges, including the NASDAQ, under the name of Lukoil (OAO) a/k/a Lukoil

Holding Co. ("LUKOY").  OAO Lukoil sells depository receipts through the Bank of New York

Mellon which allows investors in the United States to invest in OAO Lukoil.  OAO Lukoil is the

parent corporation of a vertically integrated company and Defendants LAC and LNA are

subsidiaries of OAO Lukoil.  OAO was the indirect parent of GPMI between 2000 and 2011.

OAO Lukoil itself and through its subsidiaries engages in the production of crude oil and

operates refineries and storage terminals in several countries.  The term "Lukoil" as used in this

Complaint refers to Defendant Lukoil Americas Corporation, Lukoil North America, LLC,

Lukoil Oil Company, also known as OAO Lukoil, and its related entity Getty Petroleum

Marketing, Inc.

     86.    Defendant Lukoil Pan Americas, LLC is a Delaware limited liability company

with a registered Pennsylvania address at c/o Corporation Service Company, 2595 Interstate

Drive, Suite 103, Harrisburg, PA 17110. Its principal place of business is 1095 Avenue of the Americas, 33rd Floor, New York, New York 10036.

87.     Defendant Marathon Oil Corporation is a Delaware corporation with its principal place of business at 5555 San Felipe Road, Houston, Texas 77056. Defendant Marathon Oil Corporation was formerly known as, did business as, and/or is the successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum Corporation, Marathon Holdings and Marathon Pipeline. The term "Marathon" as used in this Complaint refers to Defendants Marathon Oil Corporation, Marathon Petroleum Company LP and Marathon Petroleum Corporation, and their related entities Marathon Oil Co., Marathon DE, Marathon PC, Marathon Ashland Petroleum Company LLC, Marathon Holdings and Marathon Pipeline.

88.     Defendant Marathon Petroleum Company LP is a limited partnership organized and existing under the laws of the State of Delaware with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 539 South Main Street, Findlay, Ohio 45840. Defendant Marathon Petroleum Company LP was formerly known as, did business as, and/or is the successor in liability to Marathon Petroleum Company LLC and Marathon Ashland Petroleum Company LLC.

89.     Defendant Marathon Petroleum Corporation is a Delaware corporation with its principal place of business at 539 South Main Street, Findlay, Ohio 45840. Defendant Marathon Petroleum Corporation was formerly known as, did business as, and/or is the successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum, Marathon Holdings, and Marathon Pipeline.

90.     Defendant Motiva Enterprises LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 700 Milam Street, Suite 2028, Houston, Texas 77002.  Defendant Motiva Enterprises LLC was formerly known as, did business as, and/or is the successor in liability to Shell Oil Products Company, LLC, Shell Oil Products Company, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East).  The term "Motiva" as used in this Complaint refers to Defendant Motiva Enterprises LLC, Shell Oil Products Company, LLC, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East).

91.     Defendant NuStar Terminals Operations Partnership, LP is a Delaware limited partnership with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 17304 Preston Road, Suite 1000, Dallas, Texas 75252.  Defendant NuStar Terminals Operations Partnership, LP was formerly known as, did business as, and/or is the successor in liability to Support Terminals Operating Partnership, LP and ST Services, Inc.  The term "NuStar" as used in this Complaint refers to Defendant NuStar Terminals Operations Partnership, LP and its related entities Support Terminals Operating Partnership, LP and ST Services, Inc.

92.     Defendant Pennzoil Company, also known as, formerly known as, did business as and/or successor-in-liability to South Penn Oil Company, SOPUS Products and Equilon Enterprises LLC, is a Pennsylvania corporation that distributed and sold MTBE gasoline in Pennsylvania.  Its agent for service of process in Pennsylvania is c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101 and its principal place of business is 700 Milam Street, Houston, Texas, 77002.

35

93.     Defendant Pennzoil-Quaker State Company, also known as, formerly known as,

did business as and/or successor-in-liability to South Penn Oil Company and Pennzoil Company,

is a Delaware corporation that distributed and sold MTBE gasoline in Pennsylvania. Pennzoil-

Quaker State Company's principal place of business is at 700 Milam Street, Houston, Texas,

77002.  Pennzoil-Quaker State Company is registered to do business in Pennsylvania and has a

registered agent at 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101.

94.     Defendant Petroleum Products Corporation ("PPC") is a Pennsylvania corporation

with its principal place of business at 900 Eisenhower Blvd., Harrisburg, Pennsylvania 17111.

95.     Defendant Phillips 66 is a Delaware corporation with its principal place of

business at P.O. Box 4428, Houston, Texas.  Phillips 66 was formerly known as, did business as,

and/or is the successor in liability to ConocoPhillips Company, Phillips Petroleum Company,

Conoco, Inc., Tosco Corporation, and Tosco Refining Co.

96.     Defendant Phillips 66 Company is a Delaware corporation with a registered

Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103,

Harrisburg, Pennsylvania 17110, and its principal place of business in Houston, Texas.

Defendant Phillips 66 Company was formerly known as, did business as, and/or is the successor

in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco

Corporation, and Tosco Refining Co.

97.     Defendant The Premcor Refining Group Inc. is a Delaware corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 1700 East Putnam Ave.,

Old Greenwich, Connecticut 06870.  Defendant The Premcor Refining Group Inc. is a wholly-

owned subsidiary of and is controlled by Defendant Valero Energy Corporation.  The term

36

"Premcor" as used in this Complaint refers to Defendants The Premcor Refining Group, Inc. and Premcor USA Inc.

98.    Defendant Premcor USA Inc. is a Delaware corporation with its principal place of business at 1700 East Putnam Ave., Old Greenwich, Connecticut 06870.  Defendant Premcor USA Inc. is a wholly-owned subsidiary of and is controlled by Defendant Valero Energy Corporation.

99.    Defendant Shell Oil Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Shell Oil Company is a wholly-owned subsidiary of Royal Dutch Shell PLC.  Shell Oil Company was formerly known as, did business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Energy Services, The Pennzoil Company, and Pennzoil-Quaker State Company. The term "Shell" as used in this Complaint refers to Defendants Shell Oil Company and Shell Oil Products Company LLC, and their related entities Deer Park Refining LP, Shell Oil Products, Shell Oil Products Company, Shell Chemical, Shell Trading US, Shell Energy Services, Texaco Inc., Motiva, The Pennzoil Company, and Pennzoil-Quaker State Company.

100.    Defendant Shell Oil Products Company LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Shell Oil Products Company LLC was formerly known as, did business as, and/or is the successor in liability to Shell Oil Products Company.

101.    Defendant Shell Trading (US) Company is a Delaware corporation that is registered to do business in Pennsylvania.  Its principal place of business is 1000 Main Street, Suite 1700, Houston, Texas, 77002.

102.    Defendant Star Enterprise LLC is a Delaware limited liability company that refined and marketed MTBE gasoline in Pennsylvania.  It has a registered Delaware office is c/o Agents and Corporations, Inc., 1201 Orange Street, Suite 600, One Commerce Center, Wilmington, Delaware 19801.

103.    Defendant Sun Company, Inc. is a Pennsylvania corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business in Philadelphia, Pennsylvania.  Defendant Sun Company, Inc. was formerly known as, did business as, and/or is the successor in liability to Sunoco Inc.  The term "Sunoco" as used in this Complaint refers to Defendants Energy Transfer Partners, L.P., ETP Holdco Corporation, Sun Company, Inc., Sunoco, Inc., and Sunoco, Inc. (R&M), and their related entities Sunoco Inc, Sun Company, Inc. (R&M), Sun Refining and Marketing Company, Sun Oil Company of Pennsylvania, Sun Oil Company (PA), and Sun Oil Company.

104.    Defendant Sunoco, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal offices at 1735 Market Street, Philadelphia, Pennsylvania 19103-7583.  Defendant Sunoco, Inc. was formerly known as, did business as, and/or is the successor in liability to Sun Oil Company (PA) and Sun Oil Company.

105.    Defendant Sunoco, Inc. (R&M) is a Pennsylvania corporation with a registered

Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103,

Harrisburg, Pennsylvania 17110, and its principal place of business at 1735 Market Street,

Philadelphia, Pennsylvania 19103.  Defendant Sunoco, Incorporated (R&M) was formerly

known as, did business as, and/or is the successor in liability to Sun Company, Inc. (R&M), Sun

Refining and Marketing Company, and Sun Oil Company of Pennsylvania.

106.    Defendant Sunoco Partners Marketing & Terminals L.P., is a Texas Limited

Partnership that is registered to do business in Pennsylvania. Its primary place of business is

1801 Market Street, Philadelphia, Pennsylvania, 19103.

107.    Defendant Texaco Inc. is a Delaware corporation with a registered Pennsylvania

office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg,

Pennsylvania 17110, and its principal place of business at 6001 Bollinger Canyon Road, San

Ramon, California 94583.  Defendant Texaco Inc. was formerly known as, did business as,

and/or is the successor in liability to Texaco Refining and Marketing Inc.  The term "Texaco" as

used in this Complaint refers to Defendant Texaco Inc. and its related entity Texaco Refining and

Marketing, Inc.

108.    Defendant TMR Company is a Delaware corporation with its principal place of

business at 910 Louisiana, Houston, Texas 77002.   Defendant TMR Company was formerly

known as, did business as and/or is the successor in liability to Texaco Refining and Marketing

Inc. and TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.).

109.    Defendant TRMI-H LLC is a Delaware corporation with its principal place of

business at 6001 Bollinger Canyon Road, San Ramon, California 94583.  Defendant TRMI-H LLC

was formerly known as, did business as and/or is the successor in liability to TRMI Holdings

Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty

Oil Company (Eastern Operations), Inc.

110.    Defendant Total Petrochemicals & Refining USA, Inc. is a Delaware corporation

with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at Total Plaza, 1201

Louisiana Street, Suite 1800, Houston, Texas 77002.  The term "Total" as used in this Complaint

refers to Defendant Total Petrochemicals & Refining USA, Inc.

111.    Defendant TransMontaigne Product Services LLC ("TransMontaigne") is a

Delaware corporation that is registered to do business in Pennsylvania.  Its primary place of

business is 1670 Broadway, Suite 3100, Denver, Colorado 80202.

112.    Defendant Ultramar Diamond Shamrock Corporation was also known as,

formerly known as and did business as Diamond Shamrock Incorporated, Diamond Shamrock

Refining and Marketing Company, Ultramar Inc., and/or Valero Energy Corporation.  It has a

registered Delaware office c/o The Corporation Trust Company, Corporation Trust Center, 1209

Orange Street, Wilmington, Delaware 19801.

113.    Defendant United Refining Company is a Pennsylvania corporation with its

registered office and principal place of business at 15 Bradley St., Warren, Pennsylvania 16365.

The term "United Refining" as used in this Complaint refers to Defendant United Refining

Company.

114.    Defendant Valero Energy Corporation is a Delaware corporation with its principal

place of business at One Valero Way, San Antonio, Texas 78249.  Defendant Valero Energy

Corporation was formerly known as, did business as, and/or is the successor in liability to

Premcor Inc., Premcor Refining, Premcor Pipeline and Valero PA.  The term "Valero" as used in

this Complaint refers to Defendants Valero Energy Corporation, Valero Marketing and Supply

Company, Valero Refining Company – New Jersey and Valero Refining and Marketing

Company, and their related entities Premcor Inc., Premcor Refining, Premcor Pipeline, and

Valero PA. Valero Energy Corporation is a successor in liability to Ultramar Diamond Shamrock

Corporation.

115.    Defendant Valero Marketing and Supply Company is a Delaware corporation

with a registered Pennsylvania office at c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at One Valero Way, San

Antonio, Texas 78249.

116.    Defendant Valero Refining Company – New Jersey, now known as, doing

business as and also known as Paulsboro Refining Company, LLC, is a Delaware corporation

with its principal place of business at 800 Billingsport Road, Paulsboro, New Jersey 08066

117.    Defendant Valero Refining and Marketing Company is a Delaware corporation

with its principal place of business at One Valero Way, San Antonio, Texas 78249.

118.    Defendant Vitol S.A. is a Swiss corporation with its principal place of business at

1270 6th Avenue, Suite 1030, New York, New York 10020.  Defendant Vitol S.A. also does

business as Vitol S.A., Inc.  The term "Vitol" as used in this Complaint refers to Defendant Vitol

S.A. and its related entity Vitol S.A., Inc.

119.    Defendant Western Refining Yorktown, Inc. is a Delaware corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 1250 West Washington

Street, Suite 101, Tempe, AZ 85281.  Defendant Western Refining Yorktown, Inc. was formerly

known as, did business as, and/or is the successor in liability to Giant Yorktown, Inc.  The term

"Western Refining" as used in this Complaint refers to Defendant Western Refining Yorktown,

Inc. and its related entity Giant Yorktown, Inc.

120.    Defendant WilcoHess LLC is a Delaware limited liability corporation with a

registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320,

Harrisburg, Pennsylvania 17101, and its principal place of business at 5446 University Parkway,

Winston-Salem, NC 27105.  The company was formed as a joint venture between A.T. Williams

Oil Company and Defendant Hess Corporation, and became a subsidiary of Defendant Hess

Corporation in 2014.

121.    For purposes of this Amended Complaint, "defendant" shall mean and refer to all

of the defendants named herein.

122.    For purposes of this Amended Complaint, "MTBE Defendants" shall mean and

refer to the following parties: Exxon Mobil Corporation, ExxonMobil Oil Corporation, Exxon

Company, U.S.A.; ExxonMobil Refining & Supply Corporation, Mobil Oil Corporation,

American Refining Group, Inc., Atlantic Richfield Company, BP America Inc., BP Amoco

Chemical Company, BP Holdings North America Limited, BP p.l.c., BP Products North America

Inc., BP West Coast Products LLC, Buckeye Refining Company, LLC, Chevron Corporation,

Chevron U.S.A. Inc., CITGO Petroleum Corporation, CITGO Refining and Chemicals Company

L.P., Coastal Eagle Point Oil Company, ConocoPhillips, ConocoPhillips Company, Crown

Central LLC, Cumberland Farms, Inc., Deer Park Refining Limited Partnership, Duke Energy

Merchants, LLC, El Paso Merchant Energy-Petroleum Company, Energy Merchant, LLC,

Equilon Enterprises LLC, George E. Warren Corporation, Getty Properties Corporation, GPMI,

Gulf Oil Limited Partnership, Guttman Realty Company, Hartree Partners, LP, Hess Energy

Trading Company, LLC, Hess Corporation, Hess Oil Virgin Islands Corporation, Lukoil

42

Americas Corporation, Lukoil North Americas, LLC, Lukoil Oil Company a/k/a OAO Lukoil,

Lukoil Pan Americas, LLC, Marathon Oil Corporation, Marathon Petroleum Company LP,

Marathon Petroleum Corporation, Motiva Enterprises LLC, Nustar Terminals Operations

Partnership LP, Pennzoil Company, Pennzoil-Quaker State Company, Petroleum Products

Corporation, Phillips 66, Phillips 66 Company, The Premcor Refining Group Inc., Premcor USA

Inc., Shell Oil Company, Shell Oil Products Company LLC, Shell Trading (US) Company, Star

Enterprise, LLC, Sun Company, Inc., Sunoco, Inc., Sunoco Inc. (R&M), Sunoco Partners

Marketing & Terminals L.P, Texaco Inc., TMR Company, TRMI-H, LLC, Total Petrochemicals

& Refining USA, Inc., Transmontaigne Product Services LLC, Ultramar Diamond Shamrock

Corporation, United Refining Company, Valero Refining Company – New Jersey, Valero

Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing

Company, Vitol S.A., Inc. and Western Refining Yorktown, Inc.

     123.    For purposes of this Amended Complaint, "Insurance Defendants" shall mean and

refer to the following parties: Atlantic Richfield Company, BP America Inc., BP Holdings North

America Limited, BP p.l.c., BP Products North America Inc., BP West Coast Products LLC,

Chevron Corporation, Chevron U.S.A. Inc., ConocoPhillips, ConocoPhillips Company,

Cumberland Farms, Inc., El Paso Merchant Energy-Petroleum Company, Energy Transfer

Partners, L.P., Equilon Enterprises LLC, ETP Holdco Corporation, Getty Properties Corporation,

Gulf Oil Limited Partnership, Hess Corporation, Kinder Morgan, Inc., Lukoil Americas

Corporation, Marathon Oil Corporation, Marathon Petroleum Company LP, Marathon Petroleum

Corporation, Motiva Enterprises LLC, Phillips 66, Phillips 66 Company, The Premcor Refining

Group Inc., Premcor USA Inc., Shell Oil Company, Shell Oil Products Company LLC, Sun

Company, Inc., Sunoco, Inc., Sunoco Inc. (R&M), Texaco Inc., TMR Company, TRMI-H, LLC,

United Refining Company, Valero Energy Corporation, Valero Marketing and Supply Company,

Valero Refining and Marketing Company, and WilcoHess LLC.

124.    Each of the defendants has done, or is doing, business in Pennsylvania at all times

material hereto.

125.    At all times material hereto, MTBE Defendants Atlantic Richfield Company,

Equilon, Exxon, Hess, Motiva, Shell, Texaco, Total and Valero manufactured and sold MTBE to

manufacturers of MTBE gasoline distributed, stored and sold in Pennsylvania.

126.    At all times material hereto, MTBE Defendants American Refining, Atlantic

Richfield Company, BP America, BP Amoco Chemical, BP Products NA, BP West Coast

Products, Chevron, CITGO, Crown Central, Equilon, Exxon, George E. Warren, Hess, Motiva,

Shell, Sunoco, Texaco, TMR Company, TRMI-H LLC, Total, and Valero manufactured MTBE

used in MTBE gasoline which they manufactured, distributed, stored and sold in Pennsylvania.

127.    At all times material hereto, MTBE Defendants Buckeye Refining Company,

Coastal Eagle, ConocoPhillips, Deer Park Refining Limited Partnership, Duke Energy, Energy

Merchant, ExxonMobil Refining & Supply Corporation, Marathon, Premcor, United Refining,

Valero Refining Company –New Jersey and Western Refining manufactured and sold MTBE

gasoline distributed, stored and sold in Pennsylvania.

128.    At all times material hereto, MTBE Defendants Cumberland Farms, El Paso,

Getty, GPMI, GOLP, Lukoil, NuStar,  Exxon Company, U.S.A., Hess Energy Trading Company,

LLC, Hartee Partners, LP, Lukoil Pan Americas,  Mobil Oil Corporation, Shell Trading (US)

Company, Star Enterprise LLC, Pennzoil Company, Pennzoil-Quaker State Company,

TransMontaigne Product Services LLC, Guttman Realty Company, Sunoco Partners Marketing

44

& Terminals LP, Hess Oil Virgin Islands Corp., Petroleum Products Corporation and Vitol distributed, stored and sold MTBE gasoline in Pennsylvania.

129.     Any and all references to defendant, defendants, MTBE Defendants, Insurance Defendants or a particular defendant by name in this Complaint include all predecessors, successors, parents, subsidiaries, affiliates, divisions and agents of the referenced defendants.

130.     In committing the acts alleged in this Complaint, defendants acted in their own right and/or in the capacity of joint venturers, partners, agents, principals, successors-in-interest, surviving corporations, transferees, transferors, controllers, alter-egos, licensees, licensors, patent holders and/or indemnitors of each of the other defendants.

131.     To the extent any act or omission of any of the defendants is alleged in this Complaint, the officers, directors, agents, employees or representatives of each such defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of such defendants, and did so while acting within the scope of their duties, employment or agency.

132.     Without limiting the Commonwealth's rights, including its rights to pursue theories of liability other than those enumerated below on the claims set forth in this Complaint, each of the MTBE Defendants is jointly and severally liable to the Commonwealth.  In addition, or in the alternative to joint and several liability, market share liability and/or the commingled product theory may be an appropriate theory for liability in this case.

## MTBE GENERALLY

133.    At all times relevant hereto, MTBE Defendants manufactured, distributed, sold, controlled or otherwise represented substantially all of the market in Pennsylvania for MTBE and MTBE gasoline.

134.    MTBE and MTBE gasoline are both fungible products and lack traits that would make it possible to identify either product as being manufactured, distributed or sold by a particular defendant.

135.    At all times relevant hereto, MTBE Defendants routinely commingled their MTBE and/or MTBE gasoline with the MTBE and/or MTBE gasoline of one or more of the other MTBE Defendants and produced, distributed or sold such commingled MTBE or MTBE gasoline in Pennsylvania.

136.    As a result of product fungibility and the commingling by MTBE Defendants, in certain instances of contamination, such as where releases of MTBE and MTBE gasoline have occurred from sites not branded by particular MTBE Defendants or where records do not exist tracing the products from particular MTBE Defendants to the sites, it may not be possible to identify the actual source of the MTBE or MTBE gasoline released as having come from a particular defendant other than it was manufactured, distributed, sold or otherwise marketed in Pennsylvania by one or more of the MTBE Defendants who, as alleged, together represented substantially all of the market in Pennsylvania for MTBE and MTBE gasoline.

137.    Any inability of the Commonwealth to identify the actual source of the MTBE or MTBE gasoline released into the groundwater in particular instances at particular sites is a result of the fungibility of the products, MTBE Defendants' actions in commingling their products

and/or the foreseeable actions of others, and not as a result of any action or inaction by the Commonwealth.

## MTBE AS A GASOLINE ADDITIVE

138.    MTBE is a chemical compound produced by combining methanol, a derivative of natural gas, and isobutylene, a by-product of the gasoline refining process.  Because methanol and isobutylene are readily available compounds, MTBE was inexpensive to manufacture.  As used in this Complaint, MTBE means not only methyl tertiary butyl ether, but also the degradation byproducts of, and contaminants in, commercial grade MTBE, including tertiary butyl alcohol ("TBA").

139.    TBA is used as a raw material in the production of isobutylene.  It is also an intermediate product of MTBE biodegradation, and, as a result, TBA often appears in groundwater where MTBE contamination exists.

