**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, et al.<br><br>Plaintiffs,<br><br>v.<br><br>AMERADA HESS CORPORATION, et al.<br><br>Defendants. | Master File No. 1:00-1898(VSB)<br><br>Civil Action No. 1:08-cv-00312-VSB |

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO EXXONMOBIL'S MOTION TO DISMISS PLAINTIFFS' NATURAL RESOURCE DAMAGES CLAIMS AS UNRIPE**

---

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................1

LEGAL ARGUMENT.........................................................................................4

I.  THE LEGAL STANDARD FOR DETERMINING RIPENESS FOCUSES ON INJURY AND NOT THE CALCULATION OF DAMAGES...........................................4

II.  EXXON'S RIPENESS ARGUMENT FAILS ON THE MERITS...................................5

A. Exxon's Theory Is Foreclosed by Binding and Persuasive Case Law........................7

B. Exxon's Assertion That Remediation, Without Further Expenditure, Will Achieve Restoration is Factually Incorrect and Has Previously Been Rejected I this Litigation........................................................................................11

1. There is a distinct difference between remediation and restoration; achieving remediation does not mean restoration has been or will be achieved...................12

2. Exxon's mischaracterization of restoration as an extension of remediation has already been rejected in this MDL.......................................................15

C.  Exxon's Theory of "Ripeness" Runs Contrary to Basic Justiciability Principles ......17

D. Exxon Inappropriately Relies on the Brownfield and Contaminated Site Remediation Act ("Brownfield Act") Statue of Limitations Extension Provision for Natural Resource Damage Claims ..........................................................................18

E. The Fact That the State Does Not Seek a Double Recovery Does not Make the Case Unripe .....................................................................................20

III.  THE LIVINGSTON SITE SETTLEMENT DEMONSTRATES THE MATERIAL BENEFITS THIS LITIGATION WILL CONTINUE TO PRODUCE............................21

IV.  PLAINTIFFS ARE ENTITLED TO OTHER TYPES OF RELIEF BEYOND PRIMARY RESTORATION...............................................................................23

V.  THE CLOSED SITES ARE A MATTER FOR CASE MANAGEMENT, NOT A MOTION TO DISMISS ......................................................................24

CONCLUSION...............................................................................................24

**TABLE OF AUTHORITIES**

**PAGE**

*Federal Cases*

*Allgood v. Gen. Motors Corp.*,
  No. 102CV1077DFHTAB, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006)...............................10

*Dominic v. Consol. Edison Co. of New York*,
  822 F.2d 1249 (2d Cir. 1987)...................................................................................................17, 18

*EMR (USA Holdings), Inc. v. Goldberg*,
  No. 18 CIV. 07849 (ER), 2019 WL 5537878 (S.D.N.Y. Oct. 25, 2019) ...................................4

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  458 F.Supp.2d 149 (S.D.N.Y. 2006)...........................................................................................6

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*
  725 F.3d 65 (2d Cir. 2013)......................................................................................1, 5, 7, 13

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  No. 07 Civ. 10470, MDL No. 1358, 2015 WL 545530 (S.D.N.Y. Feb. 10, 2015) ..............2, 8, 9

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)....................................................................................................................4

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013).......................................................................................................4

*New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*
  323 F.R.D. 213 (D.N.J. 2017)............................................................................................. passim

*New York by James v. Pennsylvania Higher Educ. Assistance Agency*,
  No. 19 Civ. 9155, 2020 WL 2097640 (S.D.N.Y. May 1, 2020)................................................11

*Plains All Am. Pipeline L.P. v. Cook*,
  866 F.3d 534 (3d Cir. 2017).......................................................................................................11

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)...............................................................................................................5, 11

*Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,
  752 F.3d 239 (2d Cir. 2014).......................................................................................................4

*Wilderness Soc. v. Alcock*,
  83 F.3d 386 (11th Cir. 1996) .....................................................................................................10

*State Cases*

*New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*,
   393 N.J. Super. 388, 923 A.2d 345 (App. Div. 2007) ..........................................6, 23

*New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*,
   420 N.J. Super. 395, 22 A.3d 1  (App. Div. 2011) ..................................................19

*New Jersey. Dep't of Envtl. Prot. v. Jersey Cent. Power and Light*,
   133 N.J. Super. 375, 336 A.2d 750 (App. Div. 1975), *rev'd on other grounds*,
   69 N.J. 102, 351 A.2d 337 (1976)..............................................................................9

*State v. Exxon Mobil Corp.*,
   168 N.H. 211, 126 A.3d 266 (2015) .......................................................................8, 14

*Valley Creek Land & Timber, LLC v. Colonial Pipeline Co.*,
   432 F. Supp. 3d 1360 (N.D. Ala. 2020) ................................................................9, 10

*Rules*

Fed. R. Civ. P. 12(b)(1)............................................................................................23

*Statutes*

N.J.S.A. 58:10A-6(a) ..................................................................................................9

N.J.S.A. 58:10B17.1(b)(1) ........................................................................................19

N.J.S.A. 58:10B17.1(b)(2) ........................................................................................19

N.J.S.A. 58:10C-1 .....................................................................................................12

N.J.S.A. 58:10-23.11 ...................................................................................................2

N.J.S.A. 58:10-23.11u(b)(4) ....................................................................................6, 8

N.J.S.A. 58:10-23.11v..............................................................................................20

N.J.S.A. 58:10-11a.............................................................................................8, 9, 18

N.J.A.C. 7:26C-6.5 ...................................................................................................13

N.J.A.C. 7:26E-1.8.................................................................................................1, 6

## INTRODUCTION

Since Plaintiffs have undisputedly suffered—and continue to suffer—an injury, their claims here are ripe.  It is the existence of an *injury*, not the ability to calculate the amount of *damages* with exact certainty, that is determinative of whether a claim is ripe.  ExxonMobil's ("Exxon's") argument that Plaintiffs' case for restoration damages is not ripe and cannot be determined until remediation is complete is not only factually inaccurate, but it has already been rejected as a matter of law by the Second Circuit and by Judge Scheindlin in this MDL.  Moreover, it flies in the face of Chief Judge Wolfson's findings about the availability of restoration damages in Phase I of this case, which was remanded to the District of New Jersey from this MDL.  The binding precedent of the Second Circuit and the law of the case decides the issue at bar.  This court need look no further.

