UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __8/2/2021__

In Re: Methyl Tertiary Butyl Ether ("MTBE")  :
Products Liability Litigation                 :

This document relates to:

*Commonwealth of Pennsylvania v. Exxon*
*Mobil Corporation, et al.*, Case No. 14 Civ.
6228 (VSB)

-------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:

Master File No. 1:00-1898
MDL 1358


**OPINION & ORDER**

Appearances:

James A. Donahue, III
Pennsylvania Office of the Attorney General
Harrisburg, Pennsylvania

Linda C. Barrett
Pennsylvania Governor's Office of General Counsel
Harrisburg, Pennsylvania

Michael Axline
Miller & Axline, P.C.
Sacramento, California

Daniel Berger
Tyler E. Wren
Berger & Montague, P.C.
Philadelphia, Pennsylvania

Stewart L. Cohen
Robert L. Pratter
Michael Coren
Cohen, Placitella & Roth, P.C.
Philadelphia, Pennsylvania

*Counsel for Plaintiff Commonwealth of Pennsylvania*

James P. Tuite
Katherine M. Katchen
Matthew A. Scarola
Akin Gump Strauss Hauer & Feld LLP
Philadelphia, Pennsylvania; Washington, D.C.; San Francisco, CA

*Counsel for Defendant Lukoil Americas Corporation*

James A. Pardo
Lisa A. Gerson
McDermott Will & Emery LLP
New York, New York

*Counsel for Certain Defendants*

I.   Factual Background ................................................................................................ 3

  A.   MTBE Generally ................................................................................................ 3

  B.   LAC and Getty Petroleum Marketing Inc. ...................................................... 3

  C.   Material Safety Data Sheets Produced by Certain Defendants ........................ 6

  D.   Public Statements and Advertising by Certain Defendants ............................. 9

  E.   Certain Defendants' Claims for Payments From the Underground Storage Tank Indemnification Fund .................................................................................... 13

II.   Relevant Procedural History ............................................................................... 13

III.   Legal Standards ................................................................................................... 16

  A.   Rule 12(b)(2) ................................................................................................... 16

  B.   Rule 12(b)(6) ................................................................................................... 17

IV.   Discussion ........................................................................................................... 18

  A.   Lukoil Americas Corporation's Motion to Dismiss ....................................... 18

    1.   Personal Jurisdiction .................................................................................... 18

      a.   Applicable Law ....................................................................................... 18

      b.   Application .............................................................................................. 21

        i.   General Jurisdiction ........................................................................... 22

          a) Choice of Law ................................................................................. 23

        ii.   Specific Jurisdiction .......................................................................... 25

    2.   Failure to State a Claim ................................................................................ 35

      a.   Liability for Conduct After LAC Acquired GPMI ................................. 36

      b.   Liability for Conduct Before LAC Acquired GPMI .............................. 39

  B.   Certain Defendants' Motion to Dismiss ......................................................... 40

    1.   Count III:  Public Nuisance .......................................................................... 41

    2.   Counts VI and VII:  Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law .......................................................................... 41

      a.   Applicable Law ....................................................................................... 41

      b.   Application .............................................................................................. 42

      i.   Count VI:  The Material Safety Data Sheets................................................. 43

      ii.   Public Statements ........................................................................................ 45

           a) Government Gas Advertisement................................................................ 45

           b) Newspaper Articles................................................................................ 48

      iii.   Availability of Injunctive Relief ................................................................ 52

3.    Count IX:  Violation of the Pennsylvania Storage Tank and Spill Prevention Act...... 52

    a.   Applicable Law ........................................................................................... 52

    b.   Application ................................................................................................... 53

V.  Conclusion ............................................................................................................... 56

VERNON S. BRODERICK, United States District Judge:

This is a consolidated multi-district litigation ("MDL") relating to contamination—actual or threatened—of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol, a product formed by the breakdown of MTBE in water.  In this case, the Commonwealth of Pennsylvania ("the Commonwealth" or "Pennsylvania") alleges that defendants' use and handling of MTBE contaminated, or threatens to contaminate, groundwater within its jurisdiction.  Before me are (1) Defendant Lukoil Americas Corporation's ("LAC") motion to dismiss for lack of personal jurisdiction and for failure to state a claim; and (2) the motion to dismiss for failure to state a claim of certain other Defendants.[1]

For the reasons that follow, the motions are each GRANTED IN PART and DENIED IN PART.  Specifically, the Commonwealth has sufficiently alleged that Defendant Getty Petroleum Marketing Inc.'s veil may be pierced for jurisdictional purposes; therefore, LAC's motion to dismiss for lack of personal jurisdiction is DENIED.  However, because the Commonwealth has

---

[1] The following Defendants jointly moved to dismiss for failure to state a claim:  American Refining Group, Inc.; Atlantic Richfield Company; BP America, Inc.; BP Amoco Chemical Company; BP Holdings North America Limited; BP PLC; BP Products North America Inc.; BP West Coast Products LLC; Chevron Corporation; Chevron U.S.A. Inc.; Texaco Inc.; TRMI-H LLC; CITGO Petroleum Corporation; CITGO Refining and Chemicals Company L.P.; Coastal Eagle Point Company; El Paso Merchant Energy-Petroleum Company; Kinder Morgan, Inc.; Conoco, Inc.; ConocoPhillips; ConocoPhillips Company; Phillips 66; Phillips 66 Company; Phillips Petroleum Company; Tosco Corporation; Tosco Refining Co.; Crown Central LLC; Cumberland Farms, Inc.; Gulf Oil Limited Partnership; Duke Energy Merchants, LLC; Equilon Enterprises LLC; Motiva Enterprises LLC; Shell Oil Company; Shell Oil Products Company LLC; TMR Company; Exxon Mobil Corporation; ExxonMobil Oil Corporation; George E. Warren Corporation; Getty Properties Corp.; Hess Corporation; WilcoHess LLC; Marathon Oil Corporation; Marathon Petroleum Corporation; Marathon Petroleum Company LP; NuStar Terminal Operations Partnership L.P.; Premcor Refining Group, Inc.; Premcor USA, Inc.; Valero Energy Corporation; Valero Marketing and Supply Company; Valero Refining and Marketing Company; Sunoco, Inc. (f/k/a Sun Company, Inc.); Sunoco, Inc. (R&M); Energy Transfer Partners, L.P.; ETP Holdco Corporation; Total Petrochemicals & Refining USA, Inc.; United Refining Company; Western Refining Yorktown, Inc.  (*See* Doc. 237.)  Shortly thereafter, Defendants Shell Trading (US) Company and Pennzoil-Quaker State Company filed a notice of joinder in the motion to dismiss.  (*See* Doc. 242.)  Defendant LAC also joined in the motion.  (*See* Doc. 243.)  I will refer to these Defendants, excluding Pennzoil-Quaker State Company and LAC, collectively as "Certain Defendants" in this Opinion & Order.  The docket number citations in this Opinion & Order are to Docket 14-cv-6228.

failed to plausibly allege facts sufficient to warrant a finding that Defendant Getty Petroleum Marketing Inc.'s veil may be pierced for liability purposes and the Commonwealth has not properly pled successor liability, LAC's motion to dismiss for failure to state a claim is GRANTED.  Because the Commonwealth has once again failed to allege that any Defendants possessed or controlled the MTBE release sites that the Commonwealth alleged created a nuisance, Certain Defendants' motion to dismiss Count III is GRANTED.[2] !Because the Commonwealth has not set forth any specific allegations of deceptive and misleading conduct that are actionable under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), Certain Defendants' motion to dismiss Counts VI and VII against them are GRANTED.[3]  Finally, because the Commonwealth has adequately alleged that the Insurance Defendants[4] were required to disclose information about their private insurance coverage in response to the Commonwealth's request for information on subrogation, Certain Defendants' motion to dismiss the Commonwealth's claim under the Pennsylvania Storage Tank and Spill Prevention Act is DENIED.

---

[2] Defendants Pennzoil-Quaker State Company and LAC filed notices of joinder in the motion to dismiss.  (*See* Docs. 242, 243.)  Therefore, claims under Count III against them are also dismissed.

[3] Defendants Pennzoil-Quaker State Company and LAC filed notices of joinder in the motion to dismiss.  (*See* Docs. 242, 243.)  Therefore, claims under Counts VI and VII against them are also dismissed.

[4] "Insurance Defendants" refers to Atlantic Richfield Company, BP America Inc., BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., BP West Coast Products LLC, ConocoPhillips, ConocoPhillips Company, Cumberland Farms, Inc., El Paso Merchant Energy-Petroleum Company, Energy Transfer Partners, L.P., Equilon Enterprises LLC, ETP Holdco Corporation, Getty Properties Corporation, Gulf Oil Limited Partnership, Hess Corporation, Kinder Morgan, Inc., Lukoil Americas Corporation, Marathon Oil Corporation, Marathon Petroleum Company LP, Marathon Petroleum Corporation, Motiva Enterprises LLC, Phillips 66, Phillips 66 Company, The Premcor Refining Group Inc., Premcor USA Inc., Shell Oil Company, Shell Oil Products Company LLC, Sun Company, Inc., Sunoco, Inc., Sunoco Inc. (R&M), TMR Company, United Refining Company, Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, and WilcoHess LLC.  (Doc. 173, Second Amended Complaint ¶ 123.)

I. **Factual Background**[5]

A. *MTBE Generally*

MTBE is an additive used to oxygenate and/or enhance the octane of gasoline.  (SAC ¶¶ 138, 140.)[6]  It can be introduced into the environment "through disposals, deposits, releases, leaks, overfills, spills and evaporative releases . . . from a variety of sources, principally . . . gasoline storage and delivery systems."  (*Id.* ¶ 144.)  When it encounters water, MTBE behaves differently from the other constituents of gasoline.  (*Id.* ¶ 145.)  It separates from those constituents, dissolves easily, does not readily adhere to soil particles, and moves approximately at the rate of the movement of water.  (*Id.* ¶¶ 145–46.)  As a result, MTBE is extremely mobile in water sources and can migrate far away from the source of the environmental release, including to subsurface soil regions, from which it may leach into groundwater.  (*Id.* ¶¶ 146–47.)  Because of these properties, MTBE is also difficult to remediate.  (*Id.*)  Since its introduction into gasoline, MTBE has been found throughout the groundwaters of Pennsylvania at varying concentrations, affecting the drinking-water supplies of the entire state.  (*Id.* ¶¶ 248–49.)

B. *LAC and Getty Petroleum Marketing Inc.*

Defendant LAC is the Delaware corporation that wholly owns Defendant Getty Petroleum Marketing Inc. ("GPMI"), a Maryland corporation.  (*Id.* ¶¶ 74, 83.)  LAC is an indirect subsidiary of Lukoil Oil Company, also known as OAO Lukoil ("OAO Lukoil"), a publicly traded Russian company that has registered the name "Lukoil" as a trademark.  (*Id.* ¶¶

---

[5] This section sets forth only the factual allegations contained in Plaintiff's second amended complaint ("Second Amended Complaint") that are relevant to the instant motions.  I assume those allegations to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.  A more thorough recitation of the background facts of this MDL as a whole may be found in Judge Shira A. Scheindlin's decision *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 379 F. Supp. 2d 348, 364–67 (S.D.N.Y. 2005).
[6] "SAC" refers to the Second Amended Complaint, filed on November 6, 2015.  (Doc. 173.)

83, 85, 297.)  Defendant Lukoil North America LLC ("LNA") is also an indirect subsidiary of OAO Lukoil.  (*Id.* ¶ 84.)  The Commonwealth alleges that LAC is the alter ego of and successor-in-liability to GPMI.  (*Id.* ¶ 83.)

Prior to October 2000, GPMI leased service stations in Pennsylvania and elsewhere from Getty Realty Corporation.  (*Id.* ¶ 301.)  In October 2000, OAO Lukoil created LAC, and in November 2000, OAO Lukoil acquired GPMI.  (*Id.* ¶¶ 298, 299).  Thereafter, LAC acquired all the stock of GPMI, which it owned from January 25, 2001 to February 28, 2011, with the exception of two weeks in November 2009.  (*Id.* ¶ 304.)  After the acquisition, GPMI entered into an Amended Master Lease for the service stations it leased throughout the United States, including in Pennsylvania.  (*Id.* ¶ 301.)  The Commonwealth alleges that LAC and OAO Lukoil directed GPMI to enter into this transaction.  (*Id.*)  Under the Amended Master Lease, OAO Lukoil guaranteed GPMI's financial obligations for at least three years, "as principal and not as indemnitor."  (*Id.* ¶ 302.)

In 2004, "with the approval and at the direction of OAO Lukoil and LAC" GPMI obtained a loan and line of credit for $360 million to purchase 767 Mobil-branded service stations in New Jersey and Pennsylvania from ConocoPhillips and to provide working capital in connection with that acquisition.  (*Id.* ¶ 305.)  LAC guaranteed the loan and line of credit, and Vincent De Laurentis, president of both LAC and GPMI, signed the loan and line of credit on behalf of GPMI, and signed the guarantee on behalf of LAC.  (*Id.* ¶ 306.)  Documents related to the loan described the acquisition as "the foundation of a strategy to dramatically expand Lukoil's presence in the U.S."  (*Id.* ¶ 305.)  OAO Lukoil made a $50 million capital contribution to LAC to fund the acquisition and provided another $10 million for "near term financing liquidity."  (*Id.* ¶ 306.)

