**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW**
**YORK**

| | |
|---|---|
| **In Re: Methyl Tertiary Butyl Ether ("MTBE")** | **Master File No.  1:00 – 1898** |
| **Products Liability Litigation** | **MDL 1358 (SAS)** |

**This document refers to:**

*All Cases in MDL 1358 in which the Chevron*
*Defendants have been properly named and served,*
*and for which an answer is due.*

### THE CHEVRON DEFENDANTS' FOURTEENTH AMENDED MASTER
### <u>ANSWER AND AFFIRMATIVE DEFENSES</u>

Pursuant to the Master Answer agreement among the parties, CMO #6, and the Court's

August 3, 2021 Opinion & Order (ECF No. 4627), Defendants Chevron U.S.A. Inc. (including

its divisions Chevron Products Company and ChevronTexaco Global Trading), Chevron

Corporation (f/k/a ChevronTexaco Corporation), Texaco Inc., TRMI-H LLC (f/k/a TRMI

Holdings Inc., f/k/a Texaco Refining and Marketing Inc.), Kewanee Industries, Inc., Unocal

Corporation, Union Oil Company of California, Chevron Puerto Rico, LLC (f/k/a Texaco Puerto

Rico Inc., n/k/a PC Puerto Rico LLC), Chevron Estrella Puerto Rico Inc. (f/k/a  Texaco  Estrella

Puerto  Rico  Inc.),   Chevron  International  Oil  Company, Inc.,  Chevron  Caribbean  Inc.,

Texaco International Trader Inc. and Four Star Oil and Gas Company (collectively, "the Chevron

Defendants") answer the complaints in the MDL 1358 cases for which an answer is due, and

in which they have been properly named and served, as follows:

## I.       STATEMENTS REGARDING SELECT ALLEGATIONS

### A.       Basic Defendant Information

Defendant Chevron U.S.A. Inc. (f/k/a Gulf Oil Corporation) is a Pennsylvania corporation headquartered in San Ramon, California.  Chevron U.S.A. Inc. (d/b/a Chevron Products Company, d/b/a Chevron Chemical Company) is the only Chevron Defendant that currently refines, distributes, markets or sells gasoline products in the United States.  Chevron U.S.A. Inc. notes, however, that it sold substantially all of its Chevron and legacy Gulf retail outlets and other marketing assets in the Northeast region of the United States in 1986 and it has not been involved at all in the retail market in that region of the country since 2010, if not earlier. Chevron U.S.A. Inc. sold its refinery in Philadelphia, Pennsylvania in 1994.

Defendant Chevron Corporation (f/k/a ChevronTexaco Corporation)[1] is a Delaware corporation headquartered in San Ramon, California.  Chevron Corporation did not refine, market, distribute or sell gasoline or neat MTBE in the United States, or Puerto Rico, at any time during the time period relevant to this litigation.  Chevron Corporation does not conduct business in, or otherwise have any of the requisite contacts with, the Commonwealth of Puerto Rico or the States of Illinois, Indiana, Iowa, Missouri, Massachusetts, Pennsylvania, New Jersey, New York or Vermont.  Consequently, the Court lacks personal jurisdiction over Chevron Corporation with regard to any MDL 1358 cases filed in these jurisdictions. Nothing herein shall be deemed a waiver or relinquishment of Chevron Corporation's personal jurisdiction defense in such cases. Further, Chevron Corporation was not at any time known as or a successor in liability to Chevron U.S.A.  Inc., Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company or Chevron Chemical Company.

---

[1] From October 2001 until May 2005, Chevron Corporation was known as ChevronTexaco Corporation.

Four Star Oil & Gas Company ("Four Star") is a Delaware Corporation having offices in San Ramon, California.

Defendant Texaco Inc. is a Delaware corporation having offices in San Ramon, California. Texaco Inc. no longer engages in active operations in the United States.  In or about December 1984, Texaco Inc. transferred substantially all of its domestic gasoline refining and marketing assets to an independent subsidiary then known as Texaco Refining and Marketing Inc. (n/k/a TRMI-H LLC).  Texaco Inc. has not refined or marketed gasoline in the United States at any time since December 1984.  Texaco Inc. was not at any time known as or successor in liability to Texaco Refining and Marketing Inc.

Defendant TRMI-H LLC (f/k/a TRMI Holdings Inc., f/k/a Texaco Refining and Marketing Inc.) is a Delaware corporation having offices in San Ramon, California.  TRMI-H LLC no longer engages in active operations in the United States.  Prior to 1985, TRMI-H LLC was known as Getty Refining and Marketing Company and refined and marketed Getty-branded gasoline in certain areas of the United States.  From approximately January 1985 until December 1988, TRMI-H LLC was known as Texaco Refining and Marketing Inc. and refined and marketed Texaco-branded gasoline in certain areas of the United States. In or about December 1988, Texaco Refining and Marketing Inc. (n/k/a TRMI-H LLC) exited the U.S. gasoline market when it transferred all of its operating assets to Star Enterprise and an entity now known as TMR Company.  At that time, Texaco Refining and Marketing Inc.'s name was changed to TRMI Holding Inc.

Defendant Kewanee Industries, Inc. is a Delaware corporation having offices in San Ramon, California.  Kewanee Industries, Inc. did not refine, market or distribute gasoline (with or without MTBE) in the United States during the relevant time period for this case.

Defendant Unocal Corporation ("Unocal") is a Delaware corporation having offices in San Ramon, California.  Unocal is a holding company that no longer engages in active operations in the United States.  Unocal did not refine, market or distribute gasoline (with or without MTBE) in the United States during the relevant time period for these cases.

Unocal's former operating subsidiary, defendant Union Oil Company of California ("Union Oil"), is a California corporation headquartered in San Ramon, California.  Union Oil no longer engages in active operations in the United States. Union Oil refined, manufactured and/or distributed gasoline containing MTBE in certain areas of the United States from approximately 1986 until 1997, when Union Oil exited the U.S. gasoline market.  At various times prior to 1997, Union Oil operated refineries in the following locations:  Wilmington, CA; San Francisco, CA; Beaumont, Texas; Lemont, Illinois; and Health, Ohio.  Union Oil began blending MTBE into gasoline at its California refineries in approximately 1986.  Union Oil did not blend MTBE into gasoline at its Illinois or Ohio refineries.  Upon information and belief, Union Oil may have blended MTBE into certain gasoline produced at its former Beaumont Refinery in approximately 1988, shortly before that refinery was closed in 1989.  On March 31, 1997, Union Oil sold all of its refining, marketing and distribution assets to Tosco Corporation and exited the U.S. gasoline market.

The following Chevron and Texaco entities not identified above are named as defendants in 07-CV-10470:  Chevron Puerto Rico, LLC (f/k/a Texaco Puerto Rico Inc., n/k/a PC Puerto Rico LLC), Chevron Estrella Puerto Rico Inc. (f/k/a Texaco Estrella Puerto Rico Inc.), Chevron International Oil Company, Inc., and Chevron Caribbean Inc.  These defendants are also named in 14-CV-1014, as well as the following Chevron and Texaco entities or divisions not identified above: ChevronTexaco Global Trading and Texaco International Trader Inc. (collectively the

"Chevron Puerto Rico Defendants").  Chevron Estrella Puerto Rico, Inc. (f/k/a Texaco Estrella Puerto Rico, Inc.), Chevron International Oil Company Inc. and Chevron Caribbean Inc. never marketed or distributed gasoline or MTBE in the Commonwealth of Puerto Rico.  Chevron Estrella Puerto Rico, Inc. was a Delaware corporation and was properly dissolved under Delaware law on April 9, 2008.  ChevronTexaco Global Trading was division of Chevron U.S.A. Inc. and never issued stock.  Chevron Texaco Global Trading ceased to exist on June 30, 2004.  Texaco International Trader Inc. was a Delaware corporation and was properly dissolved under Delaware law on July 21, 2002.  Chevron Puerto Rico, LLC (f/k/a Texaco Puerto Rico Inc.) marketed gasoline in the Commonwealth of Puerto Rico until July 31, 2012. The Chevron Puerto Rico Defendants, along with Chevron Corporation and Chevron U.S.A. Inc., deny any liability for the alleged damages, costs and other relief sought by Plaintiffs.

B.            Allegations Regarding Production of MTBE or TBA

Defendant Chevron U.S.A. Inc. (d/b/a Chevron Products Company) manufactured and blended MTBE for a period of time at its refineries in the following locations: El Segundo, CA; Richmond, CA; Pascagoula, MS; Philadelphia, PA; and Port Arthur, TX. Chevron U.S.A. Inc. no longer manufactures or blends MTBE at any of its refineries in the United States. Chevron U.S.A. Inc. has never manufactured or blended MTBE at any refinery in the Commonwealth of Puerto Rico.

Defendant Chevron Corporation (f/k/a ChevronTexaco Corporation) has never manufactured or blended gasoline containing MTBE or neat MTBE in the United States or the Commonwealth of Puerto Rico.  Chevron Corporation exited the U.S. gasoline market in or about 1977, when its domestic operating assets were transferred to Chevron U.S.A.  Inc.

Defendant Four Star Oil and Gas Company did not refine, manufacture, distribute or sell gasoline containing MTBE, or neat MTBE, in the United States during the relevant time period for these cases.

Defendant Texaco Inc. has never manufactured MTBE in the United States or the Commonwealth of Puerto Rico.  In the past, two former subsidiaries of Texaco Inc., Texaco Chemical Company (n/k/a Huntsman Chemical) and Texaco Chemical Inc., manufactured MTBE at facilities located in Port Neches, Texas. Those facilities were sold to Huntsman Specialty Chemicals Corporation or related entities in 1994 and 1997, respectively.  For a period of time prior to 1985, Texaco Inc. blended MTBE into some, but not all, premium grade gasoline products at its former refinery located in Port Arthur, TX.

Defendant TRMI-H LLC (f/k/a TRMI Holdings Inc., f/k/a Texaco Refining and Marketing Inc.) has never manufactured neat MTBE in the United States or the Commonwealth of Puerto Rico.  For a period of time between 1985 and 1989, TRMI-H LLC (then known as Texaco Refining and Marketing Inc.) blended MTBE into certain gasoline products at its former refineries located in Port Arthur, TX and/or Convent, LA.   In or about January 1989, the Port Arthur, TX and Convent, LA refineries were sold to Star Enterprise.

Defendant Kewanee Industries, Inc. did not refine, manufacture, distribute or sell gasoline containing MTBE, or neat MTBE, in the United States during the relevant time period for these cases.

Defendants Unocal and Union Oil never manufactured or sold neat MTBE in the United States.  As noted above, Union Oil produced gasoline containing MTBE at its two former California refineries for a period of time prior to its divestiture of all refining and marketing assets to Tosco Corporation in 1997.  Union Oil also may have produced gasoline containing

MTBE at its former Beaumont, TX refinery for a short period of time in 1988 shortly before that refinery was closed in 1989.

The Chevron Puerto Rico Defendants have never produced or sold neat MTBE in the Commonwealth of Puerto Rico.

**C.**      **Allegations Regarding Properties and Behavior of MTBE**

The Chevron Defendants admit that MTBE is an aliphatic ether that does not occur naturally.  The Chevron Defendants admit that there are various methods for the production of MTBE and that one method of production is from methanol and isobutylene.

The Chevron Defendants state that solubility and mobility are relative properties and that while MTBE and other ethers may be more soluble and mobile in water than certain gasoline components, such as the BTEX compounds, they are less soluble and mobile in water than other components sometimes blended into gasoline, such as ethanol.  The Chevron Defendants further state that MTBE's behavior in the environment—and its behavior relative to other gasoline constituents—is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

The Chevron Defendants state that while under certain conditions MTBE may biodegrade less readily than some other components of gasoline, MTBE has been found to naturally attenuate and biodegrade in numerous ways.

**D.**      **Allegations Regarding Properties and Behavior of TBA**

The Chevron Defendants admit that TBA is the product of the hydrolysis of isobutylene. The Chevron Defendants admit that TBA can be an intermediate product of MTBE biodegradation.

The Chevron Defendants state that solubility and mobility are relative properties and that TBA is more soluble and mobile in water than certain gasoline components, such as the BTEX

compounds. The Chevron Defendants further state that TBA's behavior in the environment—and its behavior relative to other components of gasoline—is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

## E.        Allegations Regarding Taste and Odor

The Chevron Defendants admit that individuals vary in their ability to detect the taste and odor of MTBE in water.  The Chevron Defendants state that responsible federal and state regulatory agencies have considered and adopted standards fully protective of MTBE taste and odor concerns.

## F.        Allegations Regarding Health Effects of MTBE

Plaintiffs' allegations of dire human health concerns from MTBE are unsubstantiated. MTBE has been studied publicly by scientists and government agencies for more than 20 years. MTBE has never been reliably linked to cancer, and there is no consensus in the scientific field that it is carcinogenic; indeed, major world health organizations have long refused to list MTBE as a human carcinogen.  The Chevron Defendants state that responsible federal and state regulatory agencies have considered and adopted standards fully protective of any alleged health concerns related to MTBE.

## G.        Allegations Regarding Storage and Handling of Gasoline

The Chevron Defendants admit that it is commonly known that gasoline is sometimes released into the environment from USTs and other means, and state that, according to reports, major oil companies have spent hundreds of millions of dollars or more over the past 30 years to eliminate or reduce leaks, and to improve leak detection. The Chevron Defendants state that they are aware that most adults understand that gasoline should be handled carefully and should not be spilled.

**H.**         **Allegations Regarding MTBE and Groundwater**

The Chevron Defendants deny that the release of MTBE in groundwater is widespread or that the release of MTBE in groundwater is or was inevitable and foreseeable.   Further answering, the Chevron Defendants state that at all times they have fully supported and encouraged the safe handling and storage of gasoline in compliance with all laws, rules and regulations pertaining to same, irrespective of the substances used in gasoline at the time.   The Chevron Defendants deny they are responsible for the release of MTBE, TBA or gasoline containing MTBE or TBA, or for the presence of MTBE or TBA in groundwater.

The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Ad Hoc Committee on MTBE or the American Petroleum Institute's Toxicology Committee.

The Chevron Defendants deny Plaintiffs' allegations that they had knowledge of any unique environmental harm attributable to the use of MTBE in gasoline.

