**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**IN RE METHYL TERTIARY BUTYL**
**ETHER ("MTBE") PRODUCTS**
**LIABILITY LITIGATION**

**Master File No. 1:00–1898-VSB**
**MDL 1358**
**M21-88**

---

**This document relates to:**

*All Cases in MDL 1358 in which the CITGO*
*entities have been properly named and*
*served and for which an answer is now due,*
*including:*

*Commonwealth of Pennsylvania v.*
*Exxon Mobil Corp., et al.,*
Case No. 14-cv-06228

---

### THE CITGO DEFENDANTS' TENTH AMENDED MASTER ANSWER, AFFIRMATIVE AND SEPARATE DEFENSES[1]

In accordance with the November 16, 2005 Stipulation regarding Master Answers,

Case Management Order No. 6, the Court's instructions from the January 13, 2005 status

conference and the Court's Opinion and Order from August 2, 2021, CITGO Petroleum

Corporation ("CITGO"), CITGO Refining and Chemicals Company L.P. ("CRCC"),[2]

CITGO International Puerto Rico Company ("CITGO P.R."),[3] and CITGO International,

---

[1] The CITGO Defendants' Tenth Amended Master Answer, Affirmative and Separate Defenses only applies to a CITGO entity to the extent that entity has been properly named and served. Not all of the CITGO entities have been named and served in each of the cases in MDL 1358. The CITGO Defendants also expressly reserve the arguments that were rejected by the Court in its rulings on the motions to dismiss for purposes of preserving their rights, including any appeals rights.

[2] CITGO Refining and Chemicals Company L.P. was incorrectly identified in the complaints filed by the Commonwealth of Puerto Rico, et al (07 Civ. 10470, 14 Civ. 01014) as "CITGO Refining and Chemical Company, L.P."

[3] CITGO International Puerto Rico Company was incorrectly identified in the complaints filed by the Commonwealth of Puerto Rico (07 Civ. 10470, 14 Civ. 01014) as "CITGO International P.R."

Inc. ("CITGO International") (collectively referred to as "the CITGO entities"), hereby file their Tenth Amended Master Answer, Affirmative and Separate Defenses, and respond and state as follows:

<u>**TENTH AMENDED MASTER ANSWER**</u>

**I.**    <u>**RESPONSES TO COMMON ALLEGATIONS**</u>

**A.**    **Allegations Regarding the CITGO Entities**

1.    CITGO is a Delaware corporation with its principal place of business in Houston, Texas.  CITGO's parent corporation is CITGO Holding, Inc., which is a wholly-owned subsidiary of PDV Holding, Inc., which is a wholly-owned subsidiary of Petróleos de Venezuela S.A.

2.    CRCC is a Delaware limited partnership with its principal place of business in Corpus Christi, Texas.  CITGO is the general partner; CITGO Investment Company, a wholly-owned subsidiary of CITGO, is the limited partner.

3.    CITGO P.R., which was a Commonwealth of Puerto Rico general partnership, is no longer active.  CITGO P.R.'s partners were CITGO Cayman Investment, LLC and CITGO International Investment Company.

4.    CITGO International is a Delaware corporation with its principal place of business in Houston, Texas.  CITGO International is wholly owned by CITGO Investment Company, a wholly-owned subsidiary of CITGO. CITGO International was formerly known as CITGO International Latin America, Inc., the entity named and served in the 2014 complaint filed by the Commonwealth of Puerto Rico, et al (14 Civ. 01014).

5.    The CITGO entities deny all allegations that parent corporations exercised pervasive and excessive control over subsidiary entities and that subsidiary corporations

improperly acted as agents of parent corporations.

6.     The CITGO entities deny that any actions or liabilities of any named or unnamed entities, including but not limited to any predecessor, successor, parent, subsidiary, affiliate or division, or of any "related" entity, can be imputed to them, regardless of any corporate affiliation.

7.     The CITGO entities deny that they acted as a joint venturer, partner, agent, principal, successor-in-interest, surviving corporation, transferee, transferor, controller, alter-ego or indemnitor of or with any other Defendant or entity or that they are, or can be, jointly and severally liable to the Plaintiffs.

**B.     Allegations Regarding the Motivation to Add MTBE to Gasoline**

8.     The CITGO entities admit that MTBE and other oxygenates, including ethanol, were added to gasoline in varying concentrations to comply with a variety of federal fuel requirements and/or to improve its octane rating.  Following the EPA's mandate to reduce lead in gasoline, most U.S. refiners began evaluating oxygenates and octane enhancers, such as ethanol and MTBE.  CITGO was the leading supplier of ethanol-blended gasoline in the United States for a period of time in the 1980s, but it was forced to replace ethanol with MTBE in certain parts of the country due to tremendous obstacles it faced with supply; distribution; prohibitions on commingling of MTBE and ethanol; dissatisfaction from its largest customer, the auto industry and consumers; and other issues.

9.     The CITGO entities deny that Congress adopted the Reformulated Gasoline Program ("RFG") as part of the 1990 Amendments to the Clean Air Act as a result of lobbying efforts by the petroleum industry, including the Defendants.  The CITGO entities

state that many major companies within the petroleum industry actively resisted the oxygen content requirement of the RFG Program.

10.     The CITGO entities deny their decision to use MTBE as an oxygenate was solely based on cost considerations.

**C.     Allegations Regarding the Production of MTBE**

11.     CITGO manufactured MTBE at certain times at its refinery located in Lake Charles, Louisiana.  CRCC manufactured MTBE at certain times at its refinery in Corpus Christi, Texas.  CITGO P.R. and CITGO International did not own or operate a refinery and did not manufacture MTBE.

**D.     Allegations Regarding the Sale or Distribution of Gasoline with MTBE or TBA**

12.     CITGO admits that it sold gasoline for resale or arranged for the sale of gasoline (for one or more time periods between 1983 and the present) to marketers and wholesalers in at least a portion of one or more of the following states or commonwealths in which Plaintiffs have pending cases in MDL 1358: California, Pennsylvania, and the Commonwealth of Puerto Rico.  Some of this gasoline may have contained MTBE before the spring of 2006; some of it did not.  Although CITGO did not manufacture TBA, it purchased gasoline on exchange that may have contained TBA.  CRCC denies that it marketed or distributed gasoline.  CITGO International sold or arranged for the sale of gasoline to CITGO P.R.  CITGO P.R. supplied gasoline to independent distributors in the Commonwealth of Puerto Rico for a short period of time.

13.     CITGO does not currently own, operate or control gasoline stations and has not done so historically except in limited situations prior to 1985 in Pennsylvania and Orange County, California.  CITGO has never owned, operated or controlled a gasoline

station in the Commonwealth of Puerto Rico.  Furthermore, none of the other CITGO entities has ever owned, operated or controlled gasoline stations.

### E.   Allegations Regarding the Properties and Behavior of MTBE

14.   The CITGO entities admit that MTBE is an aliphatic ether that does not occur naturally.  The CITGO entities state that there are various methods for the production of MTBE and that one method of production is from methanol and isobutylene.

15.   The CITGO entities state that solubility and mobility are relative properties and that while MTBE and other ethers may be more soluble and mobile in water than certain gasoline substances, such as the BTEX compounds, they are less soluble and mobile in water than other substances sometimes blended into gasoline, such as ethanol.  The CITGO entities further state that MTBE's behavior in the environment – and its behavior relative to the BTEX compounds – is dependent on a variety of site-specific factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.

16.   The CITGO entities state that while under certain conditions MTBE may biodegrade less readily than some other substances of gasoline, MTBE has been found to naturally attenuate and biodegrade in numerous ways.

17.   The CITGO entities deny that they breached any duties to Plaintiffs, any government agency or the general public regarding MTBE.

### F.   Allegations Regarding the Properties and Behavior of TBA

18.   The CITGO entities admit that TBA is formed in the reaction of isobutylene and water.  The CITGO entities deny they manufactured TBA. The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the

allegations in Plaintiffs' complaints concerning the use of TBA as an oxygenate in gasoline.

19.     The CITGO entities state that solubility and mobility of TBA are relative properties and admit that TBA is more soluble and mobile in water than certain gasoline substances, such as the BTEX compounds.  The CITGO entities further state that TBA's behavior in the environment – and its behavior relative to the BTEX compounds – is dependent on a variety of site-specific factors, including the nature or method of its release, the geological setting, and environmental and microbial factors.  The CITGO entities admit that TBA can be an intermediate product of MTBE biodegradation.

20.     The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations concerning the properties, characteristics, persistence, remediation and health effects of TBA in groundwater or its presence in water supplies.  The CITGO entities further state that the EPA has not limited or eliminated the use of TBA.

21.     The CITGO entities object to Plaintiffs' attempt to extend their claims and allegations regarding MTBE to TBA or to some unidentified category of derivative and breakdown products of MTBE.

22.     The CITGO entities deny that they breached any duties to Plaintiffs, any government agency or the general public regarding TBA.

## G.     Allegations Regarding the Taste and Odor of MTBE

23.     The CITGO entities state whether MTBE imparts taste and odor to water depends on a variety of factors, including the MTBE concentration. The CITGO entities state that individuals vary in their ability to detect the taste and odor of MTBE in water.

The CITGO entities further state that responsible federal and state regulatory agencies have considered and adopted standards fully protective of MTBE taste and odor concerns.

### H.    Allegations Regarding the Health Effects of MTBE

24.    The CITGO entities deny Plaintiffs' allegations that they did not do enough to determine if MTBE was safe for use in gasoline.  The CITGO entities state they supported continuing efforts to test MTBE for potential health effects and that MTBE has been studied publicly by scientists and government agencies for many years.  The CITGO entities further state that these studies found that MTBE had a relatively low toxicity. MTBE has never been reliably linked to cancer; indeed, major world health organizations have long refused to list MTBE as a human carcinogen.  The CITGO entities admit the EPA in the past classified MTBE as a possible human carcinogen.  The CITGO entities admit that certain legislatures or regulatory agencies passed laws or adopted regulations to limit or eliminate the use of MTBE in gasoline, but others, including the federal government and the Commonwealth of Pennsylvania, have not.  The CITGO entities state that responsible federal and state regulatory agencies have considered, adopted and enforced standards fully protective of any alleged human health concerns related to MTBE.

### I.    Allegations Regarding the Storage and Handling of Gasoline

25.    The CITGO entities, except in limited historical circumstances prior to 1985, have not owned retail gasoline stations or the underground storage tanks used at those locations. The CITGO entities admit that gasoline can be released into the environment from leaks in underground storage tanks ("USTs") and by other means.  The CITGO entities deny that they had an indifferent attitude toward gasoline spills and leaks of any size.  Further answering, the CITGO entities state that gasoline handlers, consumers

and the general public have long been aware that gasoline should be handled carefully and should not be spilled or leaked, irrespective of its particular components. The CITGO entities deny that they are responsible for any handling or mishandling of gasoline by others, or for any spills or leaks caused by or attributed to others. The CITGO entities further note that the federal government and certain states and commonwealths have enacted laws and regulations and engaged in enforcement efforts to upgrade gasoline storage and dispensing equipment in order to eliminate or reduce spills and leaks, and the CITGO entities relied on others to comply with same.

