**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

*In Re:  Methyl Tertiary Butyl Ether ("MTBE")*    **Master File No. 1:00 – 1898**
*Products Liability Litigation*    **MDL 1358**
    **M21-88**

_____    ORAL ARGUMENT REQUESTED

**This Document Relates To:**

***Commonwealth of Pennsylvania, et al. v. Exxon***
***Mobil Corp., et al.,***

**No. 1:14-CV-06228-VSB-DCF**

_____



**REPLY IN FURTHER SUPPORT OF (1) PJSC LUKOIL'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION, (2) LUKOIL PAN AMERICAS LLC'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, AND
(3) THE REMAINING LUKOIL DEFENDANTS' MOTION TO DISMISS
<u>FOR FAILURE TO STATE A CLAIM</u>**

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ...................................................................................1

I.    PJSC'S CONDUCT DOES NOT ESTABLISH PERSONAL JURISDICTION IN
PENNSYLVANIA .........................................................................................3

    A.    This Court Lacks Specific Jurisdiction Based on PJSC's Own Contacts
with Pennsylvania ...........................................................................3

    B.    There Is No Alter Ego Relationship Between PJSC and Its Indirect U.S.
Subsidiaries .......................................................................................6

II.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER LPA ..............12

III.    THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR
FAILURE TO STATE A CLAIM AGAINST THE REMAINING LUKOIL
DEFENDANTS ...........................................................................................17

    A.    This Court Should Dismiss the Second Amended Complaint Against PJSC
Because the Commonwealth Has Failed to Plead a Theory of Indirect
Liability ...........................................................................................17

    B.    This Court Should Dismiss the Second Amended Complaint as to LNA
Because the Commonwealth Has Not Stated a Claim Based on Successor
Liability ...........................................................................................19

        i.    The Commonwealth Has Not Stated a Claim Against LNA for
Failing to Remediate Ongoing MTBE Contamination .............................20

        ii.    The Commonwealth Has Not Stated a Claim Against LNA Based
on a Theory of Successor Liability ......................................................20

    C.    This Court Should Dismiss the Second Amended Complaint Against LPA
Because It Fails to Plead Any Facts Against LPA .................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
   120 F.3d 351 (2d Cir. 1997)...................................................................................20

*Apace Commc'ns, Ltd. v. Burke*,
   522 F. Supp. 2d 509 (W.D.N.Y. 2007)...................................................................24

*Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*,
   480 U.S. 102 (1987)........................................................................12, 13, 14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................................17

*Avicolli v. BJ'S Wholesale Club, Inc.*,
   No. CV 21-1119, 2021 WL 2454454 (E.D. Pa. June 16, 2021) ...............................6

*Barber v. Pittsburgh Corning Corp.*,
   464 A.2d 323 (Pa. Super. Ct. 1983)..........................................................................7

*Berg Chilling Sys. v. Hull Corp.*,
   435 F.3d 455 (3d Cir. 2006).....................................................................................23

*Bertles v. Cycle Grp.*,
   No. 18-4707, 2020 WL 1028044 (E.D. Pa. Mar. 3, 2020) .......................................3

*Birmingham Fire Ins. Co. v. KOA Fire & Marine Ins. Co.*,
   572 F. Supp. 969 (S.D.N.Y. 1983) ...........................................................................5

*Botwinick v. Credit Exch., Inc.*,
   213 A.2d 349 (Pa. 1965) ...........................................................................................9

*Bristol-Myers Squibb Co. v. Superior Court*,
   137 S. Ct. 1773 (2017)............................................................................................15

*Canon U.S.A., Inc. v. F & E Trading LLC*,
   No. 15-cv-6015, 2017 WL 4357339 (E.D.N.Y. Sept. 29, 2017) ............................27

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
   491 B.R. 335 (S.D.N.Y. 2013)................................................................................18

*Cargo Partner AG v. Albatrans Inc.*,
   207 F. Supp. 2d 86 (S.D.N.Y. 2001)......................................................................24

*In re Chocolate Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009) ....................................................................9

*In re Chocolate Confectionary Antitrust Litig.*,
  674 F. Supp. 2d 580 (M.D. Pa. 2009) ..................................................................10

*Craig v. Lake Asbestos of Quebec, Ltd.*,
  843 F.2d 145 (3d Cir. 1988)...............................................................................9, 10

*D'Jamoos v. Pilatus Aircraft Ltd.*,
  566 F.3d 94 (3d Cir. 2009)................................................................................13, 14

*Daval Steel Prods. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991)................................................................................11

*In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*,
  735 F. Supp. 2d 277 (W.D. Pa. 2010) ..............................................................10, 11

*Foote v. Valenti Mid Atl. Mgmt.*,
  No. 18-2244, 2019 WL 266294 (E.D. Pa. Jan. 18, 2019)........................................22

*United States ex rel. Foreman v. AECOM*,
  19 F.4th 85 (2d Cir. 2021) .....................................................................................22

*Fulano v. Fanjul Corp.*,
  236 A.3d 1 (Pa. Super. 2020)............................................................................5, 9, 11

*Hamill v. Twin Cedars Senior Living Ctr.*,
  Civ. No. 3:20-CV-231, 2020 WL 7329228 (M.D. Pa. Nov. 23, 2020) ......................21, 23, 24

*Horowitz v. AT&T, Inc.*,
  No. 3:17-cv-4827, 2018 WL 1942525 (D.N.J. Apr. 25, 2018).................................11

*J. McIntyre Mach., Ltd. v. Nicastro*,
  564 U.S. 873 (2011)...............................................................................................13

*Jacobs v. District Attorney's Office*,
  No. 1:10-cv-02622, 2018 WL 1378629 (M.D. Pa. Mar. 19, 2018) ..........................26

*McCaffrey v. Windsor at Windermere Ltd. P'ship*,
  No. 17-460, 2017 WL 1862326 (E.D. Pa. May 8, 2017)........................................15

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  No. 14 Civ. 6228, 2021 WL 3371938 (S.D.N.Y. Aug. 3, 2021) ................................... *passim*

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  No. M21-88, 2015 WL 4092326 (S.D.N.Y. July 2, 2015) .....................................27

*Narco Avionics, Inc. v. Sportsman's Mkt., Inc.*,
  792 F. Supp. 398 (E.D. Pa. 1992) ........................................................14

*Noto v. Cia Secula Di Armanento*,
  310 F. Supp. 639 (S.D.N.Y. 1970) ........................................................18

*O'Connor v. Sandy Lane Hotel Co.*,
  496 F.3d 312 (3d Cir. 2007)........................................................14

*Orange Cnty. Water Dist. v. Unocal Corp.*,
  No. SACV 03-01742-CJC, 2018 WL 6133719 (C.D. Cal. Apr. 10, 2018) ...........................20

*Rhode Island v. Atl. Richfield Co.*,
  357 F. Supp. 3d 129 (D.R.I. Dec. 11, 2018) ...........................................16

*Rice v. First Energy Corp.*,
  339 F. Supp. 3d 523 (W.D. Pa. 2018) ........................................................9

*Ristenbatt v. W. Glass Supply, Inc.*,
  No. 1:20-cv-01634, 2021 WL 5867435 (M.D. Pa. Aug. 9, 2021) ...........................4

*Ritchie v. Northern Leasing Sys., Inc.*,
  14 F. Supp. 3d 229 (S.D.N.Y. 2014)........................................................27

*Shuker v. Smith & Nephew, PLC*,
  885 F.3d 760 (3d Cir. 2018)........................................................13, 16

