UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                      :

In Re: Methyl Tertiary Butyl Ether ("MTBE")  :     Master File No. 1:00-1898
Products Liability Litigation                   :     MDL 1358
                                        :

This document relates to:                 :
                                        :     **<u>OPINION & ORDER</u>**
*Commonwealth of Pennsylvania v. Exxon*  :
*Mobil Corporation, et al.*, Case No. 14 Civ.  :
6228 (VSB)                               :
                                        :
--------------------------------------------------------X

<u>Appearances</u>:

Daniel Berger
Tyler E. Wren
Yechiel M. Twersky
Berger & Montague, P.C.
Philadelphia, Pennsylvania

Stewart L. Cohen
Robert L. Pratter
Michael Coren
Cohen, Placitella & Roth, P.C.
Philadelphia, Pennsylvania

Duane C. Miller
Michael Axline
Miller, Axline & Sawyer
Sacramento, California

*Special Counsel for Plaintiff Commonwealth of Pennsylvania*

James A. Pardo
Lisa A. Gerson
Anthony A. Bongiorno
McDermott Will & Emery LLP
New York, New York

*Counsel for Defendant Exxon Mobil Corporation and on Behalf of All Defendants*

Jeremiah Anderson
King & Spalding LLP
Houston, Texas

Charles C. Correll, Jr.
King & Spalding LLP
San Francisco, California

*Counsel for Defendants Chevron Corporation, Chevron U.S.A., Inc., Texaco Inc., & TRMI-H LLC and on Behalf of the Act 2 Moving Defendants*

VERNON S. BRODERICK, United States District Judge:

This is a consolidated multi-district litigation ("MDL") relating to contamination—actual or threatened—of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE") and/or tertiary butyl alcohol, a byproduct formed by the breakdown of MTBE in water.  In this case, the Commonwealth of Pennsylvania ("the Commonwealth" or "Plaintiff") alleges that various defendants' use and handling of MTBE contaminated, or threatens to contaminate, groundwater within its jurisdiction.

Before me are four motions seeking partial summary judgment (the "PSJ Motions"). Specifically, the PSJ Motions seek rulings, on various grounds, to limit the scope of the relief that the Commonwealth can be granted in this case.  Also before me is the Commonwealth's motion to dismiss Defendant ExxonMobil's counterclaims and to strike certain affirmative defenses related to those counterclaims (the "Counterclaims Motion").

For the reasons that follow, one of the PSJ Motions is GRANTED IN PART, the other three are DENIED, and the Counterclaims Motion is GRANTED.  Specifically, while I agree with ExxonMobil's construction of the settlement agreement it reached with the Commonwealth, I find it has not sufficiently explained why, as a matter of law, all "monetary damages claims" against it in this case are barred by that construction; therefore, the Exxon Settlement Motion is GRANTED IN PART and DENIED IN PART.  In addition, because Defendants have failed to

2

explain why, as a matter of law, Pennsylvania common law prohibits "natural resource damages" ("NRD"), the NRD Motion is DENIED.  Furthermore, because I find Defendants' arguments regarding the USTIF motion misplaced, the USTIF motion is DENIED.  Additionally, because the Act 2 Moving Defendants' argument cannot be reconciled with Act 2's text, that PSJ Motion is DENIED.  Finally, as a necessary consequence of my holding that recoupment and setoff are not causes of action and must be coupled with an independent cause of action, the Commonwealth's Rule 12(f) motion to strike ExxonMobil's recoupment and setoff affirmative defense is GRANTED.

## I.      Relevant General Background for the PSJ Motions[1]

My August 3, 2021 Opinion & Order sets forth the factual and procedural background of this action more fully, *see generally In Re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, Case No. 14 Civ. 6228 (VSB), 2021 WL 3371938 (S.D.N.Y. Aug. 3, 2021), and I assume familiarity with that Opinion & Order here.  I also set forth facts relevant to each of the PSJ Motions below before embarking on a discussion of each.

The Commonwealth's currently-operative pleading in this case is the Second Amended Complaint ("SAC") filed on November 6, 2015.  (Doc. 173 ("SAC").)   The PSJ Motions are all aimed at limiting the scope of relief the Commonwealth may seek through the SAC.

On November 2, 2020, Defendant Exxon Mobil Corporation ("ExxonMobil") filed, on behalf of itself and various affiliated entities,[2] its Motion for Partial Summary Judgment Based on Settlement and Release (the "Exxon Settlement Motion").  (Doc. 558.)  On January 15, 2021,

---

[1] I will discuss the background and procedural history relevant to the Counterclaims Motion in section VII.A. below.

[2] In total, "ExxonMobil" refers to Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation, Exxon Company, U.S.A., and their related entities ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation. (Doc. 559, at 5 n.1.)

ExxonMobil filed, on behalf of all Defendants, a Motion for Partial Summary Judgment on Plaintiff's Claims for Natural Resource Damages (the "NRD Motion").  (Doc. 578.)  That same day, ExxonMobil filed, also on behalf of all Defendants, the Motion for Partial Summary Judgment on Plaintiff's Claims to Recover Funds Reimbursed from the Pennsylvania Underground Storage Tank Indemnification Fund (the "USTIF Motion").  (Doc. 582.)  On February 1, 2021, Chevron[3] filed, on its behalf and on behalf of the "Act 2 Moving Defendants,"[4] the Motion for Partial Summary Judgment as to Future Damages and Injunctive Relief at Sites Closed Under Act 2 (the "Act 2 Motion").  (Doc. 597.)[5]

Along with each PSJ Motion, Defendants filed supporting briefs, Rule 56.1 statements, and attorney declarations.  (*See* Docs. 559–62, 579–81, 583–86, 598–599.)  The Commonwealth filed opposing briefs and other papers in response to each PSJ Motion.  (Docs. 569–70, 606–608, 609–610, 614–616.)  Defendants thereafter filed reply papers on each PSJ Motion.  (Docs. 573, 618–19, 620, 628–29.)  The PSJ Motions are fully briefed and ripe for disposition.

---

[3] References to the party "Chevron" refers to Defendants Chevron Corporation, Chevron U.S.A. Inc., Texaco Inc., and TRMI-H LLC.  (Doc. 597, at 3.)

[4] "Act 2 Moving Defendants" refers to the Defendants identified on page four of the Act 2 Motion (Doc. 597, at 4), as well as to Defendant American Refining Group Inc., which on November 24, 2021 filed a notice that it was joining the Act 2 Motion.  (*See* Doc. 796).  The Act 2 Moving Defendants thus are Atlantic Richfield Company; BP America Inc.; BP Amoco Chemical Company; BP Holdings North America Limited; BP p.l.c.; BP Products North America, Inc.; BP West Coast Products, LLC; Chevron Corporation; Chevron U.S.A. Inc.; Texaco Inc.; TRMI-H LLC; Coastal Eagle Point Oil Company; El Paso Merchant Energy Petroleum Company; Kinder Morgan Transmix Company; ConocoPhillips; ConocoPhillips Company; Phillips 66; Phillips 66 Company; Conoco Inc.; Phillips Petroleum Company; Tosco Corporation; Tosco Refining Co.; Cumberland Farms, Inc.; Gulf Oil Limited Partnership; Energy Transfer Partners, L.P.; ETP Holdco Corporation; Sunoco Inc. (f/k/a Sun Company, Inc.); Sunoco, Inc. (R&M); Exxon Mobil Corporation; ExxonMobil Oil Corporation; Exxon Company, U.S.A.; ExxonMobil Refining & Supply Company; Mobil Oil Corporation; Getty Properties Corp.; Guttman Realty Company; Marathon Oil Corporation; Marathon Petroleum Company LP; Marathon Petroleum Corporation; Hess Corporation; WilcoHess LLC; Hess Oil Virgin Island; Petroleum Products Corp.; and American Refining Group Inc. (Doc. 597, at 4; Doc. 796.)

[5] Chevron filed two motions that day seeking the same relief; one of them is labeled on the docket as the "Corrected" motion.  (*See* Doc. 596; Doc. 597.)

## II.    <u>Procedural Propriety of the PSJ Motions</u>

As an initial procedural matter, the Commonwealth argues that several of the PSJ

Motions are procedurally improper because "partial summary judgment" cannot be used as a

mechanism for limiting the availability of "a particular remedy." (*See, e.g.*, NRD Opp. 18.)[6]  In

an earlier opinion regarding one of the other cases in this MDL, Judge Shira A. Scheindlin ruled

that "partial summary judgment as to particular *remedy . . .* is outside the contemplation of the

Federal Rules." *In re Methyl Tertiary Butyl Ether (*"*MTBE*"*) Prod. Liab. Litig.* ("*MTBE 2007*"),

517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007).  The rule governing summary judgment allows a

party to "move for summary judgment" as to "each claim or defense—or the part of each claim

or defense—on which relief is sought."  Fed. R. Civ. P. 56(a); 10B Charles Alan Wright &

Arthur R. Miller, Federal Practice and Procedure § 2737 (4th ed. April 2021 update) ("Thus,

amended Rule 56(a), which contains the general standard for obtaining summary judgment, now

also includes express authority for judgment on less than the entire case, denominating such

judgments in its title as a 'Partial Summary Judgment.'").  The rule does not speak to remedies.

However, despite finding that use of partial summary judgment to limit remedies is not

contemplated by the Federal Rules, Judge Scheindlin treated a motion styled as one for partial

summary judgment as to the scope of remedies "as a motion *in limine*, a motion that the Supreme

Court has recognized as stemming from the 'district court's inherent authority to manage the

course of trials.'"  *MTBE 2007*, 517 F. Supp. 2d at 666–67 (citation omitted).  In doing so she

cited to various district court cases from throughout the Second Circuit that have used pre-trial

motions to limit the scope of the relief that a plaintiff may seek.  *Id.* at 667 n.19.  There is

---

[6] "NRD Opp." refers to the Commonwealth's Opposition to Defendants' Motion for Partial Summary Judgment on
Plaintiff's Claims for Natural Resource Damages.  (Doc. 609.)

governing precedent supporting this approach.  *See Luce v. United States,* 469 U.S. 38, 41 n.4 (1984) ("Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials.").  I thus find no reason to depart from Judge Scheindlin's approach, and I will proceed to consider the PSJ Motions on their merits as motions in limine.

