UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
                                     :
                                     :    Master File

IN RE: Methyl Tertiary Butyl     :      No:
Ether ("MTBE") Products Liability :    1:00-1898
Litigation                      :
                                     :    14cv6228 (DLC)

This Document Relates To:      :
Commonwealth of Pennsylvania v.  :    OPINION AND
Exxon Mobil Corporation, et al., :      ORDER
Case No. 1:14-cv-6228         :
                                     :
----------------------------------X

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
James A. Donahue, III
Neil F. Mara
Pennsylvania Office of Attorney General
14th Fl. Strawberry Square
Harrisburg, PA 17120

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger & Montague, PC
1818 Market St Suite 3600
Philadelphia, PA 19103

Stewart L. Cohen
Robert L. Pratter
Michael Coren
Eric S. Pasternack
Cohen, Placitella & Roth
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Michael D. Axline
Tracey L. O'Reilly
Molly McGinley Han
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

For defendants Exxon Mobil Corporation and ExxonMobil Oil
Corporation:
James A. Pardo
Lisa A. Gerson
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-5404

DENISE COTE, District Judge:

This case is part of a consolidated multi-district
litigation ("MDL") relating to the contamination of groundwater
caused by releases of gasoline containing methyl tertiary butyl
ether ("MTBE").  In this action, the Commonwealth of
Pennsylvania ("Commonwealth") alleges that the defendants, which
include dozens of gasoline manufacturers and suppliers, are
liable for actual or threatened MTBE contamination in
Pennsylvania's drinking water.  This Opinion addresses
defendants Exxon Mobil Corporation and ExxonMobil Oil
Corporation's (collectively, "ExxonMobil") February 25, 2025
motion for summary judgment as to all claims for relief brought
against them with respect to 52 focus sites.[1]  ExxonMobil argues
that a 2012 settlement agreement bars the Commonwealth from
seeking damages or an injunction due to contamination at any of
the 52 sites.  For the following reasons, the motion is denied.

---

[1] Initially, this motion was joined by defendants Exxon Company,
USA, ExxonMobil Refining & Supply Company, and Mobil Oil
Corporation, but all claims against those defendants were
dismissed with consent of the parties by a Stipulation and Order
of April 3, 2025.

## Background

The following facts are taken from the documents submitted in connection with this motion.  They are undisputed or taken in the light most favorable to the plaintiff.

A.   The USTIF and STF

Pennsylvania's Underground Storage Tank and Spill Prevention Act ("Tank Act") created a regulatory scheme for protecting the Commonwealth's natural resources and public health by addressing releases of contaminants from storage tanks.  35 Pa. Stat. § 6021.102.  Among other relevant provisions, the Tank Act establishes an Underground Storage Tank Indemnification Fund ("USTIF").  Id. § 6021.704.  The USTIF is a "special fund in the State Treasury" used for "making payments to owners, operators and certified tank installers of underground storage tanks who incur liability for taking corrective action or for bodily injury or property damage caused by a sudden or nonsudden release from underground storage tanks."[2]  Id. § 6021.704(a)(1).  "Corrective action" means containing, assessing, investigating, removing, or "[t]aking measures to prevent, mitigate, abate or remedy releases" and

---

[2] The Tank Act and its regulations include restrictions on the size of payments to owners, operators, installers, including that they do not exceed the "actual costs of corrective action" or certain dollar amounts.  Id. § 6021.704(b), (b.1); see also 25 Pa. Code § 977.33.

3

violations of the Tank Act.[3] Id. § 6021.103. The USTIF is funded by fees paid by underground storage tank owners, operators, and installers, along with fines and investment income.[4] Id. §§ 6021.704(a)(1); 6021.705(d). Effectively, the USTIF is a mandatory insurance program for the costs of addressing releases from underground storage tanks.

The Tank Act also provides for another fund, the Storage Tank Fund ("STF"). Id. § 6021.702(a). Money in the STF is used to pay for the Commonwealth's storage tank programs, which are operated by the Department of Environmental Protection ("DEP"). Id.; see, e.g. id. § 6021.710 ("Underground Storage Tank Environmental Cleanup Program"); § 6021.711 ("Underground Storage Tank Pollution Prevention Program"). The STF is funded by "fees, fines, judgments, bond forfeitures, interest and

---

[3] The Department of Environmental Protection has the authority to order tank owners, operators, and others to take corrective action, id. § 6021.107(g), and it does so pursuant to a process set forth in DEP regulations. See id. § 6021.501(a)(5); 25 Pa. Code §§ 245.301-245.314. Those regulations include a presumption that a tank owner or operator is strictly liable for "damage, contamination or pollution within 2,500 feet" of the site of a tank system containing the substance that caused the contamination. 25 Pa. Code. § 245.303(c).

