```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
                                        :
IN RE: Methyl Tertiary Butyl Ether      :   Master File No:
("MTBE") Products Liability Litigation  :       1:00-1898
                                        :
This Document Relates To:               :   14cv6228 (DLC)
Commonwealth of Pennsylvania v. Exxon   :
Mobil Corporation, et al., Case No.     :   OPINION AND
1:14-cv-6228                            :      ORDER
                                        :
                                        :
----------------------------------------X
```

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
James A. Donahue, III
Neil F. Mara
Pennsylvania Office of the Attorney General
14th Fl. Strawberry Square
Harrisburg, PA 17120

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger & Montague, PC
1818 Market St Suite 3600
Philadelphia, PA 19103

Stewart L. Cohen
Robert L. Pratter
Michael Coren
Eric S. Pasternack
Cohen, Placitella & Roth
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Michael Axline
Tracey L. O'Reilly
Molly McGinley Han
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

For defendants Exxon Mobil Corp., et al., and on behalf of defendants:
James A. Pardo
Lisa A. Gerson
Krista A. Reed
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-5404

DENISE COTE, District Judge:

This case is part of a consolidated multi-district litigation ("MDL") relating to the contamination of groundwater caused by releases of gasoline containing methyl tertiary butyl ether ("MTBE"). In this action, the Commonwealth of Pennsylvania ("Commonwealth") alleges that the defendants, which include dozens of gasoline manufacturers, distributors, and sellers, are liable for actual or threatened MTBE contamination in Pennsylvania's drinking water. This Opinion addresses the plaintiff's February 25, 2025 motion for partial summary judgment on affirmative defenses. For the following reasons, the motion is granted.

## Background

The following facts are taken from the documents submitted in connection with this motion. They are taken in the light most favorable to the defendants, as the non-moving parties, unless otherwise noted.

A. MTBE

MTBE was blended into gasoline from the 1980s to 2000s, at least in part to increase gasoline's octane level, which is meant to reduce tailpipe emissions of carbon monoxide. Gasoline containing MBTE was widely distributed in Pennsylvania for use in motor vehicles. MTBE can and did enter the environment through spills, leaks, and other releases of gasoline from various storage and delivery systems, such as underground storage tanks at gas stations. Compared to at least some other ingredients of gasoline, MTBE does not easily adhere to soil particles and is highly soluble in water. Once in water, MTBE dissolves easily and moves through the ground quickly. As a result, it penetrates deeply into underground aquifers; this contamination can spread underground over great distances. Once contamination occurs, MTBE is difficult to remove and can make drinking water unfit for consumption, due to its foul taste and odor and potential adverse health effects.

B. The Commonwealth's Knowledge of and Response to MTBE Contamination

Agencies of the Commonwealth knew about and analyzed the possible impacts of releases from underground storage tanks as early as the mid-1980s. And in 1985, the predecessor to the current Pennsylvania Department of Environmental Protection

("DEP") identified MTBE contamination in groundwater at a gas station.  In the late 1980s and early 1990s, the Commonwealth received literature from other states and the federal government about characteristics of MTBE that could affect the potability of water containing it and issues relating to addressing MTBE contamination.  Since 1996, Pennsylvania has required testing for MTBE at gasoline release sites, and it adopted a statewide health standard for the concentration of MTBE in groundwater in 1997.

    Between 1998 and 2007, lawmakers in the Pennsylvania General Assembly introduced but did not enact several bills that would have banned the sale or distribution of gasoline containing MTBE.  2004 testimony from DEP's Secretary mentioned that, at the time, 17 other states had banned MTBE, and that Pennsylvania doing so would "remove the risk of MTBE contamination from spills and leaking underground storage tanks and piping."  In 2000, the DEP drafted an "MTBE Action Plan," which proposed improvements to the programs for cleaning up gasoline releases.  DEP did not ultimately develop special procedures for cleanup at release sites affected by MTBE contamination as opposed to contamination by other substances.

