```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- X
                                   :
IN RE: Methyl Tertiary Butyl       :    Master File
Ether ("MTBE") Products Liability  :       No:
Litigation                         :     1:00-1898
                                   :
This Document Relates To:          :    14cv6228 (DLC)
Commonwealth of Pennsylvania v.    :
Exxon Mobil Corporation, et al.,   :    OPINION AND
Case No. 1:14-cv-6228              :       ORDER
                                   :
                                   :
---------------------------------- X
```

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
James A. Donahue, III
Neil F. Mara
Pennsylvania Office of Attorney General
14th Fl. Strawberry Square
Harrisburg, PA 17120

Michael Axline
Tracey L. O'Reilly
Molly McGinley Han
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

Stewart L. Cohen
Eric S. Pasternack
Robert L. Pratter
Michael Coren
Cohen, Placitella & Roth
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger & Montague, PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103

For defendants Atlantic Richfield Company, BP Products North
America Inc., BP America, Inc., BP Amoco Chemical Company (n/k/a
INEOS US Chemicals Company), and BP Corporation North America,
Inc.:
Martin L. Roth
Andrew R. Running
Kelli M. Mulder
Elisabeth S. Friedmayer
Victoria A. Rackley
Kirkland & Ellis LLP
333 Wolf Point Plaza
Chicago, IL 60654

DENISE COTE, District Judge:

  This case is part of a consolidated multi-district litigation ("MDL") relating to the contamination of groundwater caused by releases of gasoline containing methyl tertiary butyl ether ("MTBE").  In this action, the Commonwealth of Pennsylvania ("Commonwealth") alleges that the defendants, which include dozens of gasoline manufacturers, distributors, and sellers, are liable for actual or threatened MTBE contamination in Pennsylvania's drinking water.  Several defendants in this case -- Atlantic Richfield Company ("Atlantic Richfield"), BP Products North America Inc. ("BP Products"), BP America, Inc., BP Amoco Chemical Company (n/k/a INEOS US Chemicals Company) ("BPACC"), and BP Corporation North America, Inc. (collectively, "BP Defendants") -- have moved for summary judgment or partial summary judgment as to certain claims or parts of claims against them.  For the following reasons, the motion is granted.

**Background**

The following facts are taken from the documents submitted in connection with this motion.  They are taken in the light most favorable to the plaintiff, as the non-moving party, unless otherwise noted.

MTBE was blended into gasoline from the 1980s to 2000s, at least in part to increase the octane level of gasoline, which is meant to reduce tailpipe emissions of carbon monoxide.  Gasoline containing MBTE was widely distributed in Pennsylvania for use in motor vehicles.  MTBE can and did enter the environment through spills, leaks, and other releases of gasoline from various storage and delivery systems, such as underground storage tanks at gasoline stations.  Compared to other ingredients of gasoline, MTBE does not easily adhere to soil particles and is highly soluble in water.  Once in water, MTBE dissolves easily and moves through the ground quickly.  As a result, it penetrates deeply into underground aquifers; this contamination can spread underground over great distances.  Once contamination occurs, MTBE is difficult to remove and can make drinking water unfit for consumption, due to its foul taste and odor and potential adverse health effects.

Two sets of facts regarding MTBE contamination in Pennsylvania are implicated by the disputed issues in the

present motion: (A) the distribution of gasoline containing MTBE that was manufactured by BPACC and (B) the timing of gasoline releases at two particular Focus Sites[1] that were once supplied with gasoline by Atlantic Richfield.

    A.    BPACC's Production of MTBE and Its Distribution

Between 1985 and 2001, an oil refinery in Whiting, Indiana owned by BP Products ("Whiting Refinery") occasionally blended MTBE in gasoline. From 1985 to 1992, and briefly during 1996, that MTBE was manufactured by a chemical plant that was owned by BPACC and also located in Whiting, Indiana. Gasoline from the Whiting Refinery was transported through pipelines to terminals in Ohio.

