UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
                                       :
IN RE: Methyl Tertiary Butyl Ether     :     Master File No:
("MTBE") Products Liability Litigation :        1:00-1898
                                       :
This Document Relates To:              :     14cv6228 (DLC)
Commonwealth of Pennsylvania v. Exxon  :
Mobil Corporation, et al., Case No.    :     OPINION AND
1:14-cv-6228                           :        ORDER
                                       :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
James A. Donahue, III
Neil F. Mara
Pennsylvania Office of the Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Michael Axline
Tracey L. O'Reilly
Molly McGinley Han
Miller & Axline, P.C.
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

Eric S. Pasternack
Stewart L. Cohen
Robert L. Pratter
Michael Coren
Cohen, Placitella & Roth, P.C.
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger Montague PC
1818 Market St Suite 3600
Philadelphia, PA 19103

For defendants Exxon Mobil Corp., et al., and on behalf of
moving defendants:
James A. Pardo
Lisa A. Gerson
Krista A. Reed
McDermott Will & Emery LLP
One Vanderbilt Avenue
New York, NY 10017-5404

DENISE COTE, District Judge:

This case is part of a consolidated multi-district
litigation ("MDL") relating to the contamination of groundwater
caused by releases of gasoline containing methyl tertiary butyl
ether ("MTBE").  In this action, the Commonwealth of
Pennsylvania ("Commonwealth") alleges that the defendants, which
include dozens of gasoline manufacturers, distributors, and
sellers, are liable for actual or threatened MTBE contamination
in Pennsylvania's drinking water.  Certain of the defendants in
this MDL have moved for partial summary judgment regarding the
Commonwealth's request for four categories of past costs.[1]  For
the following reasons, the motion is granted in part.

## Background

The following facts are taken from the documents submitted
in connection with this motion.  They are taken in the light

---

[1] A list of moving defendants can be found in Attachment A to the
defendants' notice of this motion, docketed at ECF No. 1003,
Case No. 1:14-cv-6228.

most favorable to the plaintiff, as the non-moving party, unless otherwise noted.

A.   MTBE

MTBE was blended into gasoline from the 1980s to 2000s, at least in part to increase the octane level of gasoline, which is meant to reduce tailpipe emissions of carbon monoxide.  Gasoline containing MBTE was widely distributed in Pennsylvania for use in motor vehicles.  MTBE can and did enter the environment through spills, leaks, and other releases of gasoline from various storage and delivery systems, such as underground storage tanks at gas stations.  Compared to other ingredients of gasoline, MTBE does not easily adhere to soil particles and is highly soluble in water.  Once in water, MTBE dissolves easily and moves through the ground quickly.  As a result, it penetrates deeply into underground aquifers; this contamination can spread underground over great distances.  Once contamination occurs, MTBE is difficult to remove and can make drinking water unfit for consumption, due to its foul taste and odor and potential adverse health effects.

B.   DEP Oversight Costs

Pennsylvania enacted the Storage Tank and Spill Prevention Act ("Tank Act") in 1989 to address chemical releases from storage tanks.  35 Pa. Cons. Stat. § 6021.102.  Under that law,

the Pennsylvania Department of Environmental Protection ("DEP")
may order "corrective action" to address a release or possible
release.  Id. § 6021.1302(a).  "Corrective actions" may include
various measures to contain, assess, prevent, mitigate, abate,
or remedy releases and their effects on public health and the
environment.  Id. § 6021.103.  DEP regulations set forth a
"Corrective Action Process" for owners and operators of storage
tanks, and other responsible parties, to follow.[2]  25 Pa. Code. §
245.301 - 245.314.  That process includes investigating and
reporting suspected releases, taking interim remedial actions,
replacing affected water supplies, and determining and reporting
the need for further remediation.  Id. § 245.304-311.  Various
stages of this process involve oversight by DEP, including the
review of site characterization reports and remedial action
plans, which must be submitted after reporting a release.  Id. §
245.310, 311.  DEP can approve or disapprove these submissions,
and it can order the responsible party to perform additional
tasks.  Id.  Once the DEP reviews and approves the remedial
action plan, id. § 245.311(c), the responsible party implements
it, and, upon completion, submits a remedial action completion

---

[2] The regulations include a presumption that a tank owner or
operator is strictly liable for "damage, contamination or
pollution within 2,500 feet" of a tank containing the substance
that caused the contamination.  25 Pa. Code. § 245.303(c).

