UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------- X
                                  :
IN RE: Methyl Tertiary Butyl      :
Ether ("MTBE") Products Liability :    Master File
Litigation                        :       No:
                                  :    1:00-1898
This Document Relates To:         :
Commonwealth of Pennsylvania v.   :    14cv6228 (DLC)
Exxon Mobil Corporation, et al.,  :
Case No. 1:14-cv-6228             :    OPINION AND
                                  :       ORDER
                                  :
--------------------------------- X

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
James A. Donahue, III
Neil F. Mara
Pennsylvania Office of the Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Michael Axline
Tracey L. O'Reilly
Molly McGinley Han
Miller & Axline, P.C.
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

Stewart L. Cohen
Robert L. Pratter
Michael Coren
Eric S. Pasternack
Cohen, Placitella & Roth, P.C.
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103

For defendants CITGO Petroleum Corp. and CITGO Refining and
Chemicals Co. L.P., and on behalf of moving defendants:
Lisa S. Meyer
Nathan P. Eimer
Susan M. Razzano
Gregory M. Schweizer
Clare Chiodini
Eimer Stahl LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604

DENISE COTE, District Judge:

This case is part of a consolidated multi-district

litigation ("MDL") relating to the contamination of groundwater

caused by releases of gasoline containing methyl tertiary butyl

ether ("MTBE").  In this action, the Commonwealth of

Pennsylvania ("Commonwealth") alleges that the defendants, which

include dozens of gasoline manufacturers, distributors, and

sellers, are liable for actual or threatened MTBE contamination

in Pennsylvania's drinking water.  Certain of the defendants in

this MDL, referred to as refiner defendants and local terminal

defendants, have moved for partial summary judgment based on a

lack of evidence connecting them to certain Focus Sites.[1]  For

the following reasons, the motion is granted in part.

---

[1] The term Focus Sites is explained below.  For a list of the
defendants that are moving with respect to each Site, see
Exhibit 1 to the Reply Declaration of Lisa S. Meyer, docketed at
ECF No. 1118, Case No. 1:14-cv-6228.  The term "moving
defendants" is used in this Opinion's discussion of particular
Focus Sites to refer to those listed in that Exhibit's third
column of the row corresponding to the Focus Site at issue.  A
list of moving defendants, irrespective of Focus Site, can be

## Background

The following facts are taken from the documents submitted in connection with this motion.  They are taken in the light most favorable to the plaintiff, as the non-moving party, unless otherwise noted.

A.   MTBE

MTBE was blended into gasoline at refineries from the 1980s to 2000s, at least in part to increase the octane level of gasoline, which is meant to reduce harm from tailpipe emissions. Gasoline containing MTBE was widely distributed in Pennsylvania for use in motor vehicles.  MTBE can and did enter the environment through spills, leaks, and other releases of gasoline from various storage and delivery systems, such as underground storage tanks ("USTs") at gas stations.  Compared to other ingredients of gasoline, MTBE does not easily adhere to soil particles and is highly soluble in water.  Once in water, MTBE dissolves easily and moves through the ground quickly.  As a result, it penetrates deeply into underground aquifers; this contamination can spread underground over great distances.  Once contamination occurs, MTBE is difficult to remove and can make

_____

found at Exhibit 1 to the Declaration of Lisa S. Meyer, docketed at ECF No. 1078, Case No. 1:14-cv-6228.  An Order of May 23, 2025 granted a request by defendant Getty Properties Corporation to be added to that list.

drinking water unfit for consumption, due to its foul taste and
odor and potential adverse health effects.

B.   Gasoline Distribution in Pennsylvania

Gasoline in Pennsylvania originates both from refineries
within the Commonwealth and from refineries located elsewhere,
especially in the Gulf Coast.  It is transported into the state
via pipelines, tanker trucks, and ships on the Ohio River or
Atlantic Ocean.  Six pipeline systems, all used by defendants in
this case, bring gasoline into Pennsylvania.  Waterborne
gasoline shipments enter through Philadelphia Harbor and the
Port of Pittsburgh.

Once it enters the Commonwealth, gasoline is typically
stored at distribution terminals, which often receive and store
gasoline from multiple sources.  These terminals exist
throughout the Commonwealth but are concentrated near the
population centers of Philadelphia, Pittsburgh, and Harrisburg.
A terminal may receive gasoline from only one pipeline, or it
may receive gasoline from multiple pipeline or waterborne
channels.  Following storage at a large distribution terminal,
gasoline may be transferred to a product terminal, which is a
smaller facility that is close to the retail market.  Before
distribution from a terminal to a gas station, gasoline may be
blended with additives, such as ethanol or other proprietary

4

chemicals that correspond with a particular brand.  Trucks are typically used for distribution to retail stations.  These tanker trucks may travel hundreds of miles when making deliveries of gasoline.

Throughout this supply chain, gasoline that meets certain specifications but that comes from different sources may be mixed, or commingled.  This commingling can happen in a pipeline, in a tanker truck, or in the same tank at a terminal.[2] Gasoline could be commingled multiple times, if, for instance, it is injected into a pipeline with gasoline from another refinery, then stored with yet another batch of gasoline in a tank at a terminal.  Once gasoline is commingled, it is not possible to tell which molecules of the resulting product came from which refinery or supplier, nor can the mixture be separated into its constituent inputs.[3]  While much gasoline is commingled, some companies keep their gasoline segregated in order to differentiate its properties from those of differently

---

[2] In other cases, gasoline may leave a refinery only by truck and thus is not commingled in a pipeline or terminal tank.  One defendant, United Refining Company ("United"), did not send gasoline to third-party terminals at all.