140.    Crude oil is converted to petroleum products, including gasoline, at refineries. Many of the MTBE Defendants have owned and operated petroleum refineries.  At the refinery, MTBE, which may have been manufactured by a separate defendant and purchased by a refinery defendant, or may have been manufactured at the refinery itself by a defendant, was blended into gasoline as an octane enhancer and/or as an oxygenator for use in areas of the United States, including Pennsylvania where oxygenated gasoline was sold.

## THE ROUTINE SALE OF COMMINGLED
## GASOLINE IN PENNSYLVANIA

141.    The gasoline sold at a gas station in Pennsylvania, and elsewhere across the nation, is generally not the product of just one refiner.  The gasoline present in any particular station's underground storage tanks, whether a branded or non-branded station, is often a commingled product because of how gasoline, after it is manufactured, is transported, stored and

47

distributed prior to reaching a particular gas station for retail sale. Once manufactured by a refiner to certain industry standards, the batch of gasoline is then transported for marketing in different regions of the United States via a network of national and regional pipelines, tank ships and barges. Through these pipelines and other bulk transport means, the gasoline is sent to common storage tanks located at terminals throughout the country. As the gasoline is piped into storage tanks at these terminals, it often becomes mixed or blended together. From the terminals, it is then further transshipped in bulk by pipeline or other transportation means to secondary terminals or depots, where again it is commingled with other refiners' gasoline. From these secondary terminals or depots, gasoline is then taken by truck to gas stations for retail sale.

142.    MTBE Defendants added MTBE to their gasoline products as an oxygenate. Oxygenated fuel is very similar to normal gasoline except that it contains a particular additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide.

**MTBE IS A PERSISTENT ENVIRONMENTAL CONTAMINANT**

143.    MTBE does not occur naturally in the environment and is not present therein unless introduced by the actions of man.

144.    MTBE is introduced into and contaminates the environment through disposals, deposits, releases, leaks, overfills, spills and evaporative releases (collectively "releases") from a variety of sources, principally releases from gasoline storage and delivery systems.

145.    When released into the environment, MTBE behaves differently from other constituents of concern in gasoline such as benzene, toluene, ethylbenzene and xylene (collectively, "BTEX compounds"). MTBE separates from other gasoline constituents in the presence of moisture. In contrast to the BTEX compounds, MTBE has a strong affinity for

water, is easily dissolved and does not readily adhere to soil particles, making it more mobile and able to migrate great distances from the source of the release. MTBE is more than thirty times more soluble in water than the BTEX compounds in gasoline.

146.    In groundwater, MTBE moves freely at approximately the rate of the water's movement, unlike BTEX compounds, which tend to adhere to soil and/or float on the surface of water. This renders MTBE more difficult to locate and remediate than BTEX compounds.

147.    MTBE can also migrate into subsurface soil regions where it may leach out of these soil regions into nearby groundwater for many years following the initial release.

148.    MTBE is also more persistent than BTEX compounds because it does not readily biodegrade in groundwater. If and when MTBE does degrade in the environment, the process creates other contaminants, including TBA, which are similarly problematic in groundwater.

149.    Because of its chemical and physical characteristics, when MTBE gasoline is released into the environment, it migrates farther and faster than gasoline without MTBE through soil and water, penetrates deeply into aquifers, resists biodegradation and results in persistent contamination. As a result, MTBE is and has been more difficult and more expensive to remove from groundwater. Where TBA is also present at a site subject to MTBE remediation, the risks of adverse health and environmental harms are increased, as are the costs to fully remediate the contaminated site.

150.    Given the properties of MTBE and the long history of gasoline releases during distribution, storage, sale and use of MTBE gasoline, widespread MTBE contamination of groundwater from MTBE gasoline was substantially certain and foreseeable by MTBE Defendants.

151.    MTBE has contaminated, continues to contaminate and threatens to contaminate,

the waters of the Commonwealth throughout Pennsylvania.

## MTBE DEFENDANTS' PRODUCTION AND USE OF MTBE AS A CHEAP AND PROFITABLE GASOLINE ADDITIVE

152.    In the late 1970s, pursuant to section 211 of the Clean Air Act, 42 U.S.C.A.

§ 7545 ("the CAA"), the United States Environmental Protection Agency ("EPA") registered

MTBE as a fuel additive that did not cause or contribute to the failure of any emission control

device or system.  ARCO began commercial production of MTBE in April 1979, less than two

months after the EPA approved MTBE as a blending component of unleaded gasoline.  ARCO

sold MTBE to other oil refiners to be blended into gasoline as an octane enhancer.

153.    As the market for MTBE grew, other oil refiners also began producing MTBE for

blending into gasoline.  In 1979, MTBE production was estimated at approximately 75 million

gallons.

154.    Sometime after 1979, MTBE Defendants started manufacturing, distributing

and/or selling gasoline with MTBE in concentrations averaging approximately 2% to 4% in

order to boost the octane level in higher grades of gasoline.

155.    By 1985, MTBE production in the United States was estimated at 420 million

gallons per year.  In terms of weight, MTBE ranked 44th among the top 50 chemicals produced

in the United States.  Virtually all of this MTBE was blended into gasoline in concentrations of

up to 11 percent, making MTBE among the largest components of a typical gallon of gasoline.

Overall, MTBE was present in about 10 percent of the nation's gasoline, though it was much

more common in the eastern than the western United States.

156.    When, prior to 1990, the EPA began considering options to reduce air pollution,

the petroleum industry, including some of the MTBE Defendants, lobbied Congress to adopt the

Reformulated Gasoline Program ("RFG Program") as part of the 1990 Amendments to the Clean

Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally

generated, developed and promoted by industry, not the Environmental Protection Agency

("EPA") or other parts of the federal government."

157.    In the 1990 Amendments to the Clean Air Act, Congress established the RFG

Program, as Section 211 (k) of the CAA, 42 U.S.C.A. § 7545 (k), which mandated the use of

reformulated gasoline containing at least 2% oxygen by weight in those areas of the country with

the worst ozone or smog problems. If a particular area of the country, such as a large

metropolitan area, was designated as a "non-attainment area" for carbon monoxide ("CO"), the

EPA was authorized to direct the area to participate in the RFG Program.

158.    In 1992, in conjunction with the CAA, the EPA initiated the Oxygenated Fuel

Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in

certain metropolitan areas to reduce carbon monoxide during the fall and winter months.

159.    Much of the gasoline sold in non-attainment areas under the RFG Program

exceeded that program's minimum 2% or 2.7% oxygenate requirements. MTBE comprised up

to 15% of every gallon of gasoline used in those areas. MTBE gasoline also comprised a

significant amount of the gasoline used in areas that were not participating in the RFG Program.

160.    MTBE Defendants started shipping high-content MTBE gasoline for sale in

certain metropolitan areas in 1992 as part of the Oxyfuel Program. In or around January 1995,

MTBE Defendants introduced into the stream of commerce MTBE gasoline containing even

higher levels of MTBE.

161.    As of 1995, five counties in southeastern Pennsylvania (Bucks, Chester,

Delaware, Montgomery and Philadelphia) were required to implement the RFG Program.

162.    At its peak, most if not all gasoline supplied to the Pennsylvania RFG areas had high concentrations (11% to 15%) of MTBE.  In addition, MTBE gasoline containing elevated concentrations of MTBE was often sold at locations throughout Pennsylvania outside of RFG areas at the discretion of MTBE Defendants.

163.    MTBE was not the only viable oxygenate option available to MTBE Defendants to achieve higher octane in gasoline.  The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE.  MTBE became MTBE Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered MTBE Defendants the highest profit margin of all available oxygenates.  MTBE Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different available oxygenate, such as ethanol, from a third-party.

164.    Before the 1980s, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

165.    Since gasoline containing MTBE at increased levels was introduced, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected volatile organic chemical in groundwater in the United States.  MTBE-contaminated wells have been found throughout the United States.  The USGS annually tests the groundwater and has detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

**MTBE DEFENDANTS KNEW THAT MTBE IS HARMFUL TO
THE ENVIRONMENT AND THAT IT IS DIFFICULT TO
REMEDIATE MTBE CONTAMINATION**

166.    At all times material hereto, MTBE Defendants recognized the need to assess and

study the long-term risks of MTBE contamination, including the potential health effects of low-

level ingestion of MTBE, as well as the difficulties associated with remediating a MTBE release.

Information exchanges among MTBE Defendants as well as their internal documents evidence

MTBE Defendants' awareness of the severe environmental harms arising from MTBE

contamination.

167.    By virtue of their tremendous economic power and analytical resources, including

the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists,

MTBE Defendants have at all times relevant to this litigation known or been in a position to

know the threats which MTBE poses to the environment, including groundwater, and to human

health.

168.    In addition, by virtue of MTBE Defendants' superior knowledge, and/or by virtue

of MTBE Defendants' dissemination of statements regarding the nature and impacts of MTBE,

MTBE Defendants had a duty to disclose the truth and to act in accordance with the truth about

MTBE and its ability to contaminate the environment.

169.    MTBE Defendants knew at least as early as 1980 of the harmful impact of MTBE

and its propensity to contaminate groundwater following a release event.

170.    For example, the American Petroleum Institute ("API") formed a Toxicology

Committee in or around 1980.  The API is a trade association that represents the domestic

petroleum industry, including MTBE Defendants, in a broad range of topics. The Toxicology

Committee included representatives of various MTBE Defendants, including Exxon, Mobil, Shell, ARCO, Tosco and Chevron.

171.    API's Toxicology Committee pursued a specific program to study MTBE. Meeting minutes reveal that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and the likelihood of extensive ingestion of MTBE through drinking water.

172.    In April 1984, an internal Exxon memorandum raised concerns about manufacturing MTBE gasoline, stating there are "ethical and environmental concerns that are not too well defined at this point." Among these concerns was the "possible leakage of s/s [service station] tanks into underground water systems of a gasoline component [MTBE] that is soluble in water to a much greater extent [than other components of gasoline]." The memorandum proposed that a study be undertaken to thoroughly review the issue with management, including a suggested proviso that any decision to manufacture MTBE gasoline should be reviewed by E. J. Hess, then the "Executive in Charge" of Exxon.

173.    A second internal Exxon memorandum in April 1984 contained another evaluation of the consequences of MTBE use. The memorandum noted that MTBE had much higher solubility than other gasoline components and this could lead to "higher levels of soluble organic contamination when [MTBE] gasoline comes in contact with water."

174.    A third internal Exxon memorandum, prepared in June 1984, reported some field information concerning groundwater contamination with MTBE. The memorandum reveals that Exxon personnel had communications with Shell personnel who had found that MTBE had a very low odor threshold of about 5 ppb, a much lower odor threshold when compared to other

constituents of gasoline. This finding, the memorandum observed, is consistent with the

recognized characteristics of ethers which "generally have a more objectionable odor than the

alcohols or aromatic hydrocarbons." A lower odor threshold requires very high levels of cleanup

efficiency to remove a contaminant, in this case MTBE, from groundwater to the point where it

could no longer be detected.

175.    An internal ARCO memorandum, dated June 14, 1984, summarized a meeting of

the API's "Ad Hoc Committee" on MTBE, which included representatives from those MTBE

Defendants then operating as Shell, Texaco, Phillips and ARCO. While this committee focused

primarily on toxicological issues involving MTBE, the memorandum noted that "MTBE is a

possible contaminant of groundwater, especially in association with leaking gasoline storage

tanks." The committee members decided to distribute funds to a sister API committee, the

Environmental Biology and Community Health Committee, for the purpose of studying taste and

odor issues associated with MTBE.

176.    In August 1984, an internal Exxon memorandum evaluated the consequences of

adding MTBE to Exxon's gasoline. The memorandum cautioned that a large-scale addition of

MTBE to Exxon's gasoline would likely increase the number of well contamination incidents by

a factor of three and increase the cost of cleaning up these incidents by a factor of five. The

memorandum cited a number of reasons supporting this conclusion, including:

a.      MTBE would travel farther than the other constituents of gasoline, creating the

need to clean up larger plumes;

b.      MTBE's low odor and taste thresholds would force the need to cleanup to more

stringent levels; and

c.     the ineffectiveness of carbon absorption clean-up techniques would force greater use of more expensive air-stripping technologies to remediate a MTBE release.

177.    By 1986, various MTBE Defendants were aware that the EPA had assembled data indicating "a leak rate of 35 percent based on a national survey of underground fuel storage tanks…."

178.    An internal Chevron memorandum, dated May 23, 1986, recognized MTBE's propensity to contaminate groundwater and soil.  The memorandum recognized the relatively high water solubility of MTBE, the impracticality of removing it from water with activated carbon, that using air stripping to remove it from water would be difficult, and "that MTBE will migrate more rapidly with the groundwater in the soil."  The memorandum recommended that additional testing of MTBE should be conducted.

179.    An internal Chevron memorandum, "Marketing Environmental Concerns Regarding the Use of MTBE in Mogas [Motor Gasoline]," dated June 11, 1986, identified a number of concerns about the potential increased use of MTBE by Chevron.  Referencing a cleanup in Maryland where MTBE was a contaminant, as well as an API study of MTBE, the memorandum stated MTBE had "several disturbing properties," including: a relatively high solubility and mobility, low odor and taste thresholds, low rate of biodegradation, and difficulty of removal from water.  The memorandum noted concern over the expected increased utilization of MTBE in Chevron gasoline because, "MTBE utilization could increase the cost to clean up leaks at service stations and terminals."

180.    In December 1986, an internal Amoco memorandum addressing potential groundwater research proposals stated that groundwater contamination was the "environmental issue of the decade" and one that had the potential to cost Amoco millions of dollars.  One of the

proposed research projects discussed was to examine the propensity for MTBE to be absorbed

into monitoring-well-casing materials, thus compromising the possibility of an early detection of

a gasoline release and the opportunity to minimize remediation costs that early detection

provides.

181.    In May, 1987, an internal Exxon memorandum analyzed data on MTBE

groundwater contamination in New York State and elsewhere in the region, including laboratory

analyses verifying MTBE in water samples from three wells in Harrison, New York and four

wells in Port Jefferson, New York.  In this report, Exxon stated: "We agree that MTBE in

gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including

benzene."  The report further stated that "[b]ecause of its more frequent occurrence, even when

other hydrocarbons are not found, we feel it is important for you to be aware of MTBE.  From an

environmental and engineering standpoint, you may need to be informed of its presence to assist

you in responding effectively to regulatory and remedial requirements."

182.    An internal 1987 Chevron memorandum raised concerns about the dangers of

MTBE gasoline released into the environment:

> Two considerations impact MTBE. One is potential health risk, and the
> second is increased solubility over normally regulated constituents of interest, i.e.
> benzene, toluene and xylene (BTX).

> MTBE is significantly more soluble in water than BTX.  Consequently,
> the dissolved "halo" from a leak containing MTBE can be expected to extend
> farther and spread faster than a gasoline leak that does not include MTBE as one
> of its constituents.

> Further compounding the problem of increased solubility, MTBE is more
> difficult to remove from groundwater using current technology (air stripping or
> carbon adsorption).  Because of its lower volatility, MTBE requires more than
> double the air stripping capacity to reach a 95 percent reduction.  Removal using
> carbon adsorption is even worse.  MTBE breaks through activated carbon four
> times faster than BTX.

183.    Amoco prepared an internal document, dated July 1, 1992, concerning MTBE,

entitled *Guideline for Handling & Storage of Ethers Used in Gasoline*. The document stated,

"Our new blended gasoline products containing ethers will also require increased levels of

attention, exceeding that associated with our storage and handling of traditional gasoline

products." The warnings contained in the document were intended for Amoco personnel. No

warnings were provided by Amoco, however, to marketers, customers or others handling MTBE

gasoline of the extra care required when handling this product.

184.    Amoco further emphasized in its July 1, 1992 document that MTBE gasoline

required greater care in handling: "The avoidance of environmental incidences and serious

environmental damage will require a greater vigilance than might be common practice for non-

oxygenated gasolines." The guidelines also recommended the use of double-walled storage

tanks with leak detection systems. The information and analysis contained in this document

were based, in part, on Amoco's knowledge of MTBE's properties (flammability, solubility, low

rate of biodegradation) and Amoco's experience cleaning up an MTBE release at one of its

terminals.

185.    In 1992, an internal Shell white paper described the dangers of MTBE once

released into the environment. The document stated that MTBE is nearly 25 times more soluble

than benzene and, therefore, an MTBE plume emanating from a gasoline spill was expected to

move faster and farther than a benzene plume. The white paper indicated that MTBE does not

biodegrade in the subsurface environment. It further indicated that MTBE has a low odor and

taste threshold, and that "at many locations odor and taste criteria may determine clean-up

levels." The white paper cautioned:

> MTBE has had impact on groundwater management at only a few Shell
> marketing terminals and service stations to date. However, as the usage of this

oxygenate begins to increase, a stringent clean-up criteria for MTBE will become adopted in more states [and] we should anticipate increased concerns over how its release to groundwater is managed.

186.    A February 2002 Shell "MtBE Policy Review" document noted with respect to warnings regarding MTBE: "At present little, if any, information is supplied to our customers on the environmental aspects of storing gasoline that contains MtBE…. Some customers could claim that, in the absence of such information or vetting, we are responsible for their remediation costs…."

187.    Hess discussed in a 1998 internal document the reasons that MTBE created environmental risks and then stated "Releases involving gasoline which contains MTBE pose a significantly greater cost to remediate and have greater potential for offsite migration.  As such, these facts underscore the importance of release prevention and rapid leak detection programs."

188.    Similarly, Texaco in a 1998 document specifically discussed the need to handle MTBE gasoline differently at service stations.

189.    In 1994, Amoco determined to utilize MTBE rather than ethanol as it's oxygenate in the U.S. east and south. Amoco elected to do so despite the information in its internal memoranda that MTBE was highly water soluble, extremely mobile in groundwater, would migrate quickly off site from service station release sites, was not biodegradable under natural conditions and, as a result, would foreseeably cause significant environmental contamination at hundreds of its service stations.  Amoco noted in its memoranda that its own studies showed "MTBE has nil biodegradability and moves with groundwater quickly" and "poses major estimated costs for accidental discharges of gasoline with MTBE."  On the other hand, ethanol, a competitor oxygenate, was found by Amoco to be "easily biodegraded" and to "present no more estimated costs [to remediate] than gasoline itself."

190.    Amoco estimated at the time that the annual environmental remediation costs that would result from the use of MTBE in its gasoline would be, as of 2002, $183 million to $211 million per year compared with $33 million if non-oxygenated gasoline was used.  However, in apparent reference to indemnification programs like the Commonwealth's USTIF program where public funds could be tapped to pay for cleanup of Amoco's MTBE contamination, Amoco noted that "state reimbursements program will reduce remediation costs by 10%."  Accordingly, despite recognizing internally the harmful effects of MTBE on the environment and concluding that using ethanol would have no impact on the environment, Amoco chose MTBE as its gasoline additive to meet its oxygenate requirements for RFG in the east and south.

191.    In January 1996, a CITGO memorandum summarized a conference call on MTBE among members of the API's Soil and Groundwater Technical Task Force.  It reported that "[t]he consensus of the API member company remediation experts is that MTBE poses a serious future remediation concern."  This consensus was based, in part, on the fact that MTBE did not naturally biodegrade and that the concentration of MTBE in gasoline would increase to the range of 12% to 16%, up from the earlier concentrations of 1% to 2%.

192.    An internal Shell document prepared in June 1997 shows that Shell was aware at least as of that time that remediating a MTBE spill would be difficult:

> MTBE is relatively quite soluble in water (compared to other components in Gasoline, like BTEX), and it moves essentially with the ground water, thus MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

193.    At all times relevant to this litigation, MTBE Defendants knew or should have known of the substantial harm caused by expected MTBE gasoline releases and the substantial difficulty of remediating groundwater and soil contaminated by MTBE.

**MTBE DEFENDANTS PUBLICLY DEFENDED AND PROMOTED
MTBE DESPITE THEIR KNOWLEDGE OF THE ENVIRONMENTAL
RISKS POSED BY MTBE RELEASES**

194.    MTBE Defendants defended and promoted the use of and distributed MTBE

and/or MTBE gasoline in Pennsylvania when they knew or should have known that MTBE

releases from various gasoline storage and delivery systems were likely, and that such releases

could and would pollute the waters of the Commonwealth.

195.    Further, MTBE Defendants defended and promoted the use, marketing and

distribution of MTBE and/or MTBE gasoline when they knew or should have known the unique

and difficult problems to remediate MTBE contamination from groundwater and soil, and which

problems could and would increase the costs and time associated with such remediation.

196.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of

Environmental Protection authored a paper titled "Methyl Tertiary Butyl Ether as a Groundwater

Contaminant" ("Garrett Report"). Based upon the authors' analysis of approximately 30 Maine

wells contaminated with MTBE, the report stated that: (a) groundwater contaminated with

MTBE is difficult to remediate; (b) MTBE is more soluble than the other constituents of gasoline

and therefore a plume of MTBE in groundwater will be more extensive than the plume of the

other gasoline components; and (c) MTBE has a distressing "terpene-like" odor in low

concentrations. The Garrett Report's authors recommended that MTBE be banned as a gasoline

additive, or, at least, be stored in double-contained facilities.

197.    The Garrett Report authors planned to present their report at proceedings of the

"Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference," in November

1986. This conference was jointly sponsored by the National Well Water Association and the

API.

61

198.    Before its publication and public presentation, a draft of the Garrett Report was widely circulated in the oil industry.  Oil industry representatives, including many of the MTBE Defendants, joined forces to pressure the authors to radically revise their negative conclusions and recommendations about MTBE, and/or to discredit the report in order to protect and maintain MTBE's competitive advantage as a gasoline additive.

199.    On or about December 23, 1986, a staff member of the API's Groundwater Technical Task Force ("GTTF") forwarded the Garrett Report to other GTTF members, including representatives of Shell and Exxon.  Comments from GTTF members concerning the report culminated in a letter from the API to the National Well Water Association.  The letter attacked the Garrett Report:

> The [Garrett Report] authors' "recommendations" that MTBE … be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted, and counter-productive.