Under New Jersey law, the presence of any MTBE contamination in waters of the State constitutes an injury.  *See, e.g.,* N.J.A.C. 7:26E-1.8 (definition of "injury" includes "any adverse change or impact of a discharge on a natural resource . . . .").  Exxon conflates the supposed uncertainty regarding the quantity of damages with the existence of an injury.  Exxon has made this argument before and has lost.  In *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.* ("*In re MTBE*"), 725 F.3d 65, 109-12 (2d Cir. 2013), Exxon argued, as it does here, that the City of New York's claims for MTBE contamination were not ripe because, although MTBE had contaminated groundwater, the future impact of that contamination was uncertain.  The Second Circuit flatly rejected this argument, finding that "Exxon's argument conflates the [plaintiff's] injury with its damages."  *Id.*  The Second Circuit's binding decision disposes of Exxon's motion.[1]

---

[1] Although directly on point, Exxon fails to even mention this decision even though Exxon itself brought, and lost, the issue before the Second Circuit.

Judge Scheindlin later ruled in this same vein in the Puerto Rico case in this MDL.  *See In re MTBE*, 2015 WL 545530, at *3 (S.D.N.Y. Feb. 10, 2015) (Commonwealth of Puerto Rico's claim was ripe, because it was "predicated on a present injury").  The law on this issue is well settled.

The underlying factual premise of Exxon's motion—that "work being done for remediation will also eventually achieve restoration" (ECF No. 610) (Exxon Memorandum in Support of Motion to Dismiss "Memo" at 1)—is both misleading, and wrong.  It is misleading because it focuses on the remedies for, and not on the existence of an injury.  And it is wrong for (at least) two primary reasons.  First, it conflates remediation and restoration, to which two different legal standards apply.  As a matter of law, remediation to the risk-based cleanup standard for MTBE is achieved when the State's remedial standard of 70 parts per billion ("ppb") has been reached.  Primary restoration down to the pre-discharge level (essentially 1 ppb because the practical quantitation level ("PQL") for MTBE is 1 ppb[2]) is a separate and distinct standard.  Chief Judge Wolfson (of the District of New Jersey) held on remand in this very case that Plaintiffs are entitled to recover primary restoration damages under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11, *et seq.* ("Spill Act"), *in addition* to the risk-based remediation on a showing that restoration is "reasonably capable of being done."  *See Restoration Opinion*, 323 F.R.D. at 231.  That alone is the standard under New Jersey law for determining if monetary compensation for restoration is available under the Spill Act.

Second, Exxon argues that remediation is the functional equivalent to primary restoration because, according to Exxon, contamination will eventually go away if left in the environment long enough.  While it is true that if no work is done after MTBE is remediated down to 70 ppb,

---

[2] The PQL "sets forth the lowest concentration of the contaminant that can practically be measured in groundwater using current technology."  *New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.* ("*Restoration Opinion*"), 323 F.R.D. 213, 227 (D.N.J. 2017).

then eventually—after decades or even centuries—MTBE could eventually disperse enough to be non-detectable *at a site* and concentrations may go down as the MTBE is spread over a larger volume of water, that does not mean that remediation at a site achieves actual restoration of the injured groundwater.  Rather, it could mean only that MTBE will continue to travel further off-site contaminating (*i.e.*, injuring) larger quantities of the State's waters.

Exxon also is wrong to claim that settlement of Plaintiffs' claims against it at the Livingston trial site proves that Plaintiffs' request for primary restoration damages is not ripe.  Exxon never denies that there was an injury at that site.  Exxon asserts that because the parties were able to settle the Livingston site without Exxon paying money damages proves that remediating a site will remove any need for primary restoration and the concomitant damages.  That ignores what actually happened at the Livingston site.  The Consent Order for the Livingston site requires Exxon not only to continue its remediation obligations, but *also* to "monitor the conditions and perform additional actions at the Livingston Site to ensure that restoration will be achieved."  *See* Exhibit 1 to the Declaration of Leonard Z. Kaufmann ("Kaufmann Decl.") ("Consent Order as to Livingston Site" ¶ 19).  The Consent Order plainly requires Exxon to act in order to achieve restoration *in addition* to remediation.

Plaintiffs filed this litigation *14 years ago*.  Not once in 14 years of intensive litigation has Exxon or any other defendant argued that these New Jersey specific claims and requested relief were unripe.  That is because there is no dispute that Plaintiffs have suffered a concrete actual injury from Defendants' MTBE contamination.  Thus, the various remedies that New Jersey law entitles Plaintiffs to seek are all ripe and justiciable now.

## LEGAL ARGUMENT

### I.   THE LEGAL STANDARD FOR DETERMINING RIPENESS FOCUSES ON INJURY AND NOT THE CALCULATION OF DAMAGES.

"Often, the best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).  The first requirement of constitutional standing is that "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations and citations omitted).  "[T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent' but instead 'conjectural or hypothetical.'" *Nat'l Org. for Marriage*, 714 F.3d at 688 (quoting *Lujan*, 504 U.S. at 560); *EMR (USA Holdings), Inc. v. Goldberg*, No. 18 CIV. 07849 (ER), 2019 WL 5537878, at *4 (S.D.N.Y. Oct. 25, 2019).  Thus, the basic question to be decided by this Court on this motion as to ripeness is whether an *injury*—not the availability of a particular form of *damages*—is currently evident.

In resolving a motion to dismiss under Rule 12(b)(1), this Court must accept all uncontroverted facts in the complaint as true and draw all reasonable inferences in favor of Plaintiffs. *See, e.g.*, *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  To the extent Exxon has placed jurisdictional facts in dispute (but only to such extent), the Court must "decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Id.*  In that case, the party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Id.*  (internal citations omitted).  At best, what Exxon has presented in its motion is a challenge to expert opinions on Phase II damages

– opinions that have not yet even been formulated, and for which at the appropriate time Exxon will be able to bring a challenge.

## II.     EXXON'S RIPENESS ARGUMENT FAILS ON THE MERITS.

Boiled down to its essence, Exxon's motion argues that Plaintiffs' request for primary restoration damages is unripe because the precise amounts of those *damages* at certain sites remain unknown.  Exxon's argument confuses two distinct concepts—injury and damages.  Ripeness is an inquiry into whether an "*injury* is merely speculative and may never occur."  *In re MTBE*, 725 F.3d at 110 (emphasis added).  The extent to which "*damages* . . . [are] speculative," by contrast, "is analytically distinct from whether the underlying claim is ripe for adjudication."  *Id.* at 111 (emphasis added).