In 2005, GPMI obtained a loan and line of credit for $475 million to replace the 2004 loan, to finance additional expansion efforts, and to rebrand the newly acquired Mobil stations as Lukoil stations.  (*Id.* ¶ 308.)  OAO Lukoil guaranteed the loan and line of credit.  (*Id.*)  Distributions for that loan and line of credit went to LAC, not GPMI.  (*Id.*)

"OAO Lukoil regularly transferred millions of dollars through its intermediate subsidiaries to LAC, who then funneled those dollars to GPMI."  (*Id.* ¶ 311.)  In 2005 and 2006, LAC received $2.5 million dollars quarterly from OAO Lukoil subsidiaries, and then LAC transferred that money to GPMI.  (*Id.*)

However, by 2005, GPMI was losing money because the stations governed by the Amended Master Lease were losing money and GPMI could not pay the rent it owed on those stations.  (*Id.* ¶ 312.)  In 2007, GPMI attempted to renegotiate the Amended Master Lease, but was unsuccessful.  (*Id.* ¶ 313.)  On November 13, 2009, LAC transferred all of its GPMI stock to LNA for "[in]adequate consideration."  (*Id.* ¶ 319.)  On November 16, 2009, GPMI transferred various service stations, including the stations acquired from ConocoPhillips, which were profitable, to LNA, a wholly owned subsidiary of LAC.  (*Id.* ¶¶ 84, 314, 320.)  On November 27, 2009, LNA transferred GPMI's stock back to LAC as a dividend, and retained the service stations.  (*Id.* ¶ 323.)

In 2011, allegedly at the direction of OAO Lukoil, LAC sold GPMI to Cambridge Holdings Petroleum for one dollar, and "OAO Lukoil also agreed to provide millions of dollars as a cash infusion to Cambridge in order to keep GPMI temporarily afloat."  (*Id.* ¶ 327.)  In December 2011, GPMI filed for bankruptcy and OAO Lukoil, LAC, and LNA filed claims for indemnity by GPMI relating to GPMI's sale of assets to LNA, and LNA also filed claims "relating to stations covered by the Amended Master Lease and the Purchase and Sale

Agreement between LNA and GPMI including stations in Pennsylvania." (*Id.* ¶¶ 74, 330.)

The GPMI bankruptcy trustee filed an adversary proceeding against OAO Lukoil, LAC, and LNA, asserting that the transfer of assets between GPMI and LNA constituted a fraudulent transfer. (*Id.* ¶ 331.) "OAO Lukoil, LAC and LNA settled the bankruptcy trustee's fraudulent transfer claim for $93 million in cash to be paid to the GPMI Trust." (*Id.*)

The Commonwealth alleges that through its distribution, storage, and sale of gasoline, GPMI caused the release of MTBE into the environment and thereby contaminated the groundwaters of the Commonwealth. (*Id.* ¶¶ 9, 312.) The Commonwealth's claim against GPMI is limited to recoverable insurance proceeds, (*id.* ¶ 74), but it asserts that LAC is (a) the alter ego of GPMI and therefore liable for any MTBE contamination that occurred during the period of LAC's ownership of GPMI, (*see id.* ¶¶ 339, 345-46), and (b) that LAC is the successor-in-liability to GPMI and therefore liable for any MTBE contamination by service stations leased by GPMI prior to 2001, (*see id.* ¶¶ 320, 345).

### C. *Material Safety Data Sheets Produced by Certain Defendants*

The Commonwealth alleges that in connection with the marketing, distribution, and sale of their products, Certain Defendants prepared and distributed material safety data sheets ("MSDSs"), a type of document used by manufacturers of hazardous materials to address Occupational Safety and Health Administration hazard communication requirements. (*Id.* ¶¶ 238, 275.) These MSDSs were typically divided into sections addressing specific safety, handling, and hazards issues. (*Id.* ¶ 278.) By way of example, the Commonwealth points to an October 4, 1994 Mobil MSDS, which described itself as a "compilation of health-related information, procedures for emergency situations, physical properties, and recommendations to help assure the safe handling of a particular Mobil product." (*Id.* ¶ 277.) The 1994 Mobil

MSDS contained a section entitled "Accidental Release Measures," which "recommend[ed] procedures and precautions to be taken in the event of an accidental release or spill," and a section entitled "Handling and Storage," which "recommend[ed] any special precautions to be followed during the handling and storage of Mobil products."  (*Id.* ¶ 278.)

The Commonwealth alleges that during the relevant period, Certain Defendants knew that MTBE was highly soluble in water and mobile, and that MTBE contamination of water was therefore difficult to remediate.  (*See id.* ¶¶ 280–83.)  Within their respective companies, Certain Defendants took extra precautions in handling MTBE gasoline compared with regular gasoline in order to prevent spills and leaks.  (*Id.* ¶¶ 280–81, 284.)  Despite having this knowledge, the Commonwealth alleges, Certain Defendants published MSDSs between 1986 and 2006 that suggested that MTBE gasoline could be handled just like traditional gasoline, according to the same standard of care.  (*Id.* ¶¶ 275, 285.)  Certain Defendants asked customers who resold or distributed MTBE or MTBE gasoline to furnish copies of the MSDSs to downstream handlers and customers.  (*Id.* ¶ 275.)

The Commonwealth lists a total of 217 purportedly misleading MSDSs published by Certain Defendants between 1986 and 2006.  (*Id.* ¶ 291 & Table 1.)  It further points to the MSDSs of two Defendants as exemplars of these misleading MSDSs.  First, an Amoco MSDS for MTBE gasoline, published on April 28, 1993, January 19, 1995, December 28, 1998, and July 16, 1999, contained the following text:

6.0 ACCIDENTAL RELEASE MEASURES

Remove or shut off all sources of ignition.  Wear respirator and spray with water to disperse vapors. Increase ventilation if possible.  Remove mechanically or contain on an absorbent material such as dry sand or earth.  Keep out of sewers and waterways.

7.0 HANDLING AND STORAGE

HANDLING:  Use with adequate ventilation. Ground and bond containers when transferring materials.  Wash thoroughly after handling.

STORAGE:  Store in flammable liquids storage area.  Keep container closed.  Store away from heat, ignition sources, and open flame in accordance with applicable regulations –

SPECIAL PRECAUTIONS: Keep out of sewers and waterways.  Avoid strong oxidizers.  Report spills to appropriate authorities.  USE AS MOTOR FUEL ONLY.

(*Id.* ¶¶ 286–87.)

Several years prior, however, a July 1, 1992 Amoco Oil Company internal document entitled "Guideline for Handling & Storage of Ethers Used in Gasoline" acknowledged that ethers "are much more water soluble than hydrocarbons and will have a tendency to dissolve in – groundwater if allowed to leak or spill" and that they are more difficult to clean up than non-oxygenated gasoline.  (*Id.* ¶ 280.)  Accordingly, the document advised, that "facilities handling ethers and ether/gasoline blends must be designed and operated to insure (1) low likelihood for spills and leaks, (2) early detection of leaks when they occur, and (3) rapid repair and cleanup when leaks are found."  (*Id.*)

Similarly, Shell Oil's MSDSs for MTBE gasoline products issued from October 26, 1988 until September 6, 2006 stated the following in all capitals:

Spill or Leak Procedures

Danger.  Extremely flammable.  Eliminate all ignition sources.  Handling equipment must be grounded to prevent sparking.  *** Large Spills ***  Isolate the hazard area and deny entry to unnecessary personnel.  Wear appropriate respirator and protective clothing.  Shut off source of leak only if safe to do so. Dike and contain.  Water fog may be useful in suppressing vapor cloud; contain run-off.  Remove with vacuum trucks or pump to storage/salvage vessels. Soak up residue with an absorbent such as clay, sand or other suitable material; place in non-leaking containers for proper disposal.  Flush area with water to remove trace residue; dispose of flush solutions as above.  *** Small Spills ***  Take up with an absorbent material and place in non-leaking containers; seal tightly for proper disposal.

* * *

Environmental Hazards EPA – Clean Water Act (CWA).

This product is classified as an oil under section 311 of the Clean Water Act.  Spills entering (a) surface waters or (b) any watercourses or sewers entering/leading to surface waters that cause a sheen must be reported to the National Response Center, 800-424-8802.   Keep out of surface waters and any water courses or sewers entering or leading to surface waters.

* * *

Section XII Special Precautions

Danger.  Extremely flammable.  Avoid heat, sparks, open flames, including pilot lights, and strong oxidizing agents.  Use explosion-proof ventilation to prevent vapor case accumulation.  All handling equipment must be grounded to prevent sparking.  Harmful or fatal if swallowed.  Do not siphon gasoline by mouth.

For use as a motor fuel only.  Do not use as a cleaning solvent or for other non-motor fuel uses.  Wash with soap and water before eating, drinking.  Smoking or using toilet facilities.  Launder contaminated clothing before reuse. …

If a major spill occurs.  Get upwind and notify local emergency personnel. Remember explosion and fire is the most immediate danger.

(*Id.* ¶¶ 288, 291, Table 1 (converted from all capitals))

However, a November 3, 1998, e-mail to Shell Oil from its hydrologist detailed the risks

to groundwater posed by MTBE and cautioned that "MTBE and similar oxygenates should not

be used at all in areas where groundwater is a potential drinking water supply.  If it is used,

engineering design and site operations . . . should be carefully developed to minimize the

potential for a release."  (*Id.* ¶¶ 282–83.)

### D. *Public Statements and Advertising by Certain Defendants*

The Commonwealth also alleges that in response to federal and state laws and regulations

promulgated from 1987 through 1995 regarding automotive emissions, Certain Defendants made

various false and misleading public statements about MTBE and ethanol gasoline.  (*Id.* ¶¶ 266–

67.)  These statements promoted MTBE gasoline as "clean burning gasoline good for the environment," failed to disclose "the significant environmental dangers that MTBE and MTBE gasoline posed to the public and private water supplies in the event of a spill or leak," and "disparage[d] ethanol oxygenated gasoline."  (*Id. ¶ 267*.)  For example, a May 13, 1990 newspaper article in the Philadelphia Inquirer headlined "Speeding Up the Drive For Cleaner Gas Oil Firms Are Yielding To Pressure From Laws, Consumers And Automakers To Make Fuel More Compatible With the Environment," reported that Arco, Conoco, Diamond Shamrock (now Exxon), Marathon, Phillips and Shell were beginning to sell cleaner gasolines.  (*Id.* ¶ 269 (altered from all capitals).)  The SAC excerpted portions of the article as follows:

> "There is no doubt about it," said Clayton Adams, a spokesman for Conoco, "the future is in gasolines, in fuels that are more environmentally compatible."
>
> * * *
>
> One of the biggest prods to the oil industry is President Bush's support of methanol as a cleaner alternative to gasoline in urban areas with serious pollution problems. The oil industry has vigorously opposed the President's idea.
>
> * * *
>
> "But we came to the conclusion that the customer now . . . really wanted an environmentally enhanced fuel," said Steven Miller, a Shell vice president."
>
> * * *
>
> The industry's response has been reformulated gasolines, which so far have relied largely on using the additive methyl tertiary butyl ether (MTBE).
>
> * * *
>
> So far, Exxon has announced the most ambitious plan to market reformulated gasoline, targeting 40 markets in 21 Gulf and East Coast states, including New Jersey, Pennsylvania and New York, by this summer.

(*Id.*)

The Commonwealth also alleges that Shell Oil began marketing and promoting a

"cleaner" gasoline, formulated with higher percentages of MTBE, called "SU2000E." (*Id.* ¶ 270.) In an April 12, 1990 article, Shell's president is quoted as describing this new blend as "an important step in the right direction for cleaner air." (*Id.*) In an April 23, 1990 article, the same president is quoted as stating that "[the] new gasoline reflects Shell's commitment to make environmental considerations a priority in development of our new products and processes." (*Id.*)

Finally, the Commonwealth alleges that around the same time, the American Petroleum Institute was conducting a public relations campaign to discredit ethanol oxygenated gasoline, which the Commonwealth alleges was funded by Arco, ConocoPhillips, ExxonMobil, Marathon, Shell Oil, and Sunoco, or their predecessors. (*Id.* ¶ 274.) This campaign placed an advertisement in the May 15, 1990 edition of the Pittsburgh Post-Gazette, pictured below:



(*Id.* ¶ 274 & Ex. 1.)  This advertisement contended that "politicians in Washington" were acting

as "scientists" by "writing a specific gasoline formula intended to vastly increase the use of

ethanol as an ingredient," which they would require to be used in certain urban areas.  (*Id.*)  The

advertisement characterized this formula as "Government Gas" and stated that "no testing has

been done to show 'Government Gas' is less polluting, more efficient or affordable."  (*Id.*)  To

the contrary, the advertisement contended, the "Government Gas" would increase emissions of

hydrocarbons and nitrogen oxides, the components of smog.  (*Id.*)  Finally, the advertisement

stated that automakers and oil companies were testing new fuels "in search of the best clean-

burning gasoline" and that "[a]nswers [were] just months away."  (*Id.*)  Accordingly, the

advertisement exhorted readers to "ask [their] U.S. Representative to reject 'Government Gas'

amendments to the Clean Air Act." (*Id.*)

### E. Certain Defendants' Claims for Payments From the Underground Storage Tank Indemnification Fund

The Pennsylvania Underground Storage Tank Indemnification Fund ("USTIF") was created by the Storage Tank and Spill Prevention Act ("STSPA"), 35 P.S. §§ 6021.101–6021.2104, to assist underground storage tank ("UST") owners and operators in meeting the financial responsibility requirements set forth in Pennsylvania's environmental regulations relating to releases from USTs. (*Id.* ¶ 20.) A subset of Defendants, referred to as the Insurance Defendants, owned and operated USTs and associated dispensing equipment, and participated in the USTIF. (*Id.* ¶ 21.) The Commonwealth alleges that Insurance Defendants each made one or more claims to USTIF for indemnity payments to effect remediation of releases from their respective UST systems. (*Id.* ¶ 31.) However, the Commonwealth alleges, "[m]any" of these UST releases were also the subject of claims by the Insurance Defendants to private insurers, resulting in Insurance Defendants receiving multiple payments for the same remediation, and violating the Commonwealth's right of subrogation. (*Id.* ¶¶ 31, 411–531.) The Commonwealth also alleges that Certain Defendants failed to cooperate with the Commonwealth's investigations into their claims. (*Id.* ¶¶ 529–30.)