The Chevron Defendants deny Plaintiffs' allegations that MTBE posed an unreasonable risk to groundwater.  The Chevron Defendants deny that they concealed or conveyed partial or incorrect information regarding the nature and impact of MTBE.  The Chevron Defendants deny that they possessed superior knowledge in comparison to governmental agencies with respect to gasoline and MTBE.  The Chevron Defendants deny that they breached any duties to Plaintiffs, any government agency, gasoline handlers or the general public regarding MTBE or TBA or gasoline containing MTBE or TBA.

The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding reports on the incidence of MTBE releases in groundwater by the United States Geological Survey.

9

The Report of the EPA Blue Ribbon Panel on MTBE speaks for itself, and therefore the Chevron Defendants deny the allegations that purport to describe or characterize it.

The Chevron Defendants admit that in 2001 the EPA provided advance notice of its intent to initiate a rulemaking pursuant to the Toxic Substances Control Act ("TSCA") to eliminate or limit the use of MTBE in gasoline, but this rulemaking was not completed. The Chevron Defendants admit that certain legislatures or regulatory bodies passed laws or adopted regulations to limit or eliminate the use of MTBE in gasoline, but others, including the federal government and the Commonwealth of Pennsylvania, have not.

**I.         Allegations Regarding Knowledge of MTBE Contamination at Particular Locations In 1980s**

The complaints purport to describe various publicly reported incidents of MTBE contamination in New Jersey, New York and Maine in the 1980s. The Chevron Defendants state that it was widely known among government regulators in the 1980s that various incidents involving MTBE contamination—including the ones Plaintiffs' complaints regularly list—had occurred.

The Chevron Defendants admit that the 1986 Garrett and Moreau paper described MTBE presence in certain wells in Maine. The Chevron Defendants admit that information about MTBE was known to government and the scientific community, as the 1986 Garrett and Moreau paper illustrates.

**J.         Allegations Regarding Participation In Industry Associations or Lobbying Activities**

The chemical properties of ethers like MTBE have been known in the public arena for many years. Plaintiffs claim that Defendants somehow hid this information from them, or from federal or state regulators, is baseless. The Chevron Defendants deny that they had any

agreement with another defendant to withhold from plaintiffs or government regulators information concerning MTBE.

The Chevron Defendants state that prior to 1990, Congress was preparing to take action to address the Nation's smog problem.  The Chevron Defendants admit that federal government agencies were aware of MTBE's chemical characteristics in 1986 or earlier, and that EPA held public meetings about MTBE in 1986.  Like the federal government, one or more of the Chevron Defendants were aware of the Garrett and Moreau paper in or about 1986.

The Chevron Defendants admit that one or more employees of certain Chevron Defendants may have participated in an American Petroleum Institute ("API") committee called the Toxicology Committee.  The Chevron Defendants admit that a Testing Consent Order was entered with EPA in or about 1988 by various major oil companies.

In response to plaintiffs' allegation that "the petroleum industry, including some of the MTBE Defendants, lobbied Congress to adopt the Reformulated Gasoline Program ('RFG Program') as part of the 1990 Amendments to the Clean Air Act," the Chevron Defendants state that many major oil companies in fact actively resisted the RFG Program's requirement of oxygen content levels.

**K.**          **Allegations Regarding Representations About Testing Under the Toxic Substances Control Act (TSCA) in the Late 1980s**

The 1986 Notice published by the federal Interagency Testing Committee ("ITC") speaks for itself and therefore the Chevron Defendants deny the allegations that purport to describe or characterize it.

The Chevron Defendants deny that they made any misrepresentations regarding MTBE testing to the ITC or the EPA, directly or indirectly.  The Chevron Defendants deny that they obstructed health and environmental safety research concerning MTBE, or concealed

information concerning MTBE and groundwater.  The Chevron Defendants deny that any industry group or any other Defendant named in the MTBE lawsuits made any representations about MTBE's health or safety to the public or government officials on their behalf or with their approval.

The Chevron Defendants further deny that representations or communications of other Defendants or industry trade associations are evidence of any improper act, omission or breach of any duty on the part of the Chevron Defendants.

**L.**     **Allegations Regarding Requirements and Effects of the 1990 Clean Air Act Amendments**

The Chevron Defendants state that although the 1990 Clean Air Act Amendments ("CAAA") did not literally require use of MTBE as a gasoline additive, in practical terms the CAAA certainly did compel MTBE's use. EPA and Congress knew that the oxygen requirements of the Act could not and would not be met without MTBE. The Chevron Defendants state that beginning in the late 1970s, following the U.S. EPA's mandate to reduce lead in gasoline, most U.S. refiners began evaluating oxygenates and octane enhancers such as ethanol and MTBE.  In 1990, with the amendments to the Clean Air Act, the federal government mandated an increase in the use of oxygenates (up to 2.7% oxygen content) to meet ambient carbon monoxide air requirements in winter gasoline in many cities (beginning in 1992).  In 1995, various oxygenates were extended by regulation to year-round use for severe, non-attainment ozone areas in the United States.  Reformulated gasolines used since that time have sometimes contained between 10% and 15% MTBE by volume, or up to 10% ethanol, to meet government mandates on oxygenate content.

The Chevron Defendants deny that ethanol was available in sufficient supply to fully meet the demand for oxygenated gasoline in the RFG and oxyfuel regions when the

Amendments requiring 2% oxygen content in year-round gasoline in areas using RFG became effective.

The Chevron Defendants state that they complied with the legal requirements of the lead phase-out, the RFG Program and the Oxygenated Fuel Program, to the extent applicable to their activities. The Chevron Defendants further state that several government agencies have concluded that the use of MTBE in gasoline has contributed substantially to reducing air pollution.

**M.        Allegations Regarding Representations About Gasoline With MTBE**

The Chevron Defendants deny that they misrepresented the properties of MTBE to Plaintiffs, any government agency, gasoline handlers or the public, or withheld information about MTBE. The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning when the public started to become aware of potential risks associated with releases of gasoline containing MTBE.

The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning representations made by George Dominguez in April 1987 to the Conference on Alcohols and Octane. The Chevron Defendants state that the 1996 pamphlet published and distributed by the OFA and other documents referenced and cited in the complaints speak for themselves, and the Chevron Defendants deny the allegations that purport to summarize and characterize these documents on that basis.

The Chevron Defendants deny they knew, or should have known, that MTBE was difficult and costly to remediate. The Chevron Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning what

alternatives gasoline handlers and the general public might have sought or the circumstances under which gasoline handlers and the public might have demanded MTBE-free gasoline.

The Chevron Defendants deny they breached any duty to warn or deprived Plaintiffs, any government agency, gasoline handlers or the public of any facts.

**N.      Allegations Regarding the Use of MTBE in Gasoline After Creation of the RFG Program**

The Chevron Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the production of MTBE nationally, and the use and concentrations of MTBE in gasoline by the petroleum industry after the creation of the RFG Program.  With regard to the allegations that Defendants sold gasoline with "elevated" or "high" concentrations of MTBE, the Chevron Defendants deny the implication that the use of MTBE or that a certain concentration of MTBE in their gasoline was illegal or improper.   Chevron Defendants deny that MTBE became its "oxygenate of choice" and that it "decided to forego safer oxygenates, such as ethanol."  The Chevron Defendants further state that, due to a myriad of issues with ethanol, including complexities regarding its supply and transport, ethanol was not available to satisfy all of the requirements of the RFG Program.  Further answering, the Chevron Defendants state that their products fully complied with all applicable state, commonwealth, and federal requirements regarding fuel content.

**O.      Allegations Regarding MTBE-Related Actions Taken By State or Federal Governmental Bodies**

The Chevron Defendants state that in 2000, EPA provided advance notice of its intent to initiate a rulemaking pursuant to the Toxic Substances Control Act ("TSCA") to eliminate or limit the use of MTBE as a fuel additive.  No such rulemaking was ever initiated.  The Chevron Defendants state that certain proposed legislation in the U.S. Congress may limit the use of MTBE in gasoline in the future.  The Chevron Defendants state that certain state legislatures or

regulatory bodies have passed laws or adopted regulations to limit or eliminate the use of MTBE in gasoline.  The details of such laws are a matter of public record.

**P.       Allegations Regarding Plaintiffs' Claimed Inability To Identify Relevant Sources of Gasoline Leaks Or Spills Affecting a Given Site**

Gasoline leaks, whether containing MTBE or not, are frequently traceable to a specific "point source," limited to the immediate geographic area of the source, and remediable.  The Chevron Defendants deny that gasoline can never be traced from a contamination site to its terminal or refinery source.

**Q.       Allegations Purporting To Quote Or Summarize Documents**

Numerous paragraphs in each complaint purport to quote from or summarize documents, statutes and regulations.  These written materials speak for themselves. The documents, statutes and regulations referenced by plaintiffs, which are not attached to the complaints, are the best evidence of their content, and the Chevron Defendants therefore deny plaintiffs' attempts to summarize or characterize the contents of these written materials.

**R.       Allegations Regarding Defendants Unrelated To The Chevron Defendants**

The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the matters averred in the complaints regarding the specific statements, acts or omissions of defendants unrelated to the Chevron Defendants.

**S.       Allegations Regarding Particular Claims or Counts**

In response to the portions of the complaints purporting to state particular common law or statutory claims, the Chevron Defendants incorporate each paragraph of this Master Answer as if fully restated herein.  The Chevron Defendants deny they are liable for any legal claim in any MDL 1358 complaint.

**T.**          **Allegations Regarding Claimed Injuries or Damages**

Some complaints make claims about contamination of specific wells or water resources, and others do not.  The Chevron Defendants are without knowledge or information sufficient to form a belief as to the truth of the matters averred in the complaints regarding specific incidents of alleged contamination.  The Chevron Defendants believe publicly available documents and discovery to be, or that have been, supplied by plaintiffs will demonstrate, or have demonstrated, that many of the wells or water resources at issue have not been impacted by MTBE, or have been impacted only at levels well below state action standards for MTBE.

With regard to alleged damages, the allegations require no further answer.  To the extent that further answer is deemed necessary, the Chevron Defendants admit that plaintiffs seek the relief mentioned in the complaints, but deny that plaintiffs are entitled to any relief.

**U.**          **Plaintiffs' Demands for Jury Trials**

Plaintiffs in all actions have demanded a trial by jury of all claims asserted in the complaints.   These jury demands require no answer.   To the extent any answer is deemed necessary, the Chevron Defendants admit that the plaintiffs demand jury trials, but deny that they are entitled to them on some or all of their claims.

**V.**          **Plaintiffs' Allegations of Intentional, Willful, Deliberate, or Negligent Acts**

The Chevron Defendants deny that they intentionally, willfully, deliberately, or negligently committed any acts that caused or foreseeably could have caused harm to plaintiffs or any other party.

**W.**          **Certain Plaintiffs' Allegations of Representational Standing**

Certain California plaintiffs have alleged a right to bring an action in a representative capacity.  By orders dated June 9 and 22, 2005, the Court either struck all such allegations or confirmed that such allegations have been disavowed by the plaintiff.  On the basis of these

Court orders, the Chevron Defendants decline to answer these allegations.  To the extent any answer is deemed necessary, the Chevron Defendants deny that any plaintiff has standing to bring claims in a representative capacity.

**X.        Certain Plaintiffs' Allegations of Ownership of Groundwater Resources**

To the extent that plaintiffs allege that they own or have the authority to protect groundwater, groundwater resources, water resources, water supplies, water rights, or drinking water wells, or any other right in and to water or groundwater, the Chevron Defendants deny these allegations and deny that these plaintiffs have standing to bring any claim based on allegations of property damage on behalf of themselves or any other person or entity.

**Y.        Certain Plaintiffs' Allegations of Injury to Natural Resources**

Certain Plaintiffs' complaints contain allegations of damage to natural resources and seek compensation and other relief as the alleged trustee and/or owner of those natural resources.  The Chevron Defendants admit that groundwater, surface waters, wetlands and other ecological resources exist within the states and commonwealths at issue in MDL 1358 ("MDL states"); admit that some of those resources are privately owned and some are not; admit that some natural resources may and do provide commercial, industrial, recreational, and other services to the people of the MDL states and to the economies of the MDL states.

The Chevron Defendants further admit that the police power of certain Plaintiffs extends to the protection and conservation of certain natural resources which are not the private property of any person or entity; admit that by a longstanding legal fiction this proposition is sometimes inexactly expressed by saying that a state or commonwealth is the owner or trustee of natural resources for the benefit of its people or citizens; admit that certain governmental agencies have limited regulatory authority with respect to natural resources as provided by law.  The Chevron Defendants deny that they are liable for natural resources damages.

**Z.**          **Certain Plaintiffs' Allegations of Parens Patriae Status**

The Chevron Defendants deny that any Plaintiffs' assertion of alleged parens patriae status alleviates any common law burdens of proof or of a Plaintiff's need to meet required elements of common law and statutory claims. The Chevron Defendants further deny that parens patriae status is appropriate for commonwealth-wide or state-wide relief where there is an insufficient showing of MTBE impact.

**AA.**          **Regulatory Powers of Other Agencies**

Certain California plaintiffs allege that they are entitled to assert claims to protect groundwater resources or the environment without regard to any impact on water supply wells owned or operated by them. The Chevron Defendants deny that these plaintiffs possess any such right. The Chevron Defendants further allege that, pursuant to statutes duly enacted by the California legislature, state agencies that are not parties to these lawsuits have been delegated the power and authority to (1) determine what maximum levels of contaminants, including MTBE and/or TBA, are permissible in potable water distributed in California and (2) manage activities to investigate, delineate, remediate and cleanup actual or suspected MTBE and/or TBA contamination, including determining when sufficient cleanup has been achieved.

**BB.**          **California Civil Code Section 1882 Claims**

Certain California plaintiffs have alleged causes of action and/or prayers for treble damages and attorneys' fees based on California Civil Code § 1882 et seq. By order dated May 31, 2005, the Court dismissed and struck these allegations from the complaints. On the basis of the Court order, the Chevron Defendants decline to answer these allegations. To the extent any answer is deemed necessary, the Chevron Defendants deny that any plaintiff is entitled to recovery under California Civil Code § 1882 et seq.