> **J.** **Allegations Regarding MTBE and Groundwater**

26. The CITGO entities deny that the release of MTBE in groundwater is widespread or that the release of MTBE in groundwater is or was inevitable and foreseeable. Further answering, the CITGO entities state that at all times they have fully supported and encouraged the safe handling and storage of gasoline in compliance with all laws, rules and regulations pertaining to same, irrespective of the substances used in gasoline at the time. The CITGO entities deny they are responsible for the release of MTBE, TBA or gasoline containing MTBE or TBA, or for the presence of MTBE or TBA in groundwater.

27. The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the Ad Hoc Committee on MTBE or the American Petroleum Institute's Toxicology Committee.

28. The CITGO entities deny Plaintiffs' allegations that they had knowledge of any unique environmental harm attributable to the use of MTBE in gasoline.

29. The CITGO entities deny Plaintiffs' allegations that MTBE posed an

unreasonable risk to groundwater.  The CITGO entities deny that they concealed or conveyed partial or incorrect information regarding the nature and impact of MTBE.  The CITGO entities deny that they possessed superior knowledge in comparison to governmental agencies with respect to gasoline and MTBE.  The CITGO entities deny that they breached any duties to Plaintiffs, any government agency, gasoline handlers or the general public regarding MTBE or TBA or gasoline containing MTBE or TBA.

30.     The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding reports on the incidence of MTBE releases in groundwater by the United States Geological Survey.

31.     The Report of the EPA Blue Ribbon Panel on MTBE speaks for itself, and therefore the CITGO entities deny the allegations that purport to describe or characterize it.

32.     The CITGO entities admit that in 2001 the EPA provided advance notice of its intent to initiate a rulemaking pursuant to the Toxic Substances Control Act ("TSCA") to eliminate or limit the use of MTBE in gasoline, but this rulemaking was not completed. The CITGO entities admit that certain legislatures or regulatory bodies passed laws or adopted regulations to limit or eliminate the use of MTBE in gasoline, but others, including the federal government and the Commonwealth of Pennsylvania, have not.

**K.    Allegations Regarding Knowledge of MTBE Releases at Particular Locations in the 1980s**

33.     The complaints purport to describe various incidents of MTBE releases in Maryland, New Jersey, New York, and Maine in the 1980s.  The CITGO entities state that they were not involved in any of these incidents and that they are without knowledge or information sufficient to form a belief as to the truth of these allegations.  The CITGO

9

entities deny knowing more about these incidents than what was publicly reported.

**L.      Allegations Regarding the 1986 Garrett and Moreau Report**

34.      The CITGO entities state that the 1986 Garrett and Moreau report speaks for itself, and the CITGO entities therefore deny the allegations that purport to describe or characterize it.  The allegations relating to various companies' reactions to the Garrett and Moreau report do not relate to the CITGO entities and the CITGO entities are without knowledge or information sufficient to form a belief as to the truth of those allegations and on that basis deny them.

**M.      Allegations Regarding the Defendants' Internal Documents Concerning MTBE**

35.      The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of Plaintiffs' allegations regarding certain communications or documents authored by employees of companies other than the CITGO entities.  The CITGO entities deny that any other companies acted on their behalf. The CITGO entities further state that the January 1996 memorandum summarizing some of the matters discussed during a conference call held among members of the API's Soil and Groundwater Technical Task Force speaks for itself and the CITGO entities deny any allegations that purport to describe or characterize it.

**N.      Allegations Regarding Representations about MTBE**

36.      The CITGO entities deny that they formed or participated in any task force or committee for the purpose of concealing information about MTBE from the Plaintiffs, the EPA or any other government agency, or the public.  CITGO admits that it was a member of American Petroleum Institute ("API") from January 1994 – December 2002. CITGO was not a member of the Oxygenated Fuels Association ("OFA").  None of the

other CITGO entities were members of either API or OFA.

37.     The complaints contain various allegations regarding alleged industry misrepresentations about MTBE.   The CITGO entities deny that they made any misrepresentations about MTBE to the Plaintiffs, the EPA or any other government agency, or the public, either directly or indirectly through an industry organization or trade group. The CITGO entities deny that MTBE, TBA, or gasoline containing MTBE or TBA are defective products.

**O.     Allegations Regarding Representations About Testing Under the Toxic Substances Control Act (TSCA) in the Late 1980s**

38.     The 1986 Notice published by the federal Interagency Testing Committee ("ITC") speaks for itself and therefore the CITGO entities deny the allegations that purport to describe or characterize it.

39.     The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning ARCO's representations or communications to the ITC concerning MTBE.   The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning the ITC's reliance on any ARCO representation or communication.   The CITGO entities deny that ARCO's comments, representations or communications to the ITC were submitted on their behalf or with their approval.

40.     The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning representations by ARCO and Exxon to the EPA at the EPA's December 17, 1986 Public Focus Meeting, which they did not attend.   The CITGO entities deny that they assented to any representations made by ARCO and Exxon at the December 17, 1986 meeting.   The CITGO entities deny that they

11

attempted to convince the EPA that additional testing of MTBE was not needed.

41.     The CITGO entities deny that they were members of the multi-company task group formed by certain MTBE Defendants and known as the "MTBE Committee." The complaints purport to describe or characterize documents from or by the MTBE Committee, which speak for themselves, and on that basis the CITGO entities deny those allegations.

42.     The CITGO entities deny that they made any misrepresentations regarding MTBE testing to the ITC or the EPA, directly or indirectly.  The CITGO entities deny that they obstructed health and environmental safety research concerning MTBE, or concealed information concerning MTBE and groundwater.  The CITGO entities deny that any industry group or any other Defendant named in the MTBE lawsuits made any representations about MTBE's health or safety to the public or government officials on their behalf or with their approval.

43      The CITGO entities further deny that representations or communications of other Defendants or industry trade associations are evidence of any improper act, omission or breach of any duty on the part of the CITGO entities.

**P.     Allegations Regarding the Requirements and Effects of the 1990 Clean Air Act Amendments**

44.     The CITGO entities admit that prior to 1990, the federal government was preparing to take action to address the nation's smog problem.  With passage of the Clean Air Act Amendments ("CAAA") in 1990, the federal government mandated an increase in the use of oxygenates in gasoline.  The CITGO entities state that although the CAAA did not mandate MTBE as the only oxygenate, in practical terms the CAAA did compel MTBE's use.  The EPA and Congress knew that the oxygen requirements of the CAAA

could not be met without the use of MTBE.  The CITGO entities admit the federal government mandated the use of RFG containing at least 2% oxygen by weight in certain areas of the country that were non-attainment for ozone.  The CITGO entities admit the federal government mandated an increase in the use of oxygenates (at least 2.7% oxygen by weight) in certain metropolitan areas to reduce carbon monoxide emissions during fall and winter months ("the Oxy Fuel Program").  The CITGO entities admit that RFG and Oxy Fuel may have contained between 10% and 15% MTBE by volume, or up to 10% ethanol, to meet federal government mandates concerning oxygen content.

45.    The CITGO entities deny that they misled the EPA or Congress during consideration and passage of the 1990 CAAA and implementing regulations.  The CITGO entities further deny that they worked individually, or in concert with any other party or Defendant, to block the use of ethanol as an alternative to MTBE as a permitted oxygenate.  The CITGO entities deny that ethanol was available in sufficient supply to meet the demand for oxygenated gasoline in the RFG and Oxy Fuel regions.

46.    The CITGO entities further state that they complied with the legal requirements of the lead phase-out, the RFG Program and the Oxy Fuel Program.  The CITGO entities further state that several federal and state agencies concluded that the use of MTBE in gasoline contributed substantially to reducing air pollution.

**Q.    Allegations Regarding Representations About Gasoline With MTBE**

47.    The CITGO entities deny that they misrepresented the properties of MTBE to Plaintiffs, any government agency, gasoline handlers or the public, or withheld information about MTBE.  The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning when the public

started to become aware of potential risks associated with releases of gasoline containing MTBE.

48.     The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of the allegations concerning representations made by George Dominguez in April 1987 to the Conference on Alcohols and Octane.  The CITGO entities state that the 1996 pamphlet published and distributed by the OFA and other documents referenced and cited in the complaints speak for themselves, and the CITGO entities deny the allegations that purport to summarize and characterize these documents on that basis.

49.     The CITGO entities deny they knew, or should have known, that MTBE was difficult and costly to remediate.  The CITGO entities state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning what alternatives gasoline handlers and the general public might have sought or the circumstances under which gasoline handlers and the public might have demanded MTBE-free gasoline.

50.     The CITGO entities deny they breached any duty to warn or deprived Plaintiffs, any government agency, gasoline handlers or the public of any facts.

**R.     Allegations Regarding the Use of MTBE in Gasoline After Creation of the RFG Program**

51.     The CITGO entities lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the production of MTBE nationally, and the use and concentrations of MTBE in gasoline by the petroleum industry after the creation of the RFG Program.  With regard to the allegations that Defendants sold gasoline with "elevated" or "high" concentrations of MTBE, the CITGO entities deny the implication that the use of MTBE or that a certain concentration of MTBE in their gasoline

14

was illegal or improper.  The CITGO entities deny that MTBE became its "oxygenate of choice" and that it "decided to forego safer oxygenates, such as ethanol."  The CITGO entities further state that, due to a myriad of issues with ethanol, including complexities regarding its supply and transport, ethanol was not available to satisfy all of the requirements of the RFG Program.  Further answering, the CITGO entities state that their products fully complied with all applicable state, commonwealth and federal requirements regarding fuel content.

### S. Allegations Regarding the Claimed Inability to Identify the Source of Gasoline

52.     The CITGO entities admit that the distribution of gasoline can sometimes be complex, and that refiners sometimes exchange product.  The CITGO entities deny that a release of gasoline can never be traced to a specific source.  In the vast majority of release incidents, the source of the gasoline can be identified.

### T. Allegations Purporting to Quote or Summarize Documents

53.     Numerous paragraphs in the complaints purport to quote from or summarize documents, statutes and regulations.  These materials speak for themselves.  The documents, statutes and regulations referenced by Plaintiffs are the best evidence of their content, and the CITGO entities therefore deny Plaintiffs' attempts to summarize or characterize the contents of these written materials.

### U. Allegations Regarding Particular Claims or Counts

54.     In response to the portions of the complaints purporting to state particular common law or statutory claims, the CITGO entities incorporate each paragraph of this Tenth Amended Master Answer as if fully restated herein.  The CITGO entities deny they are liable for any legal claim in any of the MDL 1358 complaints.