*State Auto. Mut. Ins. Co. v. Lucchesi*,
  563 F. Appx. 186 (3d Cir. 2014)........................................................26

*State of Maryland v. Exxon Mobil Corp.*,
  406 F. Supp. 3d 420 (D. Md. 2019) .................................................. *passim*

*State of Maryland v. Exxon Mobil Corp.*
  (D. Md. Oct. 5, 2018), ECF No. 342-1 ........................................................28

*State of Maryland v. Exxon Mobil Corp.*
  (D. Md. Mar. 25, 2019), ECF No. 387........................................................28

*Strecker v. Carr Healthcare Realty*,
  No. 2017CV30673, 2018 Colo. Dist. LEXIS 4044 (D. Colo. Aug. 15, 2018) .......................19

*Vermont v. Atl. Richfield Co.*,
  142 A.3d 215 (Vt. 2016)........................................................16

*Wexner v. First Manhattan Co.*,
  902 F.2d 169 (2d Cir. 1990)........................................................24

*Williams by Williams v. OAO Severstal*,
  No. 938 WDA, 2019 WL 4888570 (E.D. Pa. Oct. 3, 2017) .................................................7, 9

**Other Authorities**

Federal Rule of Civil Procedure 9(b).............................................................................................24

Federal Rule of Civil Procedure 12(b)(2) ................................................................................1, 2

Federal Rule of Civil Procedure 12(b)(6) ......................................................................... *passim*

Pursuant to Federal Rule of Civil Procedure 12(b)(2), Defendants PJSC LUKOIL ("PJSC") and LUKOIL Pan Americas LLC ("LPA") submit this Reply Memorandum of Law in support of their Motions to Dismiss the Commonwealth of Pennsylvania's Second Amended Complaint for lack of personal jurisdiction. Additionally, pursuant to Federal Rule of Civil Procedure 12(b)(6), PJSC, LPA, and LUKOIL North America LLC ("LNA") (collectively, the "Remaining LUKOIL Defendants") submit this Reply Memorandum of Law in support of their Motion to Dismiss the Second Amended Complaint for failure to state a claim.

## PRELIMINARY STATEMENT

The Remaining LUKOIL Defendants should be dismissed from this case because, for PJSC and LPA, the Commonwealth has not established a basis for personal jurisdiction and, for each of the Remaining LUKOIL Defendants, has not adequately alleged a factual basis for keeping them in this case.

*First*, this Court cannot exercise personal jurisdiction over either PJSC or LPA, neither of which has any direct contacts or activities directed at Pennsylvania. The Commonwealth attempts to establish alter ego jurisdiction over PJSC, which was the indirect parent of Getty Petroleum Marketing Inc. ("GPMI") between 2001 and 2009, based on GPMI's conduct in the state. But nothing about PJSC's relationship with GPMI demonstrates the level of domination or control necessary to render PJSC, a publicly-traded joint stock company organized under the laws of the Russian Federation, at home in Pennsylvania. The Commonwealth offers hundreds of pages of exhibits to its Opposition in an effort to persuade this Court to the contrary, but the exhibits simply show that PJSC and GPMI had a typical parent-indirect subsidiary relationship. Similarly, LPA has absolutely no direct contacts or activities in Pennsylvania that would warrant exercising specific jurisdiction over LPA. The Commonwealth argues that LPA, a trading

company, was somehow responsible for the distribution of certain cargoes of MTBE-gasoline as a result of its economic interest in the value of those cargoes prior to distribution through a pipeline that begins in the Gulf of Mexico.  But even if that were true, such a stream of commerce theory of jurisdiction is not sufficient to hale LPA into court in Pennsylvania.  Accordingly, each of PJSC and LPA should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

*Second*, the fact remains that the Commonwealth's allegations in the Second Amended Complaint are not sufficient to state a claim against the Remaining LUKOIL Defendants.  The Commonwealth's Opposition attempts to paint a picture of the Remaining LUKOIL Defendants as entities who were directly implicated in alleged MTBE contamination in Pennsylvania.  But the Remaining LUKOIL Defendants have nothing to do with any MTBE-related harm allegedly suffered by the Commonwealth.  The allegations all depend on GPMI's conduct.  If the allegations against LUKOIL Americas Corporation ("LAC"), the direct parent of GPMI during the years GPMI was allegedly using MTBE, are insufficient to state a claim (as this Court already held in its August 2, 2021 decision), then it follows that the allegations against PJSC (the indirect foreign parent), LNA (the successor who operated stations after MTBE was no longer in use), and LPA (a trading company with no corporate connection to GPMI) fail as well.  Simply put, the Commonwealth has not and cannot adequately plead any theory of primary or secondary liability against the Remaining LUKOIL Defendants and each of them should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## ARGUMENT

**I.    PJSC'S CONDUCT DOES NOT ESTABLISH PERSONAL JURISDICTION IN PENNSYLVANIA**

The Commonwealth concedes, as it must, that this Court has no general jurisdiction over PJSC, Opp'n at 12, and instead argues that it would be appropriate to exercise personal jurisdiction over PJSC based on its own contacts with Pennsylvania and/or based on the conduct of its alleged alter ego, GPMI.  Neither the allegations in the Second Amended Complaint, nor the assortment of exhibits submitted in support of the Commonwealth's arguments, establish jurisdiction under either theory.

### A.   This Court Lacks Specific Jurisdiction Based on PJSC's Own Contacts with Pennsylvania

The Commonwealth offers no response to PJSC's fundamental position: PJSC has never purposefully directed its activities, business or otherwise, at Pennsylvania.  *See Bertles v. Cycle Grp.*, No. 18-4707, 2020 WL 1028044, at *2 (E.D. Pa. Mar. 3, 2020) (setting out the test for specific jurisdiction and dismissing complaint for lack of personal jurisdiction).  The Commonwealth proffers various extrinsic evidence and arguments in an attempt to connect PJSC to Pennsylvania, but none of it can overcome the simple fact that PJSC has absolutely no direct contacts with Pennsylvania.

PJSC has never manufactured, distributed, sold, or purchased MTBE in the United States (Martynov Decl., ¶¶ 9, 11-12); never sold gasoline in the United States (let alone Pennsylvania) (*id.* ¶ 11); never owned or operated a refinery, a petroleum product terminal, or service station in the United States (*id.* ¶ 10); has no employees and conducts no operations in the United States (*id.* ¶ 13); maintained its own books and records (*id.* ¶ 21); and never controlled the day-to-day operations of GPMI, including its budgeting, marketing, operating, personnel, or sales (*id.* ¶ 23). On these same facts, the federal district court in the Maryland MTBE litigation concluded that

3

the State of Maryland had "not made a prima facie showing that PJSC is subject to specific personal jurisdiction in this Court based on its own conduct." *State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 446 (D. Md. 2019).  So too here.  The Commonwealth's nearly identical allegations and attempt to distract with multiple exhibits showing PJSC's varying involvement with LAC and GPMI do not meet the threshold to allow the Court to exercise specific jurisdiction over PJSC.