### III.    The Exxon Settlement Motion

In the Exxon Settlement Motion, ExxonMobil seeks an order stating that, due to a settlement agreement it previously reached with the Commonwealth, "[it] is entitled to summary judgment on the monetary damage claims in this case."  (Settlement PSJ 1.)[7]  I agree with ExxonMobil's construction of the settlement agreement, but I find it has not sufficiently explained why, as a matter of law, all "monetary damages claims" against it in this case are barred by that construction.  Accordingly, for the reasons that follow, the Exxon Settlement Motion is GRANTED in part and DENIED in part.

### A.    *Background*[8]

Pennsylvania's Underground Storage Tank Indemnification Fund ("USTIF" or the "Fund") was created by Pennsylvania law to cover the costs that underground storage tank ("UST") owners incur when addressing the release of gasoline from a UST within Pennsylvania.

---

[7] "Settlement PSJ" refers to the Memorandum of Law in Support of ExxonMobil's Motion for Partial Summary Judgment Based on Settlement and Release.  (Doc. 559.)

[8] This section, and the background sections for each of the PSJ Motions, is drawn from the various submissions of the parties in order to provide background and context for the PSJ Motion in question.  Unless otherwise indicated, the facts set forth in this section are undisputed.  I note that, although the parties sometimes purport to dispute the facts contained in their respective Rule 56.1 statements and counterstatements, many of these "disputes" are about the characterizations or implications of these facts.  Such "disputes" are improper under Local Rule 56.1, and I disregard the improper assertions.  *See LG Capital Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297, 2019 WL 3437973, at *2 (E.D.N.Y. July 29, 2019) ("The Court can . . . disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.") (internal quotation marks omitted); *Crump v. Fluid Handling, LLC.*, No. 17-CV-45, 2019 WL 2145929, at *2 (W.D.N.Y. Mar. 29, 2019) ("Rather than scrutinize a Rule 56.1 statement line by line, a court may simply disregard any improper assertions or inadmissible evidence.").  Moreover, I only set forth the uncontested facts raised by the parties to the extent relevant.

(Settlement 56.1 ¶ 1.)[9]  When a UST owner or operator takes a corrective action in response to a UST release, it may submit a claim to USTIF for reimbursement of reasonable and necessary costs.  35 Pa. Stat. § 6021.705(b); 25 Pa. Code § 977.33(a)(4).[10]  Beginning in the 1990s, ExxonMobil, through predecessor entities, submitted claims to USTIF for reimbursement, and USTIF approved those claims and reimbursed ExxonMobil's predecessor entities for some or all of their relevant costs.  (Settlement 56.1 ¶¶ 5–6.)

At some point, the Commonwealth became concerned that ExxonMobil had been receiving coverage for the cost of cleaning up UST releases not just from USTIF, but through private insurers as well.  Accordingly, the Commonwealth designated Steven A. Corr, Esq. as a Special Attorney General, and on November 21, 2011, Corr sent ExxonMobil a letter explaining that the Commonwealth sought to recover some of what USTIF had paid to ExxonMobil.  (*Id.* ¶¶ 7–8.)

On May 4, 2012, the Commonwealth, the Pennsylvania Department of Insurance, and USTIF entered into a settlement agreement with ExxonMobil.  (Settlement 56.1 ¶ 9; Ray Settlement Decl. Ex. 1 (the "Settlement Agreement").)[11]  The Settlement Agreement provides that, "[i]n exchange for the Release and Covenant Not to Sue [(the "Release")] set forth in this Settlement Agreement, and other good and valuable consideration," ExxonMobil "will pay the USTIF" $8,500,000.  (Settlement Agreement ¶ 1.)  The Release further states that

> In exchange for the Payment described in Paragraph 1, the Commonwealth shall and does forever release and discharge and covenants not to sue ExxonMobil [and various related persons and entities] from and concerning any and all past, present, and future liability, rights, claims . . . or controversies of every kind and description,

---

[9] "Settlement 56.1" refers to ExxonMobil's Rule 56.1 Statement in Support of its Motion for Partial Summary Judgment Based on Settlement and Release.  (Doc. 560.)

[10] Although not relevant to this Exxon Settlement Motion, USTIF is discussed in further detail below in Pt. V.A.

[11] "Ray Settlement Decl." refers to the Declaration of Theodore P. Ray in Support of the Exxon Settlement Motion, (Doc. 562), and the exhibits thereto.

whether known or unknown, and regardless of the legal theory, related to or in any manner arising out of applications or claims for reimbursement filed with the Commonwealth; payments made from the USTIF as a result of those applications or claims; any claim by the Commonwealth that ExxonMobil received or was eligible to receive payments or other recovery from any other source including insurance coverage . . . for the cost of environmental remediation of any property located within the Commonwealth of Pennsylvania for which ExxonMobil filed or files an application for reimbursement; and any claims for "indirect claims" and payments from the USTIF to third parties or subsequent owners of any Exxon, Mobil or ExxonMobil sites.

(*Id.* ¶ 2.)  The Release also says that

Each Settling Party acknowledges that it may hereafter discover facts different from, or in addition to, those which it now knows to be or believes to be true with respect to the matters covered by this Settlement Agreement, and agrees that this Settlement Agreement and the obligations imposed and the release contained in it shall remain in effect in all respects, notwithstanding such different or additional facts or the subsequent discovery thereof.

(*Id.*)  The Settlement Agreement includes a clause stating that it "is a fully integrated agreement which sets forth the entire agreement and understanding of the Settling Parties concerning [its] subject matter."  (*Id.* ¶ 13.)  It also includes a clause stating that it is to be "interpreted, construed, and enforced in accordance with the laws of the Commonwealth of Pennsylvania."  (*Id.* ¶ 12.)

## B.    *Discussion*

### 1.    **Applicable Law**

Under Pennsylvania law, settlement agreements are construed and enforced in accordance with basic principles of contract law.  *Consolidated Rail Corp. v. Portlight, Inc.*, 188 F.3d 93, 96 (3d Cir. 1999) (internal citations omitted).  The Pennsylvania Supreme court "has stated that the effect of a release must be determined from the ordinary meaning of its language."  *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733, 735 (Pa. 1989) (citing *Estate of Bodnar*, 372 A.2d 746 (Pa. 1977).

> The court must construe the contract only as written and may not modify the plain meaning of the words under the guise of interpretation. When the terms of a written contract are clear, this Court will not re-write it to give it a construction in conflict with the accepted and plain meaning of the language used. Conversely, when the language is ambiguous and the intention of the parties cannot be reasonably ascertained from the language of the writing alone, the parol evidence rule does not apply to the admission of oral testimony to show both the intent of the parties and the circumstances attending the execution of the contract.

*Harrity v. Med. Coll. of Pennsylvania Hosp.*, 653 A.2d 5, 10 (Pa. 1994) (internal citations omitted). "In order to ascertain the intention of the parties, 'the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject-matter of the agreement.'" *Id.* (quoting *Int'l Org. Masters of Am., Local No. 2 v. Int'l Org Masters of Am.*, 439 A.2d 621, 624 (Pa. 1981).

## 2.    Construction of the Settlement Agreement

In opposing this PSJ Motion, the Commonwealth argues that, when one accounts for the "recitals" on the first page of the Settlement Agreement, one must conclude that the Release cannot extend to "claims by the Commonwealth based on MTBE contamination of the Commonwealth's groundwater." (Settlement PSJ Opp. 13.)[12]  This follows, the Commonwealth says, because "[t]he Recitals include language expressly stating that the parties desired to bring about a 'resolution of the *issues described in this Settlement Agreement*,'" which means that the Settlement agreement can only bar claims for which ExxonMobil sought payments from USTIF despite having insurance coverage. (*See id.*)

The Commonwealth's reading fails because it seeks to use the Recitals portion of the Settlement Agreement to nullify the plain language of the Release. The Commonwealth

---

[12] "Settlement PSJ Opp." refers to the Commonwealth's Memorandum of Law in Opposition to ExxonMobil's Motion for Partial Summary Judgment Based on Settlement and Release. (Doc. 569.)

9

"covenant[ed] not to sue ExxonMobil" for "any and all past, present, and future liability . . .

regardless of the legal theory . . . related to or in any manner arising out of applications or claims

for reimbursement filed with the Commonwealth;" or for, among other things, "payments made

from the USTIF as a result of those applications or claims."  (Settlement Agreement ¶ 2.)

Nothing in the Settlement Agreement, whether in its Recitals or otherwise, suggests an intention

to carve out from the Release future MTBE or other environmental remediation claims.  To the

contrary, the Settlement Agreement is clear that

> Each Settling Party acknowledges that it may hereafter discover facts different
> from, or in addition to, those which it now knows to be or believes to be true with
> respect to the matters covered by this Settlement Agreement, and agrees that this
> Settlement Agreement and the obligations imposed and the release contained in it
> shall remain in effect in all respects, notwithstanding such different or additional
> facts or the subsequent discovery thereof.

(Settlement Agreement ¶ 2.)  The Settlement Agreement's only limitation is that it "does not

release ExxonMobil from any current or future obligation on the part of ExxonMobil to take any

corrective actions to address leaking underground storage tanks at any ExxonMobil facility."

(*Id.*)  The presence of this limitation within the Release itself demonstrates that the parties knew

how to limit the Release where they meant to do so.  *See Three Rivers Motors Co. v. Ford Motor

Co.*, 522 F.2d 885, 896 (3d Cir. 1975) (applying Pennsylvania law and finding that a "release

[that] list[ed] the specific exceptions" to it scope "further supports the view that the parties

intended a complete settlement of accounts" through their agreement).

Contrary to the cases that the Commonwealth offers in support of its position, this is not a

situation where "a release also contains specific language that demonstrates an intent to limit its

effect" to particular "claims at issue" in a prior situation.  *See A.G. Cullen Const., Inc. v. State

Sys. of Higher Educ.*, 898 A.2d 1145, 1168 (Pa. Commw. Ct. 2006) (release stated that it served

to "discharge any and all claims . . . including, but not limited to" a defined "Purchase

10

Agreement," a defined "Lawsuit," and claims a party may have "in connection with" a defined "Project").  Nor is this a case where a release is so general that it cannot fairly be said to make sense without looking to the parties' recitals.  *Cf. Foufas v. Dru*, 319 F.3d 284, 285 (7th Cir. 2003) ("the parties agree to release each other 'from and against any and all claims, rights, debts' etc. 'of every nature, character and description, whether known or unknown, suspected or unsuspected, which the Parties hereto, or any of them, now own or hold, or have at any time heretofore owned or held, or may at any time hereafter own or hold.'").  Indeed, under Pennsylvania law, "[a] background recital may not contradict a substantive provision of the contract."  *Electra Realty Co. Inc. v. Kaplan Higher Educ. Corp.*, 825 F. App'x 70, 73 (3d Cir. 2020) (quoting *Wyeth Pharm., Inc. v. Borough of West Chester*, 126 A.3d 1055, 1062 (Pa. Commw. Ct. 2015)).  The "recital . . . may provide background information or serve as an interpretative aid," but it cannot "control over the operative terms of a contract."  *Id.* (citations omitted).  The Commonwealth's reading would lead to an impermissible contradiction.