[4] The USTIF has never received appropriations from the Commonwealth's General Fund. The parties do not set forth a clear definition of the General Fund, but the Commonwealth's 30(b)(6) witness described it as the receptacle of the Commonwealth's "general revenues," which are in turn appropriated by the Pennsylvania legislature.

recovered costs collected" by the DEP, supplemented by other sources such as state and federal appropriations. Id. § 6021.702(a), (b). One source of the STF's funds is the USTIF, whose funds may be used, within limits set by the statute, to support the Tank Act's storage tank programs as long as doing so does not "impede" the USTIF's ability to pay claims. Id. §§ 6021.710(b), 6021.711(b). The DEP may also request that the USTIF reimburse it annually, up to $7 million, for "costs relating to investigating, determining responsibility, overseeing remediation and third party response and closing out cases of spills and leaks related to storage tanks," along with other related investigatory and enforcement costs. Id. § 6021.713(a). The STF has not received funds from the Commonwealth's General Fund, but it has received funding from the federal government, among other sources.

B.    2012 Agreement

During the 1990s and 2000s, ExxonMobil submitted claims to the USTIF for reimbursement. Those claims were approved and paid. The Commonwealth later came to believe that ExxonMobil had improperly received payments from the USTIF for costs that had also been covered by private insurance. On May 4, 2012, the Commonwealth and ExxonMobil entered into a settlement agreement ("Settlement Agreement"). Under the Settlement Agreement's

5

terms, ExxonMobil paid the Commonwealth $8,500,000.  In

exchange, the Settlement Agreement provided:

> the Commonwealth shall and does forever <u>release</u> and
> discharge and covenants not to sue ExxonMobil [and
> affiliates] <u>from</u> and concerning any and all <u>past,</u>
> <u>present, and future liability</u>, rights, claims . . . or
> controversies of every kind and description, whether
> known or unknown, and regardless of the legal theory,
> <u>related to or in any manner arising out of</u>
> <u>applications or claims for reimbursement filed with</u>
> <u>the Commonwealth</u>; <u>payments made from the USTIF as a</u>
> <u>result of those applications or claims</u>; any claim by
> the Commonwealth that ExxonMobil received or was
> eligible to receive payments or other recovery from
> any other source including insurance coverage . . .
> for the cost of environmental remediation of any
> property located within the Commonwealth of
> Pennsylvania for which ExxonMobil filed or files an
> application for reimbursement; and any claims for
> "indirect claims" and payments from the USTIF to third
> parties or subsequent owners of any Exxon, Mobil or
> ExxonMobil sites.

(emphasis added).  The Settlement Agreement specified that the

subsequent discovery of additional facts would not alter its

terms, and that it was to be construed in accordance with

Pennsylvania law.  It also stated that it did not "release

ExxonMobil from any current or future obligation on the part of

ExxonMobil to take any corrective actions to address leaking

underground storage tanks at any ExxonMobil facility."

    C.   MTBE and This Lawsuit

    MTBE was blended into gasoline from the 1980s to 2000s, at

least in part to increase gas's octane, which is meant to reduce

tailpipe emissions of carbon monoxide.  Gasoline containing MBTE

was widely distributed in Pennsylvania for use in motor
vehicles.  MTBE can and did enter the environment through
spills, leaks, and other releases of gasoline from various
storage and delivery systems, such as underground storage tanks
at gas stations.  Compared to other ingredients of gasoline,
MTBE does not easily adhere to soil particles and is highly
soluble in water.  Once in water, MTBE dissolves easily and
moves through the ground quickly.  As a result, it penetrates
deeply into underground aquifers; this contamination can spread
underground over great distances.  Once contamination occurs,
MTBE is difficult to remove and can make drinking water unfit
for consumption, due to its foul taste and odor and potential
adverse health effects.

     The Commonwealth initiated this case in Pennsylvania state
court on June 19, 2014.  It was removed to the United States
District Court for the Eastern District of Pennsylvania on July
17.  On July 30, the United States Judicial Panel on
Multidistrict Litigation ("Panel") transferred the case to this
District for pretrial proceedings pursuant to 28 U.S.C. § 1407.
On November 6, 2015, the Commonwealth filed its SAC.  The
Commonwealth's remaining claim against ExxonMobil is for
negligence.

Discovery began in April 2016.  Consistent with the conduct of other MTBE cases consolidated in this district, 75 focus sites were identified to be the subject of trial in the first phase of this litigation.  Of those 75 sites, 52 were the subject of a claim to the USTIF ("USTIF Sites").  Fact and expert discovery was completed in late 2022.