4

C.   The Tank Act and Act 2

Pennsylvania enacted the Storage Tank and Spill Prevention Act ("Tank Act") in 1989 to address chemical releases from storage tanks.  35 Pa. Cons. Stat. § 6021.102.  Under that law, the DEP may order "corrective action" to address a release or possible release.  Id. § 6021.1302(a).  "Corrective actions" may include various measures to contain, assess, prevent, mitigate, abate, or remedy releases and their effects on public health and the environment.  Id. § 6021.103.  DEP regulations set forth a "Corrective Action Process" for owners and operators of storage tanks, and other responsible parties, to follow.  25 Pa. Code. § 245.301 - 245.314.  That process includes investigating and reporting suspected releases, taking interim remedial actions, replacing affected water supplies, determining and reporting the need for further remediation, and submitting a "remedial action plan."  Id. § 245.304-311.  Among other steps to investigate the release and its impact, the responsible party uses various techniques to evaluate the "horizontal and vertical extent" of soil and groundwater contamination.  Id. § 245.309(c)(9)-(10).  Also as part of this process, the responsible party selects a remediation standard that will be used as a benchmark for corrective action.  Id. §§ 245.310(a)(26); 245.311(a).  Available standards are found in the Land Recycling and

5

Environmental Remediation Standards Act ("Act 2").  Id. § 245.1; see 35 Pa. Cons. Stat. § 6026.301(a) (listing remediation standards).[1]

Once the DEP reviews and approves the remedial action plan, 25 Pa. Code. § 245.311(c), the responsible party implements it, and, upon completion, submits a remedial action completion report ("RACR") to the DEP.  Id. § 245.312-245.313.  The RACR must demonstrate that the remedial actions have achieved the selected remediation standard.  Id. § 245.313(b).  The DEP then reviews the RACR and approves or disapproves it.  Id. § 245.313(c).  The regulation specifies that DEP's acceptance of a RACR "does not constitute and may not be construed as a release from civil or criminal liability."  Id. § 245.303(f).  At the end of this process, the Commonwealth expects the responsible party to abandon groundwater monitoring wells by filling them with a sealant such as cement or grout.

The DEP sent RACR approval letters for 22 Focus Sites that are the subject of the plaintiff's motion for summary judgment

---

[1] Another provision of Act 2 provides protection from liability under certain Pennsylvania environmental protection laws for those who demonstrate compliance with the remediation standards. 35 Pa. Cons. Stat. § 6026.501(a); see id. § 6026.106 (listing statutes).  For further discussion of Act 2's liability protection regime, see In re: MTBE Prods. Liab. Litig., No. 14cv6228, 2024 WL 1994205, at *13-15 (S.D.N.Y. May 6, 2024) ("May 2024 Opinion").

on the defendants' estoppel defense.  These are sites where the DEP identified one of the defendants as the responsible party.[2]  For each of the 22 Sites, the party responsible for remediation chose a regulatory standard requiring it to eliminate "any substantial present or probable future risk to human health and the environment."  35 Pa. Cons. Stat. § 6026.301(a).

   The 22 RACR letters vary in terms of their precise content and level of detail.  Most of the letters state that, based on the information in the RACR for the relevant site, the relevant remediation standard has been met.  Some say that "liability protection under Act 2 is provided."  Some letters refer to "post remedial care obligations to meet and/or attain" the Act 2 standard.  Other letters note that the DEP "will not require any further characterization, remediation or monitoring of the groundwater at this time."  Some of the letters disclaim any release of liability for "future problems which may arise as a result of conditions at the site," and some note that they do not waive the Commonwealth's right "to take enforcement action under applicable law for the conditions discussed in this

---

[2] As described below, the first phase of this litigation concerns 75 Focus Sites.  RACR approval letters were also sent with respect to five other Focus Sites, but they are not at issue in this motion because the Commonwealth is not seeking future damages for these Sites.

7

letter." Several stated that groundwater monitoring wells at the site should be "properly" abandoned or decommissioned "in a manner consistent with" DEP guidance, and instructed the recipient to submit well abandonment forms so that DEP could close its files for the site.[3] Two of the letters say that DEP "does not certify or assure this site as being clean nor does it waive liability under existing law." The letters do not say -- at least not in any explicit terms -- that their recipients will never have to undertake or pay for any remedial work at the site. Nor do they say that their recipients are shielded from all liability with respect to further costs of addressing releases at the sites.