The parties dispute whether gasoline from the Whiting Refinery ever made it into Pennsylvania. The Commonwealth points to a December 31, 2015 interrogatory response from BP Products and Atlantic Richfield. That response stated in relevant part:

> Gasoline from the Whiting Refinery was transported by pipeline into terminals in Ohio, from which gasoline, on rare occasions, <u>may have been transported into Pennsylvania by truck</u> at various times during the relevant period. While the BP Defendants continue to investigate, it appears that during the years 1985 to 2001, the Whiting Refinery sporadically blended MTBE into some gasoline. Thus, <u>it [is] possible</u> that some gasoline containing MTBE from the Whiting Refinery on

---

[1] The term Focus Sites is explained below.

4

>rare occasions could have been sold in Pennsylvania during the relevant period.

(emphasis supplied) (citation omitted). Similarly, in a September 15, 2015 interrogatory response, the BP Defendants listed the Whiting Refinery among facilities that "<u>may have manufactured</u> gasoline (with or without MTBE) that <u>might have been</u> eventually sold or <u>distributed within the State of Pennsylvania</u> during the relevant period." (Emphasis supplied.) A December 22, 2015 declaration of James Simnick, then a Senior Technical Advisor at BP America Inc., included substantially the same assertions about the Whiting Refinery having possibly been a source of gasoline distributed in Pennsylvania. In an attachment to his declaration, Simnick listed three terminals owned by BP Defendants and located in Ohio that "serve or may have served Pennsylvania," although the exhibit noted that the information was "preliminary and is subject to revision as investigation continues."

Other evidence indicates that gasoline from terminals in Ohio has sometimes been transported into Pennsylvania. One of the BP Defendants' interrogatory responses indicates that BP Defendants owned a fleet of tanker trucks based in Canton and Niles, Ohio "that would have transported gasoline product from terminals to service stations in Western Pennsylvania for

5

various times during the 1990s until the early/mid-2000s."[2] Three bills of lading from March 2000 and January 2006 reflect shipments by truck from Ohio terminals owned by BP Defendants to gasoline stations in Pennsylvania.[3]

The report of one of the plaintiff's experts, Scott Carr, explains that at least one oil pipeline runs from East Sparta, Ohio to Midland, Pennsylvania. That pipeline is connected to refineries in Ohio and Kentucky owned by Marathon Petroleum Company. Citgo Petroleum Corporation has also indicated that it owned a terminal in Tallmadge, Ohio from which gasoline was delivered to Pennsylvania beginning in 1997. A terminal in Toledo, Ohio affiliated with Sunoco Oil Company occasionally supplied oil to Western Pennsylvania. Shell Oil Company owned a terminal in Cleveland, Ohio that supplied gasoline to Pennsylvania via tanker trucks. The plaintiff has not pointed to evidence that these supply lines included gasoline from the Whiting Refinery or gasoline of any origin containing MTBE.

---

[2] An excerpt of an internal spreadsheet produced by the BP Defendants appears to show shipments between Ohio and Pennsylvania, but it does not indicate the date or contents of those shipments.

[3] Those documents state that the shipments were of gasoline that did "not meet the requirements for reformulated gasoline (RFG), and may not be used in any RFG covered area."

B.  Releases at Sites Formerly Supplied by Atlantic Richfield

Pursuant to a protocol overseen by the MDL Court, the parties in this case have identified 75 Focus Sites for discovery and the first trial in the litigation out of over 5,000 contaminated sites in Pennsylvania. Seventy-one Focus Sites remain at issue. The remaining disputes raised by this motion concern the timing of releases from underground storage systems at Focus Sites 35 and 44.

1. Focus Site 35

Focus Site 35 is located at Crossroads #45, 1901 State Street, New Castle, Pennsylvania. Multiple gasoline tanks were installed there. Before 1986, Atlantic Richfield supplied gasoline to this site. MTBE was detected at this site in 1996, when underground storage tank systems were removed and new tanks were installed. In 1996, the then-owner of the site, Guttman Oil Company, submitted a reimbursement claim to Pennsylvania's Underground Storage Tank Indemnification Fund ("USTIF"), which is a program that provides insurance against chemical releases for underground storage tank owners, operators, and installers. When USTIF investigated the release, it did not determine when releases at Focus Site 35 first occurred. The Commonwealth's 30(b)(6) witness testified that it did not know whether the tanks at Focus Site 35 had any releases prior to 1996.