4

report ("RACR") to the DEP.  Id. § 245.312-245.313.  The RACR must demonstrate that the remedial actions have achieved the selected remediation standard.  Id. § 245.313(b).  The DEP then reviews the RACR and approves or disapproves it.  Id. § 245.313(c).

The plaintiff seeks to recover $1,275,062.25, which it contends represents the compensation of DEP employees who conducted oversight work, which was part of their normal job responsibilities, at 71 Focus Sites.[3]  The Commonwealth does not have employee time records for each Focus Site.  Consequently, to reach this estimate, the plaintiff first identified the DEP employees who oversaw work at each Focus Site.  DEP also reviewed each Focus Site's file to estimate the total number of oversight hours worked at that Site.  The Commonwealth then gathered the bi-weekly salary information for the relevant DEP employees as they were paid in 2005, 2010, and 2021.  Using the highest of those rates -- usually from 2021[4] -- the plaintiff calculated an adjusted hourly rate by adding 70.7% to account

---

[3] As described below, this phase of the litigation addresses the plaintiff's claims for relief in connection with certain Focus Sites.  Those Sites are intended to be a representative sample of the contaminated sites in the Commonwealth.

[4] This rate was used regardless of when the work on a particular Site was performed.

for benefits and other payroll costs.[5]  Next, the adjusted hourly

rates were averaged across all employees at a given Focus Site,

such that each Focus Site was assigned one average hourly rate.[6]

Finally, the average rate for each Site was multiplied by the

number of hours of oversight work that DEP had estimated for

that Site.  The resulting figures for all Sites added together

is the amount that the Commonwealth seeks to recover in DEP

oversight labor costs.[7]

   During discovery, the defendants asked the Commonwealth to

identify the costs it sought to recover for oversight,

administration, and labor at the Focus Sites.  The Commonwealth

objected to the interrogatory "because it calls for expert

opinion."  The Commonwealth objected to a request for admission

regarding the same topic on the same ground.  Nevertheless, the

Commonwealth never proffered expert testimony on this issue.

---

[5] The proportion of 70.7% was calculated based on the Fiscal Year
2020 payroll, but it was applied to the hourly rate regardless
of when the employee was actually paid the rate or when the
relevant oversight work was undertaken.  The actual value of
benefit and other payroll costs over the relevant period ranged
from 29% to 70% of salary.

[6] This average weighed all employees equally, regardless of how
much time each employee actually worked on the Site.

[7] This methodology was described via written responses and
deposition testimony by one of the plaintiff's 30(b)(6)
representatives, Director of DEP's Bureau of Fiscal Management
Tina Sutton.

In response to March 2022 interrogatories, the Commonwealth
explained that the Site-by-Site time estimates were "calculated
by DEP program staff familiar with each Focus Site based on
review of the Site Files, personal experience, and other
reasonably available information and records."[8]  It attached a
list "identifying for each Focus Site the DEP employee that
primarily calculated the Estimated Aggregate DEP Personnel
Oversight Activity Time Spent (in hours) at each Focus Site."
That list included one person's name for each Focus Site.  The
list did not specify the title of the listed person or represent
that the person was involved with or otherwise had firsthand
knowledge of the oversight work done at the corresponding Site.
Another list submitted with the same discovery response included
the names of DEP personnel who worked on each Site, as well as
each of their estimated "hourly value."  The hourly value refers
to the rate of compensation the Commonwealth used in the above-
described calculation.

C.    The USTIF and Its Administrative Costs

Separately, the Tank Act establishes an Underground Storage
Tank Indemnification Fund ("USTIF").  35 Pa. Cons. Stat. §

---

[8] An earlier interrogatory response explains that the Site files
"chronicle the events and tasks that occurred in DEP's oversight
as well as identifies the DEP personnel who were involved in the
oversight."