[3] Relatedly, gasoline is considered "fungible" when gasoline from different sources can be commingled without compromising its adherence to standardized specifications that refer to chemical and physical properties.

sourced gasoline.[4]  Practically, this is accomplished by injecting gasoline into pipelines in distinct, segregated batches and by storing it in separate tanks.  Given the complexity of the distribution system, a commingled batch of gasoline may contain product manufactured or supplied by multiple defendants.  Because of some divisions within this distribution system, however, a given batch would not contain gasoline from every defendant.

Federal law required the use of MTBE in gasoline distributed in designated areas in Pennsylvania beginning in November of 1992.  The rest of the Commonwealth used gasoline which may or may not have contained MTBE.

C.    Focus Sites

Pursuant to a protocol overseen by the MDL Court, the parties in this case identified 75 Focus Sites for discovery and the first trial out of more than 5,000 contaminated sites in Pennsylvania.  The moving defendants seek summary judgment based on a lack of evidence.[5]  In most cases, the moving defendants

---

[4] One of the plaintiff's experts opined that most of the gasoline that travels through the east coast of the United States is fungible rather than segregated, although defendants dispute the bases of this opinion.

[5] For most Focus Sites (that is, all but the eighteen listed below), there is a non-moving defendant.  The non-moving defendants have reserved their right to contest liability

6

contend that there is no evidence that they supplied gasoline containing MTBE to sixty-nine Focus Sites.[6]  The Commonwealth does not oppose this motion with regard to forty-one of the sixty-nine Sites.  Its opposition to this motion, therefore, affects only twenty-eight Sites.

For eighteen Sites,[7] the Commonwealth has no evidence linking any defendant to that Site.  Instead, the Commonwealth relies exclusively on evidence that the moving defendant stored or sold gasoline containing MTBE from terminals less than 100 miles away from the Focus Site.  This theory of causation is rejected for reasons discussed below.

For ten Focus Sites,[8] the Commonwealth has submitted evidence that it contends shows a connection between a moving

_____

including on the ground that the Commonwealth cannot establish causation as to the individual defendant.

[6] Seventy Focus Sites remained at issue prior to this motion.  In its submissions related to this motion, the plaintiff additionally concedes that there is no evidence that any defendant was in the chain of distribution to Focus Site 46.

[7] They include Focus Sites 13, 14, 15, 26, 29, 30, 31, 32, 33, 39, 42, 49, 53, 56, 59, 65, 68, and 71.  The parties have disclosed that certain defendants settled claims related to some of these Sites.

[8] The defendants refer to this list as including only eight Sites, but the parties' submissions otherwise address the evidence for eleven Sites.  For reasons explained below, the motion as to one of those eleven Sites, Focus Site 75, is addressed through analysis of the Commingled Product Theory.

defendant and contamination at the Site.  The facts relevant to those Focus Sites are set forth below.  The defendants' motion is granted for nine Sites; it is denied as to Focus Site 69.

      1.  Focus Site 3

Focus Site 3 is a service center at 1901 Edison Street in Glenshaw, Pennsylvania.  One of the plaintiff's experts, hydrologist Marcel Moreau, identified one release or set of releases involving MTBE, which was discovered in August 2010 when gasoline storage systems were removed from the Site. Moreau was not able to determine the timing or volume of the MTBE release itself.

Defendant Guttman Realty Company ("Guttman"), which is not moving with respect to this Site, supplied gasoline to the Site from at least April 1998 through December 2006, which is four years or more before the discovery of the groundwater contamination.  A two-page spreadsheet produced by Guttman appears to show sales of gasoline to this Focus Site from 1998 to 2006.[9]  A column titled "Vendor Name" lists entities including "EXXONMOBIL OIL CORP," "MOTIVA ENTERPRISES," "BP PRODUCTS NORTH

---

Whether there is sufficient evidence as to the remaining ten Sites is discussed in detail below.

[9] Another form submitted by the Commonwealth appears to show two deliveries of gasoline by Guttman in January of 1990 but does not identify a moving defendant in connection with those deliveries.

AMERICA," "GULF OIL LP," "PHILLIPS 66," "CITGO PETROLEUM CORP,"
and "SUNOCO INC."  The spreadsheet does not indicate whether
these sales involved gasoline containing MTBE, and the plaintiff
points to no other evidence to establish this fact.

    2.   Focus Site 11

Focus Site 11 is a terminal at 901 Mountain Home Road in
Sinking Spring, Pennsylvania.  Defendant Petroleum Products
Corporation ("PPC"), which is not moving, owned the Site from
June 1996 through 2006.  As of September 2021, PPC was owned by
moving defendant Gulf Oil Limited Partnership ("GOLP").  There
is no evidence that GOLP assumed any of PPC's liabilities.