200.    Amongst themselves, however, MTBE Defendants knew their criticisms of the Garrett Report were inaccurate and misleading.  For example, ARCO, in a communication to others within the oil industry stated in a letter dated February 4, 1987, "we don't have any data to refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

201.    In 1986, the federal Interagency Testing-Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.  The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not "to be readily biodegradable."  The ITC recommended chemical fate

monitoring of MTBE to determine the risk MTBE poses to the environment. The ITC also

recommended additional medical testing of MTBE and invited written comments. The oil

industry, including MTBE Defendants, mobilized to convince the EPA that additional testing of

MTBE was not needed.

202.    On or about December 12, 1986, ARCO, on behalf of and/or with the approval of

MTBE Defendants, responded to the 1986 ITC Notice in an effort to derail further testing of

MTBE. ARCO's comments included a critique of the information review of MTBE on which

the ITC had relied. ARCO's submission stated that it's "critique of the report revealed that some

erroneous assumptions had been made that cause the hazards of MTBE to be seriously

overestimated." In further comments to the EPA, ARCO also stated:

> Characteristics - Moderate water solubility is reported. However, an
> ARCO Technical Bulletin states that "MTBE is only slightly soluble in water..."

*  *  *

> The … report states that potential environmental exposure is "high." This
> conclusion is not supported by the available information.

*  *  *

> Exposure from accidental spills of MTBE could occur, but should be
> regarded as a minimal possibility. The closed nature of the manufacturing and
> transportation process reduces worker exposure and product loss. Training and
> safety programs also lower the possibility of accidental spills. Many current
> programs at EPA and industry are underway to monitor and reduce the possibility
> of gasoline loss from leaking underground storage tanks … MTBE losses would
> be extremely small from this source.

*  *  *

> VI.    Environmental Information

> As has been reportedly stated, environmental entry would not occur in
> every stage of the gasoline marketing chain…. Environmental entry of MTBE
> from this course would be considerably less than the report indicates.

63

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

203.    ARCO's comments to EPA in response to the ITC Notice, which were made with other MTBE Defendants' explicit or implicit approval, were false and misleading when made, improperly downplayed the risks of MTBE contamination of groundwater and omitted material facts known to ARCO and other MTBE Defendants at the time.

204.    On or about December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. ARCO and Exxon made a presentation supporting the industry position that additional medical testing of MTBE was unnecessary.

205.    In or around early 1987, a multi-company task group was formed by MTBE Defendants, known as the "MTBE Committee." This committee's express purpose, as set forth in a written agreement, was "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." MTBE Defendants' MTBE Committee included representatives of defendants ARCO, BP Amoco, Chevron, CITGO, Exxon, Shell and Sunoco, among others industry companies. Neither EPA nor any government entities were included in the Committee.

206.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of MTBE Defendants' MTBE Committee, held its first meeting to coordinate their "plan of attack" on the 1986 ITC recommendations.

207.    Although MTBE Defendants were aware that EPA was interested in obtaining more information about MTBE in groundwater, MTBE Defendants were not forthcoming in their responses to EPA and failed to fully and fairly disclose what they knew about MTBE's environmental and health hazards.

208.    On or about February 12, 1987, ARCO responded to the EPA's request for

information about "data gaps" concerning MTBE's environmental and health effects, stating:

> Item D requests more information on the presence and persistence of MTBE in
> groundwater.  We are not aware of any incidents where MTBE contaminated
> groundwater at manufacturing facilities.  Where gasoline containing MTBE is
> stored at refineries, terminals, or service stations, there is little information on
> MTBE in groundwater.  We feel there are no unique handling problems when
> gasoline containing MTBE is compared to hydrocarbon-only gasoline.

ARCO knew these statements were false and misleading.

209.    On or about February 27, 1987, MTBE Defendants' MTBE Committee submitted

written comments to the EPA in an improper effort to deter it from requiring additional health

and environmental testing of MTBE.  The information provided by MTBE Defendants was

misleading and false.  MTBE Defendants' information to the EPA falsely represented, *inter alia*,

that MTBE is only slightly soluble in water, that potential environmental exposure is not high,

and that MTBE has excellent biodegradation characteristics.  The MTBE Defendants' MTBE

Committee's statement to EPA further falsely stated:

> there is no evidence that MTBE poses any significant risk of harm to health or the
> environment, that human exposure to MTBE and release of MTBE to the
> environment is negligible, that sufficient data exists to reasonably determine or
> predict that manufacture, processing, distribution, use and disposal of MTBE will
> not have an adverse effect on health or the environment, and that testing is
> therefore not needed to develop such data.  Furthermore, issuance of a test rule
> requiring long term chronic testing will have a significant adverse environmental
> impact.

210.    MTBE Defendants consistently misstated to EPA the environmental benefits of

MTBE while understating or concealing its serious environmental hazards, which doing so,

MTBE Defendants knew was false and misleading.  By such actions MTBE Defendants intended

to a) forestall public scrutiny of their decision to increase concentrations of MTBE in gasoline,

and, at the same time, b) avoid or obstruct health and environmental safety research that would

have revealed what MTBE Defendants already knew of MTBE's harmful effects on groundwater.

211.   In April 1987, George Dominguez, a member of MTBE Defendants' MTBE Committee, gave a presentation at an oil industry event, the Conference on Alcohols and Octane. Mr. Dominguez represented during his presentation that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." These statements were false and misleading in view of what the MTBE Committee members knew or had reason to know about MTBE.

212.   Although MTBE Defendants' MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the Committee did no such thing and disbanded approximately one year after achieving its goal of limiting testing.

213.   In April 1987, ARCO, a major manufacturer of MTBE at the time, published a bulletin describing the "proper" handling of MTBE during storage and shipping, including material compatibility and safety information.  The document stated that "[g]asoline containing MTBE is handled in the same manner as hydrocarbon-only gasoline. There are no extraordinary handling or safety precautions."  These statements were false and misleading when made and ARCO knew they were false.

214.   In February 1993, the Lyondell Chemical Company ("Lyondell")[1], which at this time was the world's leading producer of MTBE, published a Product Safety Bulletin describing Lyondell's recommendations for receipt, unloading, storage, transfer, processing, and disposal of

---

[1] The term "Lyondell" as used in this Complaint refers to Lyondell Chemical Company, Lyondell Chemical Worldwide, Inc., Arco Chemical Company and Arco Chemical Corporation.

neat MTBE.  While indicating that the water solubility of neat MTBE made some special

handling necessary, the Bulletin asserted that "Blended gasoline that contains lower levels of

MTBE is generally handled in the same manner as hydrocarbon-only gasoline and requires no

extraordinary precautions."  These statements about MTBE gasoline were false and misleading

when made and Lyondell knew they were false.

215.    MTBE Defendants knew or had reason to know that the aforesaid statements by

ARCO and Lyondell were false and misleading and that the environmental hazards, dangers and

harms of MTBE required much greater precaution and heightened safety measures.

216.    As widespread MTBE groundwater contamination began to appear, MTBE

Defendants further acted to conceal or obfuscate the true facts of the dangers that MTBE posed

to the environment.  For example, in April 1996, the Oxygenated Fuels Association ("OFA"), a

captive entity of MTBE Defendants, published and distributed a pamphlet entitled "Public

Health Issues and Answers."  The pamphlet falsely stated: "On rare occasions, MTBE has been

discovered in private drinking water wells where the source of MTBE has been attributed to

leaks from nearby underground storage tanks."  OFA's pamphlet further expressed confidence

that federal regulations and industry practices made such contamination largely a thing of the

past.  These statements were false and misleading when made and OCF and its defendant

members knew or had reason to know they were false.

217.    Through these kinds of misleading communications, MTBE Defendants failed to

properly, adequately and timely alert and inform persons and entities engaged in the storage,

transport, handling, retail sale, use, and responding to spills of such gasoline (hereinafter referred

to as "downstream handlers"), intended users and consumers and the general public to the

unapparent environmental hazards and dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

218.    A September 15, 1999 report by a special EPA Blue Ribbon Panel stated that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas, that MTBE "has caused widespread and serious contamination," and EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

219.    In its September 15, 1999 report, the EPA Blue Ribbon Panel recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely.  The Panel also recommended accelerating assessments of drinking water protection areas required under the Safe Drinking Water Act, particularly in those areas where high MTBE-content gasoline was used.  The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."

220.    In making MTBE their oxygenate of choice, MTBE Defendants decided to forego safer oxygenates, such as ethanol.  In fact, only belatedly after massive MTBE environmental harm had already occurred, did some gasoline sellers publicly acknowledge that MTBE is neither environmentally safe nor necessary.  Getty Marketing, for example, placed full page ads in the New York Times on October 13, 1999, that stated:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways.  That's what we're doing at Getty. We have replaced MTBE with ethanol in our gasoline because it helps clean the air without harming our drinking water.

**MTBE DEFENDANTS BREACHED THEIR DUTIES TO PLAINTIFF AND
THE GENERAL PUBLIC CONCERNING THE PROPER, SAFE
MANAGEMENT AND USE OF MTBE AND MTBE GASOLINE**

221.     MTBE Defendants, who promoted the use of MTBE gasoline for its purported

environmental benefits, knew or reasonably should have known of the grave harm and threat to

public health, safety and welfare and the environment represented by the proliferating use of

MTBE, including, but not limited to: a) widespread contamination of surface and groundwater

with MTBE; b) the rendering of groundwater unfit, unpalatable and unusable for consumption;

and c) the increased costs to the Commonwealth and others in addressing MTBE contamination

of waters of the Commonwealth.

222.     MTBE Defendants, as the manufacturers, refiners and suppliers of MTBE and

MTBE gasoline, knew or reasonably should have known the MTBE being sold or

acquired would be used primarily to compound and manufacture MTBE gasoline.  MTBE

Defendants were aware or reasonably should have been aware of the peculiar environmental

risks involved in such use of MTBE.  MTBE Defendants had a non-delegable duty and breached

their duty to inform and warn downstream handlers of MTBE gasoline, including jobbers and

station operators, of the peculiar risks and necessary precautions associated with the products.

223.     MTBE Defendants, as the manufacturers, refiners and suppliers of MTBE and

MTBE gasoline, had a duty and breached their duty to evaluate and test MTBE and MTBE

gasoline adequately and thoroughly to determine the environmental impact and transport

characteristics, including the potential harm to human health, comfort, safety and welfare, before

they produced and sold MTBE and MTBE gasoline.

224.     MTBE Defendants had a duty and breached their duty to minimize the

environmental harm caused by MTBE and MTBE gasoline.

225.    MTBE Defendants had a duty and breached their duty to take precautions,

including warnings and/or instructions, necessary to ensure that MTBE gasoline was properly

and safely used, transported, stored and dispensed and that all necessary measures to promptly

detect, contain, abate and respond to spills and leaks were instituted.

226.    MTBE Defendants failed to adequately evaluate, test, store, warn, mitigate or

otherwise ensure that MTBE gasoline would not contaminate waters of the Commonwealth.

227.    As a direct, indirect and proximate result of MTBE Defendants' failures and

breaches of duties as aforesaid, MTBE was released into the environment, causing, and

threatening to cause, widespread contamination of the waters of the Commonwealth.

228.    In addition to their negligent and/or reckless conduct alleged herein, MTBE

Defendants intentionally failed to warn downstream handlers and intended users and consumers

as to the danger that MTBE Defendants knew MTBE presented to the environment and to public

health, safety and welfare, and which dangers were not known and readily apparent to the

general public.  MTBE Defendants also engaged in separate and joint activity to mislead the

public regarding these same dangers.

### MTBE DEFENDANTS KNEW THAT MTBE RELEASES WOULD OCCUR IN PENNSYLVANIA FROM GASOLINE STORAGE AND DELIVERY SYSTEMS

229.    The widespread problems of gasoline releases from leaking gasoline storage and

delivery systems were well known to MTBE Defendants prior to the introduction of MTBE and

MTBE gasoline into Pennsylvania.

230.    At all times material hereto, MTBE Defendants knew, or reasonably should have

known, that gasoline storage and delivery systems in Pennsylvania and elsewhere a) generally

suffered significant and widespread leaks and/or failures, and b) released gasoline products into the environment, including into groundwater.

231.   Certain MTBE Defendants obtained first-hand knowledge and experience of the these leaks and releases because they owned and operated individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in Pennsylvania and/or exercised control over such gasoline stations through a variety of means, including written agreements, inspection rights, prescribing certain procedures and operating practices, prescribing specifications for products, conditions on sale of branded goods, agreements obligating such stations to acquire, store and sell MTBE gasoline, and training.

232.   For most of the 20th century, the petroleum industry had an indifferent attitude towards small-volume gasoline leaks and spills.  The components of traditional gasoline are relatively insoluble and biodegrade fairly readily.  Because of these characteristics they rarely caused significant health, financial and/or remediation problems to MTBE Defendants and low-level gasoline (without MTBE) releases were tolerated and accepted as part of normal business practices.  Delivery spills were thus common, maintenance activities frequently involved spilling fuel, and inventory control, which MTBE Defendants were aware or had reason to know could not detect small leaks, was generally considered to be adequate for leak and release detection. Because the solubility of the gasoline constituents was quite low generally, relatively few traditional gasoline contaminants made their way into the groundwater.

233.   The introduction of MTBE into gasoline, however, changed things dramatically and meant that small or minor types of leaks and spills could and did significantly impact groundwater.  Even a small release of MTBE gasoline could result in MTBE concentrations in

groundwater that were above taste and odor threshold levels, rendering the water unusable without expensive treatment.

234.    Downstream handlers and intended users and consumers had been releasing gasoline into the environment for decades.  These people continued to routinely spill or release gasoline after MTBE was added to gasoline as an additive because they did not know and were not told by MTBE Defendants they needed to do anything different.  Protection of groundwater and human health, however, required that downstream handlers and intended users and consumers needed to receive instructions and information alerting them that routine behavior was not suitable for handling MTBE gasoline and that even very small releases of MTBE or MTBE gasoline could lead to harmful consequences to the environment and human health.

235.    Among other things, MTBE Defendants knew, or reasonably should have known, at the time they were utilizing and promoting MTBE as a gasoline additive that:

a.    the gasoline distribution and retail system throughout Pennsylvania contained leaking gasoline storage and delivery systems;

b.    large areas of Pennsylvania were and are highly dependent upon groundwater as the source for domestic water; and

c.    release of MTBE into the environment would be an expected consequence of marketing and placing MTBE and MTBE gasoline into the stream of commerce, especially in the absence of precautionary measures necessary to prevent or mitigate such releases, which measures MTBE Defendants failed to take.

236.    MTBE Defendants also knew, or reasonably should have known, that to a greater extent than the other constituents of gasoline MTBE, when released into the environment, would move great distances, mix easily with water, resist biodegradation, render drinking water

unpalatable and non-potable, and require significant expenses to define the extent of, monitor,

treat and remediate the contamination.

237.    Despite knowing the risk of groundwater contamination posed by MTBE, and

despite the availability of reasonable alternatives and risk minimization or elimination, including

adequate warnings or instructions, MTBE Defendants failed to warn or instruct retailers,

customers, other downstream handlers, intended users and consumers and the public on the

dangers of and/or the proper handling of MTBE and MTBE gasoline.  MTBE Defendants further

failed to take appropriate precautionary measures to prevent or mitigate MTBE contamination.

Instead, MTBE Defendants falsely promoted MTBE and MTBE gasoline as environmentally

sound products suitable for widespread use.

238.    Manufacturers of hazardous substances typically address Occupational Safety and

Health Administration ("OSHA") hazard communication requirements by providing material

safety data sheets ("MSDSs") to their customers.  MTBE Defendants did not adequately address

MTBE in their MSDSs.  The public position of MTBE Defendants was that MTBE gasoline

could be handled just like traditional gasoline and that the traditional standard-of-care for

gasoline without MTBE was adequate for MTBE gasoline.

239.    Among other things, these false representations by MTBE Defendants provided

their MTBE gasoline with an unfair competitive advantage and with greater profit margins over

other gasolines in the marketplace utilizing alternative safer, but more expensive, octane and

oxygenation additives.

240.    Moreover, MTBE Defendants engaged in separate and/or joint activities to

suppress, conceal, downplay and/or discredit studies and other information regarding the hazards

of MTBE.  MTBE Defendants' wrongful conduct in this regard, among other things, proximately caused

a.      a dramatic increase in the use and corresponding presence of MTBE gasoline in Pennsylvania;

b.      the consequent contamination and damage to the waters of the Commonwealth as and when inevitable releases of MTBE gasoline occurred;

c.      substantial economic losses and damages incurred by the Commonwealth in its efforts to define the extent of, monitor, treat and remediate the contamination; and

d.      negative impact upon competitive, safe alternative oxygenate additives such as ethanol.

241.    MTBE Defendants knew at all times material that it was substantially certain that their acts and omissions as set forth herein would threaten public health, cause extensive contamination of groundwater and drinking water supplies and otherwise cause the injuries described herein.  MTBE Defendants acted or failed to act as aforesaid knowingly, willfully and fraudulently, maliciously and/or wantonly with conscious disregard of plaintiff's rights, public health and safety and probable injury to the environment, and/or with gross negligence.

**THE IMPACT OF MTBE AND MTBE GASOLINE ON THE
WATERS OF THE COMMONWEALTH**

242.    At all times material to this action, despite their knowledge that contamination of waters of the Commonwealth with MTBE was the inevitable result of their conduct, MTBE Defendants continued to refine, market, promote, and supply MTBE gasoline in the Commonwealth.

243.    Reformulated gasoline containing significant quantities of MTBE was sold on a virtually universal basis throughout Pennsylvania beginning in the 1990s as a result of MTBE Defendants' efforts.

244.    MTBE contamination is associated with all transportation, storage and use of MTBE gasoline.

245.    MTBE contamination has injured, and continues to injure and threaten, the waters of the Commonwealth, and the health, safety and welfare of the citizens of Pennsylvania on a wide-spread and substantial basis throughout the state.

246.    MTBE is a "regulated substance" under Commonwealth environmental statutes, including under 35 P.S. §§ 6021.101 – 6021.2105 and 35 P.S. §§ 6026.101 – 6026.909.

247.    At all times material hereto, the Commonwealth has established a Statewide Health Standard ("SHS") for MTBE at 20 parts per billion ("ppb") for groundwater in most aquifers in Pennsylvania.

248.    Since its introduction into gasoline, MTBE has been found in groundwater throughout Pennsylvania in varying significant concentrations as high as 2,100,000 ppb. MTBE contamination has been found in groundwater in every county in Pennsylvania.

249.    Pennsylvania relies heavily on groundwater for public drinking-water supplies. There are nearly one million private and public water supply wells in Pennsylvania. As of 2003, the combined populations served by (1) community systems with groundwater as a primary source of drinking water, (2) community systems with at least one groundwater source, and (3) private on-lot wells accounted for nearly half of the population of Pennsylvania. In 2005, about 210 million gallons of groundwater were used per day for public drinking-water supply, or nearly 15 percent of all water used for public drinking water in Pennsylvania.

250.     Under Pennsylvania law, all groundwater in aquifers is presumed to be used or currently planned for human use, unless determined otherwise by DEP. 25 Pa. Code § 250.303.

251.     MTBE has been found throughout the Commonwealth in varying concentrations and at varying times in both public water supply wells and private domestic wells.

252.     The Commonwealth and its citizens are entitled under law to clean groundwater uncontaminated by MTBE.

253.     Whether or not previously remediated to levels at or below the SHS of 20 ppb, groundwater that contains MTBE is and remains damaged as a result of MTBE Defendants' acts and omissions as alleged herein.