Ripeness turns on the threshold inquiry as to whether an *injury* is "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  It would make no sense to apply this standard to *damages*, because a precise damages figure is rarely known at the outset of litigation.  That is what discovery, presentation of evidence, and expert calculations are for.

And—particularly in the environmental context—the amount of damages to which a plaintiff may be entitled will almost certainly change over the course of litigation, particularly when litigation drags on for over a decade.  Environmental contamination, by its nature, is mobile, in flux, and subject to the laws of nature.  To conclude that an environmental claim is not ripe for adjudication because the scope of the damage is not precisely known at the outset or at some later stage prior to trial would be a gift to every polluter.  Under that mistaken theory, environmental litigation would almost never be ripe.

Here, there is no doubt that there has been an injury to the waters of the State.  Under New Jersey law, the presence of any MTBE contamination in its waters constitutes an injury.  According to New Jersey's Technical Requirements for Site Remediation, "injury" means:

> *any adverse change or impact* of a discharge on a natural resource or impairment of a natural resource service, whether direct or indirect, *long term or short term*, and that includes the partial or complete destruction or loss of the natural resource or any of its value.

N.J.A.C. 7:26E-1.8 (emphasis added).

The Spill Act and the case law interpreting it further clarifies what constitutes an "injury" to the State's natural resources.  The Spill Act empowers the New Jersey Department of Environmental Protection ("Department" or "DEP") to collect the costs of "restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge." N.J.S.A. 58:10-23.11u(b)(4).  The "restoration and replacement" provision entitles DEP to seek primary restoration (*i.e.*, the return of natural resources to their pre-discharge condition) and compensatory restoration (*i.e.*, the replacement value of natural resource losses in the interim). *See New Jersey Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 393 N.J. Super. 388, 405-06, 923 A.2d 345, 356 (App. Div. 2007); *see also Restoration Opinion*, 323 F.R.D. at 223.  Thus, the presence of contamination exceeding the "pre-discharge condition" (*i.e.,* pre-MTBE-contaminated condition) constitutes an injury for which the Department may seek relief pursuant to the Spill Act. Any unpermitted discharge of MTBE, whatsoever, is prohibited under New Jersey law.  *See, e.g.,* N.J.S.A. 58:10-23.11c ("The discharge of hazardous substances is prohibited."); N.J.S.A. 58:10A-6(a) ("It shall be unlawful for any person to discharge any pollutant . . . .").  In addition to the State's statutory law, as this Court previously held, the presence of MTBE in water at concentrations meeting regulatory standards, but at detectable levels also constitutes an injury under the common law.  *See In re MTBE,* 458 F.Supp.2d 149, 155-58 (S.D.N.Y. 2006) (regulatory

standard does not define the scope of injury).  Here, every site on the list of approximately 6,250 sites at issue in this case has had a detection of MTBE in the State's waters (that was the *raison d'etre* for creation of this list in the first place).   *See* also Kaufmann Decl., Ex. 2 (Expert Report of Graham E. Fogg at, *e.g.*, 8) ("In [New Jersey] private wells, data collected by 2009, indicated MTBE was detected in more than 7.5% of wells at concentrations above 0.5 µg/L.").  Thus, the State has established an actual injury that is not hypothetical, which was established and well known to Exxon many years ago, and throughout this lengthy litigation.

A.   **Exxon's Theory Is Foreclosed by Binding and Persuasive Case law.**

Of the many reasons to deny Exxon's motion, the simplest is this:  Exxon's "ripeness" theory has already been considered and rejected by the Second Circuit in the MTBE MDL.  *See In re MTBE*, 725 F.3d at 109-12.  That binding decision alone disposes of Exxon's motion.

In that case, as here, Exxon sought dismissal of New York City's MTBE lawsuit on ripeness grounds.  Exxon highlighted that the contaminated water wells in question were "not currently being used"—and indeed could not be "used until the City buil[t] a facility to treat existing contamination."  *Id.* at 109.  Exxon contended that this made the City's injury speculative and "unripe for resolution."  *Id.*

The Second Circuit rejected that argument, emphasizing that Exxon "mistakenly conflate[d] the nature of the City's claimed damages with its injury."  *Id.* at 110-11.  To be sure, the City sought "past, present, and future damages."  *Id.*  The amount of those damages, the court noted, could turn on future and contingent events, including the "future steps required to use" the wells.  *Id.*  But that did not render the City's *injury* speculative.  The City's claims were brought "only after testing showed the presence of MTBE" in the relevant wells.  *Id.*  The Second Circuit held that the City had "therefore alleged a *present* injury," rendering its claims "prudentially ripe."

7

*Id.* (emphasis in original).  "[W]hether that injury was significant enough for the City to prevail" and the amount of *damages* to which it was entitled, by contrast, were questions for the jury.  *Id.*

The same is true here.  Just like the City of New York, the State has squarely alleged "a *present* injury," owing to the presence of MTBE in the State's waters at every identified site. [3]  *Id.* Plaintiffs' claims are therefore "ripe for adjudication."  *Id.*

Other decisions on this topic from this MDL court are fully in accord.  In another MDL case, an MTBE defendant argued that Puerto Rico's claims were unripe "[u]ntil it becomes apparent that the Commonwealth will actually incur certain damages or suffer certain harm."  *In re MTBE*, 2015 WL 545530, at *3.  Emphasizing "that the ripeness doctrine applies to whether an injury exists in the first instance, not to the scope of damages," this Court held that "there is no legal reason, much less a prudential one, to deprive the Commonwealth of the opportunity to prove those damages."  *Id.*

Other courts have also rejected Exxon's attempts to conflate injury and damages in the ripeness context.  In *State v. Exxon Mobil Corp.*, for example, Exxon argued that the State of New Hampshire's MTBE claims were unripe because "projected injuries" to private wells in the future were "speculative and were not ripe."  *State v. Exxon Mobil Corp.* ("*New Hampshire MTBE*"), 168 N.H. 211, 262, 126 A.3d 266, 307 (2015).  The New Hampshire Supreme Court rejected that argument, ruling that the State's "claims for future testing and treatment are fit for judicial

---

[3] To the extent Exxon attempts to distinguish impacts to drinking water wells from impacts to the water in the aquifers of New Jersey, the Court must reject this distinction.  The DEP is bringing its claims in its public trustee capacity, as distinguished from the City of New York, which was a drinking water purveyor.  The Spill Act declares that the State is "the trustee, for the benefit of its citizens, of all natural resources within its jurisdiction."  N.J.S.A. 58:10-11a; *Restoration Opinion*, 323 F.R.D. at 223.  "Natural resources" are defined to include "all land, fish, shellfish, wildlife, biota, air, *waters* and other such resources owned, managed, held in trust or otherwise controlled by the State."  N.J.S.A. 58:10:23–11b (emphasis added).  "Waters" include "groundwater."  *Id.* Thus, it is the contamination of the very water, itself, that constitutes an injury here.

determination *as the harm from MTBE has already occurred.*"  *Id.* at 308 (emphasis added).  The same is true here.