### II. Relevant Procedural History

The Commonwealth filed the complaint ("Complaint") in this action in the Court of Common Pleas of Philadelphia County, Trial Division, on June 19, 2014. (*See* Docs. 1, 1-1.) Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation removed the action to the United States District Court for the Eastern District of Pennsylvania on July 17, 2014, (*id.*), and it was transferred into this MDL, which was at that time assigned to the Honorable Shira A. Scheindlin, on August 18, 2014, (Doc. 11). On October 30, 2014, the Commonwealth filed an

amended complaint ("First Amendment Complaint" or "FAC"). (Doc. 36.)

On December 23, 2014, Certain Defendants filed a motion to dismiss for failure to state a claim, (*see* Docs. 81–84; 94–95), another group of defendants ("First Insurance Defendants") filed a motion to remand, or, in the alternative, dismiss Plaintiff's insurance claims, (*see* Docs. 83–84), and Defendant LAC filed a motion to dismiss for lack of personal jurisdiction, (*see* Docs. 85–87).

Judge Scheindlin granted the LAC and the Commonwealth leave to engage in jurisdictional discovery in connection with LAC's motion. (*See* Doc. 132). At a March 5, 2015 status conference, while discovery and briefing were ongoing, the parties disagreed as to what law applied to the question of whether GPMI's veil should be pierced for the purposes of imputing its contacts to its parent company, LAC. (*See* Docs. 132–33.) Judge Scheindlin directed the parties to brief that issue on an accelerated schedule. (*See* Doc. 133.) The parties submitted letter briefs, (*see* Docs. 132, 135, 139), and on March 30, 2015, Judge Scheindlin issued a Memorandum Opinion & Order finding that based on the submissions, Maryland law applied to whether GPMI's corporate veil should be pierced. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 14 Civ. 6228, 2015 WL 1500181 (S.D.N.Y. Mar. 30, 2015) ("*March 2015 Order*").

On May 14, 2015, Judge Scheindlin issued an Opinion & Order granting in part and denying in part the First Insurance Defendants' motion to dismiss. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 14 Civ. 6228, 2015 WL 2354582 (S.D.N.Y. May 14, 2015) ("*May 2015 Opinion*"). On July 2, 2015, Judge Scheindlin issued an Opinion & Order granting Certain Defendants' motion to dismiss. *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 14 Civ. 6228, 2015 WL 4092326 (S.D.N.Y. July 2, 2015) ("*July 2015 Opinion*"). A

14

corrected version was issued on the same date.  (*See* Doc. 155).

On November 6, 2015, the Commonwealth filed a Second Amended Complaint.  (Docs. 173; *see also* Doc. 190.)  After Defendants' time to move or answer was extended by stipulated order, (*see* Doc. 232), Certain Defendants filed a motion to dismiss for failure to state a claim on January 8, 2016, (Doc. 237), along with a memorandum of law and declaration in support, (Docs. 238–39).  Defendants LAC, Pennzoil-Quaker State Company, and Shell Trading (US) Company filed notices of joinder in the motion.  (*See* Docs. 242–43.)  On February 5, 2016, the Commonwealth filed a memorandum of law in opposition.  (Doc. 261.)  On February 19, 2016, Certain Defendants filed a reply memorandum of law.  (Doc. 265.)

On January 8, 2016, Defendant LAC filed a motion to dismiss for lack of personal jurisdiction and for failure to state a claim, along with a memorandum of law, declaration, and exhibits in support.  (Docs. 243–245.)  On February 5, 2016, the Commonwealth filed a memorandum of law and declaration in opposition.  (Docs. 262–63.)  On February 19, 2016, LAC filed a reply memorandum of law.  (Doc. 266.)  With leave of court, (*see* Doc.  281), on April 15, 2016, the Commonwealth filed a supplemental memorandum of law in further opposition to LAC's motion, (Doc. 282).  On April 22, 2016, LAC filed a supplemental reply in further support of its motion.  (Doc. 287.)  On August 16, 2016, this action was assigned to me.

Subsequently, the Commonwealth filed a motion to remand the action to the District Court for the Eastern District of Pennsylvania, (Doc. 401), which I denied, (Doc. 439.)  On May 2, 2019, I entered an order, based on a stipulation, dismissing with prejudice Count VII, unjust enrichment, and Count IX, violations of the Pennsylvania STSPA, as to Chevron Corporation, Chevron U.S.A. Inc., Texaco Inc., and TRMI-H LLC.  (Doc. 455.)  Thereafter, some of the Defendants moved for partial summary judgment, (Docs. 558, 578, 582, 596, 597); those

motions remain pending.

### III.  <u>Legal Standards</u>

#### A.  *Rule 12(b)(2)*

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) (citing *Steel Co. v. Citizens For A Better Env't*, 523 U.S. 83, 93–102 (1998)).  A plaintiff opposing a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999).

To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation."  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Prior to an evidentiary hearing, a plaintiff need only make a prima facie showing that jurisdiction exists.  *Id.* at 84–85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013))).  This showing may be made through materials outside the pleadings.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

If the court considers pleadings and affidavits submitted by the parties, the plaintiff's "prima facie showing 'must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'"  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).  Plaintiff's averments "must be taken as true to the extent they are uncontroverted by the defendant's" submissions.  *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).  If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."  *Seetransport Wiking*, 989 F.2d at 580 (citation omitted).

### B.  *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* Finally, on a motion to dismiss, a court may consider a document integral to the complaint even if is not attached or formally incorporated by reference. *See, e.g., Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005). A court need not accept Plaintiff's description of the terms of the document as true, but instead "may look to the [document] itself." *See id.*

## IV. Discussion

### A. *Lukoil Americas Corporation's Motion to Dismiss*

#### 1. Personal Jurisdiction

##### a. Applicable Law

The amenability of a foreign defendant to suit in a federal court in a multi-district litigation is determined in accordance with the law of the transferor state, *Zornoza v. Terraform Glob., Inc.*, 419 F. Supp. 3d 715, 726 (S.D.N.Y. 2019), "with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee," *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)). Thus, district courts resolving issues of personal jurisdiction typically engage in a two-part analysis. *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (citation omitted). First, the court determines whether personal jurisdiction is authorized

by the law of the relevant state, and second, "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 163; *see also Grand River Enterprises*, 425 F.3d at 165. However, here, "because Pennsylvania's long-arm statute authorizes courts to exercise personal jurisdiction to the full extent permitted by" the federal Due Process clause, the personal jurisdiction inquiry "collapses into one step." *Bertles v. Cycle Grp.*, CIVIL ACTION No. 18-4707, 2020 WL 1028044, at *2 (E.D. Pa. Mar. 3, 2020); *see Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001).

Under Pennsylvania law, a court may exercise general jurisdiction over a foreign corporation that "carr[ies] on [] a continuous and systematic part of its general business within [the] Commonwealth.'" 42 Pa.C.S.A. § 5301(a)(2)(iii). Pennsylvania courts interpret that statute "to require only the minimum business activity necessary to establish general jurisdiction under the Due Process Clause." *See Mendel v. Williams*, 53 A.3d 810, 818 n.2 (Pa. Super. Ct. 2012). When a court's jurisdiction over a defendant is "based on" the Pennsylvania general jurisdiction statute, "any cause of action may be asserted against the defendant, whether or not it arises from the defendant's conduct in Pennsylvania." *Id.* at 817. Similarly, under the federal Due Process clause, "[a] court may exercise general jurisdiction over foreign corporations only 'when their affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State." *MTS Logistics, Inc. v. Innovative Commodities Grp., LLC*, 19 Civ. 4216 (PAE), 2020 WL 917321, at *10 (S.D.N.Y. Feb. 26, 2020) (quoting *Goodyear Dunlop Tires, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts, but calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (internal

quotation marks and citation omitted).  Outside "truly 'exceptional'" cases, "a corporate

defendant may be treated as 'essentially at home' only where it is incorporated or maintains its

principal place of business."  *Id.*

"A foreign defendant who does not have sufficient contacts with Pennsylvania to

establish general jurisdiction may nevertheless be subject to specific jurisdiction

in Pennsylvania pursuant to the Pennsylvania Long–Arm Statute, 42 Pa.C.S.A. § 5322," which

lists several categories of contact with Pennsylvania "deemed sufficient to warrant the exercise

of specific jurisdiction."  *Mendel*, 53 A.3d at 820 (citing *Scoggins v.  Scoggins*, 555 A.2d 1314,

1318 (Pa. Super. Ct. 1989).  Of relevance here, under the Pennsylvania long-arm statute, a court

may exercise specific jurisdiction over a foreign corporation that, directly or by an agent,

transacts business in the Commonwealth, such as by "doing [] a single act in this Commonwealth

for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with

the intention of initiating a series of such acts," "shipping [] merchandise directly or indirectly

into or through this Commonwealth," "engaging in any business or profession within th[e]

Commonwealth," or "own[ing], us[ing] or possess[ing] any real property situate[d] within th[e]

Commonwealth."  § 5322(a)(1).  Critically, the cause of action sued upon must arise out of the

contacts that provide the basis for specific jurisdiction.  § 5322(c); *see also Mendel*, 53 A.3d at

827.  Like Pennsylvania's general jurisdiction statute, the long-arm statute is coextensive with

the federal Due Process clause.  *N.T. ex rel. K.R.T. v. F.F.*, 118 A.3d 1130, 1135 n.5 (Pa. Super.

Ct. 2015).

The federal specific jurisdiction inquiry has two prongs:  "minimum contacts" and

"reasonableness."  *See Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164.  "With respect to

minimum contacts, [the court] must determine whether the defendant has sufficient contacts with

the forum state to justify the court's exercise of personal jurisdiction.  *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The court "evaluate[s] the quality and nature of the defendant's contacts with the forum state under [the] totality of the circumstances."  *Licci*, 732 F.3d at 170; *see also Grand River Enters.*, 425 F.3d at 166 (2d Cir.2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper." (citation omitted)).  Importantly, "[t]he relationship between the defendant and the forum 'must arise out of contacts that the "defendant *himself*" creates with the forum.'"  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016) (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

With respect to the "reasonableness" inquiry, the court must satisfy itself that exercising jurisdiction is "reasonable under the circumstances" and "does not offend traditional notions of fair play and substantial justice."  *Bank Brussels*, 305 F.3d 120 at 127, 129; *see also Int'l Shoe Co.*, 326 U.S. at 316 (internal quotation marks omitted).  In determining reasonableness, the court should consider the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Eades*, 799 F.3d at 169 (quoting *Queen Bee of Beverly Hills, LLC*, 616 F.3d at 164).

### b.   Application

The Commonwealth argues that this Court has specific and general jurisdiction over LAC on the basis of the Pennsylvania contacts of GPMI, its wholly owned subsidiary.  (SAC ¶ 83,

Pl.'s Opp. LAC 10–22.)[7]  LAC contends that Plaintiff has not demonstrated LAC is at home in

Pennsylvania, or that GPMI's corporate veil should be pierced for the purposes of specific or

general jurisdiction.  (LAC Mem. 12–17.)[8]  However, LAC does not contest that GPMI's

contacts, of themselves, otherwise satisfy the standard for personal jurisdiction under

Pennsylvania and federal law, nor does it contend that the cause of action does not arise out of

GPMI's contacts with the forum.  (*See generally id.*)  The only question, therefore, is whether

GPMI's veil may be pierced for the purposes of jurisdiction.

i.  *General Jurisdiction*

In its opposition brief, the Commonwealth states that it "asserts both general and specific

jurisdiction over LAC," and that "Pennsylvania courts have general jurisdiction over LAC

because LAC has a substantial connection with the forum state through its own activities and

through the activities of its agent, GPMI."  (Pl.'s Opp. LAC 10.)  This is the sole mention of

general jurisdiction throughout the entire opposition brief, and the Commonwealth makes no

effort in either its brief or the Second Amended Complaint to demonstrate how the Pennsylvania

contacts of GPMI—which allegedly leased and operated service stations in Pennsylvania and

stored and distributed petroleum in Pennsylvania, (*see* SAC ¶ 301)—were so continuous and

systematic as to make either GPMI or LAC, both foreign corporations, "at home" in the

Commonwealth.  *Mendel*, 53 A.3d at 817 (citing *Goodyear*, 564 U.S. at 924).  The

Commonwealth has not alleged that GPMI had a place of business, employees, or bank accounts

in Pennsylvania.  *Cf. id.* at 819–20.  Even though GPMI allegedly leased real property in the

---

[7] Pl.'s Opp. LAC refers to Plaintiff Commonwealth of Pennsylvania's Opposition to Defendant Lukoil Americas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, filed on February 5, 2016.  (Doc. 262.)