**CC.**          **Certain Plaintiff's Allegations of Public Nuisance**

The Commonwealth of Pennsylvania brought a claim against the Chevron Defendants for public nuisance in Count III of the complaint.  By Order dated August 3, 2021, the Court granted the Chevron Defendants' motion to dismiss the public nuisance claim in Count III of the complaint.  On the basis of that Court Order, the Chevron Defendants decline to answer these allegations.  To the extent any answer is deemed necessary, the Chevron Defendants deny liability for public nuisance.

**DD.**          **The Commonwealth of Pennsylvania's Allegations Under the Pennsylvania Unfair Trade Practices and Consumer Protection Law**

The Commonwealth of Pennsylvania's complaint contains allegations that Defendants engaged in deceptive or unfair trade practices.  The Chevron Defendants deny that they engaged in any such activity.   On August 2, 2021, the Court dismissed the Commonwealth of Pennsylvania's claims under the Pennsylvania Uniform Trade Practices and Consumer Protection Law.  On the basis of the Court's order, the Chevron Defendants decline to answer Counts VI and VII of the Second Amended Complaint filed by the Commonwealth of Pennsylvania and any allegations relating to their business practices or any allegedly deceptive or misleading conduct that can be actionable under the Pennsylvania Uniform Trade Practices and Consumer Protection Law.   To the extent an answer is deemed necessary, the Chevron Defendants deny the allegations that relate to Counts VI and VIII of the Commonwealth of Pennsylvania's Second Amended Complaint and deny that they engaged in any conduct or practice that is or was deceptive, misleading, fraudulent, or unfair or that is, or could be, actionable under the Pennsylvania Uniform Trade Practices and Consumer Protection Law or any other similar law.  The Chevron Defendants further deny that they deceived, misled, or defrauded any governmental agency, customer, or consumer.

**EE.**          **Allegations Regarding Claims of Trespass**

Some complaints contain allegations that Defendants are liable for trespass. The Chevron Defendants deny that they engaged in any such activity or are liable for any such claims. On July 2, 2015, the Court dismissed the Commonwealth of Pennsylvania's trespass claims with prejudice. On the basis of the Court's Order, the Chevron Defendants decline to answer Count V of the Second Amended Complaint filed by the Commonwealth of Pennsylvania and any allegations relating to its claim for trespass. To the extent an answer is deemed necessary, the Chevron Defendants deny the allegations that relate to Count V of the Commonwealth of Pennsylvania's Second Amended Complaint and deny that they are liable for trespass.

**FF.**          **Response To TSCA Allegations**

The Chevron Defendants generally deny that they have violated TSCA. TSCA does not require submission of the sort of data that plaintiffs allege the Chevron Defendants should have submitted to EPA regarding incidences of releases of gasoline or the occurrence of MTBE. The Chevron Defendants have submitted extensive information and data about releases of gasoline to the proper authorities. EPA's 2000 Advance Notice of Proposed Rulemaking placed no legal obligation of disclosure on the Chevron Defendants. Moreover, an Advance Notice of Proposed Rulemaking is not a rule promulgated under TSCA and therefore cannot provide the basis for a TSCA citizen suit.

Even if information about gasoline releases or the occurrence of MTBE were within the scope of TSCA, there could be no violation for failure to submit such information because EPA already has extensive information on those topics, and under EPA guidelines there is no need to report information to EPA under TSCA when EPA already is aware of essentially the same information. EPA is well-informed about releases from service stations and the occurrence of

MTBE.  EPA has a special department, the Office of Underground Storage Tanks, which gathers and publishes information about the extent of releases of gasoline and the occurrence of MTBE. Likewise, EPA receives voluminous data on those subjects from other federal agencies.  The Chevron Defendants further deny that plaintiffs have complied with the statutory requirements for filing a citizen suit under TSCA.

**GG.        Plaintiffs' Allegations Regarding MTBE's Degradation Product: TBA**

The Chevron Defendants admit that TBA is the product of the hydrolysis of isobutylene.  The Chevron Defendants admit that TBA can be an intermediate product of MTBE biodegradation.  The Chevron Defendants are without sufficient knowledge or information as to the truth of the remaining allegations concerning the use of TBA as an oxygenate in gasoline.

The Chevron Defendants state that solubility and mobility are relative properties and that TBA is more soluble and mobile in water than certain gasoline components.  The Chevron Defendants further state that TBA's behavior in the environment—and its behavior relative to BTEX—is dependent on a variety of factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

The Chevron Defendants are without sufficient knowledge or information as to the truth of the remaining allegations concerning the properties, characteristics, persistence, and remediation of TBA in groundwater, or its presence in water supplies.

The Chevron Defendants are without sufficient knowledge or information as to the truth of the allegations concerning the health effects of TBA.

## II.        <u>GENERAL DENIAL OF REMAINING ALLEGATIONS</u>

The Chevron Defendants deny the remaining allegations in the complaints in MDL 1358 cases for which an answer is presently required, and in which they have been properly named and served.

## III.        <u>RESERVATION OF RIGHT TO AMEND</u>

The Chevron Defendants reserve the right to amend this Master Answer.

## IV.        <u>AFFIRMATIVE DEFENSES APPLICABLE TO ALL CASES</u>

For their separate defenses to the complaints in MDL 1358 cases for which an answer is presently required, and in which they have been properly named and served, the Chevron Defendants state as follows:

1.       Plaintiffs' claims are barred in whole or in part by the doctrine of federal preemption.  Specifically, the complaints and each purported cause of action are barred, in whole or in part, by, including but not limited to, the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2; the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*; the Toxic Substances Control Act, 15 U.S.C. §§ 2601, *et seq.*; and rules, regulations, and decisions thereunder.

2.       At all relevant times, the Chevron Defendants' actions and products complied with and were undertaken pursuant to applicable federal, state, and local laws, rules, regulations and specifications.

3.       Plaintiffs' claims are barred in whole or in part because federal, state and/or local authorities and agencies have mandated, directed, approved and/or ratified the alleged actions or omissions of the Chevron Defendants.

4.      All acts and conduct of the Chevron Defendants, as alleged in the complaints, conformed to and were pursuant to statutes, government regulations and industry standards, and were based upon the state of knowledge existing at all material times alleged in the complaints.

5.      The relief sought by plaintiffs' complaints is, in whole or in part, within the particular expertise of and is being addressed by federal and state governments, and their relevant agencies, and thus this Court should decline to exercise jurisdiction over this matter pursuant to the doctrine of primary jurisdiction.

6.      Plaintiffs have failed to exhaust their administrative remedies.

7.      Plaintiff has a plain, common, adequate, and speedy remedy at law. In addition, Plaintiff has not properly pled a claim for equitable relief. The equitable causes of action alleged in the Complaint are thus barred, and Plaintiff is limited to seeking only money damages in this civil action.

8.      Plaintiffs are barred from seeking strict liability for design defect as any attempt to reexamine the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the Clean Air Act (CAA) would be impermissible given that Congress, through Section 211 of the CAA, authorized the EPA, and not the courts, to perform the cost-benefit analysis.

9.      If it is determined that plaintiffs or anyone on whose behalf plaintiffs are allegedly suing, was injured, as set forth in the complaints, which the Chevron Defendants deny, the Chevron Defendants allege that such hardship is outweighed by the convenience and public service rendered by the Chevron Defendants' actions.

10.      Each purported cause of action asserted in the complaints is barred under the doctrine of primary assumption of risk in that the general public, by and through its elected

representatives and their appointees, knew and understood the alleged risks of harm presented by the use of MTBE, if any, and elected nevertheless to proceed to require the use of gasoline oxygenates and to specifically permit the use of MTBE as a gasoline oxygenate.

11.     To the extent that plaintiffs have received or may receive the requested relief from a governmental agency, the Chevron Defendants assert their entitlement to an appropriate set-off or reduction of any judgment against them.

12.     The appropriate forum for plaintiffs' claims is an administrative agency, and therefore all proceedings before this Court should be stayed pending administrative resolution of the issues.

13.     The claims set forth in the complaints fail, in whole or in part, based on the doctrine of election of remedies.

14.     Each purported cause of action of the complaints as applied to the Chevron Defendants is barred because the relief sought therein would pose unreasonable barriers and substantial burdens on interstate and/or international commerce in violation of the Commerce Clause of the United States Constitution and/or the North American Free Trade Agreement.

15.     The complaints fail to state a claim upon which relief may be granted and should, therefore, be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

16.     Because plaintiffs have not suffered any cognizable harm and have not incurred any present damages, there is no current case or controversy and thus, plaintiffs' claims are not ripe for adjudication.

17.     Plaintiffs suffered no losses or injuries that were proximately caused by the Chevron Defendants.

18.     The Chevron Defendants' conduct was not the cause in fact of any injuries alleged by plaintiffs.

19.     Plaintiffs have failed to state a cause of action for nuisance because they have neither alleged nor suffered any particularized injury.

20.     The alleged injuries and damages, if any, suffered as a result of conduct legally attributable to the Chevron Defendants is *de minimus* and therefore any injunction would pose a disproportionate hardship on the Chevron Defendants, as well as on the public, in comparison to the injury and or damages allegedly suffered by plaintiffs.  Accordingly, plaintiffs are not entitled to injunctive relief as to the Chevron Defendants as a matter of law.

21.     Plaintiffs do not have a legally cognizable injury unless or until the alleged MTBE contamination exceeds state action levels.

22.     Plaintiffs may not seek attorneys' fees as an element of relief.

23.     Plaintiffs have failed to properly present any claim for attorneys' fees.

24.     Because plaintiffs have sued multiple parties, under multiple causes of action, with divisible damages, any claim for attorneys' fees must be proportioned between same.

25.     The claims set forth in the complaints are barred, in whole or in part, by the mootness doctrine.

26.     The complaints and each purported cause of action are barred, in whole or in part, by the defense of laches.   Plaintiffs' unreasonable and inexcusable delay in filing these actions caused substantial prejudice to the Chevron Defendants.

27.     The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations.

28.    The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of repose.

29.    Plaintiffs are estopped by their conduct from asserting any of the purported claims alleged against the Chevron Defendants in the complaints.

30.    Plaintiffs have not investigated the cause of the alleged harm or attempted to identify the actual party or parties responsible for their alleged injuries.

31.    Plaintiffs cannot establish the required predicates for their theories of collective liability, and therefore their defendant-identification burden remains.   In the event that the defendant-identification burden is shifted in the future, the Chevron Defendants deny that it contributed to the contamination at issue.

32.    Plaintiffs' claims are barred in whole or in part by the doctrines of waiver and estoppel.

33.    Plaintiffs assumed the risk of all acts, injuries, and damages that plaintiffs now assert against the Chevron Defendants.

34.    The Chevron Defendants are entitled to total or partial indemnity from those individuals or entities who are responsible for plaintiffs' injuries or damages, if any, in an amount in direct proportion to their relative culpability.

35.    Plaintiffs lack the capacity to sue.

36.    Plaintiffs lack standing to sue.

37.    Plaintiffs' claim is barred because the Chevron Defendants' conduct caused no physical impact to plaintiffs' property.

38.    There is a defect or misjoinder of parties, in that plaintiffs have failed to join indispensable or necessary parties.

39.     Plaintiffs have failed to name the party or parties responsible for the alleged harm.

40.     The claims set forth in the complaints fail, in whole or in part, because of the failure to identify which defendant, if any, proximately caused the alleged harm.

41.     Plaintiffs' claimed injuries were caused in whole or in part by others, whose actions were not controlled by or related to the Chevron Defendants.  Such actions are the superseding, supervening and/or intervening cause of plaintiffs' injuries and therefore plaintiffs may not recover from the Chevron Defendants as a matter of law.

42.     Plaintiffs' claims must be dismissed because they have failed to identify the particular defendant that is responsible for the harms alleged by plaintiffs.

43.     Any gasoline product sold or distributed for resale by the Chevron Defendants was properly designed, formulated, prepared and otherwise not defective in any respect.

44.     To the extent required, the Chevron Defendants provided proper warnings, information, and instructions relating to their products pursuant to generally recognized and prevailing standards in existence at the time.

45.     Plaintiffs have failed to allege that the Chevron Defendants' alleged failure to provide an adequate warning proximately caused their injuries.

46.     The Chevron Defendants had no duty to warn because the risks of injury and damages inherent in utilizing the products described in the complaints, if any, were open, obvious or known.

47.     Any gasoline product containing MTBE manufactured, sold, or distributed for resale by the Chevron Defendants was not unreasonably dangerous when made.

48.     The plaintiffs' claims against the Chevron Defendants are barred by the bulk supplier doctrine.

49.     The products at issue were sold to knowledgeable and sophisticated purchasers, and any injury alleged by Plaintiff was caused by such purchasers' failure to observe known standards of care.

50.     The products at issue were sold to learned intermediaries, and any injury alleged by plaintiffs was caused by such intermediaries' failure to observe known standards of care. Specifically, plaintiffs are sophisticated water purveyors or managers and were, at all relevant times, fully aware of the nature and risks of injury and damages described in the complaints that could arise in the operations or management of a public drinking water supply system.

51.     Any injury, damage or loss sustained by the plaintiffs was proximately caused by and/or contributed to by their own negligence, carelessness, and/or omissions under the doctrines of comparative and/or contributory negligence and pursuant to any applicable statutes.

52.     Plaintiffs' public nuisance claims should be dismissed because there were no acts or omissions by or on behalf of any of the defendants constituting an intentional, unreasonable interference with the plaintiffs' interest in the use and enjoyment of their property.

53.     Plaintiffs' public nuisance claims must be dismissed because plaintiffs have failed to allege "special damages," an absolute prerequisite to the assertion of a public nuisance claim.

54.     The Chevron Defendants owed no duty of care to plaintiffs in connection with the matter alleged in the complaints.

55.     The complaints fail to plead the elements of negligence claims with sufficient clarity, specificity, and particularity.

56.     Plaintiffs' claims are barred to the extent the conduct complained of is protected by the First Amendment to the United States Constitution.

57.     The complaints and each cause of action are barred based on the Chevron Defendants' valid exercise of the right of petition to the federal government, state government(s), and/or their respective deliberative bodies and agencies.

58.     Plaintiffs' claims are barred, in whole or in part, based on plaintiffs' actual or constructive notice of reported spills or releases, if any, from publicly available records.