### V.       Allegations Regarding Claimed Injuries or Damages

55.       Some complaints assert claims about specific wells or water resources, alleged releases from specific sites, the extent of alleged releases, the reliance on groundwater for drinking water, amounts expended to address alleged releases, and subrogation rights.  The CITGO entities are without knowledge or information sufficient to form a belief as to the truth of such allegations, and therefore deny same.  The CITGO entities believe that publicly available information and other evidence will demonstrate that many of the wells or water resources allegedly at issue have not been impacted by MTBE or TBA, or have been impacted at levels well below action standards for MTBE or TBA.

56.       With regard to alleged damages, the allegations require no further answer. To the extent that further answer is deemed necessary, the CITGO entities deny that Plaintiffs are entitled to any relief.

### W.       Plaintiffs' Demands for Jury Trials

57.       Plaintiffs demand a trial by jury of all claims asserted in the complaints. These jury demands require no answer.  To the extent any answer is deemed necessary, the CITGO entities admit that the Plaintiffs demand jury trials, but deny that they are entitled to them.

### X.       Allegations Regarding Intentional, Willful, Deliberate, or Negligent Acts

58.       The CITGO entities deny that they intentionally, willfully, deliberately, recklessly or negligently committed any acts that allegedly caused or foreseeably could have caused harm to Plaintiffs or any other person or entity.

### Y.       Allegations of Representational Standing

59.     The Orange County Water District has alleged a right to bring an action in a representative capacity.  By orders dated June 9 and 22, 2005, the Court either struck all such allegations or confirmed that such allegations have been disavowed by the Plaintiffs. On the basis of these Court orders, the CITGO entities decline to answer these allegations. To the extent any answer is deemed necessary, the CITGO entities deny that any Plaintiff has standing to bring claims in a representational capacity.

**Z.     Certain Plaintiffs' Allegations of Ownership of the Groundwater Resources**

60.     Certain Plaintiffs allege that they own or have the authority to protect groundwater, groundwater resources, water resources, water supplies, water rights, or drinking water wells, or any other right in and to water or groundwater.  The CITGO entities deny that these Plaintiffs have standing to bring certain claims on behalf of themselves or any other person or entity.

**AA.    Certain Plaintiffs' Allegations of Injury to Natural Resources**

61.     Certain Plaintiffs' complaints contain allegations of damage to natural resources and seek compensation and other relief as the alleged trustee and/or owner of those natural resources.  The CITGO entities admit that groundwater, surface waters, wetlands and other ecological resources exist within the states and commonwealths at issue in MDL 1358 ("MDL states"); admit that some of those resources are privately owned and some are not; admit that some natural resources may and do provide commercial, industrial, recreational, and other services to the people of the MDL states and to the economies of the MDL states.

62.     The CITGO entities further admit that the police power of certain Plaintiffs extends to the protection and conservation of certain natural resources which are not the

17

private property of any person or entity; admit that by a longstanding legal fiction this proposition is sometimes inexactly expressed by saying that a state or commonwealth is the owner or trustee of natural resources for the benefit of its people or citizens; admit that certain governmental agencies have limited regulatory authority with respect to natural resources as provided by law.  The CITGO entities deny that they are liable for natural resources damages.

### BB.   Certain Plaintiffs' Allegations of *Parens Patriae* Status

63.     The CITGO entities deny that any Plaintiffs' assertion of alleged *parens patriae* status alleviates any common law burdens of proof or of a Plaintiff's need to meet required elements of common law and statutory claims.  The CITGO entities further deny that *parens patriae* status is appropriate for commonwealth-wide or state-wide relief where there is an insufficient showing of MTBE impact.

### CC.   Allegations Regarding Business Practices

64.     Some complaints contain allegations that Defendants engaged in deceptive or unfair trade practices.  The CITGO entities deny that they engaged in any such activity. On August 2, 2021, the Court dismissed the Commonwealth of Pennsylvania's claims under the Pennsylvania Uniform Trade Practices and Consumer Protection Law.  On the basis of the Court's order, the CITGO entities decline to answer Counts VI and VII of the Second Amended Complaint filed by the Commonwealth of Pennsylvania and any allegations relating to their business practices or any allegedly deceptive or misleading conduct that can be actionable under the Pennsylvania Uniform Trade Practices and Consumer Protection Law.  To the extent an answer is deemed necessary, the CITGO entities deny the allegations that relate to Counts VI and VIII of the Commonwealth of

Pennsylvania's Second Amended Complaint and deny that they engaged in any conduct or practice that is or was deceptive, misleading, fraudulent, or unfair or that is, or could be, actionable under the Pennsylvania Uniform Trade Practices and Consumer Protection Law or any other similar law.  The CITGO entities further deny that they deceived, misled, or defrauded any governmental agency, customer or consumer.

**DD.    Allegations Regarding Claims of Trespass**

65.    Some complaints contain allegations that Defendants are liable for trespass. The CITGO entities deny that they engaged in any such activity or are liable for any such claims.  On July 2, 2015, the Court dismissed the Commonwealth of Pennsylvania's trespass claims with prejudice.  On the basis of the Court's order, the CITGO entities decline to answer Count V of the Second Amended Complaint filed by the Commonwealth of Pennsylvania and any allegations relating to its claim for trespass.  To the extent an answer is deemed necessary, the CITGO entities deny the allegations that relate to Count V of the Commonwealth of Pennsylvania's Second Amended Complaint and deny that they are liable for trespass.

**EE.    Allegations Regarding Claims of Public Nuisance**

66.    Some complaints contain allegations that Defendants are liable for public nuisance.  The CITGO entities deny that they engaged in any such activity or are liable for any such claim.  On July 2, 2015 and again on August 2, 2021, the Court dismissed the Commonwealth of Pennsylvania's claim for public nuisance with prejudice.  On the basis of the Court's orders, the CITGO entities decline to answer Count III of the Second Amended Complaint filed by the Commonwealth of Pennsylvania and any allegations relating to its public nuisance claim.  To the extent an answer is deemed necessary, the

CITGO entities deny the allegations that relate to Count III of the Commonwealth of Pennsylvania's Second Amended Complaint and deny that they are liable for any public nuisance.

**FF.   Regulatory Powers of Other Agencies**

67.   Certain California Plaintiffs allege that they are entitled to assert claims to protect groundwater resources or the environment without regard to any impact on water supply wells owned or operated by them.  The CITGO entities deny that these Plaintiffs possess any such right.  The CITGO entities further allege that, pursuant to statutes duly enacted by the California legislature, state agencies that are not parties to these lawsuits have been delegated the power and authority to (1) determine what maximum levels of contaminants, including MTBE and/or TBA, are permissible in potable water distributed in California and (2) manage activities to investigate, delineate, remediate and clean up actual or suspected release of MTBE and/or TBA, including determining when sufficient cleanup has been achieved.

## II.   <u>GENERAL DENIAL OF REMAINING ALLEGATIONS</u>

The CITGO entities deny each and every remaining allegation in the MDL complaints.

## III.   <u>RESERVATION OF RIGHT TO AMEND</u>

The CITGO entities reserve the right to further amend this Tenth Amended Master Answer.

## IV.   <u>AFFIRMATIVE AND SEPARATE DEFENSES APPLICABLE TO ALL CASES</u>[4]

---

[4] The CITGO entities incorporate by reference the Responses and Objections of CITGO and CRCC to Plaintiff's Eighth Set of Special Interrogatories, dated January 7, 2021, as though set forth in these affirmative and separate defenses, a copy of which will be made available to the Court upon request.

By asserting these affirmative and separate defenses that are applicable to all cases pending in MDL 1358, the CITGO entities do not assume the burden of proving any facts, issues, or elements of a cause of action that they would not otherwise bear.  Furthermore, all of these affirmative and separate defenses are asserted and pled in the alternative and do not constitute an admission of liability or an admission that Plaintiffs are entitled to any relief whatsoever.  For their affirmative and separate defenses applicable to all cases pending in MDL 1358, the CITGO entities state as follows:

1.       Plaintiffs' claims are barred in whole or in part by the doctrine of federal preemption.  Federal law required an oxygenate in much of the gasoline sold in the United States.  MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto, and with the EPA's approval.  Congress anticipated, and even intended, that MTBE would be the oxygenate used when it passed the RFG Program.  State law is also preempted where a state seeks to impose liability for an action that federal law affirmatively made available to private actors.

2.       Plaintiffs' claims are barred in whole or in part because at all relevant times, the CITGO entities' actions and products complied with and were undertaken pursuant to applicable federal, state, commonwealth, and local laws, rules, regulations and specifications.  These federal, state, commonwealth and/or local authorities and agencies mandated, directed, approved, permitted and/or ratified the use of MTBE in gasoline.  Federal law required an oxygenate in much of the gasoline sold in the United States and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  The CITGO entities did not determine the formulation of gasoline sold in a particular state and relied on others for the

supply of gasoline.  In addition, the market in a particular state established the use of reformulated gasoline with MTBE, something that Congress anticipated, and even intended, when it passed the RFG Program.

3.      Plaintiffs' claims are barred in whole or in part because the alleged acts and conduct of the CITGO entities conformed to and were conducted in accordance with and pursuant to statutes, government regulations and industry standards, and were based upon the state of knowledge existing at all material times.  The CITGO entities chose to use MTBE and to sell gasoline containing MTBE after considering a variety of factors, including but not limited to, costs, logistics, availability, the overall characteristics of the oxygenate and whether the oxygenate was federally approved.  The EPA rigorously collected information about MTBE from a wide variety of sources and approved its use. The CITGO entities relied on the EPA and Congressional approval of MTBE as an acceptable gasoline additive and on a state's decision to not ban the use of MTBE.  The CITGO entities' analysis of market factors and their reliance on others for the determinations regarding MTBE's acceptance were consistent with the standard of care that prevailed in the refining industry at the time and the state of knowledge indicated that MTBE was a wholly acceptable gasoline additive.

4.      Plaintiffs' claims are barred in whole or in part because the relief sought is, in whole or in part, within the particular expertise of and is being addressed by federal, state, and commonwealth governments, and their relevant agencies.  This Court should decline to exercise jurisdiction over these claims pursuant to the doctrines of primary jurisdiction and separation of powers.  The relief Plaintiffs seek is already occurring as the alleged MTBE releases and discharges are being investigated and remediation efforts,

where deemed necessary, are being performed.

5.      Plaintiffs' claims are barred in whole or in part because Plaintiffs have a plain, common, adequate and speedy remedy at law.  Any harm suffered by Plaintiffs, which harm the CITGO entities specifically deny, can be ameliorated by an award of damages against those parties responsible for the releases and/or discharges that caused the alleged impact (the "Responsible Parties").  The CITGO entities specifically deny they caused Plaintiffs any harm, that they are responsible for any of the alleged releases or discharges or that they are liable for any damages or injuries.  Plaintiffs also have administrative remedies available through federal and state environmental agencies to ensure the Responsible Parties perform any necessary remediation work.