Nevertheless, the Commonwealth attempts to manufacture jurisdiction through arm's length transactions and other points of connection between PJSC, LAC, and GPMI, none of which establish specific jurisdiction under Pennsylvania law.  The Commonwealth's recounting of the details of PJSC's various guarantees for LAC and GPMI, *see* Opp'n at 13-17, does not establish that PJSC directed its activities at Pennsylvania.  Notably, the Commonwealth does not argue that any of the guarantees were negotiated in Pennsylvania, executed in Pennsylvania, implemented in Pennsylvania, or that any of them contained Pennsylvania forum selection clauses.  Indeed, each contract expressly selects a forum other than Pennsylvania as the governing law.  *See* Exs. 3 (Agreement), 4 (Limited Guaranty), 18 (Guaranty of Lease), and 22 (Guaranty) (each selecting New York as the governing law for the contract).  The Commonwealth's vague allegations of PJSC's "negotiations," untethered to the state of Pennsylvania, regarding these guarantees "fall[] short of a demonstration of the level of systemic contacts within the forum state sufficient to support specific jurisdiction in the absence of a strict causal nexus." *Ristenbatt v. W. Glass Supply, Inc.*, No. 1:20-cv-01634, 2021 WL 5867435, at *6 (M.D. Pa. Aug. 9, 2021).  The Commonwealth also does not argue that any of its alleged injuries due to MTBE contamination arose out of or relate to the negotiation, execution, or implementation of any PJSC guarantee.

Moreover, the alleged guarantees described—one guaranteeing a gasoline distribution agreement broadly across the United States, another guaranteeing a lease of gas stations, also across the United States (the "Master Lease"), and a credit agreement after the purchase of gas stations in both Pennsylvania and New Jersey—are not evidence of either any purposeful availment of the privilege of conducting activities in Pennsylvania or any intent to reap any benefits of Pennsylvania law.  For example, the Commonwealth points to the Master Lease to show that PJSC negotiated an agreement that involved stations in Pennsylvania.  Opp'n at 14 (citing Han Decl., Ex. 17).  But with the Commonwealth's expansive logic, PJSC's underlying guarantee of GPMI's contracts would subject PJSC to jurisdiction not only in Pennsylvania, but also in Virginia, New York, New Hampshire, Maryland, Delaware, New Jersey, Vermont, Connecticut, Maine, and Massachusetts—anywhere GPMI leased a station or where supplied gasoline may have been delivered—and would eviscerate the limits of personal jurisdiction.  *See, e.g.*, *Fulano v. Fanjul Corp.*, 236 A.3d 1, 15 (Pa. Super. 2020) (declining to "expand the 'stream of commerce' theory" because to do so "would effectively subject defendants to specific personal jurisdiction in any forum in which it distributes a product, regardless of there being any connection between the defendant's forum contacts and the plaintiff's claims").  Courts have rejected such a sweeping view of a parent guarantor's consent to jurisdiction.  *See, e.g.*, *Birmingham Fire Ins. Co. v. KOA Fire & Marine Ins. Co.*, 572 F. Supp. 969, 973 (S.D.N.Y. 1983) (declining to exercise jurisdiction in part because "no jurisdiction exists under [New York's long-arm statute] when a nondomiciliary contracts out of state to indemnify or provide a financial guarantee for an obligation in New York").

Indeed, the federal district court in the Maryland MTBE case concluded that it could *not* exercise personal jurisdiction over PJSC in Maryland based on similarly alleged facts.  *State of*

*Maryland*, 406 F. Supp. 3d at 446 (considering the evidence regarding PJSC serving as guarantor of GPMI on various contracts and declining to exercise specific jurisdiction).  The same conclusion is required here.

In sum, there is no basis upon which this Court should exercise jurisdiction over PJSC based on its own activities in Pennsylvania. The Commonwealth incorporates various other allegations into its argument that this Court may exercise specific personal jurisdiction— including that LUKOIL executives served on GPMI's board and that PJSC used the LUKOIL logo in Pennsylvania—that, if anything, are related to alter ego jurisdiction and fail for the reasons articulated below.  *See, e.g.*, *Avicolli v. BJ'S Wholesale Club, Inc.*, No. CV 21-1119, 2021 WL 2454454, at *7 (E.D. Pa. June 16, 2021) (analyzing "common directors and officers" and "common use of a trademark or logo" as two of many factors in the alter ego jurisdictional analysis).

## B.  *There Is No Alter Ego Relationship Between PJSC and Its Indirect U.S. Subsidiaries*

The Commonwealth goes to great lengths to try to establish that this Court has alter ego jurisdiction over PJSC based on GPMI's conduct.  But the Commonwealth has not met its burden for piercing the corporate veil for jurisdictional purposes under Pennsylvania law.

PJSC has offered evidence that should be dispositive in determining that to exercise alter ego jurisdiction over PJSC based on GPMI's conduct would be improper.  PJSC did not own GPMI stock.  Martynov Decl., ¶ 18.  PJSC has its own board of directors and none of PJSC's directors were ever directors or officers of GPMI.  *Id.* ¶ 19.  PJSC maintains its own books and records and its accounts were not comingled with accounts held by GPMI.  *Id.* ¶ 21.  PJSC never controlled the day-to-day operations of GPMI, including its budgeting, marketing, operating, personnel, or sales.  *Id.* ¶ 23.  PJSC provided management oversight as the indirect parent

corporation, but never demanded that GPMI seek its approval for the majority of its operations nor directed that GPMI undertake certain action. *Id.* ¶¶ 24, 26. PJSC made every effort to maintain corporate separateness, observe corporate formalities, and functioned independently from GPMI in all regards. Indeed, PJSC, a holding company in the Russian Federation that has never been directly involved in the refining, distribution, or marketing of gasoline in the United States, could not itself have performed GPMI's function in Pennsylvania, which is a key factor in the analysis of exercising alter ego jurisdiction. *See Williams by Williams v. OAO Severstal*, No. 938 WDA, 2019 WL 4888570, at *13 (E.D. Pa. Oct. 3, 2017). The Commonwealth's emphasis on other facts is simply a distraction and does not provide a basis for exercising jurisdiction over PJSC.

In a decision that should guide this Court, the federal district court in the pending MTBE case in Maryland declined to exercise alter ego jurisdiction over PJSC based on nearly identical alleged facts and evidence as the Court is considering here, including the same evidence offered by PJSC. Although Maryland uses a different test in deciding whether to pierce the corporate veil for jurisdictional purposes, *State of Maryland*, 406 F. Supp. 3d at 447, both Maryland and Pennsylvania courts assess the degree of control a parent exercises over a subsidiary. *Compare State of Maryland*, 406 F. Supp. 3d at 447, *with Barber v. Pittsburgh Corning Corp.*, 464 A.2d 323, 331 (Pa. Super. Ct. 1983) ("[S]ubsidiary is the 'alter ego' of the parent to the extent that domination and control by the parent corporation renders the subsidiary a mere instrumentality of the parent.") (internal quotations omitted). After considering the exhibits that the State of Maryland submitted in support of its alter ego jurisdictional arguments in the Maryland MTBE case, many of which overlap with the exhibits submitted in support of the Commonwealth's Opposition, the Maryland court determined that the facts did not show that "PJSC exerted a

degree of control over GPMI greater than that of a typical parent company[.]" *State of Maryland*, 406 F. Supp. 3d at 447.  The Maryland court accepted the undisputed facts in the declaration submitted by PJSC in support of its motion—the same facts proffered here—that "PJSC and GPMI existed largely as separate entities; they maintained their own books and records, had their own boards of directors, and did not comingle their accounts," and importantly, that "PJSC never exercised control over the day-to-day operations of GPMI."  *Id.*

The Commonwealth does not dispute any of those facts here but rather attempts to focus the Court on other facts to blur the lines between GPMI and PJSC, but nothing in the Commonwealth's Opposition supports a conclusion that this Court should pierce the corporate veil to establish jurisdiction over PJSC.