The language of the Settlement Agreement is clear:  the Commonwealth cannot "sue ExxonMobil" for "claims . . . related to or . . . arising out of applications or claims for reimbursement filed with the Commonwealth" or for "payments made from the USTIF as a result of those applications or claims."  (Settlement Agreement ¶ 2.)

### 3.    Application of the Settlement Agreement to the Commonwealth's Claims

As established, the language of the Settlement Agreement bars the Commonwealth from pursuing certain claims against ExxonMobil.  The question now becomes what, if any, claims in the SAC does the Settlement Agreement bar.

Based on the materials before me, I do not find that this language goes as far as ExxonMobil urges.  However, I agree with ExxonMobil that the "subrogation claims" in

11

paragraph 40 of the SAC cannot proceed.  (Settlement PSJ Reply 6).[13]  In that paragraph, the

Commonwealth states that one of its grounds for filing suit is

> pursuant to its statutory right of subrogation under 25 Pa. Code § 977.40(a) to the
> third party claims against MTBE Defendants of the UST owners and operators who
> received payments under USTIF and pursuant to the third party insurance and
> indemnity rights, interests and claims of the Insurance Defendants who as USTIF
> indemnitees received insurance or other third party indemnification payments for
> the same costs for which they were paid by USTIF.

(SAC ¶ 40.)  This plainly falls within the Settlement Agreement's provision that the

Commonwealth "covenant[ed] not to sue ExxonMobil" over any claims "related to or in any

manner arising out of applications or claims for reimbursement filed with the Commonwealth"

or "payments made from the USTIF as a result of those applications or claims."  (Settlement

Agreement ¶ 2.)  The Commonwealth argues that the Settlement Agreement can only apply to its

"claims seeking to recover monies paid *by* the Commonwealth *to* Exxon," (Settlement PSJ Opp.

2); however, the language of the Settlement Agreement is not so limited and extends to claims

related to "payments made from the USTIF as a result of [applications or claims for

reimbursement filed with the Commonwealth]," not just payments made from the

Commonwealth to ExxonMobil.

The Settlement Agreement also bars in part the claims against ExxonMobil described in

paragraph 8 of the SAC to the extent that they are premised on "costs paid . . . by USTIF."  (SAC

¶ 8.)  However, in that paragraph, the Commonwealth states it "seek[s] to recover (i) the costs

paid or incurred . . . including by USTIF," (*id.*), which suggests that the Commonwealth

arguably seeks recovery for costs incurred other than those related to USTIF.  Accordingly,

although the Settlement Agreement limits the recovery sought in paragraph 8 of the SAC, I do

---

[13] "Settlement PSJ Reply" refers to the Reply Memorandum of Law in Further Support of ExxonMobil's Motion for
Partial Summary Judgment Based on Settlement and Release.  (Doc. 573).

not have basis to find paragraph 8 does not state any viable basis for recovery against ExxonMobil.

The parties' briefings focus almost exclusively on the construction of the Settlement Agreement, not on how to apply any construction to the SAC.  Accordingly, at this time, I will not make any further ruling as to the application of the Settlement Agreement on the claims contained in the SAC.

### IV.    The NRD Motion

The NRD Motion seeks a judgment that, as a matter of law, the Commonwealth cannot recover what it terms "natural resource damages" ("NRD") as part of the Commonwealth's "common law causes of action" as pleaded in the SAC.  (NRD PSJ 1.)[14]  Because Defendants have failed to explain why, as a matter of law, Pennsylvania common law prohibits these damages, the NRD Motion is DENIED.

### A.    *Background*[15]

Defendants define NRD to mean "restoration of groundwater to its 'original condition' and 'lost interim value and benefits,' including . . . lost use of groundwater."  (*Id.* at 1.) Defendants' NRD Motion "is directed only to Plaintiff's NRD demands" as "detail[ed] in" its "Responses and Objections to Defendants' Interrogatories Regarding Damages."  (*Id.* (citation omitted).)  In those Responses and Objections, the Commonwealth explained that it seeks various "[c]ategories of costs" that

> include costs associated with the abatement of the nuisance, including the costs to investigate, clean up and remove, remediate, assess, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the

---

[14] "NRD PSJ" refers to the Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims for Natural Resource Damages.  (Doc. 579.)

[15] *See supra* note 8.

citizens of Pennsylvania for the lost interim value and benefits of their water resources during all times of injury caused by MTBE.  These costs include past and future testing of public and private drinking water supplies for the presence of MTBE until the resource is restored; alternate water supplies; past and future monitoring of other waters of the Commonwealth to detect the presence of MTBE; remediation; and restoration or such in situ waters to a concentration less than a detectable level.   In addition, these costs include administrative, assessment, oversight and legal expenses incurred or to be incurred as a consequence of MTBE contamination of waters of the Commonwealth.

(Gerson NRD Decl. Ex. A. 10–11.)[16]

## B.    *Discussion*

Defendants' argument on this Motion includes several sub-arguments that, at least in part, build on one another and, if correct, would result in the Commonwealth not being able to recover NRD in this action.  First, Defendants aver that, under Pennsylvania law, anything categorized as NRD can only be recovered through Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), not by using a common law cause of action or any other statutory cause of action.  (NRD PSJ 2.) Defendants then argue that the HSCA would not allow for NRD because the HSCA contains a "petroleum exclusion" that disallows NRD to be collected when MTBE is used, as alleged here, as a component of a petroleum product, (*id.* at 3–5), and that a particular provision of Pennsylvania's Constitution does not create a right for the Commonwealth to recover NRD in this action, (*id.* at 5–11).

Defendants' arguments are fatally flawed in several respects.  First, the HSCA cannot be interpreted to limit the remedies available to the Commonwealth under a separate source of law. One statute codified as part of the HSCA states "[i]t is declared to be the purpose of [the HSCA] to provide additional and cumulative remedies to control the release of hazardous substances

_____

[16] "Gerson NRD Decl." refers to the Declaration of Lisa A. Gerson in Support of Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims for Natural Resource Damages, (Doc. 581), and the exhibits attached thereto.

within this Commonwealth.  Nothing contained in this act shall abridge or alter rights of action

or remedies at law or in equity." 35 Pa. Stat. § 6020.1107.[17]  Indeed, as a Pennsylvania court

recognized, "the HSCA does not limit the Commonwealth[] to only the statutory damages

described" in its provisions. *Commonwealth v. Monsanto Co.*, No. 668 M.D. 2020, 2021 WL

6139209, at *41 (Pa. Commw. Ct. Dec. 30, 2021).[18]  Accordingly, as the Commonwealth

correctly notes, there is no "basis to conclude that [the] HSCA 'impliedly' repeals all

Commonwealth remedies for groundwater contamination other than those contained in [the]

HSCA itself."  (NRD Opp. 7.)  Defendants do not address this argument concerning whether the

HSCA can be read as repealing previously-existing causes of action, whether impliedly or

otherwise.  "The question of whether a statute has been impliedly repealed by a later statute is

exclusively a question of legislative intent," and "[r]epeals by implication are not favored and

will not be implied unless there be an irreconcilable conflict between statutes embracing the

same subject matter." *See HSP Gaming, L.P. v. City of Philadelphia*, 954 A.2d 1156, 1174 (Pa.

2008) (internal quotation marks omitted).  To the extent Defendants' position on this PSJ Motion

is one of legislative intent to use the HSCA to limit the remedies and damages available to the

Commonwealth, that position is thus irreconcilable with statutory text. *See* § 6020.1107.

---

[17] Despite the Commonwealth's raising 35 Pa. Stat. § 6020.1107 in their brief on the NRD Motion, (NRD Opp. 2, 6, 7), Defendants tellingly never address the statute in their reply brief, (Doc. 620).  This fact alone could be a basis for finding that Defendants abandoned this argument. *See Doe v. Indyke*, 465 F. Supp. 3d 452, 466 (S.D.N.Y. 2020) ("Defendants do not respond to [Plaintiff's] argument in reply, and the Court deems them to have abandoned the argument."); *see also Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.*, 176 F.3d 601, 609 (2d Cir. 1999) (holding that, because the defendant "does not respond to [the plaintiff's] [contrary argument] in its Reply Brief," the court should "decline to consider" such a response).

[18] Defendants argue that "NRD are 'pure creatures of statutory conception' and 'entirely statutory remedies,'" and they cite a Pennsylvania case for that assertion.  (NRD PSJ 2 (quoting *Commonwealth Dep't of Envt'l Prot. v. Delta Chems., Inc.*, 721 A. 2d 411, 415 & n.8 (Pa. Commw. Ct. 1998).)  *Delta Chemicals* is inapposite. *Delta Chemicals*' statement "was not made relative to an analysis of whether the Commonwealth or its agencies may seek damages for environmental contaminations but, rather, in the context of whether th[e] [c]ourt has concurrent jurisdiction with the DEP's Environmental Hearing Board in cases involving equitable versus statutory remedies." *Monsanto*, 2021 WL 6139209, at *42.  Moreover, *Delta Chemicals*' statements about NRD are not supported by citations, nor does the decision purport to opine on the limitations of common law remedies.