D.   The May 2024 Opinion

On November 2, 2020, defendants filed four motions for partial summary judgment.  In one of those motions, ExxonMobil argued that the Settlement Agreement barred the Commonwealth's claims for monetary damages as to ExxonMobil.  In an Opinion of May 6, 2024, the Honorable Vernon Broderick granted in part ExxonMobil's motion.  In re MTBE Prods. Liab. Litig., 14cv6228, 2024 WL 1994205, at *3 (S.D.N.Y. May 6, 2024) ("May 2024 Opinion").  As the May 2024 Opinion explained, the Settlement Agreement released ExxonMobil from any liability related to past or future claims for reimbursement filed with the Commonwealth and to any payments made by USTIF resulting from those claims. Id. at *5.  As a result, that release barred the Commonwealth's statutory "subrogation claims" against ExxonMobil, through which the Commonwealth sought to recover costs of corrective actions

paid by USTIF to either ExxonMobil or to others.[5]  Id. at *5.
Judge Broderick clarified, however, that he did not find the
Settlement Agreement to bar all of the Commonwealth's claims
against ExxonMobil for monetary damages, as it did not
necessarily cover costs of the Commonwealth that were not
related to the USTIF.  Id. at *6.

E.    Subsequent Proceedings

On February 25, 2025, ExxonMobil moved for summary judgment
on all remaining claims against it as to the USTIF Sites.  Three
other motions for partial summary judgment were filed on the
same day -- two by defendants and one by the Commonwealth.  On
February 26, the Panel reassigned the MDL to this Court.  An
Order of March 6 set a briefing schedule for this motion and
other motions for summary judgment.  This motion was fully
briefed on April 11.  One of the other motions for partial
summary judgment filed on February 25, in which defendants
sought summary judgment on the plaintiff's strict liability
claims, was granted in an Opinion of April 22.  In re MTBE
Prods. Liab. Litig., No. 14cv6228 (S.D.N.Y. Apr. 22, 2025), ECF
No. 1063.

---

[5] Pennsylvania's Administrative Code provides that after making a
payment to address a covered release, the USTIF is subrogated to
a tank owner or operator's right to recover the costs of
remediation.  25 Pa. Code § 977.40.

## Discussion

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted). "The court's role with respect to such a motion is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).

ExxonMobil has moved for partial summary judgment on the basis that the Settlement Agreement released the Commonwealth's claims for recovery in this case as to the 52 USTIF Sites. The Commonwealth has represented to ExxonMobil that it will seek to recover DEP oversight costs, loss-of-use damages,[6] and

---

[6] Loss of use refers to the diminution in value of the waters of the Commonwealth.

10

restoration costs,[7] as well as to obtain an injunction to abate and mitigate MTBE contamination.  Because the defendant has not shown that the Settlement Agreement necessarily released those claims, its motion is denied.

In Pennsylvania, settlement agreements are construed according to the law of contract interpretation.  G.S. v. Rose Tree Media Sch. Dist., 914 F.3d 206, 209 (3d Cir. 2018).  "[T]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties."  Id. (citation omitted).  "In cases of a written contract, the intent of the parties is the writing itself."  Id. (citation omitted).

The parties' briefing separately addresses the Commonwealth's claims for DEP's oversight costs and its claims for loss-of-use and restoration costs and an injunction.  Accordingly, those two sets of claims are addressed in turn below.

I.    DEP Oversight Costs

ExxonMobil argues that because DEP oversight costs are funded by the USTIF (through the STF), the Settlement Agreement's release of liability for "payments made from the USTIF" covers the DEP oversight costs as well.  The plaintiff

---

[7] Restoration refers to the cost of restoring groundwater to the condition it was in prior to MTBE contamination.

responds that DEP's oversight costs, which are paid from the STF, are distinct from USTIF payments referenced by the Settlement Agreement's release.  The plaintiff is correct.

The Settlement Agreement's release includes no language that brings the Commonwealth's claim for the costs of DEP oversight within its ambit.  It covers payments "made from the USTIF as a result of those applications or claims" for "reimbursement filed with the Commonwealth."  This language does not extend to damages sustained by the STF simply because the STF is funded in part by the USTIF.  Even if DEP oversight costs were paid directly and entirely by the USTIF, the Settlement Agreement refers specifically to USTIF payments made "as a result of those applications or claims" for reimbursement.  The USTIF payments that indirectly fund DEP's oversight costs do not result from applications or claims made for reimbursement.  For this reason, they are easily distinguishable from the statutory subrogation claims addressed by the May 2024 Opinion, which arose directly from the USTIF's payment of claims.  See 2024 WL 1994205, at *6; id. at *8 ("[O]nce the fund reimburses applicants for remediation costs, it steps into their shoes and inherits their legal rights to seek recovery of remediation costs from others." (citation omitted)).