   D.   This Lawsuit

The Commonwealth initiated this case in Pennsylvania state court on June 19, 2014. It was removed to the United States District Court for the Eastern District of Pennsylvania on July 17. On July 30, the United States Judicial Panel on Multidistrict Litigation ("Panel") transferred the case to this

---

[3] One DEP manual explains that "Unsealed or improperly sealed wells may threaten public health and safety, and the quality of the groundwater resources. Therefore, the proper abandonment (decommissioning) of a well is a critical final step in its service life." One RACR letter mentioning well abandonment also stated that "Any remaining wells shall be maintained."

8

District for pretrial proceedings pursuant to 28 U.S.C. § 1407. On November 6, 2015, the Commonwealth filed its SAC.

Discovery began in April 2016. Consistent with the conduct of other MTBE cases consolidated in this district, 75 Focus Sites were identified to be the subject of trial in the first phase of this litigation. Fact and expert discovery with respect to the 75 Focus Sites was completed in late 2022.

On February 25, 2025, the Commonwealth moved for summary judgment on the defendants' affirmative defenses of estoppel, waiver, assumption of risk, comparative negligence, and unclean hands. The motion pertained to 70 Focus Sites, that is, the 71 Focus Sites remaining in this phase of the litigation, except for the Site that was owned by the Commonwealth, which is Focus Site 42. In their opposing brief, the defendants declined to oppose summary judgment for the plaintiff on their waiver, comparative negligence, and unclean hands defenses as to those 70 Focus Sites. The estoppel and assumption of risk defenses remain.

## Discussion

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the

9

outcome of the suit under the governing law." Choi v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted). "The court's role with respect to such a motion is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).

The plaintiff moves for partial summary judgment on the remaining affirmative defenses -- estoppel and assumption of risk -- with regard to the Focus Sites at issue. The following discussion addresses those defenses in turn.

I. Estoppel

The defendants argue that the Commonwealth is estopped from seeking future costs or injunctive relief as to 22 Sites where the DEP issued letters approving the RACR.[4] The defendants argue

---

[4] The parties' submissions indicate that a few of the sites where the defendants argue estoppel applies were not subject to the defendants' motion for partial summary judgment on the Commonwealth's claims for future investigative costs. An April 30 Opinion granted the defendants' motion. In re: MTBE Prods. Liab. Litig., No. 14cv6228, 2025 WL 1270541 (S.D.N.Y. Apr. 30, 2025).

10

that, DEP having caused the defendants to close and cap monitoring wells, the Commonwealth is estopped from requiring the defendants to reinstall wells or remediation equipment.

> Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity.

Kreutzer v. Monterey Cnty. Herald Co., 747 A.2d 358, 361 (Pa. 2000) (citation omitted).

> Under Pennsylvania law, equitable estoppel consists of three elements: 1) misleading words, conduct, or silence by the party against whom the estoppel is asserted; 2) unambiguous proof of reasonable reliance upon the misrepresentation by the party asserting estoppel; and 3) the lack of a duty to inquire on the party asserting the estoppel.

Wayne Moving & Storage of N.J., Inc. v. Sch. Dist. of Phila., 625 F.3d 148, 155 (3d Cir. 2010) (citation omitted); see also Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 165 (3d Cir. 2009) ("The essential elements of equitable estoppel are thus inducement and detrimental reliance.").

Pennsylvania courts allow estoppel to be asserted against the government, but only in limited circumstances. Chester Extended Care Ctr. v. Commonwealth, 586 A.2d 379, 382 (Pa. 1991). Courts "require a stronger showing when estoppel is asserted against a governmental entity than when it is asserted

against an individual." HUF Rest., Inc. v. Commonwealth, 315 A.3d 205, 215 (Pa. Commw. Ct. 2024) (citation omitted). Specifically, the party asserting estoppel must show the Commonwealth "(1) intentionally or negligently misrepresented some material fact, (2) [knew] or had reason to know that the other party would rely on that misrepresentation, and (3) induced the other party to act to [their] detriment because of [their] justifiable reliance on the misrepresentation." Id. (citation omitted). Each of these elements must be shown by "clear, precise, and unequivocal evidence." Id. (citation omitted).