7

One of the plaintiff's experts, hydrologist Marcel Moreau, concluded based on his analysis of MTBE leaks discovered in 1996 that they had resulted from "intermittent" releases of gasoline prior to that date, for example, from delivery spills and overfills. In a table listing his conclusions regarding characteristics of releases at the Focus Sites ("Summary Table"), including the three MTBE releases detected at Focus Site 35 in 1996, Moreau listed the "Duration" of those releases as "1980 to 1996" or "Indefinite to 1996."[4] The Summary Table does not say when those intermittent pre-1996 releases occurred.

Moreau's site-specific report also notes, without explanation, that in January 1980 "There was a release from an underground line."[5] It is not clear from either his site-specific report or the Summary Table of his analyses how he reached the conclusion that a release happened in 1980. There is also no indication that MTBE was released in 1980.

---

[4] The table identified three locations at which MTBE was located in 1996: the north wall of the tank, beneath a piping elbow, and beneath dispensers.

[5] There appears to be only one other mention of the pre-1986 release in the report, which later states "There was a piping leak at an unspecified location in 1980." The report then goes on to list and discuss releases that took place in 1996.

2. Focus Site 44

Focus Site 44 is at Hillers Rainbow Market, 1220 Broad Street, Montoursville, PA. Five gasoline tanks were installed there in 1980. Like Focus Site 35, gasoline was supplied to this site by Atlantic Richfield before 1986. A release was first reported at this site in February 2004.[6] During four days in August of 2005, over 200 gallons of gasoline were released. Moreau's Summary Table indicates that he determined that there had been "continuous" or "intermittent" releases whose duration was "indefinite to" February 2004 and August 2005.[7] It does not describe what facts or methods he used to reach those conclusions. And his site-specific report for Focus Site 44 does not describe any releases or groundwater contamination as having taken place before 2004 at all.

A. This Lawsuit

The Commonwealth initiated this case in Pennsylvania state court on June 19, 2014. It was removed to the United States District Court for the Eastern District of Pennsylvania on July 17. On July 30, the United States Judicial Panel on

---

[6] According to Moreau's Summary Table, he did not determine whether this release involved MTBE.

[7] The "Notes" column of the Summary Table states that "Leakage likely began prior to" August 2005.

Multidistrict Litigation ("Panel") transferred the case to this District for pretrial proceedings pursuant to 28 U.S.C. § 1407. On November 6, 2015, the Commonwealth filed its second amended complaint ("SAC").

Fact and expert discovery with respect to the 75 Focus Sites was completed in late 2022. On February 26, 2025, the Panel reassigned the MDL to this Court. An Order of March 6 set a briefing schedule for this motion and other motions for summary judgment. On March 21, 2025, the BP Defendants filed this motion for summary judgment or partial summary judgment as to certain Focus Sites.[8] The motion was fully briefed on April 25.

## Discussion

BPACC moves for summary judgment on all claims against it on the basis that there is no evidence any product it manufactured caused the plaintiff's injury. Atlantic Richfield moves for partial summary judgment as to Focus Sites 35 and 44 based on a lack of evidence that it supplied gasoline to those

---

[8] On April 11, along with its opposition to the March 21 motion, the Commonwealth filed a motion to strike a March 19, 2025 declaration by James Simnick that the BP Defendants filed in conjunction with their motion. That motion is addressed in the Discussion below.

Sites involved with releases.[9]  BP Products also moved for partial summary judgment as to Department of Environmental Protection ("DEP") oversight costs at five Focus Sites based on a prior agreement with the Commonwealth, but the Commonwealth responded that it does not seek those costs.  For the following reasons, the BP Defendants' motion as to the issues remaining in dispute is granted.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  Choi v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Indemn. Ins. Co. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted).  "The court's role with respect to such a motion is not to resolve disputed questions of fact but solely to determine whether, as to any

---

[9] Atlantic Richfield initially moved for summary judgment as to Focus Sites 7 and 38 as well, but the Commonwealth has clarified it is not seeking damages from Atlantic Richfield in connection with those Focus Sites.  Atlantic Richfield also sought summary judgment on the Commonwealth's claims for restoration costs and future damages at Focus Site 27, but the Commonwealth concedes it is not seeking those damages at Focus Site 27.