6021.704.  The USTIF is a "special fund in the State Treasury"
used for "making payments to owners, operators and certified
tank installers of underground storage tanks who incur liability
for taking corrective action or for bodily injury or property
damage caused by a sudden or nonsudden release from underground
storage tanks."  Id. § 6021.704(a)(1).  The USTIF is funded by
fees paid by underground storage tank owners, operators, and
installers, along with fines and investment income.  Id. §§
6021.704(a)(1); 6021.705(d).  Effectively, the USTIF is a
mandatory insurance program for the costs of addressing releases
from underground storage tanks.[9]

USTIF uses a private company, ICF International, Inc.
("ICF"), to administer claims submitted to the fund, including
by investigating the eligibility of claimants and processing
payments.  ICF's contract with the Commonwealth provides that it
is paid a flat fee for each year that each claim is open.  That
fee is fixed and does not change based on the amount of work
that ICF does with respect to a particular claim (except to the
extent that the amount of work is reflected by the number of
years the claim is open).  Relatedly, ICF does not treat a

---

[9] Some USTIF funds also go to another fund, the Storage Tank Fund
("STF").  35 Pa. Stat. § 6021.702(a).  Money in the STF is used
to pay for DEP's storage tank programs, including the oversight
costs described above.

claim -- or charge the USTIF for its processing -- differently
due to the presence of MTBE or some other particular
contaminant.  In other words, the only characteristic of a claim
that affects the amount of its processing fee is the amount of
time it takes to close.  The annual per-claim fee has risen over
time, ranging from around $750 per year in the 1990s to $1,420
per year since 2015.

     D.   Costs for Focus Site Remediation

The USTIF has paid the costs of remediation for releases at
42 Focus Sites, each of which included gasoline containing MTBE.
For those Sites, the plaintiff seeks to recover all funds
expended by the USTIF for remediation.  Those costs total around
$20 million.

One of the Commonwealth's experts, hydrologist Anthony
Brown, opined that while the presence of MTBE was not the sole
cause of contamination at the Focus Sites, it generally
increases the difficulty, cost, and time needed to address a
release of gasoline.  In his expert report, Brown opined that
"[b]ecause MBTE and TBA migrate more quickly, further, and
deeper in groundwater, it is more expensive to investigate fuel
oxygenate plumes.  That is, more monitoring wells and deeper

monitoring wells are required."[10]  He explained that because of
its chemical properties and tendency to penetrate deeper and
farther underground than other constituents of gasoline, as well
its tendency to degrade more slowly, cleanup costs for releases
involving MTBE are much higher.[11]  Brown's report noted several
studies and surveys that estimated the extent to which the
presence of MTBE increases remediation costs.  These estimates
ranged from 20% to 665%.  Brown did not conduct, with respect to
any individual Site, an analysis of remediation costs
attributable to MTBE as opposed to other chemicals in gasoline.

Brown identified 22 Sites where MTBE was detected at higher
concentration than those of other constituents of gasoline, such
that "MTBE was the primary contaminant of concern (COC) that
drove assessment and remediation efforts and costs."[12]  This
determination was based on the highest concentration of MTBE

---

[10] TBA, or tertiary butyl alcohol, is a byproduct of MTBE's
degradation.

[11] Another of the plaintiff's expert, Graham Fogg, offered
similar views on the properties of MTBE.  In addition, the
plaintiff submitted studies produced by some of the defendants
in early 1990s predicting that the costs of remediating releases
of gasoline containing MTBE would be much higher than the costs
of cleaning up gasoline otherwise.  One study, for example,
estimated that MTBE would increase the costs of groundwater
treatment by five to six times.

[12] The USTIF paid for the costs of remediation at 17 of those 22
Sites.

detected anywhere around the Focus Site, compared to the highest concentration detected of other chemicals.  He testified that this measurement was just one factor that could inform the extent to which MTBE drove remediation costs, and his opinion was generally that MTBE increased the cost of remediation of all releases that included it.  Accordingly, the plaintiff seeks costs at all 42 Sites where USTIF reimbursed the costs of remediation.

Brown also testified that MTBE's effect on the cost of remediation varied from Site to Site.  Brown has acknowledged that site-specific factors other than the presence of MTBE, such as the size of the release and its geologic context, also affect the time and expense that remediation takes.  And in his report, he explained that while some estimates put the increased costs to address MTBE contamination at 1.5 to 2 times higher than the costs of remediation without MTBE, those estimates are not consistently accurate because of the variation in site-specific conditions.  "Depending on site conditions," he wrote, "the difference in costs can range from as little as 1.5 times for smaller release sites to more than ten times for larger release sites."