    3.   Focus Site 17

Focus Site 17 is a service station at 2226 Bedford Street
in Johnstown, Pennsylvania.  It shut down in 2005 and its USTs
were removed in 2010.  According to Moreau, MTBE releases
occurred "intermittent[ly]" from 1980 to 2005 and contaminated
the soil and groundwater.

Guttman, which is not moving with respect to this Site,
supplied gasoline to it from December 1998 through October 2005.
A seven-page spreadsheet produced by Guttman appears to show
sales of gasoline to this Focus Site from 1998 to 2005.  A
column titled "Vendor Name" lists entities including "PHILLIPS
66," "MOTIVA ENTERPRISES," "GULF OIL LP," "CITGO PETROLEUM

CORP," "EXXONMOBIL OIL CORP," "BP PRODUCTS NORTH AMERICA," and
"SUNOCO INC." As was true for Focus Site 3, the spreadsheet
does not indicate whether these sales involved gasoline
containing MTBE.

    4.   Focus Site 18

Focus Site 18 is at 652 East Lincoln Highway in
Coatesville, Pennsylvania. Storage tanks were installed at this
service station in 1979, and MTBE was discovered in groundwater
beginning in 1997. Two non-moving defendants owned and supplied
the Site.

The plaintiff has provided no evidence linking moving
defendant Chevron/Texaco to this Site. It relies on an undated
spreadsheet produced by Chevron that lists a site located at
Lincoln Highway and Tenth Avenue in Coatesville, Pennsylvania.
A map of this Focus Site attached to Moreau's report, however,
indicates it sits between East Lincoln Highway, Pennsylvania
Avenue, and Pearl Alley. The map does not show any street
nearby named Tenth Avenue.

    5.   Focus Site 23

Focus Site 23 is a service station at 23 East Woodland
Avenue in Springfield, Pennsylvania. It was in operation since
at least 1984. MTBE contamination was detected beginning in

1999.  The defendant owners and operators are not moving defendants.

Between 1999 and 2006, GOLP supplied "Gulf"-branded gasoline to this Site.  Chevron U.S.A. Inc. ("Chevron"), a moving defendant for this Site, owned and licensed the Gulf tradename in Pennsylvania.  The plaintiff has not provided any other evidence to link Chevron to the supply or discharge of MTBE gasoline at Focus Site 23.

> 6.  Focus Site 35

Focus Site 35 is a service station at 1901 West State Street in New Castle, Pennsylvania whose USTs were installed in 1971.  Moreau described contamination in soil and groundwater, which was discovered in 1996 when USTs were removed.  Non-moving defendants include entities that supplied Focus Site 35 beginning in 1979.

Guttman supplied gasoline purchased from other suppliers to this Focus Site from the early 1990s through June 2006. Spreadsheets produced by Guttman appear to show deliveries of gasoline to this Site from some but not all of the moving defendants.  Sales from "GULF OIL LP" took place from April 2001 to November 2006.  Sales from "MOTIVA ENTERPRISES" spanned April 2001 to December 2006.  Sales from "PHILLIPS 66" took place on four occasions, in November 2001, March 2002, April 2002, and

11

June 2003.  Sales from "SUNOCO INC" are dated from April 2001 to
December 2006.  Sales from "CITGO PETROLEUM CORP" are listed
from April 2001 to November 2006.  As was true for the Guttman
documents on which the Commonwealth relies for its claims
relating to Focus Sites 3 and 17, the spreadsheets do not
indicate whether these sales involved gasoline containing MTBE.

    7.   Focus Site 45

Focus Site 45 is a service station at 801 Division Street
in Farrell, Pennsylvania.  Although MTBE was detected at this
Site from 1997 to 2001, Moreau was unable to identify the timing
or magnitude of any specific releases.

Non-moving defendant Guttman owned this Site from December
1974 to July 1991.  A tax document filed by Guttman for January
1990 shows gasoline shipments to this Site from a Coraopolis,
Pennsylvania terminal of "TEXACO/G.O."  Similar documents show
shipments from the same terminal in April 1990, April 1991, and
July 1991.  In addition, an April 13, 1993 Report by the
Pennsylvania Department of Environmental Resources related to a
UST at this Site refers to the Site as "Division Street Texaco."
Similarly, a May 1997 Remedial Action Plan to address releases
at the Site refers to it as "Division Street Texaco."

The moving defendants are Chevron/Texaco and TRMI-H LLC
("TRMI").  The plaintiff has identified no evidence that either

12

entity was connected to the delivery of MTBE gasoline to Focus Site 45. It is undisputed that Texaco's operating assets were sold to TRMI around December 1984. Texaco did not refine or market gasoline in the United States from that point on. TRMI then refined and marketed gasoline until December 1988, when it transferred its assets to Star Enterprise. TRMI did not refine, market, or distribute gasoline in Pennsylvania after December 1988. Thus, the plaintiff has identified no evidence that the Guttman records, which concern shipments beginning in 1990, relate to either Texaco Inc. or TRMI.

       8.   Focus Site 47

Focus Site 47 is at 51 South Juniata Street in Lewistown, Pennsylvania. USTs were initially installed in 1971, and MTBE contamination was discovered in the soil and groundwater from 1999 to 2005. Moreau identified two MTBE releases at this Site that he determined included MTBE, both of which occurred no later than 1999.