254.     Since the inception of the USTIF program in 1994, there have been approximately 3,400 documented releases of gasoline into the environment from USTIF indemnified facilities. Releases have occurred in every county in Pennsylvania.  A substantial portion of these gasoline releases have involved MTBE gasoline and resulted in MTBE contamination of groundwater and the expenditure of significant funds by the Commonwealth to define the extent of, monitor, treat and remediate MTBE contamination.  Such releases of MTBE gasoline include by way of example, but are in no way limited to, the following:

1)    Release detected on or about August 11, 1999 of MTBE gasoline from Maloy Amoco Station located at 101 Altman Road, Jeannette, PA (Westmoreland County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,381,081.82;

2)    Releases detected on or about November 1998 and March 23, 2001 of MTBE gasoline from Neffsville Sunoco Station (formerly Neffsville Amoco Station) located at 2548 Lititz Pike, Borough of Neffsville (Lancaster County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

3)    Release detected on or about May 22, 2001 of MTBE gasoline from the Five Gables Amoco station located at 5869 Business Route 220, Cessna, PA (Bedford County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,089,578.44;

4)      Release detected on or about May 14, 1996 of MTBE gasoline from the Route 119 Dunbar Amoco located at 1809 University Drive, Dunbar, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,036,118.01;

5)      Release detected on or about August 2, 1999 of MTBE gasoline from the Market Street BP located at the corner of Market Street & Loveland Avenue, Kingston, PA (Luzerne County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,033,594.85;

6)      Release detected on or about February 13, 2006 of MTBE gasoline from the Ruff Creek BP located at 720 Washington Road, Prosperity, PA (Greene County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $949.990.81;

7)      Release detected on or about October 1995 of MTBE gasoline from the Center Square CITGO Station, 1273 DeKalb Pike, Center Square, PA (Montgomery County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

8)      Release detected on or about February 1996 of MTBE gasoline from the Rick's CITGO station, 87 N. Main Street, Mansfield, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $836,152.32;

9)      Release detected on or about January 6, 1998 of MTBE gasoline from the Pikes Creek CITGO station, SR 118 & SR 29, Pikes Creek, PA (Luzerne County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

10)     Release detected on or about May 28, 2002 of MTBE gasoline from the Mt. Cobb CITGO station, Route 348 & Route 247, Lake Ariel, PA (Lackawanna County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,006,381.20;

11)     Release detected on or about November 5, 1998 of MTBE gasoline from the Jim's Food Rite/Coastal Mart #7430, State Route 54, Turbotville, PA (Northumberland County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,092,876.37;

12)     Release detected on or about October 17, 2001 of MTBE gasoline from the Fairway Coastal station, 320 South Chester Road, Wallingford, PA (Delaware County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $378,268.10;

13)     Release detected on or about December 16, 2002 of MTBE gasoline from the Honeybrook Coastal station, 2500 Conestoga Avenue, Honey Brook, PA (Chester County),

resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $880,704.43;

14)    Release detected on or about December 15, 1993 of MTBE gasoline from the Ron Matz Exxon Station (PADEP Facility ID 25-3638), 9088 W. Main Road, McKean Borough, PA (Erie County), resulting in investigation, personnel and filtration costs paid to date by the Commonwealth in excess of $400,000. In 2009, the local community obtained a $4.5 million grant and $700,000 loan from PENNVEST to fund a project to extend water supply lines to the affected area;

15)    Release detected on or about December 12, 1994 of MTBE gasoline from the Ted Sobek's Exxon station, 3091 South Pittsburgh Road, Star Junction, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $988,292.87;

16)    Release detected on or about October 31, 1995 of MTBE gasoline from the Bitner's Exxon station, 201 Susquehanna Avenue, Lock Haven, PA (Clinton County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $992,188.50;

17)    Release detected on or about February 14, 2000 of MTBE gasoline from the Lehigh Marts Exxon station, Route 313 & Route 113, Perkasie, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,272,554.83;

18)    Release detected on or about March 1994 of MTBE gasoline from the Heichel Gulf station, 82 South Main Street, Mansfield, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

19)    Release detected on or about November 25, 1998 of MTBE gasoline from the Bowers Gulf station, 12 East Avenue, Wellsboro, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $876,300.72;

20)    Release detected on or about October 7, 1996 of MTBE gasoline from the Hess Service Center, Ltd., 801 Route 15 North, Dillsburg, PA (York County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,388,543.84;

21)    Release detected on or about May 1, 1999 of MTBE gasoline from the Hess Station #38411, Route 4037, Fleetwood, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $766,776.49;

22)    Release detected on or about September 9, 1995 of MTBE gasoline from the Hilltop Sunoco, State Route 6 & I-84, Milford, PA (Pike County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000.000;

23)      Release detected on or about May 30, 2002 of MTBE gasoline from the Flinn's Mobil station, 1910 Baltimore Pike, Gettysburg, PA (Adams County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,294,810.49;

24)      Release detected on or about February 3, 2005 of MTBE gasoline from the R.P. Hoffman Mobil station, Route 940 & Long Pond Road (adjacent to Interstate 380), Pocono Summit, PA (Monroe County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,677,054.16;

25)      Release detected on or about May 22, 1998 of MTBE gasoline from the Reese's Shell station, 10 North Railroad Street, Myerstown, PA (Lebanon County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $984,979.88;

26)      Release detected on or about March 13, 2001 of MTBE gasoline from the Holiday Shell station, 8030 Perry Highway, Erie, PA (Erie County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $750,706.03;

27)      Release detected on or about October 17, 2007 of MTBE gasoline from the Bath Shell Shi Nickel station, 7857 Bethlehem-Bath Pike, Bath, PA (Northampton County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $772,866.61;

28)      Release detected on or about April 27, 1994 of MTBE gasoline from the Campbell Sunoco Ultra Service Center, 1111 Clay Pike, North Huntington, PA (Westmoreland County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,000,000.00;

29)      Release detected on or about January 13, 1998 of MTBE gasoline from the former Sunrise Sunoco station, 1479 Old Brodhead Road, Monaca, PA (Beaver County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $956,233.68;

30)      Release detected on or about February 1, 1999 of MTBE gasoline from the Toto's Sunoco Food Market, 1138 E. Susquehanna Avenue, Philadelphia, PA (Philadelphia County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $933,411.92;

31)      Release detected on or about February 4, 1999 of MTBE gasoline from the Bill's Texaco Station, 5510 Allentown Boulevard, Harrisburg, PA (Dauphin County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,015,606.17;

32)      Release detected on or about August 19, 1999 of MTBE gasoline from the Dublin Texaco Exxon station, Dublin, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

33)     Release detected on or about March 3, 2004 of MTBE gasoline from the Pipersville Texaco station, 6816 Easton Road, Pipersville, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,416,473.76;

34)     Release detected on or about October 14, 1999 of MTBE gasoline from the Starbrick BP station, 2609 Pennsylvania Avenue W., Warren, PA (Warren County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $445,625.88;

35)     Release detected on or about March 13, 1995 of MTBE gasoline from the Bruno & Sons Service Station, 500 East Lancaster Avenue, Downingtown, PA (Chester County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,482,649.41;

36)     Release detected on or about August 1, 1995 of MTBE gasoline from the Marshalls Creek Service Station, Business Route 209 & Route 402, Marshalls Creek, PA (Monroe County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,585,886.19;

37)     Release detected on or about February 27, 1996 of MTBE gasoline from the Automotion Service Center, 110 Revere Boulevard, Reading, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,987,702.37;

38)     Release detected on or about February 26, 1996 of MTBE gasoline from the Nichols Plaza station, 1103 Pennsylvania Avenue West, Warren, PA (Warren County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $971,300.00;

39)     Release detected on or about December 6, 1995 of MTBE gasoline from the Lawrenceville Downtown Time Saver station, Route 49 & Route 15, Lawrenceville, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $904,321.55;

40)     Release detected on or about October 9, 1996 of MTBE gasoline from the Fisher's Service, Inc. station, 335 N. Main Street, Butler, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $808,889.77.

41)     Release detected on or about February 25, 1997 of MTBE gasoline from the Dye's Service station, 2295 Mercer Road, Stoneboro, PA (Mercer County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $967,838.55.

42)     Release detected on or about February 20, 1997 of MTBE gasoline from the former Penns Pantry CE Schneck, 2965 Lebanon Road (Route 72), Manheim, PA (Lancaster County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,751,455.50.

43)      Release detected on or about July 20, 1998 of MTBE gasoline from the Matus Service station, 2453 Old Rt. 18, Wampum, PA (Lawrence County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,927,745.75.

44)      Release detected on or about February 22, 1999 of MTBE gasoline from the Bob Nolan's Auto Service station, 2464 Bristol Pike, Bensalem, PA (Bucks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,873,475.17.

45)      Release detected on or about June 10, 1998 of MTBE gasoline from the Kicks Convenience Store, 220 Lake Street, South Fork, PA (Cambria County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,456,102.68.

46)      Release detected on or about October 18, 1996 of MTBE gasoline from the Country Fair Store #95 facility, 76 North Main Street, Union City, PA (Erie County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $223,495.69.

47)      Release detected on or about September 1, 1995 of MTBE gasoline from the Country Fair Store #44 facility, 1681 S. Center St. Ext., Grove City, PA (Mercer County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $423,654.13.

48)      Release detected on or about July 25, 2000 of MTBE gasoline from the Country Fair Store #93 facility, 228 West Main Street, Grove City, PA (Mercer County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $266,993.88.

49)      Release detected on or about February 19, 2004 of MTBE gasoline from the Country Fair Store #84 facility, 7400 Peach Street in Summit Township, PA (Erie County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $674,454.83.

255.      Other releases of MTBE gasoline have occurred from USTIF indemnified sites in Pennsylvania owned or operated by independents not publicly affiliated with particular MTBE Defendants.  In such instances, the MTBE gasoline that was released was often obtained on the spot market from jobbers.  Jobbers purchase gasoline from various MTBE Defendants which they would sometimes blend together before sale and delivery to independent stations.  These releases of MTBE gasoline include by example, but are in no way limited to:

1)      Release detected on or about October 12, 1994 of MTBE gasoline from the Brownies Service Station, 113 Main Street, Greenville, PA (Mercer County), resulting in

investigation and remediation costs paid to date by the Commonwealth in excess of $1,056,054.14;

2)     Release detected on or about December 16, 1994 of MTBE gasoline from the CR's Friendly Market No. 1, 1501 N. 9th Street, Reading, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,596,573.36;

3)     Release detected on or about October 10, 1994 of MTBE gasoline from Cranberry Township Public Works Facility, 20727 US Route 19, Cranberry, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $924,717.79;

4)     Release detected on or about March 22, 1995 of MTBE gasoline from Morgan's Service Station, 190 South Tremont Street, Tremont, PA (Schuylkill County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,593,015.78;

5)     Release detected on or about July 19, 1995 of MTBE gasoline from the former Sheetz #17, 130 Belmont Street, Johnstown, PA (Cambria County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,087,507.84;

6)     Release detected on or about September 14, 1995 of MTBE gasoline from the former Zippy Market, Old Route 15 (Lycoming Creek Road & Stone Drive), Hepburnville, PA (Lycoming County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $827,548.52;

7)     Release detected on or about February 23, 1996 of MTBE gasoline from the Kwik Fill Station No. S-010, 631 West New Castle Road, Zelienople, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $870,608.45;

8)     Release detected on or about March 20, 1996 of MTBE gasoline from the Squirrel Hill Automotive, 2001 Murray Avenue, Pittsburgh, PA (Allegheny County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $912,494.10;

9)     Release detected on or about September 1996 of MTBE gasoline from the Landhope Farms #5, Route 10, Limestone Road, Oxford, PA (Chester County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $944,802.02;

10)    Release detected on or about November 1, 1996 of MTBE gasoline from the Bressler Service, Inc. station, Route 501 & Old US Route 22, Bethel, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $863,783.38.

11)     Release detected on or about July 1996 of MTBE gasoline from Sheetz #149, 124 N. Brady Street, Dubois, PA (Clearfield County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $995,908.98.

12)     Release detected on or about March 1997 of MTBE gasoline from Sheehan Motors, Inc., 926 Second Street, Cresson, PA (Cambria County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $927,414.78.

13)     Release detected on or about June 24, 1997 of MTBE gasoline from Dennis Lumber Company, R.R. 1, Box 109, Markleysburg, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $798,542.96.

14)     Release detected on or about October 21, 1997 of MTBE gasoline from the Doms Service Station, 2400 Eighth Avenue, Altoona, PA (Blair County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,203,814.95.

15)     Release detected on or about April 21, 1998 of MTBE gasoline from Kauffman Mini Mart, I-78 Exit 8, Shartlesville, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,131,285.05.

16)     Release detected on or about December 20, 2005 of MTBE gasoline from Lens Hartsville Garage, 1075 W. Bristol Road, Warminster, PA (Bucks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,196,770.60.

17)     Release detected on or about September 23, 1998 of MTBE gasoline from Snow Shoe Auto Truck Stop, Inc., R.R. 1 Box 143, Snow Shoe, PA (Centre County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,445,480.64.

18)     Release detected on or about September 2, 1998 of MTBE gasoline from Pickelner Lock Haven Bulk Plant facility (Lock Haven Division), 204 Second Avenue, Lock Haven, PA (Clinton County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,298,083.74.

19)     Release detected on or about March 16, 1999 of MTBE gasoline from the Top Star Middletown, 2826 E. Harrisburg Pike, Middletown, PA (Dauphin County), resulting in cleanup costs paid to date by the Commonwealth in excess of $2,503,601.60.

20)     Release detected on or about December 16, 1999 of MTBE gasoline from the former Mike's Fancy Service Center, 7947 Boyertown Pike, Boyertown, PA (Berks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,989,151.51.

21)     Release detected on or about October 13, 2000 of MTBE gasoline from Sanatoga Oil Company Inc. facility, 2177 East High Street, Pottstown, PA (Montgomery County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,211,752.03.

22)    Release detected on or about March 24, 2004 of MTBE gasoline from the former Walt Whitman Truck Stop, 3540 South Lawrence Street, Philadelphia, PA (Philadelphia County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,749,835.55.

23)    Release detected on or about March 31, 2005 of MTBE gasoline from the former 307 Mini Mart, Route 307, Moscow, PA (Lackawanna County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,422,368.97.

24)    Release detected on or about May 26, 2005 of MTBE gasoline from Lockwoods Inc. station, Route 296 & Cortez Road, South Canaan, PA (Wayne County), resulting in cleanup costs paid to date by the Commonwealth in excess of $2,984,269.63.

256.    Other releases of MTBE gasoline have occurred in Pennsylvania from sites not indemnified by USTIF for which Commonwealth funds have been and will be expended in determining the extent of, monitoring, treating, remediating and otherwise addressing releases of MTBE in the groundwater.

257.    MTBE Defendants are responsible for MTBE and MTBE gasoline that was released, directly or indirectly, into the waters of the Commonwealth.

258.    As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred, and will continue to incur, significant costs and expenses in investigating, monitoring, treating, remediating and otherwise addressing releases of MTBE into the waters of the Commonwealth.

259.    Total expenditures by the Commonwealth to date to define the extent of, monitor, treat and remediate gasoline releases from USTIF indemnified sites, a substantial portion of which have involved MTBE gasoline and resulting MTBE contamination of groundwater, exceed $738 million.

260.    Under Pennsylvania law, USTIF, after payment of any cost of corrective action, is "subrogated to all of the rights of recovery of an owner or operator against any person for the cost of remediation." 25 Pa. Code § 977.40(a).

261.    The Commonwealth, through USTIF, is subrogated to the rights of recovery of USTIF's indemnified owners and operators against MTBE Defendants for the cost of defining the extent of, monitoring, treatment, remediation and any other corrective action in addressing MTBE contamination.

262.    In addition to monies paid or incurred by the Commonwealth under the USTIF program, the Commonwealth through DEP and other agencies have expended funds and staff time in defining the extent of, monitoring, treatment and remediation of MTBE contamination from releases from both USTIF indemnified facilities and other sources.

263.    Defining the extent of, monitoring, treatment and remediation of MTBE contamination was a substantial factor in the costs incurred by the Commonwealth in each investigation and remediation of releases of MTBE gasoline.

264.    As a result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth is entitled to recover from the MTBE Defendants all of the monies and the value of the staff time expended by the Commonwealth to date and into the future in defining the extent, monitoring, treatment and remediation of MTBE gasoline and MTBE contaminated groundwater.

265.    In addition, because its natural resources are damaged by the continuing presence of MTBE in groundwater at detectable levels, the Commonwealth is entitled to recover from MTBE Defendants the future costs to define the extent of, monitor, treat and remediate MTBE contaminated groundwater.

**MTBE DEFENDANTS' DECEPTIVE PROMOTION OF MTBE GASOLINE AS CLEANER OR ENVIRONMENTALLY FRIENDLY GASOLINE**

266.    Commencing in or about 1987 and continuing through to 1995, federal and state governments, including the Commonwealth of Pennsylvania promulgated and enacted laws and

regulations addressing automotive emissions, including the 1990 amendments to the federal

Clean Air Act ("CAA") and various state implementation programs. These efforts involved,

*inter alia*, provisions promoting development and use of alternative fuels to gasoline, such as

ethanol or methanol. MTBE Defendants during this time were aware of the potential negative

impact that these governmental sponsored alternative fuel initiatives would have had on their

revenues and profits from the manufacture, distribution and/or sale of MTBE and MTBE

gasoline.

267.    The MTBE Defendants' response to the promotion of alternative fuels to gasoline

were twofold: (a) recast the marketing image and public perception of MTBE gasoline as clean

burning gasoline good for the environment; and (b) disparage ethanol oxygenated gasoline as a

competitive product and restrict or eliminate its use in gasoline by negatively dubbing it (as well

as other alternative fuels  under consideration) "Government Gas" (*See* Figure 1 *infra*.) and/or by

claiming it was more costly and less effective than MTBE gasoline. In their responses to the

government initiatives, the MTBE Defendants failed to disclose the significant environmental

dangers that MTBE and MTBE gasoline posed to the public and private water supplies in the

event of a spill or leak of MTBE or MTBE gasoline, the occurrence of which MTBE Defendants,

and their trade groups as set out above, were well aware were frequent events throughout the

gasoline distribution network.

268.    The first defendant to do so was ARCO, which in or about September 1989,

began selling a claimed low-emissions unleaded regular gasoline product containing MTBE

named "EC-1," ("EC" standing for "Emission Control.") ARCO was followed closely by

Conoco, Diamond Shamrock (now a part of Valero), Exxon, Marathon, Phillips, Shell and

Sunoco, who likewise began offering gasoline formulations with higher percentages of MTBE as

an ingredient and marketing them as cleaner burning gasoline under various brand names.

269.    According to a May 13, 1990, *Philadelphia Inquirer* article headlined

"SPEEDING UP THE DRIVE FOR CLEANER GAS OIL FIRMS ARE YIELDING TO

PRESSURE FROM LAWS, CONSUMERS AND AUTOMAKERS TO MAKE FUEL MORE

COMPATIBLE WITH THE ENVIRONMENT," ARCO, Conoco, Diamond Shamrock (now

Exxon), Marathon, Phillips and Shell began selling or announced plans to sell cleaner gasolines.

As reported in the article:

> "There is no doubt about it," said Clayton Adams, a spokesman for Conoco, "the
> future is in gasolines, in fuels that are more environmentally compatible."
>
> * * *
>
> One of the biggest prods to the oil industry is President Bush's support of
> methanol as a cleaner alternative to gasoline in urban areas with serious pollution
> problems. The oil industry has vigorously opposed the President's idea.
>
> * * *
>
> "But we came to the conclusion that the customer now . . . really wanted an
> environmentally enhanced fuel," said Steven Miller, a Shell vice president."
>
> * * *
>
> The industry's response has been reformulated gasolines, which so far have relied
> largely on using the additive methyl tertiary butyl ether (MTBE).
>
> * * *
>
> So far, Exxon has announced the most ambitious plan to market reformulated
> gasoline, targeting 40 markets in 21 Gulf and East Coast states, including New
> Jersey, Pennsylvania and New York, by this summer.

270.    In or about April, 1990, Shell Oil began marketing and promoting its own so

called cleaner gasoline named "SU2000E." Like ARCO's EC-1 product, this gasoline was

formulated with higher percentages of MTBE. One of the markets targeted by Shell in

SU200E's widely publicized launch was Philadelphia. The launch's public relations campaign

generated press articles published April 12, 1990, in the New York Times and the Chicago

Tribune, and on April 23, 1990 in the Oil & Gas Journal.  In the New York Times article, Shell's

president, Frank H. Richardson, is quoted describing Shell's new SU2000E gasoline blend as "an

important step in the right direction for cleaner air."  The Oil & Gas Journal article further quotes

him as saying, "This new gasoline reflects Shell's commitment to make environmental

considerations a priority in development of our new products and processes."

271.    As of at least 1981, Shell Oil was aware of the hazards of MTBE gasoline,

including having been advised by one of its hydrogeologists, Curt Stanley, that the MTBE in its

gasolines could contaminate and create taste and odor problems in public drinking water

supplies.

272.    Shell Oil's public statements concerning its SU2000E MTBE gasoline, however,

omitted these and other material facts of which it was aware concerning the risks and hazards of

MTBE gasoline to water supplies that were essential and necessary to present a fair and not-

misleading description and assessment of MTBE gasoline's environmental characteristics.

273.    Shell Oil's misleading and deceptive claims to the public about MTBE and its

purported cleaner gasoline harmed the citizens of Pennsylvania in that they (a) interfered with

legitimate trade and commerce by Shell's competitors, including those in the ethanol and

alternative fuels industries, thereby adversely affecting directly or indirectly the citizens of this

Commonwealth; and (b) caused and facilitated the widespread introduction, acceptance,

distribution and sale of MTBE gasoline throughout the Commonwealth and thereby misled,

misinformed and deceived downstream handlers and customers, including distributors, retailers

and the motoring public throughout the Commonwealth, all of which resulted in the leaking and

spilling of MTBE gasoline causing widespread damage to the waters of the Commonwealth from MTBE contamination.

274.    At the same time that ARCO, ConocoPhillips, ExxonMobil, Marathon, Shell Oil and Sunoco (or their predecessors) were offering MTBE gasoline to the public as a cleaner gasoline, these defendants, through the American Petroleum Institute, were financing a public relations campaign to discredit ethanol oxygenated gasoline. API's campaign included advertisements such as the one published in the May 15, 1990, edition of the Pittsburgh Post-Gazette, another major Pennsylvania newspaper, which pictured a can of "Government Gas" with the headline "It Won't Cure the Smog Problem. It Will Cost You More. It Will Cut Auto Efficiency" and the sub-headline "Let Scientists – Not Politicians – Reformulate Gasoline. That's a Clean Air Challenge We Eagerly Accept." A copy of the advertisement is attached as Exhibit 1 hereto.

### THE MTBE DEFENDANTS' FAILURE TO DISCLOSE MTBE GASOLINE'S ENVIRONMENTAL SAFETY HAZARDS IN THEIR MATERIAL SAFETY DATA SHEETS

275.    The MTBE Defendants prepared and distributed MSDSs in connection with their marketing, distribution and sale of their products. MTBE Defendants asked customers who resold or distributed MTBE and MTBE gasoline to furnish copies of the MSDS to their respective downstream handlers and customers.

276.    In preparing and distributing material safety data sheets ("MSDSs"), the MTBE Defendants omitted material facts of which they were aware concerning the risks and hazards of MTBE gasoline.

277.    MTBE Defendants' intended purpose and use of MSDSs during this time is explained in an October 4, 1994, Mobil (now ExxonMobil) publication titled: "*Material Safety Data Bulletin: An Explanation of Terms,*" which bears copyright dates of 1987, 1990 and 1994:

A Mobil Material Safety Data Bulletin (MSDB), commonly referred to as a Material Safety Data Sheet (MSDS), is a compilation of health-related information, procedures for emergency situations, physical properties, and recommendations to help assure the safe handling of a particular Mobil product.

278.    An MSDS is typically divided into sections which address specific safety, handling and hazards issues. Two important sections commonly found in MSDSs during the relevant times herein are "Accidental Releases" and "Handling and Storage." Mobil's *Explanation of Terms* explains these pertinent sections as follows:

### Section 6. Accidental Release Measures

Recommends procedures and precautions to be taken in the event of an accidental release or spill. Procedures for disposing of the product are given in Section 13. The reporting requirements indicated are for federal regulations. Since state and local reporting requirements may also exist, please check with your legal counsel or regulatory compliance advisor for reporting guidance.