Ignoring this phalanx of binding dispositive authority, Exxon relies primarily on a Northern District of Alabama case in which a court held that a private landowner's claims involving a gasoline spill were deemed unripe while remediation efforts were ongoing.  *See Valley Creek Land & Timber, LLC v. Colonial Pipeline Co.,* 432 F. Supp. 3d 1360, 1365 (N.D. Ala. 2020).  This case is easily distinguishable on the facts.  *Valley Creek* involved a landowner that had purchased the property as an investment.  *Id.* at 1363.  All of the landowner's claims "hinge[d], at least in part, on the alleged diminution in value of the property."  *Id.* at 1364.  The court found, as a matter of fact, that "some questions remain regarding the extent to which Valley Creek suffered an actual injury resulting in damages that could justify liability."  *Id.* at 1366.  Because any inquiry into "the property value would necessarily be based solely on speculation," the court held that the landowner's claims were unripe.  *Id.* at 1366-68.

This case is different.  Unlike the plaintiff in *Valley Creek*, the State is suing in its capacity as trustee over the State's natural resources, which gives it "not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public . . . are protected."  *N.J. Dep't of Envtl. Prot. v. Jersey Cent. Power and Light*, 133 N.J. Super. 375, 392, 336 A.2d 750, 759 (App. Div. 1975), *rev'd on other grounds*, 69 N.J. 102, 351 A.2d 337 (1976).  DEP is charged by law with protecting, "for the benefit of its citizens," all of "New Jersey's lands and waters"—"a unique, delicately balanced resource." N.J. Stat. Ann. § 58:10-23.11a.  As the State's complaint makes clear at the outset, its "interests .. . are not dependent upon the economic use of the waters of the State."  Plaintiffs' Fifth Amended Complaint ("FAC") ¶ 1.

Unlike in *Valley Creek*, then, Plaintiffs' claims here are not about simply "the alleged diminution in value of the property." Rather, this lawsuit is based on the ongoing injury imposed on the *people* of the State of New Jersey, as a result of the injury to New Jersey's waters that the State holds in trust. As with the City of New York, the State of New Hampshire, and the Commonwealth of Puerto Rico, New Jersey's injury was real and concrete the moment MTBE was discharged into the water, and it remains real, concrete, and justiciable today.[4]

A final point bears emphasis. Though Exxon suggests that the State's claims are not constitutionally ripe, *see* Memo at 18, its brief (and the authorities on which it relies) are focused on *prudential* ripeness. The prudential ripeness doctrine, as Exxon notes, requires courts to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Memo at 17. Even on its own terms, "prudential ripeness" hardly augers in favor of dismissing a case that has been going on for 14 years. This Court and Chief Judge Wolfson have been working towards "judicial decision" for nearly a decade and a half; and it is plainly fit to continue doing so. What is more, dismissing the State's claims as "prudentially unripe" after massive investments of time and money would render significant "hardship to the parties," including the other defendants who have spent approximately $400 million to settle their claims.

---

[4] The other two cases relied upon by Exxon are similarly far afield. *Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB, 2006 WL 2669337, at *36 (S.D. Ind. Sept. 18, 2006), also involved a case in which the claimed injury was diminution of value to private property. And *Wilderness Soc. v. Alcock*, 83 F.3d 386 (11th Cir. 1996) is simply inapposite. There, an environmental group sued to enjoin a "Final Land and Resource Management Plan," but the court dismissed the claim because "no site-specific action [would] be taken pursuant to the Plan without a second stage of decision making." *Id.* at 390.

Indeed, the United States Supreme Court has recently called into question the continuing viability of "prudential ripeness." In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Court noted that requests to "deem . . . claims nonjusticiable on grounds that are prudential, rather than constitutional . . . [are] in some tension with our recent reaffirmation that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 167 (internal alterations and quotations omitted). Since then, there is an emerging consensus "that the prudential components of ripeness may no longer be a valid basis to find a case nonjusticiable." *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 n.3 (3d Cir. 2017); *see also New York by James v. Pennsylvania Higher Educ. Assistance Agency*, No. 19 Civ. 9155, 2020 WL 2097640, at *12 (S.D.N.Y. May 1, 2020) (citations omitted) (recognizing that since *Driehaus* a court "would have to find overwhelming prudential considerations to decline jurisdiction on prudential ripeness grounds.").

The recent pronouncements by the Supreme Court provide further reason to once again deny Exxon's attempts to distort the doctrine of prudential ripeness. But, under any plausible analysis—most notably, the binding case law from the Second Circuit—this case is ripe for adjudication.

**B.**   **Exxon's Assertion That Remediation, Without Further Expenditure, Will Achieve Restoration Is Factually Incorrect and Has Previously Been Rejected In This Litigation.**

Similar to the argument it made to Chief Judge Wolfson in the District of New Jersey with respect to the remanded trial sites, Exxon claims that remediation *ipso facto* leads to restoration. *See* Memo at 1 ("[W]ork being done for remediation will also eventually achieve restoration."). Exxon presents no evidence to support this assertion beyond mischaracterizing, as discussed below, what occurred at certain sites, including the Livingston site. Exxon's argument was rejected by Chief Judge Wolfson with respect to the trial sites and it should be rejected again here.

1.  **There is a distinct difference between remediation and restoration; achieving remediation does not mean restoration has been or will be achieved.**

In her *Restoration Opinion* in this case, Chief Judge Wolfson aptly summarized the difference between restoration and remediation: "[T]he term 'restoration' of natural resources is legally distinct from the 'remediation' of contaminated sites . . . . [R]emediation concerns the reduction of contaminants 'to risk-based standards,' which task 'is different from 'restoration' of natural resources,' which concerns the reduction of contaminants 'to pre-discharge conditions (primary restoration),' and is different from 'replacement of the ecological services and values lost through compensation (compensatory restoration).'" *Restoration Opinion*, 323 F.R.D. at 223 (internal citations omitted).