[8] "LAC Mem." refers to the Memorandum in Support of Defendant Lukoil Americas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, filed on January 8, 2016.  (Doc. 244.)

state, these leases were part of a master lease for "hundreds of service stations and a petroleum storage and distribution network" throughout the United States, (SAC ¶ 301). Without further detail about the nature and scope of GPMI's business in other states, it is impossible to "apprais[e] [GPMI's] activities in their entirety" for the purposes of assessing general jurisdiction. *Lockheed Martin*, 814 F.3d at 629. Accordingly, the Commonwealth has not made out a prima facie case for general jurisdiction. I next turn to the Commonwealth's veil-piercing theory under specific jurisdiction.

### a) Choice of Law

Before discussing the Commonwealth's veil-piercing theory under specific jurisdiction I must revisit an earlier choice of law determination made by Judge Scheindlin. As the parties point out, Judge Scheindlin previously made a preliminary determination based on letter briefs that (1) state law, not federal common law, would apply to the question of veil-piercing in this case, and (2) that under Pennsylvania choice-of-law rules, Maryland law governs the veil-piercing inquiry. *See March 2015 Order*, 2015 WL 1500181. However, that determination did not account for—and the parties' letters had not addressed—what law applies to personal jurisdiction challenges in cases transferred as part of an MDL, or for the distinction between veil-piercing for jurisdictional purposes and veil-piercing for liability purposes under Pennsylvania law. *See id.* The parties do not contend that Judge Scheindlin's finding constitutes the law of the case, and the parties continue to disagree about the applicable source of law, Maryland or Pennsylvania. (*See, e.g.*, Doc. 244, at 12; Doc. 262, at 11.)

I now conclude that Pennsylvania law governs whether this Court may exercise jurisdiction over a foreign corporation through an alter ego or veil-piercing theory. It is well established that "[w]hen a challenge to personal jurisdiction is raised in a case transferred [into a

multi-district litigation], personal jurisdiction is decided under the law of the transferor state."
*Zornoza*, 419 F. Supp. 3d at 726; *In re Lou Levy & Sons Fashions, Inc.*, 988 F.2d 311, 313 (2d
Cir. 1993) ("In multidistrict litigation transfers, the law of the transferor district must be
applied."); *see, e.g.*, *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d
Cir. 1987) ("Following a transfer, the transferee judge has all the jurisdiction and powers over
pretrial proceedings in the actions transferred to him that the transferor judge would have had in
the absence of transfer." (citation omitted)).  Here, the transferor jurisdiction is Pennsylvania.

      In Pennsylvania, the jurisdictional veil-piercing inquiry is not a question of corporate law,
but rather is a question of "whether it is reasonable to extend jurisdiction to an alien parent
corporation based upon its actions within the forum as transmitted through the conduit of its
wholly-owned subsidiary."  *Williams by Williams v. OAO Severstal*, No. 938 WDA 2017, 2019
WL 4888570, at *4 (Pa. Super. Ct. Oct. 3, 2019); *Daimler AG v. Bauman*, 571 U.S. 117, 759
n.13 (2014) ("Agency relationships, we have recognized, may be relevant to the existence of
specific jurisdiction."); *see also Botwinick v. Credit Exch., Inc.*, 213 A.2d 349, 354 (Pa. 1965).
Put differently, "[r]egardless of the name given the test to determine specific personal
jurisdiction, the relevant jurisdictional principles of minimum contacts, fair play, and substantial
justice remain static."  *Williams*, 2019 WL 4888570, at *4.

      The fact that the two inquiries—veil-piercing for jurisdictional purposes and veil-piercing
for liability purposes under Pennsylvania law—are distinct is demonstrated by the fact that the
alter-ego test in the context of personal jurisdiction is "less stringent" than the test for piercing
the corporate veil to impose liability.  *Id.* (quoting *Sincavage v. Schott North America,* 2018 WL
4852218 (M.D. Pa. 2018)).  *See Bell v. Fairmont Raffles Hotel Int'l*, Civil Action No. 12-757,
2013 WL 6175717, at *3 (W.D. Pa. Nov. 25, 2013) ("The alter-ego test for personal jurisdiction

24

is 'less stringent' than the test for piercing the corporate veil to impose liability"); *Sugartown*

*Worldwide LLC v. Shanks*, 129 F. Supp. 3d 201, 205 (E.D. Pa. 2015) (Under Pennsylvania law,

the "jurisdictional analysis over an alleged alter ego is a less onerous standard than we apply

under Fed.R.Civ.P. 12(b)(6) for piercing the corporate veil for liability purposes." (internal

quotation marks omitted)).  Although Pennsylvania courts have not explicitly stated what law

should apply to questions of jurisdictional veil-piercing of foreign corporations, they have

consistently applied their own law—which in turn follows federal law—regardless of the

domicile of the corporation.  *Cf. Sugartown*, 129 F. Supp. 3d at 205; *see also Commonwealth ex*

*rel. Pappert v. TAP Pharm. Prod., Inc.*, 868 A.2d 624, 628–33 (Pa. Cmwlth. 2005) (not

explicitly addressing choice of law, but applying federal standard of control to question of

whether foreign corporation could be hauled into court on the basis of contacts of Illinois

subsidiary (citing *In re Lupron Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 283, 292

n.27 (D. Mass. 2003)); *Barber v. Pittsburgh Corning Corp.*, 464 A.2d 323, 329–330 & n.5 (Pa.

Super. Ct. 1983) (not conducting choice of law analysis, but applying Pennsylvania law in

overruling preliminary objections challenging personal jurisdiction over foreign corporation

based on contacts of two foreign subsidiaries).

### ii.   *Specific Jurisdiction*

Ordinarily, under Pennsylvania law, "a corporate parent will retain its distinct identity

and not be subject to the jurisdictions of its subsidiaries, even when it shares common directors,

officers and shareholders."  *Fulano v. Fanjul Corp.*, 236 A.3d 1, 20 (Pa. Super. Ct. 2020)

(citing *Botwinick*, 213 A.2d at 354).  However, where "a subsidiary is 'merely the agent' of its

parent corporation or the parent corporation 'controls' the subsidiary," *id.* (quoting *Lutz v.*

*Rakuten, Inc.*, 376 F. Supp. 3d 455, 470–71 (E.D. Pa. 2019)) or if "the parent and subsidiary are

so intertwined that the subsidiary is the instrumentality of the parent corporation," *Williams,* 2019 WL 4888570, at *4,* "then personal jurisdiction exists over the parent whenever personal jurisdiction (whether general or specific) exists over the subsidiary." *Fulano*, 236 A.3d at 20 (quoting *Lutz*, 376 F. Supp. 3d at 470–71 (E.D. Pa. 2019)); *see also Botwinick*, 213 A.2d at 354. "The theory applies only if 'the degree of control exercised by the parent is greater than normally associated with common ownership and directorship' and 'the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent.'" *Fulano*, 236 A.3d at 20 (quoting *Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005)).

To assess whether a court may assert jurisdiction over the parent company on the basis of the subsidiary's jurisdictional contacts, Pennsylvania courts employ an inquiry developed by the federal courts of Pennsylvania, consisting of the following factors:

> (1) ownership of all or most of the stock of the related corporation; (2) common officers and directors; (3) common marketing image; (4) common use of a trademark or logo; (5) common use of employees; (6) integrated sales system; (7) interchange of managerial and supervisory personnel; (8) performance by the related corporation of business functions which the principal corporation would normally conduct through its own agent or departments; (9) acting of the related corporation as marketing arm of the principal corporation, or as an exclusive distributor; and (10) receipt by the officers of the related corporation of instruction from the principal corporation.

*Id*. *(quoting Lutz*, 376 F. Supp. 3d at 471). "These factors are best viewed as a non-exclusive guide to help resolve the broader issue of whether the companies have a single functional and organic identity," and the court may consider "any evidence bearing on the corporations' functional interrelationship." *Id.* at 20–21 (quoting *Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 676 (E.D. Pa. 2005), and *In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 598 (M.D. Pa. 2009)).

"Ultimately, the analysis centers on whether it is reasonable to extend jurisdiction to an alien parent corporation based upon its actions within the forum as transmitted through the conduit of its wholly-owned subsidiary." *Williams*, 2019 WL 488570, at *4.  This jurisdictional test is "less stringent than the test for piercing the corporate veil to impose liability." *Id.* (quoting *Sincavage*, 2018 WL 4852218, at *10).

In *Williams*, which contains facts which are analogous to the instant case, the Superior Court of the Commonwealth of Pennsylvania found it appropriate to pierce the corporate veil for jurisdictional purposes. *See id.*  There—although the subsidiary observed corporate formalities as to accounts, records, and personnel—the parent company provided extensive, free administrative services to the subsidiary; maintained a heightened level of operational oversight that included approval of large expenditures and monthly video conferences on expenses and performance; sent its executives to the subsidiary's plant and hosted the subsidiary's executive at the parent's headquarters; maintained regular contact with the subsidiary's legal department; and required regular financial and performance reports to be prepared in accordance with certain technological and formatting specifications. *Id.* at *10–13.  The subsidiary used the logo of the parent company; the companies shared headquarters; two out of four subsidiary board members also served on the board of the parent company; the subsidiary's CFO previously worked at the parent company, was trained by the parent company, and took the CFO job at the suggestion of his manager at the parent company; decisions were made by resolution transmitted to the board members individually, including the two board members who also served on the parent's board, rather than by board meeting; the subsidiary was undercapitalized and relied on a loan from the parent company to maintain positive cash flow, which the subsidiary ultimately did not pay back. *Id.*  The court also found significant that the subsidiary performed an essential function in the

27

steel-making process that the parent would otherwise have had to perform itself:  mining coal

that was used by the parent in its steel manufacturing business.  *Id.* at *13.  Taken together, the

"intricate corporate structure, and oversight" demonstrated a level of involvement by the parent

that "exceed[ed] mere macro-management," and "align[ed] closely with situations" addressed in

decisions by Pennsylvania state and federal courts regarding alter ego jurisdiction.  *Id.* at *7–9.

   Here, as in *Williams*, the evidence suggests that GPMI and LAC were intertwined to a

degree far beyond an ordinary parent-subsidiary relationship such that they were alter egos of

each other as well as instrumentalities of their ultimate parent company, OAO Lukoil.[9]  LAC

owned all of GPMI's stock, (De Laurentis Decl. ¶ 15),[10] and there was nearly complete overlap

among the officers and directors of both companies.  Specifically, as LAC acknowledges, from

2001 to 2006, GPMI's board initially consisted of Vadim Gluzman, Vagit Sharifov, Sem

Logovinsky, and Vincent De Laurentis; later in that period, Sharifov was replaced by Andrey

Bychenko.  (De Laurentis Decl. ¶ 32; Han Decl. Ex. 11-a.)[11]  As of 2009, the Commonwealth

indicates, GPMI's board consisted of Gluzman, Logovinsky, De Laurentis, and Ilya Borodin.

(Han Decl. Ex. 7-b.)  From 2001 to 2006, LAC's board consisted of Gluzman, De Laurentis, and

Alexander Matystyn.  (De Laurentis Decl. ¶ 32; Han Decl. Ex. 11-a.)  As of 2009, LAC's board

consisted of Gluzman, De Laurentis, and Vadim Vorobyev.  (Han Decl. Ex. 7-b.)

---

[9] As LAC correctly points out, the Commonwealth's brief repeatedly conflates LAC with the ultimate parent company, OAO Lukoil.  This conflation is misleading.  To the extent that such characterizations of the evidence conflict with the evidence itself, I do not credit them.  However, as discussed *infra*, such evidence is relevant to the extent it demonstrates that OAO Lukoil was directing the actions of GPMI through LAC, or put differently, to the extent it demonstrates that LAC was directing the actions of GPMI in service of OAO Lukoil's ultimate business goals.

[10] "De Laurentis Decl." refers to the Amended Declaration of Vincent De Laurentis, filed on January 8, 2016.  (Doc. 245.)

[11] "Han Decl." refers to the Declaration of Molly McGinley Han in Support of Plaintiff Commonwealth of Pennsylvania's Opposition to Lukoil Americas Corporation's Motion to Dismiss, filed on February 5, 2016.  (Doc. 263.)