59.     There is no legal relationship upon which any duty could possibly be owed by the Chevron Defendants to plaintiffs, and therefore, plaintiffs' causes of action fail as a matter of law.

60.     The injuries and damages, if any, alleged by plaintiffs are caused in whole or in part by the presence of compounds other than MTBE (e.g., the BTEX compounds).  Under plaintiffs' own legal theories, the Chevron Defendants are not liable for damages caused by compounds other than MTBE.  In the event liability is assessed against the Chevron Defendants, such liability must be reduced where, and to the extent that, other compounds—about which plaintiffs do not complain—contributed to the alleged injury.

61.     The Chevron Defendants are not liable for contamination where chemical compounds other than MTBE exceed state actions levels or standards, requiring cleanup regardless of the presence of MTBE (particularly, but not exclusively, where MTBE is present below state action levels or standards).

62.     Any injury, damage or loss sustained by the plaintiffs in connection with the subject matter of this action was not reasonably foreseeable.

63.     If it is determined that plaintiffs or anyone on whose behalf plaintiffs are allegedly suing, was injured, as set forth in the complaints, which the Chevron Defendants deny, any award of damages must be reduced in proportion to the percentage of fault attributable to the plaintiffs.

64.     If it is determined that plaintiffs or anyone on whose behalf plaintiffs are allegedly suing, was injured, as set forth in the complaints, which the Chevron Defendants deny, The Chevron Defendants allege that any award of damages shall be reduced in proportion to the percentage of fault attributable to third parties (including but not limited to persons or entities responsible for gasoline leaks or spills).

65.     The injuries alleged in the complaints, if any, may be reasonably apportioned among the defendants, as each defendant's alleged acts and omissions, including those of the Chevron Defendants, are divisible and distinct. Therefore, no defendant is jointly and severally liable to plaintiffs for any claim alleged in the complaints.

66.     Plaintiffs' claims are barred to the extent that they have unreasonably failed to mitigate their damages, if any.

67.     To the extent that any party has settled or may settle in the future with plaintiffs, the Chevron Defendants assert their entitlement to an appropriate credit or reduction of any judgment(s) against them pursuant to any applicable statutes.

68.     Plaintiffs' claims for punitive damages violate the provisions of the U.S. Constitution, including but not limited to those provisions requiring due process of law and prohibiting excessive fines.  Permitting recovery of punitive or exemplary damages in this case would contravene Defendants' constitutional rights as reserved by the Fifth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution and other provisions of the United

States Constitution.  *See BMW of N. Am., Inc. v. Gore*, 116 S. Ct. 1589 (1996) (explaining constitutional limits on punitive damages).

69.    Chevron Defendants allege that the maximum contaminant level or other drinking water standard, to the extent they form the bases of plaintiffs' claims against the Chevron Defendants were arbitrarily and unreasonably enacted without due process and, therefore, cannot be enforced against Chevron Defendants.

70.    Plaintiffs' efforts to impose liability on the Chevron Defendants without proof of causation violate the Due Process and other clauses of the federal and state constitutions.

71.    Plaintiffs' claims are barred, in whole or in part, to the extent that Plaintiffs seek to impose liability and/or penalties on the Chevron Defendants retroactively or for conduct that was not actionable at the time it occurred.

72.    The Court does not have personal jurisdiction over Chevron Corporation and/or other Chevron Defendants.

73.    Plaintiffs are public entities and/or authorities seeking compensation for damages to natural resources under their jurisdiction or purview.  These public entity/authority plaintiffs have improperly delegated the power to prosecute these cases to private attorneys on a contingent fee basis. Such delegation is against public policy.

74.    Plaintiffs lack standing to bring a citizen suit under TSCA.

75.    The information plaintiffs claim that the Chevron Defendants should have disclosed under TSCA is not reportable under the TSCA statute or under EPA's guidance interpreting TSCA.

76.    Plaintiffs have failed to comply with the jurisdictional prerequisites for bringing a claim under TSCA.

77.     Plaintiffs cannot demonstrate that EPA was unaware of information plaintiffs allege should have been disclosed under TSCA when plaintiffs' TSCA claim was brought.

78.     The damages sought by plaintiffs are wholly speculative and conjectural.

79.     Some or all of the injury or damages suffered by plaintiffs were the product of conduct for which the Chevron Defendants cannot have liability to plaintiffs, since it is lawfully undertaken by the Chevron Defendants and their predecessors in the exercise of their rights as owner(s) of real property.

80.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

81.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of immunity from suit.

82.     If plaintiffs sustained any injury under the circumstances alleged in the complaint or in any other respect, their recovery against the Chevron Defendants, if any, is barred by the alleged conduct and conditions resulted from a necessity.

83.     Plaintiffs' strict liability claims are barred, in whole or in part, by plaintiffs' own highly reckless conduct, which is a superseding cause of plaintiffs' alleged injuries.

84.     Plaintiffs and/or others modified, altered, or changed the Chevron Defendants' products or materials referred to in the complaints, if any, so that such changes in any said products or materials proximately caused plaintiffs' injuries, loss and damages, if any.

85.     If the Chevron Defendants provided the products alleged to have been defective, and without admitting that it did so or that any product was defective and without assuming the burden of proof on these issues, the products were misused or abused by others without the knowledge or consent of the Chevron Defendants and in a manner not reasonably foreseeable by

the Chevron Defendants prior to their receipt of notice of the circumstances described in the complaints. Such misuse or abuse was the sole cause of or a contributing cause to the injuries, losses, and/or damages, if any, suffered by plaintiffs as alleged in the complaints, and by reason thereof, plaintiffs are barred from recovering some or all of any damages suffered.

86.     Plaintiffs' strict liability claims are barred, in whole or in part, by the doctrine of successor liability, including the product-line exception.

87.     Plaintiffs' strict liability claims are barred, in whole or in part, because plaintiffs did not suffer—and did not plead any suffering of—a physical injury.

88.     Plaintiffs' strict liability claims are barred, in whole or in part, based on the state of the art and/or industry standard defense(s). If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, the Chevron Defendants did not and could not have known of such an alternate design at the time. If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, such an alternate design was not feasible at the time.

89.     Plaintiffs' claims for strict liability are barred because of the principles embodied in Section 402A of the Restatement (Second) of Torts, namely that Plaintiff was not a user or consumer of the product at issue, nor does Plaintiff allege injuries arising from its consumption or use of the product at issue.

90.     Plaintiffs' claims for strict liability are also barred because of the principles embodied in Section 402A of the Restatement (Second) of Torts, comment (i), namely that the Chevron Defendants did not sell any product that was unreasonably dangerous beyond the contemplation of the ordinary consumer.

91.     Some or all of the injury or damages suffered by plaintiffs were the product of conduct for which the Chevron Defendants cannot have liability to plaintiffs, since it is lawfully undertaken by the Chevron Defendants and their predecessors in the exercise of their rights as owner(s) of real property.

92.     Plaintiffs' trespass claims are barred, in whole or in part, because the Chevron Defendants complied with all conditions precedent imposed on their access to any allegedly trespassed premises.

93.     Plaintiffs' trespass claims are barred, in whole or in part, because the Chevron Defendants reasonably believed they had been given permission to enter any premises allegedly trespassed.

94.     The Chevron Defendants are not liable for any alleged wrongful entry upon land because plaintiffs and/or plaintiffs' predecessors in interest or assignors expressly or impliedly consented to or had knowledge of all such activities or conditions.

95.     Plaintiffs' claims for trespass are barred because the Chevron Defendants are immune to liability for plaintiffs' damages, if any, caused by earth movement.

96.     Plaintiffs' claims are barred, in whole or in part, because plaintiffs have no natural resource damages.

97.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of equitable estoppel.

98.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

99.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of unjust enrichment.

100.    As to each cause of action in the complaints, the Chevron Defendants allege that the release of MTBE and/or hazardous substances, if any, and the damages resulting there from, if any, were caused by an act of God.

101.    The complaints and each purported cause of action are barred because they are ambiguous and uncertain.

102.    Certain of plaintiffs' claims are barred by prior settlements and/or releases.

103.    The Chevron Defendants incorporate by reference any affirmative defense alleged by other defendants in this action to the extent they do not conflict with the Chevron Defendants' affirmative defenses.

104.    The pleading of the defenses described above shall not be construed as an undertaking by the Chevron Defendants of any burden which would otherwise be the responsibility of plaintiffs.

## V.          DEFENSES APPLICABLE TO PARTICULAR JURISDICTIONS

For their separate defenses to the complaints in MDL 1358 cases from particular jurisdictions (for which an answer is presently required, and in which the Chevron Defendants have been properly named and served), the Chevron Defendants state as follows:

### NEW JERSEY

1.    Plaintiffs' claims against the Chevron Defendants are barred by the Natural Resource Damages Settlement Agreement between the New Jersey Department of Environmental Protection ("NJDEP") and certain Chevron Defendants dated November 16, 2005.

2.    Plaintiffs have released the Chevron Defendants from their claims for natural resource damages and/or other damages, costs and relief sought in this action.

3.      Plaintiffs' claims against the Chevron Defendants are barred by the New Jersey entire controversy doctrine, doctrine of *res judicata* and/or similar doctrines.  Without limiting the foregoing, Plaintiffs' claims are barred to the extent that Plaintiff or its affiliates or subdivisions have brought or are bringing claims against the Chevron Defendants or others for the same or similar conduct, the same or similar transactions, the same or similar damages, or the same or similar relief.

4.      Plaintiffs' claims against the Chevron Defendants are barred by the applicable New Jersey statutes of limitation, including but not limited to, N.J. Stat. Ann. § 2A:14-2.

5.      Plaintiffs' claims under the New Jersey Compensation and Control Act ("Spill Act") are barred by one or more of the statutory defenses to liability provided in the Spill Act.

6.      The Chevron Defendants did not "discharge" any hazardous substance within the meaning of the Spill Act.

7.      The Chevron Defendants are not "in any way responsible" for any discharges of hazardous substance within the meaning of the Spill Act.

8.      The costs and damages sought by Plaintiffs do not constitute "cleanup and removal costs" under the Spill Act, or they are not otherwise recoverable under the Spill Act.

9.      Plaintiffs' claim for treble damages under the Spill Act is barred because Plaintiffs have failed to comply with the requirements set forth in the Spill Act.

10.      Plaintiffs' claims are barred by the doctrine of primary jurisdiction insofar as the NJDEP is responsible for directing and allocating responsibility for investigation and remediation of the environmental condition alleged in the Complaint.

11.      Plaintiffs' claims are barred because the Chevron Defendants have complied with, and satisfied, all applicable laws, regulations, rules, orders, directives and/or other requirements

of the NJDEP and/or other state or federal agencies regarding the environmental condition alleged in the Complaint.

12.   Plaintiffs' claims under the Spill Act are barred to the extent Plaintiffs seek relief for conduct occurring or damages incurred prior to the effective date of the Spill Act.

13.   Plaintiffs' claims are barred, in whole or in part, by plaintiffs' failure to comply with the prerequisites to liability under the Spill Act, including without limitation plaintiffs' incurring of costs not authorized by the Spill Act and plaintiffs' failure to direct clean up and remediation operations in accordance with the National Contingency Plan to the greatest extent possible.

14.   Plaintiffs were contributorily and comparatively negligent, and therefore their claims are barred or diminished by such negligence under the Comparative Negligence Act and New Jersey common law.

15.   Plaintiffs' claims for natural resource damages are barred because the State's method of assessing natural resource damages was not adopted in a manner consistent with the Administrative Procedures Act, N.J.S.A. § 52:14B-2(e).

16.   Plaintiffs' claims under the Spill Act are not ripe, since clean up and remediation have not been completed.

17.   Plaintiffs' claims under the Spill Act are barred, in whole or in part, because the claims asserted are preempted by federal law, including, without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

18.   Any injury or damages suffered by Plaintiffs have been increased by Plaintiffs' failure to mitigate their damages, in that (1) the policies and activities of the State of New Jersey and its agencies during the period of time for which plaintiffs seek damages have

caused damage to natural resources greater than that would otherwise have occurred; and (2) the State and its agencies have failed to take reasonable measures available to them to reduce damages.

19.     The Chevron Defendants' conduct did not meet the minimum requirements of culpability with respect to each material element of the alleged offenses of civil conspiracy, public nuisance, and negligence, according to the applicable provision of N.J. Stat. Ann. § 2C:2-2, and, therefore, plaintiffs' claims on these counts should be dismissed.

20.     Plaintiffs' claims against the Chevron Defendants are barred, in whole or in part, by the prior settlement with certain MDL plaintiffs in New Jersey under the entire controversy doctrine, the doctrine of res judicata, and the defenses of recoupment, and accord and satisfaction.

21.     Plaintiffs have failed to join parties needed for the just adjudication of the Plaintiffs' claims, in whose absence complete relief cannot be afforded the existing parties pursuant to *N.J.Ct.R.* 4:28-1.

22.     Plaintiffs' injuries and damages, if any, were directly and proximately caused by the intervening, superseding and/or fault of other persons and entities for which the Chevron Defendants bear no responsibility.  The Chevron Defendants are entitled to apportionment of the relative degrees of fault to such other persons or entities, whether they are parties herein or not, in accordance with New Jersey law and New Jersey Joint Tortfeasors Contribution Law, N.J. Stat. Ann. 2A-53A-1 et seq.

23.     The Chevron Defendants deny that Plaintiffs are entitled to punitive damages in this case.  The Chevron Defendants did not have any intent to injure plaintiffs.  The Chevron

Defendants incorporate and assert all defenses regarding the imposition of punitive damages created by N.J. Stat. Ann. 2A:15-5.9 et seq.

24.     The imposition of punitive damages in this action would violate the Chevron Defendants' rights under the due process clause, equal protection clause, excessive fines clause, and other clauses of the Constitution of the United States and the Constitution and laws of the State of New Jersey.

25.     The legal standards regarding punitive damages are inadequate, vague and ambiguous, further violating the due process clause of the United States Constitution and the Constitution of the State of New Jersey.

26.     Plaintiffs' claims for relief associated with the rights, interests or properties of private parties, including claims for treatment of private wells or alleged damages to private property, are barred to the extent plaintiff lacks standing or the legal authority to assert such claims.