6.      Plaintiffs are barred from seeking liability against the CITGO entities for design defects because any attempt to reexamine the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the Clean Air Act would be impermissible given that Congress, through Section 211 of the Clean Air Act, authorized the EPA, and not the courts, to perform the cost-benefit analysis.  Congress and the EPA conducted extensive investigation and cost-benefit analyses as part of their approval of MTBE as a gasoline oxygenate and in developing the oxygenate requirements in the 1990 Clean Air Act Amendments.

7.      Plaintiffs' claims are barred in whole or in part because if it is determined that Plaintiffs, or anyone on whose behalf Plaintiffs are suing, were injured, which the CITGO entities deny, such injury is outweighed by the social utility, convenience and public service rendered by the CITGO entities' actions.  Congress and the EPA conducted extensive investigation and cost-benefit analyses as part of their initial approval of MTBE

as a gasoline oxygenate and in developing the oxygenate requirements in the 1990 Clean Air Act Amendments.

8.      Plaintiffs' claims are barred in whole or in part because Plaintiffs assumed the risk of all acts, injuries, and damages.  Plaintiffs were fully aware of the relevant facts about MTBE, of which they now complain, prior to adopting various programs they knew would lead to the increased use of MTBE.  Notwithstanding this knowledge, Plaintiffs failed to take specific and timely action to address the same, including, but not limited to, failing to implement their own MTBE action plan, and failing to adopt adequate and effective regulatory controls and/or failing to enforce existing laws and regulations. Plaintiffs also routinely authorized the Responsible Parties to cease remediation of gasoline release sites even though MTBE remained present in the soil and/or groundwater.

9.      Plaintiffs' claims are barred in whole or in part to the extent Plaintiffs received or may receive the requested relief from a state or federal governmental agency, including, but not limited to the EPA, any state-specific underground storage tank insurance fund, or from any other source.  These claims are barred because the CITGO entities assert their entitlement to an appropriate set-off or reduction of any judgment entered against them.  Further, any award of damages for treatment of MTBE must be set-off or reduced by the cost of treating other substances, regardless of the presence of MTBE.

10.      Plaintiffs' claims are barred in whole or in part based on the election of remedies doctrine.  Plaintiffs are able to pursue recovery from other sources, such as from the Responsible Parties or from public or publicly funded agencies, which is incompatible with the remedies and recovery sought.  The relief sought by Plaintiffs can be and/or already is being provided by the governmental agencies uniquely equipped to handle that

task and is charged with doing so.

11.     Plaintiffs' claims are barred to the extent product liability lawsuits of the nature filed by Plaintiffs effectively amount to regulation by state law (*i.e.,* by the legal and practical effect of a judgment rendered pursuant to state common law) of activities that fall within interstate commerce governed exclusively by Congress pursuant to the Commerce Clause.  Thus, the relief sought would pose unreasonable barriers and substantial burdens on interstate and/or international commerce in violation of the Commerce Clause of the United States Constitution.

12.     Plaintiffs' claims fail to state claims upon which relief may be granted and should, therefore, be dismissed pursuant Fed. R. Civ. P. 12(b)(6).

13.     Plaintiffs' claims are barred to the extent Plaintiffs, who are public entities and/or authorities, improperly delegated the power to prosecute their claims to private attorneys.  Such delegation is against public policy.

14.     Plaintiffs' claims are barred in whole or in part because they lack the capacity to sue.  Plaintiffs have not suffered any cognizable harm and have not incurred any present damages.

15.     Plaintiffs' claims are barred in whole or in part because Plaintiffs suffered no losses or injuries that were proximately caused by the CITGO entities.  The release or escape of MTBE gasoline from containment is the proximate cause of any alleged injury and, except in limited historical circumstances, CITGO did not own, operate, control or release the MTBE that is alleged to have been released.  Those releases were caused by others, which events constitute superseding, supervening or intervening events which were the proximate cause of Plaintiffs' alleged damages.

16.     Plaintiffs' claims are barred in whole or in part because the alleged injuries and damages, if any, suffered as a result of conduct legally attributable to the CITGO entities are *de minimis*.  Therefore, any injunction would pose a disproportionate hardship on the CITGO entities, as well as on the public, in comparison to the injury and/or damages allegedly suffered by Plaintiffs.  Accordingly, Plaintiffs are not entitled to injunctive relief as to the CITGO entities as a matter of law.  Further, such claims cannot give rise to liability under the *de minimis non curat lex* doctrine.

17.     Plaintiffs' claims are barred in whole or in part because Plaintiffs do not have a legally cognizable injury unless or until the alleged release of MTBE and/or TBA exceeds applicable action levels.  Plaintiffs cannot satisfy the actual injury requirement for any of their causes of action where the levels of MTBE have been deemed acceptable under governing law.

18.     Plaintiffs' claims are barred in whole or in part because they are moot.  In the Spring of 2006 the CITGO entities, and the United States petroleum industry as a whole, stopped blending MTBE in gasoline for domestic consumption.  Thus, no additional release of MTBE gasoline can occur and Plaintiffs have already identified and are addressing releases of MTBE gasoline under their respective state remediation programs.

19.     Plaintiffs' claims are barred in whole or in part by the doctrine of laches.  Plaintiffs waited decades to assert their claims.  Plaintiffs' unreasonable and inexcusable delay in filing these actions caused substantial prejudice to the CITGO entities.

20.     Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.  Plaintiffs intentionally delayed filing suit with full knowledge of all of the facts upon which they base their claims and have taken positions as a litigant that are inconsistent with their

positions and conduct as a regulator on which the regulated community relied.

21.     Plaintiffs' claims are barred in whole or in part by the applicable provisions of the pertinent statutes of limitations.

22.     Plaintiffs are estopped from asserting any of the purported claims against the CITGO entities because the Plaintiffs have been aware of the characteristics of MTBE about which they now complain for decades and have taken positions as litigants that are inconsistent with their positions and conduct as regulators on which the regulated community relied.

23.     Plaintiffs' claims are barred in whole or in part because Plaintiffs cannot establish the required predicates for their theories of collective liability, and therefore their defendant-identification burden remains.   In the event that the defendant-identification burden were to be shifted in the future, the CITGO entities deny that they contributed to any of the alleged MTBE releases, which form the bases of Plaintiffs' claims.

24.     Plaintiffs' failure to warn claims are barred in whole or in part because the potential for harm to the environment when MTBE or TBA, or gasoline containing MTBE or TBA, is released into the environment is open, obvious and generally known.

25.     Plaintiffs' claims are barred in whole or in part because Plaintiffs failed to join indispensable or necessary parties.   Plaintiffs failed to sue the necessary or indispensable parties, which include, but are not limited to, downstream handlers that own the underground storage tanks; gasoline service stations that are independently owned and not operated by major oil companies; numerous jobbers; numerous rack marketers; various gasoline traders; gasoline blenders or owners of gasoline blending facilities; manufacturers of underground storage tanks; merchant producers of neat MTBE; importers of neat

MTBE; and hundreds of spillers of gasoline and the Responsible Parties.

26.     Plaintiffs' claims are barred in whole or in part because Plaintiffs' efforts to impose liability on the CITGO entities without proof of causation violate the Due Process Clauses and other clauses of the U.S. Constitution and state and commonwealth constitutions.

27.     Plaintiffs' claims are barred in whole or in part because Plaintiffs' claimed injuries were caused in whole or in part by others, whose actions were not controlled by or caused by the CITGO entities.  The CTIGO entities did not own, operate or control the gasoline service stations or the underground storage tanks from which the releases are alleged to have occurred.  The CITGO entities are also not the successors in interest to the owners of the gasoline service stations or the underground storage tanks from which the releases are alleged to have occurred.

28.     Plaintiffs' claims are barred in whole or in part because at all times, the CITGO entities acted with due care and took reasonable precautions against foreseeable acts or omissions of any such third parties and any foreseeable consequences.  The CITGO entities operated as a bulk supplier of reformulated gasoline and other gasoline products (including gasoline that contained MTBE). The CITGO entities encouraged the safe handling and containment of all gasoline products irrespective of the specific composition of the gasoline.  The CITGO entities required its distributors to comply with all applicable environmental and safety regulations.  The CITGO entities also provided warnings to its customers in the form of MSDSs which disclosed, identified and/or included the characteristics of MTBE and/or reformulated gasoline.

29.     Plaintiffs' claims are barred in whole or in part because all gasoline products

sold or distributed for resale by the CITGO entities were properly designed, formulated, prepared and otherwise not defective in any respect. Federal law required an oxygenate in much of the gasoline sold in the United States. MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto, and with the EPA's approval. CITGO's gasoline containing MTBE complied with all applicable regulatory requirements, performed safely, and was superior or equivalent in total cost/benefit performance to any reasonably available alternative known and practicable at the time of such design, formulation, and preparation.

30.     Plaintiffs' claims are barred in whole or in part because to the extent required, the CITGO entities provided proper warnings, information, and instructions in the form of MSDSs which disclosed, identified and/or included the characteristics of MTBE and/or reformulated gasoline. The recipients of these MSDSs included, but were not limited to, distributers, other gasoline refiners, marketers, sellers, purchasers, resellers and jobbers. The MSDSs were provided pursuant to generally recognized and prevailing standards in existence at the time. Plaintiffs also failed to allege that additional warnings would have prevented the alleged damage.

31.     Plaintiffs' claims are barred in whole or in part because there is no duty to warn against the release of gasoline, including gasoline containing MTBE or TBA, into the environment because it is common knowledge that gasoline (with or without MTBE) should not be released into the environment.

32.     Plaintiffs' claims are barred in whole or in part because any gasoline containing MTBE or TBA that was manufactured, sold, or distributed for resale by the CITGO entities was not unreasonably dangerous when made. Federal law required an

oxygenate in much of the gasoline sold in the United States.  MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto, and with the EPA's approval.  CITGO's gasoline containing MTBE complied with all applicable regulatory requirements, performed safely, and was superior or equivalent in total cost/benefit performance to any reasonably available alternative known and practicable at the time of such design, formulation, and preparation.

33.   Plaintiffs' claims are barred in whole or in part by the learned or sophisticated intermediary doctrine and/or because the CITGO entities sold their products to knowledgeable and sophisticated purchasers and any alleged injury was caused by the failures of such intermediaries and purchasers to observe known standards of care.  CITGO operated as a bulk supplier of reformulated gasoline and other gasoline products (including gasoline that contained MTBE).  Assuming *arguendo* that any warnings were in fact required for MTBE or gasoline that contained MTBE, the CITGO entities provided warnings to their customers in the form of MSDSs which disclosed, identified and/or included the characteristics of MTBE and/or reformulated gasoline.  Such recipients included, but were not limited to distributors, other gasoline refiners, marketers, sellers, purchasers, resellers and/or jobbers.  In addition, the MSDSs were publicly available for anyone who wanted them and were also available on the internet.  The recipients were better situated to pass along any necessary warnings to tank owner/operators or end users of the reformulated gasoline, because the CITGO entities did not have direct contact with the gasoline service station operators or end users of the reformulated gasoline and/or gasoline containing MTBE.