*Shared executives*.  The Commonwealth highlights throughout its Opposition that certain PJSC executives sat on the board of GPMI, as if such evidence proves PJSC's control of GPMI. *See, e.g.*, Opp'n at 14 ("Mr. Safin—who was simultaneously a member of OAO Lukoil's Management Committee and a member of GPMI's board of directors—signed [a] letter acknowledging assignment of the guaranty on behalf of OAO Lukoil.").  It does not.  First, the Commonwealth seems to conflate a parent's executive sitting on the board of its subsidiary with the parent and subsidiary sharing board members.  The former is of no moment.  As to the latter, it is undisputed that a PJSC director never served as a GPMI director or officer, *see* Martynov Decl., ¶¶ 19-20, but even if the entities shared directors, that would be well within the norm. "Generally, a corporate parent will retain its distinct identity and not be subject to the jurisdictions of its subsidiaries, even when it shares common directors, officers and shareholders."  *Fulano*, 236 A.3d at 20 (citing *Botwinick v. Credit Exch., Inc.*, 213 A.2d 349, 354 (Pa. 1965)).  Even if PJSC and GPMI shared officers and directors—which is not the case here—

8

it would be of no consequence for this jurisdictional analysis. *Williams*, 2019 WL 4888570, at

*5 (citing *Botwinick*, 213 A.2d at 354).

    *Public statements of operations and control.* The Commonwealth argues that PJSC

"flaunted its presence in the U.S. gasoline market through GPMI," citing statements from a press

release and PJSC annual report to show PJSC's "dominance" in Pennsylvania over GPMI.

Opp'n at 20 (quoting Han Decl., Exs. 14 (an annual report), and 25 (a press release)). But the

fact that PJSC referred to its indirect subsidiary GPMI in public statements hardly suggests the

level of control required to find that GPMI was PJSC's alter ego. *See In re Chocolate*

*Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 570-71 (M.D. Pa. 2009) (evidence about the

corporate family in websites, annual reports, and corporate policy statements "does not construct

a prima facie case of alter ego jurisdiction. . . because it fails to demonstrate the corporate

parents' actual control over the daily affairs of their subsidiaries").

    *Gluzman testimony and statements.* The Commonwealth's reliance on snippets of

testimony and emails from GPMI's President, Vadim Gluzman, Opp'n at 22 (citing Exs. 27, 31)

likewise fails to establish PJSC's control over GPMI. Exhibit 31(b), for example, involves a

discussion of the terms for a significant financing deal for GPMI, but "it is not uncommon for a

parent corporation to exercise some control over, or be involved in, major decisions regarding

the business of its subsidiaries." *Rice v. First Energy Corp.*, 339 F. Supp. 3d 523, 539 (W.D. Pa.

2018). The Commonwealth's allegations in this regard do not suffice to pierce the corporate

veil. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 151 (3d Cir. 1988) (refusing to

pierce corporate veil despite evidence of parent's "widespread involvement" in the subsidiary's

"financial and management decisions"). And Mr. Gluzman's quoted remarks in Exhibit 27

demonstrate that PJSC asked its subsidiaries to "defend" their own budgets, which again is

uncontroversial and only buttresses the conclusion that PJSC did not directly control its subsidiaries' day-to-day budgeting or operations, but rather exercised the oversight typical of a parent holding corporation. *See In re Chocolate Confectionary Antitrust Litig.*, 674 F. Supp. 2d 580, 599-600 (M.D. Pa. 2009) (recognizing that parent corporation "is entitled to . . . approve budgets;" such "activities typify standard parent-subsidiary interactions"). The allegation that PJSC "exercised tight control" over a significant GPMI contract by requesting that certain individuals travel to Moscow to obtain approval, Opp'n at 22 (citing Han Decl., Ex. 27[1]), is more of the same and likewise does not establish an alter ego relationship.

*Shared trademarks*. The Commonwealth returns repeatedly to the shared LUKOIL brand name, as well as PJSC's licensing agreement and related marketing, to show how PJSC "used GPMI." Opp'n at 23. However, as stated in PJSC's opening memorandum of law, "[t]he common marketing image and joint use of trademarked logos fail to render [subsidiary] an alter ego of [parent] . . . this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries." *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010). That LUKOIL was "portrayed as a single brand to the public…does not demonstrate the necessary control by defendant parent over the subsidiaries." *Horowitz v. AT&T, Inc.*, No. 3:17-cv-4827, 2018 WL 1942525, at *9 (D.N.J. Apr. 25, 2018) (quoting *In re Enter.*, 735 F. Supp. 2d at 323).

*The 2009 transaction*. Finally, the Commonwealth urges this Court to find that the alleged fraudulent transfer in 2009 shows PJSC's domination over GPMI, Opp'n at 23-27, but

---

[1] Plaintiff cites to and identifies Exhibit 27 as "testimony of Bionol employee that [] traveled to Moscow to discuss with OAO Lukoil officers a Bionol-GPMI contract to supply GPMI with ethanol in Pennsylvania" but Exhibit 27 is the testimony of Mr. Gluzman. Plaintiff's Exhibit 26 is testimony from the Bionol arbitration, but the excerpts Plaintiff included are not testimony of any Bionol employee and there is no mention of traveling to Moscow for any reason.

the Commonwealth's long recitation of allegations on this point does not establish jurisdiction. The obvious and fatal rejoinder is that a *2009* transaction is beside the point: Whatever control PJSC may have asserted in 2009 is irrelevant to the injuries the Commonwealth allegedly suffered during the time MTBE was in use.  To meet this point, the Commonwealth offers *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357 (2d Cir. 1991) for the proposition that "[t]he fraudulent transfer demonstrates the extent to which OAO Lukoil treated GPMI as an agent or division throughout the entire period that Lukoil owned GPMI."  Opp'n at 26.  *Daval Steel* stands for the uncontroversial point that, in assessing the admissibility of evidence, "information from subsequent years could help piece together the earlier picture."  *Daval Steel*, 951 F.2d at 1368.  Even if that is the case, it sheds no light on this Court's analysis of whether PJSC asserted sufficient control over GPMI to disregard the entities' corporate form, an analysis that involves multiple factors of which fraud is not one.  *Fulano*, 236 A.3d at 20.

Tellingly, rather than engage with any of the ten factors set out in *Fulano* for assessing alter ego jurisdiction, the Commonwealth simply states that "[PJSC's] actions check the boxes of a majority of those factors" and tries to short circuit the specific (and undisputed) facts related to PJSC by asserting that this Court "already ruled that GPMI (and LAC) were mere instrumentalities of OAO Lukoil."  Opp'n at 26.  However, the Court's reasoning in the August 2 Order was based on an analysis of GPMI and LAC, GPMI's direct parent, and in this Court's view, notwithstanding that the Second Amended Complaint failed to state a claim against LAC, the factors weighed in favor of exercising jurisdiction over LAC based on its relationship with GPMI.  *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. 14 Civ. 6228, 2021 WL 3371938, at *16 (S.D.N.Y. Aug. 3, 2021).  While the facts alleged against LAC may relate to

PJSC, the result of the alter ego analysis is different for PJSC for the reasons articulated herein, and this Court should decline to exercise alter ego jurisdiction over the indirect parent of PJSC.

Finally, as the Maryland federal district court found, to exercise personal jurisdiction over PJSC, a foreign corporation, would "impose a significant burden upon it" and would "offend traditional notions of fair play and substantial justice." *State of Maryland*, 406 F. Supp. 3d at 448 (quoting, *inter alia*, *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 115 (1987) ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").  With such an attenuated connection to Pennsylvania and no allegations of control sufficient to establish alter ego jurisdiction based on GPMI's conduct, it would offend the notions of fair play and federal due process to hale PJSC into court in Pennsylvania.