Second, Pennsylvania common law has long allowed a plaintiff to recover damages owing to pollution of waters to which he has superior right than does a defendant.  For example, in *Wheatley v. Chrisman*, a farm owner sued "the manager of lead-mines" for "divert[ing] a portion of the water of a small stream" that ran over his land "from its natural channel, and also for having corrupted the water" by polluting it with substances that "render[ed] it unfit for watering his cattle and for domestic purposes."  24 Pa. 298, 298–299 (1855).  On appeal where the amount of damages awarded to the farm owner were questioned, the Pennsylvania Supreme Court held that because "the plaintiff had a right to the water of the stream in its natural condition," and because "the pollution or material diminution of it was a wrong," the trial court "and jury were right in giving damages for every injury which was the direct, immediate, and necessary consequence of that wrong."  *Id.* at 305.[19]

On the record before me, the Commonwealth has demonstrated an interest in its waters that will support its seeking damages owing to what, if any, "pollution or material diminution" MTBE may have caused compared with how the waters in question were in their "natural condition."  *Cf. id*.  The Commonwealth pleads that it "has a significant property interest in the waters of the Commonwealth and a quasi-sovereign and a natural resource trustee interest in protecting the waters of the Commonwealth from contamination."  (SAC ¶ 37.)  It further alleges that "[t]he contamination of the waters of the Commonwealth by MTBE and MTBE gasoline constitutes injury to the waters of the Commonwealth."  (*Id.*)  Defendants do not rebut the Commonwealth's alleged interests.

---

[19] Although the Commonwealth raises *Wheatley* in its briefing, (NRD Opp. 9), Defendants do not address it in their reply brief.

16

In short, Defendants do not support their arguments.  Defendants failed to explain why the Commonwealth is disabled as a matter of Pennsylvania law from seeking the natural resource damages it pursues as part of its common law claims.

## V.     **The USTIF Motion**

In the USTIF Motion, Defendants seek a ruling that the Commonwealth cannot pursue its subrogation claims, either because the Commonwealth is not the correct party to bring suit on these claims, or because they are time-barred.  Because I find Defendants' arguments misplaced, the USTIF Motion is DENIED.

### A.     *Background*[20]

In 1994, Pennsylvania enacted the Storage Tank and Spill Prevention Act ("STSPA"), 35 Pa. Stat. §§ 6021.101–6021.2104, which in turn created the USTIF.  *See* § 6021.704(a).  The purpose of the Fund is to

> provid[e] owners and operators of gasoline retail service stations with "primary coverage" for environmental remediation costs.  The Fund operates by charging owners and operators of USTs with a fee, "assessed by the Commonwealth for every gallon [of gasoline] that enters a UST."  In the event that gasoline is released from a UST, owners and operators may file a claim with the Fund for reimbursement.

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.* ("*MTBE 2015*"), 14 Civ. 6228, 2015 WL 2354582, at *4 (S.D.N.Y. May 14, 2015) (footnotes omitted).  The STSPA also created the Underground Storage Tank Indemnification Board (the "Board"), 35 Pa. Stat. § 6021.704(a), which was authorized to take various actions, including "[t]o sue or be sued concerning claims arising as the result of a release from an underground storage tank."  §6021.705(f)(3).

---

[20] *See supra* note 8.

By statute, the USTIF is required to "indemnify an eligible owner or operator for up to the available coverage limit" for both "corrective action" and for "bodily injury and property damage," and the amount of indemnity for either is further lessened by certain "deductible[s]" and "limits of liability."  25 Pa. Code § 977.33(a).  "[A]fter" making "any payment" to a claimant, USTIF "shall be subrogated to all of the rights of recovery of an owner or operator against any person for the costs of remediation."  *Id*. § 977.40(a).  In other words, "once the Fund reimburses . . . applicants for remediation costs," it "steps into their shoes and inherits their legal rights" to seek recovery of remediation costs from others.  *See MTBE 2015*, 2015 WL 2354582, at *1.

In the *MTBE 2015* opinion, Judge Scheindlin dismissed the Commonwealth's subrogation claim as pleaded in its First Amended Complaint against certain "Insurance Defendants."  *Id.* at *4.  This holding stemmed from Pennsylvania law's "antisubrogation rule," which "prohibits an insurer from bringing a subrogation claim against its own insureds."  *Id.*  In essence, as pleaded in the First Amended Complaint, the Commonwealth's subrogation claim against the Insurance Defendants sought to claw back from them "every dollar Defendants received from their environmental remediation costs which the [Fund] also paid."  *Id.* at *1 (alteration in original).

In the SAC, the Commonwealth pleads new subrogation claims that seek to obviate the antisubrogation rule.  (*See* SAC ¶¶ 31, 40.)  Rather than seeking to claw back money the Fund paid to a Defendant directly, the Commonwealth's subrogation claims at issue here are the "claims that those subrogor[] [Defendants] supposedly have against [] other Defendants in this case."  (USTIF PSJ 1; *see also* USTIF Opp. 1 n.2 (agreeing with Defendants' characterization of

the Commonwealth's theory of its subrogation claims at issue).)[21]  "[F]or example," in a situation where Defendant BP America, Inc. ("BP") received money from the Fund as "reimbursement . . . for work that BP performed at its own release site," the Commonwealth "is not seeking to take back" what it paid to BP using the subrogation claims.  (USTIF PSJ 1.) Instead, it "seek[s] to recover those USTIF reimbursements from all the other Defendants . . . on the theory that BP could have asserted [] negligence . . . or other tort claim[s] against those other Defendants."  (*Id.* at 1–2.)[22]

**B.    *Discussion***

Defendants argue that the Commonwealth's current subrogation claims fail because (1) the Commonwealth cannot assert subrogation claims arising from USTIF payments in its own name, because these claims must be asserted by USTIF's Board; and (2) the subrogation claims are largely time-barred.  (USTIF PSJ 2.)

**1.   Can the Commonwealth Assert USTIF Subrogation Claims?**

Defendants argue that "the operative law says the[] [subrogation] claims belong to USTIF and its Board, not [to] the Commonwealth."  (USTIF PSJ 11.)  Accordingly, although not explicitly saying so, Defendants appear to argue that USTIF, not the Commonwealth, is the real party in interest that must assert the subrogation claims.

a.   <u>Applicable Law</u>

Federal Rule of Civil Procedure 17(a)(1) mandates that a lawsuit be "prosecuted in the name of the real party in interest."  *See Cortlandt St. Recovery Corp. v. Hellas Telecomms.*

---

[21] "USTIF PSJ" refers to the Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims to Recover Funds Reimbursed from the Pennsylvania Underground Storage Tank Indemnification Fund.  (Doc. 583.)  "USTIF Opp." refers to the Commonwealth's Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiff's Claims to Recover Funds Reimbursed from the Pennsylvania Underground Storage Tank Indemnification Fund.  (Doc. 606.)

[22] Defendants' USTIF Motion does not challenge the Commonwealth's using its right of subrogation in this manner.

*S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015) ("The real party in interest principle embodied in Rule 17 ensures that only a person who possesses the right to enforce a claim and who has a significant interest in the litigation can bring the claim." (internal quotation marks and alterations omitted)).  "[T]he modern function of the rule is to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."  *Id.* at 421 (citation and alterations omitted).  Unlike the issue of Article III "standing to pursue a claim," whether a party is "a real party in interest with respect to that claim" does not implicate a federal court's subject matter jurisdiction.  *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 380 (2d Cir. 2021); *see also* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* ("Wright & Miller") § 1542 (3d ed.) (explaining the differences between possessing standing and being a real party in interest).

To satisfy Rule 17(a), a suit "must be brought 'by the person who, according to the governing substantive law, is entitled to enforce the right.'"  *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003)).  "Thus, the action will not necessarily be brought in the name of the person who ultimately will benefit from the recovery."  Wright & Miller § 1543.

In the event the real party in interest is not named as a plaintiff, a court may not dismiss the action for failure to prosecute in the name of the real party in interest "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action."  Fed. R. Civ. P. 17(a)(3).  "A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original

20

complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997).  Courts ordinarily grant leave to substitute if "(1) '[t]he complaint's only pertinent flaw was the identity of the party pursuing those claims.  In other words, the proposed amended complaint sought only to substitute one name for another; the factual and legal allegations of the complaint would remain unaltered;' (2) 'there was [no] indication of bad faith . . . or an effort to deceive or prejudice the defendants' and (3) 'the proposed substitution . . . [does not] threaten to prejudice the defendants.'" *Kinra v. Chi. Bridge & Iron Co.*, No. 17 Civ. 4251 (LGS), 2018 WL 2371030, at *3 (S.D.N.Y. May 24, 2018) (alteration in original) (quoting *Cortlandt*, 790 F.3d at 422).  On the other hand, courts may deny leave to substitute and find "bad faith" where the previous misjoinder was "deliberate or tactical." *Advanced Magnetics*, 106 F.3d at 21; *cf. Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 226 (2d Cir. 2018) ("Even if a proposed substitution meets [the requirements of Federal Rule of Civil Procedure 17(a)], it should be denied if it is being proposed in bad faith or in an effort to deceive or prejudice the defendants.") (internal quotation marks omitted).

### b.   Application

As an initial matter, no one contests that the Commonwealth is properly named as a plaintiff in this action under Rule 17(a) with regard to almost every claim it asserts in the SAC. Defendants only contend that the relevant positive law "subrogate[s]" "[t]he Fund" "to all of the rights of recovery" of a payee, and that this does not extend the right to pursue subrogation claims to "the Commonwealth." (*See* USTIF PSJ 11 (quoting 25 Pa. Code § 977.40(a)); *see also id.* at 10 (beginning argument section with heading reading "only USTIF and its Board, not the Commonwealth, may assert USTIF's subrogation claims" (some capitalization removed)).) Defendants then argue that USTIF "is so separate and independent that [the Commonwealth] is

not empowered to exercise the rights of USTIF." (*Id.* at 12.)  Among other things, Defendants

cite a statute that empowers USTIF's Board "[t]o sue or be sued."  35 Pa. Stat. § 6021.705(f)(4).