12

In arguing otherwise, ExxonMobil first emphasizes the breadth of the release, including that it applied to claims "regardless of the legal theory" and that its "length and complexity . . . alone" reflects its far reach.  But the release is not unlimited -- indeed, some of that lengthy language restricts rather than expands its scope -- and the defendant's argument fails to explain why the Commonwealth's remaining claims for relief fit within it.  ExxonMobil correctly notes that, as explained in May 2024 Opinion, the release does not only cover liability related to payments from the USTIF to claimants.  But ExxonMobil does not explain, as it must to succeed, how DEP oversight costs in general are "payments made from the USTIF as a result of those applications or claims." That the release covers claims in certain categories "regardless of the legal theory" does not mean those certain categories are limitless.

ExxonMobil also notes the large amounts of money that were transferred from the USTIF to the STF for payment of DEP's oversight and administrative costs.  See 35 Pa. Stat. § 6021.713(a).  But the suggestion that this fact means that any claim for DEP oversight costs is "related to" payments made by USTIF as a result of applications for reimbursement stretches that phrase past its breaking point.  "Related to" is

13

undoubtedly broad, but it still requires a meaningful resemblance or connection.  See Shyam Ventures, LLC v. Zoning Hearing Bd. of Castle Shannon, 313 A.3d 314, 330 (Pa. Commw. Ct. 2024).  ExxonMobil would have the Settlement Agreement's release construed as covering claims "related to" contamination at a site for which there was a claim for reimbursement.  That interpretation is not supported by the release's language, which refers only to liability related to applications for reimbursement or payments made from the USTIF as a result of those applications.

ExxonMobil's brief raises a related but distinct argument that the Commonwealth's claims as to the USTIF Sites fail because, the USTIF having paid for the DEP's oversight costs, the Commonwealth itself has not suffered any injury by expending them.  This argument gets no further.  For one, ExxonMobil provides no compelling reason to think that the USTIF is not part of the Commonwealth.[8]  And the record reflects that the USTIF is not the only source of funding for the STF anyway.  ExxonMobil tries to avoid this problem by pointing to the

_____

[8] ExxonMobil emphasizes that the USTIF is funded by payments from private parties and that its use is restricted to the storage tank programs.  It is unclear why either of those facts means it should be considered as distinct from the government of Pennsylvania.  See May 2024 Opinion, 2024 WL 1994205, at *11 (noting that, under Pennsylvania law, the USTIF is an "agency" of the Commonwealth").

Commonwealth's 30(b)(6) representative's statement that the STF never received money from the Commonwealth's General Fund.  But ExxonMobil cites no authority for the dubious proposition that the Commonwealth can seek to recover funds paid by the General Fund but not those disbursed from some other source.

II.  Loss-of-Use and Restoration Claims

        ExxonMobil makes essentially the same argument with respect to the Commonwealth's claims for loss-of-use costs and restoration costs, and for an injunction to abate or mitigate MTBE contamination at the USTIF Sites.  It argues that because under Pennsylvania law the USTIF pays for corrective actions to prevent and mitigate releases, and the Commonwealth's claims are for corrective actions, those claims are covered by the Settlement Agreement's release.  This argument fails for the same reason that it does with respect to the claim for DEP oversight costs.  As explained above, the release was not unlimited; it covered only, as relevant here, claims "related to . . . payments made from the USTIF as the result of those application or claims" for reimbursement filed with the Commonwealth.

        Specifically with respect to the Commonwealth's claims for restoration costs and an injunction, ExxonMobil also points to the May 2024 Opinion's explanation that "[n]othing in the

15

Settlement Agreement, whether in its Recitals or otherwise, suggests an intention to carve out from the Release future MTBE or other environmental remediation claims."  2024 WL 1994205, at *4.  But that sentence clarified that the claims released in the Settlement Agreement could include remediation costs -- that costs of that kind were not "carve[d] out" -- not that the release included all remediation costs no matter the circumstances or their relation to USTIF claims.  ExxonMobil reads the May 2024 Decision, like the Settlement Agreement, as extending further than its language goes.

The holding in this Opinion is narrow.  This Opinion construes the Settlement Agreement only.  It should not be read to indicate that the Commonwealth is in fact entitled to recover DEP oversight costs, loss-of-use damages, or restoration costs or to an injunction to mitigate contamination in connection with the 52 USTIF Sites.  Among other things, the parties appear to dispute that the Commonwealth has admissible evidence to permit such recoveries, even if it could establish that the recoveries would not be related to applications for reimbursement from the USTIF.  This Opinion is also not the occasion to resolve the parties' dispute as to whether the costs of restoration to pre-release conditions are distinct from costs of remediation

contemplated by Pennsylvania's regulatory framework for addressing storage tank releases.

## Conclusion

ExxonMobil's February 25, 2025 motion for partial summary judgment as to all claims for the USTIF Sites is denied.

Dated:     New York, New York
           April 24, 2025

                              DENISE COTE
                     United States District Judge