The defendants have not made the requisite showing for the Commonwealth to be estopped from bringing claims regarding the 22 Sites. They point to no facts suggesting that the plaintiff intentionally or negligently misrepresented any material fact. The defendants argue that they removed equipment and abandoned groundwater wells in reliance on the Commonwealth's promise that they would not have to redo or continue work at the 22 Sites. They point to the letters approving the RACR reports at those sites, but those letters do not make any such promise. They do not constitute "clear, precise, and unequivocal evidence" that the Commonwealth induced the defendants to act to their detriment. And even if they could be read as implicitly

misleading, there is no evidence that the Commonwealth knew or should have known at the time that the statements in the RACR letters would mislead the defendants.

The defendants submit that they have at least raised an issue of material fact as to what promise the Commonwealth made to them. "[T]o defeat summary judgment, there must be evidence on which the jury could reasonably find for the non-moving party." Saeli v. Chautauqua County, 36 F.4th 445, 456 (2d Cir. 2022) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Here, the there is no basis for a jury to find unequivocal evidence of a promise that the Commonwealth would never bring its claims in this lawsuit.

Essentially, the defendants ask that the RACR approval letters function as future liability protection with respect to the Sites for which they were sent. That result is disclaimed by Pennsylvania law, see 25 Pa. Code § 245.303(f), and a similar argument was previously rejected by this Court. May 2024 Opinion, 2024 WL 1994205, at *13. That decision explained that RACR approval letters do not shield their recipients from all claims of liability for further damages. Id. at *14-15. Yet that is effectively the outcome that the defendants seek through their estoppel defense.

The defendants point out that, this time, they do not argue that Act 2's liability shield protects them directly. But they do argue that the same event that triggers Act 2's liability shield -- demonstration of compliance with the applicable remediation standard, evidenced by the DEP's RACR approval -- also estops the Commonwealth from seeking to hold them liable under law to which Act 2's liability shield does not apply. Thus, the reasoning of the May 2024 Opinion further weighs against construing the RACR approval letters as promises against further liability, much less unequivocal ones.[5]

## II. Assumption of Risk

Next, the plaintiff seeks summary judgment on the defendants' assumption of risk defense. The Commonwealth first argues that assumption of risk is unavailable as a matter of law, and second that, even if it is available, there is no genuine dispute of material fact bearing on that issue.

### A. Assumption of Risk in Negligence Actions

First, the parties dispute whether Pennsylvania law recognizes the defense of assumption of risk in a negligence

---

[5] The parties also dispute whether any promise the Commonwealth made was lawful. That issue does not need to be decided given there is no triable issue as to whether the promise was made in the first place.

14

action. The defendants are correct that, at least in limited circumstances, it does.

The Pennsylvania Supreme Court has considered eliminating the doctrine of assumption of risk but has not clearly done so, at least not entirely. See Reott v. Asia Trend, Inc., 55 A.3d 1088, 1096 (Pa. 2012). To the extent it remains available in negligence actions, however, it does so in a limited form. In Howell v. Clyde, 620 A.2d 1107 (Pa. 1993), a plurality of the Pennsylvania Supreme Court held in a negligence action that the defendant could not be liable for what it termed "self-inflicted injuries." Id. at 1112. "Under this approach the court may determine that no duty exists only if reasonable minds could not disagree that the plaintiff deliberately and with the awareness of specific risks inherent in the activity nonetheless engaged in the activity that produced his injury." Id. at 1113.

The Commonwealth argues that assumption of risk has been abolished entirely, except in circumstances not relevant here such as with respect to claims for strict liability or express assumption of risk. But it cites no decision of a majority of the Pennsylvania Supreme Court that establishes that proposition,[6] and it acknowledges that Pennsylvania's

---

[6] In Reott, a strict liability case, the Supreme Court noted that it had "at times considered abolishment or revision of assumption of risk as an affirmative defense" in non-strict

15

intermediate appellate courts have reached different conclusions about this question. See Thompson v. Ginkel, 95 A.3d 900, 906 (Pa. Super Ct. 2014) (noting in a negligence action that "this Court has continued to apply the assumption of the risk doctrine, albeit while acknowledging that its continuing vitality remains in doubt." (citation omitted)). But see Wallis v. Se. Pa. Transp. Auth., 723 A.2d 267, 270 (Pa. Commw. Ct. 1999).