material fact, there is a genuine issue to be tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted). "In determining whether genuine issues of fact exist, . . . the court must review the record taken as a whole," drawing "all reasonable inferences in favor of the nonmoving party." Id. at 227 (emphasis omitted) (citation omitted). Once the movant has pointed to an absence of evidence on an essential element of the plaintiff's case, "the nonmovant must set forth specific facts showing that there is a genuine issue for trial." Bustamante v. KIND, LLC, 100 F.4th 419, 432 (2d Cir. 2024) (citation omitted). "Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." Id. (citation omitted). Similarly, expert "opinions that are without factual basis and are based on speculation or conjecture" and "conclusory opinions" cannot be considered on a motion for summary judgment. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).

"The elements of negligence under Pennsylvania law are: (1) a legally recognized duty or obligation of the defendant, (2) the breach thereof, and (3) a causal connection between the breach and the plaintiffs' damages." Shuker v. Smith & Nephew, PLC, 885 F.3d 760, 776 (3d Cir. 2018) (citation omitted). The

12

plaintiff has the burden to prove these elements by a preponderance of the evidence.  Walters v. UPMC Presbyterian Shadyside, 187 A.3d 214, 221 (Pa. 2018).

According to the Second Restatement of Torts, "[i]n order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm."  Restatement (Second) of Torts § 430 (Am. L. Inst. 1965).  The defendant's conduct is a legal cause of harm if it "is a substantial factor in bringing about the harm."  Id. § 431(a); see Green v. Pa. Hosp., 123 A.3d 310, 316 (Pa. 2015) (citation omitted).  Accordingly, in a products liability case, the "plaintiff must establish that the injuries sustained were caused by the product of a particular manufacturer or supplier."  Stephens v. Paris Cleaners, Inc., 885 A.2d 59, 63 (Pa. 2005) (citation omitted).

I.   BPACC's Motion

BPACC argues that the plaintiff has not raised a genuine factual dispute as to whether MTBE manufactured by BPACC contaminated the groundwater in Pennsylvania, because there is no evidence it even entered Pennsylvania.  The defendant is correct.

To succeed on its claim of negligence, the plaintiff has the burden to prove that the defendant's actions caused its injury.  The parties appear to agree that BPACC cannot be held liable for groundwater contamination in Pennsylvania if there is insufficient proof that the MTBE it manufactured ever entered Pennsylvania.  In response to BPACC's motion, the Commonwealth points to evidence that, during the relevant time period, (a) BPACC manufactured at least some amount of MTBE that was blended into gasoline at the Whiting Refinery, (b) gasoline from the Whiting Refinery was sent to terminals in Ohio, and (c) gasoline of some kind was regularly transported from terminals in Ohio into Pennsylvania for retail sale at gasoline stations.  But Pennsylvania has no evidence that gasoline that was transported to service stations in Pennsylvania was the same gasoline into which BPACC-made MTBE was blended at the Whiting Refinery.  It apparently expects a jury to infer that if gasoline from the Whiting Refinery went to Ohio, and gasoline of some origin was transported from Ohio to Pennsylvania, then gasoline from the Whiting Refinery made it to Pennsylvania.  That inference, without more, would amount to the sort of conjecture that is insufficient to defeat a motion for summary judgment.

In opposing this motion, the plaintiff relies primarily on 2015 disclosures from the BP Defendants stating that, pending

14

further investigation, it is "possible" that MTBE gasoline from the Whiting Refinery "on rare occasions, may have been transported into Pennsylvania." This disclosure near the beginning of discovery was a starting point for the parties' discovery of evidence of the sources of MTBE. It appears that in the years that followed the Commonwealth found no evidence linking BPACC's MTBE to Pennsylvania. But even taking this statement out of context, its literal terms do not fill the evidentiary gap. Where the plaintiff bears the burden of proof, "may have" is not enough.