E.   This Lawsuit

The Commonwealth initiated this case in Pennsylvania state court on June 19, 2014.  It was removed to the United States District Court for the Eastern District of Pennsylvania on July 17.  On July 30, the United States Judicial Panel on Multidistrict Litigation ("Panel") transferred the case to this District for pretrial proceedings pursuant to 28 U.S.C. § 1407. On November 6, 2015, the Commonwealth filed its second amended complaint ("SAC").  The plaintiff's remaining claim is for negligence.  Relevant to this motion, the Commonwealth seeks DEP oversight labor costs, the USTIF's claim administration costs, the costs of the USTIF's reimbursements for corrective actions, and damages that reflect the lost value and benefits of Pennsylvania's water resources contaminated by MTBE.

Discovery began in April 2016.  Consistent with the conduct of other MTBE cases consolidated in this district, 75 Focus Sites were initially identified to be the subject of trial in the first phase of this litigation.  71 Focus Sites remain at issue.  Each was the site of a release where MTBE was detected. Fact and expert discovery with respect to the Focus Sites was completed in late 2022.  On February 26, the Panel reassigned the MDL to this Court.  An Order of March 6 set a briefing

schedule for this motion and other motions for summary judgment. This motion was fully briefed on May 5.

## Discussion

The defendants move for partial summary judgment as to DEP oversight costs, USTIF's administrative costs, the costs that USTIF reimbursed to pay for corrective actions, and loss-of-use costs. The defendants argue primarily that the Commonwealth has failed to offer evidence that would allow a jury to find that it is owed these categories of damages. For the reasons explained below, the motion is granted with regard to the DEP oversight costs and loss-of-use costs, but not the USTIF administrative costs or corrective action reimbursement costs.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted). "The court's role with respect to such a motion is not to resolve

13

disputed questions of fact but solely to determine whether, as
to any material fact, there is a genuine issue to be
tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227
(2d Cir. 2024) (citation omitted). "In determining whether
genuine issues of fact exist, . . . the court must review the
record taken as a whole," drawing "all reasonable inferences in
favor of the nonmoving party." Id. at 227 (emphasis omitted)
(citation omitted). "[A]t summary judgment, where [the
defendant] has pointed to a lack of evidence on an essential
element of plaintiffs' claims, it is plaintiffs' burden to
present admissible evidence" that the element is satisfied.
Bustamante v. KIND, LLC, 100 F.4th 419, 434 (2d Cir. 2024).
"Conclusory allegations, conjecture, and speculation are
insufficient to create a genuine issue of fact." Id. at 432
(citation omitted).

     "The elements of negligence under Pennsylvania law are: (1)
a legally recognized duty or obligation of the defendant, (2)
the breach thereof, and (3) a causal connection between the
breach and the plaintiffs' damages." Shuker v. Smith & Nephew,
PLC, 885 F.3d 760, 776 (3d Cir. 2018) (citation omitted). Under
Pennsylvania law, "the burden of providing damages is on the
plaintiff, and the amount and items of pecuniary damage cannot
be presumed but must be proven by facts, and, where possible,

with certainty." <u>McMichael v. McMichael</u>, 241 A.3d 582, 588 (Pa. 2020). "[D]amages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." <u>Bailets v. Pa. Turnpike Comm'n</u>, 181 A.3d 324, 336 (Pa. 2018). "The law simply requires the claim be supported by a reasonable basis for the calculation." <u>James Corp. v. N. Allegheny Sch. Dist.</u>, 938 A.2d 474, 494 (Pa. Commw. Ct. 2007).

The defendants move for summary judgment as to four different categories of costs. The following discussion addresses each in turn.

I.    DEP Oversight Costs

The defendants argue both that the free public services doctrine bars the Commonwealth's claim for oversight costs as a matter of law, and that the Commonwealth has not shown that it can present admissible evidence at trial to support its claim for those costs. The first argument fails, but the second succeeds.