It is undisputed that the ConocoPhillips defendants, who are moving with respect to this Site,[10] did not have a direct supply agreement with this Site. An ExxonMobil Oil Corporation

---

[10] Those defendants include ConocoPhillips Company, ConocoPhillips, Phillips 66, Phillips 66 Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Company.

customer spreadsheet for this Site lists "CONOCOPHILLIPS COMPANY" as a "Customer" in a single row, but it is undated and does not describe the product involved. One column (labeled "NAME 2") in the same row includes a date of March 5, 2003. The plaintiff identifies no evidence that the ConocoPhillips defendants had any kind of supply relationship with Focus Stie 47 before 2000.

        9.   Focus Site 57

Focus Site 57 is a service station at 3627 Nazareth Road in Easton, Pennsylvania that began operations in 1980. MTBE contamination was detected in late 1998 through 2000. Motiva, which is not a moving defendant with respect to this Site, contracted to supply it with Texaco-branded[11] and Shell-branded gasoline from December 2000 through September 2006. An invoice dated July 14, 2006 indicates that Pipeline Petroleum Inc. was the owner of the Focus Site at that time.

Four groups of corporate entities have moved for summary judgment in connection with Focus Site 57.[12] The plaintiff has

---

[11] Texaco entities dispute that they supplied MTBE gasoline to Focus Site 57. They do not dispute that it was a Texaco-branded station for a period of time.

[12] This figure does not include those defendants who are moving with respect to this Site but for whom the plaintiff does not purport to have evidence of a connection to the Site.

not identified evidence linking any of them to this Site at the time releases of MTBE occurred.

To show that Chevron/Texaco supplied gasoline, the plaintiff relies on a document detailing a March 31, 1986 test of a tank at "Nazareth and Sales St., Easton, PA" that lists "CHEVRON" as the "SUPPLIER, OWNER OR DEALER."  A map submitted by defendants shows, however, that that intersection is about two miles away from Focus Site 57.[13]  The Commonwealth points to no evidence that Texaco supplied MTBE gasoline to Focus Site 57.

The plaintiff has presented no evidence that moving defendants CITGO Petroleum Corp. and CITGO Refining and Chemicals Company L.P. (collectively, "CITGO") supplied gasoline to Focus Site 57.  Instead, it relies on evidence that CITGO has marketed, distributed, supplied, or sold gasoline in every county in Pennsylvania, and to Pipeline Petroleum Inc. from May 1, 1999 to June 1, 2000.

Moving defendants also include Energy Transfer Partners, L.P., ETP Holdco Corporation, Sun Company, Inc., Sunoco, Inc., Sunoco Partners Marketing & Terminals L.P., and Sunoco, Inc. (R&M) (collectively, "Sunoco Defendants").  While Focus Site 57 became a Sunoco-branded station in July of 2006, the plaintiff

_____

[13] This map is consistent with several maps of the Focus Site submitted with one of the plaintiff's expert reports, which show Focus Site 57 located along Nazareth Road but not Sales Street.

has identified no evidence that the Sunoco Defendants were affiliated with or supplied MTBE gasoline to Focus Site 57 on or before 2000, which was the latest date on which the plaintiff's expert identified a release.  Moreover, it is undisputed that sales of MTBE gasoline in Pennsylvania had ended before 2006.

Finally, Cumberland Farms Inc. and GOLP have moved for summary judgment on the ground that the Commonwealth has no evidence that they supplied Focus Site 57.  The Commonwealth relies on a December 29, 2015 declaration by a representative of GOLP which lists Pipeline Petroleum Inc. among dozens of "Wholesalers or Jobbers" to which it supplied gasoline that may have contained MTBE.  The declaration also listed Easton, where this Focus Site is located, among hundreds of cities in Pennsylvania to which it sold or marketed gasoline.  Neither of these documents is sufficient to show a delivery to Focus Site 57.

      10.  Focus Site 69

Focus Site 69, at 16 Bradley Street in Warren, Pennsylvania, includes a refinery ("Warren Refinery") that was owned and operated from 1979 to 2006 by United.  United is not moving with respect to this Site.  The Sunoco Defendants are moving with respect to this Site but admit there is evidence that Sunoco, Inc. (R&M) stored MTBE at the Warren refinery.

16

D.   This Lawsuit

The Commonwealth initiated this case in Pennsylvania state court on June 19, 2014.  It was removed to the United States District Court for the Eastern District of Pennsylvania on July 17.  On July 30, the United States Judicial Panel on Multidistrict Litigation ("Panel") transferred the case to this District for pretrial proceedings pursuant to 28 U.S.C. § 1407. On November 6, 2015, the Commonwealth filed its second amended complaint ("SAC").  The Commonwealth's remaining claim is for negligence.

Fact and expert discovery with respect to the Focus Sites was completed in late 2022.  On February 26, 2025, the Panel reassigned the MDL to this Court.  An Order of March 6 set a briefing schedule for this motion and other motions for summary judgment.  This motion was filed on May 2 and fully briefed on June 13.

## Discussion

Certain defendants move for summary judgment on the claim that they negligently caused MTBE contamination at certain Focus Sites.  Because the Commonwealth has failed to identify genuine disputes of material fact as to the element of causation in the contexts specified by the defendants' motion, with one exception, the motion is granted in part.