### Section 7. Handling and Storage

Recommends any special precautions to be followed during the handling and storage of Mobil products. If a product is OSHA hazardous, the precautionary warning label text will be shown in Section 16.

279.    As known to the MTBE Defendants at all times material hereto, the nature and magnitude of environmental risks and hazards when MTBE is added to a gasoline product are different and greater than those associated with conventional gasoline. The deleterious nature and magnitude of MTBE's risks and hazards require that those who are handling and storing MTBE gasoline exercise greater and more costly safety, storage, handling and remedial response precautions and measures compared to conventional gasoline.

280.    The material differences between MTBE gasoline and conventional gasoline are described in a July 1, 1992, Amoco Oil Company (now part of BP) internal document, not disclosed or circulated to its distributors, gas stations and customers, entitled: "*Guideline for Handling & Storage of Ethers Used in Gasoline*" ("Amoco Guideline"):

90

Amoco oil plans to meet the new [Clean Air Act Amendments] requirements by marketing gasolines blended with ethers starting in 1992. Most Amoco oil facilities will be required to handle and store the new oxygenated gasolines containing up to 20 percent ether by volume. Amoco refineries, certain bulk terminals and the associated shipping and receiving facilities will also handle ethers in the "neat" form (100 percent concentration).

The chemical and physical properties of ethers differ from those of non-oxygenated gasolines, potentially causing new problems for Amoco facilities. Most significantly, ethers are much more water soluble than hydrocarbons and will have a tendency to dissolve in - groundwater if allowed to leak or spill. Ethers are not readily biodegradable, making cleanup of spills and separation from wastewater much more difficult than for non-oxygenated gasoline. In addition, ethers are incompatible with some elastomer seals, linings, and equipment commonly used in Amoco storage and distribution facilities, increasing the likelihood of leaks if these materials are not modified for ether use.

If allowed to occur, the contamination of groundwater and surface water with ethers will have a tremendous cost, both to Amoco's reputation as an environmentally responsible company, and as a major financial cost for cleanup. Cleanup costs for ethers are tremendously higher than for non-oxygenated gasolines. To avoid these costs, facilities handling ethers and ether/gasoline blends must be designed and operated to insure: (1) a low likelihood for spills and leaks, (2) early detection of leaks when they occur, and (3) rapid repair and cleanup when leaks are found."

(Emphasis in original.)

281.    In addition to its knowledge as aforesaid of the risks and hazards of MTBE gasoline as of at least 1981, Shell Oil was further aware as of at least 1998 of the aspects of the product that led to the risks and hazards and that MTBE gasoline's use should have been avoided in areas where groundwater was a potential drinking water supply or, if used, special handling, storage and monitoring was required to avoid groundwater contamination.

282.    Specifically, Shell Oil was informed by its hydrologist, Curt Stanley, in an email sent to it on November 3, 1998, with respect to "MTBE IN GROUNDWATER – ISSUES BRIEF" that:

1) Very small releases of MTBE (even small overfills seeping into cracks in the pavement) have the potential to adversely impact groundwater;

91

2) Based on engineering reliability studies, it is likely that a high percentage of sites using MTBE, have a soil and/or groundwater problem.  This problem is not just the result of leaking tanks, lines, fills and dispensers, but is also a result of certain operations.
3) Due to MTBE's high solubility and low attenuation rates, it has the potential to migrate large distances relative to benzene….
4) Those sites which are located over potable groundwater are potentially very high risk sites.
5) Odor and taste will drive the cleanup goals rather than risk.  We are currently looking at clean up goals between 5-15ppb.
6) Once in groundwater, MTBE is extremely difficult to remediate.  It's Henry's Law coefficient is very low which means that MTBE prefers to stay in the aqueous phase rather than being sorbed or stripped out of water.  Air sparging will be relatively ineffective.  We are currently evaluating biological and oxidation remediation techniques.
7) A simple risk assessment for all sites (like we are in the process of developing) will greatly help focus future resources.

283.    In the same email to Shell Oil on November 3, 1998, Mr. Stanley stated:

My professional opinion is that MTBE and similar oxygenates should not be used at all in areas where groundwater is a potential drinking water supply.  If it is used, engineering design and site operations (including active subsurface monitoring) should be carefully developed to minimize the potential for a release.

284.    MTBE Defendants did not disclose in their MSDSs MTBE gasoline's greater, longer-lived and more costly risks and hazards, or the additional measures they themselves internally recommended for minimizing those risks, such as were referenced in the Amoco Guideline or otherwise known to Shell and other defendants.

285.    To the contrary, the MSDSs published by the MTBE Defendants wrongly and deceptively stated or implied that MTBE gasoline could be handled just like traditional conventional gasoline and that the traditional standard-of-care for gasoline without MTBE was adequate for MTBE gasoline.

286.    Amoco, for example, published MSDSs for MTBE gasoline on or about April 28, 1993, January 19, 1995, January 5, 1998, December 28, 1998 (BP Amoco) and July 16, 1999.  Each of these MSDSs identically stated under the sections for "Accidental Release Measures"

and "Handling and Storage," and, with no distinction between gasoline with and without MTBE,

the following warnings and precautions:

### 6.0  ACCIDENTAL RELEASE MEASURES

Remove or shut off all sources of ignition.  Wear respirator and spray with water
to disperse vapors.  Increase ventilation if possible.  Remove mechanically or
contain on an absorbent material such as dry sand or earth.  Keep out of sewers
and waterways.

### 7.0  HANDLING AND STORAGE

HANDLING: Use with adequate ventilation.  Ground and bond containers when
transferring materials.  Wash thoroughly after handling.

STORAGE: Store in flammable liquids storage area.  Keep container closed.
Store away from heat, ignition sources, and open flame in accordance with
applicable regulations –

SPECIAL PRECAUTIONS: Keep out of sewers and waterways.  Avoid strong
oxidizers.  Report spills to appropriate authorities.  USE AS MOTOR FUEL
ONLY."

287.    The foregoing statements are materially different from what Amoco's

management was internally advising its operations personnel in the Amoco Guideline as to the

need for heightened (and more costly) precautions and measures regarding handling, storage and

environmental release cleanups of MTBE gasoline in view of MTBE's greater risks of harm to

ground and surface water and the larger costs associated with addressing MTBE environmental

contamination.  Amoco's (and BP's) MSDSs contained no warning or information regarding

these foreseeable enhanced risks and costs.  Nor did Amoco's MSDSs inform its distributors, gas

stations and customers that in order to avoid materially increased environmental damage and

associated clean-up and remediation costs, all facilities handling MTBE Gasoline must be

designed and operated to insure: (1) a low likelihood for spills and leaks; (2) early detection of

leaks when they occur, including the need to test and monitor for MTBE; and (3) rapid repair and

cleanup when leaks are found.  Rather MTBE gasoline was wrongfully and deceptively equated

by the MTBE Defendants with conventional gasoline with regard to precautions and measures regarding handling, storage and cleanups.

288.    Shell Oil's MSDSs for MTBE gasoline products it issued from at least October 26, 1988 forward (identified more particularly in Table 1 below) all contained in material part the following statements or ones substantially similar:

**SPILL OR LEAK PROCEDURES**

DANGER.  EXTREMELY FLAMMABLE.  ELIMINATE ALL IGNITION SOURCES.  HANDLING EQUIPMENT MUST BE GROUNDED TO PREVENT SPARKING. *** LARGE SPILLS *** ISOLATE THE HAZARD AREA AND DENY ENTRY TO UNNECESSARY PERSONNEL.  WEAR APPROPRIATE RESPIRATOR AND PROTECTIVE CLOTHING.  SHUT OFF SOURCE OF LEAK ONLY IF SAFE TO DO SO.  DIKE AND CONTAIN. WATER FOG MAY BE USEFUL IN SUPPRESSING VAPOR CLOUD; CONTAIN RUN-OFF.  REMOVE WITH VACUUM TRUCKS OR PUMP TO STORAGE/SALVAGE VESSELS.  SOAK UP RESIDUE WITH AN ABSORBENT SUCH AS CLAY, SAND OR OTHER SUITABLE MATERIAL; PLACE IN NON-LEAKING CONTAINERS FOR PROPER DISPOSAL. FLUSH AREA WITH WATER TO REMOVE TRACE RESIDUE; DISPOSE OF FLUSH SOLUTIONS AS ABOVE. *** SMALL SPILLS *** TAKE UP WITH AN ABSORBENT MATERIAL AND PLACE IN NON-LEAKING CONTAINERS; SEAL TIGHTLY FOR PROPER DISPOSAL.

* * *

**ENVIRONMENTAL HAZARDS**

EPA - CLEAN WATER ACT (CWA).  THIS PRODUCT IS CLASSIFIED AS AN OIL UNDER SECTION 311 OF THE CLEAN WATER ACT.  SPILLS ENTERING (A) SURFACE WATERS OR (B) ANY WATERCOURSES OR SEWERS ENTERING/LEADING TO SURFACE WATERS THAT CAUSE A SHEEN MUST BE REPORTED TO THE NATIONAL RESPONSE CENTER, 800-424-8802.  KEEP OUT OF SURFACE WATERS AND ANY WATER COURSES OR SEWERS ENTERING OR LEADING TO SURFACE WATERS.

* * *

**SECTION XII        SPECIAL PRECAUTIONS**

DANGER.  EXTREMELY FLAMMABLE.  AVOID HEAT, SPARKS, OPEN FLAMES, INCLUDING PILOT LIGHTS, AND STRONG OXIDIZING AGENTS.  USE EXPLOSION-PROOF VENTILATION TO PREVENT VAPOR

ACCUMULATION.  ALL HANDLING EQUIPMENT MUST BE GROUNDED
TO PREVENT SPARKING.  HARMFUL OR FATAL IF SWALLOWED.  DO
NOT SIPHON GASOLINE BY MOUTH.

FOR USE AS A MOTOR FUEL ONLY.  DO NOT USE AS A CLEANING
SOLVENT OR FOR OTHER NON-MOTOR FUEL USES.  WASH WITH
SOAP AND WATER BEFORE EATING, DRINKING.  SMOKING OR USING
TOILET FACILITIES.  LAUNDER CONTAMINATED CLOTHING BEFORE
REUSE. …

IF A MAJOR SPILL OCCURS. GET UPWIND AND NOTIFY LOCAL
EMERGENCY PERSONNEL.  REMEMBER EXPLOSION AND FIRE IS THE
MOST IMMEDIATE DANGER.

289.    Shell Oil's MTBE gasoline MSDSs omitted material information known to it, but

not to downstream handlers and customers of the products and the public generally, on the

greater magnitude of environmental risks and hazards associated with MTBE gasoline and the

correspondingly heightened precautions and responses required to prevent or respond to a release

of MTBE gasoline.

290.    Shell Oil's MTBE gasoline MSDSs' statements are materially different from

Shell Oil's statements and precautions contained in its August 4, 2005 MSDS for its Ethanol

Light Ends Coproduct Mixture-PDO-Geismar product.  Shell Oil's MSDS for this blended

product containing MTBE stated:

**6. ACCIDENTAL RELEASE MEASURES**

Avoid contact with spilled or released material.  Immediately remove all
contaminated clothing.  For guidance on selection of personal protective
equipment see Chapter 8 of this Material Safety Data Sheet.  For guidance on
disposal of spilled material see Chapter 13 of this Material Safety Data Sheet.
Observe all relevant local and international regulations.

**Protective measures**: Stay upwind and keep out of low areas.  Remove all
possible Sources of ignition in the surrounding area.  Shut off leaks, if possible
without personal risks.  Remove all possible sources of ignition in the surrounding
area.  Use appropriate containment (of product and fire fighting water) to avoid
environmental contamination.  Prevent from spreading or entering drains, ditches
or rivers by using sand, earth, or other appropriate barriers.  Attempt to disperse
the vapour or to direct its flow to a safe location for example by using fog sprays.

Take precautionary measures against static discharge. Ensure electrical continuity by bonding and grounding (earthing) all equipment.

**Clean Up Methods**: For large liquid spills (> 1 drum), transfer by mechanical means such as vacuum truck to a salvage tank for recovery or safe disposal. Do not flush away residues with water. Retain as contaminated waste. Allow residues to evaporate or soak up with an appropriate absorbent material and dispose of safely. Remove contaminated soil and dispose of safely. For small liquid spills (>1 drum), transfer by mechanical means to a labelled, sealable container for product recovery or safe disposal. Allow residues to evaporate or soak up with an appropriate absorbent material and dispose of safely. Remove contaminated soil and dispose of safely.

**Additional Advice**: U. S. regulations may require reporting releases of this material to the environment which exceed the reportable quantity (refer to Chapter 15) to the National Response Centre at (800) 424-8802. To the extent that this product, including it's chemical components (e.g. MTBE) may impact surface or groundwater, appropriate assessment and remediation (if necessary) should be implemented.

## 7. HANDLING AND STORAGE:

**Handling**: Avoid breathing of or contact with material. Only use in well ventilated areas. Wash thoroughly after handling. For guidance on selection of personal protective equipment see Chapter 8 of this Material Safety Data Sheet. Extinguish any naked flames. Do Not [sic] smoke. Remove ignition sources. Avoid sparks. Electrostatic charges may be generated during pumping. Electrostatic discharge may cause fire. Ensure electrical continuity by bonding and grounding (earthing) all equipment. Restrict line velocity during pumping in order to avoid generation of electrostatic discharge (>= 1 m/sec until fill pipe submerged to twice its diameter, then <= 7 m/sec.) Avoid splash filling. Do NOT [sic] use compressed air for filling, discharging, or handling operations. The vapour is heavier than air. Beware of accumulation in pits and confined spaces.

* * *

## 12. ECOLOGICAL INFORMATION
This section will be updated as ecological reviews are completed.

**Acute Toxicity**

| | |
|---|---|
| **Fish**: | Expected to have low toxicity: Ll/El/IL50 > 100 mg/l |
| **Aquatic Invertebrates**: | Expected to have low toxicity: Ll/El/IL50 > 100 mg/l |
| **Algae**: | Expected to have low toxicity: Ll/El/IL50 > 100 mg/l |

**Mobility**: Dissolves in water. If product enters soil, it will be highly mobile and may contaminate groundwater. Appropriate evaluation for chemical constituents such as MTBE should be made as part of a groundwater assessment, if needed.

96

**Persistence/degradability**:   Major constituents are readily biodegradable, but contains components that are persistent in the environment. While biodegradation of MTBE has been documented, it is generally less biodegradable than many petroleum hydrocarbons and has a potential to migrate relatively longer distances in groundwater.

**Bioaccumulation**:   Does not have the potential to bioaccumulate significantly.

(Emphasis in the original.)

291.   Each of the following MTBE Defendants listed in Table 1 below (who together with Amoco and Shell Oil are collectively referred to herein as "MTBE MSDS Defendants"), acting with knowledge regarding MTBE's enhanced environmental risks and hazards to ground and surface water, issued MSDSs on the dates indicated that omitted material information on the nature and magnitude of environmental hazards associated with their MTBE gasoline and the heightened necessary precautions and responses required to prevent or adequately respond to a release over those associated with conventional gasoline:

**Table 1**

| | Defendant | Date(s) MSDS issued or revised |
|---|---|---|
| a. | ExxonMobil | 10/16/1994 (Exxon Company); 10/17/1994 (Exxon Company); 07/14/1997 (Exxon Company); 08/10/1999 (Exxon Company); 05/12/2000; 03/01/2002; 03/29/2006 |
| b. | BP/Amoco | 04/28/1993; 06/08/1994; 01/19/1995; 05/03/1995; 05/03/1995; 01/05/1998; 12/28/1998 (BP Amoco); 07/16/1999; 07/16/1999 |
| c. | Chevron | 02/10/1986; 03/24/1990; 03/26/1990; 03/07/1991; 02/03/1993; 03/12/1993; 03/19/1993; 06/10/1994; 01/24/1995; 11/15/1995; 04/16/1998; 07/31/1999; 01/09/2001; 11/28/2001 |
| d. | Citgo | 07/10/1987; 10/24/1988; 02/10/1989; 06/13/1989; 04/30/1990; 10/01/1990; 03/27/1991; 06/30/1992; 09/09/1992; 12/18/1992; 03/23/1993; 03/24/1993; 10/21/1994; 11/09/1994; 11/10/1994; 01/30/1995; 10/06/1995; 12/31/1996; 08/15/1997; 03/15/2001 |

| Defendant | | Date(s) MSDS issued or revised |
|---|---|---|
| e. | Coastal | 11/02/1989; 03/28/1990; 04/30/1990; 02/26/1992; 03/05/1992; 08/04/1994; 11/15/1995; 03/28/1996; 04/03/1998; 04/04/1998; 05/19/1998; 03/05/1999; 03/11/1999; 06/22/2000; 10/17/2002 (El Paso Corp.) |
| f. | ConocoPhillips | 12/01/1994 (Bayway Refining); 07/12/1995 (Tosco); 09/29/1995 (Phillips 66); 11/24/1995 (Conoco); 05/13/1996 (Tosco); 10/02/1996 (Tosco); 10/13/1997 (Tosco); 03/29/1999 (Tosco); 01/01/2002 (Phillips Petroleum); 05/07/2002 (Conoco); 01/01/2003; 02/13/2003 (Phillips 66) |
| g. | Crown Central | 4/18/1996 |
| h. | Cumberland Farms/GOLP | 10/15/1986 (Gulf); 05/25/1989 (Gulf); 03/01/1995 (Gulf); 04/26/1995 (GOLP); 04/10/1996 (Gulf); 02/25/2004 (GOLP); 02/26/2004 (GOLP) |
| i. | Equilon Enterprises, LLC | 01/04/1999; 04/26/1999; 01/10/2000; 01/13/2000; 09/28/2000; 10/13/2000; 03/23/2001; 07/19/2001 |
| j. | Hess Corp. | 08/31/1989; 12/22/1994; 9/16/1996; 12/30/1997; 09/24/1999; 01/08/2004 |
| k. | Marathon Oil Corp.; Marathon Petroleum Co., LP | 12/29/1992; 05/22/1995; 09/30/1998; 09/12/2005 |
| l. | Motiva Enterprises, LLC | 01/04/1999; 06/10/1999; 01/10/2000; 01/13/2000; 03/23/2001; 03/13/2003 |
| m. | The Premcor Refining Group | 05/12/1999; 11/19/2000; 12/21/2000; 08/1/2005 |
| n. | Shell Oil Company | 09/18/1986; 09/02/1987 (from Champlin); 02/18/1988; 10/26/1988; 11/03/1988; 02/02/1989; 04/11/1990; 03/04/1992; 04/19/1992; 10/28/1992; 10/29/1992; 11/10/1992; 03/17/1993; 03/27/1993; 04/16/1993; 04/30/1993; 06/30/1994; 08/19/1994; 10/7/1994; 05/04/1995; 09/13/1995; 09/27/1995; 09/29/1995; 01/05/1996 (from ARCO); 01/25/1996; 02/29/1996; 06/06/1996; 08/06/1996; 08/13/1996; 09/18/1996; 08/19/1997; 03/31/1998; 04/06/1998; 04/23/1998; 09/23/1998; 01/4/1999; 04/26/1999; 01/10/2000; 01/13/2000; 06/28/2000; 10/13/2000; 03/23/2001; 07/10/2001; 10/24/2001; 08/07/2002; 03/14/2003; 06/06/2003; 09/03/2003; 09/06/2006 |

| Defendant | | Date(s) MSDS issued or revised |
|---|---|---|
| o. | Sun Company Inc. | 3/20/1998 |
| p. | Sunoco Inc. (R&M) | 02/28/2000; 02/29/2000; 03/04/2002; 04/05/2002; 04/11/2002; 05/02/2002; 08/20/2002; 08/21/2002; 08/26/2002; 09/06/2002; 01/17/2003; 05/02/2003; 09/18/2003; 10/06/2003; 11/03/2003; 12/24/2003; 04/30/2004; 08/09/2004; 08/20/2004; 08/27/2004; 08/30/2004; 09/01/2004; 09/02/2004; 09/03/2004; 09/09/2004; 12/10/2004; 03/07/2005; 04/08/2005; 04/11/2005; 04/12/2005; 04/13/2005; 04/19/2005; 07/29/2005; 08/01/2005; 08/02/2005; 12/19/2005 |
| q. | Texaco Inc. | 05/02/1991; 08/11/1993; 05/12/1994; 01/04/1995; 07/17/1996; 05/19/1997; 11/12/1997; 01/06/1998; 01/04/2000 |
| r. | Valero Energy Corporation | 01/15/1998; 12/17/1998 (Diamond Shamrock Refining); 01/01/1999 (Diamond Shamrock Refining); 06/16/2000; 06/19/2000; 01/01/2001 (Diamond Shamrock Refining); 01/17/2001 |
| s. | Valero Refining and Marketing Company | 01/15/1992; 08/19/1998 |

292.    The MTBE MSDS Defendants' deceptive and misleading descriptions and misrepresentations in their respective MSDSs gave their MTBE gasoline products an unfair competitive advantage and greater profit margins over other viable gasolines in the marketplace. Defendants also thereby gave MTBE gasoline an unfair competitive advantage over ethanol and other alternative fuels.

293.    The material facts omitted by the MTBE MSDS Defendants in their respective MSDSs concerning MTBE gasoline's peculiar and heightened risks and hazards to the environment were essential and necessary for a fair and not-misleading description and assessment of MTBE gasoline's environmental characteristics.

294.    The MTBE MSDS Defendants' misleading and deceptive statements in their MSDSs for MTBE gasoline omitted material storage, handling and environmental information

concerning MTBE which were known to them at the time their respective MSDSs were issued

and disseminated which, among other things, was relevant to and affected the determination of

MTBE's true economic costs.