Under New Jersey's licensed site remediation professional ("LSRP") program implemented under the Site Remediation Reform Act ("SRRA"), *N.J.S.A.* 58:10C-1 *et seq.*, an LSRP, retained by the party responsible for the discharge of a hazardous substance, oversees only *remediation*, then issues a Response Action Outcome ("RAO") when that remediation is complete. The LSRP program has resulted in a number of contaminated sites, including many Exxon sites, receiving RAOs (or the formerly used No Further Action letters) with respect to remediation only.[5] There is a substantial difference between the risk-based 70-ppb level LSRPs consider acceptable for *remediation* of MTBE and the pre-discharge level (essentially 1 ppb) required for *restoration* of resources contaminated by MTBE. *See Restoration Opinion*, 323 F.R.D. at 227-28. As the Second Circuit recognized, Exxon does not have a "license to pollute" up to the 70 ppb remediation

---

[5] Although not directly relevant to the motion at bar, Exxon inaccurately describes the DEP's role. *See* Memo at 5-6. Absent flagrant violations by the LSRP, the DEP is more akin to an auditor than an active participant with, or supervisor of, the LSRP.

threshold.  *See In re MTBE*, 725 F.3d at 109.  Contamination at or below that level is an actionable injury both under the Spill Act and under New Jersey common law.

The task of the LSRP ends with remediation and does not (nor does it seek to) address restoration.  Any RAOs issued by an LSRP *expressly* carve out restoration from the scope of the closure under the Program.  N.J.A.C. 7:26C-6.5.  In each RAO, the LSRP affirmatively states: "In concluding that this remediation has been completed, I am offering no opinions concerning whether either primary restoration (restoring natural resources to their pre-discharge condition) or compensatory restoration (compensating the citizens of New Jersey for the lost interim value of the natural resources) has been completed."  N.J.A.C. 7:26C App. D.  In short, the damages for restoration that Plaintiffs seek as part of this case are not the focus or the goal of the LSRP program or of remediation efforts, and are not satisfied or directly addressed by the LSRP Program.  Exxon asks this Court to assume otherwise.

The States' remediation and restoration programs are administered by separate offices within DEP.  The Office of Natural Resource Restoration ("ONRR") oversees DEP's efforts to obtain natural resource damages (including primary restoration) through multiple avenues, one of which is the filing of civil actions like this MTBE litigation.  *See Restoration Opinion*, 323 F.R.D. at 226.  In contrast, the State's remediation efforts, including the LSRP component, are administered by DEP's Site Remediation and Waste Management Program.  *Id.*

Exxon points to some remediated sites where MTBE levels have dropped below 70 ppb (Memo at 12-15), but offers no evidence that the *cause* of this drop in MTBE concentrations was remediation at the sites, as opposed to the likelihood that the MTBE plume that once was under a particular site merely migrated off the sites with the flow of groundwater and contaminated a larger area through dispersion.

13

Exxon largely bases its argument on excerpts from Plaintiffs' expert Anthony Brown's reports and depositions in which Exxon claims he "conceded" that remediation would always eventually achieve restoration. *See* Memo at 6-10. That factual characterization is a gross oversimplification of Mr. Brown's opinions, which called for substantial work at the trial sites to be done in order to actually achieve restoration. Plaintiffs will prove, through expert testimony, in Phase II that plumes have migrated off the sites and remain in off-site water resources. *See* Kaufmann Decl., Ex. 3 (Transcript of *Daubert* Hearing held on Jan. 9, 2019 ("Daubert Transcript") at 78) (Remediation at the site "does not address the contamination that has migrated away from the site some distance. Obviously, what it does, it cuts off the source. So now we have a finite concentration and massive contamination off-site."). This off-site injury is simply ignored by Exxon.

Damages for offsite investigation and for active cleanup of offsite wells was a major component of the State of New Hampshire case that resulted in a single statewide verdict for the State against Exxon. *See* Kaufmann Decl., Ex. 4 (New Hampshire Special Verdict Form awarding New Hampshire nearly $306 million to sample drinking water wells, and over $150 million to treat drinking water wells); *New Hampshire MTBE*, 168 N.H. 211, 126 A.3d 266 (upholding the verdict). Here, these same categories of damages are sought in Plaintiffs' complaint. *See* Prayers for Relief, FAC. Exxon's motion entirely ignores the offsite plumes caused by its MTBE gasoline.

Exxon is obviously correct that you cannot get groundwater to background, non-detectable levels until you first get the contamination below 70 ppb. A remediation process that is only required to get MTBE in groundwater to 70 ppb, however, does not magically ensure that restoration onsite and offsite will occur and MTBE will be reduced to background levels within a reasonable timeframe, or any timeframe.

14

### 2. Exxon's mischaracterization of restoration as an extension of remediation has already been rejected in this MDL.

Aside from the fact that Exxon's argument completely ignores the existence of a clear *injury* satisfying ripeness (groundwater contaminated with MTBE), Exxon falsely implies that responsible parties will also simply continue monitoring groundwater conditions once the 70-ppb remedial standard for MTBE is achieved, and that natural attenuation will be successful in reaching pre-discharge conditions. The problem with this assumption is that monitoring beyond what is needed for remediation is not required under the State's remediation regulations, which do not address *restoration*. And, absent continued monitoring, natural attenuation is not an effective tool to remove contamination. As Chief Judge Wolfson explained in the remanded portion of this case, monitoring is a necessary component of restoration based on natural attenuation:

> [Natural attenuation] is not an approved method of remediation recognized by the NJDEP or the EPA; only Monitored Natural Attenuation ("MNA"), involving the continued active participation of responsible parties using monitoring wells to track contaminant concentrations over time, is so recognized. . . . In apparent recognition thereof, Defendants proffer to the Court that they will undertake MNA, rather than allowing NA to take its course, if required by NJDEP. . . . At present, however, Defendants' offer to employ MNA, *if required*, essentially admits that there is no plan for MNA in place, only an alleged scientific expert consensus that NA will achieve primary restoration at some undefined point in the future.

*Restoration Opinion,* 323 F.R.D. at 229 (emphasis in original, citations omitted).