Both GPMI and LAC also had nearly identical officers:  Gluzman served as chairman and CEO, De Laurentis served as president and COO, Michael Hantman served as senior VP and CFO, Logovinsky served as VP of wholesale and new business development,[12] Michael G. Lewis served as general counsel and corporate secretary, and Joseph Colangelo served as assistant corporate secretary.  (Han Decl. ¶ 7-b.)  Only one officer differed between the two companies:  Linda A. Raynor served as treasurer of GPMI; however, no treasurer is listed for LAC.  (*Id.*)  LAC did not have any non-officer employees.  (De Laurentis Decl. ¶ 13.)  Both companies acted not through board meetings, but through unanimous consents and resolutions, which were prepared—on at least one occasion by GPMI and LAC's shared counsel, (Han Decl. Ex. 11-a)—and sent to the individual board members and to OAO Lukoil for approval, (*id.*; De Laurentis Decl. ¶ 33.)

It is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."  *In re Latex Gloves Prods. Liab. Litig.*, No. MDL 1148, 2001 WL 964105, at *4 (E.D. Pa. Aug. 22, 2001) (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).  In particular, when a parent wholly owns its subsidiaries, "it is to be expected that there will be directors which are common to the boards of both."  *Id.* (quoting *Arch v. Am. Tobacco Co.*, 984 F. Supp. 830, 838 (E.D. Pa. 1997)).  Here, however, "the nearly complete congruence of the entities shows that [LAC] *can* exercise control over its subsidiar[y]," and other evidence suggests that it "actually *does* exert such control."  *Id.*; *see also Chocolate Confectionary*, 641 F. Supp. 2d at 400–03 (finding alter ego jurisdiction over parent where boards of parent and subsidiaries had identical membership, transacted business in

---

[12] Logovinsky testified in bankruptcy court that he was not aware of his title at LAC.  (Han Decl. Ex. 5-b, at 11:2-8.)

writing, shared payroll, parent's board occasionally bought and sold assets for subsidiary, financial statements and annual shareholder reports were consolidated, companies portrayed themselves to the public as a single company, parent approved all expenditures of the subsidiary).  Here, such other evidence includes, for example, in at least one transaction that involved both GPMI and LAC, the same individual—De Laurentis—signed on behalf of both companies.  Further, deposition testimony by GPMI and LAC officers demonstrates that GPMI received other instructions from LAC throughout its lifetime.  Although the record does not make clear what Gluzman's role was in LAC and OAO Lukoil prior to the acquisition of GPMI, Gluzman testified that he was involved in the acquisition, and that an unspecified "we" "renegotiated the master lease and . . . put together a new restated inventory master lease for 15 years."  (Han Decl. Ex. 5-a 967.)  Thereafter, Gluzman promoted De Laurentis, Hantman, and Logovinsky to their roles at GPMI as president, senior vice president and CFO, and vice president and head of new business, respectively.  (Han Decl. Ex. 5-a 956:9-21.)

After the acquisition, Gluzman testified, he "did a lot of work to sort of modernize the operation, technologically," brought in a supply agreement from British Petroleum to bolster the business, spent time getting to know GPMI's business operations, and worked to link GPMI's operations into OAO Lukoil's production of crude oil.  (*Id.* at 957:14–958:16.)  He further stated that he "gave [De Laurentis and Logovinsky] instructions" to expand GPMI's service stations without adding overhead in order to build revenues.  (*Id.* at 959:12-25.)  When De Laurentis and Logovinsky eventually presented Gluzman with the opportunity to buy the Conoco Phillips stations, Gluzman thought "[it] looked very good" and "told them to go ahead and get it done." (*Id.* at 960.)  While Gluzman may have ostensibly been providing these instructions within the scope of his role as chairman and CEO of GPMI, he was also the chairman and CEO of LAC,

and the evidence suggests he was fulfilling these roles in essentially at the same time rather than "chang[ing] hats." *Latex Gloves*, 2001 WL 964105, at *4. For example, in pitch documents relating to OAO Lukoil and GPMI's application for a loan to rebrand the ConocoPhillips stations, Gluzman is described only as the "Director and CEO of Lukoil Americas;" he is not described as an officer of GPMI or listed as a member of GPMI's management. (Han Decl. Ex. 2-a, at LAC002446, LAC002457.) Similarly, internally, LAC represented GPMI's assets and employees as its own. (Han Decl. Ex. 14-c (2008 Monthly Report indicating that Lukoil Americas Corporation had 1571 gas stations and 709 employees as of December 2008)). These facts demonstrate a blurring of the lines between corporate entities.

The Commonwealth identifies evidence concerning the blurring of the corporate separation between OAO Lukoil and GPMI. For example, OAO Lukoil explicitly stated in loan documents that it aimed to use GPMI as "the U.S. marketing arm of an international, vertically integrated petroleum supply chain" that would "drive increasing volumes of product through its network," (Han Decl. Ex. 2-a, at LAC002457), and that GPMI's acquisition of ConocoPhillips stations "is the foundation of a strategy to dramatically expand Lukoil's presence in the U.S.," (SAC ¶ 305). Gluzman also described OAO Lukoil as having a "very, very strict reporting system" for all its subsidiaries and rigorous oversight over each subsidiary's budget, to the extent that a GPMI staffer had to visit the Russian headquarters each quarter to defend the budget. (Han Decl. Ex. 5-a 964–65.) OAO Lukoil also directed GPMI to carry out a $50 million dollar marketing campaign for the Lukoil brand, (Han Decl. Ex. 2-a), used the GPMI stations as an asset of OAO Lukoil for the purposes of obtaining a loan, (Han Decl. Ex. 2-a, at LAC002476); and allowed use of the Lukoil mark on GPMI service stations, (*see id.* at LAC002460).

Although the above evidence presents strong support for control of GPMI by OAO

Lukoil, c*f. Barber*, 464 A.2d at 329–30 (overruling preliminary objections to alter ego

jurisdiction where parent company's prospectus stated that it had acquired the subsidiary to

obtain "control" of it and make it "the main channel for the expansion of [the parent's] industrial

activities of this type," and where several of parent's executives served on subsidiary's board and

participated in business decisions), as LAC correctly points out, this evidence is not necessarily

probative of LAC's use of GPMI as an instrumentality.  However, combined with the evidence

of the relationship between LAC and GPMI, including the overlap in executive personnel, I find

that it does give rise to a reasonable inference that LAC was either controlling GPMI in service

of OAO Lukoil's goals, or that OAO Lukoil was using LAC and GPMI interchangeably in

service of those goals—that is, in either case supporting a finding that LAC and GPMI were alter

egos for jurisdictional purposes.  For example, LAC provided the undercapitalized GPMI[13] with

key financing, as in *Williams*, and this financing was on several occasions provided or facilitated

by OAO Lukoil.  Specifically, in 2004, GPMI obtained a $360 million loan to purchase the

ConocoPhillips stations, which was guaranteed by LAC; as noted above, De Laurentis signed the

documents on behalf of both GPMI and LAC.  (SAC ¶¶ 305–06.)  In 2005, OAO Lukoil

facilitated a loan to GPMI to rebrand the ConocoPhillips stations as Lukoil stations; in the

application, Lukoil indicated that loan money would be paid to LAC, who would funnel it to

GPMI.  (Han Decl. Ex. 2-a, at LAC 002457, 2460, 2506.)  Over the years, GPMI began

generating negative cash flow and had to refinance a credit agreement from Lehman Brothers.

(De Laurentis Decl. ¶¶ 38–39.)  Even after cost-cutting, restructuring, and other measures,

---

[13] Notably, during GPMI's bankruptcy proceeding, an expert testified that GPMI did not "have any third-party sources of capital" and relied heavily on Lukoil for funding throughout its corporate lifetime.  (Han Decl. Ex. 12-b.)

GPMI's financial situation continued to deteriorate and it faced the maturation of hundreds of millions of dollars of debt. (*Id.* ¶¶ 40–42.) In August 2009, LAC provided GPMI with $340 million in capital infusions. (De Laurentis Decl. ¶ 42.) GPMI then began selling off portions of its business to various other Lukoil subsidiaries. (*Id.* at ¶¶ 40–43.)

Finally, the Commonwealth's allegations of a fraudulent transfer of GPMI's assets by LAC also support its assertion that LAC was using GPMI as an instrumentality. Indeed, Judge Scheindlin noted in a separate opinion in connection with a discovery dispute between the Commonwealth and LAC, that there was "sufficient factual support for the allegation that the GPMI restructuring was a fraudulent scheme to deprive creditors of GPMI's profitable assets." *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 180 F. Supp. 3d 273, 283 (S.D.N.Y. 2016).

LAC contends in opposition that piercing the corporate veil would be inappropriate because the two companies observed corporate formalities: according to De Laurentis, LAC and GPMI had separate bank accounts, separate books of account, separate financial statements, and separate letterhead. (De Laurentis Decl. ¶ 31.) However, mere observance of corporate formalities does not, on its own, defeat a finding of control where such a finding is otherwise supported by the evidence. In *Williams*, for example, the subsidiary maintained even more strict corporate formalities than GPMI—such as by maintaining not only separate bank accounts and financial records, but also by avoiding common officers, records, and active personnel—yet the court nevertheless found sufficient basis to pierce the corporate veil for jurisdictional purposes. *See* 2019 WL 4888570, at *10–13.

LAC also argues that it was merely a holding company that did not operate or have any employees and therefore could not have been involved in MTBE contamination in Pennsylvania.

(LAC Mem. 1–2.)  Courts have held that although jurisdictional contacts are imputed when a subsidiary is engaged in activities that the parent would have to undertake itself, that rule does not typically apply when the parent company is a holding company, as in such cases where "the subsidiary is not performing a function that the parent would otherwise have had to perform itself;" rather, "the holding company could simply hold another type of subsidiary." *Action Mfg.*, 375 F. Supp. 2d at 422 (quoting *Gallagher v. Mazda Motor of Am., Inc.,* 781 F. Supp. 1079, 1085 (E.D. Pa.1992)); *cf. Latex Gloves*, 2001 WL 964105, at *2 n.8.  Here, however, the evidence suggests that LAC was not merely a generic holding company, but rather was used by OAO Lukoil to purchase GPMI in order to advance a specific business objective; the fact that LAC did not maintain its own substantive operations does not defeat that inference at this stage.  *See Latex Gloves*, 2001 WL 964105, at *6 (imputing jurisdictional contacts to parent holding company because of the "virtually total interrelationship of the corporate family and the pyramidal absolute control of the holding company—all of which is presented to the public as one and the same entity").

Accordingly, I find that under Pennsylvania law, the Commonwealth has made out a prima facie case for alter ego jurisdiction over LAC on the basis of its contacts with GPMI.[14] Exercising such jurisdiction is also consistent with the federal Due Process clause.  "It is . . . well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process." *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).[15]

---

[14] Because I find that the court has personal jurisdiction over LAC on the basis of GPMI's contacts, I need not and do not reach the question of whether LAC may be haled into court on the basis of the jurisdictional contacts of its predecessor, Lukoil North America, raised in the Commonwealth's supplemental reply.  (*See* Docs. 282, 287.)

[15] As in Pennsylvania, the standard for jurisdictional veil-piercing is "less onerous" than the standard for liability veil-piercing, and federal courts in this circuit—applying New York Law—employ similar factors as in *Pennsylvania.  D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (affirming district court's finding of alter ego jurisdiction based on evidence of common ownership, financial dependency, and common control of marketing and operational policies).

Finally, although LAC disputes many of the Commonwealth's factual allegations—for

example, De Laurentis contends that he "remained principally responsible for managing the

company's day-to-day operations" and that "LAC left to GPMI decisions about how to run its

business of marketing and distributing petroleum products," (De Laurentis Decl. ¶¶ 29–30; *see

also id.* ¶ 36)—at this stage, I must resolve factual disputes in the Commonwealth's favor.

Ultimately, the Commonwealth would bear the burden of proving the facts it has averred

by a preponderance of the evidence at a hearing; indeed, LAC requests, and the Commonwealth

does not oppose, holding such a hearing.[16]   However, because, as detailed below, I find that the

Commonwealth has failed to state a claim against LAC, I find that any evidentiary hearing would

be moot, and therefore deny LAC's request.

### 2.   Failure to State a Claim

The Commonwealth alleges the following claims against LAC:  strict product liability

based on defective design (Count I); strict liability for failure to warn (Count II); public nuisance

(Count III); negligence (Count IV); and trespass (Count V).   In its brief, the Commonwealth

contends it also asserts a claim based on allegations that LAC wrongfully collected USTIF

money, (Pl.'s Opp. LAC 23 (citing SAC ¶¶ 123, 411–531)), but this statement is unsupported by

---

[16] Although LAC appears to be requesting an evidentiary hearing to resolve the instant motion, it cites no authority
to suggest a hearing is required at this stage.   To the contrary, on a 12(b)(2) motion, a plaintiff's burden is only to
make out a prima facie case.   *See Eades*, 799 F.3d at 167–68.   To the extent that LAC argues that in the Third
Circuit, a hearing is required to resolve a motion to dismiss for lack of personal jurisdiction, (Pl.'s Opp. LAC 21–22
& 22 n.9), this argument fails for two reasons.   As an initial matter, a transferee court must apply its own
"interpretations of federal law, not the constructions of federal law of the transferor circuit."   *Menowitz v. Brown*,
991 F.2d 36, 40 (2d Cir. 1993).   However, prudential concerns allow a federal court overseeing an MDL to "consult
the 'law of'" the transferor circuit, given that the case will ultimately be remanded there for trial.   *In re Refco, Inc.
Sec. Litig.*, 628 F. Supp. 2d 432, 439 (S.D.N.Y. 2008).   Nevertheless, LAC mischaracterizes Third Circuit law.   The
Third Circuit has held only that a plaintiff may not rest on the pleadings in opposing a motion to dismiss for lack of
personal jurisdiction, but rather must submit "actual proofs," which may take the form of documentary evidence.
*Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984).   An evidentiary hearing is not
required at this stage; rather, as in this Circuit, the plaintiff's burden in the face of a 12(b)(2) motion is to make a
prima facie showing of jurisdiction.   *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004). !

the Second Amended Complaint.  The Second Amended Complaint contains no allegation that

either GPMI or LAC or any predecessor in liability collected USTIF money.  Paragraphs 411

through 531 set forth unjust enrichment allegations based on wrongful collection of USTIF

money against "all Insurance Defendants," including specifically "BP Insurance Defendants,"

"Sunoco Insurance Defendants," the "Chevron Insurance Defendants," "ConocoPhillips

Insurance Defendants," the "Hess Insurance Defendants," the "Valero Insurance Defendants,"

"Kinder Morgan Insurance Defendants," the "Marathon Insurance Defendants," and the "Shell

Insurance Defendants" – but not GPMI, LAC, or any other related entity.[17]  Paragraph 123 lists

all the "Insurance Defendants," but again, this list does not include GPMI, LAC, nor any other

Lukoil entity.  Accordingly, to the extent that the Second Amended Complaint can be read to

assert a claim against LAC based on wrongful collection of USTIF money, that claim must be

dismissed as unsupported by allegations in the Second Amended Complaint.