**PENNSYLVANIA**

**General Allegations in Support of Pennsylvania-Specific Defenses**

1.     Many years before the Commonwealth of Pennsylvania instituted this litigation and claimed that any amount of MTBE is harmful and must be completely remediated, the Commonwealth itself carefully considered the potential risks posed by MTBE and reached the opposite conclusion. Indeed, recognizing that low levels of MTBE are not harmful to the environment or human health, the Commonwealth consistently rejected calls to ban the use of MTBE and, acting as regulator, declined to require the complete removal of all MTBE at gasoline release sites.  Indeed, the Commonwealth has been aware of the potential for USTs to leak since at least 1984. The Commonwealth has been testing for the presence of MTBE in

Pennsylvania since at least 1985 and identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995.

2.     Around the time the Commonwealth of Pennsylvania began monitoring for the presence of MTBE in the Commonwealth's waters, the U.S. Environmental Protection Agency ("EPA") began an exhaustive analysis of MTBE.   In its 1997 Drinking Water Advisory guidance, the EPA reviewed available health effects information on MTBE and concluded that there is little likelihood that MTBE in drinking water will cause adverse health effects at concentrations between 20 and 40 parts per billion ("ppb") or below.   After further analysis of the effects of MTBE, the EPA concluded in a 1999 Blue Ribbon Panel Report that MTBE levels in water ranging from 20 to 40 ppb cannot be tasted or smelled by most individuals and, more importantly, will not cause adverse health effects to humans.   Consequently, EPA did not ban the use of MTBE or require sampling for MTBE at the federal level. Instead, as part of implementing the Safe Drinking Water Act, EPA placed MTBE on the Contaminant Candidate List (CCL) for further evaluation and encouraged the States to monitor it.

3.     The Commonwealth of Pennsylvania chose to participate in the CAA's optional RFG program in 1991 without any public hearings, meetings, or other outreach.   As a result, RFG was set to be required at terminals in 28 opt-in counties, plus five mandated counties, by December 1, 1994, and at retail stations in those counties by January 1, 1995.   Various concerns later led to Pennsylvania Governor Robert P. Casey's request for the Commonwealth to be permitted to opt out of the RFG program in the 28 opt-in counties.

4.     After weighing the ability of MTBE to substantially reduce air pollution against its potential risks, including reviewing the issue of cleaner fuels, the Commonwealth of Pennsylvania similarly declined to ban MTBE and, instead, developed a comprehensive

regulatory regime for monitoring MTBE and remediating sites where it has been released, under the Pennsylvania Storage Tank and Spill Prevention Act, 35 Pa. Code §§ 6021.101, *et seq.* ("Tank Act"), the Land Recycling and Environmental Remediation Standards Act, 35 Pa. Stat. Ann. §§ 6026.101 *et seq.* ("Act 2"), the Hazardous Sites Cleanup Act, 35 Pa. Stat. Ann. §§ 6020.101 *et seq.*, and the Uniform Environmental Covenants Act, 27 Pa. Stat. Ann. §§ 6501.101 *et seq.* Under the regime, the three types of cleanup standards available to responsible parties are background, statewide health, and site-specific standards. To demonstrate compliance with the background standard, parties must demonstrate that the regulated substance does not exceed the concentration of that substance present at the site that is not related to the release of the regulated substance. For statewide health standards, parties must attain the appropriate medium-specific concentrations, which for MTBE, are 20 µg/L for MTBE in groundwater and 2 mg/kg for MTBE in soil.

5.    The Commonwealth of Pennsylvania began requiring MTBE testing at release sites in 1996. It did not, however, participate in early United States Geological Survey USGS ("USGS") studies regarding MTBE's prevalence in the state and region. The most robust study of MTBE in Pennsylvania is the 2003 USGS study "MTBE Concentrations in Ground Water in Pennsylvania," which found that statewide MTBE was present in 11% of ambient samples and 22% of samples associated with release sites. For the southeastern portion of the state (i.e., the RFG counties), the survey showed that MTBE was present in 21% of ambient samples and 45% of leak-associated samples. A 2011 EPA report "The National LUST Cleanup Backlog: A Study of Opportunities" found that MTBE was present at 16% of the release sites on the Pennsylvania LUST list.

6.      For many years under the comprehensive regulatory framework built upon this threshold, the Pennsylvania Department of Environmental Protection ("PADEP") has partnered with private companies—including many of the Defendants in this litigation—to efficiently and effectively clean up MTBE release sites and ensure that the waters of the Commonwealth remain safe for human consumption and wildlife. PADEP and its private partners were successful in cleaning up MTBE to the satisfaction of PADEP at many release sites, as indicated by the closure letters issued by PADEP to its private partners—including many of the Defendants in this litigation—which not only represented the Commonwealth's determination that no further cleanup work was needed, but they also released the responsible party from any further remediation work at the site and grant liability protection under Act 2.

7.      Additionally, on March 28, 2019, the Chevron Defendants settled the claims set forth in Counts VIII and IX of the complaint, namely, the Commonwealth's request to recover funds paid by the Underground Storage Tank Indemnification Fund ("USTIF") to the Chevron Defendants pursuant to applications submitted by the Chevron Defendants for claims relating to release from underground storage tank systems owned or operated by the Chevron Defendants.

8.      The Commonwealth's effective, cooperative, and pragmatic approach to MTBE regulation persisted for many years, at least until the Commonwealth decided to institute the instant lawsuit.  Now, ignoring its own regulatory framework and all of the work that already has been done to protect the Commonwealth's waters, the Commonwealth contends that the Chevron Defendants must return to release sites that the Commonwealth closed long ago and further reduce already-safe levels of MTBE.

9.     The following Affirmative Defenses challenge, among other things, the Commonwealth's inexplicable about-face and demonstrate that the Commonwealth's claims are barred by well-established principles of equity and tort law.

**Pennsylvania-Specific Defenses**

1.     The Second Amended Complaint ("SAC") filed by the Commonwealth of Pennsylvania and each purported cause of action asserted therein are barred in whole or in part by the doctrine of federal preemption.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  MTBE was the only viable oxygenate available for use in Pennsylvania because, among other things, and as Plaintiff admits, prior to 2006, there were no commercial-scale plants producing ethanol in Pennsylvania and ethanol could not be shipped via pipeline.  Congress anticipated, and even intended, that MTBE would be the oxygenate of choice when it passed the RFG Program.  State law is also preempted where a state seeks to impose liability for an action that federal law affirmatively made available to private actors.

2.     The SAC and each purported cause of action asserted therein are barred in whole or in part because at all relevant times, the Chevron Defendants' actions and products complied with and were undertaken pursuant to applicable federal, state, commonwealth, and local laws, rules, regulations, and specifications.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  MTBE was the only viable oxygenate available for use in Pennsylvania because, among other things, and as Plaintiff admits, prior to 2006, there were no

commercial-scale plants producing ethanol in Pennsylvania and ethanol could not be shipped via pipeline.  Congress anticipated, and even intended, that MTBE would be the oxygenate of choice when it passed the RFG Program.

3.     The SAC and each purported cause of action asserted therein are barred in whole or in part because federal, state, commonwealth, and/or local authorities and agencies mandated, directed, approved, permitted, and/or ratified the alleged actions or omissions of the Chevron Defendants.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  The Chevron Defendants did not determine the formulation of gasoline sold in Pennsylvania and relied on others for the supply of gasoline there. The market in Pennsylvania established the use of reformulated gasoline with MTBE, something that Congress anticipated, and even intended, when it passed the RFG Program.  As a result, even if the Chevron Defendants could have determined the formulation of gasoline sold in Pennsylvania, it could not have supplied reformulated gasoline with ethanol for a variety of reasons including, but not limited to, that it was not economically feasible due to the associated increased costs and that it could not be shipped on a common pipeline.  As a result of these higher costs associated with the supply of ethanol gasoline, the Chevron Defendants would have lost market share and would have been forced to exit the Pennsylvania market.

4.     The SAC and each purported cause of action asserted therein are barred in whole or in part because all acts and conduct of the Chevron Defendants, as alleged in the SAC, conformed to and were pursuant to statutes, government regulations, and industry standards, and were based upon the state of knowledge existing at all material times.  Federal law required an

oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania. MTBE was added to gasoline in full compliance with the Federal Clean Air Act and amendments thereto and with approval of the EPA.  The Chevron Defendants did not determine the formulation of gasoline sold in Pennsylvania as it relied on others for the supply of gasoline there.  The market in Pennsylvania established the use of reformulated gasoline with MTBE, something that Congress anticipated, and even intended, when it passed the RFG Program.  The Chevron Defendants chose to use MTBE and sell gasoline containing MTBE after considering a variety of factors, including, but not limited to, costs, logistics, availability, the oxygenates' overall characteristics, and whether the oxygenates were federally approved.  The EPA rigorously collected information about MTBE from a wide variety of sources and approved its use.  The Chevron Defendants relied on the EPA and Congressional approval of MTBE as an acceptable gasoline additive and on Plaintiff's failure to ban MTBE.  The Chevron Defendants' analysis of market factors and reliance on the EPA's and the Commonwealth's determinations regarding MTBE's acceptability were consistent with the standard of care that prevailed in the refining industry at the time and the state of knowledge indicated that MTBE was a wholly acceptable gasoline additive.  Finally, the Chevron Defendants' warnings about gasoline containing MTBE were consistent with prevailing standards at the time.  The Chevron Defendants, like all other members of the industry, prepared Material Safety Data Sheets and provided them to customers, among other things.

5.     The SAC and each purported cause of action asserted therein are barred in whole or in part because the relief sought by Plaintiff is, in whole or in part, within the particular expertise of and is being addressed by federal, state, and commonwealth governments, and their relevant agencies, and thus this Court should decline to exercise jurisdiction over this matter

pursuant to the doctrines of primary jurisdiction and separation of powers. The relief Plaintiff seeks is already occurring. Pennsylvania's Department of Environmental Protection, which is specifically charged with investigating petroleum release discharges and overseeing environmental remediation, has done just that for the alleged MTBE and petroleum releases.

6.      The SAC and each purported cause of action asserted therein are barred in whole or in part because Plaintiff failed to exhaust its administrative remedies. Plaintiff must address (or already has addressed) the alleged leaks and/or spills through governmental agencies uniquely equipped to handle that task and charged with doing so, including, but not limited to, the Regional Offices of the PADEP, PADEP'S Bureau of Waste Management, Bureau of Land Recycling and Waste Management, Division of Storage Tanks in the Bureau of Watershed Conservation, and Bureau of Environmental Cleanup and Brownfields.

7.      Certain of Plaintiff's putative subrogation causes of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to, 42 Pa. Cons. Stat. Ann. § 5524. Plaintiff has been aware of the potential for USTs to leak since at least 1984. Plaintiff has been testing for the presence of MTBE in Pennsylvania since at least 1985, has identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995, and specifically required MTBE testing at remediation sites addressing gasoline releases since at least August 1, 1996. Plaintiff has been aware of the facts it now asserts to form the basis of its claims for at least 26 years prior to filing its lawsuit, which is well outside the applicable statutes of limitation. Due to Plaintiff's unreasonable and unjustified delay in bringing this action, it would be inequitable and a violation of due process to allow the nullum tempus doctrine to preclude application of otherwise pertinent statutes of limitations, including but not limited to, 42 Pa. Cons. Stat. Ann. § 5524.

8.      Certain of Plaintiff's putative subrogation causes of action are barred by the applicable provisions of the pertinent statutes of repose, including but not limited to, 42 Pa. Cons. Stat. Ann. § 5536.  Plaintiff has been aware of the potential for USTs to leak since at least 1984.  Plaintiff has been testing for the presence of MTBE in Pennsylvania since at least 1985, has identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995, and specifically required MTBE testing at remediation sites addressing gasoline releases since at least August 1, 1996.  Plaintiff has been aware of the facts it now asserts to form the basis of its claims for at least 26 years prior to filing its lawsuit, which is well outside the applicable statutes of limitation.   Due to Plaintiff's unreasonable and unjustified delay in bringing this action, it would be inequitable and a violation of due process to allow the nullum tempus doctrine to preclude application of otherwise pertinent statutes of repose, including but not limited to, 42 Pa. Cons. Stat. Ann. § 5536.

9.      Plaintiff lacks standing to assert claims for subrogation to recover payments made from USTIF, which claims must be asserted by the USTIF Board as subrogee of the claimants who received the USTIF funds.  Plaintiff also lacks standing to bring suit for alleged damages incurred by its residents, citizens, or consumers, including claims for injury or testing at private wells and claims under the Unfair Trade Practices and Consumer Protection Law.

10.     Plaintiff's negligence claim fails because Pennsylvania does not recognize negligent failure to test as a cause of action.

11.     The SAC and each purported cause of action asserted therein fail because any attempt to impose liability on the Chevron Defendants without specific proof of injury, causation or damages would improperly relieve Plaintiff of its burden of proof, prevent the Chevron Defendants from asserting certain individualized defenses and exculpating themselves at specific

sites, and violate the Chevron Defendants' due process rights under the United States and Pennsylvania Constitutions.