34.   Plaintiffs' claims are barred in whole or in part because any injury, damage

or loss sustained by the Plaintiffs was proximately caused by and/or contributed to by Plaintiffs' own negligence, carelessness, and/or omissions. Plaintiffs were fully aware of the characteristics of MTBE about which they now complain and of the alleged risks that releases of gasoline could pose to their water resources. Plaintiffs adopted various programs that they knew would lead to the increased use of MTBE gasoline and then negligently failed to take specific and timely actions to address that alleged risk, including with respect to ownership, operation, and/or remediation of State-owned UST sites. Through these and other actions, the Plaintiffs contributed, in whole or in part, to their alleged injury related to the use of MTBE in gasoline.

35.     Plaintiffs' claims are barred in whole or in part because they have not suffered any cognizable harm and have not incurred any present damages. There is no current case or controversy and thus, Plaintiffs' claims are not ripe for adjudication. The claims for remediation or restoration of groundwater to its "original condition" at one or more sites are not ripe because the Responsible Party is continuing to investigate and/or remediate any MTBE in groundwater at or near the site and, therefore, Plaintiffs have not and may never incur any injury or damage with respect to said site(s). Further, upon information and belief, no harmful levels of MTBE have been detected in the public water supplies and much of if not all of the alleged detections of MTBE that forms the basis of Plaintiffs' claims do not present a real or imminent threat of harm, as required in order to present a justiciable controversy in a court of law. Additionally, to the extent Plaintiffs seeks to "extrapolate" injury without actual proof of such injury, their claims as to injuries that have not yet and may never take place are not ripe.

36.     Plaintiffs' claims are barred in whole or in part because the CITGO entities

31

owed no duty of care to Plaintiffs in connection with the matters alleged in the complaints.

37.     Plaintiffs' claims fail because any risks associated with MTBE gasoline could have been avoided through the exercise of reasonable care by third parties when handling, storing or using the product or better enforcement of the applicable underground storage tank regulations.

38.     Plaintiffs' claims are barred in whole or in part because there is no legal relationship upon which any duty could possibly be owed by the CITGO entities to Plaintiffs, and therefore, Plaintiffs' causes of action fail as a matter of law.

39.     Plaintiffs' negligence claims fail because the alleged injuries, if any, are too remote from the CITGO entities' alleged misconduct.

40.     Plaintiffs' claims are barred to the extent the conduct complained of is protected by the First Amendment to the United States Constitution. To the extent Plaintiffs' claims are based on the CITGO entities' communications with federal or state governments, including their agencies, about issues associated with MTBE, the First Amendment protects this speech.  The imposition of liability or damages based on these communications would impermissibly restrict the CITGO entities' rights.

41.     Plaintiffs' claims are barred in whole or in part to the extent the injuries and damages, if any, alleged by Plaintiffs are caused in whole or in part by the presence of substances other than MTBE or TBA (e.g., the BTEX compounds).  Under Plaintiffs' own legal theories, the CITGO entities are not liable for injuries or damages caused by substances other than MTBE or TBA.  In the event liability is assessed against the CITGO entities, such liability must be reduced where, and to the extent that, other substances – about which Plaintiffs do not complain – contributed to the alleged injury.

42.     Plaintiffs' claims are barred in whole or in part because any injury, damage or loss sustained by the Plaintiffs in connection with the subject matter of these actions were not reasonably foreseeable.  MTBE was added to gasoline in full compliance with the Federal Clean Air Act and with the EPA's approval. The CITGO entities reasonably believed that the EPA - the agency delegated with authority over fuel additives and environmental protection - determined that the environmental and public health benefits of using MTBE in gasoline outweighed any potential environmental harms.

43.     Plaintiffs' claims for joint and several liability fail because their injuries, if any, may be reasonably apportioned among the Defendants, because the alleged acts and omissions of the Defendants, including the CITGO entities, are divisible and distinct. Therefore, no Defendant is jointly and severally liable to Plaintiffs.

44.     Plaintiffs' claims are barred to the extent they failed to mitigate their damages, if any.  Plaintiffs were fully aware of the relevant facts about MTBE, of which they now complain, and adopted various programs they knew would lead to increased use of MTBE.  Notwithstanding this knowledge, Plaintiffs failed to take specific and timely action to address the same, including, but not limited to, failing to implement their own MTBE action plan, failing to adopt adequate and effective regulatory controls and/or failing to enforce existing laws and regulations.

45.     Plaintiffs' claims are barred in whole or in part to the extent they released, settled, entered into an accord and satisfaction with respect to, or otherwise compromised their claims.

46.     Plaintiffs lack standing to assert claims for subrogation to recover payments made from USTIF, which claims must be asserted by the USTIF Board as subrogee of the

claimants who received the USTIF funds.  Plaintiffs also lack standing to bring suit for alleged damages incurred by their residents, citizens, or consumers, including claims for injury or testing at private wells and claims under the Unfair Trade Practices and Consumer Protection Law.

47.    Plaintiffs' claims for punitive damages are barred and violate the Due Process Clauses of the United States Constitution and certain state and commonwealth constitutions to the extent: (a) the law governing punitive damages provides inadequate procedural protections against arbitrary, excessive or erroneous awards; (b) the CITGO entities lacked adequate notice either of the type of conduct that could warrant an award of punitive damages or of the amount such damages could be awarded; (c) any award of punitive damages bear a close relationship to appropriate civil fines or penalties established by the legislature or administrative agencies; (d) there is impermissible discrimination against corporate defendants, such as the CITGO entities, that are organized under the laws of other states and that maintain their principal places of business in other states; (e) any claim is based on conduct by the CITGO entities that occurred outside the relevant state or commonwealth; (f) the state or commonwealth permits introduction of evidence of the CITGO entities' financial condition with respect to the quantum of punitive damages; (g) the CITGO entities' conduct that allegedly warrants punitive damages is unrelated to the Plaintiffs' alleged harm; and (h) the law governing punitive damages does not require that the jury be instructed upon, and make specific findings of fact with respect to: (1) each of the five reprehensibility factors set out in *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 419 (2003); (2) the constitutional factors that govern the permissible ratio of punitive damages to compensatory damages; (3) the comparable civil

fine that could be imposed on the Defendants for the conduct in question.; (4) the direct relationship between the CITGO entities' conduct and the specific injury allegedly suffered by the Plaintiffs; and, (5) the exclusion of all items of compensatory damage from the quantum of punitive damages.

48.     Plaintiffs' claims for punitive damages are barred by the Excess Fines Clause of the United States Constitution and similar clauses of the relevant state and commonwealth constitutions.

49.     Plaintiffs' claims for punitive damages fail because the CITGO entities did not engage in any conduct that was reckless, willful, wanton, malicious, outrageous, oppressive or that otherwise could support such a claim.  The CITGO entities acted in accordance with all applicable laws and regulations.

50.     Plaintiffs' claims are barred to the extent they failed to show any actual damages with reasonable certainty and precision, and their claims are substantially speculative and conjectural.

51.     Plaintiffs' claims for natural resource damages are barred to the extent Plaintiffs do not own or have a trusteeship interest in the property and/or natural resources allegedly impacted.

52.     Plaintiffs' claims are barred to the extent the Plaintiffs are not users or consumers of gasoline containing MTBE and no injury alleged is the result of using or consuming gasoline containing MTBE.

53.     If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, the CITGO entities did not and could not have known of such an alternate design at the time.

54.     If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, such an alternate design was not feasible at the time.

55.     Plaintiffs' claims fail because there was not a safer alternative that was available in sufficient supply at the relevant time to meet the need and demand for the product.

56.     Plaintiffs' claims relating to the Material Safety Data Sheets fail in whole or in part to the extent the information contained therein is governed by federal requirements or to the extent federal agencies have exclusive jurisdiction to pursue claims relating to information contained in an MSDS.

57.     Plaintiffs' claims are barred in whole or in part because Plaintiffs did not reasonably rely on any representation, disclaimer, warning, or other act or omission of the CITGO entities.

58.     Plaintiffs' claims are barred to the extent Plaintiffs seek any relief inconsistent with the applicable state, commonwealth or federal regulatory scheme for addressing releases.

59.     The CITGO entities are entitled to total or partial indemnity from the Responsible Parties for the Plaintiffs alleged injuries or damages, if any, in an amount in direct proportion to their relative culpability.

60.     Plaintiffs' claims are barred by the principles of due process and separation of powers, as the judiciary's retroactive imposition of tort liability for use of MTBE conflicts with the actions and decisions of both the United States' and the legislative and executive branches of state government – including, but not limited to, approval for the use

of MTBE in gasoline; creation of the RFG Program; approval for the use of MTBE in reformulated gasoline; decisions to opt-in and/or remain in the RFG Program; decisions to not ban the use of MTBE; decisions to implement any ban of MTBE at a later period of time; and the creation and implementation of state and commonwealth legislative and regulatory schemes for addressing the release of gasoline and funding for same.

61.     Plaintiffs' claims fail to the extent any attempted application of a collective liability theory, including but not limited to market share liability, is inappropriate and violates principles of due process, because: (a) not all gasoline contains or contained MTBE and not all gasoline is fungible; (b) market share cannot reliably predict MTBE's impact on the environment; (c) the identification of the parties that caused Plaintiffs' alleged injuries is possible; (d) the extended time period covered in the complaints denies the CITGO entities the ability to present an adequate defense; and (e) it will amount to the retroactive imposition of liability.

62.     Plaintiffs' claims fail to the extent using statistical evidence to prove injury and/or damages denies the CITGO entities the ability to present an adequate defense.

63.     Plaintiffs' claims fail, in whole or in part, based on the doctrine of unjust enrichment.  Plaintiffs will be impermissibly enriched by recovering costs from the CITGO entities where a state, commonwealth or federal authorized fund already exists to address response actions pertaining to the release of gasoline containing MTBE or where the Responsible Parties have paid or are paying for such remediation or restoration.

64.     The CITGO entities assert, and thereby preserve, any and all objections to personal jurisdiction in any case in which personal jurisdiction over any one or more CITGO entities is lacking, improper, contrary to law or otherwise objectionable.

65.     The CITGO entities reserve the right to assert additional defenses that may be pertinent to Plaintiffs' claims when the precise nature of such claims are ascertained through discovery and based on facts developed as this litigation progresses.

66.     The CITGO entities incorporate by reference any affirmative defense asserted or raised by the other Defendants in MDL 1358, regardless of whether that defense is a general or specific defense to a claim or complaint.   The CITGO entities further incorporate by reference any affirmative defense listed in the Affirmative and Separate Defenses Applicable to Particular States and Commonwealths section below, to the extent such defenses are also applicable generally.