## II.      THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER LPA

The Commonwealth strives in its Opposition to paint LPA as a player in manufacturing and distributing MTBE gasoline (it is not), but the allegations in the Second Amended Complaint and the Commonwealth's arguments do not establish a basis for exercising personal jurisdiction over LPA.  The Commonwealth concedes, as it must, that this Court has no general jurisdiction over LPA.  Opp'n at 31 n.17.  The Commonwealth instead relies on a stream of commerce theory of personal jurisdiction because, the Commonwealth argues, certain cargoes in which LPA might have had an economic interest may have gone into the Colonial Pipeline which supplies gasoline to stations in Pennsylvania, *id.* at 31, but that is not enough under Third Circuit and Pennsylvania law.

The strength of the stream of commerce theory has been in flux for decades.  The theory, simply put, confers specific jurisdiction over a non-resident defendant that placed goods into the stream of commerce.  *Asahi Metal Indus. Co.*, 480 U.S. 102.  In *Asahi*, the Supreme Court in a plurality opinion held "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State."  480 U.S. at 112. Similarly, mere "awareness that the stream of commerce may or will sweep the product into the forum State" does not demonstrate purposeful availment in a forum State.  *Id*; *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) ("The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.").

The Third Circuit recently declined to adopt the stream of commerce theory to exercise specific jurisdiction over the non-resident parent company of a manufacturer, explaining "[a] plurality of Supreme Court Justices has twice rejected [it]."  *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) (citing *J. McIntyre* and *Asahi*).  The *Shuker* court found that the plaintiff failed to show purposeful availment because the plaintiff only presented evidence that the manufacturer sold its products through its distributor in Pennsylvania "as part of its efforts to sell products in the United States generally—not in Pennsylvania specifically."  *Id*.

Here, too, the Commonwealth fails to demonstrate that LPA purposefully availed itself of conducting business in Pennsylvania.  In Pennsylvania, a defendant's contacts must amount to "a deliberate targeting of the forum."  *D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103 (3d Cir. 2009) (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007)). Foreseeability that a product might end up in the supply chain "has never been a sufficient

benchmark for personal jurisdiction under the Due Process Clause;" rather, "it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 105. The Commonwealth argues that LPA "used the Colonial Pipeline system in association with its gasoline buying and selling business and made widespread sales to customers that it knew served the Pennsylvania market." Opp'n at 32. But even if that were true (and it is not an accurate description of LPA's business), that is not enough to establish specific jurisdiction. Indeed, "a defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream of commerce into an act purposefully directed toward the forum State." *Narco Avionics, Inc. v. Sportsman's Mkt., Inc.*, 792 F. Supp. 398, 405 (E.D. Pa. 1992) (quoting *Asahi*, 480 U.S. at 112). Accordingly, the theory that LPA put MTBE-gasoline into the Colonial Pipeline as an "intermediary in the market for MTBE gasoline that served Pennsylvania" is not sufficient to establish jurisdiction over LPA.

Moreover, and fundamentally, despite the Commonwealth's attempt to place LPA in the middle of the distribution of MTBE gasoline, LPA has neither direct contacts nor activities directed at Pennsylvania. LPA does not manufacture, buy, sell, or blend MTBE gasoline in Pennsylvania. Wolfe Decl., ¶¶ 11, 12. As for any further presence or business activities in Pennsylvania, LPA does not maintain offices, employees, or agents in Pennsylvania, *id.* ¶ 13; does not own property in Pennsylvania, *id.* ¶ 14; and does not conduct business in Pennsylvania, *id.* ¶¶ 9-13. The Commonwealth has offered no allegations demonstrating purposeful availment beyond arguing that LPA had an economic interest in product that later is put into a pipeline that delivers gas to a variety of states. This is insufficient to establish personal jurisdiction. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1783 (2017) ("[t]he bare fact that

[a non-resident defendant] contracted with a [resident] distributor is not enough to establish personal jurisdiction in the State.").

The Commonwealth points to the fact that LPA is "registered to do business in Pennsylvania" as proof of its activities within Pennsylvania and a basis for exercising specific jurisdiction.  Opp'n at 31.  But the Commonwealth cites no authority for the proposition that having a license and registration within the state to do business is sufficient to establish specific jurisdiction.  Being registered to do business is not relevant if the company does not actually conduct business in Pennsylvania, which LPA did not.  *See McCaffrey v. Windsor at Windermere Ltd. P'ship*, No. 17-460, 2017 WL 1862326, at *6 (E.D. Pa. May 8, 2017) (concluding that "[t]he mere fact that a business entity is registered to conduct business in Pennsylvania, without more, is insufficient to establish this Court's specific jurisdiction over a defendant").

To the extent the Commonwealth attempts to compare LPA to TPRI in its Opposition, the Commonwealth misses the mark.  The Commonwealth attempts to draw a comparison between LPA in this case and TPRI in two MTBE cases in Vermont and Rhode Island that have no bearing on this case.  In those cases, the courts found they had personal jurisdiction over TPRI, which the Commonwealth now cites to demonstrate that, like TPRI in those cases, LPA's "use of the nationwide distribution system was sufficient to establish personal jurisdiction" in Pennsylvania.  Opp'n at 36.  However, the Vermont and Rhode Island decisions as to TPRI are distinguishable because in those cases, the plaintiffs actually included allegations against TPRI in the complaint that allowed for a finding of personal jurisdiction *in those states.*

Regarding the Vermont case, the Commonwealth argues that its allegations against LPA in this case should be sufficient because they are similar to the allegations in the Vermont complaint that the Vermont court found to be sufficient to establish personal jurisdiction.  Opp'n

15

at 36-37 ("The complaint in that case, like Pennsylvania here, 'alleged that TPRI was one of twenty-nine companies that refined, marketed, or otherwise supplied, directly or indirectly, MTBE or gasoline containing MTBE…into a nationwide distribution system that they knew or should have known would bring their product into Vermont.").  First, the Commonwealth has not alleged that LPA supplied gasoline directly to Pennsylvania—nor could it.  Wolfe Decl., ¶ 6. Moreover, the law in Vermont permitted a finding by that court that it had jurisdiction over TPRI based on a stream of commerce theory.  *Vermont v. Atl. Richfield Co*., 142 A.3d 215, 222-24 (Vt. 2016) (finding it sufficient for jurisdiction if a corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State") (internal citations omitted).  As discussed above, the law of the Third Circuit requires more than just delivering products into the stream of commerce.  *See Shuker*, 885 F.3d 760.  Accordingly, the Vermont case is both factually and legally inapposite.

Equally distinguishable is the case in Rhode Island, where the plaintiff alleged that "TPRI introduced MTBE into the sequence of pipelines and storage tanks dedicated to the delivery of gasoline to Rhode Island[.]"  *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 146 (D.R.I. Dec. 11, 2018).  The court concluded accordingly that this was not a case "where a defendant placed its product in 'the stream of commerce' by selling it to a retailer who acted unilaterally to sell it to the injured plaintiff," but rather, "the stream TPRI allegedly utilized was one whose distributaries led straight to Rhode Island."  *Id*.  In that case, plaintiff had sufficiently alleged TPRI had purposefully availed itself of the Rhode Island market, beyond simply putting its products into the stream of commerce somewhere in the nation.  The Rhode Island case stands in stark contrast to the matter before this Court, where the Second Amended Complaint itself contains no allegations against LPA, and the Commonwealth has had to stretch the limits of its

16

stream of commerce theory to include LPA, a theory which is not sufficient on its own to establish jurisdiction in this Circuit.  As such, this Court need not place any reliance on either the Rhode Island or Vermont MTBE decisions, and should decline to exercise jurisdiction over LPA.