Even if USTIF were the only real party in interest with regard to the subrogation

claims—a dubious proposition—I would find that this suit is already being "prosecuted in the

name of the real party in interest." *Cortlandt St. Recovery Corp.*, 790 F.3d at 420.  As

mentioned, the governing law states that "[t]he Fund, after any payment, shall be subrogated to

all of the rights of recovery of an owner or operator against any person for the costs of

remediation." 25 Pa. Code § 977.40(a).  Here, the caption and preamble of the SAC state that

the "Plaintiff" in this action is "[t]he Commonwealth of Pennsylvania, by and through" various

governmental bodies including "the Pennsylvania Underground Storage Tank Indemnification

Fund." (SAC 1, 9).  Thus, even if the Commonwealth alone could not prosecute the subrogation

claims in its own name, it named USTIF in the operative pleading. *See Choi v. Kim*, 50 F.3d

244, 246–47 (3d Cir. 1995) (disagreeing with the district court's ruling that Song was the only

named plaintiff in the complaint where the complaint in question was captioned with two names,

one of which was by and through the other).[23]

Moreover, Defendants nowhere explain why vesting the Board with authority to sue

would necessarily deprive the Commonwealth from being able to advance the subrogation

claims.  Indeed, Pennsylvania law provides that "[t]he Attorney General shall represent the

Commonwealth and all Commonwealth agencies . . . in any action brought by or against the

Commonwealth or its agencies, and may intervene in any other action . . . ."  71 Pa. Stat. § 732-

204(c).  USTIF is certainly an "Agency" within the meaning of the statute. *See* § 745.3 (defining

---

[23] This is enough to fulfill Rule 17(a)'s modern purpose of protecting a defendant for preclusion purposes. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 421.  To the extent USTIF were to attempt to sue Defendants after a final judgment in this action on the same subrogation theories, Defendants would need only point to the SAC to show that USTIF's interests were represented in this action.

"Agency" to mean "Any department, departmental administrative board or commission, independent board or commission, agency or other authority of this Commonwealth now existing or hereafter created," less certain governmental bodies not relevant here); *see also Herman v. Harman*, 583 F. App'x 33 (3d Cir. 2014) (referring to USTIF as a state agency). Given that the Commonwealth states that it brought this case "by and through" the "Pennsylvania Attorney General," as well as "by and through . . . the Pennsylvania Underground Storage Tank Indemnification Fund" itself, (SAC 1), it is plain that the Commonwealth, as Plaintiff in this litigation, has the requisite authority to pursue the subrogation claims.[24] Accordingly, Pennsylvania's "governing substantive law" allows the Attorney General to "enforce the right" of subrogation in this action. *Munich Reinsurance Am., Inc.*, 7 F.4th at 63.

## 2.    Are the Subrogation Claims Time-Barred?

Normally, "[s]ubrogation is an equitable doctrine" fashioned by courts meant to "place[] the ultimate discharge of a debt  upon the party who in fairness should bear it." *Sch. Dist. of Borough of Aliquippa v. Maryland Cas. Co.*, 587 A.2d 765, 769 (Pa. Super. Ct. 1991).  The doctrine "places the subrogee in the precise position of the one to whose rights and disabilities he is subrogated. . . . A subrogee is therefore bound by the statute of limitations as it accrues against the subrogor." *Id.*  (citations omitted).

Defendants argue that the Commonwealth's subrogation claims face the same statute of limitations that the subrogors would have faced, and, as such, that they are time barred.  (USTIF PSJ 8–9.)  The Commonwealth counters that "the doctrine of nullum tempus occurrit regi ('time

---

[24] Defendants offer no argument suggesting that the STSPA somehow impliedly repeals the statute authorizing Pennsylvania's Attorney General to sue on behalf of USTIF.  *See HSP Gaming*, 954 A.2d at 1175 (Pa. 2008) ("Repeals by implication are not favored and will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter."  (internal quotation marks omitted)).  Defendants' argument that "USTIF can only sue 'by and through' its Board,'" (USTIF PSJ 12 n.10), lacks merit.  The word "only" is Defendants' insertion; it is not found in any of the statutes Defendants identify.

does not run against the king')" renders its claims timely, regardless of the fact that its claims

arise through subrogation.  (USTIF Opp. 18–19.)

Given that the Commonwealth's subrogation claims owe their existence to state statutory

and administrative law, 25 Pa. Code § 977.40(a), I must apply Pennsylvania's "state rules

integral to the state statute of limitations" issues in this case to determine the limitations rule that

applies here, *see Converse v. Gen. Motors Corp.*, 893 F.2d 513, 515 (2d Cir. 1990); *In re TMI*,

89 F.3d 1106, 1112 (3d Cir. 1996) (holding that "statute of limitations is a substantive rule of

decision" under Pennsylvania law).

### a.    Applicable Law

In determining what rule to apply here, I must "carefully predict how the highest court of

the state would resolve" the applicable law by considering "all of the resources" that speak to

what the applicable law may be.  *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d

462, 470 (2d Cir. 2018) (quoting *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 370

(2d Cir. 1999)).  These resources may include "the language of the state intermediate appellate

courts," as oftentimes a state's highest court will not have addressed the issue at hand.  *See*

*DiBella v. Hopkins*, 403 F.3d 102, 112 (2d Cir. 2005); *see also Nolan v. Transocean Air Lines*,

276 F.2d 280, 281 (2d Cir. 1960) (Friendly, J.) ("Our principal task . . . in this diversity of

citizenship case, is to determine what the New York courts would think the California courts

would think on an issue about which neither has thought."), *judgment set aside on other*

*grounds*, 365 U.S. 293 (1961).

### b.    Application

Based on the briefing of the parties and my own research, there is only one case from the

courts of Pennsylvania that assesses the applicable limitations period on claims subrogated by

statute to arms of Pennsylvania government.[25]  In *Department of Public Welfare v. Maryland Casualty Co.*, Pennsylvania's Department of Public Welfare ("DPW") brought suit on a statutory right of subrogation that accrued to it through a statute requiring that "action" on the claim "be commenced within five years of the date the cause of action arises."  643 A.2d 139, 140 (Pa. Commw. Ct. 1994) (internal quotation marks omitted).  DPW brought suit "nearly seven years after" the event giving rise to the claim.  *Id.*  On appeal, the *Maryland Casualty* court affirmed that DPW's subrogation claim was time-barred.  First, it found that the statute's express limitations period of "five years has already passed."  *Id.* at 141.  Second, it held that "nullum tempus" could not apply because "the statute of limitations expressly limit[ed] the time in which the Commonwealth may bring an action."  *Id.*  At no time did it consider what the statute of limitations would have been had the claim been pursued by the party to whom the claim had accrued.  The *Maryland Casualty* analysis thus strongly suggests that, when the Commonwealth or one of its arms is granted a statutory right to subrogation, the time it has to sue on that claim will only be limited if a statute actually provides a specific time limit stated in the statute granting the Commonwealth the right to subrogation.

The Commonwealth's statutory right of subrogation, 25 Pa. Code § 977.40(a), has no limitations period, which means there is no basis to find that nullum tempus would not apply to the statutory subrogation claims.  *Cf. Maryland Casualty Co.*, 643 A.2d at 141.  Accordingly, I hold that the Pennsylvania Supreme Court would find that nullum tempus applies to the statutory subrogation claims at issue in this case, as that court "has always adhered to the 'old and well

---

[25] The parties cite other cases in their arguments, but they are ones in which an individual "as subrogee of" an arm of Pennsylvania government was not allowed to "invoke the doctrine of nullum tempus."  *See, e.g.*, *Sch. Dist. of Aliquippa v. Maryland Cas. Co.*, 587 A.2d 765, 771 (Pa. Super. Ct. 1991).  This case and cases like it thus shed no light on what time limitations apply when the Commonwealth is pursuing a claim as a subrogee, much less as subrogee by the operation of a statute as opposed to the operation of principles of equity.

known rule that statutes which in general terms divest pre-existing rights or privileges do not bind the sovereign without express words to that effect.'" *Dep't of Transp. v J.W. Bishop & Co.*, 439 A.2d 101, 102 (Pa. 1981).  Defendants' argument, if accepted, would violate this principle, as it would use statutory subrogation against the Commonwealth to "bind the sovereign without express words to that effect" from any relevant source of law.  *Id.*

Defendants also argue that nullum tempus cannot apply in this case because nullum tempus is premised on the "vindicat[ion of] public rights," whereas the subrogation claims would originally have been claims held by Defendants to sue other Defendants to vindicate their own private rights.  (USTIF Reply 8.)  In support, Defendants cite a case where an individual, as subrogee of a Pennsylvania school district's negligence claim, was found not to be "attempt[ing] to vindicate public rights or to protect public property" because "[t]he public interests ha[d] been made whole," and "[t]he matter [wa]s now between two private litigants."  *Sch. Dist. of Aliquippa*, 587 A.2d at 772.  Defendants' argument is misplaced.  First, the concerns from *Aliquippa* are clearly not applicable here:  it is the Commonwealth suing, not a private party, and the whole premise of the subrogation claims is that Pennsylvania has yet to be made whole for Defendants' alleged damage to its waters.  Second, Defendants' argument that one must undertake a "public rights" analysis to determine whether nullum tempus applies misses the point.  Under Pennsylvania law, "[w]henever the Commonwealth invokes the doctrine of nullum tempus, it is seeking as a plaintiff to vindicate public rights and protect public property."  *J.W. Bishop & Co.*, 439 A.2d at 104.  The Commonwealth is invoking the doctrine here.  That is sufficient for its application.[26]

---

[26] Because of my holding, I need not consider the argument made in Defendants' USTIF Motion regarding whether the Commonwealth can seek "USTIF's reimbursements as damages on its own common law tort and statutory claims" that arise through mechanisms other than statutory subrogation.  (USTIF PSJ 12.)

## VI.   <u>The Act 2 Motion</u>

The Act 2 Moving Defendants seek a ruling that they cannot be held liable "for future damages and injunctive relief for further remediation at the Closed Sites" due to their compliance with Pennsylvania's "Act 2." (Act 2 PSJ 1.)[27] "Act 2" is the name "commonly" used to refer to Pennsylvania's "Land Recycling and Environmental Remediation Standards Act," 35 Pa. Stat. § 6026.101 *et seq. See Baker v. Dep't of Env't Prot.*, No. 633 C.D. 2016, 2017 WL 817123, at *6 (Pa. Commw. Ct. Mar. 2, 2017). The "Closed Sites" are 21 "MTBE release sites," (Act 2 PSJ 10), for which the Act 2 Moving Defendants argue, they have demonstrated to the appropriate Pennsylvania agency a requisite level of environmental compliance under Act 2, and for which they are thus shielded from liability by the terms of Act 2. (*See* Act 2 PSJ 1 (arguing that "[u]nder the terms of Act 2," "each Closed Site . . . has been cleaned up" such that "no further corrective action is required."). The Commonwealth counters that Act 2's liability protections are too narrow to sustain the Act 2 Moving Defendant's motion. (*See generally* Act 2 Opp.)[28]

Because the Act 2 Moving Defendants' argument cannot be reconciled with Act 2's text, this PSJ Motion is DENIED.