The Court of Appeals for the Third Circuit has also considered an assumption of risk defense as applied to negligence claims under Pennsylvania law. Harris v. Kellogg Brown & Root Servs., Inc., 724 F.3d 458, 469-70 (3d Cir. 2013) ("This defense bars any recovery if a defendant can show that the injured party knew of the dangerous condition, which was both obvious and avoidable, yet still voluntarily encountered it."); Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 156 (3d Cir. 2001). The Third Circuit has explained that

> in a negligence action, a defendant is relieved of his duty to protect the plaintiff where the plaintiff was aware of the risk and faced it voluntarily. The defendant must show that the nature and extent of the risk were fully appreciated, and the plaintiff voluntarily proceeded to face that risk.

---

liability cases, but it did not say it had done so. 55 A.3d at 1096.

Barnes v. Am. Tobacco Co., 161 F.3d 127, 148 (3d Cir. 1998) (citation omitted).

Faced with a question of state law, it is a federal court's "job to predict how the forum state's highest court would decide the issue." E. Fork Funding LLC v. U.S. Bank, 118 F.4th 488, 496 (2d Cir. 2024) (citation omitted).  Although not strictly binding, intermediate appellate court rulings "are a basis for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. at 497 (citation omitted).  Because there are insufficient grounds to conclude that the Pennsylvania Supreme Court will hold that an assumption of risk defense is completely unavailable -- and because, as explained below, so holding is unnecessary to resolve this motion -- this Opinion does not do so.

    B.   Assumption of Risk Applied Here

The plaintiff next argues that assumption of risk does not apply to its negligence claim even assuming the defendants' factual account of the Commonwealth's knowledge and regulation of MTBE is accurate.  The defendants argue that the Commonwealth assumed the risk of its claimed injury by doing (or not doing) four things: it did not ban MTBE, it did not fully implement an

17

"Action Plan" to address MTBE contamination, it promulgated regulations related to corrective action for releases, and it "had regulatory oversight of the cleanup of specific MTBE release sites."  The plaintiff is correct that none of these facts, even assuming them to be true and viewing them in the light most favorable the defendants, are sufficient to defeat summary judgement.

The defendants cannot succeed at trial with an assumption of risk defense on the bases presented in their brief.  That a government does not expressly prohibit some particular activity does not mean that it assumed the risk of any outcome of that activity.  Creating a process for addressing a societal problem, or failing to do so, does not create a shield from liability relating to that problem.  That a regulation provides a safe harbor under certain laws does not mean it has done so for all others.  See May 2024 Opinion, 2024 WL 1994205, at *14-15.  Contrary results would have extraordinary and unacceptable consequences for the common law and a state's police powers in general.

The defendants' brief does not address their purported grounds for the assumption of risk defense in any detail.  It cites no authority in Pennsylvania law to support the notion that a state's not banning some conduct constitutes assuming the

18

risk of it.[7]  Nor does it cite any precedent for a state's regulatory activity implicitly displacing tort law.  It says only that questions of fact are raised by evidence that "the Commonwealth now seeks to recover for the same risks and associated harms it has been aware of for decades."  It does not say what those questions are.  Nor does it explain how the Commonwealth's awareness of MTBE's risks -- or of its potential for contamination and associated dangers -- means that it "voluntarily proceeded" to face those risks.

## Conclusion

The plaintiff's February 25, 2025 motion for partial summary judgment as to the defendants' affirmative defenses is granted.

Dated:      New York, New York
            May 22, 2025

                                         _____
                                              DENISE COTE
                                         United States District Judge

---

[7] The defendants cite a single case where the district court, applying different law to a different cause of action, allowed an assumption of risk defense to be mounted against the State of New York.  United States v. Hooker Chems. & Plastics Corp., 722 F. Supp. 960, 970-71 (W.D.N.Y. 1989).  The conduct at issue there -- the state's acquisition of a property, via eminent domain, that it later had to clean up -- has little to do with the Commonwealth's conduct that the defendants target with their defense in this case.