Otherwise, the Commonwealth points to bits and pieces of evidence that gasoline in general was transported from terminals in Ohio to gasoline stations in Pennsylvania. It identifies no evidence that gasoline from the Whiting Refinery made it to Pennsylvania, much less that gasoline blended with BPACC-manufactured MTBE did. It is true, as the plaintiff argues, that causation can be proven with circumstantial evidence. See Stephens, 885 A.2d at 63. But that circumstantial evidence must actually imply that the defendant's conduct caused the harm -- here, that BPACC manufactured MTBE that contaminated Pennsylvania's groundwater. Accordingly, a reasonable jury could not find without speculation that the Commonwealth has met its burden.

The parties also dispute whether a new declaration from Simnick, stating that MTBE from BPACC's plant never reached Pennsylvania, can be considered in conjunction with the defendants' motion. Among other objections, the plaintiff contends that it is untimely and speculative. But because this motion can be resolved in favor of BPACC without consideration of the Simnick declaration, it is not necessary to evaluate its admissibility or the timeliness of its submission.

In a footnote, the Commonwealth appears to argue that any ruling on this motion should not apply to the sites that were not selected as Focus Sites. The legal principles applied here, however, will not change. If the Commonwealth has evidence to support a claim that a defendant's product caused contamination, it may proceed. If it does not, then the claim will fail. The BP Defendants' 2015 disclosures, to the extent they are described herein, will not be sufficient to support a claim.

II. Atlantic Richfield's Motion Regarding Focus Sites 35 and 44

Atlantic Richfield argues that the Commonwealth cannot meet its burden to prove causation as to Focus Sites 35 and 44, because it has no evidence that the MTBE releases at those Sites contained gasoline supplied by Atlantic Richfield. The defendant is correct.

The parties agree that Atlantic Richfield did not supply the sites after 1985 and that MTBE releases were detected at the Sites, at the earliest, in 1996 and 2004, respectively.  They also appear to agree that, to prove causation, the plaintiff must show that the releases occurred while Atlantic Richfield was supplying the Sites.  But the plaintiff presents no evidence that would allow it to carry that burden.

The Commonwealth notes that releases occur before they are discovered.  That observation carries little weight given the lengthy gap in years: 11 and 19 years.

The plaintiff next argues that its expert Moreau concluded that the releases happened before 1986.  Moreau's site-specific reports and Summary Table do not support that conclusion.  His description of the MTBE releases at Focus Site 35 indicates at best that the MTBE discovered in 1996, when the new gasoline tanks were installed, was due to "intermittent" leaks before 1996, perhaps dating as far back as 1980.  In each case the volume or rate of the releases was unknown.  Nothing in the reports or Summary Table, which is the only evidence to which the plaintiff points, suggests that Moreau's conclusion about the duration of the "intermittent" releases as extending more than ten years before their discovery in 1996 would be anything

17

other than a statement that it was possible. This is insufficient to support a finding of liability.

The plaintiff's evidence regarding Focus Site 44 is even thinner. The Focus Site 44 report includes no mention of a pre-1986 release at all. While it mentions a major release in 2005 and problems in 2002 and 2004, there is nothing to suggest releases before 1986. Even if it is assumed that the expert's reports and Summary Table are properly supported with admissible evidence, the defendant's motion must be granted.

Even if Moreau had set forth clear conclusions that releases at these Sites occurred before 1986, they would be just that -- conclusions. Nothing in the documentation of his work submitted in opposition to this motion, or in the Commonwealth's brief, explains what methodology he used, what facts he gathered, or how he deduced that these releases took place over a decade before they were discovered. "An expert's conclusory opinions" are "inappropriate material for consideration on a motion for summary judgment." Salvino, Inc., 542 F.3d at 311. Because the Commonwealth has submitted nothing more than that, it has not raised a genuine issue of material fact bearing on Atlantic Richfield's liability for MTBE contamination at Focus Sites 35 and 44.

Case 1:00-cv-01898-DLC-VF   Document 4836   Filed 06/05/25   Page 19 of 19

## Conclusion

The BP Defendants' March 21, 2025 motion for partial summary judgment is granted.

Dated:   New York, New York
         June 4, 2025

                                                DENISE COTE
                                United States District Judge

19