A.    Free Public Service Doctrine

The defendants argue that the plaintiff's claim for DEP oversight costs fails as a matter of law under the free public services doctrine, also known as the municipal cost recovery rule. Because the Pennsylvania Supreme Court is not likely to

15

recognize the doctrine's applicability in these circumstances,
it does not bar the Commonwealth's claim.

When considering a question of state law, it is a federal
court's "job to predict how the forum state's highest court
would decide the issues before" it.  E. Fork Funding LLC v. U.S.
Bank, 118 F.4th 488, 496 (2d Cir. 2024) (citation omitted).
"Although [federal courts] are not strictly bound by state
intermediate appellate courts, rulings from such courts are a
basis for ascertaining state law which is not to be disregarded
by a federal court unless it is convinced by other persuasive
data that the highest court of the state would decide
otherwise."  Id. at 497 (citation omitted).

The Pennsylvania Supreme Court has not addressed the
municipal cost recovery rule, but the Commonwealth Court of
Pennsylvania has.

> A municipal corporation may not recover as damages the
> costs of services the provision of which was an
> important reason for its creation and maintenance by
> the people.  The cost of public services for
> protection from a safety hazard is to be borne by the
> public as a whole, not assessed against a tortfeasor
> whose negligence creates the need for the service.

Commonwealth v. Monsanto Co., 269 A.3d 623, 674 (Pa. Commw. Ct.
2021) (citation omitted).  In Monsanto, the court denied a
motion to dismiss based on the doctrine where the Commonwealth
sought to recover, among other damages, its costs of spending

"significant time and money to assess, investigate, and monitor PCB contamination of its natural resources." Id. at 673 (citation omitted). The court noted that the doctrine "has been applied in Pennsylvania in only a few instances," and that, "[i]mportantly, those cases were primarily limited to municipal rather than state government costs, [and] did not specifically address environmental damage." Id. at 674-75 (emphasis in original). The one other Pennsylvania case to mention this doctrine, cited by either party, states in no uncertain terms that it applies to a "municipal corporation." City of Pittsburgh v. Equitable Gas Co., 512 A.2d 83, 84 (Pa. Commw. C. 1986); see also City of Philadelphia v. Beretta U.S.A., Corp., 126 F. Supp. 2d. 882, 895 (E.D. Pa. 2000) (explaining that the doctrine bars certain suits by cities seeking to recover policing and healthcare costs).

Given the Commonwealth Court's strong indication that the municipal cost recovery rule would not apply in this case, which is brought by a state and where costs of rectifying environmental damage are at issue, this Court finds that the Pennsylvania Supreme Court would be unlikely to apply it here. The defendants provide no compelling evidence indicating otherwise. They cite two out-of-state decisions from the last 75 years applying the doctrine against a sovereign. These

17

citations are not enough to overcome a Pennsylvania appellate court's recent indication that the rule does not apply here.

The defendants' attempts to distinguish <u>Monsanto</u> fall short.  The damages at issue in that case, where the Commonwealth sought to recover "costs incurred in the performance of . . . governmental functions," are analogous to those at issue here.  <u>Monsanto</u>, 269 A.3d at 674.  In arguing otherwise, the defendants point to that decision's procedural posture, as early in the case and before discovery, and the court's corresponding emphasis on the low bar that the plaintiff's claims needed to clear to avoid dismissal.  But they do not explain why the answer to a purely legal question would be different here, or, in other words, how discovery materials would show that the doctrine applies to the Commonwealth's claims despite the law set forth in that decision.[13]  Having no

---

[13] The defendants also suggest that <u>Monsanto</u> is distinguishable because it did not apply to the salaries of government employees doing their everyday jobs.  First, that characterization is not clear from the <u>Monsanto</u> opinion, which acknowledged the plaintiff was seeking "costs incurred in the performance of . . . governmental functions."  The court quoted the plaintiff's request for all past and future costs "to investigate, assess, analyze, monitor, remediate, restore, and/or replace natural resources."  <u>Monsanto</u>, 269 A.3d at 674.  It would be surprising if those costs did not include government employees doing their everyday jobs.  Second, the defendants seek to apply the doctrine beyond employee compensation in this very motion, which argues it also bars the USTIF administrative costs.

basis to disregard the Commonwealth Court's opinion indicating that the doctrine does not apply in cases like this one brought by the Commonwealth, the defendants' argument that it bars the Commonwealth's claims is rejected.[14]

B.    Evidence of Oversight Costs

The defendants also argue that the Commonwealth does not have admissible evidence to support its request for DEP's oversight costs.  Because the plaintiff has not provided admissible evidence that it could use at trial to establish those damages, the defendants' motion is granted as to these costs.