Summary judgment is appropriate when "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). A fact is material if it "might affect the
outcome of the suit under the governing law." Choi v. Tower
Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation
omitted). "[S]ummary judgment must be rejected if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party." Indemn. Ins. Co. of N. Am. v. Unitrans Int'l
Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted). "The
court's role with respect to such a motion is not to resolve
disputed questions of fact but solely to determine whether, as
to any material fact, there is a genuine issue to be
tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227
(2d Cir. 2024) (citation omitted). "In determining whether
genuine issues of fact exist, . . . the court must review the
record taken as a whole," drawing "all reasonable inferences in
favor of the nonmoving party." Id. (emphasis omitted) (citation
omitted). Once the movant has pointed to an absence of evidence
on an essential element of the plaintiff's case, "the nonmovant
must set forth specific facts showing that there is a genuine
issue for trial." Bustamante v. KIND, LLC, 100 F.4th 419, 432
(2d Cir. 2024) (citation omitted). "Conclusory allegations,

18

conjecture, and speculation are insufficient to create a genuine issue of fact." Id. (citation omitted).

"The elements of negligence under Pennsylvania law are: (1) a legally recognized duty or obligation of the defendant, (2) the breach thereof, and (3) a causal connection between the breach and the plaintiffs' damages." Shuker v. Smith & Nephew, PLC, 885 F.3d 760, 776 (3d Cir. 2018) (citation omitted). The plaintiff has the burden to prove these elements by a preponderance of the evidence. Walters v. UPMC Presbyterian Shadyside, 187 A.3d 214, 221 (Pa. 2018). With respect to causation, the plaintiff in a products liability case "must establish that the injuries sustained were caused by the product of a particular manufacturer or supplier." Stephens v. Paris Cleaners, Inc., 885 A.2d 59, 63 (Pa. 2005) (citation omitted).

Certain defendants move for summary judgment, as to sixty-nine Focus Sites, generally on the basis that there is no evidence that they manufactured or supplied the gasoline that caused MTBE contamination at those Sites. The Commonwealth does not oppose this motion for essentially forty-one Sites. It responds with two kinds of arguments for twenty-eight Sites. At eighteen Sites, the Commonwealth seeks to avoid summary judgment by pointing to evidence that the moving defendants -- which include all of the defendants named by the Commonwealth in

19

connection with those Sites -- are connected to gasoline containing MTBE sold from at least one terminal within a limited distance, generally 100 miles, of the Focus Site at issue.[14]  For the remaining ten Sites, the Commonwealth points to specific pieces of evidence to show that the moving defendants caused MTBE contamination at those Sites.  These two sets of arguments raise distinct legal and factual issues and are addressed in turn below.

I.   The Plaintiff's Commingled Product Argument

The Commonwealth has no evidence linking any named defendant to a release of MTBE gasoline at eighteen Focus Sites. As a result, it relies on a Commingled Product Theory in an

---

[14] With respect to a couple of Sites, such as Focus Site 39 and Focus Site 75, the Commonwealth appears to argue that the moving defendants supplied MTBE gasoline through the distribution system that served Pennsylvania in general.  This does not come close to meeting its burden.  For instance, in the case of Focus Site 75, the plaintiff's response to the defendants' Statement of Material Facts states that the moving defendants transported gasoline through a pipeline.  That pipeline released MTBE gasoline in 2001, but the Commonwealth does not cite any evidence that the pipeline was carrying MTBE gasoline from any of the moving defendants at or near the time of the releases. The only support it cites is its own interrogatory response arguing that defendants sold their product into a distribution system where gasoline from different manufacturers was commingled and transported through means including this pipeline.  Similarly, in the case of Focus Site 39, the plaintiff cites no evidence but claims the moving defendants transported gasoline through the "common carrier gasoline distribution system that supplies gasoline stations in Pennsylvania."

attempt to implicate all or almost all of the terminal and refiner defendants at these eighteen Sites. The Commonwealth argues that because gasoline containing MTBE from multiple suppliers is commingled in the same distribution system within Pennsylvania, the plaintiff need not prove that a specific defendant's gasoline was delivered to any of these eighteen Focus Sites. Instead, the plaintiff argues that it need only show that a defendant stored or sold gasoline containing MTBE within 100 miles of the Focus Site, which is an approximation of the distance trucks travel when delivering gasoline from terminals to service stations, or within Pennsylvania generally. This theory of causation fails.

The Commingled Product Theory was articulated by the Honorable Shira Scheindlin, who first presided over this MDL, in a decision issued in 2005. In re: MTBE Prods. Liab. Litig., 379 F.Supp.2d 348 (S.D.N.Y. 2005) ("April 2005 Opinion"). She applied it or distinguished it in subsequent decisions. While the Commonwealth purports to rely on this Theory to carry its burden of showing that the defendants' gasoline caused MTBE contamination at the eighteen Focus Sites, its arguments misapply the Theory.

Judge Scheindlin first explained the Commingled Product Theory in the April 2005 Opinion, which ruled on motions to dismiss filed in numerous cases within this MDL.