295.    The misleading and deceptive claims to the public about MTBE gasoline in the

above MSDSs harmed the citizens of Pennsylvania in that they (a) interfered with legitimate

trade and commerce by the MTBE Defendants' competitors, including those in the ethanol and

alternative fuels industries, negatively affecting directly or indirectly the people of this

Commonwealth; and (b) caused and facilitated the widespread introduction, acceptance,

distribution and sale of MTBE gasoline and misled, misinformed and deceived downstream

handlers and customers, including distributors, retailers and the motoring public throughout the

Commonwealth, all of which resulted in or contributed to the widespread damage to the waters

of the Commonwealth from MTBE contamination.

## THE LUKOIL DEFENDANTS ARE DIRECTLY AND VICARIOUSLY LIABLE FOR GPMI'S ENVIRONMENTAL LIABILITIES

296.    Lukoil Oil Corporation a/k/a OAO Lukoil ("OAO Lukoil"), Lukoil Americas

Corporation ("LAC"), Lukoil North Americas ("LNA") and GPMI directly, indirectly, and

through agents and/or officers, transacted business in the Commonwealth of Pennsylvania.

297.    From 1998 forward, OAO Lukoil registered several trademarks for "Lukoil" with

the U.S. Patent and Trademark Office.  OAO Lukoil used those trademarks to conduct business

related to the sale of motor fuel in Pennsylvania and elsewhere through subsidiaries that held

themselves out as Lukoil, including GPMI, LAC, and LNA.

298.    In October 2000, OAO Lukoil created LAC.

299.    In November 2000, OAO Lukoil moved into the United States gasoline market by

acquiring GPMI, heralding the acquisition as the first by a Russian company of a publically held

U.S. company.  The Agreement and Plan of Merger to acquire was between GPMI and OAO

Lukoil and OAO Lukoil subsidiaries Lukoil International GmbH, Lukoil Americas Corporation

and Mikecon Corporation.  The Agreement and Plan of Merger designated Lukoil Americas

Corporation to receive all notices and communications on behalf of "any Lukoil entity."

300.    After LAC acquired GPMI in 2001, GPMI became a wholly owned subsidiary of

LAC and an indirect wholly owned subsidiary of OAO Lukoil.  OAO Lukoil and LAC took

GPMI private and no longer filed reports with the U.S. Securities and Exchange Commission.

GPMI was registered and authorized to do business in Pennsylvania.

301.    As part of the acquisition and merger transaction, GPMI, at the direction of LAC

and OAO Lukoil, entered into an Amended Master Lease for service stations in Pennsylvania

and elsewhere and an environmental indemnity agreement with Getty Realty Corporation

("Getty") for the lease of hundreds of service stations and a petroleum storage and distribution

network in the United States, including in Pennsylvania.  In these transactions GPMI acted as

agent for, and at the direction of, OAO Lukoil and LAC.

302.    At the time GPMI and Getty executed the Amended Master Lease, OAO Lukoil

guaranteed GPMI's financial obligations under the Amended Master Lease for three years.  The

"Guaranty of Lease" executed by OAO Lukoil provides that the "Guarantor [OAO Lukoil] will

derive substantial direct and indirect benefits from Tenant's [GPMI's] entering into the

[Amended Master] Lease."  OAO Lukoil affirmatively promised that it "absolutely,

unconditionally, irrevocably, jointly and severally guarantees, *as principal* and not as indemnitor

to Landlord [Getty Realty Corporation], in accordance with and pursuant to this Guaranty,

Tenant's full and punctual payment of all Guaranteed Obligations. . . .  Guarantor's liability

under this Guaranty *shall be primary* and not secondary and *Landlord may, at Landlord's option*

. . . *join Guarantor in any action or Proceeding* commenced by Landlord against Tenant in connection with the Guarantied [sic.] Obligations." (Emphasis added.)

303.   OAO Lukoil put the Lukoil trademarks on service stations in Pennsylvania, on GPMI letterhead, on correspondence to the Governor of Pennsylvania, on credit cards offered to and used by Pennsylvania customers of Lukoil service stations, and in public sponsorships.

304.   At all relevant times, GPMI, LAC, OAO Lukoil and LNA held themselves out as "Lukoil" in signage, advertising, contracts, sponsorships, and other business activities, including advertising and sponsorships by "Lukoil" at such major sports venues as the Wells Fargo Center (home of the National Hockey League's Philadelphia Flyers) and the Citizens Bank Park (home of Major League Baseball's Philadelphia Phillies) in Philadelphia.  LAC owned 100% of the stock of GPMI from January 25, 2001 until February 28, 2011, with the exception of two weeks in November 2009, when OAO Lukoil, LAC and LNA coordinated a stripping of the only profitable assets of GPMI to evade GPMI's obligations to creditors, including the Commonwealth of Pennsylvania.  At all relevant times, GPMI, LAC and LNA acted as agents for OAO Lukoil with respect to operation of GPMI leased service stations in Pennsylvania.

305.   In 2004, with the approval and at the direction of OAO Lukoil and LAC, GPMI obtained a loan and line of credit for $360 million.  The purpose of the loan and line of credit was to finance the acquisition of service stations in New Jersey and Pennsylvania from ConocoPhilips and to provide working capital associated with the acquisition.  The Executive Summary of the transaction documents stated, "Lukoil [OAO Lukoil] has acquired downstream assets in Europe and the U.S. (including the $73 million acquisition of Getty announced in November 2000).  This Acquisition [to buy the ConocoPhillips stations with the loan proceeds] is the next step in Lukoil's strategy to aggressively expand its U.S. Downstream operations."

The loan documents referred to GPMI as "the foundation of Lukoil's [OAO Lukoil's] U.S. downstream operations – a presence that Lukoil anticipates will expand dramatically in the next few years." The loan and line of credit also stated, "The Acquisition represents more than a financial investment for Lukoil, it is the foundation of a strategy to dramatically expand Lukoil's presence in the U.S."

306.    The 2004 loan and line of credit were guaranteed by LAC. Vincent De Laurentis, president of both LAC and GPMI, signed for the loan and line of credit on behalf of GPMI, and signed the guarantee on behalf of LAC. OAO Lukoil made a $50 million capital contribution to LAC to fund the acquisition and another $10 million as a "structural measure to provide near term financing liquidity."

307.    In May 2004, OAO Lukoil, through GPMI, used funds from the loan and line of credit to acquire 767 Mobil-branded stations in New Jersey and Pennsylvania from ConocoPhillips for $269.5 million. The title of the purchase agreement is "OAO Lukoil Getty Petroleum Marketing Inc. Purchase of Marketing Assets from Conoco Phillips Company and Related Financings." OAO Lukoil and LAC directed and participated in the acquisition of service stations from ConocoPhillips. OAO Lukoil and LAC guaranteed loans for the purpose of purchasing stations and property located in Pennsylvania, expanding their market share in Pennsylvania, and bringing the Lukoil name to Pennsylvania by rebranding Pennsylvania service stations as Lukoil stations.

308.    In 2005, GPMI obtained a loan and line of credit for $475 million to replace the 2004 loan and to finance additional expansion efforts and to rebrand the acquired stations to Lukoil stations. The 2005 loan and line of credit were guaranteed by OAO Lukoil. The loan documents stated, "Expanding into the U.S. has also been a strategic objective of Lukoil . . . .

Sales of Lukoil petroleum products in the U.S. reached a record level of 1.9 billion gallons (8.64 billion liters). Revenue from sales (without excise) was $2.6 billion and net profit was $11.7 million." Distributions for that loan and line of credit went directly to LAC, not GPMI.

309.    The 2005 "Guaranty" signed and agreed to by OAO Lukoil, stated that OAO Lukoil's "obligations hereunder are primary, not secondary. The obligations of the Guarantor. . . are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce such obligations, irrespective of whether any action is brought against the Borrower or any other Person . . . ." The Guaranty also included "Affirmative Covenants" which described not only OAO Lukoil's financial obligations, but also significant commitments to the operation of its subsidiaries, including commitments that OAO Lukoil would cause each subsidiary to "do, or cause to be done all things necessary to (a) preserve, renew and keep in full force and effect its legal existence and (b) the rights, licenses, permits, privileges and franchises material to the conduct of its business . . . ." OAO Lukoil also committed to cause each subsidiary to "keep and maintain all property material to the conduct of its business in good working order and condition . . . ."

310.    As part of its effort to increase the Lukoil brand awareness and increase its profits, OAO Lukoil directly funded a rebranding effort with a $10 million per year marketing and advertising campaign directed at customers in Pennsylvania and New Jersey.

311.    OAO Lukoil regularly transferred millions of dollars through its intermediate subsidiaries to LAC, who then funneled those dollars to GPMI. For example, in 2005 and 2006, LAC received $2.5 million dollars quarterly from one or more of the OAO Lukoil subsidiaries, including Lukoil Americas LLC (which merged with LAC in 2006), and Lukoil Europe Holdings B.V.. LAC would then immediately transfer that money to GPMI.

312.    By 2005, GPMI was losing vast sums of money because the GPMI legacy stations bound by the Amended Master Lease were losing money and GPMI could not pay the rent owed to Getty Realty Corporation.  At a number of these stations GPMI was exposed to environmental liability, including liability to the Commonwealth for MTBE contamination.  By 2006, GPMI was operating at a loss and it would never again be solvent.

313.    In 2007, the C.E.O. of LAC, GPMI and LNA, Vadim Gluzman, on behalf of and as agent for OAO Lukoil, told the owner of Getty Realty Corporation that if Getty did not renegotiate the Amended Master Lease, GPMI would sell off assets to a sister company, hold GPMI for one-year and then sell GPMI to anyone who would take it.

314.    In 2007, OAO Lukoil directed LAC to create LNA for the purpose of obtaining GPMI's only profitable assets (the ConocoPhillips stations not bound by the Amended Master Lease) in a future transaction that would keep those ConocoPhillips stations within the Lukoil family and drive the remainder of GPMI into bankruptcy.

315.    LAC created LNA in June 2007 as directed by OAO Lukoil and has always owned 100% of LNA's stock.

316.    Environmental and property risks associated with the gasoline stations in the United States were assessed and considered by OAO Lukoil, including risks associated with stations in Pennsylvania, when OAO Lukoil directed the restructuring of LAC and its subsidiaries and the fraudulent transfer of assets from GPMI to LNA.  By 2008, GPMI's total liabilities exceeded its total assets resulting in an accumulated deficit of $248 million.  GPMI was dependent on money from OAO Lukoil to survive.

317.    In 2009, OAO Lukoil directed LAC, LNA and GPMI to transfer GPMI's only profitable assets, including the former ConocoPhillips service stations in Pennsylvania, to the newly created LNA.

318.    In November 2009, LAC and LNA, acting at the direction of OAO Lukoil, undertook a three-step process to effectuate that transfer.

319.    On November 13, 2009, LAC transferred 100% of its GPMI stock to LNA. Upon information and belief, LNA did not give adequate consideration for the transfer of GPMI stock from LAC. The transfer of GPMI stock to LNA had no legitimate business purpose for GPMI.

320.    On November 16, 2009, while under LNA ownership, GPMI transferred stations, including the former ConocoPhillips stations, to LNA. OAO Lukoil, LAC and LNA are successors in liability for the MTBE contamination at these stations. This transfer was fraudulent and to the detriment of GPMI.

321.    The GPMI and LNA documents effecting the transfer of the ConocoPhillips stations from GPMI to LNA were all signed by the same person, the president of both GPMI and LNA, Vincent De Laurentis, on behalf of GPMI and LNA.

322.    The price LNA paid for GPMI's profitable assets was a fraction of the fair market value of those assets and was inadequate for GPMI's creditors.

323.    On November 27, 2009, two weeks after LAC transferred GPMI's stock to LNA, LNA transferred all of its GPMI stock back to LAC as a dividend. By this time, however, GPMI no longer owned the profitable former ConocoPhillips stations, which LNA kept. The result was a GPMI that was hemorrhaging cash and had rent obligations to Getty Realty Corporation that it could not afford (and that were no longer subject to OAO Lukoil's 2000 Guaranty of Lease).

LNA continued, without interruption, the operations of the former ConocoPhillips stations, including management, personnel, physical locations, and sale of motor fuel.

324.    OAO Lukoil, LAC and LNA controlled the transfer of the ConocoPhillips stations from GPMI to LNA, and ignored the corporate formalities that would ordinarily accompany such a transfer.  There was no legitimate business reason for GPMI to transfer these stations to LNA.  In transferring the stations, GPMI acted as an agent of OAO Lukoil, LAC and LNA, and not in the interests of GPMI.

325.    Semyon Logovinsky, the Vice-President of Wholesale/New Business Development for GPMI, LAC and LNA, personally met with and corresponded with the Governor Ed Rendell of the Commonwealth of Pennsylvania in February 2010 regarding gasoline supply and ethanol blending in Pennsylvania.  The correspondence expressly provided that the contact was on behalf of Lukoil and GPMI.  The correspondence bore the Lukoil trade mark on the letterhead, stated that GPMI was a subsidiary of Lukoil Oil Company, and bore a facsimile stamp from "Lukoil Americas LLC" (a.k.a. Lukoil Americas Corporation).

326.    OAO Lukoil and LAC directed gasoline blending operations in which GPMI, acting as an agent for OAO Lukoil and LAC, blended MTBE gasoline for sale in Pennsylvania and elsewhere.

327.    In 2011, OAO Lukoil directed LAC to sell GPMI to Cambridge Holdings Petroleum for one dollar.  At that time, OAO Lukoil also agreed to provide millions of dollars as a cash infusion to Cambridge in order to keep GPMI temporarily afloat.

328.    No officer of GPMI knew of or participated in the sale of GPMI to Cambridge.  Upon the sale, OAO Lukoil ordered all GPMI officers to resign their positions with GPMI.

329.    GPMI owned USTs in Pennsylvania at the time of the sale to Cambridge.

330.    OAO Lukoil, LAC, and LNA filed claims in the bankruptcy proceeding of GPMI

for indemnity by GPMI for "damages relating to purchase and sale agreement" (*e.g.*, the

November, 2009 sale of assets from GPMI to LNA). *In re GPMI Bankruptcy*, No. 11-15606-

SCC (S.D.N.Y.).  LNA also filed claims relating to stations covered by the Amended Master

Lease and the Purchase and Sale Agreement between LNA and GPMI including stations in

Pennsylvania.

331.    The GPMI bankruptcy trustee filed an adversary proceeding against OAO Lukoil,

LAC and LNA, for the fraudulent transfer of assets between GPMI and LNA.  OAO Lukoil,

LAC and LNA settled the bankruptcy trustee's fraudulent transfer claim for $93 million in cash

to be paid to the GPMI Trust.

332.    LNA owns underground storage tanks and service stations in Pennsylvania, some

or all of which are sources of ongoing MTBE contamination.

333.    Every corporate officer of GPMI held the same position with LAC and LNA,

indicative of the fact that these entities were operating as a single entity.

334.    Vadim Gluzman was the Chairman of the Board and Chief Executive Officer of

GPMI, LAC, and LNA.  Mr. Gluzman reported to the Chief Executive Officer of OAO Lukoil

and was a vice-president of OAO Lukoil from 2007 to 2009.

335.    Vincent De Laurentis was the President and Chief Operating Officer of GPMI,

LAC, and LNA.

336.    Michael Hantman was the Senior Vice President and Chief Financial Officer of

GPMI, LAC, and LNA.

337.    Semyon Logovinsky, was the Vice-President for Wholesale and New Business

Development of GPMI, LAC, and LNA.

338.   GPMI, LAC, and LNA had the same principal place of business:  Lukoil Plaza, 1500 Hempstead Turnpike, East Meadow, NY 11554.

339.   OAO Lukoil, LAC, LNA, and GPMI failed to observe corporate separateness and acted as alter-egos and/or as if GPMI was a department of OAO Lukoil and LAC and not a separate entity.  OAO Lukoil, LAC, and LNA wholly ignored the separate status of GPMI and controlled and dominated its affairs such that its separate existence was a sham and façade.

340.   Throughout the ten years that LAC owned GPMI, neither LAC nor GPMI observed corporate formalities, held regular board meetings, or prepared or maintained regular board minutes.   Business decisions of GPMI and LAC were made through "written consents" signed by three board members, including a designated board member from OAO Lukoil.

341.   OAO Lukoil prevented GPMI from obtaining financing without its approval.

342.   OAO Lukoil and LAC required GPMI to submit financial reports to OAO Lukoil.

343.   OAO Lukoil regularly called Vadim Gluzman and other GPMI, LAC and LNA officers to the headquarters of OAO Lukoil in Moscow so OAO Lukoil could tell them how to manage GPMI, LAC, and LNA.  By their actions as aforesaid and otherwise, the defendants OAO Lukoil, LAC and LNA, failed to observe GPMI's separate corporate entity, operated GPMI and/or dealt with GPMI's property as if it were their own, used GPMI as a mere shield to escape liability to the Commonwealth and otherwise to evade legal obligations to the Commonwealth.

344.   As described above, OAO Lukoil, LAC, LNA and GPMI had a unity of ownership, a unified administrative and financial control, and similar or supplementary business functions, and OAO Lukoil, LAC, LNA so dominated GPMI that GPMI did not have a true separate existence.

345.    As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability for MTBE contamination which was the result of releases that occurred at GPMI-lease sites prior to January 25, 2001.

346.    As described above, OAO Lukoil, LAC and LNA are directly, indirectly, and through agents and/or officers, or alter-egos, liable for MTBE contamination which was the result of releases at GPMI-lease sites that occurred on or after January 25, 2001.

347.    Under the totality of the circumstances, as described above, a paramount injustice would occur if LAC, OAO Lukoil, and LNA were allowed to escape liability for their and GPMI's environmental liabilities.  In addition, under the totality of the circumstances, public policy demands that OAO Lukoil, LAC and LNA not be permitted to avoid their and GPMI's legitimate legal obligations to the Commonwealth. No innocent parties will be prejudiced by holding LAC, OAO Lukoil, and LNA liable for their and GPMI's environmental liabilities.

## COUNT I
### (Against All MTBE Defendants)
### (Strict Product Liability Based On Defective Design)

348.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

349.    MTBE Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) MTBE or MTBE gasoline that was delivered into Pennsylvania or into areas outside Pennsylvania affecting the waters of the Commonwealth.

350.    MTBE Defendants represented and claimed that MTBE gasoline could be handled and used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.

351.    MTBE Defendants knew that MTBE and/or MTBE gasoline were going to be handled, purchased and used without inspection for defects and/or knew that downstream handlers and intended users and consumers did not have the wherewithal to inspect or test for defects.

352.    MTBE and/or MTBE gasoline are defective and unreasonably dangerous products because, among other things:

a.    MTBE is released more readily from gasoline transportation, storage and delivery systems or facilities than are the other constituents of gasoline and other available and viable alternative gasoline additives that can be substituted for MTBE;

b.    MTBE, when used in its intended manner, causes extensive groundwater contamination that is difficult, time consuming and expensive to respond to and remediate;

c.    even at extremely low concentrations, MTBE renders groundwater putrid, foul, and unfit for use by humans;

d.    MTBE poses significant threats to the public health, comfort, safety and welfare and the environment;

e.    upon information and belief, despite prior knowledge of potential carcinogenic or other health effects, MTBE Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the potential human health effects of MTBE;

f.    at all times relevant to this action, feasible alternatives to MTBE were available to the MTBE Defendants which could have achieved required efficiencies, octane levels and/or oxygenation and would have eliminated the unreasonable dangers and hazards posed by MTBE gasoline;

g.    commercial grade MTBE is defectively manufactured when it contains and/or

degrades into unnecessary but environmentally harmful impurities such as TBA; and

h.      any utility allegedly provided by the use of MTBE as a gasoline additive is greatly outweighed by the risks and dangers associated with MTBE.

353.    MTBE is not safe for its intended use by the intended users or consumers of MTBE.

354.    MTBE is not safe for its intended use in light of the availability of reasonably safer and available alternatives.

355.    MTBE Defendants at all times knew of the defective and unreasonably dangerous nature of MTBE and MTBE gasoline, yet still manufactured, sold and/or distributed the products without any regard for their defective characteristics.

356.    At all times relevant to this action, MTBE and/or MTBE gasoline were unreasonably dangerous for sale to or use by the intended user or consumer, and/or the great risk of harm to public welfare and the environment posed by MTBE and/or MTBE gasoline outweighed the cost to MTBE Defendants of reducing or eliminating such risk.  MTBE Defendants were able to convert to a different safer formulation without MTBE, and still profit from their gasoline sales.

357.    At all times relevant to this action, the distribution, storage, and/or use of MTBE and/or MTBE gasoline and the risks and dangers associated therewith including the risk of harm to public health and welfare and the environment outweighed any limited utility provided by MTBE and/or MTBE gasoline.

358.    At all times relevant to this action, MTBE and MTBE gasoline were used by the intended users and/or consumers of MTBE and MTBE gasoline without substantial change in

their condition, and as a proximate result of the defects previously described, MTBE and MTBE

gasoline caused the injuries and damages set forth in this Complaint.

359.    As a direct and proximate result of MTBE Defendants' acts and omissions as

alleged herein, the Commonwealth has incurred and suffered and will continue to incur and

suffer substantial costs and damages as aforesaid for which MTBE Defendants are strictly,

jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter judgment against MTBE Defendants, jointly and severally for all costs to

define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE

in the waters of the Commonwealth so that such waters are restored to their original condition,

and for all damages to compensate the Commonwealth for the lost interim value and benefits of

their water resources during all times of injury caused by MTBE, and for such orders as may be

necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)    past and future testing of all affected or potentially affected groundwater

for the presence of MTBE, including in both public and private drinking water wells ; and

2)    past and future treatment and remediation of all groundwater containing

detectable levels of MTBE until restored to non-detectable levels, including in both

public and private drinking water wells;

b.    Enter judgment against MTBE Defendants, jointly and severally, for all

reasonable costs incurred related to the investigation, response, remediation, removal,

restoration, treatment and monitoring, directly or indirectly resulting from the contamination of

the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT II
### (Against All MTBE Defendants)
### (Strict Liability for Failure to Warn)

360.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

114

361.    MTBE and MTBE gasoline were designed, manufactured, formulated, marketed, promoted, supplied and/or sold in a defective condition that was unreasonably dangerous to intended users or consumers.