Even accepting Exxon's baseless assumption that responsible parties would voluntarily take on the obligation to monitor sites even after remediation of MTBE down to 70 ppb is achieved, Chief Judge Wolfson explained that MNA might not even be an appropriate MTBE restoration method in any event, because MTBE "has been found to migrate large distances . . . ." *Id.* Chief Judge Wolfson noted that the guidance issued by DEP and the U.S. Environmental Protection Agency only supports use of MNA when the cleanup goal can be achieved in a "reasonable time;" it is not appropriate where an "expanding ground water plume indicates that [a] contaminant

release exceeds the natural attenuation capacity of the system to control the contaminants." *Id.* at 230 (citations omitted). Chief Judge Wolfson noted, with respect to the trial sites, that "Defendants present[ed] no timeframe in which natural attenuation [would] allegedly reduce the level of MTBE contamination at and around the Trial Sites to pre-discharge conditions, instead only noting that it [was] undisputed that it [would] occur at some point in the future." *Id.* Based on all of this, Chief Judge Wolfson reasoned that:

> The facts of this case, coupled with NJDEP's guidance documents, therefore raise questions whether MNA would have been approved as a remediation technique for the Trial Sites in the absence of the additional measures being proposed in Plaintiffs' primary restoration plan. Defendants' theory would require not only the assumption that such approval would be given under the conditions of the existing remediation plans, but also require viewing the existing remediation plans as if they already included an MNA component bringing MTBE concentrations down from the [remediation standard] to pre-discharge levels.

*Id.* Chief Judge Wolfson rejected Exxon's assumption that MNA would automatically occur effectively at the trial sites. *See also* Kaufmann Decl., Ex. 2 (Expert Report of Graham E. Fogg at, *e.g.*, 7) ("Evidence indicates that biodegradation, should it occur at all, is unlikely to proceed at rates high enough to control plume migration and prevent the spread of MTBE in groundwater to drinking water sources. Natural attenuation through biodegradation cannot be relied upon to protect drinking water sources in groundwater from MTBE contamination.")

Now, without even referencing Chief Judge Wolfson's decision (in this context), Exxon asks this Court to make an even bigger leap—to assume MNA would be effective not just for the handful of trial sites for which full discovery had occurred, but for the approximately 6,250 sites still at issue in Phase II, and about which limited discovery has occurred to date.

The Court cannot make this assumption. It is not supported in the record, and there is no remediation requirement that would ensure MNA of MTBE would be effective once MTBE concentrations were to fall below the 70-ppb remediation standard.

16

Moreover, MNA would be a costly process.  It would require monitoring to ensure that MTBE concentrations were actually decreasing and that MTBE plumes are not simply migrating further off site.  The installation of additional monitoring wells and the costs of monitoring itself (*i.e.*, the collection of groundwater samples and the performance of laboratory analyses) would be quite high.  Kaufmann Decl., Ex. 3 (Daubert Transcript at 58) (discussing the importance of the monitoring aspect of MNA).  Plaintiffs are certainly entitled to prove and recover such future costs.  MNA has not been approved by DEP to restore the approximately 6,250 sites, and Exxon has not committed to perform it.  And, of course, MNA, particularly the monitoring, may also reveal that more proactive measures would be necessary in a given instance to achieve restoration.  Exxon's unsubstantiated, incorrect factual assumptions do not provide a basis for granting its motion.

**C.** **Exxon's Theory of "Ripeness" Runs Contrary to Basic Justiciability Principles.**

Even putting precedent and prior rulings in this case aside, Exxon's belated attempt to have the State's claims dismissed as unripe runs contrary to basic principles of justiciability and how litigation is conducted.  Exxon essentially argues that the State's primary restoration damages are not ripe for review because the physical conditions at some of the sites are changing as a result of both ongoing remediation efforts and (possibly) natural attenuation.  But, of course, that is not true.  The filing of a lawsuit does not magically freeze the real world in time.  Indeed, the scope of damages in a case is frequently subject to change based on real-world events.  That does not mean that the case is somehow "unripe" for adjudication.

A plaintiff in an employment-discrimination case, for example, may seek damages for "front pay" to compensate that plaintiff for the net lost future earnings she could have expected to receive had she remained employed.  *See, e.g.*, *Dominic v. Consol. Edison Co. of New York,* 822 F.2d 1249, 1257 (2d Cir. 1987).  But the amount of "front pay" to which a plaintiff is entitled will

depend on a variety of factors that might change over the course of litigation. To determine the extent of damages, for example, a factfinder must consider "the salary [s]he is paid at [her] present job," *id.* at 1258, and "the ease with which the employee will be able to find other employment." *Id.* at 1257. All of these changing factors must be considered by the finder of fact, which must make an estimate as to damages based on the evidence presented at trial. *Id.* But none of this makes the plaintiff's *injury* "abstract," "hypothetical," or "uncertain."

And what is true for litigation generally is particularly true in the environmental litigation context. Environmental contamination is inherently mobile, in flux, and subject to the laws of nature. To conclude that an environmental claim is not ripe for adjudication because the contamination *might* attenuate over time would eviscerate the very concept of environmental litigation.

This case proves the point. Again, litigation in this matter has been ongoing for *14 years*. If litigation could not even *commence* until remediation was completed at every site, it would incentivize foot-dragging by polluters. It would also stymie the State—which has an obligation as trustee to protect "New Jersey's lands and waters . . . for the benefit of its citizens," N.J. Stat. Ann. § 58:10-23.11a—from obtaining any semblance of speedy relief. The span of this litigation already is set to be measured in decades. It should not be measured in lifetimes.

D.   **Exxon Inappropriately Relies on the Brownfield and Contaminated Site Remediation Act ("Brownfield Act") Statute of Limitations Extension Provision for Natural Resource Damage Claims.**

Exxon also wrongly suggests, *see* Memo at 21-22, that a provision in the Brownfield Act designed to extend the statute of limitations for natural resource damage claims means that the Plaintiffs' claims in this action have not yet accrued. Not so.

The Brownfield Act statute of limitations extension provision provides that a "civil action concerning the payment of compensation for damage to, or loss of, natural resources due to the

discharge of a hazardous substance" must "be commenced within five years and six months" after a "cause of action shall have accrued." N.J.S.A. 58:10B-17.1(b)(1). The Act elaborates:

> (2) For purposes of determining whether a civil action subject to the limitations periods specified in paragraph (1) of this subsection has been commenced within time, no cause of action shall be deemed to have accrued prior to January 1, 2002 or until the completion of the remedial action for the entire contaminated site or the entire sanitary landfill facility, whichever is later.