LAC argues that the remaining claims, premised on conduct of GPMI, must be dismissed

because:  (1) LAC cannot be held liable for conduct of GPMI after it acquired GPMI because

GPMI's corporate veil cannot be pierced, and (2) LAC cannot be held liable for GPMI's conduct

prior to the acquisition because the Commonwealth has not properly pled successor liability.

(LAC Mem. 23–24.)  I address each of these arguments in turn.

### a.   Liability for Conduct After LAC Acquired GPMI

LAC contends—and the Commonwealth does not dispute—that in accordance with Judge

Scheindlin's earlier determination, Maryland law applies to whether GPMI's corporate veil

should be pierced for the substantive purpose of holding LAC liable.  *See March 2015 Order*,

2015 WL 1500181, at *4.  In Maryland, a corporation's veil will only be pierced "where it is

---

[17] These terms are defined in the Second Amended Complaint.

necessary to prevent fraud or enforce a paramount equity." *Serio v. Baystate Properties, LLC*, 60 A.3d 475, 488 (Md. Ct. Spec. App. 2013) (quoting Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc., 340 A.2d 225 (Md. 1975)); *see also Hildreth v. Tidewater Equip. Co.*, 838 A.2d 1204, 1210 (Md. 2003) (courts will disregard the corporate entity when "the corporation is used *as a mere shield for the perpetration of a fraud*" or where failing to disregard the corporate form will create "an inequitable result, involving fundamental unfairness").  "Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil." *Serio*, 60 A.3d at 484 (citation omitted).

LAC argues that under this standard, GPMI's veil cannot be pierced.  (LAC Mem. 23.) The Commonwealth does not directly address this argument, but rather argues that "the SAC thoroughly alleges . . . that LAC itself was conducting business in Pennsylvania through GPMI." (Pl.'s Opp. LAC 23.)  Although this may be true, it does not directly address LAC's argument. Indeed, despite acknowledging that all of its allegations against LAC are premised on primary conduct by GPMI, the Commonwealth does not even attempt to demonstrate how piercing GPMI's veil would prevent fraud or enforce a paramount equity, such that veil-piercing is warranted under Maryland law.

The Second Amended Complaint does allege that LAC fraudulently transferred GPMI's assets to LNA prior to GPMI's bankruptcy, (*see* SAC ¶¶ 316–331), and the Commonwealth concedes that this allegation is evidence only "of the extent to which LAC treated GPMI as an agent or division," (Pl.'s Opp. LAC 13), and does not otherwise suggest that this allegation should support piercing of the corporate veil.  Indeed, nothing in the Second Amended Complaint or Plaintiff's opposition brief suggests that the alleged fraudulent transfer of assets constitutes a fraud or inequity that could be prevented or mitigated by piercing GPMI's corporate

veil.  To the contrary, the Commonwealth (1) did not file a notice of claim in GPMI's

bankruptcy, *see generally* Liquidating Trustee's Motion to Enforce the Bar Date and in Aid of

Confirmation Concerning Liquidating Trust Distributions, *In re Getty Petroleum Mktg. Inc.*, No.

11-15606, ECF No. 1226 (Bankr. S.D.N.Y. July 24, 2014); (2) has limited its claim against

GPMI to recoverable insurance proceeds; and (3) acknowledges that GPMI's bankruptcy trustee

filed an adversary proceeding against OAO Lukoil, LAC, and LNA for fraudulent transfer,

which was settled for $93 million in cash to be paid to the GPMI trust.  (SAC ¶¶ 74, 331.)

   I have not found, and the Commonwealth does not cite, any case suggesting that an

alleged fraudulent transfer of assets to avoid subjecting those assets to a bankruptcy proceeding

that is ultimately settled among the relevant parties can constitute "fraud or similar conduct" that

would justify piercing the corporate veil under Maryland law.  Rather, Maryland courts pierce

the corporate veil on the basis of fraud "where the corporate existence is used to perpetrate a

fraud, or to hide or distort the truth," typically against the plaintiff seeking to recover.  *Quinn v.

Quinn*, 276 A.2d 425, 430 (Md. Ct. Spec. App. 1971); *see also Colandrea v. Colandrea*, 401

A.2d 480, 485 (Md. Ct. Spec. App. 1979) (piercing veil to hold stockholder liable, where

stockholder entered into a stock redemption agreement with plaintiff on behalf of defendant

corporation with no intention of paying the notes, then later raided the corporation in a manner

that prevented it from paying the notes back).  In contrast, the Commonwealth has not alleged

that LAC used GPMI's corporate form to commit a fraud; rather, it alleges that GPMI was itself

the victim of a fraud.  The Commonwealth has not alleged that it was a victim or that it has been

impacted by the purported fraud in any way.  Accordingly, the "fraud" exception to the ordinary

rule of corporate separateness is inapplicable.

   As to the "paramount inequity" exception, no Maryland appellate court has ultimately

"found an equitable interest more important than the state's interest in limited shareholder liability." *Serio*, 60 A.3d at 484–85.  Indeed, the Maryland Court of Appeals has declined to pierce the corporate veil even where the targeted corporation had engaged in "conduct . . . clearly designed to evade a legal obligation and create corporate insolvency." *Id.* at 486 (citing, ultimately, *Bart Arconti*, 340 A.2d 225).  Specifically, in *Bart Arconti*, two brothers owned the defendant corporation as well as two other corporations.  After the defendant corporation defaulted on a construction project, the brothers allowed that corporation to become dormant and placed all new business in the other two corporations, which used the defendant's assets without compensation and credited their personal indebtedness to the defendant against salaries allegedly owed to them from the defendant.  340 A.3d at 230–31.  The Court of Appeals reversed the district court's decision to pierce the defendant corporation's corporate veil because no prior Maryland case "ha[d] allowed the corporate entity to be disregarded merely because it wished to prevent an 'evasion of legal obligations' absent evidence of fraud or similar conduct."  *Id.* at 235.  Accordingly—as I have already concluded that the alleged fraudulent transfer of GPMI's assets does not constitute the type of "fraud" that warrants piercing the corporate veil under Maryland law—I find that the paramount inequity exception is also inapplicable.  The Commonwealth has failed to allege sufficient facts to state a claim against LAC on a veil-piercing theory, and so any claims premised on GPMI's conduct following its acquisition by LAC must be dismissed.

  b.  Liability for Conduct Before LAC Acquired GPMI

Under Pennsylvania law,[18] a firm does not assume the liabilities of another firm simply

---

[18] The parties have not addressed what state's law should apply to any claim based on successor liability.  However, "the first step in a choice of law analysis under Pennsylvania law is to determine whether an actual conflict exists between the laws of the competing states.  If no actual conflict exists, further analysis is unnecessary." *McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 106 (Pa. Super. Ct. 2015) (internal quotation and alteration marks omitted).  Here, the possible alternative sources of law to Pennsylvania are Maryland, GPMI's state of incorporation, and Delaware, LAC's state of incorporation.  Both states employ tests for identifying exceptions to the general rule barring successor liability that are nearly identical to Pennsylvania's.  *See Martin v. TWP Enters.*

by buying its assets; it only assumes such liabilities if (1) the purchaser expressly or implicitly agrees to assume liability; (2) the transaction was entered into fraudulently for the purpose of escaping liability; (3) the purchase amounts to a consolidation or merger; or (4) the purchaser is a mere continuation of the seller. *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017); *see also Cont'l Ins. Co. v. Schneider, Inc.*, 873 A.2d 1286, 1291 (Pa. 2005). !

The Commonwealth makes the conclusory statement, unaccompanied by any factual allegations, that "LAC is a successor in liability for pre-2001 mtbe contamination." (Pl.'s Opp. LAC 24 (citing SAC ¶ 345).) This statement is unaccompanied by any factual allegations that would suggest that LAC's purchase of GPMI falls into any of the four exceptions to the general rule precluding successor liability. The Second Amended Complaint is similarly lacking in specific allegations. Even at the pleading stage, a Plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 570. With regard to its claims against LAC premised on successor liability, the Commonwealth has fallen far short of this burden. Accordingly, any claims against LAC premised on pre-acquisition conduct by GPMI must be dismissed.

### B.  *Certain Defendants' Motion to Dismiss*

Certain Defendants move to dismiss Count III, public nuisance; Counts VI and VII, which assert violations of the Pennsylvania UTPCPL, as well the Commonwealth's claim for injunctive relief pursuant to the those counts; and Count XI, violations of the Pennsylvania STSPA. I address each of these counts in turn below.

---

*Inc.*, 132 A.3d 361, 371 (Md. Ct. Spec. App. 2016); *Ross v. Desa Holdings Corp.*, C.A. No. 05C–05–013 MMJ, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008). Accordingly, because I cannot find, and the parties have not identified, any actual conflict between the laws of the competing states, I apply Pennsylvania law to this issue.

### 1.   Count III:  Public Nuisance

In July 2015, Judge Scheindlin held that the Commonwealth had not alleged that Defendants had "possession or control over the site[s] from which the nuisance originate[d]," a requirement for a public nuisance claim under Pennsylvania law.  *July 2015 Opinion*, 2015 WL 4092326, at *3 (quoting *Diess v. Pa. Dep't of Transp.*, 935 A.2d 895, 904–05 (Pa. Commw. Ct. 2007)).  As a result, she dismissed the Commonwealth's public nuisance claim with prejudice to the extent it was "premised on defendants' *manufacture or distribution* of MTBE or MTBE gasoline."  *Id.*  The Commonwealth now repleads that claim, identically phrased, on the ground that it has joined new defendants and is entitled to "preserve this claim for appeal."  (SAC ¶¶ 367–74; Pl.'s Opp. Defs.' 2.)[19]  Putting to the side the fact that the Commonwealth repleads this claim against previously named Defendants, despite the fact that it was dismissed with prejudice, the Commonwealth has still not alleged, even in a conclusory fashion, that any Defendants had "possession or control over the site[s] from which the nuisance originate[d]."  *Diess*, 935 A.2d at 904.  Accordingly, for the reasons stated in Judge Scheindlin's previous decision and as stated above, this claim must be dismissed.[20]

### 2.   Counts VI and VII:  Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

#### a.   Applicable Law

The UTPCPL proscribes a broad range of "[u]nfair methods of competition" and "unfair or deceptive acts or practices," 73 P.S. §§201-3–201-10, including but not limited to:

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a

---

[19] "Pl.'s Opp. Defs.'" refers to the Memorandum in Opposition to Certain Defendants' Motion to Dismiss Plaintiff Commonwealth of Pennsylvania's Second Amended Complaint, filed on February 5, 2016.  (Doc. 261.)

[20] Defendants Pennzoil-Quaker State Company and LAC filed notices of joinder in the motion to dismiss.  (*See* Docs. 242, 243.)  Therefore, claims under Count III against them are also dismissed.

sponsorship, approval, status, affiliation or connection that he does not have;

. . .

(vii) Representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model, if they are of another;

…

(viii) Disparaging the goods, services, or business of another by false or misleading representation of fact;

…

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

*Id.* §201-2.  "Deception . . . is defined as intentional misleading by falsehood spoken or acted."

*Montanez v. HSBC Mortg. Corp. (USA),* 876 F. Supp. 2d 504, 519 (E.D. Pa. 2012) (citation

omitted).  Pennsylvania courts have repeatedly emphasized that "[t]he UTPCPL is to be

construed liberally to effectuate its objective of protecting consumers of [the] Commonwealth

from fraud and unfair or deceptive business practices."  *Comonwealth ex rel. Corbett v. Peoples*

*Benefit Servs., Inc.*, 923 A.2d 1230, 1236 (Pa. Commw. Ct. 2007) (citing *Commonwealth v.*

*Monumental Props., Inc.,* 329 A.2d 812, 816 (Pa. 1974)).