12.     Any injury, damage or loss sustained by Plaintiff was proximately caused by and/or contributed to by its own negligence, carelessness, and/or omissions under the doctrines of comparative and/or contributory negligence and pursuant to any applicable statutes, including but not limited to, 42 Pa. Stat. Ann. § 7102.

a.     Chevron Defendants deny that MTBE and gasoline containing MTBE constitute defective products and/or that MTBE and gasoline containing MTBE were negligently designed, manufactured, stored, or handled by Chevron Defendants.

b.     However, even if Plaintiff could prove that MTBE and gasoline containing MTBE are defective products, or that MTBE and gasoline containing MTBE were negligently designed, manufactured, stored, or handled by Chevron Defendants, Plaintiff cannot recover damages against Defendants because it was contributorily negligent.

c.     On information and belief, Plaintiff owned (and still owns) multiple underground storage tank systems into which it placed gasoline containing MTBE.

d.     On information and belief, Plaintiff operated multiple underground storage tanks systems into which it placed gasoline containing MTBE.

e.     On information and belief, Plaintiff had a legal duty under the common law and its own statutes and regulations to inspect, maintain, repair, and/or operate those underground storage tank systems into which it placed gasoline containing MTBE with due care and in a manner that protected human health and the environment.

f.      On information and belief, many of Plaintiff's aforementioned underground storage tank systems spilled, leaked, or otherwise released gasoline containing MTBE into the groundwaters of Pennsylvania.

g.      On information and belief, the spills, leaks, and/or releases of MTBE gasoline from underground storage tank systems owned and/or operated by plaintiff proximately resulted in the contamination of groundwater resources in Pennsylvania.

h.      On information and belief, after the spillage, leakage, and/or release of gasoline containing MTBE from its own underground storage tank systems, Plaintiff remediated the release sites in accordance with its own statutes and regulations. As with many release sites for which the Chevron Defendants were the Responsible Parties, Plaintiff ceased remediation activities at sites where its own underground storage tank systems released gasoline containing MTBE without requiring that all MTBE be removed at or around the site.  Plaintiff approved these closures because it appropriately concluded that additional remediation was not necessary to protect public health and the environment.

i.      However, if, as Plaintiff now alleges in this litigation, it was negligent or otherwise wrongful for Chevron Defendants not to remove all MTBE from sites where gasoline containing MTBE was released, it also was negligent or otherwise wrongful for Plaintiff not to remove all MTBE from sites where its own underground storage tank systems released gasoline containing MTBE.

j.      In the alternative, in remediating sites at which its own underground storage tank systems released gasoline containing MTBE, Plaintiff neglected to comply with one or more of the statutes and regulations that other Responsible Parties (including, allegedly, many of the Defendants in this case) must comply with in the event of such a gasoline

release and, as a result, proximately caused additional contamination of the Commonwealth's groundwater resources.

k.      Plaintiff was additionally contributorily negligent by overseeing the Chevron Defendants' clean-up and remediation of any alleged MTBE at release sites pursuant to Act 2 ("Closed Sites").  PADEP oversaw every step in the cleanup process, approved the methods used to clean the Closed Sites, and confirmed that the responsible party had attained the applicable State standards at each Closed Site.  The closure letters issued by PADEP not only represented Plaintiff's determination that no further cleanup work was needed, but they also released the responsible party from any further remediation work at the site and grant liability protection under Act 2.  To the extent Plaintiff now claims that there should have been additional remediation at the Closed Sites, Plaintiff's failure to raise the issue during its oversight of the clean-up process was contributorily negligent.

1.      Plaintiff cannot hold Defendants liable for Plaintiff's own releases of gasoline containing MTBE or for Plaintiff's conduct in not following its own statutory and regulatory obligations under Pennsylvania law.

13.      Plaintiff's strict liability claims are barred, in whole or in part, based on the state of the art and/or industry standard defense(s).  If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, the Chevron Defendants did not and could not have known of such an alternate design at the time.  If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, such an alternate design was not feasible at the time.

a.      MTBE conformed to the state of the art at the time of sale and was designed, manufactured, and tested pursuant to generally recognized and prevailing standards and

in conformance with the statutes, regulations, and requirements that governed the product at the time of the design, manufacture, and sale.  As such, Plaintiff's claims are barred in whole or in part by the state-of-the-art defense.

b.      Furthermore, if any damages or injuries alleged in the SAC occurred because of leaks in the gasoline storage tanks and associated piping, the Chevron Defendants are not liable for those damages and/or injuries to the extent that the gasoline storage tanks and associated piping, when manufactured and distributed, conformed to the then-current state of scientific and industrial knowledge, and the tanks and associated piping were used for their intended purpose.

14.     Plaintiff assumed the risk of all acts, injuries, and damages that Plaintiff now asserts against the Chevron Defendants.

a.      Chevron Defendants deny that MTBE and gasoline containing MTBE constitute defective products and/or that MTBE and gasoline containing MTBE were negligently designed, manufactured, stored, or handled by Chevron Defendants.

b.      However, even if Plaintiff could prove that MTBE and gasoline containing MTBE are defective products, or that MTBE and gasoline containing MTBE were negligently designed, manufactured, stored, or handled by the Chevron Defendants, Plaintiff cannot recover damages against the Chevron Defendants because it assumed any risks, to the extent they existed, associated with MTBE and gasoline containing MTBE.

c.      On information and belief, Plaintiff, by and through several of its agencies (including, but not limited to, PADEP), and from those agencies' direct experiences at gasoline release sites, by no later than 1990 and perhaps significantly before that date, knew or should have known each of the alleged characteristics and properties of gasoline

51

containing MTBE that Plaintiff now claims render such gasoline a "defective product," constitute negligent design by certain Chevron Defendants, and about which Plaintiff now alleges in the SAC that the Chevron Defendants should have provided additional warnings. Because various acts taken by Plaintiff after it acquired such knowledge demonstrate that it assumed the risks (to the extent they existed) relating to gasoline containing MTBE, Plaintiff is precluded from recovering any damages caused by its assumption of those alleged risks.

d.      Specifically, Plaintiff alleges that MTBE was more soluble than most other components of gasoline, could travel farther and faster in groundwater, in some instances, than most other components of gasoline, and could impart a taste and/or odor to drinking water at relatively low levels. To the extent MTBE and gasoline containing MTBE possess these properties, Plaintiff knew or should have known that this was the case by no later than 1990 and perhaps significantly before that date based on its own experiences at gasoline release sites.

e.      Notwithstanding its actual or constructive knowledge, Plaintiff had gasoline containing MTBE delivered to its own storage tanks and, in many instances, supervised the investigation and remediation of gasoline releases from those storage tanks.

f.      Also notwithstanding its actual or constructive knowledge of MTBE's alleged characteristics and risks (to the extent they existed), in 1991, Plaintiff decided to opt several Pennsylvania counties into the federal RFG program.  Plaintiff made this opt-in decision knowing that, for many logistical and other reasons, refiners were (and would continue) manufacturing RFG by adding MTBE (an oxygenate) to comply with the RFG Program's mandate that such RFG contain an oxygenate.  Plaintiff made its opt-in

decision so that, inter alia, it would obtain the significant air quality benefits that it has acknowledged resulted from the use of RFG in general, and RFG containing MTBE in particular.  Plaintiff, after weighing the ability of MTBE to substantially reduce air pollution against its potential risks, including reviewing the issue of cleaner fuels, declined to phase out and/or ban MTBE until 2005 and, instead, developed a comprehensive regulatory regime for monitoring MTBE and remediating sites where it has been released.

g.      Notwithstanding its actual or constructive knowledge of MTBE's alleged characteristics and risks (to the extent they existed), Plaintiff continuously recognized that the use of MTBE in Pennsylvania gasoline had beneficial effects, and continued to decline efforts to phase out and/or ban the use, sale, and distribution of MTBE products in Pennsylvania until 2005.

h.      As demonstrated by the foregoing, at all relevant times Plaintiff was fully aware of MTBE's alleged characteristics and of the alleged risks posed by the sale and use of gasoline containing MTBE in Pennsylvania.

i.       As demonstrated by the foregoing, Plaintiff appreciated the alleged risks attendant to the sale and use of gasoline containing MTBE in Pennsylvania.

j.       As demonstrated by the foregoing, Plaintiff voluntarily responded to MTBE's alleged properties and risks by (1) opting several Pennsylvania counties into the federal RFG Program, knowing that MTBE would be the oxygenate used to meet the RFG Program's oxygenate mandate; (2) continuing to allow the use of MTBE in gasoline sold in Pennsylvania; (3) taking delivery of, storing, and in many instances remediating releases of gasoline containing MTBE at its own sites; (4) not requiring Public Water

Systems to routinely test for MTBE; and (5) allowing private well owners to make the decision of whether to address the presence of MTBE in their private wells.

k.      As a result of the foregoing, Plaintiff assumed the risk.

15.     The Chevron Defendants deny that Plaintiff is entitled to punitive damages in this case.   The Chevron Defendants did not have any intent to injure Plaintiff and the Chevron Defendants' conduct was not "outrageous," as defined and determined under Pennsylvania law.   The Chevron Defendants incorporate and assert all defenses regarding the imposition of punitive damages created by Pennsylvania law.

16.     The Chevron Defendants are not jointly and severally liable to Plaintiff because the Chevron Defendants, if liable at all to Plaintiff, are not liable for more than 60% of any total apportioned liability pursuant to the applicable statutes, including but not limited to, 42 Pa. Stat. Ann. § 7102.

17.     To the extent that any party has settled or may settle in the future with Plaintiff, the Chevron Defendants assert their entitlement to an appropriate credit or reduction of any judgment(s) against them pursuant to any applicable statutes, including but not limited to, the Uniform Contribution Among Tort-feasors Act, 42 Pa. Stat. Ann. §§ 8321, *et seq*.

18.     The Chevron Defendants allege that their liability, if any, be pro-rated pursuant to any applicable statutes, including but not limited to, the Uniform Contribution Among Tort-feasors Act, 42 Pa. Stat. Ann. §§ 8321, *et seq*.

19.     The SAC and each purported cause of action asserted therein are barred in whole or in part to the extent Plaintiff received or may receive the requested relief from a governmental agency or any other source, including, but not limited to, the EPA, USTIF and/or the Pennsylvania Insurance Department.   These claims are barred because the Chevron Defendants

assert their entitlement to an appropriate set-off or reduction of any judgment against them. Further, any award in damages for treatment of MTBE must be set-off or reduced by the cost of treating other contaminants, regardless of the presence of MTBE.

20.     The SAC and each purported cause of action asserted therein are barred in whole or in part because the appropriate forum for Plaintiff's claims is an administrative agency, and therefore all proceedings before this Court should be stayed pending administrative resolution of the issues.  The relief Plaintiff seeks is already occurring.  PADEP, which is specifically charged with investigating petroleum release discharges and overseeing environmental remediation, has done just that for the alleged MTBE and petroleum releases.

21.     The Chevron Defendants' conduct did not meet the minimum requirements of culpability with respect to each material element of the alleged offenses of public nuisance and negligence in order to be found liable according to the applicable provisions of 18 Pa. Cons. Stat. Ann. § 301, and, therefore, Plaintiff's claims on these counts were properly or should be dismissed.

22.     In addition to already having been dismissed, Plaintiff's claims for public nuisance are barred because at all relevant times, neither the Chevron Defendants nor their products violated any orders or regulations adopted by the Pennsylvania Department of Environmental Resources. 35 Pa. Cons. Stat. Ann. § 691.503.

23.     Plaintiff's claims are barred because the Chevron Defendants voluntarily cleaned up any alleged MTBE at the Closed Sites.  PADEP oversaw every step in the cleanup process, approved the methods used to clean the Closed Sites, and confirmed that the responsible party had attained the applicable State standards at each Closed Site.  The closure letters issued by PADEP not only represented Plaintiff's determination that no further cleanup work was needed,

but they also released the responsible party from any further remediation work at the site and grant liability protection under Act 2. Furthermore, at every site closed under Act 2, the Chevron Defendants cannot be held liable for MTBE releases based on res judicata, collateral estoppel, equitable estoppel, other estoppel doctrines, and due process, among other reasons.

24.    Plaintiff's claims are barred because it is seeking double recovery, to the extent the Chevron Defendants have already made payment and/or remediated pursuant to Act 2 and pursuant to the March 28, 2019 settlement of Counts VIII and IX of the SAC.

25.    Plaintiff's claims are barred, in whole or in part, by the doctrines of release and accord and satisfaction. Specifically, the SAC and each purported cause of action are barred to the extent that federal and/or Commonwealth of Pennsylvania agencies have settled with and/or released Chevron Defendants from any further liability respecting the presence of MTBE in the relevant groundwater for which plaintiff is asserting damages, including but not limited to, pursuant to the Chevron Defendants' voluntary cleanup of the Closed Sites pursuant to Act 2 and pursuant to the March 28, 2019 settlement of Counts VIII and IX of the SAC.

26.    The SAC and each purported cause of action are barred to the extent that such claims have been satisfied by payments or provision of alternate water supplies by the Chevron Defendants, defendants, or third parties, including but not limited to, pursuant to the Chevron Defendants' or others' voluntary cleanup of the Closed Sites pursuant to Act 2.

27.    The SAC and each purported cause of action are barred to the extent that federal and/or Commonwealth of Pennsylvania agencies have exonerated the Chevron Defendants and/or determined that any Chevron Defendants' facility did not contribute to the presence of MTBE in the relevant groundwater for which Plaintiffs is asserting damages, including but not

56

limited to, pursuant to the Chevron Defendants' voluntary cleanup of the Closed Sites pursuant to Act 2.

28.     The mootness doctrine bars, in whole or in part, claims for those sites where, because the issue of responsibility or damages already has been fully or partially resolved, there is no "live" controversy.  For example, on information and belief, certain sites that appear to be at issue in this case already have received regulatory closure from Plaintiff pursuant to Act 2, have been subject to prior enforcement actions, and/or have been addressed by prior settlements or consent decrees executed on behalf of, or with the knowledge of, Plaintiff.  Additionally, on information and belief, other sites that appear to be at issue in this case have never had an MTBE or TBA detection in the groundwater, or do not currently have any MTBE or TBA in the groundwater.  Claims at sites like these (and others) are barred by the mootness doctrine because no actual case or controversy remains (or ever existed) and, therefore, the Court lacks jurisdiction over Plaintiff's claims related to such sites.

29.     The Chevron Defendants allege that to the extent Plaintiff is claiming damages for the cost of remediation due to Plaintiff's alleged compliance with primary or secondary drinking water standard or other regulations enacted by the Commonwealth of Pennsylvania or any other governmental body, those claims are unconstitutional because they constitute an ex post facto application of a regulation disallowed by Art. 1, sec. 9 of the U.S. Constitution.

30.     Plaintiff's claims are barred in whole or in part because the Chevron Defendants have already taken "corrective action," which is defined in the Tank Act as "containing, investigating, and removing contamination and . . . taking measures to prevent, mitigate, abate or remedy releases . . . and damages to . . . wildlife and other natural resources."  25 Pa. Code § 245.203; 35 Pa. Stat. Ann. § 6021.103.

31.     Plaintiff's claims are barred in whole or in part because the Chevron Defendants are not "responsible part[ies]" under the Tank Act.  25 Pa. Code § 245.203.