## V.     AFFIRMATIVE AND SEPARATE DEFENSES APPLICABLE TO PARTICULAR STATES AND COMMONWEALTHS[5]

By asserting these affirmative and separate defenses applicable to particular states and commonwealths, the CITGO entities do not assume the burden of proving any facts, issues, or elements of a cause of action that they would not otherwise bear.   Furthermore, all of these affirmative and separate defenses are asserted and pled in the alternative and do not constitute an admission of liability or an admission that Plaintiffs are entitled to any relief whatsoever.   The CITGO entities incorporate any affirmative defense, whether general or specific to a specific state or commonwealth, alleged by other Defendants in MDL 1358 as though fully set forth herein.   The CITGO entities further incorporate by reference any affirmative defense listed in a state or commonwealth section, below, to the

---

[5] The CITGO entities incorporate by reference the Responses and Objections of CITGO and CRCC to Plaintiff's Eighth Set of Special Interrogatories, dated January 7, 2021, as though set forth in these affirmative and separate defenses, a copy of which will be made available to the Court upon request.

extent also applicable generally.

For their separate affirmative and separate defenses applicable to the particular states and commonwealths, the CITGO entities state as follows:

## CALIFORNIA

1.      The complaints and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations, including but not limited to, California Code of Civil Procedure §§ 337, 337.1, 337.2, 337.15, 338, 340, 340.8 and 343.

2.      California Civil Code §§ 1431.1 through 1431.5, commonly known as "Proposition 51," provide that the liability of each defendant for non-economic damages, if any, shall be several only and shall not be joint, and the CITGO entities therefore assert that each defendant may be held liable only for the amount of non-economic damages, if any, allocated to that defendant in direct proportion to its percentage of fault, if any.

3.      The CITGO entities allege that their liability, if any, for non-economic loss be pro-rated according to the provisions of California Civil Code § 1431.2.

4.      The complaints and each purported cause of action are barred because plaintiffs and/or their predecessors-in-interest and assignors are guilty of unclean hands due to, among other things, taking actions that have increased and/or prolonged the contamination, if any, of the aquifer with MTBE and/or other contaminants.

5.      Plaintiffs' claims fail, in whole or in part, based on the doctrine of unjust enrichment.

6.      As to each cause of action in the complaints, the CITGO entities allege that the release of MTBE and/or hazardous substances, if any, and the damages resulting therefrom, if any, were caused by an act of God.

7.      The complaints and each purported cause of action are barred because they

are ambiguous and uncertain.

8.     Plaintiffs did not reasonably rely on any representation, disclaimer, warning, or other act or omission of the CITGO entities.

9.     The CITGO entities had no duty to warn plaintiff or third-parties about the potential dangers, if any, of the product or products manufactured, packaged, labeled, used, applied and/or removed by said third parties.

10.    The CITGO entities had no duty to warn because the risks of injury and damages inherent in utilizing the products described in the complaints, if any, were open, obvious or known.

11.    Any express or implied warranties alleged by plaintiffs to have been made by the CITGO entities, if made at all, were expressly disclaimed and excluded by product labels, pursuant to the laws of the State of California, which provided that the CITGO entities made no warranties, express or implied, concerning the products or the use of said products that extended beyond the description on the label, and that all statements made concerning said products applied only when used as directed.

12.    Plaintiffs are sophisticated water purveyors or managers and were, at all relevant times, fully aware of the nature and risks of injury and damages described in the complaints that could arise in the operations or management of a public drinking water supply system.

13.    If there was a less dangerous alternate design, without admitting that there was and without assuming the burden of proof on this issue, the CITGO entities did not and could not have known of such an alternate design at the time.

14.    If there was a less dangerous alternate design, without admitting that there

was and without assuming the burden of proof on this issue, such an alternate design was not feasible at the time.

15.     Plaintiff and/or others modified, altered, or changed the CITGO entities' products or materials referred to in the complaints, if any, so that such changes in any said products or materials proximately caused plaintiffs' injuries, loss and damages, if any.

16.     If the CITGO entities provided the products alleged to have been defective, and without admitting that it did so or that any product was defective and without assuming the burden of proof on these issues, the products were misused or abused by others without the knowledge or consent of the CITGO entities and in a manner not reasonably foreseeable by the CITGO entities prior to their receipt of notice of the circumstances described in the complaints.  Such misuse or abuse was the sole cause of or a contributing cause to the injuries, losses, and/or damages, if any, suffered by plaintiffs as alleged in the complaint, and by reason thereof, plaintiffs are barred from recovering some or all of any damages suffered.

17.     The CITGO entities are not liable for any alleged wrongful entry upon land because plaintiffs and/or plaintiffs' predecessors in interest or assignors expressly or impliedly consented to or had knowledge of all such activities or conditions.

18.     The CITGO entities allege that to the extent plaintiffs are claiming damages for the cost of remediation due to plaintiffs' alleged compliance with primary or secondary drinking water standard or other regulations enacted by the State of California or any other governmental body, those claims are unconstitutional because they constitute an ex post facto application of a regulation disallowed by Art. 1, sec. 9 of the U.S. Constitution.

19.     The complaints and each purported cause of action are barred, in whole or

in part, by federal and state law, including but not limited to, the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2; the Clean Air Act, 42 U.S.C. § 7401, et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq; and rules, regulations, and decisions thereunder.

20.     The CITGO entities allege that the maximum contaminant level or other drinking water standard, to the extent they form the bases of plaintiffs' claims against the CITGO entities, were arbitrarily and unreasonably enacted without due process and, therefore, cannot be enforced against the CITGO entities.

21.     The complaints and each purported cause of action are barred because plaintiffs do not own or have abandoned, lost, waived, given up, or otherwise failed to perfect any rights, including but not limited to use rights related to any water that is the subject of the complaints.  Plaintiffs' claims are also barred because under California law, the water that is the subject of the complaints is the property of the State of California, not of plaintiffs.

22.     The complaints and each purported cause of action are barred to the extent that such claims have been satisfied by payments or provision of alternate water supplies by defendants or third-parties.

23.     The complaints and each purported cause of action are barred to the extent that plaintiffs have assigned rights and claims for certain damages and other relief, if any, to the CITGO entities, other defendants or third parties.

24.     If plaintiffs sustained any injury under the circumstances alleged in the complaints or in any other respect, their recovery against the CITGO entities, if any, is barred because the alleged conduct and conditions resulted from a necessity.

25.     Plaintiffs' claims for trespass are barred because the CITGO entities are immune to liability for plaintiffs' damages, if any, caused by earth movement.

26.     Plaintiffs' claims are barred, in whole or in part, as the result of their own knowing or negligent conduct that caused or contributed to MTBE and/or TBA contamination giving rise to these claims.

27.     The complaints and each purported cause of action are barred because plaintiffs do not own or have abandoned, lost, waived, given up, or otherwise failed to perfect any rights, including but to limited to use rights related to any water that is the subject of the complaints.  Plaintiffs' claims are also barred because under California law, the water that is the subject of the complaints is the property of the State of California, not of plaintiffs.

### PENNSYLVANIA

1.     The Second Amended Complaint (the "SAC") filed by the Commonwealth of Pennsylvania and each purported cause of action asserted therein are barred in whole or in part by the doctrine of federal preemption.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  MTBE was the only viable oxygenate available for use in Pennsylvania because, among other things, and as the Commonwealth admits, prior to 2006, there were no commercial-scale plants producing ethanol in Pennsylvania and ethanol could not be shipped via pipeline.  Congress anticipated, and even intended, that MTBE would be the oxygenate of choice when it passed the RFG Program.  State law is also preempted where a state seeks to impose

liability for an action that federal law affirmatively made available to private actors.

2.      The SAC and each purported cause of action asserted therein are barred in whole or in part because at all relevant times, the CITGO entities' actions and products complied with and were undertaken pursuant to applicable federal, state, commonwealth, and local laws, rules, regulations and specifications.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  MTBE was the only viable oxygenate available for use in Pennsylvania because, among other things, and as the Commonwealth admits, prior to 2006, there were no commercial-scale plants producing ethanol in Pennsylvania and ethanol could not be shipped via pipeline.  Congress anticipated, and even intended, that MTBE would be the oxygenate of choice when it passed the RFG Program.

3.      The SAC and each purported cause of action asserted therein are barred in whole or in part because federal, state, commonwealth and/or local authorities and agencies mandated, directed, approved, permitted and/or ratified the alleged actions or omissions of the CITGO entities.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania, and MTBE was added to gasoline in full compliance with the Federal Clean Air Act, including the amendments thereto and with the EPA's approval.  CITGO did not determine the formulation of gasoline sold in Pennsylvania and relied on others for the supply of gasoline there. The market in Pennsylvania established the use of reformulated gasoline with MTBE, something that Congress anticipated, and even intended, when it passed the RFG Program.  As a result,

even if CITGO could have determined the formulation of gasoline sold in Pennsylvania, it could not have supplied reformulated gasoline with ethanol for a variety of reasons including, but not limited to, that it was not economically feasible due to the associated increased costs and that it could not be shipped on a common pipeline.  As a result of these higher costs associated with the supply of ethanol gasoline, CITGO would have lost market share and would have been forced to exit the Pennsylvania market.

4.      The SAC and each purported cause of action asserted therein are barred in whole or in part because all acts and conduct of the CITGO entities, as alleged in the SAC, conformed to and were pursuant to statutes, government regulations and industry standards, and were based upon the state of knowledge existing at all material times.  Federal law required an oxygenate in much of the gasoline sold in the United States, including gasoline sold in Pennsylvania. MTBE was added to gasoline in full compliance with the Federal Clean Air Act and amendments thereto and with approval of the EPA.  CITGO did not determine the formulation of gasoline sold in Pennsylvania as it relied on others for the supply of gasoline there.  The market in Pennsylvania established the use of reformulated gasoline with MTBE, something that Congress anticipated, and even intended, when it passed the RFG Program.  CITGO chose to use MTBE and sell gasoline containing MTBE after considering a variety of factors, including, but not limited to, costs, logistics, availability, the oxygenates' overall characteristics, and whether the oxygenates were federally approved.  The EPA rigorously collected information about MTBE from a wide variety of sources and approved its use.  CITGO relied on the EPA and Congressional approval of MTBE as an acceptable gasoline additive and on the Commonwealth's failure to ban MTBE.  CITGO's analysis of market factors and reliance on the EPA's and the

Commonwealth's determinations regarding MTBE's acceptability were consistent with the standard of care that prevailed in the refining industry at the time and the state of knowledge indicated that MTBE was a wholly acceptable gasoline additive.  Finally, CITGO's warnings about gasoline containing MTBE were consistent with prevailing standards at the time.  CITGO, like all other members of the industry, prepared Material Safety Data Sheets and provided them to customers, among other things.