### III.   THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AGAINST THE REMAINING LUKOIL DEFENDANTS

Regardless of whether this Court has jurisdiction over PJSC or LPA, the Second Amended Complaint should still be dismissed as to each of the Remaining LUKOIL Defendants because the allegations do not plausibly state a claim against any of them.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.   *This Court Should Dismiss the Second Amended Complaint Against PJSC Because the Commonwealth Has Failed to Plead a Theory of Indirect Liability*

Separate from the jurisdictional analysis, this Court should dismiss the Second Amended Complaint against PJSC for failure to state a claim because the Commonwealth cannot meet its burden under Maryland corporate law to pierce the corporate veil.  The Commonwealth needs to have established in the Second Amended Complaint—not through extrinsic evidence—that GPMI was the alter ego of PJSC and therefore that PJSC should be liable for the conduct alleged against GPMI.  However, the Commonwealth has not alleged—nor can it—anything sufficient to pierce the multiple corporate veils between GPMI and PJSC, particularly in light of this Court's ruling that the Commonwealth failed to allege sufficient facts to state a claim against LAC, GPMI's direct parent and an indirect subsidiary of PJSC, on a veil-piercing theory.  *In re MTBE Prods. Liab. Litig.*, 2021 WL 3371938, at *19.  The claims against PJSC premised on GPMI's conduct after it was acquired by LAC should similarly be dismissed.  *Id.*

In the August 2 Order, this Court explained that under Maryland law, "a corporation's veil will only be pierced 'where it is necessary to prevent fraud or enforce paramount equity'" *id.*

at 18, and that because the "Commonwealth does not even attempt to demonstrate how piercing GPMI's veil would prevent fraud or enforce a paramount equity," such veil-piercing is not warranted as between GPMI and LAC. *Id.* The similar fraud-based allegations against PJSC, the ultimate corporate parent, multiple entities further removed from GPMI than LAC, are not sufficient to pierce the corporate veil by the same logic.

The Commonwealth asserts that the Court's August 2 Order is "not dispositive here because this Court examined only the Commonwealth's veil-piercing claims based on the relationship between LAC and GPMI." Opp'n at 29. But the Commonwealth cannot just sidestep the reality of the corporate structure of the LUKOIL entities. If the Commonwealth cannot pierce the veil of GPMI's direct parent, LAC, as this Court rightly found, then it cannot now reach over multiple other subsidiaries to pierce the veil of the ultimate parent corporation. *See Noto v. Cia Secula Di Armanento*, 310 F. Supp. 639, 647 (S.D.N.Y. 1970) (declining to pierce multiple corporate veils between subsidiaries to reach the parent corporation where "the outward indicia of the corporate form have been carefully maintained"); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) (explaining that to disregard "sister" subsidiaries, a plaintiff must "double-pierce," that is, "the veils separating each entity from the shared corporate parent must be pierced"). "[T]o reach the ultimate parent one must pierce not one but many corporate veils." *Noto*, 310 F. Supp. at 645 n.12. It is undisputed that PJSC is not the direct parent company of GPMI, or even LAC, GPMI's direct parent. Martynov Decl., ¶ 14. There are in fact multiple entities in the corporate structure between PJSC and GPMI, as well as between PJSC and the other American subsidiaries, including LAC. *Id.* Courts generally have not allowed the "extraordinary step" of piercing multiple corporate veils to reach the ultimate parent when the facts alleged do not establish an alter ego relationship, as is

18

the case here.  *See, e.g.*, *Strecker v. Carr Healthcare Realty*, No. 2017CV30673, 2018 Colo. Dist. LEXIS 4044, at *3 (D. Colo. Aug. 15, 2018) (finding that plaintiff could not pierce the corporate veils of multiple parent and subsidiary entities because they were "three distinct entities for which all company formalities are observed" and the parent did not "dominate" the subsidiaries).

Even assuming, *arguendo*, that the Commonwealth could pierce multiple veils to reach PJSC, the facts alleged are still not sufficient to satisfy the stringent two-prong test under Maryland law for disregarding corporate formalities.  As the Court has already found, nothing in the Second Amended Complaint "suggests that the alleged fraudulent transfer of assets constitutes a fraud or inequity that could be prevented or mitigated by piercing GPMI's corporate veil," in part because the Commonwealth has not alleged that it was a victim or "impacted by the purported fraud in any way."  *In re MTBE Prods. Liab. Litig.*, 2021 WL 3371938, at *19. Further, the Commonwealth has failed to meet the high burden of demonstrating an "equitable interest more important than the state's interest in limited shareholding liability," therefore making the paramount inequity exception "inapplicable."  *Id.* (citation omitted).  Accordingly, for the same reasons that the Court concluded the Commonwealth had not met its burden as to LAC, the Court should also decline to pierce the (multiple layers of) corporate veil as to PJSC, and dismiss all claims against PJSC.

### B.  This Court Should Dismiss the Second Amended Complaint as to LNA Because the Commonwealth Has Not Stated a Claim Based on Successor Liability

The Commonwealth does not allege that LNA itself manufactured, distributed, or otherwise used MTBE in gasoline.  Nor can it; the industry stopped using MTBE in gasoline in 2006.  Instead, the Commonwealth argues that LNA is (1) "liable for its own acts and omissions in causing MTBE to continue to pollute the waters of the Commonwealth, and for its failure to remediate MTBE contamination at sites it owns/owned" and (2) "is a successor in liability for

19

MTBE contamination at GPMI stations."  Opp'n at 8.  The Commonwealth's allegations do not support claims against LNA under either theory.

> ### i.    The Commonwealth Has Not Stated a Claim Against LNA for Failing to Remediate Ongoing MTBE Contamination

The Commonwealth has not articulated a legal basis or pointed to any authority that supports claims against LNA for failing to fully remediate MTBE contamination caused by prior service station owners.  The Remaining LUKOIL Defendants are unaware of any decision holding a property owner liable for negligence based on a failure to fully remediate MTBE contamination caused by a prior owner.[2]  In fact, the Second Circuit has held that there was *no basis* for a negligence claim where the plaintiff "[could not] establish that the defendants contaminated the site at all" but instead based its claim on a prior owner's use of hazardous chemicals that continued to spread underground during defendants' subsequent ownership.  *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 360 (2d Cir. 1997).  To the extent the Commonwealth's claims against LNA depend on a "failure to remediate" theory, they should be summarily dismissed.

> ### ii.   The Commonwealth Has Not Stated a Claim Against LNA Based on a Theory of Successor Liability

The Commonwealth also fails to state a claim against LNA based on a successor liability theory.  As a threshold matter, the Commonwealth asserts that LNA should be liable for GPMI's conduct both before and after GPMI was acquired by LAC, but that cannot be.  *See* Opp'n at 12 ("With respect to successor liability, the [Second Amended Complaint] alleges that LNA was the

---

[2] The lone decision the Commonwealth cites in support of its "failure to remediate" theory is inapposite.  In *Orange Cnty. Water Dist. v. Unocal Corp.*, No. SACV 03-01742-CJC, 2018 WL 6133719 (C.D. Cal. Apr. 10, 2018), defendants themselves used MTBE in gasoline and subsequently failed to remediate contamination caused by the chemical.  The court there addressed the point at which the plaintiff's injury accrued, not the circumstances in which a party may be held liable for failing to fully remediate MTBE contamination caused by another party.

successor to GPMI, and that LNA is liable for releases and conduct that occurred both *before* and after GPMI became a privately held, wholly owned subsidiary of LAC." (emphasis added)). This Court's August 2 Order—finding that the Commonwealth had failed to plead successor liability as to LAC for GPMI's conduct prior to LAC's acquisition of GPMI—extinguishes the Commonwealth's claims against LNA for pre-2001 MTBE contamination. *See In re MTBE Prods. Liab. Litig.*, 2021 WL 3371938, at *19-20. LNA cannot be a successor to GPMI's pre-2001 liability when LAC itself—GPMI's direct parent—never inherited that liability.