### A.   *Background*[29]

Act 2 is an environmental compliance law that, among other things, is aimed at "put[ting] in place" "[i]ncentives . . . to encourage responsible persons to voluntarily develop and implement cleanup plans." 35 Pa. Stat. § 6026.102(2). To this end, Act 2's Chapter 3 sets forth remediation standards and review procedures, *see id.* §§ 6026.301–6026.308, and its Chapter 5

---

[27] "Act 2 PSJ" refers to the Act 2 Moving Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment as to Future Damages and Injunctive Relief at Sites Closed Under Act 2. (Doc. 598.)

[28] "Act 2 Opp." Refers to the Commonwealth's Opposition to Defendants' Motion for Partial Summary Judgment as to Future Damages and Injunctive Relief at Sites Closed Under Act 2. (Doc. 614.)

[29] *See supra* note 8.

provides certain liability protections for persons who demonstrate compliance with those standards and procedures, *see* §§ 6026.501–6026.506.  In particular, Act 2's section 501 states

> Any person demonstrating compliance with the environmental remediation standards established in Chapter 3[1] shall be relieved of further liability for the remediation of the site under the statutes outlined in section 106[2] for any contamination identified in reports submitted to and approved by the department to demonstrate compliance with these standards and shall not be subject to citizen suits or other contribution actions brought by responsible persons.

*Id*. § 6026.501(a).  The footnotes—which appear in the above quotation without their text and which are codified in section 501's text—reference, respectively, the standards created by Chapter 3 of Act 2, *id.* n.1 ("35 P.S. § 6026.301 et seq."), and statutes providing for environmental liability under Pennsylvania law, *id.* n.2 ("35 P.S. § 6026.106").  In particular, section 106 of Act 2 states that "[t]he environmental remediation standards established under this act shall be used whenever site remediation is voluntarily conducted or is required under" several listed environmental laws "to be eligible for cleanup liability protection under Chapter 5."  *Id*. § 6026.101(a).[30]  Notably, section 301 provides that "[a]ny person who proposes or is required to respond to the release of a regulated substance at a site and who wants to be eligible for the cleanup liability protection under Chapter 5 shall select and attain compliance with one or more" enumerated "environmental standards."  *Id*. § 6026.301(a).   That person's "attainment" of the selected "standards" is then determined by the Pennsylvania Department of Environmental Protection (the "Department" or PADEP).  *See id.* § 6026.301(c); *see also id.* § 6026.103 & n.4 (defining "Department").

In other words, when "[a]ny person demonstrat[es] compliance" with Act 2's standards, meaning the standards that person selects and proves to the satisfaction of the Department, *see*

---

[30] The statutes in section 106 are Pennsylvania laws commonly known as the "Clean Streams Law," the "Air Pollution Control Act," the "Solid Waste Management Act," the "Infectious and Chemotherapeutic Waste Law," the "Hazardous Sites Cleanup Act," and the "Storage Tank and Spill Prevention Act."  *Id.* § 6026.106(a).

28

*id.* § 6026.301(a), (c), that person is "relieved of further liability for the remediation of the site under" certain other Pennsylvania laws collected in "section 106." *Id*. § 6026.501(a).  For its part, section 106 says that compliance with laws listed in section 106 provides for "cleanup liability protection under Chapter 5." *Id*. § 6026.106.

The Act 2 Moving Defendants contend they achieved Act 2 compliance with respect to the Closed Sites.  In support of this, they offer letters they received from PADEP, one with respect to each Closed Site, that they say "confirm . . . compliance with the applicable cleanup standard," which shows their "entitlement to liability protection under Act 2."  (Act 2 PSJ 11 (citing Act 2 56.1 ¶¶ 2, 4, 6, 8, 10, 12, 14, 17, 19, 22, 24, 27, 30, 33, 35, 38, 43, 45, 48, 50, 58, 60, 63, 65, 69).)[31]  By way of example, PADEP sent a letter dated September 27, 2007, to Act 2 Moving Defendant ConocoPhillips Company.  (Act 2 56.1 Ex. 4.)[32]  This letter states that, by virtue of ConocoPhillips Company's having submitted the appropriate report to PADEP detailing "the outcome of remedial actions taken subsequent to a release of regulated substances from" a particular "facility,"[33] ConocoPhillips Company "ha[d] attained . . . [the] cleanup standard [Conoco had selected] for each of the identified regulated substances associated with unleaded gasoline," and that "[t]he relief from liability for attaining this cleanup standard is set forth in Chapter 5 of" Act 2.  (*Id.*)

---

[31] "Act 2 56.1" refers to the Rule 56.1 Statement in Support of Defendants' Motion for Partial Summary Judgment as to Future Damages and Injunctive Relief at Sites Closed Under Act 2, (Doc. 599), and the exhibits attached thereto.

[32] Similar letters with similar language were sent to other Defendants.  (*See, e.g.*, Act 2 56.1 Ex. 5 (letter dated April 12, 2004, to Sunoco, Inc.); *id.* Ex. 10 (letter dated November 23, 2015, to Getty Realty Corp.).)

[33] The report ConocoPhillips Company submitted to PADEP that is referenced in this letter was also filed in support of the Act 2 Motion.  (*See* Act 2 56.1 Ex. 3.)

### B.  *Discussion*

The Act 2 Moving Defendants argue that I "should grant summary judgment" to limit all remedies "for future damages and injunctive relief against any [Act 2] Moving Defendant that" either "cleaned up [a] Closed Site" as confirmed by a letter from PADEP, or by an Act 2 Moving Defendant that "is a subsequent owner" of such a cleaned-up Closed Site.[34]  (Act 2 PSJ 12; *id.* at 18 ("the Court should grant" judgment on "all claims for future damages and injunctive relief at the Closed Sites with respect to the [Act 2] Moving Defendants".))

I am bound to apply Pennsylvania substantive law in resolving the extent of the liability protection extended by Act 2.  *See supra* Pt. V.B.2.a.  This is a matter of statutory interpretation, and as such I am guided by Pennsylvania's rules of construction, 1 Pa. Con. Stat. §§ 1901–1991. First, "these rules provide that the object of interpretation is to 'ascertain and effectuate the intention of the General Assembly,'" and to do so by looking to a "statute's plain language" as "the best indication of legislative intent."  *Whitmoyer v. Workers' Comp. Appeal Bd. (Mountain Country Meats)*, 186 A.3d 947, 954 (Pa. 2018) (internal quotation marks omitted).  "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. Con. Stat. § 1921(b).  Furthermore, "[o]nly if [I] determine that the statutory text is ambiguous may [I] look to considerations beyond the text such as the mischief to be remedied by the statute or what gave rise to its enactment."  *Whitmoyer*, 186 A.3d at 954 (citing 1 Pa. Con. Stat. § 1921(c)).

Act 2's plain text is "clear and unambiguous."  *Id.*  It provides that one who achieves compliance "shall be relieved of further liability for the remediation of the site under the statutes

---

[34] Section 501 of Act 2 extends its liability protections to "current or future owners of the identified property or any other person who participated in the remediation of the site."  § 6026.501(a)(1).

outlined in section 106 [of Act] for any contamination identified in reports submitted to and approved by [PADEP]."  35 Pa. Stat. § 501(a).  The Commonwealth does not seek to hold any Defendants liable "for the remediation of" any Closed Site "under the statutes" found in section 106 of Act 2.  This dooms the Act 2 Moving Defendants' argument that they are shielded from any "future damages and injunctive relief at the Closed Sites" through their Act 2 compliance. (Act 2 PSJ 18).  Their argument would erase the "under the statutes outlined" portion of section 501 from Act 2.  The Commonwealth emphasizes the words "*under the statutes outlined in section 106*" in its opposition brief, (Act 2 Opp. 1), but the Act 2 Moving Defendants largely ignore this language, and they never even grapple with it in their reply brief.  In other words, the Act 2 Moving Defendants essentially are seeking immunity from liability for Closed Sites under all statutes, despite Act 2's clear statement that its liability protections are not so broad.

Indeed, although the Act 2 Moving Defendants quote the "under the statutes outlined" portion of section 501 once in their opening brief, (*id.* at 7), they generally offer the overly broad contention that "Section 6026.501 provides that '[a]ny person demonstrating compliance with the [applicable] environmental remediation standards . . . ***shall be*** relieved of further liability for the remediation of the site' under state law," (*id.* at 13 (alterations and emphases in original); Act 2 Reply 2 ("Section 501(a) of Act 2 protects responsible parties from 'further liability for the remediation of the site.'").)[35]  Section 501 simply does not say what the Act 2 Moving Defendants claim that it says.  Therefore, their argument is without merit, and the Act 2 Moving Defendants' motion is DENIED.

---

[35] "Act 2 Reply" refers to Defendants' Reply in Support of Motion for Partial Summary Judgment as to Future Damages and Injunctive Relief at Sites Closed Under Act 2.  (Doc. 628.)

## VII.   The Counterclaims Motion

### A.   *Background and Procedural History* [36]

On August 3, 2021, I entered an Opinion & Order granting in part and denying in part

certain motions to dismiss the SAC.  (Doc. 662.)  Thereafter, on October 1, 2021, ExxonMobil

filed its initial answer.  (Doc. 705.)  On October 22, 2021, ExxonMobil filed its operative

Amended Answer, in which it also asserts certain affirmative defenses and counterclaims.  (Doc.

740 ("Am. Ans.").)

ExxonMobil pleads the allegations relevant to its counterclaims under a section of the

Amended Answer beginning with the heading "ExxonMobil Counterclaims."  (Am. Ans. 76.)

"The remedial activities conducted by ExxonMobil for UST site remediation have helped to

restore MTBE impacted groundwater in Pennsylvania, and, in some instances, have fully

restored groundwater at MTBE release sites in this case."  (Counterclaims ¶ 2.)[37]  Since the

"1980s, ExxonMobil" has invested in upgrading its tank systems in Pennsylvania, performed

actions required by PADEP regulations and administrative orders, and paid for "source removal

and remediation at many MTBE sites in Pennsylvania."  (*Id.* ¶¶ 4–6.)  ExxonMobil alleges that

its work "to cleanup UST release sites [has] conferred economic and environmental benefits on

the Commonwealth through the Act 2 program."  (*Id.* ¶ 7.)  Accordingly, "[t]o the extent Plaintiff

is found to be entitled to any damages as the result of this litigation," ExxonMobil pleads that it

"is entitled to an offset or recoupment of the programmatic economic and environmental

---

[36] Facts set forth in this section come from ExxonMobil's Amended Answer.  I assume the well-pleaded factual allegations therein to be true for purposes of the Counterclaims Motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.  Certain terms in this section are defined and discussed in earlier sections of this Opinion & Order.  *See supra* Pts. III.A. (discussing USTs); Pt. IV (discussing Act 2).