A lay "witness may testify to a matter only if evidence is introduced to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  In briefing a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  Accordingly, "to overcome summary judgment, [the nonmovant] must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial."  McKinney v. City

---

[14] For the same reasons, the plaintiff's March 21, 2025 motion to strike the defendants' affirmative defense based on the free public service doctrine is granted.

of Middletown, 49 F.4th 730, 745 (2d Cir. 2022) (citation omitted).

The amount of oversight costs that the Commonwealth seeks to recover hinges on, among other factors, the estimate of how much work was done at each Site by DEP employees. The plaintiff represented during the discovery period that its calculation would be presented through an expert but has not produced an expert report. Instead, the Commonwealth points to a collection of materials and a flawed calculation, arguing that they constitute admissible evidence sufficient to support a claim for the requested damages. They do not.

Without an expert, the Commonwealth would have to elicit the relevant facts from a witness with personal knowledge of the work at each Site. The Commonwealth acknowledges that its 30(b)(6) witness who explained the plaintiff's process for calculating its total costs did not have personal knowledge of the oversight work. While it provided the defendants with a list of the DEP employees who worked on each Site, it is the Commonwealth's burden to support its claim for damages and it has not provided affidavits from the employees describing the tasks they performed and the time they spent performing those tasks. There is no suggestion that that information could be gleaned from DEP records. While the files for a Site may

provide evidence of the tasks performed at the Site, it is
undisputed that DEP's records do not record the time spent on
tasks, much less the time spent by a particular employee on a
task.

In lieu of admissible evidence, the Commonwealth notes that
it provided defendants with a list of "DEP personnel who have
personal knowledge of the calculation of past oversight cost
estimated for each focus site." (Emphasis supplied.) It does
not represent, however, that those listed individuals could
provide competent testimony regarding the time it took to
perform the work done at the Sites, as opposed to the process
the individual used to make the calculation. The plaintiff's
discovery responses suggest that those individuals reviewed
documents from the Sites and developed an estimate based on
those documents. If properly supported by sound methodology,
expertise, and admissible records, those calculations may have
been admissible as expert testimony, but again, no expert
reports have been produced, nor has the Commonwealth submitted
the relevant documents in opposition to this motion.

The defendants argue as well that the assumptions on which
the Commonwealth relies in building its damages calculation are
also deeply flawed. The plaintiff argues that the quality of
its methodology is for the factfinder to assess. At the

21

extremes, however, a methodology may be too flawed to be submitted to a jury. This is one such case. But regardless of methodology, the Commonwealth must marshal admissible evidence of a key input to its calculation -- the amount of work on which its cost estimate rests -- which it has not done. Thus, the Commonwealth has not presented admissible evidence to support its claim for DEP oversight costs, and summary judgment is granted for the defendants on this claim of damages.

II. USTIF Administrative Costs

Next, the defendants argue that the plaintiff cannot prove at trial that USTIF's administrative costs, paid to ICF, were attributable to their alleged negligence.[15] The plaintiff argues that the presence of MTBE in the releases caused the claims to remain open longer -- and thus the claim processing cost to be higher -- than they would have otherwise. Because the plaintiffs have raised a triable issue of fact, the motion is denied as to these damages.

To prove causation, the plaintiff must "demonstrate the causal connection between the breach of a duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm." Green v. Pa. Hosp., 123

---

[15] The defendants also argue that the plaintiff's recovery of these costs is barred by the free public services doctrine, but that argument fails for the reasons discussed above.

A.3d 310, 316 (Pa. 2015) (citation omitted).  The question whether the plaintiff has proven causation by a preponderance of the evidence "is normally a question of fact for the jury," unless "it is clear that reasonable minds could not differ on the issue."  Rost v. Ford Motor Co., 151 A.3d 1032, 1049 (Pa. 2016) (citation omitted).