> When a plaintiff can prove that certain gaseous or liquid products (e.g., gasoline, liquid propane, alcohol) of many suppliers were present in a completely commingled or blended state at the time and place that the risk of harm occurred, and the commingled product caused a single indivisible injury, then each of the products should be deemed to have caused the harm. By way of illustration, assume that the petroleum products of ten refiners are commingled in an underground storage tank. These ten products are completely fungible and blended, combined or commingled into a single batch. Each refiner supplied ten percent of the total volume of product in the tank. If twenty percent of the petroleum in the tank leaks into the ground, it is not reasonable to assume that the harm resulting from this leak was caused by the products of only two refiners (each supplying ten percent), and to require plaintiffs to prove which two proximately caused the harm. Because the petroleum products were commingled to form a new mixture, each of the ten refiners contributed to the injury in proportion to the amount of product that each supplied. Under this theory, each refiner actually caused the injury. Thus, if a defendant's indistinct product was present in the area of contamination and was commingled with the products of other suppliers, all of the suppliers can be held liable for any harm arising from an incident of contamination. . . . [A] defendant must be able to exculpate itself by proving that its product was not present at the relevant time or in the relevant place, and therefore could not be part of the new commingled or blended product.

Id. at 377-78 (emphasis supplied).[15]

---

[15] Judge Scheindlin also described the plaintiff's burden under this theory as follows:  "So long as plaintiffs allege that defendants marketed and sold MTBE-containing gasoline in the relevant zone of injury and defendants['] products were in a

Judge Scheindlin explained that this theory of liability was justified in part because, where a liquid or gaseous commodity, "commingling the products of various suppliers," causes an injury, "the product of each supplier is <u>known</u> to be present," even if the precise proportion of the product attributable to each supplier is unknown.  <u>Id.</u> at 378-79.  Judge Scheindlin went on to predict that the Pennsylvania Supreme Court would apply two related theories to the Pennsylvania case before her, which was brought by the Northampton, Bucks County Municipal Authority, although she did not describe Pennsylvania courts' views on the Commingled Product Theory.[16]  <u>Id.</u> at 437.

In an Opinion of May 13, 2008, Judge Scheindlin applied the Commingled Product Theory in a case brought by Suffolk County,

---

completely commingled state, defendants potentially contributed to plaintiffs' indivisible injury."  <u>Id.</u> at 378 (emphasis supplied).

[16] The analysis of the Pennsylvania law of causation in the April 2005 Opinion concerned alternative liability and market share liability.  379 F. Supp. 2d at 433.  Under alternative liability, "the burden of identification is shifted to the defendants where each defendant acted tortiously toward the plaintiff, [and] one of the defendants caused the injury, but there is uncertainty as to which one."  <u>Id.</u> at 373.  Market share liability may apply where the plaintiff can prove every element of its claim except for identification of the specific tortfeasor, but the plaintiff has sued manufacturers comprising a "substantial share" of the relevant market.  <u>Id.</u> at 375.  As with Commingled Product Theory, a defendant may then prove that it did not make the specific product that injured the plaintiff. <u>Id.</u>

New York and its water authority to address MTBE contamination
of wells.  In re: MTBE Prods. Liab. Litig., 591 F. Supp. 2d 259
(S.D.N.Y. 2008) ("Suffolk County").  The record at summary
judgment showed that, except for some irrelevant exceptions, all
gasoline delivered to gas stations in Suffolk County was
transported through certain primary terminals in New York Harbor
and secondary terminals on Long Island.  Id. at 271-73.
Gasoline supplied by all of the defendants was commingled in
those terminals and thus was present in the well contamination
at issue in that case.  Id. at 269.  Accordingly, under New York
law, "a reasonable jury could conclude, based on the evidence in
the record, that all defendants contributed to the commingled
gasoline that caused contamination in plaintiffs' wells."  Id.
at 268.  The plaintiff set forth sufficient evidence to show
that "the product was in a completely commingled or blended
state at the time and place that the harm or risk of harm
occurred," id. at 278, that is, that "each defendant's gasoline
was present within the well's capture zone," id. at 275.

On the other hand, a September 10, 2013 Opinion in a case
brought by the City of Fresno, California declined to apply the
Commingled Product Theory because the plaintiff did not have
evidence that particular defendants had supplied gasoline to the
focus sites at issue.  In re: MTBE Prods. Liab. Litig., 980 F.

Supp. 2d 425, 457-58 (S.D.N.Y. 2013) ("City of Fresno").  Where
a specific, known site accounted for the source of
contamination, the plaintiff needed to show that specific
defendants' gasoline traveled to the site.  Id. at 457.  If it
did, the Commingled Product Theory would relieve it of its
burden to show that a "particular defendant's molecule versus
somebody else's molecule" caused the harm.  Id. (citation
omitted).  Judge Scheindlin distinguished City of Fresno from
Suffolk County by explaining that the former litigation focused
on specific release sites, while the latter did not.

> Alternate theories of proof are justified not when
> evidence is lacking, but when gathering evidence is,
> for practical purposes, impossible.  In Suffolk, it
> would have been impossible to determine which
> defendant's gasoline contributed to an
> undifferentiated spill; releases from multiple
> stations, supplied by multiple defendants, could have
> contributed to the contamination of any given well's
> capture zone.  Here, by contrast, Fresno could have
> gathered evidence directly connecting the Causation
> Defendants' product to the limited number of stations
> at issue for purposes of this motion.