362.    Despite their knowledge that ground and surface water contamination with MTBE was the inevitable consequence of their conduct as alleged herein, MTBE Defendants failed to provide adequate warnings or instructions, or they provided inadequate warnings or instructions, on the proper and safe use of MTBE and MTBE gasoline.  Nor did MTBE Defendants take any other precautionary measures to prevent or mitigate such contamination of the waters of the Commonwealth.

363.    MTBE Defendants did not adequately warn or instruct intended users or consumers as to the dangers of MTBE.

364.    MTBE Defendants' failure to provide the required warnings or instructions, or their provision of inadequate warnings or instructions, on the use of or dangers presented by MTBE and/or MTBE gasoline rendered these products defective and unreasonably dangerous. The absence of required warnings or instructions, or MTBE Defendants' provision of inadequate warnings or instructions, for the safe use of MTBE and/or MTBE gasoline were a direct and proximate cause of the injuries to the waters of the Commonwealth as alleged herein.

365.    Had the downstream handlers and intended users and consumers of MTBE and/or MTBE gasoline received adequate warnings or instructions concerning the safe use of MTBE and/or MTBE gasoline, they would have, or are substantially likely to have, avoided the risks or dangers attendant to the use of MTBE or MTBE gasoline, including avoiding altogether MTBE or MTBE gasoline.

366.    As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are strictly, jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)    past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)    past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.    Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.    Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

116

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter judgment against MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT III
### (Against All MTBE Defendants)
### (Public Nuisance)

367.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

368.    MTBE Defendants' negligent, reckless and intentional activities which have resulted in the contamination of the waters of the Commonwealth, a public resource, as alleged herein, and created a significant and unreasonable interference with the general public's right to clean, unadulterated water constitute a public nuisance.

117

369.     MTBE Defendants' actions and omissions in causing MTBE to enter and pollute the waters of the Commonwealth violate, *inter alia*, the Pennsylvania Storage Tank and Spill Prevention Act and the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1 *et seq.*, and constitute a public nuisance *per se* under Pennsylvania law.

370.     The public nuisance caused by MTBE Defendants has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the Commonwealth's interests in the waters of the Commonwealth, as well as the Commonwealth's ability to protect, conserve and manage the waters of the Commonwealth, a public resource.

371.     The public nuisance caused by MTBE Defendants is of a continuing nature and has produced a long-lasting effect upon the waters of the Commonwealth, as MTBE Defendants knew or had reason to know at all times material hereto.

372.     MTBE Defendants intentionally and fraudulently promoted MTBE for use as an additive in gasoline despite knowing it had latent and far-reaching adverse environmental consequences, and MTBE Defendants refined, compounded, formulated, marketed, distributed and/or otherwise supplied and controlled MTBE gasoline in Pennsylvania (and areas outside Pennsylvania affecting the waters of the Commonwealth) when, at all times material hereto, MTBE Defendants knew, or reasonably should have known, that (i) MTBE gasoline would be placed into leaking gasoline storage and delivery systems; and (ii) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

373.     Based on their conduct as aforesaid, MTBE Defendants have, at all times relevant to this action, caused, maintained, substantially participated in and/or assisted in the creation of such public nuisance and is a substantial contributor to such public nuisance.

374.     As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.     Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)     past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)     past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.     Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT IV
### (Against All MTBE Defendants)
### (Negligence)

375.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

376.    MTBE Defendants owed a duty to the Commonwealth to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or MTBE gasoline.

377.    MTBE Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise distributed MTBE and MTBE gasoline that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the Commonwealth, resulting in the damages alleged in this Complaint.

378.    MTBE Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute public water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

379.    MTBE Defendants which manufactured, promoted and/or otherwise supplied MTBE to the MTBE Defendants which refined gasoline knew or reasonably should have known that:

a.    MTBE Defendants which refined gasoline would in turn blend the MTBE into gasoline;

b.    such MTBE gasoline would then be placed into gasoline storage and delivery systems, including those in Pennsylvania, with a known propensity and/or potential to leak; and

c.    when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the Commonwealth,

including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

380.    MTBE Defendants which refined, marketed and/or otherwise supplied MTBE gasoline that was delivered, stored and sold in Pennsylvania and/or in areas affecting waters of the Commonwealth knew, or reasonably should have known, that:

a.    such gasoline would be placed into gasoline storage and delivery systems with a known propensity and/or potential to leak;

b.    MTBE would be released even more readily than the constituents of gasoline not containing MTBE from gasoline storage and delivery systems; and

c.    when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the Commonwealth, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

381.    MTBE Defendants manufactured, refined, marketed, promoted and/or otherwise supplied MTBE and/or MTBE gasoline to downstream handlers and intended users and consumers when they knew, or reasonably should have known, that MTBE would be released into the environment from commercial and consumer uses and sources in Pennsylvania other than gasoline storage and delivery systems; and contaminate the waters of the Commonwealth.

382.    Despite their knowledge that water contamination with MTBE was a probable consequence of their conduct and omissions as alleged herein, MTBE Defendants failed to provide any warnings or special instructions, take any other precautionary measures to prevent or mitigate such contamination, or undertake and perform appropriate and necessary response or remediation activities.

383.    In light of the facts alleged herein, MTBE Defendants breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or MTBE gasoline.

384.    As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)    past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)    past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;·

b.    Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

**COUNT V**
**(Against All MTBE Defendants)**
**(Trespass[2])**

385.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

---

[2]The Commonwealth acknowledges the Court's prior ruling on trespass. It continues to demand same for purposes of preserving its rights, including its appeal rights.

124

386.    The Commonwealth is the possessor and owner of rights and interests in the

waters of the Commonwealth, a public natural resource, which the Commonwealth also holds in

trust for the benefit of its citizens.  These rights and interests include, but are not limited to, the

Commonwealth's possession and control over waters of the Commonwealth and its legal

responsibilities to protect the quality of such waters from contamination and pollution, its

constitutional duties as trustee of public natural resources to conserve and maintain the waters for

the benefit of all the people, and its *parens patriae* prerogatives, duties and rights to prosecute

and recover for trespasses to waters of the Commonwealth

387.    By their tortious conduct as alleged herein, MTBE Defendants caused MTBE to

enter, invade, intrude upon and injure the waters of the Commonwealth, trespassing upon the

Commonwealth's interests and rights to such waters.

388.    Based on their knowledge of the properties and manner of distribution and storage

of MTBE and MTBE gasoline as alleged herein, MTBE Defendants were or should have been

aware that as a result of their conduct MTBE contamination of Pennsylvania's groundwater as

alleged was inevitable or substantially certain to result.

389.    The trespass upon the waters of the Commonwealth is a continuing trespass.

390.    The Commonwealth has not consented to the trespass alleged herein.

391.    As a direct and proximate result of MTBE Defendants' acts and omissions as

alleged herein, the Commonwealth has incurred and suffered and will continue to incur and

suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and

severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

125

a.      Enter judgment against MTBE Defendants, jointly and severally for all costs to

define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE

in the waters of the Commonwealth so that such waters are restored to their original condition,

and for all damages to compensate the Commonwealth for the lost interim value and benefits of

their water resources during all times of injury caused by MTBE, and for such orders as may be

necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)      past and future testing of all affected or potentially affected groundwater

for the presence of MTBE, including in both public and private drinking water wells; and

2)      past and future treatment and remediation of all groundwater containing

detectable levels of MTBE until restored to non-detectable levels, including in both

public and private drinking water wells;

b.      Enter judgment against MTBE Defendants, jointly and severally, for all

reasonable costs incurred related to the investigation, response, remediation, removal,

restoration, treatment and monitoring, directly or indirectly resulting from the contamination of

the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages

in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their

original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all

compensatory damages for the lost interim or permanent value of the waters of the

Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other

damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants'

acts and omissions alleged herein, including remedial, administrative, oversight and legal

expenses and compensation for damage to waters of the Commonwealth;

> f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to

abate or mitigate the MTBE contamination of waters of the Commonwealth;

> g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to

be determined by this Court;

> h.      Award the Commonwealth costs incurred in prosecuting this action, together with

prejudgment interest, to the full extent permitted by law; and

> i.      Award the Commonwealth such other relief as this Court deems appropriate.

### COUNT VI
### (Against MTBE MSDS Defendants)
### (Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law)

392.     The Commonwealth incorporates by reference the preceding paragraphs as

though set forth at length herein.

393.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law

("UTPCPL") was in effect all times material hereto.

394.     Section 3 of the UTPCPL, 73 P. S. § 201-3, provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices in
> the conduct of any trade or commerce as defined by sub clauses (i)
> through (xxi) of clause (4) of section 2 of this act ... are hereby declared
> unlawful.

395.     Section 2 of the UTPCPL, 73 P. S. § 201-2, provides, in pertinent part:

> "UNFAIR METHODS OF COMPETITION" and "UNFAIR OR DECEPTIVE
> ACTS OR PRACTICES" mean any one or more of the following:

> * * *

> (v)      Representing that goods or services have sponsorship, approval,
> characteristics, ingredients, uses, benefits or quantities that they do not have or
> that person has a sponsorship, approval, status, affiliation or connection that he
> does not have;

* * *

(vii)   Representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model, if they are of another;

* * *

(viii)   Disparaging the goods, services or business of another by false or misleading representation of fact;

* * *

(xxi)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

396.   The MTBE MSDS Defendants committed unfair and deceptive actions and practices as defined in in the UTPCPL in connection with their respective marketing, sale and distribution of MTBE and MTBE gasoline and violated and may or will continue to violate the UTPCPL for one or more of the following reasons:

a.   The MTBE MSDS Defendants disseminated, marketed, advertised and otherwise distributed deceptive and misleading information in their respective MSDSs for MTBE and MTBE gasoline to gasoline refiners, distributors, jobbers, retailers and the general public that represented that MTBE was a safe, suitable and effective gasoline additive, comparable in risk and hazards to conventional gasoline constituents, when in fact as defendants knew MTBE's and MTBE gasoline's posed unique environmental risks and hazards not present in conventional gasoline;

b.   The MTBE MSDS Defendants products containing MTBE as a gasoline additive and marketed as reformulated gasoline did not and do not have the characteristics, benefits or qualities  represented  in their MSDSs, including being comparable in risk and hazards to conventional gasoline constituents, in that when released into the environment their respective

MTBE gasoline caused more extensive damage to property, water supplies and other natural resources of the Commonwealth that necessitated and will necessitate longer, more difficult and more costly remedial actions.

397.    MTBE MSDS Defendants' material omissions, misrepresentations, and unfair and deceptive practices relating to the marketing, promotion, distribution and sale of MTBE gasoline and MTBE as a gasoline additive in their respective MSDSs was intended to and did deceive, mislead and confuse the public, including gasoline refiners, distributors, jobbers, retailers and consumers purchasing, storing, distributing and selling same.

398.    The Pennsylvania Office of Attorney General has reason to believe that MTBE MSDS Defendants' omissions, misrepresentations, and practices relating to the marketing, promotion, distribution and sale of MTBE as a gasoline additive and MTBE gasoline as a cleaner fuel violated, and if repeated will violate, the UTPCPL.

399.    Unless restrained, MTBE MSDS Defendants will likely engage in methods, acts or practices which have a likelihood to deceive, mislead and confuse the public in violation of the UTPCPL and are contrary to the public's interest, thereby necessitating a permanent injunction to prevent and restrain such misconduct by MTBE MSDS Defendants.

400.    Pursuant to § 4 of the UTPCPL, 73 P.S. § 201-4, the Pennsylvania Office of Attorney General believes it to be in the public interest to bring this action against MTBE MSDS Defendants to restrain any further violation of the UTPCPL.

401.    Pursuant to § 4.1 of the UTPCPL, 73 P.S. § 201-4.1, and due to their respective violations of the UTPCPL set out above, MTBE Defendants should be furthered ordered and directed by the Court to restore to all persons in interest any moneys or property, real or

personal, which may have been acquired by means of the MTBE MSDS Defendants' violations of the UTPCPL.

402.    MTBE MSDS Defendants willfully used methods, acts and practices relating to MTBE and MTBE gasoline that have a likelihood to deceive, mislead and confuse in violation of the UTPCPL and, accordingly under § 8 of the UTPCPL, 73 P.S. § 2-201-8, assessment and recovery of civil penalties on behalf of the Commonwealth is warranted and should be ordered against each defendant in a sum not exceeding one thousand dollars ($1000.00) per violation, which civil penalty is in addition to any other relief awarded the Commonwealth.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter declaratory judgment against MTBE MSDS Defendants determining and declaring that each defendant's methods, acts and practices relating to the marketing, promotion, distribution and sale of MTBE or MTBE gasoline violated the UTPCPL, 73 P.S. § 201-1 *et seq.*;

b.    Enter a permanent injunction order restraining MTBE MSDS Defendants from further violating the UTPCPL, 73 P.S. § 201-1 *et seq.*;

c.    Enter an order under § 4.1 of the UTPCPL, 73 P.S. § 201-4.1, requiring MTBE Defendants to restore to all persons in interest (which includes the Commonwealth[3]) any moneys or property, real or personal, which MTBE MSDS Defendants may have been acquired by means of their violations of the UTPCPL;

d.    Enter an order awarding to the Commonwealth civil penalties under § 8 of the UTPCPL, 73 P.S. § 201-8, against MTBE MSDS Defendants in a sum not exceeding one thousand dollars ($1000.00) per violation;

---

[3] The Commonwealth acknowledges the Court's prior ruling on its entitlement to statutory restoration in its own right. It continues to demand same for purposes of preserving its rights, including its appeal rights.

e.      Enter an order requiring the MTBE MSDS Defendants to render an accounting

and thereafter disgorge all moneys obtained as a result of their violations of the Pennsylvania

Unfair Trade Practices and Consumer Protection Law;

f.      Award the Commonwealth costs and reasonable attorney's fees incurred in

prosecuting this action, together with prejudgment interest, to the full extent permitted by law;

and

g.      Award the Commonwealth such other relief as this Court deems appropriate.

### COUNT VII
### (Against MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco)
### (Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law)

403.    The Commonwealth incorporates by reference the preceding paragraphs as

though set forth at length herein.

404.    MTBE Defendant Shell Oil's marketing and public relations campaign to sell in

Pennsylvania MTBE gasoline products as cleaner gasolines beneficial for the environment as set

out above violated the UTPCPL for one or more of the following reasons:

a.      Shell Oil's marketing and public relations campaign for SU2000E and other

MTBE gasolines disseminated and distributed deceptive, confusing and misleading information

about MTBE gasoline to gasoline refiners, distributors, jobbers, retailers and general public by

representing that its reformulated gasoline using MTBE in larger quantities than previous

contemporaneous gasoline formulations to replace other ingredients of the gasoline was safe,

suitable effective, and environmental friendly, when in fact MTBE and its MTBE gasoline's

environmental risks and hazards, which Shell Oil omitted from its public communications, posed

unique and significant risks and hazards to the environment.

131

b.      Shell Oil's claimed cleaner, more environmentally friendly MTBE gasoline products it offered beginning in or about April, 1990 did not and do not have the characteristics, benefits or qualities they were represented to possess in that if and when MTBE gasoline was released into the environment, as was foreseeable by defendants, MTBE caused far more reaching and long-lived damage to property, water supplies and other natural resources that has necessitated and will necessitate longer, more difficult and far more costly remedial actions.

405.    MTBE Defendants ConocoPhillips (successor to Conoco and Phillips), Valero (as successor to Diamond Shamrock), ExxonMobil (as successor to Exxon), Marathon, Shell Oil and Sunoco violated the UTPCPL in their public statements and marketing of their respective MTBE gasoline as cleaner, more environmentally friendly motor fuel beginning in or about 1990 by misleadingly and deceptively representing to the Pennsylvania public that MTBE gasoline had purported environmental virtues and benefits in providing the motoring public with a safe, suitable and effective alternative gasoline product, when in fact the environmental risks and hazards of MTBE and MTBE gasoline, which defendants omitted to disclose, outweighed any claimed benefits that MTBE gasoline had, if any.

406.    The Pennsylvania Office of Attorney General has reason to believe that the omissions, misrepresentations, and practices of MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco (or their predecessors in interest) relating to the marketing, promotion, distribution and sale of MTBE as a gasoline additive and MTBE gasoline as a cleaner fuel violated, and if repeated will violate, the UTPCPL.

407.    Unless restrained, MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco will likely engage in methods, acts or practices that violate the

132

UTPCPL and are contrary to the public's interest, thereby necessitating a permanent injunction

to prevent and restrain such misconduct by these MTBE Defendants.

408.    Pursuant to § 4 of the UTPCPL, 73 P.S. § 201-4, the Pennsylvania Office of

Attorney General believes it to be in the public interest to bring this action against MTBE

Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco to restrain

any further violation of the UTPCPL.

409.    Pursuant to § 4.1 of the UTPCPL, 73 P.S. § 201-4.1, and due to their respective

violations of the UTPCPL set out above, MTBE Defendants ConocoPhillips, Valero,

ExxonMobil, Marathon, Shell Oil and Sunoco should be furthered ordered and directed by the

Court to restore to all persons in interest any moneys or property, real or personal, which may

have been acquired by means of their or their predecessors' respective violations of the

UTPCPL.

410.    MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and

Sunoco (or their predecessors) willfully used methods, acts and practices relating to MTBE and

MTBE gasoline that have a likelihood to deceive, mislead and confuse that violate the UTPCPL

and, accordingly under § 8 of the UTPCPL, 73 P.S. § 2-201-8, assessment and recovery of civil

penalties on behalf of the Commonwealth is warranted and should be ordered against each

defendant in a sum not exceeding one thousand dollars ($1000.00) per violation, which civil

penalty is in addition to any other relief awarded the Commonwealth.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter declaratory judgment against MTBE Defendants ConocoPhillips, Valero,

ExxonMobil, Marathon, Shell Oil and Sunoco determining and declaring that each defendant's

(or their predecessors) methods, acts and practices relating to the sale, marketing, promotion and distribution of MTBE or MTBE gasoline violated the UTPCPL, 73 P.S. § 201-1 *et seq.*;

      b.     Enter a permanent injunction order restraining MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco from further violating the UTPCPL, 73 P.S. § 201-1 *et seq.*;

      c.     Enter an order under § 4.1 of the UTPCPL, 73 P.S. § 201-4.1, requiring MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco to restore to all persons in interest (which includes the Commonwealth)[4] any moneys or property, real or personal, these defendants (or their predecessors in interest) acquired as a result of MTBE Defendants' violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

      d.     Enter an order awarding to the Commonwealth civil penalties under § 8 of the UTPCPL, 73 P.S. § 201-8, against MTBE Defendants ConocoPhillips, Valero, ExxonMobil, Marathon, Shell Oil and Sunoco in a sum not exceeding one thousand dollars ($1000.00) per violation;

      e.     Enter an order requiring MTBE Defendants to render an accounting and thereafter disgorge all moneys or other property obtained as a result of their violations of the UTPCPL;

      f.     Award the Commonwealth costs and reasonable attorney's fees incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

      g.     Award the Commonwealth such other relief as this Court deems appropriate.

---

[4] The Commonwealth acknowledges the Court's prior ruling on its entitlement to statutory restoration in its own right. It continues to plead and demand same, however, for purposes of preserving its rights to such relief, including its appeal rights.

## COUNT VIII
### (Against All Insurance Defendants)
### (Unjust Enrichment)

411.     The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

### Allegations Specific to the BP Insurance Defendants

412.     For purposes of the Insurance Claims herein, Defendants BP p.l.c., BP Holdings North America Limited, BP America Inc., BP Products North America Inc., BP West Coast Products LLC, and their predecessor companies and subsidiaries are referred to herein collectively as "BP Insurance Defendants."

413.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the BP Insurance Defendants through a complex, multi-layer insurance program.

414.     The insurance policies issued to the BP Insurance Defendants over the years included primary, umbrella, and excess commercial general liability ("CGL") policies, pollution liability policies, all risk policies, garage liability policies, and others.

415.     In addition to obtaining the policies identified above, the BP Insurance Defendants also owned captive insurers including Jupiter Insurance Ltd., Cairngorm Insurance Limited, Greater Pacific Limited, Jupiter Assurance Ltd., Northern Resources Insurance Company Ltd., and Northern Resources Assurance Inc.  All of these captive insurers were amalgamated into Jupiter Insurance Ltd. between 2000 and 2012.  On March 25, 2011, the BP Insurance Defendants incorporated a new captive insurer, Saturn Insurance Inc. in Vermont. These captive insurers received credit ratings from ratings agencies, and the BP Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

416.     Until 2004, the BP Insurance Defendants were also partial owners in, and insured by, a mutual liability insurer known as Oil Insurance Limited, and its related excess carrier, Oil Casualty Insurance Limited.

417.     Plaintiff believes, and therefore avers, that the BP Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

418.     Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the BP Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the BP Insurance Defendants to, and paid by, USTIF.

419.     In 1992, the BP Insurance Defendants made claims and initiated settlement negotiations with many of its insurers to resolve various coverage issues, including coverage for leaking USTs that were also the subject of claims made to USTIF.

420.     The BP Insurance Defendants also initiated legal proceedings to enforce their rights under many of the aforementioned insurance policies for reimbursement of, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the BP Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.     *ARCO, et al. v. Aetna Casualty & Surety, et al.*, Superior Court of California, County of Los Angeles, No. BC015575; and

b.     *Amoco Oil Co., et al. v. Accident Casualty Insurance, et al.*, Circuit Court of Cook County, Illinois – Law Division, No. 1993-L-008484.

421.    Upon information and belief, the BP Insurance Defendants settled their claims with all of the insurers, including their coverage litigation, for millions of dollars.

422.    In exchange for payment of millions of dollars in settlement funds, the BP Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the BP Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such payments.

**Allegations Specific to the Sunoco Insurance Defendants**

423.    For purposes of the Insurance Claims herein, Defendants Energy Transfer Partners, L.P., ETP Holdco Corporation, Sunoco, Inc., and their predecessor companies and subsidiaries are referred to herein collectively as "Sunoco Insurance Defendants."