N.J.S.A. 58:10B-17.1(b)(2) (emphasis added).

While Exxon tries to pervert this statute of limitations extension provision to argue that claims for natural resource damages should not be brought until they "accrue," *see* Memo at 21-22, this is a gross misrepresentation of the actual language and purpose of this provision.  As to the text, the relevant provision expressly applies only "[f]or purposes of determining whether a civil action subject to the limitations periods . . . has been commenced within time"—that is, it only applies where a defendant argues that a claim was brought too late, not when a defendant argues that it was brought too early.  N.J.S.A. 58:10B-17.1(b)(2).

This reading accords with the provision's purpose.  As the Appellate Division has explained, "[t]he extension statute was enacted to provide DEP with . . . additional time . . . to initiate natural resource damages litigation." *N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 420 N.J. Super. 395, 405, 22 A.3d 1, 7 (App. Div. 2011) (emphasis added).  "In the 2001 Senate Environment Committee statement, the focus was on expanding the limitations period; no mention was made of curtailing the scope of DEP's regulatory authority." *Id.* at 406.  Indeed, the Acting Governor's press release upon enactment provided a definitive statement that DEP's regulatory authority was not being curtailed.  As he explained, the provision:

> gives the state *additional time* to pursue legal actions against those who are responsible for contaminating sites around New Jersey. *As a result of this act, responsible parties, not the taxpayers, will continue to be required to pay for the cleanup and the restoration of natural resources* injured by that contamination.

*Id.* (emphasis added) (quoting News Release, Office of the Governor, Acting Governor Donald D. DiFrancesco (July 13, 2001)).  In other words, the goal was to empower the Department to bring claims that would otherwise be late, not to render otherwise ripe claims premature.  Exxon's attempt to flip this provision on its head is directly contrary to the statute's text and purpose.

**E.      The Fact That the State Does Not Seek a Double Recovery Does Not Make the Case Unripe.**

The State, and its experts, have always taken (and will continue to take) the reasonable (and obvious) position that Exxon will not be forced to pay twice for the exact same work.  Put simply: if Exxon's ongoing remediation efforts reduce MTBE contamination to below 70 ppb, Exxon will not be required to pay primary natural resource monetary damages for the same remedial work.  Exxon will, however, remain liable for the work necessary to restore sites to pre-discharge conditions, and for other declaratory, compensatory and punitive damages.

Exxon makes much of testimony by the State's expert, Anthony Brown.  Exxon highlights the following statement by Brown (*see* Memo at 18):

> Q: "And you would also agree ExxonMobil should not have to pay to do the same work twice. Right?"
>
> A.  "I think that's a reasonable position to take."

That statement, by itself, demonstrates only that Plaintiffs have been consistent in acknowledging that they do not seek a double recovery.  This is consistent with the Spill Act, which also prohibits a double recovery.  *See* N.J.S.A. 58:10-23.11v.  It does not in any way prove that Exxon's remediation efforts will lead to timely and effective restoration.

At bottom, the total amount of damages to which the State will be entitled will of course depend on the current state of the sites (and off-site plumes), and Exxon will in no way be asked to pay twice for the same damage.  But that does not render the State's injury—MTBE in its

20

water—"conjectural," "hypothetical," or unripe for review.  This case was ripe the moment MTBE was discharged into the State's waters.  It was ripe on the day it was filed.  And it remains ripe today, 14 years into this litigation.  Exxon should not be permitted to further delay this already protracted litigation with arguments that have been squarely rejected by this Court and the Second Circuit.

## III.   THE LIVINGSTON SITE SETTLEMENT DEMONSTRATES THE MATERIAL BENEFITS THIS LITIGATION WILL CONTINUE TO PRODUCE.

Exxon is also wrong that an extrapolation from the Livingston Phase I trial site supports its ripeness motion. The claim at the Livingston site was always ripe because there was never any question of an injury at the site.  Exxon never asserted otherwise.  In its brief, Exxon ignores this fact while at the same time mischaracterizing the nature and import of the settlement terms.  The story of Livingston is not one of unripe claims, but of a ripe claim leading to a settlement where ultimately the State received significant consideration in Exxon's agreement to Plaintiffs' proposed restoration approach.

In 2013, Plaintiffs' expert Anthony Brown analyzed the available data and determined at that time that full restoration of the Livingston site from the then present conditions to the pre-discharge condition would cost $7.9 Million.  Kaufmann Decl., Ex. 5 (excerpts of Aquilogic Cost Summary).  "As of December of 2010, no off-site remediation had been conducted to contain and mitigate contaminant migration off- site and at depth," and there was a need for additional monitoring wells to delineate the MTBE contamination both in the unconsolidated sediments and in the bedrock.  Kaufmann Decl., Ex. 6 (excerpts of Aquilogic Revised Site Summary at 49, 59-60).  Later, in August 2017, in a supplemental report Brown lowered his estimates of the restoration work that needed to be completed, not because of any concession related to his initial estimates, but because "Exxon has implemented additional investigation and cleanup activities consistent

with the recommendations presented in [his prior] . . . expert report." Kaufmann Decl., Ex. 7 (excerpts of Aquilogic Site Summary Addendum at 26).

In other words, on the heels of Brown's expert report, Exxon adopted and implemented the Plaintiffs' expert's recommendations. It is a fair inference that this was no coincidence; rather, it was this litigation that spurred Exxon to action. Exxon did the same thing again when Brown subsequently updated his report to account for additional changes Exxon had made to its remediation approach. Kaufmann Decl., Ex. 3 (Daubert Transcript at 154) ("It does appear ExxonMobil at this particular location is implementing a program consistent with the recommendations that I made."). Again, there is no indication that, absent this litigation, Exxon would have implemented any such additional remedial activities.

Exxon also significantly underplays the value of the Livingston site settlement.[6] The settlement, despite Exxon's disingenuous attempt to moot damages, nonetheless provided Plaintiffs with additional substantial and valuable restoration work by Exxon above and beyond what is required under the LSRP remediation process. *See* Kaufmann Decl., Ex. 1 ("Consent Order as to Livingston Site" ¶ 19) ("ExxonMobil shall monitor the conditions and perform additional actions at the Livingston Site to ensure that restoration will be achieved. . . . In the event NJDEP determines that Restoration is not being achieved at the Livingston Site based on the current activities at the Site, ExxonMobil shall confer with ONRR and shall implement additional Restoration, to the extent practicable[.]")