The UTPCPL permits Pennsylvania's Attorney General to seek a temporary or permanent

injunction against any prohibited conduct if the Attorney General "has reason to believe that any

person is using or is about to use any method, act or practice."  73 P.S. § 201-4.

### b.   Application

Judge Scheindlin previously dismissed the Commonwealth's UTPCPL claim because the

relevant allegations by the Commonwealth were insufficiently specific and/or did not satisfy the

requirements of the UTPCPL.  *July 2015 Opinion*, 2015 WL 4092326, at *5.  The

Commonwealth now repleads its claim in Count VI, based on Certain Defendants' MSDSs, and

Count VII, based on various public statements made by Certain Defendants. Certain Defendants move to dismiss both counts, and also move to dismiss the Commonwealth's request for injunctive relief on its UTPCPL claims. (Defs.' Mem. 2–22.)[21]

          i.  *Count VI: The Material Safety Data Sheets*

Count VI alleges that all Defendants produced and disseminated MSDSs that misleadingly indicated that MTBE gasoline could be handled according to the standard of care applicable to regular gasoline, and failed to warn downstream customers about the dangers of and proper handling of MTBE and MTBE gasoline. (SAC ¶ 238.) The Commonwealth contends these alleged misrepresentations constitute a violation of subsections (v) and (xxi) of the UTPCPL.

As an initial matter, a UTPCPL claim may only be based on an omission if the maker of the statements has a duty to disclose. *DeSimone v. U.S. Claims Servs., Inc.*, CIVIL ACTION NO. 19-6150, 2020 WL 1164794, at *3 (E.D. Pa. Mar. 11, 2020) (citing *Smith v. Renaut*, 564 A.2d 188, 192 (Pa. Super. Ct. 1989); *Silverstein v. Percudani*, No. 3:04CV1262, 2005 WL 1252199, at *8 (M.D. Pa. May 26, 2005). The Commonwealth has set forth no allegation that would permit the inference that Defendants had such a duty, so any viable claim must be based on an affirmative statement.[22]

---

[21] "Defs.' Mem." refers to the Memorandum of Law in Support of Certain Defendants' Motion to Dismiss, filed on January 8, 2016. (Doc. 238.)

[22] The Commonwealth cites *Commonwealth by Zimmerman v. Bell Tel. Co.*, 551 A.2d 602, 604 (Pa. Cmwlth 1988), and *Commonwealth by Zimmerman v. Society of 28th Div., A.E.F., Corp.*, 538 A.2d 76, 80 (Pa. Cmwlth. 1987), for the proposition that a subsection (v) claim may be based on omissions. Both cases involved solicitors' failure to disclose material information to potential customers or donors. While neither case explicitly explained why it found omissions to be actionable, Pennsylvania courts have held "that a duty to speak exists, in the context of a business transaction with an ordinary non-business consumer, when the seller has superior knowledge of a material fact that is unavailable to the consumer." *See Zwiercan v. Gen. Motors Corp.*, No. 3235 JUNE TERM 1999, 2002 WL 31053838, at *4 (Pa. Com. Pl. Sept. 11, 2002). The instant case is not analogous.

Although the Commonwealth contends that the MSDSs[23] falsely represented that MTBE gasoline could be handled according to the same standard of care as ordinary gasoline, this broad, conclusory statement is not supported by the allegations of the Second Amended Complaint.  No MSDS is alleged to have explicitly stated that MTBE gasoline and regular gasoline could be handled in the same manner, nor has the Commonwealth provided any context or explanation to suggest that the text could mislead a downstream purchaser or customer into believing that regular gasoline and MTBE gasoline could be handled in the same manner.  The Commonwealth has not alleged what kinds of hazard disclosures and precautions were provided in the MSDSs for regular gasoline to support its argument that Certain Defendants' implicitly represented that precautions for handling both substances were the same, nor has it even alleged what specific standard of care was actually required for MTBE gasoline.  These failures are in and of themselves fatal to the Commonwealth's claims.  Moreover, the Commonwealth's allegations about Shell and Amoco's internal policies are vague, and it has offered no allegations to suggest that the standard of care set forth in the MSDSs was actually in opposition to the precautions used by Certain Defendants.  Indeed, the example MSDSs advise the handler to ensure the MTBE gasoline does not enter the water supply; the Commonwealth has not provided any allegations or context as to why these warnings were insufficient or misleading.

---

[23] Defendants contend that section 201-2(4)(v) of the UTPCPL, sometimes referred to just as "subsection (v)," is limited to false advertising claims and that the Commonwealth has failed to show that the MSDSs constituted advertising that influenced purchasing decisions, or that they contained false representations.  (Defs.' Mem. 8–9.)  At the time the instant motion was briefed, there was substantial authority for the proposition that this part of the UTPCPL required a plaintiff to show that the offending statement was false, "qualif[ied] as advertising," *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 466 (E.D. Pa. 2009), and was "likely to make a difference in [a] purchasing decision," *Weinberg v. Sun Co., Inc.*, 777 A.2d 442, 445–46 (Pa. 2001).  Since then, however, the Pennsylvania Supreme Court has disavowed *Seldon* and held that "subsection (v) . . . encompass[es] activities other than 'advertising,'" and that a statement need not have impacted a purchasing decision to be actionable.  *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1028 (Pa. 2018) (finding the Commonwealth had stated a subsection (v) claim based on allegations that a nursing home made representations to individuals after they had become residents of facility about "the extent and quality of services to be provided").  Thus, misleading MSDSs could, in theory, be actionable.

Accordingly, because the Commonwealth has not established a duty to disclose by Certain Defendants that would provide a basis to find an omission actionable, and because it has not set forth any other misrepresentations or misleading conduct, it has failed to state a claim under any subsection of the UTPCPL.[24]

### ii.  *Public Statements*

The Commonwealth also alleges that Certain Defendants' various public statements about ethanol and MTBE violated the UTPCPL because they were false and deceptive and because they improperly disparaged the products of their competitors.  (Pls.' Opp. Defs.' 17–18, 20–22.)  I address each statement separately.

### a)  Government Gas Advertisement

Certain Defendants contend that the "Government Gas" advertisement is protected by *Noerr-Pennington* immunity; that the advertisement was not placed in the conduct of "trade and commerce," as required to be actionable under the UTPCPL; and that Defendants cannot be liable on the basis of the advertisement because it was placed not by them, but by API.  (Defs.' Mem. 14–16.)

The *Noerr-Pennington* doctrine—developed in the context of antitrust litigation by a pair of Supreme Court cases, *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961)—holds that the First Amendment right to petition provides immunity from antitrust suits based on activity petitioning the government for redress of grievances.  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972).  Such activity may include judicial and administrative

---

[24] Defendants Pennzoil-Quaker State Company and LAC filed notices of joinder in the motion to dismiss.  (*See* Docs. 242, 243.)  Therefore, claims under Count VI against them are also dismissed.

proceedings, *see id.*, lobbying, *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 381 (1991), and related activities, including publicity campaigns directed toward obtaining governmental action, *see Noerr*, 365 U.S. at 140–41.  It has not yet been explicitly determined whether *Noerr-Pennington* immunity is mandated in all contexts by the United States Constitution.  *See Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 701 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) (collecting cases).  Nevertheless, because it is essentially "an application of the [F]irst [A]mendment," *Suburban Restoration Co. v. ACMAT Corp.,* 700 F.2d 98, 100–102 (2d Cir. 1983), courts "routinely" extend its application to "a wide range civil of actions under both state and federal law," *In re Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019), *reconsideration denied*, 17 Civ. 7394 (CM), 2019 WL 763532 (S.D.N.Y. Feb. 6, 2019), *supplemented*, 17 Civ. 7394 (CM), 2019 WL 759262 (S.D.N.Y. Feb. 7, 2019); *see also Klatch-Maynard v. Sugarloaf*, No. 3:06cv845, 2010 WL 5789390, at *5 (M.D. Pa. Nov. 8, 2010) (applying the doctrine to claims of violations of substantive due process and equal protection rights, conspiracy, and various other state law claims), *report and recommendation adopted*, No. 3:06CV845, 2011 WL 532168 (M.D. Pa. Feb. 8, 2011); *Firetree, Ltd. v. Fairchild*, 920 A.2d 913, 918–19 (Pa. Commw. Ct. 2007) (interference with contractual relations and interference with prospective contractual relations); *Herr v. Pequea Twp.,* 274 F.3d 109, 119–20 (3d Cir.2001) (§ 1983 claim), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (summary order) ("Noerr Pennington immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference."); *Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128–29 (3d Cir.1999) (tortious interference and unfair competition).

Here, the "Government Gas" advertisement—which exhorts readers to contact their legislators and ask them to vote against specific amendments to the Clean Air Act—is a piece of political advocacy plainly placed as part of an effort to influence government action, and therefore entitled to *Noerr-Pennington* protection.  The fact that the advertisement was allegedly placed in service of commercial objectives is irrelevant.  Indeed, the instant case somewhat resembles the facts of *Noerr* itself:  there, defendant railroads had conducted a publicity campaign "designed to influence the passage of state laws relating to truck weight limits and tax rates on heavy trucks, and to encourage a more rigid enforcement of state laws penalizing trucks for overweight loads and other traffic violations."  365 U.S. at 131.  The Supreme Court held that such conduct was not actionable under the Sherman Act, in part because holding otherwise would impair the First Amendment right to petition.  *See id.* at 137–38.  The Court specifically found irrelevant the plaintiffs' allegation that the campaign was motivated by a desire to destroy their competitors and to interfere with their competitors' customer relationships.  *Id.* at 129, 138.  It is also irrelevant that the advertisement allegedly contained misrepresentations.  The defendants in *Noerr* were alleged to have "employed deception and misrepresentation and unethical tactics," which are "condoned in the political arena."  *Trucking Unlimited*, 404 U.S. at 513 (citing *Noerr*, 365 U.S. at 141).

Although the Commonwealth objects to Certain Defendants' failure to cite any cases in which a court has granted *Noerr-Pennington* protection to a defendant in a UTPCPL claim, (*see* Pls.' Opp. Defs. 20), this omission appears to be because no Pennsylvania state or federal court has yet been faced with this precise issue.  The Commonwealth offers no argument or authority—and I cannot find any such authority—suggesting that UTPCPL claims differ from the many Pennsylvania state law causes of action that courts have found to be subject to *Noerr-*

*Pennington*.  Moreover, courts have applied the doctrine to consumer protection statutes in other states.  *See, e.g.*, *Green Mountain Realty Corp. v. Fifth Est. Tower, LLC*, 13 A.3d 123, 131–32 (N.H. 2010) (applying doctrine to claims brought under the New Hampshire Consumer Protection Act); *People ex rel. Gallegos v. Pac. Lumber Co.*, 158 Cal. App. 4th 950, 964–66 (2008) (applying doctrine to California's Unfair Competition Law), *as modified* (Feb. 1, 2008).

The Commonwealth also argues, in a conclusory fashion, that the advertisement is actually actionable commercial speech.  (Pl.'s Opp. Defs.' 20–21 (citing *Kuwait & Gulf Link Transportation Co. v. Doe*, 92 A.3d 41, 46–48 (Pa. Super. Ct. 2014) ("Under the First Amendment, different types of speech receive different levels of protection.  The United States Supreme Court has held, for example, political speech receives extensive constitutional protection; commercial speech receives an intermediate level of protection; and obscene speech receives no First Amendment protection.")  Tellingly, the Commonwealth does not address the authority cited by Certain Defendants, and provides no case law or argument for why the Government Gas advertisement should be deemed commercial speech rather than political speech.  Contrary to the Commonwealth's argument, the Supreme Court specifically held in *Noerr* that "a publicity campaign to influence governmental action falls clearly into the category of political activity." 365 U.S. at 140–41.

Accordingly, I find that the *Noerr-Pennington* doctrine protects Certain Defendants from UTPCPL liability on the basis of the Government Gas advertisement.  Consequently, I need not and do not reach Defendants' remaining contentions.

### b)  Newspaper Articles

The Commonwealth also contends that Defendants' statements to various newspapers beginning in 1990 violated sections (v), (vii), and (viii) of the UTPCPL.  (Pl.'s Opp. Defs.' 21.) As an initial matter, the Commonwealth has only identified statements by Conoco and Shell;

48

while the Commonwealth alleges generally that the Philadelphia Inquirer reported that Arco,

Diamond Shamrock/Exxon Mobil, Marathon, and Phillips were beginning to sell cleaner

gasolines, they are not alleged to have made any specific statements,[25] nor are they even alleged

to have been the Inquirer's source for the statement that they were beginning to sell cleaner

gasolines.

The only specific statements or acts alleged[26] are as follows:

- Conoco's spokesman stated that "[T]he future is in gasolines, in fuels that are more
  environmentally compatible."  (SAC ¶ 269.)

- A Shell vice president stated that Shell "came to the conclusion that the customer . . .
  really wanted an environmentally enhanced fuel."  (*Id.*)

- Shell marketed a gasoline with a high proportion of MTBE as "cleaner."  (*Id.* ¶ 270.)
  Shell's president described this new blend as "an important step in the right direction
  for cleaner air" and stated that it "reflect[ed] Shell's commitment to make
  environmental considerations a priority in development of our new products and
  processes."  (*Id.*)

As an initial matter, none of these statements can be said to be false representations of fact about

MTBE or about ethanol within the meanings of subsections (v), (vii), and (viii), nor can they be

read to disparage ethanol within the meaning of subsection (viii).