32.     Plaintiff's claims are barred, in whole or in part, because the Chevron Defendants have, at all times, met all requirements imposed by USTIF under 25 Pa. Code § 977.31 for eligibility for fund coverage.

33.     Plaintiff's claims are barred, in whole or in part, because the Chevron Defendants have, at all times, met all requirements imposed by USTIF under 25 Pa. Code § 977.32 related to participant cooperation.

34.     Plaintiff's claims are barred, in whole or in part, because the Chevron Defendants have, at all times, met all requirements imposed by USTIF under 25 Pa. Code § 977.34 related to claims reporting and/or notification.

35.     Plaintiff's claims are barred, in whole or in part, because the exclusions listed in 25 Pa. Code § 977.33(b) for USTIF coverage do not apply to the Chevron Defendants and/or their conduct at all times pleaded herein.

36.     Plaintiff's claims are barred because Plaintiff has failed to comply with the requirements set forth in the Tank Act.

37.     Plaintiff's claims are barred to the extent Plaintiff seeks relief for conduct occurring or damages incurred prior to the effective date of the Tank Act.

38.     Plaintiff's claims are barred, in whole or in part, because the claims asserted are preempted by federal law, including, without limitation the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq*.

39.     Plaintiff's claims are barred to the extent that the Chevron Defendants' use of MTBE related to compliance with the RFG Program.

40.     There is no statute or other authority for Plaintiff's requested relief relative to the testing of public and private water supplies and, accordingly, any claim for such relief must fail.

41.     With respect to groundwater or surface water with MTBE in excess of Commonwealth regulatory standards, the Plaintiff's damages, if any, are limited to the cost of restoring such waters to Commonwealth regulatory standards.

42.     To the extent Plaintiff seeks relief with respect to any property owned or allegedly impacted by a release of MTBE from property owned by the Chevron Defendants, Plaintiff's recovery is limited to amounts not subject to reimbursement by one or more of Plaintiff's petroleum reimbursement funds.

43.     The Chevron Defendants affirmatively claim by way of recoupment or offset the monetary or economic benefit which the Chevron Defendants allege Plaintiff obtained by the use of RFG gasoline, including but not limited to the air quality benefits obtained.

44.     To the extent Plaintiff recovers any damages in this matter—and the Chevron Defendants deny it is entitled to recover any damages in this matter—the Chevron Defendants are entitled to a credit and/or offset for the money they have spent to date on remediation and a release for all future remediation obligations in the Commonwealth.

45.     The SAC and each purported cause of action are barred, in whole or in part, by the doctrine of laches.

          a.      As detailed below, Plaintiff has known about MTBE for decades and, through PADEP, has worked cooperatively with Chevron Defendants for years to ensure that releases of gasoline containing MTBE are effectively remediated in accordance with the Commonwealth's comprehensive environmental statutes and regulations. Despite having all of this knowledge and experience, Plaintiff waited

years to belatedly commence this litigation. Plaintiff's unreasonable, exceptional, and inexcusable delay in bringing this action violates due process and causes substantial prejudice to the Chevron Defendants' ability to respond to and obtain discovery to present their defenses and have a meaningful opportunity to be heard.

b.      On information and belief, and accepting Plaintiff's allegations regarding the alleged risks of MTBE, Plaintiff had knowledge of those alleged risks for decades before filing this litigation.  For instance, Plaintiff extensively studied the impact of releases of MTBE-blended gasoline and adopted comprehensive measures to address such impacts many years prior to filing this action. Indeed, PADEP members, including PADEP Deputy Secretary Brisini, knew that MTBE spills contaminated groundwater as early as the 1980s.  Plaintiff has been aware of the potential for USTs to leak since at least 1984.  Plaintiff has been testing for the presence of MTBE in Pennsylvania since at least 1985 and identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995.  Plaintiff specifically required MTBE testing at remediation sites addressing gasoline releases since at least August 1, 1996.

c.      Between 1988 and 2007, Pennsylvania developed a comprehensive regulatory regime for monitoring MTBE and remediating sites where it has been released, under the Tank Act, Act 2, the Hazardous Sites Cleanup Act, 35 Pa. Stat. Ann. §§ 6020.101 *et seq*., and the Uniform Environmental Covenants Act, 27 Pa. Stat. Ann. §§ 6501.101 *et seq*.  Under the regime, the three types of cleanup standards available to responsible parties are background, statewide health, and

site-specific standards.   To demonstrate compliance with the background standard, parties must demonstrate that the regulated substance does not exceed the concentration of that substance present at the site that is not related to the release of the regulated substance.   For statewide health standards, parties must attain the appropriate medium-specific concentrations, which for MTBE, are 20 μg/L for MTBE in groundwater and 2 mg/kg for MTBE in soil.

d.      In 1993, in connection with its implementation of its MTBE monitoring and remediation regime, PADEP issued a draft publication titled "Environmental Contamination:  A Handbook for Conducting Charges," which references a 1992 guidance document, also published by PADEP, which states that "the ultimate goal of ground water remediation is to clean up the ground water to background quality—the way it was before it was contaminated by human activities." However, PADEP further acknowledged in the 1993 publication that "it is difficult to remediate ground water," and noted that, "[b]ecause of the potential for difficulty in remediation, [PADEP] allows for flexibility."

e.      Act 2 also established the Cleanup Standards Scientific Advisory Board ("CSSAB")—a 13-member advisory board created "for the purpose of assisting the department and the [Environmental Quality Board] in developing Statewide health standards, determining the appropriate statistically and scientifically valid procedures to be used, determining the appropriate risk factors and providing other technical and scientific advice needed to implement the provisions of this act."  35 Pa. Stat. Ann. § 6026.105(a).

f.      In 1995, a Background, Statewide and Site-Specific Standards Subcommittee was formed within the CSSAB to address procedures and MCLs for the background, statewide health, and site-specific standards.

g.      In 2003, in the most robust study of MTBE in Pennsylvania, the USGS study "MTBE Concentrations in Ground Water in Pennsylvania" found that statewide MTBE was present in 11% of ambient samples and 22% of samples associated with release sites.  For the southeastern portion of the state (i.e., the RFG counties), the survey showed that MTBE was present in 21% of ambient samples and 45% of leak-associated samples.  A 2011 EPA report "The National LUST Cleanup Backlog:  A Study of Opportunities" found that MTBE was present at 16% of the release sites on the Pennsylvania LUST list.

h.      In 2009, the Storage Tank Advisory Committee considered raising the groundwater concentrations for MTBE, based on health-based calculations, from 20 µg/L to 190 µg/L for residential sites and 960 µg/L for non-residential sites. PADEP never adopted the higher concentrations of MTBE due to taste and odor concerns.  A December 2, 2009 Environmental Quality Board memorandum indicated that CSSAB opposed even the existing standards for MTBE because "they do not reflect specific health-based criteria from Act 2."  Nonetheless, as further indicated in the December 2, 2009 memorandum, PADEP sought to retain the MSC for MTBE at 20 µg/L because "[PA]DEP views the 1997 Drinking Water Advisory [issued by the EPA] as a Health Advisory Level."  CSSAB repeated these concerns at June 15, 2010 and December 17, 2014 meetings, and

the Storage Tank Advisory Committee voted against the 20 µg/L level on December 6, 2013.

i.       Nonetheless, the levels remained at statewide health standards, parties must attain the appropriate medium-specific concentrations, which for MTBE, are 20 µg/L for MTBE in groundwater and 2 mg/kg for MTBE in soil when they were published for public comment between May 17, 2014 and June 17, 2014.

j.       On information and belief, Plaintiff also was aware of other MTBE litigations filed against certain of the Defendants named here and, specifically, the more than 100 cases that were transferred and consolidated as Multidistrict Litigation No. 1358 in the U.S. District Court for the Southern District of New York beginning in 2000.  On information and belief, Plaintiff also was aware of and monitored other non-MDL MTBE litigations, including the sovereign case filed by the State of New Hampshire in 2003.

k.       Despite having knowledge about the alleged presence of MTBE in Pennsylvania groundwater and drinking water for decades, and also having knowledge of other MTBE-related litigations, Plaintiff did not file the instant action until 2016, two decades after it had begun extensively studying releases of MTBE gasoline and more than a decade after Defendants stopped supplying MTBE-blended gasoline to Pennsylvania in 2005.

l.       Plaintiff's inexcusable delay in bringing this action causes prejudice to the Chevron Defendants. Key witnesses are no longer available or no longer remember relevant information, and certain documents and other evidence no longer are available.  As a result, the Chevron Defendants' ability to investigate

Plaintiff's claims and prepare the Chevron Defendants' defenses has been prejudiced by Plaintiff's inexcusable delay in bringing its claims.

46.     Plaintiff is estopped from asserting claims at law or in equity against the Chevron Defendants.  Equitable estoppel is based on numerous actions that Plaintiff voluntarily took and on which the Chevron Defendants relied.  Such reliance is detrimental unless equitable estoppel is applied.

a.     For example, and as detailed above in Paragraph 44(a) through (l), Plaintiff has long known about MTBE and MTBE release sites in Pennsylvania and, acting through PADEP, Plaintiff set MCLs for MTBE and established other risk-based corrective action policies that allowed for the investigation, remediation, and closure of sites where low levels of MTBE remained in soil and groundwater.

b.     Parties conducting investigations and/or remediations of sites where MTBE was released ("Responsible Parties"), including certain Defendants, for years have worked closely and cooperatively with PADEP and abided by, and continue to abide by, the corrective action policies and regulations enacted by Plaintiff.  These Responsible Parties, including many Defendants, have devoted enormous time and resources to investigating and remediating gasoline release sites, including sites with MTBE impacts, at and under Plaintiff's direction and in accordance with its policies and regulations. In so doing, these Responsible Parties have relied in good faith on Plaintiff's oversight, policies, regulations, and other guidance, and often have ceased investigatory and remedial activities—*with Plaintiff's permission*—when PADEP has determined that action no longer is

needed at a particular site. In addition, Defendants that merely supplied gasoline to service stations in Pennsylvania relied in good faith on plaintiff's policies, knowing that the parties responsible for releases at service stations would be required to follow PADEP's investigatory and remedial requirements, and that all investigative, remedial and closure activities were subject to PADEP oversight and approval on behalf of Plaintiff.

c.      Notwithstanding the acts and positions detailed above that Plaintiff officially took in its stance as a regulator, as a litigant, Plaintiff now seeks to hold all Defendants jointly and severally liable for, *inter alia*, the cost of returning groundwater and drinking water resources impacted by MTBE to a "pre-discharge" condition.  *See, e.g.*, Compl. ¶ 8 & Prayer for Relief.  Plaintiff also seeks to hold all Defendants jointly and severally liable for, *inter alia*, "past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells." *Id.* ¶¶ 359, 366, 374, 384, 391.  Such relief would work to the Chevron Defendants' detriment, requiring them to reinvestigate sites that were previously closed with Plaintiff's approval, and to take other actions that Plaintiff previously deemed unnecessary to protect public health and the environment.  Plaintiff is equitably estopped from obtaining relief where Responsible Parties abided by corrective action policies and regulations that Plaintiff established, and where those Responsible Parties relied upon Plaintiff's

guidance, directives and binding instructions at specific MTBE release sites, including but not limited to, Commonwealth-owned properties (where Plaintiff itself released gasoline containing MTBE and was the party responsible for performing remedial activities).

d.      In addition, Plaintiff is equitably estopped from recovering costs for which the Commonwealth already has been reimbursed or otherwise paid from funds collected (by the Commonwealth) through USTIF.

e.      Funds generated by USTIF are used to partially reimburse owners and operators of gasoline service stations for remediation costs associated with UST leaks for "primary coverage for corrective action costs and eligible claims for personal injury and property damage due to a release from a UST." 25 Pa. Code § 977.38(a).

f.      Parties pay fees into the USTIF for every gallon that enters a UST in the Commonwealth and in exchange are entitled to receive reimbursements.

g.      The Commonwealth's USTIF fee revenue for 2018 totaled $58,251,433, with total payments for open UST claims totaling $30,112,367. *Pennsylvania Underground Storage Tank Indemnification Fund*, 2018 Annual Report, *available at*

https://ustif.pa.gov/documents/10197/0/2018_PAUSTIF_Annual+Report_Final_2019-03-09-3.pdf/ff7f00b3-de87-466d-852a-0d15991c06bd.

h.      The Chevron Defendants, some of which paid oil fees to USTIF, relied on USTIF to cover costs incurred by Plaintiff to address MTBE releases. Plaintiff is equitably estopped from obtaining any damages based on remedial costs already

paid to Plaintiff by USTIF, including but not limited to, remediation performed at properties owned by Plaintiff.

47.     Plaintiff's claims are barred in whole or in part by the doctrines of waiver and estoppel.

a.     Plaintiff waived the right to pursue damages for those gasoline release sites where Plaintiff previously approved remediation plans and/or authorized site closure in a manner that allowed MTBE to remain present, including sites where plaintiff itself was the party responsible for the gasoline release and subsequent cleanup. Plaintiff (and, specifically, the PADEP) must approve a remediating party's spill prevention response plan.  35 Pa. Stat. Ann. §§ 6026.903(b).  The level of remediation required by such a corrective action plan is site-specific and within the discretion of Plaintiff, who has the authority to require Responsible Parties to continue remediation and annually update the spill prevention response plan.  *Id.* at § 6026.903(a).   On information and belief, Plaintiff routinely approves corrective action plans, including at state-owned or state-operated sites (where Plaintiff itself released gasoline containing MTBE and performed remediation), which do not require the complete removal of all MTBE from soil and/or groundwater. Indeed, on information and belief, in many instances, Plaintiff (through the PADEP) approves corrective action plans that do not require active remediation at all but, instead, allow for the monitored natural attenuation of gasoline contamination, including MTBE contamination.

b.     On information and belief, Plaintiff also often approves closure of remediation sites involving MTBE, ending the Responsible Parties' remediation

obligations at the site, without requiring that all MTBE be removed at or around the site.  Plaintiff approves these closures where it has concluded that additional remediation is not necessary to protect public health and the environment. Such closure decisions often are memorialized in closure letters or RACR approval letters from the PADEP and, in at least some instances, those letters only reserve Plaintiff's right to pursue further enforcement for site impacts or activities that are unrelated to those for which closure has been granted.  In those situations, Plaintiff has waived the right to pursue the Responsible Party for additional remedial activity or costs relating to the MTBE that Plaintiff, in granting site closure, determined did not require further remediation.

c.      Furthermore, to the extent that Plaintiff has granted closure letters to the Chevron Defendants for remediation sites involving MTBE under the Tank Act and Act 2, Plaintiff has waived the right to pursue additional remediation costs. *See* 35 Pa. Stat. Ann. § 6026.501(a) (providing that under Act 2, persons and entities that comply with the applicable environmental cleanup standards—here, the Tank Act—"shall be relieved of further liability for the remediation of the site under the statutes outline in section 106 for any contamination identified in reports submitted to and approved by [PADEP] to demonstrate compliance with these standards").