5.     The SAC and each purported cause of action asserted therein are barred in whole or in part because the relief sought by the Commonwealth is, in whole or in part, within the particular expertise of and is being addressed by federal, state, and commonwealth governments, and their relevant agencies, and thus this Court should decline to exercise jurisdiction over this matter pursuant to the doctrines of primary jurisdiction and separation of powers. The relief the Commonwealth seeks is already occurring.  Pennsylvania's Department of Environmental Protection, which is specifically charged with investigating petroleum release discharges and overseeing environmental remediation, has done just that for the alleged MTBE and petroleum releases.

6.     The SAC and each purported cause of action asserted therein are barred in whole or in part because the Commonwealth failed to exhaust its administrative remedies. The Commonwealth must address (or already has addressed) the alleged leaks and/or spills through governmental agencies uniquely equipped to handle that task and charged with doing so, including, but not limited to, the Regional Offices of the PADEP, PADEP'S Bureau of Waste Management, Bureau of Land Recycling and Waste Management, Division of Storage Tanks in the Bureau of Watershed Conservation, and Bureau of Environmental Cleanup and Brownfields.

7.      The SAC and each purported cause of action asserted therein are barred by the doctrine of primary assumption of risk in that the general public, by and through its elected representatives and their appointees, knew and understood the alleged risks of harm presented by the use of MTBE, if any, and elected nevertheless to proceed to require the use of gasoline oxygenates and to specifically authorize the use of MTBE as a gasoline oxygenate.  The Commonwealth was fully aware of the relevant facts about MTBE, of which it now complains, prior to adopting various programs it knew would lead to an increased use of MTBE in Pennsylvania.   Notwithstanding this knowledge, the Commonwealth failed to take specific and timely action to address the same, including, but not limited to, failing to implement its own MTBE Action Plan, and failing to adopt adequate and effective regulatory controls and/or failing to enforce existing laws and regulations.  The Commonwealth also routinely authorized the Responsible Parties to cease remediation of gasoline release sites even though MTBE remained present in soil and/or groundwater.

8.      The SAC and each purported cause of action asserted therein are barred in whole or in part to the extent the Commonwealth received or may receive the requested relief from a governmental agency or any other source, including, but not limited to, the EPA, USTIF and/or the Pennsylvania Insurance Department.  These claims are barred because the CITGO entities assert their entitlement to an appropriate set-off or reduction of any judgment against them.   Further, any award in damages for treatment of MTBE must be set-off or reduced by the cost of treating other contaminants, regardless of the presence of MTBE.

9.      The SAC and each purported cause of action asserted therein are barred in

whole or in part because the appropriate forum for the Commonwealth's claims is an administrative agency, and therefore all proceedings before this Court should be stayed pending administrative resolution of the issues. The relief the Commonwealth seeks is already occurring. Pennsylvania's Department of Environmental Protection, which is specifically charged with investigating petroleum release discharges and overseeing environmental remediation, has done just that for the alleged MTBE and petroleum releases.

10. The SAC and each purported cause of action asserted therein are barred in whole or in part by the doctrine of laches. The Commonwealth was aware of the alleged facts which it asserts gives rise to its claims for decades before filing its complaint. The Commonwealth has been aware of the potential for USTs to leak since at least 1984 and has been aware of MTBE at remediation sites across Pennsylvania since at least 1995, but waited until 2014 to file its lawsuit. Further, the Commonwealth was contemplating filing this lawsuit at least as early as November 2004, but waited an additional ten years before asserting its alleged claims. The Commonwealth's unreasonable and inexcusable delay in filing its lawsuit caused substantial prejudice to the CITGO entities. In addition, due to the Commonwealth's unreasonable and unjustified delay in bringing this action, it would be inequitable and a violation of due process to allow the *nullum tempus* doctrine to preclude application of the doctrine of laches.

11. The SAC and each purported cause of action asserted therein are barred in whole or in part by the applicable provisions of the pertinent statutes of limitations, including but not limited to 42 Pa. Cons. Stat. Ann. § 5524. The Commonwealth has been aware of the potential for USTs to leak since at least 1984. The Commonwealth has been

testing for the presence of MTBE in Pennsylvania since at least 1985, has identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995, and specifically required MTBE testing at remediation sites addressing gasoline releases since at least August 1, 1996.  The Commonwealth has been aware of the facts it now asserts to form the basis of its claims for at least 26 years prior to filing its lawsuit, which is well outside the applicable statutes of limitation.  Due to the Commonwealth's unreasonable and unjustified delay in bringing this action, it would be inequitable and a violation of due process to allow the *nullum tempus* doctrine to preclude application of otherwise pertinent statutes of limitations, including but not limited to, 42 Pa. Cons. Stat. Ann. § 5524.

12.    The Commonwealth is estopped by its conduct from asserting any of the purported claims against the CITGO entities.  The Commonwealth has been aware of the characteristics of MTBE about which it now complains for decades and has taken positions as a litigant that are inconsistent with its positions and conduct as a regulator on which the regulated community relied.  For example, as a regulator, the Commonwealth has not developed any stricter MTBE standards since they were established in 1997, does not require Public Water Systems to routinely test for MTBE and allows private well owners to make the decision of whether to address the presence of MTBE in their private wells. Based on these and other actions, the Commonwealth is estopped from asserting its claims against the CITGO entities.  Further, having opted certain counties in Pennsylvania into the RFG Program, the Commonwealth is estopped from complaining about the sale or RFG containing MTBE there, especially where the Commonwealth then considered but failed to ban MTBE and where CITGO properly relied on the Commonwealth's decision to allow the use of MTBE in Pennsylvania to comply with the federal oxygenate requirements.

49

13.     The SAC and each purported cause of action asserted therein are barred in whole or in part by the doctrine of waiver.  The Commonwealth has been aware of the potential for USTs to leak since at least 1984. The Commonwealth has been testing for the presence of MTBE in Pennsylvania since at least 1985 and identified MTBE as a contaminant present at remediation sites across Pennsylvania since at least 1995.  The Commonwealth specifically required MTBE testing at remediation sites addressing gasoline releases since at least August 1, 1996.  The Commonwealth intentionally delayed filing suit with full knowledge of all of the facts upon which it bases its claims and has taken positions as a litigant that are inconsistent with its positions and conduct as a regulator on which the regulated community relied.  The Commonwealth opted a number of counties into the RFG Program (at a time when it understood MTBE's properties and that MTBE was the oxygenate of choice).  The Commonwealth also never included MTBE on its list of substances that Public Water Systems must routinely test for, nor does it require routine monitoring for MTBE in either its public water supplies or its private drinking wells. The Commonwealth also authorized the closure of remediation sites where MTBE was still present in the groundwater, including at levels both above and below the Commonwealth's remediation and drinking water standards and it has issued Act 2 closure letters at many sites for which it now seeks additional investigation and remediation.

14.     The SAC and each purported cause of action asserted therein are barred in whole or in part because there is a defect or misjoinder of parties, in that the Commonwealth failed to join indispensable or necessary parties.  The Commonwealth failed to sue the necessary or indispensable parties, which include, but are not limited to, downstream handlers that own underground storage tanks in Pennsylvania; retail gasoline

stations in Pennsylvania that are independently owned and not operated by major oil companies; numerous jobbers operating in Pennsylvania; numerous rack marketers; various gasoline traders; gasoline blenders or owners of gasoline blending facilities in Pennsylvania; manufacturers of underground storage tanks; merchant producers of neat MTBE; importers of neat MTBE; and hundreds of spillers of gasoline and "Potentially Responsible Parties" identified by the Pennsylvania Department of Environmental Protection.

15.     The SAC and each purported cause of action asserted therein are barred in whole or in part, based on the Commonwealth's actual notice of reported spills or releases, if any, from publicly available records.  Releases of reportable quantities of gasoline are required to be reported to the relevant Commonwealth agencies. The Commonwealth had access to those records and reports.  The Commonwealth's claims are also barred, in whole or in part, to the extent the Commonwealth had constructive notice of spills and releases from any source.

16.     The SAC and each purported cause of action asserted therein are barred to the extent the Commonwealth failed to mitigate its damages, if any.  Fully aware of the relevant facts about MTBE, of which it now complains, the Commonwealth adopted various programs it knew would lead to increased use of MTBE in Pennsylvania. Notwithstanding this knowledge, the Commonwealth failed to take specific and timely action to address the same, including, but not limited to, failing to implement its own MTBE Action Plan, failing to adopt adequate and effective regulatory controls and/or failing to enforce existing laws and regulations.

17.     The Commonwealth's claims for natural resource damages are barred, in

whole or in part, because the Commonwealth does not own or have a trusteeship interest in the property and/or natural resources allegedly impacted.  Further, under Pennsylvania law, natural resource damages may only be recovered where a specific statute allows for their recovery and the only such statute that allows natural resource damages recover is the Hazardous Sites Cleanup Act.  The Commonwealth has not asserted a claim against CITGO under that statute.

18.     The SAC and each purported cause of action asserted therein fail because any attempt to impose liability on the CITGO entities without specific proof of injury, causation or damages would improperly relieve the Commonwealth of its burden of proof, prevent the CITGO entities from asserting certain individualized defenses and exculpating themselves at specific sites, and violate the CITGO entities' due process rights under the United States and Pennsylvania Constitutions.

19.     The Commonwealth's negligence claim fails because Pennsylvania does not recognize negligent failure to test as a cause of action.

20.     Should the CITGO entities be found liable, which liability is specifically denied, any such liability is several, rather than joint, and should be apportioned, as they did not act with joint tortfeasors in committing a wrong or separately to cause a single, indivisible injury, and/or joint and several liability otherwise is inapplicable pursuant to 42 Pa. Cons. Stat. § 7102.

21.     The Commonwealth lacks authority to bring common-law *parens patriae* claims absent specific statutory authorization. Any funds awarded to the Commonwealth must be placed into a trust to ensure such monies are used to address MTBE impact, if any, in the Commonwealth.

22.     The SAC and each purported cause of action asserted therein are barred in whole or in part because the Commonwealth does not have a legally cognizable injury unless or until the alleged level of MTBE and/or TBA exceeds applicable action levels. Pennsylvania statutes and regulations allow, and indeed encourage, the cleanup of remediation sites to one of three levels – background levels, a statewide health standard, or a site-specific standard.   At certain sites, PADEP approved cleanup based upon site-specific standards that exceeded the statewide health standard.  The Commonwealth cannot satisfy the actual injury requirement for any of its causes of action where the levels of MTBE has been deemed acceptable under Pennsylvania law.

**<u>PUERTO RICO</u>**

1.     CRCC did not conduct business in the Commonwealth or sell products for use and distribution within the Commonwealth.

2.     Plaintiffs may not pursue their claim unless they first exhaust the financial assurance instruments put in place by underground storage owners and operators pursuant to the Puerto Rico Environmental Quality Board's ("EQB") applicable Regulation for the Control of Underground Storage Tanks, Part IX.