As for LNA's alleged liability for GPMI's conduct post 2001-acquisition, the Commonwealth has failed to meet the high burden of overcoming the presumption against successor liability. "Under Pennsylvania Law, a purchaser of assets [generally] will not be liable to the debts and obligations of the seller . . . ." *Hamill v. Twin Cedars Senior Living Ctr.*, Civ. No. 3:20-CV-231, 2020 WL 7329228, at *4 (M.D. Pa. Nov. 23, 2020), *report and recommendation adopted*, 2020 WL 7323870 (Dec. 11, 2020). There are exceptions where: "(1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability." *Id.* The Commonwealth's conclusory allegations fail to satisfy any of the exceptions to Pennsylvania's default rule against successor liability.

*First*, the Second Amended Complaint does not sufficiently allege that LNA expressly or impliedly agreed to assume obligations of GPMI. The allegations the Commonwealth cites as support for the application of this exception say nothing about LNA agreeing to assume GPMI's liabilities; they merely restate the bare legal conclusion that LNA is the "successor in liability" to GPMI. *See* Opp'n at 11 (citing SAC ¶¶ 84, 320). This falls far short of meeting the pleading

21

standard.  *See, e.g.*, *Foote v. Valenti Mid Atl. Mgmt.*, No. 18-2244, 2019 WL 266294, at *4 (E.D. Pa. Jan. 18, 2019) (dismissing claim based on successor lability that only made "conclusory allegations" that defendant was the "purchaser and successor in interest").

      In an attempt to save its inadequate allegations, the Commonwealth improperly relies on an extrinsic document for the first time in its Opposition.  *See* Opp'n at 9 (citing Han Decl., Ex. 12).  But the law is clear:"[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021) (internal citation omitted).  While the court may also consider a document that is "integral to the complaint," such that the plaintiff "rel[ied] on the terms and effect of [the] document in drafting the complaint," "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and there are "no material disputed issues of fact regarding the relevance of the document."  *Id*.  The Commonwealth's Exhibit 12 is far from integral to the Second Amended Complaint; indeed, the complaint does not even reference the document or its contents, much less rely on its "terms and effect."  Accordingly, Exhibit 12 must be disregarded.

      *Second*, the allegations in the Second Amended Complaint do not support the application of the *de facto* merger or "mere continuation" exceptions.  An asset purchase amounts to a *de facto* merger where there is "(1) continuity of ownership; (2) cessation of the ordinary business by, and dissolution of, the predecessor as soon as practicable; (3) assumption by the successor of liability ordinarily necessary for uninterrupted continuation of the business; and (4) continuity of the management, personnel, physical location, and the general business operation."  *Hamill*, 2020 WL 7329228, at *5 (internal citation omitted).  Rather than identify specific allegations it

believes support the application of the *de facto* merger exception, the Commonwealth simply notes that "'mere continuation' and a *de facto* merger are similar and the facts alleged here also meet the *de facto* merger theory[.]"  Opp'n at 10 n.4.  The Commonwealth's attempt to gloss over this key element speaks volumes.

GPMI continued to exist for years following its transfer of assets to LNA.  *See, e.g.*, SAC ¶ 326 (alleging that GPMI continued to "blend[] MTBE gasoline for sale in Pennsylvania and elsewhere" after the asset sale to LNA); *id.* ¶ 327 (alleging that GPMI was sold to Cambridge Holdings Petroleum in 2011, approximately two years after the asset sale to LNA).  This is enough, on its own, to undermine the Commonwealth's argument that the transaction was a *de facto* merger.  *See, e.g.*, *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 470 (3d Cir. 2006) (where transferring corporation "continued to exist as a corporate entity, and continued to operate its other divisions, for years after the APA closed . . . this factor does not support a *de facto* merger.").[3]  Because GPMI did not "cease[] to exist" following the asset transfer, the "mere continuation" exception is also inapplicable.  *See Hamill*, 2020 WL 7329228, at *7 (holding that this exception was not pled where plaintiff "[did] not allege the existence of a single corporation following the transfer").

*Finally*, the Commonwealth has not adequately pled that GPMI fraudulently transferred assets to LNA to escape liability.  "With respect to any claim based on allegations of fraud," including in support of an exception to the rule against successor liability, "the allegations must meet the specificity requirements of Rule 9(b), Fed.R.Civ.P."  *Cargo Partner AG v. Albatrans Inc.*, 207 F. Supp. 2d 86, 92, 114 (S.D.N.Y. 2001) (allegation of "an intent to hinder, delay or defraud creditors . . . fails to meet the requirements of Rule 9(b)" for purposes of the fraud

---

[3] The Second Amended Complaint is also devoid of any allegations that LNA assumed liabilities of GPMI, as required for the *de facto* merger exception to apply.

exception to successor liability); *see also Apace Commc'ns, Ltd. v. Burke*, 522 F. Supp. 2d 509, 522 (W.D.N.Y. 2007) (dismissing claim based on fraud exception to successor liability where allegations of fraud were conclusory).  Moreover, where a claim based on fraud "is permitted on information and belief" because the "facts are peculiarly within the opposing party's knowledge . . . , a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).  The Commonwealth alleges that the transfer of GPMI's assets to LNA was "fraudulent and to the detriment of GPMI," SAC ¶ 320, but it fails to plead a sufficient factual basis to support this legal conclusion.  For example, the allegation that "[t]he price LNA paid for GPMI's profitable assets was a fraction of the fair market value of those assets and was inadequate for GPMI's creditors," SAC ¶ 322, is just another conclusion; the Commonwealth does not state the price LNA paid or provide any information on the purported fair market value of the transferred assets.  The other allegations the Commonwealth cites in support of this exception are similarly lacking in specificity.

The Commonwealth argues that "[t]his Court already determined that the complaint contains sufficient factual allegations regarding the fraudulent transfer of assets from GPMI to LNA."  Opp'n at 9-10 (citing *In re MTBE Prods. Liab. Litig.*, 2021 WL 3371938, at *16).  But this strips the Court's finding of critical context.  This Court held that the Commonwealth's allegations regarding LAC's fraudulent transfer of assets were sufficient to support alter ego jurisdiction over LAC on the basis of its contacts with GPMI, *not* to support successor liability.  Notably, this Court also found that the Commonwealth's allegations of fraudulent transfer did not support piercing the corporate veil as a matter of corporate law and dismissed all claims against LAC.  *See* 2021 WL 3371938, at *18.  The Commonwealth's allegations of fraud are

likewise insufficient to support claims against LNA based on successor liability, and this Court should dismiss all claims against LNA.