[37] "Counterclaims" refers to the portions of ExxonMobil's Amended Answer under the ExxonMobil Counterclaims heading.  (*See* Am. Ans. 76.)

benefits" it has "conferred" on the Commonwealth due to its "remediation and closure of some sites under Act 2." (*Id.*)  Specifically, ExxonMobil complied with Act 2 and voluntarily cleaned up various MTBE release sites "with the expectation that in exchange for coordinating with PADEP, the Commonwealth would grant ExxonMobil liability protection from further remediation or damages at Closed Sites" for which it received a "'Closure Letter' approving the cleanup efforts" as in compliance with Act 2.  (*Id.* ¶ 41.)  ExxonMobil lists a number of sites at issue in this litigation for which it received a Closure Letter.  (*See id.* ¶¶ 46–50.)

Based on its allegations, ExxonMobil asserts two counterclaims:  one seeking "equitable recoupment," (*id.* ¶¶ 72–84), and the other seeking "equitable setoff," (*id.* ¶¶ 85–89).  As an affirmative defense, it pleads that it is entitled to "recoupment, setoff, or offset" in the form of "a credit against any award to Plaintiff for the monetary or economic benefit that Plaintiff, related entities, or others whom Plaintiff purports to represent obtained."  (Am. Ans. 65 ¶ 38.)

On January 17, 2022, the Commonwealth filed a Motion to Dismiss Defendant ExxonMobil's Counterclaims and Strike Its Related Affirmative Defense.  (Doc. 817.)  ExxonMobil filed an opposition brief on March 1, 2022.  (Doc. 838.)  The Commonwealth filed a reply brief on March 29, 2022.  (Doc. 849.)

### B.    *Legal Standards*

### 1.  **Rule 12(b)(6)**

"A court evaluates a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) using the same standard as a motion to dismiss a complaint."  *Phoenix Cos., v. Concentrix Ins. Admin. Sols. Corp.*, 554 F. Supp. 3d 568, 585 (S.D.N.Y. 2021) (citing *A.V.E.L.A., Inc.* v. *Est. of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015)).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*
*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
A claim will have "facial plausibility when the plaintiff pleads factual content that allows the
court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully."
*Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the
complaint, the particular cause of action and its elements, and the existence of alternative
explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc.*
*v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

   In considering a motion to dismiss, a court must accept as true all well-pleaded facts
alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.
*Kassner*, 496 F.3d at 237; *Tacopina v. Kerik*, No. 14CV749-LTS-FM, 2016 WL 1268268, at *3
(S.D.N.Y. Mar. 31, 2016) ("A motion to dismiss counterclaims under Rule 12(b)(6) is decided
under the same standard applied to a motion to dismiss the claims of a complaint." (citation
omitted)); *Orientview Techs. LLC v. Seven For All Mankind, LLC*, No. 13 Civ. 0538(PAE), 2013
WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013) (same); *see also Trilegiant Corp. v. Sitel Corp.*, No.
09 Civ. 6492(BSJ)(JCF), 2012 WL 3826841, at *1 (S.D.N.Y. Aug. 27, 2012) ("Although
the Second Circuit has yet to weigh in, most lower courts that have considered the question of
the standard applicable to pleading of defenses have held that the Rule 12(b)(6) standard, as
elucidated in *Twombly* and *Iqbal*, governs the sufficiency of the pleading of affirmative
defenses." (internal quotation marks omitted)).  A complaint need not make "detailed factual
allegations," but it must contain more than mere "labels and conclusions" or "a formulaic
recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks

omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is

"inapplicable to legal conclusions."  *Id*.  Finally, on a motion to dismiss, a court may consider a

document integral to the complaint even if it is not attached or formally incorporated by

reference.  *See, e.g., Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  A

court need not accept Plaintiff's description of the terms of the document as true, but instead

"may look to the [document] itself."  *See id*.

## 2.      Rule 12(f)

Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or

any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  To

succeed on a motion to strike an affirmative defense, Plaintiff must "show that:  (1) there is no

question of fact which might allow the defense to succeed; (2) there is no question of law which

might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the

defense."  *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 96 (2d Cir. 2019) (quoting

*S.E.C. v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999)).  The first factor must be

considered by reference to "the plausibility standard of *Twombly* . . . but with the recognition of

the 'context-specific' matter of 'pleading an affirmative defense.'"  *Id.* at 98.  "Federal courts

have discretion in deciding whether to grant motions to strike," *Orientview Techs.*, 2013 WL

4016302, at *3, and such motions are generally disfavored and will not be granted "unless it

appears to a certainty that plaintiff[] would succeed despite any state of the facts which could be

proved in support of the defense," *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d

Cir.1984), *vacated and remanded on other grounds*, 478 U.S. 1015 (1986) (internal quotations

and citations omitted).

## C.    *Discussion*

The Commonwealth seeks dismissal of ExxonMobil's recoupment and setoff

counterclaims on various grounds, including that "[a]n underlying cause of action is a *necessary*

component of a counterclaim sounding in recoupment or setoff."  (Counterclaims MTD 12.)[38]

The Commonwealth also seeks to strike ExxonMobil's similarly-premised affirmative defense,

saying that if ExxonMobil had any claim it could properly plead as recoupment or offset, it

would be "as a counterclaim and not an affirmative defense."  (*Id.* 23 ("By asserting as a defense

the same impermissible claims made by counterclaim, Exxon is seeking to add a belt to its

suspenders where there are no pants.").)  ExxonMobil disagrees.  (Counterclaims Opp. 16–23.)[39]

Accordingly, I will begin by considering the doctrines of recoupment and setoff.

### 1.  Applicable Law:  Recoupment and Setoff

> At common law the term "recoupment" described a claim that defendant could
> assert against plaintiff only if it arose from the same transaction as plaintiff's
> claim.  It was purely defensive in character and could be used only to defeat or
> diminish plaintiff's recovery; recoupment could not be the basis for affirmative
> relief.  "Setoff," on the other hand, referred to a claim by defendant that was
> unrelated to plaintiff's claim.  Moreover, unlike recoupment, setoff permitted
> defendant to assert an affirmative claim for relief.  But the utility of setoff was
> limited by the requirement that the claim either be for a liquidated amount or arise
> out of a contract or judgment.

6 Charles Allen Wright & Alan Miller, Federal Practice & Procedure: Civil § 1401 (3d ed. 2023)

(hereinafter "Wright & Miller") (footnotes omitted).

Federal Rule of Civil Procedure 13 was written against the backdrop of the common-law

recoupment and setoff procedures:  a "[c]ounterclaim under Rule 13 . . . includes both setoff and

---

[38] "Counterclaims MTD" refers to the Commonwealth's Memorandum of Law in Support of Its Motion to Dismiss ExxonMobil's Counterclaims and Strike Its Related Affirmative Defense.  (Doc. 818.)

[39] "Counterclaims Opp." refers to ExxonMobil's Memorandum of Law in Opposition to the Counterclaims Motion. (Doc. 838.)

recoupment[] and is broader than either in that it includes other claims and may be used as a basis for affirmative relief." *Norwalk Cove Marina, Inc. v. S/V ODYSSEUS*, 64 F. App'x 319, 321 (2d Cir. 2003) (quoting *Inter–State National Bank v. Luther*, 221 F.2d 382, 390 (10th Cir. 1955) (en banc)); *see* Wright & Miller § 1426 (explaining that Rule 13(c)'s statement that, "'a counterclaim need not diminish or defeat the recovery sought by the opposing party,' preserves the right of a party to plead either setoff or recoupment, as well as makes it clear that a claim in excess of the [original plaintiff's] claim may be interposed." (footnote omitted)). A Rule 13(a) compulsory counterclaim, which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim," mimics recoupment's requirement of arising from the same transaction. *See* Fed. R. Civ. P. 13(a)(1)(A); *United States v. AK Steel Corp.*, Civil Action No. 97-1863, 2011 WL 13237796, at *9 (W.D. Pa. Aug. 26, 2011) ("Recoupment is a common law, equitable doctrine; it is the common law precursor to the modern compulsory counterclaim at Federal Rule of Civil Procedure 13(a)."); *United States v. Livecchi*, No. 03-CV-6451P, 2005 WL 2420350, at *19 (W.D.N.Y. Sept. 30, 2005) ("Courts have generally treated claims for recoupment as compulsory counterclaims under Rule 13 of the Federal Rules of Civil Procedure" and collecting cases). A Rule 13(b) permissive counterclaim, which is "any claim that is not compulsory" that a defendant may have against the plaintiff, encompasses setoff's broader structure of looking to the entirety of the "mutual debts" that parties may have "against each other" regardless of the transaction from which it arises, *see Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995); *see also In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998) (explaining that "mutual debts" relevant to setoff may "arise from different transactions," whereas, for "recoupment . . . the claim and counterclaim must arise out of the same transaction or set of transactions").