Here, the Commonwealth has raised a question of fact as to whether MTBE contamination was a "substantial" cause of the USTIF incurring administrative costs at the Focus Sites.  There is no dispute that the amount of administrative costs for each Site depends on the length of time remediation took to be completed.  The Commonwealth has offered expert opinions and other evidence that the presence of MTBE causes remediation to be more difficult and take significantly longer than it would otherwise.  These are facts that the jury can consider to determine whether the defendants' alleged negligence caused the Commonwealth to incur the USTIF administrative costs.

The defendants argue in response that the plaintiff's calculation of administrative costs had nothing to do with the presence or absence of MTBE.[16]  But the plaintiff has presented

---

[16] The defendants also posit in a footnote that they cannot be liable for USTIF costs, because USTIF is funded by an industry that includes the defendants.  This entirely distinct argument is accompanied by no legal authority or reasoning in support of it.

evidence that MTBE caused much of the expense at issue to be incurred, due to its effect on the length of time that claims remained open.  The defendants emphasize that the extent of remediation efforts depends on site-specific factors, and the Commonwealth's expert conducted no site-specific analysis of how much longer the presence of MTBE caused remediation at each Site to last.  These considerations may be appropriate topics for cross-examination of the plaintiff's experts, and the defendants may argue at trial that they undermine the plaintiff's proof of causation and damages.  But construing the evidence in favor of the plaintiff, these considerations do not establish that there is no dispute of material fact about whether the costs are substantially attributable to the defendants' conduct.

III. Past Costs for Corrective Actions

The defendants also move for partial summary judgment on the plaintiff's attempt to recoup the USTIF's reimbursements for the costs of taking corrective action at the 42 Focus Sites where the USTIF paid for remediation.  The Commonwealth argues it is entitled to recover all reimbursed costs of remediation at these Sites.  The defendants argue that they cannot be held liable for all remediation costs because they are attributable to other chemicals in addition to MTBE.  Because this issue

raises disputed questions of fact, the motion is denied as the USTIF reimbursements.

For much the same reasons as discussed in connection with the USTIF administrative costs, the plaintiff has presented evidence from which a jury could find that the defendants' negligence was a substantial factor in causing the Commonwealth to incur cleanup costs at the Focus Sites, all of which were contaminated by gasoline containing MTBE. The plaintiff's experts have opined on the reasons and extent to which MTBE may have accounted for substantial portions of the remediation costs. It will be up to jury to weigh that evidence, consider whether the plaintiff has met its burden as to causation, and, if it has proven negligence by a preponderance of the evidence, assess an appropriate measure of damages to redress the Commonwealth's injury.

The defendants respond primarily by invoking the "crashworthiness doctrine," which in Pennsylvania "most typically arises in the context of motor vehicle accidents" and "is defined as the protection that a motor vehicle affords its passenger against personal injury or death as a result of a motor vehicle accident." Parr v. Ford Motor Co., 109 A.3d 682, 689 (Pa. Super. Ct. 2014) (citation omitted). It requires products liability plaintiffs to identify the injuries they

25

would have received if an alternative, safer design had been used, and to show which injuries were attributable to the defective design, id., which the defendants here argue the Commonwealth cannot do.

This argument falls short for several reasons. First, it does not appear that Pennsylvania courts would apply the doctrine in cases like this one, which among other distinctions does not arise from a motor vehicle accident, or an accident involving a consumer's end use of a product at all. The defendants cite an unreported, pre-Parr strict liability case as its sole example of the application of the doctrine in Pennsylvania outside the context of automobile crashes. There, an injury to the plaintiff's hand was caused by an inaccessible on/off switch when a separately manufactured commercial cheese grater was attached to a motor designed by the defendant. Calloway v. Hobart Corp., No. 92cv1379, 1993 WL 172898, at *2 (E.D. Pa. May 18, 1993). Calloway turned on the foreseeability of the harm from a design defect, id. at *5, and is of little assistance to the defendants. The defendants may dispute whether the claimed costs are largely connected to cleaning up MTBE, but the blame for the size of the release itself is not at issue.