Id.  While the plaintiff could have invoked the Commingled
Product Theory upon proving that the relevant defendants'
"product was in the tanks at the time a release occurred," it
"produced no evidence from which a reasonable juror could
conclude that the Causation Defendants' molecules were in the
relevant stations at the relevant times in the first instance."
Id. at 458.

In an Opinion of December 18, 2014, in a case brought by the Orange County, California Water District, Judge Scheindlin again declined to apply the Commingled Product Theory where the plaintiff sought to prove causation at 31 gas stations proximate to focus sites.  In re: MTBE Prods. Liab. Litig., 67 F. Supp. 3d 619, 622-23, 632 (S.D.N.Y. 2014) ("Orange County"), motion for reconsideration granted on other grounds sub nom., Orange Cnty. Water Dist. v. Unocal Corp., No. SACV 03-01742, 2018 WL 6133718 (C.D. Cal. Feb. 8, 2018).  There, the plaintiff lacked sufficient evidence to avoid summary judgment that showed certain defendants' gasoline was delivered to the focus sites. Id. at 632.  The Commingled Product Theory, Judge Scheindlin explained, did not help the plaintiff because "gathering evidence was not impossible, nor nearly so."  Id.  The fact that the plaintiff could have but failed to "gather evidence tracing suppliers to the stations at issue" did not allow it to avoid the standard burden to prove causation, and summary judgment was granted in relevant part.  Id.

As first articulated by Judge Scheindlin, and as applied in subsequent decisions, the Commingled Product Theory does not permit the Commonwealth to escape its burden to show that a defendant's MTBE gasoline caused, or was among the gasoline products that caused, the contamination at the eighteen Sites.

26

The plaintiff argues that it need not show a particular defendant supplied gasoline to a particular Focus Site, as long as it has evidence that the defendant's gasoline containing MTBE passed through a terminal within 100 miles of the Focus Site. In other words, the plaintiff seeks to prove causation merely by showing that a defendant's gasoline was at a terminal in the same region. That is not what the Commingled Product Theory allows. The Commingled Product Theory may bridge certain gaps in proof of causation upon a showing that a defendant's indistinct product was commingled "at the time and place" of injury, April 2005 Opinion, 379 F. Supp. 2d at 378, not at some remote location. In City of Fresno -- a case in which, like this one, certain contaminated sites were selected for an initial trial -- Judge Scheindlin explained that the Commingled Product Theory may come into play once a plaintiff can prove that products "of many refiners and manufacturers were present in a completely commingled or blended state at the time and place that the harm" occurred. 980 F. Supp. 2d at 452. Like in City of Fresno, the "areas of contamination" here are the Focus Sites.[17]

---

[17] The Commonwealth's brief suggests City of Fresno does not help the moving defendants here because the defendants in that case presented exculpatory evidence of a lack of their connection to focus sites. The plaintiff misreads the caselaw. The City of Fresno analysis of the Commingled Product Theory explained that

The Commonwealth's argument is effectively that the "areas of contamination" at issue here are circles whose radii are 100 miles and whose centers are terminals where the moving defendants supplied gasoline.  That application of the Commingled Product Theory is not to be found in Pennsylvania caselaw and is also foreclosed by Judge Scheindlin's prior Opinions in this MDL.  The plaintiff cites In re: MTBE Prods. Liab. Litig., 107 F. Supp. 3d 280 (S.D.N.Y. 2015) ("Puerto Rico"), an Opinion in a case brought by the Commonwealth of Puerto Rico, to support its view of the Commingled Product Theory.  But that Opinion was based in relevant part on "considerable evidence" tracing the moving defendants' gasoline to contaminated sites, not on the Commingled Product Theory. Id. at 290 n.87, 292-93.  In fact, the gasoline that entered Puerto Rico was largely not commingled in the first place.  Id. at 283.

The Commonwealth also emphasizes that gasoline was commingled by the time it reached the terminals.  But terminals are not where the harm occurred -- the Focus Sites are.  It also suggests the Commingled Product Theory should apply because it has been difficult to gather evidence due to the passage of time

---

the causation burden never shifted to the defendants.  980 F. Supp. 2d at 457-58.

and some defendants did not have documents showing where the gasoline they manufactured or supplied was delivered.  That argument falls short as well.  "[T]he commingled products theory is an alternate theory of proof which is justified not when evidence is lacking, but when gathering evidence is, for practical purposes, impossible."  Orange County, 67 F. Supp. 3d at 632 (citation omitted).  It may be impossible to tell which particular molecules of MTBE in a leak or spill contaminated a water supply when more than one delivery of MTBE gasoline is present at a Site.  It is not impossible, however, to discover which defendants supplied gasoline to the Site.  Indeed, the plaintiff says it has done just that for many Sites.  That the Commonwealth in this case could not find records of certain defendants supplying these eighteen Sites does not negate the plaintiff's burden to prove that they did so.

II.  Evidence of Defendants' Connections to Focus Sites

For ten Sites, the Commonwealth argues it has evidence showing that moving defendants caused contamination without relying on the Commingled Product Theory.  The defendants argue that the cited documents do not create genuine disputes of material fact.  The defendants are correct, except with respect to Focus Site 69.