424.    Over several decades, hundreds of insurance carriers issued thousands of insurance policies to the Sunoco Insurance Defendants through a complex, multi-layer insurance program.

425.    The insurance policies issued to the Sunoco Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

426.    In addition to obtaining the policies identified above, the Sunoco Insurance Defendants also owned captive insurers including Helios Assurance Company Limited. Upon information and belief, this captive insurer received credit ratings from ratings agencies and the Sunoco Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

427.    At all times relevant hereto, the Sunoco Insurance Defendants were owners and insureds of the mutual liability insurer Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

428.    Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Sunoco Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

429.    Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Sunoco Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the Sunoco Insurance Defendants to, and paid by, USTIF.

430.    On or before October 4, 1996, the Sunoco Insurance Defendants began making claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

431.    The Sunoco Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement or, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Sunoco Insurance Defendants filed insurance coverage litigation including, but not limited to, *Jalisco Corporation Inc., et al. v. Argonaut Insurance Company, et al.*, Superior Court of California, Los Angeles County, No. BC158441.

432.    Upon information and belief, the Sunoco Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

433.    In exchange for millions of dollars in settlement funds, the Sunoco Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Sunoco Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Chevron Insurance Defendants**

434.    For purposes of the Insurance Claims herein, Defendants Chevron Corporation, Chevron U.S.A. Inc., and their predecessor companies and subsidiaries are referred to herein collectively as "Chevron Insurance Defendants."

435.    Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Chevron Insurance Defendants through a complex, multi-layer insurance program.

436.    The insurance policies issued to the Chevron Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

437.    In addition to obtaining the insurance policies described above, the Chevron Insurance Defendants also owned captive insurers including, but not limited to, Insco, Ltd., Bermaco Insurance Company Limited, Iron Horse Insurance Company, Heddington Insurance Ltd., and Puritan Assurance Ltd.  These captive insurers received credit ratings from ratings

139

agencies, and the Chevron Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

438.    At all times relevant hereto, the Chevron Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

439.    Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Chevron Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

440.    Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Chevron Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the Chevron Insurance Defendants to, and paid by, USTIF.

441.    Beginning in or about 1996, the Chevron Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

442.    The Chevron Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Chevron Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.      *Four Star Oil & Gas Company, et al. v. Allianz Underwriters Insurance Co., et al.*, Superior Court of California, Los Angeles County, No. BC036944;

b.      *Texaco Refining & Marketing, et al., v. Fireman's Fund, et al.*, Superior Court of California, Los Angeles County, No. BC084238; and

c.      *Union Oil Consolidated Coverage Actions*, Superior Court of California, Los Angeles County, Nos. BC271474, BC287966, and BC278535.

443.    Upon information and belief, the Chevron Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

444.    In exchange for millions of dollars in settlement funds, the Chevron Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Chevron Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the ConocoPhillips Insurance Defendants**

445.    For purposes of the Insurance Claims herein, Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessor companies and subsidiaries are referred to herein collectively as "ConocoPhillips Insurance Defendants."

446.    Over several decades, hundreds of insurance companies issued thousands of insurance policies to the ConocoPhillips Insurance Defendants through a complex, multi-layer insurance program.

447.     The insurance policies issued to the ConocoPhillips Insurance Defendants over

the years included primary, umbrella, and excess CGL policies, pollution liability policies, all

risk policies, garage liability policies, and others.

448.     In addition to obtaining the insurance policies described above, the

ConocoPhillips Insurance Defendants also owned captive insurers including, but not limited to,

Walton Insurance Ltd., Danube Insurance Ltd., Sooner Insurance Company, International Energy

Insurance Limited, Wabash Insurance Ltd., The Loil Group Limited and Peerless Insurance

Company Limited.  These captive insurers received credit ratings from ratings agencies, and the

ConocoPhillips Insurance Defendants treated captive insurance as third-party insurance in IRS

filings by, for example, deducting premiums.

449.     At all times relevant hereto, the ConocoPhillips Insurance Defendants were the

owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier,

Oil Casualty Insurance Limited.

450.     Consistent with the practice of other major oil companies, Plaintiff believes, and

therefore avers, that the ConocoPhillips Insurance Defendants, at all times relevant hereto, were

named insureds on their dealers' and jobbers' insurance policies which provided coverage for,

among other things, the investigation and remediation of releases from USTs in Pennsylvania.

451.     Upon information and belief, the commercial, captive, mutual and dealer/jobber

insurance policies described above provided coverage to the ConocoPhillips Insurance

Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the

subject of claims made by the ConocoPhillips Insurance Defendants to, and paid by, USTIF.

452.     Beginning in or about the early 1990s, the ConocoPhillips Insurance Defendants

made claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

453.    The ConocoPhillips Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the ConocoPhillips Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.    *Douglas Oil Company, et al. v. Allianz Underwriters Insurance Co, et al.*, Superior Court of California, Los Angeles County, No. BC064046; and

b.    *Tosco Corporation v. Hartford Accident and Indemnity Company, et al.*, Superior Court of California, San Francisco County, No. CGC-93-952681.

454.    Upon information and belief, the ConocoPhillips Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

455.    In exchange for millions of dollars in settlement funds, the ConocoPhillips Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the ConocoPhillips Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Hess Insurance Defendants**

456.    For purposes of the Insurance Claims herein, Defendants Hess Corporation, WilcoHess LLC, and their predecessor companies and subsidiaries are referred to herein collectively as "Hess Insurance Defendants."

143

457.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Hess Insurance Defendants through a complex, multi-layer insurance program.

458.     The insurance policies issued to the Hess Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

459.     In addition to obtaining the insurance policies described above, the Hess Insurance Defendants also owned certain captive insurers which will be further identified through discovery.

460.     At all times relevant hereto, the Hess Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

461.     Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Hess Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

462.     Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Hess Insurance Defendants for releases from USTs in Pennsylvania, which releases were the subject of claims made by the Hess Insurance Defendants to, and paid by, USTIF.

463.     Beginning in or about the early 1990s, the Hess Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

464.    The Hess Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Hess Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.    *Amerada Hess Corporation v. Travelers Indemnity Company, et al.,* U.S.D.C., N.J., No. 95-2472 (MTB);

b.    *Meadville Corporation, et al. v. Aetna Casualty and Surety Company, et al.,* Superior Court of New Jersey, Law Division, Essex County, No. L-1180-98; and

c.    *Amerada Hess Corporation and Hess Oil Virgin Islands Corp. v. Certain Underwriters at Lloyds, et al.,* U.S.D.C., V.I., No. 2003-0168.

465.    Upon information and belief, the Hess Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

466.    In exchange for millions of dollars in settlement funds, the Hess Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Hess Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

145

**Allegations Specific to the Valero Insurance Defendants**

467.     For purposes of the Insurance Claims herein, Defendants Valero Energy

Corporation, Valero Marketing and Supply Company, The Premcor Refining Group Inc., and

their predecessor companies and subsidiaries are referred to herein collectively as "Valero

Insurance Defendants."

468.     Over several decades, hundreds of insurance companies issued thousands of

insurance policies to the Valero Insurance Defendants through a complex, multi-layer insurance

program.

469.     The insurance policies issued to the Valero Insurance Defendants over the years

included primary, umbrella, and excess CGL policies, pollution liability policies, all risk

policies, garage liability policies, and others.

470.     In addition to obtaining the insurance policies described above, the Valero

Insurance Defendants also owned certain captive insurers including, but not limited to,

Colonnade Assurance Limited, Colonnade Vermont Insurance Company, Omnium Insurance &

Reinsurance Company Ltd., and Opus Energy Risk Limited.  These captive insurers received

credit ratings from ratings agencies, and the Valero Insurance Defendants treated captive

insurance as third-party insurance in IRS filings by, for example, deducting premiums.

471.     At all times relevant hereto, the Valero Insurance Defendants were the owners

and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil

Casualty Insurance Limited.

472.     Consistent with the practice of other major oil companies, Plaintiff believes, and

therefore avers, that the Valero Insurance Defendants, at all times relevant hereto, were named

insureds on their dealers' and jobbers' insurance policies which provided coverage for, among

other things, the investigation and remediation of releases from USTs in Pennsylvania.

473.   Upon information and belief, the commercial, captive, mutual and dealer/jobber

insurance policies described above provided coverage to the Valero Insurance Defendants for

releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims

made by the Valero Insurance Defendants to, and paid by, USTIF.

474.   Beginning in or about the early 1990s, the Valero Insurance Defendants made

claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject

of claims made to USTIF.

475.   The Valero Insurance Defendants initiated litigation against many of their insurers

to enforce their rights under many of the aforementioned insurance policies for reimbursement

for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Valero

Insurance Defendants filed insurance coverage litigation including, but not limited to, the

following:

a.   *Valero Energy Corporation, et al. v. National Union Insurance Company, et al.*,

Hidalgo County Texas, No. C-1530-03-1; and

b.   *Valero Energy Corporation, et al. v. Steadfast Insurance Company, et al.*, 73rd

District Court, Bexar County Texas, No. CI 02590.

476.   Upon information and belief, the Valero Insurance Defendants settled their claims

with all of their insurers, including their coverage litigation, for millions of dollars without

notifying Plaintiff.

477.    In exchange for millions of dollars in settlement funds, the Valero Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Valero Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

### Allegations Specific to the Kinder Morgan Insurance Defendants

478.    For purposes of the Insurance Claims herein, Defendant Kinder Morgan, Inc. and its predecessor companies and subsidiaries are referred to herein collectively as "Kinder Morgan Insurance Defendants."

479.    Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Kinder Morgan Insurance Defendants through a complex, multi-layer insurance program.

480.    The insurance policies issued to the Kinder Morgan Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

481.    In addition to obtaining the insurance policies described above, the Kinder Morgan Insurance Defendants also owned certain captive insurers including, but not limited to, Coastal Offshore Insurance Ltd., Colburn Insurance Company Limited. These captive insurers received credit ratings from ratings agencies, and the Kinder Morgan Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

482.   At all times relevant hereto, the Kinder Morgan Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

483.   Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Kinder Morgan Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

484.   Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Kinder Morgan Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the Kinder Morgan Insurance Defendants to, and paid by, USTIF.

485.   Beginning in or about the early 1990s, the Kinder Morgan Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

486.   The Kinder Morgan Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania. Specifically, the Kinder Morgan Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

   a.   *The Coastal Corporation, et al. v. The Aetna Casualty & Surety Company, et al.*, Superior Court of California, Los Angeles County, No. C154142; and

b.     *Kern County Land Company, et al. v. California Union Insurance Company, et al.*, Superior Court of California, San Francisco County, No. 991097.

487.     Upon information and belief, the Kinder Morgan Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

488.     In exchange for millions of dollars in settlement funds, the Kinder Morgan Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Kinder Morgan Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Marathon Insurance Defendants**

489.     For purposes of the Insurance Claims herein, Defendants Marathon Oil Corporation, Marathon Petroleum Corporation, Marathon Petroleum Company LP, and their predecessor companies and subsidiaries are referred to herein collectively as "Marathon Insurance Defendants."

490.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Marathon Insurance Defendants through a complex, multi-layer insurance program.

491.     The insurance policies issued to the Marathon Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

492.     In addition to obtaining the insurance policies described above, the Marathon Insurance Defendants also owned certain captive insurers including, but not limited to, Old Main

Assurance Ltd., and Yorktown Assurance Corporation.  These captive insurers received credit

ratings from ratings agencies, and the Marathon Insurance Defendants treated captive insurance

as third-party insurance in IRS filings by, for example, deducting premiums.

494.    At all times relevant hereto, the Marathon Insurance Defendants were the owners

and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil

Casualty Insurance Limited.

494.    Consistent with the practice of other major oil companies, Plaintiff believes, and

therefore avers, that the Marathon Insurance Defendants, at all times relevant hereto, were named

insureds on their dealers' and jobbers' insurance policies which provided coverage for, among

other things, the investigation and remediation of releases from USTs in Pennsylvania.

495.    Upon information and belief, the commercial, captive, mutual and dealer/jobber

insurance policies described above provided coverage to the Marathon Insurance Defendants for

releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims

made by the Marathon Insurance Defendants to, and paid by, USTIF.

496.    Beginning in or about the early 1990s, the Marathon Insurance Defendants made

claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject

of claims made to USTIF.

497.    The Marathon Insurance Defendants initiated litigation against many of their

insurers to enforce their rights under many of the aforementioned insurance policies for

reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically,

the Marathon  Insurance Defendants filed insurance coverage litigation including, but not limited

to, the following:

a.    *Marathon Oil, et al. v. Hartford, et al., District Court, Oklahoma County,* Oklahoma, No. CJ-93-5570; and

b.    *Marathon Oil Company, et al. v. Hartford Accident and Indemnity Company, et al.,* District Court of Galveston County, Texas, 122nd Judicial District, No. 96CV0631.

498.    Upon information and belief, the Marathon Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

499.    In exchange for millions of dollars in settlement funds, the Marathon Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Marathon Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Shell Insurance Defendants**

500.    For purposes of the Insurance Claims herein, Defendants Shell Oil Company, Shell Oil Products Company LLC, Motiva Enterprises LLC, and their predecessor companies and subsidiaries are referred to herein collectively as "Shell Insurance Defendants."

501.    Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Shell Insurance Defendants through a complex, multi-layer insurance program.

502.    The insurance policies issued to the Shell Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

503.     In addition to obtaining the insurance policies described above, the Shell Insurance Defendants also owned certain captive insurers including, but not limited to, Noble Insurance Ltd., PICO Ltd., and Noble Assurance Company.  These captive insurers received credit ratings from ratings agencies, and the Shell Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

504.     At all times relevant hereto, the Shell Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

505.     Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Shell Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

506.     Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Shell Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the Shell Insurance Defendants to, and paid by, USTIF.

507.     Beginning in or about the early 1990s, the Shell Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

508.     The Shell Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Shell

Insurance Defendants filed insurance coverage litigation including, but not limited to, *Shell Oil Company v. Certain Underwriters at Lloyd's*, Superior Court of California, San Francisco County, No. 954709.

509.    Upon information and belief, the Shell Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

510.    In exchange for millions of dollars in settlement funds, the Shell Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Shell Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

511.    Under Pennsylvania law, it is well established that a person who has been unjustly enriched at the expense of another must make restitution to the other. *Binns v. First National Bank of California, Pennsylvania,* 80 A.2d 768 (Pa. 1951); *DeGasperi v. Valicenti*, 181 A.2d 862 (Pa. Super. 1962).

512.    Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. *Schenck v. K.E. David, Ltd.,* 666 A.2d 327 (Pa. Super. 1995).

513.    At all times relevant hereto, the Insurance Defendants received benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs.

514.    Insurance Defendants had knowledge of the benefit being conferred upon them by the Commonwealth.

515.   At the same time Insurance Defendants were accepting benefits from the Commonwealth in the form of payments from USTIF, Insurance Defendants were also pursuing claims against their various insurers to recover the very same corrective action costs for which they received payment from USTIF.

516.   At various times relevant hereto, Insurance Defendants entered into settlement agreements with their insurers and accepted payments which were, at least in part, payments for the very same corrective action costs covered by USTIF payments.

517.   Insurance Defendants have been unjustly enriched by their acceptance of benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs and also receiving settlement payments from their insurers for those same corrective action costs.

518.   Insurance Defendants have been unjustly enriched by their acceptance of benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs related to pre-February 1, 1994 leaks from UST systems.

519.   As a result of the unjust enrichment, Insurance Defendants must repay the Commonwealth the full value of the benefit conferred to them as USTIF participants in the form of payments from USTIF for corrective action.

WHEREFORE, the Commonwealth respectfully requests that this Court enter judgment in its favor against the Insurance Claim Defendants for its damages, including prejudgment interest, where appropriate and all other relief, at law or equity, as the Court deems just and proper.

## COUNT IX
### (Against All Insurance Defendants)
### (Violation of the Pennsylvania Storage Tank and Spill Prevention Act)

520.   The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

521.    At all times relevant hereto, Insurance Defendants were required to abide by the STSPA as well as all regulations promulgated pursuant to the STSPA. *See e.g.*, 25 Pa. Code §§ 245.1 *et seq.* and 25 Pa. Code §§ 977.1 *et seq.*

522.    25 Pa. Code § 977.31 sets forth requirements participants must meet to be eligible for Fund coverage.

523.    25 Pa. Code § 977.32 sets forth minimum requirements for participant cooperation in the claim process to be eligible for Fund coverage.

524.    Pursuant to the STSPA, Insurance Defendants initiate claims with the USTIF by notifying the USTIF of a release *via* telephone, facsimile or electronic mail and a "Telephone Claim Report" is completed.

525.    Information from the "Telephone Claim Report" is entered onto a claim report template within the Fund's fee billing system which is then transferred electronically to ICF International for further handling and investigation.  After the Telephone Claim Report is completed, the USTIF confirms the loss report in writing to the Insurance Defendant and informs the Insurance Defendant that the loss report is being referred to a third party administrator, ICF International, to investigate the loss report on behalf of the Commonwealth to determine eligibility for benefits under the USTIF.

526.    ICF International contacts the Insurance Defendant, or its assigned agent, *via* telephone and in writing and requests information and documentation relevant to the reported loss.  The requested information includes information with respect to, among other information, the following areas: 1) description of tanks; 2) site description; 3) description of loss; and 4) subrogation.

527.     ICF International completes its investigation on behalf of the Commonwealth through interviews of representatives from the Insurance Defendant, review of documentation provided by the Insurance Defendant, and analysis of data provided by the Insurance Defendant.

528.     Once ICF International completes its investigation on behalf of the Commonwealth, the Claims Investigator completes a "First Report" to the USTIF.  The First Report is a form report, and every First Report reports investigative results in each of the following twelve areas:  1) "Description of Tanks;" 2) "Site Description;" 3) "Description of Loss;" 4) "Investigation Activity;" 5) "Eligibility;" 6) "3rd Party Claims;" 7) "Damages/Clean-Up;" 8) "Reserves;" 9) "Subrogation;" 10) "Photo & Diagrams;" 11) "Future Handling/Things to Do;" and 12) "Diary Date."

529.     Every claim reported to the USTIF is investigated by ICF International on behalf of the Commonwealth, and every investigation conducted by ICF International on behalf of the Commonwealth includes an investigation into the date the release occurred and whether there is potential subrogation available to the Commonwealth

530.     At various times relevant hereto, Insurance Defendants failed to meet the eligibility and cooperation requirements for Fund coverage by:

a.       Submitting claims for releases that occurred before February 1, 1994 in violation of 25 Pa. Code § 977.31 and § 977.33(b)(3);

b.       Failing to disclose the existence and potential applicability of their various insurance policies during the claim investigation performed by ICF Consulting on behalf of the Commonwealth which included an investigation into potential subrogation;

c.       Failing to disclose inventory records, maintenance records, company leak reports

and UST equipment repair and replacement records which would have established dates of

releases; and

d.       Failure to protect the Commonwealth's subrogation rights by entering into

settlement agreements and releasing insurance policies that provided coverage for the

investigation and remediation of environmental contamination caused by leaking UST systems.

531.    As a result of Insurance Defendants' failure to meet the eligibility requirements of

the Fund, the Commonwealth is entitled to recover all payments made to Defendants by the Fund

and to cease payment of further payments on any claim filed by Defendants.

WHEREFORE, the Commonwealth respectfully requests that this Court enter judgment

in its favor against the Insurance Claim Defendants for its damages, including prejudgment

interest, where appropriate and all other relief, at law or equity, as the Court deems just and

proper.

**PENNSYLVANIA OFFICE OF**
**ATTORNEY GENERAL**

By: /s/ James A. Donahue, III
      James A Donahue, III, Esquire
      Executive Deputy Attorney General
Strawberry Square, 14th Floor
Harrisburg, Pennsylvania 17120
(717) 705-0418
Email: jdonahue@attorneygeneral.gov

**PENNSYLVANIA GOVERNOR'S OFFICE**
**OF GENERAL COUNSEL**

By: /s/ Linda C. Barrett
      Linda C. Barrett, Esquire
      Deputy General Counsel
333 Market Street, 17th Floor
Harrisburg, Pennsylvania 17101
(717) 787-9347
Email: lbarrett@pa.gov

**With respect to MTBE Claims:**

**BERGER & MONTAGUE, P.C.**

By: /s/ Tyler E. Wren
    Daniel Berger, Esquire
    Tyler E. Wren, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3000
Email: twren@bm.net
      danberger@bm.net

**COHEN, PLACITELLA & ROTH, P.C.**

By: /s/ Stewart L. Cohen
    Stewart L. Cohen, Esquire
    Robert L. Pratter, Esquire
    Michael Coren, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
Two Commerce Square
Suite 2900, 2001 Market St.
Philadelphia, Pennsylvania 19103
(215) 567-3500
Email: scohen@cprlaw.com
      RPratter@cprlaw.com
      MCoren@cprlaw.com

**MILLER & AXLINE, P.C.**

By: /s/ Duane Miller
    Duane Miller, Esquire
    Michael Axline, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
1050 Fulton Avenue, Suite 100
Sacramento, California  95825-4225
(916) 488-6688
Email: dmiller@toxictorts.org
      maxline@toxictorts.org

**With respect to Insurance Claims:**

**STARK & STARK, P.C.**

By: /s/  Stephen A. Corr_____
    Stephen A. Corr, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
777 Township Line Road, Suite 120
Yardley, Pennsylvania  19067
(267) 907-9600
Email: scorr@stark-stark.com

**WIGGINS CHILDS QUINN & PANTAZIS**

By: /s/ Dennis G. Pantazis _____
    Dennis G. Pantazis, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
The Kress Building
301 19th Street North
Birmingham, Alabama  35203
(205) 314-0500
Email: dgp@wigginschilds.com

Admission *pro hac vice* to be requested

159

# EXHIBIT 1



## CERTIFICATE OF SERVICE

I, Tyler Wren, Esquire, attorney for Plaintiff, hereby certifies that on November 6, 2015, a true and correct copy of the foregoing Second Amended Complaint was served via electronic filing if counsel has entered an appearance and is registered with the Court's ECF system, via LexisNexis File & Serve, and on all unrepresented parties pursuant to Rule 4.


/s/ Tyler E. Wren