---

[6] Contrary to Exxon's assertion, the trial sites that were not prosecuted (even absent settlement) were not dropped because of any flaw related to the Plaintiffs' methods for calculating damages. Rather, these sites—primarily chosen for trial by defendants—were not ultimately prosecuted because it turned out, after discovery, that on a site-by-site basis the damages related to these sites were not large enough to justify the expense of trial.

IV.    **PLAINTIFFS ARE ENTITLED TO OTHER TYPES OF RELIEF BEYOND PRIMARY RESTORATION.**

Exxon concedes that natural resource damages are part of the case and that natural resource damages consist of both "primary restoration" and "compensatory restoration."  Exxon's motion, however, only discusses primary restoration; it completely ignores compensatory restoration.[7]

As discussed at length above, primary restoration is the cost of restoring resources to their pre-discharge condition; compensatory restoration is the value or cost of replacement of the natural resource lost in the interim during the time the resources are contaminated (*i.e.,* the time from when the contamination first occurred to the time it is cleaned up to the pre-discharge condition). *See Exxon Mobil Corp.*, 393 N.J. Super. at 406; *Restoration Opinion*, 323 F.R.D. at 215 n.1.

Compensatory restoration damages are calculable at this time—a fact that Exxon cannot contest.  Expert reports were submitted related to the trial sites which set forth the amount of compensatory restoration damages.  These reports took into account the start date of the contamination and the anticipated end date.  While Exxon might disagree with the anticipated end date (*i.e.,* the time when restoration will be achieved), it cannot dispute the ability of an expert to calculate past compensatory restoration damages by considering the time when the MTBE contamination first occurred to the present time.  And based on projections of when primary restoration is likely to be achieved in the future, an expert could also calculate future compensatory restoration damages as well.

---

[7] The folly of Exxon's argument here is further highlighted by its "[Proposed] Order" seeking, *e.g.*, that "ExxonMobil's Motion to Dismiss Plaintiffs' Natural Resource Damages Claims as Unripe Pursuant to Fed. R. Civ. P. 12(b)(1) be GRANTED[.]" ECF No. 609-1. But, if this vague language was ordered by the Court it would sweep into its ambit all categories of relief, including compensatory restoration damages, without any basis. In all events, the language further highlights that Exxon's motion is about a category of damages, and not claims, or injury.

In addition to not challenging the availability of compensatory restoration damages, Exxon does not challenge as unripe any other category of Plaintiffs' damages—*e.g.*, potable well testing costs, potable well treatment costs, past DEP oversight and cleanup costs, punitive damages, assessment costs, litigation costs and fees. *See* Prayers for Relief, FAC. Likewise, Exxon's arguments also do not address the injunctive relief sought in the Complaint. These forms of relief, which Plaintiffs seek pursuant to several different legal claims, clearly support the Court's jurisdiction to all claims here. Exxon has offered no basis for dismissing *any* of Plaintiffs' claims, which is reason enough for denying its Rule 12(b)(1) motion.

## V.    THE CLOSED SITES ARE A MATTER FOR CASE MANAGEMENT, NOT A MOTION TO DISMISS.

Exxon mentions in passing at the end of its brief, *see* Memo 24-25, that there are "closed sites," *i.e.*, sites where remediation has been completed—but notably, Exxon does not ask the Court to dismiss any claims or requests for relief at these sites. Plaintiffs submit that this case management issue is unrelated to Exxon's motion, and in any event inappropriate for resolution on a motion to dismiss. To the extent Exxon wishes to discuss the issue, Plaintiffs are available to meet and confer and then, if necessary, address the issue though a case management conference.

## CONCLUSION

This litigation is ripe and justiciable because it is undisputed that an injury (*i.e*, the presence of MTBE in waters of the State) currently exists. A prior decision of the Second Circuit in this MDL is on point and binding, and other directly on point decisions in this MDL are persuasive. In addition, Chief Judge Wolfson of the District of New Jersey already considered and rejected a key premise of Exxon's motion.

For the reasons set forth above, Exxon's motion to dismiss should be denied.

DATED:  June 4, 2021

Respectfully submitted,

**GURBIR S. GREWAL**
**ATTORNEY GENERAL OF NEW JERSEY**

By:    */s/ Gwen Farley*
  Gwen Farley, Deputy Attorney General
  25 Market Street
  PO Box 093
  Trenton, New Jersey 08625-0093
  Tel.:  (609) 984-4863
  E-mail: gwen.farley@dol.lps.state.nj.us

**COHN LIFLAND PEARLMAN**
 **HERRMANN & KNOPF LLP**
*Special Counsel to the Attorney General*

By:    */s/ Leonard Z. Kaufmann*
  Leonard Z. Kaufmann, Esq.
  Park 80 West - Plaza One
  250 Pehle Avenue, Suite 401
  Saddle Brook, New Jersey 07663
  Tel.:  (201) 845-9600
  E-Mail: lzk@njlawfirm.com


**LAW OFFICES OF JOHN K. DEMA, P.C.**
  John K. Dema, Esq.
  Scott E. Kauff, Esq.
  *Special Counsel to the Attorney General*
  11300 Rockville Pike, Suite 112
  Rockville, Maryland 20852
  Tel.:  (301) 881-5900
  E-Mail: jdema@demalaw.com
        skauff@demalaw.com

**MILLER & AXLINE, P.C.**
Duane C. Miller, Esq.
Michael Axline, Esq.
*Special Counsel to the Attorney General*
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825
Tel.:  (916) 488-6688
E-Mail:  maxline@toxictorts.org

**BERGER & MONTAGUE, P.C.**
Daniel Berger, Esq.
Tyler E. Wren, Esq.
*Special Counsel to the Attorney General*
1622 Locust Street
Philadelphia, PA 10103
Tel.:  (215) 875-3098
E-Mail: danberger@bm.net
           twren@bm.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day June, 2021, a true and correct copy of the following document was served on all counsel of record by electronic mail: **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO EXXONMOBIL'S MOTION TO DISMISS PLAINTIFFS' NATURAL RESOURCE DAMAGES CLAIMS AS UNRIPE AND DECLARATION OF LEONARD Z. KAUFMANN IN OPPOSITION TO EXXONMOBIL'S MOTION TO DISMISS PLAINTIFFS' NATURAL RESOURCE DAMAGES CLAIMS AS UNRIPE**

*/s/ Leonard Z. Kaufmann*
Leonard Z. Kaufmann, Esq.