Moreover, I find that these statements constitute non-actionable puffery.  The

---

[25] The article does report that Exxon has "announced . . . [an] ambitious plan to market reformulated gasoline," (SAC ¶ 269), but I do not see how such an announcement could be construed as misleading.

[26] To the extent the Commonwealth seeks to base this claim on Certain Defendants' failure to notify the public about the risks of MTBE contamination, such a claim would fail.  I have already held that the Commonwealth has not alleged any duty to disclose on the part of Certain Defendants' that would allow omissions to be actionable.  I also note that omissions in a newspaper article reported and written by a third party are even less likely to be actionable, given that a defendant does not have control over which of its statements are included and which are excluded in the final article.

Pennsylvania Supreme Court has held that a UTPCPL claim requires that the complained-of

"acts and practices . . . [be] capable of being interpreted in a misleading way;" but where "the

impression created by the statement is one of exaggeration or overstatement expressed in broad

language, it may be deemed non-actionable puffery." *Commonwealth by Shapiro v. Golden Gate*

*Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018) (citing *Castrol Inc. v. Pennzoil Co*., 987

F.2d 939, 945 (3d Cir. 1993)).

> There are two basic categories of "puffing" statements. The first involves hyperbolic boasting or bluster that no reasonable consumers would believe to be true; for example, a statement that a weight loss product will cause the pounds to "melt away in the blink of an eye." *See* 5 McCarthy on Trademarks and Unfair Competition § 27:38 (5th ed.). The second category involves claims of superiority over a competitor's product, *id.*, such as statements that a laboratory imaging device provided "unprecedented clarity," or the advertisement of a product as "the complete sports drink." *See Cytyc Corp. v. Neuromedical Systems, Inc.*, 12 F. Supp. 2d 296, 300-01 (D. Neb. 1998); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 526 (S.D.N.Y. 2003).

*Id.* "A salient characteristic of statements deemed to be 'puffery' is that consumers understand

that the statements are not to be taken literally." *Id.* "In contrast, where a plaintiff establishes

that a statement contains believable, inaccurate statements of fact, the statement falls beyond the

reach of a puffery defense." *Id.* at 1024. "Determination of whether a statement

is puffery requires consideration of the overall impression of the statement and the context in

which it is made." *Id.* While the question of whether a statement is to be deemed puffery is

typically one of fact, on occasion "the answer is so clear that it may be decided as a matter of

law." *Id.* (citing federal and state cases).

The representations by Conoco and Shell detailed in the Second Amended Complaint are

precisely the type of "excessively vague" statements that courts have found to be puffery. *See id.*

They offer subjective opinions about customer desires and about the projected future of

gasolines, but offer no inaccurate statements of fact—indeed, they offer no statements of fact at

all.  Because they do not contain any factual content, it is impossible for a consumer to take them literally and thereby be misled.  *See Cohan v. United Servs. Auto. Ass'n*, No. 683 EDA 2016, 2017 WL 57152, at *4 (Pa. Super. Ct. Jan. 5, 2017) (affirming trial court's dismissal after trial of UTPCPL claim based on advertising statements that defendant could be "trust[ed] to meet all [customers'] insurance needs," and "would protect the insurance needs" of customers" because such statements were "commercial puffery"); *Sabol v. Ford Motor Co.*, Civil Action No. 14-6654, 2015 WL 4378504, at *3 (E.D. Pa. July 16, 2015) (advertising statements that car was "safe" and "reliable" constituted puffery because they were not measurable); *cf. Golden Gate*, 194 A.3d at 1024 (court could not conclude as a matter of law that statements that nursing home would provide food, water, and clean linens were puffery).

The Commonwealth argues in opposition that the promotional statements are "affirmative false and misleading representation[s]" when "read in the context of the other allegations in the SAC."  (Pl.'s Opp. Defs.' 22.)  It is true that a court must consider "the overall impressions created by the statements at issue from the view of the consumer when reaching its conclusions that they amounted to mere puffing."  *Golden Gate*, 194 A.3d at 1024.  However, the Commonwealth does not point to any specific "context" that was available to readers and consumers[27] that would make these representations misleading, beyond generic, conclusory allegations such as that Certain Defendants "misleadingly and deceptively represent[ed] to the Pennsylvania public that MTBE gasoline had purported environmental virtues and benefits." (*See, e.g.*, SAC ¶¶ 403–10).  Even taken together, the Commonwealth's allegations are

---

[27] The Commonwealth does allege in a separate part of the Second Amended Complaint that various Certain Defendants made misleading statements about MTBE to the EPA and others in the industry, but there is no suggestion that these statements were available to consumers that influenced their perceptions of the statements made in the newspaper articles, and the Commonwealth does not suggest, either in the Second Amended Complaint or its briefs, that it is arguing that those allegations are relevant to its UTPCPL claim.

insufficient to state a UTPCPL claim based on the newspaper articles.  Accordingly, Count VII must be dismissed.[28]

<i>iii. Availability of Injunctive Relief</i>

Finally, because I have found that none of the Commonwealth's UTPCPL claims are viable, I need not and do not reach the parties' arguments as to whether injunctive relief is available under the UTPCPL.

### 3.  Count IX:  Violation of the Pennsylvania Storage Tank and Spill Prevention Act

a.  <u>Applicable Law</u>

The USTIF made primary indemnity claim payments to eligible UST owners or operators for costs incurred to undertake corrective action to remediate UST releases.  (SAC ¶¶ 23, 27.) The STSPA imposes two requirements for applicants to receive payments from the USTIF. First, applicants are only eligible for reimbursement for releases that occurred after February 1, 1994.  25 Pa. Code § 977.33(b)(3).  Second, owners and operators of USTs must "cooperate" with the USTIF by providing "all information . . . pertinent to the claim" upon request by the Fund.  *Id.* § 977.32.

> [T]he import of 25 Pa. Code § 977.32(a)(1) and (b) mandates that during the investigation of a claim, a claimant must "cooperate" by revealing all information in its possession that falls within the scope of the request and additional information that is generally associated with the request and is reasonably likely to be germane to the claim.  To interpret 25 Pa. Code § 977.32(a)(1) in a more restrictive manner . . . would eviscerate the terms "including," "other," and "pertinent," which connote that in a request for information, a claimant will not only disclose . . . the precise information requested, but also supplemental and related information that is relevant to the request and resolution of the claim.

---

[28] Defendants Pennzoil-Quaker State Company and LAC filed notices of joinder in the motion to dismiss.  (*See* Docs. 242, 243.)  Therefore, claims under Count VII against them are also dismissed.

*Gnagey Gas & Oil Co. v. Pa.Underground Storage Tank Indemnification Fund,*

82 A.3d 485, 504 (Pa. Commw. Ct. 2005) (citation omitted).

To obtain a claim payment, a participant must make a claim with the USTIF according to certain procedures set out by the STSPA. *See* 25 Pa. Code §§ 977.31–977.40. In particular, the STSPA requires that any participant "cooperate" with the USTIF. *See id.* § 977.32. In addition, the STSPA restricts USTIF coverage for releases prior to February 1, 1994. Upon payment of an eligible claim, USTIF was subrogated to all rights of recovery of an owner or operator against any person for the costs of remediation or other indemnity payments by the Fund, including against their insurance carriers. *Id.* § 977.40(a).

### b. Application

In the First Amended Complaint, the Commonwealth alleged that Certain Defendants violated the Pennsylvania STSPA by (1) submitting claims for releases that occurred before February 1, 1994 in violation of 25 Pa. Code §§ 977.31 and 977.33(b)(3); (2) failing to disclose inventory records, maintenance records, company leak reports and UST equipment repair and replacement records which would have established dates of releases; and (3) failing to protect the Commonwealth's subrogation rights by entering into settlement agreements and releasing insurance policies that provided coverage for the investigation and remediation of environmental contamination caused by leaking UST systems. (*See* Doc. 36, at ¶¶ 420–25.) In her May 2015 Opinion, Judge Scheindlin dismissed the portion of the Commonwealth's claim based on Certain Defendants' alleged failure to cooperate with the investigation, on the ground that there is no implied duty to protect the Commonwealth's subrogation rights. *May 2015 Opinion*, 2015 WL 2354582, at *5. Rather, she held, *Gnagey* "makes clear that this duty to cooperate is not triggered until the Fund makes a request for information or an investigation has been commenced." *Id.* Because the Commonwealth had not alleged that it had commenced an

53

investigation or made a request for an investigation, they had not alleged that the duty to cooperate had been triggered, and so the claim failed as a matter of law. *Id.* However, because it was conceivable that the Commonwealth had in fact done one of these things, she granted the Commonwealth leave to replead, noting that "*Gnagey* is useful precedent for the notion that, upon a request, an applicant must provide not just 'the precise information requested [but also] related information that is relevant to the request.'" *Id.* (citing *Gnagey*, 82 A.3d at 485).

In the Second Amended Complaint, the Commonwealth repleads its STSPA claim in its entirety, with the addition of a violation based on failure to "disclose the existence and potential applicability of their various insurance policies during the claim investigation . . . which included an investigation into potential subrogation." (SAC ¶ 530). Specifically, the Commonwealth alleges that all USTIF claims are investigated by a third-party administrator—ICF International—which contacts the claimant or its assigned agent and requests information and documentation relevant to the reported loss. (*Id.* ¶¶ 526, 529.) The request seeks information with respect to "1) description of tanks; 2) site description; 3) description of loss; and 4) subrogation." (*Id.* ¶ 526.)

I find that given that the Commonwealth's broad right of subrogation under the STSPA necessarily includes subrogation against a claimant's insurance carrier, the Commonwealth has adequately alleged that information on private insurance coverage constituted "related information" relevant to the Commonwealth's request for information on subrogation, and that in failing to disclose that information, Certain Defendants' violated their duty to cooperate.

Certain Defendants argue the Commonwealth's alleged inquiry into "'subrogation,' absent any specific inquiry regarding insurance, did not impose a duty on the Insurance Defendants to disclose their insurance policies." (Defs.' Mem. 23.) According to Certain

Defendants, in order to trigger their duty to disclose, the Commonwealth was required to specifically request information about their private insurance. (Defs.' Reply 9.)[29]  I disagree.  As Judge Scheindlin noted, *Gnagey* demonstrates that upon a request for information, a claimant must "reveal[] all information in its possession that falls within the scope of the request and additional information that is generally associated with the request and is reasonably likely to be germane to the claim."  82 A.3d at 504.  Indeed, Certain Defendants ask me to interpret section 977.32(a)(1) in precisely the "more restrictive manner" that the *Gnagey* court warned against, as it would "eviscerate the terms . . . 'including,' 'other,' and 'pertinent'" contained in the statute. *Id.*  Under Certain Defendants' reading of the cooperation requirement, a "claimant [could] disclose, in a technical sense, [only] the precise information requested," and avoid providing the "supplemental and related information that is relevant to the request and resolution of the claim." *Cf. id.*

Certain Defendants make two additional arguments.  First, they contend that their insurance coverage was not related to a subrogation request because standard commercial general liability insurance policies in the mid-1980s contained absolute pollution exclusions that barred coverage due to harm caused by gasoline leakage into the soil.  Whether their insurance policies were irrelevant to the Commonwealth's right of subrogation is a question of fact not appropriate for resolution at this time; the Commonwealth has sufficiently alleged that information about private insurance coverage was related to their investigation into potential subrogation.  Second, Certain Defendants contend that a "traditional" subrogation claim does not involve insurance at all, but rather "consist of the Fund standing in the shoes of a UST owner to

---

[29] "Defs.' Reply" refers to the Reply Memorandum of Law in Support of Certain Defendants' Motion to Dismiss, filed on February 19, 2016.  (Doc. 265.)

bring a claim against a third-party tortfeasor who caused a UST release." (Defs.' Mem. 24.) They offer no authority for the proposition that a subrogation claim cannot involve insurance; to the contrary, the USTIF provides for a general right of subrogation against "any person for the costs of remediation." 25 Pa. Code § 977.40(a); *see also May 2015 Opinion*, 2015 WL 2354582, at *1 ("The USTIF Act provides that once the Fund reimburses the Fund applicants for remediation costs, the Commonwealth steps into their shoes and inherits their legal rights against their insurance carriers."). Accordingly, the Commonwealth's claim under the STSPA survives.

## V.  <u>Conclusion</u>

For the foregoing reason, the pending motions are GRANTED IN PART and DENIED IN PART.  LAC's motion to dismiss for lack of personal jurisdiction is DENIED, but its motion to dismiss for failure to state a claim is GRANTED, and all claims against LAC are DISMISSED.  Certain Defendants' motion to dismiss Count III for a public nuisance claim and Counts VI and VII, under the UTPCPL, is GRANTED.  Counts III, VI, and VII against Pennzoil-Quaker State Company and LAC are also DISMISSED.  However, Certain Defendants' motion to dismiss Count IX, the Commonwealth's claim under the STSPA, is DENIED.

Certain Defendants are directed to file an answer within sixty (60) days of this Opinion & Order.

The Clerk of Court is respectfully directed to terminate the motions at docket entries 237 and 243.

SO ORDERED.

Dated: August 2, 2021
     New York, New York

                         Vernon S. Broderick
                         United States District Judge