48.    Plaintiff's claims are barred to the extent that it has unreasonably failed to mitigate its damages, if any.

d.      Plaintiff seeks to hold the Chevron Defendants responsible for the cost of returning groundwater and drinking water wells impacted by MTBE to a "pre-

discharge condition." *See, e.g.*, Compl. ¶ 9 & Prayer for Relief. Plaintiff will argue that this equates to a demand for environmental remediation and treatment of MTBE until MTBE is below detectable levels—*i.e.*, essentially zero. Yet, outside of this litigation, as a regulator, Plaintiff routinely permits Responsible Parties—including Commonwealth departments and agencies—to cease remediation with MTBE remaining in the environment at levels *above* the nondetect standard that it now demands be imposed in this case. Plaintiff allows this to occur because it knows that remediation of MTBE to this alleged "pre-discharge" standard is not necessary to protect human health or the environment. The level of remediation required by such a remediating party's spill prevention response plan under the Tank Act is site-specific and within the discretion of Plaintiff, who has the authority to require Responsible Parties to continue remediation and annually update the spill prevention response plan. Indeed, Plaintiff could have set its environmental investigation/remediation standard for MTBE at zero, but it chose not to do so. In fact, the Chevron Defendants are not aware of a single regulatory authority in the entire country that has set such a standard.

e. The Chevron Defendants agree with Plaintiff that site investigation and remediation to "pre-discharge condition" is not reasonable or necessary, for MTBE or any other constituent of gasoline. But if Plaintiff is allowed to pursue such extreme relief in this case as a litigant, Plaintiff would have failed to mitigate the very damages it now claims. By permitting Responsible Parties—including Commonwealth entities—to remediate only to certain site-specific levels, and to

cease remedial activities before groundwater has been returned to so-called "pre-discharge" conditions, Plaintiff has neglected, for decades, to mitigate the conjured damages it now seeks to recover from many of those remediating parties in this case. Moreover, on information and belief, Plaintiff has contributed to its alleged damages by, for example, allowing or requiring Responsible Parties to remove remediation systems and monitoring wells that, under Plaintiff's current litigation theory, must now be reactivated or re-installed again; and also by permitting MTBE to remain in groundwater at detectable (albeit safe) levels and potentially travel further in groundwater than it would have if plaintiff had required remediation to pre-contaminated conditions at the time remedial action was taking place. On information and belief, Plaintiff also has engaged in the above conduct in its role as the "Responsible Party" at State-owned remediation sites—*e.g.*, ceasing remediation activities despite MTBE remaining in the groundwater at detectable levels.

f.      In sum, Plaintiff should not be allowed to seek costs and injunctive relief for investigation and remediation of MTBE down to levels it never previously required of itself or other Responsible Parties.

49.      The SAC and each purported cause of action asserted therein are barred in whole or in part because there is a defect or misjoinder of parties, in that Plaintiff failed to join indispensable or necessary parties. Plaintiff failed to sue the necessary or indispensable parties, which include, but are not limited to, downstream handlers that own underground storage tanks in Pennsylvania; retail gasoline stations in Pennsylvania that are independently owned and not operated by major oil companies; numerous jobbers operating in Pennsylvania; numerous rack

marketers; various gasoline traders; gasoline blenders or owners of gasoline blending facilities in Pennsylvania; manufacturers of underground storage tanks; merchant producers of neat MTBE; importers of neat MTBE; and hundreds of spillers of gasoline and "Potentially Responsible Parties" identified by the Pennsylvania Department of Environmental Protection.

50.     The SAC and each purported cause of action asserted therein are barred in whole or in part, based on Plaintiff's actual notice of reported spills or releases, if any, from publicly available records.  Releases of reportable quantities of gasoline are required to be reported to the relevant Commonwealth agencies.  Plaintiff had access to those records and reports.  Plaintiff's claims are also barred, in whole or in part, to the extent Plaintiff had constructive notice of spills and releases from any source.

51.     Plaintiff's claims for natural resource damages are barred, in whole or in part, because Plaintiff does not own or have a trusteeship interest in the property and/or natural resources allegedly impacted.  Further, under Pennsylvania law, natural resource damages may only be recovered where a specific statute allows for their recovery and the only such statute that allows natural resource damages recover is the Hazardous Sites Cleanup Act.  Plaintiff has not asserted a claim against the Chevron Defendants under that statute.

52.     Plaintiff lacks authority to bring common-law *parens patriae* claims absent specific statutory authorization.  Furthermore, any funds awarded to Plaintiff must be placed into a trust to ensure such monies are used to address MTBE impact, if any, in the Commonwealth.

53.     The SAC and each purported cause of action asserted therein are barred in whole or in part because Plaintiff does not have a legally cognizable injury unless or until the alleged level of MTBE and/or TBA exceeds applicable action levels.  Pennsylvania statutes and regulations allow, and indeed encourage, the cleanup of remediation sites to one of three levels –

background levels, a statewide health standard, or a site-specific standard.  At certain sites, PADEP approved cleanup based upon site-specific standards that exceeded the statewide health standard.  Plaintiff cannot satisfy the actual injury requirement for any of its causes of action where the levels of MTBE has been deemed acceptable under Pennsylvania law.

**PUERTO RICO**

1.      The complaint and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to Article 1868 of the Puerto Rico Civil Code.

2.      Plaintiffs' common law claims are barred, in whole or in part, by the Public Policy Environmental Act.

3.      Plaintiffs' public nuisance claim is barred because no act or omission by the Chevron Defendants has caused, or will cause, any alleged injury recognized by P.R. Laws Ann. tit. 32 § 2761.

4.      Plaintiffs' public nuisance claim is barred because the alleged activity does not constitute an "ultra-hazardous activity" or "illegal hazardous activity" under Puerto Rico law.

5.      Plaintiffs' public nuisance claim fails because they have not alleged, and cannot show, any "special damages" under Puerto Rico law.

6.      Plaintiffs' claim for future costs is barred by P.R. Laws Ann. tit. 32 § 2761.

7.      Plaintiffs' claim for trespass is barred because it is not a recognized cause of action under the Puerto Rico Civil Code.

8.      Plaintiffs' negligence claim fails because they have to plead, and they cannot establish, the elements of a negligence claim under Art. 1802 of the Puerto Rico Civil Code.

9.      Plaintiffs lack standing to bring a citizen suit under Puerto Rico Public Policy Environmental Act ("PPEA"), P.R. Laws Ann. tit. 12 § 8001 et seq.

10.    The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc.  are not liable under the PPEA because they have followed and complied with all applicable dispositions and regulations promulgated under the PPEA, if any.

11.    The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable under the PPEA because their actions have not, in any manner, contributed or created any damage or degradation to any of the Commonwealth's natural resources.

12.    The  Chevron  Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are  not  liable  under  the  PPEA  because  the  alleged releases, if any, were caused by an act or omission of a third party, and the Chevron Defendants exercised due care and took precautions against foreseeable acts of a third party.

13.    Plaintiffs lack standing to bring a suit for alleged violations of the Water Pollution Control Act ("WPCA"), P.R. Laws Ann. tit. 24 § 591 et seq.

14.    Plaintiffs cannot recover under the WPCA because MTBE is not a "pollutant" within the meaning of the WPCA, P.R. Laws Ann. tit. 24 § 591(h).

15.    The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable under the WPCA because the prohibitions, as well as the definitions contained in the WPCA, are unconstitutionally vague.

16.    Plaintiffs' claims are barred because MTBE is not considered a "pollutant" by the Commonwealth's Water Quality Standards Regulations, Department of State Regulation No. 6616.

17.    The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable under the Water Quality Standards Regulations because MTBE is not regulated or limited under the Water Quality Standards Regulations.

18.     The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable for alleged violations of the Water Quality Standards Regulations because the releases, if any, were caused by an act of God.

19.     The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable under the Water Quality Standards Regulations because the releases, if any, were caused by an act or omission of a third party and the Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. exercised due care and took precautions against foreseeable acts of such third party.

20.     The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable for alleged violations of the Underground Storage Tank Regulations because MTBE is not considered a "Regulated Substance" under Department of State Regulation No. 4362 or other applicable regulations.

21.     The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. are not liable for alleged violations of the Underground Storage Tank Regulations because the alleged releases, if any, were caused by an act of God.

22.     The Chevron Puerto Rico Defendants, Chevron Corporation and Chevron U.S.A. Inc. complied with all applicable law and regulations in Puerto Rico governing MTBE, including but not limited to all applicable laws and regulations regarding investigation, reporting and/or remediation of MTBE in the environment.

23.     Plaintiffs' claim for exemplary and/or punitive damages is barred because such relief is not available under Puerto Rico law.

24.     Plaintiffs' claim for "restitution for unjust enrichment" and/or "disgorgement of profits" is barred because such relief is not available in these cases under Puerto Rico law.

25.     Texaco International Trading Inc. was dissolved properly under Delaware law more than three years before the Commonwealth of Puerto Rico and the Commonwealth of Puerto Rico, by and through the Environmental Quality Board, filed their complaint in 14-CV-1014.  As such, Texaco International Trader Inc. lacks the capacity to be sued in 14-CV-1014.

26.     ChevronTexaco Global Trading was never a corporation and it ceased to exist on June 30, 2004.  ChevronTexaco Global Trading lacks the capacity to be sued in 14-CV-1014.

**FEDERAL CERCLA AND RCRA CLAIMS**

1.     Plaintiffs have failed to state a claim for relief against the Chevron Defendants under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq. ("CERCLA").

2.     The Chevron Defendants are not liable parties under CERCLA as defined in 42 U.S.C. § 9607(a)(1)-(4).

3.     Plaintiffs' claims under CERCLA are barred by 42 U.S.C. § 9607(b)(3), because the alleged releases or threatened releases of hazardous substances, and alleged damages resulting therefrom, if any, were caused solely by acts or omissions of third parties.

4.     Plaintiffs' claims under CERCLA are barred and/or untimely under the applicable provisions of the pertinent statute of limitations, including, but not limited to, those set forth in 42 U.S.C. § 9613.

5.     To the extent that any or all of the defendants are found liable under CERCLA, joint and several liability is inappropriate as to the Chevron Defendants because the damages are divisible, there are distinct harms, or there is a reasonable basis for apportionment of the alleged harms suffered.

6.      Plaintiffs' claims under CERCLA are barred because petroleum products, including gasoline containing MTBE, are excluded from the definition of "hazardous substances" under CERCLA.

7.      Plaintiffs' claims under CERCLA are barred because any past or future costs, if any, incurred by Plaintiffs in responding to an alleged release or threatened release of hazardous substances are inconsistent with the National Contingency Plan or otherwise not recoverable under CERCLA.

8.      Plaintiffs' claims under CERCLA are subject to either the exclusive jurisdiction or the primary jurisdiction of the United States Environmental Protection Agency ("USEPA").

9.      Plaintiffs are unable to recover their alleged natural resource damages under CERCLA.

10.     Plaintiffs' claims under CERCLA are barred because Plaintiffs have failed to satisfy each and every condition precedent necessary to recover for past and/or future response costs under CERCLA.

11.     The costs and damages allegedly incurred or to be incurred by Plaintiffs, if any, are unreasonable, duplicative, not cost effective and, therefore, are not recoverable under CERCLA.

12.     Plaintiffs' claims under CERCLA for natural resource damages are barred, in whole or in part, because the alleged damages constitute irreversible and irretrievable commitments of natural resources.

13.     Plaintiffs' claims under CERCLA are barred by 42 U.S.C. § 9607(b)(1)-(2) because the alleged releases or threatened releases of hazardous substances, and alleged damages resulting therefrom, if any, were caused solely by acts of God and/or acts of war.

14.     Without admitting any liability, if it is determined that the Chevron Defendants engaged in any of the activities alleged by Plaintiffs, such activities on the part of the Chevron Defendants were *de minimis.*

15.     Plaintiffs' CERCLA claim is barred because Plaintiffs have failed to comply with the jurisdictional prerequisites for bringing a claim under CERCLA.

16.     The Chevron Defendants are not liable under CERCLA because Plaintiffs' claims are barred by the doctrines of estoppel, unclean hands, and/or laches.

17.     Plaintiffs' CERCLA claims are barred, in whole or in part, because the sites at issue are not listed on the NPL.

18.     Plaintiffs have failed to state a claim for relief against the Chevron Defendants under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq. ("RCRA").

19.     Plaintiffs' claims under RCRA are barred to the extent plaintiffs seek relief for conduct occurring or damages incurred prior to the effective date of RCRA.

20.     Plaintiffs' claims under RCRA are barred because MTBE and gasoline containing MTBE are not "solid wastes" and/or "hazardous wastes" under RCRA.

21.     Plaintiffs' RCRA claim fails because Plaintiffs failed to allege, and they cannot show, that the Chevron Defendants have violated RCRA Subchapter III, if applicable.

22.     Plaintiffs' RCRA claim is barred because Plaintiffs have failed to comply with the jurisdictional prerequisites for bringing a claim under RCRA.

                                    Respectfully submitted,


                                     */s/ Jeremiah J. Anderson*
                                    Robert E.  Meadows
                                    Jeremiah J. Anderson
                                    James J.  Maher

KING & SPALDING LLP
1100 Louisiana, Suite 4100
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290

Charles C. Correll, Jr.
King & Spalding LLP
101 Second Street, Suite 2300
San Francisco, California 94015
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

**Attorneys for the Chevron Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021, a true, correct, and exact copy of the foregoing document was served on all counsel via File&ServeXpress.


_/s/ Jeremiah J. Anderson_
Jeremiah J. Anderson