3.     Plaintiffs may not pursue their claim unless they first exhaust the funds available in the petroleum cleanup fund established by the EQB to pay for cleanup or

restoration of groundwater caused by petroleum releases from USTs and/or to compensate for injuries to third parties.

4.      Plaintiffs may not file any claim unless they first exhaust the funds available under the Leaking Underground Storage Tank ("LUST") Trust Fund for investigation and cleanup of areas alleged impacted.

5.      The Commonwealth's authority is limited by those powers conferred by the Constitution of the Commonwealth, the legislature in the laws of Puerto Rico, and the Congress of the United States of America in federal legislation.

6.      The EQB is acting outside the bounds of its authority, which is limited by powers delegated to it through applicable legislation.

7.      The Commonwealth is not exempted from meeting the same burden of proof as any other plaintiff in an action for damages, in accordance with Article 1802 of the Puerto Rico Civil Code.

8.      Future costs are not authorized by P.R. Laws Ann. tit. 32, § 2761.

9.      The Commonwealth's complaint fails to plead the elements of a negligence claim under Article 1802 of the Puerto Rico Civil Code with sufficient clarity, specificity, and particularity, including the alleged damages sustained by the Commonwealth, the alleged acts or omissions of the CITGO entities, and the causal nexus.

10.      The Environmental Public Policy Act ("EPPA"), P.R. Laws Ann. tit. 12, § 8001 *et seq.*, displaced any common law *parens patriae* or public trustee authority that would allow the Commonwealth to file for environmental-injury damages as well as the common law and general statutory causes of action.  (The Commonwealth also refers to the EPPA as the "Public Policy Environmental Act.").

11.    The CITGO entities are not liable under the EPPA because they have followed and complied with any applicable dispositions and regulations promulgated under the EPPA.

12.    The CITGO entities are not liable under the EPPA because their actions have not, in any manner, contributed or created any damage or degradation to any of the Commonwealth's natural resources.

13.    The CITGO entities are not liable under the EPPA because releases, if any, were caused by an act or omission of a third party, and the CITGO entities exercised due care and took precautions against foreseeable acts of a third party.

14.    The CITGO entities are not liable under the EPPA because they were not directly or indirectly responsible for discharge of any matter capable of impacting or leading to the impact of waters in such a manner as to place them outside the minimum standards of purity established by the Secretary of Health.

15.    Plaintiffs lack standing to bring a citizen suit under the EPPA.

16.    The Commonwealth lacks standing to bring a suit for alleged violations to the Water Pollution Control Act ("WPCA"), P.R. Laws Ann. tit. 24, § 591 *et seq.*

17.    MTBE is not considered an "other" pollutant as defined in the WPCA, P.R. Laws Ann. tit. 24, § 591(h).

18.    The CITGO entities are not liable under the WPCA because the prohibitions, as well as the definitions contained in the WPCA, are unconstitutionally vague.

19.    MTBE is not considered a "Pollutant" by the applicable Puerto Rico Water Quality Standards Regulation.

20.     The CITGO entities are not liable because MTBE is not regulated or limited under the applicable Puerto Rico Water Quality Standards Regulation.

21.     The CITGO entities are not liable under the applicable Puerto Rico Water Quality Standards Regulation because releases, if any, were caused by an act or omission of a third party and the CITGO entities exercised due care and took precautions against foreseeable acts of a third party.

22.     MTBE is not considered a "Regulated Substance" as defined in the Commonwealth's applicable Underground Storage Tank Regulations or other applicable regulations, and retroactive application of later-adopted regulations is unconstitutional.

23.     The CITGO entities are not liable under the applicable Underground Storage Tank Regulations because MTBE was not regulated or limited under such regulations, and retroactive application of later-adopted regulations is unconstitutional.

24.     The CITGO entities are not liable under the applicable Underground Storage Tank Regulations because those regulations apply only to owners and operators of underground storage tank systems.

25.     The Commonwealth has failed to state a claim for relief under the applicable Underground Storage Tank Regulations.

26.     The CITGO entities are not liable for alleged violations of the Water Quality Standards Regulation and Underground Storage Tank Regulations because releases, if any, were caused by an act of God.

27.     The Commonwealth's claim must be decreased by the proportion of harm for which the Commonwealth is liable due to its concurrent imprudence.

28.    The Commonwealth's award, if any, must be reduced in proportion to the damages for which third parties are liable due to their concurrent imprudence.

29.    The complaint and each purported cause of action are barred by the applicable provisions of the pertinent statutes of limitations or prescription period, including but not limited to Article 1868 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5298, and Article 1802, P.R. Laws Ann. tit. 31, § 5141.

30.    The Commonwealth's request that the court order the CITGO entities to remediate impacted water, if any, to pre-injury conditions is unrealistic to the extent that the costs would make such remediation impracticable.

31.    The Commonwealth cannot recover for the risks inherent to unintended uses of defendants' products.

32.    The CITGO entities are not liable for any alleged public nuisance because the Commonwealth, through its acts and omissions, impliedly consented to and had knowledge of all activities and conditions alleged in the complaint.

33.    The Court should deny the Commonwealth's request for a permanent injunction, because it is a drastic measure, and the Court should first provide the CITGO entities with a reasonable time to eliminate or lessen the nuisance, if any, caused by MTBE.

34.    The Commonwealth does not have standing to bring a public nuisance action for the actions alleged in the complaint.

35.    No public nuisance exists because no act or omission by or on behalf of any of the CITGO entities caused or will cause injury to health or offense to the senses, or is a nuisance to the well being of any neighborhood, or to a large number of persons as required by P.R. Laws Ann. tit. 32, § 2761.

36.     Plaintiffs' public nuisance claim fails because they have not alleged, and cannot show, any "special damages" under Puerto Rico law.

37.     No public nuisance exists because plaintiffs, or anyone on whose behalf plaintiffs are allegedly suing, have not suffered a physical, health-related or economic harm.

38.     Plaintiffs' public nuisance claim is barred because the alleged activity does not constitute an "ultra-hazardous activity" or "illegal hazardous activity" under Puerto Rico law.

39.     Plaintiffs may not recover damages on their nuisance claim because they do not own any injured property.

40.     Plaintiffs have no authority or standing to recover damages on behalf of private individuals through *parens patriae* capacity or otherwise.

41.     The damages sought by the Commonwealth are punitive in nature, and punitive or exemplary damages are not recoverable under Puerto Rico law.

42.     Gasoline containing MTBE did not fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

43.     Gasoline containing MTBE does not embody excessive preventable danger.

44.     There was no feasible, safer design for octane enhancers and oxygenates at the time CITGO used MTBE in gasoline.

45.     Plaintiffs' claims fail, in whole or in part, based on the doctrine of *in pari delicto*.

46.     Plaintiffs' claim for unjust enrichment or disgorgement of profits fails because Puerto Rico authority does not permit the Plaintiffs to pursue either as a separate cause of action or remedy.  *See* Case Management Order #118, filed April 24, 2015.

47.     Plaintiffs' unjust enrichment claim fails because the remedies they are seeking are punitive, not compensatory, and bear no relation to any environmental injuries alleged by Plaintiffs.

48.     Trespass is not an acknowledged cause of action under the Puerto Rico Civil Code or as an equitable cause of action for acts or omissions occurring within the jurisdiction of Puerto Rico.

49.     Plaintiffs' trespass claim fails because they lack exclusive possession or ownership of the land or groundwater allegedly trespassed.

50.     Plaintiffs have not established a trespass action because they have not established a particular injury.

51.     Plaintiffs have not established the CITGO entities' intent to trespass on land they allegedly owned.

52.     Plaintiffs' claims fail for lack of causation to the extent they cannot trace any CITGO entity's gasoline to a release or a release site.

53.     Plaintiffs' claims fail because they cannot show a causal nexus between any injury suffered and the manufacture, supply, or distribution of MTBE or gasoline with MTBE by any CITGO entity.

54.     Plaintiffs' claims fail to the extent the CITGO entities did not manufacture, supply, or distribute MTBE or gasoline with MTBE; did not broker transactions between sellers and buyers of MTBE or gasoline with MTBE; or did not own, operate or control service stations dispensing gasoline with MTBE or gasoline storage systems in Puerto Rico.

55.     The Plaintiffs' claims fail to the extent that the CITGO entities sold their products to knowledgeable and sophisticated purchasers, and thus they had no duty to warn of risks about which the purchasers already were aware or should have been aware.

56.     The benefits of gasoline manufactured by the CITGO entities outweighed any risks that may have accompanied the product.

57.     The Plaintiffs' design defect claims fail because defendants could not have produced gasoline in sufficient quantities without using MTBE.

58.     Plaintiffs cannot show that the design of gasoline with MTBE fell below the appropriate standard of care.

59.     The Plaintiffs' warnings claims fail because it was not more likely than not that any failure to provide adequate warnings was a substantial factor in bringing about any injuries.

60.     The CITGO entities are not liable to the extent they manufactured, supplied, distributed, or imported shipments of gasoline containing concentrations of MTBE at or below a *de minimis* threshold level.

61.     The CITGO entities are not liable to the extent there is no MTBE impact in any aquifer that serves as a supply of drinking water.

**WHEREFORE**, CITGO Petroleum Corporation, CITGO Refining and Chemicals

Company L.P., CITGO International Puerto Rico Company, and CITGO International, Inc.

request entry of judgment dismissing each of the complaints with prejudice, and awarding

them their costs and attorneys' fees, and such other relief as the Court may deem just and

proper.

Dated: October 1, 2021                           Respectfully submitted,

                                                 CITGO PETROLEUM CORPORATION, CITGO
                                                 REFINING AND CHEMICALS COMPANY L.P.,
                                                 CITGO INTERNATIONAL PUERTO RICO
                                                 COMPANY, AND CITGO INTERNATIONAL,
                                                 INC.


                                                 By:    */s/ Pamela R. Hanebutt*
                                                        Nathan P. Eimer (neimer@eimerstahl.com)
                                                         (New York Bar No. 1976067)
                                                        Pamela R. Hanebutt
                                                          (phanebutt@eimerstahl.com)
                                                        Lisa S. Meyer (lmeyer@eimerstahl.com)
                                                        EIMER STAHL LLP
                                                        224 S. Michigan Ave., Suite 1100
                                                        Chicago, IL 60604
                                                        Ph.   312-660-7600
                                                        Fax  312-692-1718

61

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this 1st day of October, 2021, a copy of the **TENTH AMENDED MASTER ANSWER, AFFIRMATIVE AND SEPARATE DEFENSES OF DEFENDANTS CITGO PETROLEUM CORPORATION, CITGO REFINING AND CHEMICALS COMPANY, L.P., CITGO INTERNATIONAL PUERTO RICO COMPANY, AND CITGO INTERNATIONAL, INC.** was served upon all parties of record via LexisNexis File and Serve.

_/s/  Susan Razzano_