### C. This Court Should Dismiss the Second Amended Complaint Against LPA Because It Fails to Plead Any Facts Against LPA

Even if the Court were to find a basis for exercising personal jurisdiction over LPA, the claims against LPA should be dismissed because the Second Amended Complaint falls far short of satisfying the pleading requirement under Rule 12(b)(6). The Commonwealth describes allegations about LPA in its Opposition that are completely lacking in the Second Amended Complaint. Making sweeping generalizations about "MTBE Defendants" and claiming LPA is included in those allegations is not enough to state a claim against LPA. The Commonwealth has not alleged a single fact regarding LPA's delivery of MTBE into Pennsylvania because to do so would be impossible—LPA has never sold or delivered gasoline containing MTBE into Pennsylvania. Wolfe Decl., ¶ 12. The Commonwealth cannot now try to retroactively fit LPA into the allegations in the Second Amended Complaint about other defendants' MTBE product.

Simply because the Commonwealth includes a brief definition of LPA (as a Delaware corporation with its principal place of business in New York), and then groups LPA with multiple other defendants does not put LPA on notice of the claims against it nor does it allow LPA to defend itself when there is not a single clue in the Second Amended Complaint as to the role it played in the alleged MTBE contamination. *Jacobs v. District Attorney's Office*, No. 1:10-cv-02622, 2018 WL 1378629, at *8-9 (M.D. Pa. Mar. 19, 2018) (dismissing multiple defendants from a complaint that named over 100 defendants because there were either no or insufficient allegations to put the defendants on notice under Rule 8).

To the extent the Commonwealth now attempts to paint a picture of LPA's purported involvement in the distribution of MTBE through the Han Declaration, this Court should

disregard those newly presented facts as outside the "four corners" of the Second Amended

Complaint. *State Auto. Mut. Ins. Co. v. Lucchesi*, 563 F. Appx. 186, 191 (3d Cir. 2014)

("Bedrock principles of Pennsylvania law require us to rely on the facts alleged in the underlying

Complaint, and not on hypothetical scenarios that reach well beyond the Complaint's four

corners.") (internal quotations omitted).  In particular, the Commonwealth directs the Court to

certain of LPA's trading books in an attempt to tie LPA, a "trading company," to the allegations

in the Second Amended Complaint, but of course such evidence may not be considered in

evaluating a motion to dismiss under Rule 12(b)(6).  *See id.*

      As for what is in the Second Amended Complaint, any allegations as to LPA specifically

are nonexistent.  In its Opposition, the Commonwealth claims that "the operative complaint

alleges that each defendant, including LPA, is liable based on its role in the chain of distribution

for MTBE gasoline."  Opp'n at 39.  The Commonwealth then cites multiple paragraphs in the

Second Amended Complaint for this proposition and the proposition "that middlemen like LPA

are liable because they are part of the chain of distribution that was responsible for polluting

Pennsylvania's waters," *id*. at 39-40.  However, the Second Amended Complaint fails to allege

any connection between LPA and the "chain of distribution."  Rather, the paragraphs to which the

Commonwealth cites either refer only to "MTBE Defendants" without any specific mention of

LPA or any other specific defendant or do not mention any defendant at all.  This effort to lump

the "MTBE Defendants" together without articulating with particularity the allegations against

each and every named defendant in the action is simply not permissible and should not survive

this motion to dismiss.  *Canon U.S.A., Inc. v. F & E Trading LLC*, No. 15-cv-6015, 2017 WL

4357339, at *7 (E.D.N.Y. Sept. 29, 2017) ("It is well-established in this Circuit that plaintiffs

cannot simply 'lump' defendants together for pleading purposes.") (citing *Ritchie v. Northern*

*Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 236 (S.D.N.Y. 2014)).  *See also, e.g.*, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, 2015 WL 4092326, at \*5 (S.D.N.Y. July 2, 2015) ("The remaining allegations accusing defendants—as a group—of engaging in deceptive conduct or otherwise violating the UTPCPL are simply too vague as to each defendant under *Twombly* and its progeny to state a claim.").

The Commonwealth refers to "traders and middlemen" throughout its Opposition in an attempt to save its case against LPA, but introducing that terminology in argument does not change the reality that the allegations in the Second Amended Complaint are, at base, about the entities that actually handled MTBE gasoline as manufacturers, refiners, or station operators. That is not LPA.  The Commonwealth asserts that "[t]he complaint alleges the parties responsible for MTBE contamination include not only manufacturers, refiners, and retail gasoline station operators, but also *traders and middlemen like LPA* that were part of the chain of custody and were responsible for supply and distribution of MTBE gasoline into Pennsylvania," Opp'n at 32, but such description is divorced from the actual allegations in the Second Amended Complaint. While the Commonwealth has named various trading companies as defendants, the allegations say nothing about how a trading company, as opposed to manufacturers, refiners, and retail gasoline station operators, could be implicated in the conduct alleged to have caused MTBE contamination.  Indeed, the Second Amended Complaint is completely devoid of allegations against LPA, save for general and broad references to "MTBE Defendants" of which LPA is merely one of dozens.  The Commonwealth is now trying to somehow fit LPA into its insufficient pleading by casting LPA as a "trader or middleman."  This attempt to retroactively write LPA into the Second Amended Complaint is impermissible and should be disregarded.

In the Maryland MTBE case, LPA moved to discuss the claims against it for lack of personal jurisdiction and for failure to state a claim based on nearly identical facts and arguments as in the instant case.  Memo. of Law in Supp. of Def. LUKOIL Pan Americas, LLC's Mot. to Dismiss for Failure to State a Claim and Lack of Personal Jurisdiction, *State of Maryland v. Exxon Mobil Corp.* (D. Md. Oct. 5, 2018), ECF No. 342-1 and Reply Br. of Def. LUKOIL Pan Americas, LLC, *State of Maryland v. Exxon Mobil Corp.* (D. Md. Mar. 25, 2019), ECF No. 387. Although the district court in Maryland chose to exercise personal jurisdiction over LPA, *State of Maryland*, 406 F. Supp. 3d at 445, the Maryland court did not analyze or offer any conclusions as to the plausibility of the allegations against LPA.  As with the State of Maryland, the Commonwealth included LPA in the Second Amended Complaint in an effort to tag any LUKOIL entity with liability, but the Commonwealth failed to plead a single fact to meet its burden as to LPA.  LPA simply is not similarly situated to the other defendants and should not be included in this sprawling litigation based on barely a mention of it in the Second Amended Complaint.  As such, this Court should dismiss all claims against LPA for failure to state a claim.

## **CONCLUSION**

For the reasons set forth in the Remaining LUKOIL Defendants' moving papers and further explained herein, the motions to dismiss should be granted, with prejudice.

Dated: February 18, 2022   Respectfully submitted,

         /s/ Joseph L. Sorkin   
         Joseph L. Sorkin
         Anne M. Evans
         AKIN GUMP STRAUSS HAUER & FELD LLP
         One Bryant Park
         New York, New York 10036
         Phone: 212-872-1000, Fax: 212-872-1002
         jsorkin@akingump.com
         aevans@akingump.com

         Daniella Roseman
         AKIN GUMP STRAUSS HAUER & FELD LLP
         1735 Market Street
         12th Floor
         Philadelphia, PA 19103
         Phone: 215-965-1200, Fax: 215-965-1210
         droseman@akingump.com

         *Counsel for PJSC LUKOIL, LUKOIL North America LLC, and LUKOIL Pan Americas LLC*

**CERTIFICATE OF SERVICE**

I certify that on February 18, 2022, I caused a true and correct copy of the foregoing

Reply Memorandum of Law as well to be served by CM/ECF to all counsel of record registered

to the Court's CM/ECF system as well as by electronic filing via File & ServeXpress on all

counsel of record.


/s/ Anne M. Evans