In federal court, outside of "bankruptcy actions," "the distinction between a recoupment and a setoff retains little significance under the modern rules for asserting counterclaims in pleading." *In re McMahon*, 129 F.3d 93, 96 (2d Cir. 1997) (explaining that "[w]hile a 'setoff' is subject to the automatic stay provision of 11 U.S.C. § 362, a recoupment is not"). Indeed, in contemporary jurisprudence, if a counterclaim can be characterized as one in the nature of recoupment or setoff, it may be allowed to proceed as a counterclaim even though it may fail if asserted in another procedural posture. *See, e.g.*, *id.*; *Oneida Indian Nation of Wisconsin v. State of New York*, 732 F.2d 261, 266 (2d Cir. 1984) ("By bringing an action, either as a plaintiff or an intervening plaintiff, a litigant waives sovereign immunity to the extent of submitting its own claims pleaded for adjudication by the court, and also subjects itself to any defensive counterclaim by way of set-off pleaded by a defendant."); *United States v. Dorio*, 483 F. Supp. 3d 145, 153 (D. Conn. 2020) (discussing "the recoupment-counterclaim exception to sovereign immunity"); *Household Consumer Disc. Co. v. Vespaziani*, 490 Pa. 209, 218 (1980) ("[R]ecoupment . . . is never barred by the statute of limitations so long as the main action itself is timely." (quoting *Bull v. United States*, 295 U.S. 247, 262 (1935)). "A classic example of recoupment is a situation in which the statute of limitations is different for two related claims arising out of the same transaction," such as where the "United States" sues "a taxpayer for underpayment of income tax," which has a longer limitations period "than the period during which a taxpayer may file a claim for a refund of overpayment of the estate tax." *In re Frescati Shipping Co.*, 886 F.3d 291, 311 n.27 (3d Cir. 2018). Thus, in a case "brought by the government to recover the extra income tax owed, the taxpayer may assert an equitable recoupment defense for the amount of the overpayment of the estate tax, even though the statute

38

of limitations has run and the taxpayer would not otherwise have been able to recover the overpayment." *Id.*

"Recoupment and setoff rights" are determined by the substantive "law" creating them. *In re McMahon*, 129 F.3d at 96; *see, e.g.*, *Vespaziani*, 490 Pa. at 220 (assessing whether a federal law created a "counterclaim" that could be asserted "in the nature of recoupment"); *In re Graboyes*, 223 F. App'x 112, 115 (3d Cir. 2007) (holding that a defense based on a Pennsylvania statute was "proper under Pennsylvania law" as "recoupment"); *Koken v. Legion Ins.*, 900 A.2d 418, 420 (Pa. Commw. Ct. 2006) (analyzing "whether [a party] can use setoff and recoupment to pursue its quasi-contract claim as an affirmative defense without violating Pennsylvania's insurance insolvency law").

### 2.    Application

The Commonwealth argues that neither ExxonMobil's recoupment nor setoff counterclaims "states a viable claim [for relief]" under Pennsylvania law and that "[a]n underlying cause of action is a *necessary* component of a counterclaim sounding in recoupment or setoff." (Counterclaims MTD 12.)[40]  I agree.

In the *Frescati* case, the Third Circuit considered an "equitable recoupment defense" raised by a party against "the United States" over who should bear the cost of an oil spill. 886 F.3d at 311. One of the questions presented was whether the party "possesse[d] a 'claim' against" the United States or if the party was merely making "a generalized request for the court to balance the equities." *Id.* The Third Circuit held that the generalized equitable recoupment claim must fail, because even when a party invokes equity, it "still must assert some cognizable

---

[40] The parties agree that any right ExxonMobil asserts in its counterclaims is governed by Pennsylvania law. (Counterclaims MTD 12; Counterclaims Opp. 18.)

claim, rather than simply a request for the Court to reduce the United States' damages in the interest of equity." *Id.* at 312.

ExxonMobil argues that "the majority of cases in Pennsylvania," unlike *Frescati*, "do not impose th[e] requirement" that recoupment or offset require a defendant to plead an actual cause of action. (Counterclaims Opp. 18.) ExxonMobil is wrong. Indeed, in every case ExxonMobil cites in support of its position, the court—whether a federal court or a Pennsylvania court— always tethered its analysis of recoupment or setoff to whether the party asserting either doctrine had a cause of action at all. In *In re Grayboyes*, a bankruptcy appeal, the court assessed whether a party could invoke violations of a Pennsylvania usury law known as "Act 6 . . . as a recoupment claim." Civ.A. 05-1780, 2006 WL 437546, at *3 (E.D. Pa. Feb. 22, 2006), *aff'd sub nom. In re Graboyes*, 223 F. App'x 112 (3d Cir. 2007). Act 6 itself creates a "substantive right to bring an action" for "[a]ny person affected by a violation of the act." 41 Pa. Stat. § 504. Similarly, in *Household Consumer Discount Co. v. Vespaziani*, the Pennsylvania Supreme Court looked to federal common law and determined that a claim brought under the federal Truth in Lending Act as a counterclaim could be asserted in the nature of a claim for recoupment and thus overcome the normal "one year statute of limitation" for asserting such a claim. 490 Pa. 209, 222–24 (1980). In *Kaiser ex rel. Taylor v. Montirend Inventory Management, Inc.*, the Commonwealth Court of Pennsylvania considered a "counterclaim in the nature of recoupment," where the underlying counts asserted were for "breach[]" of an "[a]greement," violations of a duty to disclose and intentional misrepresentation, and "promissory estoppel." 672 A.3d 359, 361–62 (Pa. Commw. Ct. 1996). The case then proceeds to analyze whether these various counterclaims were "in the nature of recoupment." *Id.* at 363–64.

The same is true for ExxonMobil's cases on setoff.  *See Hill v. Port Auth. Trans. Sys.*, 137 Pa. Cmwlth. 132, 140–41 (1991) (state agency could not seek a setoff where it "ha[d] not filed a counterclaim in the present litigation" and thus failed to bring "whatever claims the [agency] believed it possessed" that might amount to a setoff), *aff'd*, 531 Pa. 457 (1992); *Koken v. Legion Ins.*, 900 A.2d 418, 419 (Pa. Commw. Ct. 2006) ("The question is whether the Bank can use setoff and recoupment to pursue its quasi-contract claim as an affirmative defense without violating Pennsylvania's insurance insolvency law.")

As such, I hold that, under Pennsylvania law, neither recoupment nor setoff are causes of action, and therefore to be asserted must be coupled with an independent cause of action. ExxonMobil thus may not assert them as counterclaims.

In the alternative, ExxonMobil argues that it has asserted an underlying state law cause of action in support of stating recoupment and setoff counterclaims; specifically, a cause of action under 35 Pa. Stat. § 6026.501(a).  (Counterclaims Opp. 18, 20.)  However, as extensively discussed *supra* Pt. IV, this statute merely states that "[a]ny person demonstrating compliance with the environmental remediation standards established" by Act 2's relevant chapter "shall be relieved of further liability for the remediation of the site under the statutes outlined in section 106" of Act 2.  ExxonMobil provides no explanation for how this section supplies any sort of "legal or equitable right to recovery from [the Commonwealth]."  (Counterclaims Opp. 18.)[41] Nor does ExxonMobil cite to cases that have interpreted § 6026.501(a) as creating a cause of action or right to recover.

---

[41] ExxonMobil never argues that section 6026.501(a) can be read as supplying an implied right of action.  *See Palmiter v. Commonwealth Health Sys., Inc.*, 260 A.3d 967, 973 (Pa. Super. Ct. 2021) (explaining the framework for assessing Pennsylvania statutes for "implied rights of action").

As a necessary consequence of my holding that recoupment and setoff are not causes of action and must be coupled with an independent cause of action, the Commonwealth's Rule 12(b)(6) motion to dismiss and Rule 12(f) motion to strike ExxonMobil's recoupment and setoff affirmative defense are GRANTED.  First, "there is no question of fact which might allow the defense to succeed," *GEOMC CO.*, 918 F.3d at 96, because, as discussed, there is no Pennsylvania law suggesting that recoupment or setoff are affirmative defenses that ExxonMobil may assert in the face of any of the Commonwealth's claims.  *See id.* at 98 ("[A]n affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims.")  Second, this means "there is no question of law which might allow the defense to succeed."  *Id.* at 96.  Third, the Commonwealth would "be prejudiced by the inclusion of the defense," *id.*, because ExxonMobil's pursuit of this legally insufficient defense could confuse the ultimate finder of fact in this action as to the basis for awarding the Commonwealth damages,[42] if any are found to be due to it.[43]  The premise of ExxonMobil's recoupment and setoff argument is that, if the Commonwealth wins any damages against it, then ExxonMobil should be allowed to seek "a credit to account for the monies ExxonMobil spent to restore groundwater at the Focus Sites and for the value of other economic and environmental benefits conferred on the Commonwealth."  (Counterclaims Opp. 2.)  As the Commonwealth

---

[42] In making this ruling, I am not making any finding as to whether the Commonwealth will be able to prove liability and damages.

[43] A number of courts have determined that, where an "affirmative defense is legally insufficient," there is no "need [to] address whether [a movant] would be prejudiced by its inclusion."  *See, e.g.*, *State St. Glob. Advisors Tr. Co. v. Visbal*, 462 F. Supp. 3d 435, 442 n.7 (S.D.N.Y. 2020) (citing *GEOMC Co.*, 918 F.3d at 98); *Jablonski v. Special Couns., Inc.*, 1:16-CV-05243 (ALC), 2020 WL 1444933, at *3 (S.D.N.Y. Mar. 25, 2020) (citing *GEOMC Co.*, 918 F.3d at 98–99); *Car-Freshner Corp. v. Just Funky LLC*, 5:19-CV-0289 (GTS/ATB), 2019 WL 6270991, at *2 (N.D.N.Y. Nov. 25, 2019) ("a lack of factual sufficiency and/or legal validity may tend to prejudice a plaintiff by expanding the scope of the litigation."); *see also Town & Country Linen Corp. v. Ingenious Designs LLC*, 18-cv-5075 (LJL), 2020 WL 3472597, at *15 (S.D.N.Y. June 25, 2020) ("Moreover, the potentially enormous scope of Defendants' largely-undefined equitable defenses under the Fourteenth Affirmative Defense threatens to materially prejudice Plaintiffs").

aptly puts it, "Exxon is effectively saying that where it has caused $200 in damages" to "groundwater, spent $100 cleaning it up . . ., but $100 is . . . needed to finish the job, it should pay nothing towards that," because it "must be given a[] $100 credit for what it [already] did." (Counterclaims MTD 6.)[44]  It is easy to imagine a framing of this argument that would confuse a factfinder and ultimately "reduce[]" the Commonwealth's recovery, if it indeed gets any, "by the monetary value" of the remediation-related benefits that ExxonMobil thinks it has provided the Commonwealth.  (Counterclaims Opp. 6.)  If I do not strike the affirmative defense, I would be allowing ExxonMobil to argue for recoupment or setoff where it has no legal right to seek either.

## VIII.   <u>Conclusion</u>

For the foregoing reasons, the Exxon Settlement Motion is GRANTED in part, the other PSJ Motions are DENIED,[45] and the Counterclaims Motion is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions at docket entries 558, 578, 582, 596, 597, 796, and 817.

SO ORDERED.

Dated: May 6, 2024
        New York, New York

*Vernon Broderick*

Vernon S. Broderick
United States District Judge

---

[44] ExxonMobil does not address this analogy in its brief.

[45] This dismissal also applies to Defendant American Refining Group Inc. since it joined the Act 2 Motion.  (*See* Doc. 796).