Second, and perhaps more importantly, the plaintiff has
suggested an alternative design -- gasoline without MTBE -- and
it has set forth evidence that, construed in the plaintiff's
favor, could show that addressing the allegedly defective
aspects of MTBE accounted for the lion's share of cleanup costs.
The defendants point out that no plaintiff expert offers a site-
specific quantification of the MTBE-causes costs, but
"mathematical certainty" is not required to prove damages.
Bailets, 181 A.3d at 336.  The plaintiff has set forth enough
evidence to allow a jury to infer damages caused by MTBE
contamination, even if not with "entire accuracy."  Id.
Accordingly, the defendants' motion is denied as to USTIF
reimbursement costs for corrective actions.

IV.  Loss-of-Use Costs

Finally, the defendants move for summary judgment on the
plaintiff's request for damages reflecting the "lost interim
value and benefits of their water resources during all times of
injury caused by MTBE."  The defendants argue that the plaintiff
cannot succeed in recovering these damages because it has no
evidence -- and no expert testimony -- to support them.  The
plaintiff argues that it is up to a jury to determine the value
of these damages.  Because the Commonwealth has provided no
factual basis for a jury to evaluate this issue without

conjecture, the defendants' motion is granted as to loss-of-use costs.

The Federal Rules of Evidence allow expert testimony to assist a jury when it is "based on scientific, technical, or other specialized knowledge."  Fed. R. Evid. 701(c), 702.  A lay witness, who has not met the requirements of Fed. R. Evid. 702, may not offer such testimony.  Pennsylvania law agrees.  See Pa. Dep't of Gen. Servs. v. U.S. Mineral Prods. Co., 898 A.2d 590, 607 & n.21 (Pa. 2000).

The lost value of contaminated groundwater is a subject beyond the experience of lay persons.  Calculating such a figure would clearly require specialized skill and knowledge.  The plaintiff argues that the jury can rely on "common sense, human experience, and its collective judgment" to determine the appropriate value.  But it does not explain how the change in value of some undetermined amount of groundwater due to contamination by a specific chemical dissolved in it could possibly be calculated with "common sense" or common "human experience."  To make this point concrete, the Commonwealth does not point to facts that a lay or expert witness could use to prove loss-of-use damages to any degree of certainty.  It does not, for instance, point to any source of water that would have been used but was not due to MTBE contamination.  The

28

Commonwealth suggests a jury could find a damages amount based on a combination of irrelevant statutory provisions (i.e., the civil penalties DEP may impose against polluters) and costs of remediation and restoration that the Commonwealth is seeking separately, which is both irrelevant to loss-of-use damages and would improperly effect a double recovery.  See United States v. Occidental Chem. Corp., 200 F.3d 143, 149 (3d Cir. 1999).

The Commonwealth's brief also refers to the testimony of DEP personnel who have knowledge about MTBE's effect on groundwater at the Focus Sites.  It has not provided affidavits from such employees in opposition to this motion, and vague proffers are insufficient to defeat summary judgment.  The plaintiff has simply not provided admissible evidence on this issue.  The plaintiff cannot create a material dispute of fact as to loss-of-use damages merely by gesturing to a broad category of testimony that may or may not bear on the type of damages it seeks.

Otherwise, the plaintiff points out that the cases cited by the defendants for the necessity of expert testimony involved issues related to the fact of injury or the existence of causation, but not the extent of damages.  First, it is not at all clear that the Commonwealth has raised a disputed issue of the fact of loss of use.  Even if it had, the requirement that

29

damages be proven with "reasonable certainty" remains.  The
Commonwealth has provided no justification for the dubious
proposition that when the question of injury raises a technical
or scientific question, expert testimony is required, but it is
unnecessary when the extent of damages raises the same kind of
question.  Indeed, requiring expert testimony to support a
demand for damages whose amount depends on a complex scientific
or technical question is entirely consistent with, and in this
case necessitated by, the plaintiff's burden to prove the amount
of damages with a "reasonable basis for the calculation."  James
Corp., 938 A.2d at 494.

### Conclusion

The moving defendants' March 21, 2025 motion for partial
summary judgment as to the Commonwealth's claims for past cost
damages is granted in part.  The motion is granted with respect
to DEP oversight costs and loss-of-use costs.  It is denied with
respect to USTIF administrative costs and the costs of the
USTIF's reimbursement for corrective actions.

Dated:    New York, New York
          June 11, 2025

                                    DENISE COTE
                          United States District Judge