The Commonwealth cites a wide variety of documents related to the first nine Sites, and their deficiencies in establishing a triable issue are just as varied.  For Focus Sites 3, 17, and 35, the Commonwealth cites spreadsheets from Guttman, which supplied those Sites with gasoline, listing certain moving defendants as vendors.  None of those documents include any indication that any gasoline that defendants indirectly supplied to those Sites contained MTBE.[18]  And at Focus Site 35, the Guttman spreadsheets refer to sales after 2000, but Moreau opined that all MTBE releases occurred before 1997.  At bottom, evidence of sales of a product that may or may not have caused the injury (or whose timing does not overlap with that injury) would not allow a reasonable jury to conclude that the plaintiff has met its burden to prove the specific moving defendants caused contamination at these Sites.

Evidence at other Sites simply puts the moving defendants at the wrong time or place.  At Focus Site 45, the Commonwealth claims it has evidence of "Texaco" supplying the Site from 1990, 1991, 1993, and 1997.  But the parties agree that the moving defendants at that Site -- Chevron/Texaco and TRMI -- did not

---

[18] To be clear, while the Commonwealth alleges that gasoline containing MTBE from different refiners was commonly commingled, it has not pointed to evidence that gasoline containing MTBE was somehow fungible vis-à-vis gasoline not containing MTBE.

market gasoline in Pennsylvania after 1988.  The sales record
the Commonwealth cites for Focus Site 47 dates a transaction
involving a moving defendant in 2003, four years after the last
year, 1999, during which Moreau opined releases may have
occurred.[19]  And at Focus Site 18, the only evidence that the
plaintiff cites to implicate moving defendant Chevron/Texaco
refers to a different location.[20]

The cited evidence at Focus Site 11 and 23 refers to
corporate relationships that could not alone establish that the
moving defendants were responsible for contamination at those
Sites.  At Focus Site 11, the plaintiff points out that PPC,
which owned the Site through 2006, was later owned by moving
defendant GOLP, which is not a fact that could establish that

---

[19] The document is not clear about what the 2003 date references.
But it would be no more helpful to the plaintiff if it were
interpreted to be undated entirely.

[20] For this Site and some others, the Commonwealth emphasizes
that certain defendants did not have records detailing where
they supplied gasoline, especially when the transactions at
issue would have happened a long time ago.  But these
circumstances do not help the plaintiff, which carries the
burden of proof.  The plaintiff does not contend that the
defendants have failed to fulfill their discovery obligations or
are otherwise culpable for their inability to gather relevant
documents.  That this case has been litigated long after the
events underlying it does not justify construing a lack of
evidence as adverse to the defendants.

GOLP caused any injury there.[21]  And at Focus Site 23, the
Commonwealth suggests that Chevron could be held liable because
it licensed the "Gulf" trademark to other companies that are not
moving defendants for this Site.  That fact is not evidence that
Chevron caused contamination.

For Focus Site 57, the Commonwealth cites evidence that it
characterizes as tying several moving defendants to the Site.
The only document referring to "Chevron" appears to reference
the wrong location.  The evidence related to CITGO and GOLP
merely shows that they supplied PPC, which owned the Focus Site
as of July 2006.  That fact alone (i.e., without evidence that
PPC owned only this Site) could not establish that those
defendants' gasoline made it there, much less that it did so
before 1999, which is the latest that releases occurred.
Similarly, the only evidence that Sunoco Defendants were
connected to this Site was that it carried their branding by
2006.

In sum, the Commonwealth has failed to raise a triable
issue of whether the contamination at these nine Sites was
"caused by the product of a particular manufacturer or

---

[21] Even if there were evidence that GOLP acquired PPC while it
was still supplying the Site, the Commonwealth makes no argument
that a parent company can in these circumstances be held liable
for the conduct of its subsidiary.

supplier" -- here, the moving defendants.  Stephens, 885 A.2d at 63.  The documents it cites in opposition to this motion would allow a jury to do nothing but speculate about whether a given defendant could have caused the injury.  Such evidence cannot create a genuine issue to be tried.

In contrast, the Sunoco Defendants, which are moving with respect to Focus Site 69, admit that Sunoco, Inc. (R&M) stored MTBE there.  Thus, there is no need for the plaintiff to otherwise provide evidence that that entity supplied the Site or has a direct, identifiable connection to it.  The defendants do not contend that the timing of the storage at the Site, or the kind of product that was stored there, is such that it could not have caused the contamination.  Instead, defendants' only argument is that their admission does not prove that the MTBE or gasoline that Sunoco, Inc. (R&M) stored at the Site was involved in the releases.  But that issue -- whether a product that has arrived at a Site ended up in the release itself -- is not the subject of this motion.  The defendants may argue at trial that the plaintiff has not proven other links in the causal chain tying them to the alleged injury, but their motion does not point to an absence of evidence of causation at this Site as it does with respect to other Sites.  Accordingly, the motion is denied with respect to Focus Site 69.

33

## Conclusion

The moving defendants' May 2, 2025 motion for partial summary judgment for lack of evidence connecting them to certain Focus Sites is granted with a single exception.  It is denied as to Focus Site 69.

Dated:     New York, New York
           June 30, 2025

_____
DENISE COTE
United States District Judge

34